# Exhibit KK

IN THE HIGH COURT OF JUSTICE                         **Claim no. CL-2019-000723**
BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES
COMMERCIAL COURT (QBD)
B E T W E E N:

**(1)  VALE S.A.**
**(2)  VALE HOLDINGS B.V.**
**(3)  VALE INTERNATIONAL S.A.**

<u>Claimants</u>

and

**(1)  BENJAMIN (BENY) STEINMETZ**
**(2)  DAG LARS CRAMER**
**(3)  MARCUS STRUIK**
**(4)  ASHER AVIDAN**
**(5)  JOSEPH TCHELET**
**(6)  DAVID CLARK**
**(7)  BALDA FOUNDATION**
**(8)  NYSCO MANAGEMENT CORPORATION**

<u>Defendants</u>

---

**PARTICULARS OF CLAIM**

---

**OVERVIEW[1]**

1.  On 30 April 2010, Vale S.A. ("**Vale**") entered into a joint venture agreement (the "**JVA**") with BSG Resources Limited, a company incorporated in Guernsey ("**BSGR**").

2.  Pursuant to the JVA, Vale purchased 51% of BSGR's 100% interest in another Guernsey company called BSG Resources (Guinea) Limited (the "**Shares**" and "**BSGR Guernsey**"). BSGR Guernsey held Guinean mining licences via its 100% interest in a Guinean company called BSG Resources (Guinea) SARL (the "**Mining Licences**" and "**BSGR ProjectCo**"). The Mining Licences conferred valuable rights to explore and exploit iron ore reserves found in the Simandou region of southern Guinea.

---

[1]      This overview is served pursuant to CPR PD 16 para 1.4 and paragraph C1.2(c) of the Commercial Court Guide and is without prejudice to the particulars of claim as set out below.

000133

3.   On the same day, Vale, BSGR and BSGR Guernsey entered into a shareholders' agreement relating to the interests of Vale (51%) and BSGR (49%) in BSGR Guernsey (the "**SHA**"), the material terms of which are set out below.

4.   In return for the Shares, and in accordance with the terms of the JVA, Vale procured the payment of US$500 million to BSGR on 30 April 2010 and subsequently made or procured the making of payments exceeding US$746 million in connection with the joint venture.

5.   Vale's entry into the JVA and SHA was induced by a number of fraudulent misrepresentations made by BSGR (as has been established in related arbitral proceedings which are publicly available) and by the Defendants, the particulars of which are set out below.  Without prejudice to those particulars, in essence the misrepresentations made by the Defendants were:

   5.1.   That the Mining Licences were not procured by corruption or bribery.

   5.2.   That BSGR and its associated companies in Guinea did not use agents, intermediaries and consultants *inter alia* in obtaining the Mining Licences, except those which had been disclosed to Vale. The agents, intermediaries and consultants not disclosed to Vale included Frédéric Cilins, Ghassan Boutros, Pentler Holdings Limited and Mahmoud Thiam.

6.   Those representations were false as set out in detail below.  By way of example only:

   6.1.   The grant of the Mining Licences was procured by the bribery of Ms Mamadie Touré ("**Mme Touré**"), the fourth wife of the then Guinean President, Lansana Conté. Mme Touré was granted a 5% indirect interest in the "Simandou iron ore project" through a shareholding in a BSGR affiliate; and she was later paid millions of dollars in relation to that interest, for assisting BSGR in obtaining the Mining Licences, and (after President Conté's death) in an attempt to buy her silence. Mme Touré assisted with the grant of the Mining Licences by exerting influence on President Conté and other Guinean ministers.

   6.2.   In 2009/2010, following President Conté's death, the BSGR Group (as defined below) needed the new Guinean regime to confirm the validity of the Mining Licences.  They used the newly appointed Minister of Mines, Mahmoud Thiam ("**Thiam**") to achieve this end.  Thiam acted in a dual capacity and in conflict of interest: as Minister of Mines for Guinea and as adviser and consultant to BSGR and its affiliates.  His air travel was paid for by BSGR and he received bribes of at least US$5 million in return.

2

6.3.    The other individuals and entities listed at paragraph 5.2 above played important roles in the bribery and corruption associated with the BSGR Group obtaining the Mining Licences.  Frédéric Cilins ("**Cilins**") was a key liaison with Guinean officials and acted as the BSGR Group's agent on the ground in Guinea.  He attended meetings with President Conté at which the Mining Licences were discussed, made payments to Mme Touré in return for her assistance in obtaining the Mining Licences, and travelled to meet Mme Touré in Florida in early 2013 to convince her to destroy incriminating documents and give false testimony. Ghassan Boutros ("**Boutros**") was also involved in channelling money to Mme Touré; and Pentler Holdings Limited ("**Pentler**") was an intermediary through which Mme Touré held her 5% indirect interest in BSGR ProjectCo and that was also used to channel money to Mme Touré and others.

7.    As is explained below, the First Defendant is the principal ultimate beneficiary of the BSGR Group, with his interest held through the Seventh and Eighth Defendants.  The Second to Sixth Defendants were each senior executives within the BSGR Group at the time the JVA and SHA were entered into; and they were each handsomely rewarded for the part they played in inducing Vale to enter into the same.

8.    As is explained below, the Defendants each knew that the representations were false or were reckless as to their truth.  Further, they were each party to a conspiracy to conceal the true position from the Claimants by making fraudulent misrepresentations.

9.    The Government of Guinea ("**GoG**") revoked the Mining Licences by a Presidential Decree dated 17 April 2014 and Orders dated 18 and 23 April 2014, on the basis that they had been procured by bribery.

10.    But for the fraudulent misrepresentations and conspiracy, Vale would not have entered into JVA and SHA and the Claimants would not have made and/or procured payments pursuant to the JVA and SHA.  The Claimants have therefore suffered loss in the amount of US$1.246 billion (the aggregate amount paid pursuant to those agreements) plus interest.  They have been unable to recover that loss from BSGR, despite an arbitral award in Vale's favour dated 4 April 2019 (the "**Award**").

11.    Finally, in circumstances in which the JVA has been rescinded for fraudulent misrepresentation (by, at the latest, the delivery of the Award), the Claimants are entitled to and make a proprietary claim to the traceable proceeds of the funds paid thereunder.

000135

SECTION A: PARTIES

<u>The Claimants</u>

12. The First Claimant (defined above as "**Vale**") is a company registered under the laws of Brazil. It is the ultimate holding company of one of the world's largest mining and related logistics groups. Vale is, amongst other things, the world's largest producer of iron ore.

13. The Second Claimant ("**Vale Holdings**") is a company registered under the laws of the Netherlands, and is a wholly owned subsidiary of Vale. Pursuant to a merger completed on 31 October 2019, Vale Holdings acquired all of the rights of an Austrian company called Vale International Holdings GmbH (formerly called Vale Austria Holdings GmbH, "**Vale Austria**"). Until the merger, Vale Austria was wholly owned by Vale, and was the entity nominated by Vale under the JVA as the purchaser of the Shares (being entered on the BSGR Guernsey share register on 30 April 2010). It made capital contributions to BSGR ProjectCo of at least US$54 million to fund (inter alia) a feasibility study in relation to the Mining Licences. Vale Austria remained on the BSGR Guernsey share register until the Shares were transferred back to BSGR on 13 March 2015 pursuant to a share purchase deed.

14. The Third Claimant ("**Vale International**") is a company registered under the laws of Switzerland. It was on 30 April 2010 and remains a wholly owned subsidiary of Vale. On 30 April 2010, Vale International, acting on the instructions of Vale, paid the sum of US$500 million to BSGR pursuant to the JVA. Vale International also contributed a further US$581 million to the joint venture by way of promissory notes, which remain unpaid.

<u>The Defendants</u>

15. The First Defendant ("**Steinmetz**") is a businessman domiciled in Israel. He holds or has held (whether directly or indirectly) interests in a range of mining, real estate and other projects. Certain of those activities were, at all material times, and are conducted through the BSG Resources group of companies, which Mr Steinmetz founded in about 2003 (the "**BSGR Group**"). Further particulars of the BSGR Group are given in paragraph 28 below.

16. At all material times (including on 30 April 2010 when the JVA and SHA were entered into):

   16.1. The Seventh Defendant ("**Balda**") wholly owned the Eighth Defendant ("**Nysco**"), which in turn wholly owned BSGR. As pleaded below, Steinmetz and his family are the only beneficiaries of Balda (Steinmetz having been described as the sole first-class beneficiary). The Shares were therefore ultimately held by Balda for the benefit of Steinmetz and his family members.

4

16.2.    Steinmetz was presented as an 'adviser' to Balda and the BSGR Group. In fact, Steinmetz controlled all material decisions relating to the BSGR Group and BSGR (including BSGR's sale of the Shares and entry into the JVA with Vale).

17.    Steinmetz was the principal beneficiary of the US$500 million paid to BSGR under the JVA. For example, between May 2010 (after Vale paid US$500 million to BSGR) and December 2012, Balda made payments from the said monies of over US$120 million to or for the benefit of Steinmetz and/or his family.

18.    Steinmetz was found in the Award to have personally signed a certificate that made fraudulent misrepresentations, and he is currently facing criminal charges in Switzerland for bribery of Mme Touré in connection with the Mining Licences.

19.    The Second Defendant ("**Cramer**") is a businessman and provider of corporate advisory services resident in England.  He is a close associate of Steinmetz, frequently liaising with Balda regarding Steinmetz's personal affairs.  Cramer was appointed as a non-executive director of BSGR in or around 2004, and he remains a director of the company. Cramer was at the relevant times also the sole ultimate beneficial owner of a company registered in the BVI called Onyx Financial Advisors Limited ("**Onyx**") (and the related Onyx group of companies), to whom the day-to-day management of the BSGR Group was delegated. Balda and Onyx entered into a "Service Agreement" dated 4 November 1998 pursuant to which Onyx was engaged to provide such services as Balda and its underlying companies might require including fiscal, financial, administrative, advisory, corporate or other business services.

20.    Cramer was closely involved in the negotiation of the JVA and SHA, made fraudulent misrepresentations to induce Vale to enter into those agreements, and was awarded a bonus of US$10 million in about April 2010 in return for the role he played in procuring Vale to enter into the same (of which at least US$3 million has been paid).  In addition, Onyx was also awarded a bonus of US$2.5 million.

21.    The Third Defendant ("**Struik**") is a mining industry executive resident in South Africa.  At all material times he held various appointments in companies within the BSGR Group, including in BSGR ProjectCo, BSGR Guernsey and BSGR Guernsey's predecessor (a BVI company also called BSG Resources (Guinea) Limited ("**BSGR BVI**")).

22.    Struik was closely involved in the negotiation of the JVA and SHA, made fraudulent misrepresentations to induce Vale to enter into those agreements, and was awarded a bonus

of US$3 million in about April 2010 (of which at least US$2 million was paid) in return for the role he played in procuring Vale to enter into the same.

23. The Fourth Defendant ("**Avidan**") is resident in Israel.  He was appointed as President of BSGR ProjectCo in about mid-2006, and acted as the Guinean country manager for the BSGR Group from mid-2006 until about May 2010.  Avidan was closely involved in the negotiation of the JVA and SHA, made fraudulent misrepresentations to induce Vale to enter into those agreements, and was awarded a bonus of US$3.75 million in about April 2010 (of which at least US$2.5 million was paid) in return for the role he played in procuring Vale to enter into the same.

24. The Fifth Defendant ("**Tchelet**") is a chartered accountant resident in Israel. He joined the BSGR Group in 2003 and served as CFO of the BSGR Group until August 2008. From August/September 2008 onwards, he acted as strategic financial specialist for the BSGR Group.  In these capacities, Tchelet visited Guinea on at least seven occasions between July 2008 and June 2010.  He was closely involved in the negotiation of the JVA and SHA, made fraudulent misrepresentations to induce Vale to enter into those agreements, and was awarded a bonus of US$1.2 million in about April 2010 (of which at least US$800,000 was paid) in return for the role he played in procuring Vale to enter into the same.

25. The Sixth Defendant ("**Clark**") is a chartered accountant resident in Guernsey.  He was appointed as a director of BSGR and as the BSGR Group's treasurer in about March 2007.  Clark also assumed the role of money-laundering reporting officer (MLRO) for BSGR. In addition, Clark was a director and MLRO of all BSGR Group companies incorporated in Guernsey from the later of March 2007 or the date of their incorporation (including for BSGR Guernsey upon its incorporation in February 2009). Clark was closely involved in the negotiation of the JVA and SHA, made fraudulent misrepresentations to induce Vale to enter into those agreements, and was awarded a bonus of US$250,000 in about April 2010 (of which at least US$180,000 was paid) in return for the role he played in procuring Vale to enter into the same.

26. The Seventh Defendant (defined above as "**Balda**") is a Liechtenstein foundation established in about 1995.  Balda holds 100% of the shares in Nysco (the Eighth Defendant).  As noted above, Steinmetz, his wife Agnes, and the children of his marriage to Agnes are the beneficiaries of Balda.  Balda made fraudulent misrepresentations to induce Vale to enter into the JVA and SHA.  Balda also received and dealt with a substantial portion of the US$500 million paid by Vale pursuant to the JVA.

000138

27. The Eighth Defendant (defined above as "**Nysco**") is a BVI company which holds 100% of the shares in BSGR. Its shares are held by Balda. It made fraudulent misrepresentations to induce Vale to enter into the JVA and SHA. Later, a large part of the initial consideration of US$500 million paid by Vale International pursuant to the JVA was transferred to Nysco by payments totalling approximately US$371.5 million, made **(i)** on 10 May 2010 (US$22,000,000) **(ii)** on 18 May 2010 (US$145,100,716.77), **(iii)** on 25 May 2010 (US$1,200,000) and **(iv)** on 12 July 2010 (US$203,200,000).

**OTHER KEY COMPANIES AND INDIVIDUALS**

The BSGR Group

28. At all material times, the BSGR Group has had a complex corporate structure. The constituent members of the BSGR Group relevant to this claim are identified in the schedules found at Appendix 1. Terms defined in that Appendix are adopted herein.

Mme Touré

29. Mamadie Touré (defined above as "**Mme Touré**") was born in 1982 in Dubréka, Guinea. She married President Conté in 2000, becoming his fourth wife. Mme Touré moved to Sierra Leone in about early 2009, shortly after President Conté's death in December 2008, and then moved to the United States in or around 2009. Mme Touré became a cooperating witness for the United States Department of Justice in about early March 2013 (see paragraph 103 below).

Pentler and its principals

30. Pentler is a BVI company that, as pleaded below, was the vehicle through which Mme Touré held her 5% interest in BSGR BVI. Pentler's other shareholders were Michael Noy, Frédéric Cilins and Avraham Lev Ran ("**Noy**", "**Cilins**", "**Lev Ran**", collectively the "**Pentler Principals**"). Cilins and Noy are French; Lev Ran is South African (or was, at the relevant time, based in South Africa).

Boutros

31. Ghassan Boutros (defined above as "**Boutros**") is a Lebanese businessman who owned and controlled a Guinean company called Logistics & Maintenance Services SARL ("**LMS**"). Over US$5 million was paid by the BSGR Group into Boutros' control in 2009/10, purportedly by way of various consultancy payments. In fact, the money was to be used to pay bribes (in whole or in part), including US$998,000 paid to Mme Touré on about 3 September 2009.

Thiam

000139

32. Mahmoud Thiam (defined above as "**Thiam**") was the Guinean Minister of Mines between January 2009 and 22 December 2010.  He was appointed shortly after the death of President Conté.  As pleaded below, Thiam helped the BSGR Group obtain confirmation from the new regime that the Mining Licences were valid, acting as an adviser and consultant for the BSGR Group and receiving bribes of at least US$5 million.  These were not the only bribes received by Thiam when he was Minister of Mines: he is currently serving a term of seven years' imprisonment in the United States for laundering US$8.5 million of bribes paid to him by companies unconnected with the BSGR Group.


## Section B: The Mining Licences

Introduction: Guinea and Simandou

33. The Republic of Guinea, located on the west coast of Africa, has a population of about 12.5 million.  It is a former French colony, having obtained independence in 1958.  Guinea's economy is heavily dependent on mineral production, and it has rich deposits of iron ore, bauxite, gold and diamonds.

34. At the time of the events described herein, Guinea's political situation was unstable: **(i)** Lt-Col Lansana Conté seized control of Guinea shortly after the death of Guinea's first president in April 1984 and assumed the presidency; **(ii)** President Conté was later elected following the country's first multi-party elections in December 1993; **(iii)** Captain Moussa Camara in turn seized control of Guinea following a military coup d'état in December 2008, hours after President Conté's death; and **(iv)** after a period of political instability (President Camara ceasing to hold office after a failed assassination attempt on 3 December 2009), President Alpha Condé was elected in November 2010 and remains in office.

35. Guinea's capital, Conakry, is located on the Atlantic coast.  Simandou is a mineral-rich mountain range in southern Guinea's Nzérékoré region, located some 550 kilometres southeast of Conakry.  Simandou is one of the largest iron ore reserves in the world, with estimated reserves of over two billion tonnes of high-grade ore.

000140

<u>The grant of the Mining Licences to the BSGR Group</u>

36. The grant of the Mining Licences to the BSGR Group was formally governed by the 1995 Mining Code of the Republic of Guinea. Under that code, an applicant for mining rights would typically need to apply for and obtain two types of permit:

> 36.1. First, a "research licence" by which the applicant was permitted to **(i)** undertake exploratory activity to determine the existence of a commercially exploitable ore deposit and **(ii)** submit a preliminary feasibility study to the GoG.

> 36.2. Second, a "mining concession" by which the applicant was permitted to prepare more detailed feasibility studies and, eventually, begin mining activities pursuant to a formal contract with the GoG known as a 'base agreement'.

37. By December 2008, the BSGR Group held research licences over areas of land defined below as Simandou North, Simandou South, SB1 and SB2 (collectively, the "**Mining Licences**"). The said licences were granted or transferred to BSGR ProjectCo, notwithstanding the prior grant of rights over SB1 and SB2 to a local subsidiary of Rio Tinto, as follows:

> 37.1. In 1997, the GoG granted Simfer S.A., a local subsidiary of Rio Tinto ("**Rio Tinto ProjectCo**"), four research licences to explore iron ore deposits around Mount Simandou. Those licences were renewed in May 2000, although the surface area they covered was halved. The areas covered by the renewed licences were known as Simandou Blocks 1, 2, 3 and 4 ("**SB1**", "**SB2**", "**SB3**" and "**SB4**"). On 26 November 2002, the GoG entered into a so-called "base convention" with Rio Tinto ProjectCo, extending the validity period of the renewed research licences until 30 May 2006.

> 37.2. On 6 February 2006, BSGR BVI[2] was granted a total of four research licences over specified parts of the areas known as "**Simandou North**" and "**Simandou South**" (the "**North and South Permits**"). No research licences had previously been granted over these areas. The North and South Permits were transferred to BSGR ProjectCo after its incorporation in about April 2006.

> 37.3. On 20 February 2006, BSGR BVI entered into a memorandum of understanding with the GoG "regarding the Simandou iron mining project" (the "**February 2006 MoU**"). It provided for the BSGR Group to conduct a 30-month feasibility study

---

[2]     BSGR BVI acquired the shares in BSGR ProjectCo in or about April 2006 (when BSGR ProjectCo was incorporated); it transferred those shares to BSGR Guernsey in February 2009.

000141

over the SB1, SB2, Simandou North and Simandou South areas, following which (and subject to the provisions of the Guinean Mining Code) it would be granted mining concessions over the same.  The February 2006 MoU made reference to SB1 and SB2 notwithstanding that research licences over those areas had previously been granted to Rio Tinto ProjectCo as described above.

37.4.   On 30 March 2006, the GoG granted Rio Tinto ProjectCo a 25-year mining concession over SB1, SB2, SB3 and SB4 (the "**Rio Tinto Concessions**").

37.5.   On 17 July 2007, BSGR ProjectCo applied for research licences over SB1 and SB2 (notwithstanding that they were then subject to the Rio Tinto Concessions).

37.6.   On 28 July 2008, President Conté issued a presidential decree in relation to the Rio Tinto Concessions (the "**July 2008 Decree**").  The July 2008 Decree stated that **(i)** the Rio Tinto Concessions had been revoked; **(ii)** Rio Tinto would nevertheless be granted a new iron ore concession over Simandou on terms that were compliant with the Guinean Mining Code, and **(iii)** Rio Tinto's rights, as a result of (i), did not permit anything other than exploration and prospecting.

37.7.   On or about 5 August 2008, BSGR ProjectCo renewed its application for research licences over SB1 and SB2.

37.8.   On about 4 December 2008, the GoG gave notice to Rio Tinto that it was required to give up its research licences over SB1 and SB2.

37.9.   On 9 December 2008, the GoG granted BSGR ProjectCo three-year research licences over SB1 and SB2 (renewable for a further period of two years) (the "**December 2008 Permits**").  As noted above, BSGR ProjectCo already held the North and South Permits.

37.10. President Conté died on 22 December 2008.

10

**SECTION C: HOW THE MINING LICENCES WERE OBTAINED BY THE BSGR GROUP BETWEEN 2005-2008**

### C1    The BSGR Group is introduced to Guinea

38.   The BSGR Group was introduced to the possibility of acquiring mining licences in the Simandou region in 2005 by the Pentler Principals.  More specifically:

   38.1.   In about 2005, the Pentler Principals were introduced to various business opportunities in Guinea by two Malian businessmen, Ismaila Daou and Aboubacar Bah ("**Daou**" and "**Bah**"), and by the half-brother of Mme Touré, Ibrahima Sory Touré ("**I.S. Touré**").

   38.2.   In about July 2005, Noy met the then CEO of BSGR, Roy Oron ("**Oron**"), at a South African airport.  Thereafter, and as a result of that initial meeting, Cilins arranged for Oron to meet with the Guinean Minister of Mines at that time, Ahmed Souaré, on around 20 July 2005.

   38.3.   In November 2005, Oron and Struik embarked on a five-day visit to Guinea, during which both men met Cilins and I.S. Touré. Struik and Cilins also spent time at a Guinean government agency called the "Centre de Promotion at de Developpement Miniers" ("**CPDM**"), which held geological and other mining-related information.

   38.4.   On or around 14 February 2006, at BSGR's suggestion, the Pentler Principals purchased Pentler (at that stage, an off-the-shelf shell company) from Onyx, so as to provide them with a company through which they could conduct their Guinean affairs.

   38.5.   As is pleaded below, the Pentler Principals, Pentler and I.S. Touré thereafter provided substantial further assistance to the BSGR Group (and in particular BSGR BVI, BSGR Guernsey and BSGR ProjectCo) in connection with the grant of the Mining Licences.

### C2    The involvement of Pentler, Cilins, Mme Touré et al

39.   In late 2005, the Guinean Minister for Youth and Sports, Fode Soumah, arranged a meeting with Mme Touré at which he introduced her to Cilins.  Cilins used the opportunity to explain that he wanted Mme Touré to put him on behalf of the BSGR Group in touch with President

000143

Conté. Mme Touré agreed to do so and thereafter arranged a meeting by speaking with President Conté and members of the presidential guard (the "**First Touré Intercession**").

40. The meeting took place in November or early December 2005 at the President's home at the Palais des Nations, Conakry. It was attended by the President, Mme Touré, Cilins and possibly other representatives of the BSGR Group (the "**Second Touré Intercession**"). During the course of the meeting, the President called the then Minister of Mines, Ahmed Souaré, and instructed him to join the meeting. When Souaré arrived, the President introduced the BSGR Group to him, describing it as a mining developer, and told Souaré to facilitate the BSGR Group's investment in Guinea.

41. Souaré correctly inferred from the context of the meeting and Mme Touré's presence that the meeting was organised at the behest of Mme Touré as a result of an approach that had been made to her by a person(s) acting on behalf of the BSGR Group.

42. The day after the meeting, on the instructions of President Conté (at the request of Mme Touré) and/or Mme Touré, a presidential helicopter carrying BSGR Group representatives landed in an area of the Simandou region over which a permit had been granted to Rio Tinto ProjectCo (the "**Third Touré Intercession**"). The incident caused a scandal, with the result that the Minister of Mines received a telephone call from the World Bank. When the Minister of Mines asked BSGR representatives to attend a meeting to explain their conduct, they arrived together with Mme Touré and I.S Touré and used the meeting (with support from Mme Touré) to seek the grant of research licences over SB1 and SB2 (the "**Fourth Touré Intercession**").

43. As pleaded above, the North and South Permits were granted to BSGR BVI in February 2006.

44. In April 2006, BSGR ProjectCo was incorporated and the BSGR Group established an office in Conakry, though it was not officially opened until September 2006. From about April 2006, Struik ran the BSGR Group's business in Guinea with the help of Cilins. In about June 2006, Avidan arrived in Guinea to take up the role of 'country manager'. Further, the BSGR Group employed I.S. Touré from about February 2006, appointing him as BSGR ProjectCo's director of external relations in about January 2007.

45. On the day that the BSGR Group's office was officially opened in September 2006, Oron, Avidan, Cilins and I.S. Touré held a press conference at which they presented the BSGR Group's exploration plan for the Simandou project. Later that day, Mme Touré attended an event to commemorate the office's opening.

000144

46. Over the course of 2007, the BSGR Group focussed on the exploration of Simandou North and Simandou South.  It initially concentrated on Simandou North, but switched its attention to Simandou South in about mid-2007 upon the discovery of iron ore around the Zogota area.

47. On 17 July 2007, as noted above, BSGR ProjectCo applied for exploration permits over SB1 and SB2 (notwithstanding that these were covered by the Rio Tinto Concessions).

48. In August 2007, Avidan and I.S. Touré met with the Minister of Mines at that time, Ahmed Kanté, to discuss the BSGR Group's interest in SB1 and SB2.  There were then further meetings, as follows:

   48.1. (c. August / September 2007) President Conté summoned Kanté to a meeting with Avidan and I.S. Touré to discuss the BSGR Group's desire to obtain mining permits over SB1 and SB2.  Kanté told the President that the BSGR Group should prove itself first.  The President responded that Kanté should make decisions that best served Guinea's interests.

   48.2. (an hour after the meeting described at 48.1) representatives of the BSGR Group (being Avidan and I.S.Touré) visited Kanté at his offices and insisted on the transfer of rights over SB1 and SB2.  Kanté explained that President Conté had given no orders in relation to the grant of mining permits over SB1 and SB2.

   48.3. (in late 2007/early 2008) a late-night meeting was held between Avidan, Struik, Mme Touré and President Conté at the Presidential Palace; the President asked for a progress update from the BSGR Group (the "**Fifth Touré Intercession**").

   48.4. (c. December 2007) a meeting was held between President Conté, Prime Minister Lansana Kouyaté, Minister of Mines Kanté and Mme Touré in the Presidential Palace's meeting room (the "**Sixth Touré Intercession**").  Kanté voiced objections to granting the BSGR Group further permits until they had proven their abilities. Kanté's objections led President Conté to turn towards Mme Touré and say "I had told you to stay out of these mining problems".  No orders were given by President Conté at the conclusion of this meeting.

   48.5. (the day after the meeting described at 48.4) a meeting was held between Prime Minister Kouyaté, Mme Touré and Kanté (who had been summoned by the Prime Minister) at Prime Minister Kouyaté's office (the "**Seventh Touré Intercession**"). The Prime Minister told Kanté that "we have to find a solution" to Mme Touré's "problem".  Kanté responded by saying that the Rio Tinto Concessions could only

13

be withdrawn by presidential decree, whereupon the Prime Minister turned to Mme Touré and said "see, this is what I was telling you about him".

48.6. (c. February 2008) Steinmetz flew to Guinea to discuss with President Conté the possibility of the BSGR Group being granted mining licences over SB1 and SB2.

48.7. (early 2008) a meeting was held between Avidan, Chief Warrant Officer Issiaga Bangoura (a security guard engaged by the BSGR Group, "**Bangoura**"), Mme Touré and Steinmetz (joining by telephone) at the President's house (the "**Eighth Touré Intercession**").  Avidan stated that the BSGR Group wanted Mme Touré's further assistance to secure the grant of licenses over SB1 and SB2.

49. As pleaded below, in late February 2008, and following this series of meetings, BSGR ProjectCo entered into the 2008 Matinda Contracts pursuant to which Matinda (Mme Touré's company) was to receive up to US\$4 million and a 5% interest in SB1 and SB2.  Following the execution of the said contracts:

49.1. A series of meetings took place in and after April 2008 between the BSGR Group and GoG to discuss the award of the rights to SB1 and SB2 to the BSGR Group. Avidan and Mme Touré attended almost all of the said meetings; Steinmetz attended at least two as stated below.  More specifically:

a. At a meeting held in about April 2008 between (inter alia) President Conté, Steinmetz, Avidan, Mme Touré and I.S. Touré in the grounds of the Presidential Palace, the President instructed his secretary general, Mr Sam Soumah ("**Soumah**"), to conduct a review into the Rio Tinto Concessions (the "**Ninth Touré Intercession**").

b. Following a meeting held in May 2008 between President Conté, Mme Touré and Avidan, the President ordered Mr Soumah to prepare a presidential decree revoking the Rio Tinto Concessions (the "**Tenth Touré Intercession**").

c. Steinmetz returned to Guinea for a two-day visit in May 2008, during which period **(i)** Prime Minister Kouyaté (who opposed the revocation of Rio Tinto's rights) was removed from office and **(ii)** Soumah wrote to Rio Tinto ProjectCo stating that the authorities had decided to withdraw the Rio Tinto Concessions because the terms on which they had been granted were contrary to the Guinean Mining Code.

14

49.2.    As pleaded above, the Rio Tinto Concessions were revoked by presidential decree on 28 July 2008.  On 5 August 2008, BSGR ProjectCo submitted a further request to the GoG for research licences over SB1 and SB2 (referring to the 28 July 2008 Presidential decree and its previous July 2007 application).

49.3.    In September 2008, Louncény Nabé (the then Minister of Mines) was summoned by President Conté and told to "act quickly" with respect to the revocation of the Rio Tinto Concessions.  Prime Minister Souaré and Mme Touré were also present (the "**Eleventh Touré Intercession**").

49.4.    In September or October 2008, Avidan, Steinmetz, and President Conté met to discuss the BSGR Group's application for rights over SB1 and SB2.  It is to be inferred that the said meeting was arranged by Ms Touré (the "**Twelfth Touré Intercession**").  Following the meeting, the President summoned Nabé and told him to grant rights over SB1 and SB2 to the BSGR Group.

49.5.    By the 4 December 2008 decision of the Council of Ministers, Rio Tinto ProjectCo was required to retrocede its research licences over SB1 and SB2 but permitted to retain research licences over SB3 and SB4.

49.6.    On 9 December 2008 Guinea ProjectCo was granted research licences over SB1 and SB2 valid for three years (renewable for a further two years).

49.7.    Around two weeks later, on 22 December 2008, President Conté died.


**C3    How the Pentler Principals, I.S Touré and Mme Touré were paid**

50.    The BSGR Group needed to remunerate the Pentler Principals.  It also needed a vehicle through which it could, without making direct payments from any BSGR Group company, **(i)** remunerate others who provided assistance on the ground in Guinea (such as Daou, Bah and I. S. Touré) and **(ii)** bribe Mme Touré.

51.    In order to achieve these ends, the Pentler Principals purchased Pentler from Onyx on around 14 February 2006, and the following steps were taken in 2006:

51.1.    By letter dated 14 February 2006, Struik (acting on behalf of BSGR BVI) agreed that Pentler would receive a 17.65% interest in BSGR BVI together with success fees of up to US$19.5 million in return for the assistance that Pentler (and the Pentler Principals) had provided and would provide in relation to what was

15

described as the "Simandou Iron Ore Project" (the "**BSGR-Pentler Milestone Agreement**").  By that agreement, Pentler agreed to continue its efforts to "reach an agreement for [SB1] and [SB2]" and "assist in any possible manner with the Simandou Iron Ore Project".

51.2.   In turn, on 20 February 2006, Pentler entered into three further agreements, as follows:

    a.   A memorandum of understanding between (1) Pentler and (2) Bah and I.S. Touré pursuant to which Pentler would pay Bah and I.S. Touré up to US$15.625 million in connection with their assistance in obtaining mining licences to Simandou North and South and SB1 and SB2 (the "**Pentler-Bah Agreement**").

    b.   A memorandum of understanding between (1) Pentler and (2) Daou pursuant to which Pentler would pay Daou up to US$3.875 million in connection with his assistance in obtaining the same mining licences (the "**Pentler-Daou Agreement**").[3]

    c.   A memorandum of understanding between (1) Pentler and (2) Mme Touré pursuant to which Mme Touré would receive the equivalent of a 5% interest in BSGR BVI in connection with her assistance in obtaining the same mining licences, to be conferred by way of the transfer of a 33.3% shareholding in Pentler to her (the "**Touré MoU**").

51.3.   As pleaded above, the GoG granted the North and South Permits on 6 February 2006 and entered into the February 2006 MoU on 20 February 2006.  As a result of these developments, the first payments under the BSGR-Pentler, Pentler-Bah and Pentler-Daou Milestone Agreements fell due.  More specifically:

    a.   US$500,000 became payable by BSGR BVI to Pentler under the BSGR-Pentler Milestone Agreement.

    b.   US$425,000 became payable by Pentler to Bah and I.S. Touré under the Pentler-Bah Agreement.

    c.   US$75,000 became payable by Pentler to Daou under the Daou Agreement.

---

[3] The Pentler-Bah Agreement and Pentler-Daou Agreement together thus gave Bah, I.S. Touré and Daou the entirety of the $19.5 million Pentler was to receive under the BSGR-Pentler Milestone Agreement.

000148

d.   In the event, however, no payment was in fact made to Pentler under the BSGR-Pentler Milestone Agreement.  Instead, BSGR BVI paid or procured the payment of the US$500,000 directly (in cash) to Bah, I.S. Touré and Daou.

51.4.   In 2006, Pentler and BSG Metals and Mining Limited ("**BSG MM**"), a BVI company within the BSGR Group, entered into a services and co-operation agreement pursuant to which Pentler agreed to offer BSG MM its "deal flow in the mining sector" and the parties agreed that (inter alia) Pentler would receive such further consideration as may be agreed upon "from time to time on a case by case basis" (the "**BSGR-Pentler Services Agreement**").  The agreement was backdated to 15 October 2005.

51.5.   On 27 February 2006, companies owned by the Pentler Principals sent invoices to BSGR in the cumulative amount of US$125,000 for "assistance in the signature of the Memorandum of Understanding for the Simandou North and South iron ore deposits…"; those invoices were paid on 6 March 2006.

51.6.   In accordance with the BSGR-Pentler Milestone Agreement, 17.65% of the shares in BSGR BVI were transferred to Pentler by BSGR Steel Holdings Limited ("**BSGR Steel**") on 10 March 2006.  Though Pentler did not transfer 33.3% of its shares to Mme Touré pursuant to the Touré MoU, it (and the Pentler Principals) treated Mme Touré as holding such shares.  A shareholders' agreement relating to BSGR Steel and Pentler's shares in BSGR BVI was subsequently entered into between BSGR Steel, Pentler and BSGR BVI on 19 July 2007, effective from 10 March 2006 (the date on which Pentler acquired the shares).

51.7.   In May 2006 BSGR paid the Pentler Principals US$250,000, ostensibly for "assistance and consulting for the acceptance of bauxite permits in Republic of Guinea" but, at least in part, for their work on the Simandou iron ore project.

52.  Accordingly, by the middle of 2006:

52.1.   Pentler had received a 17.65% interest in BSGR BVI under the BSGR-Pentler Milestone Agreement.

52.2.   Mme Touré was entitled to a 33.33% interest in Pentler under the Touré MoU which in turn equated to a 5% shareholding in BSGR BVI, the holder of the Mining Licences. Though this shareholding was not formally transferred to Mme Touré,

000149

her entitlement to such shares was recognised by Pentler and the Pentler Principals.

52.3.   In addition to their interests in Pentler, the Pentler Principals were paid a further US$375,000.  By this stage Cilins was also being paid a monthly stipend of US$10,000 by the BSGR Group.

52.4.   Bah, I.S. Touré and Daou had collectively received US$500,000.

53.   On 27 and 28 February 2008 respectively, BSGR ProjectCo entered into two agreements with a BVI company, Matinda & Co Limited ("**Matinda**", a company owned and/or controlled by Mme Touré).  The first agreement provided (inter alia) for a commission payment of at least US$2 million and up to US$4 million to be paid by BSGR ProjectCo to Matinda for the assistance Ms Touré had provided and would provide in obtaining licences for SB1 and SB2. The second agreement provided for Matinda to be granted a 5% interest in SB1 and SB2. Both agreements, the "**2008 Matinda Contracts**", were signed on BSGR ProjectCo's behalf by Avidan.

54.   On 24 March 2008, BSGR Steel and Pentler entered into a share purchase agreement which provided for Pentler to sell its 17.65% interest in BSGR BVI back to BSGR Steel in return for the payment of US$22 million, such sum to be paid in four instalments (the "**Pentler SPA**"). The agreement also provided that **(i)** an additional US$8 million would be payable if BSGR Steel realised a profit of more than US$1 billion on the Simandou project; and **(ii)** Pentler's shareholders would "continue to advise and act as consultant for the period of 5 years from signing date hereof to the best interest of [BSGR BVI]".

55.   Thereafter:

55.1.   Payments amounting to US$4 million were made to or for the benefit of Pentler pursuant to the Pentler SPA in about April and June 2008.

55.2.   The GoG granted BSGR ProjectCo the December 2008 Permits.

55.3.   BSGR Steel failed to pay the US$9 million due to Pentler on 15 April 2009, following which a settlement agreement was entered into deferring the dates on which the remaining US$18 million due under the Pentler SPA would be paid (the "**2009 BSGR/Pentler Settlement**").

56.   On 2 August 2009, Mme Touré signed an "affidavit" in front of Staff Sergeant Abdoulaye Cisse and Bangoura in which she **(i)** acknowledged that she had agreed with "BSGR" that she would

receive US$4 million "representing the total value of all of my shares … as well as of my services provided for obtaining the mining titles for the benefit of the company BSGR in Guinean territory", **(ii)** stated that the US$4 million would be paid in four quarterly instalments of US$1 million and **(iii)** stated that receipt of the US$4 million would abrogate "all my previous contractual commitments (directly or indirectly) related to the company BSGR, its subsidiaries, or any other intermediary representing … BSGR …." (the "**2009 Affidavit**").

57. One tranche of US$1 million was paid to Mme Touré in late 2009, as follows:[4]

    57.1. An invoice dated 7 July 2009 was purportedly issued by "Matilda & Co Ltd [sic]" in the amount of US$998,000 in relation to the sale of a Caterpillar tractor and a Caterpillar excavator (the "**Matilda Invoice**"). This invoice was a sham: **(i)** Matilda & Co Ltd does not exist ("Matilda" appears to be a typographical error for Mme Touré's company "Matinda"); **(ii)** there was no intention that any machinery would be sold; **(iii)** it is inherently unlikely that Mme Touré, shortly after President Conté's death, would have started to supply heavy plant equipment; and **(iv)** no such machinery was ever supplied by Mme Touré or her company.

    57.2. On 17 August 2009, Tchelet emailed (inter alios) Clark to provide banking details to be used "for the USD1.3 million consulting fee payment to Ghassan [Boutros]." Tchelet stressed that the banking details attached to his email, and "NOT the regular ones", should be used.

    57.3. The said US$1.3 million was paid by BSG Capital Markets PCC to LMS (Boutros' company, introduced in paragraph 31 above) on 18 August 2009.

    57.4. On 18 August 2009, LMS issued an invoice to "Client #: 1113-BSGR". The invoice purported to relate to the sale of a generator (for US$40,000) and the same Caterpillar equipment as was referred to in the Matilda Invoice (for a total of US$1.26 million). The said invoice is also a sham: **(i)** there was no intention that any such machinery would be sold; **(ii)** no such machinery was ever sold; and **(iii)** the payment instruction given on 17 August 2009 (the day before the invoice was produced) referred to consulting fees and not the sale of industrial equipment.

    57.5. Boutros gave instructions to his bank for the payment of US$998,000 to Matilda on 20 August 2009. Those instructions could not be carried into effect, presumably because Matilda & Co Ltd did not exist.

---

[4] The Claimants reserve the right, following disclosure, to plead further regarding the means by which additional monies were paid by or on behalf of companies within the BSGR Group to Mme Touré.

000151

57.6.   A further invoice dated 28 August 2009 was thereafter issued by Matinda for the sale of the same equipment at the same price as was provided for by the Matilda Invoice. This invoice was a sham for the reasons given at 57.1(ii)-(iv) above.

57.7.   Boutros issued further instructions to his bank on 3 September 2009 for the payment of the US$998,000 to Mme Touré's personal account. The said instructions were carried into effect. A further US$2,000 was invoiced to LMS by Matinda in December 2009.

58.   Accordingly, by the end of 2009 (and in addition to the benefits conferred in 2006):

58.1.   Pentler had entered into an agreement to sell its interest in BSGR BVI for US$22 million, which sum would enure to the benefit of those entitled to its shares (the Pentler Principals (as to 66.66%) and Mme Touré (as to 33.33%)); and

58.2.   Mme Touré's company had entered into an agreement with BSGR ProjectCo pursuant to which it would be paid up to US$4 million. The next year, by the 2009 Affidavit, it was recorded that US$4 million would be paid to Mme Touré. Of that sum, at least US$998,000 had been paid pursuant to a series of sham documents in order to disguise why the payment was being made and where the money was coming from.

### SECTION D: 2009/10: HOW THE MINING LICENCES WERE CONFIRMED FOLLOWING PRESIDENT CONTÉ'S DEATH

The Mining Licences are confirmed and extended

59.   Following President Conte's death, the Mining Licences were confirmed and extended in the following three ways:

59.1.   On 5 May and 10 June 2009, Thiam (having become Minister of Mines in January 2009) respectively **(i)** confirmed the validity of the December 2008 Permits and **(ii)** extended the period of validity of certain parts of the North and South Permits (which included the mineral-rich Zogota region).

59.2.   On about 21 December 2009, the GoG, BSGR Guernsey and BSGR ProjectCo entered into a detailed 'base agreement' for the further exploration and exploitation of the iron ore reserves covered by the Mining Licences (the "**Base Convention**").

000152

Its key terms were as follows: **(i)** a mining concession was to be granted to BSGR ProjectCo in accordance with the Mining Code and the Base Convention terms (clause 8); **(ii)** iron ore mined pursuant to the concession would be exported through Guinea to the Guinea/Liberia border and thence to the Liberian port of Buchanan (clause 4(i)); **(iii)** Phase I: BSGR ProjectCo was to provide the infrastructure necessary to extract and transport the ore from Zogota (including an open cast iron mine and a 102-kilometre railway to transport the ore from Zogota to the Guinea/Liberia border) (clause 10.1); **(iv)** Phase II: BSGR ProjectCo was to deliver a feasibility study regarding SB1 and SB2 within 24 months (clause 10.2); **(v)** BSGR ProjectCo undertook to invest $2.542 billion in mining-related infrastructure in Guinea and Liberia (clause 11); and **(vi)** BSGR ProjectCo was to build a passenger and light cargo railway from Conakry to Kankan and then to Kerouane at a cost of $1 billion (clause 12).  The Base Convention was signed by (inter alios) Thiam (for the GoG), Struik (for BSGR Guernsey) and Avidan (for BSGR ProjectCo).

59.3.   On 19 March 2010, Guinea's interim president, General Sékouba Konaté, executed an ordinance ratifying the Base Convention and a decree granting BSGR ProjectCo a mining concession over the Zogota area of Simandou.  The documents record that they were issued on the 'proposal' and 'recommendation' of Thiam.

60.   In this statement of case, references to the Mining Licences after these dates should be construed as references to the Mining Licences as confirmed and extended.


<u>Thiam acted for and was paid by the BSGR Group</u>

61.   It is to be inferred that Thiam **(i)** was acting as a consultant, adviser, intermediary and/or representative to the BSGR Group between about early 2009 and 22 December 2010 (the date Thiam resigned as Minister of Mines), and **(ii)** received and/or had been promised substantial payments from the BSGR Group by 18 March 2010 (at the latest), in return for the assistance he provided in obtaining the confirmation and extension of the Mining Licences and persuading Vale to enter into the JVA and SHA.

62.   Pending disclosure, the Claimants rely upon the following facts and matters:

62.1.   In about late December 2008, before Thiam's appointment as Minister of Mines, the BSGR Group sought to hold a meeting with him.  Thiam agreed but insisted on the presence of Ibrahima Fofana ("**Mr Fofana**", a former Guinean economy and finance Minister who was acting as a consultant to the BSGR Group).  Thiam paid

000153

for Fofana's travel to London (where the meeting was to take place) at a cost of US$8,017, and was reimbursed by the BSGR Group.

62.2. Thiam was appointed as Minister of Mines on 14 January 2009.

62.3. Thiam travelled to France between 10 and 20 April 2009.  His ticket was purchased by a BSGR Group company.

62.4. As noted above, on 5 May 2009 Thiam confirmed the validity of the December 2008 Permits.

62.5. In about late May 2009, the BSGR Group entered into discussions with the Libyan Investment Authority/Gaddafi Development Foundation (the "**LIA**") concerning the establishment of a joint venture to exploit the Mining Licences.  During the course of those discussions, Lansana Kouyaté (the former Guinean Prime Minister) queried the validity of the Mining Licences.  Thereafter, and as evidenced by a series of informal emails between Thiam and Steinmetz, Thiam sought to assist the BSGR Group's discussions by (inter alia) **(i)** writing a letter to the LIA confirming that the Mining Licences were valid and "do not fall into the category of concessions subject to review", and **(ii)** reiterating these points at a meeting held with representatives of the LIA in London.  In the circumstances pleaded in paragraph 62 and its sub-paragraphs, the content of the emails passing between Thiam and Steinmetz is only consistent with Thiam acting as a consultant, adviser, intermediary and/or representative of the BSGR Group.

62.6. In June 2009, as noted above, Thiam extended certain parts of the North and South Permits.

62.7. In July 2009 Thiam travelled to Beijing, where on 14 July he held a meeting with a representative of China Investment Corp ("**CIC**"). Shortly thereafter, Thiam told the CIC representative that (inter alia) **(i)** he could put the BSGR Group in contact with CIC, and **(ii)** he had a very good relationship with the BSGR Group and could assist the implementation of a proposed joint venture to exploit the Mining Licences.

62.8. In September 2009, the BSGR Group paid for Thiam's flights to Israel and Hong Kong so that he could attend and/or assist with the BSGR Group's ongoing negotiations with CIC and/or a further Chinese company called Baosteel.

000154

62.9.  On 1 December 2009, Thiam (in his capacity as Minister of Mines) issued a decree establishing a commission charged with examining a Simandou North and South feasibility study prepared by, and negotiating the Base Convention with, the BSGR Group (the "**Commission**").

62.10.  The Base Convention was negotiated between about 2 and 21 December 2009. Thiam gave an introductory address to the Commission on the first day of negotiations and then left the proceedings.  Thereafter, and despite his position as Minister of Mines, Thiam assisted the BSGR Group in its negotiations with the GoG. The best particulars that the Claimants can currently give are as follows.

a.  On 17 December 2009, a member of the Commission (Mr Saada Baila Ly, "**Baila Ly**") sent an email to Thiam, copied to Avidan, updating him on that day's proceedings.  The email stated that a GoG representative, Mr Camara, had raised a number of questions, and asked Thiam for his *"comment"* and *"hint"* as to how to counter Mr Camara's financial *"logic"*.  Thiam replied the same day, explaining that one proposed BSGR Group answer was *"greaty* [sic]*"*, that other points raised by Mr Camara were answered by *"the feasibility study"*, and that *"Camara is opposed to southern route. U and sacko[5] need to manage him"*.  Accordingly, Thiam provided assistance to the BSGR Group in its negotiations against the GoG.

b.  On 18 December 2009, Ibrahima Kalil (also a member of the Commission, and the Economic and Tax Advisor at the Ministry of Mines) sent a further email to Thiam and Baila Ly, explaining that day's developments and the proposals that had been made on behalf of the GoG.  The email stated: *"We look forward to your response for counter-proposals"*.  In other words, it sought Thiam's assistance in negotiating against the GoG.  It is to be inferred from the matters pleaded in paragraph 62 and its sub-paragraphs that such assistance was provided by Thiam.

c.  On 19 December 2009, Baila Ly sought assistance from Thiam in relation to how the BSGR Group should respond to a *"non sens* [sc nonsense]*"* request made of BSGR by the GoG.  Thiam responded (copying in Avidan), stating that the latest news from inside the GoG was that Captain Sandé (the Guinean economy and finance minister) had been instructed to sign the Base Convention *"today and the annex will be submitted to me for appreciation and discussions w the investor* [sc. the BSGR Group]*."*  In the event, Captain Sandé signed the Base Convention on

---

[5]  Seemingly Maitre Momo Sakho, the vice-chair of the Commission and a senior advisor to the President.

000155

21 December 2009.  Again, Thiam provided assistance to the BSGR Group in its negotiations against the GoG.

62.11.  Following a failed assassination attempt on President Camara in early December 2009, a caretaker government took power of Guinea.  Its cabinet members were appointed on 16 February 2010.  When Struik learned that Thiam had been re-appointed as Minister of Mines he emailed Avidan and Steinmetz stating "*Good news!*".  Steinmetz responded: "*Not good, great great news!!!!*".

62.12.  In March and April 2010, Thiam assisted the BSGR Group's negotiations with Vale in connection with the JVA: **(i)** he spoke with executives representing BSGR and Vale on 18 March 2010 and orally confirmed the validity of the Mining Licences, **(ii)** he provided written confirmation to the same effect the next day, and **(iii)** he countersigned a letter sent to him by BSGR and dated 16 April 2010 to confirm that the GoG had no objection to Vale acquiring a 51% interest in BSGR Guernsey.

62.13.  In March 2010, an advisor or assistant to Thiam called Ibrahima N'Diaye suggested to Thiam that he might ask Avidan for a "budget" so that Thiam could pay private radio stations in Guinea to counter recent negative press coverage.

62.14.  On 26 June and 14 September 2010, Thiam sent Steinmetz and Avidan respectively copies of letters that had been sent by the Guinean prime minister to Rio Tinto concerning SB1 and SB2. The first letter was marked "confidential".

62.15.  On or about 15 November 2010, BSGR made a payment of US$5 million for Thiam's benefit. The payment was made from the proceeds of the US$500 million initial consideration paid by Vale pursuant to the joint venture.  It is to be inferred by reason of the matters pleaded in paragraph 62 and its sub-paragraphs that the said payment was promised to Thiam prior to 18 March 2010 at the latest.  Because the BSGR Group and Thiam wanted to disguise the said payment, it was **(i)** purportedly to a company called Companhia Carvoeira de Samoa ("**CCS**"); **(ii)** described as being referable to an "Investment in Prospecting Licences – Mozambique Coal Opportunity"; and **(iii)** in fact made to a bank account under the name 'Pacific Inter Link SDN BHD'.  CCS was a company owned and/or controlled by an associate of Thiam called M Aquil Rajahussen ("**Rajahussen**").  Rajuhussen thereafter transferred the US$5 million to Thiam or for his benefit, with a substantial portion being used to acquire a property in the United States known as 771 Duell Road, Millbrook NY.

62.16.   Later, in late October 2011, Rajahussen sought to blackmail Thiam by claiming that the US$5 million transferred by Rajahussen to Thiam or for his benefit was a loan. Thiam responded by email dated 15 November 2011 stating that "*B would agree to pay a non-refundable amount to view the data exclusively, knowing that the funds were to go to [Thiam]*"; and that Thiam and Rajahussen used this "*agreement between [Rajahussen] and B to transfer [Thiam's] funds to [Rajahussen]*" so that "*[Rajahussen] would purchase the house and hold [it] in [Thiam's] name*".  It is to be inferred that 'B' is a reference to Beny Steinmetz.

62.17.   In May 2017 Thiam was tried and convicted in the United States of laundering US$8.5 million in bribes paid to him by two companies, China Sonangol International Limited and China International Fund S.A. Those bribes were paid to Thiam in 2009 and 2010 during his tenure as Minister for Mines, in order to influence GoG's decision to enter into agreements with China Sonangol and China International Fund granting those companies exclusive rights to mine for iron ore, gold, diamonds and bauxite. The Claimants rely on these matters as similar fact evidence.

### SECTION E: THE JVA AND THE SHA

**E1     Introduction**

63.   As pleaded above, the Base Convention was entered into in December 2009.

64.   In February 2010, Struik approached a Vale executive (Eduardo Etchart) in Cape Town, and explained to him that the BSGR Group had acquired the Mining Licences and the consent of the GoG to export iron ore mined from the Simandou region through Liberia.  In light of this, Struik said, the BSGR Group was seeking a partner that could invest the capital and offer the mining expertise necessary to bring the project to fruition.

65.   On or about 22 February 2010, BSGR Guernsey entered into a "Confidentiality and Non-Disclosure Agreement" with Vale South Africa (Pty) Ltd.  The document recited that the parties were in discussions regarding the BSGR Group's "Simandou Iron Ore Project(s)" and contained the terms on which certain confidential information would be made available to Vale.  Shortly thereafter, Vale conducted technical due diligence, principally in Johannesburg (where the relevant information was kept).  A team from Vale  also visited the Simandou region, accompanied by Struik and Avidan.

000157

66. In about February or early March 2010, Eduardo Ledsham, Vale's Exploration Department Executive Director, met Steinmetz and Cramer in London to discuss the basis for any deal between the BSGR Group and Vale.

67. A series of initial meetings were held in Rio in the week commencing Monday 15 March 2010, culminating in the execution of non-binding heads of terms on Friday 19 March 2010 (the "**Heads of Terms**").  Thereafter negotiations moved to London with Vale instructing Clifford Chance LLP ("**Clifford Chance**") and BSGR instructing Skadden, Arps, Slate, Meagher & Flom (UK) LLP ("**Skadden**"), both in Canary Wharf, London.  Alongside the negotiation of detailed terms for the proposed joint venture, Clifford Chance conducted in-depth due diligence relating to (inter alia) corruption and bribery issues.  It was in this context that the Defendants made six related sets of representations to Vale.

**E2    The Representations**

*(1)    The Initial DD Questionnaire*

68. On 29 March 2010, Tchelet sent an email to Daniela Chimisso dos Santos ("**dos Santos**"), Vale's Deputy General Counsel, attaching a document entitled "Compliance Due Diligence Questionnaire for Project Hill" (the "**Initial DD Questionnaire**").  The Claimants will rely upon the Initial DD Questionnaire at trial for its full terms and true effect.

69. The Initial DD Questionnaire:

69.1. Defined the "BSG Group" as including BSGR Guernsey and BSGR ProjectCo.

69.2. Defined "Government Official" as including (inter alia) **(i)** a representative of, or person otherwise acting in an official capacity on behalf of, a national government or an instrumentality, board, commission or agency of a national government and **(ii)** an individual who holds any other official, ceremonial or other appointed position in a government or any of its agencies.

69.3. Defined the "Simandou Project" as including activities relating to prospecting, exploring and mining iron ore at and in the Simandou Blocks 1 and 2 of Simandou South.

69.4. Defined "Project Hill" as the proposed joint venture between the BSG Group and Vale SA to develop the Simandou Project.

69.5. Defined "UBOs" so as to include Steinmetz (because he ultimately owned and/or controlled the BSG Group), Cramer (because he ultimately owned and/or

000158

controlled Onyx), Nysco (because it had an indirect right to receive the financial benefit of an equity interest in the BSG Group) and Balda (because it was a shareholder of Nysco).

69.6.   Was signed by Clark, as a director and group treasurer of BSGR Guernsey, having made inquiry of the BSG Group's directors, senior executives, other employees and UBOs as appropriate, and having otherwise conducted a "thorough review of the matters addressed in this response".

70.   The Initial DD Questionnaire contained the following express representations:

70.1.   BSG Group had not in relation to the Simandou Project or Project Hill, whether directly or indirectly, including through a third party (including its directors, employees, shareholders, UBOs or consultants), made, authorised or promised any payments or benefits to any Government Officials.  (the "**First Corruption Representation**")

70.2.   BSG Group had no business or financial relationship, directly or indirectly, with any Guinean Government Official or the spouse of any such official. (the "**Second Corruption Representation**")

70.3.   BSG Group did not use any consultants, representatives, agents, brokers, or other intermediaries (whether directly or indirectly) in relation to the Simandou Project or Project Hill other than certain specified entities which did not include Pentler, the Pentler Principals, Thiam, Boutros or LMS; and further that the BSG Group did not use any intermediaries to interact with the GoG in relation to the BSG Group's efforts to obtain the Mining Licences (the "**First Consultancy Representations**").

71.   The Claimants aver that **(i)** the said representations were manifestly approved and adopted by each of the Defendants; and **(ii)** each of the Defendants provided more than trivial assistance in completing the Initial DD Questionnaire and their assistance was provided pursuant to a common design that fraudulent misstatements be made to Vale; and **(iii)** Steinmetz induced, incited, procured, reviewed and/or approved the representations contained in the Initial DD Questionnaire. The Claimants rely on the following matters (or some or all of them as necessary):

71.1.   Steinmetz controlled all material decisions relating to the BSGR Group, BSGR and its sale of the Shares; he was the key decision maker directing BSGR's participation in the joint venture negotiations; he was a UBO of whom Clark made enquiry when completing the Initial DD Questionnaire; and he is referred to in the

responses to the Initial DD Questionnaire, including as an adviser to Balda and BSGR Guernsey.

71.2.   The positions held by the Second to Sixth Defendants within the BSGR Group.

71.3.   Struik and Avidan were amongst the BSG Group's directors of whom Clark made inquiry when completing the Initial DD Questionnaire.  Tchelet also made enquiries of Struik and Avidan for input in order to complete the Initial DD Questionnaire.

71.4.   Cramer was the ultimate beneficial owner of Onyx and therefore a "UBO" of whom Clark made inquiry when completing the same.

71.5.   Tchelet co-ordinated the process by which the Initial DD Questionnaire was answered; he was one of the BSG Group's "directors, senior executives or other employees" of whom Clark made inquiry when completing the Initial DD Questionnaire; and he sent the Initial DD Questionnaire to a Vale representative (dos Santos) by email.

71.6.   Tchelet's email was copied to Cramer.

71.7.   The response to the Initial DD Questionnaire was given and signed by Clark in the capacity described above.

71.8.   The First to Sixth Defendants were each closely involved in the negotiation of the JVA and SHA.

71.9.   Clark made inquiry of Balda and Nysco as "UBOs", in preparing the responses to the Initial DD Questionnaire.

71.10.   As is pleaded below: **(i)** the JVA provided that the "awareness" of Tchelet, Struik, Avidan, Clark and Steinmetz was to be attributed to BSGR; **(ii)** the JVA provided for Cramer to become a BSGR Director of BSGR Guernsey from Completion; **(iii)** Avidan, Struik, Tchelet and Cramer all attended the 8 April FCPA Interview (defined below); and **(iv)** the Second to Sixth Defendants each received substantial bonus payments in return for the roles they played in procuring Vale to enter into the SHA and JVA.

71.11.   In the circumstances, it is to be inferred that all the Defendants discussed and agreed upon the answers to be given in the Initial DD Questionnaire in advance or otherwise manifestly approved and adopted them.

000160

(2)    *The Supplemental DD Questionnaire*

72.  On 29 March 2010, George Kleinfeld (Clifford Chance) sent BSGR (via Sandro de Bernardini at Skadden) a "Supplemental Compliance Due Diligence Questionnaire for Project Hill" (the "**Supplemental DD Questionnaire**").

73.  The Supplemental DD Questionnaire:

73.1.  Expanded the definition of "BSG Group" contained in the Initial DD Questionnaire to include (inter alia) BSGR as well as BSGR Guernsey and BSGR ProjectCo.

73.2.  Used the same definition of "Government Official" as is used in the Initial DD Questionnaire.

73.3.  Defined "Project Hills" as the proposed joint venture between the BSG Group and Vale to develop "Simandou Blocks 1 and 2, North Block and Zogota".

74.  On 31 March 2010, the BSGR Group effected an internal restructuring: BSGR transferred its 100% shareholding in BSGR Steel to Nysco: see Appendix 1, Chart 7 (the "**31 March 2010 Restructuring**").  The effect of the 31 March 2010 Restructuring was to remove BSGR Steel and its 100% subsidiary BSGR BVI from the group of companies owned and controlled by BSGR.  This was done because the Defendants did not want to disclose, in answer to the Supplemental Due Diligence Questionnaire or at all, that:

74.1.  BSGR BVI had entered into the Pentler Milestone Agreement with Pentler.

74.2.  BSGR BVI had paid the first US$500,000 due under the Pentler Milestone Agreement directly to Bah, I.S. Touré and Daou.

74.3.  Pentler had between about 10 March 2006 and 24 March 2008 owned 17.65% of the shares in BSGR BVI, and Mme Touré was from early 2006 treated as holding 33% of Pentler's shares.

74.4.  The Pentler SPA stated that Pentler's shareholders (which included Cilins) would continue to act as consultants to BSGR BVI for five years.

75.  It is to be inferred from the matters pleaded herein that the 31 March 2010 Restructuring:

75.1.  was carried out on the instructions of Steinmetz with the assistance and/or to the knowledge of the Second to Eighth Defendants.

000161

75.2.   was carried out because the Supplemental DD Questionnaire had enlarged the term "BSG Group", so as to give BSGR and the Defendants a purported (but misconceived) justification for not disclosing the involvement of (inter alios) Pentler, Cilins and Mme Touré.

76.   On 2 April 2010, Tchelet returned the completed Supplemental DD Questionnaire to Dos Santos.   The completed questionnaire was signed by Clark, on behalf of the BSG Group, Nysco and Onyx, having made inquiry of the BSG Group's, Nysco's and Onyx's directors, senior executives, other employees and UBOs as appropriate, and having otherwise conducted a "thorough review of the matters addressed in this response".   The Claimants will rely upon the Supplemental DD Questionnaire at trial for its full terms and true effect.

77.   The completed Supplemental DD Questionnaire concealed the 31 March 2010 Restructuring and contained the following representations:

77.1.   The only members of the local advisory team (including counsel, public relations advisors, and lobbyists) retained on behalf of the BSG Group (directly or indirectly) in connection with the Simandou Project or Project Hills were **(i)** a "legal counsel" called Mohammed L Boumbia; and **(ii)** a firm of labour brokers. (the "**Second Consultancy Representation**")

77.2.   BSG Group, Nysco and Onyx had not in relation to the Simandou Project or Project Hill, whether directly or indirectly, including through a third party (including its directors, employees, shareholders, UBOs or consultants), made, authorised or promised any payments or benefits to any Government Officials. (the "**Third Corruption Representation**")

78.   As to the responsibility of all of the Defendants for the said representations, paragraph 71, above, is repeated (mutatis mutandis).   In addition, the Claimants rely upon the following facts and matters (or some or all of them as necessary):

78.1.   All of the Defendants were involved in or knew of the March 2010 Restructuring, which was carried out for the purposes pleaded above.

78.2.   Cramer was expressly identified in the Supplemental DD Questionnaire as the "UBO of Onyx" (and a photocopy of Cramer's passport and a recent utility bill were exhibited); the answers in the Supplemental DD Questionnaire were given on behalf of Onyx; and Cramer was a director, senior executive and/or ultimate

beneficial owner of Onyx of whom Clark made inquiry when completing the Initial DD Questionnaire.

78.3.    Tchelet sent the Supplemental DD Questionnaire to a Vale representative (dos Santos) by email.  His email was copied to Cramer.

78.4.    Clark made inquiry of Nysco and Balda in preparing the responses to the Supplemental DD Questionnaire. Further, the responses were expressly given on behalf of Nysco.

## (3)    The 8 April Representations

79.    On 8 April 2010, George Kleinfeld, a partner at Clifford Chance's Washington DC office acting for Vale, conducted a three-hour due diligence interview with Avidan, Struik, Tchelet and Cramer in London (the "**FCPA Interview**" and "**Attendees**").

80.    The Attendees were present throughout.  They made the following representations (the "**8 April Representations**"):

80.1.    Avidan said that neither the BSGR Group[6] nor anyone acting on its behalf had **(i)** interceded with government officials in Guinea in an effort to have the Rio Tinto Concessions revoked or **(ii)** made any gift to any government official that would convey a personal financial benefit (as opposed to making ceremonial gestures and contributing to public works). (the "**Fourth Corruption Representation**")

80.2.    Avidan said that the BSGR Group **(i)** generally only used technical consultants in Guinea who provide skills that the BSGR Group needed to explore and develop their properties and **(ii)** did employ a public relations consultant in Guinea with the surname Touré, but that he was not related to President Conté or his wife (Touré being a common surname). (the "**Third Consultancy Representation**")

80.3.    Avidan, Struik, Tchelet and Cramer said that:

80.3.1. They were not aware of any financial interests held by any government officials in the BSGR Group's Guinean operations.

---

[6]       Which, at a minimum, included the entities included with the Supplemental DD Questionnaire's definition of "BSG Group".

31

80.3.2. They were not aware of any payments or other personal financial benefits conferred on any government officials on behalf of the BSGR Group in relation to their Guinean operations.

80.3.3. Nobody acting on behalf of the BSGR Group, directly or indirectly, has made or offered any corrupt payments or provided anything of value to any officials of a government agency or government owned or affiliated entity in connection with the BSGR Group's business in Guinea. (collectively, the "**Fifth Corruption Representation**")

80.4.   It is averred that:

80.4.1. When one or more of the Attendees failed to correct a representation made by another Attendee, he represented by conduct and/or implicitly represented that the said representation was correct.

80.4.2. By failing to correct the said representations and/or disavow any knowledge of the matters referred to therein in the course of the meeting, each of the Attendees expressly, alternatively impliedly, represented that he had a reasonable basis to believe that they were true.

81.  As to the responsibility of all of the Defendants for the said representations, paragraph 78 above is repeated (mutatis mutandis).  In addition, the Claimants rely upon the following facts and matters (or some or all of them as necessary):

81.1.   The topics for discussion at the FCPA Interview were circulated to Skadden, Cramer, Tchelet and others in advance, by email sent at 11:48pm on 7 April 2010.

81.2.   The representations made at the FCPA Interview followed on from (and substantively replicated) the representations made in the Initial and Supplemental DD Questionnaires, and were subsequently substantively repeated in the Steinmetz and Clark ABL Certificates and the London Meetings (each defined below).

### (4)   The Steinmetz ABL Certificate

82.  On 9 April 2010, Steinmetz executed a document headed "Certification of Benjamin Steinmetz" (the "**Steinmetz ABL Certificate**").  The Steinmetz ABL Certificate used the same definition of "Government Official" as contained in the earlier DD Questionnaires.   It was

initially held in escrow and was delivered to Vale on 30 April 2010 at completion of the JVA and SHA.

83. The Steinmetz ABL Certificate represented that (the "**Sixth Corruption Representation**"):

83.1.   Steinmetz had not and would not, directly or indirectly including through a third party, in connection with the business of BSGR Guernsey and/or the transactions contemplated by the JVA: pay, offer, promise or authorise the payment of money or anything else of value to a Government Official to **(i)** corruptly influence the official act or decision of such a person in order to assist any person in obtaining or retaining business or directing business to any third party, **(ii)** secure an improper advantage, **(iii)** induce such a person to use their influence to affect or influence any official act or decision of a government authority in order to assist any person in obtaining or retaining business, or directing business to any third party, or **(iv)** provide unlawful personal gain to such a person (a "**Prohibited Payment**"), and

83.2.   Steinmetz had no reason to believe that BSGR Guernsey, its subsidiaries and affiliates or their respective officers, directors, employees or anyone acting on their behalf, or any third party, in connection with the business of BSGR Guernsey and/or the transactions contemplated by the JVA, has or will make a Prohibited Payment.

84. As to the responsibility of all of the Defendants for the said representations, paragraph 81 above is repeated (mutatis mutandis).  In addition, the Claimants rely upon the following facts and matters (or some or all of them as necessary):

84.1.   The Steinmetz ABL Certificate was discussed at the FCPA Interview and circulated in draft by email copied to Tchelet and Cramer.

84.2.   The Steinmetz ABL Certificate is referred to in the SHA, which was reviewed by all Defendants and signed by Clark.

*(5)*   *The Clark ABL Certificate*

85. On 30 April 2010, Clark executed the "**Clark ABL Certificate**".  A copy was delivered to Vale the same day and the original was provided on 4 May 2010. The Clark ABL Certificate used the same definition of "Government Official" as contained in the earlier DD Questionnaires.

86. The Clark ABL Certificate represented that Clark had no reason to believe that BSGR, its subsidiaries and affiliates or their respective directors, employees or any person acting on

33

their behalf, have paid or will pay, offer, promise or authorise the making of a Prohibited Payment. (the "**Seventh Corruption Representation**")

87.     As to the responsibility of all of the Defendants for the said representations, paragraph 84 above is repeated (mutatis mutandis).  In addition, the Claimants rely upon the following facts and matters (or some or all of them as necessary):

   87.1.    The Clark ABL Certificate was reviewed by the First to Fifth Defendants prior to its execution.

   87.2.    The Clark ABL Certificate refers to the knowledge of BSGR "*(or its subsidiaries or affiliates) or its directors, employees or any person acting on their behalf*". That includes the all of the other Defendants.

   87.3.    The Clark ABL Certificate was part of the suite of documents executed by Clark on 30 April 2010, along with (inter alia) the JVA and SHA. The JVA contained warranties in Schedule 4 to the effect that BSGR and BSGR Guernsey had not made corrupt payments to government officials to induce them to use their influence for the benefit of BSGR or to provide government officials with an unlawful benefit.  Further, the knowledge and awareness of BSGR for the purpose of the JVA included the knowledge of Steinmetz, Struik, Avidan and Tchelet.

   87.4.    The transactional documents: **(i)** had been approved at a BSGR board meeting on 29 April 2010 at which Cramer was also present (the minutes for which expressly refer to the corruption warranties in the JVA); **(ii)** had been approved by Balda on 28 April 2010 following an investment proposal made by Cramer; and **(iii)** were executed on instructions from Steinmetz.

*(6)     Further London Meetings*

88.     Negotiations for the JVA and SHA took place over a four week period in London in April 2010. There were meetings during that period on an almost daily basis at Clifford Chance's or Skadden's offices in Canary Wharf. Vale was represented at most of these meetings by Alex Monteiro (the general manager of Vale's mergers and acquisitions department), and Daniela Chimisso (Vale's Deputy General Counsel). BSGR was represented at most of these meetings by Tchelet, Struik, Avidan and Cramer. Steinmetz also attended certain of the meetings. During those meetings the following express oral representations were made by Tchelet, Avidan, Cramer and Steinmetz:

88.1.   Tchelet, Avidan and Cramer said that no one at BSGR had made or offered, directly or indirectly, any payments or promised any gratuities, gifts, transfers of property or anything of value to any GoG official and BSGR did not employ any relatives of any GoG official.

88.2.   Steinmetz said that BSGR had obtained the Mining Licences through a 'clean' process, i.e. without engaging in any bribery or corruption; and that any accusations of bribery by BSGR were a smear campaign by Rio Tinto.

88.3.   Avidan said that BSGR "did the right things" in obtaining the Mining Licences and did not engage in any bribery or corruption (repeating the allegation that rumours to the contrary were part of a smear campaign by Rio Tinto). (together the "**Eighth Corruption Representations**")

89.   Furthermore, Monteiro asked questions about the buy back by BSGR Steel of the minority shareholding in BSGR BVI including, in particular, the identity of the selling party (which, unknown to Monteiro, was Pentler). In response to those questions, Tchelet and Cramer made the following oral representations:

89.1.   The transaction by which BSGR Steel purchased the minority interest in BSGR BVI was done for tax planning purposes; and

89.2.   The selling minority shareholder was not an external third party but a company within the Balda group. (the "**Fourth Consultancy Representation**")

90.   As to the responsibility of all of the Defendants for the said representations, paragraph 87 above is repeated (mutatis mutandis).  In addition, the Claimants rely upon the fact that the said representations substantively replicated the representations made in the Initial and Supplemental DD Questionnaires, at the FCPA Interview, and in the Steinmetz and Clark ABL Certificates.

*(7)*     *Other matters*

91.   The First to Eighth Corruption Representations and the First to Fourth Consultancy Representations were made by the Defendants to Vale with the intention that Vale should rely upon them and with the intention that they would induce Vale to enter into the JVA and SHA. Further, each of the Defendants (i) knew that Vale would pass the said representations on to its subsidiary and affiliate companies for the purposes of implementing the joint venture,

000167

including for the purpose of making payments pursuant to the JVA and SHA; and (**ii**) intended the said representations to be relied on by Vale International and Vale Austria in making any payments (or taking any other steps required) under the JVA or SHA.

92. Further, to the extent the said representations were implied representations:

92.1. each of the Defendants knew that he/it was making the implied representation and that it had the implied meaning alleged herein; and

92.2. the Claimants understood the implied representations to have been made with the meaning and in the manner set out herein.

**E3     The terms of the JVA and SHA**

93. The Claimants will rely upon the JVA and SHA at trial for their full terms and true effect.  In brief summary, the JVA and SHA provided for:

93.1. Vale to purchase, or to purchase through a wholly-owned subsidiary, the Shares (ie 51% of the shares in BSGR Guernsey).

93.2. Vale to pay, or to procure the payment of, the Initial Consideration of US$500 million and the First and Second Deferred Consideration of up to US$2 billion.

93.3. The detailed terms upon which the parties were, through BSGR ProjectCo, to comply with the terms of the Base Convention and exploit the Mining Licences.

93.4. BSGR to give numerous representations, warranties and covenants, including those given in relation to bribery and corruption at Sections 3.4 to 3.7 of Schedule 4 to the JVA and in clause 16.1 of the SHA.

93.5. Vale to provide the bulk of the funding for BSGR ProjectCo's costs of developing and exploiting the Mining Licences.

93.6. Any reference to the "awareness" of companies in the BSGR Group to be construed as a reference to (inter alia) the knowledge of Tchelet, Struik, Avidan, Clark and Steinmetz, including such knowledge as those individuals would have had had they made all reasonable enquiries in relation to the matter in question.

93.7. Certain certificates defined in the SHA as "ABL Certificates", being the Steinmetz and Clark ABL Certificates, to be provided to Vale by BSGR.

93.8.   The board of BSGR Guernsey to constitute five directors, three of whom would be nominated by Vale and two by BSGR.  Cramer was nominated as one of the BSGR Directors.  Further, that Vale would have the right to nominate the chairman of the board, the CEO, CFO and COO, and that Vale would be responsible for the day-to-day management and control of BSGR Guernsey and its subsidiaries (in a manner consistent with an agreed business plan).

**E4     Completion of the JVA and SHA**

94.   The JVA and SHA were executed by the parties and exchanged on 30 April 2010.  At the same time or shortly thereafter:

94.1.   Vale was provided with the Steinmetz and Clark ABL Certificates.

94.2.   Vale International, acting on Vale's instructions, paid US$500 million to BSGR.

94.3.   BSGR delivered to Vale a copy of a share certificate recording Vale Austria as the owner of 51% of the shares in BSGR Guernsey together with an updated copy of BSGR Guernsey's share register recording Vale Austria's shareholding.

94.4.   The names of the companies within the BSGR Group involved with the Simandou project were renamed so that their names started with the words "VBG – Vale". For the avoidance of confusion, the pre-30 April 2010 names of the relevant entities, defined above, are used in the remainder of this document.

**E5     Further payments made by Vale pursuant to the JVA and SHA**

95.   Between 2010 and 2015, the Claimants provided and/or procured further funding for the joint venture:

95.1.   Clause 6.3 of the JVA provided that, unless external funding could be secured to finance the development of the project, Vale (or one of its subsidiaries or affiliates) would be responsible for funding the project by way of a loan. Pursuant to certain promissory notes between Vale International and BSGR ProjectCo, Vale International advanced US$552,150,000 to BSGR ProjectCo between 2010 and 2015. Vale International advanced a further US$30.525 million to BSGR Logistics Corp and US$800,000 to BSGR (Liberia) Limited, two further companies forming part of the joint venture. Taking into account certain (minor) repayments, Vale International advanced a total sum of US$581,197,104, which remains unpaid.

000169

95.2.  Clause 6.1 of the JVA provided that Vale was responsible for funding the Feasibility Study in respect of SB1 and SB2 as required by the Base Convention. Between 2010 and 2012, Vale International and/or Vale Austria provided funding of US$85,365,652 in this regard.

95.3.  Pursuant to the SHA and JVA, Vale had day to day operational management of the joint venture companies.  Between 2010 and 2015, Vale incurred internal costs of approximately US$80,018,000 running and managing the joint venture.


**SECTION F: PAYMENTS TO THE DEFENDANTS AND FACILITATORS AFTER THE JVA AND SHA**


Bonus payments made to the Second to Sixth Defendants

96.  The Second to Sixth Defendants were each promised, and each received, substantial bonus payments in return for the roles that they played in procuring Vale to enter into the SHA and JVA.  It is to be inferred that the bonuses were offered to the Second to Sixth Defendants by Steinmetz, BSGR and Balda before the JVA and SHA were entered into or, alternatively, that the Second to Sixth Defendants had a reasonable expectation of receiving substantial bonuses in the event that the JVA and SHA were executed.

97.  The said bonuses are recorded in a document headed "Summary of Bonus Payments 2010" produced in about early July 2010 (the "**Bonus Schedule**") and were as follows:

97.1.  Cramer.  The sum of $10 million of which US$3 million was paid to Cramer or to a corporate vehicle owned and controlled by him on or about 6 July 2010.  In addition, Balda resolved to pay Mr Cramer's company, Onyx, a bonus of US$2.5 million. The Claimants infer that this bonus was paid by Balda in or about July 2010.

97.2.  Struik.  The sum of US$3 million, of which US$2 million was paid to Struik or to a corporate vehicle owned and controlled by him on or about 6 July 2010.

97.3.  Avidan.  The sum of US$3.75 million, of which US$2.5 million was paid to Avidan on or about 6 July 2010.

97.4.  Tchelet. The sum of US$1.2 million, of which US$800,000 was paid to Tchelet or to a corporate vehicle owned and controlled by him on or about 6 July 2010.

000170

97.5.   <u>Clark</u>. The sum of US$250,000, of which US$180,000 was paid to Clark on or about 6 July 2010.

98.   In addition to the 'bonuses' set out in the paragraph above:

98.1.   Further payments were made for Avidan's benefit to his company Fefania Asset Corp ("**Fefania**"): **(i)** on or about 19 October 2010 Fefania received a payment of US$2.8 million from Windpoint; **(ii)** on or about 24 November 2010 Fefania received a payment of US$1.7 million from BSGR; and **(iii)** on or about 31 January 2011 Fefania received a payment of US$1.42 million from Windpoint.

98.2.   During the period after 30 April 2010, further payments were made by BSGR to the Defendants, including in respect of consultancy fees, salaries and other payments.

99.   The payments described in the paragraphs above derived from the US$500 million paid by Vale International to BSGR on 30 April 2010.

<u>Payments made to Pentler and Mme Touré</u>

100.   The terms of the Pentler SPA were renegotiated in about April-May 2010, at the same time as BSGR was negotiating the JVA and SHA, to increase the consideration payable to Pentler to US$30 million (US$8 million of which had already been paid). The balance of US$22 million was paid by BSGR to Nysco on 10 May 2010 and then by Nysco to a BVI company called Windpoint Overseas Limited ("**Windpoint**") on about 17 May 2010. That payment derived from the US$500 million paid by Vale International pursuant to the JVA on 30 April 2010. In addition, in 2010 and 2011, a further US$4.5 million was paid to Pentler or for its benefit in full and final settlement of Pentler's entitlements under the BSGR-Pentler Milestone Agreement. In particular:

100.1.   On or about 5 August 2010 BSGR transferred US$3 million to Windpoint for onward payment to Pentler; and

100.2.   In or about March 2011 Nysco transferred $1.5 million to Windpoint for onward payment to Pentler.

101.   Meanwhile, Pentler entered into a number of further contracts with, and made further payments to, Mme Touré in connection with her interest in Pentler and her involvement in procuring the grant of the Mining Licences:

101.1.  By a written agreement dated 8 July 2010, and subject to "the proper implementation and functioning and the next stages of the operation conducted by our partners on the Simandu project [sic]", Pentler agreed to pay a further sum of US$5 million to Mme Touré.  By further agreement 8 July 2010, Pentler agreed to pay a further US$5.5 million to Matinda; and Matinda and Mme Touré agreed to deliver to Pentler all documents and agreements signed with Pentler and its partners in relation to the Simandou project (the "**July 2010 Contracts**").

101.2.  By a written agreement dated 3 August 2010 Pentler agreed to pay Mme Touré the sum of US$5 million in two equal instalments (to be made within 24 and 48 months of signature).  This document further differed from that at 101.1 because it makes reference to various commercial activities in Guinea (and not simply the Simandou project) and because it stated that Matinda and Mme Touré were to "refrain from making use of this document in any manner, directly or indirectly, and using this document against … Pentler and/or its partners and/or its associates in Guinea and elsewhere". By further written agreement dated 3 August 2010, Pentler agreed to pay a sum of US$5.5 million to Matinda in relation to "all the activities" that it had conducted in Guinea. This contract again contained extensive confidentiality obligations. (the "**August 2010 Contracts**")  The August 2010 Contracts were seemingly intended to replace the July 2010 Contracts.

101.3.  In total, Pentler and the Pentler Principals transferred at least US$5 million to or for the benefit of Ms Touré between July 2010 and May 2012.

### SECTION G: ATTEMPTS TO DESTROY INCRIMINATING MATERIAL

102. Between about April 2012 and April 2013, steps were taken to conceal the assistance provided by Mme Touré to the BSGR Group in procuring the grant of the Mining Licences. Those steps included procuring Mme Touré to sign false testimony and seeking to persuade Mme Touré to destroy (inter alia) original and photocopy versions of:

102.1.  The 2006 Touré MoU.

102.2.  The 2008 Matinda Contracts.

102.3.  The July and August 2010 Contracts.

(the "**Incriminating Documents**")

000172

103. The steps described in the preceding paragraph were taken by Cilins on the instructions of Steinmetz.  The best particulars that the Claimants are currently able to give are as follows:[7]

103.1.   Between April and May 2012, Cilins (acting on Steinmetz's instructions) sought to persuade Mme Touré to sign a declaration falsely stating that she had no relationship with BSGR.  Drafts of the declaration were exchanged between 27 April and 5 May 2012.  At a meeting held between Cilins and Mme Touré's representatives on 8 May 2012, Cilins explained that Mme Touré would receive US$5 million for signing the declaration, though Steinmetz was not prepared to sign a written contract confirming as much.  Later, on 5 June 2012, Noy sent a copy of the said declaration to a BSGR Group consultant asking whether any amendment was necessary.  Noy explained that it would be possible to make amendments because Cilins was still in Florida with Mme Touré.

103.2.   Cilins contacted Mme Touré again on 15 and 16 March 2013 and sought to arrange a meeting with her.  In telephone calls that were recorded and transcribed by the FBI, Cilins stated to Mme Touré that a meeting "will be good for you" and that Mme Touré stood to earn "a lot of money".

103.3.   A meeting took place between Cilins and Mme Touré at Jacksonville airport on 25 March 2013.  During that meeting, Cilins told Mme Touré that she would receive the initial sum of US$300,000 to "destroy these papers" with a further sum to be left with an unspecified lawyer.  By "these papers" Cilins meant (at least) originals and copies of the Incriminating Documents.

103.4.   At a further meeting on 11 April 2013 at Jacksonville airport, Mme Touré told Cilins that she had been approached by the FBI regarding allegations of bribery in Guinea.  During the course of the conversation:

a.   Cilins said that the documents sought by the FBI (and a Grand Jury that had by this stage been convened) must be destroyed "very urgently." Again, Cilins was referring to (at least) originals and copies of the Incriminating Documents.  He went on to say that "You have to destroy everything and deny all of this [viz. any involvement with the Mining Licences.]"

---

[7] Unbeknownst to Cilins, in about January 2013, a US Grand Jury started investigating the transfer to the US of payments made in furtherance of a scheme corruptly to obtain mining concessions over the Simandou region.  It served a subpoena on Mme Touré in about early February 2013, and in about early March 2013 Mme Touré agreed to become a co-operating witness.

b.  Cilins persuaded Mme Touré to sign "a testimony" denying any involvement in procuring the grant of the Mining Licences and seeking to distance herself from I.S. Touré by stating that Mme Touré and I.S. Touré were "rivals" (the "**False Testimony**").

c.  Cilins explained to Mme Touré that the she would receive an initial payment of US$200,000 for destroying the Incriminating Documents and signing the False Testimony, to be paid to her brother in Sierra Leone, together with a further US$800,000 once President Condé died (Cilins represented that he had "very serious cancer" of the pancreas).  Cilins also stated that Mme Touré would receive a further sum, which could be as much as US$5 million, upon the successful exploitation of the Mining Licences.

d.  Cilins explained to Mme Touré that he was acting on the direct instructions of Steinmetz.  He referred to "number 1", and Mme Touré asked if he was referring to Michael (Noy), to which Cilins responded "No, no..Beny [whispering]", and further, "Everything I tell you is directly from Beny. … I travelled to see him directly, face to face … everything I tell you comes from him.  Nobody else. …"

103.5.  At a further meeting held later on 11 April 2013, Mme Touré brought various documents to Jacksonville airport to show Cilins.  They included copies of the 2008 Matinda Contracts.  When Mme Touré said that she would destroy certain documents, Cilins told her "No, no, no.  I'll destroy it."  Cilins also re-iterated that he was taking instructions from Steinmetz.

103.6.  At a further meeting at Jacksonville airport on 14 April 2013, Cilins told Mme Touré that he had US$20,000 in cash to give to her.  Cilins also said that it was in Mme Touré's interests to destroy the Incriminating Documents, that the FBI would put her in prison if she disclosed them, and "it's like an atomic bomb for you".  He sought to persuade Mme Touré to leave America and lie low in Sierra Leone, offering to purchase an airline ticket.  When Cilins got up to check the flight departure boards, he was arrested by the FBI.  He still had the US$20,000 in cash on his person.

103.7.  On 10 March 2014, Cilins pleaded guilty to the offence of obstructing a criminal investigation contrary to Title 18 of the United States Code, Section 1510(a).  On 25 July 2014, Cilins was sentenced to 24 months imprisonment.

000174

## SECTION H: REVOCATION OF THE MINING LICENCES

104. The Mining Licences were revoked by a presidential decree of President Condé dated 17 April 2014, and two Orders of the Ministry of Mining dated 18 and 23 April 2014.  This was following the production of a report by the Guinean Technical Committee for the Review of Mining Titles and Agreements (the "**Technical Committee**").  The Technical Committee concluded that the Mining Licences had been procured by bribery and corruption, in particular by reason of the advantages conferred on Mme Touré to persuade her to exert influence on President Conté.  The Technical Committee's report (produced following an investigation instituted in late 2012 and a hearing conducted in December 2013) placed some reliance on Cilins' attempts to destroy incriminating evidence pleaded above.

## SECTION I: CLAIMS IN DECEIT

**I1      Falsity of the First to Eighth Corruption Representations**

105. The First to Eighth Corruption Representations were each false. Pending disclosure, the Claimants rely on the following matters.

## PARTICULARS IN RELATION TO MME TOURÉ

105.1.   Mme Touré fulfilled the definition of Government Official contained in the Initial and Supplemental DD Questionnaires and the Steinmetz and Clark ABL Certificates because she acted as a representative of, in an official capacity for, and held a ceremonial position within, the GoG: Mme Touré **(i)** was the fourth wife of President Conté, **(ii)** held regular meetings with government ministers in her capacity as the President's wife, **(iii)** frequently attended public events and ceremonies as the spouse of the Head of State (including the opening of the BSGR Group's Conakry office in September 2006 and a ceremony to commemorate the 50th anniversary of Guinea's independence in 2008), on occasion accompanied by the Presidential Guard, and **(iv)** held a diplomatic passport identifying her as the wife of the President of Guinea.  In any event, and at least for the purposes of the Second Corruption Representation, Mme Touré was a spouse of a Guinean Government Official.

105.2.   Mme Touré further fulfilled the definition of a 'government official' as that phrase was used at the FCPA Interview and in the London Meetings with Mr Monteiro: **(i)** in the context of the due diligence exercise being conducted, the participants in

those meetings knew that the meaning of 'government official' at those meetings was the same as the definition used in the Initial and Supplemental DD Questionnaires; and **(ii)** as a matter of ordinary language and in the context of the broad questions asked at those meetings, the term 'government official' included the wife of the President.

105.3.   Mme Touré was promised and received payments or other benefits in connection with the influence that she sought to exert on President Conté and others in order for the BSGR Group to obtain the Mining Licences.  In particular: **(i)** Mme Touré was offered a 33.33% interest in Pentler, was regarded by Pentler and being entitled to such interest, and was later paid at least US$5 million in relation to the same; **(ii)** by the 2008 Matinda Contracts, BSGR ProjectCo agreed to grant Matinda a 5% interest in SB1 and SB2 and pay Matinda the sum of up to US$4 million, an entitlement confirmed by the August 2009 Affidavit (which stated that US$4 million would be paid in four quarterly tranches); and **(iii)** at least one of those tranches was paid to Mme Touré.

105.4.   The promises at 105.3 (ii) and the payments at 105.3 (iii) were made or authorised by BSGR ProjectCo, whether acting directly or indirectly (including through a third party), because: **(i)** BSGR ProjectCo signed the 2008 Matinda Contracts; **(ii)** the August 2009 Affidavit was signed in the presence of BSGR ProjectCo's security director; and **(iii)** the tranche of US$1 million paid to Mme Touré was paid on BSGR ProjectCo's behalf and with its knowledge and assent.

105.5.   Further or alternatively, the promises and payments at 105.3 (i) to 105.3 (iii) were made or authorised by BSGR, whether acting directly or indirectly (including through a third party), because: **(i)** a director of BSGR, Sandra Merloni-Horemans, was involved in the sale of Pentler to the Pentler Principals; **(ii)** Ms Merloni-Horemans was sent a draft of the Touré MoU to review on 15 February 2006 (and it is to be inferred that she thereafter communicated her assent to the terms of the same to Cilins, Noy and/or Lev Ran); **(iii)** BSGR intentionally procured the sale of Pentler and the execution of the BSGR-Pentler Milestone Agreement so as to set up an intermediary that could confer financial benefits on Mme Touré in accordance with BSGR's wishes; **(iv)** BSGR authorised BSGR ProjectCo to enter into the 2008 Matinda Contracts and authorised and procured the payment of the US$1 million tranche that was paid thereunder; and **(v)** BSGR authorised the Pentler SPA, the 2009 BSGR/Pentler Settlement and the subsequent amendments thereto (with at

least US$5 million of the funds paid under those agreements being paid by the Pentler Principals to Mme Touré).

105.6.  Mme Touré in fact exerted influence over President Conté and others in order to procure the grant of the Mining Licences.  Pending disclosure, the Claimants rely in this regard on the First to Twelfth Touré Intercessions pleaded above.

### PARTICULARS IN RELATION TO THIAM

105.7.  Thiam fulfilled the definition of Government Official contained in the Initial and Supplemental DD Questionnaires and the Steinmetz and Clark ABL Certificates because he was the Minister of Mines between mid-January 2009 and the dates on which the said documents were completed. Thiam also fulfilled the definition of a 'government official' as that phrase was used at the FCPA Interview and in the London Meetings with Mr Monteiro.

105.8.  Thiam was promised and received payments or other benefits in connection with the steps he took to confirm the Mining Licences particularised at paragraphs 61 to 62.17 above.  In particular: **(i)** Thiam was reimbursed US$8,017 for Fofana's travel to London in early January 2009, **(ii)** Thiam's air tickets to France, Israel and Hong Kong in May and September 2009 were paid for by the BSGR Group, and **(iii)** Thiam was promised the US$5 million payment that was paid to him in the manner described above in November 2010.  The said payments or promises were made or authorised by BSGR, BSGR Guernsey and BSGR ProjectCo because they were made to obtain the confirmation and extension of the Mining Licences which were held by BSGR ProjectCo, whose parent company was (after February 2009) BSGR Guernsey and whose indirect parent company was BSGR.

### PARTICULARS: GENERAL

105.9.  Accordingly, the First and Second Corruption Representations were false because **(i)** Mme Touré was a Government Official or (for the purposes of the Second Corruption Representation only) was the spouse of a Government Official, **(ii)** BSGR ProjectCo entered into the 2008 Matinda Contracts with Mme Touré and thereby promised her a payment or benefit, and **(iii)** the part payments made thereunder were authorised by and made on behalf of BSGR ProjectCo.

105.10. The First and Second Corruption Representations were also false because **(i)** Thiam was a Government Official, **(ii)** Thiam was promised and received payments or other benefits in connection with the steps he took to confirm and extend the

Mining Licences, and **(iii)** the said payments and promises were made on behalf of BSGR Guernsey and BSGR ProjectCo.

105.11. The Third Corruption Representation was false because, in addition to the matters relied upon in 105.9 to 105.10 above, BSGR procured and authorised (whether directly or indirectly) **(i)** Pentler's entry into the Touré MoU as a means of conferring a financial benefit on Mme Touré and **(ii)** the payments and promises of payments or other benefits made to Thiam.

105.12. The Fourth Corruption Representation was false: **(i)** for the reasons given at 105.9 to 105.11 above, **(ii)** because Steinmetz, Avidan and Struik, acting on behalf of BSGR and/or BSGR ProjectCo, held multiple meetings with the President of Guinea, the Prime Minister of Guinea, the Minister of Mines and others with a view to seeking to have the Rio Tinto Concessions revoked (pleaded in paragraphs [39] to [49] above); and **(iii)** Mme Touré, acting on behalf of BSGR and/or BSGR ProjectCo, attended a number of those/similar meetings for the same purpose (see to First to Twelfth Touré Intercessions).

105.13. The Fifth Corruption Representation was false for the same reasons as are given at 105.9 to 105.12 above.

105.14. The Sixth Corruption Representation was false because **(i)** Steinmetz authorised the making of the promises and payments identified at 105.3 and 105.8 above, **(ii)** BSGR Guernsey was introduced into the corporate structure in February 2009 and accordingly was BSGR ProjectCo's direct parent company and authorised the payment of the US$1 million tranche to Mme Touré on behalf of BSGR ProjectCo in 2009, the plane tickets bought for/by Thiam in 2009 and the US$5 million which he was to be paid in November 2010, and **(iii)** the payments so authorised related to the business of BSGR Guernsey and/or its subsidiaries and/or the transactions contemplated by the JVA because they concerned the Mining Licences.

105.15. The Seventh Corruption Representation was false because **(i)** BSGR, its subsidiaries or affiliates had promised and/or authorised the payment of money or something of value to Mme Touré and Thiam (for the reasons set out above) and **(ii)** Clark knew or had reason to believe that this was the case (for the reasons set out below).

46

105.16. The Eighth Corruption Representation was false because **(i)** BSGR, its subsidiaries or affiliates had made, promised and/or authorised the payment of money or something of value to Mme Touré and Thiam (for the reasons set out above); **(ii)** the Mining Licences had not been obtained and confirmed through a 'clean' process but had involved bribery of Mme Touré and Thiam; and **(iii)** BSGR did not do the "right things" in obtaining the Mining Licences, but instead obtained them by procuring improper payments to Mme Touré to intercede on its behalf and to Thiam to procure the confirmation and extension of the same.

**I2       Falsity of the First to Third Consultancy Representations**

106. The First to Third Consultancy Representations were each false. Pending disclosure, the Claimants rely on the following matters.

<u>**PARTICULARS IN RELATION TO CILINS**</u>

106.1. Cilins acted as a consultant, representative, agent and/or intermediary to BSGR ProjectCo and was a member of the local advisory team retained by BSGR and/or BSGR ProjectCo (whether directly or indirectly), as is demonstrated by the following facts and matters:

a.   In July 2005, Cilins arranged and attended a meeting between Oron (on behalf of BSGR) and the Minister of Mines.

b.   In 2005, Cilins introduced BSGR (Oron and Struik) to Bah and I.S. Touré and conducted research at the CPDM for BSGR in relation to mining opportunities in Simandou.

c.   In 2005 and thereafter, Cilins cultivated a relationship with Mme Touré for the benefit of and/or on behalf of (inter alia) BSGR and (after its incorporation) BSGR ProjectCo.

d.   Between late 2005 and the end of 2006, Cilins arranged and attended every meeting held between representatives of BSGR and/or BSGR ProjectCo and President Conté and/or other Guinean officials.  Those meetings included the meetings particularised in paragraphs 38 to 43 above.

000179

e.   In early 2006, Noy and Cilins accompanied Oron to assist him in finalising the February 2006 MoU (which, whilst entered into on behalf of BSGR BVI, related to licences that BSGR ProjectCo was later to obtain).

f.   Before Avidan arrived in Guinea in about June 2006, Cilins was intimately connected with all of BSGR and BSGR ProjectCo's activities including because he had to translate virtually all instructions issued by Struik into French.

g.   Cilins provided logistical advice and assistance, including sourcing and establishing a local office for the BSGR Group in Conakry, hiring local staff, arranging for geologists to visit potential mining sites, and presenting BSGR's mining plans at a press conference held when the Conakry office was opened in September 2006.

h.   Cilins received a monthly stipend of US$10,000 from (at least) January to June 2006 from the BSGR Group, received other consultancy fees (including part of the US$250,000 paid for the benefit of Cilins, Lev Ran and Noy in May 2006) and was reimbursed for his expenses.

i.   Cilins allowed BSGR and BSGR ProjectCo to use his Conakry bank account to receive funds and pay necessary expenses.

j.   Cilins helped to present BSGR and BSGR ProjectCo's progress at Zogota to the Ministry of Mines in 2008.

k.   When Pentler entered into the Pentler SPA, it agreed that "The Consultant (Pentler's shareholders) will continue to advise and act as consultant for the period of 5 years from signing date hereof to the best interest of [BSGR BVI]". Pentler's shareholders included Cilins and it is to be inferred from the matters pleaded herein that Cilins continued to act on behalf of BSGR and BSGR ProjectCo on a regular basis.

l.   In April and May 2012 Cilins sought to convince Mme Touré to sign a declaration denying that she had ever received bribes or entered into illegal contracts regarding the BSGR Group's activities.

48

    m. Cilins again travelled to Florida (on Steinmetz's instructions) in 2013 to meet Mme Touré and to offer her money to destroy the Incriminating Documents and sign the False Testimony.

**<u>PARTICULARS IN RELATION TO PENTLER</u>**

106.2. Pentler acted as an intermediary (alternatively, as a consultant, representative and/or agent) to BSGR and/or BSGR ProjectCo and was a member of the local advisory team retained by BSGR and/or BSGR ProjectCo (whether directly or indirectly), as is demonstrated by the following facts and matters:

    a. Pentler was sold by Onyx to the Pentler Principals as a company through which they could conduct their Guinean affairs. Pentler was intended to be, and was, the corporate vehicle used by the Pentler Principals to represent and act for BSGR and (later) BSGR ProjectCo in Guinea.

    b. The Pentler Principals were all shareholders of Pentler from about February 2006 and their acts are to be attributed to the company.

    c. BSG MM and Pentler entered into the BSGR-Pentler Services Agreement on about 20 February 2006, backdated to 15 October 2005.

    d. When Pentler entered into the BSGR-Pentler Milestone Agreement with BSGR BVI it agreed  "to continue its efforts to reach an agreement for [SB1] and [SB2] and assist in acquiring these blocks for the Simandou Iron Ore Project and to assist in any possible way with the Simandou Iron Ore Project."  The company that was seeking to obtain licences to SB1 and SB2 and thereafter exploit the reserves available in those blocks was (as from the date of its incorporation) BSGR ProjectCo.

    e. Pentler complied with this obligation by (inter alia) entering into the Pentler-Bah, Penter-Daou and Touré MoU, thereby obtaining the assistance and services of Bah, I.S. Touré, Daou and Mme Touré for the benefit of BSGR and BSGR ProjectCo.  As is noted above, BSGR BVI paid or procured the first payment of the US$500,000 due under the first two of those agreements in cash directly to Bah, I.S. Touré and Daou.

    f. The BSGR Group regularly paid consultancy fees to Pentler over the course of 2006 and 2007.  For example, on 21 May 2007 Pentler invoiced BSGR BVI in

the amount of US$62,000 for "consultant fees" in relation to "Your mining activity in Guinea", which sum was paid by BSGR BVI shortly thereafter.

g.   Pursuant to the Pentler SPA, Pentler stood to receive US$22 million to be paid in instalments over two years, with a further US$8 million payable to Pentler (or its shareholders) in the event that BSGR Steel realised a profit exceeding US$1 billion from the Simandou project. It is to be inferred that the additional US$8 million payment was intended to encourage Pentler to continue to act as an intermediary (or consultant, representative or agent) of BSGR or BSGR ProjectCo in Guinea.

## PARTICULARS IN RELATION TO BOUTROS

106.3.   Boutros and/or LMS acted as a consultant or intermediary for BSGR, BSGR Guinea and BSGR ProjectCo:

a.   By contract dated "2008", entitled "Subcontracting and Service Provision Agreement", Boutros' company LMS purported to agree to supply various services to BSGR ProjectCo (the "**Boutros Contract**").  The Boutros Contract provided that payments due thereunder would be made within 30 days of receipt of an invoice.

b.   Thereafter 16 payments were made by the BSGR Group to Boutros, LMS or the Belgian bank account of an "Adama Sidibe", as follows (the "**Boutros Payments**"):

| Payment | Date | Recipient | Amount (US$) |
|---|---|---|---|
| 1 | 18.2.09 | Boutros | 100,000 |
| 2 | 18.3.09 | Boutros | 27,445 |
| 3 | 6.4.09 | Boutros | 200,000 |
| 4 | 27.4.09 | Boutros | 148,500 |
| 5 | 8.7.09 | Boutros | 60,000 |
| 6 | 30.7.09 | Boutros | 100,000 |
| 7 | 18.8.09 | LMS | 1,300,000 |
| 8 | 12.11.09 | LMS | 100,000 |
| 9 | 16.2.10 | Adama Sidibe | 1,000,000 |
| 10 | 1.3.10 | Adama Sidibe | 300,000 |
| 11 | 8.3.10 | Adama Sidibe | 550,000 |
| 12 | 24.3.10 | Adama Sidibe | 300,000 |

000182

| 13 | 29.3.10 | Adama Sidibe | 250,000 |
|----|---------|--------------|---------|
| 14 | 9.4.10 | Adama Sidibe | 212,000 |
| 15 | 12.4.10 | Adama Sidibe | 325,000 |
| 16 | 21.4.10 | Adama Sidibe | 200,000 |
| | | | **5,172,945** |

c.   As pleaded in paragraphs 31 and 57 to 58 above, Payment 7 was described by Tchelet as a payment for Boutros' "consulting fee" but was in fact used to pay US$998,000 to Mme Touré.

d.   The BSGR Group's records suggest that some or all of the Boutros Payments were made in return for the supply of mining-related equipment or works to group members.   In fact the Boutros Payments or the vast majority of them were paid in order that Boutros could act as an intermediary in the payment of bribes, as is to be inferred by: **(i)** the matters pleaded above in relation to Payment 7, **(ii)** the round-number sums of all but one of the Boutros Payments, **(iii)** the scant detail provided on the vast majority of the invoices produced to support the making of the Boutros Payments, **(iv)** the authorisation and/or making of several of the Boutros Payments before an invoice had been received,[8] **(v)** the fact that instructions were issued to make several of the Boutros Payments "today", "now", or on an "urgent" or "very urgent" or "extremely urgent" basis (notwithstanding the 30 day grace period in the Boutros Contract),[9] **(vi)** manuscript notes on internal BSGR Group records to the effect that a number of the payments should be removed from the 'consulting' bookkeeping code and distributed amongst other codes,[10] **(vii)** Tchelet's statement by email on 5 April 2009 that details of Payments 3 and 4 "must remain in Gsy [Guernsey]" and **(viii)** instructions given by Tchelet on or about 21 April 2009 to "remove Ghassan Boutros' name from Guinea Spreadsheet".

e.   Further or alternatively, Boutros and/or LMS acted as a consultant for BSGR, BSGR Guinea and/or BSGR ProjectCo (as recorded in internal BSGR Group emails and/or as initially recorded on payment instructions sent/produced in relation to Payments 1, 6, 7, 8, 9, 10, 11, 12).

---

[8]   Payments 5, 6, 7, 8, 9, 11, 12, 13, 15 and 16.
[9]   Payments 5, 9, 10, 13, 14 and 16.
[10]   At least payments 1, 6, 7, 8, 10, 12 and 13.

000183

**PARTICULARS IN RELATION TO I.S. TOURÉ**

106.4.  I. S. Touré was the half-brother of Mme Touré and was therefore related to both Mme Touré (by blood) and President Conté (by marriage).

**PARTICULARS: GENERAL**

106.5.  Accordingly, the First Consultancy Representations were false: **(i)** Cilins acted (directly or indirectly) as a consultant, representative, agent or intermediary on behalf of (inter alia) BSGR ProjectCo; **(ii)** Cilins interacted with the GoG when he arranged and attended meetings with Guinean officials including President Conté and the Minister of Mines; and **(iii)** such interaction related to BSGR ProjectCo's attempts to obtain the Mining Licences.

106.6.  Further or alternatively, the First Consultancy Representations were also false because **(i)** Pentler acted (directly or indirectly) as a consultant, representative, agent or intermediary on behalf of (inter alia) BSGR ProjectCo; **(ii)** Pentler interacted with the GoG when it entered into the Touré MoU with Mme Touré; and **(iii)** the Touré MoU was entered into to procure Mme Touré's assistance with obtaining the Mining Licences.

106.7.  Further or alternatively, the First Consultancy Representations were also false because Boutros and/or LMS acted (directly or indirectly) as representatives, brokers or intermediaries on behalf of (inter alia) BSGR ProjectCo by channelling funds to Mme Touré and/or acting as a consultant in respect of BSGR ProjectCo's operations.

106.8.  Further or alternatively, the First Consultancy Representations were also false because Thiam acted as a representative on behalf of BSGR ProjectCo and BSGR Guernsey. Paragraph 62 is repeated. In particular Thiam acted as a representative of BSGR ProjectCo and BSGR Guernsey when **(i)** he interacted with the LIA and exchanged informal emails with Steinmetz in May 2009, **(ii)** he interacted and met with representatives of CIC and Baosteel, and **(iii)** he assisted the BSGR Group in its negotiations for the Base Convention.

106.9.  The Second Consultancy Representation was false because the local advisory team engaged by BSGR and BSGR ProjectCo (whether directly or indirectly) included Cilins, Pentler, Boutros and LMS, and Thiam.

106.10. The Third Consultancy Representations were false because **(i)** BSGR and BSGR ProjectCo made extensive use of consultants who possessed no mining skills or expertise, including Cilins, Pentler, Boutros and LMS and Thiam and **(ii)** I.S. Touré was related to Mme Touré and President Conté.

**I3     Falsity of the Fourth Consultancy Representation**

107. The Fourth Consultancy Representation was false. Pending disclosure, the Claimants rely on the following matters.

107.1.  The transaction by which BSGR Steel purchased the minority shareholding in BSGR BVI from Pentler was not a transaction carried out for tax planning purposes internal to the Balda group. Instead, it involved the purchase of the 17.65% shareholding in BSGR BVI held by Pentler, a company external to the Balda group (owned by the Pentler Principals and Mme Touré). It did not have any, or any substantial, tax planning or fiscal motivation.

107.2.  The purpose of the Pentler SPA was to reward the Pentler shareholders (the Pentler Principals and Mme Touré) by making significant payments to them for their work for BSGR / BSGR ProjectCo in Guinea. It also served to ensure that they continued to work to obtain mining licences for BSGR / BSGR ProjectCo in relation to the Simandou project by **(i)** securing their services as consultants for a period of 5 years and **(ii)** promising them a US$8 million payment if BSGR Steel realised a US$1 billion profit on the Simandou project.

**I4     Steinmetz knew that the representations were false or acted recklessly[11]**

108. It is to be inferred that Steinmetz made each of the Corruption and Consultancy Representations knowing it was false, without belief in its truth, or reckless as to whether it was true or not:

108.1.  Steinmetz was the ultimate beneficial owner of the BSGR Group and controlled all material decisions relating to the BSGR Group, BSGR and its sale of the Shares.

108.2.  Steinmetz was closely connected with BSGR's business in Guinea.  In particular **(i)** Steinmetz attended at least four meetings to discuss the grant of mining licences

---

[11]     Pending disclosure, the Claimants rely on the particulars set out in this and the following sections as establishing the knowledge and/or recklessness of the defendants.

000185

over SB1 and SB2 at which one of or both President Conté and Mme Touré were present (the Eighth, Ninth and Twelfth Touré Intercessions and the meeting pleaded in paragraph 48.6 above), **(ii)** Steinmetz was sent and responded to the September 2007 Email, as defined and explained below, **(iii)** Steinmetz led the negotiations that culminated in the execution of the Pentler SPA and was personally involved in the negotiation of the 2009 BSGR/Pentler Settlement, and **(iv)** Steinmetz was in regular contact with Thiam over the course of 2009 and 2010.

108.3.  Steinmetz agreed to grant bonuses in the total amount of US$18.2 million to the Second to Sixth Defendants in return for the roles they played in procuring Vale to enter into the SHA and JVA.

108.4.  Steinmetz obtained a huge financial windfall as a result of Vale entering into the JVA and SHA.

108.5.  On 18 September 2007, Avidan emailed Steinmetz and Struik to update them on news from the Minister of Mines.  Avidan stated that **(i)** the minister had assured him that licences would be granted to the BSGR Group in relation to SB1 and SB2 and that "it is just a matter of technical issues"; **(ii)** the Minister of Mines had suggested that BSGR prepare a presentation on their investments in the country, following which "the President will take it [SB1 and SB2] away from Rio Tinto … and will hand it over to BSGR"; and **(iii)** "In the next few days I am going to meet some of the key people in the country including the Prime minister, the Lady [sc. Mme Touré] and maybe the President to push them forward so as to reduce some technical and administrative problems".  Steinmetz responded to the September 2007 Email as follows: "We should NOT talk about Rio [Tinto] in any written paper, as it is not our problem and government should do their own decision and otherwise it can come back to us as a bo[o]merang ! [sic]" (the "**September 2007 Email**").

108.6.  It is clear from the terms of the September 2007 Email that Steinmetz knew and approved of the role being fulfilled by Mme Touré in procuring the grant of the Mining Licences and that this role was improper.

108.7.  Steinmetz gave instructions for the 31 March 2010 Restructuring to be carried into effect for the purpose of concealing from Vale the role played by Pentler and its shareholders in securing the Mining Licences.

108.8. It is inherently unlikely that Steinmetz did not approve (1) the BSGR-Pentler Milestone Agreement, the Touré MoU, the Pentler-Bah and Pentler-Daou Agreements, (2) the Pentler SPA, and (3) the 2008 Matinda Contracts, each of which imposed a substantial financial liability on a member of the BSGR Group.

108.9. It is inherently unlikely that a company within the BSGR Group would have paid a substantial bribe without the knowledge or consent of Steinmetz.

108.10. Steinmetz gave Cilins instructions to visit Mme Touré in 2012 for the purposes of persuading her to sign a declaration falsely stating that she had no relationship with the BSGR Group.

108.11. Steinmetz gave Cilins instructions to visit Mme Touré in Florida in 2013 for the purposes of procuring her to sign the False Testimony and of destroying the Incriminating Documents in return for the payment of at least US$1 million and possibly as much as US$6 million.

108.12. The Pentler SPA (negotiated by Steinmetz) provides that Pentler's shareholders would "continue to advise and act as a [BSGR BVI] consultant for the period of 5 years ….".

108.13. Steinmetz's Blackberry was seized shortly after Cilins' arrest in April 2013. It contained a Florida telephone number for "Fred US", which it is inferred, is Cilins. In addition, it is to be inferred that Cilins was also one of Steinmetz's Blackberry messenger contacts, as the Florida number and a French number (also saved as "Fred") had associated Blackberry PIN numbers.

108.14. Steinmetz sent or received emails from Thiam on 24 and 26 May and 8 June 2009 (in connection with the BSGR Group's discussions with the LIA), 30 December 2009 (in connection with the BSGR Group's discussions with Baosteel), 4 January 2010 (in connection with a presentation to be given by the BSGR Group in China about the Simandou project), 30 April 2010 (in connection with a press release to be issued about the Vale/BSGR joint venture), 26 June 2010 (after the JVA had been entered into, with Thiam sending Steinmetz a confidential GoG letter) and 5 November 2010 (with Thiam forwarding Steinmetz an email about GoG negotiations that may affect the joint venture).

108.15. By reason of his position in the BSGR Group (as referred to above) it is to be inferred that Steinmetz knew and approved of the substantial payments made to Boutros / LMS and the purpose for which those payments were made.

108.16. Steinmetz knew that the Pentler SPA did not involve another group company or a tax planning transaction, and in fact involved the purchase of shares from a company owned by the Pentler Principals and Mme Touré.  On his own evidence in the arbitration, Steinmetz knew about BSGR's relationship with Pentler but did not disclose Pentler to Vale on the basis of advice which he falsely claimed had been given by Skadden.

## I5    Cramer knew that the representations were false or acted recklessly

109. It is to be inferred that Cramer made each of the Corruption and Consultancy Representations knowing it was false, without belief in its truth, or reckless as to whether it was true or not:

109.1.   Cramer was Steinmetz's second-in-command, as is shown by the matters pleaded below, and it is to be inferred would have known of the manner in which the Mining Licences were obtained and confirmed.

109.2.   Cramer and Onyx (a company ultimately beneficially owned and controlled by Cramer, of which he was the CEO and a director) were entrusted with day-to-day management issues arising in the BSGR Group by Balda, the ultimate corporate owner of BSGR and BSGR ProjectCo.  Cramer attended regular meetings of Balda's foundation council to update them on the BSGR Group's business.

109.3.   Cramer was appointed as a director of BSGR in or around 2004, a position he still holds. By about 2008, Cramer had effectively become the CEO of the BSGR Group.

109.4.   Onyx, whose main client was the BSGR Group, provided company secretarial, treasury, taxation advisory and corporate finance services to the BSGR Group in connection with the Simandou project, and made a number of representations in the Supplemental DD Questionnaire.

109.5.   Cramer was a required signatory of the BSGR Group for all payments exceeding US$5 million.

109.6.   The JVA provided for Cramer to become one of the two BSGR Directors in the BSGR/Vale joint venture.

109.7.  Steinmetz and Cramer attended a meeting with Eduardo Ledsham in February/March 2010 in London at which Steinmetz proposed terms that were similar to those ultimately contained in the JVA.  Thereafter, Cramer was closely involved in the BSGR Group's negotiations with Vale.  In particular, Cramer attended the FCPA Interview and was one of two BSGR Group executives copied to Tchelet's email returning the Initial and Supplemental Due Diligence Questionnaires to Vale.  Later, in about April/May 2010, Cramer visited Panama with Steinmetz and two Vale executives (including its CEO).

109.8.  Cramer was promised a bonus of US$10 million in return for the role that he played in procuring Vale to enter into the JVA and SHA.  Of this sum, at least US$3 million was paid.

109.9.  Onyx was granted a bonus by Balda of US$2.5 million in return for the role that it played in procuring Vale to enter into the JVA and SHA.

109.10. Onyx sold Pentler to the Pentler Principals in February 2006. It is to be inferred from **(i)** his position within Onyx, **(ii)** that this was a highly unusual transaction for Onyx, and **(iii)** the other matters referred to herein, that Cramer knew about the sale and the purpose of the sale (viz., to provide a company which could be used by the Pentler Principals to act as an intermediary for the BSGR Group in Guinea and as a mechanism by which money could be channelled in bribes to individuals in Guinea to assist in obtaining the Mining Licences).

109.11. It is to be inferred that Cramer was aware of and/or may have expressly approved the making of a payment of US$4 million to Pentler on about 28 July 2009, pursuant to the 2009 BSGR/Pentler Settlement. The initials on the payment instruction are 'DC', which it is to be inferred refers to Cramer or to Clark.

109.12. Cramer was responsible for the corporate structure by which the BSGR Group ultimately held the Mining Licences, including the changes to that structure effected by the 31 March 2010 Restructuring. It is to be inferred that he knew that the purpose of the restructuring was to conceal from Vale the role played by Pentler and its shareholders in securing the Mining Licences.

109.13. Cramer presented the Vale/BSGR joint venture to the Balda foundation council to obtain Balda's approval for the deal.

000189

109.14. When, in April 2010, Clifford Chance raised concerns with Skadden regarding bribery charges against Ehud Olmert (who had been involved in promoting BSGR's interests in Guinea), Skadden consulted Cramer in relation to those concerns.

109.15. On 10 May 2010, ten days after the JVA and SHA were signed, Tchelet sent Cramer an email with the subject line "Settlement in respect of Pentler" (the "**10 May 2010 Email**"). It asked Cramer to transfer US$22 million "for value today" so that Windpoint could pay Pentler that sum in "final settlement" of its rights under the Pentler SPA once "the indemnity and settlement letters have been signed by Pentler". Cramer responded "Please proceed". On 10 May 2010 US$22 million was transferred by BSGR to Nysco and thereafter by Nysco to Windpoint which in turn paid it to Pentler. It is to be inferred from the contents of the said email and the other steps that were taken to hide Pentler's involvement with procuring the grant of the Mining Licences that the settlement with Pentler was being negotiated by (inter alios) Cramer and Tchelet at the same time as the JVA and SHA, that Cramer was fully aware of the role played by Pentler in connection with the Mining Licences, and that Windpoint was used to make the payment to distance it from the BSGR Group.

109.16. Cramer was involved in BSGR's relationship with Thiam. He arranged for an invitation letter to be sent facilitating Fofana's travel to London to attend the planned meeting between BSGR and Thiam in early 2009; he was forwarded a letter from Thiam in February 2009 in relation to BSGR and Rio Tinto's rights to conduct exploration activities in North and South Simandou; and Steinmetz copied Cramer to his February 2010 email stating that it was *"great, great news!!!!"* that Thiam had been reappointed as Minister of Mines.

109.17. By reason of his position in the BSGR Group (as referred to above) it is to be inferred that Cramer knew and approved of the substantial payments made to Boutros / LMS and the purpose for which those payments were made.

109.18. Cramer knew that the Pentler SPA did not involve another group company or a tax planning transaction, and in fact involved the purchase of shares from a company owned by the Pentler Principals and Mme Touré.

**I6**      **Struik knew that the representations were false or acted recklessly**

110. It is to be inferred that Struik made each of the Corruption and Consultancy Representations knowing it was false, without belief in its truth, or reckless as to whether it was true or not:

110.1.   From about February to June 2006, Struik ran the BSGR Group's business in Guinea.  After Avidan was appointed as the BSGR Group's country manager in June 2006, Struik remained closely involved in the Simandou project.

110.2.   Struik was appointed as the CEO of BSG MM in May 2007 and was thereafter responsible for all of the BSGR Group's worldwide mining projects (whether in their exploration or production phases). He was therefore responsible for the BSGR Group's Simandou project, and would have known of the manner in which the Mining Licences were obtained and confirmed.

110.3.   Struik was promised a bonus of US$3 million in return for the role that he played in procuring Vale to enter into the JVA and SHA. Of this sum, at least US$2 million was paid.

110.4.   BSG MM, of which Struik was a director, entered into the BSGR-Pentler Services Agreement.

110.5.   Struik signed the Pentler Milestone Agreement on behalf of BSGR BVI.

110.6.   By email dated 2 March 2006, Struik confirmed that 17.65% of the shares in BSGR BVI could be transferred to Pentler.

110.7.   Struik was present in February 2006 when Oron paid Bah, Daou and I.S. Touré US$500,000 in cash in a hotel in Conakry pursuant to the Milestone Agreements between Pentler and those individuals.

110.8.   On 10 May 2006, Struik emailed Oron in relation to bauxite permits that had recently been granted to the BSGR Group.  He stated: "The Lady [viz. Mme Touré] phoned [Cilins] today … asking him whether I was happy now with these permits. [Noy] also phoned me saying that we need to process the 'first payment' now, hence the invoice attached (which I asked for)." (the "**May 2006 Email**"). Two days later, Struik confirmed that the invoice (in the amount of US$250,000) was for Cilins' services and success fees.  Tchelet later confirmed that the said invoice related to Cilins' work in relation to BSGR's bauxite and iron ore activities in Guinea.

59

This exercise demonstrates that Struik was fully aware from the outset of the roles played by Cilins and Mme Touré for the BSGR Group.

110.9.  Struik attended the meeting defined above as the Fifth Touré Intercession, held late at night between Avidan, Struik, Mme Touré and President Conté at the Presidential Palace.

110.10.Struik attended the September 2006 press conference given by the BSGR Group together with (inter alios) Cilins and I.S. Touré.

110.11.Struik was one of the three recipients of the September 2007 Email.

110.12.On about 30 November 2009, Struik received a letter written by Bah, attaching copies of the BSGR-Pentler and Pentler-Bah Milestone Agreements.  Bah stated that the Pentler-Bah Milestone Agreement had been entered into under Struik's supervision and threatened legal action unless the US$15.2 million that he alleged was outstanding under it was paid.

110.13.Struik was closely involved in negotiating the Base Convention and was a signatory to the same, such that it is to be inferred that he knew of the assistance provided by Thiam in connection with the said negotiations.

110.14.Struik was copied to a further letter from Bah on or around 26 March 2010, addressed to Cilins and Lev Ran as directors of Pentler.  Again, the letter demanded payment of US$15.2 million (though seemingly only from Pentler). Shortly thereafter, Struik sent an email to (inter alia) Clark stating that a "schmuck" from Mali (Bah) had sent a further letter by email and instructing them to "ignore and delete" the same.

110.15.The 31 March 2010 Restructuring was carried out with Struik's assistance and/or to his knowledge. It is to be inferred that he knew that the purpose of the restructuring was to conceal from Vale the role played by Pentler and its shareholders in securing the Mining Licences.

110.16.Struik ran the BSGR Group's Guinean business over the first half of 2006 with the help of Cilins, who also acted as his translator and assistant.  Over the same period, Struik gave temporary employment to I.S. Touré which led to I.S. Touré's part-time

employment by BSGR from February 2006 and full-time employment by BSGR ProjectCo in early 2007.

110.17. Struik recommended to the BSGR board that US$5 million be paid to CCS, purportedly as the price of obtaining exclusive access to due diligence on a Mozambique coal mine. In fact, the US$5 million was ultimately paid to Thiam for his assistance in securing and confirming the Mining Licences. It is to be inferred from the matters pleaded in this paragraph and at paragraphs 62.15 to 62.16 above that Struik knew that this was the case.

110.18. Struik knew that the Pentler SPA did not involve another group company or a tax planning transaction, and in fact involved the purchase of shares from a company owned by the Pentler Principals and Mme Touré.

**I7      Avidan knew that the representations were false or acted recklessly**

111. It is to be inferred that Avidan made each of the Corruption and Consultancy Representations knowing it was false, without belief in its truth, or reckless as to whether it was true or not:

111.1.   Avidan was appointed as the BSGR Group's Guinea country manager and moved to Guinea in about June 2006. He thereafter became intimately familiar with all of the BSGR Group's activities in Guinea.   Avidan was appointed as BSGR ProjectCo's President on or about June 2006, and signed the Base Convention on its behalf in December 2009.

111.2.   Avidan was promised a bonus of US$3.75 million in return for the role that he played in procuring Vale to enter into the JVA and SHA. Of this sum, at least US$2.5 million was paid. In addition, Avidan's company Fefania received a further US$2.8 million from Windpoint on or about 22 October 2010; US$1.7 million from BSGR on or about 24 November 2010; and US$1.42 million from Windpoint on or about 31 January 2011.

111.3.   Avidan was the author of the September 2007 Email.

111.4.   Avidan attended the meetings defined above as the Fifth, Eighth to Tenth and Twelfth Touré Intercessions and met President Conte on about seven or eight occasions.

000193

111.5.   Avidan signed the 2008 Matinda Contracts on behalf of BSGR ProjectCo.

111.6.   Each invoice produced purportedly to justify the Boutros Payments was addressed to Avidan.  It is to be inferred from this fact, Avidan's position as country manager and the other matters pleaded herein that Avidan was aware of and approved the making of each of the Boutros Payments and knew that they were to be used to pay bribes in whole or in part.

111.7.   Avidan was closely involved in negotiating the Base Convention and was a signatory to the same. Avidan was also copied on emails in which Thiam advised on the Base Convention negotiations, such that he knew that Thiam was acting as a consultant, adviser, intermediary and representative to the BSGR Group.

111.8.   The 31 March 2010 Restructuring was carried out with Avidan's assistance and/or to his knowledge. It is to be inferred that he knew that the purpose of the restructuring was to conceal from Vale the role played by Pentler and its shareholders in securing the Mining Licences.

111.9.   Shortly after Avidan's arrival in Guinea, he was introduced to Cilins and I.S. Touré. Avidan worked closely with Cilins between the middle and late 2006 and had a very close working relationship with I.S. Touré from the end of 2006.

111.10. Avidan was aware of the Pentler and Bah disputes and the demands for success fees by Pentler and Bah in connection with the licences obtained over SB1 and SB2.

111.11. Avidan knew that the Pentler SPA did not involve another group company or a tax planning transaction, and in fact involved the purchase of shares from a company owned by the Pentler Principals and Mme Touré

## I8      Tchelet knew that the representations were false or acted recklessly

112. It is to be inferred that Tchelet made each of the Corruption and Consultancy Representations knowing it was false, without belief in its truth, or reckless as to whether it was true or not:

112.1.   Tchelet was the BSGR Group's CFO until August 2008 and thereafter worked as a "strategic financial specialist". He was closely involved with all financial decisions

000194

relating to the BSGR Group's Guinean operations, visiting Guinea for these purposes on at least seven occasions between July 2008 and June 2010.

112.2. Tchelet was promised a bonus of US$1.2 million in return for the role that he played in procuring Vale to enter into the JVA and SHA. Of this sum, at least US$800,000 was paid.

112.3. Tchelet was copied to Struik's email of 2 March 2006 giving instructions for the transfer of 17.65% of the shares in BSGR BVI to Pentler.

112.4. In 2006, Tchelet was involved in approving consultancy payments to Pentler including: **(i)** payments totalling $125,000 for "assistance in the signature of the Memorandum of Understanding for the Simandou North and South iron ore deposits", and **(ii)** payment of a further $250,000 which Tchelet was told by Roy Oron were for Cilins' "services and success fees".

112.5. On 11 May 2006, Tchelet was sent Struik's email of the previous day in which he (Struik) **(i)** referred to "The Lady" (ie Mme Touré) having telephoned Cilins to ask him whether he was happy with bauxite permits that had been obtained and **(ii)** asked for Cilins' invoice of 10 May 2006 to be paid.  Tchelet gave the necessary payment instructions, explaining in subsequent emails that they were (contrary to the face of the invoice) referable to both bauxite and iron ore-related activity.

112.6. Between February 2009 and April 2010, Tchelet gave instructions for the payment of each of the Boutros Payments with knowledge of the facts pleaded in paragraph 106.3(d) above.  It is to be inferred from the matters pleaded herein that Tchelet approved the making of each of the Boutros Payments knowing that they were to be used to pay bribes in whole or in part.

112.7. Tchelet took steps to conceal the nature of the payments made to Boutros / LMS and Pentler:

a. On 10 March 2009, Tchelet rebuked a BSGR Group employee for sending a list of invoices that had been paid by the BSGR Group in relation to the Simandou project in February 2009 to BSGR ProjectCo's Guinean accountant. That list included reference to Boutros.  Tchelet stated: "Why was this sent with names—very bad!!  I specifically asked you not to include names and take care

for good reason!" and "From now on all Gsy correspondence must be sent to me only not to Tania or anyone in Guinea."

b.   On 5 April 2009, Tchelet instructed a member of the BSGR Group's accountancy team as follows (in relation to Boutros Payments 3 and 4): "Please ensure to speak to me about this tomorrow-these details must remain in Gsy—please speak with me on this tomorrow."  Later, on about 20 April 2009, Tchelet gave instructions to a member of the BSGR Group's accountancy team to "remove Ghassan Boutros' name from Guinea Spreadsheet".

c.   On 21 April 2009, Tchelet instructed a member of the BSGR Group's accountancy team to remove reference to US$4 million of "purchase fees paid to Pentler from this report ASAP", that he had given the report to the local accountant "after having removed" reference to the purchase fees, and that no reference to purchase fees paid to Pentler should be included on any subsequent report.

d.   On 26 April 2009, Tchelet sent a further email stating "What is sensitive is the names in respect of consulting fees paid – please always check with me first before sending reports which include details to her or anyone inside Guinea. Also, under no circumstances should any details relating to payments to Pentler, past or pending or future be sent to anyone inside Guinea without speaking with me first." (emphasis supplied)

e.   On 17 August 2009, Tchelet emailed (inter alios) Clark to provide banking details to be used "for the USD1.3 million consulting fee payment to Ghassan". As pleaded above, US$998,000 of this sum was later paid to Mme Touré. When giving the instruction, Tchelet stressed that the banking details attached to his email, and "NOT the regular ones", should be used.

f.   It is to be inferred that Tchelet sent these emails because he knew that **(i)** the Boutros Payments had and were being used to pay bribes and **(ii)** Pentler had been involved in paying bribes to Mme Touré.  The emails referred to above are hereinafter referred to as the "**2009 Tchelet Emails**".

112.8.  The 31 March 2010 Restructuring was carried out with Tchelet's assistance and/or to his knowledge. It is to be inferred that he knew that the purpose of the

64

restructuring was to conceal from Vale the role played by Pentler and its shareholders in securing the Mining Licences.

112.9.   Tchelet sent the 10 May 2010 Email.  It is to be inferred from the contents of the said email and the other steps that were taken to hide Pentler's involvement with procuring the grant of the Mining Licences that the settlement with Pentler was being negotiated by (inter alios) Cramer and Tchelet at the same time as the JVA and SHA.

112.10.  In addition to the US$22 million payment to Pentler referred to in the 10 May 2010 Email, Tchelet was involved in approving and effecting payments of US$3 million and US$1.5 million to Pentler in connection with the Pentler Settlement Agreement.

112.11.  Tchelet was involved in authorising payments for Thiam's air travel. It is to be inferred that he knew Thiam was acting as a consultant or intermediary for BSGR / BSGR ProjectCo.

112.12.  Given his role, it is to be inferred that Tchelet was involved in and/or approved the US$5 million payment to CCS and that he knew that the said payment was ultimately for Thiam's benefit.

112.13.  Tchelet knew that Cilins was paid US$10,000 per month by BSGR from January 2006 to (at least) July 2006 for the work he was undertaking for and on behalf of BSGR in Guinea.

112.14.  Tchelet knew that the Pentler SPA did not involve another group company or a tax planning transaction, and in fact involved the purchase of shares from a company owned by the Pentler Principals and Mme Touré.

**I9      Clark knew that the representations were false or acted recklessly**

113. It is to be inferred that Clark made each of the Corruption and Consultancy Representations knowing it was false, without belief in its truth, or reckless as to whether it was true or not:

113.1.   Clark is a chartered accountant with significant audit experience.  He was a director of BSGR and the BSGR Group's treasurer from about March 2007.  He was also the money-laundering reporting officer for BSGR and BSGR Guernsey, as

particularised above.  In the arbitration, Clark stated that "part of my training and background is about professional scepticism and investigation".

113.2.  Clark stated that he had conducted a "thorough review" of the matters addressed in the Initial and Supplemental DD Questionnaires.

113.3.  Clark was promised a bonus of US$250,000 in return for the role that he played in procuring Vale to enter into the JVA and SHA. Of this sum, at least US$180,000 was paid.

113.4.  Clark chaired the board meeting of BSGR which approved the Pentler SPA in March 2008.   That agreement included, inter alia, reference to Pentler's shareholders continuing to act as consultants for a period of five years.

113.5.  Clark was copied into each of the 2009 Tchelet Emails, which as described above sought to remove references to Boutros and Pentler from various accounting documents.  It is to be inferred from the content of the 2009 Tchelet Emails and the other matters referred to herein that Clark knew that Tchelet sent these emails because **(i)** the Boutros Payments had and were being used to pay bribes and **(ii)** Pentler had been involved in paying bribes to Mme Touré.

113.6.  Clark was aware of and/or involved in approving and/or processing instructions for payments to Pentler in 2009, including the payment instruction for US$4 million dated 28 July 2009 (the approval initials are "DC", which it is to be inferred refers to Clark or Cramer).  In addition, Clark signed the payment instruction as having checked it.

113.7.  Between April 2009 and April 2010, Clark approved or was otherwise involved in the process by which at least 12 of the Boutros Payments were made.  In addition to the Tchelet 2009 Emails, Clark: **(i)** acted on Tchelet's instructions of 28 July 2009 to pay US$100,000 to Boutros in the absence of an invoice (Payment 6); **(ii)** acted on Tchelet's instructions of 17 July 2009 to make a US$1.3 million payment to Boutros "tomorrow" that was "NOT" to be entered into the BSGR Group's accounting system in the usual way (Payment 7); **(iii)** acted on Tchelet's instruction of 14 February 2010 to make an "extremely urgent" payment of US$1 million to Boutros in the absence of any underlying invoice (Payment 9); **(iv)** on 1 March 2010 relayed Tchelet's instructions to make a "very urgent" payment of US$300,000 to Boutros (Payment 10); **(v)** acted on Tchelet's instructions of 7 March 2010 to make a payment of US$550,000 to Boutros for "consulting fees"

with "invoice to follow" (Payment 11); and **(vi)** acted on Tchelet's instruction of 29 March 2010 to make a US$250,000 payment to Boutros "today" (Payment 13).

113.8.  In December 2009, Clark was provided with copies of **(i)** the Pentler Milestone Agreement, **(ii)** the Pentler-Bah Milestone Agreement and **(iii)** a statement signed by Bah and Touré explaining that they had received US$425,000 from Pentler in relation to "the mining activities of BSGR Guinea Ltd in the Republic of Guinea". The said documents were enclosed with a letter sent by Bah to Struik and Cilins dated 30 November 2009 demanding the payment of US$15.2 million.  Clark considered Bah's letter and the attachments thereto and responded on 3 December 2009 on behalf of BSGR, threatening a claim against Bah in harassment, defamation and extortion.

113.9.  Clark was provided with a further letter from Bah on or around 26 March 2010, addressed to Cilins and Lev Ran as directors of Pentler.  Again, the letter demanded payment of US$15.2 million (though seemingly only from Pentler). Shortly thereafter, Struik sent an email to (inter alia) Clark stating that a "schmuck" from Mali (Bah) had sent a further letter by email and instructing them to "ignore and delete" the same.  Within a week of receipt of this letter, Clark signed the Initial and Supplemental DD Questionnaires which made no reference to Cilins or Pentler.

113.10. The 31 March 2010 Restructuring was carried out with Clark's assistance and/or to his knowledge. It is to be inferred that he knew that the purpose of the restructuring was to conceal from Vale the role played by Pentler and its shareholders in securing the Mining Licences.

113.11. The 10 May 2010 Email and subsequent exchanges on the topic of the payment to be made for the benefit of Pentler on or shortly after 10 May 2010 were copied to or in one case sent by Clark.  He subsequently sent an email on 12 May 2010 with an instruction to "load" $22 million from Windpoint to Pentler. It is to be inferred **(i)** (from the contents of the said email and the other steps that were taken to hide Pentler's involvement with procuring the grant of the Mining Licences) that the settlement with Pentler was being negotiated by (inter alios) Cramer and Tchelet at the same time as the JVA and SHA and **(ii)** that Clark knew this.

113.12. On 11 April 2012, when asked by Tchelet to find references in Pentler documentation which could "support the decision" that the BSGR Group had made (seemingly in relation to disclosure given to Vale prior to the execution of the

JVA/SHA), Clark replied: "I have already been through [the board minutes] … we were very circumspect about Pentler –".

113.13. Clark knew that the Pentler SPA did not involve another group company or a tax planning transaction, and in fact involved the purchase of shares from a company owned by the Pentler Principals and Mme Touré.

**I10    Nysco and Balda knew that the representations were false or acted recklessly**

114. Nysco made each of the Corruption and Consultancy Representations knowing it was false, without belief in its truth, or reckless as to whether it was true or not:

114.1.  The controlling minds of Nysco at the time the representations were made and the JVA/SHA entered into, and for the purpose of making those representations, were Cramer and/or Steinmetz.

114.2.  Cramer was, at the relevant time, a representative of the corporate director on Nysco's board, and had been engaged by Balda (through Onyx) to provide various consultancy, advisory and management services for the BSGR Group including Nysco.

114.3.  Steinmetz is the ultimate beneficiary and controller of the BSGR Group, and was also engaged by Balda to provide services to the Group.

114.4.  The knowledge of Cramer and/or Steinmetz as pleaded at paragraphs 108 and 109 above is accordingly attributable to Nysco and those paragraphs are repeated mutatis mutandis.

114.5.  Nysco was the recipient of the shares in BSGR Steel transferred pursuant to the 31 March 2010 Restructuring.

114.6.  As pleaded above, on or about 10 May 2010 Nysco paid US$22 million (received from BSGR on or about 10 May 2010) to Windpoint for onward payment to Pentler; and in March 2011 Nysco paid a further US$1.5 million to Windpoint for onward payment to Pentler.

115. Balda made the Corruption and Consultancy Representations knowing each of them was false, without belief in their truth, or reckless as to whether they were true or not:

115.1.  The attribution of knowledge of individuals to Balda is a matter of Liechtenstein law.

115.2.   As a matter of Liechtenstein law:

115.2.1.   The knowledge of a natural person is attributable to a legal entity (including a foundation) if the natural person is a *de facto* organ of the legal entity.

115.2.2.   A *de facto* organ is a natural person who, without having been legally entrusted with the management or representation of a legal entity, in fact fulfils the functions of the executive bodies of the legal entity by taking decisions reserved for the executive bodies and/or providing the actual management and thus decisively co-determining the decision making of the legal entity.

115.2.3.   Further, a natural person may be a *de facto* organ of a foundation if, as a matter of fact, he is entrusted with the management of the foundation and influences the formal decision making process of the foundation board.

115.2.4.   It is possible for a legal entity to have several de facto organs. The knowledge attributable to the legal entity may be that of one of the de facto organs (even if that knowledge is not shared by the other organs of the legal entity), having regard to the involvement of that particular de facto organ in the transaction or activity in question.

115.2.5.   Whether a natural person has acted as a *de facto* organ of a legal entity, including a foundation, is a question of fact and the Liechtenstein Court will take into account all the circumstances of the case in assessing whether the knowledge of a natural person is attributable to the legal entity.

115.3.   Steinmetz was a *de facto* organ of Balda at the time the representations were made and the JVA/SHA entered into. Pending disclosure, the Claimants rely on the following:

115.3.1.   Steinmetz was the first-class beneficiary of Balda;

115.3.2.   he acted as an 'adviser' to Balda purportedly pursuant to a consultancy agreement dated 1 January 1998;

115.3.3.   he had Onyx (a company owned by his close associate Cramer)  appointed as a consultant to Balda;

000201

115.3.4. he regularly requested distributions from Balda to himself and his family and those requests were always followed;

115.3.5. (based on his asset disclosure given pursuant to the Worldwide Freezing Order granted in these proceedings) he had no significant personal wealth other than as represented by the assets held by Balda (and one other Liechtenstein foundation, the Vessna Foundation);

115.3.6. he attended meetings of the Balda foundation council; and

115.3.7. In the premises, Steinmetz controlled all material decisions relating to Balda and Balda's wholly owned subsidiary BSGR (including BSGR's sale of the Shares and entry into the JVA with Vale).

115.4. Further or alternatively, Cramer was a *de facto* organ of Balda at the time the representations were made and the JVA/SHA entered into. Pending disclosure, the Claimants rely on the following:

115.4.1. Cramer and his company Onyx were engaged by Balda;

115.4.2. Cramer's proposals to the Balda foundation council (including that Balda should approve BSGR's entry into the JVA and make significant distributions to Steinmetz) were invariably followed;

115.4.3. Balda resolved to pay Cramer, via Onyx, a $2.5 million bonus following completion of the JVA; and

115.4.4. (based on his asset disclosure given pursuant to the Worldwide Freezing Order granted in these proceedings) Cramer claims to be owed £9.5 million from the 'Steinmetz foundations'.

115.5. The knowledge of Cramer and/or Steinmetz as pleaded at paragraphs 108 and 109 above is accordingly attributable to Balda and those paragraphs are repeated mutatis mutandis.

## I11 Inducement and reliance

116. Vale's entry into the JVA and SHA on 30 April 2010 was induced by and/or in reliance on each of the First to Eighth Corruption Representations and the First to Fourth Consultancy Representations.

116.1. As a reputable, global and publicly listed company, Vale had every interest in ensuring that it did not become involved in a joint venture to exploit licences that had been procured by bribery or corruption. The Defendants knew this to be the case.

116.2. Vale specifically asked about the use of consultants and/or intermediaries, which led to the Defendants making the First to Fourth Consultancy Representations. The use of consultants and/or intermediaries in a country such as Guinea would constitute a "red flag" pointing towards the possible payment of bribes and/or use of corrupt practices. Questions about the use of consultants and/or intermediaries was intended to uncover such "red flags" and, if the use of consultants and/or intermediaries were disclosed, would have led to further, extensive due diligence in relation to those consultants/intermediaries and the roles they had played which would have revealed information (such as the involvement of Pentler and Mme Touré) that would have caused Vale not to proceed with the transaction (particularly given Vale's obligations as a listed company subject to the FCPA).  Alternatively, disclosing the use of consultants and/or intermediaries would have led to further enquiries and had BSGR been unable or unwilling to provide satisfactory information and assurances in response, Vale would not have proceeded with the transaction. Again, the Defendants knew this to be the case.

116.3. Further, Vale International and Vale Austria made the payments set out at paragraphs 122.1 – 122.3 below in reliance upon the Consultancy and Corruption Representations.

### SECTION J: CLAIM IN CONSPIRACY

117. The Defendants, without just cause or excuse, conspired and combined together with the intention to cause injury to the Claimants by unlawful means, being the making of fraudulent misrepresentations to Vale; they all made fraudulent misrepresentations to Vale pursuant to that combination or understanding; and the Claimants suffered foreseeable and inevitable (and intended) loss as a result. Pending disclosure, the Claimants rely on the following:

117.1. All of the Defendants made false misrepresentations to Vale concerning the use of bribes and the use of consultants, intermediaries, agents and/or representatives in Guinea. Further, all of the Defendants knew such representations to be false or were reckless as to the truth of the same.  Paragraphs 105 to 115 above are repeated.

117.2. The misrepresentations were made by the Defendants pursuant to a common design between them, and they each provided more than trivial assistance in the making of those false representations. Paragraphs 68 to 92 above are repeated.

117.3. All of the Defendants participated in and/or knew about the March 2010 Restructuring, knowing that its purpose was to conceal from Vale's due diligence inquires the role played by Pentler and its shareholders in securing the Mining Licences.

117.4. All of the Defendants intended Vale to rely on the misrepresentations in entering into the JVA and SHA, pursuant to which (as the Defendants knew) Vale would pay initial consideration of US$500 million and be liable to pay additional billions of dollars to fund the project (and make further payments to BSGR).

117.5. All of the Defendants stood to receive substantial sums if Vale entered into the JVA and SHA (in the case of the Second to Sixth Defendants, by way of bonuses; in the case of the First, Seventh and Eighth Defendants, by virtue of their ownership of BSGR). Paragraphs 26-27 and 96-98 above are repeated.  It is to be inferred from the matters in this and the preceding sub-paragraphs that the fraudulent misrepresentations were made to advance the Defendants' own financial interests, with the inevitable, foreseeable and intended result that the Claimants would suffer loss.

117.6. It is to be inferred from the matters pleaded in these sub-paragraphs that the Defendants reached a combination, agreement or understanding to make fraudulent misrepresentations to Vale in the course of Vale's due diligence exercise between about February and 29 March 2010. Had there been no such combination, agreement or understanding between the Defendants, one or more of them would have told the truth about the corrupt promises and payments made to Mme Touré and Thiam, and BSGR / BSGR ProjectCo's use of Pentler, Cilins, Boutros and Thiam as consultants / intermediaries in Guinea in response to one or more of Vale's due diligence enquiries.

## SECTION K: PROPRIETARY CLAIM

118. As a result of Vale's institution of arbitration proceedings against BSGR on 28 April 2014 and/or the Award, the JVA and SHA were rescinded. In the circumstances, the US$500 million paid by Vale International to BSGR on 30 April 2010 and the traceable proceeds thereof are to be treated as held by BSGR on constructive trust for Vale International (alternatively, Vale). Furthermore, those individuals and/or entities which received onward transfers of the traceable proceeds of the US$500 million either as volunteers or as purchasers with notice of

000204

the deceit by which Vale was induced to enter into the SHA and JVA hold the sums received by them or the traceable proceeds thereof on constructive trust for Vale International (or alternatively, Vale).

119. In particular, each of the Defendants **(i)** were the onward recipients of the proceeds of the US$500 million; **(ii)** received the sums as volunteers, alternatively (for the reasons set out herein) with notice of the deceit by which Vale was induced to enter into the SHA and JVA, and accordingly; **(iii)** hold the sums received (including, without limitation, the sums referred to below) or the traceable proceeds thereof on constructive trust for Vale International (alternatively, Vale).

120. Without prejudice to the Claimants' rights in relation to all sums paid to the Defendants representing traceable proceeds of the US$500 million, the best particulars the Claimants are able to give as to the traceable proceeds received by the Defendants are as follows:

120.1. Steinmetz received the traceable proceeds of the US$500 million by way of payments and distributions to him made by BSGR, Nysco and/or Balda in and after 2010.

120.2. Cramer received the US$3 million paid to him in or about July 2010, and the sum of US$2.5 million paid to Onyx around the same time (as set out at paragraph 97.1 above).

120.3. Struik received the US$2 million paid to him in or about July 2010 (as set out in paragraph 97.2 above).

120.4. Avidan received the US$2.5 million paid to him in or about July 2010 (as set out in paragraph 97.3 above), together with US$5.92 million paid to Fefania between October 2010 and January 2011 (as set out in paragraph 98.1 above).

120.5. Tchelet received the US$800,000 paid to him in or about July 2010 (as set out in 97.4 above).

120.6. Clark received the US$180,000 paid to him in or about July 2010 (as set out in 97.5 above).

120.7. Nysco received the approximate sum of US$371.5 million paid to it between May and July 2010 (as set out in paragraph 27 above), together with an additional US$40 million in August 2012 and US$89.1 million in December 2012.

000205

120.8. <u>Balda</u> (it is to be inferred) received substantial sums paid to it by Nysco; and in addition dealt with and took decisions regarding expenditure of the US$500 million (the minutes of the Balda Council discuss receipt of the US$500 million and how the said monies should be applied).

SECTION L: CAUSATION, LOSS AND DAMAGE

121. But for the fraudulent misrepresentations made by the Defendants as pleaded above, Vale would not have entered into the JVA and the SHA or made (or procured) any of the payments referred to in paragraphs 122.1 to 122.4 below, neither would Vale International or Vale Austria have made such payments.

122. As a result of the fraudulent misrepresentations made by the Defendants, the Claimants have suffered loss and damage in the principal sum of US$1,264,429,365. That sum represents the aggregate amount paid by the Claimants pursuant to the JVA and the SHA, as follows:

122.1.  On 30 April 2010, pursuant to the JVA, Vale International paid US$500 million to BSGR.

122.2.  Between 2010 and 2015, Vale International provided loans to BSGR ProjectCo and two other companies owned by BSGR Guernsey which were involved in the development of the Simandou project. These loans were made pursuant to promissory notes and in accordance with clause 6.3 of the JVA, pursuant to which Vale International financed the amounts necessary to comply with the Business Plan as defined in the JVA. The total advanced under the promissory notes (after making certain allowances) was US$581,197,104.

122.3.  Between 2010 and 2012 Vale International and/or Vale Austria paid US$85,365,652 in preparation of the Simandou Feasibility Study. Vale was required to undertake the Feasibility Study pursuant to clause 5.1 of the JVA.

122.4.  Between 2010 and 2013 Vale incurred internal personnel, travel, services and other costs in supporting the joint ventures' operations totalling US$80,018,090.

000206

122.5. Between April 2014 and April 2019, Vale incurred legal fees, costs and disbursements in pursuing the Arbitration totalling US$17,848,519 (£1,413,565.42 being the costs of the arbitration and $16,000,000 for legal and expert fees).[12]

123. In the financial year ending 31 December 2014, as a result of the recovaction of the Mining Licences, Vale recognised an impairment in its audited accounts of the total value of its investment in the joint venture, in a sum of approximately US$1.135 billion.

124. Further or alternatively to paragraph 121 above, Vale has suffered loss and damage in the sum of $1,264,429,365. Such damage was suffered:

124.1. By reason of the diminution in the value of its 100% shareholdings in Vale International and Vale Austria in the sum of $1,166,562,756; and

124.2. By reason of the expenditure referred to at paragraphs 122.4 and 122.5 above.

### SECTION M: INTEREST

125. At all material times since April 2010, Vale and its underlying companies have borrowed money (typically by way of the issuance of US Dollar or Euro denominated bonds paying interest on a semi-annual basis). But for the misrepresentations and/or conspiracy, the said borrowing would have been reduced by the amounts claimed in the preceding paragraph. The average annual rate of such borrowing for the period 2010 to 2017 is 4.69%, which the Claimants claim by way of damages together with compound interest with semi-annual rests. The total amount claimed by way of interest as damages as at 15 January 2020 is US$616,686,429, as is further particularised in Appendix 2 hereto.

126. Further or alternatively, the Claimants are entitled to and claim compound, alternatively simple, interest pursuant to section 35A of the Senior Courts Act 1981 and/or the equitable and/or inherent jurisdiction of the court at such a rate and on such sums and for such periods as the court thinks fit.

**AND THE CLAIMANTS CLAIM:**

(1) An order that the Defendants are jointly and severally liable to pay damages in the sum of US$1,264,429,365; alternatively in such sum as the court thinks fit;

---

[12] GBP/USD exchange rate as at Award Date 1.31
(https://www.bloomberg.com/quote/GBPUSD:CUR).

000207

(2)     The sum of US$616,686,429 by way of damages in relation to the interest payments that Vale and its underlying companies have paid on the said US$1,264,429,365, together with such further interest as accrues after 15 January 2020; alternatively interest at such rate and for such period as the Court deems fit pursuant to the Senior Courts Act 1981 and/or the Court's inherent and/or equitable jurisdiction;

(3)     A declaration that, to the extent each of the Defendants received part of the proceeds of the US$500 million paid by the Third Claimant to BSGR on 30 April 2010, that Defendant holds those funds (or the traceable proceeds thereof) on constructive trust for the Third Claimant (alternatively, the First Claimant);

(4)     All necessary accounts and inquiries, including but not limited to those necessary to follow, trace and identify the traceable proceeds of the funds received by the Defendants and held by the Defendants on constructive trust in accordance with (3) above, together with orders directing those traceable proceeds to be transferred to the Third Claimant (alternatively, the First Claimant);

(5)     Further or other relief;

(6)     Costs.

SONIA TOLANEY QC

TIM AKKOUH

CHRISTOPHER LLOYD

000208

**STATEMENT OF TRUTH**

The Claimants believe that the facts stated in these Particulars of Claim are true. I am duly authorised by the Claimants to sign this statement.

Signed: _____

Name: _____ _Alexandre Silva D´Ambrosio_____

Position or office held: __Global General Counsel_____

Date: _____ 15 January 2020_____

000209

**Appendix 1**

# 1) Prior to March 2006 – BSG Group Structure



## 2) 10 March 2006 – Pentler and Mme Touré granted shareholdings



## 3) April 2006 – BSGR ProjectCo incorporated in Guinea



## 4) 24 March 2008 – BSGR Steel buys back Pentler's shares in BSGR BVI



## 5) 10 February 2009 – BSGR Guernsey incorporated



## 6) 17 February 2009 – Sale of BSGR ProjectCo from BSGR BVI to BSGR Guernsey



## 7) 31 March 2010 – transfer BSGR Steel and BSGR BVI to BSG Metals and Mining



## 8) 30 April 2010 – Vale acquires 51% stake in BSGR Guernsey



000218

**Appendix 2**

## Summary

Application date                    15.1.20

| Category | Date | Amount ($) | Interest rate | Pre-award interest accrued ($) |
|---|---|---|---|---|
| Promissory notes | Various | 581,197,104 | 4.6925% | 256,210,489 |
| Initial consideration | 30/04/2010 | 500,000,000 | 4.6925% | 284,737,239 |
| Costs of the feasibility study | 01/12/2011 | 85,365,652 | 4.6925% | 39,093,828 |
| Vale's internal costs | 01/12/2011 | 80,018,090 | 4.6925% | 36,644,873 |
| **Total** | | | | **616,686,429** |

End

## Promissory notes: compounded interest using Vale's average cost of debt

| | |
|---|---|
| Application date | 15.1.20 |
| Vale's average cost of debt (2010-2017) | 4.6925% |
| Number of days in a year | 365 |
| Compounding frequency per annum | 2 |
| | |
| Number of days between each compounding | 182.5 |

### Pre-award interest in relation to each promissory note

| Promisor | Date | Principal ($) | Interest ($) |
|---|---|---|---|
| VBG Guinea | 07/06/2010 | 2,075,000 | 1,165,971 |
| VBG Liberia | 12/07/2010 | 400,000 | 221,993 |
| VBG Guinea | 05/08/2010 | 2,750,000 | 1,513,180 |
| VBG Guinea | 23/08/2010 | 1,200,000 | 656,046 |
| VBG Guinea | 22/10/2010 | 700,000 | 374,470 |
| VBG Guinea | 17/11/2010 | 23,500,000 | 12,452,508 |
| VBG Guinea | 17/11/2010 | 1,800,000 | 953,809 |
| VBG Liberia | 02/12/2010 | 300,000 | 158,094 |
| VBG Guinea | 28/12/2010 | 2,800,000 | 1,461,442 |
| VBG Guinea | 14/01/2011 | 2,000,000 | 1,037,319 |
| VBG Liberia | 02/02/2011 | 100,000 | 51,500 |
| VBG Guinea | 02/02/2011 | 10,000,000 | 5,149,971 |
| VBG Logistics | 17/03/2011 | 1,000,000 | 506,741 |
| VBG Guinea | 15/04/2011 | 7,500,000 | 3,758,991 |
| VBG Logistics | 15/04/2011 | 1,000,000 | 501,199 |
| VBG Guinea | 25/04/2011 | 18,000,000 | 8,987,263 |
| VBG Logistics | 25/04/2011 | 4,000,000 | 1,997,169 |
| VBG Guinea | 17/05/2011 | 14,000,000 | 6,931,493 |
| VBG Logistics | 17/05/2011 | 500,000 | 247,553 |
| VBG Logistics | 23/05/2011 | 3,000,000 | 1,481,901 |
| VBG Guinea | 02/06/2011 | 13,500,000 | 6,642,943 |
| VBG Guinea | 02/06/2011 | 2,000,000 | 984,140 |
| VBG Logistics | 20/07/2011 | 1,000,000 | 482,996 |
| VBG Logistics | 20/07/2011 | 1,500,000 | 724,495 |
| VBG Guinea | 05/08/2011 | 11,000,000 | 5,279,826 |
| VBG Logistics | 05/08/2011 | 1,000,000 | 479,984 |
| VBG Guinea | 02/09/2011 | 8,500,000 | 4,035,184 |
| VBG Guinea | 15/09/2011 | 2,000,000 | 944,587 |

| | | | |
|---|---|---|---|
| VBG Guinea | 15/09/2011 | 1,200,000 | 566,752 |
| VBG Guinea | 26/09/2011 | 9,000,000 | 4,232,131 |
| VBG Logistics | 03/10/2011 | 4,000,000 | 1,875,718 |
| VBG Guinea | 05/10/2011 | 8,500,000 | 3,982,728 |
| VBG Guinea | 14/10/2011 | 10,500,000 | 4,902,215 |
| VBG Guinea | 01/11/2011 | 7,000,000 | 3,244,683 |
| VBG Guinea | 15/11/2011 | 4,300,000 | 1,981,976 |
| VBG Guinea | 01/12/2011 | 20,000,000 | 9,159,147 |
| VBG Logistics | 01/12/2011 | 1,300,000 | 595,345 |
| VBG Guinea | 15/12/2011 | 24,300,000 | 11,065,390 |
| VBG Logistics | 15/12/2011 | 3,000,000 | 1,366,098 |
| VBG Guinea | 27/12/2011 | 16,300,000 | 7,386,316 |
| VBG Logistics | 11/01/2012 | 3,000,000 | 1,351,143 |
| VBG Guinea | 19/01/2012 | 7,500,000 | 3,366,804 |
| VBG Liberia | 19/01/2012 | 300,000 | 134,672 |
| VBG Guinea | 08/02/2012 | 10,000,000 | 4,452,294 |
| VBG Liberia | 08/02/2012 | 300,000 | 133,569 |
| VBG Logistics | 16/02/2012 | 4,000,000 | 1,775,044 |
| VBG Guinea | 01/03/2012 | 12,700,000 | 5,603,172 |
| VBG Guinea | 15/03/2012 | 24,500,000 | 10,746,508 |
| VBG Logistics | 30/03/2012 | 4,000,000 | 1,743,573 |
| VBG Guinea | 01/04/2012 | 6,000,000 | 2,613,171 |
| VBG Guinea | 16/04/2012 | 2,000,000 | 865,589 |
| VBG Guinea | 02/05/2012 | 7,600,000 | 3,267,122 |
| VBG Guinea | 22/05/2012 | 26,000,000 | 11,082,630 |
| VBG Guinea | 01/06/2012 | 14,500,000 | 6,154,434 |
| VBG Guinea | 15/06/2012 | 10,000,000 | 4,219,118 |
| VBG Liberia | 15/06/2012 | 100,000 | 42,191 |
| VBG Guinea | 27/06/2012 | 9,700,000 | 4,071,528 |
| VBG Guinea | 16/07/2012 | 20,700,000 | 8,617,852 |
| VBG Guinea | 01/08/2012 | 5,700,000 | 2,356,634 |
| VBG Liberia | 01/08/2012 | 300,000 | 124,033 |
| VBG Guinea | 15/08/2012 | 12,600,000 | 5,177,746 |
| VBG Logistics | 03/09/2012 | 1,000,000 | 407,530 |
| VBG Guinea | 17/09/2012 | 10,500,000 | 4,252,792 |
| VBG Logistics | 17/09/2012 | 150,000 | 60,754 |
| VBG Guinea | 24/09/2012 | 5,500,000 | 2,220,782 |
| VBG Logistics | 24/09/2012 | 500,000 | 201,889 |
| VBG Guinea | 16/10/2012 | 2,100,000 | 839,705 |
| VBG Guinea | 19/10/2012 | 11,000,000 | 4,392,585 |
| VBG Logistics | 19/10/2012 | 150,000 | 59,899 |

| | | | |
|---|---|---|---|
| VBG Logistics | 01/11/2012 | 4,000,000 | 1,588,065 |
| VBG Guinea | 15/11/2012 | 12,000,000 | 4,734,395 |
| VBG Logistics | 03/12/2012 | 3,000,000 | 1,174,040 |
| VBG Logistics | 12/12/2012 | 450,000 | 175,390 |
| VBG Guinea | 12/12/2012 | 22,500,000 | 8,769,519 |
| VBG Guinea | 19/12/2012 | 2,000,000 | 777,041 |
| VBG Guinea | 24/12/2012 | 6,500,000 | 2,519,652 |
| VBG Logistics | 10/01/2013 | 1,000,000 | 384,644 |
| VBG Liberia | 10/01/2013 | 100,000 | 38,464 |
| VBG Logistics | 21/01/2013 | 1,500,000 | 574,065 |
| VBG Guinea | 30/01/2013 | 1,410,000 | 537,393 |
| VBG Guinea | 07/02/2013 | 42,400,000 | 16,100,394 |
| VBG Guinea | 20/02/2013 | 2,200,000 | 830,387 |
| VBG Logistics | 20/02/2013 | 50,000 | 18,872 |
| VBG Guinea | 06/03/2013 | 5,700,000 | 2,137,503 |
| VBG Logistics | 27/03/2013 | 1,500,000 | 557,004 |
| VBG Logistics | 24/04/2013 | 1,000,000 | 366,465 |
| VBG Guinea | 10/06/2013 | 1,980,000 | 709,490 |
| VBG Logistics | 10/06/2013 | 20,000 | 7,167 |
| VBG Logistics | 03/07/2013 | 55,000 | 19,490 |
| VBG Logistics | 03/07/2013 | 1,000,000 | 354,364 |
| VBG Guinea | 17/07/2013 | 1,700,000 | 598,326 |
| VBG Guinea | 07/08/2013 | 2,000,000 | 696,707 |
| VBG Guinea | 18/09/2013 | 1,200,000 | 409,412 |
| VBG Logistics | 22/10/2013 | 1,000,000 | 335,394 |
| VBG Guinea | 19/11/2013 | 800,000 | 264,521 |
| VBG Guinea | 16/12/2013 | 385,000 | 125,546 |
| VBG Guinea | 23/12/2013 | 1,200,000 | 389,897 |
| VBG Guinea | 13/01/2014 | 1,400,000 | 449,936 |
| VBG Guinea | 11/02/2014 | 800,000 | 253,218 |
| VBG Logistics | 31/03/2014 | 1,500,000 | 462,775 |
| VBG Logistics | 31/03/2014 | 50,000 | 15,426 |
| VBG Guinea | 24/07/2014 | 600,000 | 173,720 |
| VBG Guinea | 24/10/2014 | 770,000 | 211,400 |
| VBG Logistics | 11/12/2014 | 500,000 | 133,397 |
| VBG Guinea | 02/02/2015 | 280,000 | 72,322 |
| | | | |
| VBG Guinea | 20/10/2014 - | 1,677,896 - | 461,746 |
| VBG Guinea | 04/09/2014 - | 600,000 - | 169,601 |
| **Total** | | **581,197,104** | **256,210,489** |

000223

End

## Other pre-award: compounded interest using Vale's average cost of debt

| | |
|---|---|
| Application date | 15.1.20 |
| Vale's average cost of debt (2010-2017) | 4.6925% |
| Number of days in a year | 365 |
| Compounding frequency per annum | 2 |
| | |
| Number of days between each compounding | 182.5 |

### Other pre-award interest

| Category | Date | Amount ($) | Interest ($) |
|---|---|---|---|
| Initial consideration | 30/04/2010 | 500,000,000 | 284,737,239 |
| Costs of the feasibility study | 01/12/2011 | 85,365,652 | 39,093,828 |
| Vale's internal costs | 01/12/2011 | 80,018,090 | 36,644,873 |
| **Total** | | **665,383,742** | **360,475,940** |

End

000225