# Exhibit MM



Neutral Citation Number: [2019] EWHC 2456 (Comm)

Case No: CL-2019-262 and 269

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 20/09/2019

Before :

**MRS JUSTICE MOULDER**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **BSG RESOURCES LIMITED** | **Claimant** |
| - and - | |
| **(1) VALE S.A.**<br>**(2) FILIP DE LY**<br>**(3) DAVID A.R. WILLIAMS**<br>**(4) MICHAEL HWANG** | **Defendants** |

**Jeffrey Gruder QC** and **Iain Quirk** (instructed by **Mishcon de Reya LLP**) for the **Claimant**
**David Foxton QC** and **James Willan** (instructed by **Cleary Gottlieb Steen & Hamilton LLP**)
for **Vale S.A.**
**Mr Hooker** of for the **third and fourth Defendants**
**Boies Schiller Flexner UK LLP**
Hearing date: 4 September 2019
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

**Mrs Justice Moulder :**

1. The matters in this judgment arise out of an arbitration award dated 4 April 2019 (the "Award") following an arbitration between Vale S.A. ("Vale") and BSG Resources Limited ("BSGR") which resulted in an order for BSGR to pay damages of US$1.247 billion. BSGR has challenged the Award under sections 24 and 68 of the Arbitration Act 1996 (the "Act") and such challenge (the "Challenge Application") is due to be heard over two days in November 2019.

2. This judgment deals with the following applications:

    i)   application by Vale under Section 70 of the Act for security for the amount payable under the Award;

    ii)  application by Vale for security for its costs in respect of the Challenge Application;

    iii) application by BSGR to set aside the order of Bryan J dated 4 April 2019 granting permission to enforce the Award or to stay the enforcement thereof (the "Set Aside Application");

    iv)  application by BSGR to amend its claim form in respect of the Challenge Application (the "Amendment Application");

    v)   application by Vale to impose a condition of pursuing the Challenge Application that BSGR pay the outstanding costs order of Mr Justice Popplewell.

Hearing

3. The hearing of the various applications referred to above was in public for the reasons given in the ruling made at the commencement of the hearing.

4. The third and fourth defendants, two of the three arbitrators, were represented by Mr Hooker at the hearing. Mr Hooker largely adopted the submissions of Mr Foxton QC for Vale but did make submissions on the Amendment Application.

Background

5. It is not necessary for the purpose of determining the applications to consider the detailed background but in summary BSGR and Vale were parties to a joint venture in Guinea to exploit iron ore deposits. The government of Guinea changed and in April 2014 the mining rights were revoked following allegations of bribery and misconduct on the part of BSGR.

6. This resulted in two sets of arbitration proceedings: one brought by Vale in April 2014 against BSGR under the LCIA rules and one brought by BSGR against Guinea under ICSID. BSGR challenged the appointment of the three arbitrators and as a result of that challenge, the Chairman (but not the other arbitrators) was obliged to stand down and was replaced. This affected the timing of the hearing of the arbitration which was moved. The date of the final hearing was fixed notwithstanding the fact that BSGR said that its leading counsel was not available at such time. As a

consequence, BSGR did not attend the hearing and did not cross examine witnesses. It did however participate in the ICSID proceedings and did cross examine witnesses, certain of whom were also called in the LCIA proceedings. Initially it was agreed between the parties that there would be record sharing so that the evidence in the ICSID arbitration would be available to the arbitrators in the LCIA arbitration. However after the proceedings in the LCIA arbitration had closed, BSGR applied to adduce the evidence of the transcripts of the ICSID proceedings (which included the cross examination of the witnesses) and the post hearing briefs which was refused by the arbitrators in the LCIA arbitration.

7. In the Award the arbitrators found that BSGR had made fraudulent misrepresentations to Vale to enter into the joint venture. It did not have to decide the bribery allegations in order to determine the arbitration claim although it did make findings on the issue.

8. BSGR has brought the Challenge Application on the grounds that the arbitrators displayed apparent bias. Currently BSGR relies on four matters but by its Amendment Application, it seeks to rely on the sole ground that the refusal to admit the transcripts of the ICSID proceedings demonstrates apparent bias, having regard to the context of certain other decisions made by the arbitrators in the course of the arbitration.

9. BSGR went into administration in March 2018 and Mr Malcolm Cohen, a partner of BDO LLP and Mr William Callewaert of BDO Ltd of Guernsey were appointed the administrators by order of the Royal Court of Guernsey.

Evidence

10. The evidence before the court in respect of the applications was witness statements from Mr Jonathan Kelly, a partner of Cleary Gottlieb Steen & Hamilton LLP, solicitors for Vale, and for BSGR, evidence from Mr Malcolm Cohen, one of the joint administrators of BSGR, and from Mr Libson of Mishcon de Reya LLP.

11. At the outset it is necessary to say something about the evidence of Mr Cohen. As stated in his witness statement Mr Cohen has been a partner for over 30 years of BDO LLP. BDO LLP is the UK member of BDO International, the world's fifth largest accounting firm. Mr Cohen is the head of BDO's contentious insolvency team. He has served as a member of R3 which collectively represents the U.K.'s insolvency, restructuring, advisory and turnaround professionals. It is against that background of an experienced insolvency practitioner at a leading accountancy firm that I approach his evidence and consider the assertions made by Vale against the joint administrators and Mr Cohen.

12. In written submissions counsel for Vale referred to the statement in Mr Cohen's witness statement describing Vale as a "single, unsecured creditor with an axe to grind" or having "their own agenda" (paragraph 49 and 51). It was submitted for Vale that the "dismissive language and approach" is not what would be expected from professional officeholder acting independently in the interests of creditors.

13. It is clear from Mr Kelly's witness statements and Mr Cohen's witness statement the nature of the exchanges that have taken place between those representing Vale and the administrators. Whilst (perhaps understandably) in oral submissions counsel for Vale chose not to repeat some of the assertions made in the witness statements of Mr Kelly

against the administrators, it is in my view unsurprising that Mr Cohen (correctly in my view in the context) described Vale as having an axe to grind. What is surprising on the evidence in my view, are the assertions in the witness statements of Mr Kelly against Mr Cohen, a professional and experienced administrator, that they were guilty of a "lack of supervision and care" or that the administrators are not in a position to approach explanations and information provided to them with "scepticism and circumspection". Mr Kelly referred at paragraph 10 of his third witness statement to "serious concerns" about the steps which have been taken by the joint administrators. These included the attempt to stay the arbitration process, the alleged hostile stance towards Vale, the manner of the challenge to the Award, the role of Nysco and the management of BSGR. All of the matters raised in this regard by Mr Kelly are dealt with by Mr Cohen in his witness statement (as more particularly discussed below) and on the evidence before me the "serious concerns" are not made out.

**I Application by Vale under Section 70 of the Act for security for the amount payable under the Award**

14. The relevant provisions of Section 70 of the Act state:

    "(1)   The following provisions apply to an application or appeal under section 67, 68 or 69.

    …

    (7) The court may order that any money payable under the award shall be brought into court or otherwise secured pending the determination of the application or appeal, and may direct that the application or appeal be dismissed if the order is not complied with."

15. The legal principles to be applied by the court were said in oral submissions for Vale to be common ground and although some differences were notable in the written submissions, I proceed on the basis that for present purposes the law is as stated by Picken J in *Progas v Pakistan* [2018] EWHC 209 (Comm) that it is necessary (in relation to a challenge under section 68 or 69) to show that the challenge in some way prejudices the ability of the defendant to enforce the award or diminishes the claimant's ability to honour the award and that, at [64]:

    "… in order to show that the ability to enforce an award has been prejudiced or the ability of the applicant to honour it has been diminished, it is "effectively necessary to satisfy a similar requirement to that of a freezing injunction, namely the risk of dissipation of assets" between the time of the section 68 application and its final disposal…"

16. It was accepted by both parties that unlike the position in relation to a section 67 challenge (challenge to substantive jurisdiction) and as stated by Picken J in *Progas*, there is no threshold or additional requirement that the party seeking security should show that the challenge to the award is flimsy or otherwise lacks substance.

17. I bear in mind however the observations of Teare J in *X v Y* [2013] EWHC 1104 (Comm), cited by Picken J at [53], that:

> "… the jurisdiction conferred on the court by section 70 should not be used a means of assisting a party to enforce an award which has been made in its favour."

18. It was submitted for Vale that there is a risk of dissipation for the following reasons:

    i) BSGR is using the pending Challenge Application to resist enforcement of the Award in the United States and the existence of the Challenge Application means that Vale cannot apply to wind up BSGR;

    ii) BSGR's management (excluding the administrators) and owners are the sort of people who will do everything in their power to prevent Vale obtaining the sums awarded to it by the tribunal: the tribunal found that BSGR had committed a serious fraud; the beneficial owner of BSGR, Mr Steinmetz, has been indicted in Switzerland on charges of corruption and forgery; in 2010 BSGR dissipated US$500 million paid to it by Vale through a Lichtenstein foundation almost immediately after receipt; the tactics adopted in the arbitration suggests that BSGR will do whatever it can to avoid meeting its liabilities (including the failure to pay the costs order of £180,000 ordered by Popplewell J);

    iii) there are serious concerns that the benefit of BSGR's claims in the ICSID arbitration is in the course of being dissipated or diminished in value: in February 2019 Nysco (BSGR's parent) and Guinea announced the settlement of their dispute over mining concessions and licenses in the Republic of Guinea and that a new group of investors including Mr Steinmetz will exploit the Zogota deposit; that settlement was negotiated without the involvement of the administrators who were presented with the agreement which had already been negotiated; the new company, Niron Metals plc ("Niron") is represented by Mr Steinmetz who appears to receive a personal benefit from the settlement of the arbitration and although the administrators have stated that BSGR intends to enter into a revenue sharing agreement with Niron, there is currently no such agreement. It was therefore submitted that the reality is that administrators are being bypassed and the settlement is being implemented: in July 2019 Nyron announced that it was proceeding with a feasibility study and the government of Guinea launched a tender for the award of the mining rights.

    iv) BSGR cannot point to the administrators providing effective protection against the ability to enforce being prejudiced: the funding arrangements for the administration are such that Nysco is providing funding but with control afforded to Nysco: the administrators are required to submit a budget for agreement and drawdown requests must be sent to Mr Steinmetz's personal lawyer specifying the purposes for which funds will be used.

19. In my view for the reasons set out below Vale have not established a risk of dissipation or diminution of assets and are seeking by this application to use it as a means to assist in the enforcement of the Award.

20. <u>Firstly</u>, although the directors remain directors of BSGR they no longer have the power to manage the affairs of the company. The power of management lies solely with the joint administrators who have a duty to act in the interests of creditors. The administrators are officers of the Court of Guernsey. The position of the directors and the administrators respectively is clearly stated at paragraphs 20 and 25 of Mr Cohen's witness statement:

> "the authority to manage the affairs, business and property of BSGR lies solely with the joint administrators. The joint administrators act as agents of BSGR – and hence act firstly in the interests of BSGR's creditors. This duty manifests itself (a) in the joint administrators taking reasonable care to obtain the best realisations that the circumstances permit for BSGR's assets and (b) to ensure that those assets are held to be distributed in accordance with the relevant pari passu priority. The joint administrators are officers of the Royal Court. We have at all relevant times been clear with BSGR's directors, management etc that they are precluded from taking any actions in such a way as to interfere with the performance by the joint administrators of their functions without the joint administrators' express consent."

21. Mr Cohen acknowledged that the joint administrators have consulted the directors in relation to matters which are relevant to the administration. Although Vale complains about the number of hours that the administrators have involved the directors in the company's affairs, the evidence of Mr Cohen was that it is:

> "standard practice in administrations not to cut loose the company's management, particularly where members of the management possess knowledge or information which could benefit the conduct of the administration (and hence creditors)."

22. <u>Secondly</u>, as to the funding of the administration through Nysco and the control exercised by Nysco by virtue of its control of the funding, the evidence of Mr Cohen is (paragraph 26) that this:

> "…does not change the fact that we do not act in accordance with the instructions of any third party or the company's directors etc … Nysco offered commercially reasonable terms to meet the costs and expenses of the Guernsey administration. The fact that Nysco is connected to BSGR is irrelevant provided that those conditions are met…"

On that evidence, which I accept, the administrators are in control of the assets of BSGR notwithstanding the need for funding to take positive action.

23. <u>Thirdly</u> it was submitted for Vale that "the administrators appeared not to be exercising the degree of critical scrutiny which is required in the exceptional circumstances of the present case" and that this "casts further doubt on their ability to

> prevent those behind BSGR taking steps which will prejudice Vale's ability to enforce".

24. This criticism is not borne out by the evidence: Mr Cohen explained (paragraph 34 of his witness statement) that when the merits of the challenge application were questioned by Vale as "hopeless and plainly inappropriate", the administrators listened to Vale's position and sought further advice on whether the challenge application was a hopeless claim. Having received legal advice to the contrary the administrators have decided to continue with the Challenge Application.

25. As to the request for a stay of the arbitral proceedings following the appointment of the administrators, the evidence of Mr Cohen (paragraph 16) was that this was not done for the purpose of delaying the arbitration but:

> "is a common step taken by administrators when appointed to companies which are subject to ongoing legal proceedings in order to provide administrators with time to review and gain an understanding of such proceedings."

26. <u>Fourthly</u> the complaint by Vale that the administrators are not taking action in respect of past misconduct in my view does not go to the risk of dissipation but goes to the ability of Vale to enforce. It was submitted for Vale that the assets are being diminished by reason of the challenge because no action is being taken against assets which are now in the hands of recipients and could be traced but there is no evidence before the court to support this assertion. The assets were transferred in 2010 and there is no evidence as to what may currently be happening to the fruits of those assets. The inferences to be drawn from the transfer in 2010 are disputed by the parties but given that the transfer occurred some nine years ago, and prior to the administration it has no relevance in my view to the issue of the current risk of dissipation.

27. <u>Fifthly</u> as to Niron, the evidence of Mr Cohen (paragraph 42) is that no binding deal had been reached and

> "none would be reached without the joint administrators being satisfied that such a deal is, overall, in the best interests of BSGR and its creditors. We have therefore taken every step necessary to ensure that BSGR's rights under the ICSID arbitration are protected, while we are exploring whether an arrangement which monetises BSGR's claim in the ICSID arbitration and produces an outcome which is in the interests of BSGR and its creditors could be reached with the Republic of Guinea."

28. It was submitted for Vale that whatever the legal position, Vale is being prejudiced by events on the ground making restoration of the mining concession more difficult or impossible. However, the asset in question is the claim in the ICSID arbitration and the concession has already been revoked thus leading to the ICSID arbitration. The value of the asset is therefore the value of the claim in arbitration. The evidence of Mr Cohen, which I accept, is that the joint arbitrators are seeking to monetise the value of

that claim. In my view the events concerning the mining rights have no direct bearing on the risk of dissipation of BSGR's asset, being the claim in the ICSID arbitration.

29. <u>Sixthly</u> as to the prejudice allegedly suffered by its inability to wind up BSGR, I do not accept that this prejudice, if it exists, diminishes the assets. The evidence is that administrators' duty (as referred to above) is to take reasonable care to obtain the best realisation that the circumstances permit for the assets of BSGR and to ensure that those assets are held to be distributed in accordance with the relevant *pari passu* priority. The submission that enforcement in the United States is being hampered by the challenge goes to the ability of Vale to enforce the award and an order under Section 70(7) should not be used as a means of assisting a party to enforce an award.

30. <u>Seventhly,</u> as to past behaviour Vale relies on the conduct of the arbitration, the 2010 transfer, the circumstances in which BSGR went into administration and the failure to comply with court orders. Given the evidence that the administrators are now managing the company and not the directors, evidence which I accept, the past conduct of the directors is irrelevant to the present risk of dissipation. It would be relevant if the administrators were as alleged being influenced by the directors. However for the reasons discussed above, I do not accept that Mr Cohen (together with his joint administrator) is not acting independently and in accordance with his duties as administrator acting in the best interests of the company and the creditors as a whole. In relation to the manner in which the company was placed in administration I note that Mr Kelly accepts that the "secrecy" which he complains about is in accordance nevertheless with the laws of Guernsey (paragraph 10a of his third witness statement).

31. For all these reasons the application by Vale for security for the Award is dismissed.

II Application by Vale for security for its costs in respect of the Challenge Application

32. The principle that Vale should receive an amount by way of security for its costs pursuant to Section 70(6) of the Act is not disputed and the only issue for the court is quantum. The estimated costs of the Challenge Application on the part of Vale are US$880,00 and Vale seeks the sum of US$710,000 by way of security.

33. BSGR have proposed a payment of approximately US$510,000.

34. The principles as to quantum were not in dispute: the court should award the sum which the applicant would be likely to recover in a detailed assessment if awarded costs on the standard basis having regard to the factors set out in CPR 44.5 (Popplewell J in *Bluewaters Communications Holdings LLC v Bayerische Landesbank* [2018] EWHC 78 (Comm) at [30]).

35. Vale say that there is a real possibility that costs would be awarded on the indemnity basis given the weakness of the challenge and the history of without merit applications.

36. The first issue is therefore whether there is a real possibility that costs will be awarded on the indemnity basis: (*Danilina v Chenukhin* [2018] EWHC 2503 (Comm)). As noted by Teare J in that case, this does not involve a consideration of the merits of the claim but assumes that BSGR loses its Challenge Application. BSGR's claim is

primarily one of apparent bias on the part of the arbitrators. It is not a claim of actual bias and in my view, failure on the part of BSGR will not necessarily mean that BSGR will be found to have any improper motive in bringing the Challenge Application such as to delay enforcement of the Award. In this regard I note that there is the unusual feature that when it was put to the administrators by Vale that the Challenge Application was "hopeless and plainly inappropriate", the evidence is that the administrators sought further advice on the pending litigation and having taken legal advice on the merits, which Mr Cohen stated was "to the contrary", decided to proceed with it as being "clearly in line with the court approved objective of the administration". This in my view suggests that on the evidence before this court, Vale would be unlikely to succeed in any argument that the administrators had improperly pursued the Challenge Application such as to warrant an order for indemnity costs.

37. I am not therefore persuaded that Vale has shown a real possibility of costs being awarded on an indemnity basis. Accordingly, I seek to determine a sum which in my view would be likely to be recovered in a detailed assessment on the standard basis.

38. I was referred by BSGR to other cases by way of comparison but in my view these cases provide little assistance since the amount that would be recoverable in this case has to be determined having regard to the circumstances of this case. The factors in the CPR which the court takes into account in determining whether or not costs are proportionate include whether they bear a reasonable relationship to the amount at stake, the importance of the matter to all the parties and the complexity of the matter. Having regard to these factors, the amount at stake here is clearly very significant even by the standards of the Commercial Court; the importance of the matter is not only the value of the Award but extends to the reputational issues inherent within the findings in the Award; the Award itself is lengthy reflecting the complexity of the underlying issues. The nature of the Challenge Application relates to the refusal of the arbitral panel to admit evidence and submissions from the ICSID arbitration and therefore the documentation potentially extends beyond the conduct of the LCIA arbitration.

39. Notwithstanding these factors, the starting point is that in my view the total amount of the estimated costs of US$ 880,000 for a two-day hearing does not appear to be reasonable and proportionate, being well in excess of what the court would expect to see in such a case. Whilst the volume of material in the two arbitrations is substantial, the issue which the court will have to determine is primarily the issue of apparent bias which would appear to turn on the reasons why the material was not admitted rather than the detailed content of the material itself. Although a challenge under Section 68 requires the applicant to demonstrate substantial injustice, it is not required to show that the determination will substantially affect its rights (as is the position under Section 69) and therefore this also limits the work which will need to be undertaken in relation to the detail of the evidence which was not admitted ,in order to meet the Challenge Application.

40. Looking at the breakdown of the total figure, it seems to me that the estimated number of hours for the solicitors (a further 530 hours) appears high and the resultant charges of both solicitors and counsel cannot be said to be reasonable and proportionate. Whilst the charge out rates are not necessarily out of line with other City firms, the overall figure is in my view unlikely to be recoverable on a detailed assessment without a very significant reduction.

41. For all these reasons I therefore determine that the amount to be provided by way of security for costs is the sum of US$510,000.

III Application by BSGR to set aside the order of Bryan J dated 4 April 2019 granting permission to enforce the Award (the "Set Aside Application")

42. By order of Bryan J Vale was given permission under section 66 of the Act to enforce the Award in the same manner as a judgment or order of the High Court.

43. That order was made on an ex parte basis (as is usual) and BSGR has the right pursuant to CPR 62.18(9)(a) to apply to set it aside which it has done.

44. CPR 62.18 (9) provides:

> "Within 14 days after service of the order or, if the order is to be served out of the jurisdiction, within such other period as the court may set –"
>
> (a) the defendant may apply to set aside the order; and
>
> (b) the award must not be enforced until after –
>
> (i) the end of that period; or
>
> (ii) any application made by the defendant within that period has been finally disposed of."

45. It was submitted for BSGR that the meaning of CPR 62.18 (9)(b) and the words "the award must not be enforced until …any application made by the defendant within that period has been finally disposed of" means that any award is provisional until any challenge to the award has been finally disposed and that the order to permit enforcement must stand or fall with the determination of the challenge to the Award. It was submitted that the order for enforcement has no independent existence if the Award is set aside. It was also submitted (although not pursued in the oral submissions) that section 66 was subject to section 81 and a public policy defence given that what is being alleged is a breach of the rules of natural justice.

46. It was accepted for Vale that if the Challenge Application were to succeed the order for enforcement would be set aside. However pending the determination of the Challenge Application, it was submitted that the Award was valid and the order for enforcement should not be set aside. If in the alternative, a stay on enforcement were to be granted it was submitted that it should be granted in accordance with CPR 83.7 and conditions should be imposed on any such grant of a stay.

47. It seems to me that as a matter of construction of the language of CPR 62.18(9), the words "any application" in subparagraph (ii) of paragraph (b) refer back to any application to set aside under paragraph (a) and not to any other application such as a challenge under Section 68. This is consistent with the authority that an Award has a "presumptive validity" once made unless and until set aside: *Peterson Farms Inc v C&M Farming* [2003] EWHC 2298 (Comm) at [25]. Accordingly I do not accept that the final disposal of the Application to Set Aside can only be determined once the Challenge Application has been determined. As to the other grounds advanced as to

why the order should be set aside, BSGR have not shown that this challenge falls within the scope of any public policy defence to enforcement and I note that no reliance is placed on the express provision in section 68(2)(g) namely that the way in which the award was procured was contrary to public policy.

48. The issue for this court is therefore not whether the order should be set aside but whether a stay on enforcement should be granted. As to whether a stay should be ordered, Vale submitted that CPR 83.7 applied. CPR 83.7 (1) provides:

> "At the time that a judgment or order for payment of money is made or granted, or at any time thereafter, the debtor or other party liable to execution of a writ of control or a warrant may apply to the court for a stay of execution."

49. BSGR submitted that CPR 83.7 did not apply as there was no judgment of the court.

50. That interpretation is not supported by the textbook *Merkin on Arbitration* which at paragraph 19.16 states that the enforcement of an award under section 66 is subject to the general discretion of the court to stay execution of a judgment or order set out in CPR 83.7 and relies on the authority of *Far Eastern Shipping v AKP Sovcomflot* [1995] 1 Lloyds Rep 520. In that case Potter J considered whether the court had jurisdiction to stay enforcement of a New York Convention award once it has been converted into an English judgment for the purposes of execution. The judge held that having elected to convert an award into an English judgment, the plaintiff ought in principle to be subject to the same procedural rules and conditions as generally apply to the enforcement of such judgements. The application in that case was made pursuant to the forerunner of CPR 83.7 which provided that the court may order a stay where there were special circumstances which rendered it inexpedient to enforce the judgment or order.

51. CPR 83.7 (4) now provides that:

> "If the court is satisfied that—"
>
> (a) there are special circumstances which render it inexpedient to enforce the judgment or order; or
>
> …the court may by order stay the execution of the judgment or order, either absolutely or for such period and subject to such conditions as the court thinks fit"

52. *Merkin* also makes reference to the decision in *Socadec SA v Pan Afric Impex Co* [2003] EWHC 2086 (Comm) where an order had been made under section 66 and the defendant then lodged an appeal against the award and applied to the court to suspend the order for enforcement. The judge held that the principles which he should apply were firstly the strength of the argument that the award was invalid, assessed on a "brief consideration" and not a mini trial, and secondly the ease or difficulty of the enforcement of the award and whether if enforcement was withheld or delayed it could become more difficult by the movement of assets, problems of trading, disappearance of the defendant.

53. I note that *Russell on Arbitration* at 8–010 also states that where the court grants permission to enforce an award, it may stay the execution of that order for a limited period. *Russell* states that a party wanting to suspend enforcement should apply to set aside the order to enforce and combine that application with his challenge of the award. It states (relying on *Socadec*) that the court will consider the prospects of success of the challenge and whether enforcement might become more or less easy if it is delayed.

54. I accept that there is a distinction between subsection (1) which provides for an award to be enforced "in the same manner as a judgment or order of the court" and subsection (2) which enables a party to obtain a judgment of the court in terms of the award. Even if BSGR is correct that the application for a stay does not fall within the terms of CPR 83.7, it is in my view clear on the authorities before me that the court has the power to grant a stay on enforcement.

55. There is in my view no general rule that a stay should be granted pending the determination of the Section 68 challenge. This would be contrary to the principle that an award has a presumptive validity and would be inconsistent with the approach of the courts on an appeal where there is no automatic stay merely because an appeal against an order is pending. In determining whether or not the court should exercise such discretion in this particular case, it seems to me that the outcome is likely to be the same whether one applies CPR 83.7 by analogy (as in *Far Eastern Shipping*) or the principles identified in *Socadec*.

56. Assessing first the strength of the claimant's case, this is not a case where, on a brief assessment of the Challenge Application, it can be said that it is of such strength that it is obvious that BSGR will succeed such that a stay should be granted. A challenge of apparent bias against experienced arbitrators is not a challenge which will be easy to establish.

57. Secondly there is no evidence before the court which suggests that Vale would be unable to repay any amount obtained through enforcement should enforcement be permitted prior to the determination of the Challenge Application.

58. Thirdly unlike the position in *Socadec*, there is no evidence of any other particular concerns in relation to Vale which might militate against allowing Vale to pursue enforcement action pending the determination of the Challenge Application.

59. For all these reasons therefore I am not persuaded that in the circumstances the order of Bryan J should be set aside or that the court should exercise its discretion to order a stay on enforcement. I therefore refuse the Set Aside Application.

IV Application by BSGR to amend its claim form in respect the Challenge Application

60. The Amendment Application requires the permission of the court pursuant to CPR 17.1(2). The proposed amendments reduce the instances alleged of apparent bias from four to one but rather than refer to a "pattern of conduct" now seek to rely on the other instances as "context".

61. The Amendment Application is opposed by Vale because the matters are said to be irrelevant if only relied upon as context. (Vale also objected to the pleading in

paragraph 41 that "the tribunal's refusal to admit the ICSID material is inexplicable on any other basis" but that amendment is no longer sought by BSGR: following the hearing it has been confirmed by counsel for BSGR that such amendment is no longer being sought by BSGR).

62. There is nothing in the way in which BSGR formulates the amendments which would result in a claim which is not maintainable at law. There is no identified prejudice to Vale in granting the application to amend, it has not been argued that it should be refused as having no prospect of success and it is not opposed by the third and fourth defendants. In these circumstances in my view in order for the matter to be dealt with justly, BSGR should be permitted to amend its application. If upon determination of the Challenge Application (as amended) it is shown that the case has been pursued in a manner which was not reasonable, then this is a matter which can be taken into account, as appropriate, when determining the issue of costs.

63. The Amendment Application is therefore granted.

**V Application by Vale to impose a condition of pursuing the Challenge Application that BSGR pay the outstanding costs order of Popplewell J.**

64. Vale applies to the court for an order that the court impose as a condition of BSGR pursuing the Challenge Application that BSGR pay the outstanding costs order of Mr Justice Popplewell.

65. The evidence of Mr Cohen (paragraph 23) is that this is a debt which arose prior to the company entering into administration and therefore cannot be paid in priority to other creditors but will need to be proved as a debt. The joint administrators have no power to distribute the assets of BSGR to creditors: once the assets are realised, the joint administrators must apply to the Royal Court of Guernsey to discharge the administration order to enable either BSGR or a subsequently appointed liquidator to effect the relevant distribution to creditors.

66. It was submitted for Vale that the administration has not been recognised in England and therefore its status is not a reason not to order the payment of the costs order. In the alternative it was submitted that payment should come from those who stand behind BSGR.

67. Assuming that there is a power to impose such a condition, in my view it is not appropriate to impose such a condition in circumstances where the company is in administration, irrespective of the fact that the administration has not been recognised in England. I cannot see that the court could make an order which compels those who stand behind BSGR to make the payment. In relation to the administrators there appears to be no power for them to make such a payment and if it were paid at this time it would be contrary to the principle of *pari passu* distribution. Accordingly I am not satisfied that such an order could be complied with and if I am wrong on that, it seems to me that as a matter of comity and public policy, the court should not exercise its discretion and require the company to act in a way which is contrary to the principle of *pari passu* distribution.

68. For all these reasons the application by Vale for an order in relation to the outstanding costs is refused.