# Exhibit A

DUANE MORRIS LLP
Frederick D. Hyman (NY 2553832)
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000
RHyman@duanemorris.com

-and-

Jarret P. Hitchings (DE 5564)
222 Delaware Avenue, Ste. 1600
Wilmington, Delaware 19801
Telephone: (302) 657-4952
JPHitchings@duanemorris.com

*Attorneys for William Callewaert and Malcolm Cohen*
*in their capacity as Joint Administrators and Foreign Representatives*
*for the Debtor BSG Resources Limited (in administration)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| BSG RESOURCES LIMITED (in administration), | Case No. 19-11845 (_____) |
| Debtor in a Foreign Proceeding. | |

**DECLARATION OF MALCOLM COHEN IN SUPPORT OF (I) VERIFIED
CHAPTER 15 PETITION FOR RECOGNITION OF FOREIGN
MAIN PROCEEDING AND RELATED RELIEF, (II) APPLICATION TO
APPROVE NOTICE PROCEDURES AND (III) *EX PARTE* APPLICATION
FOR TEMPORARY RESTRAINING ORDER AND RELIEF
PURSUANT TO SECTIONS 1519 AND 105(A) OF THE BANKRUPTCY CODE**

I, Malcolm Cohen, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury

as follows:

1. I am a partner at BDO LLP (together with its affiliates, "BDO"). I am an individual

over the age of eighteen and, if called upon, could testify to all matters set forth in this Declaration.

2.      I hold a Bachelor of Science degree in accounting and finance from the London School of Economics and Political Science. I am a Fellow of the Institute of Chartered Accountants in England and Wales and have thirty-seven years of international insolvency and restructuring experience.

3.      Along with William Callewaert, a Business Advisory Director at BDO, I am one of the joint administrators for BSG Resources Limited (in administration) (the "Debtor") in a proceeding under Part XXI of the Companies (Guernsey) Law, 2008 (the "Guernsey Administration"), pending before the Royal Court of Guernsey (Ordinary Division) (the "Guernsey Court"). Guernsey is one of three crown dependencies located off the coast of Great Britain.[1]

4.      On March 6, 2018, upon an application made by the Debtor acting by its directors at that time, the Guernsey Court issued a *Court Order* commencing the Guernsey Administration and, among other things, appointing Mr. Callewaert and me as Joint Administrators of the Debtor. Shortly thereafter, the Guernsey Court issued a *Court Order* dated March 21, 2018, whereby it confirmed that it has administered to me and Mr. Callewaert the affirmation of Joint Administrator, each with the power to act alone.  The March 6 and March 21, 2018 orders are collectively referred to as the "Guernsey Administration Order" and are annexed to the Verified Petition (defined below) as **Exhibit A**.  In my capacity as Joint Administrator,  I am authorized to file a petition for recognition of the Guernsey Administration as a foreign proceeding (this "Chapter 15 Case") with the United States Bankruptcy Court for the Southern District of New York (this "Court").

5.      I submit this declaration (the "Declaration") in support of (a) the *Verified Chapter 15 Petition for Recognition of Foreign Main Proceeding and Related Relief* (the "Verified

---

[1] The other two being Jersey and the Isle of Man.

2

Petition");[2] (b) the application (the "Notice Application") for entry of an order (i) scheduling a hearing on the relief requested in the Verified Petition (the "Recognition Hearing"), (ii) setting a deadline by which all objections to recognition of the Chapter 15 Case must be filed and (iii) approving the form of notice of the Recognition Hearing and the manner of service; and (c) pursuant to Rule 65 of the Federal Rules of Civil Procedure, as made applicable by Rule 7065 of the Federal Rules of Bankruptcy Procedure and Rule 9077-1(a) of the Local Bankruptcy Rules of the United States District Court for the Southern District of New York, the *ex parte* application for a temporary restraining order (the "TRO Application"). I have caused the Verified Petition, Notice Application and TRO Application to be contemporaneously filed with this Court.

      6. In my capacity as Joint Administrator of the Debtor, I, either directly, or through my Joint Administrator or through members of my staff working under my supervision and control, am familiar with the Debtor's history, operations, assets, financial condition, business affairs, and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information and analysis prepared for me by staff working for the Joint Administrators on the Guernsey Administration, information supplied to me or verified by members of the Debtor's management or professionals retained by the Debtor both prior to and since my appointment, my review of relevant documents, and/or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.

      7. In particular, I have relied upon the *Affidavit of Peter Harold Driver in Support of Company's Application for an Administration Order* (the "Driver Affidavit") which was submitted to the Guernsey Court under seal by Peter Harold Driver, a director of the Debtor, in support of

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Verified Petition.

3

DM3\5777010.8

the Guernsey Administration Application (defined below). Certain disclosures made in the Driver Affidavit were considered to be commercially sensitive and remain so at this time. The Driver Affidavit and the exhibits thereto were therefore filed under seal before the Guernsey Court in order to maintain their confidentiality. All references which I make herein to the Driver Affidavit do not include the confidential content which is held subject to the seal of the Guernsey Court. To the extent the Driver Affidavit contains additional information germane to these proceedings, the Driver Affidavit itself is being filed under seal in this Court with the permission of the Guernsey Court in order to maintain the confidentiality over the commercially sensitive content.

## Background

I.  **The Debtor's Business**

    A.  **Corporate Structure**

8.  The Debtor is a non-cellular limited liability company incorporated in Guernsey. Driver Affidavit at ¶ 5. A chart showing the Debtor's corporate organization is annexed to the Verified Petition as **Exhibit B**.

9.  The Debtor is engaged, through certain subsidiaries and associates, in activities related to the exploration, development, extraction, refinement and marketing of natural resource products, including diamonds and power generation. Driver Affidavit at ¶ 7. The Debtor previously also actively engaged in the iron ore and ferronickel sectors. *Id.*

10. The Debtor's business and trading is limited to advisory and technical services provided to a number of its subsidiaries. The business and trading interests of the Debtor's subsidiaries can be categorized as follows:

    a.  Diamond operation held through a subsidiary, Octea Limited (incorporated and registered in Guernsey) with mining operations in the Republic of Sierra Leone (the "Octea Diamond Operation"). The Octea Diamond Operation is operating under the supervision of its board and an observer to the board

      appointed by the Joint Administrators. However, it is not presently producing cash flows which are available to the Debtor.

   b.   A minority interest in a power generation operation held through a subsidiary, West African Power Limited (incorporated and registered in Guernsey), in the Federal Republic of Nigeria (the "West African Power Operation"). The Debtor does not have effective control of the underlying operating company which is a minority interest and the subject of dispute with the co-investor, Forte Oil plc. The disputes relate to the funding of West African Power Operation and the right to representation of West African Power Limited on the board of the Nigerian operating subsidiary. West African Power Limited, in consultation with the Debtor, is currently exploring options to resolve the dispute and to monetize the Debtor's indirect investment. Accordingly, the Debtor is not receiving any current cash flows from the West African Power Operation.

   c.   Iron ore operation held through a subsidiary, BSG Resources (Guinea) Limited (incorporated and registered in Guernsey) (the "Guinean Iron Ore Mining Operation"). As described in detail in Section B below, the Debtor's Guinean Iron Ore Mining Operation has ceased.

Driver Affidavit at ¶ 8.

### B.   The Debtor's Guinean Mining Operations

11.   The Guinean Iron Ore Mining Operation relates to its interests in world-class iron ore deposits in the Republic of Guinea and comprise the following:

   a.   An iron ore mining concession granted to BSG Resources (Guinea) SARL ("BSGR Guinea") on March 19, 2010 over an area in Simandou South, near the village of Zogota (the "Zogota Mining Concession");

   b.   A mining and infrastructure agreement dated December 16, 2009 entered into by two subsidiaries of the Debtor, BSGR Guinea and VBG-Vale BSGR Ltd. (n/k/a BSG Resources (Guinea) Limited) ("VBG"), with the Republic of Guinea regarding the rights and obligations arising from the Zogota Mining Concession ("Basic Agreement"); and

   c.   A prospecting permit granted to BSGR Guinea over an area referred to as "Simandou Blocks 1 and 2" granted on December 9, 2008 ("Blocks 1 and 2 Permit").

Driver Affidavit at ¶¶ 12.1-12.3.

12.     In 2010, the Debtor entered into a joint venture with the Brazilian mining company Vale S.A. ("Vale") in relation to the development of the three rights and concessions described above (the "Mining Rights"). Driver Affidavit at ¶ 13. The joint venture, VBG, is referred to above.

13.     In 2011, Alpha Condé was elected President of the Republic of Guinea. Following President Condé's election, the Debtor, BSGR Guinea and VBG faced obstruction in developing the Mining Rights. Driver Affidavit at ¶ 14. In 2012, the Debtor was informed that President Condé had set up a committee aimed at investigating how certain mining rights in Guinea (including the Mining Rights) had been obtained (the "Guinea Review Committee"). *Id.* Throughout the review process, the Debtor complained about the lack of due process and apparent prejudice being shown to it by the Guinea Review Committee. *Id.* The Debtor denied – and continues to deny – the allegations made against it by the Guinea Review Committee. *Id.*

14.     In response to an allegation of corruption made by the Guinea Review Committee against the Debtor and a wider group of its affiliates, the Debtor's board initiated a review using an independent professional accountancy firm to verify the accuracy of its internal controls, processes and payment procedures, including confirmation that payments made by the Debtor and its affiliates in connection with the Mining Rights were proportionate and of an appropriate business nature. Driver Affidavit at ¶ 15. According to the Debtor's board, this review has not revealed any matters that support the allegations of wrongdoing by the Guinea Review Committee. *Id.*

15.     However, in March 2014, the Guinea Review Committee recommended to the Strategy Committee of the Government of Guinea (the "Strategy Committee") that the Mining

6

Rights be cancelled and expropriated, and the companies within the Debtor's control be prevented from being re-awarded the Mining Rights (the "Notification"). Driver Affidavit at ¶ 16.

16.     In April 2014, the Government of Guinea accepted the recommendations of the Strategy Committee to strip BSGR Guinea and VBG of the Mining Rights and to exclude the Debtor, BSGR Guinea and VBG from participating in the tender process to reallocate the Mining Rights. Driver Affidavit at ¶ 17.

17.     As a result of the Guinea Review Committee's recommendations and the actions of the Guinean government, the Debtor's Guinean mining operations have ceased. Driver Affidavit at ¶ 24. Whether such operations will recommence is currently uncertain. *Id.*

18.     The Debtor had asserted, prior to the appointment of the Joint Administrators, that the basis of the Guinea Review Committee's recommendation was not legitimate. Driver Affidavit at ¶ 18. The Debtor had also asserted that the decisions of the Guinea government were importuned, influenced, motivated and ultimately controlled by certain illegal conduct of George Soros and certain co-conspirators, which assertion is the basis of the Soros Claim (as defined and further described below). *Id.*

    C.    **Litigation Following the Expropriation of the Debtor's Guinean Mining Interests**

        1.    **The Guinea ICSID Proceeding**

19.     In August 2014, the Debtor initiated an arbitration proceeding with the International Centre for Settlement of Investment Disputes ("ICSID") against the Republic of Guinea. Driver Affidavit at ¶ 19. In May 2015, the Debtor repurchased Vale's shares in VBG. Driver Affidavit at ¶ 20. VBG was thereafter renamed BSG Resources (Guinea) Limited. *Id.* On October 13, 2015, VBG also issued an ICSID claim against the Republic of Guinea in respect of the Mining Rights. *Id.* Subsequently, the two ICSID claims against the Republic of Guinea were consolidated and an

Amended Statement of Claim was issued on behalf of the Debtor, VBG and BSGR Guinea on February 29, 2016 (generally, the "Guinea ICSID Proceeding"). *Id.* Through the Guinea ICSID Proceeding, the Debtor and its subsidiaries are seeking the restitution of the Mining Rights, as well as damages arising out of the unlawful revocation and expropriation of the Mining Rights. *Id.*

20. A hearing in the Guinea ICSID Proceeding was held in Paris, France between May 22 and June 2, 2017. Driver Affidavit at ¶ 21. The briefing of the Guinea ICSID Proceeding was concluded in July 2018.

21. In February 2019, a non-binding agreement was signed by the Debtor and two of its subsidiaries and the Government of Guinea to set out certain provisional matters which the parties would seek to progress as a means to resolve the Guinea ICSID Proceeding on a consensual basis. If such a consensual resolution is ultimately reached, it is anticipated that it will include the release of all of the Debtor's claims to the Simandou and Zogota licenses in return for the grant by the Government of Guinea of a new license over the Zogota deposits, to be exploited by a third party, with the Debtor to be entitled to participate in the revenues from this license, as well as a mutual withdrawal of allegations made by each party in the Guinea ICSID Proceeding. Work is proceeding towards the progression of the non-binding agreement into a formal, binding contractual arrangement. While that work is on-going, the Guinea ICSID Proceeding is currently suspended (although may be recommenced by either party in the event that the negotiations between the parties do not result in consensual settlement).

    **2.**    **The Vale LCIA Proceeding**

22. Separately, on April 28, 2014, prior to the Debtor's purchase of Vale's VBG Shares, Vale filed a Request for Arbitration against the Debtor in the London Court of International Arbitration (the "LCIA") seeking to recoup its investment in VBG which was allegedly lost as a

result of the expropriation actions of the Guinean government (generally, the "Vale LCIA Proceeding"). Driver Affidavit at ¶ 22.

23. Years later, on April 4, 2019, the LCIA tribunal entered an award in favor of Vale and against the Debtor in the amount of $1,246,580,846 plus pre- and post-award interest (the "LCIA Award"). A copy of the LCIA Award is annexed to the Verified Petition as **Exhibit C**.

24. The Debtor filed a timely challenge under Section 68 of the English Arbitration Act 1996 (the "UK Arbitration Challenge") to the LCIA Award with the High Court of Justice, Business and Property Courts of England and Wales, Commercial Court (QBD) on May 10, 2019. The UK Arbitration Challenge is made on the basis that the LCIA tribunal was infected by apparent bias and/or failed to comply with its general duty to conduct the proceedings fairly and impartially which constitutes a "serious irregularity" under English law. The primary relief sought by the Debtor in the UK Arbitration Challenge is that the LCIA Award be set aside and/or declared to be of no effect.

25. Vale has obtained an order from the English High Court dated May 9, 2019 to enforce the LCIA Award in England and Wales (the "UK Enforcement Order"). However, the UK Enforcement Order has since been stayed by virtue of an application made by the Debtor to the English High Court on May 23, 2019 to set aside the UK Enforcement Order (the "Set Aside Application"). The Set Aside Application was made on the basis that the Debtor has separately issued the UK Arbitration Challenge the effect of which, if successful, would be to set aside or annul the LCIA Award. Vale is automatically stayed from enforcing the LCIA Award in England and Wales pending final determination of the Set Aside Application.

26. Notwithstanding the UK Arbitration Challenge and the stay issued in connection with the Set Aside Application, on April 23, 2019, Vale filed a *Petition for Recognition and*

9

*Enforcement of a Foreign Arbitration Award* (the "Vale Enforcement Petition") in the United States District Court for the Southern District of New York (the "District Court"). That action is docketed in the District Court as *Vale S.A. v. BSG Resources Limited*, Case No. 19-cv-3619-VSB. Through the Vale Enforcement Petition, Vale is seeking recognition of the LCIA Award by the District Court, together with entry of judgment against the Debtor in an amount equal to the LCIA Award plus interest and costs.

### 3. The Soros Claim – the Debtor's Only U.S. Asset

27. The Debtor's only asset in the United States is a contingent litigation interest against George Soros and certain entities he controls. As described further herein and in the Verified Petition and TRO Application, recognition of the Guernsey Administration is necessary in order to protect and preserve the Debtor's interest in this asset.

28. On April 14, 2017, the Debtor, VBG (n/k/a BSG Resources (Guinea) Limited), and BSGR Guinea filed a complaint in the District Court against George Soros and Open Society Foundations, which was later amended to include as defendants Open Society Institute, Foundation to Promote Open Society, Open Society Foundation, Inc., Alliance for Open Society International, Inc., Open Society Policy Center, and Open Society Fund (collectively, the "Soros Defendants") asserting claims for illegal interference with contract, fraud, defamation and other matters relating to the Soros Defendants' involvement in the Guinean government's expropriation of the Debtor's Mining Interests (generally, the "Soros Claim"). Driver Affidavit at ¶¶ 39-40.

29. By the Soros Claim, the Debtor and its co-plaintiffs seek to recover over $10 billion in damages arising from wrongful conduct of the Soros Defendants.

30. The Soros Claim is docketed in the District Court as *BSG Resources Limited v. Soros*, Case No. 17-cv-02726-JFK-OTW (S.D.N.Y. Apr. 14, 2017). *Id.* at ¶ 30. The Soros Claim, including discovery, is presently stayed pending the outcome of the Guinea ICSID Proceeding.

10

Driver Affidavit at ¶ 40. A status conference is scheduled before the District Court on July 18, 2019 to determine the next steps in the litigation, including providing an update on the Guinea ICSID Proceeding and the possible recommencement of discovery.

31. The Joint Administrators have been informed that the Soros Claim is pledged as collateral to secure the Debtor's obligations under a certain Litigation Funding Agreement dated as of November 2017 (the "Funding Agreement") between Litigation Solutions Limited ("LSL") and the Debtor, VBG, and BSGR Guinea. Driver Affidavit at ¶ 34. Pursuant to a certain Security Agreement between these parties, the Debtor has pledged and granted LSL a security interest over a portion of any recoveries on the Soros Claim. *Id.* The continued effectiveness of the Funding Agreement is critical to the Debtor's restructuring efforts. Without the proceeds from LSL, the Debtor would not have the resources to fund the costs necessary to pursue the Soros Claim.

### D. Standard Chartered Bank Assignment

32. In addition to Vale and LSL, the Debtor has one additional alleged creditor that may have an interest in, or be affected by, this Chapter 15 Case. Together with certain of its affiliates, the Debtor is a party to a certain Implementation Agreement (as amended from time to time, the "SC Agreement") with Standard Chartered Bank ("Standard Chartered"). Driver Affidavit at ¶ 32. The SC Agreement relates to the restructuring of a $92,000,000 amortizing term loan facility extended by Standard Chartered to certain of the Debtor's affiliates. *Id.* Under the terms of the SC Agreement, Standard Chartered purports to have taken an assignment of any proceeds (including, in summary, receivables, dividends from subsidiaries or the proceeds from any claims) that may be paid to the Debtor now or in the future as security for such amounts as may be owed by the Debtor to Standard Chartered under the SC Agreement. *Id.* at ¶ 33.

  E.  **Events Giving Rise to the Guernsey Administration**

  33.  The events giving rise to the Guernsey Administration are outlined in paragraphs 11 to 26, above.

  34.  In summary, by February 2018, the Debtor's board determined that the Debtor was insolvent or likely to become insolvent, satisfying the requirements of the laws of Guernsey in respect of the making of an administration order against the Debtor by the Guernsey Court. This determination was based mainly on the expropriation of the Debtor's Guinean mining interests and the potential for an adverse judgment in the Vale LCIA Proceeding.

**II.**  **Commencement of the Guernsey Administration**

  35.  On or about February 27, 2018, the Debtor, acting by its directors at that time, submitted an *Application by the Company for an Administration Order* to the Guernsey Court pursuant to Part XXI of the Companies (Guernsey) Law, 2008 (the "Guernsey Administration Application"). The Guernsey Administration Application was supported by the Driver Affidavit. Inasmuch as the Guernsey Administration Application and the Driver Affidavit contained confidential information and were submitted to the Guernsey Court under seal, the Guernsey Administration Application was heard *in camera* by the Guernsey Court on March 6, 2018. The Guernsey Court entered the Guernsey Administration Order on the same date.

  36.  The Guernsey Administration is on-going. The statutory purpose of the Guernsey Administration as set forth in the Guernsey Administration Order is the survival of the Debtor and the whole or any part of its undertaking as a going concern. The Joint Administrators' role is to fulfil this purpose. In order to achieve this, the Joint Administrators have been working closely with the Debtor's management and advisors to preserve and ultimately monetize the Debtor's valuable assets – including the Soros Claim and the Guinea ICSID Proceeding – and to defend against asserted liabilities (*e.g.*, the Vale LCIA Proceeding). *See* Progress Reports of BSG

12

Resources Limited – In Administration dated September 5, 2018 and March 7, 2019 annexed to the Verified Petition as **Exhibits D** and **E**.

37. I have been advised by counsel of the definition of a "foreign proceeding" under Bankruptcy Code section 101(23). To the best of my knowledge, I am not aware of any other "foreign proceeding" within the meaning of Bankruptcy Code section 101(23) with respect to the Debtor.

### III. Center of Main Interests of the Debtor

38. The center of main interests, or "COMI" for the Debtor is in Guernsey. The Debtor is organized under Guernsey law and has its registered office in Guernsey.

39. Further, although the Guernsey Administration has the effect of suspending the management powers of the Debtor's directors and officers, the Debtor's main office and its chairman are resident in Guernsey. Also, the Debtor's central decision-making function prior to its entry into the Guernsey Administration, both long-range and day-to-day, took place in Guernsey. Since the commencement of the Guernsey Administration, the Debtor's decision-making function has been carried out by the Joint Administrators, one of which is resident in Guernsey. Because the other Joint Administrator is resident in London, England, some of the Debtor's decision-making function may occur jointly in London and/or via telephone to Guernsey. In any event, the Debtor's accounting function, as well as all of its corporate books and records, including documents of title, are located in Guernsey.

40. Accordingly, I submit that, pursuant to Bankruptcy Code section 1516(c), the Debtor is entitled to the presumption that its COMI is Guernsey.

## Relief Sought

### I. Verified Petition

41. With this Declaration, the Joint Administrators have filed the Verified Petition seeking entry of an order providing the following relief:

   a. recognition pursuant to section 1517 of the Bankruptcy Code of the Guernsey Administration as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code;

   b. recognition that Joint Administrators are the "foreign representatives" on a final basis (as defined in section 101(24) of the Bankruptcy Code);

   c. through the extension of relief automatically available pursuant to section 1520 of the Bankruptcy Code, an order expressly barring, enjoining, and staying, pursuant to section 362 of the Bankruptcy Code, any action to interfere with the Debtor's assets located in the United States, specifically including but not limited to the Soros Claim;

   d. the extension of any provisional relief granted under section 1519(a) of the Bankruptcy Code pursuant to section 1521(a)(6); and

   e. such other and further relief as is appropriate under the circumstances pursuant to sections 105(a) and 1507 of the Bankruptcy Code.

42. To the extent the relief requested herein exceeds the relief available to the Debtor pursuant to section 1520 of the Bankruptcy Code, the Joint Administrators request this relief pursuant to sections 1507 and 1521(a)(1) and (2).

43. In the event the Court were to determine the Guernsey Administration is not a foreign main proceeding, the Joint Administrators request that the Court nevertheless grant the relief requested above pursuant to sections 1521 and 1507 of the Bankruptcy Code.

### II. Application for Order Setting Hearing and Providing for Notice Procedures

44. With this Declaration, the Joint Administrators have also filed an application requesting an order (i) scheduling the Recognition Hearing to consider the relief requested in the Verified Petition, (ii) setting a deadline by which all objections to the Verified Petition must be

14

filed and (iii) approving the form and manner of notice of the hearing on the Verified Petition as described in the Notice Application.

45.     By the Notice Application, the Joint Administrators propose to provide notice of this Chapter 15 Case and the Recognition Hearing upon certain Chapter 15 Notice Parties (as that term is defined in the Notice Application) which include Standard Chartered, LSL, Vale and the Soros Defendants. As proposed in the Notice Application, all such parties would receive notice of the Recognition Hearing.

46.     It is my belief that service of the notice of the Recognition Hearing in the manner proposed in the Notice Application will provide the Debtor's various parties-in-interest due and sufficient notice of the Recognition Hearing and objection deadline.

### III.    *Ex Parte* Application for Temporary Restraining Order

47.     In order to further the purpose of the Guernsey Administration, pursuant to the TRO Application filed contemporaneously herewith, the Joint Administrators are seeking immediate entry, on an *ex parte* basis, of a temporary restraining order and other relief to avoid disruption and irreparable harm to the Debtor's foreign restructuring efforts that could result from creditors and other parties taking action against the Debtor's assets in the United States pending the Recognition Hearing.

48.     As described above and in the TRO Application, it is incumbent that the Debtor be able to prosecute the Soros Claim without interference from Vale. Through the Vale Enforcement Petition, Vale is prematurely attempting to enforce a foreign arbitration award that is the subject of a current, pending challenge before a foreign court of competent jurisdiction. Moreover, to the extent Vale is allowed to reduce the LCIA Award to a judgment in the United States, that judgment may directly impair the Debtor's ability to meaningfully prosecute the Soros Claim and may ultimately seek to encumber any proceeds that the Debtor might obtain in connection therewith.

15

49.    Such interference and impairment will significantly reduce the ability of the Debtor, through the Joint Administrators, to achieve a successful outcome of the Guernsey Administration, including satisfying its stated purpose as the survival of the Debtor and the whole or any part of its undertaking as a going concern. In addition, the cost and expense of responding to and defending against the Vale Enforcement Action will almost certainly dilute any recovery or distribution that might be obtained by the Debtor's other creditors and will cause unnecessary distraction to the Joint Administrators, diverting their attention from their restructuring efforts in the Guernsey Administration. If allowed to proceed, the Vale Enforcement Action may allow Vale to defeat the priorities of Guernsey and United States insolvency law to the impairment of the asserted secured claims of Standard Chartered and LSL which will, in any event, need to be resolved in the Guernsey Administration. To the extent that Vale has alleged that the Debtor owns other assets in the United States in addition to the Soros Claim, such as a bank account or real estate, the Joint Administrators have investigated the presence of such assets and have been informed that no such assets exist.

50.    Under the circumstances and as set forth in the TRO Application, the Joint Administrators respectfully submit that the relief is necessary to prevent imminent harm to the Debtor and that prior notice is impractical under the circumstances.

51.    As notice and an opportunity to be heard will be afforded any party affected by such relief at the preliminary injunction hearing (and/or the Recognition Hearing), such other parties will be minimally, if at all, harmed by the entry of a temporary restraining order now.

52.    Accordingly, for the reasons described more fully in the TRO Application, the Joint Administrators respectfully submit that good and sufficient cause exists for the immediate provisional relief requested in the TRO Application.

53. No previous request for the relief sought in the TRO Application has been made to this Court or any other court.

[*Signature Page Follows*]

DM3\5777010.8

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: June 3, 2019

Malcolm Cohen

*Joint Administrator and Foreign Representative*
*for the Debtor BSG Resources Limited*
*(in administration)*