# Exhibit L



Tel: +44 1481 724561
Fax: +44 1481 711657
mail@bdo.gg
www.bdo.gg

PO Box 180
Place du Pré
Rue de Pré
St Peter Port
Guernsey
GY1 3LL

5 March 2020

TO ALL KNOWN AND CONTINGENT CREDITORS

Dear Sirs

**BSG Resources Limited (the 'Company') - In Administration**

In accordance with the Order of the Royal Court of Guernsey ('the Administration Order') handed down on 6 March 2018, I am reporting the progress made in the administration of the Company (the 'Administration') for the period from 6 September 2019 to 5 March 2020 ('the Period'), that being the fourth six month period of the Administration.

**1   Statutory Information**

William Callewaert and Malcolm Cohen of BDO Limited and BDO LLP, respectively, were appointed Joint Administrators (the 'Joint Administrators') of the Company by the Royal Court of Guernsey ('the Royal Court') on an application made by the Company. The appointment was made by way of an order of the Royal Court dated 6 March 2018 (the 'Administration Order')

The Company's registered office address is West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX and the Company's registered number is 46565.

**2   Background to the Administration**

Full details of the background to the appointment of the Joint Administrators were provided in their first report dated 5 September 2018.

In summary, the directors took the decision to apply to the Royal Court of Guernsey to place the Company into Administration with a view to realising its two major contingent assets, the ICSID arbitration against the Government of the Republic of Guinea and the claim against George Soros and other related parties in the United States, for the court-ordered purpose of the survival of the Company, and the whole or any part of its undertaking, as a going concern.

**3   Approach to the Administration**

As we stated in our first report, the Joint Administrators' role is to fulfil the purpose of the Administration Order as detailed above. In order to achieve this, the Joint Administrators have been working with and gathering information from the Company's directors and

BDO Limited    Registered in Guernsey number 29684
Directors      J M Hallett FCA  S M Phillips FCA CPA  R M Searle FCA C.Dir  A M Trebert FCCA

BDO Limited is registered to carry out audit work in the UK by The Institute of Chartered Accountants in England and Wales.

BDO Limited, a limited liability company incorporated in Guernsey, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.



working with many of its historic advisors who possess information which is relevant to the conduct of the Administration with the aim of fulfilling the purpose of the Administration Order.

The affairs of the Company, particularly the litigation matters, are varied, complex and largely interrelated and the Joint Administrators and their team have spent a considerable amount of time liaising with the Company's management, advisors and the lawyers instructed on each individual matter to progress those matters with the overall aim of fulfilling the purpose of the Administration Order.

As advised in our previous reports, the Joint Administrators have retained the Company's premises in Guernsey and its existing employees in order to maintain the historic knowledge and cooperation of these key individuals and to ensure the best prospects of a successful outcome for the Administration.

## 4 Litigation Matters

An overview of each of the major litigation matters are set out below.

### 4.1 Claim Against the Republic of Guinea

As previously reported, in March 2019, a non-binding settlement term sheet was signed by the Joint Administrators (on behalf of the Company), as well as by representatives of two of the Company's subsidiaries (each of which is a co-claimant to the ICSID arbitration) and the Government of Guinea. The settlement term sheet sets out a provisional structure for the potential consensual settlement of the ICSID arbitration, but does not impose binding obligations on any of the parties to it. Following the signing of the settlement term sheet, the parties to the ICSID arbitration asked the tribunal to suspend work on producing its ruling, pending the finalisation of a binding settlement. This suspension of the arbitration remains in force but can be brought to an end by any party if negotiations regarding a binding settlement break down at any time.

The non-binding settlement envisages that, if binding arrangements for a settlement are agreed, all of the Company's claims to the Simandou and Zogota exploration and mining licenses shall be released in return for the Government of Guinea granting a new mining license over the Zogota deposits, to be exploited by a third party, Niron Metals plc ('Niron'), with the Company being entitled to participate in the revenues from this license.

The Joint Administrators will not enter into any binding settlement until they are satisfied that it is in the best interests of the Company and its creditors and other stakeholders. A review of Niron's preliminary plans, projections and feasibility studies has been undertaken and, at the time of our previous report, a member of the Joint Administrators' team with specialist mining expertise had visited the Zogota site with a representative of Niron.

Since our last report to creditors Niron has continued to have its own external consultants on site to prepare a detailed feasibility study and plan. This includes looking in detail at mining, transport and logistics. We understand that they have also been in discussions with relevant governments, contractors and other third parties which will be needed to export



the iron ore deposits. The Joint Administrators have maintained communications with Niron and anticipate being provided with Niron's detailed feasibility study in the coming weeks.

Due to the complexities involved, it is the Joint Administrators' intention to engage their own external specialist mining consultants to assess Niron's final feasibility study. In this regard, the Joint Administrators approached three well-regarded international firms of mining consultants to obtain proposals. The Joint Administrators have chosen the firm that they believe will offer the necessary expertise and have agreed a budgeted cost for the work to assess the feasibility study. This will include further site visits. However, as Nysco has not yet provided funding for this activity (see section 7.1 below on Nysco's relationship to the Company and its funding of the Administration), and absent other sources of financing, the Joint Administrators have not been able to instruct the firm to commence their work and are at present unable to progress their detailed evaluation of the settlement.

The Joint Administrators currently anticipate that it will be several more months before this work is completed and they are in a position to conclude on the acceptability of this deal or an alternative deal with similar or better economic effect for the Company.

The Joint Administrators have previously mentioned the matter of inaccurate reports that had appeared in the press to the effect that the proposed settlement has been finalised and is binding on the parties to it. Although the Joint Administrators made it clear (and maintain their position) that these reports were incorrect and inaccurate it is apparent that they are being represented as fact by certain parties. The Joint Administrators continue to monitor reports made in the press about the settlement term sheet and the Company generally and will consider whether any steps should be taken in respect of any such reports.

The Joint Administrators became aware from press reports in late July/early August 2019 that the Republic of Guinea was seeking developers for the Simandou iron ore deposit (being one of the deposits that are the subject of the ICSID claim). The Joint Administrators immediately wrote to the Republic of Guinea (both directly and via its legal representatives) in order to reserve the Company's rights to take such action as considered necessary to protect the Company's interests against the Republic of Guinea (which include its interests in the Simandou Deposits). It was subsequently reported in an article in the Financial Times on 13 November 2019 that a Chinese backed joint venture had been awarded the right to exploit Simandou. The Joint Administrators wrote to the Republic of Guinea's intermediary and its lawyers expressing their concerns regarding this arrangement again. A telephone discussion was held between the Joint Administrators and their lawyers and with lawyers representing the Republic of Guinea in this regard and it has been agreed that a meeting between the Joint Administrators and the Republic of Guinea be held to consider this matter further. Due to the recent elections that have been held in Guinea this meeting has not yet taken place.

As noted above, there is still a significant amount of work to be done before the Joint Administrators will be in a position to determine whether a binding settlement of the claim against the Republic of Guinea is in the best interests of the Company. If the Joint Administrators do agree to a binding settlement deal, the Joint Administrators will seek the sanction of the Royal Court prior to entering into it.



### 4.2 Filing for Mutual Recognition Under Chapter 15 of the Bankruptcy Code

As previously reported, the Joint Administrators have made an application to the US Bankruptcy Court for the Southern District of New York (the 'Bankruptcy Court') for recognition of the Administration under Chapter 15 of Title 11 of the United States Bankruptcy Code ('Chapter 15').

Chapter 15 recognition, if granted upon the terms requested by the Joint Administrators, will enable the Joint Administrators to obtain a stay of any action to execute against or attach the Company's assets located in the US. Such relief will allow the Joint Administrators to retain control of the Soros Proceedings (as detailed in section 4.4 below) and any subsequent award arising therefrom, with a view to an eventual distribution of any realisations received by the Company in respect of the Soros Proceedings to the Company's creditors in accordance with the order of priorities provided for under Guernsey law.

The Chapter 15 application is being vigorously contested by Vale S.A ('Vale'), the largest unsecured creditor of the Administration, on the basis that Vale alleges the Joint Administrators' application does not meet the tests required to be granted Chapter 15 recognition as a foreign main proceeding and in particular that the Company's centre of main interest ('COMI') is not located in Guernsey. As well as satisfying other legal requirements, COMI must be found to be in Guernsey in order for the application to be successful, on the basis that the relief is being sought by insolvency office holders appointed in main plenary proceedings which are being conducted under the laws of Guernsey (and which are therefore capable of being recognised in other jurisdictions).

The Joint Administrators are continuing to respond to a significant and wide-ranging document discovery request from Vale that comprises some 68 individual document requests (the 'Document Requests') that Vale considers to be relevant to the determination of the COMI of the Company.

The discovery process has proven to be particularly complex due to the very large size of BSGR's full document population, the multi-jurisdictional nature of the Administration, the new (and largely untested) restrictions on cross-border data transfer imposed by the European General Data Protection Regulations ('GDPR') and the need to ensure that the documents released are not subject to qualifying privilege ('Privilege').

As production has continued and, in the Joint Administrators' view, been substantially completed, Vale have disputed the appropriateness of a number of the searches prepared by the Joint Administrators to identify documents responsive to the Document Requests.

In order to assist in reaching resolution of these disputes, the Bankruptcy Court appointed a Discovery Neutral (a retired Bankruptcy Judge) whose role is to understand the issues in dispute, assist the parties in coming to an agreement or, in the absence of an agreement, to issue recommendations to the presiding Judge in the Bankruptcy Court as to the appropriate steps to be taken to resolve the issues.

Following several meetings with the Discovery Neutral, and related correspondence between the parties, the process is continuing. However, a number of the disputes have now been settled and the Joint Administrators' team is continuing to work to complete the production.



To date the Joint Administrators' team has reviewed over 92,000 documents as part of the discovery process that has included reviewing documents for responsiveness, GDPR and Privilege as well as conducting a quality control process. It is anticipated that at least a further 13,000 documents will be reviewed as part of this process.

When document discovery is complete, the Joint Administrators anticipate that the Bankruptcy Court will schedule a hearing for the Chapter 15 Recognition. In advance of such hearing, Vale will have an opportunity to take the depositions of certain witnesses.

### 4.3 Claim by Vale S.A.

*English proceedings against BSGR*

As mentioned in our last report, on 4 April 2019 the London Court of International Arbitration ('LCIA') made an award in favour of Vale in respect of proceedings brought by Vale against the Company relating to alleged fraudulent misrepresentation. The award was for US$1,246,580,846 plus pre- and post-award interest. The total claimed by Vale is in excess of US$2 billion. On 9 May 2019 Vale obtained an enforcement order from the High Court of Justice in England ('the High Court'). That order was stayed pending the outcome of a challenge of the LCIA's decision by the Joint Administrators on behalf of the Company.

A trial of certain preliminary issues was held on 4 September 2019. In its judgment issued on 20 September 2019 the Court made the following orders:

a. Vale's application for the Company to pay security for the award was denied;
b. The Company was ordered to pay security for Vale's costs of the challenge in the amount of $510,000;
c. The Court declined to set aside an order enabling Vale to enforce the award or to stay enforcement of the award;
d. The Court permitted the Company to amend its Challenge Application; and
e. The Court refused Vale's application to impose a condition on the Company pursuing the Challenge Application that the Company pay the outstanding costs order of Mr Justice Popplewell (made prior to the appointment of the Joint Administrators).

The Challenge Application itself was heard on 28 and 29 November 2019. The Court dismissed the challenge in a judgment given at the end of the trial. Costs were awarded to Vale on the indemnity basis. These costs were covered by the payment of security for costs made pursuant to the 20 September 2019 order.

*US enforcement proceedings*

In addition to seeking to enforce the LCIA award in the UK, Vale has been seeking recognition of the LCIA award in the US District Court for the Southern District of New York ('the District Court') and to enforce that award in the USA (the 'Enforcement Proceedings'). If successful, Vale could seek to interrupt or control the Company's claim against George Soros and his Open Society Foundation (the 'Soros Proceedings') and any subsequent award arising from the Soros Proceedings. The Company contested the Enforcement Proceedings



in the District Court pending the outcome of the Challenge Application and the granting of relief under Chapter 15 of the Bankruptcy Code, which would stay the Enforcement Proceedings and any other proceedings commenced in respect of assets located in the US.

Following the dismissal of the Challenge Application, the Joint Administrators' objections to the entering of an award in favour of Vale reflecting the decision of the LCIA were moot. Accordingly, the Joint Administrators and Vale negotiated a stipulation that was presented to the District Court on 21 February 2020 consenting to the entering of a judgment in favour of Vale and that is expected to be ordered by the District Court shortly.

The stipulation also dealt with the issue of Vale's right to enforce its judgment in the USA. Over the preceding weeks, the Joint Administrators have been working intensively with their lawyers to prevent enforcement taking place prior to a decision by the Bankruptcy Court on recognition of the Chapter 15 petition, which could in effect render Chapter 15 relief pointless if the Company had already lost control of its US located asset. The Joint Administrators' US lawyers had been working on the preparation of an application for a temporary injunction to prevent Vale from enforcing prior to the recognition hearing. At the same time, the District Court had asked both parties to file a statement setting out their views on the possible effects of enforcement by Vale on the ongoing insolvency proceedings and as to which court in the USA should hear the application for a temporary injunction.

Whilst these documents were being prepared, intensive discussions were taking place between the parties' respective lawyers with a view to a consensual temporary resolution of these issues.   Subject to approval by the District Court, the Joint Administrators and Vale have agreed that (amongst other things) Vale will refrain from taking certain enforcement action in the US for a period of 150 days, during which time the Joint Administrators expect that the Chapter 15 application will have been decided by the Bankruptcy Court, and that for a period of 90 days Vale would refrain from seeking discovery from the Company in furtherance of the enforcement of its judgement against the Company.

*Claims against third parties*

In addition to seeking to make recoveries from the Company, Vale also commenced action in the High Court in November 2019 seeking recovery from the Company's parent companies, as well as from individuals currently or formerly connected with the Company (including Mr Beny Steinmetz). Vale also applied for and were granted a worldwide freezing order ('WFO') over the assets of the defendants up to the amount of its claim. The Joint Administrators understand that the defendants intend to defend the claim and to apply to have the WFO set aside or amended.

Following the making of the WFO, the Joint Administrators have been working with their lawyers to assess its effect on the Administration and have become involved in extensive correspondence and discussions both with Vale and with certain defendants concerning requests for information which the defendants are required to produce to Vale.

Although not directly covering the Company itself, the WFO has nonetheless had an effect upon the operation of the Administration. Indeed, the WFO restricts the activities of one of BSGR's two directors and the Company's funding source, Nysco. As well as requiring the attention and involvement of those BSGR personnel who are continuing to assist the Joint



Administrators in carrying out their functions, the detailed terms of the WFO have caused a hiatus in funding the Administration due in particular to the restrictions imposed upon Nysco when dealing with its assets and cash. Although the situation has been alleviated to some extent in recent weeks, there remains a large backlog of payments to the Joint Administrators and their lawyers, whose continued forbearance and commitment to the interests of the creditors as a whole is acknowledged and appreciated by the Joint Administrators. It is imperative for the successful continued operation of the Administration and the fulfilment of the Court ordered objective of the Administration that these funding difficulties can be resolved in the near future.

### 4.4 Claim against George Soros

We previously reported that in 2017, prior to the Joint Administrators' appointment, the Company had filed a complaint against George Soros and related parties in the District Court. The complaint asserts various claims against George Soros, his Open Society Foundations and related entities arising out of or related to their alleged actions intentionally to deprive the Company of its iron ore mining interests in the Simandou region of Guinea. The complaint seeks not less than US$10 billion in damages.

The defendants filed a motion to dismiss and in November 2017 the District Court granted the defendants' request for a stay of the litigation pending resolution of the ICSID Arbitration described above, without otherwise ruling on the merits of a motion to dismiss.

When we last reported, the litigation had been stayed until the next hearing, which was scheduled for 10 December 2019. In the event and in light of the other significant matters which were ongoing in the Administration, including the Chapter 15 application and the proceedings commenced by Vale, the Joint Administrators agreed to a further extension of the stay pending a hearing which has now been scheduled to take place on 24 March 2020.

The Soros litigation is potentially one of the two largest assets of the Company and therefore the resolution of the litigation is expected to play an important role in the Joint Administrators' efforts to preserve the Company or any part of its undertaking as a going concern. The Joint Administrators are currently considering their approach to the 24 March hearing.

### 4.5 Cunico Litigation

As previously reported, the Company is directly involved as a party to four separate litigation proceedings:

- It is a respondent to proceedings brought in the District Court of Amsterdam, Netherlands by, amongst others, a Dutch registered company, Cunico Resources NV ('Cunico'). The Company (and the co-defendants) are contesting the jurisdiction of the District Court of Amsterdam. A hearing was scheduled for pleadings on that specific issue on 14 November 2019. However, Cunico requested that the court delay the hearing because there were cross-party settlement discussions going on. All other parties bar one agreed to the delay. The Court requested an update by 25 February 2020 as to whether the parties wished to continue the proceedings prior to this date, the Company's Dutch lawyers received a request from Cunico and other



parties to the dispute for a further stay in order to continue settlement discussions. Based upon advice from the Company's lawyers, the Joint Administrators have agreed to a further stay. Subsequently, the Court granted a further stay until 17 June 2020.

- The Company is a co-claimant in appeal proceedings against Cunico (amongst others) in the Court of Appeal in Amsterdam. These proceedings were struck off the docket but can be recommenced at any given time by any of the parties. As previously reported, the Joint Administrators used their own specialist investigator to look into the underlying assets to assess the likelihood of making recoveries if the Company is successful in its appeal in respect of the Cunico litigation. However, the information that the Joint Administrators have identified is not up to date and it is difficult for the Joint Administrators to determine whether further action is in the best interests of the Company. The Joint Administrators have held discussions with Cunico's lawyers in order to explore alternative approaches to ascertain the current asset base of Cunico. Any continuation of the appeal would be subject to obtaining litigation funding. Dutch attorneys have provided advice as to the likelihood of success of an appeal. The Joint Administrators are awaiting further communications with Cunico's lawyer to assist them in assessing the likelihood of any assets of value being available in order to evaluate the likelihood of obtaining litigation funding, the prospects of success and the prospects of any subsequent recovery.

- As previously advised, the Dubai Courts made judgement in favour of the Company against Cunico Marketing FZE ('CMFZE') and rejected an appeal. Dubai lawyers have commenced execution.

- In respect of the matter where the Company is a co-defendant in an action filed in the Supreme Court of the Bahamas, no Statement of Claim has been filed. The Joint Administrators continue to monitor the situation and will take appropriate action should it become necessary.

In respect of the other litigation in which the Company is indirectly involved, these proceedings continue to be stayed, are subject to extensions, put on hold or discussions are taking place between the parties. Settlement discussions with the other parties are being undertaken as appropriate with the objective of maximising the return, if any, to the Company.

The Joint Administrators will continue to monitor all aspects of the Cunico Litigation, whether the Company has a direct or indirect interest, in order to maximise the return (or minimise the loss), if any, to the Company.



5    Assets

In addition to the potential litigation recoveries mentioned above, the other main assets of the Company are as follows:

5.1  Octea Limited and Subsidiaries

As previously reported, the Company owns a direct subsidiary company, Octea Limited ('Octea'), that acts as the holding company for a group of companies engaged in diamond mining, extraction and refinement based in Sierra Leone, as well as the marketing and sale of diamonds.

The Joint Administrators monitor Octea's performance in consultation with its management and have observer status on its board. Whilst operations at the mine have been proceeding satisfactorily, there has been a continued requirement for investment in capital expenditure which, coupled with a persisting depressed rough diamond market, has resulted in difficult trading conditions.

Prior to the appointment of the Joint Administrators, the Company advanced funds to Octea under the provisions of a loan combination agreement dated 31 July 2012. As at 29 February 2020, the balance owed by Octea to the Company is US$166million.

The repayment of the balances will be dependent on the financial success of the underlying diamond operations described above. The Joint Administrators note that Octea will only be in a position to repay the balances due to the Company when prior ranking debts due to Star West Investments Limited (detailed below) have been satisfied. The Company is further exposed to the financial position of Octea pursuant to a guarantee in favour of Star West Investments Limited.

5.2  West African Power Limited

As previously reported, the Company owns a direct subsidiary company, West African Power Limited ('WAPL'), which ultimately holds, through a group of subsidiary undertakings, a minority investment in a Nigerian company, Amperion Power Distribution Company Limited ('Amperion'). Amperion is the owner of a power station located in Geregu, Nigeria.

For several years WAPL has been in dispute on a number of issues with its investee company and with the majority shareholder in Amperion, Forte Oil PLC ('Forte'), which has historically exercised de facto control over Amperion and who, it is alleged, has denied WAPL its rights to participate in its management.

During 2019 Forte disposed of its interest in Amperion to Calvados Global Services Limited ('Calvados'), a company understood to be owned by Femi Otedola, the previous majority shareholder of Forte.

On 17 June 2019 and 19 June 2019 Calvados filed applications with the Federal High Court in Lagos, Nigeria to prevent WAPL from transferring or otherwise dealing with its shares in Amperion. In addition, an order was sought permitting Calvados to dilute WAPL's shareholding in Amperion as a consequence of its alleged failure to offset its capital contribution to the acquisition of the Geregu power station.



The Joint Administrators understand that following an initial judgment made in favour of Calvados an appeal was filed by WAPL which has resulted in the initial judgment being stayed pending determination by the Nigerian Court of Appeal. The Joint Administrators further understand that the matter has not yet been formally listed for a substantive hearing and that liaison with the Court of Appeal registry is ongoing.

### 5.3 Roslindale PTE Ltd

The Company holds 64,826,482 redeemable preference shares in Roslindale PTE Ltd ('Roslindale'). The shares were issued at US$1 per share and carry the right to a preferential dividend which is payable as and when determined by Roslindale's board of directors.

As previously reported, the Company's management recognised an impairment to the value of these shares during 2016 to US$1,000 in aggregate, as a result of significant uncertainty over future cash flows attributable to this asset.

The Joint Administrators understand that the underlying asset of Roslindale is an undeveloped oil and gas field located in the Middle East that is the subject of territorial disputes between Israel and Cyprus. The Joint Administrators further understand that no dividend has been received from this investment to date.

The Joint Administrators are not presently in a position to determine whether this asset has any realisable value to the Company.

### 5.4 Bank Account

The Company holds a bank account with Banque J Safra Sarasin in Switzerland. At the date of appointment there was US$17,947 in this account. As at 20 February 2020, the balance of funds total US$13,454. The movement in this balance is attributable to bank charges levied.

### 5.5 Debtors

**BSG Capital Markets Limited ('Capital Markets')**

As previously reported, Capital Markets is indebted to the Company for US$1.8m, which sum fell due for payment on 31 December 2018. The Joint Administrators demanded payment of this amount but settlement has not been forthcoming, reportedly due to continued inadequate liquidity in Capital Markets.

The discussions with the debtor regarding a formal proposal to repay the amount outstanding were paused following the making of the WFO, but are expected to be recommenced shortly.

**BSG Real Estate Limited ('Real Estate')**

The sum of US$32,823 is due to the Company in respect of rent receivable from Real Estate, which occupied part of the Company's offices in Guernsey.

The Joint Administrators have demanded payment of this balance, which remains unpaid.



### Former Employee

A former employee of the Company and of two of the Company's subsidiaries, Asher Avidan, was arrested in Israel in 2016. The Company provided US$290,000 equivalent, to be lodged as a bail bond. The bond was subsequently released, but was remitted to Mr Avidan rather than being repaid to the Company.

Mr Avidan has refused to repay the monies to the Company. The Joint Administrators have received funding to retain an Israeli law firm to recover the amount due, however during December 2019 Mr Avidan was made a respondent to the WFO issued by the High Court. Accordingly, the Joint Administrators concluded that there was no benefit in taking further steps to recover this debt at present, but will continue to monitor the position with respect to the WFO and its effect on Mr Avidan.

## 5.6 Investigation of Assets

The Joint Administrators have a duty to identify any potential assets of the Company other than those mentioned above and continue to review the Company's records and investigate any potential claims that the Company may have against third parties. The Joint Administrators are also mindful of, and continue to monitor developments concerning, potential additional claims which may be made for the benefit of the Company and its creditors. To the extent that the Joint Administrators take steps to pursue any such claims we will report to and update creditors accordingly.

If you are aware of any asset or potential asset that is not included above, please provide relevant information to the Joint Administrators.

## 6  Creditors

## 6.1 Secured Creditors

### Standard Chartered Bank PLC ('SCB')

SCB is the historic lender to the Company and certain of its subsidiary undertakings and has asserted a claim to have security over all proceeds flowing into the Company to the extent of the full amount of the debt owing to it. Prior to the appointment of the Joint Administrators, the debt due to SCB was US$16m, which SCB allege increased to some US$75m plus accruing interest as a result of the Company entering administration. The Joint Administrators (on behalf of the Company) and SCB respectively have currently reserved all their rights in respect of the SCB position until it becomes necessary to resolve the question of the quantum of SCB's claim.

The Joint Administrators have continued to be in communication with SCB on a regular basis.



**Star West Investments Limited ('Star West')**

During 2016 and 2017, Star West acquired, on broadly the existing commercial terms, loan facilities between SCB and Octea and Laurelton Diamonds Inc. ('Laurelton') where the Company acted as the guarantor of those facilities.

As a result of the acquisition of the debt from SCB and Laurelton, Star West became the beneficiary of a security granted over the shares of Octea as security for the Company's guarantees of Octea's facility obligations to SCB and Laurelton.

To date, the guarantees provided by the Company under the terms of the facility have not been called upon by Star West and at present there is no debt due to Star West by the Company (although the Joint Administrators understand that there may be a technical default under the facility documents with respect to the Company entering Administration).

As at 29 February 2020, Octea is believed to be indebted to Star West in the amount of US$161million.

### 6.2 Unsecured Creditors

Following the unsuccessful challenge of the LCIA award, Vale S.A. is the principal unsecured creditor with a claim in excess of US$2 billion plus accruing interest. As previously reported, the total of the other known unsecured claims is currently believed to be some US$7 million.

## 7 Receipts and Payments Account

Attached is a summary of the receipts and payments account for the Administration to date. We comment as follows:

### 7.1 Funding

The Company has no liquid assets with which to fund the costs of the Administration.

As previously reported, a formal funding agreement between Nysco Management Corp. (the Company's immediate parent company) ('Nysco') and the Company was entered into on 18 December 2018 (the 'Funding Agreement'). The Funding Agreement sets out the terms on which Nysco has agreed to provide funding by way of loan facilities for certain aspects of the Administration.

Since our previous report £1,521,079 has been received from Nysco in respect of the Joint Administrators' fees, disbursements and legal costs incurred. However, over recent months and in particular since the making of the WFO, there has been a significant backlog of payments due under the Funding Agreement. The Joint Administrators have made it clear to representatives of Nysco that the lack of funding is now making it problematical for both the Joint Administrators themselves and for many of their advisors to progress the Administration as they would wish.



Included in the above amount is an accrual for the sum of £10,000 requested and received from Nysco in order to settle the initial legal costs expected to be incurred by the Israeli law firm in pursuing the debt due from the Company's former employee, Mr Avidan. These legal costs have not yet been incurred.

A sum of £100,000 is held by the Joint Administrators as a buffer amount which may be utilised under various circumstances including to settle certain unexpected costs that may arise.

A summary of the total amount loaned to the Company as at 25 February 2020 is set out as Appendix 1.

### 7.2 Asset Realisations

There have been no asset realisations in the Period.

### 7.3 Payments

Payments made in the period comprise the Joint Administrators' fees and disbursements and legal costs incurred by them. The Joint Administrators' fees and disbursements are discussed in detail at paragraph 8 below.

In the Period of this report legal costs incurred total £374,646 for which funding of £288,527 has been requested and of which £118,255 has been received.

In addition to the above, the Joint Administrators have engaged Duane Morris LLP to act for them in regard to certain of the US proceedings. Nysco has been paying Duane Morris's costs direct and to date has paid $500,000.

A total of nearly £1million is currently owed to a number of law firms whose fees are paid directly by Nysco.

### 7.4 Trading

Prior to the Joint Administrators' appointment, the Company acted as an adviser and administration function for a number of its subsidiaries and has continued to do so. Operational costs have been incurred, principally in respect of salaries and legal and professional fees.

Under the terms of a management agreement, fees will become payable to the Company from its direct subsidiary, Octea, upon the occurrence of certain milestones. The quantum and timing of this management fee is presently uncertain.

### 8   Joint Administrators' Remuneration

Following the first anniversary of the Joint Administrators' appointment, in accordance with the Funding Agreement, the Joint Administrators prepared a budget setting out their expected fees that would be incurred in the year to 5 March 2020. The fee budget was



agreed at £1,129,857 which represented an estimated 2,195 hours of work. This budget was approved by the Royal Court.

During the period covered by this report, the legal proceedings involving the Company, most significantly the Chapter 15 application and related document discovery, has resulted in the need for significant costs to be incurred in excess of the amount budgeted. In the period 6 March 2019 to 25 February 2020 the time spent amounted to 6,265.45 hours at a cost of £2,884,752.

The tables at Appendix 2 summarise the Joint Administrators' time costs incurred in the Period of this report and from appointment up to the date of preparation.

As at 25 February 2020 time costs totalling £1,995,557 have been incurred by the Joint Administrators since 6 September 2019.

In the period of this report Nysco advanced £1,521,079 to the Administration account in respect of the Joint Administrators' fees, disbursements and legal costs payable by the Company.

At the time of preparing this report £1,358,862 of requested funding remains outstanding. The Joint Administrators' fees for the month of February 2020 are expected to be in the region of £250,000 but have not yet been requested.

Since November 2019 Joint Administrators' fees amounting to £156,791 have been deferred for payment and will be payable should funds become available.

## 9  Disbursements

Direct disbursements are recovered in respect of precise sums paid or payable to third parties during the Administration. In the Period covered by this report, expenses totalling £280,644 have been incurred, as detailed in the table below.

| Disbursement | Amount £ |
| --- | --- |
| Data processing & hosting | 170,723.59 |
| Air travel | 20,759.44 |
| Ground travel | 1,408.19 |
| Hotels & subsistence | 1,918.02 |
| Office holder insolvency bonds | 362.88 |
| Public relations advice | 10,262.00 |
| Other | 10.00 |
| Legal costs | 75,200.00 |
| | 280,644.12 |

Data processing & hosting costs have been incurred principally in respect of the discovery process in the Chapter 15 case in the US. The expenses relate to the costs of engaging paralegal staff to review the Company's documents for responsiveness to the discovery requests, the licencing of the document review software platform and the cost of hosting the data on remote storage to allow access by the Joint Administrators' US lawyers.



Air travel predominately relates to travel to the US by the Joint Administrators and their team to attend US court hearings in respect of the Chapter 15 application.

The arbitration proceedings and other matters relating to the Company or entities associated with the Company resulted in a significant amount of media interest. The costs reported relate to the Joint Administrators' public relations advisors who manage media relations at their direction.

Legal costs disbursements relate to £75,200 incurred in respect of advice relating to the interaction of the GDPR and the US discovery process.

## 10  Future of the Administration

As mentioned above, the court-ordered purpose of the Administration is the survival of the Company and the whole or any part of its undertaking as a going concern.

The two major contingent assets in this Administration are the ICSID arbitration against the Republic of Guinea and the US litigation against George Soros. The status of these two matters has been set out above and the outcomes will determine the future strategy of the Administration and whether or not it will be possible for the Joint Administrators to achieve the purpose of the Administration. The Joint Administrators have taken legal advice as to the applicable legal requirements in this regard (in respect of which privilege is not waived) and will continue to do so.

If you require any further information, please contact the Joint Administrators at William.Callewaert@bdo.gg.

Yours faithfully
For and on behalf of
BSG Resources Limited

W- C

William Callewaert
Joint Administrator



## Appendix 1
### Joint Administrators' Summary Receipts and Payments Account

|  | Notes | From 1 Sep 2019 To 25 Feb 2020 £ | From 6 Mar 2018 To 25 Feb 2020 £ |
|---|---|---|---|
| **RECEIPTS** | | | |
| Funds loaned by Nysco Management Corporation | 1 | 1,521,079 | 2,308,812 |
| Buffer amount loaned by Nysco Management | 2 | - | 100,000 |
| Interest received | | 151 | 304 |
| | | 1,521,231 | 2,409,117 |
| **PAYMENTS** | | | |
| Joint Administrators' Fees | 3 | 1,191,797 | 1,723,078 |
| Joint Administrators' Disbursements | 3 | 80,391 | 94,566 |
| Legal Fees and Disbursements | 4 | 234,479 | 476,756 |
| Bank Charges | | 520 | 634 |
| | | ( 1,507,188) | ( 2,295,035) |
| **Total/Balance Held By The Joint Administrators** | | 14,043 | 114,082 |
| **MADE UP AS FOLLOWS** | | | |
| UK Administration Account | | | 43 |
| UK Buffer Account | 2 | | 100,262 |
| Guernsey Administration Account | | | 13,778 |
| | | | 114,082 |
| **NYSCO LOAN ACCOUNT** | | | |
| **Operating Costs** | | | |
| Salaries and associated costs (tax & soc.sec.) | 5 | ( 124,495) | ( 432,763) |
| Legal & professional fees | | ( 24,004) | ( 169,317) |
| Insurance: D&O cover | 6 | ( 102,333) | ( 201,093) |
| Office costs | | ( 7,509) | ( 58,830) |
| | | ( 258,341) | ( 862,003) |
| **Legal Fees & Associated Costs** | | | |
| Legal fees & disbursements | | ( 400,846) | ( 2,879,321) |
| IT services (online document archival) | 7 | ( 16,845) | ( 114,963) |
| US Legal Fees | 8 | ( 384,527) | ( 384,527) |
| | | ( 802,218) | ( 3,378,811) |
| **Joint Administrators' Fees & Disbursements** | | | |
| Pre-appointment fees & disbursements | | | ( 64,500) |
| Post-appointment fees | | ( 1,191,797) | ( 2,973,494) |
| Post-appointment disbursements | | ( 80,391) | ( 99,590) |
| | | ( 1,272,188) | ( 3,137,584) |
| **Total Loaned To BSG Resources Ltd (In Administration)** | | ( 2,332,747) | ( 7,378,398) |

### Notes

1. The Company's direct parent company, Nysco Management Corporation, has agreed to fund the Joint Administrators' fees, disbursements and legal costs.
2. Nysco Management Corporation has provided the sum of £100,000 to be held in respect of costs that require immediate funding.



3. The Joint Administrators' fees are approved by the Royal Court of Guernsey. Funding for fees and disbursements totalling £1,359k has been requested from Nysco Management Corp and has not yet been received. Fees for February 2020 have not been requested but are expected to be in the region of £250k.
4. During the period funding has been requested for legal fees and disbursements totalling £286k, of which £118k has been received. The balance of the £234k relates to funding received in this period for costs incurred in the previous period.
5. The Company retains two members of staff who provide administrative and operational functions.
6. Director and Officer insurance indemnity cover has been obtained in respect of the retained employees.
7. IT services includes the provision of cloud-based storage for data and digital documents relating to various legal proceedings.



## Appendix 2

**BSG Resources Limited (In Administration)**
**Summary of Joint Administrators' Time Costs**
**For the Period of this report (6 September 2019 to 25 February 2020)**

For the Period 6 September 2019 to 25 February 2020

| | Partner £712 per hour | | Principal/Director £457 per hour | | Senior Manager/Manager £402 per hour | | Other £230 per hour | | Total £420 per hour | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Hours | £ | Hours | £ | Hours | £ | Hours | £ | Hours | £ |
| Appointment Matters | - | - | - | - | - | - | - | - | - | - |
| Day One Matters | - | - | - | - | - | - | - | - | - | - |
| Litigation Matters | 496.30 | 362,936.45 | 891.20 | 407,286.23 | 1,952.85 | 799,033.94 | 95.65 | 30,455.69 | 3,436.00 | 1,599,712 |
| Trading Matters | 53.05 | 28,121.91 | 118.80 | 54,062.37 | 58.85 | 21,306.29 | 10.25 | 940.95 | 240.95 | 104,432 |
| Tax | - | - | - | - | - | - | - | - | - | - |
| Statutory Compliance | 1.90 | 1,382.65 | 15.10 | 6,280.56 | 22.60 | 7,734.78 | 0.75 | 168.75 | 40.35 | 15,567 |
| General Administration | 58.20 | 41,734.05 | 129.05 | 57,113.28 | 260.15 | 94,260.69 | 84.40 | 12,394.71 | 531.80 | 205,503 |
| Other Matters | 39.75 | 28,332.50 | 58.85 | 29,757.29 | 29.60 | 12,254.40 | | | 128.20 | 70,344 |
| Agreed Discount | - | - | - | - | - | - | - | - | - | - |
| Agreed Deferral | | | | | | | | | - | 156,791 |
| | 649 | 462,508 | 1,213 | 554,500 | 2,324 | 934,590 | 191 | 43,960 | 4,377 | 1,838,766 |

For the Period of the Administration

| | Partner £703 per hour | | Principal/Director £455 per hour | | Senior Manager/Manager £386 per hour | | Other £203 per hour | | Total £437 per hour | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Hours | £ | Hours | £ | Hours | £ | Hours | £ | Hours | £ |
| Appointment Matters | 21.50 | 14,943.00 | 49.10 | 22,839.00 | 10.85 | 4,030.00 | - | - | 81.45 | 41,812 |
| Day One Matters | 6.50 | 4,526.00 | 33.90 | 12,987.00 | 45.00 | 16,100.00 | 0.30 | 33.00 | 85.70 | 33,646 |
| Litigation Matters | 1,120.05 | 800,413.68 | 1,700.95 | 788,134.10 | 2,331.10 | 940,986.29 | 134.90 | 40,518.59 | 5,287.00 | 2,570,053 |
| Trading Matters | 137.25 | 80,211.23 | 456.10 | 188,817.58 | 301.10 | 96,455.40 | 18.05 | 2,378.01 | 912.50 | 367,862 |
| Tax | 6.35 | 4,440.23 | 25.21 | 16,772.29 | 1.00 | 302.40 | 3.65 | 646.00 | 36.21 | 22,161 |
| Statutory Compliance | 5.35 | 3,865.91 | 115.70 | 44,290.16 | 93.30 | 28,339.73 | 42.30 | 6,026.63 | 256.65 | 82,522 |
| General Administration | 166.65 | 118,851.70 | 355.50 | 159,751.90 | 599.50 | 219,952.23 | 105.40 | 14,352.78 | 1,227.05 | 512,909 |
| Other Matters | 187.45 | 132,648.09 | 349.15 | 169,460.96 | 269.90 | 105,014.50 | 36.25 | 5,081.13 | 842.75 | 412,205 |
| Agreed Discount | - | - | - | - | - | - | - | - | - | 75,856.00 |
| Agreed Deferral | - | - | - | - | - | - | - | - | - | 156,791.00 |
| | 1,651 | 1,159,900 | 3,086 | 1,403,053 | 3,652 | 1,411,181 | 341 | 69,036 | 8,729 | 3,810,522 |