# Exhibit N

**Morningside Translations**

# TRANSLATION CERTIFICATION

Date: May 14, 2020

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Dutch

To:

- English

The documents are designated as:
- Gerechtshof Amsterdam (Cunico)

Eugene Li, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

_____
Signature of Eugene Li

**Global Solutions. Local Expertise.**

© Ondernemingsrecht Updates annotations OR_2015_0376

| Commentary on | Amsterdam Court of Appeal 10/27/2015, ECLI:NL:GHAMS:2015:4379, (Cunico) |
|---|---|
| Date | 8/30/2017 |
| Author | D.M.H. de Leeuw (Annotation 1) and M.J.R. Brons (Annotation 2) |

## Amsterdam Court of Appeal 10/27/2015, ECLI:NL:GHAMS:2015:4379, (Cunico)

### 1. Additional protection for Enterprise Chamber (EC) officials: the escrow provision.

*In the Cunico decision, the EC grants an extensive escrow provision that also extends to secure the costs of legal advice and defense against personal liability claims against the officials appointed by the EC. The escrow provision seems to be a welcome supplement to the methods to protect EC officials from (unfounded) pressure from the parties affected at the legal entity, as long as its scope does not lead to unnecessary additional liquidity constraints at the legal entity.*

### 1 Introduction

The appointment of temporary directors, trustees, and equity managers by the Enterprise Chamber (hereinafter "EC") generally occurs at a time when there is disagreement about the course to be taken by the legal entity. There is frequently an impasse within the governing bodies of the legal entity that makes normal decision-making impossible. It demands decisiveness and determination in order to make far-reaching decisions under these circumstances – as a relative outsider – in the interest of the legal entity and the company associated with it. Decisions that invariably are not applauded by all of the stakeholders.

In the literature, the complexity of the temporary director's function is described in the most expressive ways: from the moment that he is 'parachuted into the company'[1], he must 'walk decisively on eggs'[2] and 'operate in a wasps' nest in which it is necessary to maneuver between opposing interests.'[3]

However, the directors, trustees, and equity managers appointed by the EC (hereinafter also "EC officials") do not stand completely unprotected in the crossfire. Case law and practice reveal a number of possibilities for EC officials to arm themselves in the dispute. Recently – in the third Cunico decision[4] – the EC added a method to this arsenal: the escrow provision. In this contribution, I discuss the desirability of this development (par. 5). Before I do so, I will first discuss the Cunico decisions (par. 2). Next, I will deal with the liability standards for EC officials (par. 3) and the possibilities available to EC officials to be able to protect themselves from the consequences of a liability claim (par. 4). I will close with a conclusion (par. 6).

### 2 The Cunico decisions

Cunico Resources N.V. (hereinafter "Cunico") holds shares in eight companies. Cunico and its subsidiaries (hereinafter also "the Cunico Group") engage in exploiting, mining, and producing ferro-nickel. The Cunico Group owns mines and factories, among other things, and has a total of about 2,350 employees.

Cunico is a joint venture of BSGR Holdings Coöperatie U.A. (hereinafter "BSGR") and International Mineral Resources B.V. (hereinafter "IMR"). Each of these companies holds 50% of the shares in Cunico's capital. This equality is also expressed in the management and the General Shareholders' Meeting (hereinafter "GSM") of Cunico. Pursuant to the articles of incorporation, BSGR and IMR each have the right to make a binding nomination for the appointment of one director. These directors are collectively authorized to represent Cunico. Pursuant to the articles of incorporation, the GSM can only adopt resolutions by an absolute majority in a meeting in which at least two shareholders are present or represented.

In mid-2015, BSGR and IMR held different views on the course to be followed by Cunico. This led to an impasse both in the management as well as in the GSM of Cunico, as a result of which the continued existence of Cunico was seriously threatened. Both BSGR and IMR therefore appealed to the EC in August 2015. They requested that the EC order an investigation into the policy and course of affairs within Cunico and to take immediate action. Before the hearing occurred, however, BSGR and IMR subsequently did reach an agreement about the provisional relief to be granted. They jointly requested that the EC do the following (among other things):

- Appoint a third, independent director with a deciding vote within the management and independent authority to represent Cunico (deviating from the articles of incorporation to the extent necessary), and

- Transfer 5% of the shares held by BSGR and IMR, respectively, in the capital of Cunico to a director to be appointed by the EC for the purpose of management.

In this connection, BSGR and IMR argued that – although they had different opinions about the question of who was to blame for what – they were in agreement that intervention was urgently necessary considering the impasse both in Cunico's management and in its GSM, as a result of which the adoption of resolutions necessary for the continued existence of Cunico (and the Cunico Group) was not happening. The EC agreed with this conclusion by BSGR and IMR and upheld the joint request to grant provisional relief by a decision dated September 2, 2015.[5]

© Ondernemingsrecht Updates annotations OR_2015_0376

However, the unanimity of BSGR and IMR seemed to have vanished again immediately after this provisional relief was granted. Scarcely a month later, IMR once again turned to the EC with a petition. Now, it did not only discuss the actions of BSGR, but also the actions of the EC official in the interim.

In summary, the following had occurred during this period. A conference between the EC officials and Cunico's financiers was planned for the beginning of October 2015. The EC officials wanted to present a long-term solution to the financiers. Shortly before the conference, Tower View Asset Management (hereinafter "TV AM") made an indicative proposal for an injection of capital, which could be the beginning of this solution according to the EC officials. In advance of the conference with the financiers, they gave IMR and BSGR the opportunity to agree with the proposal or to submit the same or a higher proposal. Just one day later, one of IMR's group companies made a higher offer. BSGR requested additional time to make a decision about the matter. As soon as IMR heard of BSGR's intent to make a higher offer, IMR raised an objection to it and asked the EC officials to only deal with the offers from TV AM and IMR, since – in IMR's view – the deadline set for making offers had already passed. The EC officials did not agree to this and instead set up rules for a bidding process in which both IMR as well as BSGR were able to submit a binding and final offer. By participating in the bid process, IMR and BSGR would accept the risk of dilution and in that case pledge not to make use of their preemptive right. In addition, they indicated their willingness, according to these rules, to offer an earn-out payment to the other shareholder if the interest of the other shareholder would be diluted. At the same time, IMR and BSGR had to provide a power of attorney on which basis the shares could be issued.

IMR objected to this course of affairs. IMR believed that BSGR had not reacted within the deadline set, that the first offer from IMR would have had to have been accepted, and that BSGR should not be put in a position to have the opportunity to still make an offer. In addition, IMR believed that the content, the possible consequences, and the necessity of the bidding procedure set up by the EC officials was questionable, while participation in this procedure by IMR and BSGR actually meant that one of them would be expropriated, which was unnecessary and disproportionate according to IMR. In that context, IMR demanded a number of further immediate relief actions. First of all, IMR demanded appointment of an (economic) advisor who could provide counsel to the EC officials, the management, and the shareholders of Cunico. In addition, IMR primarily demanded a prohibition on Cunico, the management, and the GSM from complying with the bidding procedure described above, and secondarily demanded – if this bidding procedure were to be complied with after all – the prohibition of the GSM (or any other corporate body designated for that purpose) from excluding the preemptive right.

In a decision dated October 27, 2015, the EC denied IMR's petition. The EC considered, among other things, the fact that it was clear that the situation in which Cunico was operating, as outlined, required interventions by the EC officials. In order to achieve the total solution required in this case, the EC officials had announced and set in motion a formal bidding process. According to the EC, the bidding process provided for equal treatment of the two shareholders, among other things, differently than IMR argued. The EC did not see any obstacle to admitting BSGR to the bidding process—from the perspective of equality, this specifically attested to diligence in giving both joint venture partners the opportunity to participate on an equal footing.

In an independent counter-petition contained in their statement of defense, Cunico[6] and the EC officials in turn asked the EC to grant the EC officials even greater authority so that they would be able to ensure the bidding process and the share issue provided for therein would take place as soon as possible. The EC did indeed grant these immediate relief actions. Consequently, the Cunico management was authorized, without a resolution of the GSM, to issue Cunico shares to the shareholder who would submit the best offer in the bidding process, excluding the preemptive right of the other shareholder. The EC director was also authorized to adopt binding management resolutions independently and excluding the other directors and to carry out the legal acts required for the execution and processing of the issue resolution. Moreover, the EC ruled that the EC official was not required to inform his co-directors about the offers of both shareholders, and also did not have to consult them in the decision-making process regarding these offers.

In addition, Cunico and the EC officials petitioned the EC to rule that the EC director was authorized to independently carry out all (legal) actions in order to place EUR 1.5 million in escrow outside of Cunico's assets as security for the costs of advice and legal defense of Cunico and the EC officials. What Cunico and the EC officials argued specifically is not stated in so many words in the decision. The EC does consider in this context:

'It has been sufficiently apparent that the EC officials must operate in an environment that is suspicious and in which every step that they take is threated with a liability claim. The possibility cannot be excluded that IMR will hold them liable or personally liable and file suit against them.. In this specific case, the Enterprise Chamber considers reserving costs in escrow to be necessary. Such a reservation makes it possible for the EC officials to be able to act freely and can adopt those resolutions that they consider expedient with an eye to the continuity and in the interest of Cunico.'

### 3 The EC officials: liability standards

The Cunico decision touches on a number of important questions within the right of inquiry, including the liability position of EC officials and the possibilities available to them to mitigate liability risks.

Everything necessary about the standards of liability of the EC director has already been written. The literature is reasonably unanimous in finding that the 'normal' liability standards apply to the EC director.[7] This is in line with the starting point that the EC director must be considered a full-fledged director on whom the same authorities and obligations rest as on every other director.[8] The EC director must carry out his task carefully

© Ondernemingsrecht Updates annotations OR_2015_0376

and adequately, the same as any other director.[9] When applying the liability standards of Articles 2:9 and 6:162 of the Dutch Civil Code (DCC), however, the circumstances of the case are always important.[10] This includes the fact that the special playing field on which the EC director must act can nevertheless play a role in interpreting these standards. Thus, for instance, the financial problems of the legal entity, the acute need for action, and the differences of opinion among the various parties involved – if applicable – are brought in as circumstances of the case.

Taking into account this possibility of customization, the general standards of Article 2:9 and 6:162 DCC seem to me to be an appropriate and sufficiently flexible assessment framework, also in the case of an EC director. Consequently, it is the duty of the civil judge to take note of all circumstances of the case when applying this standard.

I am unaware of any rulings in which a civil judge has actually issued a ruling on the liability of an EC director. The EC has in fact made statements about the interpretation of Article 6:162 DCC in the case of an EC director. In the e-Traction decision of 2007, the EC ruled that having one of the parties involved in the procedure hold a director appointed by the EC liable generally can 'not easily' be accepted – except perhaps in very special circumstances.[11]

The opinion that the liability of an EC director may not easily be accepted also prevails in the literature.[12] Krop, Scholten and Verburgt conclude that, considering the difficult situation in which the EC director functions, he should not easily be affected by a serious accusation.[13] They believe that when the EC assigns a specific task or defines the authorities of a director when appointing this director, this is likewise a relevant circumstance of the case in case of any ruling on liability.

Less has been written about the liability of EC trustees and managers. However, it is reasonable to assume that the trustees and managers appointed by the EC also should not be treated any differently than 'normally' appointed trustees and managers with respect to liability standards, whereby the circumstances of the case, including the circumstances under which they were appointed, can be of importance here as well.[14] This is also underscored by the circumstance that Title 8, Division 2 of Book 2 DCC does not contain any specific liability standard for EC directors, trustees, or managers, but does have one for the EC investigator.[15] The restraint discussed above in considering EC directors liable is in my opinion equally appropriate for EC trustees and managers.

**4 An EC official has a number of resources to mitigate the financial consequences of being held liable for him personally.**

First of all, the EC can specify that an EC official may insure himself against the consequences of any liability at the expense of the legal entity. The EC already ruled in the Zwagerman decision of 2001 on the matter of a trustee appointed by the EC that this was permissible in that case.[16] The EC considered the purchase of liability insurance necessary in order to achieve that the provisions would have the intended effect and the trustee could carry out his activities unimpeded. The Supreme Court ruled in 2002 that the EC was indeed authorized to do so based on Article 2:357 Para. 2 DCC.[17] Considering the risks associated with insuring an EC official, not all insurers would always be willing to insure an EC official for an acceptable (to the legal entity) premium and under acceptable (to the EC official) policy conditions.[18] In this context, the Rimari Foundation, which was established with the goal of assisting and supporting EC officials, arranged that in the meantime a collective insurance policy exists for the liability of EC officials. In addition, it may be possible for the liability risks of an attorney who is appointed as an EC official to be covered by his own professional liability insurance in some circumstances.

Second, the EC can determine based on Para. 6 of Article 2:357 DCC, which was newly added in 2013, that the legal entity pays the 'reasonable and reasonably incurred costs of defense' of the EC official in the matter of determining liability due to improper performance of duties during the temporary appointment. Of course, the liability risk itself has not yet been removed by this. In the Zwagerman decision, incidentally, the EC ruled prior to this possibility being anchored in law that in the possible case that the EC trustee in question would be held liable, the costs would be charged to the company.[19]

In the e-Traction decision, however, it was going too far for the EC (understandably) to award preliminary relief for obligatory renunciation of a liability claim and indemnification of an EC director by stakeholders.[20] According to the EC, this request exceeded the elasticity of Article 2:349a Para. 2 DCC, among other things because the requested relief could not be considered provisional according to its nature and also because a binding effect against parties not involved in the lawsuit was intended.

Liability insurance or indemnification of the legal entity, however, does not take away from the fact that liability claims – even if they lack any legal grounds – can be extremely unpleasant for the EC official in question. Not only does he not escape spending time on mounting a defense; (improper) pressure is also exerted on him in this way to dance to the tune of the party who is claiming liability against him. And this is happening at a time when the EC official generally urgently needs his time in order to protect the legal entity from its demise. There are multiple examples of EC directors who asked the EC to relieve them of their function because of ongoing liability claims.[21] The EC does not then always appoint a new official, meaning that the relief granted by the EC is frustrated and the legal entity winds up in the same rudderless position as before.

Considered in and of itself, this is obviously an undesirable development. However, these will generally be precisely the cases in which the liability claim is not obviously unfounded, in which the EC official can be caused to waver. Specifically in the cases in which the liability claim does not already turn out to be defective upon cursory investigation, there does not seem to be any reason to deny a party the right to make a liability claim. The special circumstances of the position of the EC official can be taken into account when applying the standards of Articles 6:162 and 2:9 DCC itself. When this is supplemented with guarantees for the costs of defense and a real possibility also exists for the company to purchase liability insurance for the EC official, the position of the EC official seems reasonably protected.

© Ondernemingsrecht Updates annotations OR_2015_0376

## 5 New: the escrow provision in 'special cases'

In the Cunico decision of October 27, 2015, more substance is given to the indemnification possibility outlined above in that an escrow provision can be created in addition.[22] Indemnification, after all, does not offer much of a guarantee if the legal entity itself has no assets. The escrow provision seems to me to be a logical step in this context prior to a possible ruling by the EC based on Article 2:357 Para. 6 DCC, and then specifically when there is an actual risk that the legal entity otherwise has no assets for the costs of defense.

The EC states that it considers the escrow provision necessary 'in this special case.' What exactly makes this case special is not entirely clear from the decision itself. EC officials are virtually always employed in case of a deadlock caused by a difference of opinion about the strategy to be pursued. They are generally supposed to make decisions that work out negatively for one or more of the parties involved. In this case, one of the shareholders apparently resisted tooth and nail against the course chosen by the EC official. That does not yes seem exceptional or special in and of itself.

However, the consideration 'that the EC officials must operate in an environment (...) in which every step that they take is threatened with a liability claim' implies that IMR was also not inactive outside of the courts. The (threats of) liability claims that would possibly be accumulating, combined with the fact that IMR turned to the EC with a petition that, if it had been granted, would have effectively thwarted the course chosen by the EC official, seems to have convinced the EC in this case. The EC apparently was of the opinion that the possibility for the EC officials to be able to act freely and to be able to adopt those resolutions that they consider expedient with an eye to the continuity and in the interest of the companies was threatened.

The granted immediate relief made it less attractive for IMR (but also for BSGR) to involve Cunico and the EC officials in an EC proceeding or liability proceeding under civil law. After all, it is now not just the costs that the company itself incurs, but also the costs of the EC officials for advice and legal defense that are at any rate charged to the company in which they themselves hold 50% of the shares, while an amount of EUR 1.5 million was also already placed in escrow for this purpose.

This decision makes it interesting for EC officials to combine their EC defense brief in comparable circumstances with an independent petition for such an immediate escrow provision.

The decision can thus also send a discouraging signal to parties who wish to take action against EC officials (and the legal entity under their leadership) before the EC in the future. A substantial escrow provision will not, of course, completely prevent (unfounded) liability claims and subsequent court proceedings, but will possibly limit them. Such relief also leads to the circumstance that the costs for advice and legal defense of the EC officials – differently than in case of a claim under liability insurance – will be passed through one-to-one to the legal entity from funds that are directly available for that purpose. Now, although it was also already possible to assert these costs against the legal entity even without an escrow provision, the additional discouraging effect of an escrow provision has an effect specifically in those cases in which the legal entity would possibly not have any assets without such an escrow provision, and/or the escrow provision additionally puts pressure on the liquidity of the legal entity.

In that context, the question arises of under what circumstances an escrow provision is reasonable and desirable. Specifically in case of liability claims that merely seem to serve to exert pressure on the EC officials, it is also in the interest of the legal entity itself that these costs are not charged solely to its account, but that collateral can also be provided for this purpose. This applies all the more when the EC officials are considering resigning. The possibility of creating an escrow provision can also reduce the risk of undesired selection of EC officials from the start. In this context, Josephus Jitta remarks in his note under the e-Traction decision that the mere risk of getting involved in proceedings that are hopeless from the start can be a reason not to accept an appointment as an EC official.[23]

The extent to which the liability claims in this case appeared unfounded according to the judgment of the EC, and whether this is a factor that was taken into consideration, is not apparent from the decision. The amount that can be placed in escrow (EUR 1.5 million) seems remarkably high to me. When determining the size of the amount to be placed in escrow, it is necessary in my opinion to also consider whether this does not unnecessarily put pressure on the liquidity of the legal entity.

In this context, it is also not apparent from the decision whether there was discussion of liability insurance in this case. Granting a petition for an escrow provision, insofar as it relates to the costs for advice and legal defense of the EC officials themselves, seems to me to be somewhat more difficult when it is shown that insurance exists that offers sufficient coverage. If no satisfactory insurance has yet been purchased, although this is one of the possibilities, the party that fears the grant of an escrow provision would possibly be able to still offer this as an alternative that replaces the escrow provision in whole or in part.

Given the foregoing, finally, it is appropriate to the remark that even after adding the escrow provision from the Cunico decision to the package of protective measures for EC officials, the risks for EC officials have not yet been completely removed. The escrow provision, after all, only extends to security for the costs of advice and legal defense of the EC officials. If the liability of an EC official is ultimately determined in court, he is required to pay the damages arising without having recourse to the legal entity. This may still lead to the situation that an EC official will want to resign his office because the pressure becomes too great.

## 6 Conclusion

In the Cunico decision, the EC grants an extensive escrow provision that also extends to secure the costs of legal advice and defense against personal

© Ondernemingsrecht Updates annotations OR_2015_0376

liability claims against EC officials. According to the EC, such a provision is necessary and grantable in this special case.

Liability claims that follow one another at a rapid pace and/or other (unfounded) attempts to obstruct the course chosen by the EC officials seem to construe such a special case.

In my opinion, the escrow provision is a welcome addition to the means of protecting EC officials. The result of this is that the EC official can (continue to) focus on the tasks for which he was appointed without being presented with the bill for it himself in the form of costs for mounting a defense because the legal entity itself has no assets for this purpose. Furthermore, this also serves the interest of the legal entity itself.

**Notes**

[1] A.R.J. Croiset van Uchelen, Verlengstuk van de vennootschap of van de rechter? De positie van de door de Ondernemingskamer benoemde bestuurders en commissarissen [An extension of the company or of the judge? The position of the directors and trustees appointed by the Enterprise Chamber], in: M. Holtzer, A.F.J.A. Leijten & D.J. Oranje (eds.), Geschriften vanwege de Vereniging Corporate Litigation 2007-2008, part 97, Deventer: Kluwer 2008.

[2] D.D. Krop, C.J. Scholten & B.E. Verburgt, De tijdelijke bestuurder: daadkrachtig op eieren lopen [The temporary director: walking decisively on eggs], in: M. Holtzer, A.F.J.A. Leijten & D.J. Oranje (eds.), Geschriften vanwege de Vereniging Corporate Litigation 2014-2015, part 128, Deventer: Kluwer 2015, p. 193 f.

[3] Croiset van Uchelen 2008, p. 229.

[4] Amsterdam Court of Appeal (EC) October 27, 2015, ECLI:NL:GHAMS:2015:4379.

[5] Amsterdam Court of Appeal (EC) September 2, 2015, ECLI:NL:GHAMS:2015:3981. In a decision of September 3, 2015, the director and custodian were subsequently appointed (Amsterdam Court of Appeal (EC) September 3, 2015, ECLI:NL:GHAMS:2015:3626).

[6] Although this is not apparent as such from the decision, Cunico will then be represented by the EC director, possibly supported by the BSGR director.

[7] Among others, Krop, Scholten & Verburgt 2015, p. 223, S.L. Sluijters, De aansprakelijkheid van een door de OK in het kader van een enquêteprocedure aangestelde bestuurder [The liability of a director appointed by the EC in the context of an inquiry proceeding], V&O 1999, p. 28; differently: M.W. Josephus Jitta, De aansprakelijkheid van door de Ondernemingskamer benoemde bestuurders en commissarissen [The liability of directors and trustees appointed by the Enterprise Chamber], in: C.J.M. Klaassen et al (eds.), Aansprakelijkheid in beroep, bedrijf of ambt (Onderzoekscentrum Onderneming & Recht, part 25), Deventer: Kluwer 2003, p. 468.

[8] See the established case law of the EC in this area: among others, Amsterdam Court of Appeal (EC) 11 December 2013, JOR 2014/36 with note by Josephus Jitta (Slotervaartziekenhuis), Amsterdam Court of Appeal (EC) 19 April 2007, JOR 2007/142 (Begeman), and Amsterdam Court of Appeal (EC) 18 October 2013, ARO 2013/159 (Greenchoice).

[9] This is derived, among other things, from the Zwagerman decision, in which the Supreme Court ruled in the same way in the matter of an EC official: HR 4 October 2002, JOR 2002/214 with note by Van den Ingh (Zwagerman Beheer).

[10] In this context, see among other things HR 27 February 2015, NJ 2015/240 with note by PvS (ING/Deuzeman c.s.), HR 10 January 1997, NJ 1997/360 with note by Maeijer (Staleman/Van de Ven), P.D. Olden, De OK-commissaris [The EC trustee], in: M.J. Kroeze et al, Bestuur en toezicht (Uitgaven vanwege het Instituut voor Ondernemingsrecht No. 67), Deventer: Kluwer 2009, p. 131-132, Krop, Scholten & Verburgt 2015, p. 220, and Croiset van Uchelen 2008, p. 230.

[11] Amsterdam Court of Appeal (EC) 14 December 2007, JOR 2008/34 with note by Josephus Jitta (e-Traction), r.o. 3.4.

[12] Croiset van Uchelen 2008, p. 229 and Josephus Jitta 2003, p. 466.

[13] Krop, Scholten & Verburgt 2015, p. 221-223.

[14] Regarding the EC trustee: Olden 2009, p. 131-132.

[15] See Art. 2:351 DCC.

[16] Amsterdam Court of Appeal, 29 November 2001, JOR 2002/7.

[17] HR 4 October 2002, NJ 2002/556.

[18] See among others Josephus Jitta 2003 and F. Eikelboom, Hoe kneedbaar is (de positie van) een tijdelijke bestuurder [How malleable is (the position of) a temporary director], in: M. Holtzer, A.F.J.A. Leijten & D.J. Oranje (eds.), Geschriften vanwege de Vereniging Corporate Litigation 2011-2012, part 112, Deventer: Kluwer 2012, p. 111.

[19] Amsterdam Court of Appeal, 29 November 2001, JOR 2002/7.

© Ondernemingsrecht Updates annotations OR_2015_0376

[20] Amsterdam Court of Appeal (EC) 14 December 2007, JOR 2008/34 with note by Josephus Jitta (e-Traction).

[21] This occurred, inter alia, in the e-Traction case cited in Note 11, and in the case that led to Amsterdam Court of Appeals (EC) 26 May 2003, ARO 2003/89 (Huis 77).

[22] Incidentally, Olden (2009, p. 131) already listed this as an option, with some annotations.

[23] Amsterdam Court of Appeal (EC) 14 December 2007, JOR 2008/34 with note by Josephus Jitta (e-Traction).

© Ondernemingsrecht Updates annotaties OR_2015_0376

| | |
|---|---|
| commentaar op | Gerechtshof Amsterdam 27-10-2015, ECLI:NL:GHAMS:2015:4379, (Cunico) |
| datum | 30-08-2017 |
| auteur | D.M.H. de Leeuw (annotatie 1) en M.J.R. Brons (annotatie 2) |

### Gerechtshof Amsterdam 27-10-2015, ECLI:NL:GHAMS:2015:4379, (Cunico)

#### 1. Extra bescherming voor de OK-functionaris: de escrowvoorziening.

*In de Cunico-beschikking staat de OK een ruime escrowvoorziening toe, die mede strekt tot zekerheid van de kosten van advies en verweer in rechte tegen aansprakelijkstellingen van de door de OK benoemde functionarissen persoonlijk. De escrowvoorziening lijkt een welkome aanvulling op de middelen om de OK-functionaris te beschermen tegen (ongefundeerde) druk van de bij de rechtspersonen betrokken partijen, zolang de omvang hiervan niet tot onnodige extra liquiditeitskrapte bij de rechtspersoon leidt.*

#### 1 Inleiding

De benoeming van tijdelijke bestuurders, commissarissen en beheerders van aandelen door de Ondernemingskamer (hierna: OK) vindt doorgaans plaats op het moment dat er onenigheid bestaat over de door de rechtspersoon te volgen koers. Veelal bestaat er een impasse binnen de organen van de rechtspersoon, die normale besluitvorming onmogelijk maakt. Het vergt daadkracht en vastberadenheid om onder die omstandigheden – als relatieve buitenstaander – vergaande beslissingen te nemen in het belang van de rechtspersoon en de met hem verbonden onderneming. Beslissingen die steevast niet door alle belanghebbenden worden toegejuicht.

In de literatuur wordt de complexiteit van de functie van de tijdelijk bestuurder op de meest beeldende manieren omschreven: hij moet vanaf het moment dat hij wordt 'geparachuteerd binnen de vennootschap'[1] 'daadkrachtig op eieren lopen'[2] en 'opereren in een wespennest waarin tussen tegengestelde belangen moet worden gemanoeuvreerd'.[3]

De door de OK benoemde bestuurders, commissarissen en beheerders van aandelen (hierna ook: OK-functionarissen) staan echter niet geheel onbeschermd in de vuurlinie. Rechtspraak en praktijk tonen een aantal mogelijkheden voor de OK-functionaris om zich te wapenen in de strijd. Recentelijk – in de derde Cunico-beschikking[4] – heeft de OK een middel aan dit wapenarsenaal toegevoegd: de escrowvoorziening. In deze bijdrage bespreek ik de wenselijkheid van deze ontwikkeling (par. 5). Daaraan voorafgaand zal ik eerst ingaan op de Cunico-beschikkingen (par. 2). Vervolgens behandel ik de aansprakelijkheidsnormen voor de OK-functionarissen (par. 3) en de mogelijkheden voor OK-functionarissen om zich te beschermen tegen de gevolgen van een aansprakelijkstelling (par. 4). Afgesloten wordt met een conclusie (par. 6).

#### 2 De Cunico-beschikkingen

Cunico Resources N.V. (hierna: Cunico) houdt aandelen in een achttal vennootschappen. Cunico en haar dochtervennootschappen (hierna ook: de Cunico-groep) houden zich bezig met het exploiteren, delven en produceren van ferronnikkel. De Cunico-groep beschikt onder meer over mijnen en fabrieken en heeft in totaal zo'n 2350 werknemers in dienst.

Cunico is een joint venture van BSGR Holdings Coöperatie U.A. (hierna: BSGR) en International Mineral Resources B.V. (hierna: IMR). Zij houden elk 50% van de aandelen in het kapitaal van Cunico. Deze gelijkwaardigheid komt ook tot uitdrukking in het bestuur en de algemene vergadering van aandeelhouders (hierna: ava) van Cunico. BSGR en IMR hebben op basis van de statuten elk het recht tot het doen van een bindende voordracht voor de benoeming van één bestuurder. Deze bestuurders zijn gezamenlijk bevoegd om Cunico te vertegenwoordigen. De ava kan op grond van de statuten slechts besluiten nemen met volstrekte meerderheid in een vergadering waarin ten minste twee aandeelhouders aanwezig of vertegenwoordigd zijn.

BSGR en IMR verschilden medio 2015 van inzicht over de door Cunico te volgen koers. Dit leidde zowel binnen het bestuur als binnen de ava van Cunico tot een impasse, ten gevolge waarvan het voortbestaan van Cunico ernstig werd bedreigd. Zowel BSGR als IMR wendde zich daarom in augustus 2015 tot de OK. Zij verzochten de OK om een onderzoek naar het beleid en de gang van zaken binnen Cunico te gelasten en om onmiddellijke voorzieningen te treffen. Nog voordat de mondelinge behandeling plaatsvond, bereikten BSGR en IMR vervolgens echter wél overeenstemming over de te treffen voorlopige voorzieningen. Zij verzochten de OK gezamenlijk om (onder meer):

- een derde, onafhankelijke bestuurder te benoemen met een beslissende stem binnen het bestuur en zelfstandige bevoegdheid om Cunico te vertegenwoordigen (voor zover nodig in afwijking van de statuten); en

- 5% van de door BSGR respectievelijk IMR gehouden aandelen in het kapitaal van Cunico ten titel van beheer over te dragen aan een door de OK te benoemen beheerder.

BSGR en IMR voerden in dit verband aan dat zij – hoewel zij van mening verschilden over de vraag aan wie het een en ander te wijten was – het erover eens waren dat ingrijpen dringend noodzakelijk was gelet op de impasse in zowel het bestuur als de ava van Cunico, ten gevolge waarvan de

© Ondernemingsrecht Updates annotaties OR_2015_0376

met het oog op het voortbestaan van Cunico (en de Cunico-groep) noodzakelijke besluitvorming uitbleef. De OK deelde deze conclusie van BSGR en IMR en wees het gezamenlijke verzoek tot het treffen van voorlopige voorzieningen toe bij beschikking van 2 september 2015.[5]

De eensgezindheid van BSGR en IMR leek echter na het treffen van deze voorlopige voorzieningen direct weer verdwenen. Amper een maand later wendde IMR zich wederom bij verzoekschrift tot de OK. Nu stelde zij niet alleen het handelen van BSGR, maar ook het handelen van de OK-functionarissen in de tussenliggende periode ter discussie.

Kort samengevat was er in deze periode het volgende voorgevallen. Begin oktober 2015 stond er een bespreking gepland tussen de OK-functionarissen en de financiers van Cunico. De OK-functionarissen wensten een langetermijnoplossing te presenteren aan de financiers. Kort voor de bespreking deed Tower View Asset Management (hierna: TVAM) een indicatief voorstel voor een kapitaalinjectie, dat volgens de OK-functionarissen het begin van deze oplossing zou kunnen vormen. Vooruitlopend op de bespreking met de financiers stelden zij IMR en BSGR in de gelegenheid om akkoord te gaan met dit voorstel, of eenzelfde of hoger voorstel voor te leggen. Een groepsvennootschap van IMR bracht direct een dag later een hoger bod uit. BSGR verzocht om extra tijd om hierover te beslissen. Zodra IMR van het voornemen van BSGR om een hoger bod uit te brengen vernam, maakte zij hiertegen bezwaar en verzocht zij de OK-functionarissen om enkel de biedingen van TVAM en IMR in behandeling te nemen, nu – in de visie van IMR – de gestelde deadline voor het uitbrengen van biedingen reeds was verstreken. De OK-functionarissen gingen hier niet in mee en stelden in plaats daarvan spelregels voor een biedingsproces vast, waarin zowel IMR als BSGR een bindend en finaal bod kon uitbrengen. Door mee te doen aan het biedingsproces zouden IMR en BSGR het risico op verwatering accepteren en toezeggen om in dat geval geen gebruik te maken van hun voorkeursrecht. Daarnaast verklaarden zij zich volgens deze spelregels aldus bereid om – indien het belang van de andere aandeelhouder zou verwateren – een *earn-out*-betaling aan te bieden aan deze andere aandeelhouder. Tevens dienden IMR en BSGR een volmacht af te geven op grond waarvan de aandelen konden worden uitgegeven.

IMR maakte bezwaar tegen deze gang van zaken. IMR meende dat BSGR niet binnen de gestelde deadline had gereageerd, dat het eerste bod van IMR had moeten worden geaccepteerd en dat BSGR niet in de gelegenheid zou moeten worden gesteld om nog een bieding uit te brengen. Daarnaast meende IMR dat de inhoud, de mogelijke gevolgen en de noodzaak van de door de OK-functionarissen opgezette biedingsprocedure discutabel waren, terwijl deelname aan deze procedure voor IMR en BSGR feitelijk betekende dat een van hen werd onteigend, hetgeen volgens IMR onnodig en disproportioneel was. In dat kader vorderde IMR een aantal nadere onmiddellijke voorzieningen. IMR vorderde allereerst benoeming van een (economisch) adviseur die de OK-functionarissen, het bestuur en de aandeelhouders van Cunico met raad en daad terzijde kon staan. Daarnaast vorderde IMR primair een verbod voor Cunico, het bestuur en de ava om de hiervoor omschreven biedingsprocedure te volgen en subsidiair – wanneer deze biedingsprocedure toch zou worden gevolgd – de ava (of enig ander daartoe aangewezen orgaan) te verbieden om het voorkeursrecht uit te sluiten.

Bij beschikking van 27 oktober 2015 wees de OK het verzoek van IMR af. De OK overwoog daartoe onder meer dat duidelijk was dat de geschetste situatie waarin Cunico verkeerde, ingrijpen van de OK-functionarissen vereiste. De OK-functionarissen hadden, om de in dit geval vereiste totaaloplossing te bewerkstelligen, een formeel biedingsproces aangekondigd en in gang gezet. Dit biedingsproces voorzag volgens de OK, anders dan IMR betoogde, onder meer in een gelijke behandeling van de beide aandeelhouders. De OK zag daarbij geen beletsel om BSGR tot het biedingsproces toe te laten: vanuit een oogpunt van gelijkwaardigheid getuigde het juist van zorgvuldigheid om beide jointventurepartners de kans te geven om op gelijke voet deel te nemen.

Cunico[6] en de OK-functionarissen verzochten de OK op hun beurt bij zelfstandig tegenverzoek, vervat in hun verweerschrift, om de OK-functionarissen nog ruimere bevoegdheden toe te kennen, om aldus te kunnen bewerkstelligen dat het biedingsproces en de daarin voorziene aandelenemissie op een zo kort mogelijke termijn ongehinderd zou kunnen plaatsvinden. De OK wees deze onmiddellijke voorzieningen wel toe. Het bestuur van Cunico werd aldus zonder besluit van de ava bevoegd tot uitgifte van aandelen Cunico aan de aandeelhouder die het beste bod zou doen in het biedingsproces, met uitsluiting van het voorkeursrecht van de andere aandeelhouder. Ook werd de OK-bestuurder bevoegd om zelfstandig en met uitsluiting van de andere bestuurders bindende bestuursbesluiten te nemen en de voor de uitvoering en afwikkeling van het emissiebesluit benodigde rechtshandelingen te verrichten. Daarenboven bepaalde de OK dat de OK-bestuurder zijn medebestuurders niet behoefde te informeren over de biedingen van beide aandeelhouders, en hen ook niet hoefde te consulteren bij de besluitvorming over deze biedingen.

Daarnaast verzochten Cunico en de OK-functionarissen de OK om te bepalen dat de OK-bestuurder bevoegd was om zelfstandig alle (rechts)handelingen te verrichten om EUR 1,5 miljoen buiten het vermogen van Cunico in escrow te plaatsen, tot zekerheid van de kosten van advies en verweer in rechte van Cunico en de OK-functionarissen. Wat daartoe precies is aangevoerd door Cunico en de OK-functionarissen staat niet met zoveel woorden benoemd in de beschikking. Wel overweegt de OK in dit verband:

'Voldoende is gebleken dat de OK-functionarissen moeten opereren in een omgeving die wantrouwend is en waarin iedere stap die zij zetten met aansprakelijkheidstelling wordt bedreigd. Niet uitgesloten is dat zij door IMR worden aangesproken en in rechte worden betrokken, ook in persoon. In dit bijzondere geval acht de Ondernemingskamer een reservering van kosten in escrow noodzakelijk. Een dergelijke reservering maakt dat de OK-functionarissen in vrijheid kunnen optreden en die besluiten kunnen nemen die zij geraden achten met het oog op de continuïteit en in het belang van Cunico.'

### 3 De OK-functionarissen: aansprakelijkheidsnormen

De Cunico-beschikking raakt aan een aantal belangrijke kwesties binnen het enquêterecht, waaronder de aansprakelijkheidspositie van OK-functionarissen en de mogelijkheden die zij hebben om aansprakelijkheidsrisico's te mitigeren.

© Ondernemingsrecht Updates annotaties OR_2015_0376

Over de normen voor aansprakelijkheid van de OK-bestuurder is al het nodige geschreven. De literatuur is redelijk eensgezind in de vaststelling dat voor de OK-bestuurder de 'normale' aansprakelijkheidsnormen gelden.[7] Dit is in lijn met het uitgangspunt dat de OK-bestuurder heeft te gelden als volwaardig bestuurder, op wie dezelfde bevoegdheden en verplichtingen rusten als op iedere andere bestuurder.[8] De OK-bestuurder dient zijn taak – net als iedere ander bestuurder – zorgvuldig en naar behoren uit te voeren.[9] Bij het hanteren van de aansprakelijkheidsnormen van artikel 2:9 en 6:162 van het Burgerlijk Wetboek (BW) zijn de omstandigheden van het geval echter steeds van belang.[10] Dat brengt mee dat het bijzondere speelveld waarin de OK-bestuurder moet acteren, bij inkleuring van deze normen desalniettemin een rol kan spelen. Zo kunnen bijvoorbeeld de financiële problemen van de rechtspersoon, de acute noodzaak tot handelen en het verschil van inzicht tussen de verschillende betrokkenen – indien van toepassing – worden meegenomen als omstandigheden van het geval.

Mede gelet op deze mogelijkheid tot maatwerk, lijken de algemene normen van artikel 2:9 en 6:162 BW mij een passend en voldoende flexibel toetsingskader, ook in geval van een OK-bestuurder. Het is vervolgens aan de civiele rechter om bij toepassing van deze norm acht te slaan op alle omstandigheden van het geval.

Er zijn mij geen uitspraken bekend waarin de civiele rechter daadwerkelijk heeft geoordeeld over aansprakelijkheid van een OK-bestuurder. De OK heeft zich wel uitgelaten over de invulling van artikel 6:162 BW in geval van een OK-bestuurder. In de e-Traction-beschikking uit 2007 oordeelde de OK dat het aansprakelijk stellen van een door de OK benoemde bestuurder door een van de bij de procedure betrokken partijen in het algemeen – behoudens wellicht zeer bijzondere omstandigheden – 'niet wel' kan worden aanvaard.[11]

Ook in de literatuur heerst de opvatting dat aansprakelijkheid van een OK-bestuurder niet snel mag worden aangenomen.[12] Krop, Scholten en Verburgt concluderen dat – gezien de moeilijke situatie waarin de OK-bestuurder functioneert – hem niet snel een ernstig verwijt zal treffen.[13] Zij menen daarbij dat wanneer de OK bij de benoeming van de bestuurder een specifieke taak meegeeft of de bevoegdheden van deze bestuurder afbakent, dit eveneens een relevante omstandigheid van het geval is bij een eventueel aansprakelijkheidsoordeel.

Over de aansprakelijkheid van OK-commissarissen en -beheerders is minder geschreven. Het ligt echter in de rede om aan te nemen dat ook de door de OK benoemde commissarissen en beheerders qua aansprakelijkheidsnormen niet anders zouden moeten worden behandeld dan 'normaal' benoemde commissarissen en beheerders, waarbij de omstandigheden van het geval – waaronder de omstandigheden waaronder zij benoemd zijn – ook hier weer van belang kunnen zijn.[14] Dit wordt ook onderstreept door de omstandigheid dat titel 8, afdeling 2 van Boek 2 BW geen specifieke aansprakelijkheidsnorm voor OK-bestuurders, -commissarissen of -beheerders, maar wel voor de OK-onderzoeker bevat.[15] De hiervoor besproken terughoudendheid bij het aansprakelijk achten van OK-bestuurders is mijns inziens evenzeer op zijn plaats bij OK-commissarissen en -beheerders.

**4 De middelen van de OK-functionarisDe OK-functionaris heeft een aantal middelen om de financiële gevolgen van een aansprakelijkstelling voor hem persoonlijk te mitigeren.**

Allereerst kan de OK bepalen dat een OK-functionaris zich op kosten van de rechtspersoon mag verzekeren tegen de gevolgen van eventuele aansprakelijkheid. De OK oordeelde reeds in de Zwagerman-beschikking van 2001 ter zake van een door de OK benoemde commissaris dat dit in dat geval toelaatbaar was.[16] De OK achtte het afsluiten van een aansprakelijkheidsverzekering noodzakelijk om te bewerkstelligen dat de voorzieningen het beoogde effect zouden hebben en de commissaris zijn werkzaamheden onbelemmerd kon uitvoeren. De Hoge Raad oordeelde in 2002 dat de OK hiertoe inderdaad bevoegd was op grond van artikel 2:357 lid 2 BW.[17] Gelet op de risico's die het verzekeren van een OK-functionaris met zich brengt, zullen niet alle verzekeraars steeds bereid zijn om een OK-functionaris te verzekeren tegen een (voor de rechtspersoon) aanvaardbare premie en onder (voor de OK-functionaris) aanvaardbare polisvoorwaarden.[18] Tegen deze achtergrond heeft de Stichting Rimari – die is opgericht met het doel om OK-functionarissen bij te staan en te ondersteunen – bewerkstelligd dat er inmiddels een collectieve verzekering voor aansprakelijkheid van OK-functionarissen bestaat. Daarnaast geldt dat de aansprakelijkheidsrisico's van een advocaat die wordt benoemd tot OK-functionaris, onder omstandigheden ook kunnen worden gedekt door zijn eigen beroepsaansprakelijkheidsverzekering.

Ten tweede kan de OK op grond van het in 2013 nieuw toegevoegde lid 6 van artikel 2:357 BW bepalen dat de rechtspersoon de 'redelijke en in redelijkheid gemaakte kosten van verweer' van de OK-functionaris ter zake de vaststelling van aansprakelijkheid vanwege onbehoorlijke taakvervulling gedurende de tijdelijke aanstelling betaalt. Het aansprakelijkheidsrisico zelf is daarmee uiteraard nog niet weggenomen. De OK oordeelde overigens in de Zwagerman-beschikking al voordat deze mogelijkheid in de wet werd verankerd, dat de kosten in het eventuele geval dat de OK-commissaris in kwestie aansprakelijk zou worden gesteld, ten laste van de vennootschap zouden komen.[19]

Het ging de OK in de e-Traction-beschikking (begrijpelijkerwijze) echter een brug te ver om een voorlopige voorziening tot verplichte afstand van een aansprakelijkheidstelling en vrijwaring van een OK-bestuurder door belanghebbenden toe te wijzen.[20] Dit verzoek ging volgens de OK de spankracht van artikel 2:349a lid 2 BW te buiten, onder meer omdat de gevraagde voorzieningen niet naar hun aard als voorlopig konden worden aangemerkt en daarnaast ook bindend effect jegens niet in het geding betrokken partijen werd beoogd.

Een aansprakelijkheidsverzekering of vrijwaring van de rechtspersoon neemt echter niet weg dat aansprakelijkstellingen – zelfs wanneer deze elke rechtsgrond ontberen – uitermate vervelend kunnen zijn voor de OK-functionaris in kwestie. Niet alleen ontkomt hij er niet aan om tijd te besteden aan het voeren van verweer, daarnaast wordt op deze wijze (oneigenlijke) druk op hem uitgeoefend om te dansen naar de pijpen van de partij die hem aansprakelijk stelt. Dit terwijl de OK-functionaris op dat moment doorgaans zijn tijd al hard nodig heeft om de rechtspersoon te behoeden voor de ondergang. Er zijn meerdere voorbeelden van OK-bestuurders die de OK vanwege aanhoudende aansprakelijkstellingen hebben verzocht om te worden ontheven uit hun functie.[21] De OK benoemt daarop niet altijd een nieuwe functionaris, waardoor de door de OK getroffen voorziening

© Ondernemingsrecht Updates annotaties OR_2015_0376

wordt gefrustreerd en de rechtspersoon in dezelfde stuurloze positie als voorheen terechtkomt.

Dit is op zichzelf bezien uiteraard een onwenselijke ontwikkeling. Het zullen echter over het algemeen juist de gevallen zijn waarin de aansprakelijkstelling niet evident ongegrond is, waarin de OK-functionaris aan het wankelen kan worden gebracht. Met name in de gevallen waarin de aansprakelijkstelling niet na summierlijk onderzoek al ondeugdelijk blijkt, lijkt er geen grond te zijn om een partij de bevoegdheid tot aansprakelijkstelling te ontzeggen. De bijzondere omstandigheden van de positie van de OK-functionaris kunnen in acht worden genomen bij toepassing van de normen van artikel 6:162 en 2:9 BW zelf. Wanneer dit wordt aangevuld met waarborgen voor de kosten van verweer en er daarnaast een reële mogelijkheid bestaat tot het sluiten van een aansprakelijkheidsverzekering voor de OK-functionaris door de vennootschap, lijkt de positie van OK-functionaris redelijk beschermd.

## 5 Nieuw: de escrowvoorziening in 'bijzondere gevallen'

In de Cunico-beschikking van 27 oktober 2015 wordt meer handen en voeten gegeven aan de hiervoor geschetste vrijwaringsmogelijkheid, doordat tevens een escrowvoorziening kan worden gecreëerd.[22] Een vrijwaring biedt immers weinig waarborg als de rechtspersoon zelf geen verhaal biedt. De escrowvoorziening lijkt mij in dat verband een logische stap voorafgaand aan een mogelijke uitspraak van de OK op grond van artikel 2:357 lid 6 BW, en dan met name wanneer er een reëel risico bestaat dat de rechtspersoon anders geen verhaal biedt voor de kosten van verweer.

De OK overweegt dat zij de escrowvoorziening 'in dit bijzondere geval' noodzakelijk acht. Wat dit geval precies bijzonder maakt, wordt niet geheel duidelijk uit de beschikking zelf. OK-functionarissen worden nagenoeg altijd aangesteld bij een deadlock door verschil in inzicht over de te volgen strategie. Zij zullen over het algemeen beslissingen moeten nemen die nadelig uitpakken voor één of meer van de betrokken partijen. In dit geval verzet een van de aandeelhouders zich kennelijk met hand en tand tegen de door de OK-functionarissen gekozen koers. Dat lijkt op zichzelf nog niet uitzonderlijk of bijzonder.

De overweging 'dat de OK-functionarissen moeten opereren in een omgeving (…) waarin iedere stap die zij zetten met aansprakelijkheidstelling wordt bedreigd', impliceert echter dat IMR ook buiten rechte niet heeft stilgezeten. De zich mogelijk opstapelende (dreigingen met) aansprakelijkstellingen, gecombineerd met het feit dat IMR zich wendde tot de OK met een verzoek dat – bij toewijzing – de door de OK-functionarissen gekozen koers feitelijk zou hebben doorkruist, lijkt de OK in dit geval te hebben overtuigd. De mogelijkheid voor de OK-functionarissen om in vrijheid te kunnen optreden en de besluiten te kunnen nemen die zij geraden achtten met het oog op de continuïteit en in het belang van de vennootschappen, werd in de visie van de OK kennelijk bedreigd.

Door de toegewezen onmiddellijke voorziening wordt het voor IMR (maar ook voor BSGR) minder aantrekkelijk om Cunico en de OK-functionarissen in een OK-procedure of civielrechtelijke aansprakelijkheidsprocedure te betrekken. Niet alleen de kosten die de vennootschap zelf maakt, maar ook de kosten van de OK-functionarissen voor advies en verweer in rechte komen nu immers hoe dan ook ten laste van de vennootschap waarin zij zelf 50% van de aandelen houden, terwijl hiervoor tevens al een bedrag van EUR 1,5 miljoen in escrow is geplaatst.

Deze beschikking maakt het interessant voor OK-functionarissen om in vergelijkbare omstandigheden hun OK-verweerschrift te combineren met een zelfstandig verzoek voor een dergelijke onmiddellijke escrowvoorziening.

De beschikking kan daarmee tevens een ontmoedigingssignaal afgeven aan partijen die in de toekomst willen optreden tegen OK-functionarissen (en de rechtspersoon onder leiding daarvan) ten overstaan van de OK. Een forse escrowvoorziening zal (ongefundeerde) aansprakelijkstellingen en daaropvolgende gerechtelijke procedures uiteraard niet volledig voorkomen, maar mogelijk wel beperken. Een dergelijke voorziening leidt er immers toe dat de kosten voor advies en verweer in rechte van de OK-functionarissen – anders dan in geval van een claim onder een aansprakelijkheidsverzekering – een-op-een worden doorbelast aan de rechtspersoon uit direct daarvoor ter beschikking staande middelen. Nu het echter ook zonder escrowvoorziening al mogelijk was om deze kosten ten laste van de rechtspersoon te brengen, werkt het extra ontmoedigingseffect van een escrowvoorziening met name in de gevallen waarin de rechtspersoon zonder een dergelijke escrowvoorziening mogelijk geen verhaal zou bieden en/of de escrowvoorziening daarnaast druk legt op de liquiditeit van de rechtspersoon.

In dat verband dringt zich de vraag op onder welke omstandigheden een escrowvoorziening redelijk en wenselijk is. Met name bij aansprakelijkstellingen die louter lijken te dienen om druk uit te oefenen op de OK-functionarissen, is het ook in het belang van de rechtspersoon zelf dat deze kosten niet alleen voor zijn rekening komen, maar dat hiervoor tevens zekerheid kan worden gesteld. Dit geldt temeer wanneer de OK-functionarissen overwegen om op te stappen. De mogelijkheid tot het creëren van een escrowvoorziening kan ook het risico van ongewenste selectie van OK-functionarissen aan de poort verkleinen. Josephus Jitta merkt in dit verband in zijn noot onder de e-Traction-beschikking op dat het enkele risico om zelfs in een op voorhand kansloze procedure betrokken te raken, reden kan zijn om een benoeming tot OK-functionaris niet te aanvaarden.[23]

n hoeverre de aansprakelijkstellingen in dit geval naar het oordeel van de OK ongefundeerd leken, en of dit een factor is die is meegewogen, blijkt niet uit de beschikking. Het bedrag dat in escrow mag worden geplaatst (EUR 1,5 miljoen), komt mij daarbij opvallend hoog voor. Bij het bepalen van de omvang van het in escrow te plaatsen bedrag dient mijns inziens tevens te worden meegewogen of dit de liquiditeit van de rechtspersoon niet onnodig onder druk zet.

In dat kader blijkt uit de beschikking ook niet of er in dit geval sprake was van een aansprakelijkheidsverzekering. Toewijzing van een verzoek om een escrowvoorziening, voor zover het betrekking heeft op de kosten voor advies en verweer in rechte van de OK-functionarissen zelf, lijkt mij een stuk lastiger wanneer wordt aangetoond dat er sprake is van een verzekering die voldoende dekking biedt. Indien er nog geen deugdelijke

verzekering is afgesloten, terwijl dit wel tot de mogelijkheden behoort, zou de partij die toewijzing van een escrowvoorziening vreest, dit mogelijk nog als alternatief kunnen voorstellen, dat geheel of gedeeltelijk in de plaats van een escrowvoorziening komt.

Bij het voorgaande past ten slotte nog de kanttekening dat ook na toevoeging van de escrowvoorziening uit de Cunico-beschikking aan het pakket van beschermingsmaatregelen van de OK-functionaris de risico's voor de OK-functionaris nog niet volledig zijn weggenomen. De escrowvoorziening strekt immers alleen tot zekerheid voor de kosten voor advies en verweer in rechte van de OK-functionarissen. Indien aansprakelijkheid van een OK-functionaris uiteindelijk in rechte wordt vastgesteld, is hij gehouden de daaruit voortvloeiende schade te vergoeden, zonder dat hij dit op de rechtspersoon kan verhalen. Dit kan er nog steeds toe leiden dat de OK-functionaris zijn functie zal willen neerleggen omdat de druk te hoog wordt.

## 6 Afsluiting

In de Cunico-beschikking staat de OK een ruime escrowvoorziening toe, die mede strekt tot zekerheid van de kosten voor advies en verweer in rechte tegen aansprakelijkstellingen van OK-functionarissen persoonlijk. Een dergelijke voorziening is volgens de OK in dit bijzondere geval noodzakelijk en toewijsbaar.

Aansprakelijkstellingen die elkaar in rap tempo opvolgen en/of andere (ongegronde) pogingen om de door de OK-functionarissen gekozen koers te dwarsbomen, lijken een dergelijk bijzonder geval te construeren.

De escrowvoorziening is mijns inziens een welkome aanvulling op de middelen om de OK-functionaris te beschermen. Dit heeft tot gevolg dat de OK-functionaris zich kan (blijven) richten op de taken waarvoor hij is aangesteld, zonder dat hij daarvoor zelf de rekening, in de vorm van kosten voor het voeren van verweer, krijgt gepresenteerd omdat de rechtspersoon daar zelf geen verhaal voor biedt. Daarmee wordt tevens het belang van de rechtspersoon zelf gediend.

**Noten**

[1] A.R.J. Croiset van Uchelen, Verlengstuk van de vennootschap of van de rechter? De positie van de door de Ondernemingskamer benoemde bestuurders en commissarissen, in: M. Holtzer, A.F.J.A. Leijten & D.J. Oranje (red.), Geschriften vanwege de Vereniging Corporate Litigation 2007-2008, deel 97, Deventer: Kluwer 2008.

[2] D.D. Krop, C.J. Scholten & B.E. Verburgt, De tijdelijke bestuurder: daadkrachtig op eieren lopen, in: M. Holtzer, A.F.J.A. Leijten & D.J. Oranje (red.), Geschriften vanwege de Vereniging Corporate Litigation 2014-2015, deel 128, Deventer: Kluwer 2015, p. 193 e.v.

[3] Croiset van Uchelen 2008, p. 229.

[4] Hof Amsterdam (OK) 27 oktober 2015, ECLI:NL:GHAMS:2015:4379.

[5] Hof Amsterdam (OK) 2 september 2015, ECLI:NL:GHAMS:2015:3981. Bij beschikking van 3 september 2015 zijn vervolgens de bestuurder en bewaarder benoemd (Hof Amsterdam (OK) 3 september 2015, ECLI:NL:GHAMS:2015:3626).

[6] Hoewel dit niet als zodanig uit de beschikking blijkt, zal Cunico daarbij zijn vertegenwoordigd door de OK-bestuurder, eventueel gesteund door de BSGR-bestuurder.

[7] O.m. Krop, Scholten & Verburgt 2015, p. 223, S.L. Sluijters, De aansprakelijkheid van een door de OK in het kader van een enquêteprocedure aangestelde bestuurder, V&O 1999, p. 28; anders: M.W. Josephus Jitta, De aansprakelijkheid van door de Ondernemingskamer benoemde bestuurders en commissarissen, in: C.J.M. Klaassen e.a. (red.), Aansprakelijkheid in beroep, bedrijf of ambt (Onderzoekscentrum Onderneming & Recht, deel 25), Deventer: Kluwer 2003, p. 468.

[8] Vgl. de vaste jurisprudentie van de OK op dit vlak: o.m. Hof Amsterdam (OK) 11 december 2013, JOR 2014/36 m.nt. Josephus Jitta (Slotervaartziekenhuis), Hof Amsterdam (OK) 19 april 2007, JOR 2007/142 (Begeman) en Hof Amsterdam (OK) 18 oktober 2013, ARO 2013/159 (Greenchoice).

[9] Dit wordt onder meer afgeleid uit de Zwagerman-beschikking, waarin de Hoge Raad in gelijke zin oordeelde ter zake van een OK-functionaris: HR 4 oktober 2002, JOR 2002/214 m.nt. Van den Ingh (Zwagerman Beheer).

[10] Vgl. in dit verband o.m. HR 27 februari 2015, NJ 2015/240 m.nt. PvS (ING/Deuzeman c.s.), HR 10 januari 1997, NJ 1997/360 m.nt. Maeijer (Staleman/Van de Ven), P.D. Olden, De OK-commissaris, in: M.J. Kroeze e.a., Bestuur en toezicht (Uitgaven vanwege het Instituut voor Ondernemingsrecht nr. 67), Deventer: Kluwer 2009, p. 131-132, Krop, Scholten & Verburgt 2015, p. 220 en Croiset van Uchelen 2008, p. 230.

[11] Hof Amsterdam (OK) 14 december 2007, JOR 2008/34 m.nt. Josephus Jitta (e-Traction), r.o. 3.4.

[12] Croiset van Uchelen 2008, p. 229 en Josephus Jitta 2003, p. 466.

[13] Krop, Scholten & Verburgt 2015, p. 221-223.

[14] Over de OK-commissaris: Olden 2009, p. 131-132.

© Ondernemingsrecht Updates annotaties OR_2015_0376

[15] Vgl. art. 2:351 BW.

[16] Hof Amsterdam 29 november 2001, JOR 2002/7.

[17] HR 4 oktober 2002, NJ 2002/556.

[18] Vgl. o.m. Josephus Jitta 2003 en F. Eikelboom, Hoe kneedbaar is (de positie van) een tijdelijke bestuurder, in: M. Holtzer, A.F.J.A. Leijten & D.J. Oranje (red.), Geschriften vanwege de Vereniging voor Corporate Litigation 2011-2012, deel 112, Deventer: Kluwer 2012, p. 111.

[19] Hof Amsterdam 29 november 2001, JOR 2002/7.

[20] Hof Amsterdam (OK) 14 december 2007, JOR 2008/34 m.nt. Josephus Jitta (e-Traction).

[21] Dit deed zich onder meer voor in de hiervoor in noot 11 aangehaalde e-Traction-zaak en in de zaak die leidde tot Hof Amsterdam (OK) 26 mei 2003, ARO 2003/89 (Huis 77).

[22] Olden (2009, p. 131) noemde dit overigens al – met enige kanttekeningen – als optie.

[23] Hof Amsterdam (OK) 14 december 2007, JOR 2008/34 m.nt. Josephus Jitta (e-Traction).