# Exhibit R

Case 1:20-mc-00199-JGK-OTW    Document 17-18    Filed 05/15/20    Page 2 of 22

Duane Morris LLP
Frederick D. Hyman (NY 2553832)
1540 Broadway
New York, New York 10036
Telephone: (212) 692-1000
RHyman@duanemorris.com

-and-

Jarret P. Hitchings (DE 5564)
222 Delaware Avenue, Ste. 1600
Wilmington, Delaware 19801
Telephone: (302) 657-4952
JPHitchings@duanemorris.com

*Attorneys for William Callewaert and Malcolm Cohen*
*in their capacity as Joint Administrators and Foreign Representatives*
*for the Debtor BSG Resources Limited (in administration)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| BSG RESOURCES LIMITED (in administration), | Case No. 19-11845 (SHL) |
| Debtor in a Foreign Proceeding. | |

**AMENDED DECLARATION OF MALCOLM COHEN**
**IN SUPPORT OF VERIFIED CHAPTER 15 PETITION FOR RECOGNITION OF**
**FOREIGN MAIN PROCEEDING AND RELATED RELIEF**

I, Malcolm Cohen, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury

as follows:

1.    I am a partner at BDO LLP (together with its affiliates, "BDO").  I am an individual

over the age of eighteen and, if called upon, could testify to all matters set forth in this Declaration.

2.    I hold a Bachelor of Science degree in accounting and finance from the London

School of Economics and Political Science. I am a Fellow of the Institute of Chartered Accountants

in England and Wales and have thirty-seven years of international insolvency and restructuring experience.

3.        Along with William Callewaert, a Business Advisory Director at BDO, I am one of the joint administrators for BSG Resources Limited (in administration) (the "Debtor") in a proceeding under Part XXI of the Companies (Guernsey) Law, 2008 (the "Guernsey Administration"), pending before the Royal Court of Guernsey (Ordinary Division) (the "Guernsey Court"). Guernsey is one of three crown dependencies located off the coast of Great Britain.[1]

4.        On March 6, 2018, upon an application made by the Debtor acting by its directors at that time, the Guernsey Court issued a *Court Order* commencing the Guernsey Administration and, among other things, appointing Mr. Callewaert and me as Joint Administrators of the Debtor. Shortly thereafter, the Guernsey Court issued a *Court Order* dated March 21, 2018, whereby it confirmed that it has administered to me and Mr. Callewaert the affirmation of Joint Administrator, each with the power to act alone.  The March 6 and March 21, 2018 orders are collectively referred to as the "Guernsey Administration Order" and are annexed to the Verified Petition (defined below) as Exhibit A.  In my capacity as Joint Administrator,  I am authorized to file a petition for recognition of the Guernsey Administration as a foreign proceeding (this "Chapter 15 Case") with the United States Bankruptcy Court for the Southern District of New York (this "Court").

5.        I submit this declaration (the "Declaration") in support of the *Verified Chapter 15 Petition for Recognition of Foreign Main Proceeding and Related Relief* [Docket No. 5] (the

---

[1] The other two being Jersey and the Isle of Man.

"Verified Petition"),[2] as well as in connection with, and in support of, any other relief sought in this Chapter 15 Case.

6.      In my capacity as Joint Administrator of the Debtor, I, either directly, or through my Joint Administrator or through members of my staff working under my supervision and control, am familiar with the Debtor's history, operations, assets, financial condition, business affairs, and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information and analysis prepared for me by staff working for the Joint Administrators on the Guernsey Administration, information supplied to me or verified by members of the Debtor's management or professionals retained by the Debtor both prior to and since my appointment, my review of relevant documents, and/or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.

## Background

### I.      The Debtor's Business

#### A.      Corporate Structure

7.      The Debtor is a non-cellular limited liability company incorporated in Guernsey. A chart showing the Debtor's streamlined corporate organization is annexed to the Verified Petition as Exhibit B. A supplemental corporate organization chart providing further subsidiary detail is annexed hereto as **Exhibit 1**. Copies of the Debtor's constitutional documents are annexed hereto as **Exhibit 2**.

8.      The Debtor is engaged, through certain subsidiaries and associates, in activities related to the exploration, development, extraction, refinement and marketing of natural resource

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Verified Petition.

products, including diamonds and power generation.  The Debtor previously also actively engaged in the iron ore and ferronickel sectors.

9.      The Debtor's business and trading is limited to advisory and technical services provided to a number of its subsidiaries. The business and trading interests of the Debtor's subsidiaries can be categorized as follows:

a.      The Debtor holds a direct subsidiary company, Octea Limited ("Octea"), that acts as the holding company for a group of companies engaged in diamond mining, extraction and refinement based in Sierra Leone, as well as the marketing and sale of diamonds (the "Octea Diamond Operation"). On January 2, 2019, Octea's country of incorporation, and that of certain of its subsidiaries, was migrated from the British Virgin Islands to Guernsey. The Octea Diamond Operation is operating under the supervision of its board and an observer to the board appointed by the Joint Administrators. However, it is not presently producing cash flows which are available to the Debtor.

b.      The Company holds a direct subsidiary company, West African Power Limited ("WAPL"), which ultimately holds, through a group of subsidiary undertakings, a minority investment in a power station located in Geregu, Nigeria (the "West African Power Operation"). WAPL has been in dispute for several years on a number of issues with its investee company and with the majority shareholder in the power station, Forte Oil plc, which exercises *de facto* control over it and who, it is alleged, has denied WAPL its rights to participate in its management. West African Power Limited, in consultation with the Debtor, is currently exploring options to resolve the dispute and to monetize the Debtor's indirect investment. Accordingly, the Debtor is not receiving any current cash flows from the West African Power Operation.

c.      Iron ore operation held through a subsidiary, BSG Resources (Guinea) Limited (incorporated and registered in Guernsey) (the "Guinean Iron Ore Mining Operation").  As described in detail in Section B below, the Debtor's Guinean Iron Ore Mining Operation has ceased.

**B.      The Debtor's Guinean Mining Operations**

10.      The Guinean Iron Ore Mining Operation relates to its interests in substantial iron ore deposits in the Republic of Guinea and comprise the following:

a.      An iron ore mining concession granted to BSG Resources (Guinea) SARL ("<u>BSGR Guinea</u>") on March 19, 2010 over an area in Simandou South, near the village of Zogota (the "<u>Zogota Mining Concession</u>");

b.      A mining and infrastructure agreement dated December 16, 2009 entered into by two subsidiaries of the Debtor, BSGR Guinea and VBG-Vale BSGR Ltd. (n/k/a BSG Resources (Guinea) Limited) ("<u>VBG</u>"), with the Republic of Guinea regarding the rights and obligations arising from the Zogota Mining Concession ("<u>Basic Agreement</u>"); and

c.      A prospecting permit granted to BSGR Guinea over an area referred to as "Simandou Blocks 1 and 2" granted on December 9, 2008 ("<u>Blocks 1 and 2 Permit</u>").

A copy of the Basic Agreement is annexed hereto as **<u>Exhibit 3</u>**.

11.     In 2010, the Debtor entered into a joint venture with the Brazilian mining company Vale S.A. ("<u>Vale</u>") in relation to the development of the three rights and concessions described above (the "<u>Mining Rights</u>"). The joint venture, VBG, is referred to above. A copy of the Joint Venture Framework Agreement is annexed hereto as **<u>Exhibit 4</u>**.

12.     In 2011, Alpha Condé was elected President of the Republic of Guinea. Following President Condé's election, the Debtor, BSGR Guinea and VBG faced obstruction in developing the Mining Rights. In 2012, the Debtor was informed that President Condé had set up a committee aimed at investigating how certain mining rights in Guinea (including the Mining Rights) had been obtained (the "<u>Guinea Review Committee</u>") which alleged corruption on the part of the Debtor and a wider group of its affiliates. The Debtor has denied the allegations made against it by the Guinea Review Committee.

13.     In response, the Debtor's board initiated a review using an independent professional accountancy firm to verify the accuracy of its internal controls, processes and payment procedures, including confirmation that payments made by the Debtor and its affiliates in connection with the Mining Rights were proportionate and of an appropriate business nature. According to the Debtor's

board, this review has not revealed any matters that support the allegations of wrongdoing by the Guinea Review Committee.

14.     In March 2014, the Guinea Review Committee recommended to the Strategy Committee of the Government of Guinea (the "Strategy Committee") that the Mining Rights be cancelled and expropriated, and the companies within the Debtor's control be prevented from being re-awarded the Mining Rights (the "Notification"). A copy of the Notification is annexed hereto as **Exhibit 5**.

15.     In April 2014, the Government of Guinea accepted the recommendations (the "Recommendations") of the Strategy Committee to strip BSGR Guinea and VBG of the Mining Rights and to exclude the Debtor, BSGR Guinea and VBG from participating in the tender process to reallocate the Mining Rights. A copy of the Recommendations is annexed hereto as **Exhibit 6**.

16.     As a result, the Debtor's Guinean mining operations have ceased. Whether such operations will recommence is currently uncertain.

17.     The Debtor had asserted, prior to the appointment of the Joint Administrators, that the basis of the Guinea Review Committee's recommendation was not legitimate. The Debtor had also asserted that the decisions of the Guinea government were importuned, influenced, motivated and ultimately controlled by certain illegal conduct of George Soros and certain co-conspirators, which assertion is the basis of the Soros Claim (as defined and further described below).

C.    **Litigation Following the Expropriation of the Debtor's Guinean Mining Interests**

1.    **The Guinea ICSID Proceeding**

18.    In August 2014, the Debtor initiated an arbitration proceeding with the International Centre for Settlement of Investment Disputes ("ICSID") against the Republic of Guinea. A copy of the Debtor's Request for Arbitration is annexed hereto as **Exhibit 7**.

19.    In May 2015, the Debtor repurchased Vale's shares in VBG. VBG was thereafter renamed BSG Resources (Guinea) Limited. On October 13, 2015, VBG also issued an ICSID claim against the Republic of Guinea in respect of the Mining Rights. A copy of VBG's Request for Arbitration is annexed hereto as **Exhibit 8**. Subsequently, the two ICSID claims against the Republic of Guinea were consolidated and an Amended Statement of Claim was issued on behalf of the Debtor, VBG and BSGR Guinea on February 29, 2016 (generally, the "Guinea ICSID Proceeding").

20.    Through the Guinea ICSID Proceeding, the Debtor and its subsidiaries are seeking, among other relief, a declaration that Guinea's termination of the Mining Rights was illegal and unlawful, an order restoring the Mining Rights, and an award providing compensation for damages arising out of the unlawful revocation and expropriation of the Mining Rights.

21.    A hearing in the Guinea ICSID Proceeding was held in Paris, France between May 22 and June 2, 2017. The briefing of the Guinea ICSID Proceeding was concluded in July 2018.

22.    In February 2019, a non-binding agreement was signed by the Debtor and two of its subsidiaries and the Government of Guinea to set out certain provisional matters which the parties would seek to progress as a means to resolve the Guinea ICSID Proceeding on a consensual basis. If such a consensual resolution is ultimately reached, it is anticipated that it will include the release of all of the Debtor's claims to the Simandou and Zogota licenses in return for the grant by

the Government of Guinea of a new license over the Zogota deposits, to be exploited by a third party, Niron Metals plc ("Niron"), with the Debtor to be entitled to participate in the revenues from this license, as well as a mutual withdrawal of allegations made by each party in the Guinea ICSID Proceeding. Work is proceeding towards the progression of the non-binding agreement into a formal, binding contractual arrangement. While that work is on-going, the Guinea ICSID Proceeding is currently suspended (although may be recommenced by either party in the event that the negotiations between the parties do not result in consensual settlement).

### 2.    The Vale LCIA Proceeding

23.    On April 28, 2014, Vale filed a Request for Arbitration against the Debtor in the London Court of International Arbitration (the "LCIA") seeking to recoup its investment in VBG which was allegedly lost as a result of the expropriation actions of the Guinean government (generally, the "Vale LCIA Proceeding"). A copy of the Request for Arbitration is annexed hereto as **Exhibit 9**.

24.    The Debtor was not represented at the final hearing of the Vale LCIA Proceeding. The hearing date was selected by the tribunal without reference to the availability of the Debtor's counsel, who was unable to attend. The process of the tribunal in the setting of the hearing date is alleged by the Debtor to be indicative of apparent bias by the tribunal, which is one of the grounds on which the Debtor is challenging the award (discussed in further details, *infra*). On April 4, 2019, the LCIA tribunal entered an award in favor of Vale and against the Debtor in the amount of $1,246,580,846 plus pre- and post-award interest (the "LCIA Award"). A copy of the LCIA Award is annexed to the Verified Petition as Exhibit C. Vale thereafter obtained an order from the English High Court dated May 9, 2019 to enforce the LCIA Award in England and Wales (the "UK Enforcement Order").

25.     On May 10, 2019, the Debtor filed a timely challenge under Section 68 of the English Arbitration Act 1996 (the "UK Arbitration Challenge") to the LCIA Award with the High Court of Justice, Business and Property Courts of England and Wales, Commercial Court (QBD). A copy of the UK Arbitration Challenge is annexed hereto as **Exhibit 10**. The UK Arbitration Challenge is made on the basis that the LCIA tribunal was infected by apparent bias and/or failed to comply with its general duty to conduct the proceedings fairly and impartially which constitutes a "serious irregularity" under English law. The primary relief sought by the Debtor in the UK Arbitration Challenge is that the LCIA Award be set aside and/or declared to be of no effect.

26.     On May 23, 2019, the Debtor made an application to the English High Court to set aside the UK Enforcement Order (the "Set Aside Application"). A copy of the Set Aside Application is annexed hereto as **Exhibit 11**. The Set Aside Application was made on the basis that the Debtor has separately issued the UK Arbitration Challenge the effect of which, if successful, would be to set aside or annul the LCIA Award. Vale is automatically stayed from enforcing the LCIA Award in England and Wales pending final determination of the Set Aside Application.

27.     Notwithstanding the UK Arbitration Challenge and the stay issued in connection with the Set Aside Application, on April 23, 2019, Vale filed a *Petition for Recognition and Enforcement of a Foreign Arbitration Award* (the "Vale Enforcement Petition") in the United States District Court for the Southern District of New York (the "District Court"). That action is docketed in the District Court as *Vale S.A. v. BSG Resources Limited*, Case No. 19-cv-3619-VSB. Through the Vale Enforcement Petition, Vale is seeking recognition of the LCIA Award by the District Court, together with entry of judgment against the Debtor in an amount equal to the LCIA Award plus interest and costs.

28.     On June 4, 2019, the Debtor filed an *Opposition and Cross Motion to Dismiss the Vale Enforcement Petition* (the "US Enforcement Opposition"). By the US Enforcement Opposition, the Debtor requested the District Court dismiss the Vale Enforcement Petition or, in the alternative, adjourn any decision whether to recognize the LCIA Award until the UK Arbitration Challenge is concluded. On June 18, 2019, Vale filed its *Reply* in support of the Vale Enforcement Petition and its *Opposition* to the Debtor's cross-motion. The Joint Administrators have been informed that the Debtor may file a reply in support of its US Enforcement Opposition[3] and that upon submission, briefing of the Vale Enforcement Petition will be complete. However, pursuant to an agreement between Vale and the Debtors, the parties have agreed to advise the District Court of the pendency of this Chapter 15 Case and request that the District Court refrain from issuing any decision on the Vale Enforcement Petition through at least July 10, 2019.

### 3.     The Soros Claim – the Debtor's Only U.S. Asset

29.     The Debtor's only asset in the United States is a contingent litigation interest against George Soros and certain entities he controls. Recognition of the Guernsey Administration is necessary in order to protect and preserve the Debtor's interest in this asset.

30.     On April 14, 2017, the Debtor, VBG (n/k/a BSG Resources (Guinea) Limited), and BSGR Guinea filed a complaint in the District Court against George Soros and Open Society Foundations, which was later amended to include as defendants Open Society Institute, Foundation to Promote Open Society, Open Society Foundation, Inc., Alliance for Open Society International, Inc., Open Society Policy Center, and Open Society Fund (collectively, the "Soros Defendants") asserting claims for illegal interference with contract, fraud, defamation and other matters relating

---

[3] The Joint Administrators have been informed that any reply must be provided to the District Court on or before June 25, 2019, such deadline being subject to extension by the District Court or upon agreement between the parties.

to the Soros Defendants' involvement in the Guinean government's expropriation of the Debtor's Mining Interests (generally, the "Soros Claim"). A copy of the Complaint (as amended) is annexed hereto as **Exhibit 12**.

31.     By the Soros Claim, the Debtor and its co-plaintiffs seek to recover over $10 billion in damages arising from wrongful conduct of the Soros Defendants.

32.     The Soros Claim is docketed in the District Court as *BSG Resources Limited v. Soros*, Case No. 17-cv-02726-JFK-OTW (S.D.N.Y. Apr. 14, 2017).  On July 28, 2017, the Soros Defendants filed a motion to dismiss the Soros Claim or, in the alternative, stay the proceedings on the Soros Claim until the Guinea ICSID Proceeding is concluded. The Debtor opposed the motion and resisted the imposition of the stay.  On November 29, 2017, the District Court granted the alternative relief sought by the Soros Defendants and ordered that further proceedings in respect of the Soros Claim, including discovery, be stayed pending the outcome of the Guinea ICSID Proceeding. A status conference is scheduled before the District Court on July 18, 2019 to determine the next steps in the litigation, including providing an update on the Guinea ICSID Proceeding and the possible recommencement of discovery.

33.     The Joint Administrators were informed that, prior to their appointment, the Debtor and other plaintiffs entered into a certain Litigation Funding Agreement dated as of November 2017 (the "Funding Agreement") between Litigation Solutions Limited ("LSL") and the Debtor, VBG, and BSGR Guinea. The Joint Administrators were further informed that on March 4, 2018, prior to their appointment but after the Guernsey Administration Application was submitted, the parties to the Funding Agreement entered into a Security Agreement pursuant to which the Debtor allegedly has pledged and granted LSL a security interest over a portion of any recoveries on the Soros Claim.

34.     The Funding Agreement contains a confidentiality provision pursuant to which the parties have agreed to keep confidential the terms of the Funding Agreement. Confidentiality of the terms of the Funding Agreement is necessary to avoid significant prejudice to the Debtor. Disclosure of the terms of the Funding Agreement will undermine the Debtor's ability to finance and continue to pursue the Soros Claim. Disclosure may also allow the Soros Defendants to interfere with the Debtor's prosecution of the Soros Claim resulting in the loss or impairment of the Debtor's principal asset.

**D.     Standard Chartered Bank Assignment**

35.     In addition to Vale and LSL, the Debtor has one additional alleged creditor that may have an interest in, or affected by, this Chapter 15 Case. Together with certain of its affiliates, the Debtor is a party to a certain Implementation Agreement (as amended from time to time, the "SC Agreement") with Standard Chartered Bank ("Standard Chartered"). The SC Agreement relates to the restructuring of a $92,000,000 amortizing term loan facility extended by Standard Chartered to certain of the Debtor's affiliates. Under the terms of the SC Agreement, Standard Chartered has asserted that it has a valid assignment of any proceeds (including, in summary, receivables, dividends from subsidiaries or the proceeds from any claims) that may be paid to the Debtor now or in the future as security for such amounts as may be owed by the Debtor to Standard Chartered under the SC Agreement.  As of June 4, 2019, the amount outstanding under the SC Agreement is believed by the Debtor to be $16,000,000 plus interest, although Standard Chartered alleges that the amount outstanding is $75,000,000 plus interest.  The difference between the two amounts is attributable to a difference of interpretation of the SC Agreement between the Debtor and Standard Chartered, coupled with the effect on the relevant terms of the agreement of applicable Guernsey law.

36.     The SC Agreement contains a confidentiality provision which requires each party to keep confidential the terms of the SC Agreement. Disclosure of the terms of the SC Agreement will prejudice the Debtor and could potentially result in harm to the Debtor and other non-debtor counter-parties to the SC Agreement. The SC Agreement contains confidential and commercially sensitive information concerning restructuring of the outstanding financial obligations of some of the Debtor's non-debtor affiliates.

### E.     Events Giving Rise to the Guernsey Administration

37.     The events giving rise to the Guernsey Administration are outlined in paragraphs 10 to 36, above.

38.     In summary, by February 2018, the Debtor's board determined that the Debtor was insolvent or likely to become insolvent, satisfying the requirements of the laws of Guernsey in respect of the making of an administration order against the Debtor by the Guernsey Court. This determination was based mainly on the expropriation of the Debtor's Guinean mining interests and the potential for an adverse judgment in the Vale LCIA Proceeding.

## II.     Commencement of the Guernsey Administration

39.     On or about February 27, 2018, the Debtor, acting by its directors at that time, submitted an *Application by the Company for an Administration Order* to the Guernsey Court pursuant to Part XXI of the Companies (Guernsey) Law, 2008 (the "Guernsey Administration Application").

40.     Among the documents submitted to the Guernsey Court included the Affidavit of Peter Harold Driver in Support of Company's Application for an Administration Order (the "Driver Affidavit"). The Guernsey Administration Application and its supporting documents, including the Driver Affidavit, contain commercially sensitive and highly confidential matters. Accordingly, in the Guernsey Administration Application, the Debtor requested that the Guernsey

Court consider the Guernsey Administration Application *in camera* and for the Guernsey Court to seal the case file.

41.     Specifically, the Guernsey Administration Application and its supporting documents made detailed reference to ongoing court and arbitration proceedings that were highly confidential, themselves being governed by confidentiality agreements or similar orders. These materials also included detailed descriptions of the legal and other advice given to the Debtor's board, as well as the board's opinions based on such advice including the likelihood of success of the Debtor's various litigation and arbitration claims.  The Driver Affidavit also attached a copy of a report to the board prepared by Malcolm Cohen describing certain strategies that he and William Callewaert would intend to pursue if appointed Joint Administrators.  It also attached a copy of draft, unaudited financial statements for the period ended December 31, 2017.  Such financial statements included information regarding valuation of assets and other matters that, if made public, could impair the Joint Administrators' ability to realize maximum value for such assets.

42.     The Debtor explained to the Guernsey Court that if the Guernsey Administration Application was not heard *in camera*, the privacy of the existing litigation proceedings (which are assets of the Debtor) would be compromised. The Debtors further submitted that publication of the information contained in the Guernsey Administration Application and its supporting documents could seriously prejudice the administration of the Debtor and also breach the Debtor's confidentiality obligations.

43.     In light of these concerns, the Guernsey Administration Application was heard *in camera* by the Guernsey Court on March 6, 2018. The Guernsey Court entered the Guernsey Administration Order on the same date. The Guernsey Administration Order specifically notes that

14

the hearing on the Guernsey Administration Application was held *in camera* and orders that the court file be sealed.

## III.    Status of the Guernsey Administration

44.    The Guernsey Administration is on-going. The statutory purpose of the Guernsey Administration as set forth in the Guernsey Administration Order is the survival of the Debtor and the whole or any part of its undertaking as a going concern. The Joint Administrators' role is to fulfil this purpose. In order to achieve this, the Joint Administrators have been working closely with the Debtor's management and advisors to preserve and ultimately monetize the Debtor's valuable assets – including the Soros Claim and the Guinea ICSID Proceeding – and to defend against asserted liabilities (*e.g.*, the Vale LCIA Proceeding). *See* Progress Reports of BSG Resources Limited – In Administration dated September 5, 2018 and March 7, 2019 annexed to the Verified Petition as Exhibits D and E.

45.    I have been advised by counsel of the definition of a "foreign proceeding" under Bankruptcy Code section 101(23). To the best of my knowledge, I am not aware of any other "foreign proceeding" within the meaning of Bankruptcy Code section 101(23) with respect to the Debtor.

## IV.    Center of Main Interests of the Debtor

46.    The center of main interests, or "COMI" for the Debtor is in Guernsey. The Debtor is organized under Guernsey law and has its registered office in Guernsey.

47.    Further, although the Guernsey Administration has the effect of suspending the management powers of the Debtor's directors and officers, the Debtor's main office and its chairman are resident in Guernsey. Also, the Debtor's central decision-making function prior to its entry into the Guernsey Administration, both long-range and day-to-day, took place in Guernsey. Since the commencement of the Guernsey Administration, the Debtor's decision-

making function has been carried out by the Joint Administrators, one of whom is resident in Guernsey. Because the other Joint Administrator is resident in London, England, most of the Debtor's decision-making function may occur jointly in London and/or via telephone to Guernsey. In any event, the Debtor's accounting function, as well as all of its corporate books and records, including documents of title, are located in Guernsey.

48.     The Debtor's last formal board meeting was held in Guernsey on November 27, 2018.  The Joint Administrators attended this meeting.  No other board meetings have been held since the appointment of the Joint Administrators.

49.     All or substantially all of the formal correspondence issued by the Joint Administrators is printed in Guernsey on the BDO Limited (Guernsey) letterhead and signed by William Callewaert, the Joint Administrator who is resident in Guernsey.  All vendors, including professionals retained by the Joint Administrators, render their invoices either to the Debtor's office address in Guernsey or to the address of  BDO Limited (Guernsey).  It is therefore readily ascertainable by parties dealing with the Debtor that its COMI is in Guernsey.

50.     Accordingly, I submit that, pursuant to Bankruptcy Code section 1516(c), the Debtor is entitled to the presumption that its COMI is Guernsey.

## V.     The Chapter 15 Case

51.     The Soros Claim is the Debtor's only asset is in the United States, and possibly its most valuable asset anywhere in the world.  Accordingly, the ultimate success of the Guernsey Administration requires that the Joint Administrators and the Debtor be able to prosecute the Soros Claim without disruption. The relief sought in this Chapter 15 Case is necessary to assist the Debtor's foreign restructuring efforts and to protect those efforts from the significant and

irreparable harm that could result from creditors and other parties taking unrestrained action against the Debtor's assets in the United States.

52.     In particular, it is incumbent that the Debtor be able to prosecute the Soros Claim without interference from Vale. Through the Vale Enforcement Petition, Vale is prematurely attempting to enforce a foreign arbitration award that is the subject of a current, pending challenge before a foreign court of competent jurisdiction. Moreover, to the extent Vale is allowed to reduce the LCIA Award to a judgment in the United States, that judgment may directly impair the Debtor's ability to meaningfully prosecute the Soros Claim and may ultimately seek to encumber any proceeds that the Debtor might obtain in connection therewith.

53.     Such interference and impairment will significantly reduce the ability of the Debtor, through the Joint Administrators, to achieve a successful outcome of the Guernsey Administration, including satisfying its stated purpose as the survival of the Debtor and the whole or any part of its undertaking as a going concern. In addition, the cost and expense of responding to and defending against the Vale Enforcement Action will almost certainly dilute any recovery or distribution that might be obtained by the Debtor's other creditors and will cause unnecessary distraction to the Joint Administrators, diverting their attention from their restructuring efforts in the Guernsey Administration. If allowed to proceed, the Vale Enforcement Action may allow Vale to defeat the priorities of Guernsey and United States insolvency law to the impairment of the asserted secured claims of Standard Chartered and LSL which will, in any event, need to be resolved in the Guernsey Administration.

54.     To the extent that Vale has alleged that the Debtor owns other assets in the United States in addition to the Soros Claim, such as a bank account or real estate, the Joint Administrators

17

have investigated the presence of such assets and have uncovered no evidence that such assets

exist.

## Relief Sought

### I.    Verified Petition

55.    With this Declaration, the Joint Administrators have filed the Verified Petition

seeking entry of an order providing the following relief:

a.    recognition pursuant to section 1517 of the Bankruptcy Code of the Guernsey Administration as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code;

b.    recognition that Joint Administrators are the "foreign representatives" on a final basis (as defined in section 101(24) of the Bankruptcy Code);

c.    through the extension of relief automatically available pursuant to section 1520 of the Bankruptcy Code, an order expressly barring, enjoining, and staying, pursuant to section 362 of the Bankruptcy Code, any action to interfere with the Debtor's assets located in the United States, specifically including, but not limited, to the Soros Claim;

d.    the extension of any provisional relief granted under section 1519(a) of the Bankruptcy Code pursuant to section 1521(a)(6); and

e.    such other and further relief as is appropriate under the circumstances pursuant to sections 105(a) and 1507 of the Bankruptcy Code.

56.    To the extent the relief requested herein exceeds the relief available to the Debtor

pursuant to section 1520 of the Bankruptcy Code, the Joint Administrators request this relief

pursuant to sections 1507 and 1521(a)(1) and (2).

57.    In the event the Court were to determine the Guernsey Administration is not a

foreign main proceeding, the Joint Administrators request that the Court nevertheless grant the

relief requested above pursuant to sections 1521 and 1507 of the Bankruptcy Code.

### II.    Application for Order Setting Hearing and Providing for Notice Procedures

58.    The Joint Administrators have also filed an application [Docket No. 8] (the "Notice

Application") requesting an order (i) scheduling a hearing for the Court to consider the relief

requested in the Verified Petition (the "Recognition Hearing"), (ii) setting a deadline by which all objections to the Verified Petition must be filed and (iii) approving the form and manner of notice of Recognition Hearing as described in the Notice Application.

59.     By the Notice Application, the Joint Administrators propose to provide notice of this Chapter 15 Case and the Recognition Hearing upon certain Chapter 15 Notice Parties (as that term is defined in the Notice Application) which include Standard Chartered, LSL, Vale and the Soros Defendants.  As proposed in the Notice Application, all such parties would receive notice of the Recognition Hearing.

60.     It is my belief that service of the notice of the Recognition Hearing in the manner proposed in the Notice Application will provide the Debtor's various parties-in-interest due and sufficient notice of the Recognition Hearing and objection deadline.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: June 21, 2019

Malcolm Cohen

*Joint Administrator and Foreign Representative*
*for the Debtor BSG Resources Limited*
*(in administration)*

Case 1-20-mo-00189-JGK-OTW Document 17-82 Filed 05/15/20 Page 22 of 22

## Index of Exhibits to the Amended Declaration of Malcolm Cohen

| Tab | Title |
|-----|-------|
| 1. | BSG Resources Limited Corporate Organization Chart |
| 2. | BSG Resources Limited Constitutional Documents |
| 3. | Basic Agreement between the Republic of Guinea and BSG Resources |
| 4. | Joint Venture Framework Agreement |
| 5. | CTRTCM Notification of Intention to Recommend Withdrawal of Mining Rights |
| 6. | CTRTCM Recommendations to the Strategy Committee of the Government of Guinea |
| 7. | BSG Resources Limited's Request for ICSID Arbitration |
| 8. | VBG's Request for ICSID Arbitration |
| 9 | Vale Request for Arbitration |
| 10 | UK Arbitration Challenge |
| 11. | Set Aside Application |
| 12. | Amended Complaint against the Soros Defendants |