# Exhibit 1

Neutral Citation Number: [2018] EWHC 2016 (Ch)

Claim No: HC-2015-001647

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**BUSINESS LIST (Ch D)**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 31/07/2018

Before :

**MR JUSTICE NUGEE**

- - - - - - - - - - - - - - - - - - - - -

Between :

**(1) SIR OWEN GEORGE GLENN KNZM ONZM**
**(2) KEA INVESTMENTS LIMITED**                    **Claimants**

**- and -**

**(1) ERIC JOHN WATSON**
(personally and as trustee of the Richmond Trust)
**(2) NOVATRUST LIMITED**
(personally and as trustee of the Park Trust,
Clearview Trust and Coronet Trust)
**(3) MILES JOHN ANTHONY LEAHY**
**(4) NUCOPIA PARTNERS LIMITED**
**(5) SPARTAN CAPITAL LIMITED**
**(6) MUNIL DEVELOPMENT INC**                    **Defendants**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Elizabeth Jones QC**, **Justin Higgo**, **Gareth Tilley**, **Paul Adams** and **Oliver Jones** (instructed by **Farrers**) for **the Claimants**

**John McCaughran QC**, **Hannah Brown QC** and **Eleanor Campbell** (instructed by **Oury Clark**) for **Mr Watson**

**Sa'ad Hossain QC**, **Jamie Goldsmith** and **Joyce Arnold** (instructed by **Wilson Gilmore**) for **Novatrust Ltd** (until 6 June 2017)

**Mr Leahy** in person for himself and **Nucopia Partners Ltd**

Hearing dates: 5, 8, 9, 10, 11, 12, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26 May, 6, 7, 8, 9, 12, 13, 14, 15, 16, 19, 20, 21, 22, 23, 26, 27, 28, 30 June, 20, 21, 24, 25, 26 July 2017
- - - - - - - - - - - - - - - - - - - - -

# Judgment Approved

**Index**                                                                                    **Para**

Introduction ......................................................................................................... 1

**The background and principal witnesses** ...................................................... 12
   Sir Owen ........................................................................................................ 13
   The trust arrangements .................................................................................. 21
   Mr Miller ........................................................................................................ 46
   Mr Watson ...................................................................................................... 50
   Mr Leahy ........................................................................................................ 55

**Factual narrative down to Project Edsel** ...................................................... 62
   Relationship between Sir Owen and Mr Watson ........................................... 62
   Red Mountain ................................................................................................. 64
   Property investments – ground rents .............................................................. 68
   Property investments – affordable housing .................................................... 78
   Mr Watson interests Sir Owen in property opportunities .............................. 92
   Project Edsel .................................................................................................. 94

**Claims in relation to Project Edsel** ............................................................. 127
   Fiduciary duties – (i) the law ....................................................................... 128
   Fiduciary duties – (ii) application to the facts ............................................. 135
   Did Sir Owen have any sufficient interest in Kea to support a fiduciary duty? ............... 157
   If Mr Watson owed a fiduciary duty was he in breach of it? ....................... 175
   The Term Sheet ............................................................................................. 181
   The use of the £7,045 .................................................................................... 189
   Affirmation .................................................................................................... 211
   Conclusion on Project Edsel ........................................................................ 213

**Facts - Project Spartan** ............................................................................... 214
   The background to the presentations of Project Spartan ............................. 216
   The initial presentations to Mr Miller (29 March) and Sir Owen (1 April) ...................... 224
   From the presentations to Mr Leahy's e-mail of 28 May 2012 – the draft Term Sheets ... 253
   The M&G deal and its impact – Mr Leahy's e-mail of 28 May 2012 ............... 270
   From 28 May 2012 to signature of Spartan Term Sheets on 7 June 2012 ........ 295
   From the Term Sheets to the July agreements ............................................. 317
   Newco ........................................................................................................... 320
   Personal benefits or incentives .................................................................... 326
   Obtaining more money from Kea; Voltaire ................................................. 330
   Los Angeles meetings on 10 and 11 July ..................................................... 336
   Mr Watson raises Fladgates conflict issue .................................................. 340
   The July agreements – 24 July 2012 ............................................................ 347

**Claims in relation to July agreements** ........................................................ 357
   Deceit ............................................................................................................ 358
   Autumn 2012 ................................................................................................. 378
   Affirmation .................................................................................................... 412
   Inducements .................................................................................................. 417
   Breach of fiduciary duty by Mr Watson ...................................................... 432

Breach of fiduciary duty by Mr Dickson ........................................................443

**Subsequent events** ..............................................................................**450**
The Supplemental Loan Agreement ...........................................................450
The Deed of Amendment to the Shareholders' Agreement .............................460
The Nucopia Consultancy Agreement .........................................................461
Further proposed amendments to Spartan Shareholders' Agreement................467
Project Royal................................................................................................471
The Interim Arrangement.............................................................................475
The Nevis Injunction....................................................................................478
Second and Third Kea Loan Agreements .....................................................483
Subsequent events ......................................................................................501
The 2014 Settlement with Messrs Miller and Dickson...................................515
The 2017 Settlement with Novatrust ............................................................522

**Relief**......................................................................................................**526**
Questions 1 to 3: duty and breach...............................................................528
Question 4: knowing receipt .......................................................................531
Questions 5 and 6: equitable compensation .................................................537
Questions 7 and 8: damages for deceit.........................................................555
Question 9: interest ....................................................................................561
Questions 10: did Mr Leahy receive at least $363,566 from the Munil Money? .............565
Questions 11 to 13: Project Edsel ...............................................................567
Question 14: allocation ...............................................................................569

**Conclusion** ............................................................................................**581**

**Mr Justice Nugee:**


# Introduction

1.      This judgment is given after the trial of the action.

2.      When the trial started, the claim was being pursued against all Defendants, and the action was one of three sets of related proceedings that had been managed and were being tried at the same time, the other two being a derivative action brought by Novatrust Ltd (**"Novatrust"**) on behalf of Spartan Capital Ltd (**"Spartan"**) against Kea Investments Ltd (**"Kea"**), and a petition to wind up Spartan brought by Kea. In the course of the trial however the Claimants and Novatrust reached an agreement which settled not only the Claimants' claims in this action against Novatrust and Spartan, but also the entirety of the derivative action and the petition. I am therefore now only concerned with the one action, and only with the claims brought by the Claimants against the Defendants other than Novatrust and Spartan.

3.      The protagonists are two wealthy businessmen from New Zealand, Sir Owen Glenn (he was not knighted until late 2012 but I will refer to him as **"Sir Owen"** throughout) and Mr Eric Watson (**"Mr Watson"**). Over the course of a long career, Sir Owen had founded and built up from nothing a highly successful international logistics business

known as OTS Logistics Group or **"OTSLG"**.  In 2012, by which time he was in his early 70s, he sold OTSLG for a substantial sum – I do not think the precise amount is in evidence, but it was about US$350m (in the rest of this judgment I will use $ to refer to US dollars, with A$ and NZ$ for Australian and New Zealand dollars respectively).

4.      Sir Owen had formerly owned OTSLG himself, but by the time of the sale it was held by an offshore trust called the Corona Trust which had been established in 2009 for the benefit of Sir Owen's family and a foundation which he used for his charitable and philanthropic activities called the Glenn Family Foundation (**"the GFF"**).  As a result of the sale the trust had a large amount of cash to invest, and the proceedings arise out of investment opportunities that Mr Watson made available for this purpose, in particular two investments put forward by Mr Watson codenamed Project Edsel and Project Spartan.

5.      Project Edsel came first.  This was an investment in an affordable housing scheme for the London Borough of Barking and Dagenham (**"LBBD"**).  The basic idea was that Sir Owen's interests would provide 90% of the capital required and Mr Watson's 10% but that the profits, after repayment of capital and interest, would be split 50/50.  On the Sir Owen side the investment was made by Kea, which was then owned (indirectly) by the Corona Trust (it is now owned by Sir Owen personally).  On the Watson side the investment was made by Novatrust, a professional trustee company, in its capacity as trustee of the Clearview Trust (**"Clearview"**), one of several trusts established by or associated with Mr Watson.

6.      The venture was a success and returned substantial profits to both Kea and Novatrust. However Mr Watson also benefited from a share in the management "carry", that is a share of profits payable to the managers of the investment, which in the event also gave him very substantial amounts.   The Claimants in the current action bring personal and proprietary claims against Mr Watson on the basis that this aspect of the arrangement involved a breach of fiduciary duty owed to them by Mr Watson, and on various other grounds.

7.      Project Spartan followed.  This was a project on a much larger scale.  It was again a joint venture, with the participants again being Kea on the Sir Owen side, and Novatrust on the Watson side, in this case in its capacity as trustee of the Park Trust (**"Park"**), another trust associated with Mr Watson.  Kea and Novatrust each became 50% shareholders in Spartan, a BVI company, and each had a representative on Spartan's board of directors.  Kea also agreed to lend substantial sums to Spartan which could then be deployed on a number of potential investments.

8.      Documents to give effect to this, such as a shareholders' agreement and loan agreement, were entered into in July 2012.  Although an initial presentation had been made to Sir Owen in April 2012, the negotiation of the detailed terms and the decision to go ahead were dealt with not by him but by two individuals who between them ran the Corona Trust: Mr David Miller (**"Mr Miller"**), a long-standing adviser to, personal friend and close confidant of Sir Owen's, who was the Protector; and Mr Peter Dickson (**"Mr Dickson"**), who owned and ran Pizarro Company Ltd (**"Pizarro"**), a Nevis company that was the Trustee.  The formal agreements were signed on behalf of Kea by Mr Dickson who was a director of Kea.  They involved Kea agreeing to lend Spartan over £12m in effect as the price for participating in

Spartan and to make further substantial loans (initially £50m) to Spartan for it to deploy on investments, and committed Spartan to a number of transactions (set out in schedule 2 to the shareholders' agreement and referred to in these proceedings as **"the schedule 2 transactions"**).

9.    Sir Owen however fell out with Mr Miller and Mr Dickson and proceedings were brought, first by Sir Owen in California against Mr Miller, and then by his daughter, a beneficiary of the Corona Trust, in Nevis against both Mr Miller and Mr Dickson (and Pizarro and others).   The upshot of that was that the Nevis Court appointed a new trustee of the Corona Trust, namely a company called Harneys (Nevis) Ltd (**"HNL"**), initially on an interim basis, and a new director, Harlaw Ltd (**"Harlaw"**), was subsequently appointed to Spartan's board as Kea representative.   HNL and Harlaw were companies associated with Harney Westwood & Riegels (**"Harneys"**), a firm of solicitors practising in the BVI and elsewhere, and Mr Ross Munro, a partner in Harneys, acted as director of both HNL and Harlaw.   In April 2013 Mr Munro approved Spartan entering into the schedule 2 transactions.   Spartan had already made one investment, which was successful, but thereafter no further investments were made, Spartan's board was deadlocked and Spartan's business came to a complete halt.

10.   That forms the background to the action.   In essence the Claimants sought to unwind Kea's investment in Spartan by avoiding or setting aside the Project Spartan agreements entered into by Kea in July 2012.   That claim was based on a number of alternative grounds, including allegations that Messrs Miller and Dickson were deceived into entering into them by fraudulent misrepresentations, or alternatively that Mr Dickson entered into them in breach of his duty as director of Kea (to the knowledge of Novatrust), or that Mr Watson acted in breach of a fiduciary duty owed to Sir Owen or Kea.

11.   The agreements have now in fact been set aside as between Kea, Novatrust and Spartan by consent as a result of the settlement with Novatrust, but the remaining Defendants, principally Mr Watson, were not parties to or bound by that settlement and the Claimants seek to establish against the remaining Defendants that they were indeed entitled to have the agreements set aside as this forms the basis of extensive proprietary and personal claims which they bring against them.

### *The background and principal witnesses*

12.   I will start by saying a little more about the background and the main parties involved.

# Sir Owen

13.   Sir Owen was born in Calcutta in 1940, but his family moved to New Zealand when he was still a boy, and he is a New Zealand citizen.   He has six children, three from his first marriage and three from his second, who have been referred to as his Australian and American families respectively.   He and his first wife lived in Australia and had three daughters, one of whom is Mrs Jennifer Connah who brought the Nevis proceedings I have referred to.   In 1986 however he received a "green card" entitling him to live in the US, and he and his second wife moved there; they had two daughters and a son.

14.     After leaving school Sir Owen began his career in logistics and as already mentioned over the course of a long career built up a very successful logistics business known as OTSLG. In an affidavit in the Nevis proceedings, he said that it was always his intention to build up OTSLG and sell it so as to realise significant capital which could be used to diversify his business interests, support his extensive philanthropic activities and secure his own and his family's future, and that from the early 2000s, he began to think seriously about selling OTSLG. As a result of certain advice he received about the possible US tax consequences of a sale while he was resident in the US, he gave up his green card on or around 30 December 2003 and moved to Monaco.

15.     In the event a potential buyer emerged for OTSLG towards the end of 2010 in the shape of Man Capital LLP (**"Mancap"**), a private equity group run by a wealthy Egyptian family by the name of Mansour. Sir Owen established a group called the OTSLG Advisory Board which had its inaugural meeting in Long Beach, California in March 2011. The purpose of the meeting was to bring together various people to discuss his plans to sell the business and what he proposed to do afterwards. By then matters were sufficiently far advanced for the Board to be told that Mancap was doing due diligence into a potential acquisition at $400m. This was the transaction that eventually completed in the shape of a sale of OTSLG to Mancap, albeit not until January 2012. Among the attendees on the Advisory Board was Mr Roger Hamilton SC, an Australian tax barrister and Senior Counsel who was a long-standing adviser and friend of Sir Owen's (**"Mr Hamilton"**); his evidence to the Nevis Court was that a considerable part of the meeting was devoted to outlining what Sir Owen would like to do if the Mansour transaction were successful, with Sir Owen referring to various investments and projects and making provision for his family and the GFF. Mr Hamilton's notes of the meeting indicate that there was discussion of $100m being put into broad investments (with the income for Sir Owen's children and grandchildren), with other investments being held for the benefit of the GFF.

16.     Sir Owen was appointed a Member of the New Zealand Order of Merit (ONZM) in June 2008 in acknowledgment of his services to business and the community, and was named a Knight Companion of the New Zealand Order of Merit (KNZM) in December 2012 in recognition of his philanthropic work. The details of this are not relevant to the issues in the action but it is apparent that Sir Owen has, through the GFF, given large sums of money to charitable and philanthropic causes over the years, not only in New Zealand, but also in India and elsewhere. In his affidavit in the Nevis proceedings, he said that the GFF had over the last 30 years given an estimated NZ$41m to a wide variety of worthwhile causes all over the world. Sir Owen is justifiably proud of his achievements and of the recognition accorded to him by the honours he has received.

17.     Sir Owen gave evidence before me. He is a forceful character and he gave his evidence in a forthright manner, often expressing himself with certainty. But he himself accepted in his witness statement that he found it difficult to remember the detail of the matters on which he gave evidence, and there were parts of his evidence where it could be shown that his assertions were incorrect.

18.     One notable example concerns the setting up of the trust arrangements in 2009. It is accepted by Ms Jones QC, who appeared for the Claimants – and indeed has been accepted since my first involvement in these proceedings at a case management

conference in April 2016 – that these arrangements were entered into as a result of a concern about a potential liability to US estate tax.  Sir Owen had given up his green card at the end of 2003, but if he died within a 10-year window thereafter, there would have been a potential liability to US estate tax.  The Defendants have at various stages in the proceedings suggested that another concern might have been a potential liability to US income tax (which includes tax on capital gains), and in the course of his cross-examination Sir Owen expressly accepted that the advice he took and received was in relation to income tax.  That led to Mr McCaughran QC, who appeared for Mr Watson, making an application in the course of the trial for specific inspection of certain documents dealing with the establishment of the trusts that had been withheld; the application was vigorously opposed by Ms Jones, but at my suggestion her solicitors wrote to confirm that none of those documents had in fact referred to US income tax, and on that basis Mr McCaughran did not pursue his application.  In those circumstances I conclude, as Ms Jones invited me to, that Sir Owen was simply wrong in thinking that US income tax had played any part in the decision to set up the trusts in 2009 – despite the fact that he had been quite clear in his evidence that this was so.

19.     Another example concerns the question whether Sir Owen had gone to Hong Kong in the autumn of 2011.  In cross-examination Mr McCaughran asked him if he recalled going to Hong Kong in October 2011 for the purpose of making an agreement for the sale of OTSLG to Mancap.  He said he did not recall doing so.  Further disclosure was however then given which showed beyond doubt that a trip to Hong Kong on 4 October 2011 was arranged for him, and when recalled for further cross-examination, he admitted being in Hong Kong for a meeting to close the transaction with Mancap: there was in fact a last-minute hitch and the deal went off, but he decided to go anyway.  He said he just did not recall it when first asked.

20.     In the light of matters such as these, I approach Sir Owen's evidence with a degree of caution.  I have no reason to think that he was seeking to do anything other than assist the Court, but his evidence was not wholly reliable and on matters of detail I have sought to check it against such other evidence as there is.

## The trust arrangements

21.     Part of the background to this case concerns the trust arrangements established to hold Sir Owen's wealth, and the relationship between Sir Owen on the one hand and Messrs Miller and Dickson on the other.  As already referred to, this relationship in the event broke down and ended in litigation which led to Messrs Miller and Dickson being removed from the trust.  This is not the trial of an action for breach of trust and save to a limited extent I am not concerned with the rights and wrongs of these matters, but I do have to give some account of them.

22.     Mr Miller, an Australian by birth, is a qualified accountant.  He has known Sir Owen for over 35 years.  In the 1980s he acted as Chief Financial Officer for several of Sir Owen's companies, but resigned to run his own business; not long afterwards, he re-joined Sir Owen to oversee the administration of Sir Owen's various interests.  In his affidavit in the Nevis proceedings, Sir Owen said that Mr Miller was from then on closely involved in the running of his businesses and his personal financial affairs, that he (Sir Owen) came to place complete trust and confidence in him, and that Mr Miller was not only a trusted adviser but a personal friend, such that Sir Owen asked

him to hold his power of attorney and act as executor of his will; Mr Miller is also godfather to Sir Owen's fourth daughter Michelle. An e-mail in January 2011 from Sir Owen to Mr Miller when agreeing to pay him a bonus described his role as looking out for the shareholders' interests, told Mr Miller that he should subscribe to the creed that Sir Owen should be kept informed day by day on all matters that were part and parcel of his affairs, and thanked him for being on his side; Mr Miller replied that he had always been on his side. Mr Miller was called to give evidence before me by the Defendants, and I will have to consider the quality of his evidence later; he accepted in evidence the description of himself as Sir Owen's adviser and right-hand man.

23.     Mr Dickson was not called to give evidence and I heard little evidence about him or his background. In an affidavit in the Nevis proceedings, he said that his career had been in setting up and managing trusts and offshore companies. In his own affidavit in the Nevis proceedings, Sir Owen said that he had met Mr Dickson in Bermuda in 1983, that he believed he introduced him to Mr Miller in around 1984 and that he was aware that Mr Miller subsequently engaged him as an accountant and trusts administrator; his understanding was that Mr Dickson was primarily hired to act as nominee director for his companies and the various elements of the structures that Mr Miller was responsible for. He was not a personal friend, and Sir Owen said that he had never envisaged giving Mr Dickson real power over his and his family's affairs.

24.     When Sir Owen was contemplating moving to the US in the 1980s, he took tax advice as a result of which various trusts were established for him in Bermuda. The details of these trusts were not in evidence and are not important. They are only relevant in that Sir Owen's evidence was that his experience was that although his assets were held in trust, in practice that did not mean that he lost control of them: he did dictate exactly what investments were made and what companies were bought. In his affidavit in the Nevis proceedings he said that his focus was on developing and running his businesses so he left all points of detail concerning the establishment, operation and administration of the trusts to Mr Miller, but continued to make the substantive decisions (including investment decisions and the distribution of funds for his philanthropic activities). His experience was that Mr Miller would implement his instructions in an efficient manner and without question.

25.     On 12 February 2009 two new trusts were established for Sir Owen in Nevis, one being the Corona Trust already referred to, and the other a trust called the Regency Trust. At that stage Sir Owen was himself the ultimate beneficial owner (UBO) of OTSLG, the corporate parent of the group being a BVI company called Pacifico Holdings Ltd (**"Pacifico"**), the shares in which were held by a nominee, SHR Corporate Services Ltd (**"SHR"**), for Sir Owen absolutely, and had been so held since 31 July 2007. It appears that the shares had previously been held by Mr Dickson and were put into Sir Owen's beneficial ownership in connection with a sale that was then proposed. One of the subsidiaries held by Pacifico was Kea, Pacifico being the sole registered shareholder of Kea from 8 May 2007 until 27 February 2013 (when the shares were transferred to HNL).

26.     There were a number of similarities between the Corona and Regency Trusts. In each case the Trustee was Pizarro, the Protector was Mr Miller, and the beneficiaries were Sir Owen's children and grandchildren, together with the GFF. In each case, in what appears to have become a common practice with offshore trusts, the trusts were

formally declared by the Trustee (Pizarro) over a nominal fund, the real assets being settled later. Sir Owen did not therefore appear as settlor on the face of the documents, although it was not disputed that he was the economic settlor, and there was no attempt to hide his connection with the trusts on the face of the trust deeds, with prominent reference for example to his US and non-US children and grandchildren.

27.     Pizarro, as already mentioned, was a Nevis company owned and controlled by Mr Dickson, who described himself initially as Director and later as Managing Director. Mr Miller confirmed in evidence that as far as he was aware it in fact had no other personnel and was simply a vehicle for Mr Dickson to provide trustee services. Mr Miller also said that he thought it correct that Pizarro did not do anything other than act as trustee of the Corona and Regency Trusts.

28.     There were certain differences between the trusts – in particular the Regency Trust contained provisions as to payment of Sir Owen's debts and funeral expenses, and certain specific gifts, on his death, which the Corona Trust did not – but the most significant difference between the two was that the Corona Trust was an irrevocable trust which reserved no powers to Sir Owen, whereas the Regency Trust was revocable by Sir Owen and also conferred significant other powers on him, including power to amend the trusts, add and remove beneficiaries, remove the Trustee and Protector and the like. Sir Owen was not named as a beneficiary under either trust but there was no restriction on adding him.

29.     In April and May 2009 arrangements were entered into the result of which was that the Corona Trust acquired OTSLG but there was a sum of $82m left outstanding as owed by the Corona Trust to the Regency Trust (and hence available to Sir Owen). The precise mechanics are of less importance but the material I have seen indicates that (i) on 1 April 2009 a company owned by the Corona Trust, Trans Pacifico Ltd (**"TPL"**), bought from Global Transport Holdings Ltd (**"GTHL"**), a company owned by Pacifico and hence ultimately by Sir Owen personally, the shares in a company called Global Logistics Holdings Ltd (**"GLHL"**), whose subsidiaries included OTSLG, for $91m (apparently its then book value, which was considerably less than its then market value); (ii) of the $91m, $9m was paid in cash and $82m was left outstanding as a loan from GTHL to TPL, to be repaid by TPL over a period; and (iii) on 1 May 2009 Pacifico was contributed to the Regency Trust. Mr Miller in his evidence initially suggested the arrangements had taken place in a different order, but what I have set out above is what the available documentary material indicates, as indeed he accepted. The net effect was that by the middle of 2009 the (irrevocable) Corona Trust owned OTSLG (although it later came to light that the share register was not then updated), and the (revocable) Regency Trust had the benefit of a receivable of $82m from the Corona Trust.

30.     By deed dated 30 September 2011 the Corona Trust was amended. By clause 13(a) of the original declaration of trust the Trustee (Pizarro) had power to amend the trusts with the written consent of the Protector (Mr Miller) provided that the Trustee was *"reasonably satisfied that such alteration ... does not prejudice the general interests of the Beneficiaries"*. The amendment took the form of a restated declaration of trust which was executed by Mr Dickson on behalf of Pizarro; I have not I think seen the written consent of Mr Miller. A number of amendments were made: the restated deed incorporated the provisions as to payments of Sir Owen's debts and funeral expenses

on his death which had been in the Regency Trust; the beneficiaries were restated and now excluded Sir Owen's US children and grandchildren; and a new schedule of fees was added. The original declaration of trust had provided that the Trustee could charge fees in accordance with Pizarro's fee schedule (although no such schedule was set out), and that the Protector should be provided reasonable compensation based on the amount of time spent by him and the extent of his duties and responsibilities; the restated declaration of trust provided for the Trustee to receive annual fees based on the size of the fund, a 3% *ad valorem* fee on purchases and sales of assets, and other fees on distributions, retirement and the like. The annual fee was 1.5% on the first $100m, 1% on the next $100m, and 0.5% on the next $200m, so for a fund of $400m would amount to $3.5m pa. The restated trust deed also introduced a minimum annual fee of $300,000 for the Protector. It does not appear that these fees had been agreed or discussed with Sir Owen. Nor were they disclosed at the time: Mr Miller accepted in evidence that Sir Owen was not copied in when the trust was amended, that he did not know at any time until the latter part of March 2012 what fees Mr Miller and Mr Dickson were proposing to charge, and that he was furious when he found out. (It may also be noted in passing that among other amendments this deed deleted the proviso to the amendment power that the Trustee be reasonably satisfied that any amendment did not prejudice the general interests of the Beneficiaries; this particular amendment was not something raised in evidence or submissions and I express no views on whether it was of any effect, but it is at first blush somewhat surprising that a trustee or protector should think it a proper amendment to make).

31.     At some stage Messrs Miller and Dickson caused the assets of the Regency Trust to be transferred (or "decanted" in Ms Jones' word) from the Regency Trust to the Corona Trust. The mechanics are again of less importance but briefly (i) by a Deed of Inclusion of Beneficiary dated (at least ostensibly) 31 October 2011 Pizarro as Trustee of the Regency Trust added the Corona Trust as a beneficiary of the Regency Trust (the Trustee having power to add *"persons"* as beneficiaries and *"person"* being defined to include an *"entity"*); (ii) as recorded in a memorandum also dated 31 October 2011 Pizarro as Trustee of the Regency Trust made an *in specie* distribution of the shares in Pacifico to the Corona Trust; and (iii) by a Deed of Exclusion of Beneficiary dated 30 November 2011, Pizarro as Trustee of the Regency Trust excluded the Corona Trust as a beneficiary of the Regency Trust. The practical effect was that the Corona Trust came to hold both OTSLG, and the benefit of the receivable of $82m owed by TPL to GTHL (and also Kea, Pacifico's subsidiary). Despite the dates on the documents, Ms Jones suggested that this decanting actually took place rather later and the documents were backdated. This is a point to which I will return.

32.     I received no coherent explanation of why the decanting took place. Mr Miller attempted to give an explanation in cross-examination but I found it impossible to follow. I was not referred to any contemporary documents which shed light on it. What does clearly emerge is that the decanting was not something that had been planned when the two separate trusts were set up in 2009. It is part of the Claimants' case that the decanting, which had the effect of removing the receivable of $82m from a trust where Sir Owen could, by revoking the trust, claim it for himself, to a trust where he had no rights over it, without taking into account his interests or even informing him, was wrongful and in breach of trust. That is also a point to which I will return.

33.    It had been envisaged that the sale of OTSLG to Mancap would complete in early October 2011, but the transaction as already mentioned went off just before completion was due.  Negotiations however in due course resumed and in the event it completed on 5 January 2012 at a price of about $350m, with the result that the Corona Trust then had a large amount of cash for investment.

34.    Over the next few months, an increasing rift grew between Sir Owen on the one hand and Messrs Miller and Dickson on the other.  Sir Owen assumed that it would effectively be a matter for him both as to how the cash should be invested and what distributions were made.  His evidence as already mentioned was that he had had trust structures before, and that was how they had in practice operated; Mr Miller's evidence indeed was that until the completion of the Mancap transaction, he and Mr Dickson worked very closely with Sir Owen and everything seemed to be fine.  Sir Owen was therefore disconcerted to be told that decisions on such matters were not a matter for him at all but for Messrs Miller and Dickson.  At a meeting at his house in Sydney in January 2012 Mr Dickson referred to new *"rules of engagement"* by which he meant that Sir Owen would henceforth have a limited role in investment decisions.  Sir Owen responded by e-mail to Messrs Miller and Dickson on 17 January 2012 saying that he was appalled that they had suggested that his future investments were somehow to be monitored by them and that he would be restricted into categories or levels of investments, adding *"Let me remind you who made this money"*.

35.    Sir Owen said in the same e-mail that he would support Mr Miller at his current level of remuneration until the end of June 2012, but that he then wanted him to move to Sydney (Mr Miller was then living in California), or restrict his role to trusteeship over his family affairs and adjust his remuneration accordingly.  It appears from an e-mail exchange in early 2011 that Mr Miller's *"current level of remuneration"* was a base salary of $300,000, having been set at $250,000 in 1998 and increased to $300,000 with effect from 1 January 2011, supplemented by various bonuses.  It seems fairly plain that Sir Owen was proposing to reduce his salary below $300,000 unless Mr Miller agreed to move to Sydney; Mr Miller does not seem to have replied that he and Mr Dickson had already amended the Corona Trust to guarantee him a minimum $300,000 a year as Protector.

36.    On 18 February 2012 Sir Owen e-mailed Mr Dickson instructing him to transfer A$25m to his personal account; on the same day he e-mailed Mr Miller asking for a tabulation of the fees that had been paid to, or were to be claimed by Mr Dickson, saying that all payments were to have his written approval.  He also suggested limiting or dispensing with Mr Dickson's services.  Mr Miller took advice from Mr Ord, a US attorney of the firm of Ord & Norman which had been involved in setting up the trusts, as a result of which he wrote Sir Owen a long e-mail dated 25 February 2012 passing on Mr Ord's comments.  It is not necessary to detail them: the general thrust was that there was a high risk of an audit by the IRS (the US revenue authority) as a result of the Mancap transaction, and that there would be significant adverse consequences if the trust were to be seen as a sham.  That meant avoiding any inappropriate or questionable payments to the settlor, and that the trustees should, at least on paper, be seen to be making the investment decisions, with communications from the settlor being couched as requests not demands.

37.    On 21 March 2012, Mr Dickson wrote a formal letter to Sir Owen on behalf of Pizarro (describing himself as Managing Director, and copied to Mr Miller as Policy

Director, although Mr Miller never occupied a formal position as director of Pizarro), saying that Pizarro had become very concerned about his apparent misconception with respect to his relationship to the trust. Sir Owen asked Mr Miller for a copy of the Corona Trust Deed and was provided with a copy of the Amended Deed dated 30 September 2011; this revealed the scale of trustee fees which shocked Sir Owen. After an unproductive meeting between Sir Owen and Mr Miller in the Bahamas in which Sir Owen said that the Trustee should be replaced, Mr Miller should resign and the fees not paid as they had never been approved, Mr Miller wrote another formal letter to him on 13 April 2012 (on Pizarro letterhead, describing himself as Policy Advisor to Pizarro) rejecting his suggestion of replacing the Trustee, and declining to invest in two projects that Sir Owen had put forward, a tourist railway in New Zealand, and a film about the first New Zealand rugby team to tour the British Isles in 1905 (when the name All Blacks was coined). Both this letter and that of Mr Dickson of 21 March 2012 emphasised that Sir Owen had no control over the trust.

38.     Thereafter the relationship between Sir Owen on the one hand and Messrs Miller and Dickson on the other deteriorated sharply. Sir Owen replied to Mr Miller by e-mail dated 15 April 2012 saying he was flabbergasted and apoplectic at his and Mr Dickson's decision to approve the funding of the All Blacks film, saying that he would not let *"little people like you two stand in my way"*, an expression which he was unapologetic about in cross-examination. Mr Hamilton became involved and spoke to Mr Miller by telephone on 24 April 2012; among other things he pointed out that under the terms of the Amended Corona Trust Deed Sir Owen had a right to information about the trust, a provision which Mr Miller appears to have been unaware of. After a further meeting in London on 7 May 2012, which was also unproductive (it was described by Mr Miller in evidence as confrontational, and by Sir Owen in his affidavit in the Nevis proceedings as somewhat heated), Mr Miller wrote another formal letter to Sir Owen on 9 May 2012 rejecting Sir Owen's demands that he and Mr Dickson resign. The letter refers to Sir Owen having threatened litigation if his demands were not met, and Sir Owen accepted in cross-examination that by this time there had been quite a serious breakdown in the relations between him and Messrs Miller and Dickson. By 6 June 2012 Sir Owen had instructed Mr Richard Reuben of Fladgate LLP (**"Fladgates"**), who had in turn consulted David Brownbill QC and who passed on to Sir Owen a number of options for taking proceedings, and Sir Owen accepted in cross-examination that by this date he was contemplating bringing proceedings.

39.     In the event Sir Owen brought proceedings in California against Mr Miller by Complaint dated 5 September 2012. By then Messrs Miller and Dickson had taken a number of steps in reaction to Sir Owen's threats. Mr Miller had been drawing fees from the trust at a rate of $25,000 per month (in accordance with his entitlement to a minimum $300,000 per year) and by 2 May 2012 had already drawn 5 such payments covering the period down to and including May; on 15 May 2012 however he drew a further $225,000 described as *"fees on account for 2012"*. At the same time a similar sum was paid to Mr Dickson, also described as fees on account. Mr Miller accepted in cross-examination that that was him and Mr Dickson getting some money out of the trust for their own benefit quickly now that Sir Owen had threatened litigation. On 11 June 2012 Messrs Miller and Dickson amended the Corona Trust again, this time to make Sir Owen's right to information subject to the absolute and sole discretion of the Trustee. Then on 3 August 2012, Mr Dickson paid himself some

$3.1m, and Mr Miller some $2.9m, in respect of trustee fees.  I did not receive any explanation as to how these sums were calculated at the time.  There is in evidence a subsequent reconciliation dating from December 2012 which allocates them to the period since the inception of the trust in February 2009.  It seems unlikely however that that explains how the sums paid on 3 August were calculated, as it is based on a revised fee schedule which Messrs Miller and Dickson only adopted on 20 August 2012 after receiving advice, dated 14 August 2012, from consultants called Altus Economics Inc to the effect that the trustee fees given in the original fee schedule were much higher than the level of trustee fees paid to firms providing similar trustee services, and that a significantly lower fee schedule would be more appropriate.  It is noticeable that Mr Miller's $2.9m was on any view considerably more than the fees payable to him as Protector, but he explained in evidence that Mr Dickson took the view that it was not fair that he should accept all the trustee fees and thought it was fair that Mr Miller should also share in them due to the work he had done over the years, not least in relation to the negotiations with Mancap.  To put it another way, Mr Dickson simply agreed to split the trustee fees with Mr Miller, as the latter accepted.

40.   Sir Owen's complaint in the California proceedings sought damages of $350m against Mr Miller personally for a number of causes of action such as breach of fiduciary duty, breach of loyalty, fraud and deceit.  The nature of the complaint is sufficiently indicated by the summary in paragraph 1 of the Complaint which pleads that after gaining Sir Owen's full trust and confidence Mr Miller engaged in a systematic plan to deprive Sir Owen of his ownership of OTSLG and the proceeds of its sale.

41.   Messrs Miller & Dickson had already caused the trust on 6 August 2012 to pay $200,000 to each of Ord & Norman and Liburd & Dash (Nevis lawyers) as a float for future work, and now set about establishing a so-called "defence fund".  This involved transferring 27.5m Swiss Francs to an Israeli law firm, Michael Shine & Partners, to be held by Onagul Establishment Ltd, a Liechtenstein entity ostensibly owned by Mr Dickson.

42.   The California proceedings were followed on 11 February 2013 by proceedings taken in Nevis.  The claimant was Sir Owen's daughter Mrs Connah in her capacity as a beneficiary under the Corona Trust (and other trusts), and the defendants included Pizarro, Mr Miller and Mr Dickson.  On 13 February 2013 Mrs Connah applied *ex parte* for injunctive relief; among the matters particularly relied on was Pizarro's attempt to force Sir Owen to give up his claim against Mr Miller by announcing that until that claim was settled Pizarro would not support the work of the GFF.  On 6 November 2012 Mr Dickson had sent an e-mail to the effect that in the light of the proceedings taken by Sir Owen in California against Mr Miller, Pizarro was not prepared to consider any requests for funding from the GFF, thereby putting the funding of existing projects carried out by the GFF in India and New Zealand at risk, and leading to the resignation of senior staff; and on 30 January 2013 he sent another e-mail refusing Sir Owen and his associates any access to Ubiquitous until the claim against Mr Miller was settled.  Ubiquitous was a new yacht that had been bought in December 2011; it was paid for and held by one of the companies under the Corona Trust but Mr Miller accepted in evidence that it was intended for Sir Owen's use (indeed Mr Dickson had told Sir Owen at the time of purchase that it was a real beauty to fully enjoy and that he deserved it).  It had been shipped to New Zealand, at considerable expense, where it was due to be used for a series of promotional events

for the GFF commencing on 17 February 2013; these were again put at risk by Mr Dickson's refusal to allow Sir Owen access to it.

43.     Benjamin J granted injunctive relief on 13 February 2013: I will have to look at the provisions of his Order in more detail in due course but in essence it had the effect of temporarily suspending the powers of Messrs Miller and Dickson and Pizarro to deal with the trust assets and appointed HNL as an additional trustee to take control of the assets. It fixed a return date of 26 February 2013, and on that date Benjamin J made a further Order continuing the relief until judgment. The substantive application was heard in May 2013 and on 27 August 2013 Gilford J gave judgment in favour of Mrs Connah, finding that Pizarro and Mr Miller had acted primarily in the interest of the Trustee not the beneficiaries, removing them as Trustee and Protector respectively, and appointing HNL as Trustee.

44.     That, subject to appeal, effectively brought the Nevis proceedings to an end. In due course all remaining proceedings both in California and by way of appeal in Nevis were discontinued and the parties entered into a mutual general release by way of a settlement agreement dated 23 May 2014.

45.     At some stage – I believe on 10 July 2014 – Sir Owen was added as a beneficiary of the Corona Trust. The assets, including Kea, were all appointed to him on 11 July 2014 and he was registered as the sole shareholder of Kea on 18 July 2014.

*Mr Miller*

46.     I will say something about Mr Miller's evidence here. In the absence of Mr Dickson, he is a central witness to events and in particular to the question whether he and Mr Dickson were deceived by Mr Watson when deciding that Kea should participate in Project Spartan; the Claimants are undoubtedly in the very unusual position of seeking to establish that Mr Dickson and Mr Miller were deceived by Mr Watson when they have no evidence to that effect from Mr Dickson and Mr Miller's evidence is to the contrary. His witness statement, a long and very detailed document, was entirely supportive of Mr Watson's version of events.

47.     Mr Miller did not however make a good witness. He was hesitant, nervous, easily shown in cross-examination to have a far less clear recollection or even understanding of the detail than his witness statement had suggested, often confused, and on occasion given to long pauses before answering. On many occasions he gave evidence readily accepting matters put to him in cross-examination, but which were entirely at odds with his own written evidence, and struggled to explain the discrepancies when they were pointed out. Mr McCaughran submitted that he was suggestible; that I think is probably so, but is a submission liable to backfire as it may have been his witness statement that was the product of his suggestibility rather than his answers in oral evidence. (I should make it clear that I do not mean to suggest by that that Mr Watson's legal team acted in any way other than entirely properly).

48.     On trust matters generally his conduct seems to me to have been questionable at best. It is not my function in these proceedings to go into the detailed rights and wrongs of the disputes raised in the California and Nevis proceedings, which the parties agreed to compromise long ago, and which are not the subject-matter of this action; but I do have to form some assessment of Mr Miller as a witness, and his conduct is relevant

to that. I was not impressed with it. No doubt Sir Owen's habit of treating the trust assets as if they were his own made running the trust in a way that would satisfy any IRS audit more difficult than usual, but one suspects that Sir Owen's attitude, that he was the one who had made the money and who wanted to decide what happened to it, is not that uncommon with wealthy settlors, and one would have thought that most competent offshore trustees would be well used to the somewhat delicate task of accommodating the demands of settlors without imperilling the tax advantages. Messrs Miller and Dickson however seem to have badly mishandled the relationship by adopting an aggressive and confrontational stance, to the stage when litigation was first threatened and then brought. And I was very unimpressed with Mr Miller's conduct over the fees. Mr Miller was the protector and had significant powers. One might have thought the very essence of the role of a protector would be to act as a check on the trustee, trustees very often being given extensive discretionary powers which can be abused by the unscrupulous, and that an obvious case in point would be for the protector to ensure that the trustee was not milking the fund by charging excessive fees. But far from looking out for the beneficiaries' interests, Mr Miller agreed with Mr Dickson to the setting of fees that were later said to be unjustifiably high, and then benefited from them himself, having agreed to split them with Mr Dickson, at the same time resisting any attempt to replace Mr Dickson as trustee. It is hard to avoid the conclusion that he allowed his own personal interest to influence if not dictate his dealings with the trust; indeed some of his answers suggested that he did not think Sir Owen had rewarded him adequately for the work he had done on getting Mancap to increase their offer, and that he saw Mr Dickson's agreement to split the trustee fees with him as no more than his just reward.

49.     I saw him being cross-examined in the witness box for a long time. I have come to the conclusion that I should be very hesitant about accepting his evidence, save where corroborated by contemporary documents or inherently probable. Mr McCaughran pointed out that he was a resident of California and not compellable and submitted that the most probable explanation for his coming to give evidence was that he wanted to tell the truth; Ms Jones submitted that he gave deliberately false evidence to support a false account by Mr Watson, and that Mr Watson had corrupted him to do so. Having reached the conclusion I have that his evidence cannot be relied on, I do not think I ultimately have to decide on his motivation, but I suspect the true position is probably more nuanced than the black and white choice counsel suggested. Having fallen out badly with Sir Owen (something for which he himself must bear much of the responsibility), I think he was persuaded by Mr Watson, who had gone to some lengths to woo him and Mr Dickson, into thinking that Project Spartan was a wonderful proposition; and that the worse that his relations with Sir Owen became, to the extent of his being personally sued for $350m, the more he (and Mr Dickson) sided with Mr Watson and signed up to the project, to the extent (as appears below) of colluding in steps designed to pre-empt further litigation by Sir Owen. He clearly felt very aggrieved by Sir Owen's actions, as was apparent from his evidence. In effect the consequence of the breakdown in relations with Sir Owen was to throw him and Mr Dickson more and more into the Watson camp. Having become an uncritical and indeed enthusiastic supporter of Project Spartan, I suspect his main motivation for giving evidence in support of Mr Watson was an attempt to justify his own (and Mr Dickson's) conduct and demonstrate that they were running the trust perfectly well, and everything would have been fine had Sir Owen not interfered. That I suspect in turn led him to subscribe to Mr Watson's account of events even though, as I have

referred to, his oral evidence demonstrated how far from his actual recollection it was.

# Mr Watson

50.    Mr Watson is also a New Zealander, although he has been resident in London since 2002. He is a successful businessman who in the 1990s built up and then sold a business known as Blue Star, which became Australia's largest bookseller and stationary chain.

51.    In 1995 he founded an investment company called Cullen Investments Ltd in New Zealand, which he used to conduct investment activity. After he moved to London, he founded a UK company called Cullen Investments UK Ltd, which performs a similar role in the northern hemisphere. Through these and other entities Mr Watson has interests in many businesses. He described his business dealings today as bringing people together to do a deal, identifying (or being approached for assistance with) investment opportunities and then identifying investors who would be a good fit. He said that he generally participates in the deals he facilitates either by making an investment himself or by having an interest in the business or its performance; he also provides seed capital for new businesses, thereby enabling him to participate as a founder investor. He also said that he commonly borrows all or a significant part of his investment from one of the other parties to the deal thereby enabling him to invest without seeking bank finance. In an e-mail dating from November 2011, Mr William Gibson (described by Mr Watson as *"my finance man"*; Mr Gibson's own description of himself was Mr Watson's *"right-hand man"*) sent an e-mail on behalf of Mr Watson *"to clarify Cullen's position from its perspective"*, in which he said that Cullen was among other things in the business of Capital Raising and that if Mr Watson / Cullen introduced an investor to a deal, it *"expects and endeavours to take a carry from either the incoming investor or the management."* In practical terms what this means is that if Mr Watson can persuade other people to participate in investments on these terms, he can himself make very substantial returns.

52.    At trial the Claimants devoted considerable effort to exploring what was called Mr Watson's modus operandi. The Claimants' contentions are that he carries on business using a complex web of trusts and companies; that although he claims not to be interested in certain vehicles they are in truth nominees for him; that he enters into arrangements, often undocumented, which mean that the relationships set out in formal legal documents do not reflect the true position; that he uses for his business activities trusts of which he is not a beneficiary (but where he can be added); that he employs people on the understanding that they will be paid a salary by some entity connected with him and share in profits; and that he holds out companies as being owned by third parties when they are in fact vehicles to make profits for him.

53.    Mr Watson did not dispute that it was his business model to work with a closely related group of companies and trusts – he said in evidence that:

> *"I guess the Japanese would call it a keiretsu, a group of companies with interests and trusts with similar interests, commonalities but separate shareholdings and they do absolutely work with each other and I encourage that."*

Part of the reason for the complexity of the structures through which Mr Watson does

business is no doubt a desire to avoid paying tax; part of it is what was euphemistically called *"optical reasons"*, that is that Mr Watson did not want his interests in a particular matter to be too visible to others. Mr McCaughran submitted that there was nothing sinister in the way in which he operates. I accept that a desire to keep things confidential is not necessarily sinister, but it is also true that the use of nominees and the like is something that can be used to conceal and mislead. But I do not propose to conduct a lengthy investigation into Mr Watson's general style of doing business. I propose to concentrate on such matters as I need to in order to decide the claims made in the present case.

54.     Mr Watson was another witness that I saw being cross-examined at great length. He was courteous, well-prepared and smooth – indeed one can see why those who dealt with him found him charming and persuasive. Sir Owen at one point in his evidence said he could *"charm the socks off a kitty"*. But I found many of his explanations impossible to reconcile with the contemporaneous documents, and his evidence was often more in the nature of argument than recollection. And I am completely satisfied, as set out in detail below, that in the course of the events with which the trial is concerned he resorted to deliberate deception; and that he not only did so himself but also recruited those who worked with him to do so as well. That includes in particular Mr Leahy, but also Mr Gibson. In these circumstances I do not regard his evidence as trustworthy and have approached it with very great caution.

*Mr Leahy*

55.     I should briefly mention Mr Leahy, who played a central role in Project Spartan. He is a much younger man than Mr Watson. He first met Mr Watson in 2007 and began working for him in 2010 as a consultant for various businesses and opportunities associated with Cullen Investments Ltd in New Zealand, his role being to manage investment projects including responsibility for deal structuring, capital raising and financial modelling.

56.     From late 2010 Mr Leahy provided his services through Nucopia Partners Ltd (**"Nucopia"**), which was incorporated in October 2010. It was ostensibly owned by Mr Leahy, but in reality it only had one client – Mr Watson – and he financed it, decided what money should be paid to Mr Leahy from it (as so-called "advances") and took the vast majority of any receipts from it, as shown by a number of "wash up" spreadsheets that were in evidence. For example one from 30 April 2013 showed that Nucopia's operating profit for the period 1 July 2012 to 30 April 2013 of $405,772 was to be allocated 79% to Mr Watson and only 8% to Mr Leahy (with 5% for Mr Gibson and 8% for Mr Paul Vassilakos, another person who worked with Mr Watson), the amounts for the latter three being set against distributions that they had already received. Included in these sums were fees received by Nucopia from Spartan. There is a dispute between the parties whether (as the Claimants contend) Nucopia is in truth simply Mr Watson's vehicle, or whether (as Mr Watson contends) it is Mr Leahy's vehicle but he was in practice constrained to share its receipts with Mr Watson. On any footing Mr Watson had a very significant interest in it.

57.     Mr Leahy came across as knowledgeable, intelligent and talented, and as having worked hard to deliver what he was asked to deliver. However that included, as already referred to, being drawn by Mr Watson into deception, and although I found much of his evidence of considerable assistance in understanding the technicalities,

that inevitably undermines the confidence that I can have in it. His evidence was also necessarily heavily coloured by reconstruction from the documents and on one key episode (the signing of the Second and Third Kea Loan Agreements) was demonstrated beyond doubt to have been entirely wrong, which naturally again reduces the confidence I can have in him.

58.     A number of other witnesses were called but I do not think it necessary to detail them. It will be apparent that I have significant reservations about the reliability of the evidence of each of the key witnesses that I have referred to. Despite the primacy which our trial system has long given to oral evidence, it is by now a commonplace that the memory even of witnesses who are doing their honest best is often unreliable (see *Gestmin SGPS SA v Credit Suisse (UK) Ltd* [2013] EWHC (Comm) at [15]-[23] per Leggatt J); and in cases of fraud when the credibility of witnesses is in issue, it has long been recognised to be essential to test their veracity by reference to the objective facts proved independently of their testimony, in particular by reference to the documents in the case, and also to pay particular regard to their motives and to the overall probabilities (*The Ocean Frost* [1985] 1 Ll Rep 1, 57 per Robert Goff LJ).

59.     That seems to me to be pre-eminently the case with the present case, and I have found the contemporaneous documents of much more assistance to me in trying to ascertain what happened than the meticulously prepared but inordinately lengthy witness statements, or the many days of oral evidence. In a very recent judgment, *re Edwardian Group Ltd* [2018] EWHC 1715 (Ch), Fancourt J made some remarks about the witness statements in that case and their value (or the lack of it) as evidence (see at [90]-[92]), and much the same could be said in this case. As for the oral evidence, I think with hindsight that I would have benefited from more of the trial time being devoted to examining the documented course of events and less with the witnesses: it is not I think necessary to challenge a witness on every statement with which issue is taken, and I have taken no account of submissions that if a witness was not challenged on a particular point his evidence must be treated as accepted. I do not understand that to be the law or the modern practice.

60.     I should record that I heard some expert evidence both on US tax law and on various aspects of valuation. In the end although much of it was helpful by way of background this evidence did not go to any of the central issues in the case and I have not found it necessary to resolve such differences between the experts as there were. I propose to say no more about it.

61.     I should also record that a very large number of factual issues were explored at trial, some of more central relevance than others. I have not found it necessary to resolve, or even refer to, all of them. I believe I have covered those issues which I need to decide in order to decide the case, and such others as I have found of particular assistance.

**Factual narrative – down to Project Edsel**

*Relationship between Sir Owen and Mr Watson*

62.     Neither Sir Owen nor Mr Watson could remember when they first met, but they had certainly done so before May 2008 when Sir Owen invited Mr Watson to join him either on his then yacht or at a villa he was taking near Monaco and Mr Watson's PA

e-mailed Sir Owen to the effect that Mr Watson would be in the area and also at Ascot and it would be nice to catch up. Sir Owen's evidence was that he thought that they had been introduced by Mr Rob Hersov, a South African entrepreneur who was a mutual friend; that he and Mr Watson were fellow Kiwis and had a number of shared interests (rugby, horses, golf and philanthropy); that he liked Mr Watson and thought him good company and a good bloke; that from about 2010 he began to spend more time with him; and that from early 2011 their relationship became much closer to a point where by early 2012 he thought of Mr Watson as a very good friend. Mr Watson, despite pleading in his Defence that they were business acquaintances, that he regarded Sir Owen as a potential investor/business associate, that they were not good friends and that when they arranged to meet they always did so to discuss business matters, accepted in his witness statement that the relationship was a friendly one (although based on their business relationship), and in oral evidence that by January 2012 they were certainly friends.

63.   I do not think it is necessary to go into the details, but the disclosed documents do indicate a friendly relationship, with Sir Owen suggesting to Mr Watson that they meet for a beer (August 2009) or a cleansing ale (May 2010) and describing him as a *"long time friend"* (January 2012), and Mr Watson inviting Sir Owen to a *"private dinner for friends"* (January 2010), introducing him as *"a good friend of mine"* when making inquiries about the possible rental of a Swiss chalet for him (March 2010), suggesting to Sir Owen that they meet for lunch or a drink (June 2011), and again introducing him as *"my good friend"* (January 2012). All of this indicates a social relationship that went beyond a merely business or commercial one. Mr Watson himself explained in his witness statement that his business dealings depend on personal connections, that it helps if there is a good rapport with the individuals he is dealing with, and that he used social and informal occasions such as a round of golf or a lunch or dinner to discuss business. That suggests (and the evidence in this case amply bears this out) that Mr Watson makes a practice of cultivating personal relationships with those he thinks he might be able to do business with; there is nothing very surprising or unusual in that, and I see no reason to think that it was any different with Sir Owen. It is not really in dispute that their relationship could be described as that of friends, and I do not think it matters whether or not it could be said to be that of close or good friends.

# Red Mountain

64.   The first potential investment that Mr Watson discussed with Sir Owen was in a Florida corporation called Red Mountain Resources, Inc (**"Red Mountain"**), which was engaged in the extraction of oil and gas in the US. Mr Watson was one of the original investors, as was Mr Hersov, and when in early 2011 Red Mountain was looking to raise additional capital for further acquisitions, Mr Watson and Mr Hersov each drew up lists of potential investors who could be approached. Sir Owen was one of those on Mr Hersov's list and Mr Hersov sent him a teaser on 9 March 2011, followed by a call the next day, and thought he could invest a large amount. Mr Watson followed this up on 14 March with an e-mail to Sir Owen encouraging him to pursue it (which he described as *"co-investing"*), and offering him the analysis that had been done by *"Miles, who works with us"* (a reference to Mr Leahy); Sir Owen's response was that Mr Miller was looking at it for him, and Mr Watson then gave Mr Miller contact details for Mr Leahy, commenting that it looked like a very good deal.

Mr Miller did look at it for him, speaking to Mr Leahy, and on 17 March e-mailed Sir Owen with a recommendation not to invest, to which Sir Owen replied that he agreed, and asked him to tell Mr Hersov. Mr Miller sent an e-mail to Mr Leahy, copying in Mr Watson and Mr Hersov, which made it clear that it was Sir Owen's decision not to proceed.

65.   In June 2011 Mr Watson tried again. He was introduced to Mr Miller and then, together with Mr Leahy and Mr Gibson, met Mr Miller on 17 June and told him that Red Mountain had proven reserves; Mr Leahy followed this up with a package of information, which Mr Miller passed on to Sir Owen. Sir Owen sent it both to Mr Dickson (whom he described as *"my close personal accounting provider"*) and to a contact at Lazards (asking the latter if he was willing to be *"an adviser to me"*). Mr Dickson's advice was that it was a gamble in an industry Sir Watson was unfamiliar with; the advice from Lazards was also unfavourable; and on 21 June Sir Owen e-mailed Mr Watson and Mr Hersov again declining to invest, on the grounds that there were too many uncertainties for his liking. He told Mr Miller of his decision not to invest two days later. On 28 June Mr Hersov tried again, asking Sir Owen to have a call with him and Mr Watson, to which Sir Owen replied that he had informed them he was not interested in the venture.

66.   Eventually in July Sir Owen was persuaded to invest $1m in Red Mountain, probably on 19 July after Mr Watson had agreed to offer a put option under which if Sir Owen invested $1m at $1 a share, Mr Watson would agree to buy the shares back at that price if required. Mr Miller told Mr Leahy that they would proceed on this basis, and the paperwork was completed by Mr Dickson in the name of Kea (then a subsidiary of Pacifico and an asset of the Regency Trust) on 20 July. Although the investment was a trust investment, Sir Owen referred to the decision (in an e-mail of 24 July to Mr Watson) as one effectively made by him (*"As agreed I would like to invest… Thank you for bringing these ventures to my attention."*).

67.   Ms Jones points to the investment in Red Mountain as an illustration of how Sir Owen at that stage was in practice taking the decisions on what were in fact trust investments, and that that was understood by Mr Watson. Mr McCaughran points to the fact that Sir Owen's decisions were made on the basis of his own assessment with the benefit of advice (from Mr Miller, Mr Dickson and Lazards).

## Property investments – ground rents

68.   Mr Watson next sought to interest Sir Owen in investing in property opportunities. The background to this was as follows. In about 2008 Mr Watson was introduced to Mr William Astor. In autumn 2009 he was told that Mr Astor, who was then managing a portfolio of ground rents for Mr Victor Tchenguiz, wanted to set up his own business.

69.   Mr Watson had a meeting with Mr Astor and was attracted by the idea of investing in ground rents, or to be more precise, in freehold reversions on leasehold residential properties. Where a housebuilder sells residential properties on a long leasehold basis, it will retain a freehold reversion. This is standard on the sale of flats, but had also become more common with houses. The freehold reversion will carry the right to the ground rent reserved by the lease: in the Business Plan referred to below it was

said that the ground rent is typically 10-25 basis points (that is 0.1% to 0.25%) of the leasehold value of the property, usually subject to periodic reviews, on an upwards only basis, either linked to inflation (via RPI or the capital value of the property) or increased by a fixed amount (for example doubling at each review). So for example on a sale of a property at a premium of £100,000 the initial ground rent might be anything from £100 to £250 pa, but if doubling every 20 years would reach £1600 to £4000 after 80 years. The owner of a freehold can also derive ancillary income from the property such as fees for granting consent under the lease, or for registering transfers, or premiums on the grant of extensions to the lease.

70.    The practice of selling new houses on a leasehold basis has much more recently become politically controversial because some housebuyers have found themselves trapped into expensive contracts whose terms they may not have fully appreciated, and which may make their properties difficult to sell. What particularly struck Mr Watson back in 2009/10 however was the fact that for the reversioner the ground rents were a very secure form of income, because leaseholders risk having their leases forfeited if they do not pay and hence in practice do not default. (And if a leaseholder is unable to pay, his mortgagee will usually pay to avoid losing its security; if neither pays, the freeholder receives a windfall by recovering vacant possession). He was also struck by the fact that a freehold has a reversionary value that increases over time; and it was also clear to him that by aggregating ground rents it was possible to securitise the income streams at a much lower yield (that is at a much higher value) than they had been acquired at. If for example it was possible to acquire ground rents at a "19x multiple" (that is for a capital sum of 19 times the annual rent roll) and securitise them, or sell them, at a 23x multiple (not unrealistic), then significant profits could be made, especially if the acquisition was highly leveraged.

71.    Mr Astor had done this very successfully for Mr Tchenguiz and now wanted to do this for himself. He had a prospective partner called Mr James Aumonier, a property developer. They needed capital however, which they did not have, and were looking for investors to invest £10m. Mr Watson found a contact of his, Mr Neil Richardson, who was willing to invest on the terms that Mr Watson wanted, namely that Mr Richardson would not only invest himself but provide the funds for Mr Watson to do so, the profits being split equally.

72.    The documentation for this (codenamed Project Attila) was completed in March 2010. A Limited Liability Partnership (LLP) called Abacus Land 1 LLP (**"Abacus 1"**) was incorporated in February 2010, and an LLP Agreement dated 17 March 2010 was entered into which set out the basis on which Abacus 1 was to be operated. There were three Members of the LLP: two were "InvestorCos", that is BVI companies associated with the two "Investors", Mr Richardson and Mr Watson, respectively (namely Berryblue Enterprises Ltd (**"Berryblue"**) for Mr Richardson and Gaucin International Holdings Ltd (**"Gaucin"**) for Mr Watson, held by the Summit Trust (**"Summit"**), a trust associated with him), and the third was Attila (GR1) LLP (**"Attila GR1"**), an LLP owned by the "Managers" (Mr Astor, Mr Aumonier and an associate of theirs, Mr Aldred Drummond) and which enabled them to share in the profits of the business (after a specified return to the InvestorCos) by way of management carry. Abacus 1's business was to be the acquisition, holding and disposal of portfolios of residential freehold and long leasehold interests for the purpose of investing in underlying ground rent income. A Business Plan annexed to

the agreement shows that the aim was to acquire a £40m portfolio, funded by an investment of £10m from Mr Richardson and Mr Watson and £30m of bank lending, and by cl 11.2 of the agreement Berryblue and Gaucin agreed to make available an aggregate of £10m of funding by way of capital contributions. Messrs Astor, Aumonier and Drummond did not provide significant capital (they were to contribute £200,000 through Attila GR1), but they were to provide (through a company called Attila Asset Management Ltd ("**AAM**") and in return for fees) such services as identifying opportunities for acquiring ground rents, conducting due diligence on potential acquisitions, arranging financing and instructing property managers. As this shows AAM was not itself to provide property management (collecting the ground rents and the like), but it was envisaged by cl 4.7 that the parties might in due course set up their own property management and services company in which case it would be owned one-third each by Berryblue, Gaucin and AAM, and would be paid fees for providing property management services; in July 2010 such a company, called Homeground Management Ltd, was duly set up, with Berryblue and Gaucin each owning one-third of the shares (Mr Astor and Mr Aumonier alone appear to have owned the balance).

73.   Profits of Abacus 1's business were to be split, after repayment of the capital contributions and a return of 12.75% pa on them, in such a way that Attila GR1 would take a Management Proportion of up to 25% (that is, the management carry), and the balance would be distributed pro-rata to the capital contributions. It can be seen that the Managers had a number of sources of possible receipts: as well as a return on Attila GR1's own modest capital contribution, they would benefit primarily from fees to be paid to AAM for their services, but secondarily from the management carry, and in addition have the possibility of owning one-third of a property management and services company which would be paid further fees.

74.   Mr Watson, as already mentioned, had agreed with Mr Richardson that the latter would lend him the funds to invest, and this was implemented by a Loan Agreement, also dated 17 March 2010, under which Berryblue lent Gaucin up to £5m to fund Gaucin's share of the financing required for Abacus 1 for a term of 3 years at an interest rate of 15% pa compounded quarterly. That meant that Mr Watson would only in fact make money from the investment if the returns from the investment exceeded that rate, but he thought the investment justified this risk.

75.   By cl 24 of the LLP Agreement each of the Managers covenanted with the Members that so long as he had an interest in the business and for 12 months thereafter he would not (except with the consent of both Berryblue and Gaucin) be interested in a UK Competing Business, this being defined as meaning the acquisition of residential freehold or leasehold interests in the United Kingdom for the purpose of profiting from increases in the underlying ground rent income, any ancillary income streams and reversion value. As explained below this is the source of what Mr Watson later referred to as "**the LH Investment Right**".

76.   Mr Astor sent Mr Richardson and Mr Watson an update on Abacus 1 on 27 January 2011. This showed that they had by then completed the acquisition of nearly £10m of ground rent assets and that it was estimated that a total of £43m of such assets would be acquired by the end of April.

77.   In March 2011 Mr Richardson was advised that an impending tax change made the

existing structure unattractive from a taxation point of view and insisted that a new structure be set up before he would invest any further. This involved the establishment of a limited partnership (LP) in Guernsey called Abacus Land 2 LP (**"Abacus 2"**), and Berryblue, Gaucin and Attila GR1 becoming limited partners on the terms of an LP Agreement dated 24 March 2011. At the same time Berryblue put up another £8m, £4m by way of loan to Abacus 2 and £4m by way of loan to Gaucin which Gaucin loaned in turn to Abacus 2. A similar exercise took place in June 2011 when a further Guernsey LP called Abacus Land 3 LP (**"Abacus 3"**) was established with the same partners: I do not think I was specifically told why this was thought necessary or desirable, but Mr Watson's evidence was that he did not understand these restructurings to affect the nature of the investment. Although split into Abacus 1, 2 and 3 in this way, it is not generally necessary to distinguish between them and I will refer to them together as **"Abacus"**. (There was in due course an Abacus 4 but it is convenient to use "Abacus" to refer to Abacus 1, 2 and 3 only).

# Property investments – affordable housing

78.    Mr Watson was also interested in another type of property-backed investment, which was referred to as "affordable housing". This involved the acquisition of a stock of housing and the leasing of it to providers of social housing (local authorities or housing associations) for subletting to occupiers. The acquisition might take the form of a purchase of existing stock belonging to local authorities and housing associations; or a purchase of the affordable housing component of new private sector developments; or a joint venture with a local authority to develop new housing on land belonging to the local authority. In each case the housing would be leased to the local authority or housing association on terms that would provide an index-linked return on the capital provided by the investor. The yield that could be thus obtained was both higher than could be obtained on local government bonds, and more secure.

79.    Mr Watson explained the idea to Mr Astor and they developed a business plan together in 2010. By 3 December 2010, the proposal was sufficiently far advanced for Mr Gibson to send to Mr Astor a first draft of a Letter of Intent for what was described as the Affordable Housing Venture Management Company. This was no more than a heads of terms, envisaging the agreement and execution of long-form documentation, but it showed the parties to the venture as being Mr Watson (34%), Mr Astor and Mr Aumonier (33% each); described the parties as wishing to establish a business to operate as a service provider to the affordable housing business venture *"currently presented as the 'Attila Group Highly-Rated Inflation-Linked Affordable Housing Joint Venture'"*; provided that the parties agreed to deal exclusively with each other in respect of any potential business venture of a nature consistent with the document; envisaged that the parties themselves would not need to contribute more than minimal capital but that up to £30m might be raised from investors, which could be provided or procured by any of the parties *"although it is anticipated that Eric Watson will be the lead"*; and under *"Confidentiality"* said:

    "The existence and subject matter of this document are strictly confidential to the parties, as is the involvement of Eric Watson (either directly or indirectly) in the business, other than as lead investor. This duty of confidentiality applies in all respects unless disclosure to any person is authorised in advance by Eric Watson."

80.    After some relatively minor amendments the document (**"the Attila JV Agreement"**) was signed on 14 February 2011.  It obliged the parties to use best endeavours to agree long-form documentation to give effect to its terms, and was legally binding in that respect.  The amendments included a revision of the parties' interests so that they were equal at 33⅓% each; the addition of a provision that the Managers (Messrs Astor and Aumonier) agreed to disclose to the Founding Investor (Mr Watson) any interest or opportunity that they were looking at outside the scope of the business; more detailed specification of the services to be provided; an agreement for the provision of an initial capital contribution and a provision as follows:

> "The business will operate primarily as an Asset Management company and the partners will share a pro-rata (relative to their shareholdings / interests as stated above in the Management carry achieved on all deals)."

81.    One of Mr Watson's contacts was Mr Frank Sixt who was the Group Finance Director of Hutchison Whampoa Ltd (**"HW"**).  Mr Watson sought to interest him in investing in both the ground rents and affordable housing opportunities.  Mr Sixt introduced HW's legal adviser, Mr Perry Noble, to take matters forward.  Mr Noble had met Mr Astor by December 2010 and thereafter negotiated with him.  By February 2011 there was a draft Term Sheet providing for HW to come into the business both as an investor in affordable housing (but not ground rents) and as a co-owner of the management vehicle.  Mr Noble was also expressing interest in being involved in the business in a personal capacity.

82.    The final version of the Term Sheet, with a codename Project Atlantic, had been signed by all parties by 19 April 2011 (**"the Project Atlantic Term Sheet"**).  It was headed *"£100m in Principle"* and *"Subject to Contract"* and was not legally binding (save for certain provisions such as confidentiality).  The parties were a subsidiary of HW (New Millennium Corporation or "NMC"), Messrs Astor and Aumonier ("Management"), and Mr Watson ("Founder Investor").  Under *"Background"* it referred to the fact that Management and the Founder Investor had jointly established a management business, the focus to date having been on ground rents, but wished to expand into affordable housing, and wished to introduce a new cornerstone investor that would participate in a new management company ("Management Co") and be a significant investor in structured finance in the affordable housing sector; NMC was referred to as not currently seeking to invest in the Ground Rents portfolio.  Management Co would be owned 23% by an NMC entity, and 23% each by Mr Astor, Mr Aumonier and Mr Watson, with the remaining 8% to be allocated to minorities by Management.  Under *"Investment Amount"*, it provided:

> "(i)    NMC will commit, on an in-principle basis subject to final discretionary approval of specific transactions originated by Management Co, a minimum of £100m of equity within 12 months of the formal legal agreements; and
>
> (ii)   The Founder Investors have the right to participate in up to 20% of the Asset and Project Co capital contributions,
>
> (together "Affordable Housing Commitment")"

Under *"Asset/Project Co Return waterfall"*, it provided for cash receipts to be applied first to repayment of capital contributions from Investors, then to interest at 8% pa on the capital contributions, with the balance to be split between Investors and

Management, with Management taking 20%, or once investors had received a net return of 1.35 times their invested capital 25%, by way of management carry.

83. The Project Atlantic Term Sheet also provided statements of each party's commitment: that for NMC included *"NMC will ... (vi) make the Affordable Housing Commitment"*, and that for Mr Watson (under *"Founder Investors' commitment"*) similarly provided *"Founder Investor will ... (iv) make the Affordable Housing Commitment"*. It was suggested to Mr Watson in cross-examination that this indicated that HW was expecting him to invest as referred to under the Investment Amount, but he said that his understanding was that he had a right to invest not an obligation to do so. I agree with Mr Watson on this. Leaving aside the point that the Term Sheet was not legally binding in any event, its wording is far from precise but it does seem clear that the Investment Amount provision by itself did not commit Mr Watson to anything, as it refers to a *right* to participate in *up to* 20%. In those circumstances I do not regard the reference under Founder Investors' commitment as converting this into an obligation, not least because there is also a reference to the Affordable Housing Commitment under the *"Management team commitment"* and the management team was not committed to do anything. In draft advice given to HW by K&L Gates LLP in December 2011 they noted that certain individuals would collectively have the right (but not requirement) to invest pari passu with HW up to 20% in aggregate of the total HW investment, and that *"It is not yet known whether any of the Individuals will take up this right."* I infer that that probably reflected HW's understanding in December 2011, and no doubt from April 2011.

84. The Term Sheet provided for the parties to use all reasonable endeavours to agree final form legal documents within 6 months, but they were not in fact entered into until February 2012 when Project Edsel closed, as referred to below.

85. Annexed to the Term Sheet was a Proposed Group Structure Chart which showed NMC, Mr Watson, Mr Astor and Mr Aumonier (together with Minorities) as owning a Management Co LLP, which was entitled to a profit share from both the ground rents and affordable housing portfolios, and which also owned a subsidiary Management Co Ltd which would earn fees as asset manager to both the ground rent and affordable housing portfolios. On the face of it that would entitle both HW and Mr Watson to a share in the whole of the business. But that does not seem to have been the contemporary understanding of the parties. Everyone proceeded as if HW was at that stage only interested in the affordable housing side of the business, not the ground rents; and the position with Mr Watson can be seen from an e-mail exchange he had with Mr Gibson on 20 April 2011. Mr Watson wanted to make sure that if the ground rent business expanded (so that it was not relying solely on him and Mr Richardson) the shareholders in Atlantic other than HW would have a share in its management, and indeed he wanted to be joined in the management of all ventures including ground rents going forward. Mr Gibson however said that he had sat down with Mr Astor the previous week and not pressed too hard on this point. They (Messrs Astor and Aumonier) were ok with what was proposed with affordable housing, but it would require some pressure to lock them in on everything going forward. That seems to me to indicate that nothing had at that stage been agreed about Mr Watson's share in future ground rent business. Mr Watson's evidence was that although he wanted a share in the management company profits and carry from both the ground rent and affordable housing investments, the issue on ground rents

was that if he acquired a share in AAM, he would have to disclose it to Mr Richardson, who could have prevented him.

86.    On 8 September 2011 however Mr Watson e-mailed Mr Gibson referring to having agreed with Mr Astor and Mr Aumonier an ownership of the new management company for affordable housing and other investments *"plus a fee equating to 33.333% of profits on any new GR investments"* and asked him to get Richard to consider the best way of proceeding that also protected their relationship with Mr Richardson, following it up with another e-mail that said they particularly wanted to know if the current arrangements with Mr Richardson inhibited their ability to take equity in the management company.  The reference to Richard was to Mr Reuben of Fladgates, a firm that Mr Watson used.

87.    On 8 December 2011 AAM changed its name to Long Harbour Ltd (**"Long Harbour"**).  By then the process of drafting and agreeing the long-form documents for Project Atlantic had begun: Mr Astor had circulated the commercial terms for what was then called the Atlantic Regeneration Fund on 29 November 2011, indicating that the intention was that HW and Mr Watson would become equal partners with Mr Astor and Mr Aumonier, with Mr Drummond selling his stake; and a first draft of a Shareholders' Agreement relating to Long Harbour dated 9 December 2011 referred to Mr Watson (as well as Messrs Astor and Aumonier, and an HW vehicle) as a shareholder.  Mr Mark Flay (then the Finance Director of Cullen Investments Ltd in New Zealand) suggested to Mr Watson on 12 December that his 25% be put under a new trust rather than in his personal name, to which Mr Gibson replied *"Agree re Entity vs personal name… we are still working on which one this will be, I will let you know once finalised"*; and by 20 December the proposed shareholder in Long Harbour was being referred to as *"Eric Watson's vehicle"*.  Draft 3 of the Shareholders' Agreement dated 22 December therefore referred to Eric Watson Corporate Vehicle as shareholder instead of Mr Watson.

88.    The proposed structure involved a Jersey Unit Trust.  That meant that both the Jersey lawyers involved (Mourants) and the trust operator (Aztec) would need to disclose information on the shareholders and directors of Long Harbour to the Jersey Financial Services Commission.  On 21 December Mr Gibson produced a short biography of Mr Watson for this purpose, Mr Astor explaining that it would be needed as Mr Watson was a shareholder of Long Harbour, or UBO, to which Mr Gibson replied that at the moment they were looking at a structure where the UBO was a family member of Mr Watson's.  On 23 December Mr Astor said that although Mr Watson was neither a director or shareholder, since he was clearly arranging the deal it was best to disclose his involvement up front and asked for information in particular about two historic matters (Blue Star and Hanover) involving Mr Watson.  This was provided but by 31 December Mr Reuben was referring to a decision having been made *"to delay Eric's vehicle taking up its interest in Long Harbour to post close"*, and on 4 January to the intention of the parties that Mr Watson's vehicle would come alongside when able to do so, adding that he appreciated that this was *"subject to any constraints arising from Jersey regulatory matters"*; on the same day he told Mr Simpson of Grant Thornton (who was providing tax advice to Mr Watson) that there was a Jersey regulatory issue if Mr Watson were to hold a direct interest in the Long Harbour shares, and that only an ultimate discretionary trust holding would be acceptable.  Draft 4 of the Shareholders' Agreement on 5 January therefore omitted

any reference to Mr Watson, the shareholders now being Messrs Astor and Aumonier and Atlantic Property Management Ltd (**"APM"**, an HW entity), but a draft Joint Venture Agreement to which EWV (an unspecified Eric Watson vehicle) would be party recited the intention that EWV would be entitled to subscribe for shares in Long Harbour so that all parties would hold 25% each.

89.     The structure for Mr Watson's interests was provided by a provider of offshore services called Stonehage.  By 31 January 2012 Stonehage had established a new Jersey trust called Kowhai Trust, with Novatrust, a company associated with Stonehage, as trustee, and a new BVI company called Keele Holdings Ltd (**"Keele"**) as *"the structure to be used for EJW's investment into Long Harbour Limited"* (so described by Ms Sheena Huggett of Stonehage to Fladgates in an e-mail of that date).  In the event a UK company called Ladoga Investments Ltd (**"Ladoga"**), a wholly-owned subsidiary of Keele, was used.

90.     On 20 January 2012 Mr Gibson sent an e-mail to Mr Watson with further thoughts on the structure that had come from Mr Astor.  These were that Long Harbour itself would have no right to management carry, and would not therefore generate value, being initially a cost centre, and that the agreed split (of the carry) would be dealt with in the JV agreement, the good news being that the JV agreement had nothing to do with the Jersey regulators.  When Project Atlantic closed therefore on 17 February 2012 (at the same time as Project Edsel (below)), the Shareholders' Agreement was made between Mr Astor, Mr Aumonier and APM, reciting that APM would become a 25% shareholder in Long Harbour (with Messrs Astor and Aumonier holding 37.5% each), and the JV Agreement (**"the Ladoga JV Agreement"**) was made between these three and Ladoga.  The JV Agreement no longer recited an intention that Ladoga would be entitled to subscribe for shares, but contained a provision that any future carried or profit-related interests relating to any transaction involving Long Harbour should be divided equally between the four parties to the agreement, Long Harbour itself not being entitled to participate in any carried interests.  (The provision for equal division of carried interests between the four parties did not apply to investments in ground rents, Project Edsel or future investments in affordable housing, these being left to existing arrangements).

91.     The Ladoga JV Agreement had one other significant provision.  This was in clause 5 which documented the right to co-invest alongside HW in affordable housing (**"the Ladoga Investment Right"**).  It provided that APM would commit a minimum of £100m of equity to Future Investments in Affordable Housing, and that Ladoga and the Executives (Messrs Astor and Aumonier) should have the right to participate in up to 20% of the £100m investment on the same terms as APM.  (It is notable that there is no suggestion here that there was any commitment by them to do so).

*Mr Watson interests Sir Owen in property opportunities*

92.     In the summer of 2011 Mr Watson had sought to interest Sir Owen in investing in the property opportunities.  By July 2011 he had introduced Mr Miller to Mr Astor, and on 23 July 2011 he e-mailed Sir Owen to set up a meeting for him with Mr Astor to discuss ground rents, saying that the opportunity existed to become *"a partner and investor in this business and it is definitely worth a look"*.  By August Sir Owen had met Mr Astor and there had been discussion of a deal under which Sir Owen would make an investment in ground rents when the sale of OTSLG took place (which at

that stage was expected to complete in October). The proposal was that of a total investment of £20m, Sir Owen's entity would put in £10m itself and lend £9m to Mr Watson's entity, Mr Watson's entity putting in the £9m borrowed and a further £1m of its own. Mr Gibson took this forward with Mr Miller and in an e-mail of 23 August explained that the division of the profit (after costs and expenses) would be a return of capital together with a Preferred Investor return of 8% pa, and then a split of 75% to investors and 25% to management – in other words the proposed deal was similar in structure to the existing arrangement Mr Watson had with Mr Richardson, except the 8% return was rather lower than the 12.75% return agreed with Mr Richardson. In due course draft agreements were prepared showing that the proposed structure was to use another Guernsey LP (to be named Abacus Land 4 LP). Sir Owen was keen on the proposal, telling Mr Miller on 24 August (copying in Mr Dickson, Mr Astor, Mr Watson and Mr Gibson) that:

> "Subject to Mancap closing I am looking to invest 50m Pounds in this venture – and subject to our due diligence."

Sir Owen was also interested in acquiring a share of the management company: on 2 September he e-mailed Mr Watson with a proposition he wanted to discuss with him and Mr Astor as follows:

> "IF – after we do the current deal I put in a further PDS50 million would the following be acceptable:
>
> 1.  Glenn or his interests to receive 40% of the management company.
>
> 2.  You to put up as much as you wish and take up a percentage equal to my proposal on the same formula but be a part of the 40% eg. If we both put up PDS25 million each we get 20% each-pro rata
>
> Apart from our agreement on the first deal and your kind offer to watchdog my investments I would seek to appoint a Director to the management company's Board."

Mr Astor had in fact already suggested to Mr Gibson that Sir Owen would be looking for 25% of the management company. Mr Miller reverted to this on 20 September telling Mr Watson and Mr Gibson that one of the big picture issues was what overall share of the management company they would be entitled to if they invested a further £50m; Mr Watson passed this on to Mr Astor who replied *"On the 50m not sure, but assume the same deal as Hutch."*

93.  Mr Astor provided a significant amount of information to Mr Miller to assess, but in early October the Mancap deal unexpectedly went off at the last minute (paragraphs 19 and 33 above). On 6 October Mr Miller e-mailed Mr Watson to relay the very disconcerting news that the sale had fallen through and that they would not therefore be in a position to proceed with the ground rents investment. It was not until 25 November that Sir Owen told Mr Watson that the Mancap deal was back on track, and would take another 2 months to finalise; on 21 December he told Mr Watson that he was aiming for a close by 10 January and asked if the Astor deal was still on the cards. Mr Watson replied that his partnership with William Astor had evolved, that there would be other opportunities that they could look at from time to time and that he would keep him posted.

# Project Edsel

94.   Meanwhile the first affordable housing opportunity for Project Atlantic had arisen. This was a proposed deal with LBBD, later codenamed Project Edsel. As presented by Mr Astor to Mr Watson in July 2011, it consisted of a sale and leaseback of two sites on which 502 new affordable homes would be constructed for LBBD, Atlantic providing finance of £72.4m.

95.   Mr Watson was interested in participating. His initial intention was to put in about £1.5m to £2m, telling Mr Gibson on 1 January 2012 that they needed to decide how much capital to invest and ensure that they had access to c. £2m to invest by 20 January. Mr Watson thought Mr Richardson should be offered the opportunity to invest but doubted he would do so; Mr Richardson had in fact told Mr Astor that he didn't want to invest but wanted to focus on ground rents.

96.   On 7 January however Mr Watson contacted Mr Miller about the deal, telling him that *"we will have to move quickly"*, and on 9 January referred to it in an e-mail to Sir Owen as follows:

> "Had a chat with David about a UK govt housing deal you can participate in if you want. It is very good."

Sir Owen asked Mr Miller to have a look at it.

97.   Mr Watson asked Messrs Gibson and Leahy to put together a proposal with help from Mr Flay. He told Mr Leahy the basics, namely that a Watson vehicle would invest 20% of the estimated £20m equity required (ie £4m), that being loaned by a Sir Owen vehicle (OGV), with OGV on exit to receive back its capital and a 7.5% return, and any further profits split 50-50. On 9 January Mr Flay circulated to Mr Leahy, Mr Gibson and Mr Watson a draft Term Sheet to give effect to these terms, referring now to a loan of £5.3m from OGV to a Watson vehicle (EWV) and a preferred return of 8%, with OGV having an effective 50% equity participation in EWV after repayment of the funding. In a covering e-mail Mr Flay explained that OGV could either take a 50% interest in EWV, or since *"there may be optical reasons (i.e. OGV visibility) that you may not want to go down this path"*, OGV could receive the 50% through some sort of super interest linked to the funding.

98.   Mr Flay's reference to *"optical reasons"* was to the fact that Mr Watson did not want to disclose the participation of Sir Owen to Messrs Astor and Aumonier. This caused no little difficulty for Mr Leahy and Mr Gibson who were the ones communicating with them. On 9 January Mr Leahy had told Mr Aumonier that Mr Watson would be investing his full 20% and asked him to update the IM (information memorandum) presentation (this had been produced by AAM in November 2011). That led Mr Astor to e-mail Mr Gibson on 10 January asking:

> "is this really him or is he selling down some of his equity? If so we need to know asap for bank and jersey kyc etc, also the IM Miles had is not for Investors but was a bank memo, it would have to be edited and full disclaimers added before it could go anywhere. We also have some confidentiality issues."

(the reference to *"kyc"* or KYC being to know your customer checks). Mr Gibson's

response was that he would have to check with Mr Watson about the 20%. He then e-mailed Mr Leahy (copying in Mr Watson) saying he would need to have some sort of answer for Mr Astor when he called him that night. Mr Astor also e-mailed Mr Leahy on 10 January asking him to confirm that they were not intending to circulate the IM to any external third parties, as the information was highly confidential and they would need to have very strict confidentiality agreements signed beforehand. Mr Leahy's immediate response was that he was not 100% sure on Mr Watson's intentions, and later that:

> "I have confirmed this is just for internal use – Cullen and Cullen's lenders/advisors."

Mr Leahy's evidence in cross-examination was that he thought his intention here was to use *"Cullen's lenders"* to refer to the loan Mr Watson's vehicle would be getting from Sir Owen. But it was plainly misleading to refer to it as just for internal use, as (as he accepted) he was intending to produce a pack of information to send to a third party. Mr Leahy's explanation was in effect that it was not his role to decide what Mr Watson did or did not disclose to Mr Astor: he was very conscious of the fact that in Mr Watson's business relationships were very important, so he wouldn't want to go and put his foot in it and go into more detail than was his place to do.

99.   Mr Astor pressed Mr Leahy, saying that they needed to know explicitly any external advisers or third parties, as did Mr Aumonier who added that there were very strict prohibitions on investors; Mr Leahy forwarded these to Mr Watson with the comment it was getting tricky. Later on 10 January he e-mailed Mr Gibson as follows:

> "Key story to Will Astor and Co. is Eric is simply looking to raise some debt capital off the vehicle he is using to invest in this opportunity and that there are no other equity investors coming in. No need to mention O. Glenn etc – not relevant."

Mr Watson, Mr Leahy and Mr Gibson were all asked about this. Mr Watson, having pointed out (correctly) that he wasn't copied in to the e-mail, said that it was possible that Mr Leahy was looking at bringing Sir Owen's investment in as debt rather than a co-investment. (In fact Mr Leahy had sent him that morning the draft Term Sheet referring to OGV having an effective 50% participation in the net equity of EWV post repayment of the Funding Arrangement). Mr Leahy, in answer to the suggestion he was asking Mr Gibson to tell Mr Astor something that was untrue, accepted that the draft Term Sheet at the time contemplated that effectively Sir Owen's vehicle would be taking an equity interest, and that *"that was not what was being communicated at that point in time"*, and said that he was suggesting to Mr Gibson that he not give the full picture at this stage; Mr Gibson, rather more simply, said that he had to accept that the explanation wasn't true, and that the arrangement in the Term Sheet was one that did contemplate Sir Owen as an equity investor.

100.  I very much doubt if Mr Leahy and Mr Gibson would have acted in this misleading way without discussing the line to take with Mr Watson; and the next day (11 January) Mr Reuben told Mr Simpson of Grant Thornton (who had previously been assuming that Mr Watson would be investing £1.5m to £2m) of the possibility that Mr Watson would significantly increase his investment and was considering the alternatives as to how to finance it; Mr Reuben said that Mr Watson had not shared this with HW (who wanted to deal with Mr Watson as the other principal investor) or the executives, and *"would like to keep it that way until a decision is made as to the*

*extent of his investment and how that is to be financed."* That strongly suggests that it was Mr Watson's decision on the afternoon of 10 January not to disclose to Messrs Astor and Aumonier (or indeed HW) the true position. I am not sure this was put in terms to Mr Watson; but on any view Mr Leahy and Mr Gibson were acting for Mr Watson's interests and their reluctance to answer simple questions from Mr Astor and Mr Aumonier in a straightforward way is, I find, illustrative of a tendency to be secretive which accurately reflected the way Mr Watson liked to operate. He was reluctant to disclose, even to close partners, the detail of his personal financial arrangements unless he had to, and was willing that they be misled.

101.    On 12 January Mr Leahy sent a confidentiality undertaking to Mr Miller and on 13 January received back two versions, signed on behalf of Sir Owen personally and Kea. On 16 January he sent Mr Miller a pack consisting of three documents, namely (1) an investment discussion document, (2) the draft Term Sheet (which had been slightly redrafted to accommodate a decision that Mr Watson would contribute 10% of the capital), and (3) the IM presentation. Mr Miller forwarded them to Sir Owen and Mr Dickson on 17 January.

102.    The investment discussion document was a 3-page presentation prepared by Mr Leahy. It described Project Edsel as an affordable housing opportunity providing a high quality inflation-linked 60-year income stream guaranteed by LBBD and with debt funding offers already in place for 70% of the project cost, the balance to come from equity investors. The arrangement proposed was an investment of £5.3m, of which 10% (£0.53m) would come from Mr Watson or his nominee and 90% (£4.77m) from Sir Owen or his nominee. The £5.3m represented 20% of the total equity needed of £26.5m, the other 80% coming from HW. The proposed structure was that the £4.77m and £0.53m would go into an Owen Glenn vehicle (OGV), which would then fund an Eric Watson vehicle (EWV) with the full £5.3m; EWV would then participate alongside HW as an Equity Investor in an English LP. The LP would have an Asset Management Agreement with AAM and pay it management and performance fees, and after debt servicing and management fees, the Equity Investors would receive an 8% preferred return (which would be passed up by EWV to OGV). Any upside over that would be shared 50/50 with EWV. A note under Equity Investor Returns showed that after the 8% hurdle was achieved AAM would receive performance fees of between 20% and 25%. A worked example was included which assumed debt of £53.46m, equity investment of £26.51m and sales proceeds of £103.96m. After (i) repaying the debt, fees and interest, (ii) returning the £26.5m capital to the Equity Investors (of which £5.3m would go to EWV and thence back to OGV) and (iii) paying interest at 8% to the Equity Investors totalling £5.04m (of which £1.01m would go to OGV), there would be £17.19m left. This would be sufficient to trigger the higher 25% performance fee for AAM, which would take £4.29m, leaving £12.89m for the Equity Investors, of which OGV would receive 10% (£1.29m) – this is only 10% not 20% as the upside after return of capital and interest was to be split 50/50 with EWV. The upshot was that OGV would receive back £7.6m in all for an outlay of £5.3m or a total return of £2.3m.

103.    This presentation therefore makes it clear in two places that there are performance fees payable to management, without any suggestion that OGV would share in them. A careful reading would also have made it clear that the performance fees could be substantial – in the worked example £4.29m as compared with the £2.3m total return

for OGV. Mr McCaughran suggested to Sir Owen (who accepted that he read this document) that he must have appreciated these points, but despite initially accepting that it was likely that he read it with some care, Sir Owen said that he did not scrutinise the document, leaving it to Miller and Dickson, mainly Miller. I accept this evidence, but it can be said that the document fairly discloses the existence and extent of the performance fees or management carry. On the other hand, it does not disclose that Mr Watson had any interest in the carry, although he accepted in cross-examination that at that stage he expected to have a pro rata share with management, or about a quarter.

104. The second document in Mr Leahy's package was the draft Term Sheet. This was based on the previous draft but adapted to cater for the proposal that Mr Watson contribute 10% of the capital. It was drafted as an agreement between Mr Watson and Sir Owen personally (although doing so as a commitment on behalf of their yet to be established vehicles) and the preamble provided as follows:

> "This document records the key terms regarding the arrangements described below. The parties each agree to use good faith, best commercial endeavours to seek to agree, execute and deliver as soon as possible long-form documentation necessary to provide for those arrangements. Such documentation will not include terms inconsistent with the terms set out in this document except where the parties otherwise mutually agree. In any event the provisions set out in this document relating to the foregoing and to parties & interest, future assurances, confidentiality, costs and governing law are legally binding."

Mr Watson accepted in cross-examination that Sir Owen would have understood from that that he (Mr Watson) was going to deal with him in good faith.

105. The third document was the IM. This had been prepared by Attila in November 2011. It explained the proposed arrangements with LBBD, under which 476 units would be built at two sites. It included a structure chart showing AAM as having a 25% interest (which was a reference to the management carry), but did not go into any detail, and naturally said nothing about the basis on which Sir Owen and Mr Watson would participate.

106. Taking the three documents together therefore, there was nothing to suggest to the reader that Mr Watson or his interests had any share in the management carry, and Mr Miller accepted in evidence that it was his understanding at that stage that Mr Watson would not have any share.

107. Mr Miller passed his initial comments to Sir Owen on 26 January, the overall comment being that it was *"a good project to get your feet wet with EW as the amount is not that large (PDS 4.77 Mil) And the risk is low."* Sir Owen asked him and Mr Dickson if he was being too generous to Mr Watson; this was a reference to the fact that he would fund 90% and Mr Watson 10% of the proposed £5.3m but the profits would be split 50/50. Mr Dickson's answer was that it looked very promising and got them a foot in the door with Mr Watson and that they *"can always seek to moderate EW's return on future projects so I think we need to "be kind" to EW on this smaller project"*. Mr Miller's response was that he viewed this as a one off deal with Mr Watson in anticipation of a relationship whereby they would be introduced to *"other vetted investment projects"* and that in this context he did not think Sir Owen was being too generous, to which Mr Dickson agreed, saying that *"On future deals we*

*can sharpen our pencil, esp if the Anti-is being upped."* He suggested as an alternative going back to Mr Watson and saying 60/40, adding *"Await Papal response in due course"* which was evidently a reference to Sir Owen, as Mr Miller accepted. Sir Owen did make the decision, replying *"Ok. We will go with this formula"*. On 31 January he e-mailed Mr Watson as follows:

> "I have read the paperwork on the new venture in East London--some concerns
>
> 1. I am putting in a dis-proportion amount of the investment for only 50% of the return. I would like to discuss a proportionist formula into an investment in Soul's and/or the Warriors…
>
> 3. What happened to the other property venture with Bill Astor—ie Govt and Uni properties. The return was much better and quicker with the added blue chip guarantee of the properties"

The reference to Soul's was to a restaurant in New Zealand, and to the Warriors was to a New Zealand rugby league team, both of which were ventures which Mr Watson was interested in and which he had suggested Sir Owen might invest in.

108.   In the end Sir Owen did invest in the Warriors, he and Mr Watson putting together a joint venture called GWNZ Investments Ltd (GWNZ standing for Glenn Watson New Zealand) to acquire the Warriors. This project was codenamed Project Drive. No claim is advanced in relation to Project Drive in these proceedings and it is not necessary to detail it, but I should briefly note that on 7 February 2012 Sir Owen told Mr Miller that the finances had to be audited and the projection of income scrutinised, suggesting that as Mr Miller was busy he might have to ask Mr Tony Holt (a long-standing adviser of his, who had previously been internal auditor of his companies) to do an audit; and that on 21 February Sir Owen asked Mr Watson to extend a confidentiality agreement (which permitted Mr Miller and Mr Holt to have access to confidential information) so that it included Sir Owen's lawyer Mr Hamilton and a Professor Barry Spicer who was chairman of the GFF. Sir Owen accepted in evidence that this was him ensuring that an appropriate team was in place to conduct due diligence into the investment in the Warriors.

109.   Reverting to 31 January, Mr Watson, who was encouraging Mr Gibson to hurry Mr Miller along, told Mr Gibson that Mr Miller did not need to speak to Messrs Astor and Aumonier – Mr Watson in oral evidence denied that he was trying to hide the involvement of Sir Owen from them, but said he was trying to manage the delivery of that message when and if it was needed; he did not believe they had an obligation at that point in time to disclose how their investment was being financed. Mr Gibson's reaction was that Mr Miller might want to talk to management direct. He added:

> "If Owen does invest, then I think it is bound to come out over time your involvement in the Management Company, and it should probably be covered off sooner rather than later, with a take it or leave it on this basis…don't you agree?"

Mr Watson agreed, and in a reply to Sir Owen's e-mail on 1 February included the following:

> "3/ This is the evolution of the deals with Astor, ground rents and govt properties. This deal is the first of the govt/local authority residential property deals. HWL

(Hutchison Whampoa listed hk group market cap $40b) have committed to fund the equity for the rollout. Oxford University funds are funding the capital for the ground rent investments. I have a right to co invest in both, and given the quality and pipeline of deals and co investors plus, the fact that all the equity and debt is arranged I am very keen to do so. We also have a small stake in the management carry for pulling the deal together."

110.    Several of the witnesses were asked about the final sentence. Sir Owen accepted that he did not understand Mr Watson to be suggesting, by the use of the word *"We"*, that he (Sir Owen) or his vehicle would share in the management carry. In fact he had never encountered a management carry in his business life, and although he understood with hindsight that it was a reference to the performance fee payable to the management, he made the point that Mr Watson did not specify what a small stake was, and that he did not understand that it would be disproportionate to the investment. He accepted however that he did not question it: he was talking to Mr Miller, and if he had questions he would question Mr Miller. Mr Miller said that he didn't think they really knew what percentage of the management carry Mr Watson was going to get, but that he wasn't overly worried about the participants and what they would get out of the management carry. What was important was who was managing the project and could they do it. He saw Mr Watson as the *"prime mover"* and *"leader"* of this project. Mr Watson, when asked if he regarded this as disclosure of his interest said that he regarded it as *"preliminary disclosure"*, and that he thought full disclosure was made by Mr Gibson to Mr Miller. He did not accept that the use of the word *"We"* was intended to mislead; and he justified the reference to a *"small stake"* both by saying that 23% was small compared to 100%, and that as a percentage of overall profits it was around 5%. When it was put to him that it was in fact considerably larger than the return to Kea, he said that the management return was very significant because the deal was so successful. That answer I think slightly missed the point in that so long as the profits were sufficient to trigger the higher level of management fee (then 25%), the *proportion* in which the profits were split would not change however large they were, although of course the absolute figures would. Nor do I think he was right in saying his stake was 23%; his pleaded case is that his share was not 23% but 28.18%, which would appear to be correct (see below), and 28.18% does not seem to me a small stake. But it does not ultimately matter as the relevant question is whether this was a full disclosure of his interest which it plainly was not.

111.    Sir Owen and Mr Watson then spoke, the upshot being that Sir Owen agreed to proceed and asked Mr Miller to expedite it. On 6 February Mr Gibson e-mailed Mr Miller attaching what he described as the proposed Affordable Housing Structure Chart. This showed a Trust at the top, an offshore company, a UK company, a Jersey LP and another LP, and Mr Gibson identified the relevant entities in his e-mail. Mr Miller replied that Kea would be the entity from their side, and sent Mr Gibson a structure chart that he had created, based on Mr Gibson's but with the names put in, and asked him to confirm it was correct, which Mr Gibson did on 7 February. Mr Miller's structure chart, headed *"Project Edsel Diagram of Investment Entities"* showed Kea and Clearview (a Jersey Trust established by Stonehage, and described by Mr Gibson as *"Eric's entity"*, the trustee being Novatrust and the beneficiaries Mr Watson, his children and issue and others) at the top; each of Kea and Clearview holding 50% of a BVI company called Copperstone Property Investments Ltd (**"Copperstone"**); Copperstone holding 100% of a Jersey LP called Streamside Jersey

LP ("**Streamside**"), in part directly and in part via a UK company called Foreshore Investment Holdings Ltd ("**Foreshore**"); and Streamside holding 20% of an English LP called Atlantic Regeneration Investment 1 LP ("**Atlantic 1**").   It also showed capital repayments as going direct from Streamside to Copperstone, but the income as going from Streamside to Foreshore and from Foreshore to Copperstone (as Mr Miller accepted in cross-examination).  Ms Jones drew my attention to the fact that there was no suggestion on the diagram that Streamside would have any other interest in Atlantic 1.

112.   Mr Gibson had also asked Mr Miller to have the Term Sheet signed overnight.  Mr Miller amended it by adding in the names of the various entities.  This was approved by Mr Gibson and Mr Miller sent it to Mr Dickson to sign on behalf of Kea, which he did on 7 February.  It was in due course signed on behalf of Clearview, although not until 21 February.

113.   As signed, this Term Sheet ("**the Project Edsel Term Sheet**") provided, so far as relevant, as follows:

(1)   The preamble referred to it as recording the key terms, and to the parties agreeing to use good faith, best commercial endeavours to agree long-form documentation in exactly the same terms as in the previous draft (paragraph 104 above).

(2)   The parties were Kea (referred to as "KIL") and Clearview (referred to as "CT"), instead of Sir Owen and Mr Watson personally as in the previous draft.  It provided that in signing the document they did so

"as a commitment of intent to invest in Project Edsel."

(3)   Under *"Business Purpose"*:

"The parties wish to enter into a Funding Arrangement and Equity Arrangement in relation to Project Edsel.  Details of Project Edsel are set out in the documents attached to this document."

(4)   Under *"Funding Arrangement"*:

"KIL will provide funding to Copperstone Property Investments Ltd ("CPIL") equal to 20% of the total transaction equity, currently anticipated at [£5.3m] ("Funding Amount").  KIL will receive a preferred return amounting to an 8.0% annual interest rate, calculated quarterly and compounded.  The funding will be secured over the CPIL shares.  The Funding Arrangement will only become repayable as CPIL receives income or capital profits from Project Edsel.

KIL will be funded 90% by its corporate parent or nominee and 10% by CT or nominee.  Should a shortfall arise on repayment in relation to the Funding Arrangement between KIL and CT it will be deducted off the CT or nominee share in the first instance."

(5)   Under *"Equity Arrangement"*:

"KIL will have an effective 50% participation in the net equity of CPIL post

repayment of the Funding Arrangement.  Any payments under the Equity Arrangement will only become payable if the Funding Arrangement has been fully repaid and CPIL receives additional income or capital profits from its participation in Project Edsel."

(6)       Under *"Future Assurances"*:

"The parties agree that the structure of the investment is not yet finalised. Subsequent to the signing of this document and to further the subject matter hereof, they will each engage in good faith endeavours to agree the ultimate structure for the business."

(7)       Under *"Other Terms"*:

"The long-form documentation will include other terms which are not included in this document but which are necessary or desirable to the parties."

114.    Also on 7 February a Limited Partnership Agreement relating to Streamside was entered into, the limited partners being Copperstone and Foreshore.

115.    The same day Mr Gibson told Mr Miller that Mr Reuben had requested that the funds be in his trust account by Thursday (9 February).  On 8 February Mr Gibson sent Mr Miller details of Fladgates' Trust account, the account name being *"Fladgate LLP sterling client account"*, the amount to be remitted £5.3m and the reference *"Copperstone Property Investments Limited"*.  Mr Dickson approved the transfer of funds on 9 February, and Fladgates received them that day.

116.    Also on 9 February Mr Gibson sent Mr Dickson an e-mail (Mr Miller being copied in), in which he proposed that Mr Watson's 10% participation should come in the form of a loan from his bank, J P Morgan, direct to Kea.  The proposal was rejected but what is of interest is the way Mr Gibson explained the then structure as follows:

"you may or may not be aware, that as part of the deal, Eric Vehicle will contribute 10% of the equity required for the investments into "Atlantic Regeneration Investment 1 LP", and it has been proposed that this come in at the "Kea Investments Limited" level.  Kea will invest 100% into Copperstone Investments Limited."

That accords with what the Term Sheet provided, namely that Kea would provide funding to Copperstone of £5.3m, Kea being funded 90% by its corporate parent or nominee and 10% by Clearview or nominee.  But by an e-mail of 15 February, Mr Gibson told Mr Miller and Mr Dickson that Clearview's 10% would now be coming by way of a loan from J P Morgan directly into Copperstone.  He said this was on the advice of Grant Thornton and asked them to urgently advise if this was not to be the case.

117.    Closure of Project Edsel, and of Project Atlantic, was set for 17 February 2012.  It required all the relevant parties to transmit funds to K&L Gates' client account, where they would be dealt with in accordance with a letter of undertaking from K&L Gates.  The amount required from Streamside was £1,901,546.81 as its subscription for its interests in Atlantic 1, made up of £1,894,501.81 for its A interest and £7,045 for its B interest (as set out in the formal documentation (below) the A interest carried the

entitlement to repayment of the investment with interest and profits, and the B interest Mr Watson's share of the management carry). In order to fund this, on 16 February the directors of Copperstone passed a resolution to contribute the sum of £1,901,600 to Streamside as a capital contribution under the terms of the Streamside LP Agreement. That enabled Mr Reuben of Fladgates to send the £1,901,546.81 on 16 February to K&L Gates (to be held to his order) on behalf of Streamside.

118.   Closure duly took place on 17 February, and the sums in K&L Gates' client account were dealt with in accordance with its letter of undertaking. Among other things that meant that £7,045 of the money sent by Mr Reuben was used by K&L Gates to subscribe for Streamside's B interest in accordance with an Amended and Restated Limited Partnership Deed for Atlantic 1, which was the primary vehicle for Project Edsel. This provided for two A limited partners (Atlantic Regeneration Investment Ltd (**"ARI"**), which was the vehicle for HW's investment, and Streamside, the vehicle for Sir Owen's and Mr Watson's investment), and a number of B limited partners (Messrs Astor, Aumonier, Drummond and Noble, and Streamside). Each A partner agreed to make an immediate capital contribution (some £6.7m in the case of ARI and £1,894,501.81 in the case of Streamside) and commit to further capital contributions (some £3.2m in the case of Streamside), and each B partner agreed to make much smaller capital contributions, £7,045 each in the case of Streamside, Mr Astor and Mr Aumonier and lesser sums in the case of Mr Drummond and Mr Noble, the B contributions totalling £25,000 in all. Under a provision dealing with partnership returns, the A partners were entitled to repayment of their investments with interest at 8% and further profits were then split between A and B interests, the initial split being 78.08% (A) to 21.92% (B), but so long as the A investors had received back at least 1.35 times their investment, the split would be 72.75% (A) to 27.75% (B). The profits payable to the B partners would be split between themselves in proportion to their capital contributions, so Streamside's B interest would entitle it to 7,045 / 25,000 or 28.18% of the B interest profits.

119.   On the evening of 17 February Mr Gibson sent Mr Miller an e-mail (copied to Mr Dickson) advising that Project Edsel had closed without a hitch and that he was progressing the funding of Mr Watson's portion as explained in his e-mail of 15 February. He later sent another e-mail as follows:

> "As discussed the amount that was invested in the first traunche, pro-rata with HWL was £1,901,546.80 broken down as follows:
>
> A Limited Partner £1,894,501.81
>
> B Limited partner £7,045.00"

Mr Gibson accepted in cross-examination that this was not quite right as only the £1.894m was pro rata with HW.

120.   When Pizzaro was replaced as trustee by HNL, Mr Dickson handed over to the new trustee HNL a hard copy file in relation to Project Edsel. This included a copy of Mr Miller's structure chart with a manuscript note reading *""B" share"* against Foreshore, in what Mr Miller accepted was Mr Dickson's handwriting. On the strength of this it was submitted that Mr Watson or Mr Gibson had misled Mr Dickson into believing that the B interest related to the routing of income through

Foreshore.  I am not persuaded of this: I have no evidence when Mr Dickson made his note or what prompted him to do so.

121.    Mr Watson had not up to the point of Project Edsel closing on 17 February 2012 funded either his 10% of the £5.3m investment or the £7,045 for his B interest, but this was rectified shortly afterwards.  On 21 February he transferred £7,045 from an account in his own name to Fladgates' client account.   Then on 24 February JP Morgan transferred £530,000 to Fladgates' client account: JP Morgan had agreed to lend this as a personal loan to Mr Watson, the payment to Fladgates being treated as a loan by Mr Watson to Clearview, and a contribution by Clearview to Copperstone. The sum of £530,000 was then returned to Kea on 10 April 2012.  By 16 April 2012 Copperstone had its own bank account and Mr Gibson asked Mr Reuben to transfer the remaining balance to it, which he agreed to do.  The balance on the Fladgates account was then £3,325,498.19, which equated to the £5.3m introduced by Kea and Clearview less the £1,894,501.81 transferred to K&L Gates for Streamside's A interest and £80,000 for Fladgates' fees.

122.    Attention also turned after closing to the drafting of the long form documents.  Mr Gibson sent Mr Miller a list of what needed to be drafted, explaining that rather than JP Morgan lending directly to Copperstone, Mr Watson's 10% would now come from Clearview Trust, which made things simpler.   Mr Miller contacted Mr David Maislish, a solicitor at Duane Morris, who had already given some preliminary advice, explaining that Kea had sent £5.3m to Fladgates to fund the investment and was expecting at least £400,000 back.

123.    Mr Reuben ultimately sent draft documents to Mr Maislish and Mr Miller on the morning of 28 March.   These included a draft shareholders' agreement for Copperstone which provided for 2 classes of shares, 100 A shares to be held equally by Kea and Clearview, and 1 B share to be held by Clearview.  Mr Maislish had a meeting with Mr Miller (who had come over to London) that afternoon, and that evening Mr Miller called Mr Gibson and asked for an explanation of the A and B interests, from which it seems probable that Mr Maislish had asked Mr Miller for an explanation but he had been unable to give one.  Mr Gibson told Mr Miller on the telephone that the A interests related to the investment in Project Edsel, and the B interests to entitlement of part of the management company for *"Cullen/Nucopia"* interests for putting the deal together, referring him to the split in the financial model originally provided; and in an e-mail later that evening repeated that the A interests related to the investment of the transaction (HW's 80% and Copperstone's 20%) and were entitled to the 8% initial investor return, and then between 78.02% and 72.25% of the project profits; the B interests related to the management company entitlement *"of which Nucopia Partners have a portion of for putting the deal together/bringing in HWL and the ability to co-invest against"*.  He attached a model from the due diligence folder, showing how profits were split between investors and management. Mr Miller and Mr Maislish both attended a meeting the next morning at Fladgates' offices, and from notes made by them (undated but almost certainly made at this meeting) it seems clear that a similar explanation was given.  Both notes refer to the order of repayments with monies first being used to repay the investors their principal and interest at 8% and any other capital advances, and profits then being split between investors and management, Mr Miller's note giving the split as A 80% / B 20% and Mr Maislish's rather more detailed note giving the split as either A 80% / B 20% or A

75% / B 25% *"after 1.35"* which is a reference to the increased share for management once the investors' returns had reached 1.35 times their investment; Mr Miller's note also shows the A interests flowing through to Kea and Clearview, but the B interest only to Clearview with the note *"Only CT has 'B' shares"*.

124.    It took some time for the documentation for Project Edsel to be finalised, but the documents were ultimately signed on 19 September 2012.    They included a Shareholders' Agreement, made between Kea, Novatrust (as trustee of Clearview) and Copperstone which as in the draft provided for Copperstone to have an issued share capital of 100 A shares, to be held as to 50 each by Kea and Clearview, and 1 B share to be held by Clearview.   Dividends were to be paid to the A and B shareholders in respect of Copperstone's interests (via Streamside) in Atlantic 1 as A Limited Partner and B Limited Partner respectively.   In other words, the profits from Copperstone's participation as an investor in Project Edsel would be split equally between Kea and Clearview, but the profits from Mr Watson's interest in the management carry would all go to Clearview.

125.    They also included a Loan Agreement, again made between Kea, Novatrust (as trustee of Clearview) and Copperstone.   This provided for Kea to lend £4.77m, and for Clearview to lend (i) £530,000 and (ii) £7,045 to Copperstone at 8% interest.

126.    In the event Project Edsel was very successful for the participants.   The profits from the project were realised in 2014.   In round terms Kea was repaid its investment (c. £4.85m) together with interest (c. £0.8m) and a share of the total profits amounting to c. £3.74m; Clearview was repaid its investment (c. £540,000) together with interest (c. £95,000) and the same share of profits as Kea (c. £3.74m) in respect of its A interest, but it was also paid a further c. £4.68m in respect of its B interest.   Neither the precise amounts nor the way they were calculated matters for present purposes, but it can be seen that Clearview (that is Mr Watson's interests) derived significantly more profit from his share of the management carry than it did from its A interest, and hence over twice as much as Kea did.

***Claims in relation to Project Edsel***

127.    It is convenient to deal at this stage with the claims in respect of Project Edsel.   In effect Sir Owen and Kea seek to make Mr Watson liable to account for the profit he derived from the B interest.   The claims are put in three ways:

(1)      Mr Watson acquired the B interest in breach of a fiduciary duty which he owed to Sir Owen or Kea.

(2)      Kea has a claim to the B interest because its money was used in breach of trust to acquire it.

(3)      The Term Sheet for Project Edsel provided for Kea to share in the B interest, and by giving up that right in the long-form agreements Mr Dickson acted in breach of his fiduciary duty to Kea, to the knowledge of Mr Watson.

I will consider the question of breach of fiduciary duty first.

# Fiduciary duties – (i) the law

128.  Ms Jones submitted that Mr Watson owed Sir Owen (or through him Kea) a fiduciary duty (both in relation to Project Edsel and in relation to Project Spartan).  I will deal with this question here specifically in relation to Project Edsel, although much of this is relevant also to the Project Spartan claims.

129.  Mr McCaughran submitted that Mr Watson did not owe such a duty, for two reasons.  One is that Sir Owen had no sufficient interest in the transactions which could support an allegation that a fiduciary duty might be owed to him (or though him to Kea); the second is that on a proper analysis of the law and the facts the relationship between them was not one that gave rise to fiduciary duties.

130.  I will deal with the latter point first, and start with the law.  I was referred by both Ms Jones and Mr McCaughran to a number of authorities on the question whether a fiduciary duty is owed by one person to another.  For the most part I did not detect any significant difference between them as to the law; the authorities referred to were rather put forward as illustrations, thought to be helpful to one side or the other, of the principles.  In those circumstances, I do not intend to discuss the authorities at length, but will try and summarise what I understand the principles to be.

131.  Those are I think as follows:

(1)        There are a number of settled categories of fiduciary relationship.  The paradigm example is that of trustee and beneficiary; other well-settled examples are solicitor and client, agent and principal, director and company (subject to the impact of the Companies Act 2006), and the relationship between partners: *Snell's Equity* (33rd edn, 2015) at §7-004.

(2)        Outside these settled categories, fiduciary duties may be held to arise if the particular facts warrant it.  Identifying the circumstances that justify the imposition of fiduciary duties has been said to be difficult because the courts have consistently declined to provide a definition, or even a uniform description, of a fiduciary relationship: *ibid* at §7-005.

(3)        Fiduciary duties will not be too readily imported into purely commercial relationships.  That does not mean that fiduciary duties do not arise in commercial settings – indeed they very frequently do, as the example of agency illustrates – but that outside the settled categories, this is not common, it being normally inappropriate to expect a commercial party to subordinate its own interests to those of another commercial party: *ibid*.

(4)        A joint venture is not one of the settled categories of relationship giving rise to fiduciary duties between the joint venturers.  Although at first sight the analogy with a partnership might suggest that it would be, it is clearly established that the phrase *"joint venture"* is not a term of art either in a business or in a legal context, and each relationship which is described as a joint venture has to be examined on its own facts and terms to see whether it does carry any obligations of a fiduciary nature: *Ross River Ltd v Waveley Commercial Ltd* [2013] EWCA Civ 910 (*"Ross River"*) at [34] per Lloyd LJ.

(5)        The default position is that no such fiduciary duties arise.  In the absence of agency or partnership, it would require particular and special

features for such fiduciary duties to arise between commercial co-venturers: *Crossco No 4 Unlimited v Jolan Ltd* [2011] EWCA Civ 1619 at [88] per Etherton LJ. Examples of cases where, exceptionally, fiduciary duties have been held to arise are the decision in *Ross River* itself; that of Etherton J in *Murad v Al-Saraj* [2004] EWHC 1235 (Ch) (*"Murad"*) (appealed, but not on this point: [2005] EWCA Civ 959 at [4]); and that of Peter Smith J in *J D Wetherspoon plc v Van de Berg & Co Ltd* [2009] EWHC 639 (Ch) (*"Wetherspoon"*). In *Wetherspoon* one director of the defendant company was found to have owed a fiduciary duty but the other two not, and it was said by Lloyd LJ in *Ross River* at [37] to be a good illustration of the proposition that the existence of a fiduciary duty in such a case is very fact-sensitive. With these can be contrasted two recent cases in which fiduciary duties have been held not to arise between co-venturers: *Baturina v Chistyakov* [2017] EWHC 1049 (Comm) (Sue Carr J), and *Cullen Investments Ltd v Brown* [2017] EWHC 1586 (Ch) (Barling J) (*"Cullen"*), a case coincidentally involving Mr Watson.

(6)      What then are the particular factual circumstances that will lead to the Court finding that fiduciary duties are owed? This can best be elucidated by a number of citations:

(a)      In his well-known classic judgment in *Bristol & West Building Society v Mothew* [1998] Ch 1 (*"Mothew"*) at 18A, Millett LJ said:

"A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence."

(b)      In *Arklow Investments Ltd v Maclean* [2000] 1 WLR 594 at 598G, Henry J, giving the judgment of the Privy Council, said:

"the concept encaptures a situation where one person is in a relationship with another which gives rise to a legitimate expectation, which equity will recognise, that the fiduciary will not utilise his or her position in such a way which is adverse to the interests of the principal."

(c)      In *F&C Alternative Investments (Holdings) Ltd v Barthelemy (No 2)* [2011] EWHC 1731 (Ch) at [225], Sales J said:

"Fiduciary duties are obligations imposed by law as a reaction to particular circumstances of responsibility assumed by one person in respect of the conduct of the affairs of another."

(d)      In another case involving Ross River Ltd, *Ross River Ltd v Cambridge City Football Club* [2007] EWHC 2115 (Ch) (cited by Lloyd LJ in *Ross River* at [56]-[58]), Briggs J referred at [198] to:

"well known badges or hallmarks of a fiduciary relationship, such as … [if] the plaintiff entrusts to the defendant a job to be performed, for instance, the negotiation of a contract on his behalf or for his benefit."

(e)   In *Ross River* at [51]-[52] Lloyd LJ cited with approval a passage from *Bean, Fiduciary Obligations and Joint Ventures* (1995) (itself referring to *Finn, Fiduciary Obligations* (1977)), which is too long to set out in full but the essence of which is as follows:

> "[Fiduciary] office holders are entrusted with power to act for the benefit of another, but are not under the immediate control and supervision of the beneficiary…
>
> Finn's rationale is that the fiduciary who has freedom to determine how the interests of the beneficiary are to be served requires the supervision of equity. Indeed, it is the fiduciary's autonomy in decision-making that requires equity's supervision and this is required whether or not the autonomy is created under a contract between the parties or is inherent in the office."

(7)   Without in any way attempting to define the circumstances in which fiduciary duties arise (something the courts have avoided doing), it seems to me that what all these citations have in common is the idea that A will be held to owe fiduciary duties to B if B is reliant or dependent on A to exercise rights or powers, or otherwise act, for the benefit of B in circumstances where B can reasonably expect A to put B's interests first. That may be because (as in the case of solicitor and client, or principal and agent) B has himself put his affairs in the hands of A; or it may be because (as in the case of trustee and beneficiary, or receivers, administrators and the like) A has agreed, and/or been appointed, to act for B's benefit. In each case however the nature of the relationship is such that B can expect A in colloquial language to be on his side. That is why the distinguishing obligation of a fiduciary is the obligation of loyalty, the principal being entitled to *"the single-minded loyalty of his fiduciary"* (*Mothew* at 18A): someone who has agreed to act in the interests of another has to put the interests of that other first. That means he must not make use of his position to benefit himself, or anyone else, without B's informed consent.

(8)   This analysis also explains why fiduciary duties will not readily be found in commercial settings. In commercial dealings the relationships are (usually) primarily contractual; and it is of the essence of commercial contracts that each party is (usually) entitled, subject to the express and implied constraints of the contract, to seek to prefer his own interests, and is not obliged to put the interests of the other party first.

(9)   So far as joint ventures are concerned, fiduciary duties may in particular be found to arise where one party has control of assets which are to be exploited for the joint benefit of both. Thus for example in *John v James* [1991] FSR 397 at 433 Nicholls J said of a publishing agreement:

> "The copyrights were to be assigned to the publisher, and to become its property, but with the intention that they would be exploited by the publisher, which would have complete control over the method of exploitation, not for its benefit alone but for the joint benefit. Thus, commercially, the arrangement was in the nature of a joint venture, and the writers would need to place trust and confidence in the publisher over the

manner in which it discharged its exploitation function."

And in *Ross River* Lloyd LJ (who said at [62] that *John v James* was the most useful and compelling analogy) described it at [55] as:

> "a clear and instructive example of a transaction in the nature of a joint venture where the relevant assets belong legally and beneficially to one party, whose task it is to exploit them, but they are to be exploited for the common benefit of both parties, and where fiduciary duties arose from the situation despite the fact that the operator had its own personal interest in the exploitation to which it was entitled to have regard."

(10)     Even if a party is held to have owed a fiduciary duty to another party, the nature of the fiduciary obligations owed is itself a fact-sensitive enquiry, to be determined by considering the particular relationship between the parties: *Ross River* at [64]. Thus for example in *John v James* the defendants were not disposed to dispute that the publisher owed a fiduciary obligation to account for royalties received, but it was disputed, and had to be decided, whether it owed a fiduciary obligation in respect of exploitation of the copyrights; in *Ross River* Morgan J had found that the defendants owed fiduciary duties in certain respects but not others, and the Court of Appeal found that the duties were more extensive.

132.  Mr McCaughran had a further submission on this point, which is that a distinction can be seen in the authorities between cases in which the Court has held that a fiduciary duty arises out of an existing contractual relationship as an incident of the contract between the parties, and cases in which a party is held to owe a fiduciary duty to the other party in the *negotiation* of the contract. He relied on what Lord Walker had said in *Cobbe v Yeoman's Row Management Ltd* [2008] UKHL 55 at [81] where he referred to:

> "the general principle that the court should be very slow to introduce uncertainty into commercial transactions by over-ready use of equitable concepts such as fiduciary obligations and equitable estoppel. That applies to commercial negotiations whether or not they are expressly stated to be subject to contract."

That was not in fact a case about fiduciary duties but about promissory estoppel, but I do not think that detracts from the force of what Lord Walker says, or from its good sense. Parties negotiating for a contract are normally entitled to act in their own interests and are not obliged to have regard to the interests of the other party, and it takes particular circumstances before fiduciary duties are to be imposed on them. Mr McCaughran said that in the case of negotiations for a joint venture such cases were very rare, the only example he had found being *Murad*. In *Murad* the claimants were two sisters who lived abroad and looked to the defendant, a Mr Al-Saraj, to make appropriate recommendations and assist them in connection with investments in England; they had no relevant experience, had no knowledge of the arrangements made by the defendant with third parties, and entrusted him with extensive discretion to act in matters affecting their interests. They were, in the words of Etherton J *"wholly dependent"* on him for his advice and recommendation, the negotiations with the vendors, and the instruction of professionals on their behalf, including in relation to the structure of the transaction and documentation; see at [328], [332].

133.    I accept that most of the authorities I was referred to were dealing not with the question whether a fiduciary duty arose in the *negotiation* of a joint venture, but with the different question whether a fiduciary duty arose in the *operation* of the joint venture; that different considerations apply in the two situations; and that it takes particular facts before the Court will conclude that one party to a negotiation (itself usually a situation where the parties' interests are divergent) owes a fiduciary duty to the other party. Ms Jones put forward *Longstaff v Birtles* [2001] EWCA Civ 1219 as another example where a fiduciary duty was owed in a negotiation, but that was a case where the defendants had formerly acted as solicitors to the claimants. That relationship, being one of solicitor and client, was undoubtedly a fiduciary one which gave rise to a relationship of trust and confidence, and the basis of the Court of Appeal's decision was that that relationship of trust and confidence did not cease on the termination of the retainer (see per Mummery LJ at [35]). Once that had been held to be the position, it was entirely orthodox to hold that the solicitors continued to owe fiduciary duties to their former clients which affected their negotiations with them.

134.    I will add one further point here. The reference in the cases (such as *John v James*, *Mothew* and *Longstaff v Birtles*) to a relationship of *"trust and confidence"* does not mean that every relationship in which one party trusts the other is a fiduciary relationship. Contracting parties usually do trust each other – indeed they would be unlikely to do business with each other if they did not – but this does not mean that they owe each other the duties which are peculiar to fiduciaries. What I think is meant by a relationship of trust and confidence in this context is where one party places himself, or is placed, in the position where he trusts and confides that the other party will act exclusively in the first party's interests. If the concept of trust and confidence is not confined in this way, it seems to me to cease to be of any utility in determining whether a fiduciary duty is owed: cf the recent decision of Leggatt LJ (at first instance) in *Sheikh Al Nehayan v Kent* [2018] EWHC 333 (Comm) (*"Al Nehayan"*) at [164]-[165]. This judgment, which contains a valuable analysis of the whole question of fiduciary duties (see at [153ff]), was not available at the time of the hearing, but it contains nothing with which I disagree, and on this particular point seems to me plainly right, and I have not thought it necessary to ask for the parties' further submissions on it.

*Fiduciary duties – (ii) application to the facts*

135.    Ms Jones relied on a number of matters in support of her submission that the relationship between Mr Watson and Sir Owen was such that Mr Watson owed Sir Owen and/or Kea fiduciary duties – the particular duties pleaded being (i) to act in good faith towards Sir Owen and Kea; (ii) not to make for himself any secret profit from the funds being contributed by Kea and (iii) when negotiating and dealing with third parties, to act in the best interests of Sir Owen and Kea.

136.    Ms Jones relied first on Sir Owen and Mr Watson being friends. As set out above (paragraphs 62 to 63) this was not really in dispute. I do not however see that this by itself is of any real significance. Some of the cases do refer to parties having a close personal relationship in considering whether fiduciary duties are owed (see eg *Wetherspoon* at [77]-[78]), and those who have a good personal relationship may naturally be more inclined to place trust and confidence in each other; but it is also no doubt very common for friends to do business with each other without the relationship

being one where fiduciary duties are owed (see eg *Cullen* at [261]-[266] where Barling J held that despite the personal friendship between Mr Watson and Mr Brown, the arrangements were formal, commercial and at arms' length and no supplementary fiduciary obligations were owed). Friends may act for each other in such a way as to owe fiduciary obligations, but friends may equally be no more than contracting counterparties.

137. Second, Ms Jones submitted that there was an imbalance of knowledge and experience, neither Sir Owen nor Messrs Miller and Dickson having any experience in property investments. I accept that Sir Owen had no particular experience in property, but he was very far from naïve; he was a very experienced businessman, Mr Watson at one stage referring to him having *"probably bought and sold more companies than I have had hot dinners"*. The relevant question it seems to me is not so much what relevant experience he had, but whether as a result he relied on Mr Watson to look after his interests in this respect. One can compare the facts in *Murad* where the claimants were not only inexperienced but wholly dependent on the defendant and entirely in his hands (see paragraph 132 above).

138. Ms Jones submitted that Mr Watson took advantage of Sir Owen's lack of relevant expertise to put himself forward to look after his interests. She referred to Mr Watson's acceptance in evidence that he was recommending deals to them, and giving his opinion to Sir Owen on the suitability of investments such as ground rents for the trust; to Sir Owen's reference to Mr Watson's offer to *"watchdog my investments"* (paragraph 92 above), in respect of which Mr Watson said in evidence that he assumed that if Sir Owen was going to invest in ground rents, *"we would certainly be keeping an eye on it for all of us in general, including him"*; and to Mr Miller's reference to *"other vetted investment projects"* (paragraph 107 above), and his agreement in oral evidence that the vetted investments meant that he was relying on Mr Watson to help him and Sir Owen, who were novices in the area, understand whether the projects were good and suitable.

139. Again however I think caution is needed. There is no doubt that Mr Watson was putting forward, indeed pushing, various proposals for Sir Owen to invest in, on the basis that he and his team had looked at them, and that they were very valuable. To that extent it could no doubt be said that he was *"recommending investments"* and that they were being put forward as *"vetted"* by him and his team, but the same is likely to be the case whenever one party is trying to persuade another to invest in a proposed venture. Indeed his actual answer when asked to confirm that he was recommending investments for the trust monies was:

> *"Yes, I am promoting deals, selling deals, recommending deals to them, yes."*

That looks much more like an acceptance that what he was doing was pitching opportunities to Sir Owen, rather than advising him. It does not follow from the fact that Mr Watson was recommending deals in this way that Sir Owen was relying on Mr Watson to advise him, or entrusting him with discretions, or otherwise placing himself in Mr Watson's hands, or trusting him to act with single-minded loyalty in his (Sir Owen's) interests rather than his own. And I also accept Mr Watson's explanation of the offer to *"watchdog"* Sir Owen's investments: if Sir Owen were persuaded to invest alongside him, his and Mr Watson's interests would be aligned and it would be natural for Mr Watson to keep an eye on how they were performing.

That does not seem to me to amount to the assumption of a responsibility to put Sir Owen's interests first, or turn the relationship into one where fiduciary duties were owed.

140.   On this aspect of the case I prefer the submissions of Mr McCaughran. These were in effect that Sir Owen did not trust Mr Watson to be acting exclusively in his interests, or rely on him to protect them. Instead he was anxious that the investments promoted by Mr Watson should be properly scrutinised by his own advisers. Thus when Mr Watson first proposed the Red Mountain investment, Sir Owen asked Mr Miller to look at it for him, and then accepted Mr Miller's recommendation against investing; he accepted in oral evidence that his usual way of operating when a deal was proposed for the trust was to ask Mr Miller to look at it for him, do due diligence and assess it for him (paragraph 64 above). When Mr Watson tried again, Sir Owen asked both Mr Dickson and a contact at Lazards to advise him, and on their advice again declined to invest (paragraph 65 above). When Mr Watson proposed the investment in ground rents in the summer of 2011, Sir Owen was keen and said he was looking to invest £50m in the venture *"subject to our due diligence"* (paragraph 92 above); Mr Astor did provide a significant amount information to Mr Miller for him to assess (paragraph 93 above); and Sir Owen confirmed in evidence that before the Mancap transaction went off Mr Miller was engaged in that process and reporting back to him. In relation to Project Edsel, when it was first proposed by Mr Watson in January 2012, Sir Owen asked Mr Miller to have a look at it (paragraph 96 above); when the investment discussion document was provided, Sir Owen said that he left it to Messrs Miller and Dickson, mostly Mr Miller (paragraph 103 above); and Sir Owen only agreed to proceed after Mr Miller had said that it was a good project and the risk was low, and Mr Dickson that it was very promising (paragraph 107 above). In relation to Project Drive, Sir Owen asked Mr Tony Holt, another adviser of his, to look at the figures and put together a team to conduct due diligence (paragraph 108 above); Sir Owen accepted in evidence that it was on the basis of Mr Holt's analysis that *"the Owen Glenn side"* proceeded to invest in the Warriors.

141.   I accept Mr McCaughran's submission that this is all consistent with Sir Owen relying on others, rather than Mr Watson, to look after his interests. Again the contrast with *Murad* is instructive: there the claimants did not receive proposals from Mr Al-Saraj which they considered with their own advisers – rather, they left it to Mr Al-Saraj to find investments for them and were wholly dependent on his advice.

142.   Two other relatively minor points were relied on by Ms Jones which I do not consider take matters any further. One is that in the Project Edsel Term Sheet there was an express obligation on the parties to use good faith in seeking to agree the long-form documentation (paragraphs 104 and 113(1) above); although the relevant party was Clearview (that is Novatrust as trustee of Clearview), she submitted that that in practice required Mr Watson to act in good faith, as Mr Watson had accepted in evidence (paragraph 104 above). In my judgment Ms Jones gets no assistance from this provision. A fiduciary undoubtedly does owe an obligation of good faith, this being the very first facet of the core obligation of loyalty identified by Millett LJ in *Mothew* (at 18B); but there is nothing unusual about contracting parties owing each other obligations of good faith (express or implied) without thereby becoming fiduciaries. A contractual obligation of good faith owed by a contracting party who is not a fiduciary requires not so much loyalty to the interests of the other party but

loyalty to the contract, to the spirit of the bargain (on all this see again the valuable analysis of Leggatt LJ in *Al Nehayan* at [167]-[176], especially at [175], with which again I entirely agree). In the case of the Project Edsel Term Sheet there are I think two quite strong indications that the obligation of good faith was of this contractual type, rather than an expression of a fiduciary obligation owed by Mr Watson. First, the obligation is mutual, which scarcely fits with Mr Watson loyally subordinating his interests to those of Sir Owen but not vice-versa (parties may of course, as in the case of partnership, owe each other mutual fiduciary duties, but Sir Owen's case is that Mr Watson owed him fiduciary duties, not that they owed each other mutual duties). Second, the obligation of good faith is not a general obligation, but a specific obligation to use good faith, best commercial endeavours to seek to agree, execute and deliver the necessary long-form documentation. In circumstances where the Term Sheet was quite sketchy, and expressly contemplated both that the structure was not yet finalised and might have to be agreed subsequently, and that the long-form documentation might have to contain other necessary or desirable terms (see paragraph 113(6) and (7) above), it is entirely understandable why there should be this express obligation to negotiate the long-form documentation in good faith, in the contractual sense of being loyal to the bargain; whereas if what had been intended was a contractual expression of the good faith and loyalty appropriate to fiduciaries, there would have been no reason to confine it to the agreement of the long-form documentation in this way.

143.   Ms Jones' other minor point is that Mr Watson had a habit of referring to Sir Owen as his *"partner"* or as *"partnering"* him. One example will suffice. The Project Edsel investment discussion document began:

> "This document outlines the specifics of a proposal in which an Owen Glenn Investment Vehicle ("OGV") will partner with an Eric Watson Investment Vehicle ("EWV") in a Funding and Equity Arrangement in relation to Project Edsel."

There are other examples which I need not refer to. I do not think that any weight can be attached to this at all: *"partner"* is one of those words which can have a technical meaning but is very commonly used in a looser sense. It is not suggested that any of the arrangements between Mr Watson and Sir Owen amounted to a partnership governed by the Partnership Act 1890, and I do not see that Mr Watson meant anything other than that he and Sir Owen (or their vehicles) were participating in a number of joint ventures together. That was true, but, as set out above, it is common ground that a joint venture is not without more a relationship that gives rise to fiduciary duties. In those circumstances I do not consider that for Mr Watson to refer to Sir Owen as a *"partner"* in the sense of co-venturer takes matters any further.

144.   I have now considered all the matters relied on by Ms Jones (that is in relation to Project Edsel – from mid-March 2012 there are some additional features arising out of the dispute between Sir Owen and Messrs Miller and Dickson which are relied on by Ms Jones in relation to Project Spartan) except one. That is a potentially important one which I will come to, but before doing so I will summarise my conclusions so far. In my judgment none of the matters so far referred to establish that Mr Watson owed Sir Owen (or Kea) any fiduciary duties in relation to Project Edsel. Leaving aside the point which I am about to come to, that means that the relationship between Mr Watson and Sir Owen/Kea was the same as that of any other parties negotiating for a contractual relationship: Mr Watson owed the usual obligation not to misrepresent the

position, but was otherwise free to act in his own interests and did not owe the special obligation peculiar to fiduciaries not to make a profit from his position without the fully informed consent of Sir Owen/Kea.

145.   The remaining point relied on in relation to Project Edsel is that it was Mr Watson who had the relationship with the relevant third parties, namely the managers (Messrs Astor and Aumonier) and the co-investors (HW); Sir Owen did not have that relationship and was dependent on Mr Watson to deal with those third parties on behalf of both joint venturers.  This is admitted on the pleadings as a matter of fact (save that Mr Watson says he was dealing with them on behalf of Copperstone, but I agree with Ms Jones that Copperstone is just a vehicle for the interests of Kea and Clearview, and this does not affect matters).

146.   This point requires careful consideration.  As already stated, in the case of joint ventures fiduciary duties may in particular be found to arise where one party has control of assets which are to be exploited for the joint benefit of both; thus in *John v James* the deciding factor was that the defendant publisher had control over the exploitation of the copyrights, but the intention was that this be done for the benefit of the venture (paragraph 131(9) above).  In principle it seems to me that similar considerations apply where one of the parties controls not assets as such, but a relationship with a third party.  If the intention is that he should make use of that relationship to benefit the joint venture, then it is not difficult to see that he may owe a fiduciary duty to his co-venturer not to use it for his own exclusive benefit.

147.   In the context of Project Edsel, what that means in practice I think is this.  If Mr Watson had first agreed with Sir Owen that they should co-invest and had then gone to Messrs Astor and Aumonier and HW and used the fact that he and Sir Owen/Kea were going to invest to obtain a share of the management carry for himself, I would have had little difficulty in finding that he could not keep that share of the management carry to himself but would have had to share it with Sir Owen/Kea.  That would have been closely analogous to the position of the publisher in *John v James*, who could not use the exploitation of the copyrights to benefit sub-publishers associated with itself at the expense of the plaintiffs.

148.   But as I have referred to, these cases are very fact-sensitive, and Mr McCaughran says that the facts were not like that.  What happened here is that Mr Watson negotiated for himself a share of the management carry long before approaching Sir Owen to invest.  Project Edsel was first mentioned to Sir Owen's camp (in fact Mr Miller) on 7 January 2012 (paragraph 96 above).  But Mr Watson had agreed with Messrs Astor and Aumonier as early as February 2011 (in the Attila JV Agreement) that the three of them would share pro-rata in the management carry on all deals (paragraph 80 above); and the three of them had then agreed with HW in April 2011 (in the Project Atlantic Term Sheet) for a management carry on Project Atlantic, being 20%, rising to 25% once the return to investors met the 1.35x multiple (paragraph 82 above).

149.   I accept this submission of Mr McCaughran.  It is one thing to say that a person may well be accountable if he participates in a joint venture and then exploits for his own benefit an asset or relationship that should properly be exploited for the parties' joint benefit; it seems to me quite a different proposition that a person who has already used his relationship to negotiate a benefit for himself is obliged to share it with someone with whom he later enters into a joint venture.  Unless he has agreed to

contribute it to the venture, I do not see that equity will compel him to share the benefit of it, or any principle on which he can be made accountable for it.

150.    Ms Jones submitted that Mr Watson did use Kea's money to obtain his share of the management carry because he needed it to make Project Edsel happen. (This is a separate point from the use of the £7,045 to pay for the B interest which I consider below). She made a similar submission that Mr Watson also used Kea's money to acquire the Ladoga Investment Right. Both submissions were premised on the submission that as a matter of fact HW expected the founders and partners in Long Harbour to invest a substantial sum in the project, and this in practice meant that Mr Watson was expected to put up almost all the money. He used Kea's money for this, but held it out to HW, and Messrs Astor and Aumonier, as his own.

151.    I do not accept the premise. I have already said that the Project Atlantic Term Sheet did not in my view oblige Mr Watson to co-invest, but gave him a right to do so, and that there is evidence that as late as December 2011, HW did not know if any of the individuals who had that right were going to do so (paragraph 83 above). Ms Jones relied on an answer given by Mr Gibson in oral evidence, in answer to the suggestion that HW wanted to see the colour of Mr Watson's money, to the effect that HW *"would have liked to see some skin in the game ... but they liked the investment and the level of that skin in the game was not clarified"*, together with Mr Watson's intention in January 2012 to put in £1.5m to £2m (paragraph 95 above) to suggest that HW required an investment of that order. But I do not think that can fairly be taken from Mr Gibson's evidence; Mr Watson's evidence was that HW did like to have management investing but that he was sure they would have proceeded if he hadn't invested alongside them; and there is nothing in the contemporaneous documents which contradicts this, or supports the idea that HW were insisting on significant investment from Mr Watson. There was evidence that HW wanted Mr Watson, if he was going to invest, to put his money in upfront so they were not taking a credit risk on him not completing future drawdowns, but that is a different point.

152.    I find that it has not been established that it was a requirement of HW that Mr Watson make a substantial investment, or that Project Edsel would not have gone ahead without it. It is true that Mr Watson, with the collusion of Mr Gibson and Mr Leahy, deliberately concealed Sir Owen's involvement both from HW and from Messrs Astor and Aumonier, something that is scarcely laudable, but whatever right that might have given them to complain, I do not see that it alters the position as between him and Sir Owen.

153.    Subject to one point of detail, therefore, I find that Mr Watson did not obtain his share of the management carry by exploiting his relationships with HW and Messrs Astor and Aumonier in circumstances in which he should have been doing so for the joint benefit of himself and Sir Owen. As submitted by Mr McCaughran, he had negotiated for those rights long before Sir Owen was ever approached to invest. They were therefore not benefits that he acquired in breach of a fiduciary duty to Sir Owen to acquire them for their joint benefit rather than for himself, and in those circumstances I do not see that he was obliged to bring them into the joint venture, or indeed say anything about them.

154.    I should add for the sake of completeness that I have not overlooked the fact that the Project Atlantic Term Sheet was not legally binding, but only an agreement in

principle and subject to contract (paragraph 82 above), but there is nothing in the contemporary record to suggest any reluctance on the part of HW to adhere to and formalise the agreement they had negotiated and agreed in principle. In this intensely fact-sensitive area the Court should I think have regard to the factual realities, and I accept that in reality HW had agreed that Messrs Watson, Astor and Aumonier could have a management carry from Project Edsel long before Sir Owen was approached. When Sir Owen *was* approached, it was on the express basis that after repayment of capital and interest, the remaining profits would be split between investors and management, with the management carry (or performance fees) being 20% or 25%, and with no suggestion that his investment would give him any right to any part of the management carry, as the presentation in the investment discussion document set out in some detail (paragraphs 102 to 103 above).

155.   I said that this was subject to one point of detail. That is that when Project Edsel came to be finalised on 17 February 2012, the share of profits that went to management had increased. In the Project Atlantic Term Sheet the split between investors and management was either 80% : 20%, or (once the return to investors was 1.35 times) 75% : 25% (paragraph 82 above), and this was what was presented to Mr Miller in the investment discussion document. By 17 February 2012 however the Amended and Restated Partnership Deed for Atlantic 1 provided for the split to be either 78.08% : 21.92%, or 72.75% : 27.75% (paragraph 118 above), apparently in order to accommodate a share for Mr Noble. If Mr Watson agreed to this change after Sir Owen / Kea had agreed to invest, that might be thought to be an example of his using his relationship with Messrs Astor, Aumonier and HW to benefit himself or others at the expense of the Sir Owen interests, and so raise the question whether it involved a breach of fiduciary duty. But nothing is pleaded along those lines, the circumstances in which the percentages were changed and the reasons for it were not I think explored in evidence, and the point was not argued or relied on in Ms Jones' comprehensive written submissions and only very briefly touched on in oral argument. In those circumstances I do not think the question is one I can or should pursue and I say no more about it.

156.   In my judgment therefore Mr Watson was not in breach of any relevant fiduciary duty in relation to Project Edsel as no relevant duty was owed.

*Did Sir Owen have any sufficient interest in Kea to support a fiduciary duty?*

157.   That conclusion makes it strictly unnecessary, at any rate in relation to Project Edsel, to consider Mr McCaughran's other answer to the claim that Mr Watson owed Sir Owen or Kea a fiduciary duty, namely that Sir Owen had no interest in Project Edsel in any event and so no duty could be owed to him; and that if no duty was owed to him, none was owed to Kea, which was said to be derivative or parasitic on the duty owed to him. I will however give my views, both in case I am wrong on the question of fiduciary duty and because the same point recurs in relation to Project Spartan.

158.   Mr McCaughran's argument is that on the face of the trust documents by the time of the investment by Kea in Project Edsel (and the later investment in Project Spartan), all the trust assets, including Kea, were held by the Corona Trust; since Sir Owen was not a beneficiary of the Corona Trust, he had no interest in the trust assets, and hence no fiduciary duty in relation to the use of the trust assets could be owed to him.

159.    Ms Jones had a number of answers to this submission.  One is that this does not affect
        the fiduciary duty claim by Kea in any event; another is that it is not necessary as a
        matter of law for Sir Owen to have had any interest in the assets in order to establish a
        fiduciary duty.  But she also submitted that if it were necessary for Sir Owen to have
        an interest in or connection with the assets, he did, relying on three different matters,
        namely (i) that Sir Owen could be added as a beneficiary to the Corona Trust and had
        a particularly strong claim on the trustee's discretion; (ii) that the "decanting" under
        which the assets of the Regency Trust were moved across to the Corona Trust
        (paragraph 31 above) was improper and in breach of trust; and (iii) that Sir Owen had
        a legitimate interest in being consulted about investments.

160.    These latter three matters took up a good deal of time at trial, particularly in the oral
        evidence of Mr Miller (and that of Sir Owen) and elaborate submissions were
        addressed to me on them.  I should therefore deal with them and I do so below.  But in
        my judgment they are in fact beside the point.

161.    This is because I do not accept the premise of Mr McCaughran's submissions, namely
        that it is necessary for Sir Owen to have had an interest in the trust assets before Mr
        Watson could be found to owe any fiduciary duties.  His submissions can be tested in
        this way.  An investor A is proposing to invest his own money, and an adviser B
        expressly agrees to find investments for him and in doing so to act exclusively in his
        interests.  That would be a classic case where fiduciary duties were owed by B to A,
        and if B puts forward an investment on which he had taken a secret commission, there
        would be no serious doubt that he would be accountable for it to A.  Now suppose that
        the facts were the same except that A tells B that the money he was looking to invest
        was not actually his own money but belonged to his daughter C, and asked B to put
        forward suitable investments for C to invest in.  I do not see that that would prevent a
        fiduciary duty arising, and if B put forward to C an investment on which he had taken
        a secret commission, I see no reason why he should not be accountable for it, either to
        A or to C, or perhaps to both.  The suggestion that because A had no beneficial
        interest in the monies no duty was owed to anyone, with the result that B was not
        accountable for his secret commission at all, seems to me to be wrong in principle.  In
        short the essence of a fiduciary duty is a duty to act loyally in another's interests, and
        I see no reason why A cannot deal with B on terms that B will loyally serve his
        daughter C's interests, any more than there is any objection to a contract under which
        A engages B to paint his daughter C's house.

162.    If that is right, and I have no real doubt that it is, I do not see that there is any
        difference between that and a case where A asks B to put forward investments to the
        trustees of an offshore trust which he has settled for the objects which he wishes to
        benefit (his family and his philanthropic foundation) and where the investment is to
        be made by a corporate vehicle owned by the trust.  I do not see that it matters in such
        a case that A himself has no beneficial interest in the trust, or expectation of
        benefiting directly from it, or indeed whether he expects to have or does have any say
        in the investment decisions or those are left entirely to the trustees.  In a non-technical
        sense he clearly has an interest in seeing that the investment is suitable for the trust,
        and hence in the best interests of the beneficiaries, as he was the one who established
        the trust and selected those beneficiaries to be the object of his bounty; and it would in
        my judgment be absurd to suggest that just because he himself had no beneficial
        interest in the trust, it was no concern of his whether B acted loyally in the interests of

the vehicle put forward by the trust, or instead abused his position to line his own pocket. That would be like saying that if A engaged B to paint his daughter's house, he had no interest in whether B complied with the contract because he did not have a beneficial interest in the house.

163.   If therefore, contrary to the view I have expressed above, the relationship between Sir Owen and Mr Watson was one where Mr Watson had agreed to act loyally in Sir Owen's interests, then I do not see that the fact that the money to be invested was not Sir Owen's but Kea's would have prevented a fiduciary duty being owed, and relief being given for a breach of it. I do not need to decide if such a duty would have been owed to Sir Owen or to Kea or both (or whether the duty would have been owed to Sir Owen, but would have given rise to a duty to account to Kea) partly as it does not in fact arise, and partly because if it did, both Sir Owen and Kea join in bringing the claim in any event.

164.   That makes it strictly unnecessary in my judgment to decide the three matters relied on by Ms Jones, but I will deal with them. The first was that Sir Owen could be added as a beneficiary to the Corona Trust and had a particularly strong claim on the trustee's discretion. It is not disputed that Sir Owen could be added as a beneficiary – indeed he was in 2014. The mere potential to be added cannot however have given him any particular interest in the assets of the Corona Trust in 2012, as almost anyone in the world could be so added, and it could not sensibly be suggested that everyone had a sufficient interest. So the real contention is that he had a strong claim to be so added. Mr Miller accepted in evidence that he and Mr Dickson *"wanted Sir Owen to enjoy those fruits* [of the sale to Mancap] *as much as we could"*; and that there was always a possibility that Sir Owen could be included as a beneficiary at a later date, but he said that that would be outside the 10-year timeframe (a reference to the 10-year tax window applicable to US tax residents who become non-resident), and maybe another 3 or 4 years beyond that because of the concern about an IRS audit. But I do not think this establishes that Sir Owen had a strong claim to be added as a beneficiary. Mr Miller's evidence about him and Mr Dickson wanting Sir Owen to enjoy the fruits as much as they could was not I think directed at the question of adding him as a beneficiary, but more directed at finding ways of enabling him to benefit from trust assets despite not being one – such as permitting him to use the yacht Ubiquitous (which could perhaps be justified as promoting the work of the GFF, which was a beneficiary), or a proposal to pay him a finder's fee in connection with the Mancap sale or otherwise remunerate him. And Mr Miller's cautious acceptance that there was a possibility of adding him after the end of the 10-year window and the danger of an IRS audit had passed did not amount to an acceptance that that was the intention in 2012, or had even been contemplated, nor indeed was that suggested to him. The fact that he was in fact so added in 2014 does not really assist on the likelihood in 2012 of that happening – it may well have been driven by his desire to be in the driving seat in relation to the disputes which have led to this litigation. In the absence of that factor the probability of Sir Owen being added as a beneficiary to the trust would be likely to depend on such matters as what other assets he had access to, the tax consequences if he received benefits from the trust, and the financial position of the existing beneficiaries. I had no real evidence on any of these matters; nor did I have any evidence, for example, that it had been contemplated when the trust structure was first set up in 2009, or at any time subsequently, that he would or might be added after the end of the 10-year window, or what Sir Owen's intentions as settlor

were.   The closest that the evidence came to shedding light on Sir Owen's understanding and intentions as to who would benefit from the trusts was Mr Hamilton's notes of the OTSLG Advisory Board meeting in March 2011 (paragraph 15 above).   These indicate that it was contemplated that a number of investments would be held for the benefit of his children and grandchildren, and the GFF, but (apart from a reference to *"$8m for piggy bank"*) contain nothing that could be said to contemplate Sir Owen himself directly benefiting.   I am not persuaded that in 2012 there was any significant prospect of his being added as a beneficiary, and as I have said I do not find it established that he had a strong claim to be added.

165.   The second matter that Ms Jones relied on was that the decanting was improper.   This is a point of some intricacy, starting with a submission that the decanting did not in fact take place on its ostensible date of 31 October 2011, but took place between February and April 2012, the documents being backdated.   This was something the Claimants only came to suspect at a late stage in preparation for trial, and is not in fact part of their pleaded case, which still refers to it as having taken place on 31 October 2011, but the suggestion was put to Mr Miller in cross-examination, who denied it.   It was based on the fact that in December 2011 Maples and Calder in BVI had told Messrs Dickson and Miller that the shares in Pacifico were still held by SHR for Sir Owen, and that when in February 2012 Mr Dickson was asked to provide information to Ms Huggett of Stonehage in connection with Project Edsel, he sent her KYC information on Sir Owen, completed a questionnaire to the effect that Mr Watson and Sir Owen would each be 50% beneficial owners, and sent her a copy of the declaration of trust under which SHR held the shares in Pacifico for Sir Owen; it was not until April 2012 that Mr Dickson sent to Maples and Calder in BVI the documents dated 31 October 2011 and asked them to correct the share ownership of Pacifico. The submission was supported by evidence that other trust documents were backdated, by the fact that there is no trace in the documentary record to the decanting being referred to before April 2012, and to some very hesitant answers given by Mr Miller in evidence and his inability to explain why Mr Dickson was telling Ms Huggett in February 2012 that Sir Owen was the beneficial owner of the investment.

166.   It does appear that there is no express reference to the decanting in any correspondence or e-mails before April 2012 (although there is a structure chart purporting to show the Corona Trust structure as at 5 January 2012 which has the Corona Trust owning Pacifico); and I accept that the matters relied on by Ms Jones do cast doubt on whether the decanting took place on its ostensible date, but I do not on this evidence find the backdating proved.   There is in fact no positive evidence in support of the backdating.   Nor are the inferences from what Mr Dickson was telling Ms Huggett as clear as they might be; she was also sent a structure chart showing Mr Dickson as the owner of Pacifico, and she found what she was being told confusing, as indeed it was.   I am not satisfied that I have enough material on which to find this unpleaded allegation proved; the true position remains obscure.

167.   Ms Jones' next point was that Sir Owen did not know about the transfer.   Mr Miller gave evidence that he told Sir Owen about it when they were in Hong Kong in early October 2011 (paragraph 19 above), and explained why it was necessary.   Sir Owen said he had no recollection of that; but since he had initially denied being in Hong Kong for the Mancap closing at all, I place little weight on that.   After documents had been disclosed establishing the trip had taken place, Sir Owen was recalled and

accepted that he had been wrong, explaining that he had simply not remembered the trip. Although I do not accept Mr McCaughran's invitation to find that he was lying about that, it does mean I have little confidence in his evidence as to what was discussed: if he could forget the whole trip, he could certainly forget a discussion by Mr Miller about the trust structures, his general attitude being that while he understood there were such structures for tax purposes, he left the detail to Mr Miller and did not expect them in practice to prevent him both investing and distributing the money as he wanted (paragraph 24 above). That was why he was so incensed when Mr Dickson told him in January 2012 that the rules of engagement had changed (paragraph 34 above), and when Messrs Miller and Dickson declined to fund his pet projects (paragraph 38 above). In those circumstances I do not find it at all surprising that he might have no recollection of Mr Miller telling him that they needed to take steps to move assets around the structure.

168. On the other hand, for reasons I have given above, I did not find Mr Miller's evidence impressive. I am prepared to accept that he may have explained to Sir Owen, as he said in evidence, that there were potential problems in the light of the Mancap transaction and they were going to take steps to reduce the risk, or tidy things up, but I do not accept that he gave Sir Owen a clear and coherent explanation that the steps taken would include transferring assets from the revocable Regency Trust to the irrevocable Corona Trust, leaving him with no access to them, or the reasons for it. By the time of the Nevis proceedings in early 2013, Sir Owen does not seem to have appreciated that this was what had happened, as his reaction when it came to light in April 2013 that the Regency Trust was revocable was that it was news to him, and I see no reason not to accept this. And having heard Mr Miller attempt to explain the reasons for the transfer to me, I have no difficulty in finding that he did not give a comprehensible explanation to Sir Owen. Mr Miller's evidence was that he and Mr Dickson were concerned about US legislation which concerned what were called private foreign investment companies or PFICs, and that the safest thing to do was to transfer the assets from the Regency Trust into the Corona Trust where they viewed it as a lot safer and where the US beneficiaries had been removed. That did not explain, nor did I receive any explanation, why, if the concern was the presence of US beneficiaries, they could not be removed from the Regency Trust as well; nor did it explain in what other respects the Corona Trust was safer. I am not prepared to conclude that Mr Miller did give an account to Sir Owen in Hong Kong which adequately explained to him the proposed transfer.

169. Ms Jones then submitted that Messrs Miller and Dickson did not consult with Sir Owen or the beneficiaries before executing the documents, and that this made the transfer improper and in breach of trust. Beyond what he said in Hong Kong, Mr Miller did not dispute that they did not consult with Sir Owen, and accepted that they did not consult with the beneficiaries, saying that as trustee Pizarro had no obligation to do so.

170. Ms Jones submitted that in the circumstances this was a breach of trust and improper, because the trustee and protector failed to consult the settlor and beneficiaries or to consider their best interests. I do not think the failure to consult with beneficiaries made the transfer a breach of trust: a trustee is not in general obliged to consult beneficiaries, even if adult. Nor is there in general any obligation to consult a settlor. The real question I think is whether the transfer was done in the best interests of the

beneficiaries and for proper reasons, that is to defend the trust against possible adverse consequences arising out of an IRS audit; or was done for improper reasons. I am left in real doubt whether there was a good reason for it, for the following reasons: (i) I have not understood the PFICs issue, and Mr Miller was unable coherently to explain it; (ii) the September 2011 amendment which excluded the US beneficiaries appears to have been drafted by Ord & Norman because of the PFICs issue, and one would have expected them to deal with the transfer at the same time if the Regency Trust were really a problem, whereas in fact the documents were according to Mr Miller later drafted by Liburd & Dash; (iii) Mr Dickson gave an account to the Nevis Court in which he referred to the PFICs issue as the reason for the September 2011 amendment but did not suggest that it was also the reason for the decanting, saying simply that *"At the same time Sir Owen was anxious that Pacifico Holdings Ltd should be moved from the Regency Trust to the Corona Trust"*, a statement that is impossible to reconcile with Mr Miller's account and which, having seen Sir Owen give evidence, I find highly improbable; (iv) even though I have accepted that as a matter of law a trustee is not obliged to consult a settlor, it is a momentous step to remove $80m or so of value from a revocable trust where it is ultimately at the disposal of the settlor to an irrevocable trust, and one would have expected a trustee contemplating such a step (and a protector considering whether to consent to it) to have taken great care to inform the settlor with the benefit of professional advice why it was necessary to do it, and document that they had done so, but there is no suggestion this was done and even on Mr Miller's account Sir Owen was informed of this significant step in an informal fashion; and (v) it is indeed striking that in all the increasingly acrimonious communications between Sir Owen and Messrs Miller and Dickson about the trust, they did not refer to the transfer at all, and that inevitably raises the suspicion that they did not do so because they wished to conceal it.

171.   On the other hand, I have not really understood why the decanting might have taken place if it was not done, as Mr Miller said, in the belief that it was safer from the point of view of a possible IRS audit.  Ms Jones suggested that it was done to bolster Messrs Miller and Dickson's own position.  But this does not make much sense: the bulk of the assets were in the irrevocable Corona Trust in any event, and even without the decanting Messrs Miller and Dickson were in control of that structure, and able to pay themselves substantial fees, and the existence of the Regency Trust did not really threaten that.  In the end it is the Claimants who allege that the transfer was carried out for an improper reason, and it is they who have to establish that.  Mr Watson was neither under any obligation, nor realistically in a position, to establish the true position.  I was ultimately left with very little material against which to assess Mr Miller's assertion that the transfer was done for *bona fide* reasons: I heard no expert evidence on the PFICs issue, and no attempt was made to explore in evidence what contemporary advice Ord & Norman might have given Messrs Miller and Dickson. Nor do I have any evidence casting light on the reason for the Regency Trust having been set up on a revocable basis: it might be relevant for example whether the revocability was regarded as an important feature for Sir Owen, always likely to be used in due course, or as a longstop protection that would be very unlikely to be resorted to in practice.   But the Claimants have throughout these proceedings steadfastly resisted any disclosure of the advice given on the establishment of the trusts in 2009, and I know nothing of the reasons why the trusts were structured in this way.  In the circumstances, despite my real doubts, I have concluded that I do not

have a solid enough basis to find it proved that the transfer was carried out for an improper reason or in breach of trust.

172.   The third of the three matters relied on by Ms Jones is that Sir Owen had a legitimate expectation of being consulted about investments. Up to and including Project Edsel, I do not think the facts are really in dispute: although the ultimate decision on investments was that of Messrs Miller and Dickson, in practice they acted more like advisers to Sir Owen who made the decisions. Thus, in relation to matters such as Red Mountain, and the proposal to invest in ground rents in 2011, Mr Miller said in evidence that they were all working closely together, everything seemed to be working fine, and as long as things were working out they weren't going to make a big issue of the final decision coming from the trust; he said he admired Sir Owen and admired his input, he was the wealth creator and Mr Miller didn't want to put up any unnecessary road blocks in his way as long as it didn't get out of control. The same was true of Project Edsel where Sir Owen took advice from both Mr Dickson and Mr Miller but they deferred to his decision (*"Await Papal response"*) on whether to go ahead with Mr Watson's proposed split of profits (paragraph 107 above); and Project Drive where they let Sir Owen make the decision. In relation to this period, Sir Owen not only expected to be consulted about investments, but expected Messrs Miller and Dickson to implement his decisions, which they consistently did.

173.   Matters admittedly became much more contentious after relations between them deteriorated: Mr Miller said the point where Sir Owen crossed the line and it became very difficult was when he instructed Mr Dickson to transfer A$25m to his personal account, which was on 18 February 2012 (paragraph 36 above). Thereafter Messrs Miller and Dickson took an increasingly formal position with Sir Owen (Mr Miller referred to the letters they wrote as *"military"*), ultimately excluding him altogether from the decision on investment in Project Spartan. But for Project Edsel, I accept that Sir Owen had a legitimate expectation of consultation over the investments made by the trust. Mr McCaughran said that did not give him an interest sufficient to found a fiduciary duty. It did not of course mean that he had a beneficial interest in the trust assets, but for reasons already given I do not accept that that is necessary. And he did in my judgment have a real interest in the investment of the trust assets because he had an interest in the trust doing what he had established it to do, that is provide for the beneficiaries.

174.   I have dealt with these matters in the light of the significance which they assumed at trial but in the end they do not seem to me to affect the position. For the reasons I have given above I conclude that Mr Watson did not owe a fiduciary duty to Sir Owen or to Kea in relation to Project Edsel.

*If Mr Watson owed a fiduciary duty was he in breach of it?*

175.   If I am wrong about that, the next question is whether Mr Watson was in breach of any fiduciary duty that he owed. This is relatively straightforward. One of the duties of a fiduciary is not to make a secret profit from his position, and in order to avoid being in breach the fiduciary must show that he gave full and proper disclosure of the nature and extent of his interest and that thereafter his principal gave his fully informed consent. It is not sufficient simply to disclose the existence of some interest or to say something that would put the principal on inquiry; disclosure requirements are not confined to the nature of the fiduciary's interest, but extend to disclosure of its

extent, including the source and scale of the profit made from his position.   See
*Novoship (UK) Ltd v Mikhaylyuk* [2012] EWHC 3586 (Comm) at [82]-[83] per
Christopher Clarke J and materials there cited (appealed but not on this point [2014]
EWCA Civ 908), *Gwembe Valley Development Co Ltd v Koshy (No 3)* [2003] EWCA
Civ 1048 at [65] per Mummery LJ.

176.   The only documented disclosure of Mr Watson's interest before Project Edsel closed
on 17 February 2012 was in his e-mail of 1 February in which he said that *"we have a
small stake in the management carry"* (paragraph 109 above).   That was plainly not
full disclosure of the extent of his interest, as Mr Watson accepted.   Mr Miller's
evidence in his written statement was that he had already concluded that Mr Watson
had a participation of some sort in the management carry but his oral evidence was
notably confused about this and I am not satisfied that he had; even on his own
account he accepted that he and Mr Dickson did not really know what percentage of
the management carry Mr Watson was going to get.

177.   Since Mr Watson (or more accurately Clearview) acquired the B interest on closure I
do not think there is any doubt that this was acquired at a time when no fully informed
consent had been obtained from Sir Owen or Kea, and that if Mr Watson owed
fiduciary duties, the B interest was acquired in breach of them.

178.   It is true that more information about the B interest was later provided.   Mr Gibson's
e-mail of 17 February 2012 (paragraph 119 above) refers to a discussion between him
and Mr Miller, but his e-mail confirming the discussion contains no explanation of
what the B interest is, and whatever was said I find that it was not a full explanation
of the B interest, as I accept that if it had been Mr Miller would not have had to ask
for one on 28 March.

179.   Mr Gibson did give some explanation of the B interest to Mr Miller on the telephone
and by e-mail on 28 March 2012, and an explanation was again given to Mr Miller
and Mr Maislish at the meeting at Fladgates' offices on 29 March (paragraph 123
above).   Taking these explanations together, what they revealed was that the profits
after repaying capital and interest would be split between investors and management
(80/20 or 75/25, although these figures were no longer accurate), that the B interest
represented a share of the management carry, and that it would flow through to
Clearview alone.   There is nothing however to suggest that any explanation was given
of the amount of Mr Watson's share, or indeed that it would go to Mr Watson, Mr
Gibson referring in his e-mail to Nucopia, which was untrue but what he had been
told to say by Mr Watson.   By the time the long-form documentation was executed in
September 2012, it is clear, as Ms Jones accepted, that Messrs Miller and Dickson
knew that the B interest would be going to Clearview, but I accept her submission that
there had still not been any disclosure of the size or value of the B interest, and that
there is no evidence or even suggestion that the percentage of the total B interest
taken by Clearview had been disclosed.   In these circumstances I find that there had
not, even by September 2012, been the full disclosure that would have been required
if Mr Watson had owed a fiduciary duty.

180.   Mr McCaughran also relied on what happened in 2014 when the profits from Project
Edsel were realised and Mr Munro gave approval to certain payments in respect of the
B interest being made.   That however does not seem to me to go so much to the
question whether Project Edsel was entered into in breach of any fiduciary duty, but

whether any claims in respect of Project Edsel have been lost by acquiescence or ratification, and it is more convenient to deal with it after I have considered the other ways in which the claims in respect of Project Edsel are put.

*The Term Sheet*

181.   I will consider next what is actually the third way in which the Claimants put their claims in respect of Project Edsel, which is that the Term Sheet provided for Kea to share in the B interest, and by giving up that right in the long-form agreements Mr Dickson acted in breach of his fiduciary duty to Kea, to the knowledge of Mr Watson.

182.   The starting point for this argument is the construction of the Project Edsel Term Sheet. The relevant provisions are set out in paragraph 113 above. Ms Jones relies on the first sentence under *"Equity Arrangement"*, namely that:

> "KIL will have an effective 50% participation in the net equity of CPIL post repayment of the Funding Arrangement."

In her submission this provision is straightforward to construe: it entitles Kea without qualification to a 50% interest in the equity of Copperstone, and hence, since Copperstone in fact acquired through Streamside a B interest in Atlantic 1, Kea was entitled to 50% of that as well. In other words *"the net equity of CPIL"* means the whole of Copperstone's equity, not one class of Copperstone's equity, there being nothing in the Term Sheet to support such a construction.

183.   Ms Jones said that the legal principles of contractual construction are well known; so they are, but I was helpfully taken by Mr McCaughran to the statement of principles by Lord Hodge in *Wood v Capita Insurance Services Ltd* [2017] UKSC 24 at [10]-[13]. These include his statement that textualism (a close examination of the relevant language in the contract) and contextualism (the factual background known to the parties, and the implications of rival constructions) are not conflicting paradigms but tools which can be used to ascertain the objective meaning of a contract; and his repeated statement that the quality of the drafting can affect the readiness of the Court to have regard to the wider context: see at [10] (*"the court must ... depending on the nature, formality and quality of drafting of the contract, give more or less weight to elements of the wider context"*), [11] (*"in striking a balance between the indications given by the language and the implications of the competing constructions the court must consider the quality of drafting of the clause"*) and [13] (*"The correct interpretation of other contracts may be achieved by a greater emphasis on the factual matrix, for example because of their informality, brevity or the absence of skilled professional assistance"*).

184.   Mr McCaughran submitted that the reference to *"net equity"* is to be understood as a reference to profits from Project Edsel after repayment of loans, interest and the management carry.

185.   On this point I prefer Mr McCaughran's submissions. The Term Sheet, which appears to have been drafted without professional assistance (initially by Mr Flay, with some input from Mr Leahy, neither of whom was a lawyer), is relatively brief and informal, and seems to me a paradigm case of a contract where the Court should give weight to the wider context, that is to the background matrix of fact known to the

parties and the implications of the competing constructions.  By its own terms it is not intended as a definitive and complete statement of the parties' rights but as a brief summary of the key terms which the parties agree to address in long-form documentation: see the preamble, the reference under *"Future Assurances"* to the structure not yet being finalised, and the reference under *"Other Terms"* to other terms which were necessary or desirable being included.  It does not itself seek to describe Project Edsel but refers under *"Business Purpose"* to *"the documents attached to this document"*; there is no evidence that any documents were in fact so attached, but that does not affect the fact that the provision shows that the Term Sheet itself contemplated that if one wanted to know about Project Edsel one would go outside the four corners of the document to other material which explained it.  That too indicates that it is appropriate to look at the background material known to both parties.

186.    It was not disputed by Ms Jones that the background material which forms part of the matrix of fact admissible to construe the Term Sheet includes the investment discussion document.  This had been sent by Mr Leahy to Mr Miller at the same time as the Term Sheet in draft, and explained the proposed terms of participation by Sir Owen's vehicle in Project Edsel (paragraph 102 above).  The investment discussion document referred (twice) to the upside over the 8% interest being split 50/50 between Sir Owen's vehicle (OGV) and Mr Watson's (EWV), but also made it clear that what was being shared was EWV's share of the Equity Investor Returns, and that the Equity Investor Returns were subject to the performance fees payable to AAM or management carry.   The worked example also demonstrated this.   Reading the documents together there is no doubt that the provisions under *"Equity Arrangement"* in the Term Sheet were intended to implement this 50/50 split, and construed against this background I accept Mr McCaughran's submission that what was intended to be split in this way was Copperstone's interest in the returns payable to equity investors, not any part of the management carry.  When therefore the second sentence under *"Equity Arrangement"* refers to payments only being made if Copperstone receives additional income or capital profits *"from its participation in Project Edsel"*, it seems to me that that is to be construed as referring to Copperstone's participation *as an equity investor* in Project Edsel, as the discussion document makes clear that that is the participation which is proposed to be split 50/50.  Now coming to the first sentence, it seems to me that Mr McCaughran is right that *"effective 50% participation in the net equity"* should be construed consistently with that so that it is limited to a 50% interest in Copperstone's interest as an equity investor in Project Edsel, and hence in the profits payable to Copperstone after repayment of loans, interest and the management carry.  That may not be the most natural interpretation of the language viewed in isolation, but viewed against the context that the Term Sheet was intended only to document in a brief and informal way the key terms offered for Kea's participation in Project Edsel, and that the terms offered did not include any part of the management carry but were limited (after repayment of principal and interest) to a 50% share of the Equity Investor Returns arising from the equity investment, it would be anomalous to construe the Term Sheet as also giving Kea a right to any interest in the management carry simply because Mr Watson used Copperstone for that participation as well.  That would be to give Kea a windfall that was never on offer and which it never expected to have.

187.    In those circumstances I find that Kea was not entitled by the Term Sheet to a 50%

share in Copperstone's B interest, and no question arises of Mr Dickson being in breach of his fiduciary duty to Kea in agreeing in the long-form documentation that the B interest should all go to Clearview and not be shared with Kea.

188.    I should add, although in my view it does not arise, that even if the Term Sheet as a matter of construction strictly entitled Kea to 50% of the whole of Copperstone, including its B interest, it is not obvious either that Mr Dickson would have been in breach of fiduciary duty in agreeing the long-form documentation in the terms he did, or that Mr Watson would have known that he was. Mr Dickson had the benefit of Mr Maislish's advice, and there is no suggestion that he thought Mr Dickson was doing anything wrong. Moreover, the Term Sheet required the parties to use good faith endeavours to agree the long-form documentation, and in particular to agree the ultimate structure of the business; it also contemplated that the long-form documentation would include other necessary or desirable terms not included in the document. In those circumstances, I think it distinctly arguable that if the point had been taken, Mr Watson would have taken the view that all that had been offered to Kea was a share in the equity investor returns and not a share of the management carry, and that Kea's good faith obligations required it to agree a structure for the business which respected that bargain, and hence to agree long-form documentation which included other terms required by Clearview such that Kea did not also share in the management carry. I need not decide if he would have been right about that, but it does suggest that even if I am wrong on the construction of the Term Sheet, it is far from obvious that Mr Dickson would have been giving up anything of value, or that Mr Watson would have known that he was.

*The use of the £7,045*

189.    The Claimants' remaining way of putting their claim in relation to Project Edsel is that the £7,045 used to acquire the B interest was held on trust for Kea, such that it was a breach of trust for it to be used in this way, and that Kea is entitled to claim the B interest as a result.

190.    The basic facts are documented and not in dispute. On 9 February 2012 Mr Dickson caused Kea to transfer £5.3m to Fladgates' client account (paragraph 115 above). On 16 February 2012 Mr Reuben transferred £1,901,506.81 from this account to K&L Gates' account, of which £7,045 represented the amount required from Streamside as a subscription for its B interest (paragraph 117 above). On 17 February 2012 closure took place and K&L Gates used the £7,045 for this purpose (paragraph 118 above). On 21 February 2012 Mr Watson transferred £7,045 to Fladgates' client account, thereby reimbursing the account for the £7,045 that had been used at closure (paragraph 121 above).

191.    It is striking that what this argument amounts to in practice is that because Mr Watson was 4 days late in paying £7,045 into the structure, something that caused no prejudice to anyone, Kea claims that he is accountable to it for a sum of well over £4m. Ms Jones submitted, and I accept (see below), that what is in issue in this claim is not the exercise of a discretion by the Court but a question of property rights, and that I am not concerned with whether the remedy is disproportionate to the wrong she complains of, but I will not conceal my view that at first blush the claimed result does not seem a particularly just response to the facts, and in those circumstances it needs to be analysed with some care.

192.     On the facts it is not disputed that the £7,045 used to subscribe for Streamside's B
         interest came from the £5.3m provided by Kea. Mr Watson's Defence refers to the
         fact that he had previously (through Cullen) paid more than £107,000 in due diligence
         costs for Project Edsel, the benefit of which was taken by Copperstone, which is
         confirmed by a cash analysis of the Edsel monies; but it is not suggested that any of
         this money was still available at the time of closing and it is admitted that the £7,045
         that was paid by Fladgates on 17 February 2012 was paid out of the monies held on
         their client account, and that those were the monies which had been paid into that
         account by Kea.

193.     The next question is how the £5.3m was held by Fladgates when they received it on 9
         February. Fladgates clearly held the money on trust, as is accepted, but the question
         is for whom and on what terms? Ms Jones' primary submission is that the money was
         held by Fladgates on trust for Kea; Mr McCaughran's that it was held on trust for
         Copperstone, Kea having advanced the £5.3m to Copperstone by way of loan.

194.     No-one seems to have given any particular thought to this at the time, and nothing in
         the documentary record spells out expressly how Fladgates was holding the money.
         So far as the documents are concerned, all that they show is that after Sir Owen had
         agreed to proceed and asked Mr Miller to expedite matters, Mr Gibson (i) asked Mr
         Miller to have the Term Sheet signed, which Mr Dickson did on 7 February; and
         (ii) told Mr Miller that Mr Reuben had requested that the funds be in his account by 9
         February, which Mr Dickson arranged (paragraphs 111, 112 and 115 above). There
         they sat until Mr Reuben transferred the £1.9m to K&L Gates on 16 February; at that
         date although Mr Dickson had signed the Term Sheet on behalf of Kea, Novatrust had
         not done so.

195.     The first step in Mr McCaughran's argument is that when Kea transferred the money
         to Fladgates, Fladgates was holding the money for Copperstone, not for Kea. He
         referred to an e-mail exchange much later (in February 2014) in which Mr Gibson
         asked Mr Reuben to confirm that the funds were held for Copperstone and not for
         Clearview, and Mr Reuben replied:

         "I confirm the funds were held for Copperstone. As the note mentions, the funds
           were from Kea and Clearview for their respective investments in Copperstone."

         (The reference to *"the note"* is to a statement of movement of funds which Mr
         Reuben had sent to Ms Huggett in March 2012 (and Mr Gibson had sent to Mr Miller,
         also in March 2012): this showed receipts (£5.3m from Kea, £530,000 and £7,045
         from Clearview) and payments (£1,901,546.81 completion monies paid to K&L Gates
         and £80,000 for Fladgates' fees) but did not give the dates of the respective receipts
         and payments.) I do not think Mr Reuben's confirmation in 2014 takes matters much
         further, as what he was asked to confirm was that the money was held for
         Copperstone rather than Clearview, and he was not asked the question precisely when
         and how he thought that Kea's money became Copperstone's.

196.     I will defer the question for the moment of who Fladgates was holding the money for
         on 9 February, as it seems to me that a more significant question is whether, as Mr
         McCaughran submitted, Kea had thereby loaned the money to Copperstone on
         unrestricted terms, such that it was Copperstone's money to do what it liked with.
         There are two significant difficulties with this analysis. The first is that on 9 February

it is difficult to see that any loan had been agreed. It is true that the Project Edsel Term Sheet provided under *"Funding Arrangement"* that Kea would provide funding to Copperstone equal to 20% of the total transaction equity, currently anticipated at £5.3m. But Project Edsel had not yet closed so it would be surprising if the payment by Kea to Fladgates was the completion of the loan contemplated in the Term Sheet; it looks much more like a payment of money in advance in anticipation of a loan. As a matter of general principle if A pays money to B in anticipation of a particular transaction, I would have thought the normal inference would be that B could use the money for that transaction if and when it went ahead, but could not use it for any other purpose, and if the transaction did not go ahead would have to return it to A.

197.    The second difficulty with the suggestion that Kea's payment of £5.3m was a loan to Copperstone on unrestricted terms is the evidence of Mr Miller. In his witness statement he said that Kea advanced £5.3m to Copperstone by transferring it to be held on behalf of Copperstone, but when asked in cross-examination what he meant by that gave the following answers:

> *"A. My Lord, I meant that Fladgate would be handling the escrow instructions to further invest or to further place those monies in the investment vehicles.*
>
> *Q. Right, so you regarded it as an escrow account?*
>
> *A. Er - -*
>
> *Q. You use the word "escrow" throughout the rest of your - -*
>
> *A. Yes, I noticed that they had used that word. I believe they would have had a client escrow account.*
>
> *Q. What do you mean they used that word?*
>
> *A. In correspondence I had seen that word used in the Fladgate correspondence.*
>
> *Q. Right. Now, you see paragraph 97 has been drafted to make it look as if you were saying you were intending to transfer property in the money to Copperstone at the point where you transferred it to Fladgate, but that's not right, is it?*
>
> *A. No, we were just looking to get our funds into the project on time.*
>
> *Q. Yes, so you sent it to Fladgates on the basis that they would use it for the purpose of the termsheet that you had signed - -*
>
> *A. Yes.*
>
> *Q. - - and if the transaction fell through for some reason that they would give it back to you?*
>
> *A. That's correct."*

Mr Miller's reference to the word *"escrow"* being used in the Fladgates correspondence is not supported by any of the documents I have seen, but this evidence demonstrates that Mr Miller's understanding was precisely what I have suggested above would be the normal inference in the case of a payment by A to B in

anticipation of an intended transaction, namely that the monies were not being advanced to Copperstone to do what they liked with, but were being paid to Fladgates for the specific purpose of being used for the purposes of Project Edsel, and if not used for that purpose were to be returned to Kea. Mr Miller's own understanding is not of course determinative of the terms on which the money was paid, but there was no evidence from Mr Dickson or Mr Reuben to suggest that their understanding was any different.

198.    In those circumstances I find that when Kea paid the £5.3m to Fladgates on 9 February, this was not a loan to Copperstone to do what it liked with, but was a payment by Kea on terms that Fladgates could use it for the sole purpose of completing the investment of Kea's funds in Project Edsel, and otherwise would have to return it to Kea.

199.    As Ms Jones submitted, that in my judgment gave rise to a *Quistclose* trust (see *Barclays Bank Ltd v Quistclose Investments Ltd* [1970] AC 567). There was no dispute as to the principles applicable to such a trust and I was not addressed on them, Mr McCaughran accepting that they were as stated by Lord Millett in *Twinsectra Ltd v Yardley* [2002] UKHL 12 AC at [100]. Lord Millett's analysis is that such a trust arises where A pays money to B for a particular purpose, B is not free to apply it for any other purpose, and B has to return it if for any reason the purpose cannot be carried out (see at [99]), the effect being that B holds the money on resulting trust for A, subject to B's power (or in some cases duty) to apply the money for the particular purpose. On my analysis, that precisely describes the position of the payment of the £5.3m by Kea to Fladgates on 9 February. I do not think it matters for this purpose whether B is regarded as Fladgates (so that Fladgates was trustee for Kea subject to a power to use the money for Project Edsel), or B is regarded as Copperstone (so that Fladgates held the money for Copperstone who in turn held it for Kea subject to such a power), although I think the former is probably the better analysis. On either view the money was held on trust for Kea subject to the power of Fladgates or Copperstone to use it for a particular purpose, and if used for any other purpose that would be a breach of trust.

200.    But that is not the end of the analysis. The next question is whether the use of £7,045 to acquire the B interest was a breach of trust or not. That requires a more precise identification of the purposes for which Fladgates / Copperstone held the money. Ms Jones says that the purpose for which the money was held was to cause it to be applied to Project Edsel in accordance with the Project Edsel Term Sheet. So far I agree with her, and this is supported by Mr Miller's evidence of his understanding. She then says that this in effect was to invest in a 50/50 joint venture, and was able to refer to an answer from Mr Watson that the £5.3m would be used to buy Kea's A interest in the transaction. As such she says it cannot have been a proper use of the money to use it to acquire a B interest for Mr Watson.

201.    Mr McCaughran however says that what the Term Sheet provided for was a loan of £5.3m from Kea to Copperstone. That would then become Copperstone's money. Copperstone would be under a contractual obligation to deliver the investment returns set out in the Term Sheet, and no doubt it was expected that in order to do that the money received would be applied as an investment through Streamside in the Atlantic 1 partnership; but that did indeed happen in due course.

202.    I propose to address this by assuming first, contrary to the facts, that the Term Sheet had been signed by Novatrust by closure of Project Edsel on 17 February. On that hypothesis, Kea would have been contractually obliged (to Clearview) to provide funding of £5.3m to Copperstone. (I leave aside the fact that the Term Sheet envisaged that Kea would be funded as to 10% of this (£530,000) by Clearview; this aspect of the arrangements had changed but I do not think it affects the analysis, as Messrs Miller and Dickson understood that Kea was providing £5.3m in the first instance and £530,000 would be repaid later). When therefore, as Mr Miller agreed in evidence, the £5.3m was sent to Fladgates *"on the basis that they would use it for the purpose of the termsheet you had signed"*, that would mean that on closure of Project Edsel Fladgates was authorised to advance the £5.3m to Copperstone in fulfilment of Kea's obligation to provide funding to Copperstone. It is true that Copperstone was not a party to the Term Sheet and so not contractually obliged to accept the advance; but I see no difficulty in finding that Copperstone did accept the advance on the terms of the Term Sheet: apart from anything else, Fladgates, who were Copperstone's solicitors, sent c. £1.9m to K&L Gates on 16 February and released it to them on 17 February as a payment on behalf of Streamside, which they could only do if Copperstone had accepted the money and advanced it to Streamside. Certainly by mid-April 2012 when Mr Reuben agreed to transfer the remaining balance to Copperstone's own bank account (paragraph 121 above), he must have regarded Fladgates as holding it for Copperstone (and hence the loan from Kea to Copperstone as having been made), but there is no trace in the documentary record of there having been any event, or discussion, after 17 February which could be pointed to as the occasion on which Kea agreed that the loan should be completed. That tends to support the analysis that Kea was regarded as having authorised Fladgates to complete the loan on closure of Project Edsel on 17 February.

203.    Does it make a difference that on 17 February Novatrust had not signed the Term Sheet? In my judgment it does not. What this means is that Kea could have refused to allow completion to happen until it had received back the signed Term Sheet, and if Mr Dickson and Mr Miller had been acting with due caution, they no doubt should have insisted on this, and refused to permit Fladgates to use the £5.3m until the Term Sheet was contractually binding on Clearview. In fact they were content to allow Fladgates to close Project Edsel without this, presumably in the expectation that the Term Sheet would be signed in due course. That is an indication of the rather casual way they dealt with millions of pounds of trust money, and by permitting Fladgates to close Project Edsel before the Term Sheet was signed they were no doubt running a risk which could have led to some difficult questions for them if Novatrust had not in the event signed. But I do not think it changes the analysis of what happened on 17 February: Kea had authorised Fladgates to use the £5.3m for Project Edsel on the terms set out in the Term Sheet, and had thereby authorised Fladgates to provide it as funding to Copperstone.

204.    In my judgment therefore on 17 February the £5.3m was advanced by Kea to Copperstone on the terms set out in the Term Sheet. Ms Jones pointed out that the Term Sheet provided for the funding to be secured over Copperstone's shares and that this had not happened; but this is in my view another example of Messrs Miller and Dickson allowing Kea's money to be paid away without having first secured all the rights they should have done. It does not mean they did not authorise Fladgates to advance the money to Copperstone on closure.

205.    As I understood it Ms Jones accepted in closing submissions that if the £5.3m was loaned to Copperstone it would be Copperstone's money and that would be different (because it would not be held on trust for Kea). That seems to me to be right, but I should explain why I take that view. The question is whether Copperstone was obliged to use the £5.3m in any particular way once it had received it under the Term Sheet. There is no conceptual difficulty in a loan and a *Quistclose* trust subsisting together: that was the position in *Quistclose* itself. But where A lends money to B, even for a particular purpose, it normally becomes B's money beneficially and B does not hold it on trust for A. In the present case the Term Sheet certainly envisaged that Copperstone would participate in Project Edsel: see the reference to *"its participation in Project Edsel"*, and to the Funding Arrangement only becoming repayable as Copperstone *"receives income or capital profits from Project Edsel"*; the same is also clear from the investment discussion document, which I have already said is admissible to understand the Term Sheet. And since Copperstone had no other funds, I have no hesitation in concluding that it was envisaged that Copperstone would use the £5.3m to invest in Project Edsel, that is by advancing the funds to Streamside, which would then contribute them as A partner in Atlantic 1. That was the whole purpose of Kea advancing the money. But it is a curiosity that although there is evidence that HW wanted Mr Watson to put in all his money upfront, Streamside was not in fact obliged under the terms of Atlantic 1's partnership deed to put all its money into Atlantic 1 at closing, but only some £1.89m (paragraph 118 above). That means that Copperstone did not need to invest the entirety of the £5.3m immediately, and did not do so. In those circumstances I do not see that Copperstone was obliged to keep the balance of the £5.3m intact for future investment by Streamside in Atlantic 1, so long as it was in a position to invest when called on to do so. To put it another way, I do not see that Copperstone was in breach of any trust in favour of Kea by lending (as in effect it did) £7,045 to Mr Watson for 4 days.

206.    For those reasons in my judgment the breach of trust claim is not made out. But even if I had held that the £7,045 was held on trust for Kea, I have some doubt whether it would have followed that Kea could claim the entirety of the profits made from the B interest. I accept that if the £7,045 had been held on trust for Kea, it would have been a breach of trust for Copperstone to use it to acquire the B interest, as Kea never gave authority for it to be used for that purpose. Indeed Mr Miller was asked in evidence about a statement in his witness statement to the effect that he and Mr Dickson knew in advance that the monies used to close the deal would be monies transferred from Kea to Fladgates as Mr Watson's vehicle was having problems in finalising its funding, as follows:

        *"Q. ...I just want to check that you are not suggesting there that you thought that Kea was paying for Mr Watson to make a payment in respect of his share in the management carry, whatever that was; you thought you were paying his share in the investment?*

        *A. It is related to the investment."*

207.    I also accept that if a trustee wrongfully misappropriates trust property and uses it to acquire an asset for his own benefit, the beneficiary is entitled to claim the beneficial ownership of the asset (or its proceeds), or at his option to make a personal claim against the trustee for breach of trust and enforce an equitable lien on the asset or proceeds to secure restoration of the trust fund: *Foskett v McKeown* [2001] 1 AC 102

at 130A per Lord Millett.  The right of the beneficiary to claim the asset in this way is the vindication of a property right, not a claim in unjust enrichment; it is not a matter of discretion, nor does the claim depend on whether it is fair, just and reasonable; it is a case of *"hard-nosed property rights"*: *ibid* at 109C per Lord Browne-Willkinson, 115G per Lord Hoffmann, and 127F per Lord Millett.  It does not matter if the vindication of this property right gives the beneficiary a windfall: see the example given by Lord Millett at 134F of the trustee using the trust money to buy a winning lottery ticket, the proceeds of which can be claimed by the beneficiary.

208.    Ms Jones says that on this simple analysis the use of the £7,045 to acquire Mr Watson's B interest entitles Kea to claim the proceeds of that interest.  But there are nevertheless two reasons which cause me to have some doubt if this is right.  First the simple case posited by Lord Millett at 130A assumes that the trust money is used exclusively to acquire the asset; he goes on to consider the more complex questions which arise where the trustee acquires the asset partly with trust money and partly with his own, in which case the beneficiary and trustee share the asset proportionately to their contributions.  Ms Jones' argument assumes in effect that the £7,045 was used exclusively to acquire the B interest.  It is true that this is the only cash contribution that Mr Watson (or more precisely Streamside) was obliged to make as B partner, but to regard this as the means by which he acquired the B interest seems to me to ignore the fact that he had negotiated for and obtained his share in the management carry long before (see paragraph 148 above).  The reality is that he did not acquire the B interest for the sum of £7,045, a relatively nominal sum; he acquired the B interest (or perhaps more accurately the right to complete the acquisition of the B interest for £7,045) by virtue of the fact that Messrs Astor and Aumonier had agreed to share the management carry equally with him.  They did this for reasons that do not matter, but were probably because of his ability to introduce them to sources of capital; they did not do it because he had agreed to contribute £7,045.  It seems to me rather doubtful in those circumstances if it would be right to regard the £7,045 as having been used exclusively to acquire the B interest; a better analysis might be that Mr Watson had already in effect acquired the right to the B interest, and the payment of £7,045 did no more than increase the value of that right by that amount.  That might give Kea no more than a right to a lien on the asset to secure repayment of the £7,045, and since the £7,045 was repaid almost immediately the lien would be discharged.

209.    The second doubt I have is a different one and is this.  This is not a case where a trustee uses trust money to acquire an asset for himself and then simply keeps the asset without accounting to the fund; it is a case where four days after the £7,045 was used to complete the acquisition of the B interest, Mr Watson restored the £7,045 to the fund.  I was referred to a statement in *Lewin on Trusts* (19th edn, 2015) that:

> "if the trustee purchases assets for his own benefit wholly or partly out of trust money, and the assets increase in value, the trustee cannot free the assets from the beneficiary's claim to beneficial ownership or a proportionate share in them by restoring the trust money wrongly applied in their purchase after the purchase has been made and the assets increase in value."

That is supported by a decision of the High Court of Australia, *Scott v Scott* (1962) 109 CLR 649, a case where a trustee mixed £1,014 of trust money with his own and bought a property for £1,700 which had increased in value by the time of the action to nearly £5,450.  It was held that the trustee could not avoid accounting for a

proportionate share of the profits by repaying the £1,014 to the trust fund. That seems plainly right. But it can be seen that that is very different from the proposition that the trustee could not have made good his breach of trust by accounting for the £1,014 four days after the misappropriation and at a time when the house had not increased in value at all. There is some indication that the High Court thought he would have been able to do this (at para 12):

> "Clearly enough the estate was entitled as against W. H. Scott to seek an order for sale to enforce its lien and upon any such sale the profit would have been realized. It is true, no doubt, that if the property had not increased in value the trustee, in his lifetime, might have chosen to avoid a sale by repayment of the amount for which the lien subsisted. But no such choice can be said to have been open to him in this case for he could not be allowed to escape his liability to account merely by repayment of the amount of trust moneys misapplied."

In these circumstances it seems to me distinctly arguable that if there was a breach of trust Mr Watson effectively accounted for the breach by repaying £7,045 to the Fladgates account four days later, a time at which the B interest cannot be supposed to have increased in value since he acquired it. And it could perhaps be said that that would more closely reflect the nature of the breach of trust which (assuming there was one at all) did not consist of misappropriating £7,045 and pocketing it, but of the unauthorised borrowing of £7,045 from the fund for 4 days. That is undoubtedly something a trustee should not do, but if the trustee restores the fund (with interest where appropriate, although the interest payable here for four days would be truly *de minimis*) and has not at the time of restoration made any profit for himself, it is not obvious that even the strict rules of equity require any more.

210.   Having identified my doubts however I do not need to resolve them in the light of my conclusion that there was no breach of trust, and I do not propose to do so.

*Affirmation*

211.   Nor do I need to decide if Mr Watson has a defence of affirmation, or, as it is pleaded, that any breach of fiduciary duty or trust, or receipt of any profit or benefit by Mr Watson from the B interest, was *"concurred in and/or acquiesced in and/or ratified by"* Kea and Sir Owen. The factual basis for this defence is that in 2014 Copperstone's directors, which included Harlaw (acting by Mr Munro), approved a loan of the B interest profits to Clearview, and it is to be inferred that before doing so Mr Munro obtained the consent of Sir Owen (who was then a director of Kea) as he had said that he would.

212.   Ms Jones' answer to this defence is that although Mr Munro checked that the payment of the proceeds of the B interest to Clearview was in line with documentation (being provided for in the Shareholders' Agreement (paragraph 124 above)), neither he nor Sir Owen knew the facts giving rise to any of the causes of action. I think that is right but it is unnecessary to go into the details.

*Conclusion on Project Edsel*

213.   For the reasons I have given, in my judgment none of the claims in relation to Project Edsel succeed. Standing back from the detail, this does not strike me as an unjust conclusion. I accept that there would have been a claim had I found that Mr Watson

was a fiduciary for Sir Owen or Kea, as there was no adequate disclosure of his interest; but on the footing that he was not a fiduciary, then this is a simple case of him offering Kea an opportunity to invest in Project Edsel on certain terms (which did not include any part of the management carry), which Kea accepted and which generated very substantial profits for Kea as Mr Watson had suggested it would. Neither the fact that Mr Watson himself was entitled to a share in the management carry, nor the fact that he used Copperstone for this purpose so that the long-form documentation was drafted in such a way as to deliver this to him, had any effect on Kea's receipt of the profits that it was expecting to get. Nor did the way in which he concealed Kea's participation from HW and Messrs Astor and Aumonier, nor the way in which £7,045 of money deriving from Kea was used. To have successfully claimed in addition either the whole or 50% of Mr Watson's share of the management carry would have given Kea a bonus that it never bargained for. I do not find it surprising that those claims have not been established.

*Facts – Project Spartan*

214. Project Spartan followed Project Edsel. It was a much more ambitious project, designed to persuade Sir Owen and his interests to invest in a wide range of property ventures (to be managed by Messrs Astor and Aumonier). As appears below, the general idea was that Mr Watson and Sir Owen's interests would participate in a joint venture (in the event Spartan), Mr Watson contributing a number of things to the venture, and Sir Owen's trust paying a cash sum in effect to participate; the trust would then invest significant capital in Spartan to enable it to exploit the various opportunities it had.

215. The idea of Project Spartan was initially presented to Mr Miller on 29 March 2012, and to Sir Owen on his yacht on 1 April 2012. Sir Owen gave his go-ahead to the idea but was not involved either in any of the detailed negotiations or the ultimate decision to sign the contractual documents. These were all handled by Messrs Miller and Dickson, with the assistance of Mr Maislish. It is necessary to consider the whole period between the initial presentations and 24 July 2012 when Mr Dickson executed a number of agreements (**"the July agreements"**) on behalf of Kea, but it can be conveniently divided into the following parts: (i) the background to the initial presentations; (ii) the initial presentations on 29 March and 1 April 2012; (iii) the period after the presentations down to 28 May 2012; (iv) Mr Leahy's e-mail to Mr Dickson of 28 May 2012 when he told him the project would have to be restructured; (v) the period from then until 7 June 2012 when Mr Dickson signed the Term Sheets for Project Spartan; and (vi) the period between then and 24 July 2012 when the July agreements were signed. The Claimants rely on fraudulent misrepresentations at various stages during these periods; these have to be considered one by one, but it is also necessary to stand back at the end of the exercise and consider the overall picture. The Claimants' essential claim is to set aside the July agreements, either as having been procured by deceit, or as having been entered into by Mr Dickson in breach of his fiduciary duties, not being in the best interests of Kea and the Corona Trust, or as having been procured by breaches by Mr Watson of fiduciary duties that he is said to have owed to Sir Owen or Kea, or by inducements offered to Messrs Miller and Dickson. Mr Watson was not a party to the July agreements, and they have now in fact been set aside by agreement between the Claimants and Novatrust; but it is still necessary to consider whether the Claimants have established their right to set aside

the July agreements because it affects the claims against Mr Watson and the other remaining Defendants.

*The background to the presentations of Project Spartan*

216.    The background to the presentations was as follows.  By the end of February 2012 Mr Idicula, who worked with Mr Leahy, had begun to put together a proposal which envisaged a new joint venture (JV) vehicle being put together to exploit real estate related opportunities, and identified three classes of project, namely ground rents, affordable housing and residential portfolios.  Mr Watson's position in relation to these three classes of assets was as follows:

(1)       So far as ground rents are concerned, Mr Watson had an existing interest (through his vehicle Gaucin) in the ground rent portfolios held in Abacus.   That entitled him to 50% of the equity, but subject to loans outstanding to Berryblue (Mr Richardson's vehicle) which as at March 2012 amounted to some £7.15m (**"the Berryblue loan"**).  Mr Watson also had what he referred to as the LH Investment Right, that is the benefit of the covenant by Messrs Astor and Aumonier (in cl 24 of the LLP Agreement for Abacus 1) that they would not, while interested in the business and for 12 months thereafter, be interested in any other ground rent business without the consent of Berryblue and Gaucin (paragraph 75 above); as the terms of this clause make clear, this did not in fact confer any positive right to invest on Mr Watson, but was in the nature of a non-compete clause, and was held jointly with Mr Richardson.

(2)       So far as affordable housing is concerned, Mr Watson had, through Ladoga, the Ladoga Investment Right conferred by the Ladoga JV Agreement (paragraph 91 above): this was a positive right to invest alongside HW in future investments in affordable housing.  (The Claimants' case is that the Ladoga Investment Right was in fact held on trust for them, having been acquired by using Kea's money as part of Project Edsel, but it follows from my conclusions on Project Edsel that I have not accepted this part of their case).

(3)       So far as residential property is concerned, Mr Astor had been discussing the possibility of a residential fund (also known as a REIT or real estate investment trust) with Mr Watson, saying in an e-mail of 21 February that its investment focus would be 3-fold – acquiring distressed fully let secondary portfolios, acquiring distressed assets and refurbishing, and acquiring discounted stock from housebuilders – but Mr Watson did not have any existing rights in respect of such a fund.

217.    Mr Leahy obtained some details from Mr Astor and by 9 March was able to send Mr Watson his thoughts with some preliminary numbers.  This included the new JV vehicle acquiring the whole of the existing ground rent portfolio.  Mr Leahy suggested buying out Mr Richardson's interest (at a possible cost of £8m, based on a 23x multiple) and repaying the Berryblue loan (a further £7.15m), so that it would cost £15.15m to acquire the whole portfolio, but convincing Sir Owen that the equity in the portfolio was worth £20m (based on a 26x multiple).  He also suggested Mr Watson and Sir Owen contributing to the JV on a 10%/90% basis, with profits, after

repayment of the contributions and 10% preferred interest, being split 50/50. On his assumed figures that would give Sir Owen a return of 2.6x his money (an internal rate of return or IRR of 29.6%) but Mr Watson a return of 12x his money and an IRR of 76.6%. It can be seen that the structure proposed by Mr Leahy with Sir Owen putting up 10% of the capital and the profits being split 50/50 was the same as had been used on Project Edsel: Mr Leahy commented that he thought this was probably a long shot and that it was hard to justify, but Sir Owen's returns still looked attractive.

218.    Mr Leahy then contacted Mr Miller and arranged to meet him when he was in London on 29 March.

219.    During the remainder of March Mr Leahy considered how best to present the opportunity to Sir Owen and Mr Miller. By 16 March he had produced a draft powerpoint presentation on Project Spartan: this described it as a joint venture to be owned 50/50 by Mr Watson and Sir Owen, with Sir Owen investing £75m (in return for an 8% preferred return) and Mr Watson assigning various assets to Spartan, that is by contributing his interest in the Abacus ground rent business, arranging the purchase of the balance of Abacus, and assigning the LH Investment Right, the Ladoga Investment Right, x% ownership in Homeground and the right to seed fund a residential REIT and take [50%] of the ongoing management company. It also explained that the purchase of Abacus with its existing ground rent portfolio was integral to the long term strategy of Spartan; that a premium multiple would have to be applied, likely to be at least a [30]x multiple; that Abacus was currently owned 50% by Mr Watson and 50% by another partner, referred to as *"NR"*, and that Mr Watson owed c. £7.2m to NR; and that it was proposed that Spartan acquire Abacus by buying out NR's 50% at £15.3m (equivalent to a 30x multiple) and by Mr Watson contributing his 50% for the cost of the loan (£7.2m), thereby contributing his 50% at a 53% discount and meaning that Spartan would acquire Abacus for £22.5m. This version of the presentation would therefore (a) have made it clear that Spartan was not an existing business but a new venture to which Mr Watson would contribute the property rights he had, and (b) made explicit that Mr Watson owed his partner £7.2m which would be paid off. It is also noticeable that in contrast to the numbers used in Mr Leahy's e-mail of 9 March, the 10% preferred return had reduced to 8%, and the 26x multiple used to value the ground rents had increased to a 30x multiple.

220.    On 17 March Mr Leahy sent Mr Watson a slightly amended version of this presentation. It now included a *"Highlights"* section at the front which began;

> "Project Spartan ("Spartan") is an opportunity in which Eric Watson ("EW") will take a number of established property investments and partnerships and contribute these to a 50-50 joint venture with Owen Glenn ("OG")."

In his covering e-mail, Mr Leahy told Mr Watson that the presentation was based on the structure they last discussed, but:

> "if we are going down this route I think we probably have to have the presentation build up what you are contributing to the JV a little more than it currently does."

He also commented that in terms of real assets being contributed, Mr Watson was effectively contributing his 50% of Abacus for a discount of about £8.1m (ie the value of £15.3m less the Berryblue loan paid off at £7.2m), and that:

> "We could actually up the purchase value of Abacus even further – something to consider?"

As this suggests the figure for the value of Abacus in this draft, based on a 30x multiple, was not based on any actual negotiations with Mr Richardson (it is admitted in Mr Watson's Defence that there had been no such discussions), but was a figure intended to be put forward to persuade Sir Owen of the value of what Mr Watson was proposing to contribute to Spartan.

221.   On 23 March Mr Watson suggested to Mr Leahy that he forward the draft presentation to Sir Owen and Mr Miller, but Mr Leahy replied that he would rather that they spent a couple of hours on Monday (26 March) reviewing the current draft. On 26 March Mr Leahy produced a revised version, very similar to the previous but now valuing Abacus at a 35x multiple rather than 30x (thereby changing the price to be paid for NR's 50% ownership to £20.2m, and the discount on Mr Watson's contribution to 64%).

222.   But on 27 March there was a further version which contained significant changes. The *"Highlights"* section at the front now began:

> "Project Spartan ("Spartan") is an established property investment opportunity, owned 50-50 between Eric Watson ("EW") and another partner ("NR"), which is focused on building a substantial portfolio of UK and European property investments delivering superior risk-adjusted returns."

Instead of providing that Sir Owen would provide a £75m investment to Spartan, it now proposed that Sir Owen would buy out Mr Watson's existing partner for £22.5m, and provide a £50m five-year loan note. It included statements that *"Current discussions suggest"* that NR's 50% could be acquired for c. £22.5m, implying a valuation of £45m for Spartan; and that Spartan *"is currently talking to a number of potential investors to provide a £50.0mn preferred note ... to fund additional growth"*. It also omitted any reference to the Berryblue loan.

223.   Mr Leahy produced a further version on 28 March. This was similar to the previous version but (i) now referred to Mr Watson's partner as *"PT"* rather than as *"NR"*; (ii) instead of saying that Spartan was talking to a number of potential investors about the provision of a £50m note said that a £50m note had been presented to Spartan, with the provider having the right to acquire Spartan equity; (iii) in relation to the residential REIT reduced the ownership interest which Spartan would acquire by providing the seed funding from 50% to 33%; and made some other changes designed to increase the overall value of what was being presented.

*The initial presentations to Mr Miller (29 March) and Sir Owen (1 April)*

224.   A number of further versions of the powerpoint presentation were produced before Mr Leahy met Mr Miller on 29 March. The meeting was arranged for 12, and Mr Leahy and Mr Miller then met Mr Watson for lunch; in the afternoon Mr Miller went to see Mr Astor and his team. At his morning meeting Mr Leahy took Mr Miller through the presentation. Unsurprisingly Mr Leahy could not remember precisely which version he used when presenting to Mr Miller, but I accept that it is likely to be the one in the bundle at T20/2829; this incorporates a number of minor amendments suggested by Mr Vassilakos on the afternoon of 28 March, and appears to have been sent by Mr

Leahy to Mr Idicula on the morning of 29 March at 10.57, not long before Mr Leahy's meeting with Mr Miller.  I will refer to it as **"the 29 March Presentation"**.

225.   It had been arranged that Mr Leahy and Mr Miller would both fly out that weekend to Nassau in the Bahamas to meet Sir Owen on his yacht so that Mr Leahy could present the project to him.  On the evening of Friday 30 March Mr Miller asked Mr Leahy for soft copies of the presentation and of the model (a spreadsheet which modelled the returns); Mr Leahy sent them to him, and Mr Miller then forwarded the presentation to Sir Owen.   This was a slightly amended version again, the main (but not only) changes being to remove references to Sir Owen by name, replacing them by references to *"New Partner"* (or *"NP"*).  Sir Owen complained to Mr Miller that the presentation raised a host of questions and such ventures needed to come to his notice well before they were pushed to invest, adding:

> "What about my due diligence??
>
> Eric tells me yesterday this investment could be worth billions -- Someone should take the time and effort to explain and not slap it on me at the 11th hour That's your job David"

Mr Miller explained that the project was only presented to him on Thursday, and that having spent a couple of days with EW group and Will Astor group they reshaped the information and presentation so that it was readily understandable in advance of the meeting.

226.   Mr Leahy and Mr Miller arrived in Nassau on the evening of Saturday 31 March, and had a three-hour meeting with Sir Owen on his yacht on the morning of Sunday 1 April at which Mr Leahy presented Project Spartan to Sir Owen.  For this purpose he used the same version of the presentation as had been forwarded to Sir Owen (which I accept is the one in the bundle at T20/2926), and which in the light of Mr Miller's comments appears to have been a reworking carried out jointly by Mr Miller and Mr Leahy.  I will refer to it as **"the 1 April presentation"**.

227.   The Claimants' case is that the 1 April presentation contained a number of deliberately false statements, most of them also being present in the 29 March presentation.

228.   The Claimants rely first on a number of statements to the effect that Spartan was an existing business owned 50/50 by Mr Watson and his partner and that this business owned all the assets rights and opportunities identified in the presentation.   The particular statements relied on are as follows:

(1)        On page 2 of the 1 April presentation under the heading *"Overview"* (also in the 29 March presentation under the heading *"Highlights"*):

> "Project Spartan … is an established property investment opportunity, owned 50-50 between Eric Watson ("EW") and an additional partner ("PT")…"

(2)        On page 4 of the 1 April presentation under the heading *"What is in Spartan"* (also in the 29 March presentation under the heading *"Strategy"*):

> "Spartan has a number of existing assets and opportunities…"

That is then followed by a list of the existing assets and opportunities (a largely similar list, although not including the opportunity to seed the residential fund, was in the 29 March presentation).  These include:

> "Existing Ground rent portfolio…
>
> Exclusive right to continue to work with Long Harbour Ltd on all future ground rent portfolios…[ie the LH Investment Right]
>
> …the right to participate in up to 20% of all equity … in all future Affordable Housing projects… [ie the Ladoga Investment Right]
>
> Opportunity to seed the first residential property fund and take share in the Fund Management Company… [identified on page 25 as a 33% stake]
>
> Homeground – (66% stake).  LH and Spartan have invested heavily …"

Those statements taken together are said to have amounted to a statement that all these assets and opportunities were jointly owned by Mr Watson and his existing partner through the business which they were said to own 50/50.

229.   Mr Watson naturally does not dispute the actual statements made in the presentations. Taken by themselves they do plainly indicate that Spartan was an existing business which (i) was owned 50/50 by Mr Watson and his partner and (ii) which owned a number of existing assets and opportunities.  Mr Watson's case however is that Mr Leahy orally explained both to Mr Miller on 29 March and to Sir Owen on 1 April that the presentation set out a vision for what it was intended Project Spartan would be and that the various assets and opportunities were held in different entities, thereby making it clear that Spartan was not at that date an established entity of any kind, but an investment *opportunity* (the word used on page 2 of the presentations).

230.   Mr McCaughran asked me to find that this was not only supported by the evidence but inherently likely.  I am not so persuaded, for the following reasons:

(1)      I do not find the use of the word *"opportunity"* on page 2 of any assistance on this question: on any view Sir Owen was being offered an opportunity to invest.

(2)      The 29 March and 1 April presentations go to some trouble to refer to Spartan as something which already existed and had already done things, not just a vision of a future business.  The reference on page 4 to *"Spartan has a number of existing assets and opportunities"* is not easily understood as a reference to what it will have, especially as (i) in the 1 April version this is made more explicit by the heading being changed from *"Strategy"* to *"What is in Spartan?"*; (ii) under *"Existing Ground rent portfolio"* it states *"Acquired ~£50mn of ground rent assets over the past 18 months"* which is clearly a reference to an established business; (iii) under *"Future Affordable Property"* it says *"Spartan has the right to participate..."*; and (iv) under *"HomeGround"* it says that *"LH and Spartan have invested heavily in IT and personnel …"*.  Similarly on page 17 under *"Existing residential freehold portfolio"* it says that *"Spartan has consolidated 13,000 ground rents over the past 18 months"* and gives an *"Existing Portfolio snapshot"*.  This last page

was not in the 29 March presentation. It must therefore have been added after Mr Leahy had explained the project to Mr Miller, as part of the redrafting that was carried out jointly by the two of them, which makes it unlikely that Mr Leahy explained that Spartan had not itself done anything over the past 18 months.

(3)        Moreover, the drafting history of the presentation shows that Mr Leahy initially drafted it as one where Spartan was presented as a new venture, to which Mr Watson would contribute various existing assets and opportunities. This was the case with the 16 March, 17 March and 26 March versions. These versions also explained that Spartan would acquire Abacus, by (i) buying out Mr Richardson's 50% and (ii) Mr Watson contributing his 50% in return for Spartan paying off the Berryblue loan. The version of 27 March, which formed the basis of the 29 March and 1 April presentations, was noticeably different. Instead of referring to Spartan as an opportunity in which Mr Watson *"will take a number of established property investments and partnerships and contribute these"*, it now referred to Spartan as an *"established property investment opportunity"* and instead of listing the various assets and opportunities as ones which Mr Watson would assign to Spartan, listed them as existing assets and opportunities that Spartan had. It also deliberately omitted any reference to the Berryblue loan. Mr Watson admitted on the pleadings that on or about 27 March he and Mr Leahy decided to represent that he and Mr Richardson had equal interests in an existing business; and he confirmed this in oral evidence. Having gone to the trouble of rewriting the presentation in this way, it would seem *prima facie* surprising if Mr Leahy then proceeded to undo the effect of this change by explaining that Spartan was not an existing business at all.

(4)        The statements to the effect that Spartan was an existing business owned 50% by an existing partner and which owned the various assets and rights listed were intimately connected with the statements to the effect that what Sir Owen (or NP) was being offered was the opportunity to buy out the existing partner at a price of £22.5m and become a 50% owner of the business in his place (see below). It would undermine the objective of persuading Sir Owen to do that if it were explained that Spartan did not yet exist and did not yet have any assets or rights.

(5)        Mr Leahy's evidence in his witness statement was to the effect that he explained to Mr Miller that the idea was to pull together a collection of opportunities that sat outside Abacus and put them into Spartan; and that he remembered saying that the rights listed were sitting in different places and would have to be brought together. He also said that he repeated the key issues discussed with Mr Miller when he met Sir Owen, and explained that after Mr Watson's partner had been bought out, various assets and opportunities would be put into the new Spartan vehicle. And in oral evidence he repeated that things would be pulled together and that the assets all sat in different places. In relation to an issue like this (namely, what was said orally at a meeting more than 5 years before) witness evidence is necessarily of limited weight, but I will assume that Mr Leahy did explain that the rights were sitting in different places and would be all pulled together. Nevertheless

I accept Ms Jones' submission that this is not inconsistent with, and does not take away the force of, the representations that Spartan was an existing business with existing assets which was owned 50% by Mr Watson's partner. A business can be carried on through a number of different entities, and as Mr Leahy himself said in his witness statement it is inevitable that behind an investment proposal there will be a large amount of complex moving parts, and the purpose of the presentation was not to deal with the complexities of the structure but to present the fundamentals of the proposal in a simplified form. The fundamentals of the proposal that it presented were that Sir Owen should buy out Mr Watson's existing 50% partner in a business which owned all the various rights and opportunities listed, and so replace him; and this is not affected by statements that the various rights and opportunities currently sit in different places and would all be pulled together into one place.

(6)     This last point can be simply illustrated. After the presentation Mr Watson's team started drafting a Term Sheet for Project Spartan. One of the drafts (dated 12 April) made it clear that what was envisaged was a new vehicle (to be called at that stage Spartan Real Estate Ltd or SREL and initially to be wholly owned by an EW entity), and that this new vehicle would acquire the relevant assets and rights, such as the rights to Abacus, shareholding in Homeground, the Ladoga Investment Right and the like. It provided that subject to due diligence and SREL successfully completing its acquisition of the required assets:

> "Kea has agreed to purchase a 50% shareholding in SREL from EW Entity on the basis described in this terms sheet."

On 16 April Mr Leahy circulated his comments on the draft which included Comment M2 against this provision as follows:

> "Can this be worded slightly clearer upfront that the cash is not going back to "EW Entity" but will be going to buy out an existing partnership in the Real Estate assets?"

That shows that Mr Leahy saw nothing inconsistent between on the one hand Spartan being presented as a new vehicle which would be used to pull together a number of different assets which were currently sitting in different places, and on the other the cash that Kea was to contribute (the £22.5m) being used to buy out Mr Watson's partner from an existing partnership in those assets.

(7)     Any doubt as to what Mr Miller and Sir Owen in fact understood from the presentations is cleared up by their contemporaneous e-mails. When Mr Miller e-mailed the presentation to Sir Owen (that is on 30 March, after his meeting with Mr Leahy and after revising the presentation with him) he described the proposal as follows:

> "Spartan is a business owned 50% by EW interests and 50% by existing Partner. The suggested deal is for the New Partner to take out the existing Partner by investing PDS 22.5 mil in the business (business then pays out existing Partner) and for the New Partner to provide PDS 50 mil in financing (3 year term at 8%) for start up financing."

He also sent the same version of the presentation (on 31 March) to Mr Dickson (saying *"Met with Eric Watson and his group and we came up with the attached revised presentation"*) with an identically worded explanation. These e-mails make it clear that Mr Miller did indeed understand the opportunity that they were being offered as an opportunity to take out an existing partner who owned 50% of an existing business.  As for Sir Owen, he e-mailed Mr Watson on 2 April saying:

> "I have given my approval to proceed with the purchase of the existing partners shares and the initial note for the PDS50m"

It is apparent therefore that Sir Owen was also left with the impression that what was being proposed was the purchase of the existing interest of Mr Watson's partner.

(8)     I did not find Mr Miller's evidence on this point reliable.  His witness statement supported Mr Watson's case but in oral evidence he readily accepted that the presentation showed what it appeared to show.

231.   I therefore find that the 1 April presentation (and the 29 March presentation) did represent that there was an existing business owned 50/50 by Mr Watson and his existing partner which owned the assets and opportunities listed (whether or not held through various different structures).  That was untrue and known by Mr Leahy and Mr Watson to be untrue: the true position was that although Mr Richardson had a 50% interest in Abacus, and equal rights with Mr Watson to the LH Investment Right and Homeground, he had no interest in the Ladoga Investment Right and had not been involved at all in discussions about affordable housing or the residential fund.  There was some attempt to suggest that Mr Richardson could have caused difficulties with Long Harbour but Mr Watson said in oral evidence that his view and the advice he had at the time was that the agreement he had with Mr Richardson was more specific to ground rents than affordable so it was unlikely he would have any rights to affordable.  Equally there is nothing to suggest he had any rights in relation to the residential fund.

232.   The Claimants rely next on representations that the £22.5m which Sir Owen and his interests would be required to pay was intended and expected to be invested in order to buy out Mr Watson's existing partner and paid out to that partner's vehicle, and that current discussions with Mr Watson's existing partner suggested that his interest could be acquired for around £22.5m.

233.   The particular statements relied on are as follows:

(1)     On page 3 of the 1 April presentation under the heading *"New Partner Proposal"* (also in the 29 March presentation under the heading *"Owen Glenn ("OG") Proposal"*) a diagram showed an arrow from a box marked *"NP Vehicle"* (*"OG Vehicle"* on 29 March) to a box marked *"Spartan"* with the legend:

> "**£22.5mn equity invested** in order to buy out PT"

(2)     The same diagram in each case showed an arrow from the box marked Spartan to a box marked *"PT Vehicle"* with the legend:

"£22.5mn paid out"

(3)           On page 9 of the 1 April presentation (and also of the 29 March presentation):

"Current discussions suggest PT's 50% can be acquired for ~**£22.5mn**"

234.   Mr Watson again does not of course dispute the actual statements in the presentations but Mr McCaughran makes a number of points on his behalf.  The first is that he and Mr Leahy did believe that it would cost £22.5m to buy out Mr Richardson, on the basis of paying £15m (actually £15.3m) for his 50% share of the Abacus portfolio and £7.5m (actually £7.2m) to repay the Berryblue loan.  There is a substantial dispute as to whether they really thought it might cost this much or expected that it would be possible to buy out Mr Richardson for very much less (see below), but even if it were true that this is what they thought, I do not see that it would help Mr Watson.  The statements in the presentation clearly indicated that the £22.5m was being put forward as the expected price of acquiring Mr Richardson's 50%: see in particular the statement on page 9 which expressly refers to *"PT's 50%"* being acquired for £22.5m.  That is also supported by the diagram on page 3 which in the box marked Spartan has the legend:

"Current ownership: 50% EW; 50% PT

 Valuation: **£45mn**

 NP to buy out PT for £22.5mn resulting in a 50-50 JV with EW"

the implication being that the £22.5m was an appropriate price to pay for half an interest in a business worth £45m.  It is also supported by a statement in a cash flow break down on page 7 that refers to the £22.5m as:

"Equity required to purchase 50%"

It is similarly supported by a statement on page 9 that £22.5m represented a:

"~60% discount to the NPV value at a 10% discount".

When read with the other statements on that page, what this refers to is a net present value (NPV) of Spartan calculated by taking discounted cash flows, based on the three asset classes of ground rents, affordable housing and the residential fund.  The NPV naturally depends on the discount rate selected, but at a 10% discount rate is shown as £118.4m, the reference being to the fact that £22.5m is at a c. 60% discount to the value of half this (£22.5m being 38% of £59.2m).  If the true expectation was that Mr Watson would have to pay £15.3m to Mr Richardson to acquire his 50% interest in Abacus and £7.2m to repay the Berryblue loan, then the £7.2m would not be being used to acquire his 50% of anything, but to benefit Mr Watson by discharging his liability.  There is not a hint of this in the presentation which had omitted any reference to the Berryblue loan.  Both Mr Watson and Mr Leahy accepted that Mr Watson had deliberately decided to omit any reference to the Berryblue loan, although they said that was because it would complicate matters and weaken his negotiating position.  The real reason in my judgment was that if it had been apparent that £7.2m of the £22.5m was being used to discharge the Berryblue loan, it would have shown

that Mr Watson's partner could be bought out of his 50% share for £15.3m, which would have exploded the idea that £22.5m was needed to acquire his 50%, or that the business which he was represented as owning 50% of was worth £45m.

235.   In fact I do not accept that Mr Watson and Mr Leahy genuinely thought it would cost £15.3m to buy out Mr Richardson, for the following reasons:

(1)      In January 2012 Mr Astor was in discussions with a potential purchaser for the Abacus portfolio, M&G. Mr Richardson's reaction was that *"This has got to work, it just has to"*, and when Mr Watson commented that it did not look as if it was, Mr Astor replied that it was a long process and you had to expect a few ups and downs, and that *"Neil is just a bit fixated at the moment"*. Mr Watson accepted in evidence, when shown this e-mail exchange, that he believed Mr Richardson would be a seller.

(2)      Mr Leahy's first thoughts on 9 March suggested buying out Mr Richardson at a 23x multiple which would cost £8m, but convincing Sir Owen that the portfolio was worth £20m at a 26x multiple (paragraph 217 above). Although the numbers were preliminary, it is noticeable that neither Mr Leahy nor Mr Watson suggested then that the true value of the portfolio was in fact more than £20m, and the 26x multiple was in fact itself more than Mr Astor was suggesting (see below).

(3)      Mr Leahy's first draft of the presentation on 16 March proposed buying out Mr Richardson at £15.3m (a 30x multiple), but this figure was not derived from any discussions with Mr Richardson as there had been none. Nor was it derived from any of Mr Leahy's queries to Mr Astor. On 5 March when he was trying to get some *"Big picture numbers"* he had suggested to Mr Astor an assumption that ground rents could be bought at 19x multiple and sold at 30x multiple, but Mr Astor had replied on 6 March with assumptions of a gross cost of 20x and sales at 25x. On 8 March Mr Leahy had tried modelling with these figures and queried with Mr Astor that the returns looked too good, to which Mr Astor replied that the big questions included: *"is the exit really there at 25x"*.

(4)      After the presentation to Sir Owen, Mr Watson and Mr Leahy brought in Mr Flay and Mr Bruce Armitage of Cullen in New Zealand to assist with documenting the deal. On 5 April Mr Flay asked Mr Leahy how the Berryblue loan was to be dealt with as part of the buyout of Mr Richardson, and what the current balance was. Mr Leahy replied that the loan was £5m and now around £7.2m with interest, and that it was *"included in the £17mn we have estimated to take NR out of the deal"*. Mr Watson's immediate reaction was *"That can't be right"* but very shortly afterwards he corrected himself as follows:

"Yes it can.

His 5m plus my 5m plus 2.2 pref plus his share of profit 5m = 17m+"

In oral evidence Mr Watson said that this was the beginning of a negotiation with Mr Richardson, and a suggestion of how to approach him, but this is

difficult to square with the statement that the £17m was what they had estimated to take him out of the deal.  As Mr Watson's break down indicates, the £17m equated to paying him £10m for his 50% share of the portfolio, not £15.3m.

(5)     On 6 April Mr Armitage asked Mr Leahy if what he meant was that Sir Owen would acquire Mr Richardson's interest in Abacus and the Berryblue loan so that Mr Watson would become indebted to Sir Owen.  Mr Leahy's response to Mr Armitage (copied to Mr Flay, Mr Watson and Mr Gibson) was as follows:

> "Hi Bruce – sorry this is quite complicated! No OG doesn't purchase the loan but we are eliminating this loan as part of this transaction.  So, the £22.5mn will buy:
>
> A)  NR's 50% ownership in the ground rent business
>
> B)  Will payback NR for the loan eric currently has outstanding to him.
>
> C)  The balance we need to use to buy out NR from his position in the american apparel loan and use up the rest in fees etc. (Need to think about this).
>
> The real challenge with this is that although we want to pay back NR his loan out of the funds from OG (hence eliminate [EW's – it reads "OG's" but I accept this must be a mistake for "EW's"] liability), this should be irrelevant and separate to OG – we simply want him to see 22.5mn being paid out to buy NR's 50% share and we then use those proceeds to buy NR out, clean up the Abacus loan and American apparel loan etc."

This e-mail is very revealing and confirms both that what Mr Watson and Mr Leahy wanted Sir Owen to see, and believe, was that the £22.5m was going to be used to buy Mr Richardson's 50% share, and that the reality was that they expected to be able to buy his share at a good deal less than £15.3m so that they would not only have the money to pay off the Berryblue loan but also money left over for other matters, including *"cleaning up"* the so-called American Apparel loan (it being admitted by Mr Watson that this related to separate dealings between him and Mr Richardson).

I find that Mr Watson and Mr Leahy did not think Mr Watson would need to use £15.3m to buy out Mr Richardson's 50% share, and that they expected he could do so for significantly less, around £10m.

236.  Mr McCaughran also relied on evidence that Mr Watson and Mr Leahy made it clear that Mr Watson would handle the negotiations with Mr Richardson.  The best contemporary evidence is in an e-mail from Mr Leahy to Mr Watson on 2 April with some *"rough notes"* on things that came from the meeting with Sir Owen.  These included:

> "As mentioned previously, deal with NR is YOUR deal, he can't know that OG is involved and said you and I would figure out how to structure this so NR doesn't realise."

Sir Owen's evidence was that Mr Leahy did say that he was not to be in touch with the partner and that Eric would deal with him. I accept therefore that Mr Leahy told Sir Owen that Mr Watson would deal with his partner so as not to alert him to Sir Owen's involvement.

237.   Mr McCaughran said that it must follow that Sir Owen appreciated both that Mr Watson had not yet done a deal with his partner, and that he might end up paying more or less, but there had never been any suggestion that Sir Owen or Kea understood that Kea would get the benefit of any reduction in price negotiated by Mr Watson. This has become a key plank in Mr Watson's defence, but I do not accept it. Sir Owen's evidence was that Mr Leahy never said anything about Mr Watson doing a separate and different deal with his partner, and that he trusted him to do the best deal he could. Mr Leahy himself accepted in evidence that the reason he gave for Sir Owen not being in touch with Mr Watson's existing partner was a precaution to get the best deal possible; and that if Mr Watson had done a deal it would have been for *Spartan's* benefit (that is for both his and Sir Owen's interests). In other words there is nothing to suggest that what Mr Leahy explained to Sir Owen was that if Mr Watson could do a better deal with Mr Richardson he would keep the balance for himself. Mr Leahy also at one point said that the concern was that if Mr Richardson had full insight into the proposal for Spartan, he would have wanted more money and the deal (that is the deal with Sir Owen) would have had to have been renegotiated: in other words he was neither accepting that Mr Watson would take the benefit of negotiating a lower figure with Mr Richardson, nor that he would bear the risk of having to pay a higher figure.

238.   In any event it does not affect the fact that the representation was that the £22.5m was *expected* to be the price required to buy out the partner's 50% interest, and to be used for that purpose; and that was simply untrue even on Mr Watson's and Mr Leahy's case.

239.   Mr McCaughran also referred to Mr Miller's e-mail to Mr Dickson of 31 March in which he forwarded the 1 April presentation and commented that:

> "If the total business is valued at PDS 45 mil and PDS 20 mil is recouped in year 2 then the hypothetical goodwill in the business is about PDS 25 mil, of which your 50% share would be PDS 12.5 mil."

(I do not need to consider if Mr Miller was right to refer to the *"goodwill in the business"*; as this illustrates, in the context of Project Spartan *"goodwill"* was used to refer to what Kea would be paying for over and above existing assets, and in effect consisted of the right to access the various other opportunities which were presented as part of the Spartan business.) Mr McCaughran said that that would obviously raise a question as to why all the goodwill payment was to be paid to the existing partner if it was known that the goodwill was made up of discounted cashflow values attributed to all three classes of investment (ground rents, affordable housing and residential), and that the existing partner did not own 50% of all the rights and opportunities to invest in those classes. He said that Mr Miller knew as at 1 April that not all the rights were jointly owned by Mr Watson and his existing partner as he knew that the Ladoga Investment Right was owned by Mr Watson and not his partner. I accept that the so-called goodwill was based on the £45m valuation which was itself based on discounted cashflows from all three asset classes; but I do not accept that Mr Miller

understood at the time that Mr Watson's partner had no rights in relation to the affordable housing. Admittedly in his witness statement he said that the right to participate alongside HW in affordable housing projects was a right which Mr Watson owned (rather than being jointly owned with his existing partner) but his oral evidence on this point was a good example of how different his actual recollection was from what he had put his name to in his witness statement. He first accepted that he understood that Spartan, a 50/50 business between Mr Watson and his partner, had the right to participate alongside HW; then that he took the presentation as it had been presented; and then when it was put to him that he did not know that Mr Watson himself owned one of the rights, namely the right to co-invest with HW, said:

> *"Only because I didn't really understand what the relationship was between Mr Watson and his existing partner. They were both operating out of offshore companies and structures, and to try and pin this down to this exact point, it was a grey area."*

240.   I therefore find that the 1 April presentation (and the 29 March presentation) did make the representation that the £22.5m which Sir Owen / Kea would be required to pay was intended and expected to be invested in order to buy out Mr Watson's existing partner and paid out to that partner's vehicle. For the reasons I have given that was untrue, and known to be untrue by Mr Watson and Mr Leahy; this would be so even if they did genuinely think it would cost £15.3m to acquire his interest in Abacus, but as set out above I do not accept that they did think this.

241.   As to the statement that *"current discussions suggest"* that the partner's interest could be acquired for around £22.5m, Mr Leahy attempted to justify the statement in his witness statement by saying that it referred to discussions that Long Harbour was having with the market. That seems to me a strained interpretation. What was put to Mr Miller was that he presumably believed that there had been current discussions which suggested that the partner was willing to sell his 50% for about £22.5m. He accepted that and that does seem to me the natural meaning of the statement. As such it was untrue and known to be untrue by Mr Watson and Mr Leahy, as there had as yet been no discussions with Mr Richardson, as they both knew.

242.   The Claimants rely thirdly on representations as to the business plan assumptions and valuation, their central point being that the business plan and valuation set out in the 1 April presentation was not an honest attempt to analyse and present the proposed business but a bad faith attempt to prop up an intended fraud with what looked like a supporting valuation.

243.   The specific representations relied on are as follows:

(1)       Mr Watson and Mr Leahy believed that the assumptions underlying the valuation of Spartan at £45m were justified.

This is admitted by Mr Watson in his Defence (although in general he does not plead as to whether any representations were made as to Mr Leahy's belief).

(2)       The statement on page 9 of the 1 April presentation (and also in the 29 March presentation) that:

> "The existing Ground Rent portfolio will likely be subject to a bond

> refinance in next 12 months at a ˜26x valuation, resulting in the release of ˜£20mn to the Spartan investors"

This is relied on as a representation that Mr Leahy and Mr Watson believed that such a refinance would be possible, and expected such a refinance to take place; Mr Watson admits only that it was represented that there was a realistic prospect that it would take place. I do not think either is quite correct: the natural meaning of the statement is that Mr Leahy and Mr Watson believed that it was *likely* that such a refinance would take place, which is a more definite state of mind than a belief that there is a realistic prospect of doing so, but not so definite as an expectation that it would take place.

(3)     The statement on page 17 of the 1 April presentation (not in the 29 March presentation) that:

> "Current offers on the table to securitize cash flows into a bond at 25-28x multiple
>
> Proceeds will … deliver £20-23mn cash proceeds to Spartan partners"

These statements are admitted in Mr Watson's Defence.

(4)     The statement on p 18 of the 1 April presentation (also in the 29 March presentation) that:

> "LH's team can acquire and consolidate assets at ˜19x income and securitize the cash flows into a 60-year bond at 25-30x"

This is relied on as a representation that Mr Leahy and Mr Watson believed this to be correct; Mr Watson does not admit this but admits a representation that it was justifiable to model the numbers on this basis. On this I prefer the Claimants' case: the statement is not a statement of what might be possible but what Long Harbour is actually able to do, and in my view does include an implied representation that Mr Watson and Mr Leahy believed this to be something Long Harbour could do.

(5)     The statement on page 2 of the 1 April presentation (not in the 29 March presentation) that:

> "Affordable Housing:
>
> ►   Execute on £450m of projects over next three years – substantial opportunity to increase this"

and the statement on page 19 of the 1 April presentation (also in the 29 March presentation) under *"Affordable Housing – asset overview"* that:

> "Longer term opportunity to expand commitment from HW or build larger fund"

These are relied on as representations that Mr Watson and Mr Leahy believed that there was a substantial opportunity to invest more than £450m in affordable housing over the next three years, and that there would be a longer

term opportunity after that.  These are admitted in Mr Watson's Defence.

(6)        The statement on page 6 of the 1 April presentation (also in the 29 March presentation) in relation to the residential property fund that:

"Spartan will seed an initial acquisition with ˜£25mn of equity …"

and the statement on page 23 of the 1 April presentation (not in 29 March presentation) under *"Project Royal Key statistics"*:

"▶   Equity required of ˜£23-£25mn"

These are relied on as representations that Mr Watson and Mr Leahy believed that the amount of equity required for Project Royal and to seed the proposed residential fund would be £23-25m.  Mr Watson points out in his Defence that the first statement is not a statement of what equity was required but simply what Spartan proposed to do; and that the second statement is on the same page as a box referring to the Property Fund investment as a flexible structure under which Spartan's seed funding could either be provided by purchasing Project Royal, or by simply seed funding the property fund with c. £25m of equity.  That is true but it does seem to me that implicit in the statements is a representation that Mr Watson and Mr Leahy believed both that the equity required for Project Royal was £23-25m, and that the amount required to seed fund the residential fund was £25m.

244.   As to whether these representations were false, I will start with representation (3). This is a representation of fact that there were current offers on the table to securitise at a 25-28x multiple.  Mr Leahy was necessarily dependent on what he was told by Mr Astor in relation to this.  So far as appears from the documentary record, he had been told of two potential counterparties, M&G and Axa; M&G were negotiating at a 25x multiple but that was for the whole business not a securitisation.  When Mr Leahy on 5 March suggested Axa were also offering that multiple for a securitisation, Mr Astor's response was *"Maybe, still working on it but ideally yes"*.  However on the afternoon of 30 March Mr Watson asked Mr Leahy to be sure that he fully understood the offers on the ground rents that Mr Astor had before departing, and Mr Astor confirmed to him (copied to Mr Watson) that the up-to-date position was that:

"Basically Axa is a 50 yr bond at 22.5x exit but we keep reversion.  M&G is 25x but we lose reversion."

There is no trace in the documentary record of Mr Leahy being told of any other offer on the table.  The statement that there were current offers (in the plural) to securitise at 25-28x was therefore false: there was one offer to securitise at 22.5x, and one offer to buy the business at 25x.  Mr Leahy accepted in cross-examination that the statement was probably inappropriate (and although he suggested in cross-examination that it would have been corrected in the meeting, it was admitted by Mr Watson in answer to a request for further information (an answer which was adopted by Mr Leahy) that Mr Leahy did not at his meeting with Sir Owen contradict or retract any of these statements).  Mr Watson, after referring to the fact that this was a sales pitch, suggested that Mr Leahy's view was that they could get those sort of prices, but this is not the same as offers being on the table, and he accepted that that

language was *"very promotional"*.  In fact it was plainly untrue and known to Mr Watson and Mr Leahy to be untrue.

245.   Representations (2) and (4) are also concerned with securitisation of the ground rents. Representation (4) is a statement that Mr Leahy and Mr Watson believed that Long Harbour could securitise at 25-30x, and representation (2) that they believed it likely that a 60-year bond would be entered into at 26x.  As Mr Leahy himself said in evidence, although he knew broadly about ground rents he wouldn't have classified himself as a ground rent expert, and went to Mr Astor, who was expert, as the main source for accurate information; but none of Mr Astor's e-mails gave any support for a securitisation at any higher than 25x.  Mr Leahy said in evidence that Mr Astor was thought to be conservative, and Mr Watson thought he was undervaluing the asset; he (Mr Leahy) thought a range of 25-30x was reasonable, and hence picked 26 as being at the bottom of the range.  It seems to me however that it was an exaggeration to say that Long Harbour *"can ... securitize ... at 25-30x"*; and also an exaggeration to say that it was *"likely"* that the portfolio would be subject to a bond refinance *"at a ~26x valuation"*; both are rather more definite statements than the material available to Mr Leahy warranted, as he must have appreciated.

246.   I will take next representation (6), which includes a statement that the equity required for Project Royal was £23-£25m.  Project Royal was the codename for the acquisition of an existing residential portfolio being offered by Savills.  Mr Astor had initially told Mr Leahy that he estimated it could be acquired for £65m with 65% leverage but by 17 March, when Mr Leahy forwarded the then current draft of the presentation to Mr Watson, he explained:

> "On the REIT funding – Will has sent me a little more information on this existing portfolio but the equity needed is £35mn – this takes our capital needs a little too high and I don't think it will generate a great return as the JV only gets the expected 10% IRR on that money and is topped up with 50% of the REIT Mng.Co.  I haven't used these numbers in this presentation – just gone with a seed 25mn financing into REIT."

That makes it clear both that Mr Leahy knew that the equity required for Project Royal was £35m, and that he had deliberately chosen to state that £25m was required to make the returns look better.  This was only an early draft but in the final 1 April presentation he kept a similar statement that the equity required for Project Royal was £23-£25m.  In his evidence Mr Leahy made the points that the equity required for Project Royal might change, and in any event that Project Royal was only one possible way for Spartan to seed the fund; neither of these however justify the specific statement as to what equity was required for Project Royal.  It was not suggested that there was any further information from Mr Astor that could justify that.  That was therefore a false statement and known to Mr Leahy to be false, and Mr Watson had no reason to think it was true.

247.   Representation (5) concerns the size of the affordable housing opportunity.  On 5 March Mr Leahy had asked Mr Astor what net new equity would be needed and profits generated if one assumed 2 more deals were closed this year and 3 deals a year going forward for 10 years; Mr Astor's response was:

> "Assume we spend £100 per annum for the next 3 years (we have already spent £80m this year)… This will only be a 3 year opportunity."

On 8 March Mr Leahy duly modelled the profits on affordable housing assuming £100m a year for 3 years only.  Then on 28 March he e-mailed Mr Astor asking:

"What scale you comfortable on the Affordable?  Over and above Edsel, it is currently at 100mn of projects a year for three years (30mn of Hutch equity) – could we up that to 150mn or is that also not supportable?"

Mr Astor replied *"£150m is target"* and Mr Leahy responded:

"Ok, I will up that to an additional 150mn a year as opposed to 100mn – helps the numbers a bit."

That is the source of the £450m figure which appears in the 1 April presentation.  There is however nothing from Mr Astor which suggests that there was a *"substantial opportunity to increase this"*; nor is there anything from Mr Astor about a *"longer term opportunity"*.  Mr Leahy said in oral evidence that Mr Astor was talking about the specific right to co-invest with HW, but HW did not come into deals to deploy £50m or £100m, they had billions of capital to deploy and although HW may have made an initial commitment of a smaller amount, their expectation was that the opportunity would be huge; and even if HW had decided to pull out after 3 years, Spartan would continue to be able to work with Long Harbour to deploy significantly more capital into that space, and that it was perfectly reasonable to suggest this opportunity.  I have my doubts as to whether Mr Leahy was really justified in asserting this, but I am prepared to give him the benefit of the doubt, and assume that he did believe this, which means that this representation was not untrue.

248.    That leaves representation (1) which is that Mr Leahy and Mr Watson believed that the assumptions underlying the valuation at £45m were justified. These assumptions included the following: (on page 17) an assumption that the existing ground rent portfolio could be securitised into a bond at a 26x multiple (producing net proceeds of £20m); (on page 18) an assumption that future ground rents could be securitised into a bond at a 26x multiple; and (on page 26) that Spartan provide seed investment to the residential fund by acquiring Project Royal as an initial portfolio at a cost to Spartan of £25m and then selling it into the fund for £28m.  Each of these assumptions feeds through into the cashflow which is used to generate the discounted cashflow figure of £45m as a valuation.  Since I have already concluded that none of these three assumptions was justified (and that Mr Leahy must have appreciated that), I accept that the representation that Mr Leahy believed the assumptions to be justified must itself be false.

249.    Ms Jones also suggested to Mr Leahy that the £22.5m figure (and the £45m valuation) was simply the number which Mr Watson liked the look of.  Mr Leahy denied this, giving a lengthy explanation that in an investment proposal like this, you are trying to figure out what the entry price should be, and that has to cater for two things.  First it has to generate a good return for the incoming investor based on the forecast cash flows, and second it has to be large enough to take out any existing partners.  You then put these two together, in an iterative process.  In the present case the £45m figure achieved both these things: it achieved a sensible return for the incoming investor of around 30%, and it was also enough to buy out Mr Richardson.  I accept his account of what he was trying to do and the two objectives he had, but I do not think this quite answers Ms Jones' point.  I have concluded above that Mr Watson and

Mr Leahy did not genuinely think it would cost £22.5m to buy out Mr Richardson's interests, but that it was a figure that it was hoped would generate enough to clean up other outstanding matters with him (the American Apparel loan).  The £22.5m figure itself initially came from the 16 March version of the presentation where it was presented as the supposed cost of buying Mr Richardson's half-share of Abacus (£15.3m) and the cost of paying off the Berryblue loan (£7.2m).  When the presentation was revised on 26 March to present the transaction as simply buying out Mr Watson's partner's 50% interest, the price for doing so was put at £22.5m, and it seems probable that this was because Mr Watson did want the entry price to be this high so as to enable him to deal with Mr Richardson.  Mr Leahy was I consider indeed trying to produce cashflows which could make this entry price look like one that produced a healthy return for an incoming investor.  That was why for example he did not go with the £35m equity required for Project Royal, as it did not produce a large enough return.  In other words I accept the submission that in essence Mr Leahy was trying to produce cashflows that could be used to justify the entry price of £22.5m that Mr Watson wanted, and that in doing so to some extent he used assumptions that could not be justified by the evidence he had had from Mr Astor, as he must have appreciated.

250.    Mr McCaughran had a further submission which was in effect that by the time Kea entered into the Spartan transaction in July 2012 Messrs Miller and Dickson knew the actual position and were not misled by, nor relying on, the 1 April presentation.  I will have to look at that below, but even if that is right it does not affect my overall conclusion that the 1 April presentation was a thoroughly misleading and deceitful document.  It presented Spartan as a collection of assets and opportunities owned jointly by Mr Watson and his partner in which the proposal was that Sir Owen's interests invest £22.5m to step into the shoes of Mr Watson's partner by acquiring his 50% interest.  The reality was that Mr Richardson was only interested in the ground rent business of Abacus and Homeground and had no interest or rights in relation to affordable housing or the proposed residential fund, and was only presented as a co-owner of everything to justify the entry price of £22.5m, this being put forward as 50% of what Spartan was worth, the valuation of £45m itself being bolstered by a number of unjustifiable statements.  This was designed so that Sir Owen and his side would see £22.5m being paid out to buy the 50% share, while it could in fact be used to buy Mr Richardson out, pay off the Berryblue loan and clean up the American Apparel loan, the latter two being for Mr Watson's benefit.  The central deceit was effectively accepted by Mr Leahy in oral evidence as follows:

> "*Q:  Why does it say PT's 50% can be acquired if what you really mean is: we can buy him out of all his interests, including a note?*
>
> *A.  I think we felt at this point in time this was a simple way of presenting the way the deal was going to pan out, which was that 22.5 million had to go to Neil Richardson.*
>
> *Q:  But it is not for his 50%, is it?*
>
> *A.  It is to enable Kea to come to a position that they have 50% in this overall package of opportunities.  But the payment itself, you're right, effectively an element of it was going towards paying down a liability, which had to also be bought out in order to get Kea to be a 50% partner in this venture going forwards.*"

Paying £22.5m to acquire PT's 50% may have been a simple way of presenting the proposal, but it was not a truthful one.

251.   I should add for the sake of completeness that the 1 April presentation contained a comprehensive disclaimer which included the following statements:

> "Investors should not rely on the information contained in this document as various forward looking statements are based on internally completed analysis and real results could vary materially from those presented in this document.  No warranties of any kind are given with respect to the accuracy, appropriateness or completeness of information contained herein.   All investors should conduct their own due diligence as appropriate for an investment of this type.  No person or entity shall have any liability relating to or resulting from the use of the information contained in this presentation.  Only those representations or warranties which are made in a final definitive agreement regarding an investment in Spartan when, as and if executed, and subject to such limitations and restrictions as may be specified therein, will have any legal effect."

The terms of this disclaimer are pleaded in Mr Watson's Defence.

252.   Ms Jones said that the disclaimer would be ineffective in the case of fraud.  I did not understand Mr McCaughran to argue to the contrary – he refers to the disclaimer in his written closing submissions not as providing a legal defence but as supporting a factual submission that the 1 April presentation was a sales pitch, and understood as such, and that it was expected that Kea would undertake due diligence.  That may be so, but I do not see that that affects the question whether it contained fraudulent misrepresentations, which, for the reasons I have given, I find that it did.

*From the presentations to Mr Leahy's e-mail of 28 May 2012 – the draft Term Sheets*

253.   On 2 April Sir Owen indicated his approval to proceed with the purchase of the existing partners shares and £50m loan note (paragraph 230(7) above).   The initial intention was to secure his agreement to pay the £22.5m, and then negotiate with Mr Richardson a price to buy out his interests: thus in an e-mail of 5 March to Mr Flay and others Mr Leahy referred to it being *"especially good to get the binding agreement to Owen re. the 22.5mn so that we can actually begin discussions with Neil with certainty on the capital"* and in an e-mail to Mr Gibson on 6 March he referred to a query on the calculation of the Berryblue loan which he said was worth getting right as it would be material *"when we decide what to offer Neil."*   Consistently with this, a first draft of a Term Sheet for Project Spartan by Mr Armitage on 10 April provided for Kea to advance £22.5m to a new JV company (to be initially wholly owned by an EW entity), and for the JV company to use its best endeavours to acquire Berryblue's interests in Abacus and Homeground for a total amount not exceeding £22.5m.

254.   By 14 April the strategy had changed.  As explained by Mr Leahy in an e-mail of that date to Mr Armitage the plan now was to *"bring NR on-side re. the 22.5mn receipt."*   On 18 April Mr Leahy set out some proposals in two papers headed *"Berryblue Proposals"* and *"Real Estate Joint Venture Proposal"*.   The background to these was that under the current discussions with M&G, M&G were understood to be likely to deliver c. £18.8m to the partners in Abacus, that is £9.4m each for Berryblue (Mr Richardson) and Gaucin (Mr Watson), for their interests in the Abacus portfolio and

Homeground. Since however Gaucin owed Berryblue £7.5m on the Berryblue loan, the total that Berryblue would receive from the M&G deal would be £16.9m. In the two papers it was suggested instead that the JV should buy the Abacus portfolio and their interests in Homeground, matching the M&G deal, and sell the assets on to M&G. In that way Berryblue would again receive £9.4m for its share. Instead of simply paying it £7.5m to discharge the Berryblue loan however, the proposal was that Berryblue would receive £13.1m (described as *"additional £13.1mn Goodwill Payment"*). In exchange for receiving it, Mr Richardson would receive an additional £1m, taking his total receipts to £17.9m (ie £9.4m for his share in Abacus, £7.5m for the Berryblue loan and £1m additional), and return the balance of £4.6m (ie £13.1m – (£7.5m + £1m)) by some process to be determined. The reference to the *"additional £13.1mn Goodwill Payment"* is to the difference between the £22.5m to be paid and the £9.4m of that actually required to buy out Mr Richardson. In other words what Mr Leahy was proposing was that in return for Mr Richardson agreeing to appear to receive the entire £22.5m (but in fact returning £4.6m of it to Mr Watson) he would be paid £1m. Indeed in the Real Estate Proposal there is a reference to discussions with the vendors (that is of Berryblue, ie Mr Richardson) as follows:

> "Per discussions with vendors, balance of value, which amounts to a total of £13.1mn, has been agreed to be paid to Berryblue as part of the JV's purchase of 50% share in GR portfolio ("Goodwill Payment"), on the basis that value can be returned to appropriate parties through alternative means – ie **Berryblue to receive £4.9mn + £13.1mn = £22.5mn in cash.**"

Taking that at face value, it would suggest that the proposals had already been discussed with Mr Richardson and he was agreeable to them.

255. The proposals are entirely consistent with Mr Leahy's explanation in his e-mail of 6 April to Mr Armitage that *"we simply want him* [Sir Owen] *to see 22.5mn being paid out to buy NR's 50% share"* (paragraph 235(5) above), and I am satisfied that the purpose of the proposal was so as to be able to pretend to Messrs Miller and Dickson that it had indeed cost £22.5m to buy out Mr Richardson's 50%. Mr Leahy (although saying this was an internal document, and that it never progressed very far) indeed appeared to accept in cross-examination that this was his draft of how Mr Richardson was going to be brought on side, and that Kea would see £22.5m going to Mr Richardson for his half share in the assets, while behind the scenes the loan would be paid off and the £4.6m returned to Mr Watson; Mr Watson (although also saying that these were ideas that were being bounced around and didn't eventuate) accepted that you could interpret this proposal as being in effect that Mr Richardson would look as if he was receiving the £22.5m for his 50% interest but he would only keep the £9.4m plus the loan repayment and an extra £1m as some kind of inducement.

256. There is also a revealing comment in the *"Real Estate"* paper where Mr Leahy explained that:

> "Due to ongoing circumstances, JV is unwilling to pay EW-associated vehicles any goodwill for any assets"

I accept Ms Jones' submission that that reflects Mr Leahy's (and Mr Watson's) understanding that Sir Owen and his interests were unwilling to pay any goodwill money to Mr Watson or his vehicles. That explains why what was proposed was to

make it look as if the entire £22.5m was going to Mr Richardson.

257.   Mr Leahy produced two more iterations of the Real Estate Joint Venture Proposal on 20 April.  These variants were more complex.  It is not necessary to set out the details, but under this proposal Berryblue would again receive the whole £22.5m, would retain £9.4m for its share of Abacus and Homeground and £7.6m for repayment of the Berryblue loan and a rather smaller fee (£0.25m or £0.33m), and would return the balance through a subscription in redeemable preference shares in a New Zealand company.  In each case under the heading *"Issues"* was included:

> "We have convince JV trust that BB's [ie Berryblue's] interest in GR and HG [ie Ground Rents and Homeground] are worth £22.5mn"

Ms Jones suggested that this should be read as *"We have convince[d]..."*; I think what might in fact have been meant was *"We have [to] convince..."* as the other items on this list are things to do, but on either reading it is further evidence that Mr Leahy understood that the intention was that Messrs Miller and Dickson should believe that the £22.5m was going to pay out Mr Richardson for his interest in the assets.

258.   In an e-mail of 20 April Mr Leahy asked Mr Armitage and Mr Gibson if they could do a call with *"Neil's tax guys"* about the reimbursement through the New Zealand company, and in an e-mail of 23 April Mr Leahy referred to a call having been set up the next day with *"Neil and his tax advisors"*.  Ms Jones submitted, and I accept, that that indicates that at least an initial approach had been made to Mr Richardson about these proposals as well.

259.   On 24 April Mr Leahy sent Mr Watson an e-mail with a list of things to discuss with Mr Astor, one of the *"Big picture things"* being:

> "general message that we probably have the ability to get NR across line in doing this deal in relation to our assistance on the structuring side"

This indicates Mr Leahy's confidence that Mr Richardson could probably be brought on side.

260.   On the afternoon of 9 May Mr Watson had a meeting with Mr Richardson at the Arts Club.  Mr Watson accepted that at that meeting he sounded out Mr Richardson about a potential sale of the assets of Berryblue, but denied that he had talked to him about the specifics of the transaction, saying that he had talked to him in high level, very general terms.

261.   I do not accept that evidence.  What the contemporary documents show is as follows:

(1)      At 12.35pm on 9 May Mr Leahy produced another proposal document, headed *"Strictly confidential and for discussion purposes only"* and stating that the objective was *"sale of BB via most efficient manner.  EW liquidity into New Venture"*.  The proposal included (i) removing the Berryblue loan from Berryblue before Berryblue was sold and settling it, so that Mr Richardson would receive £7.5m; (ii) Park (as set out above, a trust associated with Mr Watson) acquiring Berryblue for £22.5m; and (iii) £13m of this to be held in escrow, with a mechanism to calculate final amount to be invested into *"New*

*Venture"*.  What this therefore envisages is that Park would appear to acquire Berryblue for £22.5m, but up to £13m of this would be returned, thereby providing cash for a new venture of Mr Watson's.

(2)        At 16.43 that afternoon, Mr Leahy produced another document.  This set out what the effect would be if the M&G deal were worth (i) £20m or (ii) £22m.  In each case the *"Price paid by Spartan"* would be £22.5m.  But if the M&G deal were worth £20m, the amount *"due to Neil"* would be £10m, and *"Profit to Eric from NR"* would be £12.5m, whereas if the M&G deal were worth £22m, the amount *"due to Neil"* would be £11m, and *"Profit to Eric from NR"* would be £11.5m.  In each case Mr Watson would also receive a *"Profit from Spartan"* (of either £10m or £11m, so making Mr Watson's total receipts £22.5m in either case).  Mr Leahy said that he did not recall this spreadsheet specifically, but was sure that Mr Watson was wanting to analyse the different positions he would be in depending on where he ended up with Mr Richardson.  That is I think inaccurate: what the spreadsheet shows is the positions Mr Watson would end up in depending on what the M&G deal was worth.  But in each case the arrangement with Mr Richardson is the same: although the price paid is £22.5m, he only actually keeps half the value of the M&G deal, the balance being returned to Mr Watson.

(3)        The next morning (on 10 May) Mr Leahy e-mailed Mr Kevin Thorne of Grant Thornton, who were providing tax advice.  He said:

> "NR is happy with our proposal and we need to discuss 2 parts of it...:
>
>    1.  The paydown of the Gaucin to Berryblue loan – approx. £7.5mn – needs to be done as step one, I think. Need to think about whether this occurs post transferring the note out and settling into another vehicle or if we settle into B.blue and then it dividends out the cash?
>
>    2.  Purchase of Berryblue by Park Trust.  NR has some tax planning considerations as to how this is structured."

That clearly indicates that a proposal had been put to Mr Richardson in some detail and that he had said that he was happy with it subject to some structuring for tax planning purposes.

(4)        On the evening of 9 May Mr Leahy sent to Mr Miller and Mr Dickson the draft Term Sheet for Project Spartan.  This provided for Kea to lend £22.5m to Spartan, for Spartan to lend the £22.5m to Park, for Park to use its best endeavours to acquire the shares in Berryblue for £22.5m, and for Park to then transfer the Berryblue shares to Spartan for £22.5m (thus repaying the loan from Spartan to Park).

262.   I accept Ms Jones' submission that these documents suggest, and I find, that Mr Watson did discuss a proposal in some detail with Mr Richardson at his meeting on 9 May, very probably along the lines drafted by Mr Leahy that morning, and secured his agreement in principle to them, as a result of which Mr Leahy sent out the draft Term Sheet on the evening of 9 May providing for Park to acquire Berryblue for £22.5m. That was done in the knowledge that Mr Richardson had agreed in principle to return to Mr Watson the difference between the £22.5m price and (half) the value of the

M&G deal.

263.    I therefore reject Mr Watson's evidence that his discussions were high level and in very general terms.  Moreover I should record that I had the distinct impression when he was giving that evidence that he was not misremembering, but was deliberately covering up the truth.

264.    Mr Leahy sent the draft Term Sheet for Spartan to Messrs Miller and Dickson on 9 May.  That was followed by a revised draft on 14 May and further drafts on 21 and 23 May.  In each case the Claimants rely on alleged misrepresentations, the essence of them being that Kea would be contributing £22.5m which would be used to buy out Berryblue.  The details are as follows.

265.    The 9 May draft envisaged the following transactions: Spartan would acquire the shares in Gaucin for £22.5m, the amount being left outstanding as a loan by Summit (the trust that owned Gaucin) to Spartan; Kea would also lend £22.5m to Spartan which would be on-lent by Spartan to Park which would:

> "use its best endeavours to acquire the shares in Berryblue … for a total amount of £22.5 million"

Park would then transfer the shares in Berryblue to Spartan for £22.5m, which would repay the loan from Spartan to Park.

266.    Messrs Miller and Dickson had instructed Mr Maislish, and he met Mr Dickson (who had come to London) on 14 May.  Mr Maislish's notes of that meeting indicate that he understood that Spartan would in effect buy Berryblue's assets for £22.5m.  On the evening of 14 May Mr Leahy sent Messrs Miller and Dickson a revised draft Term Sheet.  This was similar to the first draft save that it provided that Park would establish a new company (Newco), that Spartan would on-lend Kea's £22.5m to Newco and that Park would:

> "use its best endeavours to procure that Newco acquires the Berryblue Assets … for a total amount of £22.5m"

with Park then transferring the shares in Newco to Spartan for a nominal sum.  The change from acquiring the shares in Berryblue to acquiring Berryblue's assets appears to have come from Mr Richardson's tax advisers.  Mr Leahy met Mr Dickson and Mr Maislish on 15 May and went through the revised Term Sheet.  Mr Maislish's notes of that meeting show that he understood that the proposal was that Newco would buy Berryblue's assets for £22.5m.

267.    On 17 May Mr Maislish sent Mr Leahy a redraft of the Term Sheet, with the comment that the original was a little all over the place, with provisions out of sequence.  His redraft set out the transactions which were to happen, and they included:

> "4.  Newco will buy the Berryblue Assets from Berryblue for £22.5M."

On 21 May Mr Leahy sent back to Mr Maislish a further revision based on Mr Maislish's draft.  This made a number of changes but left the description of transaction 4 unchanged, as it was in a further draft circulated on 23 May.

268.   The various drafts circulated by Mr Leahy are pleaded as containing representations that it was contemplated that Kea would make an equity investment of £22.5m, all of which sum was required to buy out and would be used to buy out Berryblue, or the assets of Berryblue.  Save that it points out, correctly, that it was contemplated that the proposed deal in each case involved a loan from Kea to Spartan in the sum of £22.5m rather than an equity investment, Mr Watson's defence admits this representation but asserts that it was true.

269.   I am satisfied that it was false and that what was in fact contemplated was that it should appear that the whole £22.5m would be used to acquire Berryblue or Berryblue's assets, but that the true price for them would be very much less, the difference being returned to Mr Watson through some mechanism agreed with Mr Richardson.

*The M&G deal and its impact – Mr Leahy's e-mail of 28 May 2012*

270.   Mr Dickson was due to meet Mr Leahy on 29 May to discuss the then draft of the Term Sheet.  But on 28 May Mr Leahy sent him an e-mail to the effect that Project Spartan would have to be restructured because the M&G deal had just been finalised. What he said was as follows:

> "I have got some good news re. the M&G deal on the ground rents — looks like it was finalized over the weekend - an agreement to purchase Abacus assets at 27x as well as substantial commitment of capital for more ground rents in the future which will deliver significant value into the Long Harbour ground rent management company, which Spartan will have the right to buy in at a substantial discount. I think this also delivers the opportunity to substantially simplify the Spartan deal and I am working on laying out exactly how I think that might work today — result will hopefully be less DD, simpler structure, less tax but same commercial outcome.
>
> Slight irritating flip side of all this is that it might change the structure of the Spartan term sheet a bit (not commercially, just how things move around). As such — I think best if you meet with Eric and me tomorrow, before you meet with DMM, to discuss how we think the deal should now be structured before you meet with DMM to finalize a term sheet which will likely move around. After we have our meeting tomorrow, you and I can both go and meet DMM together (either later on Tuesday or on Wednesday) to lay out how the new structure will work and we can get the new term sheet finalized whilst you are here."

271.   This e-mail is relied on by the Claimants as containing an implied representation that it was Mr Leahy's and Mr Watson's opinion, genuinely held on reasonable grounds, that the revised structure that they intended to put forward was commercially equivalent to the structure put forward in the 1 April presentation and the draft Term Sheet.

272.   The background to this was that Long Harbour had been pursuing a possible deal with M&G for some time, since at least January 2012 (paragraph 235(1) above).  Mr Watson was naturally interested in what this might mean, not only because it involved a sale to M&G of Abacus's existing portfolio (in which he was interested through Gaucin) but also because M&G was interested in an ongoing relationship in the form of an "offtake" arrangement (also called an origination agreement) under which Long Harbour would originate and manage future ground rents for M&G, and Mr Watson

had a 1/3 interest in profits from any new ground rent investments (paragraph 86 above). Thus for example on 2 April 2012, when he was preparing for a trip to the Dominican Republic where he had been invited by Sir Owen to play golf, he asked Mr Gibson to bring him *"a full analysis of the m&g deal and what it delivers to the management co."*.

273.   Mr Watson arrived in the Dominican Republic on 13 April 2012 and was there with Sir Owen for about 3 days. During that time they spoke about a number of things. Mr Watson's evidence was that this included the possibility of the M&G deal. I think there is little doubt that Mr Watson did speak to Sir Owen about M&G as on 15 April he got Mr Idicula to send him detailed information on M&G which he sent on to Sir Owen. There is no documentary record of what Mr Watson might have said, but his evidence was that he raised the possibility of Spartan acquiring a piece of the management company. Sir Owen denied this when it was put to him, but he accepted that if he was to proceed on any front with Long Harbour, his proposal was that he have a percentage shareholding in that company, and in general his recollection of what was discussed was (understandably) quite vague. I consider it probable that Mr Watson did raise the possibility of Spartan acquiring a part of the company which would manage M&G's investments in ground rents if that happened, not least because that could provide another source of profit to him, and that Sir Owen was interested in, if not indeed excited by, the suggestion.

274.   That is consistent with the fact that on 18 April Mr Leahy told Mr Gibson that there were ongoing discussions with Long Harbour about carving out the carry with the ground rent business into a new company to be owned by Mr Astor and Mr Aumonier, which would sell a 25% interest to Spartan, the purchase price not yet being finalised but Spartan being likely to pay about £3m for its 25%.

275.   In the remainder of April and May Mr Leahy (and Mr Watson) considered what impact the M&G deal would have on the proposed Spartan deal. There were three aspects to this: (i) how the timing of the two potential deals could be made to fit; (ii) whether and on what terms Spartan would have the right to deploy capital in the purchase of ground rents if the M&G deal went ahead; and (iii) whether and on what terms Spartan could acquire a share of the company managing the ground rents.

276.   Thus in Mr Leahy's e-mail of 24 April to Mr Watson outlining discussion points with Mr Astor (paragraph 259 above), one of his *"Big picture things"* was that £3m had been agreed in principle for purchase of a 25% share in the ground rent business, but he added:

"OG will want the flexibility to buy GRs through Spartan also – need to manage this"

and he also referred (under *"More detailed discussion points"*) to:

"General discussion around the actual ability / process in which LH could continue to buy GRs for the existing LLP partners (Spartan, post deal with M&G)"

and to:

"Timing of M&G versus OG – how can we manage this…Cannot really sign M&G up for exclusivity if we want to do a deal with OG?"

277.   On 27 April Mr Astor circulated a very rough draft of a Term Sheet (under the name Project Antartica, the codename for the origination agreement with M&G) which provided, among other things, for Mr Astor and Mr Aumonier to establish a new management business, to be called Long Harbour Residential Freeholds (**"LHRF"**), and to sell Spartan [25]% of the shares in LHRF for £[3m] – this aspect of the proposal was later codenamed Project South Sea.   On the face of it, as Mr Leahy accepted in evidence, the proposal was that the vendors should be Messrs Astor and Aumonier alone and the purchaser Spartan; Mr Watson however had an equal interest in the profits of the ground rent business and it may have been that the actual intention even at this stage was a sale by the three of them equally – it is not I think necessary to resolve this question.

278.   At that stage the draft Term Sheet contemplated a sale to M&G of the existing Abacus portfolio at a 25x multiple together with 20% of Homeground.   But on 9 May Mr Richardson and Mr Watson were asked if they would agree to a proposal under which M&G would buy the existing Abacus portfolio (and also any new ground rents purchased up to the end of August 2012) and 100% of Homeground at a 27x multiple. On 14 May they were told that the relevant individual at M&G was waiting for one more sign-off but felt confident they could move ahead with the deal; Mr Leahy's reaction was to tell Mr Watson that they needed to be careful that whatever was signed did not hold back what they were doing (that is with Spartan); Mr Watson agreed and told him to keep close to Mr Astor.

279.   On 15 May Mr Leahy e-mailed Mr Astor:

> "These guys are very ready to go.  If we do the m&g deal, I reckon we could get them to buy 40% of LH GR management business at a 12mn valuation, if you wanted them to.. That would be almost 5mn off the table.  Peter is excited about this."

That indicates, and I find, that Mr Leahy had already raised the possibility with Mr Dickson that Abacus might be sold to M&G, and that if that happened, it might be possible for Spartan to acquire a share of the management business.  That is consistent with a manuscript note (albeit undated) on a hard copy of the 1 April presentation, which Mr Miller thought was in Mr Dickson's handwriting and which reads:

> "Get big institution to bring on board and sell earlier + take a share in management company."

280.   Mr Astor replied to the proposal (to sell Spartan 40% of LHRF at a £12m valuation if they did the M&G deal) to the effect that M&G had confirmed that the deal was on but that a £12m valuation was too low.  Mr Watson told Mr Leahy to tell him that it was too late.  That suggests that at that stage Mr Watson still saw himself as a buyer not a seller.

281.   By 22 May however Mr Leahy was working on a different proposal for the sale of a share in LHRF.  This was that the bulk of the share to be sold to Spartan should come from Mr Watson's 33.3% interest with the aim that after the sale Mr Watson (through a combination of his remaining interest and his half-share in Spartan's interest) would still be on equal terms with each of Mr Astor and Mr Aumonier.  This was designed to allay a concern that Mr Astor had that Mr Watson should not end up with a larger

share of the company than he and Mr Aumonier. Mr Leahy's first iteration of this on 22 May had Mr Watson sell Spartan 22.2% and Messrs Astor and Aumonier 5.6% each (making a total of 33.4% of which Mr Watson would pick up 16.7%), thereby leaving Messrs Astor and Aumonier with 27.8% each, and Mr Watson the same (11.1% + 16.7%, making 27.8%). His second iteration, which he proposed to Mr Astor later that day, was that Mr Watson sell Spartan 26.7% and Messrs Astor and Aumonier 6.7% each (making a total of 40%), thereby leaving Messrs Astor and Aumonier with 26.7% each, and again the same for Mr Watson (6.7% + 20%, making 26.7%). Mr Leahy proposed a price of 30% at a £12m valuation, and 10% at a £17.5m valuation (that is £3.6m + £1.75m, making £5.35m for 40%, equivalent to a valuation of £13.375m for the whole). Since Mr Watson on this scenario was selling 26.7% to Spartan and acquiring (through Spartan) 20%, it is evident that Mr Watson was selling more than he was buying and that it was no longer in his interest to keep the price down, but to push it up. Mr Leahy asked Mr Astor:

> "We could see if we can get this across the line – would you do the deal?"

282.  Also on 22 May he arranged to meet Mr Dickson in London the following week, and told him that he hoped by then to have more clarity on the potential M&G deal. (That again confirms that he had mentioned a possible deal with M&G to Mr Dickson by then). He also asked Mr Astor for the latest draft of Project Antarctica and the origination deal, saying that the quicker they could get these sorted, the sooner he could sit down with Kea and show them the new deal. Mr Astor sent it that evening: this referred to LHRF having agreed a £250m origination contract with M&G, and for LHRF to continue to acquire residential freeholds for a period of 4 years for Spartan *"where expressly permitted by the Long Harbour/M&G Term Sheet"* but on a non-exclusive basis; and to continue to do so after 4 years subject to no further agreement with M&G continuing.

283.  Mr Leahy redrafted it and sent it back on 25 May. Despite the proposal (which Mr Leahy thought Mr Astor was happy with) that Mr Watson sell a disproportionate part of LHRF, this still provided for "Management" (that is Messrs Astor and Aumonier) to sell a percentage of LHRF to Spartan (at that stage 35% for £4.48m), and Mr Leahy also deleted any reference to Mr Watson as a party (I infer because he did not want Messrs Miller and Dickson to see his name on the Term Sheet). He also redrafted it to provide for LHRF to acquire residential freeholds for Spartan exclusively *"apart from the requirements to buy for M&G and Oxford Investment Partners"* (Oxford Investment Partners being another body that LHRF was proposing to buy ground rents for). He told Mr Astor that:

> "It really is critical that we have this in an agreed form by Monday [ie 28 May] … as we need to sit down with Peter in order to try and re-hash the Spartan deal in light of M&G."

On 27 May Mr Leahy e-mailed Mr Astor again to the effect that Mr Watson wanted him and Mr Aumonier to agree in principle to Spartan acquiring 40% (disproportionately as discussed), *"assuming we could get it across the line on these terms"*, and on the morning of 28 May reiterated that it was *"key for us to get sign off on that 40% so we can pitch it to Peter this afternoon"*.

284.  Mr Astor replied that he had spoken to Mr Aumonier who was agreed in principle but

asked if they could get the net take out to be £1m rather than £890,000 (which is what the 40% proposal at £5.35m would deliver to each of them for their 6.7%). Mr Leahy suggested 33% at £12m and 10% at £17.5m, which would take their net take out to just over £1m, saying *"I can try for that?"*, to which Mr Astor replied that he meant £1m based on an increased valuation not increased sale of shares. Mr Leahy then suggested 30% at £12m and 12% at a £17.5m valuation, saying *"Let me know if you are happy with that, I will see if we can squeeze it out of them."* Mr Astor however repeated that they did not want to sell any further shares, just an increased valuation. Mr Leahy said he would see what he could do but *"assuming we can't get higher valuation than this, are you ok on the terms described previously?"* and on the afternoon of 28 May sent a further draft of the Term Sheet (now called the Project South Sea Term Sheet) which had Messrs Astor and Aumonier selling 40% of LHRF to Spartan for £5.35m. Then on 29 May he e-mailed Mr Astor as follows:

> "Think we can get you and James your 1mn each, without selling more shares."

He followed that up on 30 May with a spreadsheet showing Spartan acquiring 40% (26.7% from Mr Watson and 6.7% from each of Messrs Astor and Aumonier) for £6m (a valuation of £15m), which would deliver £4m to Mr Watson and £1m to each of the others, describing it in the covering e-mail to Mr Astor as *"what we are shooting for"*. In the event the proposal put to Kea (Mr Dickson and Mr Maislish) on 30 May was that 40% of LHRF be acquired for *"up to £8m"*; and by 8 July when a draft of the Project South Sea Term Sheet was provided to Messrs Miller and Dickson, the proposal was that 40% be acquired for £7m.

285. Both Mr Watson and Mr Leahy were asked about these various proposals. Mr Watson said that he pushed Mr Astor to get a better deal for Spartan; Mr Leahy said that he was trying to get the price as low as possible. That seems to me impossible to reconcile with the e-mails and I cannot accept this evidence. Since Mr Watson under the most recent iteration was selling 26.7% to Spartan and acquiring (through Spartan) 20%, Mr Watson was selling more than he was buying and it was no longer in his interest to keep the price down, but to push it up (paragraph 281 above). Mr Leahy accepted this to be the case *"on day one"* but said this was not necessarily the case going forwards as Mr Watson was a 50% shareholder in Spartan, his evidence being echoed in a submission by Mr McCaughran that as a matter of mathematics Mr Watson benefited *"in the short term"* by an increase in the price to be paid by Spartan, but this was not what was going on. I do not understand this. It seems to me that Mr Watson would benefit from a higher price, and that there would be no ongoing disadvantage to him. Mr Leahy said he found it difficult to say whether he was acting for one side or the other and that he was just trying to get a deal across the line; I find that he was certainly not acting in Kea's interests and trying to keep the price down, but was trying to find a price that he could persuade Messrs Dickson and Miller to pay – this is what he meant by *"squeez[ing] it out of them"*, *"getting this across the line"* and *"what we are shooting for"*.

286. Reverting to Mr Leahy's e-mail to Mr Dickson of 28 May 2012, it is now possible to assess his statements that the revised Spartan deal would have the *"same commercial outcome"* and that the structure might be changed but *"not commercially, just how things move around"*.

287. Ms Jones submitted that Mr Leahy and Mr Watson knew perfectly well that the

revised deal they were about to put forward was commercially different from the proposal in the 1 April presentation. She relied first on the loss of the LH Investment Right. The original proposal in relation to ground rents, as presented in the 1 April presentation and the draft Term Sheet, was that by buying into Spartan Kea would acquire not only an interest in the existing portfolio in Abacus but also the LH Investment Right. This was responsible for the majority of the discounted cashflow valuation of Spartan as presented in the 1 April presentation. The cashflows were premised on Spartan having an exclusive right to continue to work with Long Harbour on all future ground rent portfolios, amounting to a c. £40m annual pipeline of future purchases, and leverage of 75%, meaning an annual deployment by Spartan of £10m, or £100m over 10 years, and a return of £210.5m over the same period, or profits of £110.5m over 10 years.

288.   By contrast, even with Mr Leahy's redraft providing for Spartan to have exclusivity after M&G and Oxford Investment Partners, it was quite uncertain how much capital Spartan would be able to deploy into ground rents if the M&G deal happened (as Mr Leahy himself said in an e-mail of 4 June). And the opportunity to acquire 40% of LHRF could not begin to make up the loss of the LH Investment Right: on 4 June Mr Leahy produced cashflows for LHRF based on M&G buying £300m of ground rents over 4 years which he estimated to produce a net income for LHRF; on this basis Spartan would have 40% of that, or £12.9m (but would have to pay over £5m for this); and this was nowhere near the cashflows projected for the LH Investment Right.

289.   I accept on this basis that if the comparison Mr Leahy was making was with the original proposal in the 1 April presentation, it is difficult to see that they could have been regarded as commercially equivalent.

290.   Mr Watson's Defence however denies that Mr Leahy was making a comparison with the original proposal in the 1 April presentation, and asserts rather that Mr Leahy was setting out his expectation that if the M&G deal took place, the Spartan transaction would remain commercially the same as the revised form of transaction which he had already discussed with Mr Dickson. This was based on Mr Leahy's evidence that he had already discussed with Mr Dickson the potential M&G deal and its consequences (namely that the origination agreement would generate value in LHRF, that Spartan could acquire a share in LHRF, and that Spartan could still deploy capital into acquiring ground rents, albeit behind M&G), but initially with a view to Spartan acquiring the Abacus portfolio from Gaucin and Berryblue, and then subsequently selling it on to M&G; and that when in his 28 May e-mail he said that the revised structure was commercially the same, the comparison he was making was between this understanding of what would happen if the M&G deal closed after Spartan had acquired the assets, and the revised deal under which the assets would be sold direct to M&G.

291.   I have come to the conclusion that I should accept Mr Leahy's evidence about this. First, I accept (as already referred to) that Mr Leahy had mentioned to Mr Dickson, at least by 15 May if not before, the possibility of the M&G deal, and that Spartan might be able to acquire a share of the management company.

292.   Second, as Mr Leahy pointed out, his e-mail to Mr Dickson of 28 May is echoed by a similar e-mail which he sent to Ms Huggett and Mr Gibson on 1 June as follows:

"Please find attached the proposed draft Term Sheets for the Spartan transaction (now split into 2). Things have moved around a little bit because a deal with M&G to acquire the Abacus GR assets (which were originally going to be sold to Spartan first) has materialized a little earlier than expected — as such, it has now been decided that the proceeds of this sale, as opposed to the assets themselves, will be invested into Spartan (this saves cash basically moving in a circle and also saves stamp duty tax issues that existed prior to this). The commercial elements of what was proposed still remain the same, once all is completed."

This language, in particular the reference to things having moved around, and the commercial elements remaining the same, is very close to his e-mail of 28 May. But it makes it much clearer that what he is comparing the revised deal with is one under which the assets were originally going to be sold to Spartan first and then on-sold to M&G.

293.   Despite the fact that (as Ms Jones points out) Mr Leahy did not come forward with this explanation until late in the current litigation, I accept that this is what Mr Leahy was referring to. Ms Jones said that the reference to the Term Sheet in the e-mail showed that this must be wrong (and was able to refer to an answer she elicited from Mr Watson that what Mr Leahy was referring to was the deal as set out in the current Term Sheet); but I do not see that Mr Leahy's explanation is inconsistent with the wording of his e-mail. Once it is accepted that what he meant is that what required a redraft of the Term Sheet was the proposal that the assets be sold to M&G before rather than after being sold into Spartan, then the reference in his e-mail to *"chang[ing] the structure of the Spartan term sheet (not commercially, just how things move around)"* seems to me to make sense.

294.   In those circumstances I do not find that this e-mail contained the misrepresentations alleged.

*From 28 May 2012 to signature of Spartan Term Sheets on 7 June 2012*

295.   On 29 May 2012 Mr Leahy and Mr Watson met Mr Dickson at Mr Watson's flat to present their revised proposal; on 30 May 2012 Mr Leahy met Mr Dickson and Mr Maislish at Mr Maislish's offices. The next misrepresentation relied on by the Claimants is said to have been made at the latter meeting.

296.   There is no contemporaneous record of the meeting on 29 May, but Mr Leahy prepared a document headed *"Changes to Proposal"*, and his evidence was that he and Mr Watson explained the new proposal to Mr Dickson by reference to this document (and the draft Project South Sea Term Sheet); and that at the meeting on the next day with Mr Maislish he again went through the *"Changes to Proposal"* document. Among other things it contained the following. Under the heading *"M&G deal"* it explained that this put a price on the Gaucin and Berryblue assets of c. £21m; and under the heading *"Deal puts clear numbers on Abacus asset value vs. Goodwill for Spartan"* it explained that this meant that with a total value for the Spartan deal of £45m:

"Implied goodwill being paid by Spartan - £24mn (50% to be paid in cash and 50% in form of EW ownership in Spartan)"

Under *"Spartan proposal adjustments"* it explained that Spartan would no longer buy

Abacus 1, 2 and 3 but that Mr Watson and Kea would each put the cash equivalent (£10.5m) into Spartan, and continued:

> "2.   Separate out Goodwill and purchase that separately – avoids potential stamp duty issues with attaching Goodwill to Berryblue and Gaucin purchases (Risk that HMRC attributes total value to assets as opposed to some to goodwill as a result of 'market value' approach)
>
>  3.   "Project South Sea" – deal papered to grant the right to buy into LH GR Company at substantial discount to future value along with incremental rights to continue Ground rent deals post M&G capital is deployed
>
>  4.   Spartan to buy South Sea from holders for the goodwill component of the original proposal…"

and under *"Do not buy Abacus 1, 2 and 3 – why?"* it referred among other things to:

> "Buying Berryblue assets for £22.5mn (including the goodwill price) potentially creates a 'stampable' purchase price for the assets of 22.5mn instead of the rightful true asset value (excluding goodwill) of £10.5mn…
>
> Before selling something to Spartan for 45.0mn and then essentially sell for 20.0mn – aesthetically doesn't look great.  Now goodwill attached to purchase of Project South Sea – far more robust structure for beneficiaries."

The document contained a diagram which showed Newco (labelled *"Newco – "Goodwill" Owns South Sea"*) as owned as to 50% by each of two owners, Holder 1 and Holder 2; Mr Watson as contributing £10.5m cash to Spartan (in lieu of his interest in Abacus) and Kea as contributing £22.5m; and Spartan acquiring Newco at a total value of £24m, in the shape of £12m of the cash from Kea which would be paid to Holder 2, and £12m in shares in Spartan which would go to Holder 1, such that *"Post deal, Kea and EW Entity will have 50-50 holding"* in Spartan.

297.   This document illustrates a number of things.  First, it is a clear demonstration of what Mr Leahy meant by *"goodwill"*, namely what Spartan would be paying for over and above the Abacus assets, which was in effect access to various other opportunities. That is why he described the M&G deal as putting clear numbers on the value of the Abacus assets, and hence on the *"implied goodwill being paid by Spartan"*, this being the £24m difference between the £45m to be paid by Spartan and the £21m value placed on the Abacus assets by the M&G deal.  Second, it confirms that the previous proposal involved the acquisition of the Berryblue assets for £22.5m, that is that the price to be paid to Berryblue was both for Berryblue's Abacus assets and for half the goodwill – this is confirmed by the reference to *"Buying Berryblue assets for £22.5mn (including the goodwill price)…the rightful true asset value (excluding goodwill) of £10.5mn"*, and the reference to the advantage of not doing this being that it avoided stamp duty issues, namely the risk that HMRC would treat the whole of the £22.5m payable to Berryblue and Gaucin as the price for their assets, not attributing any of it to goodwill, and hence as stampable.  Third, it explains the new transaction as attaching the goodwill payment to the acquisition of South Sea from its holders, this being the two 50% owners of Newco, of which Holder 1 was a Mr Watson entity (it being proposed that Spartan acquire Holder 1's 50% interest in Newco *"in form of EW ownership in Spartan"* such that post deal, *"Kea and EW Entity will have 50-50*

*holding"*).  It says nothing about who Holder 2 is.

298.   Mr Maislish made a manuscript note at the meeting on 30 May.  This divides the proposed transaction into two parts, the first consisting of Park selling 50% of Spartan to Kea for £1, Kea advancing a £50m loan to Spartan, Gaucin paying the proceeds (of the M&G deal, c. £10m) to Summit who would lend it to Spartan, and at the same time Kea lending an equal £10m.  The second part of the transaction has 2 steps as follows:

> "1    Form Newco (BVI) – owned by Park + another
>
> Will have in it Ladoga co-invest + new JV Agreement (right to buy up to 40% of Long Harbour Ground rent co for up to £8M)
>
> Kea 12.5M loan (terms as 10M)
>
> 2    Spartan acquires Newco from Park + another for £45M less net received consid by Gaucin & Berryblue from M&G – prob about £25M – 50% cash + 50% outstanding [?] as a loan"

This confirms that Mr Leahy explained Holder 1 as intended to be Park.  Mr Maislish's written evidence was that he had a clear recollection of raising with Mr Leahy at the meeting who the *"+ another"* was, and that Mr Leahy told him that he was deliberately referring to Mr Watson's partner as *"another"* rather than by name to ensure that it was not possible for Kea and the partner to get in touch; they (by which he assumed Mr Leahy meant Mr Watson and himself) were concerned that if the partner became aware of the Spartan deal, he might either not want to sell or would seek to do so at a different price.  Mr Maislish added that Mr Dickson indicated to him at the meeting that he was already aware of this and it was acceptable.  His oral evidence was to the same effect and was unshaken in cross-examination.

299.   This is pleaded as a representation by Mr Leahy that it was intended that Newco would be owned by Park and its or Mr Watson's existing partner; and as false and known to be false as the actual intention was that Newco would be owned by entities connected with Mr Watson (or that it would be ostensibly owned by Mr Watson and Mr Richardson but Mr Richardson would be induced to participate in a scheme where he would receive the cash but apply all or most of it for Mr Watson's benefit).

300.   Mr Leahy said several times in oral evidence that he could not remember the details of the meeting and did not precisely recall it, nor did he have any notes of it that he could look back on.  But he denied that Holder 2 was Berryblue – they had made it very clear that Berryblue was no longer a part of the transaction and Holder 2 was intended to be another Park entity related to Mr Watson, and although it didn't say that anywhere in the *"Changes to Proposals"* document, it was *"inherent in the discussion"*.  He said he wouldn't have said what Mr Maislish said he did, for two reasons; first, it was not the case at the time – Mr Watson was still concerned that Mr Richardson might look to participate in some of the value so Mr Leahy might have mentioned that he might participate but he wouldn't have said that he was going to be the owner in its entirety; and second, Mr Maislish's account did not make sense as he thought Mr Dickson and Mr Miller knew full well that it was Mr Richardson.

301.   Mr McCaughran invited me to reject Mr Maislish's evidence as unreliable and

submitted that Mr Leahy's evidence should be preferred.  He relied on a large number of points:

(1)      First, he said that Mr Maislish already knew the identity of Mr Watson's partner, namely Mr Richardson.  For this, Mr McCaughran referred to a document which Mr Maislish produced from his files.  This is a copy of the first draft of the Term Sheet for Project Spartan (as sent by Mr Leahy to Mr Dickson and Mr Miller on 9 May) with extensive manuscript markings, one of which identifies Berryblue as *"Neil Richardson"* and another of which notes *"NR selling assets of Berry Blue Not Berry Blue – no legacy issues as buying assets"*.  Mr Maislish's evidence was that the writing was not his; he thought that it was either Mr Dickson's or Mr Miller's and that it was likely he had swept up the notes at the end of one of the meetings he had had on 11, 14 or 15 May.  Mr McCaughran suggested that that meant that Mr Maislish had been at a meeting at which Mr Richardson's name had been mentioned and therefore that he already knew the name.

(2)      I do not accept this suggestion.  The handwriting appears in fact to be that of Mr Dickson (this was not disputed).  He was noting on a copy of the first draft Term Sheet the change to purchasing the assets of Berryblue as opposed to its shares.  In an e-mail to Mr Dickson of Sunday 13 May Mr Leahy referred to this change and said *"we went through that in our meeting"* and given the timing, that must I think be a reference to a meeting that Mr Dickson had with Mr Leahy on 11 May (before meeting Mr Maislish).  In the circumstances I think it most likely that Mr Dickson made the manuscript notes at that meeting on 11 May.  Mr Maislish was not present at that meeting.  Accepting therefore that this document shows that Mr Dickson knew the name of Mr Richardson, and that Mr Maislish probably swept it up at the end of one of his meetings with Mr Dickson, I nevertheless agree with Ms Jones that it does not establish that Mr Maislish was present at a meeting at which Mr Richardson's name was mentioned, or undermine Mr Maislish's evidence, which was to the effect that he did not recollect the name being said and that he did not recall the name Richardson at all.

(3)      Nor was there in fact any evidence that Mr Miller knew the name of Mr Watson's partner: when asked in oral evidence, he said he did not think he did, but he might have done; it is also not clear if he was at the meeting on 11 May.  I find therefore that all that has been established is that Mr Dickson (and possibly Mr Miller) knew Mr Richardson's name, not that Mr Maislish did.  It might seem odd that Mr Dickson knew Mr Richardson's name and did not tell Mr Maislish, but Mr Maislish's account of Mr Dickson telling him not to concern himself about it (in oral evidence he said that Mr Dickson, who was sitting on his left, obviously knew all about it because he raised his hand and said *"David, it is okay"* and so he moved on) rings true and is consistent with his evidence that in both Project Edsel and Project Spartan his instructions were not to get involved in the commercial merits of the transactions.  I accept that this however does not affect the point that it would have made no sense for Mr Leahy to say that they did not want Kea knowing the name of the partner when Mr Dickson already knew it.  This is a point I come back to below.

(4)        Mr McCaughran's next point was that Mr Maislish could not have understood that Mr Watson and his existing partner were each contributing half the business that Kea was funding Spartan to acquire, and that the £12m shown on the document (or £12.5m as it in due course became) was going to the partner.  He knew that Spartan was a new joint venture company being set up to acquire assets; that Gaucin and Berryblue owned the Abacus assets, but the Ladoga Investment Right was owned by an Eric Watson vehicle (and Mr Dickson had told him this was very valuable); that it was intended that Spartan would invest in residential property with Long Harbour using Mr Watson's relationship with Long Harbour; and that the £12m (or £12.5m) was for goodwill, which would have included the goodwill for the Ladoga Investment Right and the access to residential property deals.  He cannot therefore have understood that the goodwill payment would be going to Mr Watson's partner as on the information he had, that partner had no apparent interest in the rights and opportunities that were the subject of the revised Spartan deal.  Although he had said in his witness statement that he understood that after the revision to the deal to take account of the sale of the Abacus assets to M&G, Kea would pay some £12.5m to enable Spartan to acquire assets from a third party, in oral evidence he said he could not remember what assets he was referring to as he did not have the transaction in his head any more; and when it was put to him that it must have occurred to him that the £12.5m payment could not all be going to the owner of Berryblue, he said that he did not remember what occurred to him.

(5)        I accept that Mr Maislish had material, had he thought it was a matter he needed to concern himself with, which might have given him reason to query why the £12.5m was still going to Mr Watson's partner.  But I do not think that is a reason to reject his evidence that he thought the payment was still going to Mr Watson's partner.  I do not find it surprising that he could not when giving oral evidence reconstruct what he understood would be acquired from the partner; indeed he said at one point that when Mr Leahy explained why the revised proposal was really the same, *"it was going, as far as I was concerned, at 100 miles an hour"*.  What appears however from Mr Leahy's *"Changes to Proposal"* document – and hence what Mr Leahy would, I find, have explained at the meeting – was (i) that previously the £22.5m was going to Berryblue, of which part represented payment for the Abacus assets and part for goodwill; (ii) that the Abacus assets would no longer be acquired but the payment for goodwill would still be made; (iii) that the goodwill payment would now be used to acquire Project South Sea, that is Newco (or its assets); (iv) that Newco was owned by two 50% owners, of whom Holder 1 was a Mr Watson entity (identified as Park, as Mr Maislish wrote down) and Holder 2 was not identified as such.  I see nothing improbable in Mr Maislish understanding from this that the payment of £12/£12.5m for goodwill going to Holder 2 was going to Mr Watson's partner, just as it would have done when the payment of £22.5m was going to go to Berryblue.

(6)        I can deal with Mr McCaughran's next point very briefly.  This relied on a typed note that Mr Maislish made in preparation for the meeting on 15 May which referred to Park incorporating Newco, which would acquire an investment right (that is the Ladoga Investment Right) and enter a joint

venture (that is Project South Sea with LHRF) and that Spartan would buy Newco or its assets. This note therefore is completely silent as to the involvement of Berryblue, and Mr McCaughran said it suggested that Spartan would acquire Newco or its assets from Park. But whatever Mr Maislish might have understood or thought when he prepared his typed note, by the time of the meeting on 30 May the proposed transaction was clearly presented as one under which Newco would have two separate owners, who were indeed to be treated differently.

(7)      Mr McCaughran also made the point that Mr Miller's evidence did not support Mr Maislish's account. Mr Miller was not at the meeting on 30 May but in his witness statement he said that Mr Dickson updated him after the meeting and that one of the key points was that Mr Watson's partner would be removed from the transaction and all the goodwill value would be going to Mr Watson's interests. I am however unable to place any reliance on this evidence. First it was not Mr Leahy's evidence that he had expressly said this – what he said was that it was *"inherent"* in the discussion, which I take to mean that it was not expressly said. Second, when Mr Miller was asked in oral evidence whether he recalled Mr Dickson passing on to him what Mr Maislish said had been said, he answered *"Generally that's the context of what my understanding was"*. Mr McCaughran said that no attempt was made to explore this further or put to him clearly that his witness statement was wrong, but I am satisfied that this is an example of how little reliance can be placed on Mr Miller's written evidence.

302.    My findings are as follows. I start with a disposition to accept Mr Maislish's evidence: he was apparently credible, and has no particular reason to do anything other than give his genuine recollection, and the very fact that in other respects he could not remember details makes it more likely that he is reliable when he says that he has a clear recollection of this particular matter. I see no reason therefore to doubt that Mr Leahy told Mr Maislish that Newco would be owned by Park and another – this is what Mr Maislish wrote down, twice; it is also effectively what the diagram on Mr Leahy's document shows, where Holder 1 is presented as an EW entity and Holder 2 is not. I also see no reason to doubt Mr Maislish's evidence that he asked who the other was – as he said that was not because he thought it was important but it was just a natural part of the conversation – or that Mr Leahy did not tell him and Mr Dickson said it was okay, and that as a result Mr Maislish did not pursue the point. The only question that is of any difficulty is whether Mr Leahy said that it was Mr Watson's partner, but that they did not want to give his name.

303.    At this point it is worth asking why Holder 2 was introduced into the transaction at all. If it had been intended to explain that all the goodwill would now be going to Mr Watson and his interests, it is difficult to see why Holder 2 would be needed: Park was going to incorporate Newco, so Spartan could have simply bought Newco from Park. But there is no doubt that Mr Leahy was anxious that Newco should be presented as having two equal owners, not just be owned by Park: not only is this what the diagram on his document shows, but he sent an e-mail to Mr Gibson on the evening of 29 May reminding him that he needed to set up Newco *"and it's appropriate shareholdings asap"*; Grant Thornton, who gave tax advice to Novatrust in its capacity as trustee of Park on 7 June, had also been given to understand that

Newco would initially be owned by Park but that a third party would then acquire a 50% interest for a nominal consideration. The obvious inference is that Mr Leahy wanted Newco to have two equal owners because he wanted to be able to present the new proposals as consistent with the previous proposals: under the previous proposals half the £45m value of Spartan (£45m) was (ostensibly) going to go to Berryblue, in part for the Abacus assets and in part for goodwill, and now that Spartan was no longer going to purchase the Abacus assets, it would be consistent for Mr Watson's partner to receive the same goodwill payment. Having two equal holders allowed Mr Leahy to present the goodwill as going equally to two different parties, and hence half the goodwill as continuing to go somewhere else than to Mr Watson, namely to his partner. It will be recalled that he had earlier expressed the view that they wanted Sir Owen to see the whole £22.5m going to Mr Richardson, and that *"JV is unwilling to pay EW-associated vehicles any goodwill for any assets"* (paragraphs 235(5) and 256 above) and it seems to me unlikely that he would have done anything to suggest that the goodwill was going to Mr Watson's interests, or anywhere other than to Mr Watson's existing partner (there being no hint of a suggestion that anyone else was involved).

304.    In these circumstances, I accept Mr Maislish's evidence and find that when Mr Maislish asked who the other was, Mr Leahy said words to the effect that it was Mr Watson's partner. I am more doubtful if Mr Leahy went on to give the explanation that Mr Maislish ascribed to him, namely that they did not want any chance of Kea and this person having any contact, because I see the force of the point that this would make no sense if Mr Dickson, to Mr Leahy's knowledge, already knew Mr Richardson's name (which he did), and I therefore make no finding to that effect. But that does not detract from my finding that Mr Leahy gave Mr Maislish to understand that Holder 2 was Mr Watson's existing partner. As such that statement was untrue and known by him to be untrue as it was not intended that Mr Richardson would receive the benefit of the payment for goodwill.

305.    On 31 May Mr Leahy circulated two amended Term Sheets in respect of Spartan. These are pleaded as containing a further misrepresentation but since the Term Sheets remained unchanged in this respect until they were signed, I will deal with this allegation by reference to the signed Term Sheets.

306.    The next pleaded misrepresentation arises out of an e-mail exchange on 4 June 2012. Mr Miller thanked Mr Leahy for the amended Term Sheets, and asked him to send *"the latest business model showing all cash flows and projections"*. Mr Leahy replied with two documents. One he described as *"the main Spartan business model, which is the same as the original that was provided"*, although he went on to explain that in the light of the M&G deal, the quantum of the ground rent investment would be likely to change. The document he sent was headed *"Overall returns summary"*, and was a copy of a document that he had first provided to Mr Miller on 30 March 2012. It contained lines for *"Equity Return for OG"* and *"Equity Return for EW"* which show the equity returns being split equally. The Claimants' pleaded case is that there is no reference on this document to an additional £12.5m profit being made by Mr Watson, and this is said to be a representation that the only profits which Mr Watson and his interests would make from the Spartan joint venture would be the dividends which Novatrust would receive on its proposed 50% shareholding in Spartan.

307.    I can deal with this briefly.  I agree with Mr McCaughran that this allegation is not made out.  As Mr Leahy explained in his covering e-mail this was not represented to be anything other than the original business model for Spartan, that is the business going forward once it had been established, what Mr Leahy called in evidence *"a go forward of Spartan...the future cashflows of Spartan once you've got your 50/50 shareholdings"*.  Moreover it does not purport to do anything other than reproduce what the original business model was.  I do not think it can fairly be read as saying anything about the £12.5m not being received by Mr Watson – it is simply silent on the destination of the £12.5m, and it does not claim to say anything about the initial transaction in setting up Spartan.

308.    The next misrepresentation pleaded is in an e-mail of 7 June 2012.  This was sent by Mr Leahy to Mr Maislish (and forwarded by him to Messrs Miller and Dickson).  The purpose of the e-mail was to give an *"Explanation on cash paid"* by reference to the Term Sheets.  It assumed that Gaucin and Berryblue would receive £10m each from the M&G deal so the amount paid for Newco would be £25m, and it included the line:

> "Park vends in its half of Newco for 12.5mn also, left in as vendor loan."

This is pleaded as a further representation that by the time Spartan acquired Newco, Newco would only be half owned by Novatrust, the other half being owned by some third party.  I agree that it clearly represents that Park will only own half of Newco, and the other half would be owned by someone else.  That was saying no more than the diagram on Mr Leahy's *"Changes to Proposal"* document with its depiction of Holder 1 and Holder 2.  The 7 June e-mail however by itself said nothing about who the owner of the other half would be.  I do not think it can be treated as a representation that the owner of the other half would be Mr Watson's existing partner, although it is undoubtedly consistent with the statement to that effect at the meeting on 30 May.

309.    The final pleaded misrepresentation in this period is in the Term Sheets.  As set out above (paragraph 305), Mr Leahy circulated amended Term Sheets on 31 May to give effect to the proposal as revised to take account of the M&G deal.  They were subsequently amended and signed by Mr Dickson on behalf of Kea on 7 June, and by Novatrust on 12 June.

310.    There were two Term Sheets.  The explanation for this is that although Messrs Astor and Aumonier would have been content to grant the Project South Sea rights (that is the right to buy shares in LHRF and the right to invest in ground rents behind M&G) direct to Spartan, and the initial draft Term Sheet had been drafted by Mr Astor on this basis, Mr Watson and Mr Leahy wanted those rights put into a separate company (Newco), so that Newco could be sold into Spartan in return for the goodwill payment.  On 28 May therefore Mr Leahy told Mr Astor that South Sea *"might not be directly with Spartan, possibly a separate vehicle but that doesn't impact the commercials of what we are agreeing"* and on 4 June the relevant Term Sheet was redrafted to substitute NewCo as the grantee of the rights (now an option to acquire 40% of LHRF for £5.35m) instead of Spartan.  That still left Messrs Watson and Leahy with a problem, however, which was that Messrs Astor and Aumonier wanted to see the Spartan Term Sheet (as noted by Mr Leahy in a file note on 25 May).  Mr Leahy and Mr Watson however did not want to show Messrs Astor and Aumonier the whole deal as they did not want to disclose to them the goodwill payment; if they had

done, Mr Astor might have wanted some of that payment.   The solution, as foreshadowed in Mr Leahy's file note of 25 May, was to have two Term Sheets, one dealing with the initial steps (which could be shown to Messrs Astor and Aumonier) and the other with the goodwill payment.

311.   Term Sheet 1 therefore provided as follows. It was made between Kea and Novatrust as trustee of Park and except as otherwise stated was legally binding.  It provided for the following: (1) Kea would acquire 50% of Spartan for £1; (2) Kea would lend Spartan £50m to fund its future growth; (3) following the sale of Gaucin (or its assets) by Summit, Park would procure Summit to make a loan to Spartan of an amount up to the net proceeds of sale; and (4) Kea would lend an equal amount.  It then set out the business that Spartan would carry on (focusing on building a portfolio of property investments aiming to deliver superior risk-adjusted returns), provided for Kea to carry out due diligence (and for the provisions of the Term Sheet to end if Kea did not confirm that it was satisfied with due diligence investigations), and contained other provisions such as an obligation to enter into a shareholders' agreement providing among other things for Spartan to enter into a consultancy agreement with Nucopia, and an obligation on the parties to negotiate documentation in good faith to give effect to the transactions.

312.   Term Sheet 2 was again made between Kea and Park, and except as otherwise stated was legally binding.  Recital (C) was as follows:

> "A new company ("Newco"), to be incorporated in The British Virgin Islands or some other location agreed by the parties and intended initially to be owned by Park Trust, will by the time this Terms Sheet becomes unconditional own (i) the Investment Right; and (ii) the benefit of a joint venture agreement to be entered into by Newco with the company to be established by the owners of Long Harbour Limited ("Long Harbour"), which joint venture agreement will include certain rights relating to deployment of capital and the right for Newco to acquire up to 40% of Long Harbour for up to £8 million."

(The Investment Right was the Ladoga Investment Right).  The Term Sheet provided for the following: (1) Spartan would acquire Newco (or its assets) for a consideration equal to £45m less the net sale proceeds received by the respective owners of Gaucin and Berryblue from the sale of them (or their assets) to M&G; (2) the consideration would be satisfied in part in cash and in part by way of vendor's loan (see below for the precise terms of this provision); (3) Kea would lend the required cash to Spartan (in the same sum as the vendor's loan); (4) Kea's loan and the vendor's loan would be on the same terms as the Kea and Summit loans in Term Sheet 1.  As in Term Sheet 1, there was then provision in respect of Spartan's business, for Kea to carry out due diligence and confirm that it was satisfied, and for the parties to negotiate documentation in good faith.

313.   A side letter signed at the same time as the Term Sheets set out what was to happen if the M&G transaction did not go ahead.  This provided that Kea would acquire Spartan and lend it £50m (as per Term Sheet 1) but that in lieu of Term Sheet 2 Spartan would seek to acquire the assets of Gaucin and Berryblue and the Ladoga Investment Right for £45m, half to be provided by a cash loan by Kea to Spartan and half by a vendor's loan by Summit.

314.   The precise terms of transaction 2 in Term Sheet 2 were as follows:

"2. The consideration for the acquisition of the Newco Shares or the Newco Assets by Spartan will be satisfied in two equal parts; one will be cash paid by Spartan and the other will be a loan made by one of the owners of Newco to Spartan ("Vendor's Loan")."

This is relied on as containing a further misrepresentation, the pleaded case being that it represented that the money (c. £12.5m) cash which Kea was to pay Spartan if the M&G transaction went ahead would be used by Spartan to acquire the shares or assets of Mr Watson's business partner, a third party.

315.    I do not think this is made out. It plainly represents that there will be more than one owner of Newco (as Mr Watson accepted) and the natural inference from the reference to two equal parts is that there will be two equal owners (as Mr Leahy accepted, there being one who would remain a lender to Spartan and one who would take cash). This is entirely in line with the way the revised proposal had been presented by Mr Leahy at the meeting on 30 May with Holder 1 and Holder 2 owning Newco equally. But Term Sheet 2 does not say anything about who the recipient of the cash would be, and I do not think it can be read as representing that the recipient would be Mr Watson's business partner. On the basis of my finding that this is what Mr Leahy told Mr Maislish on 30 May, it can fairly be said that the Term Sheet left that uncorrected, but I do not think it can be treated as repeating it.

316.    On the other hand I do not accept Mr McCaughran's submission that the effect of Recital (C) providing that Park would be the initial owner of Newco was to imply that Newco would by the time it was sold to Spartan be owned by two Park entities. This is not what it says, and both at the 30 May meeting where Mr Leahy referred to Holder 1 and Holder 2 as *"Park and another"*, and in the 7 June e-mail where Mr Leahy referred to Park vending in *"its half of Newco"*, Mr Leahy had made it clear that Park would own half of Newco and not the other. In the light of this, I do not see how Recital (C) can be regarded as implying that the other owner would be a Park entity.

*From the Term Sheets to the July agreements*

317.    It took until 24 July before the long-form agreements to give effect to the Term Sheets were negotiated and signed. There are a number of matters in this period that the Claimants rely on and which I should deal with; but there are no further specific misrepresentations pleaded. Before considering this period, it is helpful to pull together the effect of my findings above.

318.    The Claimants' case can I think be summarised as being that Mr Watson and Mr Leahy set out to represent to the Sir Owen parties (Sir Owen himself, and Messrs Miller and Dickson) that the payment to be made for Kea for a 50% interest in Spartan would be going to a third party, namely Mr Watson's business partner, to buy him out, rather than to Mr Watson, whereas the reality was that a substantial part of that payment was always intended to be for Mr Watson's benefit.

319.    In its essentials that case is on my findings made out. Up until 28 May the proposal was that Kea pay £22.5m to acquire a half share in Spartan (Spartan being valued at £45m), the £22.5m being represented as the expected cost of buying out Mr Watson's existing 50% partner, whereas the real cost was expected to be very much less; under

the revised deal from 28 May onwards, the proposal was that Kea pay for the goodwill element alone (c. £12m or £12.5m), which was represented as going to one of the two 50% owners of Newco, namely Holder 2 as shown on Mr Leahy's diagram (paragraph 296 above), and Mr Leahy told Mr Maislish that this was Mr Watson's partner (paragraph 304 above), whereas the real intention was that the goodwill payment would benefit Mr Watson.  I will come back to the question whether Messrs Miller and Dickson were deceived by these misrepresentations or not at the time of entering into the July agreements after considering the matters relied on in the period down to 24 July.

*Newco*

320.    The most directly relevant matter is the setting up of Newco.  This was handled by Mr Gibson.  He sent an e-mail on 28 June 2012 to Mr Urs Meier of EH&P Investments AG (**"EH&P"**) asking him to set up a new entity to be held 50% by Park and 50% by an EH&P nominee.  EH&P was a provider of trust and investment services based in Switzerland which had previously set up a trust called the Samos Trust for Mr Watson.  The Samos Trust owned Munil Developments Inc (**"Munil"**), a Panamanian company.  Mr Gibson's e-mail said the following:

(1)       Mr Watson and his business partner (accepted by Mr Watson in his Defence to be a reference to Mr Richardson) wished to set up a JV company (ie Newco) to hold an agreement that delivered a right to buy into a property management company (ie LHRF), but currently Mr Watson's partner did not have an offshore structure so the suggestion was that he become a client of EH&P and EH&P set one up for him.

(2)       The rights would have been obtained by Mr Watson and:

"given the size of the transaction, EW wants to spread the value of these between two entities of which he is the Settlor. Through Park Trust and Munil Developments Inc."

(3)       He then suggested:

"Given timing, and wanting to show consistency of EW JV partner throughout the transaction, I believe it best that the initial company is set up as 50% Park Trust and 50% Munil held in EH&P Nominee company.  Once the rights are vested into the entity, and EW JV partner has his structure sorted, the balance of the shares are sold to EW JV partner."

(4)       He then set out the 4 steps which he envisaged.  Step 1 was that EH&P set up the new entity with 50% for Park and 50% for an EH&P nominee on behalf of Munil, giving the explanation:

"(require anonymity of Munil in the transaction at time of sale in step 4 below)"

(5)       Step 2 was for the new entity to acquire the rights in LHRF.

(6)       Step 3 was:

"Munil will sell 50% to EW JV partner for circa US$12m, with loan back to

Munil (or EH&P Nominee for Munil)."

Mr Gibson accepted that he here meant to refer to £12m rather than $12m, and to a vendor's loan (by Munil) rather than a loan to Munil.

(7)      Step 4 was the subsequent sale of the new entity with the proceeds to go to Park and Mr Richardson's trust.

321.   Ms Jones submitted that this e-mail demonstrates that Mr Watson and his team still understood themselves to be deceiving Messrs Miller and Dickson as to where the £12m or £12.5m goodwill payment would be going, as follows:

(1)      Mr Watson admitted in his Defence that the effect of Mr Gibson's 4 steps, if they were implemented (which they were not) would have been that Kea would have seen the c. £12m paid by it to Spartan then being paid on by Spartan to a vehicle owned by Mr Richardson (Mr Gibson himself said much the same in cross-examination, accepting that the scheme would mean that Kea would see the goodwill payment going to Mr Richardson to purchase his half share in Spartan). Ms Jones said that in reality the c. £12m would have flowed on to Mr Watson's vehicle Munil; subject to the qualification that the actual amount passed on would depend on negotiations with Mr Richardson, that too is effectively admitted by Mr Watson.

(2)      Mr Gibson's e-mail shows a desire to hide the involvement of Munil from Kea. That is why he suggested a nominee company to hold the other 50% and said that he required *"anonymity of Munil"* at the time of the sale (to Spartan).

(3)      That also explains why he referred to *"wanting to show consistency of EW JV partner throughout the transaction"* or in other words that he wanted it to look as if Mr Richardson had been involved from the outset.

322.   I accept these submissions. There is as Ms Jones said no reason why the arrangements in this e-mail would have been devised other than a desire to set up Newco with two equal holders, one of them being Park and the other (Holder 2) appearing to be Mr Richardson's vehicle, while the actual benefit of the goodwill payment to be made to Holder 2 would, without this being visible to Kea, flow through to Munil.

323.   In due course EH&P did provide a company to act as Newco, namely Rygen Holding Ltd (**"Rygen"**). In an e-mail to Mr Gibson on 7 August 2012 Mr Meier told him that a Mr Roland Waldvogel would purchase Rygen and arrange for the issue of two certificates in the name of Douglas Services, an EH&P nominee, and as a second step would sell 50% of Rygen to Park. By the end of August Mr Waldvogel had established Rygen with Douglas Services as nominee for Munil as the then 100% shareholder, with 50% due to be sold to Park.

324.   That was followed by an e-mail exchange between 6 and 12 September 2012 between Ms Huggett, Mr Gibson and Mr Waldvogel. Ms Huggett (acting for Novatrust in its capacity as trustee for Park) asked Mr Waldvogel for a copy of the declaration of trust. Mr Waldvogel misunderstood this as a reference to a new trust he had discussed

with Mr Gibson, referred to as *"Joshua's Trust"*. Mr Gibson explained that she was actually referring to the Samos Trust, that is Munil's owner, and that *"Joshua's entity"* would come in later, and that the trust would be set up with Mr Joshua Gilberston as Appointer and Mr Joshua Buckley as beneficiary. Mr Joshua Gilberston is Mr Gibson's husband or civil partner, and Mr Joshua Buckley is an old friend of his who had formerly worked as an assistant to Mr Watson. Mr Gibson accepted in oral evidence that Mr Watson was not giving away £12.5m to Mr Buckley and Mr Gilbertson; and when it was put to him that the intention was that this structure, Mr Buckley and Mr Gilbertson's structure, was going to be holding the share in Rygen for Mr Watson's benefit, he agreed that that had been an intention, although it did not go ahead.

325.    Ms Jones submitted that this shows that as late as September 2012, some 6 weeks after the July agreements were signed, Mr Watson and his team understood there to be a need to put up an elaborate charade to hide the fact that Kea's £12.5m would be going to Mr Watson. By that stage the plans did not involve Mr Richardson, but this only serves to underline the fact that Mr Richardson was not in fact intended to receive any of the money. I accept this submission, and I also accept that it must follow, as Ms Jones said, that all this was only necessary because Mr Watson wished to conceal from Messrs Miller and Dickson where the £12.5m was going, which in turn means he must have thought that Messrs Miller and Dickson did not then know.

*Personal benefits or incentives*

326.    The second matter relied on by the Claimants in this period concerns a distinct allegation, namely that Mr Watson offered personal benefits to Mr Dickson and Mr Miller, it being the Claimants' case that these constituted in law incentives offered to agents or bribes. I will consider the legal claims later, but so far as the facts are concerned, they are largely documented and there is little dispute.

327.    I will take first Mr Dickson. The facts are as follows:

(1)        On 7 June 2012 (that is the same day as he signed the Spartan Term Sheets), Mr Dickson e-mailed Mr Leahy (copying in Mr Watson) attaching information about his daughter Katrina and saying *"I appreciate your kind assistance"*. Ms Dickson, then aged 22, wanted to become a solicitor. She had a non-law degree and had recently completed a Graduate Diploma in Law, and was looking for a training contract with a firm of solicitors that would enable her to start the Law Practitioners Course (LPC) in October 2012 for which she had a place. She provided background information which explained that the firms which offer training contracts pay for the LPC fees and then train graduates for two years; that although they did not automatically guarantee a job to trainees at the end of the two years, most trainees are given the option if they impress the firm; that a training contract was essential to become a fully qualified solicitor; and that she needed a training contract to start the LPC in October. Failing that, she would like work experience with a firm over the summer or through to January.

(2)        On 8 June Mr Watson forwarded Mr Dickson's e-mail to Mr Leahy and Mr Gibson, saying *"Make this happen"* and suggesting that Mr Reuben was the best option. Mr Leahy approached Mr Reuben; but Mr Reuben said

he could not help: in large firms it was virtually impossible to get people through like this and proper applications had to be made.  He suggested a smaller firm might be easier, although this would only be work experience, not a training contract.

(3)  On 9 June Mr Leahy asked Mr Gibson to try Macfarlanes saying *"Would be good if we can help Peter here"*.

(4)  On 11 June Mr Leahy asked a contact at Graubard Miller (a firm of US lawyers in New York), saying *"We would really like to help out this colleague of ours"* but the response was that they were unable to help.

(5)  On 18 June Mr Dickson e-mailed Mr Watson (copying in Mr Leahy) with information about his daughter, saying that she had a place for the LPC (year 2):

> "...**but needs a Training Contract with a Law Firm to commence Year 2.**
>
> I would be most appreciative if you could help in any way with this."

(Emphasis in original).  Mr Gibson passed the details on to a contact at Macfarlanes but they were unable to help either.

(6)  On 19 June Mr Leahy told Mr Watson they had run out of options, although he had told Mr Dickson that Fladgates could not help but they were exploring some other options; Mr Watson suggesting trying K&L Gates, and on 21 June, after Mr Leahy had forwarded Ms Dickson's explanation of the difference between a training contract and work experience, asked Mr Gibson to push for a training contract.  Mr Gibson contacted Mr Astor who told him on 22 June that a solicitor at K&L Gates would be happy to spend a morning with her to guide her through what needed to be done to get a training contract.

(7)  On 17 July Mr Leahy reverted to the question of a training contract with Mr Reuben, saying that *"it is becoming increasingly material and it would help hugely if we could deliver something here."*  He told Mr Watson whose response was *"We need a positive answer on this ideally before 24th"* (24 July being the date for signing of the July agreements), and when Mr Leahy said that he thought it was unlikely, his reaction was *"In that case we will be talking to new lawyers"*, suggesting a probable move before Christmas, to which Mr Leahy responded *"Ok, let's see if Richard can get us this training contract as a start.  We will make it clear how important it is."*  Mr Watson replied *"We will definitely move the business.  I want a firm that partners us."*

(8)  That was how matters stood at 24 July when Mr Dickson signed the July agreements.  Mr Watson had not succeeded in procuring a training contract for Ms Dickson, although he had evidently been keen to do so, to the extent of suggesting moving business away from Fladgates.

(9)  In September 2012 Mr Watson tried again.  On 21 September when Mr Leahy and Mr Gibson were due to attend a meeting with Stonehage, Mr Watson asked them to ask Stonehage what lawyers they recommend and

whether they could orchestrate a job for Ms Dickson.

(10)        On 24 September Mr Gibson met Mr Dan Morrison of Grosvenor Law, a firm of solicitors that was later instructed on behalf of Spartan. Mr Gibson mentioned that Ms Dickson was looking for a training contract and put the two in touch; Mr Dickson then suggested to Mr Watson that he meet Mr Morrison before Ms Dickson attended for an interview so that Grosvenor Law appreciate the potential of business opportunities, in the hope that might smooth the way. Mr Gibson told Mr Dickson that he would help prepare his daughter for a potential interview for a training contract at Grosvenor Law, and arranged to do so, Mr Watson telling him to *"get her prepped well"*; she told Mr Gibson that she had not yet arranged an interview as her father would tell her when it was best to do so as Mr Watson might meet with Mr Morrison beforehand. Mr Gibson's advice to her was to contact Mr Morrison straight away but ask for an interview at the end of the next week so that Mr Watson could see him first, a suggestion endorsed by Mr Dickson himself who said that it would *"allow Eric to set the stall earlier next week"*.

(11)        By 11 October however Mr Morrison had not responded to her request for an interview and Mr Dickson raised the issue again; Mr Watson's reaction to Mr Leahy and Mr Gibson was *"This is now totally pissing me off guys. I've STRESSED you follow this up"* and himself spoke to Mr Morrison and ascertained that she would be offered an interview.

328.    The oral evidence adds little to what is apparent from the e-mails. Mr Watson accepted that he had offered to see if he could help Mr Dickson, it being not at all uncommon for him to try and help people they were doing business with; that it was just a favour he was trying to do; that without doubt they were trying to help this young lady get a training contract; that he would have liked an answer by 24 July because he was seeing Mr Dickson then and wanted to be able to give him good news; that when he referred to moving from Fladgates he was frustrated because he was not getting his own way; that he did these things for lots of people all the time, helping people if he had the ability to do so; and that in the event he was unable to deliver and Katrina Dickson was not offered a training contract. Mr Leahy was asked why he had said on 17 July that it was becoming *"increasingly material"* and *"would help hugely"*. He said that Mr Watson was becoming increasingly embarrassed that he couldn't pull together a training contract with all his influence and relationships; that he would presumably have told Mr Dickson that it would not be an issue; that Mr Dickson was probably getting a bit worked up about it because he thought Mr Watson could deliver something and he couldn't; and that:

> *"It was getting embarrassing as Eric had promised to deliver a training contract, as he would with any friend or business partner, and a man of influence who can't manage to get a training contract at two or three law firms, it was rather embarrassing."*

329.    So far as Mr Miller is concerned, the facts are as follows:

(1)        Mr Miller and Mr Dickson were due to meet Mr Watson and Mr Leahy in Los Angeles on 10 and 11 July, and on 2 or 3 July he asked Mr Watson to keep a couple of hours free to meet him about an alternative energy project in

Indonesia that needed a financing plan and financial assistance. This was a project to produce energy from biomass, and Mr Miller, who had helped fund working capital for the venture, had a 5% interest in it. Mr Watson did meet Mr Miller on 11 July, a meeting for which Mr Miller prepared a detailed presentation. After the meeting Mr Watson put Mr Miller in touch with his brother Richard Watson and Mr Vassilakos, said that as discussed they would start to work with him to fully understand the technology and business opportunity, and suggested they meet at Cullen's farms in Georgia.

(2)      Mr Richard Watson told his brother that he thought the science behind the proposal was sound, and he and Mr Vassilakos duly met Mr Miller at the farms in Georgia and spent some time going through the deal. Mr Vassilakos reported back to Mr Watson on 21 July with a summary focusing on financials and structure with the comment:

> "Please note, due to outside circumstances I purposely avoided some harsh/contentious questions that should eventually be asked should we decide to proceed."

That I infer is a reference to Mr Watson wanting Mr Vassilakos to give a positive response to Mr Miller and not be too discouraging. Mr Vassilakos reported that their involvement would be to advise on the appropriate capital raising method and help create a viable business plan, financial model and fund raising models and the like; and that Mr Miller would like them to visit Indonesia with him in the first week of September. On 23 July Mr Vassilakos followed up on this suggestion by e-mailing Mr Miller and asking him about the possible Indonesia trip.

(3)      That was how matters stood at 24 July when the July agreements were signed.

(4)      The trip to Indonesia took place in late September. Mr Noble agreed to join in the meetings in Jakarta by telephone but told Mr Watson beforehand that it looked like *"extreme investing"* to him with a number of significant risks; Mr Watson's response was that his summary was likely to be correct, but they had an important relationship with Mr Miller and wanted to help him as much as they could; Mr Noble replied that he understood the sensitivities and would behave himself.

(5)      Mr Vassilakos reported back to Mr Watson on the trip on 3 October (in an e-mail for internal use only). He said that if the purpose of the trip was to maintain and build their relationship with Mr Miller, the trip was a success, Mr Miller being very appreciative of his coming and thankful for business advice. If the purpose of the trip was to find and investigate a potential opportunity it was a waste of time and money, for numerous reasons which he gave. He then sent a version of the report, omitting these comments, to Mr Miller.

(6)      On 1 November Mr Watson was meeting Mr Miller to discuss Spartan but also had a meeting with him about the biomass project. Mr Watson told Mr Leahy the next day that they would help fund £8m for the biomass project

and help prepare an investor proposal.  He also told Mr Leahy that they would employ Mr Miller's son Addison for a year or so.  The natural inference is that in both respects he was relaying what he had told Mr Miller at the meeting; both Mr Miller and Mr Watson disputed this in oral evidence but I prefer the contemporaneous material to their recollection, and find that is what happened.

(7)     Mr Watson and Mr Vassilakos continued to show interest in the biomass project: later in November Mr Watson told Mr Leahy that Mr Miller wanted to meet him about it in Los Angeles; Mr Miller met him for lunch on 9 January 2013 and showed him an organisation chart for the project, and later that month met Mr Vassilakos in London, who asked him to keep him up to date on progress and let him know how they could help formalise the structure and business plan.

(8)     Mr Miller brought his son Addison to the lunch on 9 January.  He had recently graduated with a degree in International Business.  After the lunch Mr Watson sent an e-mail to Mr Justin Davis-Rice, the Managing Director of Bendon (one of Mr Watson's businesses in Australia) introducing Addison Miller to him and suggested to Mr Addison Miller that he travel to Sydney the following next week; on 12 January he e-mailed Mr Vassilakos and Mr Leahy saying:

> *"Also fyi…will likely employ addison at bendon in Sydney.  Quality kid actually!"*

(9)     Mr Addison Miller did start work at Bendon shortly thereafter and spent a couple of years there.

*Obtaining more money from Kea; Voltaire*

330.    The third matter relied on by the Claimants in this period concerns Mr Watson's attempts to obtain more money from Kea.  The Term Sheets provided for Kea to pay c. £12.5m for its 50% in Spartan, and then lend a further £50m for Spartan to deploy. On 26 June 2012 Mr Leahy told Mr Astor that he needed to show a pipeline of deals to Kea the following week and that ideally they wanted to produce a pipeline that could use £50-£100m in the next 12 months.  Mr Leahy accepted in oral evidence that he wanted this as they were going to try and increase the loan amount by another £50m odd.  Mr Astor then asked Mr Drummond if he could have a pipeline meeting with Mr Leahy, saying he needed to show *£200m* for Kea – that may have just been an error or may reflect a further discussion but Mr Leahy accepted in evidence that the more they had in the pipeline the better.  And on 2 July when Mr Drummond sent Mr Leahy a pipeline of possible deals which he calculated as having a gross purchase price of £80m, his reaction was to ask Mr Drummond if there was any way he had some other deals which could double that.

331.    Mr Watson also tried to interest Kea in investing in a separate venture called Voltaire. The background to this was as follows:

(1)     Mr Krishan Rattan, a banker, was in 2012 Managing Director and Global Head of Alternative Capital Solutions and Head of Emerging Markets

Structuring at Société Générale in London.  He and two of his colleagues at the bank (Mr Anuar Ushbayev and Mr Vladimir Diminic) and another man (Mr Fulvio Dombrich) had for some time been interested in developing their own fund for second tier sovereign debt financing, the plan being to establish a business which would create a lending platform to operate as an intermediary between issuers of sovereign debt and investors.

(2)      The idea was to buy sovereign and similar debt through partner banks, the purchase being financed in part by a bank loan (using a so-called *"repo"*, a form of short-term borrowing under which bonds would be sold to the bank with an obligation to repurchase them), most likely although not necessarily from the same partner bank, and in part by private capital put up by investors; (possibly) hedge the transaction with credit default swaps; and sell the bonds to institutional investors again through the partner bank.  The anticipated revenue streams included an upfront fee from the bank on acquisition of the bonds, interest while the bonds were held, and gains on bond sales.  If the investment were profitable, management would receive a management carry.

(3)      Mr Rattan and his colleagues had originally been introduced to Mr Watson and Mr Astor in connection with an approach by Long Harbour which was seeking possible sources of finance, initially in a telephone call in February 2012 and then at a meeting in April.  In early May, they had another meeting with Mr Watson and discussed their business idea with him.  He was interested and offered to assist, both by providing working capital and by introducing them to potential investors; in return he would want an equity interest in the business.

(4)      By 10 June 2012 the name Voltaire had been picked for the fund (probably by Mr Watson although possibly by Mr Rattan), and by 13 June Mr Idicula had produced drafts of a presentation for Voltaire, and of a JV agreement between Mr Watson on the one hand and Mr Rattan and his colleagues on the other.  This provided for Mr Watson to own 50% of the business, and for all income to be split equally.  On 19 June Mr Diminic confirmed that their side were all happy with the JV agreement.

332.   By 28 June plans were under way to seek to interest Messrs Miller and Dickson in investing in Voltaire: Mr Watson was due to meet them in Los Angeles on 10 and 11 July, and Mr Leahy's schedule for the trip included a meeting with them on Voltaire. Before then Mr Watson called Sir Owen and spoke to him.  He sent an e-mail to Mr Leahy the same day reporting that Sir Owen believed that the best interests of the trust and Kea would be to increase the amount of funds to £100m+ via Spartan, and that an investment into Voltaire (via Spartan or an associated vehicle) made a lot of sense and he would be pleased if the trust and Kea committed £100m+, but that he had no control or influence over the funds and they should propose the additional initiatives to Mr Miller.  On 5 July Mr Leahy forwarded this e-mail to Messrs Miller and Dickson with detailed proposals as to how they might achieve it, proposing that Kea lend another £50m into Spartan, and an additional £100m to become the cornerstone investor in Voltaire.  He attached a teaser in relation to Voltaire and a presentation, neither of which made any reference to Mr Watson's interest in it.

333.   Mr Watson's report of his conversation with Sir Owen can be contrasted with an

e-mail that Sir Owen sent to Mr Miller on 27 July. It had been prompted by a letter from Mr Dickson to him of 14 July which in effect said that the Corona Trust's capital capacity was taken up with existing projects, foremost among which were Project Spartan at £116m (= $185.6m) and Project Voltaire at up to €100m (= $130m). Sir Owen's e-mail to Mr Miller in response included the following:

> "Have you carefully studied the investment opportunity offered by Spectrum? Since I have been excluded from any involvement I caution you to protect Trust funds
>
> The "Voltaire" investment as referred to needs to be examined carefully
>
> I have only had a 10 minute conversation with Eric Watson and on face value I would not proceed without thorough due diligence.
>
> I am concerned"

That is consistent with an e-mail from David Brownbill QC dated 17 July 2012 in which he referred to a call that day in which Sir Owen had said that he was surprised to hear that Project Voltaire was going ahead.

334. Ms Jones invited me to find that Mr Watson's 4 July e-mail was a misleading account of his conversation with Sir Owen, designed to be used by Mr Leahy for his e-mail to Messrs Miller and Dickson. Mr Watson did not claim to have any recollection of the conversation but said he believed his e-mail to be an accurate record, and that he would have been very keen on promoting Voltaire to Sir Owen. I agree however that it is unlikely that in the course of a relatively short telephone conversation (Mr Watson said his records showed it took 20 minutes) Sir Owen would have expressed enthusiasm either about increasing the investment in Spartan to £100m+ or about putting £100m+ into Voltaire; that seems inconsistent with his 27 July e-mail which reveals him as both conscious of being excluded from any involvement in the decision making and anxious that Messrs Miller and Dickson proceed cautiously. It seems to me probable, and I find, that Mr Watson did give a misleading account of his conversation in his e-mail, and that it was indeed written to be sent to Messrs Miller and Dickson with a view to persuading them to increase Kea's investment from £50m to £200m.

335. It is of interest that Mr Dickson's own reaction to Mr Leahy's e-mail, as expressed on 6 July to Mr Miller, was that he was not taken by the Voltaire suggestion and was *"suspicious about Eric's OGG e.mail too"*; and in a later e-mail to Mr Miller added *"I'm beginning to think Eric is playing games (and is two-faced)."* Mr Miller accepted in evidence that what Mr Dickson was saying in his 6 July e-mail was that he was suspicious whether Mr Watson was telling the truth about his conversation with Sir Owen, but that he did not make any attempt to contact Sir Owen and find out if it was true.

*Los Angeles meetings on 10 and 11 July*

336. Mr Watson and Mr Leahy met Messrs Miller and Dickson in Los Angeles on 10 and 11 July 2012. On 8 July Mr Leahy sent them an information pack which included a list of Meeting Discussion Points, a Step Plan for Spartan and a number of backing documents.

337.    One of the Meeting Discussion Points was agreement on the amount of equity that would be contributed to Spartan under the Spartan Term Sheet 1. This had provided that after the sale of Abacus to M&G by Summit, Park would procure Summit to make a loan to Spartan of *"up to"* the amount of the sale proceeds received by Summit (paragraph 311 above). The proposal as put to Mr Dickson and Mr Maislish on 29 and 30 May had been that Mr Watson would contribute cash equivalent to the sale proceeds of Abacus, then assumed to be likely to be about £10.5m, as shown on Mr Leahy's *Changes to Proposal* document (paragraph 296 above). But the wording of Term Sheet 1 specified only that it would be up to that amount, and the Step Plan envisaged that this might be £2.5m to £5m; in the event what was agreed at the Los Angeles meetings was £3.5m.

338.    The Step Plan also dealt with the purchase by Spartan of Newco at an estimated price of £25m; none of the documents disclosed that all of that would go to Mr Watson's interests. The Step Plan then dealt with the proposed purchase by Newco of 40% of LHRF, which was contemplated as taking place immediately after Spartan had acquired Newco. In support of that Mr Leahy provided a draft of the Project South Sea Term Sheet; this was drafted as an agreement between Newco and Messrs Astor and Aumonier (referred to as "Management") under which Management, which had established LHRF, agreed that Newco should have the option to acquire 40% of LHRF for £7m. It is noticeable (i) that the Term Sheet is expressly subject to contract and hence not legally binding; (ii) that the Term Sheet presents the vendors of the 40% interest as Messrs Astor and Aumonier without any reference to Mr Watson being one of the vendors (and in fact the principal vendor); and (iii) that the price for 40% was now £7m (compared to the £5.35m proposed by Mr Leahy on 28 May and the £6m that *"we are shooting for"* on 1 April (paragraph 284 above)).

339.    Another of the items listed under Meeting Discussion Points was General Spartan Management, which included a reference to *"bankers"*. It is clear that there was some discussion about this as both Mr Miller and Mr Dickson noted *"HSBC"* against this item, and Mr Dickson also noted *"Bank a/cs Multicurrency Principal a/c"*. On 11 July Mr Leahy e-mailed Mr Gibson asking him to set up bank accounts for Spartan as soon as possible, ideally that week before Kea bought in as 50% partner as they wanted to avoid all the KYC on Kea. Ms Jones invited me to find that the potential difficulty was that Sir Owen was still shown as UBO of Kea, and that no-one wanted to disclose to Sir Owen exactly what was going on. Mr Leahy clearly did think that doing KYC on Kea would be a problem: he repeated to Mr Gibson in further e-mails on 11 July and 12 July that he wanted to get moving while only they were the shareholders (in Spartan) and that they needed to get moving so that for the KYC the banks were only seeing Park. It was also put to him in oral evidence that the desire to sign Kea up and get its money in quickly was all aimed at getting as much money out of the trust as they could before Sir Owen could take proceedings, to which he replied:

> *"I think because of what was going on with Owen we were aware there were potential issues there and we wanted to get the capital safe, yes."*

That is a reference to the fact that Mr Watson and his team knew that Sir Owen was contemplating litigation over the trust (see below). I accept Ms Jones' submission and find that there probably was discussion at the meetings in Los Angeles about the potential difficulty with KYC on Kea being that Sir Owen was still shown as the

UBO, and that no-one at the meetings wanted to keep him informed in case he intervened.

*Mr Watson raises Fladgates conflict issue*

340.    Sir Owen's relationship with Messrs Miller and Dickson had deteriorated sharply by 15 April 2012 (paragraph 38 above).  Mr Watson was in the Dominican Republic playing golf with him at around this time (paragraph 273 above), and Sir Owen's evidence was that he explained to Mr Watson that he had lost all confidence in Messrs Miller and Dickson and felt he had been tricked into the position where all the proceeds of sale of his business were in their hands and he had no control over them.  Mr Watson denied this but he accepted in oral evidence that he had a lot of conversations with Sir Owen at that time, and that he certainly learnt that Sir Owen was not happy with the way Messrs Miller and Dickson were not listening to his recommendations and was clearly upset and frustrated with them because they would not do what he wanted; and that the relationship was becoming very acrimonious.

341.    The breakdown of his relationship with Mr Miller had an impact on Sir Owen's health: on 18 April, shortly after Mr Watson had left the Dominican Republic, Sir Owen was admitted to hospital there with raised blood sugar.  Sir Owen confided in Mr Watson, telling him he was suffering anxiety attacks and that his doctor told him it was stress related, and on 19 April that although his health was normal, the underlying cause for the stress was still there and suggested that Mr Watson keep on arms' length terms with Mr Miller.  Later that day he sent an e-mail to Mr Hamilton suggesting a meeting in Los Angeles with Mr Miller on 2 May and that it would be useful to have a litigation attorney there, the objective being to *"shake DJM's cage"* and force him to replace Mr Dickson, or for both him and Mr Dickson to retire or alternatively *"consider an action against them for misinformation and fraud"*.  Although not openly copied into the e-mail, Mr Watson received a copy (no doubt by being blind copied in), as on the same day he forwarded it to Mr Leahy.  He and Mr Leahy therefore knew from 19 April that relations between Sir Owen and Mr Miller had reached a stage at which Sir Owen was actively contemplating litigation with Mr Miller and Mr Dickson on the grounds of misinformation and fraud.

342.    Sir Owen came to London in early May.  Mr Watson had gone to some lengths to arrange meetings and social events for him.  Among other things Sir Owen had asked Mr Watson when he was in the Dominican Republic to introduce him to some solicitors in London.  Mr Watson asked Mr Gibson to set up a meeting for him with Mr Reuben of Fladgates, and it took place on 3 May.  As well as Sir Owen, Mr Watson and Mr Gibson were there, and three Fladgates representatives (Mr Reuben, Mr David Way (a trust and private client partner) and Ms Ella Leonard).  An attendance note (no doubt made by Ms Leonard) showed that the meeting was taken up with the trust matters, with Sir Owen wanting to know what his rights were and what he should do, and that there was discussion of potential litigation, possibly in the Nevis courts.  An engagement letter from Mr Reuben dated 17 May to Sir Owen confirmed that he had instructed them to act on his behalf in relation to his relationship with the Corona Trust and specifically that he was concerned that the acts of the trustee and protector were not in the interests of the beneficiaries, and mentioned that the matter was likely to involve litigation in Nevis, and possibly elsewhere.  Mr Watson said in his witness statement that he spent much of the meeting reading and sending e-mails on his mobile and that at some point he left the

meeting, but it seems probable that he understood at the very least that Sir Owen was asking for advice on what he could do in the circumstances, and that the dispute with Messrs Miller and Dickson had reached the stage when litigation was a real possibility.

343.   Mr Reuben in his engagement letter also raised the question of a possible conflict of interest given that Fladgates were acting for the other party in Project Spartan which was being considered by the trustee; he said that he had already discussed this both with Sir Owen and the other party to Project Spartan and had explained that if a conflict arose, he would cease to act for Sir Owen but the remainder of the team (Mr Way and others in the litigation department) would continue to act for him.   Mr Reuben had in fact spoken to Mr Gibson on 14 May about whether he should attend a meeting the next day between Mr Way and Sir Owen's tax advisor, and told him (as reported by Mr Gibson to Mr Watson) that:

> "If we feel that Richard is conflicted then Richard will step out and David Way will run with Owen as a client."

Mr Gibson said that he thought Mr Reuben should attend the meeting as he would:

> "still have the ability to direct this to an amicable solution"

and Mr Watson agreed.   Although Mr Gibson was reluctant to accept this, that is fairly clearly a reference to Sir Owen's dispute with Messrs Miller and Dickson, and confirms that both Mr Gibson and Mr Watson understood that there was such a dispute which might not be resolved and which might end in litigation.

344.   That all gives context to Mr Leahy's evidence that they wanted to *"get the capital safe"*, that is out of Kea and into Spartan.  Following the Los Angeles meetings, Mr Watson was in Auckland from 14 July.  Sir Owen was also there; they spent two days in strategy meetings on the Warriors, and had dinner together on 16 July.

345.   While Sir Owen was there he received Mr Dickson's letter of 14 July referring to commitments to Project Spartan and Project Voltaire of $185m and $130m (paragraph 333 above); and on 17 July he had a call with Mr David Brownbill QC.  Mr Brownbill followed it up with an e-mail to Mr Reuben (who had evidently been on the call) raising the question whether Voltaire should be put on hold, and in terms which make it clear that at that stage freezing orders were contemplated and that he had given advice about the effect of intended injunctions on future and existing transactions.  Mr Reuben replied that he would recall that Fladgates were involved in the Spartan deal and that they were about to become involved in Voltaire.  The next day Mr Watson told Mr Gibson and Mr Leahy that he had asked Sir Owen to replace Fladgates as Mr Reuben was conflicted, adding *"This will happen"*.  Sir Owen sent Mr Reuben an e-mail on 20 July confirming that Mr Watson had suggested that his continued representation bordered on a conflict and making it clear that he was not happy as they had discussed it in some detail and Mr Reuben had convinced him he did not see any conflict, and it was a waste of his time and resources.  He told Mr Reuben that:

> "Eric's point of view is that as you represent him in the property deals that the trust is investing in – they will likely use this factor to withdraw."

There was subsequently a dispute about paying for Fladgates' fees and in a letter of 7

September 2012 from the finance partner, Fladgates said that for their part they did not think there was a professional conflict that prevented them from acting; Sir Owen told Mr Watson that it was his contention that Mr Watson had pressured Fladgates into dropping their representation of him.

346.   Ms Jones invited me to find that Mr Watson insisted that Sir Owen move his legal representation from Fladgates as he was concerned that litigation might end up with Messrs Miller and Dickson being removed or subject to an injunction before the Spartan transaction could go through. Mr Watson accepted that Sir Owen told him that Fladgates were going to be taking action against the very people that were about to be involved in Spartan and suggested that might be a conflict, but I accept that Mr Watson did not just suggest that it might be, but was insistent that Fladgates stop acting for Sir Owen (despite neither Fladgates nor Sir Owen thinking it necessary) with the result that they did (as he had told Mr Gibson and Mr Leahy that they would); I also accept that Mr Watson gave a false explanation to Sir Owen (namely that Messrs Miller and Dickson would use it to withdraw, something which he did not believe). In those circumstances I accept Ms Jones' submission that the real reason that Mr Watson took these steps was to prevent the litigation derailing Project Spartan.

*The July agreements – 24 July 2012*

347.   The long-form documents for the Spartan transaction were in almost final form by the time of the meetings in Los Angeles on 10 and 11 July, and they had been finalised and signed by Novatrust by (Friday) 13 July. Mr Leahy e-mailed copies of the signed documents to Mr Dickson and told him the originals were being couriered on Monday (16 July). Mr Dickson however was going to be on holiday that week and was not planning to sign anything before he was back on 24 July. Mr Leahy told him and Mr Miller that delaying signing until then could create problems on Project Royal as they had been putting off due diligence whilst they waited for the operating capital from Spartan and if they delayed further they could risk losing the deal. He suggested signing soft copies in the meantime and wiring an initial £100,000, or just wiring it anyway. The suggestion that Project Royal was at risk was untrue, as Mr Leahy told Ms Huggett (*"Ignore the comments below – this was getting them to hurry up with the wire"*); but it worked as Mr Dickson agreed to remit the £100,000 before signing.

348.   Mr Leahy also wanted to fix up another meeting with Messrs Dickson and Miller to finalise the proposal (which had been discussed at the earlier meetings in Los Angeles) to increase Kea's investment in Spartan to £100m and add an investment of a further £100m by Kea in Voltaire. On 14 July he sent Messrs Dickson and Miller a two-page proposal (headed *"Increased Capital Allocation Proposal"*) detailing this, and a meeting was then fixed up for 24 July in Los Angeles after Mr Dickson's return and before Mr Miller himself went off on holiday. The meeting took place on 24 July between Mr Watson (who flew into Los Angeles on the way back to London from New Zealand), Mr Leahy (who came out for the purpose) and Messrs Miller and Dickson.

349.   At the meeting Mr Dickson signed the long-form agreements for Spartan (that is the July agreements) on behalf of Kea, witnessed by Mr Miller. I give their terms below. There was also discussion about the proposal for Kea to allocate further capital, and it is possible to reconstruct what was agreed from manuscript notes made by Mr Miller

on a copy of Mr Leahy's proposal (Ms Jones suggested these were Mr Dickson's notes but Mr Miller accepted in evidence that the handwriting was his):

(1)     The Spartan Term Sheet 1 had provided for Kea to fund Spartan to the extent of £50m by way of preferred note, £25m to be paid on initial funding and £25m after 6 months (or earlier if requested by Spartan) at an interest rate of 8% pa, to be repaid as cash flows permitted and in full after 4 years. That was given effect to by a Loan Facility Agreement which was one of the July agreements, although in this the original proposal for a straightforward loan had been replaced by a loan facility for 4 years under which any amounts repaid could be redrawn by Spartan, the first £25m to be advanced within 40 days and the second £25m after 6 months or 40 days after Spartan requested a drawdown.

(2)     The first element of Mr Leahy's proposal was that the first £25m be deposited within 40 days as agreed (and start incurring the 8% coupon), but that the second £25m be deposited as soon as possible in a Spartan bank account. While in the account Spartan would pay over to Kea whatever interest it in fact received (expected to be about 0.5% to 1%), and would only incur the 8% when Spartan drew on the account. Any monies repaid by Spartan within the 4 year term would be re-deposited on similar terms in a Spartan bank account. All of this was agreed.

(3)     The second element of Mr Leahy's proposal was for Kea to make a second £50m facility available on the same structure but for a term of 6 years and at a coupon of only 5% rather than 8%. This was agreed subject to the term being 7 years and the coupon 6%.

(4)     Mr Miller's note indicates that there was also discussion of the £50m being increased to £55m to provide a £5m *"fighting fund"*, although he noted that this was something to discuss with Mr Maislish. I accept that that shows that what was being suggested was that a £5m fighting fund should be created in Spartan, and that that indicates that all those at the meeting were conscious that litigation was a real possibility. In the event, in his e-mail that evening to Mr Dickson (below) Mr Miller suggested that they forget the fighting fund.

(5)     The third element of Mr Leahy's proposal was for Kea to invest £100m in Voltaire (by way of a similar loan facility to a new vehicle). This was not agreed, but Mr Miller's note indicates that he and Mr Dickson were considering a smaller sum, to be added to the second £50m facility for Spartan – perhaps £20m, or perhaps extending the facility to £80m to include Voltaire.

(6)     Mr Miller sent an e-mail that evening to Mr Dickson in which he said that he was a projecting a cash balance of about $75m at the end of 2012 and $50m at the end of 2013 (before the Voltaire investment) and they were leaving themselves short; he therefore suggested that Mr Dickson go back to Messrs Watson and Leahy with a maximum investment of £15m ($23m) in Voltaire. Mr Dickson duly sent an e-mail to Mr Watson saying that the maximum the trust could commit to Voltaire would be $20m, as the second £50m Spartan loan had denuded the ability to invest any more at that time; Mr Watson replied that $20m was fine and they would do their best to keep the

opportunity open to allow him to increase the $20m, to which Mr Dickson said that *"If we can squeeze out more later, we will."*

350.     The July agreements consisted of four documents.  The first was a Share Purchase Agreement between Kea and Novatrust (as trustee of Park) under which Kea agreed to buy 50% of Spartan's issued share capital for $1, with completion to take place immediately.

351.     The second was a Shareholders' Agreement between Kea, Novatrust and Spartan. Clause 2.1 set out the business of Spartan, and provided that it:

> "must include the key transactions set out in Schedule 2, which have been agreed between the parties involved in Project Spartan."

Clause 4.1 provided that the parties would procure that Mr Dickson would be appointed as a Kea Director, and Chaumont (Directors) Ltd (a Stonehage company, **"Chaumont"**) would continue as director.  Clause 4.2 provided that Nucopia would be appointed under a separate agreement to provide advisory services to Spartan. Clause 5 provided for the management of the company in terms that effectively required the agreement of Kea and Park through their respective directors to decisions.  Thus it provided among other things for: a minimum of two directors (cl 5.1); equal numbers of Kea Directors and Park Directors, to be nominated by, and capable of being removed by, Kea and Park respectively (cll 5.2, 5.3 and 5.4); a quorum of at least one Kea Director and one Park Director (cl 5.5); and that decisions of the directors would only be effective if approved by at least one Kea Director and one Park Director (cl 5.12).

352.     Schedule 2 (headed *"Key Project Spartan transactions"*) gave effect to the Spartan Term Sheet 2, as follows:

(1)          Paragraph 2 referred to it being intended that M&G acquire Gaucin and Berryblue (or their assets), and that if M&G did complete such acquisitions paragraphs 4, 5 and 6 would take place.

(2)          Paragraph 3 provided:

> "It is further intended that Newco will acquire or own the benefit of a joint venture agreement to be entered into by Newco with a company (**Long Harbour Subsidiary**) to be established by the owners of Long Harbour Limited, which joint venture agreement will include certain rights relating to deployment of capital and the right for Newco to acquire up to 40% of Long Harbour Subsidiary for up to £8 million."

That rather vague wording reflected the fact that at this stage, as Mr Leahy accepted, Newco did not have any enforceable rights – they were still in the middle of negotiating them.

(3)          Paragraph 4 provided that if the M&G acquisition completed, Park would procure Summit to make a loan to Spartan of *"up to"* the net sale proceeds received by Summit for the sale of Gaucin (or its assets), and Kea would make a loan of an equal amount (the Second Kea Loan), the precise amount of the loans to be agreed by Park and Kea (although it will be recalled

that the figure discussed in Los Angeles on 10 and 11 July was £3.5m).

(4)         Paragraph 5 provided that once Newco owned the Newco Assets (defined as the assets intended to be acquired by Newco as set out in paragraph 3) Spartan would acquire Newco (or the Newco Assets) for a consideration equal to £45m less the net sale proceeds received on the sale of Gaucin and Berryblue (or their assets) by Summit and the owner of Berryblue, 50% to be paid by Spartan in cash and:

> "50% in the form of a loan from one of the owners of Newco, to [Spartan] (**Vendor's Loan**) ..."

(5)         Paragraph 6 provided that Kea would lend Spartan the money needed to provide the cash required under paragraph 5 in a sum equal to the amount of the Vendor's Loan (the Third Kea Loan).

(6)         Paragraph 8 provided that Spartan would acquire Atherton (that is Atherton Property Holdings Ltd) which held the Investment Right (that is the right to co-invest alongside HW previously referred to as the Ladoga Investment Right) for a nominal sum.

(7)         Paragraph 9 provided, in line with the side letter entered into contemporaneously with the Term Sheets, that if the M&G acquisition did not complete Spartan would acquire Gaucin's and Berryblue's assets (their partnership interests in Abacus, all other rights in relation to working with Long Harbour, and the 66.6% shareholding in Homeground) for £45m.

353.   The third of the July agreements was the Loan Facility Agreement already referred to (paragraph 349(1) above).  As there set out, it provided for Kea to make available to Spartan a loan facility for 4 years of £50m, of which £25m was to be provided within 40 days (more precisely £100,000 within 5 days – in fact already provided – and the balance of £24.9m within 40 days) and £25m within 6 months or if earlier within 40 days of a drawdown request by Spartan, at an interest rate of 8%, and (in place of the straightforward loan provided for in Term Sheet 1) for Spartan to have the right to re-draw any amounts repaid before the end of the 4 year term.

354.   Clause 6 provided for Kea to have security in the form of a first charge over Park's shares in Spartan, and the fourth of the July agreements was a Security Deed whereby Novatrust granted such a charge to Kea.  Again this was a change from the provision in Term Sheet 1 which had provided that the £50m loan would be secured against the assets of Spartan.  By clause 4 of the Security Deed, Kea could only enforce the charge after the conclusion of an Orderly Winding Up of Spartan and if there then remained any sums outstanding.  Since an Orderly Winding Up was defined as a procedure whereby Spartan's board had implemented a sale down process to ensure all of its assets were sold, it is not obvious that there were any circumstances in which the charge was likely to be of any benefit to Kea as by the time it came to be enforced, it is likely that Spartan would have no assets and the shares no value.

355.   Ms Jones submitted that the transaction as embodied in the July agreements was a far cry from the deal put to Sir Owen in the 1 April presentation.  That had involved his interests buying out Mr Watson's 50% partner in an existing business for £22.5m, Mr

Watson contributing capital of equivalent value by contributing his 50% interest in the business, hence giving them 50/50 interests in Spartan, proportionate to their contributions.  But under the July agreements (i) Kea was not acquiring an interest in any existing business, as the only existing business (Abacus) was to be sold to M&G; (ii) Kea was not buying out an existing partner as Mr Richardson was in effect selling all his interests to M&G; (iii) Spartan had no existing rights or assets of any kind, as Newco was still negotiating the joint venture arrangement with LHRF; Atherton, which was said to hold the Ladoga Investment Right, had not in fact acquired it; and although there had been discussion of Spartan seeding a residential fund (Project Royal) and acquiring an interest in the management company, there were no enforceable rights to any of this; and (iv) the rights that Newco was intended to acquire (and in effect what Kea was paying £12.5m for) were dependent on Newco paying *"up to £8m"* for *"up to 40%"* in LHRF.  I accept this submission.

356.   Ms Jones further submitted that Mr Watson would effectively acquire a 50% stake in Spartan and access to £50m of Sir Owen's capital without having to contribute anything at all, the Summit loan of £3.5m contemplated by paragraph 4 of schedule 2 to the Shareholders' Agreement being more than offset by the £12.5m goodwill payment.  (In fact paragraph 4 did not specify any particular amount of the loan, the amount being left to be agreed between Park and Kea).  Moreover Mr Watson stood to benefit from (i) the goodwill payment of £12.5m; (ii) the bulk of the *"up to £8m"* to be paid by Newco for its stake in LHRF; (iii) any investments made by Spartan through Long Harbour or Voltaire; and (iv) the obligation for Spartan to enter into a consultancy agreement with Nucopia (on the basis that although ostensibly owned by Mr Leahy he would in fact benefit from the (bulk of) such payments).  Again I accept this submission; and I further accept that the deal delivered a very large number of benefits to Mr Watson, and was very far from the proportionate sort of deal that Sir Owen had made it clear that he wanted.

*Claims in relation to July agreements*

357.   It is now possible to deal with the Claimants' claims in relation to the July agreements.  They can be summarised as follows:

(1)      The agreements were induced by fraudulent misrepresentations.

(2)      The agreements were entered into in breach of the fiduciary duty that Mr Dickson owed to Kea and the Corona Trust, to the knowledge of Mr Watson and Mr Leahy.

(3)      The agreements were entered into in breach of a fiduciary duty owed by Mr Watson to Sir Owen and/or Kea.

(4)      The agreements were entered into in circumstances where Mr Watson had offered personal incentives to Mr Dickson and Mr Miller.

For one or more of these reasons the agreements are said to be voidable (and Kea elects to rescind them), or void, with the result that the payments received by Spartan have at all material times been held on trust for Kea.

*Deceit*

358.   I will start with the claim in deceit.  I have considered the various misrepresentations above.  The most significant of these are the various representations as to what was to happen to Kea's payment to buy into Spartan, initially £22.5m and after 28 May c. £12m or £12.5m (which I will refer to as **"the £12.5m"**).   The various misrepresentations to this effect that I have found proved are: (i) representations in the 1 April presentation that the £22.5m which Sir Owen and his interests would be required to pay (**"the £22.5m"**) was intended and expected to be invested in order to buy out Mr Watson's existing partner and paid out to that partner's vehicle, and that current discussions with Mr Watson's existing partner suggested that his interest could be acquired for around £22.5m (paragraphs 232 to 241 above); (ii) representations in the various drafts of the Term Sheets prepared by Mr Leahy (or as redrafted by Mr Maislish and not corrected by Mr Leahy) that it was contemplated that Kea would make an investment of £22.5m, all of which sum was required to buy out and would be used to buy out Berryblue, or the assets of Berryblue (paragraphs 264 to 269 above); and (iii) a representation by Mr Leahy at the meeting with Mr Dickson and Mr Maislish on 30 May that it was intended that Newco would be owned by Park and its or Mr Watson's existing partner (paragraphs 299 to 304 above).  In each case I have found that these representations were made, were untrue and were known to be untrue.

359.   Mr Watson's case however is that by the time the July agreements were signed Messrs Miller and Dickson knew that the £12.5m would be received by Mr Watson entities, save for the unlikely possibility that some or all of those monies might be paid to Mr Richardson as part of the deal for removing him completely.

360.   As Ms Jones submitted, that case turns entirely, or almost entirely, on the oral evidence.  There is not a single document throughout the period from the first presentation to Mr Miller on 29 March 2012 down to the signing of the July agreements on 24 July 2012 in which those on Mr Watson's side (principally Mr Leahy) can be said to have disclosed the destination of the £22.5m or the £12.5m to Messrs Miller and Dickson.  On the contrary, as I have sought to show above, elaborate lengths were gone to to make it look first as if the £22.5m was going to be used to buy out Mr Watson's partner, or to acquire Berryblue or its assets; and then that the £12.5m was going to one of two equal holders of Newco, the other being Park.

361.   Ms Jones placed reliance among other things on what she said was the constantly shifting nature of the Defendants' case on the destination of the £12.5m.   She identified four iterations of this.  The first was in a witness statement made by Mr Leahy on 19 September 2014.  It was made on behalf of Novatrust in the derivative action brought by Novatrust (see paragraph 2 above) for the purposes of Novatrust's opposition to an application by Kea and Harlaw challenging the jurisdiction of the English court.  Mr Leahy had been asked by Novatrust to give an account of Project Spartan.  When explaining the original proposal presented to Sir Owen on his yacht, he said that the £22.5m was:

> "based on the value of the existing ground rent portfolio plus a proposed value for the pipeline deal-flow, or goodwill, which Park / Novatrust (through Mr Watson and his net work of connections) would bring to Spartan ("the Goodwill Value")"

and that:

> "Although not all explicitly spelled out in the original proposal, from Novatrust's and Mr. Watson's perspective the original proposal had been premised as follows: Corona acquiring 50% of Spartan for a loan of £22.5 million, with it separately lending Spartan £50 million for investment purposes. The value of the existing ground rent portfolio was around £20 million. Accordingly, the original deal had Corona / Kea paying £10 million for 50% of that portfolio, with the balance of the £22.5 million (£12.5 million) being an agreed payment for its 50% share of the Goodwill Value which Novatrust (through Mr. Watson and his network of connections) was bringing to Spartan."

Then when explaining the revised deal arising from the proposed M&G acquisition of Abacus, he said:

> "The consideration for the acquisition of Rygen by Spartan from Park and Munil was to be £45 million less the price paid by The Third Party Purchaser for the acquisition of the existing ground rent portfolio (£20 million). That is, Spartan would pay Park £25 million. The net effect of these Schedule 2 Transactions was therefore that Park would still receive its approximately £12.5 million Goodwill Value payment."

And after referring to a later e-mail exchange with Mr Dickson (in December 2012) he said;

> "This exchange with Mr. Dickson clearly shows that Kea understood the purpose, nature and effect of the Schedule 2 Transactions, and Mr. Dickson's specific reference to "the Goodwill" value of "an estimated UKP 12.5 m" shows that Kea was also fully aware that they were intended to ensure that Park would still receive its approximately £12.5 million Goodwill Value payment."

362. The natural reading of this account is (i) that £12.5m of the £22.5m under the original proposal was intended to go to Mr Watson's interests; (ii) that this was agreed by Kea as a payment for the dealflow which Novatrust/Mr Watson was bringing to Spartan; (iii) that the purpose of the schedule 2 transactions in the revised proposal was that Watson interests (*"Park"*) would still receive the £12.5m; and (iv) that Kea fully understood that the purpose of the schedule 2 transactions was that Park would still receive the £12.5m. I agree with Ms Jones that the account being put forward there is that Kea always understood that £12.5m of the payment would go to Watson interests.

363. That is impossible to reconcile with the Defendants' current account: Mr Watson said in evidence that Mr Leahy's account was not right, because at an early stage in the negotiations it was very likely they would have to pay Mr Richardson up to £22.5m, and Mr Leahy himself said in evidence that it was not quite right and a little confusing. Nor is it possible to reconcile with the contemporaneous documents: in particular it does not explain how the 1 April presentation could suggest that the £22.5m was expected to be used to buy out Mr Watson's partner, or how the draft Term Sheets could indicate that the £22.5m would be used to acquire Berryblue or its assets; nor is it consistent with Mr Leahy's explanation to Mr Armitage on 6 April that they simply wanted Sir Owen to see £22.5m being paid out to buy Mr Richardson's 50% share (paragraph 235(5) above). It may have contained some truth in revealing that *from Mr Watson's perspective* the original proposal was intended to deliver a goodwill payment of about £12.5m to his entities; but the suggestion that

this was something understood by Kea is impossible to reconcile with Mr Leahy's explanation in his Real Estate paper of 18 April that the JV was unwilling to pay EW-associated entities any goodwill for any assets (paragraph 256 above).

364.   The second explanation by the Defendants of the intended destination of the goodwill payment was in Mr Watson's Defence in this action, served on 30 July 2015.  The Claimants had alleged that at the time of the 1 April presentation Mr Watson and Mr Leahy did not intend that all the £22.5m would be used to buy out Mr Richardson or Berryblue, but intended (but did not reveal) that approximately £10m would be used for this purpose, the remaining £12.5m being used to provide a secret profit for Mr Watson or Novatrust.  In response Mr Watson pleaded that Mr Leahy had calculated £22.5m by ascribing half the value of the assets it was proposed Spartan would hold to Berryblue, because Mr Watson believed that Berryblue had the potential ability to inhibit the exercise of the Ladoga Investment Right, and that:

> "Neither Mr Watson, Novatrust, or any Watson entity, expected to receive any part of the purchase price (whether that was £22.5 million, or any other figure) paid to Mr Richardson in respect of Berryblue or its assets: in the event that Kea had invested in Project Spartan on the basis anticipated in the [1 April presentation], all monies it invested would have been paid to Berryblue.  No profit, secret or otherwise, would have been received by Novatrust, or Mr Watson, or any entity associated with either of them."

Mr Watson also pleaded that the Claimants had misunderstood the account given by Mr Leahy in his witness statement, and that he had not suggested that any part of the £22.5m would have been received by Novatrust rather than Berryblue *"and it would not have been"*.  This account is clearly inconsistent with any suggestion that Kea appreciated that any part of the £22.5m might go not to Berryblue but to Watson entities.

365.   In relation to the proposal as revised on 28 May Mr Watson pleaded that if the sale to M&G proceeded, it was clear from Schedule 2 to the Spartan SPA that the sum to be invested by Kea in Spartan would fund the purchase of Newco and that:

> "it had been clear from the Spartan Term Sheets that the "Newco" to be purchased would "initially be owned by the Park Trust".
>
> From at least early June 2012, when the Spartan Term Sheets were executed, therefore, Mr Dickson, and therefore Kea, knew and understood that if the M&G sale completed, Kea's portion of the payment by Spartan for "Newco" would be paid to Park/Novatrust".

He repeated this later with a plea that Mr Watson and Mr Leahy had informed Mr Miller and Mr Dickson of this (that is that if the M&G sale proceeded Kea would fund a payment by Spartan to Park/Novatrust):

> "through the revised wording of the Spartan Term Sheets."

That was a reference to the fact that the revised Term Sheet 2 included a statement in recital (C) that Newco was intended initially to be owned by Park (paragraph 312 above).  And in response to a request for further information, Mr Watson pleaded that he and Mr Leahy understood from their discussions with Mr Miller and Mr Dickson

that they clearly understood that it was a feature of the transaction that Kea would fund a payment by Spartan to Park/Novatrust, but could not plead any specific communication of that fact prior to October/November 2012.

366. This second case therefore drew a sharp distinction between the original proposal, under which none of the £22.5m was intended to go to Watson entities, and the revised proposal under which the whole of the £12.5m was to go to Watson entities; it also asserted that Messrs Miller and Dickson clearly understood that that was a feature of the revised transaction, but no specific communication of that fact to them was relied on other than the wording of the revised Term Sheets.

367. Mr Watson served an Amended Defence on 29 August 2016 (although it had been provided in draft in March 2016). This pleaded that Mr Miller and Mr Dickson were informed in the course of the negotiation of the Term Sheets and the July agreements that there was a remote possibility that Mr Richardson would acquire an interest in Newco (in which case the purchase of that interest would be funded by the Kea monies), but that this was unlikely and that it was far more likely that the shareholders would all be Park entities such that monies paid by Spartan for the purchase of Newco would be paid to entities associated with him.

368. I accept Ms Jones' submission that this third case is a rather different case from the second case; instead of Messrs Miller and Dickson clearly understanding that the £12.5m would go to Park/Novatrust, it was now said to be unclear whether Mr Richardson would receive any part of it or not.

369. It is also very difficult to reconcile with the contemporary documentation. Not only is there nothing in the written material going to Messrs Miller and Dickson which mentions the possibility (but unlikelihood) of a payment to Mr Richardson, it does not explain why Mr Leahy went to such trouble to present Newco as intended to have two equal owners (and Mr Gibson to the trouble of ensuring that it was set up that way). If the true position was, and was understood to be, that Park was not only going to be the initial owner of Spartan, but in all likelihood the only recipient of the payment, what was the purpose of Holder 2 at all? If Mr Watson had merely wanted to guard against the possibility of having to pay Mr Richardson something, that would not have required a second 50% owner.

370. Mr Watson served a Re-amended Defence on 27 January 2017. This now pleaded that Mr Miller (and Sir Owen) understood right at the outset (that is at the time of the 1 April presentation) that Mr Watson might obtain some benefit or return of value from negotiating terms with his existing partner.

371. Again I accept Ms Jones' submission that this fourth case is rather different from the second and third cases under which it had been pleaded that at the outset Mr Watson did not expect to receive any part of the purchase price, whether that be £22.5m or any other figure.

372. In his submissions Mr McCaughran said that Mr Watson rejected the suggestion that his case had emerged piecemeal on this issue. But I agree with Ms Jones that the various iterations of the Defendants' case are indeed very different from each other (although the pleaded cases were in Mr Watson's Defence, Novatrust and Mr Leahy adopted his Defence on each occasion). I have spent a little time explaining in what

respect, as in a case of this type the fact that a defendant has given shifting and inconsistent answers can be very relevant to an assessment of the credibility of the account he gives at trial.

373.   Against that background it is possible to assess the oral evidence.  As for Mr Watson:

(1)        So far as the original proposal is concerned, Mr Watson's evidence was that he explained to Mr Miller on 29 March, and again to Sir Owen when he was in the Dominican Republic, that he would deal with his partner.  That does not seem to me to take away the force of the statement in the 1 April presentation that it was expected that the £22.5m would all go to buy out his partner, and indeed Mr Watson's evidence at trial was that he did think it would cost that much to satisfy Mr Richardson.  For the reasons given above (paragraphs 234 to 235) I do not accept this evidence.

(2)        So far as the revised proposal is concerned Mr Watson said that it was clear from the revised Term Sheets that the Kea monies would be paid to an entity associated with him.  I do not accept this (paragraph 316 above), and the very fact that Mr Watson relied on this point tended to reinforce the point that there was nothing else that could be pointed to that could be said to have made it clear.

(3)        In relation to the meeting on 30 May attended by Mr Maislish, Mr Watson said that he was not at the meeting but if Mr Leahy had said that the new company would have been jointly owned by him and his partner, it would have been correct as the structure was far from settled; his position with Mr Richardson needed to be resolved and that resolution might involve Mr Richardson obtaining an interest in Newco.  He gave a similar explanation as to the reference to the *"owners of Newco"* in the draft Term Sheets; and as to why Mr Gibson was instructed to have Newco set up with two owners.  I find it impossible to accept this explanation.  What Mr Leahy presented to Mr Maislish on 30 May (and to Mr Dickson on 29 May) was a proposal under which Newco would have two equal owners, one being Park.  Mr Watson's explanation that having the second owner was to cater for the unlikely possibility of having to accommodate Mr Richardson makes no real sense, quite apart from the fact that I am satisfied that Mr Richardson had long since been brought on side anyway.

(4)        Finally Mr Watson said that he told Messrs Miller and Dickson prior to execution of the July agreements that the possibility of Mr Richardson retaining some interest was remote, and that it was far more likely that the shareholders in Newco would all be Park entities.  In the light of what I have already said about his evidence, I am cautious about accepting it on matters that are not reflected in the contemporary documents.  There is nothing in the contemporaneous documents which supports the idea that what Messrs Miller and Dickson were being told was that in all probability the £12.5m would be going to Kea entities.  The elaborate steps taken to make it look as if Newco had two equal owners would all have been unnecessary if the true position was as Mr Watson suggested.

374.   So far as Mr Leahy is concerned:

(1)      In relation to the original proposal he accepted in evidence that the 1 April presentation clearly said that the money was going to Mr Richardson (and hence that Sir Owen could not have understood that any part of it would be going to Mr Watson).

(2)      He accepted in terms that this is what *"the team"* were trying to do:

> "Q.   ...you set about arranging matters so that what Sir Owen would see was 25 million being paid out to buy NR's 50% share?
>
> A.    Yes.  22.5, yes.
>
> Q    Yes, that is what you did.
>
> A.    Yes.  Yes."

(3)      In relation to the revised proposal, he did not claim to be able to recall either the 29 May meeting with Mr Dickson or the 30 May meeting with Mr Maislish.  He did say that he might have mentioned that Mr Richardson might look to participate in Holder 2, but I do not accept this: I have found that what he told Mr Maislish was that the Newco would be owned by Park and another, and that the other was Mr Watson's partner (paragraph 304 above).

375.   That leaves Mr Miller's evidence.  I have already said that I cannot rely on his evidence.  His evidence as to the destination of the goodwill payment is a good example of the way in which he frequently accepted matters put to him in cross-examination that were quite at odds with his witness statement.  Thus:

(1)      He readily accepted that at the time of the 1 April presentation he believed Spartan to be an established property investment opportunity owned 50/50 by Mr Watson and an additional partner; that his understanding of the proposal at that stage was that £22.5m was going to be paid by Kea into Spartan which would then be paid out again to the partner's vehicle to buy out his right; and that he believed there had been discussions which suggested that the partner was willing to sell his 50% for about £22.5m.

(2)      That was directly at odds with his evidence in his witness statement where he had said that he knew that the £22.5m was not being paid to acquire the shares in an existing business from Mr Watson's existing partner.

(3)      Again although Mr Miller was not at the 30 May meeting between Mr Leahy, Mr Dickson and Mr Maislish, he said that he spoke to Mr Dickson afterwards, and accepted that Mr Maislish's account was:

> *"Generally that's the context of what my understanding was."*

(paragraph 301(7) above) although this was quite contrary to the evidence in his witness statement that he understood that it was likely that all of the goodwill value would be going to Mr Watson's interests.

(4)      In relation to the draft revised Term Sheets, Mr Miller's oral evidence, although confused, appeared to accept that his understanding was that Newco

would be owned by Mr Watson and his partner and that the structure of the deal was that Newco would be sold into Spartan with Mr Watson getting a loan and his partner getting the cash.   Again that was at odds with the statement in his witness statement that he understood that it was possible that Mr Watson's partner might have an interest in Newco although it was unlikely, and that it was likely that the goodwill would be paid to Mr Watson's interests.

I have come to the conclusion that it is very difficult for me to place any weight at all on Mr Miller's evidence as to his (or Mr Dickson's) understanding of the goodwill payment.

376.   There is no evidence from Mr Dickson, the individual who made the decision on behalf of Kea to proceed with Project Spartan and signed both the Term Sheets and the July agreements.

377.   On the basis of the material that I have so far considered, I would be strongly disposed to find that Mr Dickson did not understand that under the original proposal a large part of the £22.5m was not in fact expected and intended to be used to buy out Mr Richardson's 50% interest; and that he did not understand that under the revised proposal the £12.5m would be going to Mr Watson's interests.

*Autumn 2012*

378.   But before coming to a conclusion on this aspect of the case, I should refer to one other matter on which Mr McCaughran placed considerable reliance, which is what happened in the autumn of 2012.   By that stage Sir Owen had commenced proceedings against Mr Miller in California; and as referred to below steps had been taken not only for Kea to sign up to a further £63m loan, but for over £100m to be transferred from Kea to Spartan; steps had also been taken to make it difficult to remove and replace Mr Dickson as Kea Director of Spartan.

379.   Mr McCaughran said that it was made clear to Messrs Miller and Dickson in the autumn of 2012 that Newco would be entirely owned by Park and other Watson entities and that Mr Watson's interests would receive the whole of the £12.5m.   He relied on three matters in particular: (1) meetings that Mr Watson and Mr Leahy had with Mr Dickson in Paris on 23 October 2012 and with Mr Miller in London on 31 October and 1 November 2012; (2) a telephone call between Mr Leahy and Mr Dickson on 16 November 2012; and (3) a revised Business Plan drafted by Mr Leahy and initially provided to Mr Dickson and Mr Maislish on 8 December 2012.

380.   The Paris meeting was arranged to update Mr Dickson on Spartan, and in particular the status of the schedule 2 transactions.   The pack that Mr Leahy produced for the meeting contained a page dealing with the acquisition and valuation of Newco.   This indicated that the M&G acquisition of Abacus had closed with total net proceeds to Gaucin and Berryblue of c. £19.5m, meaning that the price for Newco was estimated at c. £25.5m and that Kea's cash payment would be c. £12.74m rather than £12.5m.   It said nothing about the ownership of Newco or who would receive the £12.74m.

381.   Mr Watson and Mr Leahy then met Mr Miller in London on 31 October and 1 November 2012.

382.   On 3 November Mr Leahy sent an e-mail to Mr Watson saying that *"As discussed, here are some notes"* on what they had discussed with Mr Miller that week and with Mr Dickson in Paris.  These included:

> "Review of overall Spartan transactions left to complete – in particular the purchase of Newco and the fact that Park/EW entities were now the ultimate beneficial owner of all the cash proceeds being paid by Spartan for the purchase of Newco etc., given that Berryblue and former EW partners are now no longer part of these transactions. Peter and David understood this…
>
> …both Peter and David seemed excited to pursue all the opportunities we had on the table and were comfortable with all the remaining transactions to be completed including re-allocation of goodwill to EW entities."

Mr McCaughran submitted that this was an internal e-mail and there was no reason for Mr Leahy to have produced an inaccurate record; Ms Jones that it was a "window-dressing" e-mail written for the file.

383.   I accept that it was evidently written for the record: Mr Watson had been at the meetings and so did not need to be informed of what had happened, and the e-mail itself shows that Mr Leahy was sending it *"as discussed"* and hence that Mr Watson had asked Mr Leahy for it (and when he received it, Mr Watson replied that it looked to him to cover all the key points discussed), so the natural inference is that Mr Watson had asked him to send it as a record.

384.   That does not itself resolve whether it was accurate or deliberately inaccurate.  Mr McCaughran said that at that date the issue of the destination of the £12.5m had not arisen so there was no reason for Mr Leahy to be misleading about it, but as Ms Jones pointed out, the question of who was going to receive the £12.5m, and what Messrs Miller and Dickson were or were not told about it, had obviously been and continued to be a matter of significant concern.  Mr Watson and Mr Leahy were undoubtedly concerned as to the possible impact of Sir Owen's proceedings on Kea's investment in Spartan, and I take the view that it is not all unlikely that they thought it might be helpful to be able to point to material demonstrating that Messrs Miller and Dickson had been told of the destination of the £12.5m and had agreed to it.

385.   Two other points were relied on by Ms Jones.  First, the e-mail is written as if what it records (or purports to record) is that Messrs Miller and Dickson had been told for the first time that the cash was going to Park/Watson entities and that this was a change (see the reference to *"now"* the ultimate beneficial owner, and *"re-allocation"*).  That is very difficult to reconcile with the case now being put forward that Messrs Miller and Dickson appreciated the likely destination of the £12.5m before the July agreements were signed, and indeed supports the Claimants' case that they did not know in July that the payment would (in all probability) go to Mr Watson.

386.   Second, there is nothing in writing from Mr Leahy to Messrs Miller and Dickson at or around the time of these meetings confirming that this is what was going to happen. When asked about this, Mr Leahy referred to the revised Business Plan, but this was not sent until over a month later; and in any event does *not* clearly state that the £12.5m would go to Watson entities (see below).

387.   Moreover, as again Ms Jones pointed out, the steps to ensure that Newco (or Rygen as

it became) had two equal owners continued after this date.  As appears above (paragraph 323) Rygen had been established by EH&P with a nominee holding 100% of the shares for Munil, the intention being to sell 50% to Park.  That agreement was not signed until 21 December 2012 (although backdated to 1 December 2012).  If by that stage Messrs Miller and Dickson understood that Rygen was effectively 100% owned by Watson interests and the £12.5m would all go to Park/Watson entities, it is not obvious why these arrangements would still need to be put in place.

388.  I conclude that it is indeed probable that the account recorded by Mr Leahy on Mr Watson's instructions was deliberately written for the file to be referred to later if necessary, and cannot be relied on as indicating that the conversation it purports to record actually took place.

389.  Much the same applies to the second matter relied on by Mr McCaughran, an e-mail of 19 November from Mr Leahy to Mr Watson reporting on key things he had taken Mr Dickson through in a telephone conversation with him on 16 November, including an explanation of the revised Business Plan which was coming:

> "Most notably this section addressed the fact that the shareholders of Berryblue are no longer part of the deal and that a diagram in the new agreement clearly explained the flow of Goodwill back to Newco owners, which are part of the Park group."

I have found it difficult to be confident that this e-mail does reflect an actual conversation to that effect with Mr Dickson, although it is possible that it does.

390.  That brings me to the revised Business Plan.  A meeting was due to take place on 12 December, to be attended by Mr Leahy, Mr Dickson and Mr Maislish together with representatives of Fladgates and of Grosvenor Law, which had by then been instructed by Spartan; the purpose of the meeting was to go through a proposed revised version of the Spartan Shareholders' Agreement.  On 8 December Fladgates circulated the participants, including Mr Dickson and Mr Maislish, with a package of documents in preparation for the meeting.  This included a draft of the revised Shareholders' Agreement, attaching the revised Business Plan.  It also included a covering letter from Mr Dan Morrison of Grosvenor Law explaining the rationale for the proposed amendments to the Shareholders' Agreement: under the existing version, if Spartan were to become deadlocked for any reason, Spartan would not be in a position to continue with its Business Plan, but under the revised version, Spartan could continue to carry on executing its Business Plan notwithstanding a deadlock.  For this purpose the Business Plan had been revised to provide clarity of the projects Spartan was looking to invest in.

391.  The revised Business Plan included under the heading *"Structure"*:

> "The Spartan structure and key transactions (as set out in Schedule 3) have evolved significantly since originally being presented in early 2012.  Substantial changes have occurred relating to what assets may be purchased, the partners involved, the structure of the transactions required to establish Spartan and the final structure of the vehicle itself.  Primarily these changes are that:
>
> 1.  the Loan facility has increased from £50m (fifty million pounds) to a total of £113m (one hundred and thirteen million pounds);

2.  Spartan is no longer buying Gaucin or Berryblue, as originally contemplated. As a result, the original partners in the form of Berryblue and its shareholders are no longer part of the structure or transactions;

3.  Park has now delivered access to ground rent investments through the purchase of Rygen by Spartan.

...

Chart 1 below summarises the structure of Spartan post all transactions completing, including those currently described in Schedule 3."

The diagram showed a box marked Spartan in the middle; a box on the right marked Park and Related Entities, which itself contained two boxes, one marked Summit (with an arrow to Spartan labelled *"Summit Loan of GBP 3.5mn"*) and the other marked Newco Owner (with an arrow to Spartan labelled *"Vendor Loan of ˜GBP 12.7mn (50% of consideration for Newco)"*); and a box marked Newco below Spartan, with an arrow to Spartan labelled *"Sold to Spartan"* and an arrow from Spartan labelled *"˜GBP 12.7mn cash (50% of consideration)"*.

392.  Mr McCaughran submitted that this diagram made it absolutely clear that Park and related entities owned Newco and that Newco was to be sold to Spartan with 50% of the consideration being £12.7 million cash from Kea.  I do not accept this.  It is true that the box marked Park and Related Entities includes Newco Owner (in the singular).  But it had been intended since the revision to the transaction at the end of May that Newco should have two equal owners, one of which would be Park, and that Park should receive £12.5m for its 50% share of Newco to be left outstanding as a vendor's loan.  The arrow from Newco Owner to Spartan refers to this vendor's loan, and does not refer to the £12.5m cash for the other 50%.  That is shown as going to Newco, which is shown separately.  The diagram seems to me at best ambiguous – it is to my mind consistent with the transaction as presented by Mr Leahy to Mr Dickson and Mr Maislish on 30 May and incorporated into the Term Sheets and the July agreements under which Park was to be a 50% owner of Newco and receive 50% of the consideration (left outstanding as a vendor's loan) and Holder 2 would be the other 50% owner and receive its half of the consideration in cash.  The diagram does not to my mind say anything about who the recipient of that cash will be.

393.  Moreover there is a revealing contrast with the corresponding diagram in an earlier draft by Mr Leahy of the revised Business Plan which was not circulated.  This is very similar but here there is a dotted line from the box marked Newco (below Spartan) to the box marked Park and Related Entities (to the right of Spartan), and the latter contains boxes marked Summit and Newco Owners (in the plural).  That to my mind did make it clear that both Newco Owners were Park or related entities; and the dotted line reinforces that by linking the Newco box (and hence the receipt of the £12.7m cash) with the Park and Related Entities box.  The obvious question is why Mr Leahy removed these features of the diagram.  He was asked but could not explain it, suggesting only that maybe he had thought it unnecessary.  I regard that as wholly unconvincing, and I have not been able to think of a good reason why Mr Leahy should have deliberately altered the diagram in the way he did, which had the effect of making it more obscure.  I accept Ms Jones' submission that the most plausible explanation is that Mr Leahy wanted to create a paper trail that could later be pointed to, while not being explicit.  It is notable that the reference in the text to the changes

do refer to Spartan no longer buying Gaucin or Berryblue and the original partners in the form of Berryblue and its shareholders no longer being part of the structure or transactions but do *not* say that the £12.5m payment is now going to Park and related entities.

394.    Mr McCaughran referred to the fact that Mr Maislish accepted in cross-examination that the diagram in the revised Business Plan (as sent to him on 12 December which was in the same form as circulated on 8 December) stood out from the page, would have been very helpful, and made it absolutely clear that Park and related entities owned Newco.  But Mr Maislish said he had no recollection of it at all.  He accepted that he did read through the redline version of the revised Shareholders' Agreement sent to him on 8 December as he made manuscript notes on it.  However although he made notes on various other parts of it, his note on the revised Business Plan (schedule 2) was:

"Tel PD.  Just accept all this, he has agreed it.  DD? No, not me"

and there are no notes on the rest of the schedule.  I therefore accept Mr Maislish's evidence that he did not in fact consider the revised Business Plan when first sent to him (and the redline version which he did consider did not in fact contain the relevant diagram in any event).  Mr McCaughran relied on the fact that Mr Maislish later passed on to Fladgates a minor textual amendment suggested by Mr Dickson to the revised Business Plan, and that he accepted that he would have checked that Fladgates had duly incorporated it (as they did), and submitted that it was more likely than not that he would have read through at least one version of the revised Business Plan.  I think that unlikely – it is a dense and detailed document and having been told it was not for him, I see no reason why he should have troubled to read through it, and it would have been easy enough to check that the minor amendment had been made without doing so.  That means that Mr Maislish's acceptance of what the revised Business Plan shows is not a reflection of what he thought at the time, but what he now thinks it shows, and as such I do not regard it as carrying any particular weight.

395.    In these circumstances I find that the revised Business Plan was not a clear statement that the £12.7m cash payment was going to Watson entities.

396.    Ms Jones also placed reliance on two telephone conferences which Mr Leahy participated in in March 2013, one on 25 March and the other on 26 March.  By then an injunction had been granted in Nevis and Harneys were asking for information.  In the first telephone call, Mr Morrison raised the question whether Harneys might say that the schedule 2 transactions were not arms' length, and that Kea didn't anticipate spending £20m on an asset that they were *"buying from you"* to which Mr Leahy suggested that it had *"Always been disclosed (revised business plan)"* and *"Good that they got docmt in Nov 2012"*; in the second telephone call, Mr Morrison said *"Nov business plan – saviour to us.  Dickson [k]new about it.  Not our problem if Dickson didn't come back on it."*  That evening Mr Morrison drafted a letter to be sent to Harneys which included the statement that:

"Mr Dickson was provided with full disclosure of all matters in relation to the Transaction in [November] 2012…"

Mr Leahy responded that he was fine with this draft.  Ms Jones made the point that

these statements all read as if the revised Business Plan was the only relevant disclosure, and that it was up to Mr Dickson to query it; they are not written as if he and Mr Miller had appreciated in May, or at any time before the July agreements were signed, that the £12.5m would be very likely to go to Watson entities; or indeed as if there had been express discussions to this effect in October and November 2012. There is I think considerable force in this.

397.   In these circumstances the true position as to what Messrs Miller and Dickson were told, and did or did not understand, in the autumn of 2012 remains obscure. On the one hand the revised Business Plan did state that the shareholders in Berryblue were no longer part of the structure or transactions, whereas on the other Mr Leahy, as I find, deliberately altered the diagram to make the position more opaque. In those circumstances, and in circumstances where I have not felt able to trust any of the oral evidence or Mr Leahy's e-mails to Mr Watson, I am left quite uncertain what Mr Watson and Mr Leahy did tell them. I am not persuaded that they were told, or did understand, in the autumn of 2012 that the £12.5m would now be going to Watson entities, and on the balance of probabilities I find that they were not.

398.   I recognise however that it is possible that this is wrong and that Mr Watson and Mr Leahy did bring Mr Dickson and Mr Miller on board. I find that if Mr Watson and Mr Leahy did tell them, that it was explained as a *"re-allocation"*, not as something that only reflected what they had understood to be very likely to be the case back in May.

399.   Mr McCaughran made the point that Mr Leahy would scarcely have drafted the revised Business Plan in the way he did (referring to the owners of Berryblue no longer being part of the structure or transactions) if he and Mr Watson had successfully deceived Messrs Miller and Dickson as to the destination of the £12.5m. I have given careful thought to this point. The most likely explanation I think is as follows. By this stage Mr Watson and Mr Leahy were very confident that Messrs Miller and Dickson had been so persuaded by them of the merits of Spartan that they were very keen to pursue it. Indeed the threats posed to Spartan by Sir Owen's litigation had made them all the keener to press on with Spartan and try to prevent it being derailed, Mr Dickson for example describing the impetus for the proposed amendments in an e-mail of 5 December to Mr Maislish as follows:

> "We are strengthening the Shareholders Agreement to make it more difficult to freeze or attack Spartan and its business in view of certain current litigation by Mr Glenn against DJM and potentially against the Trust that owns Kea Investments Ltd."

In other words Messrs Miller and Dickson saw Kea's interests as being to pursue Spartan, and the effect of Sir Owen's litigation against Mr Miller had been to drive them to align themselves closely with Mr Watson and Mr Leahy who also wished to progress Spartan.

400.   In those circumstances I think Mr Leahy and Mr Watson were confident that if necessary they could persuade Messrs Miller and Dickson that it did not matter that the owners of Berryblue were no longer part of the transaction as it did not affect the fundamentals of the deal: Kea had always been going to pay for goodwill and was still going to pay the same and it did not matter who it had been re-allocated to. It is

noticeable that Mr Watson and Mr Leahy had a dim view of Messrs Miller and Dickson's critical abilities: on 17 July Mr Leahy had described Mr Dickson in an e-mail to Mr Watson as *"incredibly lazy about the whole thing"* and said (in relation to completing the agreements on 24 July) *"I don't imagine either of them will have given it much thought"*; again on 18 July he said in another e-mail to Mr Watson *"These two are unbelievably lazy about the whole thing"*. By the time of the revised Business Plan, I think Mr Leahy thought (with some justification) there would be little difficulty in persuading them to continue with Spartan despite any re-allocation of the goodwill. Mr Miller in his evidence did come across as genuinely enthusiastic about Spartan, although he found it difficult to explain why he thought it was worth paying £12.5m for it.

401.   Mr McCaughran also made the point that Mr Leahy and Mr Watson would scarcely have provided the revised Business Plan to Mr Maislish (as Mr Leahy and Fladgates did on more than one occasion) if they had previously sought to deceive him. Mr Leahy had in fact been very reluctant for Mr Maislish to give any advice to Kea at this stage (as is apparent from the notes of a meeting on 31 October 2012 in which Mr Leahy suggested variously that Mr Dickson was taking advice from Spartan; that it would cause a timing issue; that maybe they should get a different lawyer for Kea; that a lawyer wearing a lender hat would see things that they would not like, and asking if they could look at it just from a shareholder perspective; and that perhaps Mr Morrison could advise Kea). But I also consider that Mr Leahy understood that Mr Maislish was not expected by Messrs Miller and Dickson to concern himself with the underlying commercial terms but with the legalities; and again that if any question had been raised by him (which it was not) the matter would have been explained as a re-allocation.

402.   In the final analysis the evidence in relation to the autumn of 2012 does not cause me to change my provisional view as to what Mr Dickson understood in July. I find that Mr Dickson did not understand at any stage before executing the July agreements that the £12.5m would be going, or would be very likely to be going, to Mr Watson's interests. That involves not only rejecting the evidence of Mr Watson and Mr Leahy but also that of Mr Miller, but I have already said that I have not felt able to regard any of this evidence as reliable.

403.   I can deal much more shortly with the other elements of the deceit claim. First, there is on the pleadings a question as to whether all the representations made by Mr Leahy were made on behalf of both Novatrust and Mr Watson, Mr Watson's pleaded case being that the 1 April presentation was made on behalf of him but not Novatrust (as Mr Watson had not yet decided which entity to use), and that later representations were made on behalf of Novatrust but not Mr Watson. These points were not pressed in Mr Watson's closing submissions, but I will deal with them briefly. The latter point seems to me plainly unsustainable: Mr Leahy was at all time acting not only for the benefit of Mr Watson (who stood to benefit from Project Spartan in a number of ways) but worked very closely with him, seeking his instructions, direction and approval, and in his own words was part of a *"team"* acting for Mr Watson, saying for example in answer to one question:

   *"Yes I think the team would have set out a way of putting together a structure that enabled Mr Watson to have a negotiation around that price…"*

I do not think there is any doubt that any representations made by Mr Leahy throughout the period from the 1 April presentation to the signing of the July agreements were made on behalf of Mr Watson even once Novatrust had been identified as the other contracting party.

404.　As to whether the representations in the 1 April presentation were made on behalf of Novatrust, again I do not think there is any difficulty. Novatrust may not have been identified by 1 April as the vehicle that Mr Watson would use (although the proposal at that stage did in fact involve Novatrust, in its capacity as trustee of Summit, selling Gaucin to Spartan), but Novatrust (in its capacity as trustee of Park) had been identified as the vehicle to be used by 17 April 2012, and had been told the bare outlines of the transaction. At that date nothing had been said to correct the representations in the 1 April presentation and on general principles the representations were therefore continuing. I do not see why the representations initially made on 1 April in order to induce a contract with an as yet unidentified vehicle should not be regarded as continuing to be made on and after 17 April when the vehicle was identified as Novatrust, and hence as being from that date made on behalf of Novatrust.

405.　It is also a requirement that the representations be made with the intention that they be acted upon. Again I do not think there is any difficulty about that. The whole purpose of the way in which the 1 April presentation was drafted was to make it look as if Sir Owen was being asked to provide the £22.5m to buy out Mr Watson's existing partner. As submitted by Ms Jones, when taken with the statement that current discussions suggested that the partner could be bought out for £22.5m, that provided support for the valuation of £45m. That was why the reference to the Berryblue loan was taken out of the presentation, Mr Leahy accepting that Mr Watson:

> "did not want to put that loan into the presentation precisely because he thought it would upset the negotiation position with Owen."

As Mr Leahy said, what they wanted Sir Owen to see was the £22.5m being paid out to buy Mr Richardson's share, and they can only have wanted him to see that because they understood that that would help induce him to approve the transaction. The suggestion that the £22.5m was expected and intended to be paid out to acquire his 50% share also indicated that Mr Watson's 50% share was equally worth £22.5m, and hence that he would be contributing equally with Sir Owen. Mr Watson and Mr Leahy knew that Sir Owen thought he had been too generous to Mr Watson on Project Edsel and wanted other deals to be done on a proportionist basis. That was why Mr Leahy commented that the JV was unwilling to pay any goodwill to EW-associated vehicles (paragraph 256 above). And the various steps taken to make it look as if the whole £22.5m was going to Mr Richardson (and later that the £12.5m was going to Mr Watson's partner as one of the two 50% owners of Newco), including setting up Rygen with two equal owners, long after the July agreements had been concluded, only make sense if Mr Watson and his team continued to think it material to do that. I have no doubt in the circumstances that Mr Watson and Mr Leahy understood their representations to be material and intended them to be relied upon.

406.　The next question is whether Mr Dickson was induced to enter into the July agreements by the representations. (Both parties had a tendency to ask this question

by reference to whether Mr Dickson *"relied"* on the representations, but strictly the better formulation of the law is I think whether he was *"induced"* by them). Ms Jones pointed out that there is a presumption of inducement in a case where a false statement has been made: see *Chitty on Contracts* (32nd edn, 2015) at §7-040:

> "Once it is proved that a false statement was made which is "material" in the sense that it was likely to induce the contract, and that the representee entered the contract, it is a fair inference of fact (though not an inference of law) that he was influenced by the statement, and the inference is particularly strong where the misrepresentation was fraudulent."

The principle is well established and was not disputed, and has recently been endorsed by the Supreme Court (albeit in a case not cited to me): see *Hayward v Zurich Insurance plc* [2016] UKSC 48 at [34]-[38] per Lord Clarke where at [34] he endorsed this passage from *Chitty*, and at [37] said that the authorities support the conclusion that it is very difficult to rebut the presumption.

407.   Mr McCaughran's answer to the presumption was two-fold. First that neither Mr Miller nor Mr Dickson were concerned about where the £22.5m was paid, their only interest being that Mr Watson's partner should be removed from the deal – nor indeed was Sir Owen; and second that there was in any event no reliance because by the time of the July agreements the deal had changed and Messrs Miller and Dickson knew that it was likely that the £12.5m payable under the revised deal would be paid to Mr Watson's interests. On my findings of fact that later submission cannot succeed.

408.   As to the former submission, Mr Miller gave some evidence to that effect, but I do not accept it. It seems to me to underplay the effect of the 1 April presentation which, as Ms Jones submitted, was the platform on which everything else was built. The whole purpose of Mr Leahy flying out to the Bahamas and presenting the 1 April presentation to Sir Owen was to persuade him to give his go-ahead to the deal, which he did in his e-mail of 2 April saying that he had given his approval to proceed with the purchase of the existing partner's shares (paragraph 230(7) above). It seems to me a reasonable inference that if the presentation had not represented that the £22.5m was expected to be needed for that purpose he would not have done so. The fact, relied on by Mr McCaughran, that Sir Owen had forgotten by April 2013 that any up front payment was to be made at all, does not mean that it was not something that was material and that induced him to agree to proceed in April 2012.

409.   So far as Messrs Miller and Dickson are concerned, I think it is too simplistic to take one element of the transaction (who was going to end up receiving the £12.5m?) and look at it in isolation as if it stood on its own. The 1 April presentation was carefully constructed so that the various parts of it reinforced each other. Thus the valuation of £45m, which justified asking Sir Owen / Kea to pay £22.5m for a 50% share, was supported and reinforced by the statement that it was expected that the £22.5m was going to be used to buy out Mr Watson's 50% partner, and that current discussions suggested that this would be possible. That set the value for Spartan at £45m and Kea's entry price to acquire 50% of Spartan at £22.5m. Since Messrs Miller and Dickson never obtained any valuation of their own of the rights and opportunities that Spartan would give Kea, it is impossible to believe that the representation that that was what was expected to be needed to buy out Mr Watson's partner did not form part of the material inducing them to proceed at that price – that was the whole purpose of

including it.  At any rate the presumption that Mr Dickson was so induced has not in my judgment been rebutted.  And once the entry price of £22.5m had been set, that became the source of the calculation of the £12.5m which was the price for what was left of Spartan after the M&G acquisition.  In that way the initial deceit in the 1 April presentation led directly to Mr Dickson agreeing to pay the £12.5m.

410.   Quite apart from that, there is material showing that Messrs Miller and Dickson were just as keen as Sir Owen to see that Mr Watson was not getting disproportionate benefits from a deal.  In relation to Project Edsel they had agreed with Sir Owen that he was being generous to Mr Watson, and Mr Dickson had said that they could seek to moderate his return on future projects and *"sharpen our pencil"* (paragraph 107 above).  It was certainly Mr Leahy's understanding that the Sir Owen side would not be willing to pay goodwill to Mr Watson associated entities; that is precisely why he initially pretended the £22.5m was all expected to go to Mr Watson's partner for his 50% share, and later that the £12.5m which replaced it was going the same way.  I find that the presumption that these representations induced Mr Dickson has not been rebutted.

411.   In those circumstances my conclusion is that Mr Dickson was induced to enter into the July agreements (and the Spartan Term Sheets which preceded them) by fraudulent misrepresentations, and subject to the question of affirmation, Kea was entitled to set them aside.

*Affirmation*

412.   It is convenient to take the question of affirmation next.  This rests on the fact that Mr Munro, on behalf of HNL, agreed to allow the schedule 2 transactions to proceed in April 2013.

413.   The facts are (very briefly) as follows:

(1)       On 13 February 2013, Benjamin J granted an injunction in the Nevis High Court (paragraph 43 above).  Among other things this appointed HNL as interim trustee and authorised it to administer the Corona Trust.

(2)       Following this, Harlaw was appointed to the Spartan board as Kea representative.  Harlaw acted by Mr Munro.  Mr Munro first met Mr Leahy and Mr Watson in London on 8 April 2013, and then (with Sir Owen and others) at a meeting in Auckland on 21 April 2013.

(3)       The agenda for the 21 April 2013 meeting was whether the schedule 2 transactions should go through.

(4)       On 24 April 2013, Mr Munro approved the completion of the Rygen and Atherton transactions.

(5)       Mr Watson's case is that Kea thereby affirmed the July agreements and the subsequent agreements.

414.   The Claimants have a very large number of answers to this case.  I do not think it is necessary to go through them one by one.  One of them is that Sir Owen and Harlaw were not aware of the misrepresentations prior to the July agreements.   Mr

McCaughran's first answer to this is that Kea had not been induced to execute the July agreements by misrepresentation. That fails as I have found that Kea was so induced.

415.    Mr McCaughran's second answer is that Messrs Miller and Dickson knew the true destination of the £12.5m in the autumn of 2012, and by proceeding with the agreements elected to affirm them at that stage, and it was not therefore open to Harlaw to rescind them as at March to April 2013. There are three reasons why I do not accept this: (i) the point is not pleaded and Ms Jones objected to it on that basis; (ii) I have not been persuaded that Messrs Miller and Dickson did understand in the autumn of 2012 that the £12.5m would be going to Watson entities; and (iii) even if they did understand that, affirmation requires full knowledge of the material facts. As set out above, the destination of the £12.5m was only part of the original deception and should not be looked at in isolation. The original scheme involved Sir Owen's interests paying £22.5m to participate in Project Spartan on the basis that that was what was expected to be needed to buy out Mr Watson's 50% partner. That deception was used to support the £45m valuation, which in turn formed the basis for the calculation of the £12.5m. Even if Messrs Miller and Dickson understood in the autumn of 2012 that the £12.5m had been re-allocated to Mr Watson, there is nothing to suggest that they understood that the basis on which Kea had initially been asked to pay £22.5m was itself an entirely false basis. I do not think they had the requisite full knowledge to affirm the agreements in autumn 2012; and I do not think Harlaw had the requisite full knowledge in April 2013 to affirm the agreements either.

416.    In those circumstances the defence of affirmation fails, quite apart from all the numerous other grounds relied on by the Claimants. It follows that Kea was entitled to set aside the July agreements as having been induced by fraudulent misrepresentations. Ms Jones submitted that if that were right, none of the subsequent agreements could stand, as they all proceeded on the basis that the July agreements were valid. That seems to me to be right, and I did not understand Mr McCaughran to contend to the contrary.

*Inducements*

417.    I will take next the question of inducements.

418.    There was no significant dispute as to the law. Ms Jones referred me to *Daraydan Holdings Ltd v Solland International* [2004] EWHC 622 (Ch) at [52]-[54], *Logicrose Ltd v Southend United Football Club Ltd* [1988] 1 WLR 1256 (*"Logicrose"*) at 1260F-1261A, *Fiona Trust & Holding Corporation v Privalov* [2010] EWHC 3199 (Comm) (*"Fiona Trust"*) at [72]-[73] and *Otkritie v Urumov* [2014] EWHC 191 (Comm) at [68]. Mr McCaughran accepted that these authorities establish the following propositions:

(1)    If one contracting party pays or offers a secret commission to the agent of the other, the other is entitled to rescind the contract.

(2)    That applies to payments of money. It also applies to offers to pay money.

(3)    It also applies to the conferring of benefits which have a monetary

value, such as holidays, or offers to confer such benefits.

(4)         Where these strict rules apply, it is not relevant to enquire what the motive was of the party who pays the bribe or secret commission; and it is not relevant to enquire whether the agent who received it was actually influenced by its receipt.   There is, for perfectly understandable policy reasons, an irrebuttable presumption of inducement.

419.    There is an exception to these rules where the amount involved is trivial.   Again that is not disputed as a matter of law.   In *Shipway v Broadwood* [1899] 1 QB 369, the defendant agreed to buy a pair of horses from the plaintiff, a horse-dealer, if the defendant's agent, a veterinary surgeon, certified them as sound.   At trial, it emerged that the plaintiff had offered a sum of money to the veterinary surgeon and he had accepted the offer.   No evidence was given as to the amount of the sum or if it was actually paid.   All three members of the Court of Appeal held that this was a case of a bribe, and Chitty LJ said (at 373):

> "If it was intended to bring the matter within the maxim "De minimis non curat lex," it was necessary for the plaintiff's counsel to shew by re-examination that the amount was trivial; but that was not done."

In *Fiona Trust* Andrew Smith J said (at [73]):

> "ii)   The law recognises that some gifts or benefits are too small to create even a real possibility of a conflict of interest and so too small to be treated as a bribe. The defendants say that some benefits that Mr. Nikitin is said to have provided to Mr. Skarga and Mr. Izmaylov were of insufficient value to be bribes, and were only what Gorell Barnes J called in The "Parkdale", [1897] P 53, 58–9 "a little present". It is a question of fact depending on the circumstances of each case where the line is to be drawn between "a little present" and a bribe, and so unsurprisingly there is little guidance about this in the authorities, but the test, as I understand it, is whether it is sufficient to create a "real possibility" of a conflict between interest and duty: Imageview Management v Jack, [2009] 1 Lloyd's Rep 436 para 6 per Jacob LJ. It is not whether such a conflict is actually created."

420.    In these circumstances Mr McCaughran had two alternative submissions.   The first was that the inducements offered in this case did not fall within the rules relating to secret commissions at all as no money was paid, no money was offered, no benefits of any monetary value were conferred and no benefits of any monetary value were offered.   The second is that if the rules as to secret commissions apply at all, the benefits involved fall within the exception where the amount involved is trivial.

421.    I propose to put on one side the interest shown by Mr Watson in Mr Miller's Indonesian biomass project.   All that had happened by the time the July agreements were signed on 24 July was that Mr Watson had sat through a presentation and invited Mr Miller on a visit to Georgia.   No doubt that was intended to hold out the prospect of more tangible assistance, but at the relevant time Mr Miller had neither received anything of monetary value nor had anything really been offered to him.

422.    In the case of Katrina Dickson however Mr Watson and his team had already by 24 July made considerable efforts to obtain a training contract for her; on 17 July Mr

Leahy described it as *"becoming increasingly material"* and said that *"it would help hugely if we could deliver something"*; and Mr Watson said that *"we need a positive answer, preferably before 24 July"* (paragraph 327(7) above).  As Mr Leahy accepted in evidence, that was no doubt because it was becoming embarrassing that Mr Watson, having promised to help, was unable to deliver a training contract (paragraph 328 above).

423.   I do not think there is any doubt that if he had actually procured a training contract for Ms Dickson, that would have been of significant and material benefit to *her*.  I had no evidence as to the typical value of a training contract, but Ms Dickson's own description of the benefits of a training contract makes it clear how valuable it is: not only do the firms that offer them pay the LPC fees, but provide training for two years, and although they do not provide any guarantee of a job, they do offer at least a reasonable prospect of one.  It also appears that it was essential for her to have a training contract in order to start the LPC course in October, as well of course as being essential to becoming a fully qualified solicitor.  It is also common knowledge that trainees are paid a reasonable salary, and no attempt was made to suggest, let alone establish, that that would not have been a significant amount.  I do not think that on any basis such a contract could be described as a trivial or *de minimis* benefit to the trainee herself.

424.   Mr McCaughran's main point was that although it would have been a benefit to her, it was of no material benefit to Mr Dickson at all – its monetary value to him was probably zero.  He accepted that Mr Dickson would have been pleased but said that unless there was a sum of money offered, or something equivalent to money, the rules as to bribes did not apply, and it was necessary to inquire whether he was actually influenced in the exercise of his duties.

425.   He referred me by way of comparison to *The Libyan Investment Authority v Goldman Sachs International* [2016] EWHC 2530 (Ch) where the claimant (the LIA) contended that certain trades it had entered into with the defendant (Goldman Sachs) had been brought about by undue influence.  In relation to some of the disputed trades, the LIA relied on a specific instance of actual undue influence, namely that Goldman Sachs improperly influenced the deputy chairman of the LIA by offering his younger brother a prestigious internship at the bank: see at [6], [10] and [162]-[194].  Rose J held that the claim was not made out on the facts.

426.   I do not think this decision is of any assistance to the questions I have to decide.  The claim was squarely put as a case of actual undue influence, and in such a case the influence has to be proved, and all that Rose J in the end decided was that it was not established on the facts: see at [190]-[193].  The claim was, for whatever reason, not put on the basis that the offer of the internship attracted the consequences of bribery, although both parties recognised that that might have been possible.  Thus Goldman Sachs accepted that the offer of, for example, a free holiday to a director or agent of a company in his personal capacity would be improper and give rise to other remedies, but submitted it would not amount to undue influence (at [165]); whereas the LIA submitted that while there were other causes of action by which a company could challenge a bribe to its director or agent, that did not preclude there being a claim for undue influence (at [166]).  In the light of her conclusion on the facts, Rose J did not have to decide this point of law; nor did she decide anything about whether the internship would in fact have attracted the consequences of bribery had that been the

claim pleaded. A case is of course only authority for what it decides, not what it does not decide, let alone what the parties have not even suggested that it should decide.

427. I come back then to Mr McCaughran's submission that a training contract for Ms Dickson would have been outside the scope of the law of bribery because it would not have had any financial value to him. I consider that that is to take too narrow a view. The essence of the law of bribery is that a principal is entitled to the single-minded loyalty of his agent, free from anything which gives rise to a realistic possibility of a conflict of interest. See for example *Logicrose* at 1260G:

> "The remedy is not confined to cases where the agent has taken a bribe or secret commission in the strictest sense. It is available whenever, without his principal's knowledge and consent, the agent has put himself in a position where his interest and duty may conflict. A principal is entitled to the disinterested advice of his agent free from the potentially corrupting influence of an interest of his own. Any such private interest, whether actual or contemplated, which is not known and consented to by his principal, disqualifies him."

And see *Imageview Management Ltd v Jack* [2009] EWCA Civ 63 at [6] per Jacob LJ:

> "If you undertake to act for a man you must act 100%, body and soul, for him. You must act as if you were him. You must not allow your own interest to get in the way without telling him. An undisclosed but realistic possibility of a conflict of interest is a breach of your duty of good faith to your client."

428. The question therefore is whether the agent has been offered something that gives rise to a realistic possibility of a conflict of interest. I have not been shown any authority which confines this to the payment of money or the conferring of benefits of a monetary value, and I see no reason why it should be so confined. No doubt in most cases that come before the courts the thing that gives rise to a realistic possibility of a conflict is the payment or promise of money or something equivalent, but it seems to me that anything that could realistically give rise to such a conflict ought to fall within the principle. Most people after all are interested in many things other than money. In my judgment the question is not whether the benefit takes the form of money or something with a monetary value but whether it is something that could realistically give rise to a possibility of a conflict of interest.

429. Mr Dickson was obviously in fact interested in seeing his daughter obtain a training contract as his e-mail of 18 June to Mr Watson, saying that he would be *"most appreciative"*, shows (paragraph 327(5) above). I do not find this surprising. It seems to me entirely natural for a father with a daughter of the age of Ms Dickson to wish to see her able to pursue her chosen profession; one cannot put a monetary value to the father on that, but for the law to take the view that it would therefore have been of no interest to him seems to me quite unrealistic. Indeed I suspect that for many parents in Mr Dickson's position seeing their children safely established in their own careers is something that is likely to be one of the things of most importance to them at that particular stage in their life.

430. For the same reason, I do not think the benefit to him can be dismissed as trivial. On the contrary, I find that it was something that could give rise to a realistic possibility of a conflict of interest. Mr McCaughran said that Mr Watson had not promised that he would be able to secure a training contract only that he had offered to help try to

find her one.  Ms Jones was in fact able to point to a statement by Mr Leahy that Mr Watson was embarrassed because he had *"promised to deliver a training contract"* (paragraph 328 above); but in any event I do not think it matters.  Mr Watson had not been able to deliver on a training contract by 24 July, but he was evidently still hoping to be able to, and Mr Dickson no doubt hoped he would be able to assist – indeed Mr Leahy said he was getting worked up because he thought Mr Watson could deliver it. Mr Watson's agreement to assist his daughter, even if not a promise, seems to me something that is realistically capable of having the effect of undermining Mr Dickson's single-minded loyalty to the interests of Kea (and hence the trust and the beneficiaries) and giving rise to a conflict of interest.  Those are precisely the circumstances that the rules against bribery are designed to address.

431.    In those circumstances I find that the July agreements were affected by Mr Watson's offer to assist Ms Dickson in obtaining a training contract, and are voidable on this ground as well.  Again it seems to me to logically follow that the subsequent agreements also fall to be set aside as if the July agreements are set aside the whole basis of the subsequent agreements has gone.

*Breach of fiduciary duty by Mr Watson*

432.    I will take next the question whether the 24 July agreements involved a breach of a fiduciary duty owed by Mr Watson to Sir Owen or Kea.

433.    I have considered the principles above in connection with Project Edsel.  So far as Project Spartan is concerned, it is helpful to draw a distinction between the question whether Mr Watson owed a fiduciary duty to Sir Owen, and whether he owed one to Kea.

434.    So far as Sir Owen is concerned, Ms Jones relied principally on the personal relationship between them.  In addition to the matters she relied on down to the closing of Project Edsel in February 2012, she referred to the way in which Mr Watson offered practical and emotional support to Sir Owen once he fell out with Mr Miller who had been his right-hand man for many years.  There is indeed plenty of evidence to that effect: Mr Watson had learned when in the Dominican Republic that Sir Owen was very unhappy with Mr Miller, appreciated that the relationship was becoming very acrimonious, and knew by 19 April that the stress had made Sir Owen unwell and that he was thinking of suing him for misinformation and fraud (paragraphs 340 to 341 above); and when Sir Owen came to London, Mr Watson arranged many meetings, both professional and social for him, including a meeting with Fladgates (paragraph 342 above).  Sir Owen's evidence was that Mr Watson had been very supportive to him during this period, and this is reflected in an e-mail he sent Mr Watson on 11 May with the subject *"My gratitude"* in which he said:

"Many many thanks for all you have done to support me in this period of turmoil"

to which Mr Watson replied:

"We have and are a winning team."

Mr Watson accepted in oral evidence that Sir Owen's e-mail could be described as emotional, and that that was because Sir Owen was genuinely grateful for everything

that Mr Watson had done to support him in this extremely difficult period of his life.

435.   I accept all that.  I also accept that Sir Owen confided in Mr Watson in relation to his dispute with Messrs Miller and Dickson – indeed Mr Watson and Mr Gibson came to his meeting with Fladgates – and that he would scarcely have done that unless he assumed that Mr Watson was on his side in the dispute with Messrs Miller and Dickson.  None of this however seems to me to address the relevant question, which is whether a fiduciary relationship arose between Sir Owen and Mr Watson in relation to Project Spartan.

436.   I do not see that it did.  Although Sir Owen had initially said in his e-mail of 2 April to Mr Watson that he wished to be kept directly involved, by the time of the Dominican Republic trip, Sir Owen's evidence was that he told Mr Watson that the use of the proceeds of sale of his business was out of his control; and Mr Watson said in evidence that Sir Owen encouraged him to deal with Messrs Miller and Dickson as they were the ones making the decisions.  Thereafter Mr Watson and Mr Leahy dealt with Messrs Miller and Dickson in relation to Project Spartan and not with Sir Owen; indeed one of Sir Owen's complaints is that Mr Watson did not keep him informed as to what was going on, giving the impression that Messrs Miller and Dickson were dragging their feet.  But whether that is so or not, I do not see that the strength of the personal relationship between Mr Watson and Sir Owen and the emotional and practical support Mr Watson gave to Sir Owen in this period meant that Mr Watson came under fiduciary obligations to Sir Owen in relation to the negotiation of Project Spartan when it was known that that was being progressed not by Sir Owen but by Kea, and that it was something over which he had no control or even involvement.  However much Sir Owen was relying on Mr Watson for support generally, I do not see that he was relying on Mr Watson to look out for his interests in relation to Project Spartan.  In his e-mail of 27 July to Mr Miller he said that since he had been excluded from any involvement, he cautioned him to protect trust funds; and that he would not proceed with Voltaire without thorough due diligence (paragraph 333 above); that seems to me more consistent with his expecting Mr Miller to look out for the interests of the trust than expecting Mr Watson to.  In my judgment despite the increased support and friendship that Mr Watson showed him in the period from April 2012 onwards, Mr Watson did not owe Sir Owen a fiduciary duty in relation to Project Spartan any more than he did in relation to Project Edsel.

437.   So far as concerns Kea, Ms Jones relies in particular on the fact that at the time of the July agreements many of the underlying rights and projects had yet to be finalised and delivered, and that it was Mr Watson who had the relationships with the parties involved.  The rudimentary nature of the rights that Kea would be paying for under the schedule 2 transactions is quite striking.  As set out above (paragraph 352) paragraph 2 of schedule 2 to the Shareholders' Agreement provided that if the M&G acquisition happened, the transactions in paragraphs 3, 4 and 5 would then take place; paragraph 5 provided that *"Once Newco acquires or owns the Newco Assets"* Spartan would acquire Newco or its assets for a sum of £45m less the net proceeds of sale of Gaucin and Berryblue (or their assets), a sum expected to be around £25m; and paragraph 6 obliged Kea to provide Spartan with a cash loan equal to half that amount.  The *"Newco Assets"* were defined as the assets or rights intended to be acquired by Newco as set out in paragraph 3; but paragraph 3 merely referred to Newco acquiring the benefit of a JV agreement with LHRF which would include:

"certain rights relating to deployment of capital"

and:

"the right for Newco to acquire up to 40% of Long Harbour Subsidiary for up to £8 million."

438.    Mr Leahy accepted in cross-examination that Messrs Miller and Dickson were well aware that he and Mr Watson were in the middle of negotiating those rights; that they did not know what they were going to be; and that:

"they trusted Eric to go out and do the best job he could to negotiate that with Long Harbour."

439.    That seems to me to fall directly within the principle that I have referred to above (paragraph 146) that where one joint venturer controls a relationship with a third party and the intention is that he should make use of the relationship to benefit the joint venture, then he may owe a fiduciary duty to his co-venturer not to use it for his own benefit.  In circumstances where Kea was dependent on Mr Watson negotiating an agreement between Newco (Rygen) and Long Harbour, which Spartan and hence Kea was going to pay for, Mr Watson in my judgment owed Kea a fiduciary duty to do that in the exclusive interests of Spartan (and hence Kea), and not to exploit that position for his own benefit.

440.    If that is right, there does not seem to be any doubt that Mr Watson was in breach of that duty.  A core aspect of a fiduciary duty is that the fiduciary is not at liberty to make any undisclosed profit for himself.  In the present case, Mr Watson at the time of the July agreements was not only intending to benefit from the receipt of the £12.5m (by having it paid to Munil), but also from the sale of LHRF to Rygen, where he was expected to be the vendor of the majority of the shares.  None of that was disclosed: on my findings of fact Messrs Miller and Dickson did not know that the £12.5m was going to Mr Watson's interests.  Equally they did not know that Mr Watson was expected to be the vendor of LHRF shares to Rygen.  The highest it was put by Mr Miller was that he did not know for sure that part of the payment for LHRF would be going to Mr Watson, but he suspected that Mr Watson was involved with Messrs Astor and Aumonier; and in closing Mr McCaughran submitted that Mr Miller *"believed/suspected/assumed"* that Mr Watson would have an interest in LHRF and that he would receive part of the purchase price for the acquisition by Spartan of shares in LHRF.  Even if that were right (and I need not go into the detail of that) it would not constitute disclosure by Mr Watson of his interest.  Indeed Mr McCaughran very fairly accepted in terms in the course of his oral closing submissions that he had not sought to say that if there was a fiduciary duty in relation to Spartan everything that should have been disclosed was disclosed.

441.    I add for the sake of completeness that in the event Mr Watson never became a shareholder in LHRF in his own name, the shares being taken in the name of Ivory Castle Ltd, an entity ostensibly owned by a trust associated with Mr Gibson.  The Claimants' case is that Ivory Castle is yet another nominee for Mr Watson, Mr Gibson simply acting as a placeholder for him.  Mr Watson's case is that Mr Gibson was indeed the beneficial owner of the structure, that he had a longstanding arrangement under which Mr Gibson had a percentage interest in Mr Watson's total net wealth,

and that allowing Mr Gibson to have the LHRF shares was a means of fulfilling, at least in part, that understanding.  None of this in my judgment makes any difference, and I need not resolve who is right: on any view Mr Watson was potentially interested in the sale of LHRF in a way which was not disclosed.

442.   In my judgment therefore Mr Watson was in breach of a fiduciary duty owed to Kea in not disclosing his interests under the schedule 2 transactions, and for that reason too the July agreements, and again all the subsequent agreements, are not binding on Kea.

*Breach of fiduciary duty by Mr Dickson*

443.   The remaining basis on which the Claimants contend that the July agreements were not binding on Kea is that Mr Dickson, to the knowledge of Mr Watson and Mr Leahy, entered into them in breach of the duties he owed to Kea as director.

444.   Kea is a BVI company.  The duties of Mr Dickson as director of a BVI company are found in the BVI Business Companies Act 2004.  s. 120(1) of that Act provides:

> "Subject to this section, a director of a company, in exercising his powers or performing his duties, shall act honestly and in good faith and in what the director believes to be in the best interests of the company."

It is common ground, as is apparent from its terms, that the question whether a director is acting in accordance with this section or in breach of it depends on his subjective belief as to whether what he is doing is in the best interests of the company.

445.   Ms Jones deployed a number of submissions as to why Mr Dickson cannot have believed that the July agreements were in the interests of Kea, not least because the explanations put forward by Mr Miller as to why he and Mr Dickson thought they were were difficult to follow and unconvincing.  It is indeed difficult to see how Messrs Miller and Dickson could have thought that it was appropriate to enter into the July agreements.  But on the pleadings this claim is only advanced if Messrs Miller and Dickson realised that the effect of the July agreements was to transfer significant value to Mr Watson's interests for no consideration.  On my findings of fact, this was not the case, and I do not think it would serve any useful purpose to consider the question on the hypothesis that the facts were different.

446.   Ms Jones also relied on Mr Dickson not having entered into the July agreements for a proper purpose.  s. 121 of the BVI Business Companies Act 2004 provides as follows:

> "A director shall exercise his powers as a director for a proper purpose…"

Ms Jones submitted that Mr Dickson did not exercise his powers for a proper purpose because there was no need to enter into the July agreements in July 2012 at all: there was no imminent transaction, and there was a strong reason not to enter into the agreements at a time when the underlying rights contemplated by schedule 2 had not yet been agreed.  Her submission was that the real reason for going ahead with the July agreements was the desire to get money out of the trust and into Spartan before Sir Owen could take any steps to prevent it, and that that could not be a proper purpose.  There is I think considerable force in that submission: see Mr Leahy's evidence in relation to the Los Angeles meetings on 10 and 11 July that they wanted

to *"get the capital safe"* (paragraph 339 above).

447.    But so far as I can see this case is not pleaded.  So far as the July agreements are concerned, the only basis pleaded in the Re-amended Particulars of Claim for alleging that they were entered into for an improper purpose is (in paragraph 132.2):

> "Alternatively the execution of the July 2012 Agreements was carried out contrary to the best interests of Kea and the Corona Trust and for an improper purpose namely to provide an unjustified benefit to Mr Watson and/or Novatrust and/or Munil alternatively to secure personal benefits for Messrs Miller and Dickson…"

That case is itself premised on the supposition that Messrs Miller and Dickson did know that the July agreements would transfer significant value to Mr Watson's interests.  That seems to me something entirely different from the contention that the improper purpose was the desire to get the money out of the trust and *"safe"* (and the alternative suggestion that it was to secure personal benefits for Messrs Miller and Dickson, which would require it to be affirmatively proved that this was what was motivating Mr Dickson, has not been pursued).  In those circumstances I do not think it is necessary, nor would it be appropriate, to consider this claim either.

*Conclusion on July agreements*

448.    For the reasons I have given above in my judgment the Claimants have established that the July agreements were not binding on Kea, and they are entitled to avoid them. They have in fact been set aside as a result of the settlement with Novatrust, but the effect of this is that the Claimants have established their rights to avoid the agreements as against the remaining Defendants.

449.    I have also concluded that in circumstances where the July agreements were liable to be set aside, none of the subsequent agreements can stand.  Nevertheless I will go on to explain, relatively briefly, the subsequent course of events.

**Subsequent events**

*The Supplemental Loan Agreement*

450.    On 27 July 2012 Sir Owen e-mailed Mr Miller saying that he wanted to put his affairs in order and proposing that Mr Miller become trustee in place of Mr Dickson, with a professional trust protector; on 1 August Mr Miller replied refusing to contemplate any trustee other than Mr Dickson or any protector other than himself.  Sir Owen replied on 2 August:

> "YOU did not earn this money.  It is tatamount to stealing. Shame on you David"

That appears to have marked the failure of Sir Owen's final attempt to effect a reconciliation with Mr Miller, and from then on Messrs Miller and Dickson seem to have regarded litigation as increasingly likely (although as the discussion of a possible fighting fund on 24 July showed, they had already contemplated it as a possibility).  It was on 3 August that they paid themselves over $6m in fees (paragraph 39 above); and on 6 August that they transferred $200,000 to each of Ord & Norman (US lawyers) and Liburd & Dash (Nevis lawyers) as floats on account of legal fees (paragraph 41 above).

451.  Sir Owen commenced his California proceedings against Mr Miller on 5 September 2012 (paragraph 39 above).

452.  Under the terms of the Loan Facility Agreement £24.9m was due to be advanced by Kea within 40 days of its signing (paragraph 353 above).  It was in fact transferred on 9 September 2012.  The remaining £25m of the Kea loan of £50m was not due until 6 months after signing (or within 40 days of a drawdown request by Spartan but that would mean that Spartan started incurring interest at 8%), but it had been agreed at the meeting on 24 July in Los Angeles that the Loan Facility Agreement would be amended (i) to provide that the second £25m would be deposited in a Spartan bank account but without Spartan incurring the 8% interest and (ii) to provide for a second £50m facility on similar terms (paragraph 349(2) and (3) above).

453.  Agreement had been reached in August on the terms of a Deed of Loan Amendment and Restatement to give effect to these proposals but this had not yet been signed.  On 12 September 2012 Mr Leahy wrote himself a note headed *"Reasons to sign"*, which evidently listed the reasons why Mr Dickson should sign the document.  Amongst these was:

> "Better to move now BEFORE anything comes against the trust directly."

Mr Dickson signed the Deed of Loan Amendment and Restatement on 12 September 2012.  It provided for the loan facility to be increased to a total of £113m (that is the original £50m, the second £50m and the £13m (equivalent to $20m) that Messrs Miller and Dickson had agreed for Voltaire).  Of this the first two tranches (£100,000 and £24.9m) had already been paid, and the other two tranches (tranche 3 being the remaining £25m of the original £50m, and tranche 4 the balance of £63m) were now to be paid within 40 days of the date of the Deed of Amendment and Restatement, to be paid into holding accounts in the name of Spartan on terms that Kea would receive the interest paid on such accounts and that Spartan would only become liable to pay interest at 8% on tranche 3 after 6 months or earlier drawdown, and at 6% on tranche 4 only when drawn down.

454.  Notwithstanding that neither tranches 3 or 4 were due until 40 days after signing, Mr Leahy sent wire instructions to Messrs Miller and Dickson on 12 September asking for the whole £88m to be remitted, telling Mr Watson that he had sent instructions *"as if all is normal"*.

455.  At the same time Sir Owen, who evidently still regarded Mr Watson as someone in whom he could confide, sent an e-mail to Mr Watson (it is not clear precisely when, as the time-stamps on the e-mail show Sir Owen as sending it on the morning of (Sunday) 16 September, but Mr Watson as forwarding it to Mr Leahy on the evening of (Friday) 14 September).  This said:

> "On the subject of the Trust investment in the property project, you agreed to keep me advised on the close of legal proceedings.  I have heard nothing.  I am taking action to petition the court to freeze assets and stop any investment initiatives until a full audit is completed."

Mr Watson replied:

> "Legal proceedings are still bouncing around…Rome was built more quickly!  We

feel as much pressure as possible has been applied and the deal is at risk."

Mr Watson suggested in evidence that he was there referring to discussions with Long Harbour, but I accept Ms Jones' submission that that cannot be right, and I regard it as a disingenuous answer. Sir Owen was plainly asking what was happening with Spartan, and Mr Watson did not give him an honest update but a misleading one, suggesting that the deal (that is with Kea) had not yet been done and was at risk and that Mr Watson was having to put pressure (that is on Messrs Miller and Dickson).

456.  In fact Mr Leahy was at the same time arranging for Kea to transfer another £16m for Project Spartan. This was the total of the further sums that it was expected Kea would become liable for in due course under schedule 2 of the Shareholders' Agreement, namely the Second Kea Loan under paragraph 4 of schedule 2 to match Summit's loan, expected to be £3.5m, and the Third Kea Loan under paragraph 6 of schedule 2 for the cash element of the purchase of Newco (or Rygen) expected to be about £12.5m (paragraph 352(3) and (5) above). These sums were on any view not payable unless and until the M&G acquisition had completed, and on 22 August Mr Leahy had told Mr Dickson that the £12.5m would be completed once LHRF had finalised the origination deal with M&G, which he hoped to be completed by the end of September (and in the event it was delayed further).

457.  As at 14 September therefore there was no question of the £16m being due – indeed no loan agreements had then been drafted for the Second and Third Kea Loans. Nevertheless on that day Mr Leahy asked Fladgates to set up a client account for Monday am (17 September) to receive the £16m, to be released on completion of the agreed terms, saying *"This is incredibly important"*. He then spoke to Mr Dickson over the weekend, with the result that on Monday 17 September Mr Dickson gave instructions for the £88m to be remitted to Spartan and the £16m to Fladgates. The sums were in fact received on 20 September.

458.  It is an obvious inference that this was all done as a reaction to the threat of Sir Owen taking steps to freeze the assets of the trust – indeed Mr Leahy accepted that it was because they were *"concerned to ensure that Spartan had its capital"*.

459.  Messrs Miller and Dickson took other steps to protect themselves against the threat of litigation. On 13 September 2012 Mr Dickson set up the "defence fund" of 27.5m Swiss Francs (paragraph 41 above); on 14 September Mr Dickson caused Pizarro to grant an indemnity to Ord & Norman against loss incurred in connection with any legal action; and on 17 September Mr Dickson caused Pizarro to grant similar indemnities to himself and to Mr Miller.

*The Deed of Amendment to the Shareholders' Agreement*

460.  Also on 17 September 2012 a Deed of Amendment to the Spartan Shareholders' Agreement was executed. This replaced clauses 5.3 and 5.4 of the Shareholders' Agreement (under which Kea and Park Directors were to be nominated by, and could be removed by, Kea and Park respectively) with new clauses under which the appointment and removal of a Kea Director required the written approval of Park (and vice-versa). Again it is obvious – and Mr Miller accepted – that that was designed to prevent Mr Dickson being removed and replaced without Mr Watson's consent, and was put in place because of the threat of litigation from Sir Owen. No attempt was

made by Messrs Miller and Dickson to obtain legal advice from Mr Maislish on this amendment.

*The Nucopia Consultancy Agreement*

461.    Clause 4.2 of the Shareholders' Agreement had provided that Nucopia would be appointed under a separate agreement to provide consultancy services to Spartan. As referred to above (paragraph 56) although Nucopia was ostensibly owned by Mr Leahy, Mr Watson took the vast majority of any receipts from it, and there is a dispute between the parties whether (as the Claimants contend) Nucopia is in truth simply Mr Watson's vehicle, or whether (as Mr Watson contends) it is Mr Leahy's vehicle but he was in practice constrained to share its receipts with Mr Watson. For present purposes however I do not think that it matters. What is undeniable is that Mr Watson directly benefited (and to a far greater extent than anyone else) from fees charged by Nucopia to Spartan, and it was no doubt always expected by him and Mr Leahy that he would do so.

462.    None of this was of course disclosed to Kea. Mr Miller said in evidence that he suspected that Mr Watson might have been involved in Nucopia, and discussed that with Mr Dickson, but there is no documentary support for that and in the light of the way the negotiation of Nucopia's consultancy agreement was approached it makes no sense. I do not accept it, and it is another example of the unreliability of Mr Miller's evidence.

463.    What happened was that Mr Leahy and Mr Watson put together a plan under which it would look as if Mr Watson was genuinely negotiating with Mr Leahy on behalf of Spartan, but with the intention of securing Kea's agreement to as high a fee as possible, thereby extracting more money primarily for Mr Watson's benefit.

464.    Thus:

(1)        As early as 16 July Mr Leahy was asking for Mr Watson's comments on a fee proposal of £250,000 a year and a 5% carry for Nucopia. He also suggested that Mr Watson propose a *"small"* bonus of say £200,000 for getting the deal done, saying that he thought Messrs Miller and Dickson would be inclined *"if they felt it was for me."* He suggested putting something in legal form for the proposed meeting on 24 July and sending it to Mr Watson *"as if I'm pitching it to you as well"*; he could then bring it up at the meeting and Mr Watson could be supportive of it. Mr Watson's response was *"£250k at least"*.

(2)        Mr Leahy in fact sent a first draft of the consultancy agreement (providing for an annual fee of £250,000 and a 5% carry) on 31 July, addressing it, as he had suggested, to Mr Watson as well as to Messrs Miller and Dickson as if he was pitching it equally to all of them.

(3)        On 12 August Mr Watson continued the pretence by e-mailing Mr Dickson saying he was being pressed by Mr Leahy over the consultancy agreement and:

"I'm ok with his proposal and if you are too, just confirm with Miles."

(4)        The pretence worked.  When (on 14 August) Mr Dickson e-mailed Mr Miller with various minor points on the drafting, he said that they should run them by Mr Watson first before reverting to Mr Leahy.  That shows that as far as he was concerned Mr Watson was on the same side of the negotiation as them (and the other side from Mr Leahy).  However when Mr Dickson forwarded this to Mr Watson asking him if he had any comments, Mr Watson simply sent it straight on to Mr Leahy with the comment *"Bingo"*.

(5)        There are further communications in the same vein which I need not set out.  It is plain that Mr Watson was pretending to negotiate with Mr Leahy for the benefit of Spartan but in fact assisting Mr Leahy in obtaining as much as possible for his own benefit.  Indeed Mr Leahy accepted in evidence that the more that Nucopia could get the better it was for Mr Watson.

465.    It had been intended that the draft Consultancy Agreement be considered by Mr Maislish but in the event Mr Leahy persuaded Mr Dickson that it seemed rather pointless to ask him to review it as it was so simple, and suggested instead (on 11 September) that Mr Watson ask Mr Gibson to look at it for him, adding:

> "this might also help Peter and David get comfortable, seeing as DMM is not reviewing"

Mr Watson duly asked Mr Gibson (on 14 September), and Mr Gibson duly said it seemed ok from his perspective (on 17 September).  That was sufficient for Mr Dickson to agree with Mr Watson to go ahead.  Mr Maislish was never asked to look at it at all.

466.    The Consultancy Agreement was ultimately dated 10 October 2012.  It provided for Spartan to pay Nucopia an annual fee of £250,000 for certain specified services (with any additional services to be charged at additional fees), and for the agreement to continue for an initial period of 2 years and thereafter for subsequent 2 year periods subject to 6 months' notice being given by either party before the end of any 2 year period that it did not wish to renew.  Since Spartan could only act with the agreement of both a Kea Director and a Park Director, that in effect meant that it could continue as long as Mr Watson wanted it to.  It did not deal with the 5% carry which it was decided for tax reasons should be put into a separate vehicle.

*Further proposed amendments to Spartan Shareholders' Agreement*

467.    Despite the Deed of Amendment to the Shareholders' Agreement, Mr Leahy was still concerned about the possible impact on Spartan's business of proceedings by Sir Owen.  In October he secured Mr Dickson's agreement to Spartan instructing Mr Morrison of Grosvenor Law to review Spartan's documents, although Mr Morrison's engagement letter shows that he understood that his instructions related to litigation advice, and indeed he was a litigation lawyer not a corporate lawyer.

468.    Messrs Watson, Leahy and Dickson met Mr Morrison on 25 October.  The main concern was that if Kea was dissolved or ceased to trade, the trust would want its money back and Spartan could be obliged to go into an orderly wind down; there was discussion about the impact on Spartan of a freezing order.

469.   That led in due course to proposed amendments to the Shareholders' Agreement.  It was these that were circulated on 8 December together with the revised Business Plan and were due to be discussed at a meeting on 12 December (paragraph 390 above). The proposed amendments were extensive.  Mr Morrison explained that they were designed to ensure that Spartan could continue to carry on executing its Business Plan notwithstanding a deadlock.  To that end they provided for the appointment of an *"independent director"*   (in fact a company called Jupiter Directors One Ltd (**"Jupiter"**), represented by a Mr Chris de Putron, who had previously acted in Mr Watson's affairs) if there were two inquorate meetings; and if there were failure to agree on material issues (and in certain other circumstances) for a procedure called the *"Orderly Execution of Business Plan"* to be implemented.  If this were triggered, Nucopia would carry out the Orderly Execution over a 10 year term and be given full authority to do so.  Any loans from Kea would have their terms extended to the end of the 10 years, and Nucopia would be paid additional fees, expressed to be a monthly fee of 2% of the assets under management (although this may have been intended to be an annual fee of 2% paid monthly rather than as drafted an annual fee of 24%). Provision was also made for the introduction of a new 5% shareholder called Genovela Ltd – this was intended to be the means of delivering the 5% carry that had been suggested for Nucopia.

470.   Mr Maislish, having considered the amendments on 10 December, felt very uneasy about them.  He recognised that they had the potential to remove any control of Kea's investment from Kea at a time when Mr Dickson was aware of the threat of litigation from Sir Owen.  He therefore sent a short e-mail to Messrs Dickson and Miller on 11 December saying that the arrangement could be unlawful and that he would not be attending the meeting himself and advising them against attending the meeting the next day or signing anything.  Mr Dickson duly postponed the meeting and the amendments were not executed.

*Project Royal*

471.   Project Royal was the codename for the acquisition of a residential portfolio (paragraph 246 above).  In the 1 April presentation it was said that the equity required was c. £23-£25m (paragraph 243(6) above) and that:

> "For bridging the purchase of this portfolio Spartan expects to secure ~33% stake in the property fund Management Company"

The business plan for the residential property fund showed this 33% stake as generating substantial returns, amounting after 5 years to £1.6m a year and then in Year 10 fees of £61.8m.   That made a significant contribution to the overall discounted valuation of £45m.

472.   At the time of the July agreements however there were no enforceable rights to any stake in the management company at all.   In November 2012 Mr Leahy was proposing to Mr Astor that Spartan have a 16.7% shareholding/carry in the REIT management company going forwards and that *"EW/Nucopia"* have a further interest (not shared with Spartan) of

> "25.0% of all LH Management and performance fees (carry) generated on any future capital raised by EW/Nucopia"

In the event a Term Sheet signed on 8 January 2013 provided that Spartan would have a profit share equal to 16.67% of net recurring and performance fees earned by Long Harbour from any future capital raising, and 16.67% of net capital proceeds of any sale of the management vehicle, but excluding any fees and proceeds in respect of any investment made by HW, various Oxford University entities and Spartan itself.

473.    This is therefore a good illustration of the weakness from Kea's point of view of having signed up to the July agreements without the underlying rights having been granted, and the conflict of interest that Mr Watson was in in seeking through Mr Leahy to negotiate interests both for Spartan and at the same time for himself.

474.    On 21 January 2013 Spartan's board resolved to invest in Project Royal.  The amount ultimately invested was c. £34m.

*The Interim Arrangement*

475.    There had been attempts to settle Sir Owen's litigation against Mr Miller but on 22 January 2013 Mr Miller told Mr Watson in an e-mail that no further progress had been made and that it appeared Sir Owen was disposed never to settle.  By 4 February Mr Watson was telling Mr Leahy that they needed to ensure some short-term solutions to potential Spartan risks.  Mr Miller accepted in evidence that the risk was Sir Owen bringing an attack which would stop Mr Dickson being able to act.

476.    The solution found was a short agreement to amend the Spartan Shareholders' Agreement.  This provided that if the Kea Director (or Park Director, but this was obviously aimed at Mr Dickson) was unable to act for any reason as a member of the Board, he would give written notice of the same and Jupiter (acting by Mr de Putron) would be appointed with immediate effect to form a quorum with the other director; that would have the effect of suspending Mr Dickson's powers to vote until he gave a further notice that he was able to continue acting.  It also provided that an Orderly Winding Up could only be triggered with the written consent of both Kea and Park.

477.    The agreement was signed by Novatrust on 8 February 2013 and sent to Mr Dickson for signature.  Mr Dickson signed it at some point between then and 13 February while in Zug, Switzerland, and brought it with him to London where he arrived on 14 February.

*The Nevis Injunction*

478.    On 11 February 2013 the Nevis proceedings were brought by Mrs Connah (paragraph 42 above).  Pizarro, Mr Dickson, Mr Miller and Kea were among the defendants.  On 13 February Benjamin J made an Order granting injunctive relief at a without notice hearing (paragraph 43 above).  The injunction was granted until further order, but a return date was set of 26 February.  The terms of the Order included the following:

(1)          By paragraphs 8 to 10 (headed *"Suspension of Powers"*) the powers of Pizarro, Mr Miller and Mr Dickson were suspended.  Paragraph 10 was in this form:

"Until further order of the court the Third Respondent [ie Mr Dickson] shall not exercise any right of power vested in him by or under the Settlements [as defined, which included the Corona Trust] whether as emergency

protector or emergency trustee thereof or otherwise."

(2)        By paragraph 11 HNL was appointed as an additional trustee.

(3)        By paragraph 12 Pizarro was ordered forthwith to transfer all assets held, whether directly or indirectly, under the Settlements to HNL; and by paragraph 13(1) HNL was to take all necessary steps to obtain a transfer or control of all such assets and have sole ownership, possession, custody or control of them.

(4)        By paragraph 13(2) HNL was to administer the settlements in all respects, and exercise all trusts and powers under them as if it were sole trustee thereof, save that it was not permitted to exercise any power of investment thereunder.

(5)        By paragraph 14 a proprietary injunction was granted against, among others, Pizarro, Mr Dickson and Mr Miller to the effect that they must not:

> "without the prior consent in writing of the Applicant's solicitors in Nevis, in any way dispose of, deal with or diminish the value of any assets that are held, directly or indirectly, on the trusts of the Settlements, including (without limitation) the following assets in particular:
>
> > (1)  the shares in and any rights or powers whether as shareholder or otherwise in or over:
> >
> > …
> >
> > > (d)  Kea Investments Limited
> >
> > …
> >
> > > (collectively referred to as the **'Companies'**);
> >
> > (2)  any bank account or any other asset held by (whether directly or indirectly) or in the name of any of the Companies"

(6)        By paragraph 15 a similar injunction was granted against Kea and the other Companies to the effect that they must not:

> "whether through their shareholders, directors, employees, agents or otherwise, in any way dispose of, deal with or diminish the value of any assets that they hold (whether directly or indirectly)…"

(7)        There were also provisions in the usual way requiring the respondents to provide information including orders (by paragraphs 17 and 21) that Pizarro, Mr Dickson, Mr Miller and Kea itself provide within 72 hours of service copies of all resolutions of Kea and all contractual documents relating to Kea.

479.    The Order also provided for service on Pizarro by service on its Nevis attorneys Liburd & Dash, and on Mr Miller and Mr Dickson by e-mail. Mr Dash of Liburd & Dash confirmed in an affidavit in the Nevis proceedings that the Order was served on

Pizarro at his firm's chambers on 14 February (a Thursday). He also said that he was able to make *"rapid contact"* with Mr Dickson and explained to him the seriousness of the Order, although it is to be noted that he said Mr Dickson was in the Philippines.

480.   The Order was also served on Mr Dickson by e-mail to his various e-mail addresses at 15.56 (London time) on 14 February, and was delivered to his home address in Bermuda at 12.47 (Bermuda time) on 14 February where it was handed to his wife's sister.

481.   It was also served on Mr Miller by e-mail on 14 February. He accepted in his witness statement that he became aware of it that day and that he spoke to Mr Dash about it on that date. Mr Dash had accompanied Mr Dickson to Switzerland and had just arrived back in Nevis.

482.   Mr Dickson was not at home in Bermuda on 14 February. On that day he travelled from Switzerland to London, arriving at lunchtime. There is an issue as to when he became aware of the Order; this issue is bound up with the execution of the Second and Third Kea Loan Agreements.

*Second and Third Kea Loan Agreements*

483.   The Second and Third Kea Loan Agreements were signed by Mr Dickson on behalf of Kea and dated by him 11 February 2013. It is common ground however that they were not signed by him on that date and that he cannot have signed them until 17 February 2013 at the earliest (that is after the injunction), and Mr McCaughran in his closing submissions made it clear that he was not putting forward any positive case that Mr Dickson acted in compliance with his fiduciary duties in relation to them. He submitted however that Mr Watson was not aware at the time of any breach of duty.

484.   The facts are as follows. Mr Dickson had a meeting arranged with Mr Leahy at 9.30 on the morning of Friday 15 February at Cullen's office in Knightsbridge. Mr Watson was in New Zealand but Mr Leahy had arranged for Mr Dickson to call him at 9.30. Mr Leahy had prepared some powerpoint slides for the meeting. These included a reference to the Second and Third Kea Loans as follows;

"Shareholder loans

o    2x ˜12.5mn loans from Kea and Park (Kea's has already been funded to escrow) to close concurrent with Rygen purchase

o    2x 3.5mn loans to close immediately post sale of Rygen to Spartan"

This shows that when the slides were prepared the intention was that the loans would not be made until the completion of the purchase of Rygen; and also that the precise amount of the Third Kea Loan had not then been identified. This is because it was intended to be exactly 50% of the purchase price of Rygen, and the purchase price itself depended on the identification of the net proceeds of sale of Gaucin's and Berryblue's interests in Abacus. Back in October at the Paris meeting this had been estimated at £12.74m, and in an e-mail of 14 December to Messrs Miller and Dickson Mr Leahy had explained the sequence of events that would take place as follows:

(i)    the completion statements for the sale of Abacus are sent to Fladgates for them

to review and they confirm to the Spartan Board the final price for Rygen;

(ii)     a share purchase agreement is drafted between Spartan and Rygen;

(iii)    Rygen due diligence and KYC is completed;

(iv)    Kea signs the £12.7m *"(or whatever final number is)"* loan agreement with Spartan and money is transferred from Fladgates escrow *"(where it sits now)"* into Spartan;

(v)     Spartan signs share purchase agreement to purchase Rygen;

(vi)    Rygen is sold to Spartan for £25.5m, £12.7m in cash and £12.7m by way of vendor's loan from Park;

(vii)   Park and Kea's £3.5m loans will be executed at the same time.

At this stage the first step had not happened. Fladgates had however prepared drafts of the Second and Third Kea Loan Agreements and they had been circulated in December. That for the Third Loan Agreement (sent by Fladgates to Mr Maislish on 18 December) was drafted by reference to a loan of £12.7m.

485.    At the meeting Mr Dickson made some notes on his copy of the slides. He noted against the Shareholder loans *"may get £200k to £300k back"*. Since Kea had transferred £12.5m to Fladgates for the Third Kea Loan (as part of the £16m) that indicates that Mr Leahy told him that the end figure might be £12.2m to £12.3m.

486.    On the evening of Friday 15 February Mr Dickson flew from London to Manila via Hong Kong, arriving at 18.45 (Philippines time) on Saturday 16 February.

487.    The two Loan Agreements as executed show Mr Dickson's signature as witnessed by Mr Leahy. In his witness statement for trial, Mr Leahy suggested that the most likely sequence of events was that Mr Dickson had signed the agreements in Switzerland (which is why they were dated 11 February), brought them with him to London, asked Mr Leahy to witness his signature at the meeting on 15 February which he did, and left the originals with him. He did say however that this was reconstruction from the documents not recollection as he had struggled to recall the events. It became apparent at trial that this reconstruction was entirely wrong.

488.    What actually happened is as follows:

(1)    At 20.45 on the evening of Saturday 16 February Mr Leahy asked Ms Leonard of Fladgates to e-mail the final £12.5m and £3.5m loan documents to Mr Dickson on the basis that they had been reviewed by Mr Maislish, saying:

"This has been discussed with Peter already, so he will be expecting them."

(2)    Shortly afterwards Mr Leahy sent another e-mail asking her to hold off, but he spoke to her on the telephone on the morning of Sunday 17 February (apologising for disturbing her on a Sunday), and at 10.37 that morning she e-mailed him pdfs of the two loan agreements. These were similar to the drafts that had been circulated but were no longer marked

*"Draft"* and the Third Kea Loan Agreement was now in the sum of £12.5m rather than £12.7m.

(3)　　　At 16.56 that day Mr Leahy e-mailed the two agreements to Mr Dickson saying:

> "As discussed, please find attached soft copies of the shareholder loan agreements"

(4)　　　Mr Leahy accepted in a further witness statement made during the course of the trial that the version of the Third Kea Loan Agreement sent to him by Ms Leonard on the morning of 17 February and sent on by him to Mr Dickson in the afternoon appears to be the first version containing the figure of £12.5m instead of £12.7m, and that as the version signed by Mr Dickson itself was in the sum of £12.5m, it was almost certainly the case that what he signed was this version. This means he cannot have signed it in Switzerland and that Mr Leahy cannot have witnessed his signature on 15 February in London.

(5)　　　Instead Mr Dickson signed the agreements in Manila and sent them back in hard copy to Mr Leahy. "Wet ink" versions were disclosed during the trial and on one of them imprints could be seen indicating that that they had been put in an envelope addressed to Mr Leahy at Nucopia and that they had come from Mr Dickson at an address in Manila. The likelihood is that they were couriered.

(6)　　　Mr Leahy had received them by 21 February as on that day he e-mailed copies to Ms Huggett asking her to have the Spartan director execute them, and said he would put the originals in the post for execution as well. When they arrived from Manila, they had only been signed by Mr Dickson and not by any witness, and Mr Leahy added his own signature as witness to Mr Dickson's. He accepted in evidence that that was *"not best practice"*, which is something of an understatement.

(7)　　　At 15.56 on 21 February Ms Huggett confirmed to Mr Leahy that they had been executed, that is by Chaumont, the Park Director of Spartan.

(8)　　　At 01.26 (Manila time) on 22 February (which was 17.26 the previous day in London – see below), Mr Dickson sent an e-mail to Mr Leahy asking him to put together a compilation of agreements and other documents as this was a mandate of the Court Order. The terms of the e-mail indicate that Mr Leahy was already aware that there was an Order, although there is no written communication of that in evidence.

489.　　There does not seem to be any doubt that Mr Dickson knew of the Nevis injunction when he executed the loan agreements. He arrived in Manila on the evening of Saturday 16 February (local time). His own evidence to the Nevis Court was that he became aware of the injunction when he switched on his computer in the Philippines on the morning of Sunday 17 February and downloaded an enormous number of documents that had been sent to him. The time zone for the Philippines is UTC + 8, which means that in February, when London is on GMT, Manila is 8 hours ahead. Mr

Leahy e-mailed the agreements to him at 16.56 London time on 17 February, which would therefore have been 00.56 on 18 February in Manila.  It follows that Mr Dickson by his own account knew of the injunction when he executed them.

490.    There was considerable dispute at trial as to whether (i) Mr Dickson in fact learned of the injunction earlier than he claimed and (ii) when Mr Leahy and Mr Watson knew of the injunction.  So far as I can see these questions make no difference to the validity of the agreements.

491.    So far as Mr Dickson's authority to sign on behalf of Kea is concerned, the simplest analysis is that paragraph 10 of the Nevis Order directly suspended his power to act as director of Kea on the basis that this was a power vested in him under the Corona Trust (paragraph 478(1) above).  That is I think distinctly arguable but I need not resolve that, as even if that were not the case, the Loan Agreements were in my judgment in breach of paragraph 15 of the Order which restrained Kea from disposing of or dealing with or diminishing the value of any assets that it held (paragraph 478(6) above), the asset in question being the £16m sitting in Fladgates' client account and the effect of Kea entering into the Loan Agreements being to release that money to Spartan.  I do not see how Mr Dickson could have had authority to cause Kea to breach the injunction in this way.  That seems to me quite sufficient to establish that he had no authority to execute the Loan Agreements on behalf of Kea once he knew of the injunction.

492.    I also accept Ms Jones' submission (although for the reasons I have just given I do not think she needs this) that it was a breach of Mr Dickson's duty to exercise his powers for a proper purpose for him to execute the agreements on behalf of Kea at a time when he knew of the injunction.  The obvious inference from his backdating of the documents to 11 February 2013 is that he did so in an attempt to circumvent the injunction, and that cannot possibly have been a proper purpose.  Mr Dickson was therefore acting in breach of s. 121 of the BVI Business Companies Act.  As already referred to, Mr McCaughran, while not formally admitting this, advanced no case to the contrary.

493.    s. 31 of the BVI Business Companies Act contains protections for those dealing with companies as follows:

"(1)    A company or a guarantor of an obligation of a company may not assert against a person dealing with the company or with a person who has acquired assets, rights or interests from the company that

(a)    this Act or the memorandum or articles of the company has not been complied with;

(b)    a person named as a director in the company's register of directors

…

(iii)    does not have authority to exercise a power which a director of a company carrying on business of the kind carried on by the company customarily has authority to exercise;

…

(e) a document issued on behalf of a company by a director, employee or agent of the company with actual or usual authority to issue the document is not valid or not genuine;

unless the person has, or ought to have, by virtue of his relationship to the company, knowledge of the matters referred to in any of paragraphs (a) to (e).

(2) Subsection (1) applies even though a person of the kind specified in paragraphs (b) to (e) of that subsection acts fraudulently or forges a document that appears to have been signed on behalf of the company, unless the person dealing with the company or with a person who has acquired assets, rights or interests from the company has actual knowledge of the fraud or forgery."

494.   That means that Kea cannot assert against Spartan that s. 121 of the Act had not been complied with, that Mr Dickson had no authority to execute the loan agreements, or that the loan agreements were not valid, unless Spartan had actual knowledge of those facts.  But Mr Dickson was at the time a director of Spartan.  I do not myself see why on this simple basis it cannot be said that Spartan had actual knowledge of everything that he knew, as the fact that he acquired the knowledge as director of Kea does not mean that it was not also something that he knew as director of Spartan.

495.   Ms Jones in fact had a more complex submission which is that at a Spartan Board meeting of 18 October 2012 it was resolved that:

"Chaumont (Directors) Limited will be authorised to sign any legally binding documentation solely on behalf of the Company, however prior to this, Peter Dickson must confirm that he has reviewed and approved the documentation for signing."

That had the effect that Mr Dickson had to approve the documentation in his capacity as director of Spartan, and hence that his knowledge was to be attributed to Spartan. That also seems to me to be right, and on that footing the agreements were not binding on Kea.

496.   In those circumstances it is not I think strictly necessary for me to decide who knew about the injunction when.  I will however deal with it briefly.  Ms Jones submitted that it was improbable that Mr Dickson did not look at his e-mails when in London. However I think it unlikely that he had in fact learned of the injunction before his meeting with Mr Leahy on the morning of 15 February as if that had been the case it is difficult to imagine that the meeting would simply have proceeded as planned as it seems to have done.

497.   On the other hand, I accept Ms Jones' submission that the only credible explanation for the activity over the weekend is a desire to have the documents finalised as soon as possible, and the only credible explanation for that is that Mr Dickson and Mr Leahy had learned of the injunction. There was otherwise no rush as the money itself was already at Fladgates, and was not due to be paid over until completion of the acquisition of Rygen; the amount of the Third Kea Loan had not been settled; and the Second Kea Loan was meant to be matched by an equal loan of £3.5m from Summit. The fact that Mr Leahy felt it necessary to disturb Ms Leonard's weekend shows that there was a sudden urgency which is otherwise inexplicable.

498. It is apparent that Mr Leahy had spoken to Mr Dickson on Saturday 16 February, as he refers to it in his e-mail that evening to Ms Leonard and said that Mr Dickson was expecting the documents (paragraph 488(1) above). That e-mail was sent at 20.45 London time, which was 04.45 on 17 February in Manila. It seems to me that the most likely explanation for Mr Leahy sending the e-mail is that Mr Dickson had switched on his computer in the Philippines at some time between getting in the previous evening and 04.45, found the injunction, and spoken to Mr Leahy asking him for the documents. (That is not necessarily inconsistent with Mr Dickson's statement that he became aware of the injunction on the morning of 17 February, but for obvious reasons I place little weight on his statement.) If he did that, it seems to me very probable that he would have explained to Mr Leahy why he wanted them. Everyone had been concerned at a possible injunction for weeks, and I think it highly improbable that Mr Dickson would have just asked for the documents without explaining why. Mr Leahy was clearly told of the Court Order at some time before 21 February, but was unable to say when he first learned of it, but I find on the balance of probabilities that he did learn of the injunction on 16 February. That means that he knew when he received the agreements back signed by Mr Dickson and put his signature as witness to them that Mr Dickson had executed them after learning of the injunction and in order to defeat it.

499. Mr Leahy was in regular contact with Mr Watson and accepted that when he learned of the Court Order he would have told him. It was suggested that they did not know of the injunctive effect of the Order and thought it only required Mr Dickson to provide information, but that seems to me very implausible. If Mr Dickson told them of the Order, as he plainly did, it seems very unlikely that he would have pretended that all it did was require him to supply information and not explain that it was the injunction which they had been anticipating.

500. I find therefore that when the Second and Third Loan Agreements were executed each of Mr Dickson, Mr Leahy and Mr Watson knew that they had been executed in breach of the Nevis injunction.

*Subsequent events*

501. Subsequent events are primarily relevant to the question whether the Claimants have affirmed the Spartan transactions, a question I have already addressed above (paragraphs 412 to 416). I received very extensive evidence and submissions in relation to them but I do not think it is necessary to go into matters in any detail and I will simply record the outline of events.

502. On 26 February 2013 Benjamin J heard the application to continue the Nevis injunction at an *inter partes* hearing, and made an Order continuing it until judgment or further order.

503. On 7 March 2013 Mr Dickson gave notice that he was unable to act as a member of the Board of Spartan; Jupiter was appointed as director the same day.

504. On 8 March 2013 Harneys wrote to Fladgates on behalf of HNL asking for information about Project Spartan, saying they understood Kea was a major investor in it and that HNL was concerned to ensure that it was aware of any forthcoming developments.

505.   Fladgates did not reply until 19 March, and then sent a rather stalling response, asking for KYC and a list of the information Harneys already held.  On the same day the Board of Spartan (that is Chaumont and Jupiter) resolved to approve the schedule 2 transactions, that is the purchase by Spartan of Rygen and Atherton and two loans from Park (the Second Park Loan of £3.5m, previously referred to as the Summit Loan, and the Third Park Loan, being the Vendor's Loan for Park's 50% of Rygen). In advance of the meeting Mr Reuben had sent an e-mail to Mr Douglas (representing Chaumont) and Mr de Putron (representing Jupiter) explaining the background to what it was they were being asked to approve, saying;

> "There is a push to get these matters closed this week…"

He said that Mr Leahy would convene a board call for the directors of Spartan to approve the transactions in principle, and explained that they would not be completed until the agreements between Rygen and LHRF had been finalised and executed.  In a separate letter to the Board, Mr Reuben explained the calculation of the precise purchase price payable by Spartan for Rygen, which meant that the final amount of the Third Kea Loan and the Third Park Loan was quantified at £12,143,133 each. Fladgates did not say anything about this Board meeting in their letter to Harneys.

506.   On 20 March the Board also approved an addendum to the Nucopia consultancy agreement under which Nucopia would receive additional fees amounting to 2% of any capital deployed by Spartan (save in relation to Project Royal where the fee was 0.5% and in relation to the purchase of Rygen where no fee would be due).

507.   On 22 March Mr Munro participated in a telephone call with Mr Reuben and Mr Leahy as a result of which he learned that the Rygen and Atherton acquisitions were expected to close early in the next week, and also that they involved the payment of c. £12m to Novatrust.

508.   It was then agreed that completion be put off to 10 April.  Mr Munro came to London for a meeting on 8 April attended by Mr Leahy and Mr Watson (and also Mr Noble and Mr Rattan).  There are a number of disputes as to what was said at the meeting but I do not propose to resolve them.  It is not in dispute that Mr Munro's main objective was to secure the appointment of Harlaw to the Board of Spartan and that Mr Watson readily agreed to this.

509.   Mr Munro was unable to satisfy himself that the Rygen and Atherton acquisitions were in the best interests of Spartan, and said so in a letter of 14 April 2013.

510.   A meeting was then arranged in Auckland for 21 April 2013.  It was attended by Sir Owen, Mr Munro, his partner Mr Riegels, Mr Holt, Mr Harley (a New Zealand lawyer who was acting for Sir Owen), Mr Watson and Mr Leahy.  It is common ground that Mr Munro led the discussion for the Sir Owen side, and initially took a tough line. But at a critical point in the meeting Mr Leahy found on his laptop Sir Owen's e-mail of 2 April 2012 approving the purchase of the existing partner's shares (paragraph 230(7) above).  That was at odds with what Sir Owen had been telling Mr Munro (which was that he did not recall there being a price for buying into Spartan) and rather took the wind out of the sails of Sir Owen's side, and the meeting thereafter became more conciliatory.

511.   After the main meeting Mr Munro and Mr Riegels looked at the 1 April presentation on Mr Leahy's laptop and Mr Leahy took them through it.  Mr Munro was left with the impression that the schedule 2 transactions as they now stood were consistent with what had been presented to, and approved by, Sir Owen back in April 2012, although he understood that the structure had changed.   Specifically he understood, as he accepted in cross-examination, that he had seen the passages in the presentation which referred to the making of an equity investment to buy out Mr Watson's existing partner for £22.5m; that that matched 50% of the £45m valuation starting point for the price payable for Rygen (in paragraph 5 of schedule 2 to the Shareholders' Agreement); that the sum of just over £12m which was Kea's share of the proposed price was derived from the figure of £22.5m; and that that was to be paid to an entity related to Mr Watson and not to buy out an existing partner (although he said he was unclear exactly how Mr Watson had gone from having an existing partner to where they were in April 2013).

512.   On 24 April 2013 Mr Munro e-mailed Mr Reuben approving Spartan proceeding with the acquisition of Rygen and Atherton, and the documents to give effect to this were executed the same day.  They consisted of a Share Purchase Agreement whereby Spartan agreed to buy the shares in Rygen (held by Douglas Services Inc equally for Park and Munil) for a price of £24,286,266 with completion to take place immediately, a Share Purchase Agreement whereby Spartan agreed to buy the shares in Atherton for £1, the Second Park Loan in the sum of £3.5m, and the Third Park Loan in the sum of £12,143,133.

513.   The practical effect was that the Kea's £12.5m (the Third Kea Loan) was used to fund the payment by Spartan of £12,143,133 to Munil.  The balance of £356,867 was returned to Kea on 3 May 2013.

514.   I have already found that Mr Munro's approval to the schedule 2 transactions going ahead did not amount to an affirmation of them precluding Kea from now setting them aside (paragraph 416 above).

*The 2014 Settlement with Messrs Miller and Dickson*

515.   The Nevis proceedings were heard by Gilford J in May 2013 (paragraph 43 above).  She gave judgment on 27 August 2013 in favour of Mrs Connah and made an Order removing Pizarro as trustee of various trusts, including the Corona Trust, and replacing it with HNL as sole trustee, and removing Messrs Miller and Dickson from all their offices and positions under the trust.  She was critical of their actions, finding that Mr Dickson had resisted giving a clear and detailed account of the trust to the beneficiaries, and that it was patently obvious that what was foremost in the minds of Mr Dickson and Mr Miller was not the interest of the beneficiaries but the interest of the trustee.

516.   Pizarro and Messrs Miller and Dickson appealed, but before the appeal came on both the appeal and the California proceedings against Mr Miller were settled by a Settlement Agreement and Mutual and General Release dated 23 May 2014.  The parties included Sir Owen, HNL (in its capacity as trustee of various trusts including the Corona and Regency trusts), Pizarro, Mr Miller and Mr Dickson.  The parties agreed to have the California proceedings dismissed and the Nevis appeal withdrawn, and cl 3.1 provided for a mutual general release as between the Sir Owen Releasing

Parties (Sir Owen, Mrs Connah, and HNL as trustee) on the one hand and the MDP Releasing Parties (which included Messrs Miller and Dickson and Pizarro) on the other hand.  This provided that they:

> "release, waive, discharge and relinquish any and all claims, demands, obligations and causes of action of any nature whatsoever, whether in tort, contract, under or by way of statute or any other theory of recovery, whether in law or equity, under any law or legal principle of any nation, foreign or domestic, arising anywhere in the World, for whatever form of remedy or relief, including without limitation, for actual, consequential, compensatory or punitive damages, equitable relief or otherwise, and whether now known or unknown, suspected or unsuspected, having accrued or which may accrue, no matter where any such claim, demand, obligation or cause of action may have arisen or accrued, and no matter where jurisdiction might lie, foreign or domestic, from the beginning of time to the Effective Date, which any of the Sir Owen Releasing Parties have or may have against the MDP Releasing Parties, or which any of the MDP Releasing Parties have or may have against the Sir Owen Releasing Parties, relating in any way to or arising from the Nevis Action, the California Action or under any other matter related in any way to Sir Owen's Estate…"

The Effective Date does not appear to be defined as such but counsel were agreed that it was the date of the agreement (23 May 2014).  Sir Owen's Estate was defined in cl 2.1 as:

> "any trust, settlement, estate, entity or asset owned directly or indirectly at any time by Sir Owen or any trust, settlement, estate, entity or asset affiliated with him, or which was held at any time for the benefit of persons or entities that included Sir Owen or any member of Sir Owen's family…"

There does not seem any doubt that the effect of cl 3.1 would be to preclude Sir Owen and HNL as trustee of the Corona Trust from bringing any proceedings against Messrs Miller and Dickson in respect of the matters complained of in these proceedings.

517.  Mr McCaughran submitted that although Kea is not named as a party to the agreement, Kea could not have claimed against Messrs Miller and Dickson either.  To take a concrete example, I have found that Mr Dickson executed the Second and Third Kea Loan Agreements after knowing of the Nevis injunction and hence for an improper purpose, which was a breach of the duty owed by Mr Dickson as director to Kea.  Mr McCaughran submits however that Kea can no longer sue him for this breach: cl 3.1 must have the effect that any company owned by the Corona Trust such as Kea could not sue him because any other interpretation would mean that he was not released in any meaningful sense.  The agreement is governed by California law and its meaning and effect is therefore a matter for that law, but I will assume that Mr McCaughran is or may be right that the agreement by Sir Owen and HNL to release Mr Dickson prevents Kea (formerly owned by the Corona Trust and now owned by Sir Owen) from suing him as well.

518.  Mr McCaughran then submits that the effect of the release is not only to exonerate Mr Dickson from the breaches of duty to Kea alleged in these proceedings but also to ratify those transactions, thereby making it impossible to rely on such breaches as against Mr Watson and the other Defendants in these proceedings.

519.   I have had great difficulty in understanding this point. As Mr McCaughran himself points out, the concepts of exoneration of the agent and ratification of a contract purportedly made by the agent are distinct: see *Suncorp Insurance and Finance v Milano Assicurazioni SpA* [1993] 2 Ll Rep 225 at 235 where Waller J said that it should be possible for the principal to ratify as against the third party (which he might wish to do for commercial reasons so as to preserve his reputation) without thereby waiving any breach of duty as against the agent, saying:

> "There seems no reason to me why the principal should not be able to make his position clear in this regard, in that there are two distinct but connected contractual relations."

See also *ING Re (UK) Ltd v R & V Versicherung AG* [2006] EWHC 1544 (Comm) at [150] per Toulson J where he refers to this part of Waller J's judgment and to there being different sets of contractual relations to consider.

520.   Since that is the principle, I do not see why the same should not be true the other way round. Just as a principal might wish to ratify the contract with the third party but preserve his rights against the agent, there are circumstances (such as the present case) where he might wish to abandon or compromise his rights against the agent but preserve the right to claim as against the third party that the contract was unauthorised. I do not see why he should not be equally able to do that.

521.   If that is right, and in my judgment it is, the only remaining question is what the effect of the mutual general release in the 23 May 2014 agreement was. As before this is technically a question of California law, but no attempt was made to suggest that there were any particular principles of California law that applied, and I therefore proceed on the assumption that California law is the same as English law. Construing the agreement on this basis I see nothing in the relevant clause which says anything at all about ratifying or adopting any contract or other transaction: it is all about releasing claims against the relevant parties (who do not include Mr Watson or the other Defendants to this action). I therefore reject Mr McCaughran's submission that the Settlement Agreement has any bearing on the claims in this action.

*The 2017 Settlement with Novatrust*

522.   Novatrust took a full part in this action until part-way through the trial. But between the trial being adjourned on Day 16 (26 May) for the Whitsun vacation and being resumed on 6 June, I was informed by Mr Hossain QC, leading counsel for Novatrust, that a settlement had been reached between the Claimants and Novatrust not only of the claims against Novatrust in this action, but of the other two proceedings (the derivative action brought by Novatrust on behalf of Spartan, and the petition to wind up Spartan) as a whole. On Day 17 (6 June) I therefore made three orders (by consent as between the Claimants, Novatrust and Spartan), one in each of the sets of proceedings. They were sealed on 8 June.

523.   The consent order in this action provided as follows:

(1)       Paragraph 1 set aside all the agreements entered into between Kea and Spartan. That comprised the following: (i) the two Spartan Term Sheets dated 12 June 2012; (ii) the July agreements dated 24 July 2012 (the Spartan Share

Purchase Agreement, the Spartan Shareholders' Agreement, the Loan Facility Agreement in the sum of £50m, and the Security Deed); (iii) the Deed of Loan Amendment and Restatement dated 12 September 2012 (and a further Security Deed entered into at the same time); (iv) the Deed of Amendment to the Shareholders' Agreement dated 17 September 2012; (v) the Interim Arrangement purportedly dated 8 February 2013; and (vi) the Second and Third Kea Loans purportedly dated 11 February 2013.

(2)        Paragraph 2 provided that that should be binding as between the Claimants, Novatrust and Spartan but not on the other Defendants and should not prejudice the Claimants or the other Defendants in respect of any issues between them.

(3)        Paragraph 3 provided for a stay of the proceedings in this action as between the Claimants, Novatrust and Spartan on the terms of a settlement agreement dated 2 June 2017.

(4)        Paragraph 6 provided that as between the Claimants, Novatrust and Spartan there should be no order as to costs.

524.    No copy of the settlement agreement was annexed to the Order and I was not shown, and have not seen, a copy of it.  It is not however disputed that Novatrust has caused Spartan to repay to Kea very substantial sums under this agreement.  I have seen a letter from Novatrust's current solicitors stating that the total sum transferred, on or about 13 June 2017, was £80,037,607.67.  That figure appears to be accepted by the Claimants as it is pleaded in draft Re-re-amended Particulars of Claim prepared by them.

525.    In that draft the Claimants accept that the total sums they have received are as follows:

(1)        £356,867

This is the balance of the £12.5m Third Kea Loan which was in the event not needed for the purchase of Rygen and was repaid to Kea on 3 May 2013 (paragraph 513 above).

(2)        £230,914.89

This is said to be the total amount of interest received by Kea from Spartan between January and October 2013.

(3)        £50,000,000

This is said to have been paid on 24 July 2016.  It is not explained in the draft pleading.  Mr McCaughran's closing submissions refer to it as the first repayment due under the Spartan Loan Facility Agreement (as amended by the Deed of Loan Amendment and Restatement); Ms Jones told me that it was repaid on the basis that it was either a repayment of that loan, or pursuant to the Claimants' claims and so was due on any view.

(4)        £80,037,607.67

This is the sum said to have been received by Kea on 13 July 2017 under the settlement with Novatrust.

Those four sums together total over £130m (£130,625,389.56 to be precise). I do not think I have any evidence formally proving these amounts but there is no need at this stage to make any finding as to the precise amounts, and I am not at this stage aware of there being, or being likely to be, any significant dispute between the parties in relation to them.

## Relief

526.    I come now to the various arguments on the relief that should be granted to the Claimants. This is made more intricate than it might otherwise be by a number of factors, namely (i) the settlement made by the Claimants with Novatrust and how that impacts on the claims against the remaining Defendants; (ii) the Claimants' draft amendments to their Particulars of Claim, which are opposed by Mr McCaughran; (iii) the joinder of Munil into the action at a late stage on certain terms; and (iv) the desire of the Claimants to keep their options open so far as possible until they have seen the judgment.

527.    I asked counsel to see if they could agree precisely which issues I should decide in this judgment, and which should be left over for determination at a later stage. That led to a list of questions for determination at this stage, which was very helpfully almost entirely agreed between counsel, subject to one or two points of detail.

*Questions 1 to 3: duty and breach*

528.    The first question on the agreed list is:

"1.    Whether Kea or Sir Owen succeed on any of the claims which they have brought to set aside the various agreements on any of the bases alleged (ie deceit, inducements, want of authority, breach of Mr Watson's fiduciary duty) (this to include the issues of affirmation)"

I have dealt with these matters above. For the reasons given my conclusions are as follows:

(1)        The July agreements are liable to be set aside for deceit. The same applies to all the subsequent agreements between Kea and Spartan.

(2)        The July agreements are also liable to be set aside as a result of the inducements. Again the same would apply to all the subsequent agreements.

(3)        The July agreements are liable to be set aside for breach of Mr Watson's fiduciary duty owed to Kea. Again the same would apply to all subsequent agreements.

(4)        The Second and Third Kea Loans are liable to be set aside for want of authority by Mr Dickson and/or as having been executed for an improper purpose, in each case to the knowledge of Spartan. I am conscious that I have

not made any express findings as to whether other agreements are liable to be set aside on this basis but I do not see that anything of any significance turns on this.

(5)         The defence of affirmation is not made out.

529.   The second question on the agreed list is as follows:

"2.    Whether Mr Watson owed a fiduciary duty to Kea or Sir Owen and if so what duty or duties and whether that duty or those duties were breached in relation to both Spartan and Edsel"

Again I have already dealt with these matters above.  For the reasons given my conclusions are follows:

(1)         Mr Watson did not owe Sir Owen a fiduciary duty in relation to either Edsel or Spartan.

(2)         Mr Watson did not owe Kea any relevant fiduciary duty in relation to Edsel.

(3)         Mr Watson did owe Kea a fiduciary duty in relation to Spartan.  That duty included a duty to disclose his interest in the schedule 2 transactions.

(4)         Mr Watson was in breach in not providing full disclosure of his interest in the schedule 2 transactions.

530.   The third question on the agreed list is:

"3.    What the consequences of those breaches of duty were"

Although this is an agreed item, I am not now sure what the parties intended by it. The most obvious consequence is that Kea is entitled to avoid all the agreements between it and Spartan.  That has of course been achieved by agreement under the 2017 settlement with Novatrust as between Kea and Spartan themselves, but the effect of my findings above is that Kea has established this (that it is entitled to set aside the agreements) as against the other Defendants.  That is a necessary step in the relief which the Claimants seek against those Defendants.

*Question 4: knowing receipt*

531.   The fourth question on the list was not agreed, but was suggested by Mr McCaughran, as follows:

"4.    Whether Mr Watson is potentially liable in knowing receipt of sums received from Munil, subject to the question (not for decision in the judgment) whether Kea can trace the Munil monies through Munil."

This requires a little explanation.  Munil was not originally joined as a defendant but on 25 November 2016 I made an Order permitting Munil to be joined.  The Claimants re-amended their Particulars of Claim and included in the Re-amended Particulars of Claim allegations that Spartan paid the sum of £12,143,133 to Munil (**"the Munil Money"**); that Munil received the Munil Money on 26 April 2013 as nominee for Mr

Watson and held the same on bare trust for him; and that Munil was obliged to account to Sir Owen and/or Kea in respect of the profits it received for Mr Watson. The Claimants also advanced a separate tracing claim under which Kea claimed to be entitled to trace into and make a proprietary claim to such part of the Munil Money as was retained by Munil in its accounts and to any assets held by Munil which are the traceable product of any part of the Munil Money. Kea also asserted tracing claims (i) against any assets obtained by use of the Munil money and held by Mr Watson and (ii) against a particular property in Richmond, Surrey said to have been acquired with the traceable product of the Munil Money and held by Mr Watson and Mr Gibson as trustees of a trust known as the Richmond Trust. (Mr Gibson has not been joined to these proceedings but Mr Watson has been appointed to represent the trustees of the Richmond Trust).

532.  Munil served its Defence to the claims against it on 20 February 2017. Munil admitted receipt of the Munil Money (save for £7) on 26 April 2013. In relation to the two claims against it (the nominee claim and the tracing claim) Munil relied on a number of principles of Swiss and Liechtenstein law which it said would apply, as well as a plea that if English law applied to the tracing claim Munil was a bona fide purchaser for value without notice.

533.  It was recognised by the Claimants that it would be difficult to accommodate the claims against Munil in the trial and by a consent order made by me on 27 March 2017 the claims against Munil (the nominee claim and tracing claim) were stayed until after judgment on the claims against the other Defendants or further order. As a result of that Munil did not take any part in the trial.

534.  As well as tracing claims against Mr Watson and the trustees of the Richmond Trust, the Claimants have claims in knowing receipt against Mr Watson. Both the tracing claims and the knowing receipt claims require Mr Watson to have received Kea's money. One of Mr Watson's defences to the claims against him (at any rate so far as concerns the Munil Money and any moneys or assets derived from it) is that if Munil is a bona fide purchaser for value, Kea cannot trace the Munil Money through Munil so it does not matter if Mr Watson later received it, as long as he received it from Munil. The Claimants do not accept that this is so, but it is accepted that this is not a matter I should deal with in this judgment (as the wording of the suggested issue recognises).

535.  That means that the intended scope of this issue is, as I understand it, simply whether Mr Watson had the requisite knowledge to be liable in knowing receipt, assuming receipt by him of Kea's money can be established. The test for knowledge in this context was laid down by the Court of Appeal in *BCCI (Overseas) Ltd v Akindele* [2001] Ch 437: see at 455E per Nourse LJ where he said that there ought to be a single test of knowledge for knowing receipt, which he formulated as follows:

> "The recipient's state of knowledge must be such as to make it unconscionable for him to retain the benefit of the receipt."

536.  In circumstances where I have found that the July agreements were induced by deceit, a deceit planned and orchestrated by Mr Watson, and that the Third Kea Loan Agreement was, to his knowledge, put in place after and in breach of an injunction, I do not see how it can be maintained that it would be anything other than

unconscionable for him to retain the benefit of any receipt of Kea's money. Although the issue has therefore taken me a little time to explain, it has not taken me any time to resolve, and I see no reason why I should not say so now.

*Questions 5 and 6: equitable compensation*

537.   The next two questions on the list can be taken together. They are as follows:

> "5.   Whether the amendment in relation to equitable compensation is necessary and if so should it be allowed
>
> 6.   Whether equitable compensation should in principle be awarded"

538.   This requires first looking at what is currently pleaded in terms of equitable compensation. The relief claimed in the Claimants' current pleading (the Re-amended Particulars of Claim), which does not take account of the 2017 settlement with Novatrust, is claimed under a number of heads as follows:

(1)         The first head is *"Avoidance of Agreements"*. This simply claims that Kea is entitled to set aside the various agreements it entered into with Spartan (or alternatively that they are void). It makes no claim to monetary relief.

(2)         The second head is *"Proprietary and Restitutionary Claims"*. Here are found (i) a proprietary claim to monies held by Spartan; (ii) a proprietary claim to the investment made by Spartan in Project Royal and any profit realised from that investment (it appears from the draft pleading that Project Royal made a substantial profit); (iii) the tracing claims already referred to against Munil, Mr Watson and the trustees of the Richmond Trust in respect of any assets derived from the Munil Money; (iv) tracing claims to any other sums paid out of Spartan that have come into the hands of Mr Watson, Novatrust, Mr Leahy or Nucopia; and (v) a claim that since the agreements between Kea and Spartan are to be set aside, the consideration for the payment of the sums by Kea to Spartan has totally failed and Spartan is liable to make restitution to Kea.

(3)         There are then claims for knowing receipt against Mr Watson, Novatrust, Mr Leahy, Nucopia and Spartan; and claims for an account of profits made by Spartan and Mr Watson.

(4)         There is then a claim for equitable compensation pleaded (in paragraph 265) as follows:

> "Insofar as any of the above sums claimed by way of proprietary or restitutionary claim or by way of account of profits or by way of personal claim against parties as constructive trustees cannot be recovered together with interest, then to the extent that Sir Owen and/or Kea has suffered loss Sir Owen and/or Kea are entitled to equitable compensation from Mr Watson in respect of his breaches of fiduciary duty. Sir Owen and Kea reserve the right to amend their pleading in this regard once further information has been received from the Defendants."

(5)         Finally there is a claim for interest pleaded (in paragraph 266) as

follows:

> "The Claimants are entitled to compound, alternatively simple, interest pursuant to the court's equitable jurisdiction and/or section 35A of the Senior Courts Act 1981 on the sums found to be due to them at such rate as would have been obtained by Kea by investing in proper trustee investments, or at such other rate and for such period as the Court considers appropriate."

539.   This slightly bewildering array of claims requires some analysis.  A useful starting point is the claim in restitution:

(1)        Where A has paid money under a voidable contract to B and the contract is later set aside, A is *prima facie* entitled to the return of the money from B.  That is the claim pleaded as a restitutionary claim by Kea against Spartan on the grounds of total failure of consideration.  This is a common law claim, traditionally called a claim for money had and received or a claim in quasi-contract but which is now regarded as a claim for restitution on basis of unjust enrichment.

(2)        I do not understand there to be any dispute as to the amounts actually paid by Kea under the various agreements which have been set aside.  Apart from the $1 payable by Kea to Novatrust to acquire 50% of Spartan's issued share capital, Kea's payments all took the form of advances to Spartan in the total sum of £129m (£113m under the terms of the Loan Facility Agreement as amended, and £3.5m and £12.5m under the Second and Third Kea Loan Agreements).

(3)        Such a claim would not carry interest at common law, but the Court can award interest under s. 35A of the Senior Courts Act 1981.  That section applies to proceedings *"for the recovery of a debt or damages"* but for these purposes the claim in restitution, being a claim for recovery of a defined sum, is regarded as a claim in debt.  It is not a claim in damages.

(4)        Interest awardable under s. 35A is limited to simple interest.  The rate is in the discretion of the Court.  Various factors may affect the rate that the Court may choose to award, but there is no question of a claimant being *entitled* to any particular rate.  The rate is often determined after judgment as part of the consequential matters.

(5)        The claim in restitution is the only common law money claim currently pleaded.  No claim for common law damages is pleaded although the Claimants seek to amend to introduce one as part of their proposed amendment (see below).

540.   In addition to giving rise to a common law claim for restitution, the setting aside of the agreements may have further effects in equity as follows:

(1)        Where A is able to and does set aside an agreement with B, the effect is to re-vest in A the equitable title to the moneys A paid to B under the agreement.  This may not be so in every case where A is able to avoid the transaction, but I need not consider whether this is so as there is clear authority

that it does apply in cases where the ground for setting aside is fraudulent misrepresentation: see *El Ajou v Dollar Land Holdings plc* [1993] 3 AER 717 at 734c per Millett J:

> "But if the other victims of the fraud can trace their money in equity it must be because, having been induced to purchase the shares by false and fraudulent misrepresentations, they are entitled to rescind the transactions and revest the equitable title to the purchase money in themselves, at least to the extent necessary to support an equitable tracing claim."

To similar effect is the statement of Peter Gibson LJ in *Halifax Building Society v Thomas* [1996] Ch 217 at 226G:

> "Or it could have exercised a right inconsistent with the affirmation of the mortgage, that is to say to seek the setting aside of the mortgage, obtained as it was by fraud. It might then have claimed in equity that it remained the owner of the moneys advanced and traced those moneys into the flat and the sale proceeds, or it might have made a common law claim for money had and received to the society's use."

(2)　　　It can be seen that Millett J referred to re-vesting the equitable title *"at least to the extent necessary to support an equitable tracing claim"* and Peter Gibson LJ also referred to tracing the money. Strictly speaking there is a difference between following and tracing, following being the process of following the same asset from hand to hand and tracing the process of identifying a new asset as a substitute for the old; and strictly speaking tracing is not the same as claiming, as tracing is neither a claim nor a remedy, but a process of identifying property as the claimant's which may be the prelude to a successful claim, which may itself be personal or proprietary: see *Foskett v McKeown* [2001] 1 AC 102 at 127-8 per Lord Millett. But it is common to speak of a tracing claim where what is meant is that the claimant seeks to follow and trace his proprietary interest into some specific asset held by a defendant, and then claims that property as his own property in equity.

(3)　　　This is the basis therefore for Kea's various tracing claims, namely (i) against Munil for any part of the Munil Money still held by Munil, or for any assets representing the traceable product of any part of the Munil Money; (ii) against Mr Watson and the trustees of the Richmond Trust for specific assets said to be the traceable product of the Munil Money; and (iii) against Mr Watson, Novatrust, Mr Leahy and Nucopia for any other part of the sums paid to Spartan which has come into their hands.

(4)　　　The same re-vesting of the equitable title in Kea is the basis of Kea's claims in knowing receipt. This is a personal claim seeking to make the recipients liable as constructive trustees, but depends on identifying the moneys and assets received by the recipients as being Kea's.

(5)　　　In addition to forming the basis for the tracing and knowing receipt claims, this re-vesting of the equitable title is also relied on by Ms Jones as giving Kea a right to make Spartan a constructive trustee of its money, and claim back the £129m from Spartan on that basis. That is of course duplicative of the common law claim for money had and received or

restitution, but has this difference, namely that it enables Kea to claim interest not just under s. 35A of the Senior Courts Act 1981 but under the equitable jurisdiction of the Court.   There was no dispute that this was so, Mr McCaughran expressly accepting in his oral closing submissions that if the claim against Spartan to set aside the agreements was well-founded, so that the agreements would not only be set aside by agreement but could have been set aside for legal reasons, he would not dispute that there would have been a claim for interest as well, and that would have been a claim either under the equitable jurisdiction of the Court or for statutory interest under s. 35A of the Senior Courts Act.

(6)         There is an issue between the parties as to what rate of interest would have been awarded against Spartan under the equitable jurisdiction (which I will call "equitable interest" for short) (see below).

(7)         Kea had another claim against Spartan which was to make it account not only for the £129m and equitable interest, but for the actual profits it made from Project Royal, on the basis that Spartan being a constructive trustee of the £129m was accountable for any profit that it made from use of that money. Ms Jones accepts that she cannot claim interest on the sums deployed in Project Royal for the period that they were so deployed.   I have heard no argument as to whether this claim to profits is well-founded.

541.   It is now possible to identify what the claim for equitable compensation is.   As has just been explained, Kea had a claim against Spartan to make it account as constructive trustee for the £129m and equitable interest.   But Kea always expected that Spartan would be unable to pay the entirety of that sum.   The claim for equitable compensation is a claim against Mr Watson for breach of fiduciary duty if the total recoverable from Spartan and the other parties falls short of that claim.   The way it was explained by Ms Jones in her closing submissions was as follows:

> *"The reason for that, my Lord, is it has always been obvious that Spartan is insolvent.  That is why it is no good getting an order for 129 million plus interest against Spartan, because it hasn't got it.  That is why the equitable compensation has always been in there: to recover from Mr Watson anything that couldn't be recovered from other parties."*

542.   It is now possible to answer Question 6 on the list, which is whether equitable compensation should in principle be awarded.   This seems to me to be justified in principle.   The primary remedy where a fiduciary has failed in breach of duty to disclose his interest in a transaction with his principal is to set aside the transaction and restore the parties to the position they were in.   It is however well established that if this cannot be done, the fiduciary can come under a liability to pay equitable compensation in lieu, the locus classicus being *Nocton v Lord Ashburton* [1914] AC 392, and I see no reason to doubt that the same applies if the claimant does set aside the agreement but is unable to receive back from the counterparty all the sums paid under it with interest.   I did not understand Mr McCaughran to advance any reason why equitable compensation should not in principle be awarded if I found, as I have, that Mr Watson was in breach of a fiduciary duty.   My answer is therefore Yes.

543.   That brings me to Question 5, which is whether the amendment in relation to

equitable compensation is necessary and if so should be allowed.  The draft amended pleading was initially sent under cover of a letter dated 6 June 2017 (that is the day the trial resumed on Day 17) but by agreement between the parties the application to amend was not pursued at the time but was left over until closing submissions.

544.   So far as equitable compensation is concerned, apart from a very minor change in paragraph 265 (replacing *"cannot be recovered"* with *"are not recovered"*, the significance of which escapes me) the relevant draft amendment consists of new paragraphs 265A and 265B as follows:

> "265A Sir Owen and Kea estimate the present value of their claim for equitable compensation is in an amount of £47,570,872, being the sum of:
>
>> 265A.1 the capital sums of £100,000, £24.9 million, £25 million, £63 million, £12.5 million and £3.5 million paid by Kea to Spartan (and to Fladgates acting as solicitors to Spartan) as pleaded at paragraphs 119, 148 and 167 above; plus
>>
>> 265A.2 compound interest at 8% on the said capital sums with annual rests from the date of the respective payments until the transfer out of £34,197,800 in relation to Project Royal on 24 January 2013; plus
>>
>> 265A.3 compound interest at 8% on the outstanding balance of £94,802,200 with annual rests from 25 January 2013 to 24 July 2016; plus
>>
>> 265A.5 the profit earned from the investment in Project Royal in the sum of £9,631,647.43; but taking into account and giving credit for
>>
>> 265A.6 the Spartan receipts.
>>
>> 265A.7 Sir Owen's and Kea's claim for equitable compensation continues to accrue on this basis at a daily rate of £10,426.49.
>
>> 265B Alterantively Sir Owen and Kea estimate the present value of their claim for equitable compensation is a minimum amount of £23,361,156.40, being the same calculation as at 265A but with interest at a minimum rate of 3% above BBR on the said capital sums, and a claim continuing to accrue at a daily rate of £2080.10. Sir Owen and Kea will say that 3% above BBR is the minimum rate at which the Court should assess the loss to Kea and/or Sir Owen by being kept out of funds."

545.   Mr Watson expressly accepted in oral closing submissions that he did not quibble with the rate pleaded in paragraph 265B of 3% above BBR (base rate) as an appropriate rate for the Court to award both under s. 35A of the Senior Courts Act 1981 and as equitable interest, nor with the interest being compounded (in the case of equitable interest).   He objected however to paragraph 265A under which the Claimants seek to introduce a claim to interest at 8% compound.  As can be seen this makes a significant difference to the figure, increasing it from some £23m to some £47m.

546.   Ms Jones said she did not in fact need permission to amend, as there is already a plea in paragraph 266 that the Claimants are entitled to interest at *"such rate as would have been obtained by Kea by investing in proper trustee investments"* and that

allowed her to rely on such evidence as had been adduced at trial as to what return Kea would have made. All she was doing in paragraph 265A therefore was quantifying a claim that was already on the pleadings.

547.   I think I should decide first whether she could obtain 8% interest on the basis of the unamended plea. I was referred to two examples of cases where judges have grappled with the question of what interest rate to apply, *Challinor v Juliet Bellis & Co* [2013] EWHC 620 (Ch) (Hildyard J) and *Reinhard v ONDRA* [2015] EWHC 2943 (Ch) (Warren J). In each case the rate in fact awarded was 3% over base. Mr McCaughran submitted that what one sees in these cases is the Court setting an interest rate by reference to bank rates and not by a detailed factual inquiry into the circumstances of the claimants.

548.   That does seem to me to be borne out by those cases. In *Challinor v Bellis*, Hildyard J recorded at [21(2)] a submission by the claimants that:

> "the Court adopts a broad brush. For practical reasons it will not make an enquiry into the claimant's actual loss; nor will it enquire or speculate as to what the claimant would have done with the money had he not been deprived of it."

See also [21(3)] where the claimants' submission referred to what Forbes J had said in *Tate & Lyle Food and Distribution Ltd v Greater London Council* [1982] 1 WLR 149 at 154. Forbes J said that in commercial cases the interest is intended to reflect the rate at which the plaintiff would have had to borrow money, but one should not look at any special position in which the plaintiff may have been, but take the rate at which plaintiffs with the general attributes of the plaintiff in the case could in general borrow money. Hildyard J does not anywhere say he rejects these submissions, and when he came to set a rate in the case before him (where there were a number of different claimants) he said (at [37]);

> "Again, a broad brush is required: in assessing any special rate the Court disclaims the task of determining what each claimant's financial position is and at what rate that claimant could have borrowed money."

Then in *Reinhard v ONDRA*, Warren J again referred (at [5]-[7]) to the decision of Forbes J in *Tate & Lyle v GLC*, and at [9] to a passage from *Fiona Trust v Privalov* [2011] EWHC 664 (Comm) where Andrew Smith J said:

> "it would be neither practical nor proportionate (even in a case involving as large sums as these) to attempt a minute assessment of what will precisely compensate the recipient. In particular, the courts do not have regard to the rate at which a particular recipient of compensation might have borrowed funds. This policy is adopted in order to control the extent of the enquiry to ascertain an appropriate rate…the court will, however, consider the general characteristics of the recipient in order to decide whether to assess interest at a rate that is higher or lower than is conventional."

Again there is no suggestion that Warren J disagreed with that.

549.   It can be seen that these citations are concerned with cases where the rate of interest was based on the rate at which the claimant can borrow, and decide that one does not look at the individual claimant but at what a class of claimant (small business, large

business and the like) can borrow at. I accept that the borrowing rate, which has been said to be suitable in commercial cases, is not necessarily suitable in all types of case (see Hildyard J's detailed analysis of this point in *Challinor v Bellis*) and that where the claimant that is out of pocket is a trustee that would otherwise have invested in proper trustee investments, the appropriate rate would not be the borrowing rate but a rate to reflect the return on such investments. I also accept that this would apply to Kea which although not itself a trustee is a vehicle for trustee investment. However I do not see that this affects the principle that in assessing such a rate the Court adopts a broad brush approach based on what a person with the general characteristics of the claimant might have received by way of investment on trustee investments, not a rate that reflects what the individual claimant would itself have done.

550. That is I think supported by the usual practice in cases where interest is sought against defaulting trustees. The Court does not as far as I am aware attempt to investigate what other investments the particular trust fund might have made, but adopts, on a broad brush basis, a rate that is intended to be a proxy for the rate of return that trustee investments would normally earn. In the 19th century that was 4%, but in more modern times has been fixed by reference to investment returns. I would accept, by analogy with what Forbes J said in *Tate & Lyle v GLC*, that the Court could take into account the general characteristics of the trust in question, so if large private trusts were shown to earn higher investment returns than small ones that could be taken into account, but I do not accept that under this jurisdiction the Court would have regard to what the claimant itself would have done or its particular appetite for investments.

551. In the present case the evidence that Ms Jones relies on in support of the claim to 8% interest is not evidence of what large trust funds are in general able to obtain by investing in proper trustee investments, but evidence of what Kea itself would have wanted to do and sought to do. I do not need to detail the evidence she relied on as in accordance with the principles that I have referred to, I do not think this sort of inquiry is one that the Court would entertain on an application for equitable interest.

552. Nor do I think that the pleading of the claim to interest in paragraph 266 fairly alerts the reader that what the Claimants would seek to do is rely on evidence as to what Kea itself would have done to support a claim for equitable interest at 8%. Ms Jones said that the Defendants could always have asked for particulars, but the terms of the claim to interest (*"at such rate as would have been obtained by Kea by investing in proper trustee investments"*) do not to my mind make it clear that the Claimants will be inviting the Court to make findings not as to what Kea would have made had it invested in conventional trustee investments but what Kea would have made by investing in the particular types of investment that it is said Kea was interested in.

553. I conclude that the claim to equitable interest at 8%, on the basis that Kea seeks to advance it, is not open to Kea on the current pleading.

554. That leaves the question of amendment. There is no objection to the proposed pleading in paragraph 265B (3% above base rate), but Mr McCaughran opposes the proposed pleading in paragraph 265A (8%). Having decided that this is not open to the Claimants on the current pleading, I agree with Mr McCaughran that it should not be permitted. By the time the draft pleading was produced, the trial was well under way. There had been nothing to alert the Defendants that the claim was going to be put in this way – Ms Jones accepted that nowhere in her opening did it suggest that an

interest rate of 8% would be claimed.  I do not think it necessary to refer to the principles on which applications for permission to amend at a late stage are made; it is accepted that they have to be determined in accordance with the overriding objective, which is to deal with cases justly; and in my judgment it is not fair or just that an amendment of this significance should be introduced half way through the trial at a stage at which much of the evidence had been called without the Defendants knowing that this point was going to be taken.  If the point had been clearly pleaded before the trial started, the evidence might well have been different.  In any event, since I have already decided that the claim as sought to be put forward is not an appropriate way to approach the question of equitable interest, it seems only logical to decline to allow it to be put on the face of the pleading.

*Questions 7 and 8: damages for deceit*

555.   I can take the next two questions together.  They are as follows:

"7.   Whether the amendment to claim damages for deceit is allowed.

8.   If so, whether damages should in principle be awarded for deceit."

556.   There is no claim for damages at all on the current pleading.  The Claimants seek to introduce a claim for damages for deceit as follows:

"251A   Further to the claim for rescission of the July 2012 Agreements pleaded in paragraph 245 above, Kea is entitled to and claims damages for deceit from Mr Watson in respect of the loss which it has suffered, giving credit for the sums that Kea has received and will receive from Spartan

251B   The best particulars that Kea is presently able to give of the amount of its loss are as follows:

251A   Kea transferred the sums of £100,000, £24.9 million, £25 million, £63 million, £12.5 million and £3.5 million paid by Kea to Spartan (and to Fladgates acting as solicitors to Spartan) as pleaded at paragraphs 119, 148 and 167 above.

251B   Kea has received:

251B.1   the sum of £356,867 repaid to Kea by Spartan on 3 May 2013 (being the unused balance of the Third Kea Loan Agreement);

251B.2   the cumulative sum of £230,914.89 received by Kea by way of interest from Spartan between January and October 2013 (Kea's loss being calculated on the basis of receipt of the all sums on 16 June 2013);

251B.3   the sum of of £50,000,000 received by Kea from Spartan on 24 July 2016; and

251B.4   the sum of £80,037,607.67 that Kea received on 13 July 2017 following the the compromise it has reached with Novatrust and Spartan of the claims made in these and in all related proceedings (collectively with the sums in paragraphs 251B.1 to 251B.3 "the Spartan receipts")."

251C Kea has suffered damage in the amount of £52,285,368.44 as a consequence of the loss of the use of its funds; calculated as the sum of £129m plus interest at 8%, compounded annually, being the rate of return that Kea would have expected to receive by way of investment of its funds, but taking into account and giving credit for the Spartan receipts;

251D Kea's loss on this basis will continue at a daily rate of £11,459.81, until payment of the same.

251E Alternatively Kea has suffered damamge in the minimum amount of £19,276,971.56 as a consequence of the loss of the use of its funds, calculated as the sum of £129m plus interest at such other rate as the Court may find that Kea would have received by way of return on the use of its funds, but at a minimum of BBR plus 3% compounded annually (being the minimum rate at which an investor such as Kea would be compensated for loss of the use of its funds by way of an award of interest by the Court), but taking into account and giving credit for the Spartan receipts;

251F Kea's loss will continue on this basis at a minimum daily rate of £1716.44, until payment of the same."

557.    It can be seen that this plea seeks to claim as damages the return that Kea would have received on the use of its funds, either at 8% or at 3% above base. I accept that in principle Kea has a claim in the tort of deceit for any loss that it has suffered, and that that can include any investment return that it would have made had it not invested in Spartan. Ms Jones accepts that such a claim has to be specifically pleaded and proved.

558.    Ms Jones says that the amendment should be allowed as it arises out of matters already pleaded and in issue, and that the issue of what is an appropriate rate at which to compensate Kea for being out of its money for 5 years is already an issue in the action. I do not accept this. What is already in issue in the action is the appropriate rate of interest that the Court should award either under s. 35A of the Senior Courts Act 1981 or as equitable interest, and for the reasons given above that is in principle an enquiry as to what is a suitable rate having regard to the investment return that a large private trust could expect to have made on proper trustee investments. It is not an enquiry as to what Kea would have done with the money instead. But the latter enquiry is what a claim for damages involves.

559.    Ms Jones says that in practice it is unclear what further evidence could be relevant to an assessment of the hypothetical investments that Kea might have made beyond the evidence already before the Court. It may be that the evidence would not be very different. But it is impossible to be confident that the Defendants would have called exactly the same evidence, or asked exactly the same questions of the Claimants' witnesses had they known that they were facing a claim for damages, especially one of this magnitude.

560.    In these circumstances and for much the same reasons as with the equitable compensation claim I do not think it would be just or in accordance with the overriding objective to allow the amendments.

*Question 9: interest*

561. The next question on the list is as follows:

> "9.   Whether the Claimants are entitled to interest at anything higher than BBR plus 3% either by way of damages or by way of equitable compensation.  If so, at what rate"

562. I do not think this quite captures the relevant question.  Since I have not allowed the amendment to claim damages, the relevant question is what equitable compensation is payable.  But as the discussion above shows, what the Claimants (or rather Kea) claims by way of equitable compensation is the shortfall between what Kea claimed from Spartan, including interest, and has received from Spartan.  The relevant question I think is what rate of interest should be used for this purpose.

563. I have decided above that Kea's claim for equitable interest at 8% cannot be sustained on the basis on which it is sought to be put forward, and that the appropriate rate of interest depends on that available on proper trustee investments.   That is not something that the parties have really addressed.  Ms Jones quite correctly points out that the question of what rate of interest should be awarded is very often dealt with after judgment, and it appears, judging from the reported cases (and my own experience), that it is not uncommon for parties to put material before the Court after judgment to justify a particular interest rate.

564. That raises the question therefore whether I should assess the appropriate rate now on such material as I have, or give the parties a further opportunity to adduce material on this question.  This question was not dealt with in closing submissions and although Question 9 is on the agreed list, I think I ought to hear from the parties as to whether Kea (and indeed Mr Watson) should have any further opportunity to establish what an appropriate interest rate should be.

*Question 10: did Mr Leahy receive at least $363,566 from the Munil Money?*

565. The next question on the list is as follows:

> "10.   Whether Mr Leahy has received at least $363,566 from the Munil Money"

Although this is on the agreed list, it affects Mr Leahy rather than Mr Watson.  Mr Leahy was acting in person at the trial and did not take any part in the oral closing submissions, filing brief written submissions instead.  I cannot assume that he agreed to this issue being determined at this stage.  His submissions do not address this point at all.

566. I have decided that it is appropriate to defer this question.  It is addressed briefly in Ms Jones' written submissions but was not I think referred to in oral submissions, and I do not know very much about it.  It would appear to be bound up with the question of what payments were made out of the Munil Money, although as I understand it Ms Jones' point is that since the payment was calculated as a bonus of 2% of the Munil Money it does not matter if it was in fact made out of that money or other money.  I am not sure that is right, but I think the question deserves further argument.

*Questions 11 to 13: Project Edsel*

567.   I can take the next three questions together.  They all relate to Project Edsel and are as follows:

> "11.   Whether Kea is entitled to the B share in Edsel on the basis that its money was used to acquire it.
>
> 12.   Whether Kea is entitled to claim a 50% share in the Edsel B share on the basis of the Edsel Term Sheet (including whether any such right was given away by the terms of the long form agreements)
>
> 13.   Whether any claim in relation to Edsel has been lost by virtue of affirmation"

568.   I have considered all these questions above.  My answers are:

(1)         Question 11: No.

(2)         Question 12: No.

(3)         Question 13: this does not arise.

*Question 14: allocation*

569.   The final question on the list is as follows:

> "14.   Whether Kea is only entitled to allocate monies paid to it under the Novatrust Settlement to claims against Spartan and Novatrust which would have been likely to succeed"

This is not an agreed item but one of those suggested by Mr McCaughran.  Ms Jones said she did not feel strongly about it but pointed out that the Claimants have not yet allocated any of the monies to anything.  It was however fully argued and I agree with Mr McCaughran that I might as well deal with it now.

570.   The question arises as follows.  Kea has received substantial sums under the terms of the settlement with Novatrust.  Ms Jones accepts that Kea has to give credit for those sums in its claims against Mr Watson.  But she says that Kea is entitled to appropriate the settlement monies to whichever it wishes of the claims it had against Spartan, or against Novatrust, including not only its claim to the return of the £129m, but its claims for interest and its claims for costs, and that that is conclusive so long only as the claims are not manifestly unsustainable.

571.   I was referred to three authorities on the point.  The first is the decision of the Court of Appeal in *Townsend v Stone Toms & Partners* (1984) 27 BLR 26 (**"Townsend"**).  The plaintiff, an employer under a building contract, sued the architect (Stone Toms) and the contractor (Laings).  Most (but not quite all) of the claims against Laings overlapped with the claims against Stone Toms in the sense that the damage was the same: for example, a claim against Laings for defective workmanship was almost entirely matched by a claim against Stone Toms for defective supervision, and a claim against Laings for overpayment by a claim against Stone Toms for wrongful certification.  There were also distinct claims against Stone Toms for defective design.  Laings made a payment into court of £30,000 which the plaintiff accepted.  He

continued to trial against Stone Toms.  The trial judge proceeded as follows.  He first assessed to what extent the plaintiff could have recovered on their claims against Laings.  He found that figure at £25,130.10 – in other words he assessed it to the last penny.  It is to be noted that the *claims* against Laings had been pleaded at a much larger figure (about £229,000) but the judge was obviously unpersuaded that claims of that size were well founded.  Against that the plaintiff had recovered £30,000 and his costs.  That meant that he had fully recovered from Laings all the damage he had suffered on defective workmanship, overpayment and consequential loss.  He therefore concluded that the plaintiff's claims for that damage had been fully satisfied and hence that the plaintiff had no further claim against Stone Toms for the same damage.  He therefore awarded him nothing for any claim where their liability was concurrent and co-extensive.

572.    The Court of Appeal dismissed an appeal.  Oliver LJ started with the proposition that where a plaintiff with concurrent claims against two persons has actually recovered part or all of his loss against one, that goes in diminution of the damages recoverable against the other, a plaintiff never being able to recover more than the total sum due (at 38).  Then (at 41) he said:

> "But granted for the moment that there may appear to be a question of apportionment of the sum between claims which are good, claims which are bad, and claims which are not concurrent, the mere fact that this may not be altogether straightforward does not, to my mind, absolve the Judge from attempting the task. It is said that the burden lies on the defendant to show that a part of the claim against him has already been satisfied, and to demonstrate the extent to which recovery has already been completed by the plaintiff; and reliance is placed on the decision in the case of *The World Beauty* [1970] P 144. Allowing this, however, it seems to me that that initial burden is discharged when the defendant shows acceptance of a payment in, in respect of causes of action where there are concurrent claims against him. If it is to be said that the payment in relates to some claims which are not concurrent, or which could not succeed against the defendant, the only person capable of providing that guidance is the plaintiff himself, who has accepted the payment. That the payment has to be taken into account in some way seems to me to be beyond doubt, and it is, of course, always open to a plaintiff who wishes to accept a payment in or thinks that its acceptance may cause him some embarrassment in the matter of apportionment to request an amendment of the notice of payment in to apportion the sum paid among the causes of action in respect of which it is paid. In the ordinary way that would, I think, solve any difficulty, though I would like to reserve the position — which of course does not arise here — where there may be grounds for asserting that the apportionment is collusive or is not made *bona fide* .
>
> Where, however, the party who has to bring the money into account himself provides no material to show how any apportionment should be made (or, as in this case, invites the Judge to deal with it in a particular way) the Judge has to do his best with what material he has, and the only material that he had in this case was the claims themselves. What he had to ascertain was what the plaintiffs had lost, and to what extent that loss had been mitigated or satisfied by what had been received. There was really no other reliable way of doing this except by assessing the true value of the plaintiffs' claims against Laings, and comparing it with the £30,000 received."

Purchas LJ agreed.  He said (at 51):

"If the appellants wished to appropriate the payment into Court against particular claims raised in their Statement of Claim, they could have required the payment into Court to be appropriated by Laings under the provisions of Order 22, rule 1, and then decided whether to accept the appropriated amounts or not.

The effect of the acceptance of the payment into Court in satisfaction of all claims between the plaintiffs and Laings must raise a *prima facie* presumption that where those claims overlap claims made against another defendant, that the latter claims have also been satisfied. The presumption is rebuttable by evidence led by the plaintiffs, and is no bar to their pursuing their claims if they can establish that that part of the payment into Court attributable to the "concurrent claims" does not fully satisfy the damage they have suffered under this head. Of course, if the payment exceeds the aggregate of damage suffered by the plaintiffs under both heads, i.e. the "concurrent claims" and claims against Laings alone, then no problem arises; both the second and third categories have received full compensation under the payment into Court and, therefore, in respect of the second category, the plaintiffs must give credit for the full value and there is nothing more to claim. The plaintiffs' claim must be restricted to damages claimed under the first category.

Apart from the special cases where the Court orders trial on liability only or, having determined liability, orders an inquiry as to damages, in normal actions for recovery of damages it is for the plaintiff to prove both the liability of the defendants whom he sues, and the loss he has suffered. *Qua* the remaining defendant after the plaintiff has withdrawn, for whatever reason, his claim against a co-defendant, nothing has happened to alter this position. The plaintiff, in order to obtain a judgment for damages, must prove that there is still a quantum of damage which has not been satisfied by a previous recovery whether as a result of a payment into Court or a prior judgment, in respect of which he is entitled to recovery from the remaining defendant or defendants….

Where the previous recovery stems from the acceptance of a payment into Court made and accepted not only in respect of the claim for damages under consideration, but also in respect of other claims not relevant, the Court must decide, and it is for the plaintiff to establish, by how much that part of the payment attributable to the instant claim falls short of the total value of the claim itself. For my part I cannot see how this exercise can be done without an investigation of the other claims, unless it be for the Court to say that the plaintiff has failed to establish that there is any excess of damage suffered in respect of which he, the plaintiff, is entitled to continue his action for damages against the remaining defendant."

Waller LJ agreed with both judgments. He said (at 56) that:

"It is for the defendant to show, in the first place, a *prima facie* case that the plaintiff has been wholly or partially compensated for the loss he has suffered. In my opinion, however, once there is a *prima facie* case that the plaintiff has received a sum of money which reduces the loss he has suffered from that particular event, it is for him to show, if it be the case, that some part of that sum was for another, unrelated, cause of action.

In this case, in my opinion, there can be no possible doubt that some part of the £30,000 paid into Court and taken out by the plaintiffs comprised damages which were for injuries for which damage was also being claimed against the defendant in this action. It was then for the plaintiff to show which, if any, parts of the £30,000 were not so attributable."

573. These citations seem to me to establish (i) that a plaintiff may before accepting a payment in require it to be apportioned among the various causes of action in respect of which it is paid and this would ordinarily solve any difficulty save in the case of collusion or lack of bona fides; (ii) where that is not done, it is for the plaintiff to satisfy the court in his claim against the remaining defendant (D2) how much damage he has suffered, and for that purpose to establish what is left of the claim having regard to the payment from the defendant with whom he has settled (D1); and (iii) it is difficult to see how this can be done except by an investigation of the other claims and assessing their true value.

574. The second case to which I was referred was *Banque Keyser Ullman SA v Skandia (UK) Insurance Co Ltd (No 2)* [1988] 2 AER 880 (*"Keyser Ullman"*), a decision of Steyn J. Here a group of banks sued an insurance company (Skandia) and also a firm of brokers (Notcutt). Notcutt settled on the first day of the trial. The banks accepted that they had to bring the settlement monies into account but claimed that if they could establish any separate claims against Notcutt, the payment should be allocated first to such separate claims and credit only given for the excess. In essence Steyn J accepted that proposition. He went on to consider whether the banks could establish the separate claims they relied on, considering first two arguments put forward by Chemical Bank.

575. The first was that Chemical had a separate claim against Notcutt for the costs of the action against Notcutt. Steyn J agreed. At 882b he said this:

> "I am satisfied that Notcutt would have been held liable in full for the agreed costs if the matter had proceeded to trial against Notcutt. The principle appears to be that if a plaintiff who receives payment from one tortfeasor establishes an additional separate claim against that tortfeasor, the payment is allocated first to that claim, and credit must be given in favour of the second tortfeasor only for the excess necessarily referable to the overlapping claim. That seems to me the approach indicated by the Court of Appeal judgments in [*Townsend*] … and by the actual decision of the Court of Appeal in *The Morgengry, The Blackcock* [1900] P 1, a decision which was not cited in [*Townsend*]. It also appears to me to be the approach which is required by an application of first principles."

The second argument for Chemical was that it had a claim to recover against Notcutt certain costs which had been disallowed against Skandia. Steyn J rejected this claim. At 884e he said this:

> "In [*Townsend*] the Court of Appeal held that, once there is a prima facie case that the plaintiff has received money from a second tortfeasor which reduces his loss, it is for him to show that the payment relates to some separate claim against the second tortfeasor. That involves showing that the separate claim was sustainable on the facts and in law. In my judgment Chemical's argument that they would have recovered against Notcutt the costs which were disallowed against Skandia ought not to succeed. I do not regard it as a reasonably foreseeable head of loss, and its recovery in an action against Notcutt is not demanded by the dictates of common sense or justice. It is too remote. In any event, Chemical have failed to discharge the burden of proving that this alleged separate claim would have been likely to succeed at a trial against Notcutt."

Steyn J then considered the claim of a bank described as Keysers. Keysers contended that it had a claim against Notcutt in respect of a particular loan (the first loan) on

which it had failed against Skandia and that it could apportion the whole of its settlement with Notcutt to that claim. Steyn J accepted this. At 884h Steyn J said this:

> "Keysers contends that they are entitled to appropriate the whole of their recovery under the Notcutt settlement to their loss under the first loan. If that is right, Keysers need give no credit at all to Skandia for money received under the Notcutt settlement. I am satisfied that Keysers' claim in respect of the first loan would have succeeded against Notcutt if the action against Notcutt had not been settled. Indeed the contrary was not seriously suggested. Counsel for Keysers took his stand on the principle that a plaintiff is entitled to appropriate a recovery from one defendant to separate additional claims, giving credit to a second defendant only to the extent that recoveries are necessarily referable to overlapping claims. That is a proposition which is supported by the decision in *The Morgengry* and by dicta in [*Townsend*]. It is also consistent with first principles, and I have applied it in relation to an issue between Chemical and Keysers."

576.    The propositions which I derive from this decision are as follows: (i) it is for a plaintiff to show that some part of the settlement with D1 relates to a separate claim that does not overlap with the claims against D2; (ii) to do that he has to establish that the claim is sustainable on the facts and in law; (iii) if he fails to discharge the burden that the alleged separate claim would have been likely to succeed at trial, he cannot allocate any part of the settlement monies to it; (iv) if he does discharge the burden of showing that there were separate claims against D1, he can appropriate the recovery under the settlement with D1 to those claims, and need give credit in his claim against D2 only for the excess (which is necessarily referable to the overlapping claims). These propositions seem to me entirely in line with the Court of Appeal judgments in *Townsend*.

577.    The third case to which I was referred was *Barings plc v Coopers & Lybrand (a firm)* [2003] EWHC 1319 (Ch), a decision of Evans-Lombe J. Here a number of companies in the Barings group had brought claims against their auditors. Two of these (the Coopers defendants) settled the claims against them at an early stage for £65m, the amount not being appropriated between the various claims or the various claimants; the third (D&T) was found liable at trial, but not in respect of the pre-1994 period. The claimant in the claim against D&T (BFS) appropriated the recovery from the Coopers defendants entirely to that period; D&T contended that it was not open to them unilaterally to do so – this was a matter for the Court and should only be done if the recipient were able to establish that that claim would have succeeded at trial. Evans-Lombe J was referred to both *Townsend* and *Keyser Ullman*. He held (at [1116]) on the basis of the passages from *Keyser Ullman* that I have referred to that the claimant (the Barings parties) might appropriate the settlement monies to the post-1994 claims as long as those claims met the necessary threshold. I agree that *Keyser Ullman* does establish that.

578.    He continued:

> "1116    …The real issue is the level of that threshold: must the court decide whether the claims would have succeeded at trial, or is some lesser scrutiny required?
>
> 1117    Mr Brindle for BFS pointed out that, in *Banque Keyser Ullman*, Steyn J gave the judgment from which I have quoted above at the end of a full trial. He

already had a clear and informed view on the strength of the costs claims which were in issue. He was therefore able to decide without any need for further evidence that the claim for disallowed costs referred to in the second passage would have failed at trial. Mr Brindle distinguished *Townsend* on the grounds that there was there only one claimant; the court there had been given no material at all on which to base an appropriation; and that the payment there was a payment into court, which is made under a special procedure and which it may be more difficult for a claimant unilaterally to appropriate to particular claims. By contrast, the general rule, where a creditor is owed two debts by a debtor and receives a payment which is not appropriated between them, is that the creditor may appropriate the payment between the debts as he thinks fit.

1118 Mr Brindle suggested that Steyn J would be horrified if he were told that his ruling required me to hear the full case against the Coopers defendants, over the course of several weeks, purely in order to decide this point. I agree with him, and would be very reluctant to make such a finding unless authority compelled me to do so. I do not think either *Banque Keyser Ullman* or *Townsend* do so compel me.

1119 *Banque Keyser Ullman* is explicable on the grounds suggested by Mr Brindle. In *Townsend* the Court of Appeal stated that even a payment into court may be appropriated to particular claims, by the claimant requesting an apportionment in the notice of payment in. That would be conclusive, as long as the apportionment were not collusive or not made bona fide (per Oliver LJ at page 41). In the case of a negotiated settlement, it seems to me that the normal rule allowing appropriation by the recipient should apply (*Halsbury's Laws*, 4th ed., volume 9(1) paragraph 956), subject to the sort of low-level threshold indicated by Oliver LJ. One of Mr Brindle's formulations of that threshold was whether the claims were obviously unsustainable. That seems to me a preferable approach to his alternative approach, by analogy to the Civil Liability (Contribution) Act 1978, which would pay no regard at all to the chances of the claimant making out his claim at trial."

579.   Ms Jones submitted that that meant that she could allocate the monies received under the settlement with Novatrust to any of the claims that she had so long only as they were not manifestly unsustainable. I agree that that is the submission that Evans-Lombe J appears to have accepted, and I fully understand and sympathise with the practical difficulties which faced Evans-Lombe J in circumstances where he did not wish to embark on a trial of claims that had been settled in order to decide the point – although it is noticeable that he in fact felt able on the material he had seen to conclude that it was very likely that if the Coopers defendants had been found liable at trial that their liability would have been in relation to post-1994 events. But with all respect to him I have great difficulty in seeing how his analysis is reconcilable with what the Court of Appeal said in *Townsend* about the burden on the plaintiff of establishing what is left of his claim against D2, or with what Steyn J actually did in *Keyser Ullman*.

580.   Mr McCaughran's submission was that in a case where a trial judge has sat through a trial and therefore is well placed to form a view as to whether or not particular claims would or would not have succeeded, then the judge ought to proceed on the basis of the view which he or she had of the claims. That seems to me to be more consonant both with the guidance from the Court of Appeal and with the exercise undertaken by

Steyn J in *Keyser Ullman* and I accept it.  I say nothing about what a Court should do in a case where it is not in a good position to form a view of the separate claims against D1, but where as a result of hearing the claims against D2 the Court is able to form a view of the claims against D1 despite the fact that they have been settled, then it seems to me that the claimant can only allocate the monies received under the settlement with D1 to the extent that the Court is satisfied that such claims are (in the words of Steyn J) *"sustainable on the facts and in law"* and *"would have been likely to succeed at a trial against [D1]"*.

### *Conclusion*

581.    That I think concludes the issues which counsel agreed should be decided in the judgment, and it only remains for me to thank them and their legal teams for the very great assistance they have given me on all the many points that have been argued, and for the patience which they and their clients have shown in circumstances where, for reasons neither of my choosing nor under my control, they have had to wait longer than I would have wanted for this judgment.