# Exhibit 2

A

Chancery Division

# Shalson and others *v* Russo and others (Mimran and another, Part 20 claimants)

## [2003] EWHC 1637 (Ch)

B  2003  March 14, 17–21, 24–28;                              Rimer J
        April 3, 4, 7–11;
        July 11

*Trusts — Constructive trust — Loan — Claimant fraudulently induced to loan money to defendant — Claimant bringing proceedings to trace money — Whether circumstances of loan giving rise to constructive trust — Whether issuing of proceedings amounting to implied rescission of loan contract —*
C  *Whether tracing remedy available*
*Trusts — Settlement — Sham — Settlor executing deed resettling trusts — Beneficiary under trust seeking to treat trust assets as his own — Settlor intending settlement to be genuine — Whether to be treated as sham*

Between 1997 and 2000 the first claimant was fraudulently induced by the first
D  defendant to part with some £20m on the understanding that it would be used for various joint business ventures. The first claimant deposited the moneys with the sixth defendant, a bank which was under the de facto control of the first defendant and which paid money received from its depositors into its account with P, a Swiss bank. In 1998 the first claimant and the first defendant set up a company, E, to be the vehicle for the acquisition of a yacht and over the next two years the first claimant made a series of deposits into E's account with the sixth defendant in pursuance of that venture. In 1999 the first defendant and the eighth defendant set up a company,
E  W, to be the vehicle for joint ventures between them. Between 1999 and 2000 the eighth defendant made four loan payments to W totalling US$7·5m, the money being paid into the sixth defendant's account with P. The first defendant fraudulently represented that the moneys were to be used in joint venture property transactions, but in fact the first defendant used the funds for his own purposes, including making loan payments to E towards the acquisition of the yacht. In 1999 the second defendant, a Jersey company which was independent of the first defendant, executed
F  a deed resettling on wide discretionary trusts the assets formerly held by it in three trusts settled by the first defendant worth a total of US$39m. In March 2001, the first defendant, the first claimant and E executed a charge in favour of the first claimant over the loans made to E by the first defendant. Subsequently the claimants, the first claimant and two companies under his control, brought proceedings claiming, inter alia, repayment of the £20m from the first and sixth defendants and damages from the second to fifth defendants for dishonestly assisting in the misappropriation of the
G  claimants' money. On 3 October 2001 the judge gave judgment for the claimants against the first and sixth defendants in the sum of £20m and ordered that the eighth and ninth defendants be joined in the proceedings. The eighth and ninth defendants brought a Part 20 claim seeking, inter alia, (i) to trace the US$7·5m loan payments through the sixth defendant's account with P and on into further assets acquired with that money, and (ii) a declaration that the settlement of 1999 was a sham whose assets were held on trust for the first defendant, on the ground that, although the
H  second defendant was not a knowing party to the sham nature of the settlement, the first defendant sought to use it as a vehicle into which he purported to put his own assets whilst in fact ensuring that they were available for his own use.

On the Part 20 claim—

*Held,* (1) that where a person was fraudulently induced to lend money to another the money advanced did not become subject to an immediately binding constructive

282
**Shalson v Russo (Ch D)**                                                                     [2005] Ch

trust in the lender's favour but became the borrower's property both legally and
beneficially; that, therefore, the eighth defendant could not establish a proprietary
interest in the loan payments on the basis of a constructive trust; that, however, in
those circumstances the loan contract between the parties was voidable and could be
set aside by the lender; that by issuing the Part 20 claim the eighth defendant had
evinced a sufficient intention to impliedly rescind the loan contract between him and
W; that upon rescission of a contract for fraudulent misrepresentation the beneficial
title in the money advanced revested in the lender who then enjoyed a sufficient
proprietary title to enable him to trace it; and that, accordingly, the eighth defendant
was in principle entitled to trace the money advanced to W into assets into which it
was subsequently applied ( post, paras 108, 119, 120, 122, 127).

   *Banque Belge pour l'Etranger v Hambrouck* [1921] 1 KB 321, CA applied.
   Dictum of Lord Browne-Wilkinson in *Westdeutsche Landesbank Girozentrale v
Islington London Borough Council* [1996] AC 669, 715, HL(E) not applied.
   *In re Goldcorp Exchange Ltd* [1995] 1 AC 74, PC considered.
   (2) Dismissing the tracing claim, that, with the exception of US$899,702 of the
first loan payment which had put the sixth defendant's current account with P into
credit, the rest of the money advanced had simply gone to reducing the sixth
defendant's liability to P and so had not become represented by an asset into which it
was possible to trace; that although the US$899,702 was in principle traceable into
the loans made out of the sixth defendant's account to E, in March 2001 the first
claimant became a good faith purchaser for value of those loans without notice of the
eighth defendant's claim to trace into them; and that, accordingly, the eighth
defendant's tracing claim failed ( post, paras 138–139, 140, 142, 158–160, 167,
218).
   (3) Dismissing the claim for a declaration, that a settlement executed by a settlor
and a trustee could not be regarded as a sham unless both the settlor and the trustee
intended it to be a sham from the outset, or later came to share such intention; and
that, accordingly, since the second defendant had intended the settlement to be
genuine the acts or intentions of the first defendant could not have made it a sham
( post, paras 188, 190–191, 215, 218).
   *Snook v London and West Riding Investments Ltd* [1967] 2 QB 786, CA applied.

The following cases are referred to in the judgment:

*Abdel Rahman v Chase Bank (CI) Trust Co Ltd* 1991 JLR 103
*Adam v Newbigging* (1886) 34 Ch D 582, CA; (1888) 13 App Cas 308, HL(E)
*Agip (Africa) Ltd v Jackson* [1991] Ch 547; [1991] 3 WLR 116; [1992] 4 All ER 451,
    CA
*Andrabell Ltd, In re* [1984] 3 All ER 407
*Ayerst v C & K (Construction) Ltd* [1976] AC 167; [1975] 3 WLR 16; [1975] 2 All
    ER 537, HL(E)
*Bank Tejerat v Hong Kong and Shanghai Banking Corpn (CI) Ltd* [1995] 1 Lloyd's
    Rep 239
*Bankers Trust Co v Shapira* [1980] 1 WLR 1274; [1980] 3 All ER 353, CA
*Banque Belge pour l'Etranger v Hambrouck* [1921] 1 KB 321, CA
*Barlow Clowes International Ltd v Vaughan* [1992] 4 All ER 22, CA
*Bishopsgate Investment Management Ltd v Homan* [1995] Ch 211; [1994] 3 WLR
    1270; [1995] 1 All ER 347, CA
*Box v Barclays Bank* [1998] Lloyd's Rep Bank 185
*Bristol and West Building Society v Mothew* [1998] Ch 1; [1997] 2 WLR 436; [1996]
    4 All ER 698, CA
*Chase Manhattan Bank NA v Israel-British Bank (London) Ltd* [1981] Ch 105;
    [1980] 2 WLR 202; [1979] 3 All ER 1025
*El Ajou v Dollar Land Holdings plc* [1993] 3 All ER 717
*Esteem Settlement, In re* 2003 JLR 188
*Falcke v Scottish Imperial Insurance Co* (1886) 34 Ch D 234, CA

**[2005] Ch**

A    *Foskett v McKeown* [2001] 1 AC 102; [2000] 2 WLR 1299; [2000] 3 All ER 97, HL(E)

*Goldcorp Exchange Ltd, In re* [1995] 1 AC 74; [1994] 3 WLR 199; [1994] 2 All ER 806, PC

*Halifax Building Society v Thomas* [1996] Ch 217; [1996] 2 WLR 63; [1995] 4 All ER 673, CA

*Hallett's Estate, In re* (1880) 13 Ch D 696, CA

B    *Hitch v Stone* [2001] EWCA Civ 63; [2001] STC 214, CA

*James Roscoe (Bolton) Ltd v Winder* [1915] 1 Ch 62

*Jyske Bank (Gibraltar) Ltd v Spjeldnaes* (unreported) 23 July 1997, Evans-Lombe J

*Leslie (R) Ltd v Sheill* [1914] 3 KB 607, CA

*Lonrho plc v Fayed (No 2)* [1992] 1 WLR 1; [1991] 4 All ER 961

*MC Bacon Ltd, In re* [1990] BCLC 324

*McCormick v Grogan* (1869) LR 4 HL 82, HL(I)

C    *Neste Oy v Lloyds Bank plc* [1983] 2 Lloyd's Rep 658

*Oatway, In re* [1903] 2 Ch 356

*Polly Peck International plc, In re (No 2)* [1998] 3 All ER 812, CA

*Quistclose Investments Ltd v Rolls Razor Ltd* [1970] AC 567; [1968] 3 WLR 1097; [1968] 3 All ER 651, HL(E)

*R v Clowes (No 2)* [1994] 2 All ER 316, CA

*Reese River Silver Mining Co Ltd (Directors of the) v Smith* (1869) LR 4 HL 64, HL(E)

D    *Small v Attwood* (1832) You 407

*Snook v London and West Riding Investments Ltd* [1967] 2 QB 786; [1967] 2 WLR 1020; [1967] 1 All ER 518, CA

*Space Investments Ltd v Canadian Imperial Bank of Commerce Trust Co (Bahamas) Ltd* [1986] 1 WLR 1072; [1986] 3 All ER 75, PC

*Stocks v Wilson* [1913] 2 KB 235

*Twinsectra Ltd v Yardley* [2002] UKHL 12; [2002] 2 AC 164; [2002] 2 WLR 802;

E    [2002] 2 All ER 377, HL(E)

*Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1996] AC 669; [1996] 2 WLR 802; [1996] 2 All ER 961, HL(E)

*Wigan v English and Scottish Law Life Assurance Association* [1909] 1 Ch 291

No additional cases were cited in argument.

F    The following additional cases, although not cited, were referred to in the skeleton arguments:

*Antoniades v Villiers* [1990] 1 AC 417; [1988] 3 WLR 1205; [1988] 3 All ER 1058, HL(E)

*Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1995] QB 375; [1995] 2 WLR 607; [1995] 2 All ER 769, CA; [1997] AC 191; [1996] 3 WLR 87; [1996] 3 All ER 365, HL(E)

G    *Barley v Walford* (1846) 9 QB 197

*Bradford Third Equitable Benefit Building Society v Borders* [1941] 2 All ER 205, HL(E)

*Briess v Woolley* [1954] AC 333; [1954] 2 WLR 832; [1954] 1 All ER 909, HL(E)

*Car and Universal Finance Co Ltd v Caldwell* [1965] 1 QB 525; [1964] 2 WLR 600; [1964] 1 All ER 290, CA

*Carreras Rothmans Ltd v Freeman Matthews Treasure Ltd* [1985] Ch 207; [1984]

H    3 WLR 1016; [1985] 1 All ER 155

*Casio Computer Co Ltd v Sayo* [2001] EWCA Civ 661, CA

*Clark v Urquhart* [1930] AC 28, HL(NI)

*County NatWest Ltd v Barton (Note)* [2002] 4 All ER 494, CA

*Derksen v Pillar* (unreported) 17 December 2002, Mr Michael Briggs QC

*Derry v Peek* (1889) 14 App Cas 337, HL(E)

*Diplock, In re* [1948] Ch 465; [1948] 2 All ER 318, CA                              A
*Downs v Chappell* [1997] 1 WLR 426; [1996] 3 All ER 344, CA
*Doyle v Olby (Ironmongers) Ltd* [1969] 2 QB 158; [1969] 2 WLR 673; [1969] 2 All ER 119, CA
*Dubai Aluminium Co Ltd v Salaam* [2002] UKHL 48; [2003] 2 AC 366; [2002] 3 WLR 1913; [2003] 1 All ER 97, HL(E)
*Dyer v Dyer* (1788) 2 Cox Eq Cas 92                                                  B
*Edgington v Fitzmaurice* (1885) 29 Ch D 459, CA
*Hagan v Waterhouse* (1991) 34 NSWLR 308
*Harrold v Plenty* [1901] 2 Ch 314
*Hornal v Neuberger Products Ltd* [1957] 1 QB 247; [1956] 3 WLR 1034; [1956] 3 All ER 970, CA
*JEB Fasteners Ltd v Marks Bloom & Co* [1983] 1 All ER 583, CA
*Jones (F C) & Sons (Trustee of the Property of) v Jones* [1997] Ch 159; [1996] 3 WLR 703; [1996] 4 All ER 721, CA                                                    C
*Kellar v Williams* [2000] 2 BCLC 390, PC
*Kitcher v Fordham* [1955] 2 Lloyd's Rep 705
*Kuwait Asia Bank EC v National Mutual Life Nominees Ltd* [1991] 1 AC 187; [1990] 3 WLR 297; [1990] 3 All ER 404, PC
*Lipkin Gorman v Karpnale Ltd* [1991] 2 AC 548; [1991] 3 WLR 10; [1992] 4 All ER 512, HL(E)
*Midland Bank plc v Wyatt* [1997] 1 BCLC 242                                          D
*Polhill v Walter* (1832) 3 B & Ad 114
*Richardson v Silvester* (1873) LR 9 QB 34
*Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378; [1995] 3 WLR 64; [1995] 3 All ER 97, PC
*Sinclair v Brougham* [1914] AC 398, HL(E)
*Slough Estates plc v Welwyn Hatfield District Council* [1996] 2 PLR 50
*Smith v Chadwick* (1884) 9 App Cas 187, HL(E)
*Smith New Court Securities Ltd v Scrimgeour Vickers (Assset Management) Ltd*         E
[1997] AC 254; [1996] 3 WLR 1051; [1996] 4 All ER 769, HL(E)
*Trustor AB v Smallbone (No 2)* [2001] 1 WLR 1177; [2001] 3 All ER 987
*Wilkinson v Downton* [1897] 2 QB 57

**CLAIM**

By a claim form dated 12 March 2001, the claimants, Peter Shalson, Promptcroft Ltd and Promptcroft (Netherlands) BV, brought a claim against   F
the defendants, (1) Onofrio Russo, (2) Cantrust (CI) Ltd, (3) Darleen Holding Co NV, (4) Darleen (UK) Ltd, (5) Homaco BV, (6) Westbond International Bank Ltd and (7) Enter Five Ltd, claiming, inter alia: (i) against the first and sixth defendants, repayment of the sum of £20m purportedly held by the sixth defendant and repayable on demand; (ii) alternatively against the first and sixth defendants restitution of £20m as moneys had and   G
received; (iii) declarations that all the assets held by the defendants representing or derived from the money deposited by the claimants with the sixth defendant were beneficially owned by the claimants; (iv) alternatively declarations that the money deposited by the claimants with the sixth defendant pursuant to the terms of a deed of agreement and declaration of trust dated 28 June 2000 was advanced for the specific purposes set out therein and was thereby impressed with a trust, the beneficial interest   H
remaining with the claimants until their express written consent to the release of such moneys; (v) declarations that the claimants were entitled to trace such money and/or the proceeds thereof into the hands of the defendants; (vi) declarations that each of the defendants dishonestly assisted

A   in breaches of trust by being parties to the deed of 28 June 2000 and/or facilitating the misappropriation of the claimants' money and were liable to account as constructive trustees therefor; and (vii) damages for breach of the deed of 28 June 2000.

    On 3 October 2001, Jacob J entered summary judgment against the first and sixth defendants and made an order permitting Jean-Claude Mimran and Oceanwave International Holdings Ltd to be joined in the proceedings

B   as eighth and ninth defendants. On 29 January 2002, the eighth and ninth defendants brought a Part 20 claim against the first to sixth defendants and Westland Portfolio Ltd and Hamilton Holdings Ltd claiming, inter alia: (i) a money judgment in the sum of US$11m against the first and sixth defendants; (ii) declarations that the eighth and ninth defendants were entitled to trace US$7·5m loaned to Westland Portfolio Ltd; and

C   (iii) a declaration that the Brookscastle settlement, settled by the second defendant on 4 March 1999 was a sham whose assets were held on trust for the first defendant.

    The claimants' claim against the seventh defendant and the eighth and ninth defendants' claims against Westland Portfolio Ltd and Hamilton Holdings Ltd were settled before the matter came to trial. The claimants'

D   claims against the second to fifth defendants were settled on 26 March 2003.

    The facts are stated in the judgment.

    *Anthony Trace QC*, *Michael Green*, *Louise Hutton* and *Oliver Michell* for the claimants.

    *Michael Pooles QC* and *Francis Bacon* for the second to fifth defendants.

    *Stephen Smith QC* and *Graham Shipley* for the eighth and ninth

E   defendants and Part 20 claimants.

    The first defendant did not appear and was not represented.

    The submissions of counsel are sufficiently set out in the judgment.

                                      *Cur adv vult*

F     11 July. **RIMER J** handed down the following judgment.

### Introduction

    1   These proceedings were started by a claim form dated 12 March 2001. The claimants are: (1) Peter Shalson; (2) Promptcroft (UK) Ltd ("Promptcroft"); and (3) Promptcroft (Netherlands) BV ("Promptcroft

G   BV"). Promptcroft BV is a subsidiary of Promptcroft, which is wholly owned by Mr Shalson. They were represented by Mr Anthony Trace, Mr Michael Green, Miss Louise Hutton and Mr Oliver Michell.

    2   The first defendant is Onofrio Russo, an Italian national. The litigation arises out of frauds he practised on the claimants and others. He induced Mr Shalson to part with £19·45m. The issue of the claim form was

H   followed by early interim orders of a freezing and interrogatory nature against Mr Russo and he was cross-examined about what he had done with the money. He breached various orders and on 9 July 2001 Neuberger J committed him to prison for contempt for two years. On 3 October 2001, Jacob J entered summary judgment against him for £20m and interest.

Mr Russo has taken no part in the trial.  Before it started, the claimants had    A
settled their claims against Enter Five Ltd, the seventh defendant, one of
Mr Russo's companies.

3    The claimants' claims against the second to fifth defendants remained
alive until day nine of the trial, when they were settled on undisclosed terms.
These defendants are: (2) Cantrust (CI) Ltd ("Cantrust"), a Jersey company;
(3) Darleen Holding Co NV ("Darleen NV"), a Cantrust subsidiary
incorporated in the Netherlands Antilles; (4) Darleen (UK) Ltd, a subsidiary    B
of Darleen NV; and (5) Homaco BV, another subsidiary of Darleen NV.
They were referred to at the trial as "the Cantrust parties" and were
represented by Mr Michael Pooles and Mr Francis Bacon.  The claims
against them were for compensation for their allegedly dishonest assistance
in breaches of trust and fiduciary duty committed by Mr Russo and for
tortious misrepresentation.  Cantrust held the shares in Darleen NV as    C
trustee of the Brookscastle settlement, a Russo settlement.  Cantrust is
independent of Mr Russo, but the claimants' position was that, despite
Cantrust's formal control of Darleen NV and its subsidiaries as such trustee,
it left Mr Russo to run these companies and to deal with other trust assets as
if they were his own.  A further claim brought by the claimants against
Cantrust—also disposed of on the compromise with the Cantrust parties—    D
was that the settlement was a sham and that its assets were in reality
Mr Russo's.  A holding that the settlement was a sham would have
facilitated the enforcement of the judgment against Mr Russo.

4    The sixth defendant is Westbond International Bank Ltd ("WIB"), a
company incorporated in Antigua and Barbuda.  WIB is a bank which was at
all material times under Mr Russo's de facto control, although some 70% of    E
its shares were held by the Brookscastle settlement.  It had an account with
PKB Privatbank AG ("PKB"), a Swiss bank based in Lugano.  Mr Shalson's
£19·45m was paid into that account.  On 3 October 2001, Jacob J entered
summary judgment against WIB for £19·45m.  On 9 October 2001,
Patten J made an order appointing provisional liquidators of WIB and on
28 November 2001 it was ordered to be wound up.  It has not taken part in
the trial.    F

5    The eighth and ninth defendants are Jean-Claude Mimran and his
company, Oceanwave International Holdings Ltd ("Oceanwave").  They
were referred to as "the Mimran parties" and are also victims of Mr Russo's
frauds.  On 3 October 2001, Jacob J acceded to their application to be
joined in the proceedings.  On 29 January 2002, they served a Part
20 claim, joining as defendants the claimants (hereafter "the Shalson
parties"), the Cantrust parties, WIB and two new parties, Westland    G
Portfolio Ltd and Hamilton Holdings Ltd, although in the latest version of
their pleading they abandoned their claims against Hamilton, the claims
both by and against Hamilton having been compromised in December
2002.  The Mimran parties were represented by Mr Stephen Smith and
Mr Graham Shipley.

6    The Mimran parties claim to have been swindled out of (at least)
US$7·5m by Mr Russo, which they too paid into WIB's account with PKB.    H
Their primary claim is to trace the US$7·5m into a valuable motor yacht
called the *Mosaique*, which was constructed and acquired pursuant to a joint
venture between Mr Shalson and Mr Russo.  That venture was carried out
through Edenton Ltd, in which Mr Shalson and Mr Russo each had a share,

A   held in turn through companies.  Following some complicated events in
    August 2001, Mr Shalson now has the sole beneficial enjoyment of the
    *Mosaique* (via its lessee, Braemar Ltd, a subsidiary of Promptcroft),
    although he claims that it is owned by an independent company called
    Cardinal Yachting Ltd ("Cardinal").  In these circumstances, the Mimran
    parties' tracing claim is resisted by the Shalson parties.  An odd feature of the
    tracing claim is that the Mimran parties have not joined as defendants either
B   of the companies which between them can be said to own the *Mosaique*—
    namely, Cardinal and Braemar.

    7   On 21 June 2002, Lightman J made an order requiring WIB's
    liquidators to write to all known creditors and any other persons they
    thought might wish to make a tracing claim.  He further ordered that the
    Mimran parties' and all other tracing claims, should be heard together.
C   Both WIB and Hamilton made such claims, but both have since
    withdrawn them.

    8   Apart from their tracing claim, the Mimran parties ask for money
    judgments for the US$7·5m and other sums against Mr Russo and WIB.
    With a view to assisting the enforcement of any judgment against Mr Russo,
    they too ask for a declaration that the Brookscastle settlement is a sham.  As
D   I have said, the Shalson parties had themselves originally claimed such a
    declaration, and the Mimran parties' original plan was (with certain
    reservations) to adopt and support that case.  Following the settlement of the
    Shalson parties' claims against the Cantrust parties, the Mimran parties
    pursued the challenge to the settlement on their own.

    9   I turn to the facts.  I will first say something about WIB, then set out
    the background to the Mimran parties' tracing and money claims, which
E   will also involve setting out the Shalson story.  I will then set out my
    decisions on those claims.  Finally, I will deal with the Mimran parties' claim
    to challenge the Brookscastle settlement.

*Westbond International Bank Ltd ("WIB")*

    10   WIB is at the heart of the case.  It had a banking licence from the
F   Government of Antigua.  The court has been assisted in understanding its
    affairs by the evidence of Nicholas Wood.  He and Andrew Conquest (both
    partners in Grant Thornton) are licensed insolvency practitioners and are
    the joint liquidators of WIB.

    11   WIB was incorporated in 1996 after which it carried on business as a
    bank accepting deposits from individuals, companies and other entities.  It
G   had about 75 account holders, its customers including the Government of
    Antigua.  Its customers used standard form documents when opening their
    accounts.  It maintained separate ledgers for each of its depositors, which
    recorded the receipts from them and the payments purportedly made on
    their behalf.  It would pay money received from its depositors into one or
    other of its own current accounts with PKB.  In relation to those deposits, the
    relationship between PKB and WIB was that of banker and customer, or
H   debtor and creditor.  WIB did not maintain separate accounts at PKB for its
    own depositors.  It simply issued statements to its depositors based on the
    ledgers it kept.  However, the WIB statements issued to its own customers
    did not reconcile with the PKB statements issued to WIB in respect of its own
    account. Mr Wood said in his witness statement:

A

"In particular [WIB] statements for individual depositors detail credits which are not reflected in the PKB account which, at least as far as the liquidators are aware from the documentation retained by them, are not reflected in any [WIB] statements.  The liquidators do not, therefore, accept that the [WIB] bank statements accurately reflect what funds were, in fact, received and paid out on behalf of individual depositors."

B

In cross-examination, Mr Wood said that the extent of the false accounting at WIB was "endemic" and that its customer statements were thoroughly unreliable.  All payment instructions with regard to the WIB accounts with PKB were given either by Mr Russo or by Dr Alberto Petronio, his associate, and Mr Russo had de facto control of WIB.

C

12   WIB's current account with PKB was divided into 13 sub-accounts in eight different currencies.  PKB issued separate statements to WIB for each of these accounts.  In addition, PKB would periodically transfer money from these accounts to fiduciary deposit, or call, accounts ("the deposit accounts").  These were held at financial institutions other than PKB, and earned higher rates of interest.  They were held in the name of PKB, not WIB, but were for the benefit of WIB.  PKB would produce statements to WIB for each such account.  The opening of the deposit accounts was governed by a trust agreement between WIB and PKB dated 15 March 1996.  By clause 1, WIB instructed PKB "to effect capital investments in the form of time deposits with foreign banks or foreign companies in [PKB's] own name, but for the account and at the risk of [WIB]".  Clause 3 provided that such deposits were: "effected within the limits of [WIB's] existing credit balances. It is deemed agreed that in the case of investments which [PKB] places at its own discretion, it may not utilise any of the credit facilities granted to [WIB]."  As regards the overall position as between PKB and WIB at any one time, PKB would prepare schedules which included the deposit accounts as assets of WIB.  A question I will have to answer is whether, in considering the Mimran parties' tracing claim, it is legitimate to treat the deposit accounts as consolidated with the sub-accounts and as so representing a single current account held by WIB with PKB.

D

E

F

13   WIB's accounts were audited by PricewaterhouseCoopers.  Their unqualified audit report for the period ending 31 December 1999 is dated 17 July 2000.  The balance sheet included as part of its assets WIB's deposits with other banks, and its liabilities included its customer deposits.  Note 8 to the accounts recorded that WIB had, as at 31 December 1999: "facilitated the placement with third parties of deposits totalling $102,343,852 (1998: $83,976,244).  The bank has no liability to the depositors in the event of third party defaults."

G

*The Mimran parties' story*

14   The Mimran parties are Jean-Claude Mimran and his company Oceanwave International Holdings Ltd.  Mr Mimran's principal claim is to trace through the WIB/PKB account and into the *Mosaique* US$7·5m he lent to Westland Portfolio Ltd.  He and Oceanwave also have separate claims for payment.  Mr Mimran is a French national living in Switzerland.  He met Mr Russo in 1981.  Mr Russo was then practising as a lawyer in Italy.  They shared an interest in vintage car racing, became friends and in 1995 they

H

A   began to engage in business deals together.  I summarise these deals under
the following sub-headings.

### The Global Sim Spa deal

15   In 1995, Mr Mimran agreed to buy 1·275m shares in Global Sim Spa
("GSS") at a particular price per share and to subscribe for a further 7·65m
B   shares at a lower price.  The attraction of the deal was that Brookscastle Ltd
(a Russo company) would later be committed to buying them back in
tranches, the last repurchase to be on 30 December 1996.  The price to be
paid by Brookscastle would represent a substantial profit to Mr Mimran, of
which he was to pay Mr Russo 10%.  The deal was recorded in an agreement
of 9 May 1995.  Mr Russo guaranteed the payment of the money due from
Brookscastle to Mr Mimran.
C   16   The terms of the agreement were varied by a letter of 20 August
1996.  This reduced the cash payments to be made by Brookscastle to
Mr Mimran to an amount roughly equivalent to his original investment in
GSS.   The balance which would otherwise have been paid to him
(representing his profit) was instead to be satisfied by the issue to him of
shares in Westbond Holdings Ltd ("Westbond").  The variation provided for
D   a schedule for the cash payments, and Mr Mimran received them in six
tranches between 30 September 1996 and 29 May 1997.  The total paid was
some US$7·9m.  The issue to Mr Mimran of shares in Westbond was
deferred, but in 1997 relations between him and Mr Russo were good and
Mr Mimran had no reason to doubt that his profit would in due course be
applied in the issue to him of Westbond shares for an equivalent value.
Mr Russo had told him that he owned 39% of Westbond.
E   17   In January 1998, Mr Russo and Mr Mimran agreed that the amount
of profit due to him on the GSS deal was US$8·5m.  They made an agreement
on 22 January 1998 under which Mr Russo was to subscribe on
Mr Mimran's behalf for 9·5% of Westbond's shares, which were to have a
value at the point of subscription exceeding US$8·5m.  If the subscription
was not effected by 28 February 1998, Mr Mimran was entitled to require
F   Mr Russo to pay him US$8·5m in cash, with interest from 1 January 1997.
In fact, it was not effected by 28 February 1998, but Mr Mimran felt secure
because he was still holding his GSS shares, and he also held some
Brookscastle Ltd shares as security for the performance of Mr Russo's
obligations.

### The January and July 1997 loans
G
18   In January 1997, Mr Russo asked Mr Mimran to lend him US$2m in
connection with an Italian stock deal.  Mr Mimran lent the money for a 5%
fee and at 5·4% interest.  It was repaid in full, with all interest and the fee, by
June 1997.  In July 1997, Mr Mimran lent Mr Russo US$2m on the same
terms, in connection with another Italian stock deal.  Mr Russo made a
repayment of some US$1,154,000 on 23 September 1997.  I presume this
H   loan was later repaid in full as there is no claim in respect of it.

### The November 1997 loan

19   In November 1997, Mr Mimran made an oral agreement with
Mr Russo under which he lent him US$2·5m in connection with another

Italian stock deal.  This carried a 7% fee for each two months the loan was     A
outstanding, plus interest at the LIBID rate.  Mr Russo made various
payments under this loan between 24 February 1998 and 27 December
2000.  He claimed to have repaid the principal of US$2·5m to Mr Mimran
on 2 February 2000, in circumstances to which I shall come.  In fact, he did
not so repay it: the pretended payment was a fiction.  Mr Mimran has a
claim against Mr Russo for judgment for this US$2·5m plus interest from
2 February 2000.                                                                 B

### Westland Portfolio Ltd: the proposal for a joint venture

20    This joint venture is the source of the Mimran parties' tracing claims.
The story started on 16 September 1998, at a meeting at Mr Russo's office at
37 Upper Grosvenor Street, London.  Mr Russo, Mr Mimran, Mr Hans
Jerne and Mr Paul Siegel were there.  Mr Jerne is, like Mr Mimran, also      C
resident in Switzerland, he is Mr Mimran's financial manager and looks
after his everyday business affairs.  Mr Siegel lives in New York and
occasionally acts on Mr Mimran's behalf.  Mr Russo's proposal at this
meeting was that he and Mr Mimran should form a company which would
invest in European property deals which Mr Russo would identify.  They
would own the equity equally.  The company was initially to be funded with
US$10m, to be provided by loans of US$6m by Mr Mimran and US$4m by      D
Mr Russo.  Any further loans would be provided by them in equal shares.
21    No projects had yet been identified, and Mr Mimran says it was
implicit that he would not be putting up any money for this venture until
Mr Russo had satisfied his obligations with regard to the US$8·5m profit due
to him in respect of the GSS deal.  Mr Jerne recalls that Mr Siegel made this
explicit at the meeting, and Mr Siegel's evidence is that he did just that.   E
Mr Mimran said he had asked Mr Siegel to try and achieve the issue to him
of his Westbond shares, and Mr Siegel said that he took Mr Russo to one side
and told him that, unless Mr Mimran got his 9·5% shareholding in
Westbond, there would be no investment by him in the new property
venture.  The matter of Mr Mimran's 9·5% holding in Westbond was
discussed.  Mr Mimran's preference was still to have the shares rather than
the cash and interest.  Mr Russo explained that the assets then held by      F
Westbond had only been acquired since the agreement of 22 January 1998
and that there would need to be a further agreement as to what needed to be
paid for the subscription for the 9·5% holding which was to be issued.  The
agreement would be with Oceanwave, which was to hold the Westbond
shares.
22    The agreement was later set out in a letter from Mr Russo to Hans     G
Jerne of 7 October 1998, which Mr Mimran approved and signed.  A further
letter of 12 October 1998 set out the amount to be subscribed for the 9·5%
holding.  This provided for two alternatives, and Mr Russo preferred the one
requiring him to pay US$12,682,320 for the shares.  Mr Mimran observed in
his written evidence—apparently only with hindsight—that it was odd that
Mr Russo should be willing to pay some US$12m to satisfy a liability of
US$8·5m; and it might be thought that foresight would have told him that.    H
But he said he presumed Mr Russo knew what he was doing, and so he left it
to him, his only concern being that he was issued with the 9·5% holding.  The
subscription was dealt with in an agreement having effect as from
29 September 1998.  By it, Westbond and its shareholders agreed that

[2005] Ch                                   Shalson v Russo (Ch D)
                                                            Rimer J

A    Oceanwave would subscribe for 1,050 Class E shares (representing the 9·5%
     holding) for US\$12,682,320.
         23   On 12 November 1998, Dr Petronio sent Mr Jerne forms for the
     opening with WIB of accounts both for Oceanwave and for Mr Mimran
     personally. Account numbers had already been allocated. On 17 November
     1998, the directors of Oceanwave (Mr Jerne and Mr Matzinger) resolved
B    that Oceanwave should open an account with WIB, which each director
     could operate on his single signature; and Mr Jerne returned to Dr Petronio
     the completed forms for its opening. Both Mr Mimran and Mr Jerne denied
     in their oral evidence that there was in fact ever any question of Mr Mimran
     opening a personal account, or that Mr Mimran ever considered doing so,
     and none was opened. Mr Mimran said in his oral evidence that he knew
     that WIB belonged to Mr Russo and that it had a banking licence from the
C    Antiguan Government. He knew nothing else about it, but assumed it was a
     responsible bank, because he regarded all banks as responsible. He accepted
     that Mr Jerne had his authority to open Oceanwave's account with WIB. He
     accepted that Oceanwave knew no more about WIB than he, Mr Mimran,
     did and that Oceanwave knew whatever he knew about it. Mr Jerne said he
     knew no more about WIB than Mr Mimran did. Mr Jerne was Mr Mimran's
     nominee in relation to the running of the Oceanwave account.
D        24   On 17 December 1998, Dr Petronio faxed Mr Jerne a credit advice
     from WIB purporting to show that US\$12,683,000 had been credited to
     Oceanwave's account with WIB. This was the subscription money for the
     9·5% holding in Westbond. On 21 December 1998, Mr Jerne sent Mr Russo
     instructions to transfer US\$12,682,320 from Oceanwave's WIB account to
     Westbond's WIB account, by way of subscription for the shareholding and
E    Oceanwave's account was debited accordingly.   On 8 March 1999,
     Mr Pratolongo (Westbond's treasurer) sent Mr Mimran what the latter
     regarded as genuine share certificates for Oceanwave's shareholding, and
     Mr Mimran regarded Mr Russo as having satisfied his obligation arising out
     of the GSS deal.

     *Westland Portfolio Ltd: the joint venture is implemented*
F
         25   Having received the share certificates, Mr Mimran was prepared to
     embark on the joint property venture which had been discussed in
     September 1998. I find that, had he known the truth of the circumstances
     surrounding the purported issue to Oceanwave of those shares, he would not
     have been so prepared. The truth, as Mr Russo was much later to admit,
     was that the credit to the Oceanwave account of the US\$12,683,000 was a
G    fictitious entry, and no money actually moved to Oceanwave at all: nor was
     there any true onward payment to Westbond. The creation by, or at the
     direction of, Mr Russo of the false pieces of paper purporting to evidence
     these transactions was just one aspect of the false accounting so widespread
     at WIB. The result was that any Westbond shares issued to Oceanwave were
     unpaid. In innocent ignorance of this, and in the belief that Mr Russo had
     duly honoured his obligations, Mr Mimran was now prepared to proceed
H    with the property venture, and this got going shortly afterwards. The vehicle
     chosen for it was Westland Portfolio Ltd ("Westland"), which was
     incorporated on 10 March 1999 in the British Virgin Islands.
         26   Westland's only shareholders were Mr Russo and Mr Mimran.
     Resolutions dated 10 March 1999 were signed appointing Mr Jerne and

Dr Petronio as its sole directors.  Mr Jerne was Mr Mimran's nominee, and    A
Dr Petronio was Mr Russo's.  Further board resolutions dated 22 March
2000 were signed, by which Dr Petronio and Mr Jerne resolved that
Westland should open an account with WIB, and that each could operate the
account on his sole signature.  Mr Mimran had wanted Westland to have its
account with UBS, but Mr Russo insisted it should bank only with WIB,
explaining that it would look odd if they did not use "his" bank for the joint
venture, and Mr Mimran agreed to go along with that.  He said in cross-       B
examination that he was reassured that WIB had an account with PKB "and
that normally the money would be at PKB".  Dr Petronio sent Mr Jerne the
account opening documents, Mr Jerne completed them and WIB opened an
account for Westland (No VAB 875 W9 1C).  Mr Mimran had not yet met
Dr Petronio, indeed he has never met him.  Mr Mimran said in cross-
examination that he was content that Mr Russo and his nominee should deal    C
as they thought fit with this account.  He trusted them both.  Mr Jerne's
function as a director of Westland was to keep abreast of the financial side of
the investments.  He too has never met Dr Petronio.  Mr Mimran does not
appear to have played any sort of an active role in Westland other than to
give Mr Jerne instructions.  Mr Russo's role was to find the investment
opportunities and to deal with legal formalities in relation to investments,
including instructing lawyers.  Mr Jerne did not check what Mr Russo was      D
doing: he knew he was a lawyer, he believed he was himself investing in
Westland, and did not believe he would take any shortcuts.  Dr Petronio
looked after Mr Russo's interests and managed WIB's day to day affairs.

27   I come now to the payments Mr Mimran made to Westland, which
are the subject of Mr Mimran's tracing claim.  When he did pay money to
Westland, he in fact paid it to the credit of WIB's account with PKB,        E
although he did not have access to its PKB bank statements.  But statements
of Westland's account with WIB were provided to Westland, Mr Mimran
saw these, and they showed the payments he had made as credits to that
account.  They also purported to show the payments others had made to its
credit, and the debits to it.  In the light of what has since been discovered, it is
clear that these statements were, in the latter respects, largely works of
fiction created by Mr Russo.   They lulled Mr Mimran into a false            F
understanding of the dealings with the Westland account and played a
material part in Mr Russo's fraud on him.

*Mr Mimran's payments to Westland*

*(a) US$3·5m*
                                                                              G
28   Mr Mimran was due to pay Westland his initial US$6m loan.
However, Mr Russo still owed him the principal of the November 1997
US$2·5m loan, and he agreed with Mr Mimran that he would pay this to
Westland towards satisfaction of Mr Mimran's US$6m loan obligation.
This meant that Mr Mimran only had to find US$3·5m.

29   On 8 April 1999, Mr Mimran transferred US$3·5m from his
UBS account to WIB's account with PKB, the reference for the transfer being   H
"VAB 975 W9IC", being Westland's account with WIB.  In his oral evidence
he described that loan as an interest-free, shareholder loan, which he said
could be considered as permanent capital, although it could only be regarded
as in the nature of loan capital.  When he made this payment, no specific

A   property investment had been identified, nor was there then any specific discussion about what it could be used for, but his evidence was that it could only be used for property purchases in Europe because that was what had been agreed with Mr Russo on 16 September 1998.

30   On 18 May 1999, the two Westland directors signed a further resolution that Westland should also open a bank account at UBS. Dr Petronio and Mr Jerne were again each individually authorised to operate it. There is no evidence of any further directors' resolutions of Westland ever being signed or passed. There were of course some meetings between Mr Mimran and Mr Russo about Westland's affairs.

B

31   On 2 June 1999, Mr Jerne complained to Dr Petronio that he had still not received bank statements for Westland's account at WIB since it was opened. In response, on 3 June 1999 Mr Jerne received a letter from Dr Petronio enclosing a Westland statement dated 31 May 1999 showing the payment of US$3·5m that Mr Mimran had made and purporting to show that Mr Russo had also paid his US$4m into the Westland account. The latter entry is now known to be a false one: Mr Russo had not paid any money in. The statement also purported to show that US$7·5m (a combination of the two credits) had been placed on deposit at Banque Paribas in Guernsey. That entry was also false. Mr Russo's purpose in creating this statement was to continue his deception of Mr Mimran. Mr Mimran saw this statement at the time. He also saw a further statement sent to Mr Jerne on 31 August 1999.

C

D

*(b) The Leipzig deal: the US$1·5m*

32   The first Westland deal that Mr Mimran recalls was one in Leipzig for the building of shops and commercial premises. Mr Mimran saw, but has since lost, a brochure relating to it. He understood from Mr Russo that Westland was to be partnered by AMEC plc, with each putting up DM5m. Mr Russo sent Mr Mimran a fax about this on 27 December 1999. The essence of its generalised information was that there was a joint venture in Leipzig being carried on through a vehicle called KIG Imobillengesellschaft mbH & Co ("KIG"), which Mr Russo described as being "the German joint venture company between us and AMEC plc". Mr Mimran's evidence was that he assumed that, by then, Westland had used up all the money earlier lent to it, because Mr Russo was now asking him to put up a further US$1·5m. Mr Mimran had not seen any evidence showing that, or how, the money had been used up. He accepted that, at that stage, he was content to let Mr Russo run Westland as he saw fit.

E

F

G   33   Mr Mimran remitted the US$1·5m on 27 December 1999. Mr Jerne handled the remittance, and transferred the money to WIB's PKB account. The money was credited to Westland's account with WIB on 28 December, as shown by a statement of account dated 31 December 1999. The statement also showed the purported transfer on the same date of US$2,594,834·65 (representing DM5m) to Hypo Vereinsbank in respect of the Leipzig project. That might suggest that Mr Russo was applying Westland's US$1·5m to the Leipzig project. Mr Mimran says the US$1·5m was advanced only for use in the Leipzig deal, he saw that statement at the time, and he would have drawn just that inference. In a sense Mr Russo was applying the US$1·5m to the Leipzig project: but in fact he was so applying it on behalf of Cantrust's interest (held through Homaco BV) in that project.

H

That is shown by a statement he created of Cantrust's Euro account with      *A*
WIB.  A statement he created of Cantrust's US$ account with WIB shows a
credit of US$2·6m being received as a gift on 28 December 1999.  That was
fiction.  There was no such credit.

### (c) The US$2·5m payment

34  Mr Mimran said in re-examination that he noticed from the early      *B*
Westland bank statements he had seen that Mr Russo had not paid Westland
the US$2·5m he had agreed to pay it by way of repayment of the November
1997 US$2·5m loan.  On 2 February 2000, however, there was a purported
credit to Westland's WIB account of US$2·5m.  Mr Mimran claims that (at
the time) he believed that Mr Russo had made this payment by way of
repayment of the loan, and so was satisfying the balance of Mr Mimran's      *C*
obligation to advance US$6m to Westland.  He said in cross-examination
that, by the time of this purported credit, there had been further discussions
with Mr Russo about property investments, because he had by then found
some deals, and of course the Leipzig one had been identified.  This credit
was also a fiction.  Mr Russo made no such payment, he simply created a
false credit entry enabling him to pretend to Mr Mimran that he had repaid
his US$2·5m.      *D*

### (d) The US$1·5m advance

35  In fact, Mr Mimran only learnt of the purported credit of US$2·5m
in May 2000.  On 7 May 2000, Mr Russo sent him some details about two
further deals he had identified for Westland—at Bamber Bridge, Preston, and
Castle Gate, Dudley—and provided a schedule recording that he had put      *E*
US$4m into Westland, and that Mr Mimran had put in US$3·5m, US$1·5m
and US$2·5m, the last figure being a reference to the purported loan
repayment.  These projects were said to need an investment of over £18m,
with an initial contribution by the end of May of £7·36m, or
US$11,334,000.  Mr Russo explained in his letter that Westland needed to
raise a further US$2,134,000 immediately.  He also explained that "we"      *F*
expect to engage in a further investment in June, requiring about £10m to
£15m; and that he had also "received more than one interest to buy the
[Leipzig] development in the region of DM240m which would give a return
of DM34m hopefully in the near future".  He made no suggestion that
Westland was about to buy Cantrust's interest in that development for
US$62·25m—which is what it purported to do by an agreement dated      *G*
19 May 2000 ("the first Westland agreement"), to which I shall come when
relating the Shalson story.

36  On 17 May 2000, Mr Russo wrote further to Mr Mimran, again
confirming that he had credited US$2·5m to the Westland bank account on
Mr Mimran's behalf and saying that a bank statement had been sent to
Mr Jerne.  He again made no mention of a proposal to commit Westland to
the first Westland agreement.  On 29 May 2000, Dr Petronio sent Mr Jerne a      *H*
Westland bank statement showing the US$2·5m credit in February 2000,
and purporting also to show that US$9·19m had promptly been placed on a
three month deposit.  Both entries were fictitious and recorded transactions
which had not happened.  On 28 July 2000, Dr Petronio sent more Westland

A    bank statements to Mr Jerne, which purported to show a credit to the
     account of US$1.5m paid in by Mr Russo—another false entry.
         37   Mr Mimran later asked Mr Russo if he had matched his December
     1999 US$1·5m loan—after the first US$10m, they were to make loans
     equally—and he said he had.  Some time before 14 September 2000,
     Mr Russo produced a schedule to Mr Mimran which purported to confirm
B    this.  It identified what each of Mr Russo and Mr Mimran were supposed to
     have deposited with Westland and so showed Mr Mimran as having
     deposited US$7·5m (US$2·5m from the November 1997 loan, plus the
     US$3·5m and the US$1·5m) and Mr Russo as having deposited US$5·8m.
     The total deposits from the two were therefore shown as US$13·3m.  It
     showed the amounts supposed to have been paid into real estate projects as
     US$15·5m, although the source of the extra US$2·2m is unclear.
C    Mr Mimran believed that Westland had at that stage invested this in the
     Leipzig, Preston and Dudley projects.
         38   On 14 September 2000, Mr Russo wrote to Mr Mimran and said he
     needed US$1·5m to complete the Dudley acquisition, which had been
     purchased for £10·77m.  He said he needed it by way of bridging finance and
     that Mr Mimran would be reimbursed "in maximum 30 days".  Mr Mimran
D    sent the US$1·5m to WIB on 18 September 2000.  He says that it was
     provided for the specific purpose for which it was requested, namely
     investment in the Dudley project.  He later received a credit advice note from
     WIB showing the US$1·5m as credited to Westland on 19 September.  He
     was not repaid within 30 days, or at all.  He says he asked for the money,
     although there is no written record that he did.  Challenged about this in
     cross-examination, he said, with some force, that "I do not know how it is
E    possible not to ask for the refund of [US$]1·5m" and added that Mr Russo
     told him in December 2000 that he would send him the money on the
     completion of a deal in Italy.
         39   On 7 November 2000, Mr Jerne asked Dr Petronio for bank
     statements for Westland for the third quarter of 2000 and October.
     Dr Petronio provided them on 1 December 2000.  They showed that
F    Mr Mimran's US$1·5m payment had promptly been paid to an entity called
     Investment Management and that on 2 October and 2 November 2000 a
     total of US$11·37m had also been paid to it.  Mr Jerne did not know who or
     what Investment Management was but did not ring Mr Mimran up to tell
     him what he had seen.  If he had, Mr Mimran would have told him he had
     never heard of Investment Management either.  Mr Jerne asked Dr Petronio
G    at some uncertain date what these transactions were, but got no response.
     On 9 January 2001, Mr Jerne wrote to Mr Russo to ask for an explanation
     of the transfers and of who Investment Management was.  The evidence does
     not disclose what the payments to it purported to be for.  They are not
     reflected in the PKB account.

     *(e) The US$1m*

H        40   In December 2000, Mr Mimran was in Africa.  Mr Russo wrote two
     letters to him on 5 and 7 December 2000.  In the former, he wrote that:

         "On the total purchase price of US$70m Westland will participate with
         equity for US$10m lent to the Westland in equal parts by both of us—of

your 5m, 1·5m will be credited from me directly on Westland Bank  A
account with Westbond on your behalf."

It is not clear what US$1·5m is there referred to, but Mr Mimran said it was
the money he had advanced in September.

41    Neither letter asked for an advance of US$1m. But on 7 December
2000, Mr Russo wrote to Mr Mimran's son David asking him to make two
transfers, one of which was US$1m to Westland's account. Mr Mimran's  B
evidence is that, as he was in Africa, he considered that David could handle
the matter of the further advance more easily for him, since he had access to
Mr Mimran's funds, and he had asked Mr Russo to deal with David. David
remitted US$1m to Westland on 11 December 2000. It was remitted from
his account with Goldman Sachs International.

42    The Shalson parties dispute that this US$1m was Mr Mimran's  C
money, or was lent by him. They say it was David's money. Mr Mimran
disagrees and asserts that it was his. David also disagrees and said in his
witness statement that it was paid "out of moneys that I held on [my
father's] behalf" and that it was his father's money. During his oral
evidence, David produced copies of bank statements of certain of
Mr Mimran's accounts at UBS and Credit Suisse as well as of his (David's)
account at Goldman Sachs. One of Mr Mimran's accounts was marked  D
"custodian of his children", of which he has five. US$2m was transferred
from that account to David's Goldman Sachs account on 2 September
1998. David said he was unaware that his father held any money as such a
custodian. On 31 August 1998, Mr Mimran instructed Mr Jerne to arrange
for the transfer of US$1·5m from another of his accounts at UBS (one not
suggesting that he held the money in it as custodian for anyone) to David's  E
account at Goldman Sachs, and to transfer the balance remaining to
another of Mr Mimran's accounts. The US$1·5m was transferred to
David's account on 2 September 1998. On 8 September 1998, a further
payment of US$1·5m was transferred to David's account from an account
Mr Mimran had with Credit Suisse.

43    David's evidence was that his account at Goldman Sachs was used  F
for the buying of stock, and the bank statements show that in September
1998 he bought some US$28m stock of Archer Daniels Midland Co. It was
purchased in David's name, and David said that he accounted to the revenue
for the tax in respect of any profits made on these holdings. He said that the
money used to buy them derived both from himself and, as the statements
show, from Mr Mimran; but he also explained that the account was in the
nature of a margin account, and that part of the required money was
borrowed by him from Goldman Sachs, a loan on which he paid interest.  G
Subsequent statements of David's account show payments being made to its
credit (for example, US$1m in October 1999), but this was not used to buy
more stock: the payments were required because the value of the stock had
gone down, and the bank wanted to reduce its exposure on the money it had
advanced to buy it. David's evidence was that Mr Mimran had provided the
required money. As at 30 November 2000 (shortly before the US$1m  H
payment to Westland), the state of account as between David and Goldman
Sachs was that the bank held stock for David valued at some US$32m and
David's account with the bank was some US$15m overdrawn. The US$1m
payment—which, in cross-examination, David said "my father instructed

297

[2005] Ch                                    Shalson v Russo (Ch D)
                                                          Rimer J

A   me to pay"—required an increase in that overdraft, although the bank was
    well secured for its repayment.

### The true position

    **44**   Mr Mimran claims to have made his payments totalling US$7·5m
    (US$3·5m, US$1·5m, US$1·5m and US$1m) to Westland in good faith, in
B   the belief that he was engaging in an honest joint venture with an honest
    partner.   On 4 April 2001, there was a meeting at Mr Russo's office.
    According to Mr Siegel, Mr Russo gave various inconsistent explanations of
    what he had done with Mr Mimran's money but the bottom line was that he,
    Mr Russo, had not paid Westland any of the money he was supposed to pay
    it, that he had taken money from WIB, and may have taken or borrowed
    money from other depositors' accounts.   Mr Siegel said in evidence that
C   Mr Russo changed his story "20 times" when he was questioning him.
    Mr Russo also admitted that he had fabricated paperwork which purported
    to show transactions with or by WIB which had not occurred.   These
    included false entries purporting to show credits to the WIB account deriving
    from him.   At a further meeting on 11 May 2001, Mr Russo admitted to
    Mr Siegel that the US$12,683,000 purportedly paid for the Westbond shares
D   was not real, that the payment was a mere paper transaction and that he,
    Mr Russo, had "made a mistake".   He again admitted that he had made up
    the paperwork showing contributions from him to the Westland account,
    including the $2·5m supposedly credited in February 2000.   The truth of
    those admissions is supported by the fact that none of the purported
    payments is shown on the statements of WIB's account with PKB.
E   Mr Mimran's investigations showed that none of his payments to Westland
    had been used for the benefit of Westland.   He claims he is the victim of a
    fraud Mr Russo played on him, and I find that he is.

### The Shalson story

    **45**   Mr Shalson was also a victim of Mr Russo's fraud, and his and
    Mr Mimran's stories are in part interlinked.   Mr Shalson met Mr Russo in
F   1995 and they and their families became close friends.   They holidayed
    together.   Mr Russo conveyed the impression of being a wealthy and
    successful businessman, with particular expertise in the field of currency
    trading and investment banking.   Mr Shalson undoubtedly was and is a
    wealthy and successful businessman.   He made his fortune in the plastics
    industry, and sold out in 1998 for about £85m.   Mr Russo told Mr Shalson
G   about WIB, that it dealt with the financial affairs of Westbond and that most
    of the US$400m deposited at WIB had been deposited by 15 wealthy
    individuals.   One was Mr Mimran, to whom Mr Russo introduced
    Mr Shalson in December 1997.

    **46**   From 1997 onwards, Mr Shalson and Mr Russo engaged in various
    ventures, or proposed ventures.   They resulted in Mr Russo persuading
    Mr Shalson to part with £19·45m to WIB, which Mr Shalson has lost.   It is
H   obvious, if I may say so, that Mr Shalson is no fool and he displayed some
    embarrassment in his oral evidence that he had allowed himself to become so
    easy a prey.   He explained that Mr Russo was an unusually charismatic
    character, blessed with remarkable interpersonal skills, whom he came to
    regard as a brother and in whom he developed complete faith and trust until

eventually he saw through him.  The scales did not, however, finally fall   *A*
from his eyes until about December 2000.

47   Mr Shalson was cross-examined at length.   Mr Smith, in his
submissions, said that his evidence was in part either unreliable or dishonest,
and he made a comprehensive attack on Mr Shalson's good faith.   I make
clear that I did not regard Mr Shalson as an untruthful witness.   On the
contrary, I regarded him as a straightforward and honest one.   In at least one
respect, there was an inconsistency between his oral evidence and what he   *B*
had earlier said on affidavit, and both versions cannot be correct.   I did not,
however, regard him as seeking to mislead the court.   He was, however,
unable to help the court on matters of detail, because he is obviously not a
details man, no doubt because he leaves matters of detail to others, in
particular to Mr Daniel Wolinsky, the finance director of one of his
companies, SGI Ltd.   Many of the questions that Mr Shalson could not   *C*
answer could probably have been answered by Mr Wolinsky, but he did not
give evidence.   Mr Smith was critical of this omission, but I cannot see any
ground for that.   It was for the Shalson parties to decide what evidence to
call, and they took the risk as to whether it was sufficient for the purposes of
their case.

### The Mosaique                                                            *D*

48   The first Shalson/Russo matter to which I will refer is the *Mosaique*,
the motor yacht which was the subject of their joint venture.   This was
primarily a pleasure venture, but it also had its commercial side (the
proposed chartering of the boat).   Mr Mimran's primary claim is to trace his
US$7·5m advances to Westland into the *Mosaique*.

49   In the summer of 1998, Mr Russo suggested to Mr Shalson that they   *E*
should build a 50 metre motor yacht together, use it for holidays and charter
it out.   This led to a meeting on 26 August 1998 between Mr Russo,
Mr Shalson, Mr Stillerman (a director of Fitzwilliam Research Ltd, trading
as BDO Stoy Hayward Wealth Management ("BDO")), and Mr Fraser, a
solicitor.   Mr Russo and Mr Shalson decided that they would buy from the
Proteksan boatyard in Istanbul a cruiser then under construction.   The cost   *F*
was US$14·5m plus any VAT payable.   The boat was to be named the
*Mosaique*.   Mr Stillerman's meeting note reveals that there were discussions
about how the boat was to be owned, and whether there would be
VAT advantages if it were owned by an overseas company.   VAT was the
subject of early discussion, and it was the avoidance of a potential liability to
VAT which led to the implementation in August 2001 of a complicated
scheme affecting the *Mosaique*.                                           *G*

50   BDO provided a shelf Isle of Man company, Edenton Ltd
("Edenton"), as the vehicle for the acquisition of the *Mosaique*.   Edenton had
two issued shares.   Mr Shalson's was held through BMS Second Nominees
Ltd.   Mr Russo's was held through Hamilton Holdings Ltd ("Hamilton"), a
Liberian company.   Finance for the boat's construction was to be provided
by loans to Edenton by Mr Shalson and Mr Russo equally.   Edenton needed
a bank account.   Predictably, Mr Russo insisted that it should use WIB, and   *H*
an account was opened there for Edenton on 22 November 1998.

51   Mr Shalson made a series of deposits to Edenton's account towards
payment of his part of the liability for building the *Mosaique*.   His first
payment was on about 1 September 1998 (in fact before the Edenton

*A*  account was opened).  This was for US$650,000, paid to the credit of WIB's account with PKB, and was by way of a deposit on the *Mosaique*.  He says his payments were loans to Edenton, were made solely for the purposes of the construction of the *Mosaique* and that Mr Russo knew he regarded these deposits as earmarked exclusively for the *Mosaique*.  A statement of Edenton's account with WIB for the period 22 November 1998 to

*B*  31 December 2000 shows various credits deriving from Mr Shalson, and also reflected in the PKB account.  It also shows various credits said to derive from the Brookscastle settlement and Hamilton.  Save with regard to one Hamilton credit, about which there is a query, none of the Hamilton credits is reflected by a transaction in the PKB account and one inference is that these are or may be fictitious.  But Hamilton had its own account with WIB, and there is evidence (which Mr Wood did not seek to question) supporting

*C*  the view that Hamilton did make substantial payments into its account between September 1996 and January 2001.  It is, therefore, possible that its alleged loans to Edenton were simply reflected in internal entries in the books of WIB, which did not need to be reflected in transactions in WIB's PKB account.

  52  On 29 January 1999, Edenton entered into an agreement with

*D*  Henley Trading Ltd for the construction of the *Mosaique*.  Mr Shalson's evidence is that, from August 1998 until the end of 2000, he was constantly involved in *Mosaique* matters.  He recruited the captain and chief engineer, he was in regular communication with the designers, the boatyard and the captain, and he flew to Turkey three times to inspect progress.  Mr Russo only visited the boatyard once.  I shall have to return to the more recent history of Edenton and the *Mosaique*, in particular to events in late 2000 and

*E*  2001, but turn now to the business deals between Mr Shalson and Mr Russo. In fact, although Mr Russo's practice was to refer to these deals as "his" deals, they were ostensibly Cantrust's deals in its capacity as trustee of the Brookscastle settlement.

### (a) The Telecom Italia flotation

*F*  53  The first investment opportunity in which Mr Russo involved Mr Shalson was the proposed flotation of Telecom Italia ("TI").  This was in December 1997.  The proposal was that Mr Shalson should subscribe for shares in TI, which could quickly be resold at a profit.  Mr Russo was to trade the shares through WIB.  Mr Shalson agreed, and on 13 May 1998 he transferred £1·25m to WIB's account with PKB.  He never saw any

*G*  documents relating to the deal.  Mr Russo later told him that he had sold Mr Shalson's shares at a profit and that he would retain the realisations at WIB in an account in the name of Pesha (PEter SHAlson).  He later produced statements showing that the original £1·25m investment had grown to £1·8m by the time of the AMEC deal, to which I shall come.  It is probable that the profit of £0·55m was fictitious, and it is not known what Mr Russo did with the original £1·25m.

*H*  ### (b) The Rotch Italia deal

  54  Mr Russo became interested in this deal in the autumn of 1998.  It involved the sale and leaseback of commercial premises in Italy.  Mr Russo invited Mr Shalson to take part.  They were to invest £27m: £20m from

Mr Shalson and £7m from Mr Russo.  Their investment was to be by loans    A
to a joint venture company set up by Mr Shalson's accountants, BDO Stoy
Hayward ("Stoy Hayward").  This was Seatride Ltd.  Seatride was in turn to
acquire a 50% holding in Rotch Italia SrL, which held the rights in Italy.
Mr Shalson engaged solicitors, Paisner & Co, to act for him on this
transaction, to whom Mr Russo provided documentation for them to
review.  Paisners had reservations about Mr Russo and the arrangements,
but Mr Shalson continued to have complete faith in Mr Russo, whom he       B
considered had achieved a handsome profit for him on the TI deal.
Mr Shalson says that Mr Russo assured him that the money would not be
used without his consent for anything other than their joint purposes.  On
2 October 1998, Mr Shalson transferred £5m by way of loan to Seatride,
which was paid to the credit of Seatride's account with WIB.  Mr Russo
produced statements showing that he too had purportedly credited £5m to    C
that account on 2 October 1998, and showing that £10m had then been
deposited at Banque Paribas in Luxembourg.  Nothing came of the Rotch
Italia deal.  Mr Russo constantly told Mr Shalson that it was going to be
"next month", and fruitless discussions went on until October 1999.
Mr Shalson believed his £5m loan to Seatride remained safely on deposit.

*(c) The AMEC joint venture*                                                D

55   In the autumn of 1999, Mr Russo told Mr Shalson he had done a
deal with AMEC Developments Ltd ("AMEC"), a subsidiary of AMEC plc.
He was to work in partnership with AMEC on commercial premises in
England and Germany.  A development in Leipzig, allegedly worth
DM206m, was said to be already under way.  Mr Russo proposed that he
and Mr Shalson should participate in half of a £50m joint venture:        E
Mr Shalson was to put up £20m, and Mr Russo £5m.  The vehicle proposed
for their partnership was Promptcroft BV, which was incorporated for the
venture.

56   There was little documentation about the deal, Paisners had
reservations about it and Mr Shalson pulled out of it in December 1999.  On
about 22 December 1999, Mr Russo spoke to Mr Stella of Paisners and told
him he had gone ahead on his own account.  Early in 2000, Mr Russo started  F
working on Mr Shalson again, extolling the deal's virtues.  He said they
could sell half their stake for US$50m profit within a year, probably within
three months; and that the funds would not be used on the project until he,
Mr Shalson, agreed.

57   Mr Shalson was persuaded.  He expected to own 25% of the
AMEC venture through Promptcroft BV.  Mr Russo explained that his       G
interest in the Leipzig venture was held through Homaco BV, a subsidiary of
Darleen NV, the joint venture vehicle being the partnership I have
abbreviated to KIG.  His interest in the English developments (at Dudley and
Preston) was held through Darleen UK (also a subsidiary of Darleen NV),
which owned 25% of the English joint venture company, Primequota Ltd.
Cantrust's consent to the introduction of Promptcroft to the venture was
required, because Cantrust was the parent of Darleen NV.  AMEC's consent    H
was also required, because otherwise it might be entitled to terminate the
joint venture, and so Mr Russo agreed to introduce Mr Shalson to Mr Early
of AMEC to obtain the consent.  Mr Shalson was induced by Mr Russo's
sales pitch to sign up to "the first trust deed".

A  *The first trust deed*

58   This was dated 17 February 2000.  It was between Mr Shalson,
Promptcroft BV, Mr Russo, Cantrust, Darleen NV and Darleen UK.  In
essence, the Russo companies declared that Promptcroft had a 50% interest
in their half of the AMEC joint venture.  Mr Shalson was to be introduced to
Mr Early.  He was also forthwith to deposit £7·5m at WIB, which was to be
B  held in his name, earn 12% interest and be repayable on demand.  Mr Russo
guaranteed its repayment.  The £5m Mr Shalson had lent to Seatride in
October 1998 was treated as repaid to him, re-lent to Darleen UK and
deposited with WIB.  Mr Shalson was also to pay a further £7·5m to WIB.
Both further deposits were to be held on the same terms as the first £7·5m,
and Mr Russo guaranteed their repayment as well.

C  *The first Westland agreement*

59   Mr Shalson said that in about May 2000 Mr Russo told him he had
found purchasers for the 50% interest in the AMEC joint venture not owned
by AMEC, and that the sale would realise the profit of £50m that he had
been promising.  The purchaser turned out to be Westland, of which
Mr Shalson had not previously heard.  Mr Russo had told him, however,
D  that the purchasers consisted of four investors, one of whom was
Mr Mimran.  Mr Shalson had met Mr Mimran in December 1997 and
believed him to be extremely wealthy.  He said that Mr Russo told him that
the investors were willing to pay a total of £62·25m.  On 17 May 2000,
Mr Shalson told Mr Stella that Mr Russo was intending to sign the sale
documentation the next day.  On 18 May 2000, Mr Shalson signed an
E  instruction for the payment of the final instalment of his investment in the
AMEC joint venture.  He did this because he was about to leave the country,
although payment was still only to be made on receipt of his further
instructions.
60   The first Westland agreement was entered into on 19 May 2000.  It
was between Cantrust (as trustee of the Brookscastle settlement) and
Westland.  In essence, Cantrust agreed to sell to Westland for £62·25m its
F  equity interest (held through various companies) in the joint venture
agreement with AMEC.  Westland was to pay the price by ten equal
instalments of £6,225,000 on defined dates between 30 June 2000 and
31 May 2001.  The shares were to be transferred on payment of the full
price.  The agreement was purportedly signed by Mr Russo for Cantrust and
by Mr Jerne for Westland.

G  *Mr Shalson's £5·7m payment*

61   Mr Russo faxed a copy of the first Westland agreement to Mr Stella
on 20 May 2000, who told Mr Shalson of it and faxed him a copy on 22 May
2000.  Comforted by sight of the agreement, Mr Shalson authorised the
payment of his final instalment in the AMEC joint venture.  He says that,
had he not been provided with a contract evidencing the Westland purchase,
H  he would have demanded the payment of the money he had previously
deposited much earlier than he did.  Shortly afterwards, Mr Russo told him
that the sale was being renegotiated.  I find that the signing of the first
Westland agreement provided a major incentive to Mr Shalson to pay the
further instalment.  He in fact paid £5·7m, representing the satisfaction by

him of his obligation under the first trust deed to provide a further £7·5m.    *A*
The difference of £1·8m was regarded as satisfied by (a) the £1·25m he had
put up on the TI deal plus (b) the profit of £0·55m he was supposed to have
earned on that deal, the combined amount of £1·8m being allegedly held for
him in his Pesha account with WIB.

*The second trust deed*

  62   This was dated 28 June 2000.  It was between Mr Shalson,    *B*
Promptcroft BV, Cantrust, Darleen NV, Darleen UK and Homaco.  It dealt
further with Mr Shalson's participation in the AMEC joint venture, the
details of which do not matter.  Of more significance is clause 8, headed
"[WIB] deposits", which acknowledged that Mr Shalson had deposited a
total of £20m with WIB.  The agreement provided that this was to be held in
Mr Shalson's name and was to be repayable on demand; and that no part of    *C*
it could be used in connection with the joint venture without Mr Shalson's
express agreement.  Clause 8.3.3(iii) provided that Mr Shalson could at any
time demand repayment of the £20m and that Mr Russo guaranteed its
repayment.

*The second Westland agreement*    *D*

  63   This was purportedly entered into on 30 June 2000 (the date it
bears), and superseded the first Westland agreement.  It was between
Cantrust, Darleen NV and Westland.  Although so dated, Cantrust did not
execute it until 9 October 2000, and it was then backdated.  Its complicated
details do not matter.  It provided for the purchase by Westland of Cantrust's
interest in the AMEC joint venture.  The price of £62·25m was payable to
Darleen NV.  Westland was to pay it by ten equal instalments of £6,225,000    *E*
each on specified dates between June 2000 and May 2001, the first three
dates being 30 June, 31 July and 29 September 2000, all preceding the date
Cantrust signed the agreement.  The agreement was purportedly signed on
behalf of Westland by Mr Jerne.

*Did Mr Jerne sign the two Westland agreements?*    *F*

  64   I shall make my finding later, but summarise the evidence here.  The
relevance of this is that the Shalson parties claim that the Westland
agreements were a dishonest sham.  They say they caused Mr Shalson to part
with more money to Mr Russo which he would not otherwise have done.
They also say that, but for the Westland agreements, they would have taken
action against Mr Russo earlier than they did.  Their case is that Mr Mimran    *G*
authorised Mr Jerne to sign the agreements, and so lent dishonest assistance
to Mr Russo's continuing fraud on Mr Shalson.  Mr Mimran's answer is that
he did not authorise Mr Jerne to sign the agreements, about which he knew
nothing, and Mr Jerne denies signing them.

  65   I have referred to the correspondence between Mr Russo and
Mr Mimran in May 2000, immediately before the signing of the first
Westland agreement, in which no reference to the transaction was made.    *H*
Mr Jerne's evidence is that he was unaware until after the start of these
proceedings that there was any agreement by which Westland was to pay
£62·25m to acquire the interest the subject of the Westland agreements: and
he says that Westland did not have the funds enabling it to enter into such

A  agreements.  He says he had never heard of any of the Cantrust parties until after the start of this action.  He says he would never have signed any such agreement on Westland's behalf and that his purported signature and initials on the two agreements are forgeries.  He said he first became aware of the Westland agreements, and that he had purportedly signed them, in the summer of 2001, although it was not until 28 May 2002 that he made a witness statement denying he had signed them and asserting that his
B  signatures and initials had been forged.  That statement was produced on the morning of the hearing of an interim application by the Shalson parties for summary judgment striking out the Mimran parties' claim.  At the hearing, Lightman J directed that the Shalson parties could serve on the Mimran parties questions arising out of the evidence they had put in, including Mr Jerne's statement of 28 May 2002.

C  66   I should refer to the pleadings.  The Shalson parties pleaded the two Westland agreements in paras 23 and 24 of the particulars of claim, and para 25 alleged that they were shams.  In their original defence, all that the Mimran defendants did was not to admit the agreements.  It was only by an amendment to it that they first alleged that Mr Jerne's signature was a forgery and that Mr Jerne had not signed at all.  The questions that were put to Mr Jerne following Lightman J's order included a reminder of the
D  Mimran parties' original defence in this respect, and Mr Jerne was asked why they had pleaded their case in the way they did and had not asserted then that Mr Jerne's signature and initials on the documents were forgeries.  Mr Jerne declined to answer those questions.

67   Mr Mimran said that he too was unaware of the existence of either of the Westland agreements until after these proceedings had started.  He
E  said he did not authorise Mr Jerne to sign either of them, and denied he had signed them.  He stood firmly by that in cross-examination.  He said no one could sign a £62·25m agreement such as that without authorisation, and Mr Jerne had none.  He said that he did not believe that Mr Jerne had signed either agreement, and that his signature was a forgery.  Mr Mimran was similarly unaware that Mr Shalson or any of his companies had any interest in the Lepzig, Dudley or Preston deals.  His understanding was that the only
F  investors in these various deals were Amec, Mr Russo (or his companies) and Mr Mimran.

*No instalments are paid*

68   Westland paid no instalments under either Westland agreement. Mr Shalson says that, between May and October 2000, Mr Russo
G  continually referred to the renegotiation of the first Westland agreement as the reason why.  In the meantime, Mr Shalson pressed for a sight of the amended agreement and a copy was eventually faxed to him on 10 October 2000, the day after it had been signed by Cantrust.

69   During this period, Mr Shalson pressed for payments from Mr Russo.  He believed Promptcroft BV was entitled to a share of the monthly instalments Westland was supposed to be paying.  On 7 July 2000,
H  Mr Wolinsky sent Promptcroft BV's bank details to Mr Russo, but no payment came.  On 9 August 2000, Mr Wolinsky wrote to Mr Russo asking if Westland had "now agreed to the way their participation is structured, to allow you to release our share of the first instalment?"  Still nothing was paid. At the same time, Mr Russo was supposed to be, but was not, making

payments for the *Mosaique*.  He made excuses to Mr Shalson as to why, one
of which was that his correspondent bank was having difficulties with
his SWIFT transmission system.  On 8 September 2000, Mr Wolinsky
complained to Mr Russo that the August interest of £200,000 due to
Mr Shalson on his WIB deposits had not been paid.  On 15 September 2000,
Mr Stella e-mailed Mr Russo that Paisners' account from June was still
outstanding.  On 16 October 2000, Mr Wolinsky reminded Mr Russo that
Mr Shalson had not received the September interest of £200,000, money in
respect of which Mr Wolinsky sent a chaser on 20 October.  It was obvious
that Mr Russo was in financial difficulty, and on 21 October Mr Shalson sent
him an e-mail complaining that he "really cannot accept this situation any
more.  Interest payments have been regularly promised by you to be
promptly paid, yet they are always late".  He said he was not prepared to do
business this way any more.  It was not just that the interest payments were
always late, he had been given continual promises since June 2000 of capital
payments under the Westland agreement, and nothing had been paid.  On
23 October, Mr Shalson e-mailed Mr Wolinsky saying that Mr Russo had
promised a payment of £7·5m that week, which of course was not made.
Mr Shalson admitted in cross-examination that by now he was very
concerned about the position.

70   So concerned was he that he covertly recorded a meeting with
Mr Russo at SGI's offices on 22 November 2000.  Mr Shalson said he did not
tell Mr Russo he was recording it because he still trusted him and it would
have damaged their relationship.  But he admitted that by then he also
thought that Mr Russo was not being honest with him.  The transcript of the
recording shows that Mr Russo appeared to contemplate that the Westland
deal would "not go through" but that he claimed he had received £6·45m
profit from the deal which he had to share with Mr Shalson.  Mr Shalson said
he believed him and that the reference was to the June instalment, although
that instalment should in fact have been only £6,225,000.  Mr Shalson said
he did not know why Mr Russo could not transfer his share of the payment
to him.  Mr Russo produced a list of assets he said he was willing to give
Mr Shalson by way of security for the £20m he owed him.  These included
various alleged business interests and his 50% shareholding in Edenton
(represented by one share held by Hamilton), which owned the *Mosaique*.
Mr Shalson said that at this stage he still believed that Mr Russo had funds
available, but that he could not get hold of them because of the problems
with his SWIFT system, although he accepted that he was doubtful about the
position.  I interpret the sense of his then attitude to be that his continuing
faith in Mr Russo was based on what he wanted to believe rather than on
what he actually believed.  He said in evidence that by now he realised that
Mr Russo had problems, and that he did not think he was being honest with
him, but that he did not believe he was trying to defraud him.

71   Mr Shalson had a further meeting with Mr Russo on 1 December
2000, which he also covertly recorded.  Mr Russo suggested that his
continuing payment problems were all because of a virus in the payment
system.  Mr Shalson accepted in his oral evidence that by this stage he
probably did not believe any of Mr Russo's excuses.  During this meeting,
Mr Shalson asked whether, were Mr Mimran to ask for his money from
WIB, he could be paid it, and Mr Russo said no.  He would face the same
problem, but he said Mr Mimran did not need his money.  Mr Shalson

A accepted in his evidence that, had Mr Mimran sought a repayment, he would have been affected by Mr Russo's problems just as he was. He suggested sending someone to see Dr Petronio with a view to finding out from him what was going on. He explained in his evidence that the purpose behind that was to see if Mr Russo was telling the truth.

 72 Mr Russo and Mr Shalson also discussed and agreed the giving of security to Mr Shalson over what Mr Russo said was an original picture by
B Cézanne, *Pommes et Oranges*, which Mr Russo claimed was worth between US\$20 and US\$30m and of which he produced a photograph. He said it had been in his family for 40 years. Mr Shalson believed him and also agreed that, come what may, he would not sell it for at least 12 months. Mr Shalson asked Mr Wolinsky to accompany Mr Russo to his house to collect the picture and then (as he did) arrange for it to be put in safe keeping with
C Christie's Fine Art Security Services Ltd.

*Mr Wolinsky visits Dr Petronio*

 73 Moving briefly ahead in the chronology, Mr Wolinsky had a meeting with Dr Petronio in Lugano on 14 December 2000. Dr Petronio explained that WIB's SWIFT system had been installed in about June 2000, and had
D started to cause problems in about September or October. He explained that WIB was being investigated by the Antiguan authorities and that Chase Manhattan, its correspondent bank in New York, had cut ties with it. He said he expected the problems to be resolved within two weeks. He said that 90% of the instructions to WIB were direct from Mr Russo. One of the matters mentioned was a £7·5m transfer due to Mr Shalson. Mr Russo had told Mr Shalson that Dr Petronio was handling it, but Dr Petronio said he
E was unaware of it and would find out about it. The result of the Lugano visit was relayed to Mr Shalson, who regarded it as further evidence that Mr Russo had been lying to him.

*The charge over the picture*

 74 Mr Shalson asked Mr Wolinsky to do some research on *Pommes et*
F *Oranges*. Mr Wolinsky's Internet search of 4 December 2000 disclosed that it was ordinarily displayed at the Musée d'Orsay in Paris, not at Mr Russo's house, and had originally belonged to Gustave Geffroy. Mr Wolinsky told Mr Shalson, who developed suspicions about the picture's authenticity. Mr Wolinsky also bought a book on Cézanne, which confirmed what the Internet had told him. On 18 December 2000, Mr Shalson arranged for the
G picture to be examined by a Cork Street art dealer, whose view was that it might be a mere copy. Mr Shalson then wrote to Mr Feilchenfeldt, who had contributed to the book Mr Wolinsky had bought, sending him the photograph Mr Russo had given him and asking his view. Mr Feilchenfeldt replied on 20 December 2000, although Mr Shalson did not see his reply until early January 2001. His opinion was that the picture was a copy. Mr Shalson says that he now realised Mr Russo could not be trusted. He
H said in cross-examination that he realised that Mr Russo had defrauded him, but he still did not consider that he had set out to defraud him from the outset. He was positive in his oral evidence that it was not until the results of the search order obtained in March 2001 that he had realised that Mr Russo had set out to defraud him from the outset. He may say that now, but it is

not what he said in his affidavit of 8 March 2001 sworn in support of the     *A*
application for that order.  There, in para 122, he deposed:

> "In view of the endless excuses that Russo has given, I believe that
> Russo never intended to use the funds for the stated purpose or, at least,
> had other alternative purposes in mind for them when he obtained them
> from me.  In short, it seems that he was not honest with me about the true
> position and his intentions from the very outset."                         *B*

Mr Shalson appreciated the difference between what he deposed to in March
2001 and his current oral evidence, and said he did not regard what he said
in March 2001 as accurate.

75   Even though Mr Shalson knew that the picture was a copy, he took a
pledge over it by a deed dated 26 February 2001.  It recited the second trust
deed, and that Mr Russo had agreed to procure WIB to repay (and had       *C*
guaranteed that it would repay) Mr Shalson's £20m and interest.  The
picture was not to be sold before the expiry of 380 days from 1 December
2000.  Mr Shalson said it made no sense that he should have taken this
security over a worthless copy: he could not explain why he did.

*The charge over the Hamilton share*
                                                                            *D*
76   Mr Shalson obtained further security for Mr Russo's obligations by
way of a charge over Hamilton's share in Edenton.  Mr Shalson said he
always understood that Hamilton held its share in Edenton as a nominee for
Mr Russo, and he referred to Mr Russo's letter to Mr Stillerman of 21 June
2000 in which he had written "[Hamilton is] . . . the nominee shipping
company which will hold 50% of the shares in Edenton on my behalf".  The
giving of this security had been agreed between Mr Shalson and Mr Russo    *E*
on 22 November 2000.  On 23 November, Mr Wolinsky sent Mr Russo a
stock transfer form in respect of the share for execution on behalf of
Hamilton.  The named transferee was Mr Shalson.  On 5 December,
Mr Wolinsky received the Hamilton share certificate and an executed stock
transfer form, signed by Henry Sherman on behalf of Hamilton on
1 December.  A register of members for Edenton shows that on 1 December
2000 Hamilton transferred its Edenton share to Mr Shalson, although       *F*
I presume this was written up much later.  I find that the intention was that
such transfer was intended to be only by way of security, although no charge
document had yet been executed.

77   On 18 December 2000, there was purportedly held an extraordinary
general meeting of Edenton, apparently attended by Mr Russo and
Mr Shalson.  The main purpose was to change Edenton's articles so as to    *G*
provide that its directors were to have no discretion to refuse to register any
share transfer from Hamilton in favour of Mr Shalson or whoever he should
direct.  I find that this was Mr Wolinsky's idea: he wanted to ensure that
Mr Shalson would have no difficulty in enforcing his security.  Both
Mr Russo and Mr Shalson signed the minutes.  It is obvious that in fact no
meeting took place on that date, nor were the purported minutes of it signed
then.  That is because a note of a meeting held on 15 January 2001 between   *H*
Mr Wolinksy and Mr Russo shows that one of the things they discussed was
the proposed passing by Edenton of the very resolution purportedly passed
on 18 December 2000 and, to that end, that "[Mr Russo] agreed to get the
documents signed by [Hamilton] and return them to [Mr Wolinsky]".  Those

A were the documents which, when signed, are now dated 18 December 2000. The choice of that date is a mystery. The only other significant event known to have occurred on that day was the throwing by the Cork Street art dealer of cold water over *Pommes et Oranges.*

78 The charge over the share was discussed by Mr Russo and Mr Wolinsky at their meeting on 15 January 2001, the note of which records that, having read through the charge document and made various
B amendments to it, Mr Russo signed it. The charge itself is by a document dated 2 March 2001 between Mr Russo and Mr Shalson. It is over the:

> "one share of £1 in . . . [Edenton] . . . which Shalson or such person as he shall direct now or hereafter holds as nominee on trust for Russo which shall, for the avoidance of doubt, not include the one share owned beneficially on behalf of Shalson by . . ."

C
The charge secured the due performance of Mr Russo's obligations under the second deed. The theory underlying it is that the Hamilton share transferred to Mr Shalson on 1 December 2000 had since been held by him on trust for Mr Russo. By the time of his oral evidence, Mr Shalson knew nothing about this transaction. The Edenton share register records that on 8 March 2001 he transferred the charged share to Charter Corporate
D Services Ltd ("Charter"). Mr Shalson denied all knowledge of Charter. I have no doubt that that was a truthful answer, and infer that Charter was a company someone else had decided would be a suitable nominee. To the question in cross-examination "What share was that?"—i e that referred to in the passage just quoted—his reply was: "I am not sure. Maybe it was the boat." As I have said, Mr Shalson is not a details man.

E
*The charge over the Edenton debt to Hamilton/Mr Russo*

79 Mr Shalson also obtained a charge over money allegedly owed by Edenton to Mr Russo. The documents leading up to this are suspicious. One is a purported assignment dated 10 February 1999 between (1) the Brookscastle settlement and (2) Hamilton. It is signed merely by Mr Russo, on behalf of Hamilton. It recites that Edenton owed Brookscastle
F US$1,515,000 and that Brookscastle had agreed to sell the debt to Hamilton for US$1,515,000. By the assignment, Brookscastle assigned the debt to Hamilton. That document, despite its purported date, was signed by Mr Russo on 23 January 2001, as shown by the notes of his meeting on that day with Mr Wolinsky. Brookscastle's signature had to be made by Cantrust, the trustee. But Cantrust declined to sign it because, as Mr Frith
G explained in an e-mail to Mr Russo on 16 February 2001, there was "no way we could sign such a long backdated document, in particular as the trust was not established until 4 March 1999".

80 So Mr Russo thought again and produced an assignment dated 18 December 2000—again that special date—purportedly between Hamilton and himself. It recited that Edenton owed US$7·18m to Hamilton, and that Hamilton had agreed to sell the debt to him for
H US$7·18m. By the assignment, and in consideration of US$7·18m allegedly paid by Mr Russo to Hamilton, Hamilton assigned the debt to Mr Russo. Mr Russo signed both for himself and Hamilton. There is of course no doubt that the document was created after 16 February 2001 and backdated. Its form is, mutatis mutandis, identical to the purported assignment of

10 February 1999. It is unlikely that Mr Russo was able to pay US$7·18m to   A
Hamilton at the time, and I would be inclined to infer that he paid it nothing,
although if Hamilton was a mere nominee for him, perhaps he would not
have needed to pay it anything. Mr Shalson said he knew nothing about the
alleged loan from Hamilton to Edenton.

  81   The charge of the loan to Mr Shalson is dated 2001, with the day and
month left blank, although it was probably executed on about 1 March
2001, as I find it was. It was signed as a deed by each of Mr Russo,   B
Mr Shalson and Edenton. Recital (A) recited the second trust deed and
Mr Russo's and WIB's obligation to pay Mr Shalson £20m. Recital
(B) recited that "Russo and certain others on his behalf" had lent Edenton
the eight sums listed in schedule 1, being loans allegedly made between June
1999 and February 2000 (the last is for US$1,515,000, the amount referred
to in the phoney assignment of 10 February 1999) and totalling   C
US$7,592,130. None of the listed payments is reflected in credits in the
PKB account. By clause 1, Mr Russo and Edenton agreed that the loans were
to be repayable on three months' notice by Mr Shalson. By clause 2,
Mr Russo assigned the loans to Mr Shalson by way of security for the due
performance of his obligations under the second trust deed.

  82   The deed does not expressly identify what, if any, consideration
Mr Shalson gave for the charge. Its terms had, however, been under   D
negotiation between Mr Russo and Mr Wolinsky for some time and at their
meeting on 23 January 2001 Mr Russo sought to have the notice period in
clause 1 extended to six months, but Mr Wolinsky stood firm, Mr Russo
agreed and he signed the charge. When considering the issues, I shall return
to the question of whether Mr Shalson can be regarded as having given value
for this security.   E

*The Mosaique VAT scheme*

  83   The *Mosaique* raised a potential VAT problem. It was being built in
Turkey and was to be tested outside EU waters, but entry by it into an
EU port would trigger a liability to account for VAT on its value. Mr Shalson
said the need for VAT planning had been a focus of the project from its early
stages. BDO, Mr Wolinsky and Mr Russo had all made inquiries about it.   F
Mr Adam Katten is a director of BDO. His work includes advising wealthy
individuals on aspects of their financial affairs. He began to advise
Mr Shalson in about February 1998, but his main involvement with the
*Mosaique* started on 22 January 2001, when he had a meeting with
Mr Wolinsky, who asked for assistance with various tasks related to the
*Mosaique*. Mr Katten had, however, had at least some prior involvement in   G
the project: one task he had performed in 1999 was to assist in setting up a
procedure for the approval of payments to the contractors and designers
working on the *Mosaique*. Under the procedure, the directors of Edenton
(who included Bernard Galka) sought the approval of Mr Shalson and
Mr Russo before approving any payments by Edenton.

  84   Mr Katten's evidence is that he was aware, by early 2001, that
Mr Shalson "either directly or indirectly owned the entire share capital in   H
Edenton and owned the right to the repayment of all the loans made to
Edenton to fund the construction of the *Mosaique*". He said he derived that
from Mr Wolinsky, although it is inaccurate since in early 2001 Mr Shalson
was at most a chargee of the Hamilton share and of the loans to Edenton.

309

A  Nevertheless Mr Katten proceeded on the basis that Mr Russo had no further interest in the *Mosaique* and that he did not need to communicate with him. He was, in particular, concerned with the VAT problem, and Mr Shalson had been advised by BDO that, to minimise VAT, a scheme would need to be implemented. Various schemes were suggested.

85  On 21 March 2001, a brokerage company called Navigator SAM
B  sent Mr Shalson a valuation of the *Mosaique* as being within the range US$24m to US$25m. Mr Shalson could not explain why, but thought it might have been to do with insurance, although I suspect it probably had more to do with the VAT scheme. On 11 May 2001, Mr Katten wrote to Mr Wolinsky and recommended the so-called IOM yacht leasing commercial charter option. By then, the *Mosaique* was nearing completion and would soon be ready to enter EU waters.

C  86  The VAT scheme as implemented started from the premise that Mr Shalson owned the entirety of Edenton and the right to the repayment of all loans made to Edenton to construct the *Mosaique*. Most of the documents evidencing the transactions were executed on 15 August 2001. Mr Shalson's evidence is that he was not involved in the implementation of the scheme, but says he was "generally aware that a VAT scheme was being
D  devised and implemented during 2001 to minimise the impact of VAT in relation to the *Mosaique*". He denies that it was any part of his intention to defeat the claims of anyone to an interest in the *Mosaique*, or to make it more difficult for others to make such claims. I will come to the steps in the scheme in a moment, but mention first that, on 15 August 2001, Mr Shalson appears to have taken steps to enforce his rights as a chargee of (a) the Edenton loans from Mr Russo, and (b) Hamilton's share in Edenton. By a
E  letter of 15 August 2001 to Mr Russo, Mr Shalson referred to certain alleged payment demands he had earlier served and claimed he was enforcing his security over the loans. On the same day, as attorney for Mr Russo, he assigned the loans to himself and recorded that:

F      "The value of the loans shall constitute a realisation by Shalson under the loan and assignment and the liability of Russo under the Russo guarantee shall be reduced by that amount."

On the same day, also as attorney for Mr Russo, he purported to transfer Mr Russo's beneficial interest in the Edenton share to himself, and recorded that the value of the share should effect a like realisation and reduction of Mr Russo's liability to him. I do not understand on what basis Mr Shalson
G  claimed to do either of these things. Mr Trace suggested that he was exercising his powers of sale as a mortgagee, but he plainly was not. I infer that he was purporting to exercise a right of foreclosure, and doubt whether the exercise was effective to achieve the intended result. I turn now to the steps in the scheme affecting the *Mosaique*.

87  First, Mr Shalson, Edenton and Redshore Ltd ("Redshore") entered into a novation agreement. Redshore is a British Virgin Islands company
H  owned by Mr Shalson. Under the agreement, Mr Shalson released Edenton from its obligation to repay him the £13·2m due to him (representing his own loans and those whose benefit he claimed to have acquired by exercising his rights as a chargee), and Redshore was recognised as the lender (and creditor) in his place. Edenton's agreement to that is reflected in the board

minutes of a meeting purportedly held on 10 August 2001. Redshore is a    A
nominee for Mr Shalson.

88   Second, Edenton sold the *Mosaique* to Cardinal Yachting Ltd
("Cardinal").   Cardinal is said by Mr Katten to be "an independent
professional yacht leasing company incorporated in and operating from the
Isle of Man" although he agreed that it was set up specifically for this
transaction.  The importance of a sale to Cardinal was that it was considered    B
that, for the VAT scheme to work, it was necessary for the *Mosaique* to be
held by a yacht leasing company, which Cardinal was and Edenton was not.
The documents relating to this sale are a bit of a mystery.  On 31 July 2001,
Edenton issued an invoice to Cardinal for £13·2m, plus VAT of £2·31m, for
the sale to it of the *Mosaique*.  The invoice stated that the *Mosaique* was
"sold subject to execution of bill of sale".  Edenton's VAT return for the
quarter to 31 July 2001 included £2·31m by way of VAT on an alleged sale    C
during that quarter.  According to a memorandum prepared by Mr Katten
on 2 August 2001, Cardinal was a dormant company immediately before the
sale.  If a sale was effected on 31 July 2001, it is difficult to understand
Edenton's board minutes of 10 August 2001 recording a directors'
resolution to sell the *Mosaique* to Cardinal for £13·2m and to issue a bill of
sale in favour of Cardinal "for £1 plus other consideration": it would seem    D
that the sale had happened 11 days before.  Mr Shalson said he did not have
a clue what was going on here.  There was no question of any price being the
subject of an arm's length negotiation.  It was presumably simply taken from
a valuation, which is what I understood Mr Shalson to suggest.  No one from
Cardinal inspected the boat, which was in Turkey.  Nor was there any
formal written contract between Edenton and Cardinal.

89   On 15 August 2001, a bill of sale in favour of Cardinal was signed,    E
recording the consideration for the purchase of the *Mosaique* to be "£1 plus
other valuable consideration".  On the same day, Mr Banks of BDO wrote to
an insurance broker confirming that Cardinal was now the owner of the
*Mosaique*, but that Braemar Ltd would be paying the insurance premiums
and would be entitled to recover any insurance money.  Despite that
confirmation, on 16 August 2001 Allen & Overy wrote to Withers (solicitors
for the Mimran parties), saying they had been asked by Mr Shalson to set out    F
the details of the ownership of the *Mosaique*.  They wrote that: "As at the
date of this letter, the yacht is wholly owned by [Edenton]."  They also said
that Mr Shalson had enforced his security over the Russo/Edenton loans and
over the Hamilton share in Edenton.  They said that Mr Shalson now wholly
owned Edenton through his nominees, BMS Second Nominees Ltd and
Charter Corporate Services Ltd.  Mr Shalson doubted that he had himself    G
provided that information to Allen & Overy, and thought Mr Wolinsky
might have given the instructions.  There is no evidence explaining why that
letter was written.  On 16 August 2001, Mr Wilkes of Allen & Overy made a
witness statement which referred to the enforcement by Mr Shalson of his
securities, but made no mention of the sale to Cardinal.  That statement was
used in support of an application to the court on 3 October 2001, and even
then no updating evidence was provided to the court to explain that in fact    H
the *Mosaique* had been sold to Cardinal.

90   Third, and in order to enable Cardinal to buy the *Mosaique*,
Redshore agreed to advance £13·2m to Cardinal, the repayment of which
was to be secured by a mortgage by Cardinal of the *Mosaique* to Redshore.

A   The loan was a 25-year, interest-free one governed by an agreement of 15 August 2001. Clause 4(c) provided that the terms and conditions of drawdown could be satisfied by Redshore "procuring the delivery of [the *Mosaique*] with unencumbered title in favour of [Cardinal]". The effect of this was that delivery of the *Mosaique* to Cardinal was equivalent to the drawdown of the £13·2m, so that no money actually changed hands. The *Mosaique* was in Turkey and there is no evidence that it was in fact delivered

B  to Cardinal. A condition precedent of the loan was that Cardinal should have entered into a finance lease with Braemar and a put option agreement with Redshore. Braemar is an Isle of Man company owned by Mr Shalson through Promptcroft.

    **91**  Fourth, Cardinal entered into this finance lease. It leased the *Mosaique* to Braemar for 25 years for £528,000 a year, a sum totalling

C  £13·2m over 25 years, so enabling Cardinal to pay off its 25-year interest-free mortgage to Redshore. Reverting to the mortgage over the *Mosaique*, clause 6 provided that the Cardinal loan was to be repaid to Redshore out of the Braemar rent payments, and clause 8 limited Redshore's right of recourse to Cardinal to that rent, any VAT received and retained by Cardinal, the *Mosaique*, its net sale proceeds (less any sales tax to which Cardinal might be liable, and Redshore also agreed to indemnify Cardinal against such tax)

D  and any insurance proceeds in respect of it. Mr Katten said that rent payments were in fact made to Cardinal, which would then make its mortgage payments to Redshore—he said that money actually moved between the three companies. The lease also provided for an annual charge of £15,000 payable by Braemar to Cardinal to cover the start-up costs of the leasing and internal and administrative expenses: this was Cardinal's reward

E  for making the scheme available and taking part in it, and for all practical purposes that was all that Cardinal got out of it. Braemar was given a call option to buy the *Mosaique* from Cardinal at any point during the currency of the lease, at a price equal to the amount of the loan then outstanding to Redshore. A side letter provided that this option could be exercised by any of Villach Holding BV ("Villach"), Promptcroft and Mr Shalson. Villach is

F  also a Shalson company.

    **92**  Fifth, Redshore and Cardinal entered into a put option agreement, under which Cardinal could compel Redshore to buy the *Mosaique* at the same price as that payable under the call option. A side letter described the call option as having priority over the put option. In a further side letter, Cardinal confirmed it would exercise the put option if asked to do so by Redshore. By a letter of 9 November 2001, Cardinal confirmed to Braemar

G  that which it said was implicit in the finance lease, namely that any gain realised by Cardinal on a sale of the *Mosaique* would be paid to Braemar.

    **93**  Mr Katten gave evidence as to the value of the *Mosaique*. On 3 August 2001, John Winterbotham & Partners valued it for the Royal Bank of Scotland plc at US$19m, then equivalent to £13,266,396. This included a small premium which a buyer wanting immediate delivery might pay. The fair market value was otherwise stated to be US$17·15m, or £11,974,668.

H  The total cost of building the *Mosaique* was US$16,789,593·73, or £11,809,436 at the exchange rate prevailing on 14 August 2001. Mr Katten's evidence is that the sale of the *Mosaique* to Cardinal would ordinarily result in a VAT liability, but that Manx customs approved an arrangement whereby, instead of the VAT being charged by Edenton and

later recouped by Cardinal, a VAT offset would be permitted.  He says    *A*
Cardinal was able to reclaim the VAT because it was acquiring the *Mosaique*
for the purposes of its business, that of yacht leasing.  The arrangement made
the sale overall VAT neutral.  He says that the objective of the whole scheme
was to avoid the payment of £2·31m of VAT that would have been payable
on the entry by the *Mosaique* into EU waters.

94   In November 2001, Mr Shalson was suffering from cashflow    *B*
difficulties and needed to raise money.  He did so by arranging for Cardinal
to borrow £8,994,755 from Capital Bank plc ("Capital"), which Capital
paid to him.  The repayment to Capital was secured by a mortgage of the
*Mosaique* and by a personal guarantee from Mr Shalson.

*The issues*

*(1) The Mimran parties' tracing claim*    *C*

95   The Mimran parties claim to be entitled to trace the US$7·5m paid
to Westland into (i) the *Mosaique* or its proceeds, alternatively (ii) the
Edenton debt to Hamilton/Russo, alternatively (iii) the Hamilton share in
Edenton.  The claim raises many issues.  I deal with them under the
following sub-headings.

*D*

*(a) For what sum are the Mimran parties entitled to make a tracing claim?*

96   The only issue here is as to how much Mr Mimran and/or
Oceanwave paid to Westland.  There is no evidence that Oceanwave paid
anything to Westland, and I find it did not.  The only payments made to
Westland were made by Mr Mimran and his son, David.  Mr Mimran claims
that all the payments were made either by him or on his behalf, and totalled    *E*
US$7·5m (US$3·5m in April 1999, US$1·5m in December 1999, US$1·5m in
September 2000 and US$1m in December 2000, the last payment being
made by David) and he claims to be entitled to trace all such payments.  He
concedes he cannot trace in respect of the payment of US$2·5m to Westland
purportedly made on his behalf by Mr Russo in February 2000: he accepts
this was a fiction.

97   For the Shalson parties, Mr Trace's main point on this issue was that,    *F*
even if Mr Mimran could show he had paid Westland the US$6·5m
represented by the first three payments, he could not show he had also made
the fourth payment of US$1m.  Mr Trace said that David made this
payment, and that there was no evidence that it was paid on Mr Mimran's
behalf rather than David's.  Mr Trace was not even prepared to accept that
Mr Mimran had paid the US$6·5m represented by the first three payments.    *G*
That is because Mr Mimran's case was that all the Mimran money paid to
Westland was his (Mr Mimran's) own money, whereas Mr Trace said that
Mr Mimran had not proved that the US$6·5m was his own money as
opposed to money he held on trust for others.  The trigger for that argument
was the revelation that one of Mr Mimran's UBS accounts was described as
being held by him as a custodian for his children.

98   I consider that there is nothing in Mr Trace's point about the first    *H*
three payments.  They came out of accounts in Mr Mimran's name, and
there is no evidence showing or suggesting that he held the money in those
accounts otherwise than beneficially, which is how I find he did hold it.  But
even if he did hold it as a trustee for others, it can make no difference.  On

A    that basis he would have made his advances to Westland as such a trustee, but that would not diminish any right he may have to trace the money into assets into which it has been applied. The beneficial entitlement to the money he advanced to Westland is of no concern to the Shalson parties.

99    The position with regard to David's US$1m payment is less clear. Mr Mimran's case is that this was paid out of money David held on his

B    behalf, a case supported by David's evidence in chief. But David's cross-examination showed the facts to be more complicated. The account from which the US$1m was paid was David's overdrawn account at Goldman Sachs ("the bank"), so that strictly David borrowed from the bank in order to make the payment. He faced no difficulty in doing so, because the bank held valuable stock on his behalf, such that the overall position as between David and the bank was a substantial credit balance of more than US$16m

C    in David's favour. I also find that David's account at the bank had been fed by Mr Mimran to the tune of at least US$5m, which was used to buy the stock. It remains the fact, however, that the US$1m was borrowed money: and so Mr Mimran's case that the US$1m was paid out of money held by David on his behalf is an inaccurate account of what was happening. In addition, (i) there is a presumption of advancement between father and son, which invites the inference that the money paid by Mr Mimran to David

D    became his beneficial property; and (ii) David said in cross-examination that he paid the tax on the profits on the stock he bought, which is also consistent with his being its beneficial owner.

100    I do not regard the fact that David's account was overdrawn as fatal to Mr Mimran's case. This means that the US$1m was borrowed money, but the lender (the bank) did no more than lend it to David: it did not

E    itself lend to Westland. The money David paid to Westland was either a loan made by him of his own money (borrowed from the bank) or else was a loan made by him on behalf of his father. The question is which it was.

101    In my judgment, the evidence supports the conclusion that the US$1m was advanced by David on his father's behalf, and I so find. Before making the advance David had no interest in Westland, and there is no evidence that he even knew anything about it. There is no reason to assume

F    that he had suddenly decided to make an advance to it of US$1m of his own money, which is contrary to the probabilities. The evidence satisfies me that, in December 2000, Mr Russo asked Mr Mimran for a further US$1m for an Italian venture, but because Mr Mimran was in Africa it was not practicable for him to make the advance out of one of his own accounts. So he asked David to make it for him—David said his father "instructed" him to do so—

G    and David then made the payment out of his account with the bank. Even assuming, as I am prepared to do, that the only person interested in that account was David, and that he was the beneficial owner of all the stock bought through it, I can see no reason why he should not be regarded as having made the US$1m advance on behalf of his father. If so, then as between Westland and Mr Mimran, Mr Mimran would be the lender; and as between David and Mr Mimran the latter might owe the former US$1m.

H    In fact, it appears that David did not regard his father as owing him anything, perhaps because he regarded the US$1m as (in substance) being financed by the stock held by the bank, to whose purchase price Mr Mimran had contributed at least US$5m. But whether there was any liability as between father and son arising out of the payment of the US$1m is

Ch 2005—13

immaterial.    David made the payment on his father's request and    A
instruction, he made it on his behalf and I find that the payment so made is to
be regarded as having been made by his father.  I find, therefore, that
Mr Mimran made advances to Westland totalling US$7·5m.

### (b) Tracing generally

102   As Lord Millett explained in *Foskett v McKeown* [2001] 1 AC 102,    B
128, tracing is neither a claim nor a remedy.  It is the process by which a
claimant seeks to show that an interest he had in an asset has become
represented by an interest in a different asset.  Typically, he will seek to show
that his share of the proceeds of the original asset has been applied in the
acquisition of the different asset.  Having shown that, he will endeavour to
maintain a proprietary interest in the different asset referable to the
application of his property into it.  But an ability to trace into the different    C
asset will not automatically entitle him to maintain his claim to such an
interest.  The legal owner of that asset may have one or more defences to it,
for example that of a good faith purchaser for value.  Considerations such as
this will raise questions as to whether, having established his tracing claim,
the claimant can assert his proprietary claim in respect of the different asset.
But the first question is whether he can trace into the asset at all.    D

103   There have traditionally been differences as to the rules applicable
to tracing at common law and in equity.  The common law did not permit
tracing into a mixed fund, whereas equity did, although it has for long been
regarded as a precondition to tracing in equity that "there must be a
fiduciary relationship which calls the equitable jurisdiction into being": *Agip
(Africa) Ltd v Jackson* [1991] Ch 547, 566H, per Fox LJ.  This difference has
been criticised.  Lord Millett voiced his disagreement with it in *Foskett v*    E
*McKeown* [2001] 1 AC 102, 128, 129, and in his dissenting speech Lord
Steyn, at p 113, expressed similar sentiments.  Mr Smith submitted that
I should regard *Foskett v McKeown* as having decided that there is no longer
any difference between the common law and equitable rules of tracing and,
in particular, no need to identify a fiduciary relationship as a precondition to
tracing into a mixed fund.    F

104   I do not regard *Foskett v McKeown* [2001] 1 AC 102 as having
decided that.  Having voiced his opinion on the point at p 128, Lord Millett
then said, at p 129:

"This is not, however, the occasion to explore these matters further,
for the present is a straightforward case of a trustee who wrongfully
misappropriated trust money, mixed it with his own, and used it to pay
for an asset for the benefit of his children.  Even on the traditional    G
approach, the equitable rules are available to the plaintiffs."

Lord Millett therefore deliberately stopped short of deciding that the
traditional precondition to tracing in equity should be regarded as
overruled.  Lord Hoffmann agreed with Lord Millett's speech, and cannot
by that expression of view have been deciding any more on this point than
did Lord Millett.  Lord Browne-Wilkinson, at p 108, also agreed with Lord    H
Millett's speech, but he too, at p 109D, expressly made clear that he did "not
now want to enter into the dispute whether the legal and equitable rules of
tracing are the same or differ".  Lord Hope of Craighead did not deal with
the point.  Lord Steyn may be regarded as having adopted a more positive

315

A  stance.  But, overall, my view is that it cannot be said that *Foskett v McKeown* [2001] 1 AC 102 has swept away the long recognised difference between common law and equitable tracing.

105   In any event, there is no need to consider the point further.  If Mr Mimran can establish a proprietary interest in the *Mosaique*, it can only be because money in which he had a proprietary interest was applied in its acquisition.  If he had no proprietary interest in any of the money so applied,

B  then he can have acquired no proprietary interest in the *Mosaique*: as Lear advised Cordelia in the opening scene of his tragedy, nothing will come of nothing.  In this case, Mr Mimran claims a proprietary interest in the money he paid to Westland, and he claims to be able to trace that money onward into the *Mosaique*, and so he does claim to start with something sufficient to set up a worthwhile tracing process.  Each of the three alternative ways in

C  which he claims to set up his initial proprietary interest is dependent on there being a fiduciary relationship sufficient to invoke equity's tracing ability.  This being so, there is no need to consider whether he can do the tracing he wants without needing to establish such a relationship.  I now consider the three alternative ways in which Mr Mimran asserts his proprietary interest in the money advanced to Westland.

D  *(i) Constructive/resulting trust*

106   The primary way in which Mr Smith argued this aspect of the case is that he says that Mr Mimran was cheated by Mr Russo out of the US$7·5m he paid to Westland.  He says that from start to finish Mr Russo lied to him and deceived him, his lies and deceits being largely represented by the false WIB bank entries which he caused to be created.  They started with

E  the fictitious credit in favour of Oceanwave, which Mr Mimran drew on in the innocent belief that it enabled him to make a genuine payment for the Westbond shares.  I find that, but for that initial fraud, Mr Mimran would not have proceeded with the Westland venture at all.  From then on Mr Russo practised lie after lie on Mr Mimran.  He pretended he needed the US$1·5m in December 1999 for Westland's investment in the AMEC venture, but then applied it on Cantrust's behalf.  He lied about

F  having paid US$2·5m into Westland in February 2000 and about having later paid in a further US$1·5m, which combined to induce Mr Mimran to continue to believe that the Westland venture was a genuine one and in turn to make his further payments of US$1·5m and US$1m in September and December 2000.  I find that Mr Mimran would not have paid anything to Westland but for Mr Russo's continuing lies.

G  107   Building on this factual foundation, Mr Smith's primary proposition is that if C is fraudulently induced by D to lend money to him, D's conscience is immediately so affected by his fraud that he is regarded as holding the money on a constructive trust for C, who remains the beneficial owner of the money lent.  It follows that, on discovery of the fraud, C is entitled to advance a proprietary claim to the money which entitles him to trace the money into other assets into which it may have been applied.

H  Mr Smith said that this principle applies to the present case.  He argued also that, if it is necessary for C first to rescind the loan contract before he can set up a proprietary claim to the money advanced, then Mr Mimran evinced the necessary intention to rescind it by the issue of his Part 20 proceedings, which joined Mr Russo, Westland and WIB as defendants.  Mr Smith

developed the argument by submitting that Mr Russo had control at all
times both of Westland's account with WIB and of WIB's account with PKB,
so that Mr Russo's knowledge of what he was doing could and should be
attributed to both Westland and WIB.  He submitted that there was no
question of Mr Mimran being able to trace his money through the Westland
account with WIB, because the entries in that account were largely fictitious
and so made any tracing impossible.  But the practical reality was that the
Westland money was paid into the WIB account with PKB, WIB was fixed
with Mr Russo's knowledge of his own fraud in relation to that money and
so Mr Mimran can trace his money into and through that account.  Indeed,
Mr Smith's preferred stance was that the money should be regarded as never
having even reached the Westland account with WIB, but as having simply
been paid into the WIB account with PKB.  His argument involved various
steps, but the first one requires me to consider whether Mr Mimran retained
or has since acquired any proprietary interest in the US$7·5m he paid over.
Despite Mr Smith's submission that this money should be regarded as never
having reached Westland, I propose to proceed on the basis that it did.  It
was, after all, shown in Westland's account with WIB.

108   Cogently though he argued the point, Mr Smith's proposition that
the moneys advanced by Mr Mimran to Westland became subject to an
immediately binding constructive trust in his favour is in my view contrary
to principle.  The facts of the case are extreme, but the resolution of its
problems must be governed by ordinary principles.  The case is one in which
Mr Mimran was induced to make his various loans to Westland by
fraudulent misrepresentations made by Mr Russo.  It is no different in kind
from any other case in which a representee is induced to enter into a
disadvantageous contract by a dishonest deceit.  It is well established that
any such contract is voidable, not void, and that it is and remains a valid
contract until set aside by the representee: see *Directors of the Reese River
Silver Mining Co Ltd v Smith* (1869) LR 4 HL 64, 73, 74, per Lord
Hatherley LC and *Adam v Newbigging* (1886) 34 Ch D 582, 592, per
Bowen LJ.  A typical case of a voidable contract induced by deceit is one in
which C overpays for a house as the result of a fraudulent mispresentation by
D as to its physical condition.  In such a case, when C pays over the purchase
price he intends D to become the legal and beneficial owner of it, as D does;
and D has a like intention in relation to the house when he assures it to C on
completion.  The contract remains voidable despite completion; but until it
is avoided those respective beneficial entitlements to price and house remain
the same.  Mr Smith's submission involves a reversal of that ordinary
principle.  On his argument, as from the moment of completion D becomes a
trustee of the purchase money for C—and presumably C becomes a trustee
of the house for D, since C cannot at the same time be beneficially entitled to
both house and price.  Mr Smith's submission to the effect that D becomes a
trustee of the money for C at the moment it is paid over—and that in the
present case Westland or WIB became a trustee of the money for Mr Mimran
immediately the money was advanced—is, in my judgment, incorrect.  What
the position is when and if, on discovery of the fraud, C elects to *rescind* the
contract of course raises a different question.

109   For authority in support of his primary proposition, Mr Smith
relied on these obiter observations of Lord Browne-Wilkinson in

A   *Westdeutsche Landesbank Girozentrale v Islington London Borough
    Council* [1996] AC 669, 715–716:

> "*The stolen bag of coins*
>
> "The argument for a resulting trust was said to be supported by the
> case of a thief who steals a bag of coins. At law those coins remain
> traceable only so long as they are kept separate: as soon as they are mixed
> B  with other coins or paid into a mixed bank account they cease to be
> traceable at law. Can it really be the case, it is asked, that in such
> circumstances the thief cannot be required to disgorge the property
> which, in equity, represents the stolen coins? Moneys can only be traced
> in equity if there has at some stage been a breach of fiduciary duty, i e if
> either before the theft there was an equitable proprietary interest (e g the
> C  coins were stolen trust moneys) or such interest arises under a resulting
> trust at the time of the theft or the mixing of the moneys. Therefore, it is
> said, a resulting trust must arise either at the time of the theft or when the
> moneys are subsequently mixed. Unless this is the law, there will be no
> right to recover the assets representing the stolen moneys once the moneys
> have become mixed.
>
> "I agree that the stolen moneys are traceable in equity. But the
> D  proprietary interest which equity is enforcing in such circumstances arises
> under a constructive, not a resulting, trust. Although it is difficult to find
> clear authority for the proposition, when property is obtained by fraud
> equity imposes a constructive trust on the fraudulent recipient: the
> property is recoverable and traceable in equity. Thus, an infant who has
> obtained property by fraud is bound in equity to restore it: *Stocks v
> E  Wilson* [1913] 2 KB 235, 244, *R Leslie Ltd v Sheill* [1914] 3 KB 607.
> Moneys stolen from a bank account can be traced in equity: *Bankers
> Trust Co v Shapira* [1980] 1 WLR 1274, 1282c–e: see also *McCormick v
> Grogan* (1860) LR 4 HL 82, 97."

110  I do not find that an easy passage. As to the first paragraph, a thief
ordinarily acquires no property in what he steals and cannot give a title to it
even to a good faith purchaser: both the thief and the purchaser are
F   vulnerable to claims by the true owner to recover his property. If the thief
has no title in the property, I cannot see how he can become a trustee of it for
the true owner: the owner retains the legal and beneficial title. If the thief
mixes stolen money with other money in a bank account, the common law
cannot trace into it. Equity has traditionally been regarded as similarly
incompetent unless it could first identify a relevant fiduciary relationship,
G   but in many cases of theft there will be none. The fact that, traditionally,
equity can only trace into a mixed bank account if that precondition is first
satisfied provides an unsatisfactory justification for any conclusion that the
stolen money must necessarily be trust money so as to enable the
precondition to be satisfied. It is either trust money or it is not. If it is not, it
is not legitimate artificially to change its character so as to bring it within the
supposed limits of equity's powers to trace: the answer is to develop those
H   powers so as to meet the special problems raised by stolen money.

111  As to Lord Browne-Wilkinson's more general proposition in the
second paragraph that property obtained by fraud is automatically held by
the recipient on a constructive trust for the person defrauded, I respectfully
regard the authorities he cites as providing less than full support for it. At

A

any rate, they do not in my view support the proposition that property transferred under a voidable contract induced by fraud will immediately (and prior to any rescission) be held on trust for the transferor.

112   The first two cases related to void rather than voidable transactions, and so are not of direct present assistance. They concerned the rights of plaintiffs who had been induced to deal with infants who had falsely represented themselves as being of full age. Under section 1 of the Infants Relief Act 1874 (37 & 38 Vict c 62) all contracts for money lent or to be lent, or goods supplied or to be supplied, were absolutely void. In *Stocks v Wilson* [1913] 2 KB 235 the infant had not paid for the goods supplied and had sold part of them for £30. It was held he was liable to account to the vendor for that sum. Lush J explained, at pp 242–244, that the infant could not be sued either in contract or in tort, but that:

B

C

"What the court of equity has done in cases of this kind is to prevent the infant from retaining the benefit of what he has obtained by reason of his fraud. It has done no more than this, and this is a very different thing from making him liable to pay damages or compensation for the loss of the other party's bargain. If the infant has obtained property by fraud he can be compelled to restore it; if he has obtained money he can be compelled to refund it. If he has not obtained either, but has only purported to bind himself by an obligation to transfer property or to pay money, neither in a court of law nor a court of equity can he be compelled to make good his promise or to make satisfaction for its breach . . . The equitable liability depends, not on the validity of the contract, but on the fact that the defendant while an infant obtained goods from the plaintiff by a false and fraudulent representation."

D

E

113   Those observations, taken at face value, may perhaps be regarded as supporting the view that the infant becomes a trustee of the goods for the unpaid vendor. But I regard the fuller analysis of the position by the Court of Appeal in *R Leslie Ltd v Sheill* [1914] 3 KB 607 as tending to undermine any such support. The *Sheill* case was a case in which the plaintiffs had been induced to lend the infant £400 which he had not repaid, and they sought to recover the money. The judge entered judgment against the infant, but the Court of Appeal reversed his decision. Lord Sumner said, in *R Leslie Ltd v Sheill* [1914] 3 KB 607, 618–619, by way of explanation of the decision in *Stocks v Wilson* [1913] 2 KB 235 and for his decision in the *Sheill* case, that:

F

"I think it is plain that Lush J conceived himself to be merely applying the equitable principle of restitution. The form of the claim was that, by way of equitable relief, the infant should be ordered to pay the reasonable value of the goods, which he could not restore because he had sold them. The argument was that equity would not allow him to keep the goods and not pay for them, that if he kept the property he must discharge the burthen, and that he could not better his position by having put it out of his power to give up the property . . . The learned judge thought that the fundamental principle in *In re King, Ex p Unity Joint Stock Mutual Banking Association* (1858) 3 De GJ & J 63 was a liability to account for the money obtained by the fraudulent representation, and that in the case before him there must be a similar liability to account for the proceeds of the sale of the goods obtained by this fraud. If this be his ratio decidendi,

G

H

A    though I have difficulty in seeing what liability to account there can be (and certainly none is named in *In re King*), the decision in *Stocks v Wilson* [1913] 2 KB 235 is distinguishable from the present case and is independent of the above dictum, and I need express no opinion about it. In the present case there is clearly no accounting. There is no fiduciary relation: the money was paid over in order to be used as the defendant's own and he has so used it and, I suppose, spent it. There is no question of

B    tracing it, no possibility of restoring the very thing got by the fraud, nothing but compulsion through a personal judgment to pay an equivalent sum out of his present or future resources, in a word nothing but a judgment in debt to repay the loan. I think this would be nothing but enforcing a void contract. So far as I can find, the Court of Chancery never would have enforced any liability under circumstances like the

C    present, any more than a court of law would have done so, and I think that no ground can be found in the present judgment, which would be an answer to the Infants Relief Act."

    **114** I will not also refer to the judgments of Kennedy LJ and A T Lawrence J, but say in summary that I find it difficult to deduce from the reasoning in *R Leslie Ltd v Sheill* [1914] 3 KB 607 that either the defendant

D    in that case, or the defendant in *Stocks v Wilson* [1913] 2 KB 235, could be (or was regarded as becoming) a *trustee* of the property or money paid to him as a result of his fraud. If the defendant in the *Sheill* case had been so regarded, then in principle he would have been liable to make good the trust fund he had spent, and to restore it to the plaintiff. But the court made no such suggestion. Having spent the money, the defendant was regarded as off

E    the restitutionary hook. I also do not understand how property or money purportedly passing from C to D under a void contract can be held by D as a trustee for C: D acquires no proprietary interest in it, the entirety of which is retained by C, and so D holds no interest in respect of which he can be a trustee. C's proprietary rights entitle him to recover the property, but his claim to do so cannot and does not need to be dependent on the existence of a supposed trust relationship.

F    **115** Nor, with respect, do I regard *McCormick v Grogan* LR 4 HL 82 as carrying the weight which Lord Browne-Wilkinson attached to it. In *Halifax Building Society v Thomas* [1996] Ch 217, *McCormick's* case was cited to the Court of Appeal as supporting the proposition that property acquired by fraud becomes held on trust for the victim, a view which that court was not prepared to accept. Peter Gibson LJ said, at p 228, that the

G    relevant statement in *McCormick's* case

      "must be read in the context in which it was made, namely the jurisdiction where a secret trust is alleged. It cannot be elevated into a universal principle that wherever there is personal fraud the fraudster will become a trustee for the party injured by the fraud."

H    Judgment in *Halifax Building Society v Thomas* [1996] Ch 217 was delivered on 29 June 1995. The argument in *Westdeutsche Landesbank Girozentrale v Islington London Borough Council* [1996] AC 669 in the House of Lords concluded on 13 July 1995, judgment was given on 22 May 1996 and the *Halifax* case was not mentioned by Lord Browne-Wilkinson in his speech. I respectfully prefer the Court of Appeal's more cautious

approach as to the weight to be attached to *McCormick v Grogan* LR 4 HL    A
82. So did Ferris J in *Box v Barclays Bank* [1998] Lloyd's Rep Bank 185,
200, when he too was asked to treat *McCormick's* case as establishing
the wide principle that Lord Browne-Wilkinson derived from it. Ferris J
concluded his consideration of the authorities by saying, at p 201, that he did
not think that Lord Browne-Wilkinson could be taken to have been laying
down a principle applicable to all cases of fraud.

116    That leaves the reliance Lord Browne-Wilkinson placed on *Bankers*    B
*Trust Co v Shapira* [1980] 1 WLR 1274, the well-known decision of the
Court of Appeal as to the court's willingness to give claimants all necessary
interlocutory assistance in tracing assets in respect of which they claim
proprietary rights. Lord Denning MR said, at p 1282:

"It should only be done when there is a good ground for thinking the
money in the bank is the plaintiff's money—as, for instance, when the    C
customer has got the money by fraud—or other wrongdoing—and paid it
into his account at the bank. The plaintiff who has been defrauded has a
right in equity to follow the money."

117    The case concerned claims by the bank to trace money it had paid
out on cheques said to have been forged. The bank's claim can be    D
characterised as founded on deceit and so analogous to the present claim and
also, I consider, to the bank's claim in *Banque Belge pour l'Etranger v
Hambrouck* [1921] 1 KB 321. By the time the court was seised of the
matter, the bank had (as in the *Banque Belge* case) at least impliedly
rescinded the transaction and was asserting a proprietary claim to follow
what it said was its own money. The decision does not in my view cast any
direct light on where the beneficial entitlement to the money was    E
immediately after it was paid out by the bank and before the implied
rescission. Ferris J, in *Box v Barclays Bank* [1998] Lloyd's Rep Bank 185,
did not, I infer, regard *Bankers Trust Co v Shapira* [1980] 1 WLR 1274 as
supporting Lord Browne-Wilkinson's general proposition, although he did
not discuss it.

118    Mr Smith also relied by way of support for his primary submission    F
on Bingham J's decision in *Neste Oy v Lloyds Bank plc* [1983] 2 Lloyd's Rep
658, which Lord Browne-Wilkinson might have added to his own list, but
did not. Bingham J, at pp 665–666, drew on Goulding J's decision in *Chase
Manhattan Bank NA v Israel-British Bank (London) Ltd* [1981] Ch 105,
and similarly espoused a general principle that money paid as a result of
accident, mistake or fraud would become held on a constructive trust by the
recipient. But the *Chase* case has since been criticised, including by Lord    G
Browne-Wilkinson in the *Westdeutsche* case [1996] AC 669, 714–715, and
in *Box v Barclays Bank* Ferris J expressed his view that (in effect) the
principle favoured by Bingham J was essentially founded on the availability
of a remedial constructive trust in English law, whereas such a trust has at
present no recognised role: see the *Westdeutsche* case, p 716, and *In re Polly
Peck International plc (No 2)* [1998] 3 All ER 812. I also respectfully share    H
the caution with which Ferris J regarded the existence of the general
principle which Bingham J applied in the *Neste Oy* case.

119    In my view, the position immediately after the making by
Mr Mimran of each of his loans to Westland was that the money advanced
became Westland's property both legally and beneficially: that is what

A   Mr Mimran intended should happen and that is what did happen. In place
of his money, Mr Mimran acquired a chose in action in the nature of a right
to claim repayment by Westland of the money so advanced. The money
itself became Westland's to do as it liked with. I reject the argument that in
equity the money remained Mr Mimran's from the moment it was paid over.

B   120   However, following the discovery of his fraud, Mr Mimran
brought his Part 20 claim. He joined as defendants not just Westland, but
also Mr Russo and WIB. His claim is not merely for repayment by Westland,
which would be unanswerable but pointless. It is a restitutionary claim
against all three, including claims to trace the whereabouts of the money
advanced. It does not in terms ask that the loan contracts be rescinded, or
claim declarations that they have been, but Mr Smith submitted that the
mere making of the claims amounted to an implied rescission of the loan

C   contracts, and he relied on the observations of Atkin LJ in *Banque Belge
pour l'Etranger v Hambrouck* [1921] 1 KB 321, 332. By contrast, Mr Trace
submitted that the Mimran parties could not claim to have rescinded the
loan contracts, and that it was now too late for them to do so. There was no
evidence satisfying me that Mr Mimran had unequivocally affirmed the loan
contracts since discovering the frauds, and I accept that his issue of the Part

D   20 claims (the proprietary claims in which are consistent only with an
implied rescission) did evince a sufficient intention to rescind them.

    121   The question then arises as to the consequence of such rescission.
I had virtually no argument on this, Mr Smith devoting the bulk of his effort
to his primary argument and Mr Trace asserting that there was no question
of there having been a rescission. However, I did understand Mr Smith's
secondary position to be that, if it was necessary for him to rely on

E   rescission, then rescission there had indeed been and its effect was to revest
in Mr Mimran the title to the money he had been induced to advance to
Westland, carrying with it a right to trace it onwards.

    122   Rescission is an act of the parties which, when validly effected,
entitles the party rescinding to be put in the position he would have been in if
no contract had been entered into in the first place. It involves a giving and
taking back on both sides. If it is necessary to have recourse to an action in

F   order to implement the rescission, the court will make such orders as are
necessary to put both contracting parties into the position they were in
before the contract was made. There is, however, also a line of authority
supporting the proposition that, upon rescission of a contract for fraudulent
misrepresentation, the beneficial title which passed to the representor under
the contract revests in the representee. The representee then enjoys a

G   sufficient proprietary title to enable him to trace, follow and recover what,
by virtue of such revesting, can be regarded as having always been in equity
his own property. This may be an essential means of achieving a proper
restoration of the original position if the representor has in the meantime
parted with the property and is ostensibly a man of straw unable to satisfy
the court's orders for restoration of the original position.

H   123   Early support for this is to be found in *Small v Attwood* (1832) You
407, 533–538. Moving to the last century, in *Banque Belge pour l'Etranger
v Hambrouck* [1921] 1 KB 321, 332, Atkin LJ said:

        "I will assume therefore that this is a case not of a void but of a
    voidable transaction by which Hambrouck obtained a title to the money

until the plaintiffs elected to avoid his title, which they did when they    A
made their claim in this action.  The title would then revest in the
plaintiffs subject to any title acquired in the meantime by any transferee
for value without notice of the fraud."

Bankes LJ also assumed that Hambrouck obtained a voidable title to the
money: see p 325.  The Court of Appeal held that the bank was entitled to
trace the money into an account in the name of Hambrouck's mistress and to    B
recover it.  In *Lonrho plc v Fayed (No 2)* [1992] 1 WLR 1, 12, Millett J said:

"It may well be that if the representee elects to avoid the contract and
set aside a transfer of property made pursuant to it the beneficial interest
in the property will be treated as having remained vested in him
throughout, at least to the extent necessary to support any tracing claim."

Millett J said much the same, this time with more confidence, in *El Ajou v*    C
*Dollar Land Holdings plc* [1993] 3 All ER 717, 734:

"But if the other victims of the fraud can trace their money in equity it
must be because, having been induced to purchase the shares by false and
fraudulent misrepresentations, they are entitled to rescind the transaction
and revest the equitable title to the purchase money in themselves, at least    D
to the extent necessary to support an equitable tracing claim: see *Daly v*
*Sydney Stock Exchange Ltd* (1986) 160 CLR 371, 387–390 per
Brennan J.  There is thus no distinction between their case and the
plaintiff's.  They can rescind the purchases for fraud, and he for the
bribery of his agent; and each can then invoke the assistance of equity to
follow property of which he is the equitable owner.  But, if this is correct,
as I think it is, then the trust which is operating in these cases is not some    E
new model remedial constructive trust, but an old-fashioned institutional
resulting trust."

Tuckey J recognised the same principle in *Bank Tejerat v Hong Kong and*
*Shanghai Banking Corpn (CI) Ltd* [1995] 1 Lloyd's Rep 239, 248; and
Millett LJ reverted to it in *Bristol and West Building Society v Mothew*
[1998] Ch 1, 23, when he referred to his earlier quoted observations in *El*    F
*Ajou v Dollar Land Holdings plc* and said that, in making the suggestion he
did, he was

"concerned to circumvent the supposed rule that there must be a
fiduciary relationship or retained beneficial interest before resort may be
had to the equitable tracing rules . . . Until the equitable tracing rules are
made available in support of the ordinary common law claim for money    G
had and received some problems will remain incapable of sensible
resolution."

124    These authorities support the view that, upon the implied rescission
of the loan contracts, Mr Mimran became entitled to assert a proprietary
interest in the money he advanced to Westland, being an interest which
would then entitle him to trace the money further.  I should, however,    H
mention certain obiter views of the Privy Council in *In re Goldcorp*
*Exchange Ltd* [1995] 1 AC 74.  The judgment of the Board was delivered by
Lord Mustill who, at pp 102–104, expressed the view that the consequence
of any rescission by the purchasers of their purchase contracts for

A    misrepresentation (there had in fact been no such rescissions) would be to
     entitle the purchasers merely to personal rights to recover the money paid
     under the contracts, but would not entitle them to any sort of proprietary
     right in respect of such money.  Lord Mustill said, at pp 102–103:

          "Upon payment by the customers the purchase moneys became, and
       rescission or no rescission remained, the unencumbered property of the
B      company.  What the customers would recover on rescission would not be
       'their' money, but an equivalent sum.  Leaving aside for the moment the
       creation by the court of a new remedial proprietary right, to which totally
       different considerations would apply, the claimants would have to
       contend that in every case where a purchaser is misled into buying goods
       he is automatically entitled upon rescinding the contract to a proprietary
       right superior to those of all the vendor's other creditors, exercisable
C      against the whole of the vendor's assets.  It is not surprising that no
       authority could be cited for such an extreme proposition.  The only
       possible exception is *In re Eastgate; Ex p Ward* [1905] 1 KB 465.  Their
       Lordships doubt whether, correctly understood, the case so decides, but if
       it does they decline to follow it."

D    **125**    The report of the argument in *In re Goldcorp Exchange Ltd* [1995]
     1 AC 74, 80 shows that the Board was referred to *El Ajou v Dollar Land
     Holdings plc* [1993] 3 All ER 717, but to none of the other authorities to
     which I have referred on the proprietary consequences of a rescission.  Taken
     in isolation Lord Mustill's observations might be read as suggesting that the
     approach they favoured is wrong, and that upon rescission of a voidable
     contract induced by misrepresentation the representee has at most a
E    personal claim for the repayment of money paid under it.  If so, that would
     appear to impose serious limitations on the remedies available to those who
     have been induced into such contracts.  In particular, I cannot see how the
     bank in *Banque Belge pour l'Etranger v Hambrouck* [1921] 1 KB 321 could
     have achieved the recovery it did from the fraudster's mistress, since unless
     the rescission operated retrospectively to revest in the bank a proprietary
F    title to the money sufficient to justify a tracing claim, the mistress's plea that
     the fraudster had given her the money ought to have been an answer to the
     bank's claim.  Similarly, I do not follow on what basis the court could have
     considered it appropriate to give the bank in *Bankers Trust Co v Shapira*
     [1980] 1 WLR 1274 the assistance it did with regard to tracing the
     whereabouts of the money of which it had been defrauded.

     **126**    I doubt, however, if in fact there is any difference of approach
G    between the views expressed in *In re Goldcorp Exchange Ltd* [1995] 1 AC 74
     and those expressed in the other cases.  Lord Millett is a judge whose views
     in this area of the law command the very highest respect.  First, he was
     careful to qualify his observations by saying that the effect of the revesting
     was "at least" to entitle the claimant to set up a tracing claim.  Secondly, he
     was not focusing on the type of situation to which the Privy Council was
     directing its comments in the *Goldcorp* case, namely one in which the
H    representee's purchase price, when paid over, became subject to a floating
     charge granted by the representor, and the assumed rescission followed its
     crystallisation.  It is no part of the philosophy of the revesting theory that all
     intermediate transactions occurring prior to the rescission can be undone.
     Until rescission, the property is vested in the representor; and if it is disposed

of to a good faith purchaser, that purchaser will obtain a title which will be       A
unimpeachable after any rescission.  Such purchasers would include the
representor's chargees.  I read Lord Mustill's observations in the *Goldcorp*
case as saying no more than this.  Similarly, if a representor company were to
go into compulsory liquidation before any rescission, its assets would cease
to be beneficially part of its property and would become subject to the
statutory scheme in favour of creditors of the nature discussed in *Ayerst v
C & K (Construction) Ltd* [1976] AC 167; and I should be surprised if any       B
subsequent rescission entitled the representee to say that the property
transferred to the company under the voidable contract must be regarded as
having at all time been his property so as to fall outside that scheme.  But in
cases in which third party rights such as this have *not* accrued, I would not
wish to exclude the possibility that the representor might be able to assert
the proprietary rights arising on rescission which the line of authority to       C
which I have referred supports.  Such a claim would not involve giving him
any preferential rights over creditors: it would merely assert his right to
recover property in which they can have no interest.

128    I propose, therefore, to follow the guidance given in the *Banque
Belge pour l'Étranger v Hambrouck* [1921] 1 KB 321 line of authorities.
I hold, therefore, that upon the implied rescission of the loan contracts
effected by the bringing of his Part 20 claim, Mr Mimran had revested in him       D
the property in the money he advanced to Westland entitling him at least to
trace it into assets into which it was subsequently applied.

### (ii) Is Mr Mimran entitled to the benefit of a Quistclose trust?

128    As an alternative argument in support of Mr Mimran's claim to a
proprietary interest in the money advanced to Westland, Mr Smith       E
submitted that Mr Mimran's loans were made on the basis that the money
lent could be used only for the purposes of property investments by Westland
and that, subject to this, they were held on trust for him.  It is said that none
of the money was so used—nor did Mr Russo ever intend so to use it—and
so was always held by Westland beneficially for him.  Reliance is placed on
*Quistclose Investments Ltd v Rolls Razor Ltd* [1970] AC 567, a case too well       F
known to need further explanation.  It is primarily a question of fact as to
whether, in any particular case, a *Quistclose* trust has been created.

129    I will deal with this shortly since in my view the evidence does not
establish such a trust.  All it proves is that Mr Russo and Mr Mimran agreed
to form a company, Westland, to which they were each to make loans and
which would invest the money lent in property.  There was no agreement
between them that the money lent by Mr Mimran could only be used for       G
property investment purposes and that, subject to being so used, it was to be
held on trust for him personally.  No doubt Mr Mimran only made his
advances in the expectation that Westland would only use them for property
investments—that was why Westland was established in the first place—but
it does not follow that, in default, it was part of the agreement that the
money belonged in equity to him.  There was no express agreement to this
effect, and nor is there any basis for regarding the parties as having impliedly       H
so agreed.  Further, the fact that his money was not to be kept in a separate
account, but was (as I find Mr Mimran understood) liable to be mixed with
other Westland money, in particular with any loans which Mr Russo made in
accordance with the initial agreement, points away from any intention to

A   create a trust: see *In re Andrabell Ltd* [1984] 3 All ER 407, 415–416, per
    Peter Gibson J and *R v Clowes (No 2)* [1994] 2 All ER 316, 325–326, per
    Watkins LJ. In *Quistclose Investments Ltd v Rolls Razor Ltd* [1970] AC 567,
    the parties went to the lengths of placing the money in a separate account
    opened specially for the purpose of the payment.

        130   In *Twinsectra Ltd v Yardley* [2002] 2 AC 164, 185, para 73, Lord
B   Millett said:

        "A *Quistclose* trust does not necessarily arise merely because money is
        paid for a particular purpose.  A lender will often inquire into the purpose
        for which a loan is sought in order to decide whether he would be justified
        in making it.  He may be said to lend the money for the purpose in
        question, but this is not enough to create a trust; once lent the money is at
        the free disposal of the borrower.  Similarly payments in advance for
C       goods or services are paid for a particular purpose, but such payments do
        not ordinarily create a trust.  The money is intended to be at the free
        disposal of the supplier and may be used as part of his cashflow.
        Commercial life would be impossible if this were not the case."

    Those observations are directly in point.  I hold that no *Quistclose* trust was
    created in the present case, and that this line of argument does not enable
D   Mr Mimran to set up a proprietary interest in the money he paid to the credit
    of Westland's account with WIB, let alone to any money in WIB's account
    with PKB.

    *(iii) Did Mr Russo owe Mr Mimran fiduciary duties in respect of the moneys
    advanced to Westland?*

E       131   This is the third alternative way in which Mr Mimran seeks to
    establish that he had a proprietary interest in the money he advanced to
    Westland.  The proposition is that Mr Russo had undertaken to act in
    Mr Mimran's interests with regard to the application of the money
    advanced; that Mr Russo was in a position to deal with the money in a way
    which could or would affect Mr Mimran's interests; that Mr Mimran was
F   vulnerable to an abuse by Mr Russo of the position he occupied with regard
    to dealing with the money so advanced; and that Mr Mimran had not agreed
    to Mr Russo applying the money merely in his own interests.  It is said that
    these ingredients combined to result in Mr Russo becoming a fiduciary for
    Mr Mimran with regard to the money the latter advanced to Westland, so
    giving Mr Mimran a right to trace the money when it was misapplied by
    Mr Russo in breach of his fiduciary obligations.

G       132   I do not accept that Mr Russo became such a fiduciary.  The
    argument ignores that the Russo/Mimran venture was one they agreed was
    to be conducted through Westland.  When Mr Mimran made his loans, the
    money so advanced became (as he intended) Westland's money: it ceased to
    be his own money.  Mr Russo was not a director of Westland, but I find that
    he gave the instructions as to the dealings with Westland's money, and
    I accept that he owed fiduciary duties with regard to such dealings.  But any
H   such duties would have been owed only to Westland, not to Mr Mimran,
    since the dealings related to Westland's money, not to Mr Mimran's.  It may
    be that the Westland venture can be characterised as a joint venture between
    Mr Russo and Mr Mimran personally.  But I do not consider that this entitles
    Mr Mimran to say that, with regard to the Westland money, Mr Russo owed

separate fiduciary duties to him as well.  They chose to conduct their venture *A*
through a company, and it is simply to the company that each would have
owed fiduciary duties.  Nor can I see any reason why the duties should need
to be regarded as being owed more widely than that.  If Mr Russo breached
his duties to Westland and misapplied its money, it would be open to
Mr Mimran—if necessary, by a derivative action—to bring proceedings for
Westland's benefit against Mr Russo.  I do not, therefore, accept this third
alternative way of putting Mr Mimran's case.                                *B*

*(c) Is Mr Mimran entitled to trace his payments into WIB's PKB account?*

   **133**   Having accepted that the implied rescission of the loan contracts
was effective to revest in Mr Mimran a title to the money advanced to
Westland, the next question is whether he is entitled to trace his money into
WIB's PKB account, and thence elsewhere.  No suggestion has been            *C*
advanced that his claim involves an impermissible competition with
Westland's rights.  As for WIB, it is in liquidation, but it has withdrawn its
own tracing claims, and so Mr Mimran's claim involves no competition with
WIB, nor does it seek to establish any proprietary priority over its creditors.
   **134**   Mr Trace submitted that any tracing claim to which Mr Mimran
may be entitled is confined to tracing through the Westland/WIB account.
He said that whilst the money Mr Mimran advanced was actually paid into   *D*
the WIB/PKB account, the money in this account belonged beneficially to
WIB and no right to trace into it could arise.  Mr Smith submitted that there
can be no question of tracing through the Westland/WIB account, since the
bulk of the relevant entries are fictitious so that any tracing exercise is
impossible.  I agree with Mr Smith about that, but it does not automatically
lead to the conclusion that Mr Mimran must instead be entitled to trace into *E*
the WIB/PKB account.
   **135**   I have, however, come to the conclusion that Mr Mimran is entitled
so to trace his money.  If WIB were an innocent, independent bank, in no
way privy to Mr Russo's dishonesty, I would agree with Mr Trace that there
could be no question of any tracing into its PKB account.  The Mimran
money credited to that account is to be regarded as having been paid in by
Westland, and the ordinary principle is that money paid by a customer to its *F*
bank becomes the bank's property beneficially and the bank assumes a
personal liability in debt to the customer: *Space Investments Ltd v Canadian
Imperial Bank of Commerce Trust Co (Bahamas) Ltd* [1986] 1 WLR 1072,
1073, per Lord Templeman and *Foskett v McKeown* [2001] 1 AC 102, 128,
per Lord Millett.  But whilst I agree with Mr Trace that WIB was a genuine
bank, I find that the conduct of its banking business was, during the relevant *G*
period, thoroughly dishonest, manifested by its creation of the false
statements.  This was either the personal work of, or was instigated by,
Mr Russo, the purpose being both to deceive and to cover the tracks of his
deception, but the statements were WIB statements.  Mr Mimran's various
loans were procured by Mr Russo's dishonesty, and I find that knowledge of
that dishonesty is to be attributed to WIB, of which he had in all relevant
respects de facto control.  Mr Russo and WIB were at all times on notice of *H*
the facts giving rise to Mr Mimran's equity to rescind the loan transactions
and to recover the money he advanced under them; in particular, WIB was
(a) on such notice when it received Mr Mimran's money into its account
with PKB, and (b) knew that the entries in Westland's own account with it

A   were sufficiently fictitious as to make impossible any following or tracing of money through that account. In my view, WIB cannot be in any better position as regards Mr Mimran's tracing claim than was the mistress in *Banque Belge pour l'Etranger v Hambrouck* [1921] 1 KB 321. I hold that, in principle, Mr Mimran was entitled to trace his money into and through WIB's account with PKB.

B   *(d) Was the WIB/PKB current account overdrawn?*

   **136**  WIB had a current account with PKB, subdivided into 13 different currency sub-accounts, although it is agreed that for present purposes they should be treated as consolidated into one account ("the current account"). In addition, WIB had the benefit of the various deposit and call accounts which PKB held for it at other financial institutions, which I have earlier

C   referred to as "the deposit accounts". The evidence analyses the state of account at the date of each Mimran payment, and shows that, unless the deposit accounts are treated as consolidated with the current account, the current account was overdrawn at the time of the first two payments. With one qualification, they simply operated to reduce WIB's overdraft on the current account. Even if the deposit accounts are treated as so consolidated,

D   the current account was still overdrawn at the time of the last two payments: they again simply reduced the overdraft. The qualification is that whilst most of the first payment of US\$3·5m also went to reduce the overdraft, US\$899,702 of it created a credit balance in that sum, although the account was again overdrawn by the time of each of the three later payments.

   **137**  The first question I have to decide is whether, for the purpose of conducting any tracing exercise, it is appropriate to consolidate the current

E   account with the deposit accounts. That will enable Mr Mimran to say that it was in credit, at least at the time of his first two payments, and so he will in turn be entitled to say that his first two payments can be traced into an asset represented by that account. Mr Smith submitted that the accounts can and should be consolidated. He relied on the fact that in its overall reconciliation of its position from time to time with WIB, PKB brought the deposit accounts into consideration. He said also that clause 3 of the agreement of

F   15 March 1996 provided that deposits could only be placed "within the limits of [WIB's] existing credit balances" and so PKB must have regarded the current account as being and remaining in credit or else it could not have created the deposit accounts without being in breach of clause 3. Mr Trace argued against any consolidation.

   **138**  I prefer, and accept, Mr Trace's submission. I see no justification

G   for the suggested consolidation. The current account was in overdraft, a feature resulting in WIB incurring a liability to pay interest charges to PKB. The deposit accounts were in credit, but they were quite separate accounts held at other institutions, and held not in the name of WIB but in that of PKB. I accept that in its reconciliations from time to time, PKB brought both the deposit and current accounts into consideration—just as Goldman Sachs did in its reconciliation of the position as between itself and David Mimran.

H   I do not find that surprising: it is what I would expect. But I do not understand why this should justify the court in engaging in the consolidation exercise that Mr Mimran invites so as to assist him in his tracing claim. It is an entirely artificial one, designed simply to create the impression that certain of his payments were paid into a current account which was in credit,

whereas in fact it was overdrawn. Nor do I follow why the point Mr Smith    *A*
made on clause 3 should require some different assessment of the position.
The purpose of the suggested consolidation is, in effect, to create a notional
balance sheet showing assets exceeding liabilities, and so yielding a figure for
net assets. But it is not possible to trace into *net* assets: it is only possible to
trace into assets, and this requires the identification of the assets in which it is
said the claimant's property is represented. Mr Mimran's difficulty is that,
with one qualification, the WIB account into which his money was paid was      *B*
not an asset but a liability; and all his payments did was to reduce that
liability.

139   I therefore reject Mr Smith's submission that I should consolidate
the current account with the deposit accounts. Ferris J rejected a similar
argument in *Box v Barclays Bank* [1998] Lloyd's Rep Bank 185, 202,
holding that the overdrawn account must be looked at in isolation, ignoring    *C*
the fact that other accounts were in credit. I adopt the same approach in this
case.

140   Subject to the mentioned qualification, this conclusion deals a
serious blow to Mr Mimran's tracing claim. That is because it is not possible
to trace into and through an overdrawn account, because such an account is
not an asset at all: it is a liability. The consequence is that the claimant
cannot show that his money has become represented by an asset into which    *D*
it is possible to trace: all his money has done is to reduce a liability, and so
has ceased to exist. This is shown by *In re Goldcorp Exchange Ltd* [1995]
1 AC 74, 104–105, per Lord Mustill, *Bishopsgate Investment Management
Ltd v Homan* [1995] Ch 211, 220–221, per Dillon LJ, and, at p 222, per
Leggatt LJ and *Box v Barclays Bank* [1998] Lloyd's Rep Bank 185, 203, per
Ferris J.                                                                      *E*

141   In case I were to conclude that the current account is to be regarded
as overdrawn, Mr Smith submitted that the authorities do not impose an
absolute bar on tracing. He relied on Dillon LJ's obiter observations in
*Bishopsgate Investment Management Ltd v Homan* [1995] Ch 211, 216–
217, to the effect that proof of a connection between the acquisition of a
particular asset with money from an overdrawn account and
misappropriation from a trust fund enabling the borrowing for the            *F*
acquisition to be repaid might enable the beneficiary to trace into the asset,
although Leggatt LJ, at pp 221–222, expressed a different view
(Henry LJ simply agreed with both judgments, although his agreement could
not have extended to this point). Mr Smith also relied on Evans-Lombe J's
decision in *Jyske Bank (Gibraltar) Ltd v Spjeldnaes* (unreported) 23 July
1997, in which the judge expressed his preference for Dillon LJ's approach,  *G*
although he had had no argument on the point. I too respectfully prefer
Dillon LJ's approach. But even if it is well founded, I cannot detect any
evidential connection between the *Mosaique* payments and the
misappropriations of Mr Mimran's money which might be regarded as
sufficient to enable it to be invoked in this case.

142   The qualification I have mentioned is that the effect of Mr Mimran's
first payment of US$3·5m was not only to reduce the overdraft on the         *H*
current account, but to put the account into credit to the tune of
US$899,702. Although Mr Trace argued otherwise, in principle I accept
that that sum can be regarded as an asset beneficially owned by Mr Mimran,
and that if it can be traced by any legitimate process into the *Mosaique* or

A  elsewhere then (subject to any other defences) it would be open to Mr Mimran to claim a proportionate share in any asset into which it might be traced. I do, however, face a difficulty in exploring further precisely how much of this figure might be traceable, since the Mimran parties' evidence does not carry out the exercise necessary to enable me to do so. Their approach has been to carry out the tracing exercise on the assumption that the deposit accounts are consolidated with the current account, one I have
B  held to be illegitimate. In case I am wrong on that, I should however, now say something about the tracing method adopted by the Mimran parties.

*(e) The nature of the suggested tracing claim*

   143  Having performed the consolidation of the current and deposit accounts, their chosen method was to recast the consolidated bank statements by: (i) identifying in one column the balance on the account
C  immediately *before* a relevant payment was made by Mr Mimran ("the general fund"); (ii) identifying in a separate column the amount of the relevant Mimran payment by which that balance was increased ("the trust fund"); (iii) showing subsequent payments out of the account *other* than in respect of the *Mosaique* as debited exclusively to the general fund; and (iv) showing payments out in respect of the *Mosaique* as being debited
D  exclusively to the trust fund. Subsequent receipts into the accounts are treated as topping up the general fund. Once the point is reached at which the general fund is exhausted—resulting in a necessary drawing on the trust fund also for the purposes of non-*Mosaique* payments—any subsequent credits of the account are *not* regarded as replenishing the trust fund. To the extent that the exercise shows trust money as having been applied in the
E  *Mosaique*, Mr Smith submits that Mr Mimran can trace that money into the *Mosaique*. To the extent that it shows that trust money has been applied elsewhere, he accepts it is no longer traceable.

   144  This method is a "cherry-picking" exercise, as Mr Smith recognised. But in a case in which the only contest is between the claimant seeking to trace (Mr Mimran) and the wrongdoer (WIB/Mr Russo), there is,
F  he says, every reason why the latter's interests should be subordinated to the claimant's. Normally, it is presumed that if a trustee uses money from a fund in which he has mixed trust money with his own, he uses his own money first: *In re Hallett's Estate* (1880) 13 Ch D 696. But Mr Smith submits that this is not an inflexible rule and that if the trustee can be shown to have made an early application of the mixed fund into an investment, the beneficiary is entitled to claim that for himself. He says, and I agree, that this is supported
G  by *In re Oatway* [1903] 2 Ch 356. The justice of that is that, if the beneficiary is not entitled to do this, the wrongdoing trustee may be left with all the cherries and the victim with nothing. The limitation referred to in the penultimate sentence of the previous paragraph is the "lowest intermediate balance" rule, illustrated by *James Roscoe (Bolton) Ltd v Winder* [1915] 1 Ch 62.

H  145  Illustrating this by reference to the US$1·5m Mimran payment on 27 December 1999, that increased the balance on the consolidated account from US$6,901,723·58 to US$8,401,723·58. Of that, the US$1·5m (the trust fund) required tracing, and the balance (the general fund) did not. The first payment said to be traceable is a payment of US$30,000 on 28 December 1999 to Sam Navigator, a *Mosaique* expense. In fact, there

was also a bank charge of US\$19 debited to the account for that payment, *A*
but the Mimran parties suggest that that should not be regarded as part of
the relevant payment out, or as reducing the balance of the trust fund: their
position is that bank charges should be treated as paid out of the general
fund. The net result of this exercise, after treating other *Mosaique* payments
as payable out of the US\$1·5m trust fund, is that US\$867,956·20 of that
fund is said to be traceable into the *Mosaique*, but the balance is not. A like *B*
exercise with regard to the US\$3·5m shows that US\$3,209,672·55 is
traceable into the *Mosaique*. The overall result is that a total of
US\$4,077,628·55 of the first two payments is said to be traceable. The
Mimran parties accept that, even after a consolidation of the current and
deposit accounts, the consolidated account was overdrawn at the time of the
last two Mimran payments, but they have also performed an exercise
directed at showing that these payments are also traceable—this has *C*
necessitated a presumption that at the material time PKB held assets of
WIB that more than covered the overdrawn balances. The performance of
this exercise produced the claim that a further US\$823,583·83 is said to be
traceable.

146   The Mimran parties' method does not, however, reduce the trust
fund even by payments out that WIB actually made to Mr Mimran. Thus in *D*
relation to the US\$3·5m credit on 13 April 1999, which thereupon became a
trust fund requiring tracing, there was a payment to Mr Mimran on 3 August
1999 of US\$175,020, but that is not treated as reducing the trust fund. The
reason for that is that an assumption has been made that that represents the
repayment of other debts to Mr Mimran, so that it is open to the Mimran
parties to elect whether to trace into that payment or into other assets. Their
case is that they are entitled to cherry-pick and trace into the *Mosaique*. In *E*
principle, I agree. On the footing that the payments to Mr Mimran are in
satisfaction of some debt unrelated to the Westland advances, they cannot be
regarded as repayments of trust money. They did not purport to be that, and
the only effect of so treating them is to appropriate them to the discharge of
an obligation quite different from that which they in fact discharged.

147   As regards the Shalson parties, Mr Smith submits that their *F*
interests can be ignored in the performance of the tracing exercise. Although
they originally had tracing claims of their own, they abandoned them in their
re-amended particulars of claim; and in para 7 of their defence dated
10 March 2003 served in response to WIB's claim, they admitted that "save
where there were special terms agreed between [WIB] and a customer, the
sums paid into PKB by [WIB] were its funds in respect of which no such
customer had or has any proprietary interest". Thus, to the extent that such *G*
funds may have derived from the Shalson parties, the latter disclaimed any
retained proprietary interest in them sufficient to mount any tracing claim.
Further, their pleaded defence to the Mimran parties' tracing claim repeated
their contention that the money in the WIB/PKB account belonged
beneficially to WIB, and was essentially confined to this enigmatic offering:

> "In the premises, on any basis, the Mimran defendants cannot trace *H*
> into any of Mr Shalson's assets. Further and alternatively, if the Mimran
> defendants succeed in showing that they can trace their moneys, [the
> Shalson parties] will seek to set off, in diminution or extinction of the
> Mimran defendants' tracing claim, their better right to trace into the

A   payments to or for the benefit of Mr Mimran from [WIB] and the assets
    representing the same."

    148   I find that difficult to follow, but it does not appear to set up a
    competing tracing claim by Mr Shalson. I cannot see how any tracing claim
    he may ever have had can have operated as a set-off against Mr Mimran's.
    I agree with Mr Smith that the Shalson parties do not raise on their pleadings
B   any identifiable tracing claim into the *Mosaique*, and I hold that they have
    not raised such a claim. I therefore approach the issues on the basis that
    Mr Mimran is advancing the only tracing claim. That position was made
    clear by Mr Smith at the start of the trial and no attempt was made by the
    Shalson parties to amend their pleadings to mount a tracing claim.

    149   Despite this, the case was argued by Mr Trace on the basis that the
    Shalson parties do have a competing tracing claim, and Mr Trace's
C   submission is that, in the circumstances, the correct approach to any tracing
    exercise is to adopt a so-called pari passu method. The way that works is
    that it is said that it is necessary to calculate the net contributions to the
    WIB/PKB account made by each of Mr Mimran and Mr Shalson over the
    whole period of the account. It is said that they then have a proprietary
    interest in the *Mosaique* or its proceeds of sale referable to their net
D   contributions, and (as between the two of them) in proportion to their
    respective net contributions.

    150   That method appears to me to have little to do with tracing, and to
    be illogical and potentially unfair. Mr Smith illustrated this by the example
    of a fraudster with £50 in his account, who then steals £25 from each of
    A and B and pays it into his account, so increasing the balance to £100. He
E   uses £50 of it to buy a car, so reducing the balance to £50. He then steals
    £25 from C and pays that into the account, so increasing it to £75, and then
    dissipates the lot. On Mr Trace's argument, each of A, B and C can trace his
    money into the car. On Mr Smith's argument, only A and B can. I agree
    with Mr Smith. I can see no basis why C can or should be entitled to trace
    his money into the car, because by no rational process can his money be
    regarded as having paid for it. It may be that Mr Trace's suggested method
F   of tracing represents an appropriate way in which, in certain circumstances,
    to divide up a fund (compare *Barlow Clowes International Ltd v Vaughan*
    [1992] 4 All ER 22) but I do not regard it as providing an appropriate tracing
    method in this case. It is said to be supported by the guidance given by Lord
    Millett in *Foskett v McKeown* [2001] 1 AC 102—a very different case on its
    facts—but I was not convinced that it is.

G   151   Mr Smith submitted that, if the Shalson parties are entitled to a
    tracing claim, it is, first, confined to the various payments totalling £19·45m
    that Mr Shalson made to Mr Russo. Although Mr Shalson lent money to
    Edenton which went into WIB which went into the *Mosaique*, Mr Shalson
    assigned his Edenton indebtedness to Redshore and so he cannot claim a
    continued beneficial entitlement to any such indebtedness for any tracing
    purposes. This point is weakened by the fact that Redshore was, I find, a
H   nominee for Mr Shalson, although since Mr Shalson apparently thought it
    necessary to constitute such a nominee for himself, it is not clear to me why
    he can simply claim to stand in Redshore's shoes for the purpose of these
    proceedings. Secondly, he submitted that a like method of tracing is
    applicable as the Mimran parties have themselves adopted. The exercise

simply requires a further column of Shalson trust funds, and to the extent *A*
that payments from the WIB account are in respect of the *Mosaique*, those
payments would be treated as made in proportion to the relative sizes of the
two trust funds at the time the payment is made. The Mimran parties have
carried out such an exercise, and its net overall result is, they say, that
US$4,077,628·75 of the Mimran payments is traceable into the *Mosaique*
and US$1,429,154 of the Shalson payments is also so traceable.                *B*

*( f ) Is Mr Mimran entitled to trace into (i) the Mosaique; (ii) the
Hamilton/Russo loans to Edenton; or (iii) the Hamilton share in Edenton?*

152   For reasons given, I have held that the bulk of Mr Mimran's tracing
claim fails because the WIB/PKB account was overdrawn. I have, however,
recognised that he can show that US$899,702 of his payments became
represented as an asset in that account and that he may be able to trace this *C*
either into the *Mosaique* or elsewhere, although to identify to what extent he
can (by the Mimran methodology), an inquiry may be necessary. I now
consider whether in principle Mr Mimran is able to trace any of this money
into any of these three assets.

*(i) The Mosaique*                                                           *D*

153   Edenton agreed to build, acquire and own the *Mosaique* before
Mr Mimran made any of his payments. Edenton was owned by Mr Russo
and Mr Shalson through their companies, each owning one share.
Mr Russo's share was held through Hamilton. The arrangement between
Mr Russo and Mr Shalson was that Edenton would pay for the construction
and acquisition costs with finance by way of loans provided by each of them. *E*
That was Edenton's only source of funds. Mr Shalson made his loans by
way of payments to Edenton's account with WIB; and Edenton's bank
statement shows that the Brookscastle settlement and Hamilton (which also
had an account at WIB) also purportedly made payments to Edenton,
although the extent to which these entries represent truth or fiction is
uncertain. The payments are not reflected in WIB's PKB account, a factor
which casts doubt on them, but they could have been genuine transactions *F*
reflected simply by internal entries in WIB's books.

154   The *Mosaique* payments paid out of the WIB account can be
regarded as made by Mr Russo. It was he who had control of the account
and he whom I consider should be regarded as the wrongdoing trustee who
has dealt with a mixed fund in part comprising trust money belonging to
Mr Mimran. In order to identify what, if any, proprietary interest those
payments might give Mr Mimran it is, I consider, necessary to identify what, *G*
if any, interest they could or would have given Mr Russo but for any
wrongdoing on his part: in principle, I consider that Mr Mimran's only right
can be to assert for himself the interest which, absent any wrongdoing, the
payments would have given Mr Russo.

155   I cannot see any basis on which Mr Russo could have claimed that
the payments gave him a personal proprietary interest in, or charge over, the *H*
*Mosaique*. He was not making the payments either as a purchaser or
chargee of the *Mosaique*. The only purchaser of the *Mosaique* was Edenton,
and whilst Mr Russo's motives and intentions at any time are not easy to
fathom, he cannot be regarded as having made the payments in competition

A  with Edenton.  On the contrary, he had, through Hamilton, a half share in
Edenton, which was building the boat and owned it, and the only way in
which Edenton could pay the bills was if it was provided with funds by its
shareholders.  The agreement between Mr Russo and Mr Shalson was that
they would each lend Edenton the money.

B  156   In these circumstances, looking at the matter both from Mr Russo's
and from Edenton's viewpoint, I do not see that the money Mr Russo paid
out can be regarded as representing anything other than the application of
money lent to Edenton by its shareholders, in exchange for which loans
Edenton assumed obligations in debt.  Moreover, there is no basis for
attributing to Edenton the knowledge that any of the money paid out on its
behalf was trust money belonging to Mr Mimran.  First, the evidence about
Edenton did not satisfy me that it should be fixed with knowledge of
C  Mr Russo's activities in relation to the operation of the WIB account: it was
in no sense a wrongdoer in relation to the operation of that account.
Secondly, at the time the payments were made, there is no basis on which
Edenton could be fixed with knowledge that any of the payments made on its
behalf were made from loans deriving from anyone other than its
shareholders or from nominees on their behalf.  In my view, had a claim been
D  levelled by Mr Mimran against Edenton for a share in the *Mosaique*,
Edenton's answer would have been that it was a good faith purchaser of the
money lent to it by its shareholders, and had no notice of Mr Mimran's
claims.  As it is not a party to the action, and no claim has ever been made
against it, it has not had the opportunity of advancing any such answer.

E  157   If, however, the money so paid out towards the *Mosaique* is *not* to
be characterised as the application of money lent to Edenton, then the only
alternative is that it was the gratuitous application by Mr Russo of the
money of others towards the building of Edenton's boat.  But that could not
have given those whose money was so applied any proprietary interest in or
charge over the *Mosaique*.  As Bowen LJ said in *Falcke v Scottish Imperial
Insurance Co* (1886) 34 Ch D 234, 248:

F      "The general principle is, beyond all question, that work and labour
    done or money expended by one man to preserve or benefit the property
    of another do not according to English law create any lien upon the
    property saved or benefited, nor, even if standing alone, create any
    obligation to repay the expenditure.  Liabilities are not to be forced upon
    people behind their backs any more than you can confer a benefit upon a
    man against his will."

G  The unwitting contributor would have a claim against Mr Russo for
misapplying his money, and I would not exclude the possibility that he might
have a personal restitutionary claim against Edenton.  But he would not have
a proprietary interest in the *Mosaique*.  I reject Mr Mimran's claim to trace
into the *Mosaique*.

H  *(ii) The Hamilton/Russo loans to Edenton*

158   Mr Smith was critical of the suggestion that Hamilton actually
made any loans to Edenton, albeit that there is some evidence justifying the
inference that it did.  However, for the purposes of this alternative way of
putting Mr Mimran's tracing claim, he accepted that such loans were made.

159   As follows from what I have said, I consider the correct inference is *A* that, to the extent that Mr Russo was applying money from the WIB account towards the acquisition of the *Mosaique*, that money must be regarded as representing his contribution of the necessary loans to Edenton. In fact, I understand that he has never claimed to have made any loans to Edenton himself: and by early 2001 he appears to have regarded Hamilton as the only relevant lender on his side of the joint venture, although Mr Shalson's *B* evidence was that he knew nothing about any loans from Hamilton, and that he assumed the loans had been made by Mr Russo. Despite Mr Shalson's understanding, I find that the relevant *Mosaique* payments are to be regarded as representing part of the Hamilton loans to Edenton. I am prepared to assume that Hamilton can properly be fixed with knowledge of whatever Mr Russo was doing on its behalf. I also find that to the extent that the Hamilton loans are to be regarded as in part made up of money *C* belonging beneficially to Mr Mimran, Hamilton could not assert a title to that part against him.

160   In my view, therefore, the Mimran money is in principle traceable into the Hamilton loans to Edenton. Whether any such claim can be made good against Mr Shalson, who now claims the benefit of those loans, is a matter to which I come in (g) below. *D*

### (iii) The Hamilton share in Edenton

161   I reject the further alternative argument that the money is traceable into the Hamilton share in Edenton. There is no evidence suggesting that the share was acquired with the Mimran money.

### (g) Is a defence of a "good faith purchaser for value without notice" open to *E* Mr Shalson?

162   By March 2001, Mr Russo claimed to be the beneficial owner of the Edenton loans owed to Hamilton, having purportedly acquired them by an assignment from Hamilton shortly before. If Mr Mimran had an equitable interest in, or charge over, those loans immediately before the Hamilton/Russo assignment, he would have had a like interest immediately *F* afterwards: Mr Russo was not a good faith purchaser without notice. On about 1 March 2001, Mr Russo, Edenton and Mr Shalson executed the charge in favour of Mr Shalson over the Edenton indebtedness to Mr Russo, being indebtedness which Edenton expressly acknowledged.

163   Mr Smith submitted that the Hamilton/Russo assignment was a sham, largely because he said it was obvious that Mr Russo did not pay the *G* stated consideration for it. In my view that would not make it a sham, although it might result in Hamilton having a lien on the loans for the unpaid price. But I do not see how this argument could help the Mimran parties since they have abandoned their claims against Hamilton. I am anyway not disposed to make any finding that the Hamilton/Russo assignment was a sham. I proceed on the basis that it was valid.

164   I turn to Mr Russo's charge of the loans to Mr Shalson. I see no *H* reason why, for what it was worth, it did not take effect according to its terms. I find that, at the time, Mr Shalson had no actual or constructive notice of Mr Mimran's claim to be entitled to any interest in those loans. I accept that he knew that Mr Mimran was owed money by Mr Russo or

A   WIB which could not be paid, but knowledge of that would not have given
    him the further knowledge of Mr Mimran's claim to an interest in the loans.
    Nor do I find that Mr Shalson had any relevant Nelsonian knowledge by
    failing to make relevant inquiries of matters of which he was put on notice.
    Of course, he knew that Mr Russo was heavily stretched, and was probably
    insolvent.  But I do not see why he was not entitled to obtain what security
    he could to protect his own position.  He was simply a substantial creditor of
B   Mr Russo and WIB, who was taking normal commercial steps to protect his
    own position as best he could, although no doubt there was a risk that they
    would or might be avoided as preferences in the event of Mr Russo's
    bankruptcy.  I find that he was not on notice of any impropriety by Mr Russo
    in effecting the charge of the loans, or at any rate not on notice of any
    impropriety which impacted on Mr Mimran.  I record that I find that he
C   personally knew nothing of the Hamilton loans to Edenton, but I also record
    that I find that Mr Wolinsky did know of them.

        **165**  I find, therefore, that Mr Shalson had no notice of Mr Mimran's
    claims at the time of the March charge over the loans.  As a chargee of the
    loans who took his interest by grant, he may technically have been a
    "purchaser".  But even so, he would only take free of Mr Mimran's claims if
D   he gave value for the charge and took it in good faith.

        **166**  I hold that there is no basis for finding any want of good faith on
    Mr Shalson's part.  Less easy is the question whether he gave value for the
    charge.  The charge identifies no consideration moving from Mr Shalson to
    Mr Russo, and the antecedent debt from Mr Russo would not constitute
    such consideration.  The charge had, however, been in negotiation at least
    since January 2001, and I have explained the negotiation between Mr Russo
E   and Mr Wolinsky as to the length of notice which Mr Shalson could give for
    calling in the loans.  I infer that they would ordinarily be payable on
    demand, but Mr Shalson agreed to a three-month notice period (Mr Russo
    had wanted six months), and I would be disposed to regard that as
    constituting a sufficient variation of rights to constitute the giving by
    Mr Shalson of value for the charge.  But in these circumstances the courts are
F   anyway ready to find that consideration has been impliedly given for the
    security.  In *Wigan v English and Scottish Law Life Assurance Association*
    [1909] 1 Ch 291, 297–298, Parker J said:

        "If such a security is given, it may of course be given upon some express
        agreement to give time for the payment of the debt, or to give
        consideration for the security in some other way, or, if there be no express
G       agreement, the law may very readily imply an agreement to give time.  It
        may not be a definite time, but to forbear for some indefinite time in
        consideration of the security being given.  And further than that, if there is
        no express agreement, and no agreement can be implied at the time and
        under the circumstances at and under which the indenture giving the
        further security is executed, yet if that security be communicated to a
        person who could otherwise sue on the debt, and on the strength of that
H       security he does in fact forbear to sue on the debt, he does give that time
        with the object of securing which the security is presumably given, and
        then I think it appears on the cases that there is sufficient consideration,
        though in a sense it is an ex post facto consideration, for the security
        which is given."

167   In my judgment, this is a case in which it is possible to find that (in A addition to the consideration I have identified) there was an implied consideration in the nature of a forbearance to sue, if only for a short time, and in the event Mr Shalson actually sued within a fortnight. The evidence shows that the consideration Mr Russo sought on the giving of his other securities to Mr Shalson was the holding by Mr Shalson of his hand for the briefest of times, illustrated by his letter of 2 March 2001 in which he offered B Mr Shalson security over his Rotch Italia interest "in consideration of your not today demanding payment of this deposit". I find that it was implicit that the consideration for the charge over the loans was the giving of time, if only a short time, in addition to the agreement to defer the calling in of the Edenton loans for three months. I find, therefore, that in March 2001 Mr Shalson became a good faith purchaser for value of the Edenton loans, C without notice of Mr Mimran's claim to trace into the loans, and that he therefore took his charge free of Mr Mimran's claim. The result is that Mr Mimran's tracing claim fails.

168   I add that if Hamilton did have a vendor's lien on the loans for the unpaid price, it might have been arguable that Mr Mimran could trace his claim into that lien, that Mr Shalson should be fixed with Mr Wolinksy's knowledge of the Hamilton/Russo assignment and, in turn, with notice that Hamilton retained such a lien. But no such case was argued or suggested, D and as any such claim would be one against Hamilton, against which Mr Mimran has abandoned his claims, I do not consider it further.

## (b) The Mimran tracing claims: generally

169   Had I concluded that Mr Mimran could trace into the Edenton loans, it is not obvious that such a right could prove to be of any value to E him. I should be surprised, but do not know, if Edenton has any assets. I infer that its only asset was the *Mosaique*, although this has been sold to Cardinal, with Braemar being entitled to the benefit of what might be regarded as its full commercial value. A feature of the August 2001 transactions—which are not of the simplest—is that whereas at one moment Edenton owned a boat said to be worth £13·2m, and resolved to sell it to F Cardinal for that sum, immediately after the sale it appeared to have nothing to show for it: Cardinal owns the boat, Braemar has a 25-year lease of it, Cardinal uses the rent to repay the borrowed purchase price to Redshore and Edenton gets nothing.

170   I should, however, at least make certain findings of fact. First, I find that the sale to Cardinal was not motivated by any intention on anyone's part to defeat anyone else's proprietary claims to the *Mosaique* or their G claims as a creditor. I find that the sole motive for the sale was that it offered a route to a saving of VAT. Much was made by Mr Smith of Allen & Overy's letter of 16 August 2001 wrongly stating that Edenton was the owner of the *Mosaique*. That was a mistake, and how it arose I do not know. But it anyway had zero effect on the Mimran parties. They have never displayed any interest in joining Edenton as a party, and although they have known about Cardinal's role for a year or more, they have never displayed any H interest in joining Cardinal either (or, for that matter, Braemar). I also find that the letter was in no way motivated by a desire or intention to mislead. Secondly, and consistently with the motive behind the sale, it was structured in an artificial way so as to achieve the desired VAT saving, whilst

A  maintaining almost the entire commercial interest in the *Mosaique* in a
Shalson company, namely Braemar. Thirdly, I do not find that the
transaction was a sham, as Mr Smith suggested it was: the documents were
intended by everyone to have the effect they purported to have. The result is
that I find that Cardinal did become and is the owner of the *Mosaique*,
although it derives no commercial interest from the acquisition other than its
£15,000 a year, its reward for making the scheme available and being a
B  party to it. It is perhaps best regarded as in a position analogous to that of a
freeholder of a property held on a long lease at a low rent and subject to put
and call options in favour of others.

*(i) The claim for alleged dishonest assistance by Mr Jerne in signing the
Westland agreements*

C     171    The Shalson parties assert that both Westland agreements were part
of the fraud that Mr Russo practised on Mr Shalson and that, in so far as
Mr Mimran assisted in that part of the operation, he is liable for dishonest
assistance in Mr Russo's breach of trust and fiduciary duty. The case is that
the Westland agreements were used to persuade Mr Shalson that he would
be participating in a hugely profitable venture, whereas the truth was that
they were used by Mr Russo to buy time in which to misappropriate, or
D  conceal the misappropriation of, Mr Shalson's money out of WIB. I am
prepared to assume that that is a possible explanation of what lay behind the
Westland agreements. On that assumption, the issue is whether Mr Mimran
was a party to that dishonesty. He and Mr Jerne deny that they knew
anything about the Westland agreements, but the Shalson parties rely on the
fact that each agreement is purportedly signed for Westland by Mr Jerne.
E  This claim is not advanced by the Shalson parties as a freestanding one in its
own right: it is advanced merely as a claimed set-off to the Mimran parties'
tracing claim. I do not find that an easy concept to follow, but will first
consider the general merits of the allegation.
      172    I have explained the slowness with which Mr Jerne asserted his
denial that he signed the Westland agreements. One might have expected
him to rush to do so once he had learnt the position, but he did not, and
F  I must take that into account in deciding whether he is telling the truth about
this part of the case. What might also have been of value was some expert
evidence as to whether the signatures were Mr Jerne's. Mr Smith told me
that the Mimran parties would have wished to call such evidence, but were
met with the difficulty that no original of either Westland agreement was
available: and they were advised by a leading handwriting expert that
G  in those circumstances she could not give an opinion on the authenticity of
the signatures, a difficulty explained to Lloyd J at a pre-trial review on
10 February 2003.
      173    I am, therefore, faced with two agreements apparently signed by
Mr Jerne, but which he has belatedly denied he signed and says are forgeries.
Mr Mimran also denies all knowledge of the agreements. The absence of
expert evidence has been explained, and so I am left with the issue of
H  whether or not I should accept the evidence to the effect that Mr Mimran
and Mr Jerne both knew nothing of the Westland agreements, and had no
part in their execution.
      174    I do accept that evidence. Whilst Mr Russo has demonstrated his
capacity for dishonesty, there is no basis at all for painting Mr Mimran or

Mr Jerne in like colours. Mr Mimran was, I find, as much an innocent victim *A*
of Mr Russo's fraud as was Mr Shalson. In May 2000, Westland was simply
not in a position to enter into the agreement it did, and the correspondence
between Mr Russo and Mr Mimran shortly before the signing of the first
Westland agreement is quite inconsistent with any then proposal on the part
of Westland to commit itself to the transaction into which it entered on
19 May. If Mr Mimran were a knowing party to the then impending first
Westland agreement, I would have expected mention to have been made of it *B*
in those letters. I regarded both Mr Mimran and Mr Jerne as honest
witnesses, and I find that they had no part in the Westland agreements and
that the signatures on them purporting to be Mr Jerne's were not made either
by his hand or with his or Mr Mimran's authority. I reject this part of the
Shalson parties' case.

*C*

*(j) The Mimran parties' claim under section 423 of the Insolvency Act 1986*

**175**   The Mimran parties say that the charges Mr Russo granted
Mr Shalson over the Edenton share and loans were transactions entered into
at an undervalue so as to be capable of being avoided by a creditor such as
Mr Mimran. Mr Mimran relies on section 423 of the Insolvency Act 1986.

**176**   In my view there is nothing in this. All Mr Russo did by these *D*
charges was to give one of his creditors securities for his indebtedness which
that creditor would not otherwise have had. As Millett J explained in *In re
M C Bacon Ltd* [1990] BCLC 324, 340 the giving of those securities did not
deplete Mr Russo's assets or diminish their value. All he lost as a result was
the ability to apply the charged assets otherwise than in satisfaction of the
secured debts. I see no reason why Mr Russo was not entitled to create the
charges or why Mr Shalson was not entitled to take them. They involved no *E*
disposition of assets at an undervalue and section 423 is not engaged at all.
In the event of Mr Russo's subsequent bankruptcy, they might perhaps have
amounted to preferences under section 340, but that is a different matter.
I reject this claim.

*(2) The Mimran parties' other claims*                                      *F*

**177**   These are claims against Mr Russo and WIB. They have not been
defended but the relevant facts have been proved by the evidence.

*(a) The GSS deal*

**178**   I have summarised the essential history of this. I add that I find that
by October 1998, it was agreed that Mr Russo would subscribe and pay for *G*
Oceanwave's holding of 1,050 shares in Westbond, but that if this was not
done by 30 November 1998 Mr Russo was to pay Mr Mimran US$8·5m
plus interest from 1 January 1997 at the interbank rate. It was not done by
that date, although it was purportedly done in December 1998, when a
fictitious payment was credited to Oceanwave's account with WIB, and
Oceanwave used it (or believed it was using it) to pay for the Westbond
shares issued to it. Although Oceanwave later received share certificates for *H*
its shares, Westbond denies that any shares were validly issued to it, as is
shown by a letter of 18 April 2001 from Henry Sherman of Westbond to
Mr Jerne. Alternatively, if the shares were validly issued, Westbond would
be likely to have a lien on them for the US$12,682,320 unpaid purchase

339

[2005] Ch

Shalson v Russo (Ch D)
Rimer J

A  price. Either way, Mr Russo did not fulfil the conditions of the agreement of October 1998, and it follows that Mr Mimran is entitled to judgment against him for US$8·5m plus interest from 1 January 1997.

179   Mr Shipley, who argued this part of the Mimran parties' case, submitted that Oceanwave is also entitled to judgment against WIB for the US$12,683,000 credited to its account. Even though this was a fictitious entry, which did not represent the real movement of a single cent, he said

B  that WIB's bank statement showing this credit amounted to an admission by WIB against interest, and so Oceanwave is entitled to judgment against WIB for this amount. He acknowledged that I could not give unconditional judgments both in favour of Mr Mimran for US$8·5m and Oceanwave for US$12,683,000, since that would amount (at least, in theory) to double recovery, but said that I could and should give judgments for both sums on

C  the basis that Mr Mimran and Oceanwave would have to make an election as to which judgment to enforce. Mr Shipley's point was that it is too early at this stage to know how they might wish to exercise any such right of election.

180   I see the merit of that proposal, but I am anyway not prepared to give judgment for Oceanwave against WIB. The credit entry of US$12,683,000 was a fraudulent fiction which did not represent the

D  movement of any money into WIB. Now that the truth is out it is unreal to regard Oceanwave as having a claim against WIB in respect of such a sum. It does not represent money paid into the account either by Oceanwave or by anyone else. It is simply a lie, which appears to recognise a debt due from WIB to Oceanwave, but one for which Oceanwave gave no consideration to WIB. The credit entry can, in my view, be regarded as a

E  mistake which WIB's liquidator ought to be entitled to correct. I reject Oceanwave's claim for this sum. But Mr Mimran is entitled to judgment against Mr Russo for US$8·5m plus interest. I will hear further from counsel as to whether credit needs to be given against this for any recoveries in the US proceedings to which Mr Shipley referred.

F  *(b) The November 1997 loan to Mr Russo*

181   In November 1997, Mr Mimran lent Mr Russo US$2·5m, which Mr Russo pretended to repay on 2 February 2000, but did not. Mr Mimran is entitled to judgment for that sum against Mr Russo, together with interest from (as Mr Shipley proposes) 2 February 2000.

G  *(c) Claims in respect of the US$7·5m*

182   Mr Mimran asks for judgment for US$7·5m against Mr Russo and WIB. This is the total of the four loans he was induced by Mr Russo to make to Westland. These loans were induced by Mr Russo's deceit, but for which they would not have been made at all, and the money has been lost. Mr Mimran is entitled to damages against Mr Russo for US$7·5m, plus interest on each of the four loans making up that sum from the dates they

H  were respectively paid. The evidence satisfies me that WIB was a conspiring party to Mr Russo's deceit, a material part of his false representations being based on the fictitious entries for Westland's account with WIB. I hold that WIB is liable to Mr Mimran in conspiracy for damages in the same sum of US$7·5m, plus like interest.

*The Mimran parties' challenge to the Brookscastle settlement*                A

183   As a creditor of Mr Russo, Mr Mimran has an interest in
challenging the validity of the Brookscastle settlement.  Mr Pooles, for
Cantrust, did not argue that Mr Mimran had no status entitling him to
mount the challenge.

184   The Brookscastle settlement ("the settlement") is a Jersey
settlement created by a deed of 4 March 1999.  The deed was executed solely     B
by Cantrust and purported to resettle, on wide discretionary trusts as to
capital and income, the assets formerly held by it in three existing Russo
trusts: the Windsor settlement, created on 3 March 1990; the Kensington
No 2 settlement, created on 5 February 1993; and the Westbond settlement,
created on 14 July 1995.  Cantrust recited the resettlement as being in
accordance with the wishes of the beneficiaries and protectors of those         C
trusts.  The beneficiaries of the settlement were described as being the issue
of Pasquale Russo and Rosaria Aiello (Mr Russo's parents), and as being at
the date of the settlement the three Russo brothers and their children,
namely (i) Mr Russo and his two children, (ii) Renato and his child, and
(iii) Roberto and his two children.  The trustees had a power both to add
beneficiaries (confined to spouses, widows and widowers of the original
class of beneficiaries) and to subtract beneficiaries, and they had the widest   D
investment powers.  Clause 7(d) provided that it was a condition of the
resettlement that trust money should initially be invested with WIB which
"shall be the preferred vehicle for depositing and investing trust funds".  The
protectors were Renato and Roberto.  The scheduled trust assets included
seven unquoted investments, money in three currencies at WIB, and ten
loans (including £5m due from Seatride).  The total value of the resettled        E
assets was said to be some US$39m.  The evidence was that there was an
initial list of scheduled assets, which Cantrust regarded as final, but which
was then the subject of discussion with Mr Russo and others as to whether it
was comprehensive, and it was only later that a definitive list was agreed,
which involved some changes to the original list and a substitution of a new
one.  The reason for the uncertainty was because Cantrust did not have
comprehensive records of the assets of the prior trusts, which were in part       F
kept by associates of Mr Russo.

185   The pleaded claim is that the true settlor or sole beneficiary of the
settlement was and is Mr Russo.  Its essence is that he used it as a vehicle into
which he purported to put his own assets whilst in fact ensuring that they
were available for use by him as and when required; and it is said that the
settlement was always operated in accordance with his wishes and                  G
instructions and was under his effective control.  The claim is that the
settlement is a sham and that its assets are held for Mr Russo.

186   This part of the trial followed an unusual course.  Mr Trace opened
the case on the documents, but withdrew from its further prosecution after
the Shalson parties had settled with the Cantrust parties.  The Mimran
parties then pursued it alone.  In Mr Smith's absence, Mr Shipley cross-
examined the Cantrust witnesses, and Mr Pooles then embarked on his               H
closing speech.  When it was nearing its end, Mr Smith returned to the scene
in order (i) to make an application to amend the pleaded case and (ii) to
make the Mimran parties' speech in reply.  I refused the application for
reasons to be given in this judgment, to which I will come later.

A      187   Cantrust is a subsidiary in the WJB Chiltern Group.  The group's history and structure is complicated, but it is unnecessary to explain it. Cantrust's oral evidence was from Charles Malet de Carteret, Brian Frith and Leslie Perrier, who joined the group in July 1992, on 12 October 1998 and on 1 February 1999 respectively.  This claim has (like the others) generated a vast mass of files, and a summary of the evidence relevant to it—which was the subject of a somewhat rambling inquiry—is not easy.  Before

B      turning to it, I should first endeavour to identify the principles by reference to which the court will consider whether a transaction is a sham.  Mention of "sham" invites immediate reference to Diplock LJ's familiar words in *Snook v London and West Riding Investments Ltd* [1967] 2 QB 786, 802, where he said that a sham means:

C          "acts done or documents executed by the parties to the 'sham' which are intended by them to give to third parties or to the court the appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intend to create.  But one thing, I think, is clear in legal principle, morality and the authorities (see *Yorkshire Railway Wagon Co v Maclure* (1882) 21 Ch D 309 and *Stoneleigh Finance Ltd v Phillips* [1965] 2 QB

D          537), that for acts or documents to be a 'sham', with whatever legal consequences follow from this, all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating."

       188   Those principles were reaffirmed and applied by the Court of Appeal in *Hitch v Stone* [2001] STC 214, paras 62–70 of Arden LJ's

E      judgment, with which Sir Martin Nourse and Kay LJ both agreed.  Arden LJ re-emphasised, at para 69, that the relevant intention must be a common intention.  After a careful consideration of the authorities, the Royal Court of Jersey held in *In re Esteem Settlement* 2003 JLR 188, (to which I was referred by counsel after I had reserved judgment) that the like principle applies to an allegedly sham settlement: both the settlor and the trustee must intend the settlement to be a sham, and they rejected the proposition that all

F      that counts is the settlor's intention.  They considered *Abdel Rahman v Chase Bank (CI) Trust Co Ltd* 1991 JLR 103 (a case on which Mr Smith placed some reliance) and concluded that it was not possible to derive from it any decision to the effect that it is sufficient to look only at the settlor's intention in considering whether a settlement is a sham.

       189   If that principle is right, it puts the Mimran parties' case in

G      difficulty.   That is because, during his cross-examination, Mr Shipley conceded that everyone at Cantrust acted honestly in all material respects in relation to the settlement; and Mr Smith conceded in his closing speech that Cantrust was in no sense a knowing party to the allegedly sham nature of the settlement.  His case is that it is enough to look at Mr Russo's acts and omissions in relation to the trust assets to enable the view to be formed that the settlement was and is a sham; and that the fact that Cantrust always

H      regarded the settlement as a genuine one is irrelevant.

       190   Despite Mr Smith's 12-page submissions to the contrary effect, I respectfully regard the approach adopted by the Royal Court of Jersey in *In re Esteem Settlement* 2003 JLR 188 as correct.  It is not only squarely in line with the guidance given by the Court of Appeal in *Snook v London and*

*West Riding Investments Ltd* [1967] 2 QB 786 and *Hitch v Stone* [2001]    A
STC 214, it also appears to me to be correct in principle.  When a settlor
creates a settlement he purports to divest himself of assets in favour of the
trustee, and the trustee accepts them on the basis of the trusts of the
settlement. The settlor may have an unspoken intention that the assets are in
fact to be treated as his own and that the trustee will accede to his every
request on demand.  But unless that intention is from the outset shared by     B
the trustee (or later becomes so shared), I fail to see how the settlement can
be regarded as a sham.  Once the assets are vested in the trustee, they will be
held on the declared trusts, and he is entitled to regard them as so held and to
ignore any demands from the settlor as to how to deal with them.  I cannot
understand on what basis a third party could claim, merely by reference to
the unilateral intentions of the settlor, that the settlement was a sham and
that the assets in fact remained the settlor's property.  One might as well say   C
that an apparently outright gift made by a donor can subsequently be held to
be a sham on the basis of some unspoken intention by the donor not to part
with the property in it.  But if the donee accepted the gift on the footing that
it was a genuine gift, the donor's undeclared intentions cannot turn an
ostensibly valid disposition of his property into no disposition at all.  To set
that sort of case up the donee must also be shown to be a party to the alleged
sham.  In my judgment, in the case of a settlement executed by a settlor and a   D
trustee, it is insufficient in considering whether or not it is a sham to look
merely at the intentions of the settlor.  It is essential also to look at those of
the trustee.

    191   In the present case, the settlement was in fact executed simply by
Cantrust. In particular, Mr Russo was not a party to it. It took effect by way
of a resettlement by Cantrust of assets held by it under the prior trusts. In    E
creating the new settlement, Cantrust was exercising powers it regarded
itself as having under those trusts, and no pleaded challenge is raised either
to the validity of those trusts (it is not suggested they were shams) or to the
exercise of the power to resettle their assets. Given those circumstances, the
concessions to which I have referred and the principles which I regard as
applicable, I am unable to accept the proposition that the settlement created
in March 1999 was a sham.  If the only person executing the document         F
which created the settlement intended it to be a genuine settlement—as
Cantrust did—the acts or intentions of others cannot have made it a sham.
As I shall explain, the execution of the settlement was a matter to which
various members of the Russo family, including Mr Russo, had given their
prior written consent, and I am prepared to assume that those consents were
a necessary preliminary to the exercise (I in fact had no argument on that).   G
But whatever may have been the private intentions of the Russo family, if
Cantrust intended the settlement to be a genuine one the settlement must
have resulted in the resettled assets becoming held on the trusts that Cantrust
regarded itself as creating and which, on the face of it, it did create.

    192   The wider case made by the Mimran parties is that Mr Russo
always dealt with the alleged trust assets as if they were his own, that he
must be regarded as the true settlor of the settlement and that the trustees    H
merely acted on his instructions.  For reasons given, I do not accept that that
can help their case.  But they anyway do not even go the whole way on that.
Thus in the Shalson parties' pleaded case, various instances to this effect are
alleged.  In respect of certain of them, Mr Mimran's pleading expressly

A   adopts a neutral position, with the net result that (the Shalson parties having withdrawn from this claim) the allegations remain unproved against Cantrust. They include important matters, namely Cantrust's participation in the Rotch Italia, AMEC ventures and Westland agreements. No case has been made that Cantrust's participation in them was merely on Mr Russo's instructions.

B   193   There are, in addition, positive examples in the evidence of Cantrust exercising independent control and taking proper possession of trust assets, including assets which (on the face of it) did not even derive from Mr Russo. On 8 October 1998, Mr Russo's parents transferred their interest in certain Italian properties to Hammond Properties Ltd, subject to reserving a life interest in their favour. The transfer was in exchange for shares in Hammond, and on 4 May 1999 they transferred those shares to

C   Cantrust as assets of the settlement. Another example is in relation to the Rotch Italia venture. The shares in Rotch Italia SrL were held equally by Renato Russo (not Mr Russo) and Mr Secchia. They were transferred into a Madeira company called Baroque Services Ltd, and 50% of the Baroque shares were transferred to Cantrust sometime after the creation of the settlement (the other 50% were held by the Tchenquiz Trust, which was administered by Guinness Flight Trustees in Guernsey). The correspondence

D   shows that Renato played a positive personal role in the Rotch Italia matter, and (rather later, on 17 June 2000) Mr Stella of Paisners (Mr Shalson's solicitor) went to Milan to discuss it with him.

   194   As for the proposition that Cantrust simply responded on demand to every request from Mr Russo, that was not proved by the evidence, some of which related to the prior trusts as well as to the settlement. On

E   30 October 1998, in a memorandum from Mr Beardsley of Chiltern to Mr Malet de Carteret and Mr Frith, there is a reference to "the client" wishing to dispose of assets in the Kensington No 2 and Windsor settlements at below commercial value. I find that "the client" was Mr Russo and Mr Smith makes the fair point that for Cantrust to refer to one of the beneficiaries as "the client" reflects less than total comprehension of its role as trustee. But the memorandum also shows that there was no question of

F   Cantrust agreeing to a disposition of assets at less than full value. It reflects Cantrust's consideration of whether, under the trust deeds, a different route might enable the like result to be achieved, but makes clear that it was only prepared to deal with the matter in a manner permitted by the deeds.

   195   There is, however, no escaping that in material respects Mr Russo *was* endeavouring to deal with certain of the trust assets as if they were his

G   own. But an example of Cantrust taking him to task on this is Mr Frith's letter of 18 November 1998. This related to certain transactions Mr Russo had purportedly effected in relation to the Westbond settlement. Mr Frith required the reversal of transactions Mr Russo had purportedly effected on the Westbond settlement's account with WIB, including one transferring £5m to Seatride. The documentary background is that on 30 September 1998 £5m was credited to Cantrust's WIB account, the legend describing

H   this as "Funds received from Mr Pasquale Russo as a donation". On 30 September 1998, Mr Russo wrote in his capacity as protector of the Westbond settlement to Mr Malet de Carteret, expressing his wish that the £5m be transferred to the credit of Seatride's account with WIB. It appears that Mr Russo effected the transfer. Mr Frith pointed out in his letter that

Seatride was not a beneficiary, it could not benefit from a remittance of trust *A* funds, and that transfers of money out of Westbond's WIB account required signatures on behalf of Cantrust.  He also required a reversal of a loan to Zedfleet Ltd (the former name of SGI, Mr Shalson's company), the transaction being unauthorised by Cantrust.  Mr Frith made clear in his letter that before Cantrust could lend to a non-beneficiary it must be given some commercial logic for the lending, and that, where appropriate, *B* Cantrust would expect security.  What lies behind these complaints is that because Mr Russo had de facto control of WIB he was in a position to do what he liked with everyone's money in it, including the Westbond settlement's.  But this letter shows Cantrust objecting to the unauthorised transactions with trust assets, and requiring their reversal.  The Seatride matter became, however, somewhat questionable when it appears that it was only on 2 December 1999 that Mr Petronio sent Mr Perrier Pasquale's *C* signed deed of gift of the £5m—one dated 30 September 1998—and also Mr Russo's letter of wishes dated 30 September 1998 to Mr Malet de Carteret requesting that the £5m be transferred to Seatride's account.

**196**  Another instructive document is a Cantrust file note of 28 January 1999, in which Mr Frith and Andre Bischoff (of the London office) met Mr Russo to discuss the amalgamation of the then three existing trusts into the single Brookscastle settlement.  Cantrust's note records that the principal *D* beneficiaries of the new settlement were to be Mr Russo and his two brothers (the trust as executed differed slightly from the proposals noted), and that the three brothers had signed an acknowledgment that the current trust assets had all been settled by their father, Pasquale.  Pasquale had also signed a letter agreeing to the amalgamation.  Mr Russo was to be appointed the investment adviser to the new settlement at a salary to be agreed.  The note *E* referred to Cantrust's need to invite letters of wishes from the brothers with regard to their respective interests.  It also referred to the fact that Mr Russo was currently securing the Rotch Italia venture, and that in due course the Baroque shares would be transferred to the new settlement.  The note concludes with the observation that Mr Russo was keen for the new trust to be properly and professionally run and that he understood that Cantrust needed to control it and have a power of veto.  The Mimran parties make no *F* suggestion that Cantrust did not take everything reflected in that note at face value, save that Mr Frith acknowledged that Cantrust did not assume that Pasquale had in fact provided all the assets of the previous settlements.  Their view appears to have been that he was appropriate to be regarded as the settlor of the resettlement because he was the head of the family law firm and Cantrust understood he had been the originator of the family's wealth. *G* I record that on 24 September 1999 Mr Perrier sent a fax in which he stated the settlor to be Mr Russo, but Mr Frith's view was that that was simply a mistake.  On 1 March 1999, Mr Frith sent Mr Russo a draft of his proposed appointment as financial adviser to the Brookscastle settlement (which was to be created three days later).  It said that: "You will note that the financial terms have been left open, failing which we can include the figure referred to by your father."  On 22 March 1999, Mr Frith wrote a letter to Mr Russo *H* with regard to the possibility of 16 Old Bond Street Ltd (a trust asset) making distributions of profits to charity.  The letter shows Mr Frith applying an independent mind as to whether this could or could not be done: he was not simply going along with what Mr Russo wanted.

A    197  On 19 March 1999, Mr Stella of Paisners—Mr Shalson's
solicitor—wrote to Mr Frith with regard to the possibility of Cantrust
investing with Mr Shalson in the AMEC venture.  He so wrote because
Mr Russo had, in his capacity as financial adviser to Cantrust, introduced
the possibility to Mr Shalson.  Mr Stella provided explanations and material
to Mr Frith, who on 25 March 1999 made his comments on the draft
agreement that Mr Stella had provided.  This is a working example of
B    Mr Frith dealing with a trust matter on behalf of Cantrust: he was not simply
dancing to Mr Russo's tune.  Mr Frith responded to Mr Stella on 25 March
saying that in principle Cantrust agreed, but also raising various points,
including that he had a number of comments in relation to the draft joint
venture agreement, on which he would write separately.  In the event, that
proposed joint venture came to nothing.

C    198  A file note of Mr Frith dated 15 April 1999 reflects further positive
action being taken by Cantrust with regard to the settlement's affairs.
Mr Frith refers to various ongoing matters.  One related to a proposed
purchase by the settlement from Slough Estates of a property in Oxfordshire.
Mr Russo was pursuing the matter, but the note records that Cantrust was
applying its own mind to it.  It records that Mr Russo's mother was passing
the Hammond shares into the trust, as she did, and it refers to the Rotch
D    Italia venture.  It records that Mr Russo "had still not agreed the schedule of
assets for Brookscastle and we are to liaise with him next Monday on this
matter".  It reflects that Mr Russo was driving the transactions, but that
Cantrust was involving itself in what he was doing.  On 15 April 1999,
Mr Frith wrote to Mr Russo saying that Cantrust had spoken extensively to
Knight Frank & Rutley with regard to the Oxfordshire property, had made
E    an offer of £5·8m, had been told that it would be unlikely to be accepted
unless increased and that Cantrust had concluded that it should not be
increased.  Mr Frith concluded his letter by saying that it was unlikely that
Cantrust would acquire the property.

199  Mr Frith made a file note on 19 November 1999 of a conversation
he had had with Mr Russo.  It related to various transactions (including
Rotch Italia and AMEC).  It reflects what appears to be a proper
F    communication between Cantrust and its investment adviser, Mr Russo,
about trust matters.  It does not reflect that Cantrust was simply acting on
Mr Russo's bidding.  Consistently with this, a file note by Mr Frith of
11 January 2000 records him following up a proposal by Mr Russo with
regard to the adoption of a new corporate structure in relation to the
AMEC project, and reflects Mr Frith's concern to be informed as to what it
G    involved and the need for Cantrust to consider whether it should take on
"the active management role" in the project.  In like vein is a fax of
21 November 2000 from Mr Perrier to *Renato* Russo complaining that a
general meeting of Baroque had been purportedly held without the
settlement having been given prior notice.  Mr Perrier wanted to know who
had claimed to represent Cantrust at the meeting.  He asked for a copy of the
minutes and a copy of certain accounts before he was prepared to consider
H    making a requested payment.  This shows that the Russo brothers were
doing things in relation to trust matters without proper prior reference to
Cantrust, but it also shows that Cantrust was unhappy about it and wanted
to be kept in the picture.  An exchange of faxes in November 2000 between
Paisners and Cantrust with regard to a possible joint venture agreement

relating to something called Visson also reflects Paisners' assumption that   A
Cantrust was a party with whom they had to deal.  I have earlier referred to
Mr Frith's refusal in February 2001, on behalf of Cantrust, to sign the long
backdated assignment of Brookscastle's alleged debt from Edenton to
Hamilton.  If Cantrust were just acting as Mr Russo's nominee, it might well
have taken a less independent line.

200   These various references provide pointers away from the settlement   B
being one in which Cantrust simply did what Mr Russo asked of it or
allowed him to treat the trust assets as his own.  Other evidence shows,
however, that the operation of the settlement—as of the prior trusts—was
not regarded by Cantrust as straightforward.  Thus when Mr Frith joined
Cantrust in October 1998, he said in a note of 9 November 1998 that he
"found the constant change in beneficiaries and protectors under the current
deeds somewhat confusing and that it is not normal for a trust to be used in   C
this way".  He explained that he found it difficult to identify who the
beneficiaries were.  He was also concerned to discover that Cantrust did not
have a full record of all the assets of the three trusts, and he admitted that at
that stage a lot needed to be done to put the trusts' affairs in order.
Cantrust's concern about this is reflected in a note made by Mr Beardsley (a
file handler at Chiltern's London office) at about the end of 1998 or early
1999 of a meeting he had had with Mr Frith recording the latter's concern at   D
the way that "the settlors/protectors/beneficiaries change regularly and if
ever up in court the trusts would appear a sham!!!!" The note recorded that
Mr Frith wanted to meet the "clients" in Jersey to discuss the matter, and
that he wanted all shares in the trusts to be kept in Jersey.  It reflects
Mr Frith's ambition to bring a degree of order to the trusts.  In his oral
evidence, Mr Frith said the reference to "settlors" changing regularly was   E
probably incorrect, and he did not understand that reference.  Nor do I: I do
not understand how a *settlor* can change.  Mr Frith also said that he did not
consider that regular changes of protectors and beneficiaries would point to
the trust being a sham, and questioned the accuracy of what the note
attributed to him.  Mr Malet de Carteret, whose experience of the prior
trusts goes back to 1992, denied that at any stage there was any uncertainty
as to their respective beneficiaries.   F

201   The evidence did, however, illustrate the unusual way in which the
affairs of the prior trusts had been managed.  An early instance is that on
15 February 1991 Roberto Russo wrote to Cantrust in its capacity as trustee
of the Windsor settlement and recorded that he held to its order certain share
certificates in Enter Five Ltd and Kingswell Ltd.  But Cantrust ought to have
taken possession of them itself, and the inference from Cantrust's   G
manuscript note on the letter, "Kingswell shares now in our safe", suggests it
did just that, at least as regards those shares.  Moreover, on 15 June 1992,
Mr Sarikhani of Cantrust wrote to Dr Petronio emphasising that Cantrust
had to hold the share certificates of its company assets, and indicating that, if
Dr Petronio was not prepared to agree to this, Cantrust would resign as
trustee.  That illustrates a proper recognition by Cantrust of its duty to take
possession of the trust assets.  But Mr Perrier accepted in evidence that the   H
difficulty he faced when preparing a list of assets for the proposed
Brookscastle settlement in early 1999 was that there were still some share
certificates which were not in Cantrust's possession, and he had to go to
others to ascertain the identity of the trust assets; and, for example, on 4 May

347

[2005] Ch                                            Shalson v Russo (Ch D)
                                                                    Rimer J

A   1999 (two months after the creation of the Brookscastle settlement), he
    wrote to Mr Russo for confirmation of the assets of the new settlement.
    A further example of Cantrust's lax practice during the currency of the prior
    trusts is that records were in part kept not by Cantrust, but by
    Mr Pratolongo, although apparently he used to supply copies on a monthly
    basis.  Mr Frith rightly acknowledged that that was not good practice, and
B   following his arrival in Cantrust he put in hand a change to it so that
    Cantrust had "a proper handle on our client affairs".  Mr Malet de Carteret's
    evidence with regard to the prior trusts was to different effect.  He asserted
    that Cantrust maintained records of all trust assets of which they were
    aware; to which I add that it is difficult to see how alleged trust assets of
    which Cantrust was not aware could have been trust assets at all.

C       202    Another instance investigated in the oral evidence related to the
    Westbond settlement's holding of WIB shares.  On 9 March 1998, Cantrust
    wrote to Mr Russo saying that its records showed that it had purchased 700
    shares in WIB in October 1995, but that he had produced draft accounts as
    at 30 September 1997 showing Westbond as holding 900 shares.  Mr Malet
    de Carteret said that his recollection was that the further 200 had been given
    to Westbond by Pasquale in 1997.  That is not easy to reconcile with the
    notes of a meeting Mr Malet de Carteret had with Mr Russo on
D   23 September 1997, when Mr Russo said that Westbond had purchased the
    extra 200 shares from Hamilton.  But Mr Malet de Carteret said that
    Westbond had done no such thing: it could only have bought the extra shares
    if it had consciously chosen to do so, whereas it had not.  This was simply an
    example of Mr Russo purporting to perform a transaction on behalf of
    Westbond for which he had no authority.  Mr Malet de Carteret could not
E   explain Pasquale's involvement, save that he said that he recalled he had
    executed a deed of gift to record the donation by him of the extra 200 shares.
    He said he would not have signed off the 1997 accounts (as he did) without
    being satisfied as to the Westbond settlement's holding of 900 shares in WIB.
    The evidence includes a copy of a deed of gift purportedly executed by
    Pasquale and in favour of the Westbond settlement.  It is dated 11 September
F   1997, and purports to gift seven assets, including 200 WIB shares, which is
    the seventh listed asset.  There is also in evidence an almost identical deed of
    gift executed by Pasquale, also dated 11 September 1997, which includes
    only five of those assets, not including the 200 WIB shares.  It is obvious that
    the deed gifting the 200 shares was executed after 11 September 1997, and
    (if validly executed at all) was executed on 1 October 1997.  It was on that
    day that Mr Malet de Carteret sent a fax to Mr Pratolongo requesting the
G   execution of the deed gifting the 200 shares to Westbond.  That was because
    those shares were shown in draft accounts for Westbond to 30 September
    1997, and he wished to be satisfied that they were indeed assets of the trust.
    Mr Malet de Carteret was adamant that Cantrust had no reason to believe
    other than that they reflected genuine gifts from Pasquale, although bearing
    in mind that Pasquale's executed deed of gift was returned by Mr Pratolongo
    on the same day, one might have thought that Mr Malet de Carteret would
H   have questioned how such celerity had been achieved: his evidence was that
    Mr Pratolongo was ordinarily resident in London and that Pasquale lived in
    Milan.  Mr Malet de Carteret then signed off the accounts as at 30 September
    1997, which included the 200 WIB shares as an asset.  Strictly, he should not
    have done, because on his approach to the matter they were only gifted to

Cantrust *after* 30 September 1997.  He knew that the date of 11 September     A
1997 on the deed was a lie.

   203   However, even after the establishment of the Brookscastle
settlement, Cantrust did not retain personal custody of all trust assets.  Some
of them, for example, its 1·7m shares in Prima Industrie SpA, were held by a
wholly-owned subsidiary company as its nominee, namely Almond
International SA in Luxembourg.  These shares were the subject of a deed of     B
gift dated 14 June 1999 executed by Mr Russo.  The deed expressed his wish
that Cantrust would not interfere with the management of Prima Industrie,
but that wish would not have prevented it from doing so had it been of the
opinion that it should, and on the face of it the deed made clear that the
shares became assets of the settlement.  Mr Perrier explained that there was
apparently a tax advantage in having the shares held by a Luxembourg
company as its nominee.  The gift included an option to buy more shares,       C
which Mr Russo invited Cantrust to take up and Mr Perrier's evidence was
that Cantrust considered this and agreed to it.  But this transaction sheds an
unattractive light on the way both Mr Russo and Cantrust operated.  On
29 October 1999, Mr Perrier sent Almond a draft of the deed of gift
subsequently backdated 14 June 1999, and suggested to Mr Petronio that
Mr Russo should execute it, as he did.  Mr Perrier's explanation for that is
that Mr Russo had gifted the shares to Cantrust back in June, but that         D
Cantrust had no deed of gift showing what he had done, and so he
considered one should be created, as it was.  That is an example of Cantrust
"catching up" with a disposition to it which Mr Russo had earlier purported
to make, and doing so by way of a suggestion to Mr Russo that he should
execute a backdated document.

   204   More blatantly, the documentation also shows instances of      E
Mr Russo simply dealing with trust assets as if they were his own, or perhaps
rather as if he had Cantrust's authority to do so.  Thus on 10 October 1996
he wrote a letter on Westbond settlement notepaper to WIB enclosing
certificates for 100,000 shares in Brookscastle Investment Ltd, then said to
be worth US$1·219m.  They were assets of the Westbond settlement.  He
instructed WIB to deposit them into an account in the name of the Westbond
settlement.  He also sought a credit facility for the settlement.  On the face of     F
it he had no authority to do any of those things, nor should he have had the
possession of the share certificates.  That was not an isolated incident, and
Mr Frith admitted such things happened.  He said that the settlements would
only adopt the transactions if they were appropriate ones.  A further like
incident occurred on 28 December 1996 when Mr Russo wrote to WIB in his
capacity as protector of the Kensington No 2 settlement on what purported
to be its notepaper.   He deposited 344,625 B shares of Brookscastle      G
Investments Ltd, to be held in a custody account in the name of the
settlement.  Mr Malet de Carteret said that the letterhead was not that of the
settlement, and that Cantrust was unaware of Mr Russo's purported
instructions at the time.  He said that it was not uncommon for this sort of
transaction to take place, but had Cantrust known of this one it would have
raised it with Mr Russo.  He said he was unaware of any such shareholding
being part of the assets of the Kensington No 2 settlement at that time, and     H
had no recollection of how or when they did become part of its assets.

   205   A curious transaction took place in October 2000, when the
settlement's holding of redeemable Brookscastle Investment Ltd shares was

A  redeemed and the proceeds, totalling US$28,461,768, were purportedly distributed to Mr Russo and his two brothers in equal shares. The amount was debited to Cantrust's WIB account, but no payment out of the money is reflected in the PKB account. Mr Frith said that Cantrust had no knowledge of this transaction at the time, one which has Mr Russo's fingerprints all over it. It is an extreme example of his propensity to act in trust matters without

B  authority. He was in a position to do it, because he controlled WIB and, therefore, Cantrust's money deposited in WIB. He had of course required the settlement to include the provision I have mentioned that its money would be deposited with WIB. That gave him the entrée to personal control of it. But Mr Frith said that is not how Cantrust perceived it at the time: they regarded him and his associates as honest and trustworthy people. The purported dealing with the Brookscastle shares was an extreme instance.

C  More usually, Mr Russo would approach Cantrust with a proposed deal and persuade it to take the deals up.

206  Another instance was on 2 March 2001, when Mr Russo wrote to Mr Shalson confirming his agreement to charge his 50% interest in the Rotch Italia venture: this was at a time when Mr Russo was under considerable pressure from Mr Shalson. In fact, that interest belonged to Cantrust, and it

D  was an attempt to treat it as his own. Mr Perrier said in evidence he had not seen this letter, and that had Mr Russo asked Cantrust to create the charge it would not have agreed to do so. Mr Perrier recognised that Mr Russo would negotiate deals, or proposed deals, on behalf of Cantrust, but he said that the practice was that he would then present them to Cantrust for its consideration, and I have already referred to certain instances of that. Another example is Cantrust's agreement in early 2001 to adopt the

E  transaction Mr Russo negotiated in relation to Via Tortona, Milan.

207  Another matter investigated in evidence was the position of Pasquale. I have related how he was acknowledged in early 1999 as having been the settlor under the three prior trusts. But that was not borne out by the documents. They suggest that Mr Russo and his brother Roberto were the settlors of the Windsor settlement. An inference from a letter of wishes

F  dated 5 February 1993 is that Mr Russo was the settlor of the Kensington No 2 settlement; and a Cantrust declaration of 20 February 1996 recorded that he was, one of the signatories to it being Mr Malet de Carteret, who confirmed in evidence that he understood Mr Russo to have been the settlor. A Cantrust memorandum of 20 November 1998 describes the settlors of the Westbond settlement as being Mr Russo and Pasquale. On 28 August 2001,

G  Mr Frith made an affidavit in which he swore that Mr Russo was the settlor of the Westbond settlement and that Pasquale was the deemed settlor of the other two trusts—which he explained as meaning that Pasquale was, as Cantrust had been told, "the originator of the wealth, the originator of the assets". Cantrust's own position as to Pasquale being, so it claimed, the notional settlor of the Brookscastle settlement was also somewhat ambivalent. On 24 September 1999, Mr Perrier wrote to Intertrust

H  (Luxembourg) SA saying that Mr Russo was the settlor of the Brookscastle settlement, although in his oral evidence he said that he knew that Pasquale was the settlor (as shown by the letter of 3 January 1999) and that he simply used Mr Russo's name as a matter of expediency—an explanation I simply do not understand.

208  Mr Frith's evidence was that all instructions from Pasquale *A* appeared to come either from Mr Russo or one of his associates like Mr Pratolongo.  Mr Frith has never met Pasquale; and nor have Mr Malet de Carteret and Mr Perrier.  When it came to establishing the settlement, Cantrust, however, accepted that Pasquale should be regarded as having been the settlor of the three prior trusts, Mr Frith's evidence being that Cantrust was told that he was the originator of all the businesses in the trusts.  He acknowledged, however, that Cantrust did not regard all the *B* wealth in the three trusts as having derived from Pasquale, although he said it was led to believe that some had.  Although Cantrust had no personal dealings with Pasquale, he did sign up to the letter of wishes in relation to the settlement.  Mr Frith's evidence was that Cantrust's primary concern was to make sure that that settlement was in favour of all the right beneficiaries. But he said that his choice as deemed settlor of the settlement was with *C* everyone's agreement at the time.  I confess that I do not understand why it was necessary to identify such a deemed settlor at all: the settlement was the result of an exercise by Cantrust of its powers under the prior trusts.

*The application to amend*

209  Towards the end of Mr Pooles's closing speech, Mr Smith applied *D* to amend the Mimran parties' claim on this part of the case.   The amendment ran to some 18 single-spaced paragraphs, covering over two pages.  Certain of the amendments were unnecessary, for example, a repeat of allegations that the Brookscastle settlement was a sham, or that the court could and should pierce its veil and rule that its assets all belonged to Mr Russo.  But a main part of their thrust was to widen the claim so as to raise, for the first time (and in part in an unacceptably unparticularised way), *E* factual allegations said to support the conclusion that the three prior settlements were also shams.  That was a new departure, since the only pleaded claim Cantrust had come to meet was that the Brookscastle settlement was a sham.  In addition, the amendment sought to put in issue for the first time Cantrust's power to execute the Brookscastle settlement and to assert that, because of the changes to the schedule of assets in the deed creating that settlement, there was no sufficient certainty of objects to *F* constitute a valid trust.  It also sought to rely on factual matters which had been the subject of the Shalson's parties' pleading, but in respect of which the Mimran parties had, down to that point, adopted an expressly neutral attitude.

210  I do not question that it may sometimes be just to permit an amendment to a pleading after the close of the evidence.  But all cases turn *G* on their facts, and I refused leave because I regarded it as too late to permit the Mimran parties' case to be widened in the way Mr Smith sought.  The proposal to challenge the prior settlements involved the making of a brand new case.  Mr Smith sought to justify it by saying that all the documentation in relation to the prior trusts had been disclosed and included in the trial bundles, and that he could make out his new case on the basis of that material and also the written and oral evidence from the Cantrust witnesses, *H* a material part of the former being expressly directed to the history of the prior trusts.  I regarded that as no justification at all.  The point is that Cantrust and its witnesses did not come to meet a challenge to the prior settlements: they came only to meet a challenge to the Brookscastle

351

[2005] Ch                                        Shalson v Russo (Ch D)
                                                                Rimer J

A  settlement.  If they had been given a forewarning of a challenge to the
prior settlements along the lines outlined in the proposed amendment, it is
likely that their defence to the claim would have been different.  They would
have reviewed the entire position in relation to the prior trusts, they would
have focused in particular on the nature of the challenges to them, and
would have considered what evidence they needed to call to meet them.  As it
is, really the only witness who could deal with the prior trusts at all was
B  Mr Malet de Carteret, but not even his knowledge went back to their
creation, and Cantrust might well have sought to call additional witnesses to
meet the wider challenge.  Similarly, as to the points about the execution and
certainty of the Brookscastle settlements, these might well be good points,
but it is possible that Jersey law provides an answer to them, and Cantrust
had not been given the opportunity to obtain relevant evidence.

C      211  Mr Smith was rightly sensitive to the fact that the main burden of
his proposed amendments could only be permitted if Cantrust were also
given a fair opportunity to supplement their evidence, including as to Jersey
law.  He said that I should meet this by allowing the amendments and
directing an appropriate adjournment.  On the adjourned hearing, Cantrust
could call such further witnesses as it wished.  I accept that I had a discretion
to grant such an adjournment even at that late stage of the trial, but I took
D  the view that to do so would require exceptional circumstances, whereas
there were none in the present case.  The parties had prepared for a trial on
issues of an extremely serious nature.  Those issues had been identified in the
pleadings, Cantrust had called its evidence on them and the trial was for all
practical purposes over, apart only for the remainder of the final speeches.
By their proposed amendments, the Mimran parties were asking for a retrial
E  on much wider issues.  In my judgment, they had had sufficient time before
the trial started to consider whether or not to broaden the scope of their
challenges, and by the time the evidence was closed it was simply too late to
seek to do so.  To subject Cantrust to the ordeal of such a retrial would have
been oppressive and unfair.  Nor did it appear to me that to allow the
amendments at that stage, to grant the inevitable adjournments and to
embark on what would in a material respect be a new trial would be in line
F  with the need to dispose of cases in a just, economical and proportionate
way.

*The issues*

    212  The case pleaded against Cantrust is, in summary, that the
Brookscastle settlement was a device in respect of which the true settlor and
G  sole beneficiary was Mr Russo; and that he used it to pretend that assets
which were really his were in fact assets of the settlement, whilst his true
intention at all times was that he could and would be able to use those assets
for his own purposes as and when he required to do so.  The purpose, it is
said, was to prevent his assets being applied in satisfaction of his personal
obligations.  The pleaded case asserts that this was all done with Cantrust's
knowledge.  It therefore alleged that Cantrust was a dishonest party to the
H  creation of a sham trust intended to defraud creditors.
    213  In the event, no attempt was made by the Mimran parties to make
out any such case against Cantrust.  Mr Shipley, in his cross-examination,
disclaimed any suggestion that anyone at Cantrust had ever acted
dishonestly and Mr Smith in his address adopted that disclaimer and

conceded that Cantrust was at no time privy to any dishonest designs on   A
Mr Russo's part.  He also disclaimed any suggestion that Cantrust regarded
the Brookscastle settlement as a sham, or that either at its inception or at any
time it was party to some agreement with Mr Russo that the settlement was
intended to operate otherwise than in accordance with its terms: there was
no side agreement between them, or even a side understanding.  In short, the
case pleaded against Cantrust was abandoned.  I might also add that many   B
of the factual matters raised in the pleaded case were not even put to the
Cantrust witnesses, but I do not propose to identify them.

214   I therefore start from the position that there is no challenge to the
validity of the three prior trusts, and the Brookscastle settlement which
Cantrust executed in March 1999 resulted from the exercise by it of powers
under those settlements to resettle the settled assets.  There is no challenge to
the validity of that exercise and, given the concessions, the bona fides of   C
Cantrust in the exercise is not in question.  Had I permitted the amendments,
there might have been a question as to whether the assets were identified
with sufficient certainty for the purposes of the new settlement, and there
might also have been a point as to whether the subsequent alterations to the
scheduled assets affected its validity.  But even if there is something in these
points, presumably the consequence would be that the assets purportedly   D
resettled would not have been resettled at all and would still be held by the
three prior trusts (subject always to any issue as their validity): they would
not simply become Russo assets.

215   In these circumstances, and given that I take the view, for reasons
given, that if the settlement is to be held to be a sham, it is essential to show
that Cantrust was a knowing party to the sham, I consider that the attack on
the validity of the settlement must fail.  Mr Smith submitted, however, that   E
I could nevertheless regard Mr Russo's de facto control over the trust
activities as sufficient to justify a conclusion that in reality the settlement
was, and should be held to be, a sham.

216   I was not persuaded by that case, which I regard as failing to meet
the real point.  First, it is not good enough to approach this sort of argument
in the generalised way in which the Mimran parties did.  What needs to be
done is to focus on a particular Russo asset or assets and then ask the   F
question whether or not it has become an asset of the Brookscastle
settlement.  If it has, by being vested in Cantrust, then (for the reasons given)
I do not understand on what basis it cannot or should not be regarded as
other than a genuine trust asset.  If it has not, then the question does not
arise.  Secondly, I anyway do not accept the proposition that the settlement
was under Mr Russo's effective control in any ultimately relevant sense.   G
I readily accept that he played a major part in the operations of the
companies owned by the trust.  That is not surprising.  He was the
settlement's investment adviser, he was regarded as a highly competent and
successful businessman and Cantrust was entitled to allow him to negotiate
the deals he did, although its stance was that the ultimate decision was a
matter for it.  There is no doubt that Cantrust regarded him as honest and
that it had no reason to believe he was engaged in wholesale fraud.   H
Mr Shalson and Mr Mimran had similar respect for his business acumen,
abilities and integrity.  But the evidence anyway does not show that Cantrust
simply responded to his every request, or allowed him to run the trust.  It
shows that it sought to bring its own mind to bear on the transactions he was

353

[2005] Ch                                              Shalson v Russo (Ch D)
                                                                   Rimer J

*A*  proposing, and there is no suggestion that this was all a mere pretence. It
also shows instances of Mr Russo purporting to do things on behalf of the
settlement without authority. But those acts were not the acts of Cantrust
and so I cannot see their relevance: Cantrust had the option of adopting
or disowning them.  It also shows that Cantrust occasionally acted
unprofessionally, being prepared to take at face value so-called deeds of gift
which it knew were backdated. But given the disclaimer that Cantrust was a
*B*  party to any alleged sham, I regard this as of little materiality. The terms of
the settlement also show that Mr Russo wanted the trust money to be
deposited at WIB.  That was an unusual provision, on which Mr Smith
placed great reliance, and it may well be that Mr Russo's motive was so that
he could help himself to it. But there is no evidence that Cantrust knew of
that, or intended that, or that it intended other than that it should have
*C*  proper control of the trust money so deposited. On the contrary, Mr Frith
said Cantrust had no intention that Mr Russo could take control of the trust
money.  Mr Smith submitted that this was an example of Mr Russo not
divesting himself of trust assets at all, but as retaining dominion over them at
all times, so as to be inconsistent with any intention to settle them. I doubt if
that analysis is correct. If the money never became trust money, then it was
*D*  not settled property.  If it did, and Mr Russo simply misappropriated it by
using his de facto control of WIB, then what he was doing was
misappropriating trust assets.

   217  The evidence overall satisfies me that Cantrust was doing its best, if
not always very cleverly, to control the affairs of the settlement, albeit that
Mr Russo was often several steps ahead of the game, resulting sometimes in
Cantrust having to catch up with what he had been doing.  I find that,
*E*  whatever Mr Russo's intentions with regard to the settlement, Cantrust
executed the document that created it with the honest belief and intention
that it was creating a valid settlement, and was at no time a party to any
understanding with Mr Russo that the settlement was merely warehousing
his assets.  I decline to find that the settlement was a sham or that it is
appropriate to pierce the settlement's veil and declare that assets duly vested
*F*  in it in fact belong exclusively to Mr Russo.  I dismiss the claim against
Cantrust.

*Overall result*

   218  The Mimran parties' tracing and section 423 claims fail, as does
their claim against Cantrust.   Oceanwave's claim against WIB fails.
*G*  Mr Mimran is entitled to judgment against Mr Russo for (i) US$8·5m plus
interest from 1 January 1997, (ii) US$2·5m plus interest from 2 February
2000, and (iii) damages of US$7·5m, plus interest on the four loans making
up that sum from their respective dates of payment.  He is also entitled to
judgment against WIB for the same sum of damages and interest.
   219  May I express my gratitude to all solicitors and counsel for the
excellence of the preparation and presentation of their respective cases.
*H*

*Order accordingly.*

   *Solicitors: Allen & Overy; Withers; Vizards Wyeth.*

Reported by SARAH ADDENBROOKE, Barrister

*Ch 2005—15\**