# Exhibit 3

Classics Series

# HANBURY AND MARTIN

## MODERN EQUITY

Twenty-First Edition

Classics Series

# HANBURY AND MARTIN

## MODERN EQUITY

### Twenty-First Edition

**JAMIE GLISTER**
*Associate Professor*
*Faculty of Law, the University of Sydney*

**JAMES LEE**
*Reader in English Law*
*The Dickson Poon School of Law, King's College London;*
*Associate Academic Fellow of the Honourable Society of the Inner Temple*

**SWEET & MAXWELL**

 THOMSON REUTERS

First Edition          1935
Twenty-First Edition   2018

Published in 2018 by Thomson Reuters, trading as Sweet & Maxwell. Thomson Reuters is registered in England & Wales, Company No.1679046.
Registered Office and address for service: 5 Canada Square, Canary Wharf, London, E14 5AQ.

For further information on our products and services, visit *http://www.sweetandmaxwell.co.uk*

Typeset by Letterpart Limited, Caterham on the Hill, Surrey, CR3 5XL.

Printed and bound in Great Britain by CPI Group (UK) Ltd, Croydon, CR0 4YY.

No natural forests were destroyed to make this product; only farmed timber was used and re-planted.

A CIP catalogue record of this book is available for the British Library.

ISBN: 978 0 414 06037 1

Thomson Reuters, the Thomson Reuters Logo and Sweet & Maxwell ® are trademarks of Thomson Reuters.

Crown copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland.

All rights reserved. No part of this publication may be reproduced, or transmitted in any form, or by any means, or stored in any retrieval system of any nature, without prior written permission, except for permitted fair dealing under the Copyright, Designs and Patents Act 1988, or in accordance with the terms of a licence issued by the Copyright Licensing Agency in respect of photocopying and/or reprographic reproduction. Application for permission for other use of copyright material, including permission to reproduce extracts in other published works should be made to the publishers. Full acknowledgement of the author, publisher and source must be given.

© 2018 Thomson Reuters

# TABLE OF CONTENTS

PAGE

*Preface*................................................................................................v
*Acknowledgements* ..........................................................................ix
*Table of Cases* ..............................................................................xxix
*Table of Statutes* ......................................................................cxxxix
*Table of Statutory Instruments* .......................................................clv
*Table of Foreign Legislation*...........................................................clvii
*Table of Treaties and Conventions*..................................................clix

PARA

## PART I
### Introduction

## 1. HISTORY AND PRINCIPLES

| | | | |
|---|---|---|---|
| 1. | GENERAL | ..........................................................................1–001 | |
| 2. | HISTORICAL OUTLINE | ...........................................................1–003 | |
| | A. | The Medieval Chancellor | .........................................1–004 |
| | B. | Petitions to the Chancellor | .....................................1–005 |
| | C. | The Chancellor's Discretion | ....................................1–006 |
| | D. | Attendance of the Defendant | ..................................1–007 |
| | E. | Enforcement | .........................................................1–008 |
| | F. | The Use | ...............................................................1–009 |
| | G. | The Advantages of the Use | .....................................1–010 |
| | H. | The Statute of Uses 1535 | ......................................1–011 |
| | I. | A Use upon a Use: The Trust | ..................................1–012 |
| | J. | The Struggle over Injunctions | ................................1–013 |
| | K. | The Transformation of Equity into the Modern System | ..............................................................1–014 |
| | L. | The 19th Century and the Judicature Acts 1873 and 1875 | ...............................................................1–015 |
| | M. | Current Role of the Lord Chancellor | .......................1–017 |
| 3. | THE NATURE OF EQUITABLE RIGHTS | ...............................1–018 | |
| 4. | THE RELATIONSHIP BETWEEN LAW AND EQUITY: FUSION | .............1–020 | |

5.   THE MAXIMS OF EQUITY ................................................1–024

6.   EQUITABLE REMEDIES ...................................................1–037

7.   THE BONA FIDE PURCHASER OF THE LEGAL ESTATE.....................1–039
     A.   Purchaser for Value...........................................1–040
     B.   Legal Estate..................................................1–041
     C.   Notice........................................................1–042
     D.   Overreaching..................................................1–047
     E.   Other Applications of the Doctrine of Notice...............1–048

8.   THE SUBJECT-MATTER OF EQUITY.....................................1–049

9.   THE CREATIVITY OF EQUITY ........................................1–050

10.  THE RECOGNITION OF TRUSTS ACT 1987..............................1–051

## 2.   NATURE AND CLASSIFICATION OF TRUSTS

1.   DISTINCTIONS ...........................................................2–001
     A.   Bailment......................................................2–002
     B.   Agency........................................................2–003
     C.   Contract......................................................2–004
     D.   Debt..........................................................2–009
     E.   Conditions and Charges.......................................2–012
     F.   Interest under a Will or Intestacy...........................2–013
     G.   Powers........................................................2–021

2.   CLASSIFICATION OF TRUSTS...........................................2–028
     A.   Express Trusts................................................2–029
     B.   Resulting Trusts..............................................2–032
     C.   Constructive Trusts..........................................2–033
     D.   Bare Trusts...................................................2–034
     E.   Trusts in the Higher Sense and Trusts in the Lower
          Sense ........................................................2–035

## 3.   EQUITY AND THE MODERN COMMERCIAL WORLD

1.   GENERAL ................................................................3–001
     A.   The Utility of Trusts.........................................3–002
     B.   Tax and Transparency..........................................3–003
     B.   Insolvency....................................................3–004

2.   TRUSTS IN THE WAKE OF THE GLOBAL FINANCIAL CRISIS
     AND THE CREDIT CRUNCH ..............................................3–005

3.   COMMERCIAL CONTEXTS .................................................3–008
     A.   Consequences of Breach of Trust.............................3–009
     B.   The "Domestic Consumer Context" in the Context of
          Land .........................................................3–010
     C.   Interpretation................................................3–011

D.   Conclusions...............................................................................3–012


# PART II
### Trusts and Powers


## 4. CERTAINTY AND CAPACITY

1.   CERTAINTY.................................................................................4–001
     A.   Certainty of Intention.................................................4–003
     B.   Certainty of Subject-matter .......................................4–005
     C.   Certainty of Objects: The Beneficiaries ...................4–008

2.   CAPACITY TO CREATE A TRUST .......................................4–023
     A.   Children......................................................................4–024
     B.   Persons who Lack Mental Capacity...........................4–025


## 5. CONSTITUTION OF TRUSTS

1.   THE GENERAL PROBLEM .................................................5–001
     A.   Requirements of Conveyance and Declaration ........5–001
     B.   Methods of Benefiting an Intended Donee ..............5–002
     C.   Invalid Transfers Not Construed as Declarations of
          Trust ...........................................................................5–006
     D.   Purchasers and Volunteers ........................................5–008
     E.   Dealings with Equitable Property.............................5–013

2.   TRANSFER OF THE PROPERTY TO TRUSTEES UPON TRUST
     A.   Legal Interests............................................................5–014
     B.   Equitable Interests.....................................................5–016

3.   DECLARATION OF SELF AS A TRUSTEE.............................5–017

4.   COVENANTS TO SETTLE ..................................................5–020
     A.   Contracts (Rights of Third Parties) Act 1999 ..........5–021
     B.   Covenants to Settle prior to the Contracts (Rights of
          Third Parties) Act 1999 ............................................5–022

5.   ACTION FOR DAMAGES BY THE TRUSTEES. TRUSTS OF
     CHOSES IN ACTION........................................................5–023
     A.   Action by the Trustees...............................................5–024
     B.   Trust of the Benefit of the Covenant.......................5–025
     C.   Specific Performance at the Suit of the Contracting
          Party ...........................................................................5–026

6.   TRUSTS OF FUTURE PROPERTY .......................................5–028

7.   EXCEPTIONS TO THE RULE THAT EQUITY WILL NOT ASSIST A
     VOLUNTEER
     A.   The Rule in *Strong v Bird* .......................................5–029
     B.   Donatio Mortis Causa...............................................5–030

  C. Statutory Exception: Conveyance to Child .............................5–039

# 6. FORMALITIES AND SECRET TRUSTS

 1. GENERAL ........................................................................6–001

 2. DECLARATIONS OF TRUST ...............................................6–002
  A. Land ........................................................................6–003

 3. TRANSFERS OF EQUITABLE INTERESTS ...........................6–008
  A. Disposition ..............................................................6–009

 4. SECRET TRUSTS
  A. Introduction.............................................................6–022
  B. Incorporation by Reference .....................................6–023
  C. Fully Secret Trusts..................................................6–024
  D. Half-secret Trusts....................................................6–031
  E. Can the Secret Trustee Benefit? ..............................6–034
  F. Theoretical Basis of Secret Trusts...........................6–035

# 7. POWERS

 1. POWERS AND TRUSTS .....................................................7–001

 2. BARE POWERS AND FIDUCIARY POWERS .........................7–002

 3. POWERS OF APPOINTMENT ...............................................7–003
  A. General, Special and Intermediate (or Hybrid) Powers...........7–004
  B. The Requirement of Certainty; Wide Powers; Capricious
   Powers....................................................................7–005
  C. Duties of Donee of Power; Rights of Objects .........7–006
  D. Power to Apply for Purposes...................................7–008

 4. EXERCISE OF POWERS OF APPOINTMENT
  A. General Rule ............................................................7–009
  B. Excessive Execution ...............................................7–011
  C. Defective Execution................................................7–012
  D. Contract to Exercise................................................7–016

 5. DELEGATION OF POWERS ...............................................7–017

 6. FRAUD ON A POWER.......................................................7–018
  A. Prior Agreement......................................................7–019
  B. Benefit to Appointor ...............................................7–020
  C. Non-objects ............................................................7–021
  D. Excessive Exercise; Severance................................7–022
  E. Releases ..................................................................7–023
  F. Position of Third Parties..........................................7–024

 7. RELEASE OF POWERS
  A. Why Release? .........................................................7–025

B.  How to Effect a Release ..........................................................7–026
C.  Validity of Release .................................................................7–027

## 8. PROTECTIVE TRUSTS

1.  THE GENERAL PROBLEM .................................................................8–001

2.  DETERMINABLE AND CONDITIONAL INTERESTS ..............................8–002

3.  SELF-PROTECTION ..........................................................................8–003

4.  PROTECTED LIFE INTERESTS IN PERSONS OTHER THAN THE
    SETTLOR .........................................................................................8–004

5.  TRUSTEE ACT 1925 SECTION 33 ..................................................8–005

6.  FORFEITURE OF THE LIFE TENANTS INTEREST .............................8–006
    A.  Determining Events .............................................................8–007
    B.  Order of the Court under the Trustee Act 1925 Section
        57 .........................................................................................8–008
    C.  Order of the Court under the Matrimonial Causes Acts
        1859–1973 ...........................................................................8–009

7.  ADVANCEMENTS .............................................................................8–010

8.  EFFECT OF FORFEITURE ..................................................................8–011

## 9. DISCRETIONARY TRUSTS

1.  GENERAL .........................................................................................9–001

2.  USES OF DISCRETIONARY TRUSTS .................................................9–002
    A.  To Protect the Beneficiary Against Creditors .........................9–003
    B.  To Continue to Exercise Control over Young or
        Improvident Beneficiaries .....................................................9–004
    C.  To React to Changes in Circumstances ...................................9–005

3.  USUAL FORM OF DISCRETIONARY TRUSTS
    A.  Trustees' Discretion ..............................................................9–006
    B.  The Trust Period ..................................................................9–007
    C.  Power to Accumulate ............................................................9–008
    D.  Power to Add to, or to Exclude from, the Class of
        Beneficiaries ........................................................................9–009
    E.  Power to Appoint Upon New Trusts ......................................9–010
    F.  Miscellaneous Administrative Provisions ................................9–011

4.  THE SELECTION OF TRUSTEES ........................................................9–012

5.  THE NATURE OF THE INTEREST OF THE BENEFICIARIES
    UNDER A DISCRETIONARY TRUST ...................................................9–013
    A.  Exhaustive and Non-Exhaustive Discretionary Trusts ............9–014
    B.  The Nature of the Interest of the Beneficiaries ......................9–015

         C.   Powers and Duties ..................................................9–017

**10. TAXATION AND TRUSTS**

   1.   ESTATE AND TAX PLANNING ........................................10–001

   2.   INCOME TAX ...............................................................10–002

   3.   CAPITAL GAINS TAX....................................................10–004

   4.   INHERITANCE TAX .......................................................10–005
         A.   Estate Duty...........................................................10–006
         B.   Capital Transfer Tax ............................................10–007
         C.   Inheritance Tax.....................................................10–008

   5.   INHERITANCE TAX AND SETTLEMENTS..........................10–014
         A.   Settlements in which there is an Interest in Possession.........10–015
         B.   Settlements in which there is No Interest in
              Possession ...........................................................10–019
         C.   Protective and Other Trusts...................................10–027

**11. RESULTING TRUSTS**

   1.   GENERAL ....................................................................11–001
         A.   Transfers on Trust.................................................11–003
         B.   Apparent Gifts.......................................................11–004

   2.   TRANSFERS ON TRUST
         A.   Where a Trust Fails...............................................11–006
         B.   Incomplete Disposal of Beneficial Interest .............11–007
         C.   Methods of Disposal of Surplus Funds ..................11–008
         D.   No Beneficial Interests Declared...........................11–018

   3.   APPARENT GIFTS
         A.   Presumption of Resulting Trust.............................11–020
         B.   Presumption of Advancement................................11–026
         C.   Rebutting the Presumptions...................................11–031

**12. CONSTRUCTIVE TRUSTS**

   1.   GENERAL ....................................................................12–001
         A.   Overlap in Classification.......................................12–002
         B.   Establishing the Existence or the Terms of the Trust ...........12–003
         C.   The Duties of a Constructive Trustee.....................12–004
         D.   Distinction Between Constructive Trusts, Accountability
              and Proprietary Remedies......................................12–005

   2.   WHEN A CONSTRUCTIVE TRUST ARISES ........................12–006
         A.   Unauthorised Profit by a Trustee or Fiduciary.......12–007
         B.   The Vendor under a Specifically Enforceable Contract
              for Sale................................................................12–008

C. Common Intention Constructive Trust .................................... 12–010
D. *Pallant v Morgan* ...................................................... 12–011
E. Mutual Wills ........................................................... 12–012
F. Secret Trusts .......................................................... 12–019
G. Conveyance by Fraud .................................................... 12–020
H. Acquisition of Property by Killing ..................................... 12–021
I. Constructive Trusts of a 'New Model': Justice and Good
   Conscience ............................................................. 12–026

3. THE POSSIBILITY OF A REMEDIAL CONSTRUCTIVE TRUST ............ 12–028

**13. TRUSTS OF THE FAMILY HOME**

1. INTRODUCTION .............................................................. 13–001

2. ACQUISITION OF INTERESTS IN THE HOME
   A. Background to the Problem: Marriage, Civil Partnership
      and Unmarried Cohabitation ........................................... 13–002
   B. Legal Title in Both Parties ......................................... 13–005
   C. Conveyance to One Party Only ........................................ 13–010
   D. The Relevance of Contexts and the "Commercial
      Dimension" in the Purchase of Property .............................. 13–018
   E. Alternative Solutions ............................................... 13–020
   F. Potential Reform .................................................... 13–021

3. CONSEQUENCES OF CO-OWNERSHIP
   A. The Trust of Land ................................................... 13–022
   B. Occupation Rights ................................................... 13–023
   C. Sale by Sole Trustee ............................................... 13–025
   D. Disputes over Sale ................................................. 13–028

**14. TRUSTS, LEGAL POLICY AND ILLEGALITY**

1. TRUSTS CONTRARY TO THE GENERAL POLICY OF THE LAW
   A. Purposes Contrary to Law, Public Policy or Morality ........... 14–002
   B. Statutory Provisions Against Discrimination ...................... 14–003
   C. Conditions Precedent and Subsequent; Determinable
      Interests ............................................................ 14–006

2. CONSEQUENCES OF ILLEGALITY AND ILLEGALITY AS A
   DEFENCE ................................................................. 14–013

3. PERPETUITY, DURATION AND INALIENABILITY
   A. General .............................................................. 14–016
   B. Tying Up Land ....................................................... 14–017
   C. Remote Vesting. Life in Being Plus 21 Years ....................... 14–018
   D. Wait and See ........................................................ 14–019
   E. Duration and Inalienability ......................................... 14–021

4.   ATTEMPTS TO KEEP PROPERTY FROM CREDITORS
     A.   General ..................................................................14–022
     B.   Insolvency Act 1986 ..............................................14–023
     C.   Protection of the Spouse and Family ......................14–035

## 15. CHARITABLE TRUSTS

1.   INTRODUCTION ..........................................................15–001

2.   ADVANTAGES ENJOYED BY CHARITABLE TRUSTS
     A.   Purpose Trusts.......................................................15–002
     B.   Objects Need Not be Certain..................................15–003
     C.   May be Perpetual ..................................................15–004
     D.   Fiscal Advantages ................................................15–005

3.   THE DEFINITION OF CHARITY: BASICS
     A.   Position Before the Charities Act 2006..................15–007
     B.   The Charities Acts 2006 and 2011 .........................15–008
     C.   Public Benefit .......................................................15–009
     D.   Exclusively Charitable..........................................15–010
     E.   Charitable Purposes Overseas................................15–011

4.   THE DEFINITION OF CHARITY: PURPOSES UNDER CHARITIES
     ACT 2011 SECTION 3(1)
     A.   The Prevention or Relief of Poverty ......................15–012
     B.   The Advancement of Education .............................15–014
     C.   The Advancement of Religion................................15–022
     D.   The Advancement of Health; Saving Lives ............15–025
     E.   The Advancement of Citizenship ...........................15–026
     F.   The Advancement of the Arts, Culture, Heritage or
          Science ..................................................................15–027
     G.   The Advancement of Amateur Sport.......................15–028
     H.   The Advancement of Human Rights; Conflict
          Resolution; Promotion of Religious or Racial Harmony;
          Equality and Diversity...........................................15–029
     I.   The Advancement of Environmental Protection or
          Improvement ..........................................................15–030
     J.   Youth, Age, Ill-health, Disability, Financial Hardship...........15–031
     K.   The Advancement of Animal Welfare .....................15–032
     L.   The Promotion of the Efficiency of the Armed Forces,
          Police and Rescue Services ...................................15–033
     M.   Other Purposes.......................................................15–034

5.   POLITICAL TRUSTS ARE NOT CHARITABLE....................15–038

6.   PUBLIC BENEFIT
     A.   Preliminary Points ................................................15–040
     B.   The Benefit Aspect ...............................................15–041
     C.   The Public Aspect.................................................15–043

7.   THE INTERPRETATION OF CHARITABLE GIFTS AND
     PURPOSES........................................................................15–055
     A.   The Motive of the Donor......................................15–056
     B.   The Charitable Status of the Trustee.....................15–057
     C.   The Objects Must be Exclusively Charitable.........15–058
     D.   Disaster Appeals ................................................15–065

8.   CY-PRÈS
     A.   The Cy-Près Doctrine Prior to 1960 .....................15–066
     B.   Initial Failure. Paramount Charitable Intent.........15–067
     C.   Subsequent Failure..............................................15–074
     D.   Termination in Favour of Non-charity ..................15–075
     E.   The Widening of Cy-Près Jurisdiction. Charities Act
          2011 Section 62 .................................................15–076
     F.   The Cy-Près Scheme ...........................................15–080
     G.   Small Charities; Spending Capital; Mergers.........15–081

9.   THE ADMINISTRATION OF CHARITIES
     A.   Legislative position.............................................15–082
     B.   The Authorities ...................................................15–083
     C.   The Register.........................................................15–086
     D.   Decisions on Registration....................................15–087
     E.   Advice ................................................................15–088
     F.   Other Powers of the Charity Commission .............15–089
     G.   Investment...........................................................15–093
     H.   Delegation ..........................................................15–095
     I.   Trustees ..............................................................15–096

16. NON-CHARITABLE PURPOSE TRUSTS

1.   THE GENERAL PROBLEM
     A.   Private Trusts, Purpose Trusts, Charitable Trusts ..16–001
     B.   Trusts for Persons and Purposes...........................16–002

2.   OBJECTIONS TO PURPOSE TRUSTS ...............................16–004
     A.   The Beneficiary Principle; Enforceability.............16–005
     B.   Uncertainty.........................................................16–006
     C.   Excessive Delegation of Testamentary Power .......16–007
     D.   Perpetuity ..........................................................16–008

3.   EXCEPTIONAL CASES UPHOLDING PURPOSE TRUSTS ....16–009
     A.   Tombs and Monuments .......................................16–010
     B.   Animals ..............................................................16–011
     C.   Other Anomalous Purposes .................................16–012

4.   THE FAILURE OF THE ASTOR TRUST............................16–013

5.   UNINCORPORATED ASSOCIATIONS ................................16–014
     A.   Charitable Purposes ............................................16–015
     B.   Non-Charitable Purposes .....................................16–016

      C.   Property Held on Trust for the Members ...............................16–017
      D.   Ownership by Members on Contractual Basis.......................16–019

  6.   MANDATE OR AGENCY ................................................................16–020

  7.   PERPETUITY
      A.   Excessive Duration .............................................................16–022
      B.   Human Lives Only...............................................................16–023
      C.   A Fixed Number of Years....................................................16–024

  8.   USELESS OR CAPRICIOUS PURPOSES............................................16–025

  9.   ALTERNATIVE SOLUTIONS ..........................................................16–026
      A.   By the Draftsman.................................................................16–027
      B.   By the Legislature...............................................................16–032
      C.   Offshore Jurisdictions .........................................................16–033

## 17. TRUSTS OF PENSION FUNDS

  1.   INTRODUCTION ..........................................................................17–001
      A.   Types of Pension Scheme....................................................17–002
      B.   Beneficiaries not Volunteers ...............................................17–005

  2.   SPECIAL RULES APPLICABLE TO PENSION TRUSTS........................17–006
      A.   Pensions Acts 1995 and 2004.............................................17–007
      B.   Other Statutory Provisions...................................................17–028

  3.   EQUAL TREATMENT ....................................................................17–033

  4.   PENSIONS ON DIVORCE OR DISSOLUTION OF A CIVIL
     PARTNERSHIP ..............................................................................17–034

## PART III
### Trustees and Fiduciaries

## 18. GENERAL PRINCIPLES OF THE ADMINISTRATION OF TRUSTS

  1.   ONEROUS NATURE OF OFFICE.......................................................18–001

  2.   STANDARDS APPLICABLE TO TRUSTEES
      A.   Duties and Discretions.........................................................18–002
      B.   The Statutory Duty of Care ..................................................18–003
      C.   Trustee Exemption Clauses ..................................................18–005

  3.   LIABILITY TO THIRD PARTIES.......................................................18–006

  4.   UNANIMITY.................................................................................18–007

  5.   WHO MAY BE A TRUSTEE ...........................................................18–008

6.   DISCLAIMER ................................................................18–015

7.   NUMBER OF TRUSTEES ..............................................18–016

8.   APPOINTMENT OF TRUSTEES
     A.   The First Trustees ..........................................18–017
     B.   Who May Appoint New Trustees .........................18–018
     C.   Appointment by the Court..................................18–024

9.   VESTING OF THE TRUST PROPERTY IN TRUSTEES
     A.   Requirement of Vesting ....................................18–026
     B.   Vesting Declaration under Section 40 ...................18–027
     C.   Vesting Orders under Sections 44 to 56 ................18–029

10.  SELECTION OF TRUSTEES
     A.   On Appointment by the Court under Section 41 ...........18–030
     B.   On Appointment under Express Power or under Section
          36...................................................................18–031
     C.   On Appointment by the Settlor ............................18–034

11.  RETIREMENT ...............................................................18–035
     A.   Under an Express Power in the Trust Instrument .........18–036
     B.   Under Section 39 .............................................18–037
     C.   Under an Order of the Court ...............................18–038
     D.   By Direction of the Beneficiaries.........................18–039

12.  REMOVAL ...................................................................18–040

13.  CONTROL OF TRUSTEES.................................................18–041
     A.   Giving of Reasons ...........................................18–042
     B.   Power of Decision ...........................................18–044
     C.   Intervention by the Court ..................................18–045

14.  SETTING ASIDE TRUSTEES' DECISIONS: *PITT V HOLT* ....................18–046

## 19. DUTIES OF TRUSTEES IN RELATION TO THE TRUST PROPERTY

1.   DUTY TO COLLECT IN THE ASSETS
     A.   Duty on Accepting Office...................................19–001
     B.   Extent of Duty ...............................................19–002
     C.   Litigation.....................................................19–003
     D.   A Continuing Duty...........................................19–004

2.   DUTY TO INVEST
     A.   Meaning of Investment......................................19–005
     B.   Types of Investment.........................................19–006
     C.   Express Powers of Investment .............................19–010
     D.   The Purchase of Land.......................................19–011
     E.   Authorised Investments ....................................19–012
     F.   Duties Relating to the Standard Investment Criteria .............19–015

      G.   Proper Advice ........................................................19–016
      H.   Duty of Care .........................................................19–017
      I.    Delegation of Investment Powers............................19–018
      J.    General Duty in Choosing Investments; Ethical
           Investments ........................................................19–019
      K.   Trustees Holding Controlling Interest in a Company............19–022
      L.   Extension of Investment Powers by the Court.......................19–023

  3.   DUTY TO DISTRIBUTE. SATISFACTION OF CLAIMS
      A.   Liability for Wrongful Payments............................19–024
      B.   Doubtful Claims....................................................19–025
      C.   Relief under Section 61 .........................................19–030
      D.   Discharge ............................................................19–031

## 20. DUTIES OF TRUSTEES IN RELATION TO THE BENEFICIARIES

  1.   DUTY TO MAINTAIN EQUALITY BETWEEN THE
      BENEFICIARIES.................................................................20–001
      A.   The Former Rule in *Howe v Earl of Dartmouth* ..................20–002
      B.   Other Methods of Apportionment ..........................20–011
      C.   Company Distributions...........................................20–017

  2.   DUTY TO PROVIDE ACCOUNTS AND INFORMATION
      A.   Accounts ............................................................20–018
      B.   Information. Trust Documents................................20–020

## 21. POWERS OF TRUSTEES

  1.   INTRODUCTION ..............................................................21–001

  2.   TRUSTEES OF LAND.....................................................21–002

  3.   POWER OF SALE
      A.   Land ...................................................................21–003
      B.   Chattels ..............................................................21–004
      C.   Other Property.....................................................21–005
      D.   Sales by Trustees ................................................21–006

  4.   POWER TO GIVE RECEIPTS: TRUSTEE ACT 1925 SECTION
      14.................................................................................21–007

  5.   POWER TO INSURE: TRUSTEE ACT 1925 SECTION 19
      A.   Insurance ............................................................21–008
      B.   Reinstatement......................................................21–009

  6.   POWER TO COMPOUND LIABILITIES: TRUSTEE ACT 1925
      SECTION 15.................................................................21–010

  7.   POWER IN REGARD TO REVERSIONARY INTERESTS: TRUSTEE
      ACT 1925 SECTION 22

8. POWER TO DELEGATE ..................................................................21–012
   A. The Early Rule in Equity
   B. Trustee Act 1925 ..............................................................21–013
   C. Trustee Act 2000 ..............................................................21–014
   D. Other Statutory Provisions Permitting Delegation of
      Discretions ......................................................................21–019
   E. Delegation by Enduring or Lasting Power of Attorney .........21–020

9. POWERS OF MAINTENANCE AND ADVANCEMENT .........................21–022
   A. Maintenance: Trustee Act 1925 Section 31 .........................21–023
   B. Advancement ...................................................................21–035
   C. The Court's Inherent Power to Provide Maintenance and
      Advancement ...................................................................21–046
   D. Responsibility of the Trustees to See to the Application
      of the Money Advanced .....................................................21–047

## 22. TRUSTEESHIP AND FIDUCIARY DUTIES

1. REMUNERATION AND REIMBURSEMENT .......................................22–001
   A. Remuneration Authorised by the Trust Instrument ...............22–002
   B. Trustee Act 2000 ..............................................................22–003
   C. Other Statutory Provisions .................................................22–004
   D. Remuneration Authorised by the Court ................................22–005
   E. Remuneration for Litigious Work by
      Solicitor-Trustees .............................................................22–006
   F. Authorisation by Contract ..................................................22–007

2. TRUSTEES MUST NOT BE PURCHASERS
   A. Purchase of the Trust Property: The Self-Dealing
      Rule .................................................................................22–008
   B. Purchase of the Beneficial Interest: The Fair Dealing
      Rule .................................................................................22–010

3. INCIDENTAL PROFITS
   A. Trustees ...........................................................................22–011
   B. Other Fiduciaries ..............................................................22–017

3. PERSONAL AND PROPRIETARY REMEDIES
   A. Accountability ..................................................................22–026
   B. Bribes and Secret Commissions .........................................22–027
   C. *Lister*, *Reid* and *Sinclair* ..........................................22–028
   D. *FHR European Ventures* ...................................................22–031

## 23. VARIATION OF TRUSTS

1. THE BACKGROUND ...................................................................23–001

2. VARIATIONS WHICH NEED THE APPROVAL OF THE COURT ............23–003
   A. Inherent Jurisdiction ........................................................23–004

B.  Statutory Provisions (other than Variation of Trusts Act 1958) ....................................................................23–007
C.  Variation of Trusts Act 1958 ................................................23–012

**PART IV**
**Personal and Proprietary Claims**

## 24. CONSEQUENCES OF BREACH OF TRUST

1.  PERSONAL LIABILITY ....................................................24–001
    A.  General ..........................................................................24–002
    B.  Equitable Compensation .........................................24–006

2.  BASIS AND MEASURE OF LIABILITY
    A.  Trustee Accounting ...................................................24–007
    B.  Modern Approach ......................................................24–009
    C.  Particular Situations ................................................24–014

3.  LIABILITY INTER SE: CONTRIBUTION AND INDEMNITY
    A.  Joint and Several Liability.......................................24–022
    B.  Contribution ..............................................................24–023
    C.  Indemnity ...................................................................24–024

4.  CRIMINAL LIABILITY .......................................................24–028

5.  PROTECTION OF TRUSTEES..........................................24–029
    A.  Participation in, or Consent to, a Breach of Trust .................24–030
    B.  Release and Acquiescence .......................................24–034
    C.  Impounding the Beneficiary's Interest: Trustee Act 1925 Section 62 ..............................................................24–035
    D.  Statutory Relief: Trustee Act 1925 Section 61 .....................24–037
    E.  Limitation and Laches ..............................................24–040

## 25. PERSONAL CLAIMS AGAINST THIRD PARTIES

1.  GENERAL ..........................................................................25–001
    A.  Personal and Proprietary Claims ...........................25–002
    B.  A Note on Terminology ...........................................25–004

2.  KNOWING RECEIPT..........................................................25–005
    A.  Breach of Trust or Fiduciary Duty .........................25–006
    B.  Beneficial Receipt of Traceable Assets ..................25–008
    C.  Knowledge ..................................................................25–010
    D.  Remedies....................................................................25–015

3.  DISHONEST ASSISTANCE .................................................25–017
    A.  Breach of Trust or Fiduciary Duty .........................25–018
    B.  Assistance ...................................................................25–019
    C.  Dishonesty...................................................................25–020

D.  Remedies.....................................................................25–024

4.  DE FACTO TRUSTEES.................................................25–029

5.  THE PERSONAL ACTION IN RE DIPLOCK .......................25–032

6.  LIMITATION AND THIRD PARTIES.................................25–035

## 26. TRACING

1.  INTRODUCTION ........................................................26–001
    A.  Tracing, Following and Claiming............................26–002

2.  TRACING AT COMMON LAW ......................................26–004

3.  TRACING IN EQUITY.................................................26–007
    A.  Entitlement to Trace..........................................26–008
    B.  Unmixed Funds.................................................26–014
    C.  Mixed Funds ...................................................26–015
    D.  Tracing and Debts.............................................26–024

4.  SUBROGATION ........................................................26–027

5.  CHANGE OF POSITION ..............................................26–030
    A.  Potential Application to Proprietary Claims ...........26–031

## PART V
### Miscellaneous Equitable Remedies and Doctrines

## 27. SPECIFIC PERFORMANCE

1.  GENERAL PRINCIPLES.................................................27–001
    A.  Discretionary...................................................27–002
    B.  Common Law Remedies Inadequate......................27–003
    C.  Specific Performance is a Remedy in Personam .......27–004
    D.  Ensuring Observance.........................................27–005
    E.  The Enforcement of Positive Contractual Obligations .........27–006
    F.  Time for Performance.........................................27–007
    G.  Specific Performance and Damages or Compensation.........27–008

2.  EFFECT OF ORDER ON OTHER REMEDIES.......................27–009
    A.  Common Law Remedy not Excluded .....................27–010
    B.  The Court's Discretion........................................27–011
    C.  Subsequent Performance Regulated by Terms of
        Order ............................................................27–012

3.  SPECIFIC PERFORMANCE IN PARTICULAR SITUATIONS..................27–013
    A.  Contracts for the Sale of Land .............................27–014
    B.  Contractual Licences..........................................27–015
    C.  Contracts for the Sale of Personal Property.........................27–016

D. Contracts to Pay Money .........................................................27–018
E. Volunteers..............................................................................27–019
F. Contracts Requiring Supervision..........................................27–020
G. Contracts for Personal Services............................................27–024
H. Contracts for the Creation of Transient or Terminable
   Interests ................................................................................27–025
I. Contracts to Leave Property by Will.....................................27–026
J. Contracts to Transfer Goodwill ............................................27–027
K. Contracts to Refer to Arbitration..........................................27–028
L. No Specific Performance of Part of a Contract ....................27–029

4. MUTUALITY
   A. Refusal of Specific Performance for Lack of
      Mutuality..............................................................................27–030
   B. The Time at which the Remedy must be Mutual..................27–031

5. DEFENCES TO SPECIFIC PERFORMANCE ........................................27–033
   A. Mistake and Misrepresentation.............................................27–034
   B. Conduct of the Claimant.......................................................27–035
   C. Laches or Delay ....................................................................27–036
   D. Hardship................................................................................27–038
   E. Misdescription of Subject-matter .........................................27–039
   F. Public Policy .........................................................................27–043

6. THE JURISDICTION UNDER LORD CAIRNS' ACT
   A. Award of Damages under Lord Cairns' Act..........................27–044
   B. Measure of Damages under Lord Cairns' Act ......................27–045

7. SPECIFIC PERFORMANCE AND THIRD PARTIES .............................27–047

8. JURISDICTION ...............................................................................27–051

## 28. INJUNCTIONS

1. JURISDICTION
   A. The High Court....................................................................28–001
   B. The County Court ................................................................28–003

2. TYPES OF INJUNCTIONS
   A. Prohibitory and Mandatory Injunctions ................................28–004
   B. Perpetual and Interlocutory (or Interim) Injunctions .............28–005
   C. Injunctions Without Notice...................................................28–006
   D. Quia Timet Injunctions ........................................................28–007

3. GENERAL PRINCIPLES
   A. Nature of Remedy.................................................................28–008
   B. Locus Standi ........................................................................28–012
   C. Protection of Legal or Equitable Rights................................28–014

4.   PERPETUAL INJUNCTIONS ............................................28–016
     A.   Prohibitory Injunctions ..........................................28–017
     B.   Mandatory Injunctions............................................28–018
     C.   Suspension of Injunctions.......................................28–021

5.   INTERLOCUTORY (OR INTERIM) INJUNCTIONS
     A.   General..............................................................28–022
     B.   Principles Applicable to the Issue of Interlocutory
          Injunctions..........................................................28–028
     C.   Mandatory Interlocutory Injunctions.....................28–040
     D.   Conditions and Undertakings ................................28–041

6.   QUIA TIMET INJUNCTIONS .........................................28–042

7.   DEFENCES
     A.   Delay .................................................................28–043
     B.   Acquiescence ......................................................28–045
     C.   Hardship.............................................................28–046
     D.   Conduct of the Claimant.......................................28–047
     E.   The Public Interest ...............................................28–048

8.   THE JURISDICTION UNDER LORD CAIRNS' ACT............28–050
     A.   Award of Damages under Lord Cairns' Act...........28–051
     B.   Measure of Damages under Lord Cairns' Act ........28–053

9.   INJUNCTIONS IN PARTICULAR SITUATIONS
     A.   To Restrain a Breach of Contract..........................28–055
     B.   To Restrain a Breach of Trust ...............................28–064
     C.   To Restrain the Commission or Continuance of a Tort .........28–065
     D.   Breach of Confidence and Misuse of Private
          Information .........................................................28–068
     E.   Family Matters.....................................................28–070
     F.   Judicial Proceedings ............................................28–071
     G.   To Prevent Removal or Destruction of Evidence: Search
          Orders................................................................28–072
     H.   To Prevent Removal of Assets: Freezing Injunctions............28–075

## 29. RESCISSION AND RECTIFICATION

1.   RESCISSION
     A.   General...............................................................29–001
     B.   Grounds for Rescission.........................................29–003
     C.   Loss of the Right to Rescind.................................29–016

2.   RECTIFICATION
     A.   Nature of the Remedy...........................................29–020
     B.   The Nature of the Mistake.....................................29–021
     C.   Proof of the Mistake ............................................29–023
     D.   Instruments which may be Rectified......................29–024
     E.   Defences.............................................................29–026

## 30. LICENCES AND ESTOPPEL

1.    GENERAL ...................................................................................30–001

2.    THE SITUATION AT COMMON LAW ................................................30–002
      A.   Bare or Gratuitous Licence.....................................................30–003
      B.   Licence Coupled with a Grant (or an Interest) ......................30–004
      C.   Contractual Licences..............................................................30–005

3.    CONTRACTUAL LICENCES AFTER THE JUDICATURE ACTS..............30–006
      A.   Injunction to Restrain a Licensor from Breaking a
           Contractual Licence ...............................................................30–007
      B.   The Licensee's Remedy for the Breach .................................30–008
      C.   Express or Implied Contracts .................................................30–013
      D.   Contractual Licences and Third Parties .................................30–014

4.    CONSTRUCTIVE TRUSTS .................................................................30–016

5.    LICENCES BY ESTOPPEL .................................................................30–018
      A.   Types of Estoppel ..................................................................30–019
      B.   Conveyancing Problems Caused by Licences by
           Estoppel..................................................................................30–034

                                                                        PAGE
Index ..................................................................................................921

CHAPTER 26

**TRACING**

| | | | | | |
|---|---|---|---|---|---|
| 1. | Introduction . . . . . . . . . . . **26–001** | | C. | Mixed Funds . . . . . . **26–015** | |
| | A. Tracing, Following and Claiming . . . . . . **26–002** | | D. | Tracing and Debts . . . . . . . . . . . **26–024** | |
| 2. | Tracing at Common Law . . . . . . . . . . . . . . . . . **26–004** | | 4. | Subrogation . . . . . . . . . . . . **26–027** | |
| 3. | Tracing in Equity . . . . . . . . **26–007** | | 5. | Change of Position . . . . . . . **26–030** | |
| | A. Entitlement to Trace . . . . . . . . . . . . **26–008** | | | A. Potential Application to Proprietary Claims . . . . . . . . . . . **26–031** | |
| | B. Unmixed Funds . . . . **26–014** | | | | |

1. Introduction

MOST actions at law and in equity are personal. We now have to consider the occasions on which a claimant has the right to proceed against a particular asset in the defendant's hands. Such proprietary claims exist to a very limited extent at law; and these, for convenience and for the sake of comparison, will be described here.[1] In equity the right to follow or trace property is more extensive. We will see that proprietary rights may be asserted where the claimant is making a claim at law or in equity to a specific piece of property, and also where she is making a claim in equity against a mixed fund to which property of hers (in equity) has contributed.

**26–001**

There are two main advantages of a proprietary over a personal claim. First and foremost, satisfaction of the claimant's demand does not depend on the solvency of the defendant. If the property traced is the claimant's in equity, it escapes the defendant's bankruptcy.[2] Secondly, in some cases, the claimant will be able to take advantage of increases in the value of the property. For these reasons a claimant will want to make a proprietary claim if she can, and to do so she will need to locate the property by following or tracing it.

Following and tracing are normally used to identify assets in respect of which a proprietary claim may lie. However, they are also relevant to some personal actions. For example, a tracing analysis may be employed to determine whether or not trust property was received by the defendant for the purposes of liability in knowing receipt.[3]

---

[1] Below, paras 26–002, 26–004—26–006.
[2] Insolvency Act 1986 s.283.
[3] *Relfo Ltd (In Liquidation) v Varsani* [2014] EWCA Civ 360; [2015] 1 B.C.L.C. 14; below, para.26–025.

## A. Tracing, Following and Claiming

**26–002**  The concepts of tracing and following are distinct. In *Foskett v McKeown*,[4] Lord Millett said:

> "[Tracing and following] are both exercises in locating assets which are or may be taken to represent an asset belonging to the plaintiffs and to which they assert ownership. The processes of following and tracing are, however, distinct. Following is the process of following the same asset as it moves from hand to hand. Tracing is the process of identifying a new asset as the substitute for the old. Where one asset is exchanged for another, a claimant can elect whether to follow the original asset into the hands of the new owner or to trace its value into the new asset in the hands of the same owner. In practice his choice is often dictated by the circumstances."[5]

As following involves tracking the same asset as it moves from hand-to-hand, it rarely presents evidential difficulties. Problems only arise if the asset is mixed with another asset in a way that renders the original asset no longer identifiable, or if the asset is joined to another asset in such a way that it is impractical to separate them. In most cases the law's response to these situations is to treat the mixed property as co-owned by the owners of the contributing assets.[6] For example, in *Spence v Union Marine Insurance Co Ltd*,[7] cotton bales belonging to several different consignees became indistinguishable when their markings were washed away in a shipwreck. Although such loss of marking should not strictly alter the ownership of the individual bales, the court held the remaining bales to be co-owned. The original bales could be followed into co-ownership of the remaining bales.

Even though following itself may be a straightforward process, this does not mean that a claim can easily be made in respect of the followed property. This is because in many cases the original item will have been exchanged for another, and the person who now holds the original item will have a good defence to any claim made in respect of it. If a trustee wrongly misuses trust money to buy a car in her daughter's name, it is easy to follow the trust money into the hands of the car dealer. However, the dealer will almost certainly be a bona fide purchaser of the money and no claim will succeed against him.[8] Instead, the claimant beneficiary will trace the value into the substituted asset—the car in the hands of the trustee's daughter—and claim that property instead. The important point here

---

[4]  [2001] 1 A.C. 102. See also *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch) [1464]; L. Smith, *The Law of Tracing* (Oxford: Oxford University Press, 1997), pp.6–14.

[5]  [2001] 1 A.C. 102 at 127.

[6]  The two exceptions to this are the doctrines of accession (where a junior item accedes to a dominant item and thereby ceases to exist) and specification (where an item is transformed into a completely new item of property). See generally P. Birks in N. Palmer & E. McKendrick (eds), *Interests in Goods*, 2nd edn (London: LLP, 1998), Ch.9. When accession involves land, it is known as the doctrine of fixtures: see *Elitestone Ltd v Morris* [1997] 1 W.L.R. 687.

[7]  (1868) L.R. 3 C.P. 427. For a more modern example see *Hill v Reglon Pty Ltd* [2007] NSWCA 295 (indistinguishable scaffolding poles).

[8]  *Thorndike v Hunt* (1859) 3 De G. & J. 563; *Thomson v Clydesdale Bank* [1893] A.C. 282. See also *Independent Trustee Services Ltd v GP Noble Trustees* [2012] EWCA Civ 195; [2013] Ch. 91 (money paid under consent order in divorce proceedings); T. Cutts [2013] L.M.C.L.Q. 17.

is that tracing and following are merely processes; they are *not* claims or remedies in themselves. In *Foskett v McKeown*, Lord Millett continued[9]:

> "[Tracing] is merely the process by which a claimant demonstrates what has happened to his property, identifies its proceeds and the persons who have handled or received them, and justifies his claim that the proceeds can properly be regarded as representing his property. Tracing … identifies the traceable proceeds of the claimant's property. It enables the claimant to substitute the traceable proceeds for the original asset as the subject matter of his claim. *But it does not affect or establish his claim.*"

The discussion which follows shows that different tracing rules currently operate at law and in equity. There is arguably little point in maintaining this distinction, since in either case a tracing exercise simply identifies property over which a claim may be made. Both Lord Steyn and Lord Millett took this view in *Foskett v McKeown*,[10] although their comments were obiter dicta. Subsequent cases have acknowledged these comments,[11] but they have not been treated as actually settling the law in favour of a unified tracing process.[12] Notably, the Supreme Court made reference to the separate common law and equitable tracing rules in *FHR European Ventures LLP v Cedar Capital Partners LLC*.[13] The current position is that discrete common law and equitable tracing rules remain, although it seems possible that a unified process will eventually evolve. The expansion of the circumstances in which a constructive trust may be found also means that it is often easy to establish an entitlement to trace in equity.[14]

**26–003**

## 2.   TRACING AT COMMON LAW[15]

The point of tracing in equity is normally to identify property in respect of which a proprietary remedy may be sought. That remedy may be a declaration that certain property is held on constructive trust, or is charged to secure a debt owed to the claimant. It is true that the claimant's ultimate aim is rarely to acquire the property in the sense of it being transferred to him. Rather, the point is to establish the proprietary right and then to realise that right by collecting the proceeds of sale of the property. But the claimant is still making a proprietary claim in respect of proprietary rights.

**26–004**

The position at common law is slightly different. Claimants still trace in order to identify assets in respect of which they can assert proprietary rights, but they do not seek proprietary remedies. This is because the common law never developed an action for chattels that entitled a claimant to seek specific

---

[9]  [2001] 1 A.C. 102 at 128 (emphasis added).

[10]  [2001] 1 A.C. 102 at 113 (Lord Steyn), 128 (Lord Millett). See Lord Millett's extra-judicial views in (1998) 114 L.Q.R. 399 at 409 and [1999] 14 *Amicus Curiae* 4. See also L. Smith, *The Law of Tracing* (1997), pp.278–279; R. Walker [2000] R.L.R. 573; Goff and Jones, 9th edn, para.7–18.

[11]  See *Shalson v Russo* [2005] Ch. 281 at [103]–[104].

[12]  See *London Allied Holdings Ltd v Lee* [2007] EWHC 2061 (Ch) at [246]–[247].

[13]  [2014] UKSC 45; [2015] 1 A.C. 250 at [45].

[14]  Although the Supreme Court has recently sounded a note of caution here: below, para.26–012.

[15]  M. Scott (1966) 7 W.A.L.R. 463; S. Khurshid and P. Matthews (1979) 95 L.Q.R. 78; P. Matthews in P. Birks (ed.), *Laundering and Tracing* (Oxford: Clarendon Press, 1995), p.23; D. Fox, *Property Rights in Money* (Oxford: Oxford University Press, 2008). See P. Birks, *An Introduction to the Law of Restitution,* revised edn (Oxford: Oxford University Press, 1989), p.358.

recovery.[16] Historically, the point of tracing at common law was to establish rights in an asset sufficient to allow the claimant to sue in conversion or to bring an action for money had and received. Both of these are personal claims, and personal actions as a general rule abate on bankruptcy. This is indeed the case with money had and received, where the claimant will only receive an insolvency dividend. However, an action in conversion is comparable to a proprietary claim in one important respect. This is because the claimant's entitlement is to the chattel or to its value—its full value that is, even if the defendant is insolvent, and not merely to a dividend in the insolvency.[17] Nowadays cases will often not refer to the action in conversion. Instead it is simply said that a claimant can bring a proprietary claim.[18] However, the analysis remains the same on the essential point; namely, *when* will a claimant be able to trace property in order to sue in conversion, or in order to bring a proprietary claim? One advantage of the new terminology is also that the action can be seen as available in respect of intangible property.[19]

**26–005**    There is no doubt that a claimant can bring an action in respect of a chattel owned by him. The question then arises whether this right is limited to the case of a specific chattel. Should this right not continue if the defendant had exchanged one chattel for another; or the chattel for a sum of money; or had spent that money on another chattel? The answer was given by Lord Ellenborough in *Taylor v Plumer*[20]:

> "It makes no difference in reason or law into what other form, different from the original, the change may have been made, whether it be into that of promissory notes for the security of the money which was produced by the sale of the goods of the principal, as in *Scott v Surman*,[21] or into other merchandise, as in *Whitecomb v Jacob*,[22] for the product of or substitute for the original thing still follows the nature of the thing itself, as long as it can be ascertained to be such, and the right only ceases when the means of ascertainment fail, which is the case when the subject is turned into money, and mixed and confounded in a general mass of the same description. The difficulty which arises in such a case is a difficulty of fact and not of law, and the dictum that money has no ear-mark must be understood in the same way; i.e. as predicated only of an undivided and undistinguishable mass of current money. But money in a bag or otherwise kept apart from other money, guineas, or other coin marked (if the fact were so) for the purpose of being distinguished, are so far ear-marked as to fall within the rule on this subject, which applies to every other description of personal property whilst it remains (as the property in question did) in the hands of the factor [the bankrupt] or his general legal representatives."

---

[16] A discretion to award specific recovery in an action in detinue was given to the court in 1854: Common Law Procedure Act 1854 s.78. Detinue was abolished by the Torts (Interference with Goods) Act 1977 s.2; but the discretionary power of the court to order specific recovery in an action in conversion is retained by s.3.

[17] S. Khurshid and P. Matthews (1979) 95 L.Q.R. 78; M. Scott (1966) 7 W.A.L.R. 463. See *Giles v Perkins* (1807) 9 East. 12; *Scott v Surman* (1742) Willes 400.

[18] See *Jones (FC) & Sons (Trustee) v Jones* [1997] Ch. 159 at 168: "The trustee must bring his claim at common law. It follows that, if he has to trace his money, he must rely on common law tracing rules, and that he has no proprietary *remedy*. But it does not follow that he has no proprietary *claim*." (original emphasis).

[19] By contrast, conversion does not apply in respect of intangible property: *OBG Ltd v Allan* [2008] 1 A.C. 1.

[20] (1815) 3 M. & S. 562 at 575; *Re J Leslie Engineers Co Ltd* [1976] 1 W.L.R. 292 at 297.

[21] (1742) Willes 400.

[22] (1710) Salk. 160.

In *Taylor v Plumer*, the defendant handed money to a stockbroker, Walsh, to purchase bonds. Walsh instead purchased American investments and bullion and hurried off to Falmouth to sail to America. He was caught, and the investments and bullion were seized by the defendant. On Walsh's bankruptcy, his assignees in bankruptcy sought to recover them from the defendant. They failed. The investments were the ascertainable product of the defendant's money and owned by him. If the parties had been reversed, and the defendant had been suing for the recovery of the securities and bullion, his action would have succeeded, but the assignees would have had the choice of returning them or of paying their full value in damages; just as if Walsh had taken the defendant's coach and horses and had them in his possession on his bankruptcy.

The crucial question at common law is whether identifiable property exists, the title to which has not passed to the defendant.[23] In *Banque Belge pour L'Etranger v Hambrouck*[24] money passing through substantially unmixed bank accounts was treated by the majority of the Court of Appeal as still identifiable. In *Lipkin Gorman v Karpnale Ltd*,[25] the House of Lords considered that the claimant firm could have traced at common law where money was drawn out of its client account by a partner, Cass, and paid to the Playboy Club. Although the claimant had no proprietary interest in the money in the account, the bank's debt was a chose in action which was the legal property of the claimant. This could be traced into its product, the money withdrawn (apparently even though Cass had legal title to that), and followed into the hands of the volunteer recipient. In *Jones (FC) & Sons (Trustee) v Jones*[26] a partner withdrew £11,700 from a partnership account by cheques in favour of his wife after an act of bankruptcy on the part of the firm and the wife opened an account with a broker, into which the money was paid. The money was profitably invested in potato futures and the wife received cheques from the broker for £50,760 which she paid into another account she had opened with R Bank. The wife conceded that the trustee in bankruptcy was entitled to £11,700 but claimed to keep the profit. Her claim was rejected by the Court of Appeal. She had taken possession of money (£11,700) the legal title to which was vested in the trustee in bankruptcy under the insolvency legislation. He was entitled at common law not only to trace his property into its exchange product but also to trace any profit made from it.

It has been persuasively argued that *Taylor v Plumer* was in fact a decision on tracing in equity and thus not authority for the proposition that tracing into an **26–006**

---

[23] See M. Scott (1966) 7 W.A.L.R. 463 at 481.

[24] [1921] 1 K.B. 321.

[25] [1991] 2 A.C. 548 (a personal action); P. Watts (1991) 107 L.Q.R. 521; M. Halliwell [1992] Conv. 124; E. McKendrick (1992) 5 M.L.R. 377; L. Smith (2009) 125 L.Q.R. 338. It was conceded (p.572) that the claimant's legal title to the money was not defeated by any mixing by Cass with his own money before payment to the club (cf. *Bank of America v Arnell* [1999] Lloyd's Rep. Bank. 399). Presumably mixing by the club would defeat a common law tracing claim.

[26] [1997] Ch. 159; P. Birks and W. Swadling [1996] All E.R. Rev., p.366; P. Birks (1997) 11 T.L.I. 2; D. Fox (1997) 56 C.L.J. 30; C. Mitchell (1997–98) 8 K.C.L.J. 123; L. Smith, *The Law of Tracing* (1997), pp.320–340; P. Millett in A. Burrows and A. Rodger (eds), *Mapping the Law* (Oxford: Oxford University Press, 2006), Ch.14.

"exchange product" is possible at common law.[27] It is clear, however, that *Taylor v Plumer* has been accepted in the subsequent case law as authority for that proposition.[28] In the *Jones* case Millett LJ acknowledged that *Taylor v Plumer* was concerned with the rules of equity but held that this did not mean that the common law did not recognise claims to substitute assets or their products. Thus the trustee in bankruptcy could follow the chose in action constituted by the partnership account into the cheques drawn on it, and could follow those cheques into the account with the broker, the cheques from the broker, and ultimately the chose in action constituted by the account with R Bank. He was entitled at law to the balance in that account, whether greater or less than the original amount withdrawn from the partnership account.[29]

What the common law cannot do is to provide full protection to the claimant in the most important type of case in which these questions arise: where the defendant has received the claimant's money, mixed it with other money in a bank account, and has gone bankrupt.[30] In *Agip (Africa) Ltd v Jackson* the claimant sought to trace money transferred to the defendants as a result of the fraud of the claimant's accountant, who had changed the names on payment orders. The money had been paid out (to B Co and thence to the defendants) by a London bank on the telexed instructions of a Tunis bank (where the claimant maintained an account), which then instructed a New York bank to reimburse the London bank. The defendants had paid most of the money away, but part of it remained and was paid into court. Millett J[31] rejected the claim based on common law tracing on the ground that no physical asset of the claimant (such as a cheque or its proceeds) could be identified in the defendant's hands. Nothing but a stream of electrons passed between the banks as a result of the telegraphic transfers. The London bank paid with its own money, subject to reimbursement, and not with anything identifiable as the product of the claimant's property. It was not possible to show the source from which the London bank was reimbursed without tracing the money through the New York clearing system. There it was mixed, which defeated the common law claim. The decision was upheld on appeal on the basis that mixing defeated the claim.[32] Lord Millett subsequently restated the view that the common law cannot trace money transferred electronically both judicially and

---

[27]  S. Kurshid and P. Matthews (1979) 95 L.Q.R. 78; L. Smith [1995] L.M.C.L.Q. 240; P. Matthews and P. Birks in P. Birks (ed.), *Laundering and Tracing* (1995), pp.49–51 and 297–298 respectively.

[28]  *Banque Belge pour L'Etranger v Hambrouck* [1921] 1 K.B. 321; *Lipkin Gorman v Karpnale Ltd* [1991] 2 A.C. 548; *Agip (Africa) Ltd v Jackson* [1991] Ch. 547.

[29]  cf. *SmithKline Beecham v Apotex Europe Ltd* [2007] Ch. 71 at 88, where Jacob LJ said that he could not see why equity had no role to play in the *Jones* case: "it looks like a plain case of constructive trusteeship."

[30]  P. Birks (1992) 45 C.L.P. 69. For the view that mixing does not prevent common law tracing, see L. Smith, *The Law of Tracing* (1997), pp.162–174.

[31]  [1990] Ch. 265 at 286; P. Birks (1989) 105 L.Q.R. 528; P. Millett (1991) 107 L.Q.R. 71. See also *Bank of America v Arnell* [1999] Lloyd's Rep. Bank. 399; D. Fox (2000) 59 C.L.J. 28.

[32]  [1991] Ch. 547 at 565. Tracing in equity was allowed. In *Jones (FC) & Sons (Trustee) v Jones* [1997] Ch. 159, it was not necessary to trace the passage of the money through a clearing system.

extra-judicially,[33] and it found support elsewhere.[34] It may be, however, that such money remains traceable at common law if it has not been mixed by passing through an inter-bank clearing system.[35]

Whether or not the common law can trace electronic money, the most important point is that the common law does not allow tracing through mixtures. As we will see, mixing does not prevent tracing in equity. In practical terms, most of the situations in which a claim to trace arises are cases of money in mixed bank accounts, in which the common law remedy is not available. Tracing at common law therefore has limited practical importance today. It is much more advantageous to trace in equity if it is possible to do so.

### 3. TRACING IN EQUITY

Equity has developed more sophisticated methods of tracing. The rules have developed, and are usually applied, in the context of property in the hands of trustees or other fiduciaries, and often on the bankruptcy of the fiduciary. But the rules can also be relevant to third parties; for example, in *Relfo Ltd (In Liquidation) v Varsani*,[36] the point of the tracing exercise was to establish whether or not a third party had received property for the purposes of liability in knowing receipt.

**26–007**

### A. Entitlement to Trace

A claimant who wishes to trace in equity must establish his entitlement to do so. The easiest way to do this is by showing that he had some pre-existing equitable proprietary interest in the original asset before it was misdirected; the asset may have been held on trust for the claimant, or he may have held an equitable charge[37] over it.

Where the claimant is initially the legal and beneficial owner of property, on the other hand, he does not hold an equitable interest in it. In these cases it used to be thought that the ability to trace depended on the property being misdirected in

**26–008**

---

[33] *El Ajou v Dollar Land Holdings Plc* [1993] 3 All E.R. 717 at 733 (not discussed on appeal at [1994] 2 All E.R. 685); (1991) 107 L.Q.R. 71 at 74; (1995) 9 T.L.I. 35 at 39; [1999] 14 *Amicus Curiae* 4.

[34] *Nimmo v Westpac Banking Corp* [1993] 3 N.Z.L.R. 218; *Bank Tejarat v Hong Kong and Shanghai Banking Corp (CI) Ltd* [1995] 1 Lloyd's Rep. 239. Cf. *BMP Global Distribution Inc v Bank of Nova Scotia* [2009] 1 S.C.R. 504; noted D. Fox (2010) 69 C.L.J. 28. Where a payment is made between two bank accounts telegraphically, electronically or by cheque, one chose in action is reduced or extinguished and another created, thus no property of the payer is obtained by the payee within the Theft Act 1968; *R. v Preddy* [1996] A.C. 815. Following *Preddy*, a new Theft Act 1968 s.15A was inserted, creating the offence of obtaining a money transfer by deception. That offence was repealed for actions taking place after 15 January 2007 and the area is now covered by the Fraud Act 2006.

[35] A. Oakley (1995) 54 C.L.J. 377. See also L. Smith, *The Law of Tracing* (1997), pp.253–258; L. Smith in F. Rose (ed.), *Restitution and Banking Law* (Oxford: Mansfield Press, 1998), Ch.8; J. Ulph [2007] 15 R.L.R. 76.

[36] [2014] EWCA Civ 360; [2015] 1 B.C.L.C. 14.

[37] *Dick v Harper* [2006] B.P.I.R. 20.

breach of a fiduciary duty owed to the claimant[38]; this explained why claimants could trace property misdirected by company directors and agents.[39] More recently, however, the need for a fiduciary relationship has been questioned.[40] Although it has never been formally abandoned, the current approach of the law is to ground a claimant's entitlement to trace on an equitable interest in the relevant property, even if that interest did not pre-date the misdirection of the property from its owner.

This is a welcome development in that the requirement of a fiduciary relationship may be quietly forgotten. That requirement was superfluous in the case of express trusts, difficult to apply in respect of resulting and constructive trusts, absurd in the case of thieves, and it could not explain why the holder of an equitable charge can trace. On the other hand, it is arguable that the nature of the claimant's interest (a point relevant to claiming) is now being conflated with the separate point of his entitlement to trace in equity.[41] Indeed, it is arguable that a desire to allow claimants to trace in equity has led to an increase in the circumstances in which an equitable interest may be created, and also some historical distortion of fiduciary principles. Nonetheless, it cannot be denied that the nature of the claimant's interest and his entitlement to trace are closely linked in the current law.

**26–009**    **i.  Pre-Existing Equitable Proprietary Interests.**    A beneficiary holding an equitable interest under an express trust is clearly entitled to trace the value of trust property that is wrongly disbursed from the trust.[42] The same applies to beneficiaries of resulting and constructive trusts where the property is held on pre-existing trusts before the relevant misapplication.[43] For example, it has now been settled by the Supreme Court that secret commissions obtained in breach of fiduciary duty are held on constructive trust for the fiduciary's principal.[44] The

---

[38] *Sinclair v Brougham* [1914] A.C. 398; *Re Hallett's Estate* (1880) 13 Ch.D. 696; *Agip (Africa) Ltd v Jackson* [1991] Ch. 547. Televantos argues that "fiduciary" in this context did not refer to duties to avoid unauthorised conflicts and profits, but instead merely identified a person who had control of assets in which another party held proprietary rights. Those proprietary rights may have been legal (as in the case of bailment or theft) or equitable (as in the case of a trust): A. Televantos (2017) 133 L.Q.R. 492.

[39] Also executors; *Re Diplock* [1948] Ch. 465. This category differs because people entitled under a will or intestacy do not hold a proprietary interest in the assets of the estate, at least for most purposes: *Commissioner of Stamp Duties (Queensland) v Livingston* [1965] A.C. 694; above, para.2–020. However, it can be argued that they do hold a proprietary interest sufficient for the purposes of tracing, and are analogous to the objects of discretionary trusts: see R. Nolan (2006) 122 L.Q.R. 232; M. Conaglen [2008] I.P.Q. 82 at 89. cf. D. Salmons (2017) 76 C.L.J. 399, arguing that a proprietary claim ought not to have been available in *Re Diplock*.

[40] P. Birks (1995) 9 T.L.I. 124; *Bristol and West Building Society v Mothew* [1998] Ch.1 at 23; L. Smith, *The Law of Tracing* (1997), pp.123–130, 340–347; *Foskett v McKeown* [2001] 1 A.C. 102 at 128; A. Televantos (2017) 133 L.Q.R. 492 (arguing the requirement can be traced to Lord Greene MR's misreading of earlier authorities in *Re Diplock* [1948] Ch. 465, and concluding that modern courts are not bound by it).

[41] See *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 23; *Foskett v McKeown* [2001] 1 A.C. 102 at 128.

[42] *Foskett v McKeown* [2001] 1 A.C. 102.

[43] See Chs 11 and 12 above.

[44] *FHR European Ventures LLP v Cedar Capital Partners LLC* [2015] 1 A.C. 250. cf. *Clegg v Pache (deceased)* [2017] EWCA Civ 256 at [87]–[90] (analysis extended to gains made by a company

trust arises at the point of receipt. If the fiduciary then invests those funds on his own account, the principal can trace into the fruits of that investment.[45]

When a trustee disposes of property in an unauthorised fashion the beneficiary's equitable interest still encumbers the property.[46] That interest will be extinguished if the trustee wrongly transfers the property to a bona fide purchaser for value without notice. The interest will still bind the property in the hands of an innocent recipient who does not give value, but it is important to note that such a volunteer is not subjected to any duties in respect of that property unless and until she becomes aware of the prior interest. If the property is dissipated before the recipient is made aware of the interest, the recipient owes no liability in equity in respect of it. On the other hand, if the property still exists (albeit in altered form, or mixed with the recipient's own property) the beneficiary can trace into the substitutes.[47]

## ii. Newly-Created Equitable Proprietary Interests.

*(a) Rescission, Intention and Resulting Trusts.* We now turn to property that is not held subject to pre-existing equitable interests. It is well-established that a claimant who elects to rescind a voidable transaction, such as a contract induced by misrepresentation or undue influence, can trace the property that has passed under that contract. This is on the basis that the property revests in equity in the claimant on rescission.[48] The transferor then becomes entitled under a resulting[49] trust. This equitable interest vests retrospectively for the purpose of allowing the claimant to trace in equity, although not for all purposes.[50]

**26–010**

It is important to note that the recipient acquires a full title until the transferor exercises her "mere equity" and rescinds.[51] The transferor intends that full legal title to the relevant property should pass to the recipient, although the vitiating

---

controlled by the wrongdoing fiduciary, thus enabling a proprietary claim in respect of some of those gains that were subsequently paid to a third party).

[45] *Attorney General for Hong Kong v Reid* [1994] 1 A.C. 324. See also *Keown v Nahoor* [2015] EWHC 3418 (Ch) (property transferred to third party in breach of a constructive trust).

[46] *Independent Trustee Services Ltd v GP Noble Trustees Ltd* [2012] EWCA Civ 195; [2013] Ch. 91 at [104]; *Akers v Samba Financial Group* [2017] UKSC 6; [2017] A.C. 424 at [51]. See generally D. Fox in P. Birks and A. Pretto (eds) *Breach of Trust* (Oxford: Hart Publishing, 2002) Ch.4.

[47] It does not necessarily follow that the beneficiary can successfully *claim* the substitutes: see *Re Diplock* [1948] Ch. 465 at 546–548.

[48] *Daly v Sydney Stock Exchange* (1986) 160 C.L.R. 371; *Lonrho Plc v Fayed (No.2)* [1992] 1 W.L.R. 1; *El Ajou v Dollar Land Holdings Plc* [1993] 3 All E.R. 717 at 734 (reversed on other grounds [1994] 2 All E.R. 685); *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 22; *Shalson v Russo* [2005] Ch. 281 at 317–318, 321–324; *Independent Trustee Services Ltd v GP Noble Trustees Ltd* [2013] Ch. 91 at [104]; *National Crime Agency v Robb* [2014] EWHC 4384 (Ch); [2015] Ch. 520 at [49]; *Bainbridge v Bainbridge* [2016] EWHC 898 (Ch) at [24]; P. Millett (1998) 114 L.Q.R. 399 at 416 and [1998] 6 R.L.R. 283.

[49] It has been suggested that the trust is properly characterised as constructive, and is a species of the "unconscionable retention" trust discussed below at para.26–011: see *National Crime Agency v Robb* [2015] Ch. 520 at [44].

[50] *Bristol & West Building Society v Mothew* [1998] Ch. 1 at 23; *Shalson v Russo* [2005] Ch. 281 at [125]–[127]; *Independent Trustee Services Ltd v GP Noble Trustees Ltd* [2013] Ch 91 at [53]. cf. P.G. Turner (2016) 75 C.L.J. 206.

[51] *Guinness Plc v Saunders* [1990] 2 A.C. 663 at 698; *Re Ciro Citterio Menswear Plc* [2002] 1 W.L.R. 2217 at 2231.

factor means that she is allowed to change her mind. If and when she does, the property revests in equity (and does so retrospectively for the purposes of tracing).

The importance of the transferor's intention can also be seen in *Westdeutsche Landesbank Girozentrale v Islington LBC*.[52] One question in that case was whether the claimant bank retained an equitable proprietary interest in money paid to the defendant local authority under a transaction (an "interest rate swap") that was ultra vires (so far as the defendant was concerned) and void. Tracing would in any event have been impossible because the money had been mixed with other money in an account and used for general expenditure, the account having been subsequently overdrawn several times.[53] The defendant conceded personal liability to repay, but the issue was whether compound interest could be awarded to the bank. Their Lordships unanimously agreed that the bank retained no equitable proprietary interest in the money, which, according to the majority, meant that there was no jurisdiction to award compound interest.[54] *Sinclair v Brougham*,[55] where the House of Lords had permitted tracing by creditors (depositors) of a bank whose business was ultra vires, was overruled. Although in *Westdeutsche* the bank's belief in the validity of the transaction was mistaken, it intended the money to become the absolute property of the defendant and had been prepared to take the risk of insolvency. As a general rule, property in money passes even though a contract is void, although there may be limited exceptions in the case of "fundamental mistake" in the orthodox sense.[56] Thus there was considered to be no moral or legal reason why, had there been an insolvency, the claimant should have had priority over general creditors. The defendant received the money neither as a resulting trustee (because the property had passed as intended) nor as a constructive trustee (because it was unaware of the invalidity until after the money had been spent and its conscience was thus unaffected) but was merely subject to personal liability at common law to repay.

**26–011**   *(b)   Conscience and Constructive Trusts.*   As an alternative to a resulting trust, it may be possible for a claimant to establish that the recipient holds the transferred property on constructive trust. Constructive trusts respond to the recipient's conscience rather than to the transferor's intention.

As we have seen, no resulting or constructive trust was found in *Westdeutsche*. There was no constructive trust because the money had been spent by the time the recipient's conscience was affected.[57] However, there are similar cases where the recipient has been found to hold transferred property on constructive trust. In

---

[52] [1996] A.C. 669. M. Cope (1996) 112 L.Q.R. 521; P. Birks [1996] R.L.R. 3; G. Jones (1996) 55 C.L.J. 432; C. Mitchell (1996) 10 T.L.I. 84; S. Gardner [2008] 16 R.L.R. 107.

[53] See below, para.26–023.

[54] This aspect has now been overtaken by the decision in *Sempra Metals Ltd (formerly Metallgesellschaft Ltd) v IRC* [2008] 1 A.C. 561.

[55] [1914] A.C. 398.

[56] [1996] A.C. 669 at 690; *Angove's Pty Ltd v Bailey* [2016] UKSC 47; [2016] 1 W.L.R. 3179 at [30].

[57] [1996] A.C. 669 at 700. Interest rate swaps were found to be ultra vires the powers of local authorities in *Hazell v Hammersmith & Fulham LBC* [1992] 2 A.C. 1. The first instance decision in that case was delivered in November 1989, over two years after Westdeutsche had paid the money to Islington LBC.

*Chase Manhattan Bank NA v Israel-British Bank (London) Ltd*,[58] Goulding J allowed the claimant to trace money paid by mistake of fact to the defendant (now insolvent) on the basis that the defendant retained an equitable proprietary interest in the money. Although this reasoning cannot be supported—as a full legal owner the claimant had no equitable interest prior to the payment[59] —the result of the case can be supported on the basis that the defendant bank became aware of the mistake within two days and retained the money in traceable form. Thus the bank's conscience was sufficiently affected to found a constructive trust. Lord Browne-Wilkinson explained it in the following way in *Westdeutsche*[60]:

> "[In *Chase Manhattan*] the defendant bank knew of the mistake made by the paying bank within two days of the receipt of the moneys. The judge treated this fact as irrelevant… but in my judgment it may well provide a proper foundation for the decision. Although the mere receipt of the moneys, in ignorance of the mistake, gives rise to no trust, the retention of the moneys after the recipient bank learned of the mistake may well have given rise to a constructive trust."

On this analysis, where a recipient takes property innocently, then for as long as that property remains identifiable the claimant can give the recipient notice of her claim and thereby turn it into an "unconscionable retention" case. At that point, the claimant gains an equitable interest in the transferred property. In *Clark v Cutland*,[61] for example, a director transferred company assets in breach of fiduciary duty to his pension trustees. The pension trustees were innocent volunteers, but a constructive trust clothed the transferred assets once they had been notified of the company's claim.[62]

When the recipient learns of the claim the law behaves rather like it does on rescission of a voidable transaction. The claimant's interest vests retrospectively for the purposes of tracing, but it must be remembered that the title passed fully until the revesting. This means that no liability will exist in respect of property that has already been dissipated.[63] But it is still important that the interest vests retrospectively for tracing purposes, because this enables the claimant to treat substitutes that were made before the revesting as subject to her claim (if they can still be identified). Once again, though, it does not automatically follow that a claim in respect of those substitutes will be successful.

Lord Browne-Wilkinson's "unconscionable retention" analysis in *Westdeutsche* **26–012** has been applied several times in subsequent cases,[64] although the reception has

---

[58] [1981] Ch. 105; W. Swadling (1996) 16 L.S. 110; G. McCormack [1996] Conv. 86; A. Burrows (2001) 117 L.Q.R. 412 at 426.

[59] It may be added that the payment was intended, although mistaken; so no resulting trust arose on transfer.

[60] [1996] A.C. 669 at 715.

[61] [2004] 1 W.L.R. 783.

[62] [2004] 1 W.L.R. 783 at 792–793.

[63] Specifically, there will be no liability specifically for dissipating the claimant's property (because it was not at the relevant time the claimant's property). But there may still be liability under a claim for money had and received.

[64] *Papamichael v National Westminster Bank Plc* [2003] 1 Lloyd's Rep. 341; *Clark v Cutland* [2004] 1 W.L.R. 783; *Commerzbank Aktiengesellschaft v IMB Morgan Plc* [2005] W.T.L.R. 1485 at 1495; *Re Farepak Food and Gifts Ltd* [2006] EWHC 3272 (Ch) at [40]; *Wambo Coal Pty Ltd v Ariff* [2007]

not been universally positive.[65] Some further recent doubt has been cast on the matter by Lord Sumption's judgment in *Angove's Pty Ltd v Bailey*.[66] That case did not involve any form of mistake. Instead, it concerned an argument that an agent collecting customer payments for a principal would hold the funds on constructive trust if the agent knew when it collected the payments that it would be unable properly to account for them because of the agent's imminent insolvency. Lord Sumption disapproved of an earlier case, *Neste Oy v Lloyd's Bank Plc*,[67] where a recipient who knew at the time of receipt that it was insolvent was found to hold the sums on trust for the transferor. He said[68]:

> "[W]here money is paid with the intention of transferring the entire beneficial interest to the payee, the least that must be shown in order to establish a constructive trust is (i) that that intention was vitiated, for example because the money was paid as a result of a fundamental mistake or pursuant to a contract which has been rescinded, or (ii) that irrespective of the intentions of the payer, in the eyes of equity the money has come into the wrong hands, as where it represents the fruits of a fraud, theft or breach of trust or fiduciary duty against a third party. .. [But] the prospect of a total failure of consideration, however inevitable, is not a circumstance which could [vitiate] the intention of [a payer] to part with its entire interest in the money."

These comments do not conflict directly with the unconscionable retention analysis, since the case did not concern mistake (and indeed Lord Sumption expressly allowed that "fundamental mistake"[69] could still ground a constructive trust). However, to the extent that the unconscionable retention analysis turns on the conscience of the recipient, and not on the vitiated intention of the transferor, the comments in *Angove's v Bailey* do sound a note of caution. Lord Browne-Wilkinson suggested in *Westdeutsche* that it was the recipient's knowledge of the mistake that mattered.[70] That is not immediately easy to reconcile with Lord Sumption's comment in *Angove's v Bailey* that "Property rights are fixed and ascertainable rights. Whether they exist in a given case depends on settled principles, even in equity."[71]

**26–013**   Whether or not a constructive trust over a mistaken payment can be enlivened by the recipient's knowledge that it was paid under mistake, it is clear that a constructive trust may be found when the recipient acquires property fraudulently in the first place.[72] It will be a case of unconscionable acquisition, not merely of

---

NSWSC 589 at [32]–[44]. For academic support see B. McFarlane in J. Glister and P. Ridge (eds), *Fault Lines in Equity* (Oxford: Hart Publishing, 2012), Ch.8.
[65] P. Millett (1998) 114 L.Q.R. 399 at 413; *Wuhan Guoyu Logistics Group Co Ltd v Emporiki Bank of Greece SA* [2013] EWCA Civ 1679 at [19]; Goff and Jones, 9th edn, para.37–24.
[66] [2016] UKSC 47; [2016] 1 W.L.R. 3179; above, para.12.030.
[67] [1983] 2 Lloyd's Rep. 658 (only the final payment of several was held on trust).
[68] [2016] 1 W.L.R. 3179 at [30]. The comments were obiter dicta because the Court held that the agency agreement had been validly terminated. There being no authority to collect any moneys, no question of a trust over them could arise.
[69] As Professor Watts has observed, absent further refinement, "the concept of 'fundamentality' is going to be asked to do a lot of work": P. Watts (2017) 133 L.Q.R. 11 at 14.
[70] [1996] A.C. 669 at 715.
[71] [2016] 1 W.L.R. 3179 at [28].
[72] *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] A.C. 669 at 716. Lord Sumption did not doubt that property acquired through fraud or theft could be held on constructive trust: *Angove's Pty Ltd v Bailey* [2016] 1 W.L.R. 3179 at [30].

unconscionable retention. Of course, fraud in the acquisition of property may—depending on the transaction in question—also give the claimant the ability to rescind and acquire an interest under a resulting trust.[73] Either way, the claimant will have a sufficient equitable interest to enable her to trace the property. A difficulty arises, however, with stolen property. A thief does not acquire the victim's title, and the victim remains the full legal owner of stolen property. Yet it seems absurd that a victim of theft should be left to a personal remedy against the thief, as the following example demonstrates:

> X owes £1,000 to his creditors and has only £100. He steals £1,000 from Y and mixes that money in his account which now has £1,100. He now "owes" £2,000. Should the available money be shared rateably between Y and the creditors, or should Y get back first her £1,000, which X should never have had? Common law tracing is not available because the funds are mixed. Neither is equitable tracing, unless—as would be unlikely—X was initially Y's fiduciary.

Equity's response has been to say that a thief holds stolen property on trust for his victim.[74] Although this ignores rather than answers the question about the thief's title,[75] it does provide a basis for the victim of theft to trace and claim the stolen property.

## B. Unmixed Funds

The easy case is that in which there has been no mixing of the trust funds with the trustee's own money. If the trustee has sold the trust property, the beneficiary may take the proceeds if he can identify them. (If the purchaser from the trustee had notice, the beneficiary may elect to take either the property or the proceeds as the purchaser will not be able to raise the defence of bona fide purchase.[76]) If the proceeds of sale have been used to purchase other property the beneficiary may

**26–014**

> "elect either to take the property purchased, or to hold it as a security for the amount of trust money laid out in the purchase; or, as we generally express it, he is entitled at his election either to take the property, or to have a charge on the property for the amount of the trust money."[77]

---

[73] See *Halley v Law Society* [2003] EWCA Civ 97 at [45]–[48].

[74] *Black v S Freedman & Co* (1910) 12 C.L.R. 105; *Lennox Industries (Canada) Ltd v The Queen* (1987) 34 D.L.R. 297; *Bishopsgate Investment Management Ltd v Maxwell* [1993] Ch. 1 at 70; *Westdeutsche Landesbank Girozentrale v Islington LBC* [1996] A.C. 669 at 715–716; *Armstrong DLW GmbH v Winnington Networks Ltd* [2013] Ch. 156 at 220–221. But see doubts expressed in *Shalson v Russo* [2005] Ch. 281 at [110].

[75] See R. Chambers, *Resulting Trusts* (1997), p.117, and in E. Bant and M. Harding, *Exploring Private Law* (Cambridge: Cambridge University Press, 2010), Ch.10, preferring a resulting trust analysis; L. Smith, *The Law of Tracing* (1997), pp.343–347; S. Barkehall Thomas (2009) 3 J.Eq. 52; J. Tarrant (2009) 3 J.Eq. 170. Of course, if a legal owner could trace in equity there would be no need for the trust: see A. Televantos (2017) 133 L.Q.R. 492, 494.

[76] Above, para.1–039.

[77] *Re Hallett's Estate* (1880) 13 Ch.D. 696 at 709, per Jessel MR.

The beneficiary is entitled to any increase in value even though the trustee could have made the purchase with his own money.[78] However, an increase in value must be distinguished from discrete profits made as a result of the use of the property. The existence and amount of these profits may be relevant to an action for breach of fiduciary duty, but those profits do not represent the traceable substitutes of the original property.[79]

## C. Mixed Funds

26–015   The position is more complicated where the trustee has mixed the trust funds with other money, and possibly converted the mixed funds into other property. The position differs according to whether the claim is against the trustee (or his successors), or whether the ownership of the mixed fund must be apportioned between two trusts or a trust and an innocent volunteer. Also, there are special rules applicable to cases of mixed funds in bank accounts.

26–016   **i. Position as Against the Trustee.** The rule here is that the beneficiaries have a first claim over the mixed fund or any property purchased with it. The onus is on the trustee to prove that part of the mixed fund is his own.

> "[I]f a trustee amalgamated [trust property] with his own, his beneficiary will be entitled to every portion of the blended property which the trustee cannot prove to be his own."[80]

Assuming the trustee can prove his contribution, the beneficiaries share any property purchased from the mixed fund with the trustee (or his successors), the shares being proportionate to the contributions. In *Foskett v McKeown*,[81] the trustee used his own money to pay the first three premiums on a life assurance policy and trust money to pay the fourth and fifth, after which he died. It was held by a majority of the House of Lords that the beneficiaries were entitled to a 40% share in the policy proceeds. The trustee had settled the policy on his children but they, being volunteer successors, could be in no better position than the trustee. Lord Millett expressed the rule as follows:

> "Where a trustee wrongfully uses trust money to provide part of the cost of acquiring an asset, the beneficiary is entitled *at his option* either to claim a proportionate share of the asset or to enforce a lien upon it to secure his personal claim against the trustee for the amount of the misapplied money. It does not matter whether the trustee mixed the trust money with his own

---

[78]   See the example of the winning lottery ticket in *Foskett v McKeown* [2001] 1 A.C. 102 at 134; and below, para.26–032.

[79]   *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch) at [1470]–[1475]. cf. *Jones (FC) & Sons (Trustee) v Jones* [1997] Ch. 159, a case on common law tracing, which may be explained as an "increase in value" case.

[80]   *Re Tilley's WT* [1967] Ch. 1179 at 1182, quoting *Lewin on Trusts*, 16th edn (1964), p.223; *Lupton v White* (1808) 15 Ves.Jr. 432; *Indian Oil Corp Ltd v Greenstone Shipping SA* [1987] 2 Lloyd's Rep. 286; P. Stein (1987) 46 C.L.J. 369; *Coleman v Harvey* [1989] 1 N.Z.L.R. 723; *Glencore International AG v Metro Trading International Inc* [2001] 1 Lloyd's Rep. 284; *Sinclair Investments (UK) Ltd v Versailles Trade Finance Ltd (In Administrative Receivership)* [2011] EWCA Civ 347; [2012] Ch. 453 at [138] ("maelstrom account").

[81]   [2001] 1 A.C. 102; P. Birks and W. Swadling [2000] All E.R. Rev. 2000, p.320; R. Walker [2000] R.L.R. 573; A. Burrows (2001) 117 L.Q.R. 412; D. Fox [2001] L.M.C.L.Q. 1.

in a single fund before using it to acquire the asset, or made separate payments (whether simultaneously or sequentially) out of the differently owned funds to acquire a single asset … As against the wrongdoer and his successors, the beneficiary is entitled to locate his contribution in any part of the mixture and to subordinate their claims to share in the mixture until his own contribution has been satisfied. This has the effect of giving the beneficiary a lien for his contribution if the mixture is deficient."[82]

The dissenting judgments proceeded on the basis that, on the particular facts, the premiums paid with trust money did not add to the value of the policy, so that the beneficiaries were entitled only to the return of the sums paid with their money.

It may be argued that the trustee ought not to receive any benefit from property bought from a mixed fund that has increased in value, at least in cases where the asset is not severable and so there is no possibility that the trustee could have bought only his share (a boat, for example, as opposed to company shares). In *Scott v Scott*,[83] a trustee had mixed personal and trust money to buy a house. The trustee unsuccessfully sought to keep all of the increase in value, but there was no occasion to consider whether the same claim by the beneficiaries would have been successful.[84] *Foskett v McKeown* indicates that the trustee will retain the increase in value associated with his share of the mixed asset, although again the contrary position was not argued and on the facts the insurance policy would still have paid out even without the later trust fund contributions.[85] This is a difficult point of principle: while there is an obvious reluctance to allow the trustee to profit in any way from the misuse of trust money, it can be argued that by choosing to claim a proportionate share of the asset bought from mixed funds the beneficiaries adopt the trustee's "investment".[86] It would be inconsistent also to claim the increase in value associated with the trustee's share on the grounds that it was the fruit of a breach of fiduciary duty.

Finally, the beneficiaries must be able to trace into a particular mixed fund, or to property bought from a particular mixed fund, in order to make a claim. The contrary was suggested in *Space Investments Ltd v Canadian Imperial Bank of Commerce Trust Co (Bahamas) Ltd*, where Lord Templeman said that if a bank trustee misappropriated trust money for its own benefit it would be possible

**26–017**

"to trace the trust money to all the assets of the bank and to recover the trust money by the exercise of an equitable charge over all the assets of the bank."[87]

The difficulty with this is that it suggests that if a mixed fund has been lost, the beneficiaries still have a proprietary claim to the trustee's remaining assets, which

---

[82] [2001] 1 A.C. 102 at 131. In fact the provenance of the third premium was disputed; if the third premium had been paid with trust funds, the beneficiaries would have been entitled to 60% of the proceeds.
[83] (1963) 109 C.L.R. 649.
[84] Such a claim had been rejected at trial and the beneficiaries did not cross-appeal on the point.
[85] The policy would have been kept on foot by, in effect, dipping into its own profits to pay the premiums due.
[86] Compare *Paul A Davies (Australia) Pty Ltd (In Liquidation) v Davies* [1983] 1 N.S.W.L.R. 440.
[87] [1986] 1 W.L.R. 1072 at 1074. The point did not arise on the facts because the mixing had been done lawfully.

are impressed with a charge. Such a view would be unfair to the general creditors, and is supported neither by principle nor by policy.[88]

Lord Templeman's comments have not been well-received in subsequent cases.[89] If they still carry any weight, it is only in the specific context of bank trustees. In *Serious Fraud Office v Lexi Holdings*,[90] the Court of Appeal rejected the argument that a charge could be imposed on all of the defendant's assets (including his share of the matrimonial home bought some years earlier) where the trust funds could no longer be identified:

> "This cannot be right, in our view. For the equitable charge to attach it must attach to assets in existence which derive from the misappropriated trust funds. There must be a nexus. Were it otherwise the principles of following and tracing could become otiose."[91]

26–018    **ii.   Position as Between Two Trusts, or Trust and Third Party.**    It may be, however, that the trustee has mixed the funds of two trusts, whether or not with his own, or has transferred the funds to an innocent volunteer,[92] who has mixed them with her own.[93] The rule here is that the two trusts, or the trust and the volunteer, share pari passu (i.e. rateably) in the mixed funds or any property purchased out of them.[94]

Where there have been several victims but there is no realistic possibility that other claimants will seek to assert a charge ranking rateably with the claimant's, the claimant may be permitted to trace an amount in excess of that which she would obtain on a rateable division. Whether the rights of third parties may be raised as a partial defence to a tracing claim depends on the circumstances of each case.[95]

26–019    **iii.   Bank Accounts.**    Any mixing is likely, however, to occur in the context of a banking account, to which special rules apply. Again, it is necessary to distinguish the position as between trustee and beneficiary and as between two trusts or trust and innocent volunteer. These rules govern the allocation of payments out of the mixed fund.

---

[88]  See the criticisms in R. Goode (1987) 103 L.Q.R. 433.

[89]  Later cases have often distinguished *Space Investments* rather than expressly disapproved it: see *Re Goldcorp Exchange Ltd* [1995] 1 A.C. 74; *Bishopsgate Investment Management Ltd v Homan* [1995] Ch. 211; *Fortex Group Ltd v MacIntosh* [1998] 3 N.Z.L.R. 171; *Re BA Peters Plc (In Administration)* [2010] 1 B.C.L.C. 142. But the general reception is negative: *Lehman Brothers International (Europe) v CRC Credit Fund Ltd* [2010] 2 B.C.L.C. 301 at [184]–[192].

[90]  [2009] Q.B. 376

[91]  [2009] Q.B. 376 at 393.

[92]  A recipient who, although not dishonest, ought to have known that the money was not his is not an innocent volunteer: *Boscawen v Bajwa* [1996] 1 W.L.R. 328 at 337.

[93]  In *Foskett v McKeown* [2001] 1 A.C. 102 at 132 their Lordships distinguished innocent volunteers who were contributors from those who were merely successors in title to the wrongdoer and in no better position.

[94]  *Re Diplock* [1948] Ch. 465; *Foskett v McKeown* [2001] 1 A.C. 102.

[95]  *El Ajou v Dollar Land Holdings Plc (No.2)* [1995] 2 All E.R. 213.

(a) *Re Hallett's Estate.* In *Re Hallett's Estate*,[96] Mr Hallett, a solicitor, mixed with his own money certain funds from two trusts. One of the trusts was his own marriage settlement of which he was trustee. The other was a trust of which a client, Mrs Cotterill, was beneficiary, but Mr Hallett was not the trustee. At his death there were insufficient funds to pay Mr Hallett's personal debts and to meet these claims. The question was how to allocate the withdrawals that had been made from the fund as between Mr Hallett and the claimants. This would determine entitlement to the money that remained.

**26–020**

The Court of Appeal held that the payments out of the fund must be treated as payments of Mr Hallett's own money. This left sufficient money to satisfy the claims of Mrs Cotterill and of the beneficiaries under the marriage settlement, so the question of how to allocate the payments between the claimants inter se did not arise.[97] The reason given by Jessel MR for allocating payments to Mr Hallett's money and not to the trust was that wherever an act, "can be done rightfully, [a man] is not allowed to say, against the person entitled to the property or the right, that he has done it wrongfully."[98]

(b) *Re Oatway.* The principle in *Re Hallett's Estate* operates in the context of a claim against a balance in the account,[99] and does not derogate from the general principle that the beneficiaries have a first claim on any property bought out of a mixed fund.

**26–021**

In *Re Oatway*,[100] the trustee withdrew money from the mixed fund and invested it. Later he withdrew the balance of the fund and dissipated it. Joyce J rejected the argument that the money drawn out first must be treated as his own, holding that the beneficiaries' claim must be satisfied from any identifiable part of the mixed fund before the trustee could set up his own claim. Thus the beneficiaries were entitled to the investments in priority to the creditors of the trustee.

The balance of the money was dissipated in *Re Oatway*. More difficult is the case where property has been purchased from a mixed fund, but where sufficient balance remains to satisfy the beneficiary's claim. The point will be significant where the property purchased has increased in value, or if the balance has been spent on a property which has increased by a smaller amount. *Re Tilley's Will Trusts*[101] suggests that the beneficiaries must be content with a claim to the balance (or the second property, as the case may be).[102] It was also held in *Turner*

---

[96] (1880) 13 Ch.D. 696. The principle has been applied to a common law claim to wrongly mixed oil; *Glencore International AG v Metro Trading International Inc* [2001] 1 Lloyd's Rep. 284; J. Ulph [2001] L.M.C.L.Q. 449.

[97] In the court below, where, on the view taken by Fry J, this question did arise, it was solved by applying the rule in *Clayton's Case* (1817) 1 Mer. 572.

[98] (1880) 13 Ch.D. 696 at 727.

[99] Thus it cannot be relied on in a criminal case to show that the accused was withdrawing his own money; *R. v Clowes (No.2)* [1994] 2 All E.R. 316.

[100] [1903] 2 Ch. 356; *Re Tilley's WT* [1967] Ch. 1179 at 1185.

[101] [1967] Ch. 1179.

[102] See P. Birks, *An Introduction to the Law of Restitution* (Oxford: Oxford University Press, 1995), p.370; A. Oakley (1995) 54 C.L.J. 377 at 416; cf. D. Hayton in P. Birks (ed.), *Laundering and Tracing* (1995), p.6.

*v Jacob*[103] that, where a trustee had mixed trust funds with her own in a deposit account, and a sum equal to the trust fund remained in the account, the beneficiary had no beneficial interest in property purchased with funds from the account but could claim only against the account.

The better view, however, is that the beneficiary should be allowed to "cherry pick" if the only contest is between the beneficiary and the wrongdoer. This avoids the wrongdoer being "left with all the cherries".[104] The rule may also be understood as being that the situation is to be interpreted whichever way is less favourable to the trustee. The point was explained by Campbell J in the Supreme Court of New South Wales[105]:

> "When a trustee has wrongfully taken property from a trust fund, his first obligation is, so far as the trust property can be seen as remaining in his hands, to make restitution—i.e. to put back *in specie* into the trust fund whatever of the trust property he still retains. Until he has performed that obligation, equity will not permit him to assert that he has unfettered ownership of *any* of the property into which any part of the trust property has been converted or mixed. In this way, there is a potential for any of the property into which the trust property has been converted or mixed to be the subject of, eventually, an order for restitution *in specie*."

The point did not arise in *Foskett v McKeown*, although the tenor of the majority judgments supports the view that beneficiaries may treat a mixed fund as charged in their favour,[106] and may then elect to trace the value of their interest into any property bought from that fund. The presumption in *Re Hallett's Estate* is accordingly limited to apportioning to the trustee any non-traceable withdrawals from a mixed fund.

**26–022**  *(c)  Clayton's Case.*   It remains to consider the position where the mixed funds in the bank account represent the funds of two trusts, or of a trust and an innocent volunteer. Here the rule in *Clayton's Case*[107] lays down that, in the case of a current bank account, the first payment in is appropriated to the earliest debt which is not statute-barred; in other words, first in, first out. This is a rule which has some relevance and convenience in commercial matters, such as when a debtor makes a payment to a creditor that could be applied to one of several debts, and neither the debtor not creditor expressly allocates the payment. However, we have seen that it does not apply to accounts between trustee and beneficiary.

The "first in, first out" rule in *Clayton's Case* has been applied as a means of determining entitlement in a mixed banking account between rival persons with a

---

[103] *Turner v Jacob* [2008] W.T.L.R. 307 at [102].

[104] *Shalson v Russo* [2005] Ch. 281 at [144]; D. Hayton in P. Birks and A. Pretto (eds), *Breach of Trust* (2002), pp.386–387. But the beneficiary can at most cherry-pick among assets bought *from* the mixed fund: *FHR European Ventures LLP v Mankarious* [2016] EWHC 359 (Ch) at [36]–[42].

[105] *Re French Caledonia Travel Service Pty Ltd (In Liquidation)* (2003) 59 N.S.W.L.R. 361 at 386.

[106] Care must be taken with the use of the word "charge" here. The fact that property is purchased with "charged funds" does not mean that the beneficiary is limited to claiming a "charge" over that property: see *Re French Caledonia Travel Service Pty Ltd (In Liquidation)* (2003) 59 N.S.W.L.R. 361 at 386.

[107] *Clayton's Case, Devaynes v Noble* (1817) 1 Mer. 572; cf. *Re British Red Cross Balkan Fund* [1914] 2 Ch. 419 (where later subscribers to a fund could not claim surplus to the exclusion of earlier subscribers).

right to trace,[108] and also between a person with a right to trace and an innocent volunteer.[109] But it is not the only approach that may be taken. In *Barlow Clowes International Ltd v Vaughan*, Woolf LJ said[110]:

> "[I]t is settled law that the rule in *Clayton's Case* can be applied to determine the extent to which as between each other, equally innocent claimants are entitled in equity to monies which have been paid into a bank account and then subject to the movements within that account. However, it does not … follow that the rule has always to be applied for this purpose. In a number of different circumstances the rule has not been applied. The rule need only be applied when it is convenient to do so and when its application can be said to do broad justice having regard to the nature of the competing claims."

The *Barlow Clowes* case concerned a failed investment company that had gone into liquidation and the question was how to distribute the remaining assets among the unpaid investors. The Court of Appeal confirmed the default status of the rule in *Clayton's Case*, but recognised that the rule ought not to apply if its application would be impractical or would cause injustice. In *Barlow Clowes*, the rule was not applied because it would have been contrary to the presumed intention of the investors, who knew their money was to be pooled. Instead, a pari passu (rateable) distribution was ordered.

Cases since *Barlow Clowes* confirm that the modern approach is to distinguish *Clayton's Case* rather than to apply it.[111] Indeed, in *Russell-Cooke Trust Co v Prentis*,[112] Lindsay J said that it might now be "more accurate to refer to the exception that is, rather than the rule in, *Clayton's Case*." Although it is "probably"[113] still the default rule, very little is required to displace it in favour of the rateable approach.

*(d) Lowest Intermediate Balance.* So far as claims against a bank balance are concerned, the rule is that tracing can succeed against a mixed fund in the bank account to the extent that the trust funds can still be shown to be there. If the account falls below that sum, that part of the trust money must have been spent.[114] Later payments in are not treated as repayments of the trust fund unless the trustee shows an intention to do so.[115] This means it is important to ascertain from the accounts the lowest balance in the fund; to that extent tracing is

**26–023**

---

[108] *Re Hallett's Estate* (1879) 13 Ch.D. 696 (Fry J); *Re Stenning* [1895] 2 Ch. 433; *Re Diplock* [1948] Ch. 465 (the National Institute for the Deaf).

[109] *Re Stenning* [1895] 2 Ch. 433; *Mutton v Peat* [1899] 2 Ch. 556 at 560; *Re Diplock* [1948] Ch. 465 at 559–563.

[110] *Barlow Clowes International Ltd v Vaughan* [1992] 4 All E.R. 22 at 39.

[111] *Russell-Cooke Trust Co v Prentis* [2003] 2 All E.R. 478; *Re International Investment Unit Trust* [2005] 1 N.Z.L.R. 270; *Commerzbank Aktiengesellschaft v IMB Morgan Plc* [2005] W.T.L.R. 1485; *National Crime Agency v Robb* [2015] Ch. 520 at [64]; *Charity Commission for England and Wales v Framjee* [2015] 1 W.L.R. 16 at [49].

[112] [2003] 2 All E.R. 478 at [55].

[113] *Charity Commission for England and Wales v Framjee* [2015] 1 W.L.R. 16 at [49].

[114] In *James Roscoe (Bolton) Ltd v Winder* [1915] 1 Ch. 62, 69 Sargant J said that tracing extended to "such an amount of the balance ultimately standing to the credit of the trustee as did not exceed the lowest balance of the account during the intervening period".

[115] *James Roscoe (Bolton) Ltd v Winder* [1915] 1 Ch. 62; *Re Goldcorp Exchange Ltd* [1995] 1 A.C. 74. See also *Glencore International AG v Metro Trading International Inc* [2001] 1 Lloyd's Rep. 284 (wrongly mixed oil).

available. Of course the personal claim remains as to any shortfall, in cases where the trust money withdrawn cannot be traced into other property.

If tracing is not permitted beyond the "lowest intermediate balance" of an account, then it may be thought that a fortiori there can be no tracing when an account is operated in overdraft. This indeed is the traditional position: if trust money is paid into an overdrawn account it will repay—in part or in full—a debt due from the customer to the bank. The bank will in normal circumstances be a bona fide purchaser for value without notice, so no claim will lie against it, and there will at that point be no traceable substitute of the money. The bank may subsequently allow further drawing on the overdraft, but any property bought with that new money cannot be seen to have been bought with trust money.[116]

However, considerable doubt has been cast on this position (and by extension on the lowest intermediate balance rule) by the Privy Council's decision in *Brazil v Durant*.[117] That case is considered in more detail in the next section, but it is relevant for present purposes because Lord Toulson reviewed the authorities concerning tracing through an overdraft and noted that

> "An account may be used as a conduit for the transfer of funds, whether the account holder is operating the account in credit or within an overdraft facility. The Board therefore rejects the argument that … the court can never trace the value of an asset whose proceeds are paid into an overdrawn account."[118]

Lord Toulson was careful not to doubt the outcomes in *Roscoe v Winder*[119] and *Re Goldcorp*,[120] the leading cases concerning the lowest intermediate balance rule. Nonetheless, the future of the rule remains uncertain.[121]

## D. Tracing and Debts

**26–024**  The purpose of tracing is to identify substitutes of trust property in respect of which claims may be made. If a trustee wrongly uses trust money to buy a house in her daughter's name, the beneficiaries can trace into and claim the house. Tracing works straightforwardly in situations like this, where one asset has been directly exchanged for another.

Credit and clearing facilities present a potential problem. When a credit card is used to buy goods, the cardholder borrows money from the credit card company to fund the purchase. That debt is repaid in due course. But if trust money is subsequently used to repay the debt it cannot strictly be said that the trust money

---

[116] *Re Goldcorp Exchange Ltd* [1995] 1 A.C. 74; *Re Registered Securities Ltd* [1991] 1 N.Z.L.R. 545 at 554.

[117] *Federal Republic of Brazil v Durant International Corp* [2015] UKPC 35; [2016] A.C. 297; below, para.26–026.

[118] [2016] A.C. 297 at [39]–[40]. Some earlier cases had similar points; e.g. *Hagan v Waterhouse* (1991) 34 N.S.W.L.R. 308 at 358.

[119] *James Roscoe (Bolton) Ltd v Winder* [1915] 1 Ch. 62.

[120] *Re Goldcorp Exchange Ltd* [1995] 1 A.C. 74.

[121] The Jersey Courts in *Brazil v Durant* had been able to say that the lowest intermediate balance rule simply did not form part of the laws of Jersey: [2012] JRC 211 at [219]; [2013] JCA 71 at [62]. While the future of the rule in England is uncertain, it cannot be said that the rule does not exist.

itself was used to buy the goods.[122] In *Bishopsgate Investment Management Ltd v Homan*[123] Leggatt LJ firmly rejected the concept of tracing into an asset acquired by the trustee before the trust money was misappropriated and thus without its aid.[124] Dillon LJ, however, regarded it as arguable that the beneficiary could claim in respect of an asset if there was a connection between the misappropriated money and the acquisition of the particular asset, as where the asset was bought with borrowed money and at the time of the borrowing it could be inferred that the trustee intended to repay with trust money.[125]

Although in such cases the trust money is not strictly used to acquire the asset, more recent authorities have taken a wider view of the connection necessary between the misapplied trust money and the asset sought to be traced. In *Relfo v Varsani*,[126] a director of Relfo Ltd wrongly caused the company to pay £500,000 to an account in the name of Mirren Ltd. The transfer was made on 5 May. On the same day, another company called Intertrade LLC paid the dollar equivalent of £500,000 to Mr Varsani. Beyond that the facts were unclear: it appeared that Mirren had reimbursed the money used to make the Intertrade payment to Mr Varsani, but that it had done so after the Intertrade payment had already been made. In particular, Relfo accepted that it could not **26–025**

> "point to specific transactions passing between the Mirren and Intertrade accounts to show how the Relfo/Mirren payment was translated into the Intertrade payment which went to Mr Varsani's account".[127]

Nonetheless, both Sales J and the Court of Appeal allowed Relfo to trace the misapplied money into the hands of Mr Varsani. The Court of Appeal found that Sales J had been entitled to draw the inference that the money misdirected from Relfo had been used to put Intertrade in funds and had then been used to pay Mr Varsani. That conclusion could validly be drawn even if it did not accord with the strict chronology of the payments into and out of the various accounts.[128]

A similar point arose in *Brazil v Durant*,[129] where the mayor of Sao Paulo had accepted bribes amounting to $10.5 million in relation to infrastructure contracts. Those bribes were held on constructive trust under the principle in *Attorney General for Hong Kong v Reid*.[130] The mayor channelled the bribe money from a New York bank account to accounts in Jersey held in the names of two companies, Durant International and Kildare Finance. Those two companies were controlled by the mayor and his son. The claimant, which was in effect the **26–026**

---

[122] If the repaid debt had been secured, subrogation to the security may be possible; below, para.26–027.

[123] [1995] Ch. 211. The purchaser had incurred a debt through drawing down an overdraft, had used that money to buy the goods, and had then repaid the overdraft with trust money.

[124] [1995] Ch. 211 at 221–222.

[125] [1995] Ch. 211 at 217. Henry LJ agreed with both judgments.

[126] *Relfo Ltd (In Liquidation) v Varsani* [2014] EWCA Civ 360; S. Watterson (2014) 37 C.L.J. 496; R. Nolan (2015) 131 L.Q.R. 8.

[127] [2014] EWCA Civ 360 at [13].

[128] [2014] EWCA Civ 360 at [63].

[129] *Federal Republic of Brazil v Durant International Corp* [2015] UKPC 35; [2016] A.C. 297; P.G. Turner (2016) 75 C.L.J. 462. J. Campbell (2016) 42 Aust. Bar Rev. 32.

[130] [1994] 1 A.C. 324; above, para.22–029.

Municipality of Sao Paulo, successfully sought a declaration that the companies held those funds on constructive trust in the amount of $10.5 million.

The defendant companies appealed to the Privy Council, arguing that the constructive trust ought to be limited to $7.7 million rather than the full $10.5 million. The basis for this argument was that some payments had been credited to the Jersey accounts before the relevant money had left the New York account. But Lord Toulson concluded that the lower courts had been justified in allowing the claimant to trace to the full amount of $10.5 million[131]:

> "If the court is satisfied that the various steps are part of a coordinated scheme, it should not matter that, either as a deliberate part of the choreography or possibly because of the incidents of the banking system, a debit appears in the bank account of an intermediary before a reciprocal credit entry. … But the claimant has to establish a coordination between the depletion of the trust fund and the acquisition of the asset which is the subject of the tracing claim, looking at the whole transaction, such as to warrant the court attributing the value of the interest acquired to the misuse of the trust fund."

While tracing will not be forestalled by arrangements of the type seen in *Brazil v Durant* and *Relfo v Varsani*, the Privy Council rejected as too broad the proposition that money used to pay a debt may be traced into whatever was acquired in return for the debt.[132] What is required is a "coordination"; a "close causal and transactional link between the incurring of a debt and the use of trust funds to discharge it".[133] Future cases will explore and explain the nature of the link that is required, but it appears that attention will be focused on whether the trustee incurred the debt already intending to use trust money to repay it.[134]

## 4. SUBROGATION

**26–027**  This is a doctrine with common law and equitable origins whereby one person is entitled to stand in the shoes of another and assert that other's rights.[135] The most common examples are insurance and suretyship. An insurer who pays the loss is entitled to stand in the shoes of the insured and assert his rights against the wrongdoer. The House of Lords in *Napier and Ettrick (Lord) v Hunter*[136] held that an insurer's subrogation rights should have proprietary protection in the form of a lien (rather than a more onerous constructive trust) over damages paid to the

---

[131] [2016] A.C. 297 at [38]–[40].

[132] [2016] A.C. 297 at [33], rejecting the argument made in L. Smith (1995) 54 C.L.J. 290.

[133] [2016] A.C. 297 at [34]. The required link was not present in *Labrouche v Frey* [2016] EWHC 268 (Ch) at [277].

[134] See *Foskett v McKeown* [1998] Ch. 265 at 283 per Scott VC, quoted with approval in *Federal Republic of Brazil v Durant International Corp* [2016] A.C. 297 at [24], [38]; T. Cutts (2016) 79 M.L.R. 381; R. Nolan in P.G. Turner (ed.), *Equity and Administration* (Cambridge: Cambridge University Press, 2016) Ch.4. cf. M. Conaglen (2011) 127 L.Q.R. 432.

[135] See C. Mitchell and S. Watterson, *Subrogation: Law and Practice* (Oxford: Oxford University Press, 2007); Goff and Jones, 9th edn, Ch.39; L. Smith (1995) 54 C.L.J. 290; C. Mitchell in A. Burrows and A. Rodger (eds), *Mapping the Law* (2006), Ch.6.

[136] [1993] A.C. 713. See also *Lonrho Exports Ltd v Export Credits Guarantee Department* [1999] Ch. 158 (if insurer recovers from third party a sum greater than its entitlement by subrogation, surplus is held on trust for the insured).

insured by the wrongdoer. Thus unsecured creditors would not benefit from the double payment at the expense of the insurer on the bankruptcy of the insured.

In the insurance cases the payer is subrogated to the rights of the payee against third parties.[137] In other cases the payer is subrogated to the rights of third parties against the payee, as where the payee has used the money to pay off creditors.

In the context of tracing, the question is whether the claimant may be subrogated to the position of a secured creditor paid off by the defendant with the claimant's money. (If the creditor was unsecured, subrogation will not improve the claimant's position). In *Re Diplock*[138] the next of kin's money had been wrongly paid to hospital charities, two of which used it (innocently) to pay off secured and unsecured debts. It was held that there was no right of subrogation, because that would require reviving debts and securities which had been extinguished. This outcome was criticised as allowing the unjust enrichment of the charities at the expense of the next of kin, and the position was eventually reviewed by the Court of Appeal in *Boscawen v Bajwa*.[139] A building society advanced money for the purchase of property and the discharge of a legal charge on that property. The society intended to have a first legal charge on completion. It sent the money to the solicitor acting for itself and the purchaser, intending to retain the beneficial interest in the money until the security was in place, but its instructions were not carried out. The purchase was not completed, but the society's money was used to redeem the existing charge. It was held that the society was entitled to be subrogated to the position of the legal chargee. It would be unconscionable to assert that the charge had been redeemed for the landowner's benefit.

The application of the doctrine to a loan which is valid, intended to be secured, and which is used to pay off a secured loan, is not surprising. However, the Court of Appeal took the opportunity to state that the doctrine applied in circumstances such as those of *Re Diplock*. The passage in that case which denied the remedy was considered difficult and in need of review in the light of later developments in the law of restitution. It could not be objected that the creditor's security had been extinguished: that was not a bar to subrogation but a precondition. What had motivated the Court of Appeal to deny the remedy in *Re Diplock* was a desire to avoid injustice to a charity which had redeemed a mortgage which the bank was content to leave outstanding indefinitely.

**26–028**

> "It may be doubted whether in its anxiety to avoid injustice to the hospital the court may not have done an even greater injustice to the next of kin, who were denied even the interest on their money."[140]

---

[137] R. Merkin and J. Steele, *Insurance and the Law of Obligations* (Oxford: Oxford University Press, 2013), Ch.5.

[138] [1948] Ch. 465.

[139] [1996] 1 W.L.R. 328; P. Birks (1995) 9 T.L.I. 124; N. Andrews (1996) 55 C.L.J. 199; A. Oakley [1997] Conv. 1; P. Matthews (1997) 3 T. & T. 18. See also *Castle Phillips Finance v Piddington* [1995] 1 F.L.R. 783; *Anfield (UK) Ltd v Bank of Scotland Plc* [2011] 1 W.L.R. 2414.

[140] [1996] 1 W.L.R. 328 at 341, per Millett LJ.

Millett LJ, with the agreement of Waite and Stuart-Smith LJJ, thought the solution should have been to delay enforcement of the revived security until the charity had had a reasonable opportunity to obtain a fresh loan on suitable terms.

The House of Lords examined the role of intention in subrogation in *Banque Financière de la Cité v Parc (Battersea) Ltd*.[141] It was considered that in cases where the doctrine rested upon a contractual basis, as in the insurance cases, it was based on the common intention of the parties. However, no such intention was required where the claim was founded on the law of restitution (as in *Boscawen v Bajwa*[142]), where the aim was to reverse or prevent unjust enrichment. Where the claimant's money had been used to pay off a first chargee, the availability of subrogation did not depend on any common intention between the claimant and the second chargee or between the claimant and the payee that the claimant should be subrogated to the security of the first chargee. This issue was whether the second chargee would be unjustly enriched at the claimant's expense in the absence of such subrogation. Intention was, however, relevant to the question whether the enrichment would be unjust: it would not be if the transaction had been intended to create merely an unsecured loan.

26–029  In *Menelaou v Bank of Cyprus UK Ltd*,[143] Mr and Mrs Menelaou wanted to sell their own house and use some of the proceeds to buy a house in their daughter's name. The Bank of Cyprus, which held a charge over the parents' house, agreed to release that security in return for a new charge over the daughter's house. In fact, however, the bank never acquired a valid charge over the daughter's house. The question was whether the bank could be subrogated to the unpaid vendor's lien that had briefly encumbered the daughter's house before it had been paid off with the proceeds of sale of the parents' house.

The Supreme Court held unanimously that the bank could indeed be subrogated to the unpaid vendor's lien, although the Justices differed in their reasons for reaching that result. Lords Clarke, Neuberger, Kerr and Wilson applied an unjust enrichment analysis and held that subrogation would apply to prevent the daughter being unjustly enriched at the expense of the bank.[144] Even assuming that the funds used to discharge the lien were not actually the bank's money, a "sufficient causal connection"[145] still existed on the facts to mean that the daughter's enrichment would be at the expense of the bank. This unjust enrichment would be prevented by subrogating the bank to the unpaid vendor's lien. Lord Carnwath, by contrast, held that subrogation would only be an appropriate remedy if the bank could show that it had a proprietary interest in the

---

[141] [1999] 1 A.C. 221. Subrogation was held to apply only as between the claimant and the second chargee. See P. Watts (1998) 114 L.Q.R. 341; C. Mitchell [1998] 6 R.L.R. 144; M. Bridge [1998] J.B.L. 323; D. Friedmann (1999) 115 L.Q.R. 195. See also *Cheltenham and Gloucester Plc v Appleyard*, *The Times*, 29 March 2004.

[142] [1996] 1 W.L.R. 328. See also *Halifax Plc v Omar* (2002) 2 P. & C.R. 26; *Anfield (UK) Ltd v Bank of Scotland Plc* [2011] 1 W.L.R. 2414 at 2417.

[143] [2015] UKSC 66; [2016] A.C. 176; S. Watterson [2016] C.L.J. 209; C. Buckingham and L. Chambers [2016] Conv. 219; M. Cleaver (2018) 29 J.B.F.L.P 34, Goff and Jones, 9th edn, paras 7–03—7–11.

[144] For trenchant criticism of the Supreme Court's unjust enrichment analysis, see G. Virgo (2016) University of Cambridge Faculty of Law Research Paper No. 10/2016.

[145] [2016] A.C. 176 at [27]. See further on this point *Investment Trust Companies v Revenue and Customs Comrs* [2017] UKSC 29; [2018] A.C. 275 at [37]–[66].

funds used to discharge the lien. His Lordship held that a proprietary interest did exist on the facts: in an application of "the *Quistclose* principle",[146] it could be said that the proceeds of sale of the parents' house, when received by the solicitors, were held on trust such that the bank had a proprietary interest.[147] Those funds were used to purchase the daughter's house, and to discharge the unpaid vendor's lien, thus establishing the necessary "tracing link" between the bank's property and the discharge of the security to which the bank now sought to be subrogated.

Lords Clarke, Neuberger, Kerr and Wilson agreed that the result could be reached in the way suggested by Lord Carnwath (unlike Lord Carnwath, the other Justices did not think the result could *only* be reached in that way). In addition to deciding that subrogation is an available remedy for unjust enrichment,[148] the case is therefore a further illustration that subrogation to an unpaid vendor's lien is an available remedy when a claimant's property can be traced into the funds used to discharge that lien.

## 5. CHANGE OF POSITION[149]

We have seen that a person into whose hands the claimant's property has been traced or followed may be able to raise the defence of bona fide purchase.[150] There may also be another defence open to the recipient: that of change of position.[151] It should be emphasised that both the bona fide purchase and change of position doctrines are defences to *claims*; they are not directly concerned with the tracing process itself.

**26–030**

The doctrine of change of position provides that a defendant's liability may be reduced pro tanto,[152] or eliminated, if his "position has so changed that it would be inequitable in all the circumstances to require him to make restitution, or alternatively restitution in full".[153] A causal link between the receipt and the

---

[146] [2016] A.C. 176 at [133]–[140]. referring to *Barclays Bank Ltd v Quistclose Investments Ltd* [1970] A.C. 567; above, para.2–009.

[147] Alternatively, the bank may have had proprietary interest through a charge over the proceeds of sale: see *Buhr v Barclays Bank plc* [2001] EWCA Civ 1223, [2002] B.P.I.R. 25 at [45].

[148] See *Swynson Ltd v Lowick Rose LLP (formerly Hurst Morrison Thomson LLP) (In Liquidation)* [2017] UKSC 32; [2018] A.C. 313 at [29].

[149] See L. Smith, *The Law of Tracing* (1997), pp.34–38; G. Virgo and J. Palmer [2005] 13 R.L.R. 34 and 53 respectively; C. Mitchell [2005] L.M.C.L.Q. 168; T. Wee [2006] 14 R.L.R. 55; G. Jones in A. Burrows and A. Rodger (eds), *Mapping the Law* (2006) Ch.4; E. Bant, *The Change of Position Defence* (Oxford: Hart Publishing, 2009); A. Burrows, *A Restatement of the English Law of Unjust Enrichment* (Oxford: Oxford University Press, 2012), pp.117–122.

[150] A purchaser in an arm's length transaction not involving investigation of title to land will not normally have constructive notice: *Sinclair Investments (UK) Ltd v Versailles Trade Finance Ltd (in administrative receivership)* [2011] EWCA Civ 347; [2012] Ch. 453 (this point not affected by *FHR European Ventures LLP v Cedar Capital Partners LLC* [2015] 1 A.C. 250).

[151] Bona fide purchase is not a species of the change of position defence because the consideration does not need to be adequate: *Lipkin Gorman v Karpnale Ltd* [1991] 2 A.C. 548; K. Barker [1999] 7 R.L.R. 75.

[152] *David Securities Pty Ltd v CBA* (1992) 175 C.L.R. 353 at 385.

[153] *Lipkin Gorman v Karpnale Ltd* [1991] 2 A.C. 548 at 580.

change of position is required.[154] The defence normally operates where the defendant has disposed of money or other property in an exceptional and irretrievable manner in reliance upon the validity of his receipt of the claimant's property.[155] It is not limited to disposals of money or property, however, and could also apply in rare cases where the defendant has given up his job[156] or performed services in reliance on entitlement to payment. In a 2014 Australian case, the defence was accepted when, in reliance on the receipt of a mistaken payment, the recipient chose to forgo legal action against third parties.[157]

The defence is available to an innocent defendant but not to a wrongdoer.[158] Differing views have been expressed as to whether a defendant who, although honest, ought to have known that the property was not hers is "innocent" for this purpose.[159] Mere carelessness on the part of the defendant is not a bar to the defence. Often the claimant has been careless in making the payment, and the court will not balance the fault of each party.[160] On the other hand, conduct short of dishonesty may bar the defendant from relying on the defence, as where she suspected a mistake but made no enquiries.[161] General suspicions unrelated to the transaction in question may not bar the defence.[162] The question is not whether she was dishonest but whether, in the circumstances, it would be inequitable to allow the recipient to deny restitution.[163] The recipient cannot rely on an illegal act as a change of position, even if she was unaware of the illegality.[164]

---

[154] *Scottish Equitable Plc v Derby* [2001] 3 All E.R. 818; *Dextra Bank & Trust Co Ltd v Bank of Jamaica* [2002] 1 All E.R. (Comm) 193 at 203; M. McInnes (2002) 118 L.Q.R. 209; P. Watts (2002) 61 C.L.J. 301; P. Birks and W. Swadling [2002] All E.R. Rev., p.316; T. Akkouh and C. Webb [2002] 10 R.L.R. 107.

[155] See *Philip Collins Ltd v Davis* [2000] 3 All E.R. 808 (overpaid royalties: partial defence where defendants had geared their outgoings to income over an extended period); cf. *Hillsdown Holdings Plc v Pensions Ombudsman* [1997] 1 All E.R. 862 at 904 (no defence where money used to pay tax which was recoverable).

[156] See the discussion in *Commerzbank AG v Price-Jones* [2003] All E.R. (D) 303; P. Birks (2004) 120 L.Q.R. 373.

[157] *Australian Financial Services and Leasing Pty Ltd v Hills Industries Ltd* [2014] HCA 14; (2014) 253 C.L.R. 560.

[158] *Lipkin Gorman v Karpnale Ltd* [1991] 2 A.C. 548; *Cressman v Coys of Kensington (Sales) Ltd* [2004] 1 W.L.R. 2775 (no defence where property given away after knowledge of mistake). On the wrongdoer bar, see P. Birks, *Unjust Enrichment* (2005), Ch.9; E. Bant [2009] L.M.C.L.Q. 166; E. Bant, *The Change of Position Defence* (2009), Ch 6; and E. Bant [2012] L.M.C.L.Q. 122; cf. Y. Hu [2011] 19 R.L.R. 112 at 124.

[159] Law Com. No. 227 (1994), para.2.23; *South Tyneside MBC v Svenska International Plc* [1995] 1 All E.R. 545 at 569; R. Nolan and P. Birks in P. Birks (ed.), *Laundering and Tracing* (1995), pp.158 and 325; M. Jewell [2000] R.L.R. 1 at 16; cf. R. Chambers [1996] R.L.R. 103; P. Birks (2000) 14 T.L.I. 217 at 223–227.

[160] *Dextra Bank & Trust Co Ltd v Bank of Jamaica* [2002] 1 All E.R. (Comm) 193.

[161] See *Fea v Roberts* [2006] W.T.L.R. 255 (legacy paid to wrong person).

[162] *Abou-Rahmah v Abacha* [2007] W.T.L.R. 1 (suspicions of money-laundering); G. Virgo (2007) 66 C.L.J. 22; J. Lee [2007] 15 R.L.R. 135.

[163] *Niru Battery Manufacturing Co v Milestone Trading Ltd* [2004] Q.B. 985; A. Tettenborn [2003] 11 R.L.R. 98. The approach of the Court of Appeal is criticised as muddying the waters in P. Birks (2004) 120 L.Q.R. 373 at 377, and also in A. Burrows (2004) 63 C.L.J. 276; A. Tettenborn [2004] 12 R.L.R. 155; E. Ellinger (2005) 121 L.Q.R. 51.

[164] *Barros Mattos Jnr v MacDaniels Ltd* [2005] 1 W.L.R. 247. The effect of *Patel v Mirza* [2016] UKSC 42; [2017] A.C. 467 on this point remains to be seen; above, para.14–014.

## A. Potential Application to Proprietary Claims

The change of position defence was accepted by the House of Lords in *Lipkin Gorman v Karpnale Ltd*.[165] However, that case involved a personal action for money had and received, and it is not clear how far the defence will be generally available. Specifically, it is not clear if the defence applies where the claimant is asserting property rights in respect of assets in the defendant's hands.

**26–031**

An earlier version of the defence can perhaps be seen in *Re Diplock*,[166] where innocent volunteers (charities) had spent the claimant's money on improvements and alterations to their own land. It was held that no charge should be imposed, because a charge is enforceable by sale and it would be harsh to make the volunteers sell their land.

On the other hand, the difficulty with allowing a change of position defence to operate in the context of proprietary claims is that, as Professor Fox has written[167]:

> "It is alien to the security of property interests that the conduct of a person who receives the plaintiff's asset should affect the plaintiff's right to enforce his property in it. It is in the nature of a proprietary interest that it should remain enforceable against persons generally, provided that the conditions for its continued survival are fulfilled. … [T]he defence should not be available in restitutionary actions which aim directly at the vindication of title, other than those where the plaintiff's title is itself created in response to unjust enrichment."

In *Foskett v McKeown*, Lord Millett commented[168]:

> "[A] claim in unjust enrichment is subject to a change of position defence, which usually operates by reducing or extinguishing the element of enrichment. An action like the present is subject to the bona fide purchaser for value defence, which operates to clear the defendant's title."

The application of the change of position defence may therefore depend on the genesis of the proprietary right that is being asserted.[169] This position seems to balance appropriately the security of property interests and the security of receipts.[170] Quite simply, however, the point is not settled.

Finally, it is worth noting the limited effect of any recognition of change of position. The defence, if it applies to proprietary claims, only reduces liability by the amount of an exceptional expense that would otherwise not have been incurred. The defence is not, therefore, concerned with situations when the expense *would* normally have been incurred, but where it just happened to be

**26–032**

---

[165] [1991] 2 A.C. 548; G. Jones (1993–94) 4 K.C.L.J. 93.

[166] [1948] Ch. 465 at 546–548; see *Boscawen v Bajwa* [1996] 1 W.L.R. 328 at 341.

[167] D. Fox [2000] R.L.R. 465 at 488.

[168] [2001] 1 A.C. 102 at 129.

[169] See also R. Nolan in P. Birks (ed.), *Laundering and Tracing* (1995) Ch.6 at pp.175–185; A. Burrows in S. Degeling and J. Edelman (eds), *Unjust Enrichment in Commercial Law* (Sydney: Thomson Reuters, 2008) Ch.17 pp.352–357; cf. Goff and Jones, 9th edn, para.27–68; E. Bant, *The Change of Position Defence* (2009), pp.204–208; A. Burrows, *A Restatement of the English Law of Unjust Enrichment* (2012), p.118.

[170] See *National Bank of New Zealand Ltd v Waitaki International Processing (NI) Ltd* [1999] 2 N.Z.L.R. 211; *Kleinwort Benson Ltd v Lincoln CC* [1999] 2 A.C. 349 at 382.

incurred out of the claimant's property. In these situations, the defendant cannot be said to have changed his or her position.

An example might be a winning lottery ticket bought with funds traceable by the claimant, but which could just as easily have been bought with the innocent defendant's own funds.[171] This is not a case of change of position at all. Any amelioration of harsh results must instead depend on judicious findings of fact (which facts oust the tracing presumptions), or on the ability to award the defendant an allowance. The irony of the lottery ticket example is that, if the ticket had not won and the money had therefore been dissipated and become untraceable, the innocent defendant would not have owed any personal liability in equity in respect of the claimant's lost £2.

---

[171] See *Foskett v McKeown* [2001] 1 A.C. 102 at 134. In Lord Millett's example the defendant was a wrongdoer, but that does not matter.