# Exhibit 5

**IN THE HIGH COURT OF JUSTICE**          **Claim No.: CL-2019-000723**

**BUSINESS AND PROPERTY COURTS**

**OF ENGLAND AND WALES**

**COMMERCIAL COURT (QBD)**

**B E T W E E N:**

**(1) VALE S.A.**

**(2) VALE HOLDINGS B.V.**

**(3) VALE INTERNATIONAL S.A.**

**Claimants**

**— and —**

**(1) BENJAMIN STEINMETZ**

**(2) DAG LARS CRAMER**

**(3) MARCUS STRUIK**

**(4) ASHER AVIDAN**

**(5) JOSEPH TCHELET**

**(6) DAVID CLARK**

**(7) BALDA FOUNDATION**

**(8) NYSCO MANAGEMENT CORPORATION**

**Defendants**

_____

**DEFENCE OF THE SECOND DEFENDANT**

_____

## I.   INTRODUCTION AND SUMMARY

1.   In this Defence of the Second Defendant ("**Mr Cramer**"):

1.1 Unless stated otherwise, references to paragraph numbers are references to paragraphs numbers in the Particulars of Claim ("**Particulars**");

1.2 Where appropriate, Mr Cramer adopts definitions or headings used in the Particulars, he does so for ease of reference and without admitting that they are accurate or relevant;

1.3 Where Mr Cramer refers to a written agreement, he does so by way of summary and will refer to that agreement in due course for its full terms, meaning, and effect;

1.4 Where Mr Cramer does not admit an allegation in the Particulars, he is unable to admit or deny that allegation and, where relevant, he requires the Claimants (collectively "**Vale**") strictly to prove it; and

1.5 Unless expressly admitted or not admitted below, Mr Cramer denies each allegation in the Particulars.

2. Mr Cramer is not liable to Vale as alleged or at all.  His Defence is, in summary, as follows:

2.1 The alleged fraud concerns allegations as to the making of corrupt payments and the use of intermediaries, so as to acquire mining licences for the development of an iron ore mine in the Republic of Guinea (the "**Mining Licences**" and the "**Simandou Project**" respectively). Mr Cramer, whose expertise was not in mining but in treasury and asset management, had no involvement at all with that project nor with the acquisition of those licences.  Save for very briefly meeting Mr Thiam, he never met with, spoke to or corresponded with any of the alleged intermediaries.  At the material time he had never visited Guinea.  He had no knowledge of the means by which the licences were acquired.

2.2 BSG Resources Limited, a company incorporated in Guernsey and now in administration (**"BSGR"**), was (and is) the operating company of a

division of the group of companies associated with the First Defendant ("**Mr Steinmetz**"), which has been known by various names but is here defined as the "**BS Group**". BSGR and other companies in its resources division were responsible for the Simandou Project and acquiring the Mining Licences. However, Mr Cramer managed an entirely different division of the BS Group: the capital markets division. He also owned a BVI company ("**Onyx**") that provided management services to some entities within the BS Group. Onyx did not provide any such services to BSGR.

2.3    Mr Cramer was involved in negotiating two financial issues in respect of the joint venture between BSGR and the First Claimant ("**Vale S.A.**"), neither of which is material to the alleged claim. He did not make any of the representations alleged. Vale's allegation to the contrary principally involves alleging:

(a)    First, that by remaining silent at a meeting when certain others were addressing matters within their own knowledge, he was (somehow) making an implied or even (it is somehow alleged) an express representation. Such an allegation is a non sequitur (not least because by remaining silent, he plainly intended to make no representation, not the opposite) and is, in any event, bad in law.

(b)    Second, that Mr Cramer is somehow responsible for representations as to compliance with anti-bribery laws made by Mr Steinmetz and the Sixth Defendant ("**Mr Clark**"). They made those representations in written certificates provided in connection with the joint venture agreement (the "**JVA**"). This allegation is misconceived and is denied. Those certificates (plainly) did not provide that any representation was being made by Mr Cramer (or on his behalf). He was not, in any event, involved in their preparation. Moreover, the JVA expressly

identified which individuals' knowledge was relevant for the purposes of the joint venture. Mr Cramer was not one of them.

2.4     Without prejudice to the generality of these denials, if Mr Cramer were held to have made any representation to Vale in relation to the Mining Licences or the Simandou Project, then he never knew that he was doing so. He cannot have intended Vale to rely on a representation that he did not know he was making, nor have believed any such representation to be false (nor been reckless as to its truth).

2.5     Further, and in any event, (i) Vale S.A. knew that Mr Cramer did not have any relevant knowledge in this regard; (ii) Vale S.A. procured and received representations from the individuals who did have specific knowledge of the relevant matters; and (iii) by the JVA, Vale S.A. agreed that Mr Cramer's knowledge was not relevant. In these circumstances, it is denied that Vale ever relied on any representations made by Mr Cramer.

2.6     Further, and in any event, it should be inferred that Vale S.A. did not in fact rely on the truth of any representations made by <u>any</u> of the Defendants (or, put alternatively was reckless as to whether those representations were true or false).

2.7     Mr Cramer does not know whether any corrupt payments were made in the acquisition of the Mining Licences, nor whether any intermediaries were engaged, nor whether any representations made by any other person were false. Accordingly, if and insofar as necessary, he puts Vale to proof of those matters. Further, if (which is denied) Mr Cramer made any representation, he had no belief that any such representation was false, nor was reckless as to its truth: he did not have the relevant knowledge at the time or now.

2.8     In any event, if (which is denied) any cause of action were to have accrued in respect of Mr Cramer, it would be time-barred.  New York law applies and accordingly, the principal claims made are approximately four years out of time.  Alternatively, if English law applies, the claims are nevertheless barred under the Limitation Act 1980.

## II.   OVERVIEW

3.   Since the matters pleaded in paragraphs 1 to 11 by way of overview are either addressed in greater detail in the body of the Particulars, or duplicative of those matters, Mr Cramer's response thereto appears below.

## III.  THE BS GROUP AND MR CRAMER'S ROLE WITHIN IT

### A.     The BS Group structure

4.   Since about 2003, the BS Group has carried on business in a variety of different sectors: mineral resources, diamonds, real estate and capital markets.  At all material times, the structure of the BS Group has been as follows:

4.1     At the apex of the BS Group (the "**Foundation Level**") were two Liechtenstein foundations: the Seventh Defendant ("**Balda**") and the Vessna Foundation ("**Vessna**").  Balda owned the entire issued share capital of the Eighth Defendant ("**Nysco**").  Vessna held the entire issued share capital of VS Holdings Limited ("**VS Holdings**", together with Balda, Vessna, and Nysco, the "**Foundation Entities**").  At all material times, a Foundation Council has managed Balda (the "**Balda Council**") and another Foundation Council has managed Vessna.

4.2     Beneath the Foundation Level, the BS Group was comprised of several independent business units (the "**Divisional Level**" and the "**Divisions**" respectively).  A main operating company sat at the head of each Division.  At all material times, Nysco was a majority shareholder of the main operating companies of the following Divisions:

(a)     BSG Resources (the "**BSGR Division**"), which operated in the mining and resources sector.  BSGR was the main operating company of this Division.  At various times, it owned among other things diamond, bauxite and iron mines, and mining services businesses.

(b)     The BSG Real Estate Division, which carried on the business of property investment.

(c)     The BSG Energy Division, which carried on the business of investment in the energy sector.

(d)     The Chestergate Investments Corporation Division (the "**Chestergate Division**"), which held certain other assets.

4.3     Nysco also had a beneficial interest in the Steinmetz Diamonds Group (the "**SDG Division**"), which carried on the business of diamond trading.

4.4     At all material times, VS Holdings owned the BS Group's capital markets business (the "**BSG Capital Division**").  From around 2007, BSG Capital Markets PCC ("**BSG Capital**"), a Guernsey company, was this Division's main operating company.  The BSG Capital Division was primarily responsible for the Foundation Entities' investment activities.

4.5     Save for the Chestergate Division, each Division was a substantial enterprise with its own independent management and finance teams.

4.6     Over time, each Division engaged in a wide range of its own projects (the "**Projects**").  One such project for the BSGR Division was the Simandou Project.

### B.    The Onyx Group

5.    At all material times, the Onyx group of companies (the "**Onyx Group**") has included the following companies:

    5.1    Onyx Financial Advisors Limited ("**Onyx**"), a company incorporated in the British Virgin Islands.  Mr Cramer first obtained a beneficial interest in Onyx in September 2006.  He became its sole shareholder in about December 2009;

    5.2    Onyx Financial Services SA ("**Onyx Switzerland**"), a company incorporated in Switzerland, which was a wholly owned subsidiary of Onyx; and

    5.3    BSG Management Services Limited ("**BSG Management**"), a company incorporated in England, which was a wholly owned subsidiary of Onyx Switzerland.

6.    At the Foundation Level, at all material times Onyx provided management services to the Foundation Entities and reported on the financial performance of each Division to those entities.

7.    At the Divisional Level, the Onyx Group provided the following services:

    7.1    From 2005, BSG Management provided management services to the BSG Capital Division.

    7.2    BSG Management provided some corporate and investment banking advice to entities in all the Divisions, as and when required.

    7.3    At all times, Onyx Switzerland provided company secretarial services and corporate structuring services to the Divisions.  At all material times, Mr Cramer had no day-to-day involvement in this business.  It was operated by Ms Sandra Merloni-Horemans from Geneva, largely

independently of Mr Cramer (who was based in London) and the other parts of the Onyx Group.

8.  Onyx did not provide any management services to the BSGR Division.  In the period from about 1999 to 2007, Norinter Financial Advisors (Pty) Limited ("**Norinter**"), a company wholly owned by Roy Oron, then the CEO of BSGR, provided such services to that Division.  From 2007 when Mr Oron left BSGR, Norinter ceased to provide those services.  BSGR did not thereafter receive any external management services and it provided such services to the other companies in the BSGR Division.

### C.    Mr Cramer's role and knowledge

9.  Mr Cramer joined the BS Group in 2003, with responsibility for its investment activity, including its financial markets transactions.  He consolidated these activities into BSG Capital, becoming its CEO in 2007.  His duties included reporting bi-annually to Balda at meetings of the Balda Council on the accounts, performance and finances of each Division of the BS Group.

10.  In or around 2003, Mr Cramer was appointed as a non-executive director of BSGR.  He was also appointed as a non-executive director of Five Mounts Properties Holding Limited, the main operating company of the BSG Real Estate Division.  The primary purpose of these appointments was to facilitate his reporting on the financial performance of those divisions to Balda.  As a non-executive director, he was not involved in the day-to-day management of business in the BSGR Division or the BSG Real Estate Division, nor with their individual Projects.

11.  At all material times since joining the BS Group, Mr Cramer worked with Mr Steinmetz.  The other Division heads (and senior individuals within those Divisions) did likewise with respect to the business of their own Divisions.  By reason of the matters aforesaid and at all material times:

11.1    Save for the BSG Capital Division, Mr Cramer was not involved in the day-to-day management of any Division;

11.2    Save for BSG Capital, Mr Cramer was not the CEO of any main operating company in the BS Group;

11.3    Mr Cramer was not involved in procuring the Mining Licences, or the Simandou Project more generally.  Save to the very limited extent identified in 150.2 below, he never met, spoke with or corresponded with any of the individuals whom Vale alleges were intermediaries and/or recipients of corrupt payments in relation to the Simandou Project.

11.4    Mr Cramer was unaware of: (i) the means by which the Mining Licences were acquired; (ii) whether the Mining Licences were improperly acquired as alleged, or not; and (iii) any dealings that BS Group personnel had with those alleged intermediaries.  Accordingly, in this Defence he is unable to and does not make any admissions or denials in this regard.

11.5    Likewise, it is not admitted that (i) there was any any unlawful common design, conspiracy, understanding or combination between any of the other Defendants; or (ii) that any of the other Defendants conspired to defraud the Vale Parties, or any of them, by unlawful means.  However, if (which is not admitted) there was any such common design (or the equivalent), Mr Cramer was never party to it.  He did not otherwise act dishonestly, as alleged or at all, in relation to the Mining Licences or Vale.

12.    In the premises (and subject to certain exceptions; principally admissions of matters which are of public record), Mr Cramer is unable to plead to and does not admit most of the allegations contained in, the following sections of the Particulars:

12.1    Section B: The Mining Licences.

12.2    Section C: The "BSGR Group's" acquisition of the Mining Licences between 2005-2008.

12.3    Section D: The alleged confirmation of the Mining Licences following President Conté's death.

12.4    Section G: The alleged attempts to destroy purportedly incriminating material.

13.    Vale relies upon a significant number of documents in the Particulars. With a few exceptions, Mr Cramer did not see those documents at the material time. He was provided with copies of many of the documents for the first time in the course of an internal investigation into allegations relating to the Simandou Project or in subsequent proceedings, including the LCIA arbitration claim brought by Vale S.A. against BSGR (under LCIA Arbitration No. 142683, the "**Arbitration**") in relation to the Simandou Project. Accordingly:

13.1    Mr Cramer admits as documents the documents which are mentioned in paragraphs 36, 37.1, 37.2, 37.3, 37.4, 37.6, 37.9, 49.5, 49.6, 51.1, 51.2(a)-(b), 51.3-51.6, 54, 55.3, 57.1, 57.2, 57.4, 57.6. He also admits that those paragraphs summarise the relevant document, or a part of the relevant document. However, Mr Cramer is unable to and does not make any further admissions regarding those documents and he will rely on them as appropriate for their full terms, true meaning and effect.

13.2    In the Arbitration, as well as in the ICSID arbitral proceedings brought by BSGR against the Republic of Guinea, BSGR alleged that several significant documents were forged or otherwise has not accepted their authenticity. Mr Cramer, having not been involved in the material events, is unable to admit or deny whether that is the case. Accordingly, he does not admit that the 2008 Matinda Contracts (identified in paragraphs 49 and 53), the Touré MoU (identified in paragraphs 51 and 52) or the 2009 Affidavit (identified in paragraph 56) are authentic.

## IV.   THE PARTIES

### A.        The Claimants

14.   Paragraph 12 is admitted.

15.   As to paragraph 13:

   15.1     The first sentence is admitted.

   15.2     The second, fourth and fifth sentences are not admitted.

   15.3     The third sentence is admitted, save that it is not admitted that, until the merger, Vale S.A. wholly owned Vale Austria.

16.   Save that no admissions are made as to the second and fourth sentences, paragraph 14 is admitted.

### B.        The Defendants

17.   As to paragraph 15:

   17.1     The first and second sentences are admitted.

   17.2     As to the third sentence, it is admitted, insofar as it is alleged, that Mr Steinmetz founded the BS Group though no admissions are made as to the relevant date.  It is denied that he founded the "BSG Resources group of companies" as alleged.  The latter term is inaccurate since it implies that the business of just one division (the BSGR Division) was the business of the entire group of companies associated with Mr Steinmetz.  The sentence is otherwise admitted.

18.   Paragraph 16.1 is admitted.

19.   As to paragraph 16.2:

19.1    As to the first sentence, Mr Steinmetz was an advisor to the BS Group, including Balda, BSGR and the BSGR Division.  The allegation that he was "presented" as an advisor is embarrassing for want of particulars and is accordingly not admitted.

19.2    As to the second sentence;

(a)    It is admitted, insofar as it is alleged that Mr Steinmetz recommended to BSGR that it should sell the Shares and that it should enter into the JVA with Vale.

(b)    The allegation that he "controlled all material decisions" is embarrassing for want of particulars.  Mr Cramer is entitled to reserve and reserves his right to plead further in this regard, if and in the event that Vale pleads proper particulars.

(c)    That allegation, as well as the allegation that he controlled all material decisions relating to BSGR's sale of the Shares and entry into the JVA with Vale is, in any event, denied.  BSGR had its own independent board of directors and Balda its own independent council which decided upon the sale of the Shares and the entry into the JVA.

20.    No admissions are made as to paragraph 17.

21.    As to paragraph 18:

21.1    Vale S.A. commenced its claim in the Arbitration on 28 April 2014.  The LCIA tribunal delivered its Award five years later, on 4 April 2019.  The tribunal made the Award following an evidential hearing in which BSGR did not participate at all.  Moreover, the claim (and the Award) was made against BSGR only and not against any of the Defendants (including Mr Cramer), who were not party to the Arbitration and had no right to be (and were not) separately represented.

21.2    The Award is not probative of any claim made by Vale herein and the findings made by the tribunal in that Award are irrelevant.

21.3    In these circumstances, the paragraph is not admitted.

22.    As to paragraph 19:

22.1    The first and fifth sentences are admitted.

22.2    As to the second sentence, the meaning of the phrase "Steinmetz's personal affairs" is embarrassing for want of particulars and is accordingly not admitted.  It is admitted that Mr Cramer often reported to the Balda Council regarding distributions that Balda proposed to make to the Steinmetz family, as did other individuals.  No admissions are made as to the vague allegation that he was a "close associate" of Mr Steinmetz.  Paragraph 11 above is repeated in this regard.

22.3    The third sentence is admitted, save that Mr Cramer was appointed in December 2003.  Since the appointment of administrators to BSGR on 7 March 2018, Mr Cramer has been unable to exercise (and has not exercised) any powers as a director of BSGR.

22.4    Save that it is admitted, insofar as it is alleged, that Mr Cramer was sole beneficial owner of Onyx from December 2009, the fourth sentence is denied.  Onyx was not responsible for the day-to-day management of the group of companies to which Vale refers as the "BSGR Group" but was in fact the BSGR Division.  Paragraph 8 above is repeated.

22.5    The paragraph is otherwise denied.

23.    Paragraph 20 is duplicative of Vale's allegations against Mr Cramer that are pleaded in greater detail in in the body of the Particulars.  It is denied for the reasons pleaded below.

24.   As to paragraph 21, the first sentence is admitted.  It is also admitted that, for a period of time, Mr Struik has held appointments in companies within the BSGR Division (including as CEO of BSG MM) and that BSGR Guernsey's predecessor was BSGR BVI.  The paragraph is otherwise not admitted.

25.   Paragraph 22 is not admitted.

26.   As to paragraph 23, the first sentence is admitted.  It is also admitted that, for a period of time, Mr Avidan held the office of President of BSGR ProjectCo, and acted as the Guinean country manager for the BSGR Division.  The paragraph is otherwise not admitted.

27.   As to paragraph 24, the first and second sentences are admitted.  The paragraph is otherwise not admitted.

28.   As to paragraph 25, the first, second and third sentences are admitted.  The paragraph is otherwise not admitted.

29.   As to paragraph 26, the first and second sentences are admitted.  The third sentence is admitted, save that the class of beneficiaries also include the issue and remoter issue of the children of Mr Steinmetz's marriage to Agnes, as well as any charity that the Balda Council has unanimously determined and the Balda Protector has approved.  The paragraph is otherwise not admitted.

30.   Save that the first and second sentences of paragraph 27 are admitted, no admissions are otherwise made.

## V.   OTHER KEY COMPANIES AND INDIVIDUALS

31.   Paragraph 28 is embarrassing for want of particulars.  Vale has failed to define which companies it alleges constituted part of the corporate group which it characterises as being the "BSGR Group".  Without prejudice to the foregoing:

31.1　　BSGR, BSGR Steel, BSGR BVI, BSG MM, BSGR ProjectCo and BSGR Guernsey were from time to time part of the BSGR Division and also therefore part of the BS Group.

31.2　　Since around December 2003, BSGR has not had any legal or beneficial interest in BSG MM or its subsidiaries, including Windpoint.

31.3　　Pentler was not part of the BSGR Division nor the BS Group.

31.4　　Save that no admissions are made as to the identities of shareholders in Pentler and the relative proportions of their shareholdings, the schedules in Appendix 1 are admitted.

31.5　　No admissions are otherwise made.

32.　Paragraph 29 is not admitted.

33.　Save that it is admitted that Pentler is a BVI company, and that Messrs Noy, Cilins and Ran were its shareholders, paragraph 30 is not admitted.

34.　Paragraph 31 is not admitted.

35.　As to paragraph 32:

35.1　　The first and second sentences are admitted.

35.2　　The final sentence is irrelevant and in any event not admitted.

35.3　　No admissions are otherwise made.

## VI.　THE MINING LICENCES

### A.　　Introduction: Guinea and Simandou

36.　Paragraph 33 is admitted, save that (without prejudice to the relevance of the allegation) it is not admitted that Guinea's economy is "*heavily dependent on mineral production*".

37. Paragraph 34 is not admitted.

38. Paragraph 35 is admitted.

### B.     BSGR Group's acquisition of the Mining Licences between 2005-2008

39. Mr Cramer does not plead to paragraphs 36 to 53 which are outside his knowledge and accordingly are not admitted.

### C.     Allegations concerning Pentler

40. Paragraph 54 is admitted as a general summary of the Pentler SPA and that document is admitted as a document. Mr Cramer had no involvement in negotiating or executing the Pentler SPA. It was executed by Ms Merloni-Horemans on behalf of BSGR Steel and Mr Lev Ran on behalf of Pentler.

41. Paragraphs 55 and 55.1 are admitted. Mr Cramer did not approve the making of any of those payments.

42. Paragraph 55.2 is admitted.

43. Paragraph 55.3 is admitted. Mr Cramer was not at the material time aware of any obligation on the part of BSGR Steel to make any payment to Pentler on 15 April 2009, nor was he involved in any negotiation of the 2009 BSGR/Pentler Settlement.

44. As to paragraph 56, it is admitted as a summary of the 2009 Affidavit. It is not admitted that the affidavit is authentic and no admissions are otherwise made.

### D.     Allegations concerning BSG Capital and LMS

45. The matters alleged in paragraph 57 and its sub-paragraphs are outside Mr Cramer's knowledge and no admissions are made, save that paragraph 57.3 is denied. BSG Capital did not make the alleged payment to LMS. The payment

was made by BSGR Treasury Services Limited ("**BSGR Treasury**"), a company in the BSGR Division.  Mr Cramer neither approved the making of this payment nor had any knowledge of it at the material time.

46.   The matters alleged in paragraph 58 and its sub-paragraphs are outside Mr Cramer's knowledge and no admissions are made.

47.   It is admitted (insofar as it is alleged) that the Pentler SPA recorded a price of US$22 million for the sale of shares in BSGR BVI.

## VII.  HOW THE MINING LICENCES WERE CONFIRMED FOLLOWING PRESIDENT CONTÉ'S DEATH

48.   No admissions are made as to paragraphs 59 to 62.

## VIII.  THE JVA AND SHA

### A.   Introduction

49.   Paragraph 63 is not admitted, save that the Base Convention is admitted as a document.

50.   No admissions are made as to paragraph 64.

51.   Paragraph 65 is not admitted, save that the Confidentiality and Non-Disclosure Agreement is admitted as a document, and the contents of that paragraph are admitted as an accurate summary of the relevant parts of that document.

52.   As to paragraph 66:

52.1    It is admitted that Mr Steinmetz and Mr Cramer met Eduardo Ledsham, Vale's Exploration Department Executive Director, in London in about February or early March 2010.  There were two very short meetings on consecutive days.

52.2    It is denied, insofar as it is alleged (i) that Mr Cramer attended the meeting for the purpose of discussing the basis for any deal between the parties; and (ii) that at that meeting, Mr Cramer was involved in any such discussion.

52.3    Rather, Mr Steinmetz invited Mr Cramer to attend.  Mr Cramer had no involvement in organising it.  At the meetings, Mr Ledsham pitched, to Mr Steinmetz, the idea of a joint venture between BSGR (or the BSGR Division) and Vale.  Mr Cramer did not contribute at all to this short discussion.

52.4    Save as aforesaid, the paragraph is denied.

53.   As to paragraph 67:

53.1    Save that the Heads of Terms are admitted as a document, the first sentence is not admitted.

53.2    The second sentence is admitted.

53.3    It is denied, insofar as it is alleged, that Clifford Chance conducted "*in-depth*" due diligence in relation to corruption and bribery issues.  The third sentence is otherwise admitted.

53.4    Insofar as it relates to Mr Cramer, the fourth sentence is denied, for the reasons pleaded in paragraphs 53 to 115 below.  Insofar as it relates to the other Defendants, the fourth sentence is not admitted.

**B.    The Alleged Representations**

The Initial DD Questionnaire

54.   The first sentence of paragraph 68 is admitted.  Mr Cramer will rely upon the Initial DD Questionnaire, as necessary, for its full terms, true meaning and effect.

- 18 -

55.  Paragraph 69.1 is admitted, save that the definition incorrectly referred to "*BSGR Guinea SARL*" rather than BSG Resources (Guinea) Sarl (which is the company defined in the Particulars as "BSGR ProjectCo").

56.  Paragraphs 69.2 to 69.4 are admitted.

57.  As to paragraph 69.5, the definition of "UBOs" was "*an individual or entity that, directly or indirectly, ultimately owns or controls or has a right to receive the financial benefit of an equity interest in the BSG Group*"; and was said to include "*all shareholders and UBOS of NYSCO management corporation and Onyx Financial Advisers*".  No admissions are otherwise made.

58.  As to paragraph 69.6:

   58.1  The Initial DD Questionnaire was directed to four companies of which Mr Cramer was not a director and in respect of which he had no involvement (BSGR Guernsey, BSGR ProjectCo, BSG Resources (Liberia) Ltd and BSGR (Liberia) Ltd, defined therein as the "BSG Group").  The response to that questionnaire was filed by Mr Clark expressly on behalf of the "BSG Group".

   58.2  Insofar as it is alleged that Mr Clark made any inquiries of Mr Cramer for the purpose of preparing his response to the Initial Due Diligence Questionnaire, that allegation is denied.

   58.3  It is admitted that (i) the paragraph accurately summarises the first paragraph of the "Certification" section of the form; (ii) Mr Clark signed that form; and (iii) he did so in his capacity as director and group treasurer of BSGR Guernsey.

   58.4  No admissions are otherwise made.

59.  Paragraph 70.1 contains an inaccurate summary of the representation which appears at paragraph A of Section III of the Initial DD Questionnaire and is therefore denied.  If and insofar as necessary, Mr Cramer will rely upon that

paragraph for its full terms.  That representation was, in any event, not made by Mr Cramer nor on his behalf.

60. Paragraph 70.2 is admitted.  That representation was not made by Mr Cramer nor on his behalf.

61. As to Paragraph 70.3:

   61.1   It is denied:

      (a)   The first clause contains an inaccurate summary of the representation which appears in paragraph A of Section IV of the Initial DD Questionnaire.  In particular, the representation made only concerned "Consultants" (as defined therein) which were "*retained by or on acting on behalf of the BSG Group*".

      (b)   The second clause refers to paragraph F of Section III of the Initial DD Questionnaire.  No such representation was made there.  Rather, a specific representation was made as to BSGR Guinea not using any intermediary in its application process or during further discussions with the technical department of the Ministry of Mines.

   61.2   Without prejudice to the foregoing, no representation was made by Mr Cramer or on his behalf that (i) appears in paragraph A of Section IV of the Initial DD Questionnaire; (ii) appears in paragraph F of Section III; or (iii) is otherwise alleged in paragraph 70.3.

62. Insofar as paragraph 71(i) relates to Mr Cramer, the paragraph is denied.  More particularly:

   62.1   If (which is denied, for the reasons pleaded above) representations in terms of the alleged First Corruption Representation, the alleged Second Corruption Representation and the alleged First Consultancy Representation (the "**Alleged Initial DD Representations**") were made, then those alleged representations were made by BSGR Guernsey

- 20 -

or alternatively by all the companies there defined as being the BSG Group.

62.2   Further and in any event, Mr Cramer was not asked to, and did not, contribute to the completion of the Initial DD Questionnaire, nor did he provide information for the purposes of any of the representations contained therein.  Mr Cramer did not approve or adopt the relevant representation, whether manifestly or at all.

62.3   Alternatively, if (which is denied) Mr Cramer approved or adopted any of the Alleged Initial DD Representations, he had no knowledge of doing so and accordingly did not (and cannot) have had any intention to make any representation in this regard.

63.   Insofar as paragraph 71(i) relates to the other Defendants, no admissions are made.

64.   As to paragraph 71(ii):

64.1   It is denied (1) that Mr Cramer provided any assistance at all in completing the Initial DD Questionnaire; and (2) that Mr Cramer was ever party to any common design that fraudulent misstatements be made to Vale.

64.2   It is not admitted that any such fraudulent misstatements were made or that there was any common design between any of the other Defendants to make such statements.

64.3   No admissions are otherwise made.

65.   No admissions are made as to paragraph 71(iii).

66.   As to paragraph 71.1:

66.1    It is denied that Mr Steinmetz (i) controlled all material decisions relating to the BS Group, BSGR or the sale of the Shares; and (ii) was the key decision maker.  At all material times, each company in the BSGR Division had its own independent board of directors which made its decisions.  Mr Steinmetz had no legal or other authority to make any decisions on behalf of those companies or to direct those companies to take any particular action.

66.2    It is admitted that Mr Steinmetz directed BSGR's participation in the joint venture negotiations.  He was assisted in this regard by David Barnett.

66.3    It is admitted that the response to the Initial DD Questionnaire refers to Mr Steinmetz as an advisor to Balda.  Contrary to Vale's allegation, that response does not refer to him as being an advisor to BSGR Guernsey.

66.4    No admissions are otherwise made.

67.    Paragraph 71.2 is embarrassing for want of particulars.  Pending the provision of proper particulars, Mr Cramer is entitled to reserve and reserves his right to plead further in this regard and no admissions are made.

68.    No admissions are made as to paragraph 71.3.

69.    As to paragraph 71.4, it is admitted that Mr Cramer was the UBO of Onyx at the material time.  It is denied:

69.1    That Mr Clark (or anyone else) made any enquiry of Mr Cramer when completing the Initial DD Questionnaire;

69.2    That Mr Cramer was a "UBO" within the meaning of that form, since Onyx was not a company within the BSG Group (as there defined);

69.3   Insofar as it is alleged, that the Initial DD Questionnaire imposed any obligation on the person completing it to make any inquiries of any UBO; or

69.4   Insofar as it is alleged, that Mr Clark ever certified in that form that he had made any inquiry of Mr Cramer.  Rather, he referred to having "*made inquiry*" of (amongst other people) "*UBOs*" (of whom Mr Cramer was not one) "*as appropriate*".  It would not in any event have been appropriate to make any inquiries of Mr Cramer in this regard, since he had no knowledge of the subject matter of that due diligence questionnaire – being the Simandou Project.

70.   As to paragraph 71.5, it is admitted that Mr Tchelet coordinated the process by which the Initial DD Questionnaire was answered.  He was also responsible for co-ordination of the due diligence process for BSGR.  It is also admitted that he sent the questionnaire to Ms dos Santos by email.

71.   Paragraph 71.6 is admitted but irrelevant.   Mr Cramer never had any responsibility for the due diligence process.  Rather, the entire process (including the preparation of the Initial DD Questionnaire, as well as the Supplemental DD Questionnaire, the Clark ABL Certificate and the Steinmetz ABL Certificate, collectively the "**Due Diligence Documents**") was (and was understood by Mr Cramer at the material time to have been) overseen by other individuals on behalf of BSGR.  Mr Cramer understood those individuals to include Mr Barnett and BSGR's external lawyers, Skadden.  Further, at the material time, Mr Cramer understood that prior to execution of any of the Due Diligence Documents, those documents (as well as the draft SHA and draft JVA) would have been carefully reviewed and approved by those people for and on behalf of BSGR.

72.   Insofar as Vale intends, by paragraph 71.7, to cross-refer to paragraph 69.6, the former paragraph is admitted.  If Vale does not so intend, paragraph 71.7 is embarrassing for want of particulars and is not admitted.

73.   As to paragraph 71.8:

    73.1   The negotiation of the JVA and SHA was known at the time as "**Project Hills**".  The negotiations were managed by Mr Barnett, with assistance from BSGR's external lawyers, Skadden. It is admitted that Mr Steinmetz was also closely involved in them.

    73.2   Insofar as the paragraph relates to Mr Cramer, it is denied.  He did not negotiate the terms of the JVA or the SHA.  Rather, Mr Cramer's role in the negotiations with Vale S.A. was limited to two financial issues concerning the joint venture, being (i) the cost of the capital being lent by Vale S.A. to fund the future costs of the Simandou Project; and (ii) the pricing of the sale of the products from the mine and the level of the royalties due on such sales.

    73.3   No admissions are otherwise made.

74.   No admissions are made as to paragraph 71.9.

75.   Paragraph 71.10(i) is denied.  Pursuant to clause 1.8 of the JVA, BSGR's knowledge, for the purposes of the JVA, was not (as alleged) the "awareness" of Messrs Steinmetz, Struik, Avidan, Tchelet and Clark.  Rather, it was (i) the *actual* knowledge of those individuals; (ii) as well as the actual knowledge of Mr Barnett; (iii) together with such knowledge as those individuals should have had, taking into consideration their office and respective duties, had they each made all reasonable enquiries in relation to the matter in question as at the date of that Agreement.  The knowledge of BSGR did not include any knowledge of (or enquiries to be made by) Mr Cramer whatsoever.

76.   Paragraph 71.10(ii) is admitted.  Mr Cramer's proposed appointment reflected (i) his senior position within the BS Group; (ii) his prior experience as an executive of a multinational corporation (Anglo American Corporation); (iii) his suitability to represent Balda's interests on the Board, as CEO of Onyx; and (iv) the convenience for him to attend Board meetings in Guernsey, given his London

residence.  It did not imply or reflect any knowledge of (or prior involvement in) the Simandou Project.

77.   Paragraph 71.10(iii) is admitted.  Mr Cramer relies on paragraphs 92 to 99 below.

78.   Insofar as paragraph 71.10(iv) relates to each of the remaining Defendants, the paragraph is not admitted.  Insofar as it relates to Mr Cramer, he relies on paragraphs 121 to 127 below.

79.   Paragraph 71.11 is denied.  Specifically, it is denied:

79.1   That Mr Cramer knew about any of the answers to be given in the Initial DD Questionnaire, let alone discussed or agreed upon them with any other Defendant;

79.2   That he approved or adopted (manifestly or at all) any of the answers given in the Initial DD Questionnaire; and

79.3   That the facts and matters alleged in paragraph 71 are capable of supporting the inference alleged against Mr Cramer.

<u>The Supplemental DD Questionnaire</u>

80.   Paragraph 72 is admitted.  The email was not sent to Mr Cramer.

81.   Paragraph 73 is admitted.

82.   As to paragraph 74:

82.1   The first sentence is denied.  BSGR transferred its 100 per cent shareholding in BSGR Steel Holdings Limited to BSG MM, not to Nysco.

82.2   The second sentence is admitted.  The principal document effecting the transaction was a Sale and Purchase Agreement dated 31 March 2010 (the "**31 March SPA**").  Mr Clark and Ms Merloni-Horemans executed that document on BSGR's behalf.  She also executed that document on

BSGMM's behalf.  Mr Cramer was not a signatory, nor was the document shared with him in advance.

82.3   Insofar as the third sentence and sub-paragraphs 74.1 to 74.4 relates to Mr Cramer, they are denied:

(a)   Mr Cramer was not involved in the March 2010 Restructuring, nor did he even have any knowledge that it was going to take place.  If (which is not admitted) the matters in paragraphs 74.1 to 74.3 are correct, Mr Cramer did not know about them and therefore had no intention to conceal them.

(b)   Insofar as it is alleged in paragraph 71.4, it is admitted that the Pentler SPA says that Pentler's shareholders would continue to act as consultants to BSG BVI for five years.  At the material time, Mr Cramer had not seen that agreement nor was he even aware of its existence, nor was he aware of any such obligation.

82.4   Insofar as the third sentence and sub-paragraphs 74.1 to 74.4 relates to the other Defendants, no admissions are made.

83.   As to paragraph 75:

83.1   It is denied that the 31 March 2010 Restructuring was carried out with the assistance or knowledge of Mr Cramer.

83.2   It is admitted that Mr Clark knew about and assisted with that transaction, since he signed the 31 March SPA.  No admissions are made in relation to the knowledge or assistance of the other Defendants.  It is not admitted that the 31 March 2010 Restructuring was carried out on the instructions of Mr Steinmetz.

83.3   No admissions are made in relation to paragraph 75.2.

83.4    The allegation that an inference should be drawn "*from the matters pleaded herein*" is embarrassing for want of particulars.   Without prejudice to the foregoing, it is denied, insofar as it is alleged, that the matters alleged in respect of Mr Cramer do or could support any such inference being drawn as against him.

84.   As to paragraph 76:

84.1    The first sentence is admitted.

84.2    As to the second sentence:

(a)   It is admitted that: (i) Mr Clark signed the Supplemental DD Questionnaire; and (ii) the contents of the sentence accurately summarises the first paragraph of the "Certification" section of the form.

(b)   It is denied, insofar as it is alleged, that (i) Mr Clark made any inquiries of Mr Cramer in relation to the Supplemental DD Questionnaire; or (ii) that questionnaire was in fact signed (or submitted) on behalf of Onyx.

(c)   No admissions are otherwise made.

84.3    Mr Cramer will rely upon the Supplemental DD Questionnaire, as necessary, for its full terms, true meaning and effect.

85.   As to paragraph 77:

85.1    The allegation that the Supplemental DD Questionnaire "*concealed*" the 31 March 2010 Restructuring is embarrassing for want of particulars. Pending the provision of proper particulars, Mr Cramer is entitled to reserve and reserves his right to plead further in this regard and the allegation is denied.

85.2    Mr Cramer will rely upon the Supplemental DD Questionnaire for its full terms, true meaning and effect.  Without prejudice to that fact:

(a)    Paragraph 77.1 is admitted as a general summary of section IV.A of that document, save that it refers to "*Mohammed L Doumbia*" as being "local counsel" and not Boumbia nor "legal counsel" as alleged.

(b)    Paragraph 77.2 is an inaccurate summary of section III. A of that document and is therefore denied.

86.   As to paragraph 78:

86.1    It is denied that Mr Cramer was responsible for the alleged Second Consultancy Representation or the alleged Third Corruption Representation:

(a)    Those alleged representations were made (i) by Mr Clark on his own behalf; (ii) further or alternatively, and insofar as the response to the Supplemental DD Questionnaire was expressed by him to have been made in his capacity as a "director", on behalf of BSGR, of which he was a director; (iii) further or alternatively, on behalf of the companies defined therein as being the "BSG Group" (being those companies identified in the Initial DD Questionnaire, as set out in paragraph 57.1 above, plus BSGR Treasury Services Limited and Resources Advisory Services Ltd).

(b)    Further, and in any event, the response to the Supplemental DD Questionnaire was not (and was not expressed to be) made on behalf of Mr Cramer; and

(c)    Further, in relation to Vale's repetition of paragraph 71, Mr Cramer repeats his response thereto in paragraphs 61 to 78 above, mutatis mutandis.

86.2    No admissions are made as to the responsibility of any of the other Defendants.

87.    As to paragraph 78.1, it is denied that Mr Cramer was either involved in or knew about the 31 March 2010 Restructuring or its purposes.  Paragraph 82.3 above is repeated.  No admissions are made as to the involvement or knowledge of any of the other Defendants or the purposes of the transaction.

88.    As to paragraph 78.2:

88.1    It is admitted that Mr Cramer was a director and senior executive of Onyx and that he was its ultimate beneficial owner.

88.2    It is also admitted, insofar as it is alleged, that (i) Mr Cramer was identified as the "*UBO of Onyx*" by reference to exhibits to the Supplemental DD Questionnaire; (ii) those exhibits included a photocopy of his passport and of a utility bill (though it is denied that the utility bill was "*recent*").  As apparent from the letter dated 1 April 2010, which is also exhibited thereto, those photocopies were not actually provided by Mr Cramer, but rather by Ms Merloni-Horemans.

88.3    It is denied that the answers in the Supplemental DD Questionnaire were given on Onyx's behalf.  The answers were given by Mr Clark and/or on behalf of BSGR and/or the entities in the "*BSG Group*", as there defined.  Paragraph 86.1(a) above is repeated.

88.4    It is denied that Mr Clark (or any other person) made any inquiry of Mr Cramer when completing the Initial DD Questionnaire.

89.    Paragraph 78.3 is admitted.   The email was also copied to Mr Barnett.  Paragraphs 70 and 71 above are repeated.

90.    No admissions are made as to the first sentence of paragraph 78.4.  The second sentence is denied.  Paragraph 86.1(a) above is repeated mutatis mutandis.

91.   It is denied that the matters alleged in paragraph 78 support (or are capable of supporting) the inference alleged as against Mr Cramer.

The Alleged 8 April Representations

92.   Paragraph 79 and the first sentence of paragraph 80 are admitted.

93.   Paragraphs 80.1 and 80.2 are admitted as summaries of statements made by Mr Avidan during that meeting and it is admitted that he made the alleged Fourth Corruption Representation and the alleged Third Consultancy Representation.  It is denied, insofar as it is alleged, that Mr Cramer thereby made any such representations.

94.   As to paragraph 80.3:

94.1   It is admitted, insofar as it is alleged, that Messrs Avidan, Struik and/or Tchelet made the alleged Fifth Corruption Representation (or a representation to a similar effect).

94.2   Mr Cramer made no such statement and no such representation.  Rather, after Messrs Avidan, Struik and/or Tchelet made the alleged Fifth Corruption Representation, Mr Kleinfeld said to Mr Cramer: "The same is true of Onyx?" or words to that effect.  Mr Cramer said "yes" or words to that effect.  It is denied he thereby made any representation at all.

94.3   Alternatively, if (which is denied) he did thereby make any such representation in response to that question asked of him on behalf of Onyx, the representation was that:

(a)   He was not aware of any financial interests held by any government officials in the BSGR Division's Guinean operations;

(b)   He was not aware of any payments or other personal financial benefits conferred on any government officials on behalf of the BSGR Division in relation to their Guinean operations; and

(c)   He was not aware that anybody acting on behalf of Onyx had made or offered any corrupt payments or provided anything of value to any officials of a government agency or government owned or affiliated entity in connections with the BSGR Division's business in Guinea.

94.4   Further, if (which is denied) by replying "yes", Mr Cramer made any such representation, he was not aware of so doing and, in any event, such a representation would have been true.

95.   Paragraph 80.4 is denied.  Without prejudice to the generality of that denial:

95.1   It is not admitted that any of the alleged 8 April Representations were false;

95.2   If (which is not admitted) any of those alleged representations were false, it is denied that Mr Cramer "failed" to correct them.  Mr Cramer did not know (nor did he represent that he knew) that any of those representations were false.  Accordingly, he could not have corrected them, nor by the same token, have failed to have done so;

95.3   Further, and in any event, the allegations that mere silence can constitute (i) a representation by conduct; and or (ii) an express representation; are misconceived and are denied;

95.4   Further, and in any event, it is denied that mere silence on the part of a third party ("**B**") can constitute (i) an "implicit" (or implied) representation that a representation made by another person ("**A**") was correct; or (ii) an implied representation that B had a reasonable basis to believe a representation made by A was true.

96.   In the premises, it is denied that Mr Cramer made the alleged 8 April Representations or any of them.

97.   As to paragraph 81:

97.1 It is denied that Mr Cramer was responsible for any of the alleged 8 April Representations since (i) he did not make them; and (ii) he is not (and could not be) liable by reason of mere silence whilst any such representations were made by others.

97.2 Further, the allegation that all the Defendants were (somehow) responsible for the alleged 8 April Representations is embarrassing for want of particulars.

97.3 Further, if and to the extent that Vale alleges it should be inferred, from the allegations it makes in paragraph 78, that all the Defendants are responsible for the alleged 8 April Representations, that allegation is misconceived and is denied.  Paragraph 78 concerns different matters: the March 2010 Restructuring and the Supplemental DD Questionnaire.

98. As to paragraph 81.1:

98.1 It is admitted.  The list of topics actually mostly concerned technical, operational and historical issues relating to the Simandou Project.

98.2 It is, in any event, irrelevant.  It does not follow from the fact that a list of topics was circulated in advance, that any person should be responsible for any representation subsequently made in that meeting, still less a person who did not even make such a representation in that meeting.

99. As to paragraph 81.2:

99.1 It is admitted, insofar as it is alleged, that the FCPA Interview followed the Initial and Supplemental Due Diligence Questionnaires and preceded the Steinmetz and Clark ABL Certificates and the London Meetings.

99.2 No admissions are made as to the extent of any similarity or repetition of any representations made in those documents or in those meetings

and in any event, no proper particulars in that regard are pleaded in paragraph 81.2.

99.3 The paragraph is, in any event, irrelevant.  If (which is not admitted) representations were made at the FCPA Interview which (i) followed on from (and substantively replicated) the Initial and Supplemental Due Diligence Questionnaires; and (ii) were substantively repeated in the Steinmetz and Clark ABL Certificates and in the London Meetings; it would not follow that Defendants who/which did not make those alleged representations somehow became responsible for them.

The Steinmetz ABL Certificate

100. Paragraph 82 is admitted.  Mr Cramer was not involved in the preparation, drafting or execution of this document.  He never discussed it or its contents with Mr Steinmetz at the material time.

101. Paragraph 83.1 is an incomplete summary of clause 2(a) of the Steinmetz ABL Certificate and paragraph 83.2 is an incomplete summary of clause 3.  Those paragraphs are admitted as summaries.  Mr Cramer will rely, as necessary, on the document for its full terms, true meaning and effect.

102. Paragraph 84 is denied:

102.1 Each of the representations made in the Steinmetz ABL Certificate was expressly made (i) by Mr Steinmetz in his personal capacity; (ii) only by him; and (iii) only on his own behalf.

102.2 Insofar as Vale repeats paragraph 81, Mr Cramer repeats his response thereto in paragraphs 96 to 98 above.

103. As to paragraph 84.1:

103.1   It is denied that the Steinmetz ABL Certificate was discussed at the FCPA Interview.  On the contrary, in that meeting, Mr Kleinfeld said that a draft certificate would be circulated shortly.

103.2   Paragraph 71 above is repeated mutatis mutandis.

103.3   The paragraph is otherwise admitted but irrelevant.  It does not follow from the fact, without more, that Mr Cramer was copied to an email containing a draft version of the certificate, that he should somehow be responsible for any representations subsequently made by Mr Steinmetz in such a certificate.  Mr Cramer did not even review the attachment when it was received.

104.   As to paragraph 84.2:

104.1   The Steinmetz ABL Certificate was not attached to the SHA.  It is admitted that Mr Clark signed the SHA and that it refers to that certificate.  There is a single oblique reference to it in the definition of a term in Schedule 4 thereto.

104.2   It is denied that, by reason of such a reference (let alone such a reference in a schedule to a 58 page agreement which was not even signed by him), Mr Cramer should somehow be held responsible for making a representation as to the truth of the content of the Steinmetz ABL Certificate.

104.3   It is admitted that Mr Cramer reviewed the SHA.  He did not specifically consider the oblique reference to the Steinmetz ABL Certificate and certainly did not consider by reviewing the SHA he was making any representation as to the truth of the contents of that certificate.  He was not doing so.

104.4   Further, and in any event, Mr Cramer understood that the Steinmetz ABL Certificate (as well as the SHA) had been reviewed and approved by

Mr Barnett and Skadden.  Paragraph 71 above is repeated mutatis mutandis.

104.5 No admissions are made as to whether the other Defendants reviewed the SHA.

The Clark ABL Certificate

105. Paragraph 85 is admitted.  Mr Cramer was not involved in the preparation, drafting or execution of this document and never discussed it or its contents with Mr Clark.

106. Paragraph 86 is admitted as an incomplete summary of clause 2 of the Clark ABL Certificate.  Mr Cramer will rely, as necessary, on the document for its full terms, true meaning and effect.

107. Paragraph 87 is denied:

107.1 Each of the representations made in the Clark ABL Certificate was expressly made on behalf of BSGR and only on behalf of BSGR, or alternatively, only on behalf of BSGR and Mr Clark.

107.2 Insofar as Vale repeats paragraph 84, Mr Cramer repeats his response thereto in paragraphs 102 to 103 above mutatis mutandis.

108. As to paragraph 87.1:

108.1 It is denied that Mr Cramer reviewed the Clark ABL Certificate prior to Mr Clark executing it.  Mr Cramer was not involved in preparing the certificate, did not comment on any draft Certificate, and did not discuss the certificate's contents with Mr Clark (whether before or after he signed it).

108.2 No admissions are otherwise made.

109. As to paragraph 87.2 is denied:

109.1   The Clark ABL Certificate refers to the knowledge of BSGR and its subsidiaries only.   It (plainly) does not refer to the knowledge of directors, employees or "*any other person acting on their behalf*".

109.2   It is, in any event, irrelevant.  If (which is denied) that certificate did refer to such knowledge, then it would not follow that any director, employee or any other person acting on behalf of BSGR would (somehow) be responsible for a representation made by Mr Clark therein.

110.  As to paragraph 87.3:

110.1   The JVA did not provide that the knowledge and awareness of BSGR for the purposes of that agreement included that of Mr Cramer.  This paragraph is therefore irrelevant to any allegation made by Vale as against him.

110.2   Without prejudice to the foregoing, it is admitted.

111.  As to paragraph 87.4:

111.1   It is denied, insofar as it is alleged, that the Clark ABL Certificate was approved at the BSGR board meeting on 29 April 2010 or at the Balda Council meeting on 28 April 2010.  Those meetings were concerned with the approval of the JVA and SHA, not the Clark ABL Certificate.

111.2   Points (i) and (ii) are otherwise admitted.

111.3   Point (iii) concerns an allegation against Mr Steinmetz and no admissions are made.

111.4   In the premises, this paragraph provides no basis (whether proper or at all) for alleging that Mr Cramer (or any Defendant) was responsible for making any representation contained in the Clark ABL Certificate.

<u>Further London Meetings</u>

112. As to paragraphs 88 and sub-paragraphs 88.1, 88.2 and 88.3:

    112.1    Save that the relevant period was approximately four weeks, the first and second sentences of paragraph 88 are admitted.

    112.2    As to the third and fourth sentences of paragraph 88, Mr Cramer did not attend most of the meetings and principally only attended meetings concerning the two commercial issues identified in paragraph 72.2 above.  Accordingly, the third sentence is outside his knowledge and is not admitted, and the fourth sentence is denied.

    112.3    Further, the fourth sentence of paragraph 88 and sub-paragraphs 88.1 to 88.3 are embarrassing for want of particulars.  Vale has failed to plead when those representations were alleged to have been made; whether they were made in one meeting or more than one meeting; and which individuals are alleged to have attended each such meeting.  Mr Cramer is entitled to reserve and reserves his right to plead further in this regard, if and in the event that Vale is permitted to and does plead proper particulars of its allegations.

    112.4    Without prejudice to the foregoing and insofar as paragraph 88.1 relates to Mr Cramer, it is denied.

    112.5    Pending the provision of proper particulars, no admissions are otherwise made.

113. As to paragraphs 89 and sub-paragraphs 89.1 and 89.2:

    113.1    It is denied that Mr Monteiro asked any such questions of Mr Cramer and that he gave any such answers as alleged.

    113.2    No admissions are otherwise made.

114. Paragraph 90 is denied:

    114.1    As to the first sentence, it is denied that paragraph 87 (which concerns the Clark ABL Certificate) is relevant to the allegation that all the Defendants are somehow responsible for the alleged Eighth Corruption Representations.

    114.2    As to the second sentence, paragraph 99 above is repeated mutatis mutandis.

<u>Other matters</u>

115. As to paragraph 91:

    115.1    Insofar as the first sentence relates to Mr Cramer:

        (a)    He did not make any of the alleged First to Eighth Corruption Representations.

        (b)    If (which is denied) Mr Cramer made any of those alleged representations, it is denied that he did so intending that: (i) Vale should rely on them; or (ii) they would induce Vale to enter the JVA and SHA.  This is because:

            (i)    He was unaware that he was making any such representation at the time; and

            (ii)    In any event, he could not have intended that Vale should rely upon any representation made by him in respect of the conduct of BSGR in relation to the Simandou Project, when he had no relevant knowledge in that regard.

        (c)    Further, if (which is denied) Mr Cramer were somehow responsible for alleged representations made by other Defendants and if (which is not admitted) any such representation was false, then it

is denied that he had the intention set out in sub-paragraph (b) above.  This is because:

(i)     He did not know that he was thereby making any such representation himself; and

(ii)    He did not intend (and could not have intended) that Vale should rely upon his silence, in particular in circumstances in which he had no relevant knowledge as to the Simandou Project and therefore (1) would not have known that any such statement was incorrect; and (2) moreover, would have been unable to correct it in any event.

(d)   Further, and in any event, at the time of the making of the alleged representations, Mr Cramer was unaware (i) of the existence of Vale Austria; and therefore (ii) that it would participate in the joint venture with BSGR.  In these circumstances, he had no intention that Vale Austria would rely on any representation.

115.2   The second sentence is denied.  Paragraph 115.1(d) above is repeated.

115.3   The paragraph is otherwise denied in relation to Mr Cramer.   No admissions are made in relation to the other Defendants.

116.  Insofar as paragraph 92 concerns Mr Cramer, it is denied.  He made no implied representation as alleged or at all.  Alternatively, if (which is denied) he made any such implied representation:

116.1   He was not aware that was the case and not aware of its alleged meaning; and

116.2   In any event, he did not intend (and could not have intended that Vale would rely upon it), in circumstances where he had no relevant knowledge of the Simandou Project.

- 39 -

117.  Insofar as paragraph 92 concerns the other Defendants, no admissions are made.

**C.      The Terms of the JVA and SHA**

118.  Mr Cramer will rely as necessary upon the JVA and SHA for their full terms, true meaning and effect.  Without prejudice to the foregoing:

118.1    Paragraphs 93.1, 93.3, 93.4, 93.6 and 93.8 are admitted as general summaries of provisions in those agreements.

118.2    Paragraph 93.2 is denied.  The JVA did not provide that Vale S.A. could procure the payment of the Initial Consideration or the First and Second Deferred Consideration by another person.  On the contrary, sections 3, 12.1 and 12.2 thereof provide that the payments shall be made by Vale S.A.

118.3    Paragraph 93.5 is not admitted.

118.4    Paragraph 93.6 is admitted, save that clause 1.8 of the JVA refers to the knowledge of BSGR and any "*BSGR Guinea Group Company*", not the BSGR Group as alleged.

118.5    Paragraph 93.7 is denied.   Schedule 4 to the SHA defined "*ABL Certificates*" as meaning the Steinmetz and Clark ABL Certificates. However, neither Schedule 4 nor any other provision in the JVA or SHA required BSGR to provide those certificates to Vale.

**D.      Completion of the JVA and SHA**

119.  Paragraph 94 is admitted.  Mr Cramer did not execute the JVA or SHA on behalf of any party, nor was he involved in the exchange.

**E.      Further payments Vale allegedly made pursuant to the JVA and SHA**

120.   As to paragraph 95 and its sub-paragraphs, the first sentences of sub-paragraphs 95.1, 95.2 and 95.3 are admitted.  No admissions are otherwise made.

## IX.  ALLEGED PAYMENTS TO THE DEFENDANTS AND OTHERS AFTER THE JVA AND SHA

**A.      Alleged bonus payments made to the Second to Sixth Defendants**

121.   As to paragraph 96 and in relation to Mr Cramer:

121.1   On or about 18 June 2007, Nysco and VS Holdings and Skuld Investments Limited (a company incorporated under the laws of the British Virgin Islands, which was wholly owned by Mr Cramer) ("**Skuld**") entered into an agreement entitled "Terms of Remuneration" ("**Remuneration Agreement**").   In summary, pursuant to that agreement:

(a)   Nysco and VS Holdings agreed to provide a remuneration and incentivisation package to Skuld, in order to ensure that Mr Cramer continued to provide investment management and financial advisory services to Nysco and VS Holdings.

(b)   By clauses 2 and 10, as part of that package Nysco and VS Holdings agreed to make the following payments to Skuld (subject to various qualifications): (i) 2.5 per cent of the annual increase in the value of the two companies' portfolio of investments in equities and other capital markets assets; (ii) 0.25 per cent of the annual increase in net asset value of the two companies; and (iii) 10 per cent of the equity increase of, and profits distributed to, Balda and Vessna regarding any business or investment which

had originated with Skuld, or which Skuld had facilitated, and BSG Capital had made.

121.2    Manerhorn Holdings SA ("**Manerhorn**") (a company incorporated under the laws of the British Virgin Islands, of which Mr Cramer was the sole owner) was subsequently substituted for Skuld under the Remuneration Agreement.

121.3    By about May 2010, Mr Cramer was owed (i) US$6.382 million pursuant to clause 2 of that agreement; plus (ii) further sums not yet calculated under clause 10.

121.4    In or about late June 2010, and following completion of the JVA and SHA, at a meeting in London attended by Mr Struik, Mr Avidan, Mr Tchelet, Mr Barnett and Mr Cramer, Mr Steinmetz said that he would recommend that BSGR pay bonuses to various personnel who worked on Project Hills: namely, the negotiation and completion of the JVA and SHA.  He did not say that a bonus would be paid to Mr Cramer.  Mr Steinmetz also said that the bonuses would be split into two instalments: (i) the first would be paid in about early July 2010; and (ii) the second would be paid after BSGR received the next tranche of funds under the JVA: namely, the US$500 million comprising the "First Deferred Consideration" under Section 3(b) of the JVA.

121.5    Immediately after that meeting, Mr Cramer had a separate discussion with Mr Steinmetz in which:

(a)    Mr Steinmetz suggested that (i) BSGR, on behalf of Nysco and VS Holdings, should pay the sums outstanding under the Remuneration Agreement; and (ii) Mr Cramer should be rewarded for his professionalism and performance since the onset of the global financial crisis.

      (b)    Mr Steinmetz agreed that Mr Cramer should receive a total payment of US$10 million in this regard, some of which would be immediately payable from BSGR.

121.6    On or about 30 June 2010, (i) the BSGR Remuneration Committee recommended to BSGR's Board that bonus payments totalling US$13.5 million should be paid to various personnel who worked on Project Hills.  However, the Committee noted that the particulars of any payments to Mr Cramer were yet to be finalised; and (ii) the BSGR Board then approved that recommendation.

121.7    Around the same time, Mr Steinmetz informed Mr Cramer that:

      (a)    BSGR would pay him US$10 million in two instalments: (i) US$3 million in July 2010 ("**First Instalment**"); and (ii) US$7 million once it had received the First Deferred Consideration from Vale ("**Second Instalment**");

      (b)    US$1.3 million of the First Instalment was to be paid as a bonus for Mr Cramer's professionalism and performance, including for his work on Project Hills; and

      (c)    The Second Instalment and the balance of the First Instalment were to satisfy Mr Cramer's existing entitlement under the Remuneration Agreement (with an adjustment to recognise the delay in payment).

121.8    On or about 6 July 2010, BSGR paid the First Instalment to Manerhorn. Mr Cramer has not been paid the Second Instalment.

121.9    It is not admitted that Messrs Struik, Avidan, Tchelet or Clark, or Balda and Nysco, received any bonuses, whether substantial or at all.

122.  In the premises, as to paragraph 96:

122.1   It is denied that (i) any bonuses were promised before the JVA or SHA was executed; or (ii) Mr Cramer had any expectation of receiving a substantial bonus in return for his work on Project Hills.

122.2   It is not admitted that Vale S.A. was procured to enter into the SHA or JVA.  If it was so procured, it is denied that Mr Cramer played in any role in that regard.

122.3   It is admitted that he received a bonus in respect of his work on Project Hills.  This bonus was offered and received after the JVA and SHA were executed.

122.4   No admissions are otherwise made.

123. As to paragraph 97, the Bonus Schedule is admitted as a document.  It is divided into two parts being "*BSGR Payments 6th July 2010*" and "*Payments awaiting further instruction*".

123.1   As to paragraph 97.1:

(a)   It is admitted that a payment was made to a company owned and controlled by Mr Cramer (Manerhorn) in the sum of US$3 million on or about 6 July 2010.

(b)   It is admitted, insofar as it is alleged, that a payment of US$2.5 million was made to Onyx at around the same time; it was made in fact on 15 July 2010.  No part of that sum has ever been paid to Mr Cramer.

(c)   Paragraph 97.1 is otherwise denied.  More particularly, it is denied:

(i)   That Mr Cramer was ever due a bonus of US$10 million in respect of execution of the JVA and SHA.  Paragraph 121 above is repeated.

(ii)   That a payment of US$2.5 million to Onyx is recorded in the Bonus Schedule.

(iii)   That the payment was made by Balda.  The payment was made by Nysco.

(iv)   That the payment of US$2.5 million was a bonus to Onyx. Rather, the payment related to the costs of chartering a yacht, "Meamina".  Balda, Nysco and Onyx agreed, in summary, that (a) part of the sum would be used to discharge the outstanding liability of Onyx to Nysco under two loan agreements.  The loans related to the costs of chartering Meamina; and (b) the balance would be used for future charter costs.  Upon receipt of the monies, Onyx paid the sum of US$1,707,214.66 back to Nysco,  discharging the liability under the two loan agreements.  The balance was then applied towards two charter hire payments on 16 July 2010 (US$306,284.94) and 21 July 2010 (US$578,193.28).

124.   As to paragraphs 97.2 to 97.5:

124.1   The Bonus Schedule records that a sum of US$2 million was due to Mr Struik on 6 July 2010 and a further sum of US$1 million was a payment awaiting further instruction.

124.2   The Bonus Schedule records that a sum of US$2.5 million was due to Mr Avidan on 6 July 2010 and a further sum of US$1.25 million was a payment awaiting further instruction.

124.3   The Bonus Schedule records that a sum of US$800,000 million was due to Mr Tchelet on 6 July 2010 and a further sum of US$400,000 was a payment awaiting further instruction.

124.4 The Bonus Schedule records that a sum of US$180,000 was due to Mr Clark on 6 July 2010 and a further sum of US$70,000 was a payment awaiting further instruction.

124.5 Save as to aforesaid, no admissions are made as to paragraphs 97.2 to 97.5.

125. No admissions are made as to paragraph 98, save that it is admitted that since 30 April 2010, BSGR has paid Mr Cramer his regular salary as a non-executive director.  He has received no other payments from BSGR.

126. Paragraph 99 is not admitted.

## B.   Alleged payments made to Pentler and Mme Touré

127. Save that it is admitted that, on 10 May 2010, BSGR paid Nysco the sum of US$22 million, no admissions are made as to paragraphs 100 and 101.

## X.   ALLEGED ATTEMPTS TO DESTROY ALLEGEDLY INCRIMINATING MATERIAL

128. No admissions are made as to paragraphs 102 and 103.

## XI.   REVOCATION OF THE MINING LICENCES

129. As to paragraph 104:

129.1 The first and second sentences are admitted.

129.2 The third sentence is admitted as a summary of the Technical Committee's report.

129.3 No admissions are made as to the fourth sentence.  If necessary, Mr Cramer will refer to that report for its full terms.

## XII. CLAIMS IN DECEIT

### A.      Applicable law

130.  The law applicable to the claims which Vale characterises as deceit is New York law.  This is by reason of the following facts and matters.

*Particulars*

130.1   Article 4(1) of Regulation (EC) No 864/2007 on the law applicable to non-contractual obligations ("**Rome II**") applies.  Accordingly, the applicable law is the law of the country in which the damage occurs.

130.2   If (which is denied) any damage did occur, it occurred in New York, being the place the where both the Initial Consideration was paid by Vale International and was received by BSGR ProjectCo.

130.3   Alternatively, article 4(3) of Rome II applies.  If (which is denied), the place where the damage occurred was not New York, the alleged tort is manifestly more closely connected with New York for (amongst other reason) because (i) Vale S.A. was at the material time (and is) listed in New York; (2) the alleged tort concerns alleged misrepresentations in respect of a due diligence exercise conducted purportedly for the purposes of Vale S.A.'s compliance with obligations applicable to it under New York law, being the FCPA; and (3) the Initial Consideration was paid and received in New York.

131.  Vale has not brought claim under New York law.  In these circumstances, Mr Cramer pleads below as to the claim made under English law, entirely without prejudice to his contention that New York law is the applicable law.

### B.      Alleged falsity of the alleged representations

132.  No admissions are made as to paragraphs 105 to 107.

### C.    Alleged knowledge of the other Defendants

133. Paragraphs 108 and 110 to 113 concerns claims made against and allegations as to the knowledge of the other Defendants.  Accordingly, those paragraphs are not admitted.

### D.    Alleged knowledge of Mr Cramer

134. As to paragraph 109:

134.1    It is not admitted that any of the alleged representations were false.

134.2    It is denied that Mr Cramer made any of the alleged representations.

134.3    Alternatively, if (which is denied) Mr Cramer made any of the alleged representations, it is denied that he was aware he was doing so. Paragraphs 115.1(b)(i)and 115.1(c)(i) are repeated.  He did not believe (and cannot have believed) any representation that he did not know he was making to be false, nor was he reckless as to its truth or falsity.

134.4    In the further alternative, if (which is denied) Mr Cramer made any of the alleged representations and if (which is denied) he was aware he was doing so:

(a)    Mr Cramer did not, in any event, believe any such representation to be false, nor was he reckless as to its truth or falsity.  Mr Cramer had no knowledge of the matters that were the subject of the alleged representations.  Paragraphs 115.1(b)(ii) and 115.1(c)(ii) are repeated.

(b)    Further, and in any event, it is denied that the facts and matters alleged in paragraphs 109.1 to 109.18 are capable of supporting any alleged inference to the contrary.

134.5   The following is pleaded without prejudice to the generality of the above denials.

135.   Paragraph 109.1 is denied.  Mr Cramer was not Mr Steinmetz's *"second-in-command"*.  Paragraph 11 is repeated.  Further, Mr Cramer did not know how the Mining Licences were obtained and confirmed.  Moreover, he could not have known, given his lack of involvement in the Simandou Project.

136.   As to paragraph 109.2:

136.1   It is denied that there was any BSGR Group.  Rather, there was a BSGR Division within the BS Group.  Paragraph 4 above is repeated.

136.2   Further, it is denied that Mr Cramer or Onyx were entrusted with day-to-day management issues arising in the BSGR Division (or in the BS Group).  Norinter and then BSGR itself, handled the day-to-day management issues arising in that BSGR Division.  Paragraph 8 above is repeated.

136.3   Mr Cramer was responsible for reporting to the Balda Council principally on (i) the accounts and financial performance; (ii) of companies within the BS Group (not only those in the BSGR Division).  He never made any report to Balda as to how the Mining Licences were (or were to be) acquired.

136.4   Save as aforesaid, the paragraph is admitted.

137.   As to paragraph 109.3:

137.1   Save that Mr Cramer became a non-executive director of BSGR in 2003, the first sentence is admitted.

137.2   The second sentence is denied.  By 2008, Mr Cramer had effectively become the CEO of one company within the BS Group, being BSG Capital.  He never performed such a role in respect of the BSGR Division.

138. As to paragraph 109.4:

    138.1    It is admitted, insofar as it is alleged, that Onyx's main client was the BS Group. Onyx's main client was not the BSGR Division within that group.

    138.2    It is denied that Onyx provided any services to the BS Group (or the BSGR Division) in connection with the Simandou Project.

    138.3    Onyx Switzerland provided some company secretarial services to companies in the BSGR Division in connection with the Simandou Project. Ms Merloni-Horemans provided these services on Onyx Switzerland's behalf. Moreover, BSG Management provided a very limited amount of M&A advice in connection with that project. Those services were provided by Hagai Shiloh and Eyal Hahn.

    138.4    Mr Cramer was not involved in the provision of any of the said services or the said advice.

    138.5    Further, it is denied that Onyx made any representations in the Supplemental DD Questionnaire. Paragraph 88 above is repeated.

139. Save that the corporate group is the "BS Group", paragraph 109.5 is admitted.

140. Paragraph 109.6 is admitted. It does not follow from this provision that he had any knowledge of the Simandou Project. Paragraph 76 above is repeated.

141. Save that Mr Cramer was never closely involved in the BSGR's negotiations with Vale, paragraph 109.7 is admitted. As to Mr Cramer meeting with two executives of Vale in Panama, the purpose of the trip was for Mr Steinmetz to discuss with Roger Agnelli, Vale's CEO, the possibility of working together on a Panamanian copper project. Mr Cramer attended at Mr Steinmetz's invitation and, in any event, was not materially involved in those discussions.

142. Paragraph 109.8 is denied. Paragraph 121 above is repeated.

143. Paragraph 109.9 is denied.  Paragraph 123 above is repeated.

144. As to paragraph 109.10:

    144.1    It is admitted that, on 14 February 2006, Onyx sold its shares in Pentler to FMA International Trading Limited.

    144.2    It is not admitted that such a transaction was highly unusual for Onyx.

    144.3    Save as aforesaid, Paragraph 109.10 denied.   The transaction was effected by Ms Merloni-Horemans on Onyx's behalf.  Mr Cramer had no knowledge of nor involvement with it.  Paragraph 82.3 above is repeated.

145. Paragraph 109.11 is denied.  The initials *"DC"* on the payment instruction refer to Mr Clark, not Mr Cramer.  This should be inferred from the facts that:

    145.1    In BS Group documentation, the initials "*DLC*" were commonly used to refer to Mr Cramer and the initials "*DC*" were commonly used to refer to Mr Clark.

    145.2    Mr Cramer did not see the payment instruction at the material time. Moreover, it states that "*Underlying payment has been approved by*", followed by the initials "*DC*".  Mr Cramer never approved that payment. Nor did he have any responsibility for approving payments of that amount made by BSGR.

    145.3    The payment instruction includes Mr Clark's signature beside the words "*checked by*", and not the signature of Mr Cramer.

    145.4    Mr Clark processed other payments to Pentler using the initials "*DC*" (for example, the payment instruction to transfer US$22 million on 17 May 2010).

146. Save that no admissions are made as to the purposes of the 31 March 2010 Restructuring, paragraph 109.12 is denied.  Mr Cramer did not even know about that exercise.  Paragraph 82.3 above is repeated.

147. Paragraph 109.13 is admitted.

148. Paragraph 109.14 is admitted but irrelevant.   In or around June 2009, Ehud Olmert had entered into a consultancy agreement with Onyx, pursuant to which he agreed to provide consultancy services to the whole BS Group.  On 16 April 2010, Clifford Chance asked Skadden to obtain an assurance from Balda that: (i) Mr Olmert's ongoing activities would immediately cease; and (ii) Balda would not instruct or authorise Mr Olmert to engage in any consulting activities regarding the BSGR Division or its business.  As Mr Olmert's consultancy agreement was with Onyx, Skadden consulted Mr Cramer in this regard.

149. As to paragraph 109.15:

   149.1   The first sentence is admitted.  The 10 May 2010 Email was also copied to Ms Chapman, Ms Merloni-Horemans and Mr Clark.

   149.2   It is denied that the second sentence is an accurate summary of the 10 May 2010 Email.  That email did not refer to the Pentler SPA nor to any rights thereunder.

   149.3   The third sentence is admitted.  The payment instruction records that "*DC*" and "*YT*" approved the underlying payment, being Mr Clark and Mr Tchelet.  The latter called Mr Cramer before sending the 10 May 2010 Email and said, in summary, that a large payment needed to be made to a minority shareholder who had been bought out in 2008, and still needed to be paid.  The payment was in fact discussed in several internal emails, none of which were sent to Mr Cramer.  He had no reason to disbelieve Mr Tchelet and did not do so.

   149.4   The fourth sentence is not admitted.

149.5   Save that no admissions are made as to whether Pentler was involved
with procuring the grant of the Mining Licences, and if so, whether any
steps were taken to hide such involvement, the fifth sentence is denied.
Further, it is denied that the matters alleged in paragraph 109.15 do
support or are capable of supporting the inferences alleged.

150.   As to paragraph 109.16:

150.1   The first sentence is denied.  It is not admitted that BSGR had any
relationship with Mr Thiam.  If (which is not admitted), there was any
such relationship, Mr Cramer was never involved in it and the matters
alleged in the second sentence do not support any inference to that
effect.  Mr Cramer has met Mr Thiam only on three occasions.  He was
briefly introduced to Mr Thiam prior to his appointment as Minister for
Mines when he attended BSG Management offices for a meeting with Mr
Avidan and Mr Steinmetz.  He has also met him socially on two occasions
(once at the Monaco Grand Prix and once at the wedding of
Mr Steinmetz's daughter) and both encounters were brief.

150.2   As to the second sentence:

(a)   It is admitted that, in 2009, Mr Cramer arranged for an invitation
letter to be sent facilitating Mr Fofana's travel to London to attend
a meeting.

(b)   It is not admitted that the meeting was to be attended by Mr
Thiam and Mr Cramer was never told that was the case.  Rather,
Mr Avidan asked Mr Cramer to prepare such a letter to Mr Fofana
asking the latter to "*come for a meeting in London*" and to send
the letter to Mr Avidan, for forwarding to Mr Fofana.  The letter
was intended to support an application for a UK Visa.  BSG
Management often sent such invitation letters on behalf of visitors

who needed visas for their travel to the UK, in connection with the business of the BS Group.

(c)     The sentence is otherwise admitted.  Neither the letter to which Mr Cramer was copied on 12 February 2009 (concerning the rights of BSGR and Rio Tinto to conduct exploration activities in North and South Simandou) nor the email to which Mr Cramer was copied a year later (on 16 February 2010, concerning Mr Thiam's re-appointment as Minister of Mines) evidence  (i) any relationship between Mr Thiam and BSGR; (ii) any involvement of Mr Cramer in any such relationship; or (iii) or any corrupt or unlawful activity.

151.  Paragraph 109.17 is denied.  If (which is not admitted) any payments were made to Mr Boutros or LMS, Mr Cramer did not know of them nor their purpose.  In this regard:

151.1    The invoices for the relevant payments were only addressed to Mr Avidan and were not provided to Mr Cramer.  Each payment was less than US$5 million and each was approved by others, without the involvement of Mr Cramer.  The payments were made pursuant to a contract (the Boutros Contract) between LMS and BSGR ProjectCo.  The Boutros Contract was signed by Mr Avidan.  Mr Cramer had no involvement with either company and was unaware of the contract at the material time.

151.2    The release of funds was arranged by Mr Clark and his team.

152.  Paragraph 109.18 is denied.  Paragraph 149 above is repeated.

### E.     Alleged knowledge of Balda and Nysco

153.  As to paragraph 114 and its sub-paragraphs:

153.1   Paragraph 114.1 is embarrassing for want of particulars and is, in any event, denied.   Nysco had its own independent board of directors. Neither Mr Cramer nor Mr Steinmetz was ever one of those directors. Nor did Mr Cramer ever act on Nysco's behalf, nor is he alleged in the Particulars to have acted on its behalf or as its agent.

153.2   As to paragraph 114.2:

    (a)   It is denied that Mr Cramer was a representative of "the corporate director on Nysco's Board". Rather, at the material times (i) Nysco had two corporate directors, being Margali Management Corporation ("**Margali**") and Second Board Limited ("**Second Board**"); (ii) Mr Cramer was a director of Margali but never represented it on Nysco's board. Ms Merloni-Horemans did so. Mr Cramer was never a director of Second Board.

    (b)   It is denied that Mr Cramer was ever engaged by Balda to provide services to the BSGR Division or the BS Group (or any person). Rather, Onyx was engaged by Balda pursuant to the Service Agreement between those two entities dated 4 November 1998 (the "**Service Agreement**").

    (c)   It is admitted that Onyx provided services to Nysco, pursuant to the Service Agreement and a later agreement directly with Nysco dated 11 May 2001.

    (d)   No admissions are otherwise made.

153.3   Paragraph 114.4 is denied.   Paragraphs 153.1 and 153.2 above are repeated.

153.4   Paragraph 114.5 is denied.  Paragraph 82.1 above is repeated.

153.5   No admissions are otherwise made.

154. Paragraph 115 is denied for the reasons pleaded below:

154.1   Paragraph 115.4.1 is denied.  Mr Cramer was never engaged by Balda. Onyx was engaged pursuant to the Service Agreement.  Insofar as it is alleged that at the time of that Agreement being made, Onyx was owned by Mr Cramer, that allegation is denied.  Mr Cramer did not become a beneficial owner until more than 7 years later, and did not become its sole beneficial owner until more than 11 years later.

154.2   By paragraph 115.4.2, Vale acknowledges that the Balda foundation council was the relevant decision-making organ.  This paragraph is therefore inimical to Vale's own allegation that Mr Cramer was a *de facto* organ of Balda.  Without prejudice to that fact:

(a)   The paragraph is denied.  Mr Cramer's proposals were not invariably followed by the Balda Council.

(b)   If (which is denied), Mr Cramer's proposals were followed, it would not in any event follow that he was a *de facto* organ of Balda. Rather, it would indicate that Balda decided to follow the advice which it had engaged Onyx to provide.

154.3   Paragraph 115.4.3 is irrelevant.  If (which) is denied, the payment of US$2.5 million was a bonus to Onyx, it would not follow (nor could it be inferred that) Onyx, still less Mr Cramer, was a *de facto* organ of Balda. Without prejudice to the fact, the paragraph is denied.  The payment of US$2.5 million was not a bonus.  Paragraph 123.1 above is repeated.

154.4   Paragraph 115.4.4 is also irrelevant.  It does not follow from the fact that Mr Cramer is owed debts by Nysco and VS Holding that Mr Cramer was a *de facto* organ of Balda.  Without prejudice to that fact, it is admitted.

155. Insofar as paragraph 115.5 concerns Mr Cramer, it is denied for the reasons pleaded in paragraph 154 above.  Insofar as it concerns Mr Steinmetz, it is not admitted.

156. No admissions are otherwise made as to paragraphs 114 and 115.

### F.        Alleged inducement and reliance

157. Paragraph 116 is denied.  In this regard:

157.1    It is denied that Mr Cramer made any alleged representation.  If (which is denied) he did make any such representation, it is denied that (i) he was aware of making any such representation; and (ii) he intended Vale to rely upon it.

157.2    Alternatively, if (which is denied) Mr Cramer made any representation as alleged, was aware he was making such a representation and intended Vale to rely upon it, then it is denied that it induced to make Vale S.A. to enter into the JVA or the SHA or that Vale otherwise relied upon it or that Vale relied upon the truth of any such representation.  Pending the provision of disclosure, inspection and/or further information herein, this should be inferred from the following facts and matters.

*Particulars*

(a)    Vale was aware that Mr Cramer did not have any relevant knowledge as to the Simandou Project or the obtaining of the Mining Licences.  This was reflected in (amongst other things) (i) the fact that his knowledge was not relevant for the purposes of the JVA (as to which paragraph 75 above is repeated); and (ii) his silence during the FCPA Interview in this regard.

(b)    Further, Vale sought and obtained representations as to the Mining Licences being acquired without the use of intermediaries or the making of corrupt payments from individuals (i) who had

executive functions at BSGR; and (ii) moreover, had themselves been involved in the process of acquiring the Licences.  In these circumstances, there would have been no reason to rely on any alleged representation made by Mr Cramer and Vale did not so rely.

(c)     The matters pleaded in paragraph 157.3 below.

157.3   Further, or alternatively, it is to be inferred that, if (which is not admitted) any of the other Defendants made any other representations as alleged (i) Vale did not at the material time believe in the truth of any of the alleged representations; and (ii) accordingly, the alleged representations did not induce Vale S.A. to enter into the JVA or SHA. Pending the provision of disclosure, inspection and/or further information herein, Mr Cramer relies on the following facts and matters in support of that inference:

(a)     Vale was well aware of allegations concerning the involvement of BSGR, I.S. Touré and Mme Touré in bribery and corruption in relation to the Simandou Project.  Moreover, Vale did not specifically address those allegations in its due diligence exercise.

*Particulars*

(i)     By an email dated 25 October 2008 (at 12.09), Mr Ledsham (of Vale) said to, amongst others Mr Monteiro (also of Vale), that, in relation to the Simandou Project, BSGR is "*acting in an unethical manner and talking directly to one of the wives of the President in an attempt to get something*".

(ii)    In a presentation entitled "Projeto Venezia" apparently prepared by Vale in 2009, Vale said (amongst other things) that (1) Mme Touré was suspected of having received approximately US$2 million from BSGR; (2) payments to

her could be a first level of a structure of payments used by BSGR to acquire the mining rights at Simandou; and (3) Mme Touré had placed her brother as a director with BSGR.

(iii)   Nardello & Co, an investigative firm, was instructed by Clifford Chance LLP, on behalf of Vale S.A, to investigate (amongst other things) the activities of BSGR and Mr Steinmetz in Guinea.  This was for the purpose of due diligence into the proposed joint venture with BSGR. Nardello & Co said in its report, amongst other things and in summary, that (1) it was reported that "*BSGR Guinea*" was "*close to the Conte clan*"; and (2) I.S. Touré was in charge of external relations for BSGR in Guinea and he was the brother of Mme Touré, who was the fourth wife of the late President Conté,

(iv)   In an email dated 7 January 2009 (at 10.42), Mr Alves (of Vale) said to amongst others, Mr Ledsham (amongst other things) likewise that (1) I.S. Touré was responsible for international relations for BSGR with respect to Guinea; and (2) he is the brother of the fourth wife of the deceased President Conté.

(v)   In an internal Vale report prepared by Eduardo Etchart dated 14 September 2009, concerning a visit to Guinea, he referred to (amongst other things): BSGR's "*controversial relationship with former president Conté, particularly one of the wifes* [sic] *of the defunct president which sponsored BSGR in Guiné*".

(vi)   Notwithstanding the matters set out above, in its due diligence questionnaires, Vale asked no specific questions about Mme Touré or her brother, I.S. Touré at all.

(b)   BSGR's 2008 Consolidated Financial Statements were provided to Vale as part of the due diligence exercise and expressly recorded that a payment of US$22m had been made to acquire a minority shareholding in BSGR BVI.  Vale nevertheless asked no specific questions about this payment in its due diligence exercise.

(c)   Vale failed in other respects to carry out a proper or complete due diligence exercise in respect of the proposed transactions.   In particular:

   (i)   Vale did not carry out any financial due diligence in respect of BSGR Guinea, nor in fact any of the companies it identified as the subject of its own Supplemental Due Diligence Questionnaire, other than BSGR Guernsey;

   (ii)   Vale instructed Ernst & Young to produce a due diligence report but the latter actually carried out no audit procedures in Guinea as part of that exercise; and

   (iii)   Vale completed on the transaction before even receiving the due diligence report from Ernst & Young – which was not in fact completed until 16 May 2010.

(d)   Vale expressly recognised the limitations of its due diligence exercise, saying it might put them in breach of the FCPA, immediately upon entering into the JVA and SHA.  Thus:

   (i)   On 13 April 2010 (at 05.37), Mr Monteiro (then Vale's Director of Mergers and Acquisitions) wrote in an email that:

      "*Our recommendations to the business department have been the following, based on the legal and commercial risks:*

> 1. *If the decision is of closing the deal, that it be made in escrow (bank financing doesn't eliminate FCPA risk). The lawyers' standing is clear, once we close it, we run the risk of already being in violation the FCPA on D+1, given that we couldn't do a books and accounts review of the 4 companies that come in the acquisition package (located in Guernsey, Guinea, Liberia and BVI)* [...]
>
> 3. *Due Diligence – the result of the due diligence is not satisfactory, nor exhaustive; more time and information is needed from the other party.* [...]."

(ii)   On 13 April 2010 (at 13.06), Mr Monteiro wrote in a further email that: "*In regard to the FCPA* [...] *I think the risk of closing the deal without escrow is not only reputational, rather, "risk is of civil administrative liability to the SEC for the Company", transcribing the words of Clifford Chance's specialist in FCPA*".

(e)   If Vale believed in the truth of the alleged representations then it would have conducted a complete due diligence exercise or alternatively would, at the very least, have taken those steps that are set out in paragraphs 157.3(a)(vi), 157.3(b) and 157.3(c) above.

(f)   As pleaded in paragraph 167.5 below (i) the Technical Committee for review of Mining titles and agreements appointed by the GoG (the "**Technical Committee**") alleged that BSGR had committed bribery in relation to the Simandou Project by letters dated 30 October 2012 and 9 May 2013; and (ii) the US Department of Justice (the "**DOJ**") announced that it had indicted Mr Cilins for related offences on 15 April 2013.  Vale nevertheless continued to invest in the Simandou Project throughout that period and until 2 February 2015.

## XIII.   CLAIM IN CONSPIRACY

### A.      Applicable law

158.   The law applicable to Vale's claims in the tort of conspiracy is New York law. Paragraphs 130 and 131 above are repeated mutatis mutandis.

### B.      Substantive claim

159.   Insofar as paragraph 117 relates to Mr Cramer, it is denied.  He did not make any alleged misrepresentations to Vale (fraudulent or otherwise) and he was not party to any unlawful combination or understanding with the other Defendants. More particularly, as regards Mr Cramer:

159.1   Paragraph 117.1 is denied.  He did not make any misrepresentations to Vale.  If (which he is denied) he did make any misrepresentations, he did not do so knowing he was making any such representation and knowing any such representation to be false or being reckless as to its falsity. Paragraph 132 above is repeated.

159.2   Paragraph 117.2 is denied.  If (which is not admitted) there was any common design between the Defendants (or any of them), Mr Cramer was not party to it.   Further, if (which is not admitted) the other Defendants made any false representations, Mr Cramer did not provide any (or alternatively any more than trivial) assistance in that regard.

159.3   Paragraph 117.3 is denied.  Mr Cramer did not know about the March 2010 Restructuring or its purpose.  Paragraph 82.3 above is repeated.  In any event, it is not admitted that its purpose was as alleged nor that Pentler or its shareholders played any role in securing the Mining Licences.

159.4   Save that it is admitted that Mr Cramer knew that Vale S.A. would pay initial consideration of US$500 million pursuant to the JVA, paragraph 117.4 is denied.

159.5     As to paragraph 117.5:

   (a)     As to the first sentence, it is admitted that a part of the bonus of US$1.3 awarded for Mr Cramer's professionalism and performance was in respect of his work on Project Hills.  No admissions are otherwise made.

   (b)     The second sentence is denied.  Mr Cramer did not make any fraudulent misrepresentations.  Without prejudice to the generality of that denial, the payment of any bonus to Mr Cramer was not however contingent upon Vale entering into the JVA or SHA.  Moreover, BSGR did not announce that it would pay any bonus to him until about June 2010.  Yet, the misrepresentations which he is alleged to have made are alleged to have been made in April 2010.

160. Insofar as paragraph 117 relates to the other Defendants, no admissions are made.

161. Paragraph 117.6 is denied.  Without prejudice to the generality of this denial (i) it is denied that the matters alleged are capable of supporting the alleged inference; and (ii) the second sentence is bad for circularity.

## XIV.   PROPRIETARY CLAIMS

### A.     Applicable law

162. The law applicable to the proprietary claims made by Vale S.A. and Vale International's proprietary claim is New York law.  This is by reason of the following facts and matters.

*Particulars*

162.1     The existence of any proprietary right and the availability of proprietary remedies are to be determined in accordance with the choice of law rules

for property claims, specifically the *lex situs* of the property at the time of each transfer. The Initial Consideration was paid (as well as received) in New York. The *lex situs* is New York law.

162.2   Alternatively, if (each of which is denied) (i) Vale International's proprietary claim were to be characterised for the purposes of Rome II as a claim in restitution to reverse unjust enrichment; (ii) article 10 of Rome II were to apply; and (iii) if BSGR were unjustly enriched; then:

(a)   BSGR was unjustly enriched in New York and the applicable law pursuant to article 10(3) is therefore New York law; or

(b)   Alternatively, if (which is denied) the law applicable under article 10(3) were not New York law, then New York is, in any event, manifestly more connected with such a claim and accordingly would apply, pursuant to article 10(4). Paragraph 130.3 above is repeated, mutatis mutandis.

163. Vale S.A. and Vale International have brought no claim under New York law. Accordingly, Mr Cramer pleads below to their claim under English law, without prejudice to his contention that New York law is the applicable law.

## B.   Substantive Claim

164. Paragraph 118 is denied. If (which is denied) English law applies, then Vale does not have any right to bring any proprietary claim as against Mr Cramer or any of the Defendants. In this regard:

164.1   On or about 30 October 2012, Vale received the Notification Letter. If (which is denied), Vale S.A. was induced to enter into the JVA or SHA by fraud on the part of Mr Cramer, then from at least that date Vale was aware that was the case and therefore of any legal right to rescind those agreements.

164.2   Vale S.A. did not rescind those agreements when it instituted the Arbitration on 28 April 2014.  This is apparent from the facts (amongst others) that:

(a)   In the Arbitration, Vale S.A. claimed (amongst other remedies) damages for breach of warranties contained in the JVA.  Such a remedy would (plainly) have been unavailable if the JVA had been rescinded; and/or

(b)   By a settlement agreement dated on or about 13 March 2015 between Vale S.A., BSGR and BSGR Guernsey, the parties subsequently agreed to terminate the JVA and SHA (the "**Settlement Agreement**").  The parties (plainly) could not have agreed to terminate a contract that had already been rescinded.

164.3   Vale S.A. also did not rescind the JVA or SHA upon the delivery of (or by reason of) the Award on 4 April 2019.  This is because:

(a)   Vale S.A. had, by then, already agreed to terminate those agreements by means of the Settlement Agreement.  By agreeing so to terminate, Vale had affirmed the JVA and SHA  and thereby barred any right to rescind thereafter;

(b)   Further, and in any event, BSGR had gone into administration on 6 March 2018.  From that date, the rights of BSGR's creditors had intervened, barring any rescission at least for so long as the company remained in administration.

164.4   Alternatively, if (which is denied), the effect of the Settlement Agreement is to preserve any right for Vale S.A. to claim the remedy of rescission, then by clause 6.3 thereof the right was only preserved for the purpose of being claimed in the Arbitration.  Accordingly, that remedy cannot be claimed herein.

164.5    Further, or alternatively, Vale S.A. did not have title to the property transferred pursuant to the JVA.  The Initial Consideration was not paid to BSGR by Vale S.A.  It was paid by Vale International.  Vale S.A. had no (and has no) proprietary interest in respect of property that it did not own and did not transfer pursuant to the JVA.  Moreover, Vale International has no proprietary interest in respect of monies transferred pursuant to a contract to which it was not party and it did not rescind.

164.6    Further or alternatively, if (which is not admitted) any money received by Mr Cramer represents the traceable product of the Initial Consideration, then:

(a)    The payment to Mr Cramer is a further bar to rescission; and

(b)    Further and in any event, Vale is not entitled to trace into such money because Mr Cramer was a good faith purchaser for value without notice.  The consideration provided by Mr Cramer for the payment is identified in paragraphs 73.2 and 121.1 above.  If (which is not admitted) any alleged fraudulent representations were made by the Defendants (or any of them), Mr Cramer had no knowledge or notice that was the case.

164.7    In the premises, if (which is not admitted) Mr Cramer received any traceable product of the Initial Consideration, it is denied that any such sum was ever held on constructive trust for either Vale International or Vale S.A.

165.  Accordingly, as to paragraph 119:

165.1    Point (i) is not admitted;

165.2    In relation to Mr Cramer, point (ii) is denied.  Paragraph 164.6 above is repeated.  No admissions are otherwise made; and

165.3    Point (iii) is denied.  Paragraph 164.7 above is repeated.

166.  As to paragraph 120:

166.1    It is denied that Vale has any right to trace into any money received by Mr Cramer.  Paragraph 154 above is repeated.

166.2    It is denied, insofar as it is alleged, that Vale is entitled to trace the payment of US$2.5 million paid to Onyx into Mr Cramer's hands.  Such monies have never been paid to Mr Cramer and moreover has long since been spent by Onyx.  Paragraph 123 above is repeated.

166.3    It is not admitted that either (i) the sum of US$3 million received by Manerhorn on or about 6 July 2010; or (ii) the sum of US$2.5 million paid to Onyx on 15 July 2010; is a traceable product of the Initial Consideration.

166.4    No admissions are otherwise made.

## XV.  LIMITATION, LACHES AND DELAY

167.  Pursuant to article 15(h) of Rome II, the applicable law determines the manner in which an obligation may be extinguished and rules of prescription and limitation.  In the premises, the effective limitation period in relation to all of the claims against Mr Cramer is that prescribed by New York law.  Each of those claims is time-barred pursuant to the New York Statute of Limitations.

*Particulars*

167.1    Pursuant to §213(8) of NY CPLR, a civil claim for fraudulent misrepresentation under New York law must be commenced within the greater of six years from the date that the cause of action accrued or two years from the time that the claimant (or the person under whom the claimant claims) discovered the fraud or could with reasonable diligence have discovered it.

167.2    Further, under New York law if the tort upon which a civil conspiracy claim is predicated should become time-barred, then the conspiracy claim shall also become time-barred.

167.3    Under New York law, any claim to recover the Initial Consideration or the proceeds thereof would be brought by way of rescission. Pursuant to §213 of NY CPLR, where rescission is sought on ground of actual fraud, the civil claims must be commenced within the greater of six years from the commission of the fraud or two years from when the claimant discovered or should have discovered the fraud.

167.4    Vale International paid the Initial Consideration on or around 30 April 2010.

167.5    Further, if (which is denied) Vale has any such cause of action against Mr Cramer, it discovered (or alternatively could with reasonable diligence have discovered) that cause of action from (at the latest) the following dates.  (Mr Cramer reserves his right to plead further in this regard, pending the provision of disclosure, inspection and/or further information herein):

(a)    By 30 October 2012, when the Technical Committee wrote to BSGR ProjectCo (by this time renamed VBG-Vale BSGR (Guinea) Sarl, the management of which was controlled by Vale S.A.) listing a series of allegations of corruption and bribery in relation to the acquisition of the Mining Licences by BSGR.

(b)    Alternatively, by 12 April 2013, when Vale S.A.'s then General Counsel and Chief Compliance Officer, Clovis Torres, and a lawyer (or lawyers) for Vale S.A. from Cleary Gottlieb, Steen & Hamilton, met in Paris with (1) Scott Horton, a lawyer from DLA Piper LLP, acting for and on behalf of GoG; and (2) Steven Fox, an investigator from Veracity Worldwide, retained by GoG.  At that meeting, Mr

Fox gave a presentation as to the evidence that GoG had obtained in its investigation of BSGR for alleged corruption in connection with Simandou.

(c)   In the further alternative, by 15 April 2013, when the DOJ issued a press release, saying amongst other things (and in summary) that (i) Mr Cilins had been arrested and charged with attempting to obstruct an ongoing federal grand jury investigation concerning potential violations of the FCPA and laws proscribing money laundering; (ii) the investigation concerns whether a particular mining company and its affiliates  (on whose behalf Mr Cilins was working) transferred funds into the United States in furtherance of a scheme to obtain and retain valuable mining concessions in the Simandou region; (iii) the documents that Mr Cilins sought to destroy included copies of contracts between the mining company and its affiliates and the former wife of a now-deceased Guinean government official, who at the relevant time held an office in Guinea allowing him to influence the award of mining concessions; and (iv) by the said scheme, the mining company and its affiliates offered the said wife of the Guinean official millions of dollars, which was to be distributed to her as well as ministers or senior officials of the GoG.

(d)   In the further alternative, by 7 May 2013, when the Technical Committee wrote to BSGR ProjectCo concerning its investigation into the acquisition of the Mining Licences by BSGR and the indictment of Mr Cilins.

(e)   In the further alternative, by 4 December 2013, when the Technical Committee wrote to BSGR ProjectCo and provided it with various documents including a declaration by Mme Touré, an affidavit of Mr Cilins and transcripts of recorded conversations between those two individuals.

167.6    These proceedings were issued on 3 December 2019.  Accordingly, more than 6 years had elapsed since any such alleged cause of action accrued and more than 2 years had elapsed since Vale discovered the alleged fraud (or alternatively could with reasonable diligence have discovered it) and therefore any such claim would be time-barred.

168.    Alternatively, if (which is denied) English law applied to Vale's claims, then each of those claims is time-barred pursuant to the Limitation Act 1980 (the "**1980 Act**").

*Particulars*

168.1    Pursuant to section 2 of that Act, the limitation period in respect of any claim in the torts of deceit or conspiracy is 6 years from the date on which the cause of action accrued.

168.2    If (which is denied), Vale has any cause of action against Mr Cramer in deceit or in conspiracy, then the limitation period has accordingly elapsed.   Paragraphs 167.5 and 167.6 above are repeated mutatis mutandis.

168.3    Pursuant to section 21(3) of the 1980 Act, the limitation period in respect of a claim by a beneficiary to recover property pursuant to a constructive trust is 6 years from the date on which the right of action accrued.  If (which is denied) Vale International had any such right of action as against Mr Cramer, and if (which is not admitted) the payment to Manerhorn on 6 July 2010 included the traceable proceeds of the Initial Consideration, then the right of action accrued when Manerhorn received that payment.  Accordingly, the limitation period has elapsed.

169.    Further, or alternatively, if (which is denied) Vale had any such equitable proprietary claim against Mr Cramer, it is barred by laches.

169.1   Vale International was aware of its rights to bring any such claim since (at the latest) 30 October 2012, 7 May 2013 or 4 December 2013 or alternatively could with the exercise of reasonable diligence have discovered such rights on or by those dates.  Paragraph 167.5 above is repeated.

169.2   Vale International delayed more than 6 years alternatively approximately 6 years before bringing that claim.

169.3   Onyx ceased to provide services to the BS Group in 2016 and thereafter certain of its records were transferred to Onyx Switzerland.  The latter company then went into liquidation in November 2019.  If Vale International had brought any such claim promptly, Mr Cramer would have been able to refer to and rely upon the records of Onyx Switzerland and the evidence of its employees, as well as certain records of Onyx.

169.4   In the premises, it would be unconscionable and/or practically unjust to allow Vale International any equitable remedy.

## XVI.  CAUSATION, LOSS AND DAMAGE

170. As to paragraphs 121 and 122:

170.1   If (which is denied) Mr Cramer made any fraudulent misrepresentations, then:

(a)   It is denied that those representations caused: (i) Vale S.A. to enter into the JVA or SHA; (ii) Vale to make or procure any payments, as alleged or at all; (iii) Vale International or Vale Austria to make any payments, as alleged or at all; and accordingly (d) the Vale Parties to suffer any loss and damage, as alleged or at all.

(b)   Further, or alternatively, if (which is not admitted) Vale has suffered any loss and if (which is denied) Mr Cramer would

otherwise be liable for such loss, then such loss was in fact caused by:

(i) The GoG's (wrongful) revocation of the Mining Licences, which broke the chain of causation.

(ii) Further or alternatively, a drop in iron ore prices which has rendered the Simandou Project unprofitable.

Accordingly, Vale is not entitled to damages as alleged or at all. Alternatively, Vale's damages should be capped at the amount of the profit (if any) that Vale would have earned pursuant to the JVA and the SHA given the prevailing price of iron ore.

170.2 Without prejudice to the generality of those denials:

(a) Mr Cramer puts Vale to proof in respect of all aspects of their case on causation and quantum of loss.

(b) Vale has failed to mitigate any losses, including by failing to assist BGSR: (i) to prevent the GoG from revoking the Mining Licences; and (ii) in its efforts to resist the Technical Committee findings in its Report.

171. Paragraph 122.1 is not admitted.

172. As to paragraph 122.2, if (which is not admitted) Vale International advanced US\$581,197,104 under the promissory notes ("**Alleged Promissory Note Debt**"), it is denied that any of the Vale Parties are entitled to claim that sum against Mr Cramer, for they have waived their rights to do so. In particular:

172.1 By a written agreement dated on or about 13 March 2015 (the "**Vale Debt Amendment Agreement**"), Vale International, BSGR Guernsey, BSGR ProjectCo, BSGR Liberia and BSGR Logistics Corporation ("**BSGR Logistics**") agreed (amongst other things) that:

(a)     Vale International had advanced a total of US$549,592,103.53 to BSGR ProjectCo, BSGR Liberia and BSGR Logistics ("**VBG Subsidiaries**"); and (ii) the VBG Subsidiaries had each issued certain promissory notes to Vale International ("**Promissory Notes**").

(b)     By clause 2.1, Vale International and the VBG Subsidiaries agreed to amend the terms of each of the Promissory Notes as set out in Schedule 3.

(c)     Under clause 3.1, BSGR Guernsey agreed to become jointly and severally liable with each VBG Subsidiary for the payment obligation arising under each Promissory Note, as amended.

(d)     By clause 1.1, the aggregate amount Vale International advanced to BSGR Guernsey and the VBG Subsidiaries through issuing the Promissory Notes (including any interest and other amounts accrued to 29 April 2014) totalled US$734,003,185.75 ("**VBG Debt**").

172.2   Further, the Settlement Agreement provided that:

(a)     By clause 6.3(ii), following completion, Vale and its Affiliates would "*not be entitled to make any claim whatsoever against BSGR and/or any of its Affiliates in respect of the VBG Debt other than as part of the LCIA Arbitration ...*"; and

(b)     By clause 1.1, (i) "Affiliate" was defined as, in relation to a specified person, "*any person who [was] a director or officer of the specified person... and in the case of any Party [included] their respective subsidiaries*"; and (ii) "VBG Debt" had the meaning the Vale Debt Amendment Agreement gave to it.

172.3   At all material times: (i) Mr Cramer has been a BSGR director; (ii) Vale Holdings and Vale International have been wholly owned subsidiaries of Vale.

172.4   In the premises: (i) as a BSGR director, Mr Cramer is an Affiliate of BSGR; (ii) as a wholly subsidiary of Vale, Vale Holdings and Vale International are Affiliates of Vale; (iii) the Vale Parties have each waived their rights to advance any claim whatsoever for the VBG Debt against Mr Cramer; and (iv) the quantum of the Vale Parties' claim against Mr Cramer cannot include the Alleged Promissory Note Debt, which forms part of the VBG Debt.

173.   As to paragraph 122.3, if (which is not admitted) Vale International or Vale Austria paid US$85,365,652 in preparing for the Feasibility Study, it is denied that this constitutes a loss.  The study still has considerable value to any prospective investor in the Simandou region.  In any event, Vale is required to provide the full details of the steps it has taken to mitigate its losses as regards the Feasibility Study.

174.   Paragraph 122.4 is not admitted.

175.   As to paragraph 122.5, if (which is not admitted) Vale incurred US$17,848,519 in legal fees, costs and disbursements in pursuing the Arbitration, it is denied that Mr Cramer caused that loss.  Vale's decision to institute arbitral proceedings against BSGR (a third party), for loss allegedly caused by BSGR (a third party) was not caused by Mr Cramer.  Without prejudice to the foregoing, Vale is required strictly to prove that those legal fees, costs and disbursements were reasonably incurred and reasonable in any amount.

176.   Paragraph 123 is not admitted.

177.   Paragraph 124 is denied:

177.1   Recovery of the alleged loss is barred by the rule against reflective loss.

177.2    Further, it is denied that such a claim can be made in addition to the claim for direct loss made in paragraph 121.

177.3    Further, it is in any event denied that the value of the shares in Vale International and Vale Austria would have been diminished by the same amount as expended by those companies.

## XVII. INTEREST AND PRAYER

178. Paragraphs 125 and 126 are denied:

178.1    Vale is not entitled to any principal sum.  It is therefore not entitled to any interest thereon; and

178.2    Vale is not entitled to compound interest in respect of any damages for conspiracy or deceit.

179. It is denied that Vale is entitled to any relief as alleged or at all.

**ROBERT WEEKES**

**CARMINE CONTE**

## Statement of truth

The Second Defendant believes that the facts stated in this Defence are true.  I understand that proceedings for contempt of court may be brought against anyone who makes or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed ....................

Full Name: Dag Lars Cramer

Date 1 May 2020

**Claim No CL-2019-000723**

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (QBD)**

**B E T W E E N:**

**(1)  VALE SA**
**(2)  VALE HOLDINGS BV**
**(3)  VALE INTERNATIONAL SA**

**Claimants**

**—and—**

**(1)  BENJAMIN STEINMETZ**
**(2)  DAG LARS CRAMER**
**(3)  MARCUS STRUIK**
**(4)  ASHER AVIDAN**
**(5)  JOSEPH TCHELET**
**(6)  DAVID CLARK**
**(7)  BALDA FOUNDATION**
**(8)  NYSCO MANAGEMENT CORPORATION**

**Defendants**

---

**DEFENCE OF THE**

**SECOND DEFENDANT**

---

Covington & Burling LLP
265 Strand
London WC2R 1BH

Tel:  020 7067 2000
Ref: CP/EE/RK/042733

Solicitors for the Second Defendant