# Exhibit 6

<u>IN THE HIGH COURT OF JUSTICE</u>                    <u>Claim no. CL-2019-000723</u>
<u>BUSINESS AND PROPERTY COURTS OF</u>
<u>ENGLAND AND WALES</u>
<u>COMMERCIAL COURT (QBD)</u>

**B E T W E E N:**

**(1)  VALE S.A.**
**(2)  VALE HOLDINGS B.V.**
**(3)  VALE INTERNATIONAL S.A.**

<u>Claimants</u>

**- and -**

**(1)  BENJAMIN (BENY) STEINMETZ**
**(2)  DAG LARS CRAMER**
**(3)  MARCUS STRUIK**
**(4)  ASHER AVIDAN**
**(5)  JOSEPH TCHELET**
**(6)  DAVID CLARK**
**(7)  BALDA FOUNDATION**
**(8)  NYSCO MANAGEMENT CORPORATION**

<u>Defendants</u>

---

### DEFENCE OF THE THIRD DEFENDANT

---

### INTRODUCTION

1.    In this Defence:

    1.1.    Unless otherwise stated or clear from the context, references to paragraph numbers are to paragraphs in the Particulars of Claim.

    1.2.    For convenience only, the Third Defendant ("**Mr Struik**") adopts many of the defined terms and headings used in the Particulars of Claim. Further:

        (1)    The depersonalised abbreviations of people's names to a surname only are adopted but with the adoption of an appropriate prefix.

(2)      Mr Struik does not adopt the definition of "**BSGR Group**" that the Claimants appear to wish to use (see paragraph 28 and the Appendix to the Particulars of Claim). For the purposes of this Defence (and any denial, non-admission or admission), the "**BSGR Group**" comprises only the following companies: (a) BSGR; (b) BSGR Steel; (c) BSGR BVI; (d) BSGR Guernsey; (e) BSG MM; (f) BSGR ProjectCo; (g) BSGR Resources (Liberia) Limited; (h) BSGR (Liberia) Limited; and (i) BSGR Logistics Corp.

1.3.    Mr Struik does not plead to certain allegations in the Particulars of Claim because they are addressed to or concern other Defendants. For the avoidance of doubt, no admissions are made in respect of those allegations. Indeed, Mr Struik is under no obligation to admit or deny the Claimants' allegations otherwise than on the basis of his current knowledge and what is readily ascertainable from information or documents at his ready disposal. As set out below, Mr Struik pleads to some allegations made by the Claimants on the basis of information from his Co-Defendants; when he does so, the source of that information is matters set out in their Defences save where otherwise stated.

1.4.    Further, in the context of the Claimants' overly long and repetitive Particulars of Claim (which do not comply with the requirements of paragraphs C1.1(a), (c), (e), (i), (k) and (n) of the Commercial Court Guide), Mr Struik admits certain allegations made by the Claimants, and in relation to certain documents identified by the Claimants, notwithstanding his lack of involvement in the relevant matters. Such admissions are based on documents or information obtained by Mr Struik in the course of legal proceedings or other investigations undertaken after the times that are material to these proceedings. To the extent that Mr Struik admits those allegations, it is not admitted that he had knowledge of the fact, matter, relevant document or information at the time, unless an allegation is made in respect of a document signed by him personally or unless that is specifically alleged and admitted or an allegation is made of an act or omission by him personally.

1.5.    Moreover, the Claimants are required under CPR PD16 para 8.2 fully to plead all

particulars of notice or knowledge of any fact upon which they wish to rely, and Mr Struik responds directly to such allegations if and when they are made. Otherwise, for the avoidance of doubt, where Mr Struik admits or denies any matter alleged, he is not admitting that he has knowledge of the relevant matter or had such knowledge at any other time.

1.6.    Save insofar as any allegation is specifically admitted or not admitted below, each and every allegation in the Particulars of Claim is denied.

## OVERVIEW

2.    This claim against Mr Struik in deceit and conspiracy is brought by the world's largest iron ore miner against an individual mining engineer with over 30 years' experience of mining projects in Africa. It arises out of the Claimants' involvement in what proved to be a disappointing joint venture with BSGR in the Simandou region of Guinea many years ago. That disappointment was occasioned when the GoG revoked the Mining Licences on which the venture was based, ostensibly because they had been procured by bribery and corruption.

3.    The Claimants' claim will fail for a number of reasons as explained below, including limitation. Any cause of action accrued in 2010 and the Claimants had, or with reasonable diligence could have acquired, the information required to pursue their claims long ago. Among other things, the allegations which led to the revocation of the mining titles were put to the joint venture company, BSGR ProjectCo, on 30 October 2012. Vale, in a letter from its lawyer, foreshadowed a claim in deceit against BSGR as long ago as 19 April 2013. Yet the present claim was not issued until 3 December 2019. That was long after the expiry of the limitation period applicable either under New York law (which governs this claim) or English law (which the Claimants allege applies).

4.    In the meantime, by way of an arbitration commenced in April 2014, Vale has pursued its contractual counterparty, BSGR, in proceedings which raised broadly the same issues as are raised in these proceedings. Vale obtained an award in those proceedings in April 2019 and has brought these proceedings as an afterthought against several of the individuals and entities alleged to have been involved in the underlying events.

5.    Indeed, the claim in these proceedings is no more than a belated attempt to blame Mr Struik for loss which the Claimants would have suffered in any event and without any proper analysis as to the proper law of their claims. It is brought in respect of representations which (i) in most cases were not even made by Mr Struik; (ii) were not false; and/or (iii) were not known by him to be false. It is denied that Mr Struik is liable to the Claimants as alleged or at all.

6.    The Claimants' case is an extreme one, namely that <u>all</u> of the Defendants, despite their very different roles and positions, are responsible for a large number of false representations made in the course of the due diligence performed by Vale in respect of entry into the joint venture. The principal representations relied on by the Claimants are that (i) the Mining Licences had not been acquired through bribery and corruption; and (ii) the BSGR Group had not used any agents, consultants or other intermediaries, other than those disclosed to Vale, in obtaining the Mining Licences.

7.    The Claimants rely on 18 distinct representations. Of these, only three are alleged to have actually been made by Mr Struik himself (although he is wrongly accused of somehow adopting or approving all of the representations). The three which he is alleged to have made, all of which are comprised in the Fifth Corruption Representation, are not admitted. Of these:

7.1.    The first alleged representation is to the effect that Mr Struik was not "*aware of*" any financial interests held by any government officials in the BSGR Group's Guinean operations. That is a representation about the state of Mr Struik's knowledge. If he made it, it was true. He was not aware of any such interest. Nor in fact were there any such interests (see below).

7.2.    The second is to the effect that Mr Struik was not "*aware of*" any payments or other personal financial benefits conferred on any government officials on behalf of the BSGR Group in relation to its Guinean operations. That too is a representation about the state of Mr Struik's knowledge. If he made it, it was true. He was not aware of any such payments. Nor in fact were any such payments made or benefits conferred (see below).

7.3.   The third is to the effect that the BSGR Group had not been involved in bribery or corruption in Guinea.

8.   Such a representation would have been, to the best of Mr Struik's knowledge and belief both then and now, true. The Claimants' case that such bribery and corruption took place, often expressed in the vaguest terms, is seriously flawed. Among other things:

8.1.   The cornerstone of the Claimants' case is the allegation that the BSGR Group used third parties to pay bribes to Mme Touré, a Guinean businesswoman in her twenties, who the Claimants say was the then President of Guinea's fourth wife (but who was not in fact married to the President). These bribes were allegedly paid to procure the exercise of Mme Touré's "*influence*".

   (1)   The manner in which this influence was exercised is never explained by the Claimants. It is inherently unlikely that the President, a soldier who first came to power in a military coup and had been in office for over 20 years by the times that are material to these proceedings, was pressured by Mme Touré into revoking a mining concession held by the Rio Tinto Group and granting title over the same ore-rich area to the BSGR Group.

   (2)   The Claimants identify 12 purported "*Intercessions*" by Mme Touré, some of which are denied and some of which are not admitted, but most of which (even taking the Claimants' case at its highest) disclose no more than that she was present at a meeting where the BSGR Group's interest in the Simandou region was discussed. In any event, (a) Mr Struik is not aware of any intercession by Mme Touré on behalf of BSGR; and (b) neither Mr Struik nor the BSGR Group needed the assistance of Mme Touré in advancing the position of the BSGR Group in relation to the GoG and its activities in Guinea.

   (3)   The real reason the Rio Tinto Group's rights were revoked was because of the GoG's frustration at the Rio Tinto Group's long-standing failure

5

to explore and exploit the riches of the region, to the detriment of the nation. They were granted to the BSGR Group because the GoG believed in the BSGR Group's commitment to realise the resources that the Rio Tinto Group had allowed to languish.

8.2.   The Claimants' case as to alleged payments to Mme Touré is similarly flawed.

(1)   The alleged bribes are said to have consisted of (a) the conferral of a 33.3% interest in Pentler, a company which held a 17.65% interest in BSGR BVI (BSGR ProjectCo's then holding company); (b) an agreement entered into by BSGR ProjectCo to pay Mme Touré's company, Matinda, the sum of US$4 million; and (c) a payment of US$1 million to Mme Touré through an alleged intermediary.

(2)   In fact:

(a)   The conferral of the interest in Pentler never came to fruition and, in any event, was a matter between Pentler and Mme Touré (who had their own business relationship).

(b)   The agreement purportedly entered into by BSGR ProjectCo to pay Mme Touré has been disclaimed by the person purported to have signed it (Mr Avidan) as a forgery.

(c)   The payment of US$1 million was in fact a legitimate payment to a known supplier of BSGR ProjectCo (LMS), which had its own independent business relationship with Mme Touré.

8.3.   Further and in any event, insofar as Mr Struik made the alleged representations, he believed them to be true. If, despite Mr Struik's belief to the contrary, any bribery or corruption did take place, he was unaware of it. He was the CEO of BSGR's Mining & Metals Division. His role entailed advising the BSGR board on possible projects and deploying his and his team's technical expertise within the business as and when needed. He did not have an overall management responsibility or function for every project. In particular, he was not responsible

6

for the day-to-day management of the Simandou project. That responsibility belonged (after his arrival in Guinea) to the country manager, Mr Avidan. Mr Struik was not, nor was it part of his job to be, aware of every relationship and transaction connected with the Simandou project or the grant of the Mining Licences. So far as he was aware, those Licences were legitimately obtained. To the best of Mr Struik's knowledge (and by way of overview only):

(1)     Mme Touré was not the wife of the President and, in any event, she played no part in the grant of the Mining Licences to the BSGR Group.

(2)     Pentler and the other Pentler Principals were rewarded because they had introduced the BSGR Group to Guinea in the first place. Their role in relation to the BSGR Group's activities in Guinea and the Simandou project in particular was otherwise very limited. While, at an early stage, Mr Cilins provided some logistical and administrative support, including translation assistance, his role ended shortly after the appointment of Mr Avidan in mid-2006, and he played no part in the grant of the Mining Licences to the BSGR Group.

(3)     Mr Thiam was the Minister of Mines and acted on behalf of the GoG at all material times. He was not a consultant, agent or otherwise an intermediary for the BSGR Group, nor was he paid bribes in connection with the confirmation and "*extension*" of the Mining Licences (or otherwise).

(4)     The various payments made (or allegedly made) to third parties upon which the Claimants rely, to the extent that they were made at all, were made for legitimate purposes unconnected with the grant of the Mining Licences.

(5)     The BSGR Group had never been involved in any form of bribery or corruption in Guinea (or elsewhere).

8.4.    Moreover, Mr Struik denies that he is responsible for representations that he did not personally make and there is no proper basis for seeking to attribute any

7

such representations to him.

9.    For the avoidance of doubt, unless admitted or not admitted below, the allegations contained in paragraphs 1 to 11 are denied for the reasons set out elsewhere in this Defence.

## SECTION A: PARTIES

<u>The Claimants</u>

10.    Paragraph 12 is admitted.

11.    Save that (a) the second sentence; (b) the fourth sentence; and (c) the reference to the alleged merger in the third sentence are not admitted, paragraph 13 is admitted.

12.    Save that it is not admitted if and to what extent any of the promissory notes were paid (or, if paid, have not been repaid), paragraph 14 is admitted.

<u>The Defendants</u>

13.    As to paragraph 15:

13.1.   The first and second sentences are admitted.

13.2.   Save that it is admitted that certain of those activities have been carried out during the material period by entities in the BSGR Group, the third sentence is not admitted.

13.3.   Mr Struik responds below to the cross-reference to paragraph 28.

14.    As to paragraph 16:

14.1.   The opening words of paragraph 16 and paragraph 16.1 are admitted, save that it is not admitted whether there are no other beneficiaries than Mr Steinmetz, his wife Agnes, and the children of that marriage.

14.2. As to the first sentence of paragraph 16.2:

    (1)    The allegation that Mr Steinmetz was "*presented*" to act as an adviser to Balda and the BSGR Group is embarrassingly vague. It is in any event denied.

    (2)    In fact, Mr Steinmetz was contracted to act (and did in fact act) as an adviser to Balda.

14.3. As to the second sentence of paragraph 16.2:

    (1)    The allegation that Mr Steinmetz "*controlled all material decisions relating to the BSGR Group and BSGR*" is embarrassingly vague. It is in any event denied.

    (2)    In fact, BSGR and the BSGR Group were controlled by their directors and ultimately by their shareholders.

    (3)    Without prejudice to the foregoing, Mr Steinmetz did give advice in relation to material decisions and his advice was often followed. In the absence of proper particulars, it is not admitted what role or influence Mr Steinmetz had in relation to any specific decision, save that it is admitted that he provided advice with regard to entry into the SHA and JVA.

15. Paragraph 17 is embarrassingly vague. Pending proper particulars (as to what is meant by "*principal beneficiary*"), it is not admitted.

16. Paragraph 18 is admitted. Its relevance is denied.

17. As to paragraph 19:

17.1. The first sentence is admitted.

17.2. The second sentence is embarrassingly vague. Pending proper particulars (as to

what is meant by the allegation that Mr Cramer is an "*associate*" of Mr Steinmetz), it is not admitted.

17.3.  The third sentence is admitted, but Mr Struik does not know the exact date this appointment occurred.

17.4.  As to the fourth sentence:

   (1)  It is admitted that Mr Cramer was from December 2009 the sole ultimate beneficial owner of Onyx.

   (2)  His ownership of Onyx before that time, and his ownership of any other entities intended to be included in the embarrassingly vague reference to "*the related Onyx group of companies*", are not admitted.

   (3)  The vague allegation that the "*day-to-day management*" of "*the BSGR Group*" was "*delegated*" to Onyx (or to the "*related Onyx group of companies*") is not admitted, save that it is admitted that Onyx provided certain administrative services to the BSGR Group.

17.5.  The final sentence is not admitted.

18.  As to paragraph 20:

18.1.  It is admitted that Mr Cramer was involved in the negotiation of the JVA and SHA. The subjective allegation that he was "*closely involved*" is embarrassingly vague. Pending proper particulars, it is not admitted.

18.2.  The allegation that Mr Cramer made fraudulent misrepresentations to induce Vale to enter into the JVA and SHA is addressed to Mr Cramer and is not properly included within a section of the Particulars of Claim that purports simply to identify the parties.

18.3.  It is admitted that a bonus was awarded to Mr Cramer, but denied that this was in about April 2010. It was in about July 2010. It is further denied that the bonus was awarded "*for the role he played in procuring Vale to enter into*" the JVA and SHA.

18.4.   Further as to Mr Cramer's bonus:

(1)     Mr Cramer's wholly owned BVI company, Manerhorn Holdings SA, was paid the sum of US$3 million on or about 6 July 2010.

(2)     Mr Cramer was due to receive a further payment of US$7 million but only if a second sum of US$500 million was paid to BSGR by Vale pursuant to section 3(b) of the JVA (which never happened).

(3)     Save that Mr Struik is aware that at least a substantial part of this US$10 million was a bonus (for work including but not limited to the transaction with Vale) he does not know the full details of what it was for, or to what extent these sums were by way of bonus or some other form of remuneration or settlement, as he understands Mr Cramer to allege at paragraph 121 of his Defence. Accordingly, the size of Mr Cramer's bonus is not admitted.

18.5.   As to the second sentence, Balda is recorded as having resolved to pay US$2.5 million to Onyx in remuneration for and recognition of its efforts in increasing Balda's net asset value. It so resolved in or about July 2010. Mr Struik does not know whether this, or any sum, was in fact paid. This sentence is otherwise not admitted.

18.6.   Save as set out above, paragraph 20 is denied.

19.   As to paragraph 21:

19.1.   Save that it is admitted that Mr Struik is resident in South Africa, the first sentence is denied. Mr Struik is not a "*mining industry executive*". He is a mining engineer who has held management roles in various companies with mining interests.

19.2.   Save that it is admitted that Mr Struik held positions within the BSGR Group including as a director of each company expressly identified therein, the second sentence is embarrassingly vague. Pending proper particulars as to what is meant by holding "*various appointments within the BSGR Group*" at "*all material times*", the second sentence is not admitted.

11

20.    As to paragraph 22:

20.1.  Paragraphs 18.1 and 18.3 above are repeated, making changes where necessary and appropriate. Mr Struik's role in supporting the negotiations is set out at paragraph 63.7 below.

20.2.  Further as to Mr Struik's bonus:

(1)    His company Ennismore Consultants Ltd was paid US$2 million on or about 9 July 2010. He was to receive a further US$1 million only if a second sum of US$500 million was paid to BSGR by Vale pursuant to section 3(b) of the JVA (which never happened).

(2)    Mr Struik's bonus related to work done for/value added to the BSGR Group generally, including in relation to Guinea, and was not limited to the transaction with Vale.

20.3.  Save as set out above, paragraph 22 is denied. It is specifically denied that Mr Struik made any fraudulent misrepresentations as alleged or at all.

21.    Mr Struik pleads to paragraph 23 on the basis of information from Mr Avidan:

21.1.  The first sentence is admitted.

21.2.  As to the second sentence:

(1)    It is admitted that Mr Avidan was the BSGR Group's country manager for Guinea from about mid-2006 until about May 2010.

(2)    It is denied that Mr Avidan was appointed President of BSGR ProjectCo in about mid-2006 or at all. However, after leaving his post as country manager following the conclusion of the JVA and SHA with Vale, Mr Avidan was appointed President of BSGR.

21.3.  As to the third sentence, paragraphs 18.1 to 18.3 above are repeated, making changes where necessary and appropriate.

21.4.  Further as to Mr Avidan's bonus:

(1)     Fefania Assets Corporation, a Panamanian company owned by Mr
        Avidan and his wife, was paid US$2.5 million on or about 6 July 2010.
        He was to receive a further US$1.25 million only if a second sum of
        US$500 million was paid to BSGR by Vale pursuant to section 3(b) of
        the JVA (which never happened).

(2)     Mr Avidan's bonus related to work done for/value added to the BSGR
        Group generally, and in particular to work done in relation to Guinea,
        but it was not limited to the transaction with Vale.

21.5.  Save as set out above, paragraph 23 is denied.

22.    Mr Struik pleads to paragraph 24 on the basis of information from Mr Tchelet:

22.1.  The first sentence is admitted.

22.2.  As to the second and third sentences:

(1)     From 1 September 2003 to 31 August 2008, Mr Tchelet was employed as
        a financial manager by a company known when he joined as Norinter
        Financial Advisors (Pty) Ltd, later renamed BSGR Advisory Services
        (Pty) Ltd, a South African company owned by Mr Oron which provided
        management and corporate services to the BSGR Group.

(2)     In that role:

        (a)     Between March 2007 and August 2008, Mr Tchelet acted as the
                CFO of the BSGR Group by default, no CFO being appointed.

        (b)     From time to time Mr Tchelet acted as the CFO of certain
                subsidiaries of BSGR as and when necessary in periods leading up
                to major transactions involving those subsidiaries.

(3)     From September 2008 to about February 2017, Mr Tchelet provided
        services as a Strategic Financial Specialist to BSGR through his wholly
        owned company. In that role, Mr Tchelet from time to time acted as the
        CFO of the BSGR Group and of certain subsidiaries of BSGR, including

13

BSGR Guernsey, as and when necessary in periods leading up to major transactions involving those subsidiaries.

(4)     Since about February 2017, Mr Tchelet has provided advisory services to a wholly owned subsidiary of BSGR (and to that subsidiary's subsidiaries) through his wholly owned companies.

(5)     Save as set out above, the second and third sentences are denied.

22.3.   The fourth sentence is admitted, save that the capacities in which Mr Tchelet acted are as set out above, and save that it is denied (if it be so alleged, as appears to be the case given the Claimants' use of the words "*at least*") that Mr Tchelet visited Guinea on more than seven occasions during this period. On each of his seven visits, Mr Tchelet only visited Conakry, the capital of Guinea.

22.4.   As to the fifth sentence:

(1)     Paragraphs 18.1 to 18.3 above are repeated, making changes where necessary and appropriate.

(2)     Further as to Mr Tchelet's bonus:

(a)     Mr Tchelet's company, Evergreen Valley Production Ltd, was paid US$800,000 on or about 6 July 2010. He was to receive a further US$400,000 only if a second sum of US$500 million was paid to BSGR by Vale pursuant to section 3(b) of the JVA (which never happened).

(b)     Mr Tchelet's bonus related to work done for/value added to the BSGR Group generally, including in relation to Guinea, and was not limited to the transaction with Vale.

22.5.   Save as set out above, paragraph 24 is denied.

23.     As to paragraph 25:

23.1.   The first to fourth sentences are admitted.

23.2.   As to the fifth sentence, paragraphs 18.1 to 18.3 above are repeated, making

changes where necessary and appropriate.

23.3. Further as to Mr Clark's bonus:

   (1)    Mr Clark was paid US$180,000 on or about 6 July 2010. He was to
          receive a further US$70,000 only if a second sum of US$500 million was
          paid to BSGR by Vale pursuant to section 3(b) of the JVA (which never
          happened).

   (2)    Save that Mr Struik understands from Mr Clark's Defence that his
          bonus was paid as a reward for his hard work for the BSGR Group, the
          precise purpose of Mr Clark's bonus is not known to Mr Struik.

24.    As to paragraph 26:

24.1. Save that it is denied that Balda was established in 1995, and save as set out in
      paragraph 14.1 above, the first to third sentences are admitted. According to an
      official certificate of the Land and Public Register Office for the Principality of
      Liechtenstein, Balda was established in 1994.

24.2. As to the fourth sentence, paragraph 18.2 above is repeated, making changes
      were necessary and appropriate.

24.3. The fifth sentence is vague and is not admitted. Mr Struik does not know
      whether Balda received or dealt with any part of the US$500 million paid
      pursuant to the JVA.

25.    As to paragraph 27:

25.1. The first and second sentences are admitted.

25.2. As to the third sentence, paragraph 18.2 above is repeated, making changes were
      necessary and appropriate.

25.3. The fourth sentence is not admitted pending disclosure and/or further
      information, save that it is admitted that BSGR transferred the sum of
      $203,200,000 to Nysco on around 12 July 2010 and the sum of US$22 million to
      Nysco on around 10 May 2010.

## OTHER KEY COMPANIES AND INDIVIDUALS

The BSGR Group

26.   As to paragraph 28:

26.1.   The first sentence of paragraph 28 is denied. The structure of the BSGR Group as set out in Appendix 1 is not "*complex*" as appears to be alleged by the Claimants.

26.2.   The second sentence is embarrassingly vague in that the Claimants have failed to provide a clear and comprehensive list of the companies that are said to be relevant to this claim. The Appendix is over-inclusive for the purpose of the definition proffered by the Claimants. Paragraph 1.2(2) above is repeated.

Mme Touré

27.   As to paragraph 29:

27.1.   Mr Cilins introduced Mr Struik to Mme Touré in 2005 as a Guinean businesswoman and his business partner. Mr Struik was told by Mr Cilins that he and Mme Touré were involved in importing chickens, toothpaste and condoms into Guinea. Mr Struik further understands from Mr Noy's evidence in the Arbitration that Mme Touré dealt in, among other things, consumer goods, pharmaceuticals and mining.

27.2.   Save that Mme Touré's year and city of birth are not admitted, the first sentence is admitted.

27.3.   The second sentence is denied. Although Mme Touré has claimed to be President Conté's fourth wife, she was not in fact married to him. Mr Struik was told that Mme Touré was President Conté's protégé. She was the daughter of an old army friend who, when dying, had asked the President to look after her, which he agreed to do.

27.4.   Save that it is admitted that President Conté died in December 2008, the third sentence is not admitted.

27.5.   As to the fourth sentence:

(1)     It is admitted that in 2013 Ms Touré was cooperating with US authorities.

(2)     Paragraph 103 is addressed below.

(3)     Save as set out above, the fourth sentence is not admitted.

Pentler and its principals

28.    As to paragraph 30:

28.1.   It is denied (for the reasons set out below) that Pentler was the "*vehicle*" through which Mme Touré held "*her 5% interest*" in BSGR BVI. Mme Touré has never held an interest in BSGR BVI or any interest in Pentler.

28.2.   It is not admitted that Mr Noy is French or that Mr Lev Ran is South African. Mr Struik understands from their evidence in the Arbitration that both are Israeli.

28.3.   Save as set out above, paragraph 30 is admitted.

Mr Boutros

29.    As to paragraph 31:

29.1.   Mr Struik met Mr Boutros a few times and knew that he was a businessman who supplied various goods to the project, such as generators, air conditioning units, satellite dishes and some mining equipment. Mr Struik did not know of LMS, or that this was the name of Mr Boutros' company, and did not see the invoices referred to by the Claimants. Mr Struik did not have any dealings with Mr Boutros (or with LMS) beyond occasionally bumping into Mr Boutros on site. Mr Struik therefore pleads to paragraph 31 on the basis of the documents and of information from Mr Tchelet and Mr Avidan.

29.2.   As to the first sentence:

(1)     It is not admitted that Mr Boutros "*owned and controlled*" LMS.

(2)     Mr Boutros was a Lebanese businessman who was an owner of, and had some control over, LMS.

29.3. As to the second sentence:

(1)     In 2009/10, the BSGR Group paid sums in excess of US$5 million to LMS (and/or Mr Boutros or Mr Boutros' business partner Adama Sidibe). It is not admitted that these payments constituted payments into *"[Mr] Boutros' control"*.

(2)     It is denied that those sums were paid by the BSGR Group "*purportedly by way of various consultancy payments*". Mr Struik understands from Mr Avidan that the sums were paid for goods and services provided by LMS, Mr Boutros and/or Mr Sidibe.

(3)     In particular, and materially for the purposes of the Claimants' claim, LMS entered into a Subcontracting and Service Provision Agreement with BSGR ProjectCo in 2008, pursuant to which LMS was engaged to supply various goods and services to BSGR ProjectCo. Mr Struik understands from Mr Avidan that he regarded this contract as having formalised a relationship which was already in place from about 2006 and which continued throughout Mr Avidan's time as country manager.

29.4. As to the third sentence:

(1)     It is denied that money was paid by the BSGR Group to LMS for the purpose of paying bribes (whether to Mme Touré or anybody else).

(2)     The vague allegation that monies paid to LMS were to be used to pay bribes is not properly included within a section of the Particulars of Claim that purports simply to identify other key companies and individuals.

(3)     In any event, as to the alleged bribe identified by the Claimants (and as set out in more detail below), Mr Struik understands from Mr Avidan that BSGR paid US$998,000 to LMS as part of a genuine transaction for earthmoving machinery. If (which is not admitted) Mr Boutros thereafter directed any payment of those monies to Mme Touré, that payment was not made by or on behalf of the BSGR Group.

29.5.  Save as set out above, paragraph 31 is denied.

<u>Mr Thiam</u>

30.    As to paragraph 32:

30.1.  The first and second sentences are admitted.

30.2.  As to the third sentence:

(1)      As Minister of Mines and by way of a letter dated 5 May 2009, Mr Thiam provided confirmation on behalf of the newly formed GoG that (as was the case) the Mining Licences were valid.

(2)      The allegation that Mr Thiam received bribes of US$5 million is not properly included within a section of the Particulars of Claim that purports simply to identify other key companies and individuals.

(3)      In any event, as set out in more detail below, BSGR did make a payment of over US$5 million to a Mozambican company called Companhia Carvoeira de Samoa Limitada ("**CCS**") but (a) this was not a payment to Mr Thiam personally; and (b) it was made for a legitimate purpose and not as a "*bribe*".

30.3.  As to the fourth sentence:

(1)      The needless repetition of the allegation made in the third sentence is noted. Paragraph 30.2 above is repeated.

(2)      It is admitted that Mr Thiam is serving a seven-year sentence in the United States for laundering bribes paid to him by companies unconnected to the BSGR Group. The relevance of that conviction is denied.

(3)      It is not admitted (if it is alleged) that Mr Thiam in fact received or laundered any bribes paid to him by companies unconnected to the BSGR Group. If it is so alleged, Mr Struik will, if necessary, rely on the rule in <u>*Hollington v Hewthorn*</u> [1943] K.B. 587 to render inadmissible the

contents of the judgment of the US Court in relation to Mr Thiam.

30.4.  Save as set out above, paragraph 32 is denied.

## SECTION B: THE MINING LICENCES

Introduction: Guinea and Simandou

31.    Save that part of the Simandou range is located in the Kankan region of Guinea, paragraphs 33 to 35 are admitted.

The grant of the Mining Licences to the BSGR Group

32.    As to paragraph 36:

32.1.  Save that the grant of Mining Licences were actually (and not merely "*formally*") governed by the 1995 Mining Code of the Republic of Guinea ("**the 1995 Mining Code**"), the first sentence is admitted. All mining titles from time to time granted to the BSGR Group, and all titles granted to other persons at all relevant times, were governed by the 1995 Mining Code.

32.2.  As to the second sentence and its sub-paragraphs:

(1)    A person could not explore for iron ore without a prospecting permit (described by the Claimants as a "*research licence*").

(2)    To mine for iron ore, a person needed *either* an operating permit *or* a mining concession.

(3)    Further, by reason of the 1995 Mining Code:

(a)    The constitutive order for a prospecting permit would set a minimum programme of work which the holder had to carry out while the permit was in effect (article 35).

(b)    The holder of a prospecting permit had to start prospecting work within six months after the permit was issued and continue it diligently and according to recognised standards (article 35).

(c)    At the request of the holder, the term of an 'industrial'

prospecting permit could be renewed twice, for a maximum period of two years each time, and on the same conditions as before (article 30).

(d) A prospecting permit would be renewed automatically by operation of law if the holder had met all his obligations and his application for renewal set out a minimum programme of work building on the results of the preceding period (article 30).

(e) With each renewal, the area of a prospecting permit was reduced by half (article 30).

(f) A mining concession could only be issued where one or more deposits had been discovered and on evidence duly constituted by a feasibility study (article 41).

(g) A mining concession would be issued by decree on the recommendation of the Minister of Mines and was subject to (inter alia) the conditions set out in a mining agreement (article 43).

(h) A mining agreement would define the rights and obligations of the parties and set out the legal, financial, tax and social conditions that would govern the mining operation for the duration of the agreement (article 11).

(i) Mining titles were always issued subject to existing rights (article 47).

(4) The reference to what was "*typically needed*" is embarrassingly vague and, save as set out above, the second sentence and its sub-paragraphs are not admitted.

33. As to paragraph 37:

33.1. The first sentence is admitted.

33.2. As to the second sentence, it is admitted that the Mining Licences were granted

and that Rio Tinto ProjectCo had previously held rights over SB1 and SB2.

33.3. The second sentence, the sub-paragraphs and further paragraphs in the Particulars of Claim refer to certain matters occurring "*notwithstanding*" the existence of certain rights or interests of the Rio Tinto Group.

   (1)   The Claimants' use of that word is embarrassingly vague. If (which is unclear) the Claimants use that word to imply that any of the BSGR Group's rights or actions were in any way illegitimate, improper or otherwise inappropriate, that implication is denied.

   (2)   As pleaded in paragraphs 33.8 to 33.11 below, by the time the Mining Licences were granted to BSGR ProjectCo, Rio Tinto ProjectCo no longer held any rights in respect of SB1 and SB2. Those rights had been legitimately removed by and at the initiative of the GoG, due to the GoG's view that the Rio Tinto Group had failed to take sufficient action in pursuance of those rights.

33.4. Save that it is not admitted that the "*base convention*" "*extend[ed] the validity*" of the renewed prospecting permits until 30 May 2006, paragraph 37.1 is admitted.

33.5. Paragraph 37.2 is admitted.

33.6. As to paragraph 37.3:

   (1)   The first sentence is admitted. Mr Struik will refer to the February 2006 MoU at trial for its full terms, meaning and effect.

   (2)   As to the second sentence:

      (a)   It is admitted that the February 2006 MoU (i) made provision in relation to the BSGR Group carrying out of a 30-month feasibility study in respect of the areas identified by the Claimants; and (ii) contemplated the potential grant of mining concessions in due course, subject to the 1995 Mining Code.

      (b)   However, the conduct of the 30-month feasibility study in respect of the relevant area, which included SB1 and SB2, was premised

on the grant of a prospecting permit to BSGR BVI or BSGR ProjectCo in respect of that area (see clause 1.2). At that time, no company within the BSGR Group held a prospecting permit in respect of SB1 or SB2.

(c)     Moreover, (i) the GoG was at all relevant times dissatisfied and frustrated at the Rio Tinto Group's perceived inaction, and considered it conceivable that its rights in relation to SB1 and SB2 might cease in the future; and (ii) the relevant BSGR Group entity was aware of the GoG's view, and was interested in obtaining rights in respect of SB1 and SB2 in the event that they ceased to be held by the Rio Tinto Group and became available.

(d)     Save as set out above, the second sentence is denied.

(3)     As to the third sentence, it is admitted that the February 2006 MoU made reference to SB1 and SB2. Rio Tinto ProjectCo's licences have been addressed above. Paragraph 33.6(2)(c) above is repeated.

33.7.  Paragraph 37.4 is admitted. The Rio Tinto Concessions were granted subject to the 1995 Mining Code, including its provisions in relation to the revocation of such rights. A mining concession could be revoked, among other things:

(1)     Where the prospecting, operation or development period was suspended for more than six months in the case of explorations or more than eighteen months in the case of operations, or was severely restricted without legitimate grounds and in such a way as to be detrimental to the public interest; and

(2)     For violations of one of the provisions of the 1995 Mining Code.

33.8.  Paragraph 37.5 is admitted. Paragraph 33.6(2)(c) above is repeated.

33.9.  As to paragraph 37.6:

(1)     The first sentence is admitted.

(2)     Save that the July 2008 Decree was concerned with Rio Tinto ProjectCo,

rather than "*Rio Tinto*", the second sentence is admitted as a broad summary of the July 2008 Decree.

(3)     Further, the July 2008 Decree was lawful. The reasons for the revocation of Rio Tinto ProjectCo's concession were set out in two letters from the GoG to Rio Tinto ProjectCo dated 22 May 2008 and 30 July 2008. The true position, as reflected in those letters, was that:

(a)     Rio Tinto ProjectCo had not submitted a feasibility study prior to grant of the concession or subsequently.

(b)     The base convention and mining concession purported to confer on Rio Tinto ProjectCo continuing long-term prospecting rights without obliging it to make an investment decision regarding mining operations.

(c)     Taken together, the concession and convention constituted a freeze on Guinea's mineral resources, which was contrary to the GoG's efforts to achieve rapid benefit from its mineral resources so as to increase State revenues.

(d)     Over the course of 11 years, Rio Tinto ProjectCo had only engaged in limited prospecting activities, and only over a limited part of its holdings. Such delay in bringing its mining project into operation was a breach of the legal undertakings linked to the grant of the mining concession.

33.10. Paragraph 37.7 is admitted.

33.11. Paragraph 37.8 is admitted. Further:

(1)     Between July and October 2008, the GoG afforded Rio Tinto ProjectCo the opportunity to submit, among other things, a feasibility study and retrocession plan indicating which 50% of the area covered by its concession it proposed to give up.

(2)     Rio Tinto ProjectCo did not submit either a feasibility study or a realistic retrocession plan which complied with the GoG's requirements.

Accordingly, on or about 4 December 2008 Rio Tinto ProjectCo was required to cede SB1 and SB2.

33.12. Paragraphs 37.9 and 37.10 are admitted.

## SECTION C: HOW THE MINING LICENCES WERE OBTAINED BY THE BSGR GROUP BETWEEN 2005-2008

**C1   The BSGR Group is introduced to Guinea**

34.    As to paragraph 38:

34.1.  Save as set out below, the first sentence is denied. The Pentler Principals did not introduce the BSGR Group to the "*possibility of acquiring mining licences in the Simandou region*". Rather, the Pentler Principals introduced the BSGR Group to Guinea on the basis that the country offered possible mining opportunities, no more.

34.2.  Save that it is admitted that Mr IS Touré was the half-brother of Mme Touré, paragraph 38.1 is not admitted.

34.3.  Save that it is admitted that Mr Oron met with Mr Souaré, then Minister of Mines, on or about 20 July 2005, paragraph 38.2 is not admitted. It was at this meeting that Mr Oron learned, on behalf of the BSGR Group, that there was an opportunity to be involved in exploring and potentially mining for iron ore in the Simandou region.

34.4.  Paragraph 38.3 is admitted. Further:

(1)    Mr Struik made two or three visits to the CPDM on this trip. Mr Cilins accompanied Mr Struik to the CPDM to translate because Mr Struik was not fluent in French. Mr Cilins took no substantive part in the discussions that Mr Struik had with the CPDM about mining.

(2)    During one of these visits to the CPDM, Mr Struik discovered that rights over Simandou North and Simandou South were available and became aware of Rio Tinto's lack of activity in exploiting its rights in the Simandou region.

25

34.5.  Save that it is denied that BSGR suggested that Pentler be purchased, paragraph 38.4 is admitted. In fact, Mr Struik understands from Mr Noy's evidence in the Arbitration that:

(1)     The decision to acquire a corporate vehicle for their Guinean affairs was made by the Pentler Principals, independently of BSGR.

(2)     The only link with BSGR was that, upon learning that the Pentler Principals wanted a corporate vehicle for their Guinean affairs, Mr Oron suggested that Onyx might have an off-the-shelf company they could use.

34.6.  Paragraph 38.5 is denied. The limited assistance these persons provided to the BSGR Group is addressed below.

**C2    The alleged involvement of Pentler, Mr Cilins, Mme Touré et al**

35.    Save as set out below, paragraphs 39 to 42 are not admitted. Despite the seriousness of the allegations made by the Claimants, these paragraphs are vague and embarrassing for want of particularity. Further:

35.1.  In circumstances where the Claimants do not even consider they can actually plead that any "*representatives of the BSGR Group*" were present at the alleged meeting, let alone who was present (instead equivocally asserting that they were "*possibly*" there), that allegation is denied and should be struck out.

35.2.  For the avoidance of doubt, Mr Struik has not at any relevant time believed or understood Mr Cilins to have been a "*representative of BSGR*", or to have acted as alleged either on behalf of the BSGR Group or at all.

36.    Paragraph 43 is admitted.

37.    As to paragraph 44:

37.1.  Save that the date on which BSGR ProjectCo was incorporated is not admitted, the first sentence is admitted.

37.2.  As to the second sentence:

(1)     It is admitted that from about April 2006, Mr Struik was principally responsible for running the BSGR Group's business in Guinea, such as it was, and Mr Cilins provided "*help*" to him in this role. That help was logistical and administrative in nature.

(2)     Mr Cilins acted as Mr Struik's interpreter and local assistant until the arrival of Mr Avidan and performed day-to-day tasks such as opening local bank accounts, procuring vehicles, and assisting in the process of hiring security and domestic staff.

(3)     Mr Struik understands from Mr Avidan that, after Mr Avidan's arrival, Mr Cilins continued to provide some similar assistance to the business in Guinea for a brief period. In particular, he assisted Mr Avidan in establishing the BSGR Group's local office, and sourcing the necessary office equipment and hiring staff. On one occasion Mr Cilins arranged a meeting at the CPDM which Mr Avidan and Mr Struik attended, but in which Mr Cilins played no substantive part. However, since Mr Avidan was himself fluent in French, it quickly became apparent that Mr Cilins no longer had a role to play in the business. Mr Cilins' involvement ceased altogether within a matter of months of Mr Avidan's arrival.

37.3.   The third sentence is admitted.

37.4.   As to the fourth sentence:

(1)     It is denied that the BSGR Group employed Mr IS Touré from about February 2006. He was employed from about April 2006, occasionally and on a temporary basis, to assist in finding local staff. Mr Avidan subsequently made Mr IS Touré's position permanent.

(2)     It is admitted that Mr IS Touré was appointed BSGR ProjectCo's director of external relations in about January 2007.

37.5.   Save as set out above, paragraph 44 is denied.

38.     As to paragraph 45:

38.1.   The first sentence is denied. In fact:

(1)     On the day that the BSGR Group's office was officially opened in Guinea, a conference (which was not a "*press conference*") was held by the BSGR Group at the GoG's invitation.

(2)     During that meeting, Mr Struik gave a presentation to a number of government officials, representatives of Ministries, the CPDM and journalists setting out the BSGR Group's exploration goals in Simandou North and South. Mr Cilins translated for him. Mr Oron, Mr Avidan, and Mr IS Touré were also present.

38.2.   The second sentence is admitted. Mme Touré was one of around 100 people who attended that event. Mr Struik does not know who invited her. He understands from Mr Avidan that it is likely she was invited by her business partner, Mr Cilins.

39.   Paragraph 46 is admitted.

40.   Paragraph 47 is admitted. Paragraph 33.6(2)(c) above is repeated.

41.   Save for paragraph 48.3 (which alone concerns Mr Struik), Mr Struik's response to paragraph 48 is based on information from Mr Avidan:

41.1.   As to the first sentence of the opening paragraph, it is admitted that Mr Avidan met with Mr Kanté, then Minister for Mines, in around August or September 2007 and discussed the BSGR Group's interest in SB1 and SB2. Mr IS Touré accompanied Mr Avidan but played no substantive part in the meeting (or the meeting referred to in paragraph 48.1).

41.2.   As to the second sentence of the opening paragraph, the alleged "*further meetings*" (identified in the sub-paragraphs) are addressed below.

41.3.   As to paragraph 48.1:

(1)     As to the first sentence:

(a)     It is admitted that Mr Avidan and Mr IS Touré met with President Conté and Mr Kanté in about August or September 2007.

(b)   It is not admitted whether Mr Kanté was "*summoned*" to attend that meeting.

(c)   It is denied that this was a meeting to "*discuss the BSGR Group's desire to obtain mining permits over SB1 and SB2*". Mr Struik understands from Mr Avidan that the purpose of the meeting was to provide the President and Minister with an update on the BSGR Group's progress with respect to its Simandou North and South blocks, and in particular Zogota. SB1 and SB2, and the Rio Tinto Group's inactivity in relation thereto, came up in conversation, at which point Mr Avidan mentioned that the BSGR Group would be interested in obtaining rights over SB1 and SB2 should they become available, referring to the BSGR Group's right of first refusal under the February 2006 MoU.

(2)   The second and third sentences are not admitted, save that it is admitted that Mr Kanté and President Conté had an exchange to the effect alleged.

41.4.   Paragraph 48.2 is denied. No such meeting occurred as alleged or at all. Mr Avidan and Mr IS Touré never visited Mr Kanté's office and "*insisted on the transfer of rights over SB1 and SB2*".

41.5.   As to paragraph 48.3:

(1)   Sometime in 2007 or 2008, on a Tuesday night at about 10pm, President Conté invited Mr Avidan and Mr Struik to the Presidential Palace in Conakry.

(2)   When they arrived they were shown into a room where President Conté was, to their surprise, accompanied by Mme Touré. They were watching football on television. The President asked Mr Avidan and Mr Struik how BSGR's work in Simandou North and South was progressing. He asked whether BSGR was serious about Zogota or whether they would delay like Rio Tinto.

(3)   At one point Mme Touré interrupted President Conté while he was

29

asking questions.

(4)     President Conté reacted angrily and told her to shut up and not to interfere in his business (or words to that effect). Mme Touré was otherwise silent during the meeting.

(5)     Save as set out above, paragraph 48.3 is denied.

41.6.   Paragraphs 48.4 to 48.6 are not admitted.

41.7.   Save that it is admitted that Mr Bangoura was engaged by the BSGR Group at around that time (probably as chief of security, rather than a security guard, as he was promoted to this position at around this time), paragraph 48.7 is denied. No such meeting occurred at any time.

42.   Mr Struik responds to paragraph 49 on the basis of information from Mr Avidan:

42.1.   The first sentence is denied.

(1)     The alleged "*series of meetings*" have been addressed above.

(2)     As pleaded at paragraph 46.1 below, BSGR ProjectCo did not enter into the 2008 Matinda Contracts.

42.2.   As to paragraph 49.1(a):

(1)     It is admitted that Mr Steinmetz and Mr Avidan met President Conté in the grounds of the Presidential Palace in about April 2008. Mr IS Touré accompanied them, but he played no substantive part in the meeting. Mme Touré did not attend this meeting.

(2)     It is denied, if it is alleged, that Mr Soumah was present throughout that meeting. He joined briefly at the end. It is admitted that the President instructed Mr Soumah to review the Rio Tinto Group's mining rights.

(3)     It is denied that any "*intercession*" on the part of Mme Touré took place, of any kind. Indeed, paragraph 49.1(a) fails to disclose any such intercession on her part.

42.3.  As to paragraph 49.1(b), it is denied that the meeting, and accordingly any "*intercession*" (whatever this is meant to be), occurred. It is not admitted whether the alleged order was given.

42.4.  Paragraph 49.1(c) is admitted. It is unclear whether the Claimants allege any causative link between Mr Steinmetz's visit and the events identified in paragraphs 49.1(c)(i) and (ii).  Pending proper particulars, it is denied that there was any such link.

42.5.  Save as set out above, paragraph 49.1 is denied.

42.6.  Paragraph 49.2 is admitted. Paragraphs 33.9 to 33.11 above are repeated.

42.7.  Paragraph 49.3 is not admitted.

42.8.  As to paragraph 49.4:

(1)  Save that the application also sought rights in respect of SB3, the first sentence is admitted. It is denied (if it is alleged) that Mme Touré was present at the meeting.

(2)  It is denied that the meeting was arranged by Mme Touré as alleged in the second sentence. The basis for the purported inference is not explained or understood. The meeting was in fact arranged by Mr Avidan and Mr IS Touré.

(3)  The third sentence is not admitted.

42.9.  Paragraphs 49.5 to 49.7 are admitted. Paragraphs 33.9 to 33.11 above are repeated.

**C3   Alleged payments to the Pentler Principals, Mr IS Touré and Mme Touré**

43.  As to paragraph 50:

43.1.  The Claimants have failed properly to explain the nature or basis of the alleged "*need*" on the part of the BSGR Group to remunerate the Pentler Principals. Pending proper particulars, the first sentence is not admitted.

43.2. The Claimants have also failed properly to explain why the BSGR Group "*needed a vehicle*" through which it could make payments to the individuals identified in the second sentence. Pending proper particulars, the second sentence is denied.

43.3. Further, and in any event, on the basis of his own knowledge and information from others, and as pleaded further below, Mr Struik believes that the BSGR Group did not, and did not have any need to, disguise payments or make bribes as alleged or at all.

44. As to paragraph 51:

44.1. It is denied that any steps were taken in order to fulfil the alleged ends identified in paragraph 50. Paragraph 43 above is repeated.

44.2. It is admitted that the Pentler Principals purchased Pentler from Onyx on or around 14 February 2006. Paragraph 34.5 above is repeated.

44.3. As to paragraph 51.1:

(1) Mr Struik will refer to the letter dated 14 February 2006 at trial for its full terms, meaning and effect. Mr Struik signed this letter on the instructions of Mr Oron, who had negotiated the agreement with Mr Noy. Mr Struik's only input was to advise Mr Oron on the technical milestones and timeframes appended to the letter.

(2) It is denied that the 17.65% interest was granted "*in return for the assistance that Pentler (and the Pentler Principals) had provided and would provide in relation to what was described as the 'Simandou Iron Ore Project'*". The letter does not so provide.

(3) Further, according to Mr Noy's evidence in the Arbitration, and Mr Tchelet's stated recollection of what he had been told by Mr Oron, the 17.65% interest was granted in order to reward the Pentler Principals for introducing the BSGR Group to Guinea and its mining opportunities generally.

(4) While the letter recorded that success fees were payable for services rendered in connection with achieving certain milestones related to the

"*Simandou Iron Ore Project*", it does not specify that they were payable for any services that had already been provided.

(5)     The services that were provided by Pentler and the Pentler Principals were in fact limited in their scope. They (a) introduced the BSGR Group to Guinea (see paragraph 44.3(3) above); and (b) provided logistical and administrative assistance to Mr Struik (mainly through Mr Cilins) prior to the arrival of Mr Avidan in Guinea, and continued to provide similar services to the business for a short time after his arrival (see paragraph 37.2 above). Further, Mr Struik understands from Mr Avidan that neither Pentler nor the Pentler Principals provided assistance with respect to the grant of rights over SB1 and SB2 thereafter. Mr Struik understood the benefits provided under the agreement in substance to be by way of a finder's fee for the Pentler Principals' introduction of the BSGR Group to Guinea.

(6)     Save as set out above, paragraph 51.1 is admitted.

44.4.   As to paragraph 51.2:

(1)     Mr Struik had no involvement in and has no direct knowledge of the making of any of the three agreements. He pleads to them below on the basis of the documents and the evidence in the Arbitration.  He will also refer to them at trial for their full terms, meaning and effect.

(2)     Any insinuation by the words "*in turn*" as to a causal connection between the BSGR-Pentler Milestone Agreement and the agreements pleaded in the sub-paragraphs is not admitted.

44.5.   As to paragraphs 51.2(a) and (b):

(1)     The existence of the documents identified in paragraphs 51.2(a) and (b) is admitted. Their validity or legal effect is not admitted. All references to the Pentler-Bah Agreement and the Pentler-Daou Agreement (including admissions or non-admissions in respect thereof) are subject to the foregoing non-admission.

(2)     Those documents provided for payment, upon certain milestones being achieved, "*for their services, counsel, and assistance in the development of a project for the exploration and exploitation of the SIMANDOU iron deposit in which Pentler … is participating*", with the project stated to be split into two stages, the first concerning Simandou North and South and the second SB1 and SB2.

(3)     Mr Struik understands from Mr Noy's evidence in the Arbitration that the purpose of these agreements was for Pentler to reward Mr Bah, Mr Daou and Mr IS Touré for introductions that they had made and as payment for assistance provided to Pentler on the ground in Guinea, not for the purposes alleged at paragraph 50.

44.6.   As to paragraph 51.2(c):

(1)     It is admitted that there is a memorandum of understanding dated 20 February 2006, apparently concluded by Pentler and Mme Touré. Its validity or legal effect is not admitted. All references to the Touré MoU (including admissions or non-admissions in respect thereof) are subject to the foregoing non-admission.

(2)     The Touré MoU purported to provide that Mme Touré *might* receive a 33.3% interest in Pentler, upon (a) the establishment of a partially state-owned company to develop and exploit part of the Simandou iron ore deposits, and (b) that company being awarded "*the mining rights for the operation of the mining area of SIMANDOU*".

(3)     It is not admitted whether these are "*the same mining rights*" which were the subject of the Pentler-Bah and Pentler-Daou Agreements.

(4)     It is admitted that, insofar as Pentler held a 17.65% interest in BSGR BVI at the time of transfer, such an interest would roughly equate to a 5% indirect interest in BSGR BVI (in fact around 5.88%).

(5)     It is denied that the document provided for this interest to be transferred to Mme Touré "*in connection with her assistance in obtaining the same mining licences*". Rather, it merely described Mme Touré as a

"*local partner*" and provided for transfer upon the conditions specified above.

(6)     Further, Mr Struik understands from Mr Noy's evidence in the Arbitration, and also on the basis of his own knowledge in the case of paragraph (c) below, that:

   (a)   Mme Touré never in fact received an interest in Pentler, nor did she ever become entitled to one under the Touré MoU since the conditions precedent were never met.

   (b)   The Touré MoU was entered into by Pentler at the behest of Mr Bah and Mr IS Touré. Pentler had originally envisaged granting a shareholding to them in Pentler for the same reasons as the milestone agreement, but they requested that their shareholding be given to Mme Touré instead. Pentler considered this to be a matter for them, and so agreed to do this.

   (c)   Mme Touré had no involvement in the granting of exploration permits to the BSGR Group in February 2006 or in the negotiation or signing of the February 2006 MoU.

(7)     Save as set out above, paragraph 51.2(c) is denied.

44.7.  As to paragraph 51.3:

(1)     The first sentence is admitted.

(2)     Subject to paragraphs 44.5 and 44.6 above, the second sentence of the opening paragraph and paragraphs 51.3(a) to (c) are admitted.

(3)     As to paragraph 51.3(d):

   (a)   The first sentence is not admitted.

   (b)   The second sentence is insufficiently particularised and is denied. To Mr Struik's knowledge, no such payment was made or procured to be made by BSGR BVI, whether to Pentler, Mr Bah,

Mr IS Touré or Mr Daou.

(c)     Further (i) Mr Noy's evidence in the Arbitration refers to Pentler having made payment of US$425,000 to Mr Bah and Mr IS Touré; and (ii) the allegation (made by Mr Bah) of a payment made in cash (by Mr Oron in the presence of Mr Struik) is false and was fabricated years after the event to extort money from the BSGR Group.

44.8.   Save that the Claimants have not accurately quoted from the BSGR-Pentler Services Agreement (in that the agreement in fact provided for Pentler to offer BSG MM "*its deal flow in the mining, infrastructure, engineering and telecommunications sector*" (not just its "*deal flow in the mining sector*")), paragraph 51.4 is admitted. This provision in the BSGR-Pentler Services Agreement accurately reflected the fact that the relationship between the BSGR Group and Pentler was not intended to be limited to mining in Guinea. Pentler and the Pentler Principals would and did, from time to time, advise the BSGR Group of other opportunities (including mining opportunities in other African countries).

44.9.   Save that it is not admitted that payment was made on 6 March 2006, paragraph 51.5 is admitted. Mr Struik understands from Mr Tchelet that this payment was approved by Mr Oron and made on his instructions, and that, as Mr Oron told Mr Tchelet, the invoices were rendered in respect of costs incurred by the Pentler Principals in procuring local legal advice and organising the logistics of the negotiations on behalf of the BSGR Group.

44.10. As to paragraph 51.6:

(1)     The first sentence is admitted.

(2)     As to the second sentence, it is admitted that Pentler did not transfer 33.3% of its shares to Mme Touré pursuant to the Touré MoU.

(3)     The allegation that Pentler and the Pentler Principals "*treated Mme Touré as holding such shares*" or as entitled to a shareholding is too vague properly to be answered. Pending proper particulars, it is not admitted. According to the terms of the Touré MoU itself, she did not become

entitled to a shareholding at any time.

(4)     The third sentence is admitted.

44.11. As to paragraph 51.7:

(1)     A company related to BSGR (BSGR Treasury) but not BSGR itself paid Pentler (for the benefit of the Pentler Principals) the sum of US$250,000 in May 2006. This was by way of a payment to one of the Pentler Principals' associated companies, FMA International Trading.

(2)     It is admitted that the fee was stated in the invoice raised by FMA to be for "*assistance and consulting for the acceptance of bauxite permits in Republic of Guinea*". That description was incorrect.

(3)     The fee was in fact part of a milestone and reward payment made to Pentler under the BSGR-Pentler Milestone Agreement, and therefore related to the BSGR Group's introduction to Guinea generally, rather than being related to any specific work by Pentler related to bauxite permits or the Simandou iron ore project.

(4)     It is not understood what "*work on the Simandou iron ore project*" the Claimants allege that the Pentler Principals did. The limited work they actually carried out for the BSGR Group beyond the introduction they made is set out above.

44.12. Save as set out above, paragraph 51 is denied.

45.     The allegations made in paragraph 52 are largely repetitious of allegations made elsewhere in the Particulars of Claim and have been addressed by Mr Struik above. Without prejudice to the foregoing:

45.1.   As to the second sentence of paragraph 52.3, it is admitted that Mr Cilins received a monthly stipend of US$10,000 from about January 2006 to July 2006. This was payment for logistical and administrative assistance which Mr Cilins provided to Mr Struik in Guinea prior to the arrival of Mr Avidan.

45.2.   Save as set out more generally above, paragraph 52 is denied.

46.   Save that it is not admitted whether Matinda was owned or controlled by Mme Touré, paragraph 53 is denied. Further:

46.1.   Mr Struik understands from Mr Avidan that he (Mr Avidan) did not sign the so-called 2008 Matinda Contracts. They are forgeries which have been used by Mme Touré in attempts to extort money from the BSGR Group. One such attempt was made by letter dated 8 June 2010 (a spurious claim that was unequivocally withdrawn on 23 June 2010).

46.2.   In any event, at all material times, Mr Struik had no knowledge of the so-called 2008 Matinda Contracts.

47.   Paragraph 54 is admitted. Mr Struik will refer to the Pentler SPA at trial for its full terms, meaning and effect.

48.   Paragraph 55 is admitted.

49.   As to paragraph 56:

49.1.   The existence of the "*affidavit*" is admitted. It is further admitted that the "*affidavit*" included the contents set out by the Claimants. It is not admitted that the "*affidavit*" is authentic.

49.2.   It is denied, if it be alleged, that the contents of the "*affidavit*" were true, or that there was any such agreement between "*BSGR*" or any BSGR Group entity and Mme Touré. Indeed, the "*affidavit*" was subsequently invalidated and annulled at Matinda and Mme Touré's request on 8 June 2010 and 30 July 2010.

49.3.   Save as set out above, paragraph 56 is not admitted.

50.   As to paragraph 57:

50.1.   As to the purported reservation of rights in footnote 4, the Claimants have no rights to reserve save for the ordinary rights of any litigant to apply to amend a statement of case under the CPR, which rights are subject to strict rules relating to limitation.

50.2.   As to paragraph 57.1:

(1)     The existence of the Matilda Invoice is admitted. Its validity is not admitted.

(2)     At all material times, Mr Struik had no knowledge of the Matilda Invoice or the underlying transaction between LMS and Matilda/Matinda, or whether and at what times Matilda & Co, Matinda or Mme Touré operated in the provision of heavy machinery or came to do so.

(3)     It is admitted (on the basis of a later invoice) that "*Matilda*" may have been a typographical error in spelling "*Matinda*". Mr Struik understands that the invoice was issued to LMS.

50.3.   Paragraph 57.2 is admitted. Mr Struik understands from Mr Tchelet that he emphasised the banking details to ensure that (a) no mistake was made, and (b) the sum of US$1.3 million was paid to the correct account. There was nothing wrong or improper in him doing so (and it is noted that the Claimants have not sought to allege that there was).

50.4.   Paragraph 57.3 is admitted, save that the payment was made by BSGR Treasury Services Limited, not BSG Capital Markets PCC.

50.5.   As to paragraph 57.4:

(1)     The first sentence is admitted. The invoice related to the sale of a generator for US$40,000 and Caterpillar equipment.

(2)     It is denied that the invoice was a "*sham*", or merely "*purported*" to be in respect of the stated items.

(3)     Mr Struik pleads to points (i) and (ii) on the basis of information from Mr Avidan:

(a)     It is denied that there was no sale of, or intention to sell, such machinery. In fact, Mr Boutros was the BSGR Group's main supplier in Guinea for machinery and various other equipment.

(b)     This type of machinery was generally required to clear debris and

construct roads. At least 20 Caterpillar diggers and extractors had been acquired for use on BSGR ProjectCo's sites. Much of this earthmoving equipment was supplied by Mr Boutros/LMS, although he was not the project's only supplier.

(c)   Mr Avidan placed an order for the machinery with Mr Boutros and Mr Boutros sourced it through his company LMS. Mr Boutros then requested urgent payment from the BSGR Group for the total sum of US$1.3 million for this machinery and a generator. Mr Avidan in turn asked the BSGR Group to make the payment, which it did. LMS duly invoiced the BSGR Group for this sale in the appropriate sum. This was a legitimate sale of earthmoving equipment which was needed, ordered, paid for, and delivered (probably to Zogota or SB2, Mr Avidan cannot now recall).

(4)   As to point (iii):

(a)   It is admitted that the payment instruction was given the day before the invoice was provided and that the payment instruction described the payment as "*consulting fees*".

(b)   It is denied that these facts indicate that the invoice was a sham or (if it is alleged) that any wrongdoing occurred or was known by Mr Struik to have occurred.

(c)   As for the timing of the invoice and the payment, Mr Struik understands from Mr Tchelet and Mr Avidan that, although it was typical for documentation to be provided prior to payment, that was not an invariable practice. Mr Avidan would from time to time contact Mr Tchelet to arrange payment before an invoice was rendered. However, supporting documentation would be provided afterward (as occurred in this case).

(d)   Mr Struik understands from Mr Avidan that it was not uncommon that equipment would need to be purchased urgently so that it could be transported to the relevant site with a particular

shipment. There would be a significant cost to the project if work was unable to be done because the necessary equipment was not in hand, and it was part of Mr Avidan's job to prevent such a situation from arising. Such urgency could also arise because Mr Avidan was only in Conakry for a short time (much of his time being spent in the field). He would therefore need to purchase important equipment, and organise payment, at pace. It was for these reasons that he would sometimes ask for a payment to be approved on the basis of a quote agreed with the relevant supplier (principally LMS) with an invoice to follow.

(e)     As for the description in the payment instruction, Mr Struik understands from Mr Tchelet that this was a generic description, only used due to the lack of documentation. LMS and Mr Boutros were, and were known to the BSGR Group as, among other things, a supplier of earthworks and construction services to the project in Guinea. Mr Struik's awareness of Mr Boutros and LMS are as set out at paragraph 29.1 above.

(5)     Save as set out above, paragraph 57.4 is admitted.

50.6.   Paragraph 57.5 is not admitted.

50.7.   As to paragraph 57.6, the existence of the further invoice is admitted. Its validity is not admitted. Paragraph 50.2(2) above is repeated, making changes where necessary and appropriate.

50.8.   As to paragraph 57.7:

(1)     It is admitted that Mr Boutros issued instructions to his bank on 3 September 2009 for the payment of the US$998,000 to Mme Touré. It is not admitted that the account to which payment was to be made was her "*personal account*".

(2)     The second sentence is not admitted.

(3)     The third sentence is admitted.

50.9. Save as set out above, paragraph 57 is not admitted.

51.   The allegations made in paragraph 58 are essentially repetitious of allegations made elsewhere in the Particulars of Claim and have been addressed by Mr Struik above. Accordingly, save as set out more generally above, paragraph 58 is denied.

### SECTION D: 2009/10: HOW THE MINING LICENCES WERE CONFIRMED FOLLOWING PRESIDENT CONTÉ'S DEATH

<u>The Mining Licences are confirmed and renewed</u>

52.   As to paragraph 59:

52.1. Save that the 10 June 2009 decision did not "*extend the period of validity of certain parts of the North and South Permits*", paragraph 59.1 is admitted. By that decision the North and South Permits were renewed, in accordance with the 1995 Mining Code, on BSGR ProjectCo's application. The company was required to give up (or "retrocede") 50% of its area.

52.2. As to paragraph 59.2:

(1)   Save that the Base Convention was in fact signed on 16 December by Mr Struik, Mr Avidan and Mr Thiam, the first and third sentences are admitted.

(2)   The second sentence of paragraph 59.2 is admitted as containing a broad summary of certain terms of the Base Convention. Mr Struik will refer to the Base Convention at trial for its full terms, meaning and effect.

52.3. Paragraph 59.3 is admitted.

53.   Paragraph 60 is noted.

<u>Allegation that Mr Thiam acted for and was paid by the BSGR Group</u>

54.   Save that it is admitted that Mr Thiam resigned as Minister of Mines on 22 December 2010, paragraph 61 is denied. Mr Thiam did not act as a consultant, adviser, intermediary and/or representative to the BSGR Group as alleged or at all. He was not

promised or paid anything by the BSGR Group in return for any "*assistance*".

55.    As to paragraph 62:

55.1.  It is denied that the matters set out in paragraph 62 support the allegations made by the Claimants in paragraph 61 (which are denied above).

55.2.  Paragraph 62.1 is admitted. Mr Struik understands from Mr Thiam's evidence in the Arbitration that Mr Thiam met with a number of mining companies prior to his appointment as Minister of Mines in January 2009. He was, at that time, unfamiliar with the BSGR Group and the BSGR Group did not pay for Mr Thiam's flight. In any event, the meeting with the BSGR Group did not proceed because Mr Thiam fell ill. See paragraph 55.7(6) below.

55.3.  Paragraphs 62.2 to 62.4 are admitted.

55.4.  As to paragraph 62.5:

(1)    The first sentence is admitted.

(2)    Save that it is admitted that Lansana Kouyaté is a former Prime Minister of Guinea, the second sentence is not admitted.

(3)    The third sentence is too vague properly to be answered (in that certain matters are said to be evidenced by unspecified emails and the precise form of assistance said to have been given by Mr Thiam is unclear). Pending proper particulars, it is denied. Without prejudice to the foregoing:

(a)    As to point (i), it is admitted that Mr Thiam wrote a letter to the LIA's chairman Saif Gaddafi on 8 June 2009 in which he confirmed that the BSGR Group held permits and that "*BSGR's exploration permits do not fall into the category of concessions subject to review*". The letter did not refer expressly to the validity of the permits. Similarly, President Camara wrote a letter to Mr Gaddafi on the same date assuring him that Libyan investment in Guinea was invited and encouraged.

(b)  It is admitted that Mr Thiam's letter (like the President's letter) was intended to assist BSGR in its discussions with the LIA. These were ordinary actions by pro-active political leaders seeking to encourage investment in their country.

(c)  As to point (ii), it is admitted that Mr Thiam met with the chairman of the LIA. However, Mr Struik understands from Mr Thiam's evidence in the Arbitration that that meeting took place in Libya, not London. It is understood that the purpose of the meeting was to reassure the chairman that the GoG was supportive of Libyan investment (i.e. such investment generally, not specifically in relation to BSGR). It is not admitted that Mr Thiam reiterated the points made in his letter.

(4)  As to the fourth sentence, it is denied that Mr Thiam took steps (i) or (if he took it) (ii), or any other steps which were of assistance to the BSGR Group, because he was acting as the BSGR Group's consultant, adviser, intermediary and/or representative. He acted solely on behalf of the GoG in his capacity as the Minister of Mines. The allegation that "*the content of the emails passing between Thiam and Steinmetz*" is consistent only with Mr Thiam having acted on behalf of the BSGR Group is embarrassing for want of particularity. Pending proper particulars, it is denied.

(5)  Save as set out above, paragraph 62.5 is denied.

55.5.  As to paragraph 62.6, paragraph 52.1 above is repeated.

55.6.  Save that it is admitted that Mr Thiam met with representatives of the CIC in Beijing in July 2009, paragraph 62.7 is not admitted.

55.7.  As to paragraph 62.8:

(1)  It is admitted that Mr Thiam travelled to Israel and Hong Kong in September 2009 and that the BSGR Group paid for his flights on around

25 November 2009.

(2)     It is denied that in September 2009 BSGR was involved in negotiations with CIC or Baosteel. It was involved in negotiations at that time with Chinalco. Negotiations with Baosteel began only in around December 2009 when the Chinalco negotiations fell through.

(3)     It is denied that (a) Mr Thiam's travel to Israel, or (b) the BSGR Group's payment for his flight, was for the purpose of Mr Thiam "*attend[ing] and/or assist[ing] with*" negotiations in which the BSGR Group was involved. Mr Struik understands from Mr Steinmetz's Defence that the purpose of Mr Thiam's visit to Israel was to attend Mr Steinmetz's daughter's wedding.

(4)     It is not admitted that (a) Mr Thiam's travel to Hong Kong, or (b) the BSGR Group's payment for his flight, was for the purpose of Mr Thiam "*attend[ing] and/or assist[ing] with*" negotiations in which the BSGR Group was involved.

(5)     In any event, even if that is what occurred (which is denied in respect of Israel and not admitted in respect of Hong Kong), this would not have been improper. The GoG was likely to play a key role in the project going forward (as any potential joint venture partner would appreciate). The Minister of Mines' presence at such negotiations would serve a useful and proper purpose.

(6)     Further, the BSGR Group did not pay for Mr Thiam's flights in return for "*assistance*" to be provided in connection with the Mining Licences. It was standard (and a legitimate) practice for mining companies at times to pay for the flights of ministers and other GoG officials when they were invited to attend events abroad. In any event, there is no basis for the allegation that covering the cost of Mr Thiam's flights was in any way a quid pro quo for corrupt assistance in relation to the grant, validation or extension of valuable mining rights, and none is pleaded.

45

55.8. Paragraph 62.9 is admitted.

55.9. Mr Struik pleads to paragraph 62.10 on the basis of his own knowledge and information from Mr Avidan:

(1)     As to the first sentence, it is denied that negotiation of the Base Convention began on around 2 December 2009. The committee was formally created by way of a decree made by Mr Thiam as the Minister of Mines dated 1 December 2009. However, negotiation of the Base Convention started around the time that the feasibility study was submitted in November 2009.

(2)     Negotiations between the BSGR Group and the GoG lasted until 16 December 2009, when the Base Convention was signed by the BSGR Group and Mr Thiam, as set out in paragraph 52.2 above. Between 16 December 2009 and 21 December 2009, pending the final signature of Captain Sandé, the finance minister, the fate of the Base Convention was to some extent uncertain and the GoG continued to scrutinise and debate the matter internally. Ultimately, on 21 December 2009, Captain Sandé added his signature to the agreed Base Convention. Mr Avidan does not now recall the details, but believes that some relatively minor open details were also addressed during this period, and were likely to have been dealt with in annexures.

(3)     As to the second sentence, it is admitted that on 2 December 2009, the first day after the Commission's formal establishment, Mr Thiam gave an introductory address and then left the proceedings. Mr Thiam periodically checked on the progress of negotiations, and ultimately signed the Base Convention as set out above, but had limited substantive involvement in the negotiations over its terms. This sentence is otherwise denied.

(4)     The third sentence is denied for the reasons set out below in relation to paragraphs 62.10(a) to (c).

46

(5)     The fourth sentence is not admitted.

(6)     As to paragraph 62.10(a):

(a)     The first four sentences are admitted as a broad and partial summary of the email exchange. As to the footnote, it is not admitted who "*sacko*" was.

(b)     The final sentence is denied. This email exchange discloses no more than a political disagreement within the GoG about the detail of the Base Convention. Some within the GoG favoured the agreement and some were opposed to it. This email does not show that Mr Thiam took a position on behalf of, or to assist, the BSGR Group "*against*" the GoG or its interests. A political office holder may support a development, or disagree with a colleague about its terms or implementation, without acting on behalf of the proponent, let alone being its "*consultant, adviser, intermediary and/or representative*".

(c)     As to Mr Avidan's being copied, Mr Struik understands that Mr Avidan cannot now recall this email exchange, but that he expects that he was copied into it as a courtesy, merely for his information.

(7)     As to paragraph 62.10(b):

(a)     It is admitted that Mr Kalil sent Mr Thiam an email on 18 December 2009 (copying in Mr Baila Ly) with the subject line "*Zogota Convention*". The email provided a report from an extraordinary Council of Ministers on the Base Convention. It is not admitted that this comprised an explanation of the day's developments. It is also not admitted that the email purported to set out "*proposals that had been made on behalf of the GoG*", or if it did, the nature or status of such proposals. Insofar as this description is intended to suggest that there was a single or settled

viewpoint held by the GoG as a whole at that point, rather than (as was in fact the case) that the Base Convention was the subject of ongoing internal debate, it is denied. The email purports only to set out "*points that came up*" at the Council.

(b)  The second sentence is admitted.

(c)  The third sentence is denied. There is no basis for the suggestion that Mr Kalil, himself part of the GoG, was seeking the "*assistance*" of Mr Thiam, likewise part of the GoG, "*in negotiating against the GoG*". As explained in paragraph 55.9(2) above, the Base Convention continued to be debated internally pending Captain Sandé's signature. This email shows no more than that Mr Kalil kept Mr Thiam, the Minister of Mines who had already signed the Convention, informed of what had happened, and sought his feedback. That is entirely unexceptional.

(d)  The fourth sentence is denied. The other allegations in paragraph 62 are addressed elsewhere. Those matters and this email do not support the inference that Mr Thiam provided the BSGR Group with assistance in negotiating "*against*" the GoG.

(8)  As to paragraph 62.10(c):

(a)  As to the first sentence, it is admitted that on 19 December 2009 Mr Baila Ly sent an email to Mr Thiam referring to an upcoming meeting to discuss a "*non sens request to the investor*" and stating that he would call Mr Thiam during the meeting. Save that it is denied, if it is alleged, that this email shows that Mr Baila Ly or Mr Thiam were "*assisting*" the BSGR Group, the first sentence is otherwise not admitted.

(b)  The second and third sentences are admitted. For the avoidance of doubt, it is not admitted that there was any causal link between the date of Captain Sandé's signature and the continued

discussion of the Base Convention. As set out above, the agreement was signed on behalf of the BSGR Group and by the principal minister responsible, Mr Thiam, on Wednesday 16 December 2009. Captain Sandé was due to sign after Mr Thiam did. He did so on Monday 21 December 2009. This was at a time when there had recently been an attempt on the life of President Camara and the usual business of government was disrupted.

(c)     The fourth sentence is denied. Mr Thiam's reply does not disclose or indicate the provision of assistance to the BSGR Group. His email was no more than an update about what was happening.

(d)     As to Mr Avidan's being copied, Mr Struik understands that Mr Avidan cannot now recall this email exchange, but that he expects that he was copied into it as a courtesy, merely for his information.

55.10. Paragraph 62.11 is admitted. The fact that Mr Struik and Mr Steinmetz were pleased with Mr Thiam's re-appointment does not indicate any impropriety. Mr Thiam was a Minister with whom the BSGR Group had developed a constructive working relationship. The appointment of a new Minister could have caused delay to the project or jeopardised it.

55.11. As to paragraph 62.12:

(1)     The matters alleged in points (i) to (iii) are admitted.

(2)     It is denied that, by reason of those matters, Mr Thiam can fairly be described as having "*assisted*" the BSGR Group's negotiations with Vale in connection with the JVA, save in the sense of providing the sort of straightforward confirmation one might expect to be provided by a diligent and competent Minister upon request by a major company investing in the country to help facilitate substantial further investment.

(3)     Mr Thiam acted on behalf of the GoG in his capacity as Minister of

Mines throughout. He was not acting on behalf of the BSGR Group.

55.12. As to paragraph 62.13:

(1)     It is admitted that Mr N'Diyae sent Mr Thiam an email on 26 March 2010 which referred to private radio stations and asking Mr Avidan for *"support"* and *"to help us get a budget"*. The Claimants' summary of the effect of that email is not admitted. Further:

(a)     It is not clear, and not admitted, who Mr N'Diaye was, or what he was suggesting Mr Thiam might ask Mr Avidan to provide. Mr Struik understands that Mr Avidan believes he was a journalist.

(b)     There was no reply to the email, and the Claimants do not allege that it was acted on by Mr Thiam.

(c)     Mr Struik understands from Mr Avidan that he did not receive a request from Mr Thiam in relation to private radio stations at around this time or at all. In all the circumstances, it is to be inferred that whatever the request was, in the event, Mr Thiam did not act on it. It is denied that the email supports the allegation the Claimants make at paragraph 61.

(2)     As to paragraph 62.14:

(a)     The existence of the letter dated 25 June 2010, and the fact that Mr Thiam sent it to Mr Steinmetz on 26 June 2010, are admitted. It is denied that the letter was marked as *"confidential"*. It was not.

(b)     Paragraph 62.14 is otherwise not admitted. Mr Struik understands that Mr Avidan has no recollection of receiving or reading the alleged second letter, and the Claimants have failed to provide a copy of it.

(c)     It is denied, if it is alleged, that there was any impropriety in Mr

Thiam sharing this information in the way he did. Indeed, Rio Tinto's efforts to win back SB1 and SB2 were of legitimate interest to both the BSGR Group (which now held the rights in relation to those blocks) and the GoG.

55.13. As to paragraph 62.15:

(1)     It is admitted that the BSGR Group made a payment of US$5 million on around 15 November 2010.

(2)     It is denied that the payment was made for Mr Thiam's benefit. In fact, the payment was made to CCS in the following circumstances:

(a)     As at November 2010, CCS held three coal prospecting licences in the well-known coal district of Moatize in the Tete Province, Mozambique.

(b)     On 13 November 2010, BSGR and CCS entered into a non-disclosure agreement whereby BSGR was granted a 60-day period of exclusivity (extendable by 30 days) within which to, among other things, carry out due diligence. In return, BSGR was to pay CCS the initial sum of US$5 million.

(c)     This was regarded as a significant opportunity by BSGR. It sent a team of experts to the site between 22 and 25 November 2010 to conduct the said due diligence. In the event, the team's report was unfavourable and the project did not proceed.

(3)     The second sentence is not admitted.

(4)     As to the fourth sentence, it is denied that the BSGR Group and Mr Thiam wanted to disguise a payment of US$5 million. As to point (i), payment was made to CCS, not purportedly to CCS. The matters alleged at points (ii) and (iii) are not admitted.

(5)     The fifth and sixth sentences are not admitted.

(6)     Save as set out above, paragraph 62.15 is denied.

55.14. Paragraph 62.16 is not admitted.

55.15. As to paragraph 62.17, paragraphs 30.3(2) and 30.3(3) above are repeated.

## SECTION E: THE JVA AND SHA

**E1     Introduction**

56.     Paragraph 63 is admitted.

57.     As to paragraph 64:

57.1.   It is admitted that Mr Struik encountered Eduardo Etchart ("**Mr Etchart**") at a mining conference in Cape Town in February 2010. It is denied that Mr Struik approached Mr Etchart. In fact, it was Mr Etchart who enquired about the Simandou project.

57.2.   In the course of their conversation, Mr Struik told Mr Etchart, among other things, that:

(1)     BSGR ProjectCo had signed a Base Convention which allowed it to export iron ore mined from the Simandou region through Liberia;

(2)     BSGR ProjectCo had obtained a 25-year mining concession in respect of Zogota; and

(3)     Negotiations with the LIA, Chinalco and Baosteel had fallen through.

57.3.   Mr Etchart was interested in the whole project, particularly the right to export iron ore through Liberia. It was Mr Etchart who approached Mr Struik about a fortnight later, at which point he formally expressed Vale's interest in a joint venture.

52

57.4.  Save as set out above, paragraph 64 is denied.

58.    Paragraphs 65 and 66 are admitted.

59.    Paragraph 67 is admitted save that:

59.1.  It is denied that Clifford Chance conducted "*in-depth*" due diligence. The due diligence was demand-led by Vale and, in the light of Vale's desire to conclude the deal quickly, performed in little over a month. See paragraphs 170 to 176 below.

59.2.  The final sentence is denied, for the reasons set out below.

**E2     The Alleged Representations**

(1)     The Initial DD Questionnaire

60.    Paragraph 68 is admitted (save that Ms dos Santos' title at that time was Associate General Counsel, not Deputy General Counsel).

61.    Paragraph 69 is admitted as containing a broad summary of some of the provisions of the Initial DD Questionnaire and the responses thereto save that:

61.1.  It is denied that the Initial DD Questionnaire "*defined*" UBOs as alleged in paragraph 69.5. Rather, that term was defined to mean "*an individual or entity that, directly or indirectly, ultimately owns or controls or has a right to receive the financial benefit of an equity interest in the BSG Group*". It is not admitted whether any of the alleged persons answered that description.

61.2.  The precise scope of the enquiries and review conducted by Mr Clark (referred to in paragraph 69.6) is not admitted.

61.3.  Mr Struik will refer to the Initial DD Questionnaire and the responses thereto at trial for their full terms, meaning and effect.

62.    As to paragraph 70:

62.1.  Paragraph 70.1 is denied. The relevant representation was as follows:

**Question**: "*In connection with the Simandou Project or Project Hill, has the BSG Group, or to its knowledge after reasonable inquiry any of its Personnel [defined to mean its officers and directors], shareholders or UBOs, either directly or indirectly, including through a third party, made, authorized or promised any payments or benefits to any Government Officials …?*"

**Answer**:   "*None whatsoever*"

62.2.  Paragraph 70.2 is admitted.

62.3.  Paragraph 70.3 is denied. The relevant representations were as follows:

**Question**: "*Please identify any consultants, representatives, agents, brokers, or other intermediaries (collectively, "Consultants") retained by or acting on behalf of the BSG Group (directly or indirectly) in connection with the Simandou Project or Project Hill (if any) …*".

**Answer**:   The answer did not identify Pentler, the Pentler Principals, Mr Thiam, Mr Boutros or LMS.  (It did not need to do so given that it related <u>solely</u> to the position as at the date of the submission of the Questionnaire.)

**Question**: "*Please indicate if the BSG Group used any intermediaries to interact with the Government of Guinea in relation to BSG Group's efforts to obtain the Concessions …*"

**Answer**:   "*BSGR Guinea obtained all its exploration concessions through formal application in writing. BSGR Guinea did not use any intermediary in its application process nor during any further discussions with the CPDM, which is the technical department of the Ministry of Mines, responsible for adjudicating the applications and final awarding of the exploration licences to the successful party.*"

63.    As to paragraph 71:

63.1.  Insofar as paragraph 71 and its sub-paragraphs are addressed to or concern Mr Struik, and save as set out below, paragraph 71 is denied. Insofar as they are addressed to or concern other Defendants, Mr Struik does not plead to them.

63.2.  It is denied that the matters identified in paragraphs 71.1 to 71.11 (even if true)

support the averrals made by the Claimants in the first sentence of paragraph 71.

63.3. As to point (i) in paragraph 71, Mr Struik did not approve or adopt (whether "*manifestly*" (whatever that may mean) or otherwise) any of the representations identified by the Claimants in paragraph 70 or in the Initial DD Questionnaire.

63.4. As to point (ii) in paragraph 71:

(1) The allegation as to the assistance Mr Struik is alleged to have provided is embarrassingly vague. Mr Struik's involvement in completing the Initial DD Questionnaire was limited to responding to Mr Tchelet's and Mr Clark's requests for information. Mr Tchelet collated the information that Mr Struik provided to him, together with information provided by others, and drafted the responses to the Initial DD Questionnaire. Mr Struik does not know the purpose of the enquiries made by Mr Clark. He inferred at the time that Mr Clark was seeking to satisfy himself about the accuracy of certain responses.

(2) Mr Struik cannot recall precisely what information was requested by, or provided to, Mr Tchelet or Mr Clark. However, that information would have been limited to matters within Mr Struik's own knowledge and expertise, and in particular the history of the project and technical matters relating to it.

(3) It is admitted that this amounted to the provision of more than "*trivial*" assistance, but denied that such assistance was provided in any way "*pursuant to a common design that fraudulent misstatements be made to Vale*".

63.5. As to paragraph 71.2, the position held by Mr Struik "*within*" the BSGR Group was CEO of Mining & Metals, a division of BSGR. It is denied that, by reason of this position, Mr Struik should be taken to have approved and adopted every representation made in a document which had several contributors and was drafted and signed by somebody else, or that he thereby participated in a common design to defraud Vale.

55

63.6.  As to paragraph 71.3:

    (1)    Paragraph 71.3 is embarrassingly vague as to the nature of the specific enquiries made of Mr Struik, and does not allege that Mr Struik provided any information in response.

    (2)    Without prejudice to the foregoing, it is admitted that enquiries were made of Mr Struik.  Several people contributed information to the Initial DD Questionnaire and Mr Struik had no involvement in, or oversight of, its drafting or finalisation. Mr Struik's role in responding to it was as set out above.

63.7.  As to paragraph 71.8:

    (1)    The subjective allegation that Mr Struik was (and the other Defendants were) "*closely involved*" in the negotiation of the JVA and SHA is embarrassingly vague. Pending further particulars, it is not admitted.

    (2)    Mr Struik merely co-ordinated the technical due diligence and provided technical information (and other information within his own knowledge) to the BSGR Group as needed. However, the deal itself was being negotiated by others, including Mr Steinmetz, with advice from internal lawyer David Barnett and Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**"), and subject to board approvals. Mr Struik's role does not support the conclusion that he adopted or approved the contents of the Initial DD Questionnaire ("*manifestly*" or otherwise) or participated in a common design to defraud Vale.

63.8.  Paragraph 71.10(i) is admitted as a broad summary of the effect of section 1.8 of the JVA, but the relevance of this fact for the purposes of the allegations in paragraph 71 is denied. The attribution of Mr Struik's "*awareness*" to BSGR for the purpose of the subsequently executed JVA has no bearing on whether he adopted or approved the contents of a different, earlier document, or whether he dishonestly made false representations or participated in a common design to defraud Vale.

63.9.   Paragraph 71.10(iii) is admitted, but the relevance of this fact for the purposes of the allegations in paragraph 71 is denied. Mr Struik's subsequent attendance at the FCPA Interview does not support the conclusion that he adopted or approved the contents of the Initial DD Questionnaire ("*manifestly*" or otherwise) or participated in a common design to defraud Vale. On the contrary, the fact that Mr Avidan, Mr Struik and Mr Tchelet all attended this interview supports the opposite conclusion. No one of them could speak to every aspect of the company's affairs, nor did any of them purport to do so.

63.10. As to paragraph 71.10(iv), paragraph 20 above is repeated.

63.11. Paragraph 71.11 is denied. No such inference is to be drawn. The "*Defendants*" did not all discuss and agree upon the answers to be given in the Initial DD Questionnaire. The process by which that questionnaire was completed is explained above, and involved information being sourced and collated from different persons according to their knowledge and expertise. In any event, even if they did so, this vague and general allegation does not support the allegation that the Defendants were participating in a common design to defraud Vale.

(2)   Supplemental DD Questionnaire

64.   Save that the email referred to is not admitted, paragraphs 72 and 73 are admitted.

65.   As to paragraph 74:

65.1.   The first sentence is denied. On 31 March 2010, BSGR transferred its shareholding in BSGR Steel to BSG Metals and Mining Ltd, not to Nysco.

65.2.   The second sentence is admitted (save that is it is not admitted, if it is alleged, that the alleged effect was the only effect of the 31 March 2010 Restructuring).

65.3.   Insofar as paragraph 74 and its sub-paragraphs are addressed to or concern Mr Struik, and save as set out below, paragraph 74 is denied. Insofar as they are addressed to or concern other Defendants, they are not admitted.

65.4.  Mr Struik was not involved in the 31 March 2010 Restructuring. It is accordingly denied that the restructuring was done because he did not want to disclose those matters alleged. On the basis of Mr Tchelet's stated understanding, the purpose of the restructuring was to prevent the due diligence exercise from being expanded to include an examination of other group companies that had nothing to do with the transaction. Mr Struik remembers hearing incidentally that a restructure had been carried out around the time it occurred, but he cannot remember who said this. He did not know the detail of the restructure or its purpose.

65.5.  As to paragraphs 74.1 to 74.4, paragraphs 44.3, 44.6, 44.7 and 47 above are repeated.

66.   As to paragraph 75, insofar as it is addressed to Mr Struik, it is denied that the 31 March 2010 Restructuring was carried out with his assistance, or that he acted in any way for the reasons alleged. Paragraph 65.4 above is repeated. No admissions are otherwise made.

67.   As to paragraph 76, the first and second sentences are admitted, save that the precise scope of the enquiries and review conducted by Mr Clark is not admitted. Mr Struik will also refer to the Supplemental DD Questionnaire at trial for its full terms, meaning and effect.

68.   As to paragraphs 77:

68.1.  As to the opening sentence, it is admitted that the completed Supplemental DD Questionnaire did not identify the 31 March 2010 Restructuring. It is denied that it "*concealed*" it. The Questionnaire did not require the disclosure of the restructuring.

68.2.  It is admitted that the Supplemental DD Questionnaire contained in substance the representation alleged in paragraph 77.1. As the language of the Questionnaire makes clear, this related to the position as at the date the Supplemental DD Questionnaire was completed, not at any other time. The full text of the relevant request (so far as relevant) was as follows: "*Please identify the*

*entire local advisory team, including counsel, public relations advisors and lobbyists, retained by or acting on behalf of the BSG Group (directly or indirectly) in connection with the Simandou Project, Project Hills or the Liberian Project (collectively, "**Consultants**") (if any)."*

68.3.   It is denied that the Supplemental DD Questionnaire contained the representation alleged in paragraph 77.2. The relevant representation was as follows:

**Question**:*"In connection with … Project Hills, has NYSCO Management Corp, Onyx Financial Advisors or the BSG Group, or to its knowledge after reasonable inquiry any of its Personnel [defined to mean its officers and directors], shareholders or UBOs, either directly or indirectly, including through a third party, made, authorized or promised any payments or benefits to any Government Officials …?"*

**Answer**:   *"none whatsoever".*

69.   As to paragraph 78:

69.1.   As to the cross-reference to paragraph 71 in the first sentence, paragraph 63 above is repeated, making changes where necessary and appropriate.

69.2.   Paragraph 78.1 is denied. Paragraphs 65 and 66 above are repeated.

69.3.   Paragraphs 78.2, 78.3 and 78.4 are addressed to other Defendants and Mr Struik does not plead to them.

(3)   The 8 April Representations

70.   Paragraph 79 is admitted.

71.   As to paragraph 80:

71.1.   The first sentence is admitted.

71.2.   As to the second sentence, it is denied (if it is alleged) that all the Attendees made all of the representations alleged in paragraphs 80.1 to 80.3. Those

paragraphs and the making of the representations are addressed below. Mr Struik cannot now recall what was said at this meeting and pleads to these paragraphs on the basis of what he understands to be the case from Mr Tchelet and Mr Avidan.

71.3.  Paragraph 80.1 is admitted (on the basis that Mr Avidan has admitted the same).

71.4.  As to paragraph 80.2:

    (1)    It is admitted that Mr Avidan made the statement in paragraph 80.2(i) (on the basis that Mr Avidan has admitted the same).

    (2)    As to paragraph 80.2(ii):

        (a)    Mr Struik cannot recall Mr Avidan making such a statement. Mr Struik therefore denies paragraph 80.2(ii) on that basis, and on the basis of information from Mr Avidan, as set out below.

        (b)    Although Mr Avidan cannot recall precisely what he was asked, or what he said in response, he would not have suggested that Mr IS Touré was a "*consultant*" (because he was in fact an employee), or that Mr IS Touré was related to President Conté or his wife (because he was not, Mme Touré not in fact being the President's wife).

        (c)    To the best of his recollection, Mr Avidan was not asked whether Mr IS Touré was related to President Conté or his wife. Rather, he was asked whether he was related to former President Touré, which he (correctly) denied.

71.5.  As to paragraph 80.3:

    (1)    So far as they relate to Mr Avidan and Mr Tchelet, the opening line and sub-paragraphs 80.3.1 to 80.3.3 are admitted (on the basis that Mr Avidan and Mr Tchelet have admitted the same).

(2)     So far as they relate to Mr Struik, the opening line and sub-paragraphs 80.3.1 to 80.3.3 are not admitted. Mr Struik cannot recall whether he made the statements set out therein. The best Mr Struik is able to say is that if (which he cannot recall) he had been asked about those matters, he would likely have made statements broadly to the effect alleged (since he believed those propositions to be true).

(3)     So far as they relate to Mr Cramer, the opening line and sub-paragraphs 80.3.1 to 80.3.3 are not admitted. Mr Struik cannot recall whether Mr Cramer made these statements.

71.6.   As to paragraph 80.4, insofar as it is directed to Mr Struik:

(1)     It is admitted (if it is alleged) that Mr Struik would not have sought to "*correct*" any of the representations made by the other Attendees. It is also admitted (if it is alleged) that Mr Struik would not have sought to "*disavow any knowledge of the matters referred to therein*".

(2)     This was because (i) so far as he knew, those statements were not false; (ii) he was not verifying and would not have been purporting to verify the statements of others by his mere presence and silence, particularly insofar as questions were directed at others rather than him; and (iii) it was not, and he would not have understood it to be, incumbent upon him to explain to what extent he did or did not have knowledge concerning matters stated by other Attendees.

(3)     Mr Struik's silence in relation to anything said by any other Attendee did not constitute a representation of any kind.

71.7.   Save as set out above, paragraph 80 is denied.

72.   As to paragraph 81:

72.1.   Insofar as the first sentence is addressed to or concerns Mr Struik, it is denied. Insofar as it is addressed to other Defendants, Mr Struik does not plead to it. As

to the cross-reference to paragraph 78, paragraph 69 above is repeated, making changes where necessary and appropriate.

72.2.   The first sentence of paragraph 81 simply repeats allegations made elsewhere in the Particulars of Claim that have been addressed by Mr Struik above.

(1)    Paragraph 81.1 is addressed to other Defendants and Mr Struik does not plead to it, save that it is denied (if it be alleged) that the "*others*" included Mr Struik.

(2)    As to paragraph 81.2, the sequence of events is admitted, and it is admitted that the questions raised on each occasion covered similar themes. However, it is denied that each instance of questioning "*substantively replicated*" questions previously asked. There were fine, but not insignificant, variations in the precise wording of the questions asked.

(3)    In any event, it is denied that this matter supports or is capable of supporting the conclusion that every Attendee at the FCPA Interview (let alone those not attending) was responsible for everything said at that interview, regardless of who was asked about it, who said it, what it was about, or what he knew in relation to the relevant matter. Mr Struik is only responsible for his own utterances and responses.

72.3.   Save as set out above, paragraph 81 is denied.

(4)    Steinmetz ABL Certificate

73.    Paragraph 82 is admitted.

74.    As to paragraph 83:

74.1.   It is denied that the Steinmetz ABL Certificate made the representations alleged. Mr Struik will refer to the Steinmetz ABL Certificate at trial for its full terms, meaning and effect.

74.2. As to paragraph 83.1, the relevant representation was as follows:

*"In connection with the business of [BSGR Guernsey], and/or the transactions contemplated in the Joint Venture Framework Agreement, I have not and will not, directly or indirectly including through a third party:*

a. *Pay, offer, promise, or authorize the payment of money or anything of value, to a Government Official … or to anyone else, while knowing or having reason to believe that any portion of such exchange is for the purpose of* [defined herein as *"***Prohibited Purposes***"*]:

    i. *corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist [BSGR Guernsey] or any other person in obtaining or retaining business, or directing business to any third party;*

    ii. *securing an improper advantage;*

    iii. *corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Government Authority in order to assist [BSGR Guernsey] or any other person in obtaining or retaining business, or directing business to any third party; or*

    iv. *providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s)."*

74.3. As to paragraph 83.2, the relevant representation was as follows:

*"I do not know or have reason to believe that [BSGR Guernsey], its subsidiaries and affiliates or their respective officers, directors, employees, or anyone acting on their behalf, or any third party in connection with the business of [BSGR Guernsey] and/or the transactions contemplated in the Joint Venture Framework Agreement has paid or will pay, offer, promise, or authorize the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to believe that any portion of such exchange is for [a Prohibited Purpose]."*

75. As to paragraph 84:

75.1. Insofar as the first sentence is addressed to or concerns Mr Struik, it is denied. Insofar as it is addressed to other Defendants, Mr Struik does not plead to it. As to the cross-reference to paragraph 81, paragraph 72 above is repeated, making changes where necessary and appropriate.

75.2. Save to admit that the Steinmetz ABL Certificate was circulated in draft to Mr Cramer and Mr Tchelet, paragraph 84.1 is not admitted. The allegation that the

Certificate was "*discussed*" at the FCPA Interview is embarrassingly vague. Mr Struik does not recall whether the Certificate was discussed at all at the interview. In any event, it is denied that Mr Struik is or would be responsible for the contents of the Steinmetz ABL Certificate because (if that be the case) (a) he was present at a meeting when it was "*discussed*", or (b) someone else was sent a draft of it.

75.3. It is admitted that the Steinmetz ABL Certificate is referred to in the SHA and that Mr Struik was aware of its existence. The allegation that the SHA "*was reviewed by all the Defendants*" is embarrassingly vague. Mr Struik reviewed the SHA from a technical perspective (and out of interest, to see how the deal was to be structured). However, it was not his role to approve the document, nor did he have any input into its drafting (his role in its negotiation being as set out above). To the extent inconsistent with the foregoing, the allegation that the SHA was reviewed by Mr Struik is denied. It is in any event denied that Mr Struik's knowledge of the existence of the Certificate makes him responsible for its contents.

75.4. Further, Mr Struik is not, and cannot be, responsible for the representations contained in the Steinmetz ABL Certificate, in circumstances where they purport to have been made and were made explicitly by Mr Steinmetz, and related to Mr Steinmetz's conduct and state of knowledge. Mr Struik did not purport to and did not seek to adopt or confirm that Certificate or any representation made therein as such. There is no reason why responsibility for them should be attributed to Mr Struik.

## (5)   The Clark ABL Certificate

76. Paragraph 85 is admitted, save that it is not admitted (i) when a copy, or (ii) when or if the original, was delivered or provided to Vale.

77. Paragraph 86 is denied. The relevant representation was as follows:

   "*[I] do not know or have reason to believe that [BSGR] (or its subsidiaries and affiliates) or its directors, employees, or any person acting on their behalf, have paid or will pay, offer, promise, or authorize the payment of money or anything of value, directly or*

*indirectly, to a Government Official while knowing or having reason to believe that any portion of such exchange is for [a Prohibited Purpose]."*

78.   As to paragraph 87:

78.1.   Insofar as the first sentence is addressed to or concerns Mr Struik, it is denied. Insofar as it is addressed to other Defendants, Mr Struik does not plead to it. As to the cross-reference to paragraph 84, paragraph 75 above is repeated, making changes where necessary and appropriate.

78.2.   As to paragraph 87.1, the allegation that the Clark ABL Certificate was *"reviewed"* by the First to Fifth Defendants prior to its execution is embarrassingly vague. So far as it concerns Mr Struik, this paragraph is denied. Mr Struik was aware of the Certificate's existence but had no input into its drafting. He does not recall whether he even saw a copy of it prior to its execution. It is in any event denied that any knowledge of the existence of the Certificate on Mr Struik's part would make him responsible for its contents. Insofar as this paragraph concerns the other Defendants, Mr Struik does not plead to it.

78.3.   Paragraph 87.2 is admitted. This knowledge is referred to in the context of a representation about what Mr Clark knew or had reason to believe. It is denied, if it is alleged, that the Clark ABL Certificate made every subsidiary, affiliate, director, employee or other person acting on behalf of BSGR responsible for Mr Clark's representations merely because their knowledge was referred to in that certificate. That is self-evidently not the case.

78.4.   As to paragraph 87.3, the first sentence and third sentences are admitted, and the second sentence is admitted as a broad summary of certain of the warranties in Schedule 4 to the JVA relating to bribery and corruption. None of these matters has any bearing on Mr Struik's responsibility for the representations contained in the Clark ABL Certificate.

78.5.   Paragraph 87.4 is not admitted. None of these matters has any bearing on Mr Struik's responsibility for the representations contained in the Clark ABL

Certificate.

78.6. It is denied that any of these matters render Mr Struik responsible for the Clark ABL Certificate or any representations made therein. The Clark ABL Certificate was made explicitly by Mr Clark, and related to Mr Clark's state of knowledge and understanding of that of others in the BSGR Group. Mr Struik did not purport to and did not seek to adopt or confirm that certificate or any representation made in it. There is no reason why responsibility for such representations should be attributed to Mr Struik.

(6)   Further London Meetings

79.   As to paragraph 88:

79.1. The first and second sentences are admitted as a broad summary of the negotiations which took place in London.

79.2. Save that it is admitted that Vale was represented by Mr Monteiro and Ms Chimisso (among other people) at most of the meetings that Mr Struik attended, the third sentence is not admitted.

79.3. The fourth sentence is embarrassingly vague and Mr Struik is unable to plead to it, save to say that he, Mr Tchelet, Mr Avidan and Mr Cramer were present at some, but not all, of the meetings which took place (albeit each was not present at all of the same meetings).

79.4. The fifth sentence is admitted.

79.5. Mr Struik is unable to plead to the sixth sentence of paragraph 88 and paragraphs 88.1, 88.2 and 88.3 because those allegations are embarrassingly vague.

(1)   The allegations contained therein fail to identify at which one or more of the many alleged meetings that took place over a decade ago the representations are alleged to have been made, what words were used

and who else was present.

> (2)     In any event, Mr Struik cannot recall Mr Avidan, Mr Tchelet, Mr
> Cramer or Mr Steinmetz making statements to the effect alleged in
> paragraphs 88.1, 88.2 and 88.3.

80.    Save as set out below, paragraph 89 is denied. Mr Struik pleads to this paragraph on
the basis of information from Mr Tchelet:

> 80.1.  It is not admitted what interactions, if any, Mr Monteiro had with Mr Cramer in
> Mr Tchelet's absence. With regard to Mr Monteiro's discussion with Mr Tchelet,
> what in fact happened was as follows.

> 80.2.  The data room established and maintained by Mr Tchelet for the purpose of due
> diligence contained BSGR's Consolidated Financial Statements for the year
> ending 31 December 2008 ("**2008 Financial Statements**") and BSGR Guernsey's
> Statement of Financial Affairs for the period ending on 31 December 2009 ("**2009
> Statement of Financial Affairs**").

> 80.3.  The 2008 Financial Statements contained the following statement under the
> heading '*Goodwill on acquisition of BSG Resources (Guinea) Limited: USD
> 22,000,000*':

>> "*In 2006 the Group acquired 82.35% of the unlisted share capital of BSG Resources
>> (Guinea) Limited, a[n] iron ore exploration and mining company, registered in the
>> British Virgin Islands and operating in Guinea. In March 2008, the Group acquired
>> the remaining 17.65% equity interest in BSG Resources (Guinea) Limited it previously
>> had not held, thereby increasing its interest to 100%. The total purchase consideration
>> for this transaction was USD 22,000,000, creating goodwill of USD 22,000,000 as at
>> the date of the acquisition the non-controlling interest's proportionate share of the
>> acquiree's identifiable net assets was USD Nil.*"

> 80.4.  Under the heading '*Other Financial Liabilities*', the 2008 Financial Statements said:

>> "*In March 2008, the Group entered into a Share Purchase Agreement (SPA) with a
>> third party to acquire shares representing 17.65% of the issued share capital of BSGR
>> Resources (Guinea) Limited. By the terms of this Agreement the total consideration for
>> this acquisition was USD 22,000,000, of which USD 4,000,000 has been paid in 2008.
>> The debt is unsecured and does not bear interest. In July 2009 the terms of the*

*outstanding balance were renegotiated whereby USD 4,000,000 was repaid within 3 business days of the date of signature of the settlement agreement, which was signed in July 2009. USD 5,000,000 is repayable on or before 31 December 2009 and USD 9,000,000 is repayable on or before 15 April 2011."*

80.5.   The 2009 Statement of Financial Affairs contained a note titled '*Exploration and Evaluation of Assets – Analysis by area and year*'. That note included the figure of US$22 million for "*Goodwill on acquisition*".

80.6.   At one of the meetings in the course of the London negotiations, Mr Monteiro asked to speak with Mr Tchelet alone in a separate room. They then did so. Mr Cramer was not present. During this discussion:

(1)     Mr Monteiro questioned Mr Tchelet about the minority shareholding disclosed in the 2008 Financial Statements and the figure of US$22 million for goodwill disclosed in the 2009 Statement of Financial Affairs. He asked why there had been a change in the company structure in April 2009.

(2)     Mr Tchelet told Mr Monteiro that there had previously been a minority shareholder in BSGR BVI. The minority shareholder was bought out in 2008 and, in accordance with BSGR's corporate governance and accounting policy, BSGR Guernsey was incorporated so that management of the company could be brought under the auspices of the BSGR Group's head office in Guernsey.

(3)     Further:

(a)     Mr Monteiro did not ask Mr Tchelet who the minority shareholder (or "*selling party*") was.

(b)     Mr Tchelet did not tell Monteiro that the buy-out of the minority shareholding was done for tax planning purposes.

(c)     Mr Tchelet did not tell Mr Monteiro that the minority shareholder was part of the "*Balda group*" or that it was not an external third

party. Indeed, it would have been obvious from the nature of the arrangement that this was unlikely to be the case.

(d)   More generally, the due diligence process was demand-led. Vale knew about the share purchase agreement and the settlement agreement underlying the Pentler share buyback but did not ask to see either document.

80.7.   In the premises, it is denied that Mr Tchelet made the Fourth Consultancy Representation as alleged or at all.

81.   As to paragraph 90:

81.1.   Insofar as the first sentence is addressed to or concerns Mr Struik, it is denied. Insofar as it is addressed to other Defendants, Mr Struik does not plead to it.  As to the cross-reference to paragraph 87, paragraph 78 above is repeated, making changes where necessary and appropriate.

81.2.   As to the second sentence, it is denied that the representations alleged at paragraphs 88 and 89, or, in the latter case, what was actually said by Mr Tchelet, "*substantively replicated*" the earlier alleged or actual representations (insofar as Mr Struik pleads to those). Each representation (to the extent it was made at all) was made in its own terms and context. It is denied that any substantive replication, insofar as shown, would render Mr Struik responsible for any representations made by other Defendants.

(7)   Other matters

82.   As to paragraph 91, insofar as it is addressed to or concerns Mr Struik (no admissions otherwise being made):

82.1.   It is denied that Mr Struik made or was otherwise responsible for all of the so-called First to Eighth Corruption Representations and First to Fourth Consultancy Representations. The only representations alleged to have been made by Mr Struik were those allegedly uttered by him at the FCPA Interview

(namely those comprised in the Fifth Corruption Representation), which are not admitted.

82.2. It is admitted that those representations, to the extent made by Mr Struik, would have been made with the intention that Vale could rely upon them should it wish to do so. It is denied that they would have been intended to "*induce*" or did in fact induce Vale to enter the JVA and SHA. Mr Struik believes that Vale would have entered into the JVA and SHA in any event.

82.3. It is denied that Mr Struik knew that the alleged representations would be passed onto Vale's "*subsidiary and affiliate companies for the purposes of implementing the joint venture, including for the purpose of making payments pursuant to the JVA and SHA*". Mr Struik had no knowledge of the Vale group's structures and processes and did not consider whether or how his representations would be passed on or relied on by other group companies.

82.4. It is denied that Mr Struik intended the alleged representations to be relied on by Vale International and Vale Austria in making any payments (or taking any other steps required) under the JVA or SHA. Mr Struik was participating in negotiations with Vale for the purpose of concluding a transaction with that company on behalf of BSGR. He did not intend what he told Vale to be relied on by any other person.

82.5. Save as set out above, paragraph 91 is denied.

83. As to paragraph 92:

83.1. In the premises, insofar as paragraph 92.1 is addressed to or concerns Mr Struik, it is denied. The only specific allegations of any implied representation in the Particulars of Claim are at paragraph 80.4, to which Mr Struik responds specifically above. He made neither these nor any other implied representations. He accordingly did not know he was making any or that they had the meanings alleged. No admissions are otherwise made.

83.2. As to paragraph 92.2, it is denied that the Claimants had any understanding as

to the meaning of representations that were not in fact made. The Claimants' alleged state of mind is otherwise not admitted.

**E3    The terms of the JVA and SHA**

84. Save as stated below, paragraph 93 is admitted as a broad summary of some of the provisions of the JVA and SHA. Mr Struik will refer to the JVA and SHA at trial for their full terms, meaning and effect. Further, as to the sub-paragraphs:

84.1. As to paragraph 93.2, it is denied that the JVA provided or allowed for Vale to procure payment of the Initial and Deferred Consideration, as opposed to pay it itself. Pursuant to section 3 (and sections 4.2(i) and 12), payment of the Initial and First and Second Deferred Consideration was to be made by Vale itself, upon satisfaction of the relevant conditions precedent.

84.2. Paragraph 93.7 is denied. Neither the JVA nor the SHA required the provision of the Clark and Steinmetz ABL Certificates to Vale, although the SHA refers to those Certificates.

**E4    Completion of the JVA and SHA**

85. Paragraph 94 is admitted.

**E5    Further payments made by Vale pursuant to the JVA and SHA**

86. As to paragraph 95:

86.1. Save as set out in paragraph 12 above, and in addressing the sub-paragraphs of paragraph 95 below, the opening sentence is not admitted.

86.2. As to paragraph 95.1:

(1)    The first sentence is admitted as a broad summary of section 6.3 of the JVA.

      (2)        The second and third sentences are admitted.

      (3)        The fourth sentence is not admitted.

86.3.  As to paragraph 95.2, the first sentence is admitted as a broad summary of section 6.1 of the JVA. The second sentence is not admitted.

86.4.  As to paragraph 95.3, the first sentence is admitted. The second sentence is not admitted.

## SECTION F: PAYMENTS TO THE DEFENDANTS AND ALLEGED FACILITATORS AFTER THE JVA AND SHA

<u>Bonus payments made to the Second to Sixth Defendants</u>

87.    As to paragraph 96:

87.1.  As to the first sentence, (a) it is admitted that the Second to Sixth Defendants were promised and paid bonuses; and (b) it is denied that the bonuses were promised or paid for the reason alleged. As to the circumstances, nature, amount, timing and purposes of the bonuses, paragraphs 18.3 to 18.5, 20.1, 20.2, 21.3, 21.4, 22.4, 23.2 and 23.3 above are repeated.

87.2.  The second sentence is denied:

      (1)        It is denied that the bonuses were offered to the Defendants before the entry into the JVA and SHA. The bonuses were arranged (both promised and paid) <u>after</u> entry into the JVA and SHA. They were awarded by BSGR and confirmed to each recipient by way of a letter from Mr Clark written on behalf of that company.

      (2)        It is denied that the Second to Sixth Defendants had a "*reasonable expectation of receiving substantial bonuses in the event the JVA and SHA were executed*". Mr Struik anticipated that bonuses might be paid, but that was based on what he considered to be fair in the circumstances

72

and past experience, and was not engendered by any specific representation by the BSGR Group or Mr Steinmetz. The bonuses were not agreed beforehand, nor were they a *fait accompli*. Mr Struik and Mr Avidan had to argue for them after the conclusion of the JVA and SHA.

87.3.   Save as set out above, paragraph 96 is denied.

88.   Save that it is admitted that the "Bonus Schedule" document was produced in about early July 2010 and save as set out in paragraphs 18.3 to 18.5, 20.1, 20.2, 21.3, 21.4, 22.4, 23.2 and 23.3 above, paragraph 97 is denied.

89.   As to paragraph 98:

89.1.   The bonuses (which were actual bonuses and not alleged bonuses as appears vaguely to be alleged by the use of inverted commas) have been addressed above.

89.2.   Paragraph 98.1 is admitted.

89.3.   Paragraph 98.2 is embarrassingly vague. Insofar as it is addressed to Mr Struik and pending proper particulars, it is denied. Without prejudice to the foregoing denial:

(1)   It is admitted that Mr Struik received a monthly salary (and one small bonus) as the CEO of the Mining & Metals Division in the period between 30 April 2010 and his resignation in 2016. This was paid with funds sourced from BSGR Guernsey (before July 2014) or by BSGR Guernsey itself (after July 2014).

(2)   It is denied, if it be so alleged, that there is anything inherently improper in BSGR making payments to honour its commitments to those engaged by it or rewarding persons who assisted its work. Quite the contrary.

90.   Paragraph 99 is not admitted.

<u>Payments allegedly made to Pentler and Mme Touré</u>

91.   As to paragraph 100:

91.1.   As to the first sentence, on the basis of the evidence of Mr Steinmetz and Mr Noy in the Arbitration and the Defence of Mr Steinmetz, it is admitted that the Pentler SPA was renegotiated to the effect that Pentler would receive a further US$22 million on top of US$8 million that had already been received by the end of 2009. It is admitted that this renegotiation occurred in May 2010, after entry into the JVA and SHA, but not admitted whether it occurred in April 2010 or "*at the same time as BSGR was negotiating the JVA and SHA*".

91.2.   The second sentence is admitted (save that it is inapt to describe the $22 million as a "*balance*", when it was the product of a renegotiation rather than part of an originally agreed sum). Windpoint then paid the sum of US$22 million to Pentler.

91.3.   The third sentence is not admitted.

91.4.   The fourth sentence and the sub-paragraphs are not admitted save as follows:

(1)   On the basis of Mr Steinmetz's evidence in the Arbitration and his Defence, it is averred that in July 2010 Mr Noy approached Mr Steinmetz and demanded more money, citing the BSGR-Pentler Milestone Agreement. On or about 16 July 2010, Mr Steinmetz and Mr Noy agreed, subject to approval by the BSGR board, that Pentler would be paid a further US$4.5 million ($3 million in 2010 and $1.5 million in 2011). These sums were then paid to Pentler pursuant to this settlement. Insofar as it is inconsistent with this, the fourth sentence is denied.

(2)   Paragraph 100.1 is admitted. On or about 5 August 2010, Windpoint then paid the sum of US$3 million to Pentler pursuant to the above settlement.

(3)   Paragraph 100.2 is admitted. On or about 22 March 2011 Nysco

74

transferred the sum of US$1.5 million to Windpoint, which in turn paid that amount to Pentler pursuant to the above settlement.

92.    As to paragraph 101:

92.1.   As to the first sentence:

(1)    The further contracts and payments alleged in the sub-paragraphs are addressed below.

(2)    It is not admitted that each or any of the contracts and payments alleged was made "*in connection with [Mme Touré's] interest in Pentler and her involvement in procuring the grant of the Mining Licences*". Their purpose is unknown to Mr Struik.

(3)    Neither Mr Struik, nor to his knowledge any of the Defendants, the BSGR Group or any person on their behalf, was involved in (or a party to) these alleged contracts and payments, or the making of any corrupt payments to Mme Touré, or any efforts to obtain assistance from Mme Touré in the procurement of the Mining Licences.

(4)    Mr Struik is not aware of any involvement on the part of Mme Touré in procuring the grant of the Mining Licences.

92.2.   As to paragraph 101.1:

(1)    The first sentence is not admitted. Mr Noy has given evidence in the Arbitration that the document referred to therein (that purports to be a written agreement between Pentler and Mme Touré) is a forgery.

(2)    It is admitted that there is a document purporting to record an agreement as described in the second sentence. It is not admitted that the document is authentic or that any such agreement was in fact made.

92.3.   As to paragraph 101.2, Mr Noy has admitted in the Arbitration that the August

2010 Contracts were concluded. Save that the final sentence is not admitted, the paragraph is otherwise admitted as a broad and partial summary of the August 2010 Contracts. Mr Struik will refer to the August 2010 Contracts at trial for their full terms, meaning and effect.

92.4.  Paragraph 101.3 is not admitted.

## SECTION G: ATTEMPTS TO DESTROY ALLEGEDLY INCRIMINATING MATERIAL

93.  Paragraphs 102 to 103 concern matters outside the direct knowledge of Mr Struik and with which he had no involvement. Save insofar as they (in passing) refer to allegations which are dealt with elsewhere in this Defence (and to that extent, the relevant parts of the Defence are repeated), they are not admitted.

## SECTION H: REVOCATION OF THE MINING LICENCES

94.  As to paragraph 104:

94.1.  The first two sentences are admitted.

94.2.  The remainder of paragraph 104 is improperly pleaded evidence, the relevance and admissibility of which is denied. If and insofar as it is alleged that the report of the Technical Committee was in any respect accurate, that allegation is embarrassing for want of particularity and Mr Struik is unable to plead to it.

## SECTION I: CLAIMS IN DECEIT

95.  Mr Struik's case on the alleged making of and responsibility for the alleged representations is set out above. In pleading to the alleged falsity of the alleged representations below, Mr Struik does so without prejudice to his case as set out above that the representations were not made as alleged and/or that he was not responsible for them, and for convenience only does not repeat his case as to whether representations were in fact made or as to responsibility for them.

96.  Further, Mr Struik notes that the Claimants have chosen to frame their claim as one

based on English law.  That is wrong.

96.1.  For the purposes of Regulation (EC) No 864/2007 on the law applicable to non-contractual obligations (the "Rome II Regulation"), the damage alleged by the Claimants occurred in the country where the account from which the money was paid is located.

96.2.  The initial payment of US$500 million and all or much of any subsequent payments were made from an account in New York.

96.3.  Accordingly, the damage occurred in New York and the Claimants' claims in tort are governed by New York law pursuant to Article 4 of the Rome II Regulation.

96.4.  Given that the proper law of any claim against Mr Struik is New York law, in the absence of any pleaded case by the Claimants under New York law, the Claimants' claim should be struck out on the basis that they have failed to set out the facts and matters on which their claim is properly based.

**I1    Alleged falsity of the so-called First to Eighth Corruption Representations**

97.    Save as detailed and set out below, paragraph 105 is denied.

<u>**PARTICULARS IN RELATION TO MME TOURÉ**</u>

98.    As to paragraph 105.1:

98.1.  The opening words (up to the colon) are denied.

98.2.  Point (i) is denied. Mmé Touré was not in fact President Conté's wife, notwithstanding that she may have presented herself as such.

98.3.  Point (ii) is denied. Mme Touré was not the President's wife. Further and in any event, it is not admitted that she held regular meetings with government ministers or purported to hold any such meetings in that "*capacity*".

98.4.  Point (iii) is denied:

    (1)    Mme Touré did not attend any public events and ceremonies "*as the spouse of the Head of State*" given that she was not the spouse of the Head of State.

    (2)    Further and in any event, it is not admitted that Mme Touré "*frequently*" attended such events or that in doing so she was accompanied by the Presidential Guard.

    (3)    Further, as to the allegation in parentheses regarding Mme Touré's attendance at the BSGR Group's office opening in Conakry in 2006, it is admitted that Mme Touré was at this event. She was there along with around 100 other people. It is denied that she attended it in any official capacity. Mr Struik does not know who invited her, but understands from Mr Avidan that it was likely Mr Cilins. She had not been invited in any official capacity and did not purport to act at any time during the event in such a capacity.

    (4)    As to the allegation in parentheses regarding Mme Touré's attendance at a ceremony to commemorate the 50th anniversary of Guinea's independence, it is not admitted that she attended this ceremony (in the capacity alleged or at all), or was invited or purported to act at any time during it in an official capacity.

98.5.  As to point (iv), it is admitted that Mme Touré held a passport which described her as the spouse of the President of the Republic of Guinea. This description was incorrect. Paragraph 27.3 above is repeated.

98.6.  Further, even if all of the facts alleged in points (i) to (iv) were true (which they are not), it is denied that that would mean that Mme Touré acted as a representative of or in an official capacity for, or held a ceremonial position in, the GoG (or otherwise mean she was a "*Government Official*").

    (1)    She held no constitutional position or governmental post. She was

merely, on the Claimants' case, married to someone who did.

(2)     It is normal for a President's wife to attend social functions, to attend state events, to socialise with government ministers, to be guarded by her husband's guards, and to hold a diplomatic passport.

(3)     That does not mean she represented, or performed any official or ceremonial function on behalf of, the GoG. The Claimants have not pleaded any facts which suggest that she did.

99.     Paragraph 105.2 is denied.

99.1.   As to point (i), the expression "*government official*" was not defined for the purpose of the FCPA Interview and London Meetings. The Claimants' allegation appears to be that, every time that expression was used, the First to Sixth Defendants recalled and acted on the definition contained in the Initial and Supplemental DD Questionnaires. That is implausible, and insofar as addressed to Mr Struik, is denied. These were face-to-face conversations in which the expression "*government official*" would have been given its ordinary and natural meaning.

99.2.   As to point (ii), it is denied that the ordinary and natural meaning of "*government official*", whether in the (unparticularised) context of the questions asked or otherwise, included the wife of a President or other government official with no governmental position of her own, let alone a businesswoman with no such position.

100.    As to paragraph 105.3:

100.1.  The opening words (up to the colon) are denied.

(1)     Neither Mr Struik, nor to his knowledge any of the Defendants, the BSGR Group or any person on their behalf, was involved in the making of any corrupt payments to Mme Touré, or any efforts to obtain assistance from Mme Touré in the procurement of the Mining Licences.

(2)    Further, the matters alleged do not support the allegation that Mme Touré received (or was promised) anything by the BSGR Group "*in connection with the influence that she sought to exert on President Conté and others*", still less that she actually had or exercised any such influence (which allegations, insofar as in fact made, have been addressed above). The specific allegations made in this paragraph are addressed below.

100.2. As to point (i):

(1)    It is admitted that Mme Touré appears to have been offered a 33.3% interest in Pentler. However, her entitlement to the same was conditional and never arose. In any event, that was a transaction between Mme Touré and Pentler/the Pentler Principals, not the BSGR Group.

(2)    It is not admitted whether or in what way (which is not explained) Pentler regarded Mme Touré as entitled to a 33% interest. On the terms of the Touré MoU itself, she did not become entitled to a shareholding at any time. Paragraph 44.10 above is repeated.

(3)    It is not admitted that Pentler paid Mme Touré at least US$5 million in connection with the Touré MoU. Even if it did, that was a transaction between Mme Touré and Pentler/the Pentler Principals, not the BSGR Group.

100.3. As to point (ii), what these documents purport to state is admitted. However, as pleaded in paragraph 46.1 above, the 2008 Matinda Contracts are forgeries. Further, as pleaded in paragraph 49 above, it is denied that the 2009 Affidavit records an agreement reached between BSGR and Mme Touré, and that document was disavowed by Mme Touré herself.

100.4. As to point (iii), as pleaded in paragraph 50 above, it is denied that "*at least one*" quarterly tranche of US$1 million was paid to Mme Touré pursuant to the 2008 Matinda Contracts.

101.   As to paragraph 105.4:

    101.1. As to the opening words (up to the colon), the alleged promises and payments have been addressed above.

    101.2. It is denied that the alleged promises or payments were made by BSGR ProjectCo as alleged or at all.

    101.3. Save as set out above, paragraph 105.4 is denied.

102.   As to paragraph 105.5:

    102.1. As to the opening words (up to the colon), the alleged promises and payments have been addressed above.

    102.2. As to point (i), it is admitted that Sandra Merloni-Horemans was a director of BSGR, and that she was involved in the sale of Pentler to the Pentler Principals. She was so involved in her capacity as an officer of Onyx. Paragraph 34.5 above is repeated.

    102.3. As to point (ii), it is admitted that Ms Merloni-Horemans was sent a draft of the Touré MoU on 15 February 2006. Point (ii) is otherwise denied. There is no basis for the inference that Ms Merloni-Horemans was to "*review*" the document (and in particular, insofar as it is alleged, its terms) or that she thereafter "*communicated her assent*" to its terms, and none is pleaded.

    102.4. Point (iii) is denied. The decision to acquire Pentler was made by the Pentler Principals for their own reasons, independently of BSGR. Paragraph 34.5 above is repeated. Further, and as pleaded above, it is denied that Pentler was formed for the purpose of conferring financial benefits on Mme Touré, or that BSGR "*wished*" to do the same.

    102.5. Point (iv) is denied. As pleaded in paragraph 46.1 above, those contracts are forgeries. Further, as pleaded in paragraphs 50 above, payment relied on by the Claimants (of US$998,000) was in fact paid to LMS in respect of the supply of

earthmoving machinery.

102.6. As to point (v), it is not admitted that the Pentler SPA and/or BSGR/Pentler Settlement Agreement, and any subsequent amendments thereto, were authorised by BSGR. The allegation in parentheses is not admitted. In any event, the fact that (if true) Pentler paid some of the money it received under those agreements to Mme Touré is immaterial. That does not make the BSGR Group responsible for what Pentler did.

103.  As to paragraph 105.6, the alleged "*Touré Intercessions*" have been addressed above at paragraphs 35, 41.5 to 41.7, 42.2, 42.3, 42.7 and 42.8. In relation to the allegations regarding the alleged "*Intercessions*" that Mr Struik has been able to admit or deny above, the first sentence is denied. The relevant facts do not support this alleged conclusion. The opening words are otherwise not admitted. Paragraph 100.1(1) above is repeated.

## PARTICULARS IN RELATION TO MR THIAM

104.  Paragraph 105.7 is admitted.

105.  As to paragraph 105.8:

105.1. The allegation that Mr Thiam was made or promised payments, and specifically the payments alleged at points (i) to (iii), have been addressed at paragraphs 54 and 55 above.

105.2. In the premises, it is denied that such promises or payments as were made were in connection with such steps that Mr Thiam took to confirm the Mining Licences. Rather, they were made, as pleaded above, for purposes unconnected with the confirmation and "*extension*" of the Mining Licences.

105.3. The final sentence is accordingly denied.

## PARTICULARS: GENERAL

106.     As to paragraph 105.9 to 105.12, paragraphs 35 to 42, 54 to 55, and 98 to 105 above are repeated. In the premises:

106.1. Paragraph 105.9 (relating to the alleged First and Second Corruption Representations) is denied.

106.2. Save that it is admitted that Mr Thiam was a Government Official, paragraph 105.10 (relating to the alleged First and Second Corruption Representations) is denied. The fact that Mr Thiam was a Government Official does not of itself make any of the representations alleged in the Particulars of Claim false.

106.3. As to paragraph 105.11 (relating to the alleged Third Corruption Representation):

     (1)     It is denied that the Third Corruption Representation was false. Paragraphs 105.9 and 105.10 have been addressed immediately above, and Mr Struik's responses are repeated.

     (2)     The embarrassingly vague allegation as regards point (i) is not admitted. Paragraph 100.1(1) above is repeated.

     (3)     The allegation at point (ii) is denied. Paragraph 105 above is repeated.

106.4. As to paragraph 105.12 (relating to the alleged Fourth Corruption Representation):

     (1)     As to point (i), paragraphs 105.9 to 105.11 have been addressed above.

     (2)     Point (ii) is denied.

          (a)     Paragraphs 39 to 49 have been addressed above.

          (b)     As pleaded in paragraph 33.6(2)(c) above, the fragility of Rio Tinto's title was well known. The BSGR group merely, and legitimately, sought to position itself as the frontrunner to inherit

83

whatever Rio Tinto might lose.

(c)   In any event, even if those persons had lobbied for the revocation of the Rio Tinto Concessions, that would not make the Fourth Corruption Representation false. In the context of the FCPA Interview, that representation did not include an attempt to persuade the GoG to take a lawful step.

(3)   As to point (iii), the alleged Touré Intercessions have been addressed above. Paragraph 103 above is repeated. The alleged First, Second and Fifth Intercessions are not alleged to have related to Rio Tinto, and this allegation is accordingly denied in respect of those Intercessions in any event.

(4)   Accordingly, it is denied that the Fourth Corruption Representation was false, save that this is not admitted to the extent that the allegations at point (iii) are not admitted.

107.   As to paragraph 105.13 (the alleged Fifth Corruption Representation), paragraph 106 above is repeated, making changes where necessary and appropriate.

108.   As to paragraph 105.14 (the alleged Sixth Corruption Representation):

108.1. As to point (i), the alleged promises and payments referred to have been addressed above. Insofar as they occurred, it is not admitted that they were authorised by Mr Steinmetz (save that Mr Struik understands from Mr Avidan that Mr Avidan, and not Mr Steinmetz, authorised the payments for Mr Thiam's flights).

108.2. As to point (ii), it is admitted that BSGR Guernsey was introduced into the corporate structure in 2009 and was BSGR ProjectCo's direct parent company. The payments to Mme Touré and of US$5 million to Mr Thiam are denied and accordingly so too is their alleged authorisation by BSGR Guernsey. As for the payments of Mr Thiam's flights, paragraph 55.7 above is repeated. Their alleged authorisation by BSGR Guernsey is not admitted. These were authorised by Mr

Avidan, and (so Mr Struik understands from Mr Tchelet) the payments were approved and requested to be made by BSGR Guernsey on that basis by Mr Tchelet.

108.3. Save that it is admitted that the payments of flight expenses related to the business of BSGR Guernsey or its subsidiaries (but not the JVA/SHA), point (iii) is denied. These payments have been addressed at paragraphs 50, 54 and 55 above. It is denied (if it is alleged) that this renders the payments illegitimate or the Sixth Corruption Representation false.

108.4. In the premises, it is denied that the Sixth Corruption Representation was false save that this is not admitted to the extent that non-admissions are made in respect of the alleged payments and promises to Mme Touré referred to in point (i) and the alleged authorisation thereof.

109.    As to paragraph 105.15 (the alleged Seventh Corruption Representation):

109.1. As to point (i), the alleged promises and payments have been addressed above. Accordingly:

(1)     Point (i) is denied in respect of promises or payments to Mr Thiam. The payments admitted to have been made to him did not render the Seventh Corruption Representation false.

(2)     Point (i) is denied in respect of promises or payments to Mme Touré that are denied above as having been made or authorised by the BSGR Group, and otherwise not admitted.

109.2. Point (ii) is addressed to Mr Clark and Mr Struik does not plead to it, save that it is denied that Mr Clark knew or had reason to believe any matter was false that was not in fact false.

109.3. Accordingly, it is denied that the Seventh Corruption Representation was false, save that this is not admitted to the extent that non-admissions are made in respect of the alleged payments and promises to Mme Touré referred to in point

(i) and the alleged authorisation thereof.

110.    As to paragraph 105.16:

110.1. As to points (i) to (iii), paragraph 109 above is repeated, making changes where necessary and appropriate.

110.2. Further as to points (ii) and (iii), it is denied that any bribery of Mr Thiam took place, or was authorised to take place, or that he was given any payments (improper or otherwise) to confirm and extend the Mining Licences. The allegations of bribery with regard to Mme Touré, and of intercessions on behalf of the BSGR Group, are addressed (and not admitted or denied) above.

110.3. Accordingly, it is denied that the Eighth Corruption Representation was false, save that this is not admitted to the extent that non-admissions are made in respect of the alleged payments and promises and bribes to Mme Touré and the authorisation thereof, and her alleged intercession on behalf of the BSGR Group.

## I2    Alleged falsity of the First to Third Consultancy Representations

111.    Paragraph 106 is denied. The specific allegations in the sub-paragraphs are addressed below. None of those allegations demonstrates that the alleged First to Third Consultancy Representations were false. In particular, none of those matters disclose that:

111.1. There was an undisclosed consultant, representative, agent, broker, intermediary or member of the local advisory team who was (or had been) retained by the BSG Group in connection with the "*Simandou Project*" or "*Project Hill*".

111.2. The BSG Group had used an intermediary to interact with the GoG in relation to the group's efforts to obtain the Mining Licences; or

111.3. The BSG Group had not "*generally*" only used technical consultants in Guinea who provided skills that the BSG Group needed to explore and develop their properties.

## PARTICULARS IN RELATION TO MR CILINS

112.   As to paragraph 106.1:

112.1. It is denied that Mr Cilins acted as a consultant, representative, agent and/or intermediary or was a member of the local advisory team retained by BSGR and/or BSGR ProjectCo (whether directly or indirectly). His role in assisting the BSGR Group was limited, as set out above.

112.2. Even if (which is denied) the limited role Mr Cilins in fact played entailed that he acted in one of the alleged capacities, that would not render any of the alleged First to Third Consultancy Representations false. None of those alleged Representations involved a representation that no persons had acted for the BSGR Group in such a capacity *simpliciter*.

112.3. In any event, if (which is denied) Mr Cilins acted in any of the alleged capacities, he did not do so at the times of the Questionnaires, which are the relevant times for the purposes of the first part of the First Consultancy Representation (i.e. the representation alleged at paragraph 70.3 up to the semi colon and addressed above).

112.4. Save in relation to paragraph 106.1(c), where matters are admitted or not admitted in relation to paragraphs 106(1)(a) to (m), it is denied that those matters are sufficient to demonstrate the allegation in the opening paragraph.

113.   Paragraph 106.1(a) is not admitted.

114.   As to paragraph 106.1(b):

(1)   It is admitted that Mr Struik and Mr Oron (on behalf of BSGR) were introduced to Mr IS Touré through Mr Cilins in 2005 (albeit separately).

(2)   It is admitted that Mr Struik (on behalf of BSGR) was introduced to Mr Bah by Mr Cilins, but this occurred early in 2006. Mr Oron was not with him at the time (and it is not admitted if Mr Cilins introduced Mr Oron

to Mr Bah at any time). This paragraph is otherwise denied. The research at the CPDM was conducted by Mr Struik. Paragraph 34.4 above is repeated.

115. Paragraph 106.1(c) is not admitted. Paragraph 100.1(1) above is repeated.

116. As to paragraph 106.1(d), insofar as the Claimants allege that any meetings took place other than those particularised at paragraphs 38 to 43, the allegation is embarrassing for want of particularity and Mr Struik is unable to plead to it. No admissions are made in relation thereto. As to the meetings actually particularised, paragraphs 34 to 36 above are repeated.

117. Paragraph 106.1(e) is denied. Mr Noy and Mr Cilins' role was limited to procuring local legal advice and organising the logistics of the negotiations. Paragraph 44.9 above is repeated.

118. As to paragraphs 106.1(f) and 106.1(g):

   118.1. It is admitted that Mr Cilins translated for and assisted Mr Struik from time to time prior to the arrival of Mr Avidan (and continued to perform a similar role for a short period after Mr Avidan's arrival). Paragraph 37.2 above is repeated.

   118.2. It is denied that Mr Cilins was "*intimately connected with all of BSGR and BSGR ProjectCo's activities*" simply because he had translated for Mr Struik from time to time.

   118.3. To the extent that it is alleged Mr Cilins was "*intimately connected*" with those activities for a reason other than translation, paragraph 106.1(f) is embarrassing for want of particularity and Mr Struik is unable to plead to it.

   118.4. Save as set out above, paragraphs 106.1(f) and 106.1(g) are denied.

119. As to paragraph 106.1(h):

   119.1. Paragraph 45.1 above is repeated.

119.2. The allegation that Mr Cilins received "*other consultancy fees … and was reimbursed for his expenses*" in the form of "*part of the US$250,000 paid … in May 2006*" is denied. The US$250,000 was part of a milestone and reward payment due to Pentler, not Mr Cilins personally, under the BSGR-Pentler Milestone Agreement. In any event, that payment did not relate to any work performed in connection with the grant of the Mining Licences or the Simandou project, but to the BSGR Group's introduction to Guinea generally. Paragraph 44.11 above is repeated.

119.3. Paragraph 106.1(h) is otherwise embarrassing for want of particularity. Pending proper particulars, it is denied.

120.  Paragraph 106.1(i) is admitted. It took some time for the BSGR Group to open its own bank account in Guinea. Mr Cilins made his bank account available on a temporary basis so that the BSGR Group had access to a local bank account.

121.  Paragraph 106.1(j) is denied. Mr Struik understands from Mr Avidan that Mr Cilins ceased providing assistance to the BSGR Group in Guinea in 2006, shortly after Mr Avidan's arrival.

122.  As to paragraph 106.1(k):

122.1. It is admitted that Mr Cilins was a shareholder of Pentler and that the Pentler SPA contained the terms quoted by the Claimants. Following the conclusion of the Pentler SPA, Pentler did thereafter advise the BSGR Group on various opportunities in African countries (including in relation to, among other things, iron ore, gold and base metals).

122.2. It is denied that Mr Cilins acted after 2006 for the BSGR Group or BSGR ProjectCo in relation to the Simandou project or in Guinea.

123.  As to paragraphs 106.1(l) and (m), paragraph 93 above is repeated. These events, insofar as they occurred as alleged, took place long after the entry into the JVA and SHA, and do not demonstrate that Mr Cilins had any role for or in connection with the BSGR Group prior to or at the time thereof.

## PARTICULARS IN RELATION TO PENTLER

124. Paragraph 106.2 is denied. The matters relied on by the Claimants in the sub-paragraphs are addressed below. Paragraphs 112.2 and 112.3 above are repeated, making modifications as necessary and appropriate.

125. As to paragraph 106.2(a):

125.1. Paragraph 34.5 above is repeated.

125.2. It is denied that Pentler was or was intended to be the corporate vehicle used by the Pentler Principals to "*represent and act for BSGR and (later) BSGR ProjectCo*". The purpose of that company at the time of its establishment was to conduct the Pentler Principals' Guinean affairs. Following Mr Avidan's arrival in Guinea in 2006 and the consequent cessation of Mr Cilins' limited role as described above, those affairs did not include those of the BSGR Group (save to the extent that, passively, Pentler stood to benefit from certain of the BSGR Group's exploits pursuant to the BSGR-Pentler Milestone Agreement and Pentler SPA).

126. As to paragraph 106.2(b):

126.1. It is admitted that the Pentler Principals were all shareholders of Pentler from about February 2006.

126.2. Paragraph 106.2(b) is otherwise denied. There is no basis for attributing all of the acts of a company's shareholders to the company (and none is pleaded).

127. Save that the date on which the BSGR-Pentler Services Agreement was entered into is not admitted, paragraph 106.2(c) is admitted.

128. As to paragraph 106.2(d), paragraph 44.3 above is repeated. As to the BSGR Group's position and hopes as regards SB1 and SB2, paragraph 33.6(2)(c) above is repeated.

129. As to paragraph 106.2(e):

90

129.1. Paragraphs 44.4 to 44.6 above are repeated.

129.2. As to the first sentence, it is denied that Pentler's entry into the Pentler-Bah and Pentler-Daou Agreements and the Touré MoU constituted compliance with any obligation under the BSGR-Pentler Milestone Agreement, or that this was Pentler's purpose in entering into them. It is further denied that by those agreements Pentler obtained "*the assistance and services*" of Mr Bah, Mr IS Touré, Mr Daou and Mme Touré for the benefit of "*BSGR and BSGR ProjectCo*". Pentler had a relationship with those persons. To the best of Mr Struik's knowledge, the BSGR Group did not (save for the employment relationship between Mr IS Touré and BSGR ProjectCo).

129.3. The second sentence is denied. Paragraph 44.7 above is repeated.

130. As to paragraph 106.2(f):

130.1. The first sentence is embarrassing for want of particularity. Pending proper particulars, it is denied.

130.2. The second sentence is admitted. Mr Struik understands from Mr Tchelet that he was told by Mr Oron at the time that this payment related to costs and expenses incurred by Pentler and its Principals in relation to the establishment of the BSGR Group's Guinea office. So far as Mr Struik is aware, Mr Cilins was not doing any work for the BSGR Group in Guinea in May 2007.

131. As to paragraph 106.2(g), the first sentence is admitted. The second sentence is denied. There is no basis for the alleged inference. BSGR Steel was obliged to pay the additional US$8 million regardless of what Pentler did in the meantime. This provision appears to have been intended to tie the level of Pentler's remuneration to the success enjoyed by the BSGR Group, following its introduction to Guinea by Pentler.

### PARTICULARS IN RELATION TO MR BOUTROS

132. Paragraph 106.3 is denied. The matters relied on by the Claimants in the sub-

paragraphs are addressed below.

133.   Save that the agreement of LMS was actual and not purported, and save that the date
       it was entered into is not admitted, paragraph 106.3(a) is admitted. Paragraph 29.3(3)
       above is repeated. Mr Struik will refer to the contract at trial for its full terms, meaning
       and effect.

134.   Paragraph 106.3(b) is admitted.

135.   As to paragraph 106.3(c), paragraphs 31, 57 and 58 have been addressed above and
       paragraphs 29, 50 and 51 above are repeated by way of response. Payment 7 was made
       in response to an invoice which contained a genuine demand from a known supplier
       for equipment that was needed, ordered and in due course delivered. It was not used
       by the BSGR Group to pay US$998,000 to Mme Touré.

136.   As to paragraph 106.3(d):

       136.1. The first sentence is admitted.

       136.2. As to the second sentence, the opening words (up to the colon) are denied. There
              is no basis for this allegation or inference. Apart from Payment 7, which has been
              dealt with above, the Claimants do not identify to whom these alleged bribes
              were paid or for what purpose. Mr Struik understands from Mr Avidan that
              these payments were made in respect of legitimate business transactions. Points
              (i) to (viii) are addressed below.

       136.3. As to point (i), Payment 7 has been addressed above. It was not paid as a bribe.

       136.4. As to point (ii), the amount of the payments is admitted. The fact that some
              payments were made for round numbers does not mean or indicate that they
              were bribes. The payments were made on a frequent but irregular basis in a
              variety of sums, and each is supported by one or more invoices which contains a
              breakdown of the goods and services provided.

       136.5. Point (iii) is embarrassing for want of particularity. The payments and invoices

referred to are not identified. In any event, the final sentence from the previous sub-paragraph is repeated.

136.6. As to points (iv) and (v), Mr Struik understands from Mr Tchelet and Mr Avidan that from time to time a payment would need to be made urgently and/or in advance of the corresponding invoice having been rendered (as set out in paragraph 50.5(4)(d) above). Whether to seek such a payment on an urgent basis was a judgment made from case to case by Mr Avidan, based on the circumstances. Where the corresponding invoice was not provided in advance, in every case it was provided by LMS thereafter, detailing what the payment was for.

136.7. Point (vi) is admitted in respect of the Payments identified in footnote 10. Mr Struik understands from Mr Tchelet that this occurred because the 'consulting' code was sometimes used inappropriately by staff in Guernsey (as a general catch-all). The re-distribution of these payments to other (more appropriate) codes reflected nothing more than the correction of clerical and bookkeeping errors. Any allegation intended to be made (by the words "*at least*") in relation to other unspecified invoices is embarrassing for want of particularity and Mr Struik is unable to plead to it.

136.8. As to point (vii), the email statement alleged is admitted in respect of Payment 3 only. It was not made in respect of Payment 4 (although in principle the same instruction would have applied). Mr Struik understands from Mr Tchelet that this statement meant only that certain information relating to payments made from Guernsey was not to be sent to Guinea so as to avoid its being incorrectly included in the books for BSGR ProjectCo, where it did not belong.

136.9. As to point (viii), it is admitted that a copy of email correspondence between Mr Tchelet and Helen Nicolle dated 20 and 21 April 2009 contains the manuscript note: "*Remove Ghassan Boutros' name from Guinea Spreadsheet*". Mr Struik understands from Mr Tchelet that this meant only that the individual's name should not be used in lieu of that of the corporate entity to which the liability was in fact owed.

137.   Paragraph 106.3(e) is denied. Paragraphs 132 to 136 above are repeated.

## PARTICULARS IN RELATION TO MR IS TOURÉ

138.   As to paragraph 106.4:

138.1. It is admitted that Mr IS Touré is Mme Touré's half-brother and was related to her by blood.

138.2. It is denied that Mr IS Touré was therefore related to President Conté by marriage or otherwise. Mme Touré was not married to the President.

## PARTICULARS: GENERAL

139.   Paragraph 106.5 largely repeats allegations made elsewhere in the Particulars of Claim in relation to Mr Cilins (in particular, paragraph 106.1). Paragraphs 112 to 123 above are repeated.

140.   Paragraph 106.6 essentially repeats allegations made elsewhere in the Particulars of Claim in relation to Pentler (in particular, paragraph 106.2). Paragraphs 124 to 131 above are repeated.

141.   Paragraph 106.7 essentially repeats allegations made elsewhere in the Particulars of Claim in relation to Mr Boutros (in particular, paragraph 106.3). Paragraphs 132 to 137 above are repeated.

142.   Paragraph 106.8 essentially repeats allegations made elsewhere in the Particulars of Claim in relation to Mr Thiam (in particular, paragraph 62). Paragraph 55 above is repeated.

143.   In the premises, paragraphs 106.9 and 106.10 are denied.

**I3    Alleged falsity of the so-called Fourth Consultancy Representation**

144.   As to paragraphs 107:

94

144.1. It is denied that the Fourth Consultancy Representation was made. Paragraph 80 above is repeated.

144.2. Without prejudice to the foregoing, save that Pentler was not owned by Mme Touré, paragraph 107.1 is admitted.

144.3. Paragraph 107.2 is denied.

(1)     Mme Touré was not a shareholder in Pentler.

(2)     As to the first sentence, the purpose of the Pentler SPA was for BSGR Group to re-acquire the 17.65% of BSGR BVI then owned by Pentler. The payments made thereunder were in consideration of the sale of the shares.

(3)     As to the second sentence:

(a)     In relation to point (i), none of the Pentler Principals were working or engaged at that time to work (as consultants or otherwise) for the BSGR Group in relation to the Simandou project (and paragraph 122 above is repeated). The agreement did not and did not purport to secure Mme Touré's services as a consultant for any period.

(b)     In relation to point (ii), paragraph 131 above is repeated.

**I4     Mr Steinmetz allegedly knew that the representations were false or acted recklessly**

145.    Paragraph 108 is addressed to Mr Steinmetz and relates to his alleged knowledge. Mr Struik therefore does not plead to it.

**I5     Mr Cramer allegedly knew that the representations were false or acted recklessly**

146.    Paragraph 109 is addressed to Mr Cramer and relates to his alleged knowledge. Mr Struik therefore does not plead to it.

**I6      Mr Struik allegedly knew that the representations were false or acted recklessly**

147.   As to paragraph 110:

147.1. It is denied that Mr Struik made "*each of the Corruption and Consultancy Representations*".  The Claimants have failed to state a case that Mr Struik did in fact make each of those representations.

147.2. The Claimants have in fact only alleged that Mr Struik made three of the 18 representations alleged to have been made by the Defendants (namely those comprised in the Fifth Corruption Representation). Mr Struik has pleaded to the alleged making of each of those representations above.

147.3. In any event, it is denied that Mr Struik made any representation knowing it to be false or reckless as to its truth.

147.4. It is noted that the Claimants have not sought to plead that Mr Struik was aware of all of the facts and matters which are alleged to have made the alleged representations false, but instead only seek to rely on the matters pleaded in the sub-paragraphs to paragraph 110 in relation to his alleged knowledge.

147.5. Save as set out above, paragraph 110 is denied.

148.   As to paragraph 110.1:

148.1. The first sentence is admitted. Prior to Mr Avidan's appointment in about June 2006, Mr Struik's principal activities included:

(1)     Conducting research at the CPDM, whereby he identified the availability of Simandou North and Simandou South (and the potential future availability of SB1 and SB2, in the light of the GoG's frustrations with the Rio Tinto Group's inaction in those areas);

(2)     Hiring external consultants to assess the value of the prospecting permits in respect of Simandou North and Simandou South;

(3)     Overseeing the negotiation of the February 2006 MoU, the incorporation of BSGR ProjectCo, and the application for prospecting permits in respect of Simandou North and Simandou South (and meeting with government officials in relation thereto);

(4)     Establishing the business in Guinea by setting up a local office (e.g. opening bank accounts, obtaining insurance and procuring vehicles); and

(5)     Providing technical advice and direction in relation to the Group's exploration activities in Guinea.

148.2. The second sentence is admitted. Mr Struik and his team were the source of the BSGR Group's technical knowledge and expertise. His technical input was therefore required after Mr Avidan's appointment, particularly in relation to the completion of the feasibility study and negotiation of the Base Convention. Otherwise, he frequently visited the site in Kérouané to check on the status of the project and submitted various reports to the CPDM to ensure that it was informed of the progress being made. Mr Struik was keen to ensure that the BSGR Group was not stripped of its rights due to inaction, as the Rio Tinto Group had been.

148.3. It is denied, if it is alleged, that it follows from either of these matters that Mr Struik was privy to everything that had happened or was happening on the ground in Guinea. He was not. Mr Struik was based in South Africa throughout. The business was in a start-up phase when he was in charge of it. Following Mr Avidan's appointment, responsibility for the day-to-day management of the project rested with Mr Avidan and his team.

149.    As to paragraph 110.2:

149.1. The first sentence is denied. Mr Struik was not appointed CEO of BSG MM. He was appointed the CEO of the Mining & Metals Division of BSGR. In that role he was responsible for the technical outcome of each project, as it was he who was responsible for carrying out or overseeing the feasibility study for most, if not

all, of them. It was often Mr Struik's decision whether a project was to be progressed. However, he was <u>not</u> responsible for the day-to-day management of each project. That was a matter for the relevant local management team, led by the country manager (here, Mr Avidan). In any event, it does not follow from Mr Struik's responsibility for the project (as just described) that he knew everything that had happened or was happening on the ground in Guinea.

149.2. As to the second sentence, it is admitted that this responsibility (as averred above) extended to the Simandou project. The allegation as to what Mr Struik *"would have known"* is embarrassingly vague, and wholly inadequate as a plea of knowledge (particularly in a fraud claim). Such specific averments as are made in the Particulars of Claim as to Mr Struik's knowledge are addressed as and when they arise elsewhere in this Defence. To the best of Mr Struik's knowledge, the Mining Licences were obtained and confirmed as pleaded above (and not, as appears to be insinuated, through bribery and corruption). This sentence is otherwise denied.

150.   As to paragraph 110.3, paragraph 20 above is repeated.

151.   Paragraph 110.4 is admitted. Further:

151.1. The BSGR-Pentler Services Agreement was negotiated by Mr Oron and Mr Noy and signed by Ms Merloni-Horemans without any input from Mr Struik. He became aware of its existence and purpose at around that time.

151.2. Consistently with that agreement, and with the Pentler SPA, Pentler would occasionally approach the BSGR Group with potential mining opportunities in Africa. Mr Struik would review and advise Mr Oron, and, following his departure, the BSGR board, about these from time to time.

152.   Paragraph 110.5 is admitted. This agreement was also negotiated by Mr Oron and Mr Noy, with limited input from Mr Struik. He advised Mr Oron about appropriate technical milestones and timeframes and signed the agreement on Mr Oron's instructions. He believed it to be an agreement to reward Pentler for the part the Pentler Principals had played in introducing the BSGR Group to Guinea. He regarded

it as a finder's fee.

153. Paragraph 110.6 is admitted. Mr Struik was asking Ms Merloni-Horemans to carry out the agreement made by Mr Oron and Mr Noy. That was an appropriate step for him to take. It does not disclose knowledge of bribery or corruption or indicate that Pentler played a role in relation to the BSGR Group's affairs beyond that set out above.

154. Paragraph 110.7 is denied. Mr Struik witnessed no such event. This allegation is based on a lie told by Mr Bah. Paragraph 44.7(3)(c) above is repeated.

155. As to paragraph 110.8:

155.1. The first to fourth sentences are admitted as a broad summary of the emails referred to therein. Mr Struik will refer to them at trial for their full terms and effect.

155.2. The fifth sentence is embarrassingly vague and wholly inadequate as a plea of knowledge (particularly in a fraud claim). It is in any event denied (if it is alleged) that Mr Struik was aware of any wrongdoing by Mr Cilins or Mme Touré, or that the emails (or "*exercise*", whatever is meant by this) "*demonstrate*" that. It is not understood on what basis this is alleged where no allegation is made of any wrongdoing (by anyone) in connection with the bauxite permits to which the 10 May 2006 email principally related. In fact:

(1) Mr Struik's email of 10 May 2006 made it clear that it was Mr Cilins who had a relationship with Mme Touré, not Mr Struik or the BSGR Group. The permits referred to were bauxite permits for exploration in the north of Guinea, as explained below.

(2) Development in the north of Guinea (where the relevant land under the bauxite permits was located) was important to President Conté and the GoG. Mr Struik was aware of this because the CPDM and Mr Oron had told him so.

(3) Mr Cilins had also suggested to Mr Struik that the BSGR Group should

take these bauxite permits. Mr Struik understood from Mr Cilins that he did so at the request of Mme Touré.

(4)     Mr Struik did not (and does not) know why Mme Touré had an interest in these permits. He did not even know at the time that she claimed to be the President's wife. He inferred that she was interested in them because the President wished to see development in that area, and she wanted to curry favour with him for her own purposes.

(5)     Mme Touré did not act for or on behalf of the BSGR Group in relation to the application for the bauxite permits (or, to the best of Mr Struik's knowledge, in any other connection).

(6)     The US$250,000 payment was part payment of a milestone due under the BSGR-Pentler Milestone Agreement. That is why Mr Struik's email of 10 May 2006 stated that "*Michael also phoned me saying that we need to process the 'first payment' now, hence the invoice attached (which I asked for)*".

(7)     Mr Oron's email of 11 May 2006 stating that the payment related to "*Fred services and success fees*" and Mr Struik's reply stating that "*this is correct and as agreed with them [viz. the Pentler Principals]*" are to the same effect.

(8)     The invoice referred to therein incorrectly provided that the US$250,000 payment related bauxite. It did not.

(9)     This email exchange does not suggest that Mr Cilins' role extended beyond that initial introduction and the logistical assistance provided prior to and shortly after Mr Avidan's arrival in Guinea as set out above (let alone that Mr Struik knew as much).

156.   As to paragraph 110.9:

156.1. Paragraph 41.5 above is repeated.

156.2. Mme Touré's presence at this meeting was not anticipated by Mr Struik. Nor did she play any meaningful role in it. When she attempted to interrupt the President, he became angry with her and told her to shut up and not to interfere in his business.

156.3. Mr Struik's impression following this meeting was that Mme Touré had no influence over the President at all.

157.   As to paragraph 110.10:

157.1. Paragraph 38.1 above is repeated.

157.2. Mr Struik attended the conference (which, again, was not a "*press conference*") because he had to present on BSGR's exploration plan.

157.3. Mr Cilins merely translated for Mr Struik. Mr IS Touré was there in his capacity as an employee of the BSGR Group. He was a journalist by trade and had the local connections necessary to drum up press interest in the conference.

157.4. His and their presence at the conference was therefore entirely unexceptional. It does not suggest that Mr Cilins and Mr IS Touré played the extensive role in relation to the Simandou project alleged by the Claimants, let alone that Mr Struik knew about the same.

158.   Paragraph 110.11 is admitted, as is the email exchange referred to therein. Mr Struik did not participate in this email exchange. If he read it at the time, he no longer has any recollection of doing so. In any event, the manner in which Mr Struik's receipt of this email is said to support the alleged inference of knowledge or recklessness is not particularised adequately or at all and is not understood. It is denied that it supports such an inference.

159.   As to paragraph 110.12:

159.1. This paragraph is admitted as a broad summary of the letter referred to therein. Mr Struik will refer to it at trial for its full terms and effect.

159.2. It is denied, if it is alleged, that the Pentler-Bah Milestone Agreement was entered into "*under the supervision of*" Mr Struik.

159.3. Mr Bah's claim to the contrary is untrue. Until appended to this letter, Mr Struik had no knowledge of this agreement.

159.4. Mr Bah's letter was nothing more than an attempt to blackmail the BSGR Group. Mr Struik regarded his claim as being without foundation and ignored it.

160.   As to paragraph 110.13:

160.1. As to the opening words of this paragraph (up to the comma), it is admitted that Mr Struik was involved in the negotiation of the Base Convention, in his role as one of the principal negotiators on behalf of BSGR. Otherwise, pending further particulars, the embarrassingly vague and subjective allegation that he was "*closely involved*" is not admitted.

160.2. It is admitted that Mr Struik was a signatory to the Base Convention. He signed in his capacity as a director of BSGR BVI.

160.3. The remainder of paragraph 110.13 is denied.

(1)     The reference to alleged "*assistance*" provided by Mr Thiam in connection with the negotiation of the Base Convention is understood to be a reference to the matters pleaded in paragraphs 62.10(a), (b) and (c) of the Particulars of Claim.

(2)     Mr Struik was not involved in, or aware of, any of these emails. Nor was he aware of the matters to which they refer.

(3)     In any event, even if he were, this would not amount to knowledge of "*assistance*" provided by Mr Thiam in connection with the negotiation of the Base Convention. No such assistance was provided. Paragraph 55.9 above is repeated.

161.  As to paragraph 110.14:

161.1. It is admitted that the first and second sentences contain a broad summary of a letter sent by Mr Bah to Mr Cilins and Mr Lev Ran in their capacity as directors of Pentler. The letter was copied to various BSGR Group entities and dated 15 March 2010. However, it is denied that the letter "*seemingly*" only demanded payment from Pentler (and it is denied, if it is alleged, that the letter demanded payment from anybody else). The letter on its terms only demanded payment from Pentler.

161.2. Save that it is admitted that Mr Struik sent the email referred to therein, the third sentence is denied.

(1)     Mr Struik did not "*instruct*" anybody to "*ignore and delete*" Mr Bah's email. He asked that they do so.

(2)     He did that because (a) Mr Bah's claim did not concern the BSGR Group, being addressed to Pentler; and (b) as when Mr Bah had previously attempt to blackmail BSGR in relation to the same subject matter, Mr Struik regarded Mr Bah's claim against the group to be unfounded and best ignored.

162.  As to paragraph 110.15, the first sentence is denied, save that Mr Struik had the limited knowledge described at paragraph 65.4 above (which paragraph is repeated herein). Mr Struik was not involved in the 31 March 2010 Restructuring. The second sentence is denied.

163.  As to paragraph 110.16:

163.1. The first sentence is admitted, save that it is denied, if it is alleged, that Mr Cilins' role extended beyond acting as Mr Struik's "*translator and assistant*". The fact that Mr Cilins so acted during the first half of 2006 does not suggest that he acted as a consultant or intermediary in connection with the grant of the Mining Licences, still less that Mr Struik knew that he had done so.

163.2. The second sentence is admitted, save that it is denied that such temporary employment "*led to*" Mr IS Touré's part-time or full-time employment with the BSGR Group. It was Mr Avidan who decided to employ Mr IS Touré on a more permanent basis.

163.3. In any event, Mr IS Touré was an employee, not a consultant or intermediary. So far as Mr Struik was aware, he did not play any role in connection with the grant of the Mining Licences. Further, Mr Struik did not, and does not, believe Mr IS Touré to be a relation of the President (because Mme Touré was not the President's wife).

164. As to paragraph 110.17:

164.1. The first sentence is denied. Mr Struik did not recommend to the board that US$5 million be paid to CCS. He was told, he cannot recall by whom, that BSGR had agreed to pay US$5 million for exclusive access to the due diligence. That sum was the actual and not "*purported*" price of obtaining such exclusive access. Paragraph 55.13 above is repeated.

164.2. As to the second sentence, paragraph 55.13 above is repeated.

164.3. The third sentence is denied.

(1) Mr Struik believed the payment to have been made to a legitimate company for a legitimate purpose, namely the exclusive right to conduct due diligence in respect of a Mozambican coal prospect.

(2) The prospect was then investigated by a technical team who conducted a three-day site visit. Their unfavourable report led Mr Struik to recommend against pursuing this particular opportunity.

(3) Mr Struik did not know that the money paid to the CCS was paid to anybody else, let alone to or for the benefit of Mr Thiam for the purpose alleged (if that was the case, which is not admitted). Nor was Mr Struik aware of any of the matters pleaded in paragraphs 62.15 and 62.16 of

the Particulars of Claim.

165. Paragraph 110.18 is admitted save that it is denied that Pentler was owned in any part by Mme Touré, or that Mr Struik knew or believed it to be. It was not, and he did not. Paragraph 44.6 above is repeated.

**I7     Mr Avidan allegedly knew that the representations were false or acted recklessly**

166. Paragraph 111 is addressed to Mr Avidan and relates to his alleged knowledge. Mr Struik therefore does not plead to it.

**I8     Mr Tchelet allegedly knew that the representations were false or acted recklessly**

167. Paragraph 112 is addressed to Mr Tchelet and relates to his alleged knowledge. Mr Struik therefore does not plead to it.

**I9     Mr Clark allegedly knew that the representations were false or acted recklessly**

168. Paragraph 113 is addressed to Mr Clark and relates to his alleged knowledge. Mr Struik therefore does not plead to it.

**I10    Nysco and Balda allegedly knew that the representations were false or acted recklessly**

169. Paragraphs 114 and 115 are addressed to Nysco and Balda and relate to their alleged knowledge. Mr Struik therefore does not plead to them.

**I11    Inducement and reliance**

170. Paragraph 116 and its sub-paragraphs are denied for the reasons set out below. In particular, it is denied that Mr Struik "*knew*" of those matters alleged in paragraphs 116.1 and 116.2. Paragraph 82.2 above is repeated. In all the circumstances, it is to be inferred that the Claimants (i) did not rely on the representations Mr Struik is alleged to have made, whether in entering into the JVA and SHA or making any of the alleged payments in connection therewith; and/or (ii) would have entered into the JVA and SHA and made those payments even if those representations had not been made.

Pending disclosure, inspection and/or the provision of further information, Mr Struik relies on the facts and matters set out at paragraphs 171 to 176 below.

171. Since long before and at the time of the negotiation of and entry into the JVA and SHA, Vale was desperate to acquire an interest in iron ore in Simandou, and eliminate the major "*threat*" it perceived of a competitor gaining and exploiting such an interest instead.

171.1. In an internal report dated 14 September 2009, Mr Etchart (Vale's General Manager for Exploration in Africa) stated that an interest in Simandou was the company's "*highest priority opportunity*" for iron ore outside of Brazil.

171.2. In a presentation titled 'Project Venezia', prepared by Vale personnel in 2008 or 2009, Simandou is described as a "*major Iron Ore threat for VALE in the world*".

171.3. In an email from João Mendes (Vale's Director of Iron Ore Business Development) ("**Mr Mendes**") to Mr Etchart dated 9 February 2010, Mr Mendes referred to a channel which Mr Etchart had opened up with Mr Struik as presenting an opportunity to "*advance this Simandou/Guinea matter, because this is Vale's goal, to position ourselves in the region!*".

171.4. Although Vale was contemplating a deal with BSGR, its intention, as disclosed in an email from Mr Mendes to Eduardo Ledsham (Vale's Executive Director of Vale's Exploration Department) ("**Mr Ledsham**") dated 16 February 2010, was, in due course, to "*move forward with just Vale*".

171.5. In an email from Vale's Edson Ribeiro ("**Mr Ribeiro**") to Mr Ledsham dated 17 February 2010, Mr Ribeiro stated that "*we cannot run the risk of the deposit falling into the hands of the Chinese, and we cannot stand by just watching, we must act*". He said that, absent a joint venture with Rio Tinto, "*we need to be aggressive and buy the rights from BSGR*".

172. Vale knew that Pentler had introduced BSGR to Guinea. It knew that Mr IS Touré was engaged by BSGR and believed that Mr IS Touré was related to Mme Touré, who Vale (incorrectly) believed to be President Conté's fourth wife. Further, Vale was privy to

rumour and other innuendo regarding alleged corruption on the part of the BSGR Group and an alleged connection between BSGR and Mme Touré and/or Mr Thiam.

172.1. Sometime in 2006, Mr Struik and Mr Cilins encountered Mr Etchart at the Ministry of Mines in Conakry. Mr Struik introduced Mr Etchart to Mr Cilins. He told him that Pentler had introduced BSGR to Guinea and that Mr Cilins was assisting him with general matters (e.g. renting office space, procuring vehicles, and providing assistance in relation to the hiring of staff).

172.2. In an undated "Kick Off Meeting" presentation cited by the First Defendant in paragraph 194.1 of his Defence, Vale expressed the view that "*thanks to their close relationship with influential people of the GoG (the fourth spouse of President Conté), we suppose that BSGR is a strong candidate to be granted with the areas that might be withdrawn from RT [Rio Tinto]*".

172.3. In an email from Vale's Marco Monteiro ("**Mr M. Monteiro**") to Mr Ledsham dated 25 October 2008, Mr M. Monteiro stated that BSGR was being "*very aggressive, but acting in an unethical manner and talking directly to one of the wives of the President in an attempt to get something*".

172.4. During a meeting on 24 November 2008, Vale was put on notice by Rio Tinto PLC that Mr Steinmetz's and BSGR's efforts to obtain the Simandou concession from Rio Tinto involved "*bribery and other acts of political corruption*" (according to an Amended Complaint filed by Rio Tinto PLC in the United States District Court, Southern District of New York, on 15 August 2014).

172.5. In an email from Vale's José André Alves ("**Mr Alves**") to Mr Ribeiro, copied to Mr Ledsham and dated 7 February 2009, Mr Alves stated that: "*BSGR as you have seen has as responsible for international relations Ibrahima Sory Touré, brother of the fourth wife of the deceased Gen. Conté, Mr. [sic] Mamadie Conté*".

172.6. In the internal report dated 14 September 2009 referred to above, Mr Etchart referred to BSGR's "*controversial relationship with former president Conté, particularly one of the wifes [sic] of the defunct president which sponsored BSGR in Guiné*".

172.7. In the Project Venezia presentation referred to above, BSGR was described as having a history "*fraught with bribery affairs and high-level corruption scandals in the country that could affect the process for the Simandou project*" and a "*very strong relationship with the president's 4th wife*". The nature of that alleged relationship is later elaborated on:

> "*[Mme Touré] [h]as influence in the government. She placed her brother as a director with BSGR and suspected to [sic] have received around 2MUS$ to interfere in the procedure that would grant the 50% that would be taken from RT [Rio Tinto], to favour BSGR; it could be the first level of a structure of payments to be defined in the process to grant those rights to BSGR.*"

172.8. In an email from Mr Mendes to Vale's José C Martins dated 2 February 2010, in relation to the signature of a confidentiality agreement between Vale and BSGR, Mr Mendes stated: "*… it's a document Vale will be signing with this group of 'ill-reputation'. But for me, it has to be that way, otherwise we can't analyse it for buying purposes and get them out of the way*".

172.9. A report authored by Nardello & Co, commissioned by Clifford Chance on behalf of Vale for the purpose of its due diligence exercise, reported that "*BSGR Guinea was 'close to the Conte clan'*", and that Mr IS Touré, who was "*in charge of external relations for BSGR in Guinea*", was "*a brother of Mamadie Conté, the 4th wife of the late President*".

172.10.   Mr Steinmetz is described in the same report as having a "*close connection*" and "*good working relationship*" with Mr Thiam.

172.11.   In March 2010, Mr Alves, Cello Henning and Mr Etchart (all of Vale) travelled to Guinea with Mr Struik for a site visit as part of Vale's due diligence exercise. During that site visit, Mr Struik told Mr Alves, Mr Henning and Mr Etchart that Pentler had introduced BSGR to Guinea.

172.12.   In any event, as pleaded in paragraph 80 above, BSGR Steel's US$22 million purchase of a 17.65% interest in BSGR BVI from a third party (viz. Pentler) was disclosed in the 2008 Financial Statements and 2009 Statement of Financial Affairs, both of which were provided to Vale in the course of the due diligence

exercise.

173. Against that background, Vale conducted a superficial and inadequate due diligence
exercise.

173.1. None of the Initial DD Questionnaire, Supplemental DD Questionnaire, Clark
ABL Certificate, Steinmetz ABL Certificate or FCPA Interview specifically
addressed the alleged relationship between the BSGR Group and Pentler, Mme
Touré or Mr Thiam (or any allegation of bribery or corruption in relation
thereto). The only specific question asked by Vale pertained to Mr IS Touré, who
Vale already believed to be related to Mme Touré.

173.2. Despite the size and significance of the deal and the risks involved, the due
diligence exercise was 'completed' within little over a month, and Vale initially
agreed to limit the scope of its due diligence to BSGR Guernsey.

173.3. Ernst & Young (who were contracted by Vale to carry out financial due diligence
in relation to the transaction) did not perform any audit work in Guinea, or
provide its due diligence report to Vale, until after the transaction had been
completed.

173.4. According to paragraph 196.4 of the First Defendant's Defence, Vale pressured
Ernst & Young into altering their initial conclusion that BSGR posed a high risk
of bribery and corruption.

174. Vale knew that (i) there was a very real risk that bribery and corruption had occurred
in relation to Simandou; (ii) there were serious reputational and regulatory risks for it
in the event that bribery or corruption had in fact occurred in relation to Simandou
(including under the US Foreign Corrupt Practices Act of 1977 (15 U.S.C. § 78dd-1, et
seq.) ("**FCPA**") and from the US Securities Exchange Commission ("**SEC**")); and (iii) it
had undertaken an inadequate due diligence exercise, but it nonetheless entered into
the JVA and SHA and made any payments in connection therewith. In particular, in
addition to the matters set out above:

174.1. On 13 April 2010, Alex Monteiro, Vale's then Director of Mergers and

Acquisitions ("**Mr A. Monteiro**"), emailed Fabio Barbosa (also of Vale):

> "*Our recommendations to the business department have been the following, based on the legal and commercial risks:*
>
> *1. If the decision is of closing the deal, that it be made in escrow (bank financing doesn't eliminate FCPA risk). The lawyers' standing is clear, once we close it, we run the risk of already being in violation the FCPA on D+1, given that we couldn't do a books and accounts review of the 4 companies that come in the acquisition package (located in Guernsey, Guinea, Liberia and BVI);…3. Due diligence – the result of the due diligence is not satisfactory, nor exhaustive; more time and information is needed from the other party …*"

174.2. In a later email from Mr A. Monteiro to Mr Barbosa, also dated 13 April 2010, he stated:

> "*In regard to FCPA, adding to what has been said, I think the risk of closing the deal without escrow is not only reputational, rather, 'risk is of civil administrative liability to the SEC for the Company', transcribing the words of Clifford Chance's specialist in FCPA.*"

175. Accordingly, it is to be inferred that Vale regarded the representations made (or allegedly made) by Mr Struik (and the other Defendants) with such scepticism that they did not assuage the FCPA risk associated with the transaction. The only reasonable conclusion is that Vale did <u>not</u> rely on, and was not induced by, the truth of those representations, and decided to enter into the JVA and SHA without any regard thereto. In doing so it acquired the interest in Simandou which it so desperately desired and put itself in a position to rid itself of its junior partner (the BSGR Group) in due course. It is to be inferred that this commercial interest overrode any interest Vale might have ordinarily or otherwise had (which is not admitted) in not being exposed to the risks identified in paragraph 116.1. That paragraph is accordingly denied.

176. Further and in any event, in the premises Vale knew or did not care about (i) the involvement of Pentler or its Principals in the BSGR Group's introduction to Guinea; (ii) the alleged relationship between Mr IS Touré and Mme Touré; and/or (iii) the alleged relationship between Mme Touré and the BSGR Group. Vale would not have relied, and did not rely, on any representation to the contrary. In particular, it is denied that any further disclosures as to the existence of such persons as "*consultants*"

or "*intermediaries*" would have been a "*red flag*" for the Claimants. It would not have led to any or any substantial further due diligence being conducted, and in any event the results of any due diligence carried out (whether from independent investigation or responses from the Defendants) would not have affected the Claimants' decision to enter into the transaction. Paragraph 116.2 is accordingly specifically denied.

## SECTION J: CLAIM IN CONSPIRACY

177.  As to paragraph 117, so far as it is addressed to Mr Struik (no admissions otherwise being made):

177.1. Paragraph 96 above is repeated.

177.2. The opening paragraph is denied. There was no combination, agreement or understanding between Mr Struik and any other Defendant to make fraudulent misrepresentations to Vale in the course of the due diligence exercise or otherwise.

177.3. It is denied that Mr Struik made any false representations at all, and further that he did so knowingly (or recklessly), or pursuant to any "*combination*". It is denied that he acted unlawfully, and in any event he genuinely believed at all times that he was acting lawfully.

177.4. It is denied in any event that the Claimants have suffered loss as alleged, for the reasons set out below.

177.5. Paragraph 117.1 is denied. Paragraphs 105 to 115 have been addressed above. Paragraphs 97 to 169 above are repeated.

177.6. Paragraph 117.2 is denied. Paragraphs 68 to 92 have been addressed above. Paragraphs 60 to 83 above are repeated.

177.7. Paragraph 117.3 is denied. Paragraphs 65 to 66 and 162 above are repeated.

177.8. Paragraph 117.4 is denied. Paragraphs 82.2 to 82.4 above are repeated.

177.9. Save that it is admitted that Mr Struik was subsequently awarded a bonus, paragraph 117.5 is denied. Paragraphs 26 to 27 and 96 to 98 have been addressed above. Paragraphs 24, 25 and 87 to 89 above are repeated. To the extent that Mr Struik made any representations during the course of the due diligence process, these were made not made to advance his (or "*the Defendants'*") own financial interests, but in good faith. It is specifically denied that loss was inevitable, foreseeable or intended.

177.10. Paragraph 117.6 is denied. Mr Struik did speak honestly about the alleged matters, insofar as (on the basis of the true position and his knowledge) they arose at all. The true position is addressed above.

### SECTION K: PROPRIETARY CLAIM

178. As to Section K, paragraph 96 above is repeated. Further or alternatively, as a matter of New York law, which applies to this claim, the Claimants have no proprietary claim, for the reasons set out at paragraph 42 of the First Defendant's Defence. Accordingly, all claims made and relief sought in this section are denied. Without prejudice to this, Mr Struik pleads as follows to this section on the basis that (contrary to his case) English law applies.

179. As to paragraph 118:

179.1. Save that it is admitted that Vale initiated the Arbitration proceedings on 28 April 2014, and that it resulted in an Award, the first sentence is denied. The JVA and SHA were not in fact rescinded by Vale. Rather, they were terminated by agreement (and therefore affirmed) by clause 6.1 of the share purchase deed entered into by Vale, BSGR and BSGR Guernsey on 13 March 2015. That termination was without prejudice to the LCIA Arbitration claim by Vale against BSGR (clause 6.2). However, neither that agreement nor the Award binds Mr Struik or any other third party.

179.2. Further or alternatively, Vale elected in the Arbitration to claim damages for deceit which were assessed, as Vale asked them to be, without giving any credit for the value of any proprietary claim. In those circumstances, Vale is not

entitled to claim any proprietary remedy in relation to the proceeds from any person.

179.3. Further or alternatively, even if (which is denied) the JVA and SHA were rescinded, that rescission did not have the result that the US$500 million paid to BSGR by Vale International, a third party, was impressed with a constructive trust (whether in favour of Vale International or Vale).

179.4. The remainder of paragraph 118 is accordingly denied.

180.   As to paragraph 119, insofar as it is addressed to Mr Struik (no admissions otherwise being made):

180.1. Point (i) is not admitted.

180.2. Point (ii) is denied. Mr Struik did not receive any part of the US$2 million as a volunteer. That sum was remuneration for work done and value added to the BSGR Group. Nor did he receive any part of that sum with notice of deceit as alleged.

180.3. Point (iii) is denied, for the reasons set out above in the preceding sub-paragraphs and paragraphs 178 and 179 above.  Further or in the alternative to Mr Struik's primary case as to when the cause of action for the proprietary claim arose (upon payment of the monies, as set out below), it is further denied (if it be alleged) that any alleged constructive trust arose on receipt of the relevant funds. No trust could arise until the rescission of the JVA.

181.   As to paragraph 120, insofar as it is directed to Mr Struik (namely paragraph 120.3), it is admitted that Mr Struik's company received US$2 million in July 2010. It is not admitted that this, or any other sum received by Mr Struik at any time, represented the "*proceeds*" of the US$500 million, and denied for the reasons set out above that it represents the traceable proceeds thereof.

**SECTION L: APPLICABLE LAW AND LIMITATION**

182. Save to the extent of any inconsistency with the foregoing, Mr Struik hereby adopts and pleads in his own Defence the facts and matters pleaded by the First, Second, Sixth, Seventh and Eighth Defendants in relation to:

    182.1. The law applicable to the Claimants' claims, being New York law. The Claimants do not plead any claim under New York law, and Mr Struik reserves the right to respond to any such case if made, including by setting out further particulars in relation to New York law;

    182.2. The limitation periods and principles of laches applicable to the Claimants' claims under New York law, alternatively English law; and

    182.3. The date on which the Claimants' causes of action accrued, or the relevant limitation period otherwise started to run (on the basis of knowledge that had been or could with reasonable diligence have been acquired), under New York law, alternatively English law.

183. In the premises, the Claimants' claims are time-barred or barred by laches.

### SECTION M: CAUSATION, LOSS AND DAMAGE

184. Paragraph 121 is denied.  Paragraphs 170 to 176 above are repeated.

185. As to paragraph 122:

    185.1. The opening paragraph is denied. In the premises, it is denied that the Claimants are entitled to any of the sums claimed by way of damages.

    185.2. Paragraph 122.1 is admitted.

    185.3. Paragraphs 122.2 to 122.5 are not admitted. Insofar as the costs allegedly spent in the arbitration are proven, they represent a failure by the Claimants to mitigate their losses. It was not a reasonable step to spend so much pursuing BSGR in arbitration, and less could have been spent to achieve the same or a similar outcome as was in fact achieved.

186.  Paragraph 123 is not admitted.

187.  As to paragraph 124, it is denied that the Claimants have been caused any loss by any wrongdoing by Mr Struik. Further and in any event:

    187.1. Paragraph 124.1 is a claim for reflective loss to which the Claimants are not entitled as a matter of law;

    187.2. As to paragraph 124.2, paragraph 185.3 above is repeated.

**SECTION N: INTEREST**

188.  Paragraph 125 is not admitted, save that it is denied, in the premises, that the Claimants are entitled to any interest.

189.  In the premises, paragraph 126 is denied.

190.  As to the prayer, it is denied that the Claimants are entitled to the relief claimed, or any relief.

**TOM WEISSELBERG QC**

**DAVID LOWE**

**WARREN FITT**

**15 May 2020**

I believe that the facts stated in this Defence are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Full name: Marcus Struik (Third Defendant)

Signed:

Date: 15 MAY 2020

115
