# Exhibit 7

**IN THE HIGH COURT OF JUSTICE**    **Claim no. CL-2019-000723**
**BUSINESS AND PROPERTY COURTS OF**
**ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

B E T W E E N:

(1)  **VALE S.A.**
(2)  **VALE HOLDINGS B.V.**
(3)  **VALE INTERNATIONAL S.A.**

**Claimants**

- and -

(1)  **BENJAMIN (BENY) STEINMETZ**
(2)  **DAG LARS CRAMER**
(3)  **MARCUS STRUIK**
(4)  **ASHER AVIDAN**
(5)  **JOSEPH TCHELET**
(6)  **DAVID CLARK**
(7)  **BALDA FOUNDATION**
(8)  **NYSCO MANAGEMENT CORPORATION**

**Defendants**

---

### DEFENCE OF THE FOURTH DEFENDANT

---

### INTRODUCTION

1. In this Defence:

  1.1. Unless otherwise stated or clear from the context, references to paragraph numbers are to paragraphs in the Particulars of Claim.

  1.2. For convenience only, the Fourth Defendant ("**Mr Avidan**") adopts many of the defined terms and headings used in the Particulars of Claim. Further:

    (1) The depersonalised abbreviations of people's names to a surname only are adopted but with the adoption of an appropriate prefix.

1

(2)     Mr Avidan does not adopt the definition of "**BSGR Group**" that the Claimants appear to wish to use (see paragraph 28 and the Appendix to the Particulars of Claim).   For the purposes of this Defence (and any denial, non-admission or admission), the "**BSGR Group**" comprises only the following companies: (a) BSGR; (b) BSGR Steel; (c) BSGR BVI; (d) BSGR Guernsey; (e) BSG MM; (f) BSGR ProjectCo; (g) BSGR Resources (Liberia) Limited; (h) BSGR (Liberia) Limited; and (i) BSGR Logistics Corp.

1.3.   Mr Avidan does not plead to certain allegations in the Particulars of Claim because they are addressed to or concern other Defendants. For the avoidance of doubt, no admissions are made in respect of those allegations. Indeed, Mr Avidan is under no obligation to admit or deny the Claimants' allegations otherwise than on the basis of his current knowledge and what is readily ascertainable from information or documents at his ready disposal.  As set out below, Mr Avidan pleads to some allegations made by the Claimants on the basis of information from his Co-Defendants; when he does so, the source of that information is matters set out in their Defences save where otherwise stated.

1.4.   Further, in the context of the Claimants' overly long and repetitive Particulars of Claim (which do not comply with the requirements of paragraphs C1.1(a), (c), (e), (i), (k) and (n) of the Commercial Court Guide), Mr Avidan admits certain allegations made by the Claimants, and in relation to certain documents identified by the Claimants, notwithstanding his lack of involvement in the relevant matters. Such admissions are based on documents or information obtained by Mr Avidan in the course of legal proceedings or other investigations undertaken after the times that are material to these proceedings. To the extent that Mr Avidan admits those allegations, it is not admitted that he had knowledge of the fact, matter, relevant document or information at the time, unless an allegation is made in respect of a document signed by him personally or unless that is specifically alleged and admitted or an allegation is made of an act or omission by him personally.

1.5.   Moreover, the Claimants are required under CPR PD16 para 8.2 fully to plead all

particulars of notice or knowledge of any fact upon which they wish to rely, and Mr Avidan responds directly to such allegations if and when they are made. Otherwise, for the avoidance of doubt, where Mr Avidan admits or denies any matter alleged, he is not admitting that he has knowledge of the relevant matter or had such knowledge at any other time.

1.6.   Save insofar as any allegation is specifically admitted or not admitted below, each and every allegation in the Particulars of Claim is denied.

## OVERVIEW

2.   This claim against Mr Avidan in deceit and conspiracy is brought by the world's largest iron ore miner against a former Israeli diplomat with over 20 years' experience of foreign affairs. It arises out of the Claimants' involvement in what proved to be a disappointing joint venture with BSGR in the Simandou region of Guinea many years ago. That disappointment was occasioned when the GoG revoked the Mining Licences on which the venture was based, ostensibly because they had been procured by bribery and corruption.

3.   The Claimants' claim will fail for a number of reasons as explained below, including limitation. Any cause of action accrued in 2010 and the Claimants had, or with reasonable diligence could have acquired, the information required to pursue their claims long ago. Among other things, the allegations which led to the revocation of the mining titles were put to the joint venture company, BSGR ProjectCo, on 30 October 2012. Vale, in a letter from its lawyer, foreshadowed a claim in deceit against BSGR as long ago as 19 April 2013. Yet the present claim was not issued until 3 December 2019. That was long after the expiry of the limitation period applicable either under New York law (which governs this claim) or English law (which the Claimants allege applies).

4.   In the meantime, by way of an arbitration commenced in April 2014, Vale has pursued its contractual counterparty, BSGR, in proceedings which raised broadly the same issues as are raised in these proceedings. Vale obtained an award in those proceedings in April 2019 and has brought these proceedings as an afterthought against several of the individuals and entities alleged to have been involved in the underlying events.

3

5.    Indeed, the claim in these proceedings is no more than a belated attempt to blame Mr Avidan for loss which the Claimants would have suffered in any event and without any proper analysis as to the proper law of their claims. It is brought in respect of representations which (i) in most cases were not even made by Mr Avidan; (ii) were not false; and/or (iii) were not known by him to be false. It is denied that Mr Avidan is liable to the Claimants as alleged or at all.

6.    The Claimants' case is an extreme one, namely that <u>all</u> of the Defendants, despite their very different roles and positions, are responsible for a large number of false representations made in the course of the due diligence performed by Vale in respect of entry into the joint venture. The principal representations relied on by the Claimants are that (i) the Mining Licences had not been acquired through bribery and corruption; and (ii) the BSGR Group had not used any agents, consultants or other intermediaries, other than those disclosed to Vale, in obtaining the Mining Licences.

7.    The Claimants rely on 18 distinct representations. Of these, only seven are alleged to have actually been made by Mr Avidan himself (although he is wrongly accused of somehow adopting or approving all of the representations). The seven which he is alleged to have made are comprised in the Fourth, Fifth and Eighth Corruption and Third Consultancy Representations. Of these:

7.1.    The representations comprised in the Fourth and Fifth Corruption and Third Consultancy Representations were to the effect that (i) the BSGR Group had not been involved in bribery and corruption in Guinea; (ii) the BSGR Group generally only used technical consultants in Guinea; and (iii) Mr IS Touré was a "*public relations consultant*" and was not related to President Conté or his wife. The making of representations to the effect of (i) and (ii) is (as set out more precisely below) admitted. The making of a representation to the effect of (iii) is denied.

7.2.    The allegations that Mr Avidan made the two representations comprised in the Eighth Corruption Representations (also to the effect that the BSGR Group had not been involved in bribery and corruption in Guinea) are embarrassingly vague and Mr Avidan has been unable to plead to them.

8.     Further, those representations that Mr Avidan did make were, to the best of his knowledge and belief both then and now, true. The Claimants' case that such bribery and corruption took place, often expressed in the vaguest terms, is seriously flawed. Among other things:

8.1.     The cornerstone of the Claimants' case is the allegation that the BSGR Group used third parties to pay bribes to Mme Touré, a Guinean businesswoman in her twenties, who the Claimants say was the then President of Guinea's fourth wife (but who was not in fact married to the President). These bribes were allegedly paid to procure the exercise of Mme Touré's "*influence*".

(1)     The manner in which this influence was exercised is never explained by the Claimants. It is inherently unlikely that the President, a soldier who first came to power in a military coup and had been in office for over 20 years by the times that are material to these proceedings, was pressured by Mme Touré into revoking a mining concession held by the Rio Tinto Group and granting title over the same ore-rich area to the BSGR Group.

(2)     The Claimants identify 12 purported "*Intercessions*" by Mme Touré, some of which are denied and some of which are not admitted, but most of which (even taking the Claimants' case at its highest) disclose no more than that she was present at a meeting where the BSGR Group's interest in the Simandou region was discussed. In any event, (a) Mr Avidan is not aware of any intercession by Mme Touré on behalf of BSGR; and (b) neither Mr Avidan nor the BSGR Group needed the assistance of Mme Touré in advancing the position of the BSGR Group in relation to the GoG and its activities in Guinea.

(3)     The real reason the Rio Tinto Group's rights were revoked was because of the GoG's frustration at the Rio Tinto Group's long-standing failure to explore and exploit the riches of the region, to the detriment of the nation. They were granted to the BSGR Group because the GoG believed in the BSGR Group's commitment to realise the resources that

the Rio Tinto Group had allowed to languish.

8.2.    The Claimants' case as to alleged payments to Mme Touré is similarly flawed.

(1)     The alleged bribes are said to have consisted of (a) the conferral of a 33.3% interest in Pentler, a company which held a 17.65% interest in BSGR BVI (BSGR ProjectCo's then holding company); (b) an agreement entered into by BSGR ProjectCo to pay Mme Touré's company, Matinda, the sum of US$4 million; and (c) a payment of US$1 million to Mme Touré through an alleged intermediary.

(2)     In fact:

(a)     The conferral of the interest in Pentler never came to fruition and, in any event, was a matter between Pentler and Mme Touré (who had their own business relationship).

(b)     The agreement purportedly entered into by BSGR ProjectCo to pay Mme Touré was a forgery, and was not in fact signed by Mr Avidan.

(c)     The payment of US$1 million was in fact a legitimate payment to a known supplier of BSGR ProjectCo (LMS), which had its own independent business relationship with Mme Touré.

8.3.    Further and in any event, Mr Avidan believed that the representations he made were true. If, despite Mr Avidan's belief to the contrary, any bribery or corruption did take place, he was unaware of it. He was the BSGR Group's Director of Operations in Guinea (or, as the role was often called, its 'country manager'). As such, he was responsible for the day-to-day management of the Simandou project and the principal point of contact between the BSGR Group and the GoG. He never paid, or authorised anybody else to pay, a bribe or other corrupt payment to any person. Nor did he retain, or authorise anybody else to retain, a consultant, agent or other intermediary in connection with the grant of the Mining Licences. Nor was he aware of anyone else making such payments or

retaining such persons on behalf of the BSGR Group. To the best of Mr Avidan's knowledge (and by way of overview only):

(1)   Mme Touré was not the wife of the President and, in any event, she played no part in the grant of the Mining Licences to the BSGR Group.

(2)   Pentler and the other Pentler Principals were rewarded because they had introduced the BSGR Group to Guinea in the first place. Their role in relation to the BSGR Group's activities in Guinea and the Simandou project in particular was otherwise very limited. While, at an early stage, Mr Cilins provided some logistical and administrative support, including translation assistance, his role ended shortly after the appointment of Mr Avidan in mid-2006, and he played no part in the grant of the Mining Licences to the BSGR Group.

(3)   Mr Thiam was the Minister of Mines and acted on behalf of the GoG at all material times. He was not a consultant, agent or otherwise an intermediary for the BSGR Group, nor was he paid bribes in connection with the confirmation and "*extension*" of the Mining Licences (or otherwise).

(4)   The various payments made (or allegedly made) to third parties upon which the Claimants rely, to the extent that they were made at all, were made for legitimate purposes unconnected with the grant of the Mining Licences.

(5)   The BSGR Group had never been involved in any form of bribery or corruption in Guinea (or elsewhere).

8.4.   Moreover, Mr Avidan denies that he is responsible for representations that he did not personally make and there is no proper basis for seeking to attribute any such representations to him.

9.   For the avoidance of doubt, unless admitted or not admitted below, the allegations contained in paragraphs 1 to 11 are denied for the reasons set out elsewhere in this

Defence.

## SECTION A: PARTIES

<u>The Claimants</u>

10.   Paragraph 12 is admitted.

11.   Save that (a) the second sentence; (b) the fourth sentence; and (c) the reference to the alleged merger in the third sentence are not admitted, paragraph 13 is admitted.

12.   Save that it is not admitted if and to what extent any of the promissory notes were paid (or, if paid, have not been repaid), paragraph 14 is admitted.

<u>The Defendants</u>

13.   As to paragraph 15:

13.1.   The first and second sentences are admitted.

13.2.   Save that it is admitted that certain of those activities have been carried out during the material period by entities in the BSGR Group, the third sentence is not admitted.

13.3.   Mr Avidan responds below to the cross-reference to paragraph 28.

14.   As to paragraph 16:

14.1.   The opening words of paragraph 16 and paragraph 16.1 are admitted, save that it is not admitted whether there are no other beneficiaries than Mr Steinmetz, his wife Agnes, and the children of that marriage.

14.2.   As to the first sentence of paragraph 16.2:

(1)   The allegation that Mr Steinmetz was "*presented*" to act as an adviser to Balda and the BSGR Group is embarrassingly vague. It is in any event

8

denied.

    (2)      In fact, Mr Steinmetz was contracted to act (and did in fact act) as an adviser to Balda.

14.3.  As to the second sentence of paragraph 16.2:

    (1)      The allegation that Mr Steinmetz "*controlled all material decisions relating to the BSGR Group and BSGR*" is embarrassingly vague. It is in any event denied.

    (2)      In fact, BSGR and the BSGR Group were controlled by their directors and ultimately by their shareholders.

    (3)      Without prejudice to the foregoing, Mr Steinmetz did give advice in relation to material decisions and his advice was often followed. In the absence of proper particulars, it is not admitted what role or influence Mr Steinmetz had in relation to any specific decision, save that it is admitted that he provided advice with regard to the entry into the SHA and JVA.

15.    Paragraph 17 is embarrassingly vague. Pending proper particulars (as to what is meant by "*principal beneficiary*"), it is not admitted.

16.    Paragraph 18 is admitted. Its relevance is denied.

17.    As to paragraph 19:

17.1.  The first sentence is admitted.

17.2.  The second sentence is embarrassingly vague. Pending proper particulars (as to what is meant by the allegation that Mr Cramer is an "*associate*" of Mr Steinmetz), it is not admitted.

17.3.  The third sentence is admitted, but Mr Avidan does not know the exact date this

appointment occurred.

17.4.  As to the fourth sentence:

(1)     It is admitted that Mr Cramer was from December 2009 the sole ultimate beneficial owner of Onyx.

(2)     His ownership of Onyx before that time, and his ownership of any other entities intended to be included in the embarrassingly vague reference to "*the related Onyx group of companies*", are not admitted.

(3)     The vague allegation that the "*day-to-day management*" of "*the BSGR Group*" was "*delegated*" to Onyx (or to the "*related Onyx group of companies*") is not admitted, save that it is admitted that Onyx provided certain administrative services to the BSGR Group.

17.5.  The final sentence is not admitted.

18.    As to paragraph 20:

18.1.  It is admitted that Mr Cramer was involved in the negotiation of the JVA and SHA. The subjective allegation that he was "*closely involved*" is embarrassingly vague. Pending proper particulars, it is not admitted.

18.2.  The allegation that Mr Cramer made fraudulent misrepresentations to induce Vale to enter into the JVA and SHA is addressed to Mr Cramer and is not properly included within a section of the Particulars of Claim that purports simply to identify the parties.

18.3.  It is admitted that a bonus was awarded to Mr Cramer but denied that it was in about April 2010. It was in about July 2010. It is further denied that the bonus was awarded "*for the role he played in procuring Vale to enter into*" the JVA and SHA.

18.4.  Further as to Mr Cramer's bonus:

(1)     Mr Cramer's wholly owned BVI company, Manerhorn Holdings SA, was paid the sum of US$3 million on or about 6 July 2010.

(2)     Mr Cramer was due to receive a further payment of US$7 million but only if a second sum of US$500 million was paid to BSGR by Vale pursuant to section 3(b) of the JVA (which never happened).

(3)     Save that Mr Avidan is aware that at least a substantial part of this US$10 million was a bonus (for work including but not limited to the transaction with Vale) he does not know the full details of what it was for, or to what extent these sums were by way of bonus or some other form of remuneration or settlement, as he understands Mr Cramer to allege at paragraph 121 of his Defence. Accordingly, the size of Mr Cramer's bonus is not admitted.

18.5.   As to the second sentence, Balda is recorded as having resolved to pay US$2.5 million to Onyx in remuneration for and recognition of its efforts in increasing Balda's net asset value. It so resolved in or about July 2010. Mr Avidan does not know whether this, or any sum, was in fact paid. This sentence is otherwise not admitted.

18.6.   Save as set out above, paragraph 20 is denied.

19.   As to paragraph 21:

19.1.   Save that it is admitted that Mr Struik is resident in South Africa, the first sentence is denied. Mr Avidan understands from Mr Struik that Mr Struik is not a "*mining industry executive*". He is a mining engineer who has held management roles in various companies with mining interests.

19.2.   Save that it is admitted that Mr Struik held positions within the BSGR Group including as a director of each company expressly identified therein, the second sentence is embarrassingly vague. Pending proper particulars as to what is meant by holding "*various appointments within the BSGR Group*" at "*all material times*", the second sentence is not admitted.

20.   Mr Avidan pleads to paragraph 22 on the basis of information from Mr Struik:

20.1.   Paragraphs 18.1 to 18.3 above are repeated, making changes where necessary and appropriate.

20.2. Further as to Mr Struik's bonus:

(1)     His company, Ennismore Consultants Ltd, was paid US$2 million on or about 9 July 2010. He was to receive a further US$1 million only if a second sum of US$500 million was paid to BSGR by Vale pursuant to section 3(b) of the JVA (which never happened).

(2)     Mr Struik's bonus related to work done for/value added to the BSGR Group generally, including in relation to Guinea, and was not limited to the transaction with Vale.

20.3. Save as set out above, paragraph 22 is denied.

21.   As to paragraph 23:

21.1. The first sentence is admitted.

21.2. As to the second sentence:

(1)     It is admitted that Mr Avidan was the BSGR Group's country manager for Guinea from about mid-2006 until about May 2010.

(2)     It is denied that Mr Avidan was appointed President of BSGR ProjectCo in about mid-2006 or at all. However, after leaving his post as country manager following the conclusion of the JVA and SHA with Vale, Mr Avidan was appointed President of BSGR.

21.3. As to the third sentence, paragraphs 18.1 and 18.3 above are repeated, making changes where necessary and appropriate. In Mr Avidan's case, his only work for the BSGR Group prior to the conclusion of the JVA and SHA related to the Group's Guinean operations, but this was not limited to the Simandou project. His role in supporting the negotiations is set out in paragraph 63.7(2) below.

21.4. Further as to Mr Avidan's bonus:

(1)     Fefania Assets Corporation, a Panamanian company owned by Mr Avidan and his wife, was paid US$2.5 million on or about 6 July 2010. He was to receive a further US$1.25 million only if a second sum of

US$500 million was paid to BSGR by Vale pursuant to section 3(b) of the JVA (which never happened).

(2) Mr Avidan's bonus related to work done for/value added to the BSGR Group generally, and in particular to work done in relation to Guinea, but it was not limited to the transaction with Vale.

21.5. Save as set out above, paragraph 23 is denied. It is specifically denied that Mr Avidan made any fraudulent misrepresentations as alleged or at all.

22. Mr Avidan pleads to paragraph 24 on the basis of information from Mr Tchelet:

22.1. The first sentence is admitted.

22.2. As to the second and third sentences:

(1) From 1 September 2003 to 31 August 2008, Mr Tchelet was employed as a financial manager by a company known when he joined as Norinter Financial Advisors (Pty) Ltd, later renamed BSGR Advisory Services (Pty) Ltd, a South African company owned by Mr Oron which provided management and corporate services to the BSGR Group.

(2) In that role:

(a) Between March 2007 and August 2008, Mr Tchelet acted as the CFO of the BSGR Group by default, no CFO being appointed.

(b) From time to time Mr Tchelet acted as the CFO of certain subsidiaries of BSGR as and when necessary in periods leading up to major transactions involving those subsidiaries.

(3) From September 2008 to about February 2017, Mr Tchelet provided services as a Strategic Financial Specialist to BSGR through his wholly owned company. In that role, Mr Tchelet from time to time acted as the CFO of the BSGR Group and of certain subsidiaries of BSGR, including BSGR Guernsey, as and when necessary in periods leading up to major transactions involving those subsidiaries.

(4)     Since about February 2017, Mr Tchelet has provided advisory services to a wholly owned subsidiary of BSGR (and to that subsidiary's subsidiaries) through his wholly owned companies.

(5)     Save as set out above, the second and third sentences are denied.

22.3.   The fourth sentence is admitted, save that the capacities in which Mr Tchelet acted are as set out above, and save that it is denied (if it be so alleged, as appears to be the case given the Claimants' use of the words "*at least*") that Mr Tchelet visited Guinea on more than seven occasions during this period. On each of his seven visits, Mr Tchelet only visited Conakry, the capital of Guinea.

22.4.   As to the fifth sentence:

(1)     Paragraphs 18.1 to 18.3 above are repeated, making changes where necessary and appropriate.

(2)     Further as to Mr Tchelet's bonus:

(a)     His company, Evergreen Valley Production Ltd, was paid US$800,000 on or about 6 July 2010. He was to receive a further US$400,000 only if a second sum of US$500 million was paid to BSGR by Vale pursuant to section 3(b) of the JVA (which never happened).

(b)     Mr Tchelet's bonus related to work done for/value added to the BSGR Group generally, including in relation to Guinea, and was not limited to the transaction with Vale.

22.5.   Save as set out above, paragraph 24 is denied.

23.     As to paragraph 25:

23.1.   The first to fourth sentences are admitted.

23.2.   As to the fifth sentence, paragraphs 18.1 to 18.3 above are repeated, making changes where necessary and appropriate.

23.3.   Further as to Mr Clark's bonus:

(1)    Mr Clark was paid US$180,000 on or about 6 July 2010. He was to receive a further US$70,000 only if a second sum of US$500 million was paid to BSGR by Vale pursuant to section 3(b) of the JVA (which never happened).

(2)    Save that Mr Avidan understands from Mr Clark's Defence that his bonus was paid as a reward for his hard work for the BSGR Group, the precise purpose of Mr Clark's bonus is not known to Mr Avidan.

24.    As to paragraph 26:

24.1.  Save that it is denied that Balda was established in 1995, and save as set out in paragraph 14.1 above, the first to third sentences are admitted. According to an official certificate of the Land and Public Register Office for the Principality of Liechtenstein, Balda was established in 1994.

24.2.  As to the fourth sentence, paragraph 18.2 above is repeated, making changes were necessary and appropriate.

24.3.  The fifth sentence is vague and is not admitted. Mr Avidan does not know whether Balda received or dealt with any part of the US$500 million paid pursuant to the JVA.

25.    As to paragraph 27:

25.1.  The first and second sentences are admitted.

25.2.  As to the third sentence, paragraph 18.2 above is repeated, making changes were necessary and appropriate.

25.3.  The fourth sentence is not admitted pending disclosure and/or further information, save that it is admitted that BSGR transferred the sum of $203,200,000 to Nysco on around 12 July 2010 and the sum of US$22 million to Nysco on around 10 May 2010.

## OTHER KEY COMPANIES AND INDIVIDUALS

The BSGR Group

26.    As to paragraph 28:

    26.1.  The first sentence of paragraph 28 is denied. The structure of the BSGR Group as set out in Appendix 1 is not "*complex*" as appears to be alleged by the Claimants.

    26.2.  The second sentence is embarrassingly vague in that the Claimants have failed to provide a clear and comprehensive list of the companies that are said to be relevant to this claim.  The Appendix is over-inclusive for the purpose of the definition proffered by the Claimants. Paragraph 1.2(2) above is repeated.

Mme Touré

27.    As to paragraph 29:

    27.1.  Mr Avidan understands from Mr Noy's evidence in the Arbitration that Mme Touré was a Guinean businesswoman who dealt in, among other things, consumer goods, pharmaceuticals and mining. He further understands from Mr Struik that Mr Cilins told him that she and Mr Cilins were business partners who had been involved in importing chickens, toothpaste and condoms into Guinea. Mr Avidan became aware himself during his time in Guinea that Mme Touré was involved in the import and export of chickens and pharmaceuticals.

    27.2.  Save that Mme Touré's year and city of birth are not admitted, the first sentence is admitted.

    27.3.  The second sentence is denied. Although Mme Touré has claimed to be President Conté's fourth wife, she was not in fact married to him. Mr Avidan was told by Mr IS Touré that he and Mme Touré had a connection to President Conté because he (the President) had hid from the previous President, Ahmed Sekou Touré, in their family's village. Their father was a contemporary and military colleague of Conté in the resistance against former President Touré. President Conté looked favourably on Mme Touré due to the shelter provided by their father.

27.4. Save that it is admitted that President Conté died in December 2008, the third sentence is not admitted.

27.5. As to the fourth sentence:

(1)   It is admitted that in 2013 Ms Touré was cooperating with US authorities.

(2)   Paragraph 103 is addressed below.

(3)   Save as set out above, the fourth sentence is not admitted.

<u>Pentler and its principals</u>

28.   As to paragraph 30:

28.1. It is denied (for the reasons set out below) that Pentler was the "*vehicle*" through which Mme Touré held "*her 5% interest*" in BSGR BVI. Mme Touré has never held an interest in BSGR BVI or any interest in Pentler.

28.2. It is not admitted that Mr Noy is French or that Mr Lev Ran is South African. Mr Avidan understands from their evidence in the Arbitration that both are Israeli.

28.3. Save as set out above, paragraph 30 is admitted.

<u>Mr Boutros</u>

29.   As to paragraph 31:

29.1. Mr Avidan worked closely with Mr Boutros throughout his time as country manager. At times he saw him nearly every day. Mr Boutros had a good network of contacts and was able to source a range of hardware required by the business (such as generators, air conditioning units and earthmoving machinery), even at short notice. Mr Avidan regarded the goods and services supplied by Mr Boutros to BSGR ProjectCo (which included the construction of a road between Kankan and Kérouané) as critical to the progress of the Simandou project.

29.2. As to the first sentence:

(1)  It is not admitted that Mr Boutros "*owned and controlled*" LMS.

(2)  Mr Boutros was a Lebanese businessman who was an owner of, and had some control over, LMS.

29.3.  As to the second sentence:

(1)  In 2009/10, the BSGR Group paid sums in excess of US$5 million to LMS (and/or Mr Boutros or Mr Boutros' business partner Adama Sidibe). It is not admitted that these payments constituted payments into "*[Mr] Boutros' control*".

(2)  It is denied that those sums were paid by the BSGR Group "*purportedly by way of various consultancy payments*". The sums were paid (and Mr Avidan believed that the sums were paid) for goods and services provided by LMS, Mr Boutros and/or Mr Sidibe.

(3)  In particular, and materially for the purposes of the Claimants' claim, LMS entered into a Subcontracting and Service Provision Agreement with BSGR ProjectCo in 2008, pursuant to which LMS was engaged to supply various goods and services to BSGR ProjectCo. Mr Avidan regarded this contract as formalising a relationship which was already in place from about 2006 and which continued throughout Mr Avidan's time as country manager.

29.4.  As to the third sentence:

(1)  It is denied that money was paid by the BSGR Group to LMS for the purpose of paying bribes (whether to Mme Touré or anybody else).

(2)  The vague allegation that monies paid to LMS were to be used to pay bribes is not properly included within a section of the Particulars of Claim that purports simply to identify other key companies and individuals.

(3)  In any event, as to the alleged bribe identified by the Claimants (and as set out in more detail below), BSGR paid US$998,000 to LMS as part of a genuine transaction for earthmoving machinery. If (which is not

admitted) Mr Boutros thereafter directed any payment of those monies to Mme Touré, that payment was not made by or on behalf of the BSGR Group.

29.5.  Save as set out above, paragraph 31 is denied.

<u>Mr Thiam</u>

30.    As to paragraph 32:

30.1.  The first and second sentences are admitted.

30.2.  As to the third sentence:

(1)      As Minister of Mines and by way of a letter dated 5 May 2009, Mr Thiam provided confirmation on behalf of the newly formed GoG that (as was the case) the Mining Licences were valid.

(2)      The allegation that Mr Thiam received bribes of US$5 million is not properly included within a section of the Particulars of Claim that purports simply to identify other key companies and individuals.

(3)      In any event, as set out in more detail below, BSGR did make a payment of over US$5 million to a Mozambican company called Companhia Carvoeira de Samoa Limitada ("**CCS**") but (a) this was not a payment to Mr Thiam personally; and (b) it was made for a legitimate purpose and not as a "*bribe*".

30.3.  As to the fourth sentence:

(1)      The needless repetition of the allegation made in the third sentence is noted. Paragraph 30.2 above is repeated.

(2)      It is admitted that Mr Thiam is serving a seven-year sentence in the United States for laundering bribes paid to him by companies unconnected to the BSGR Group. The relevance of that conviction is denied.

(3)      It is not admitted (if it is alleged) that Mr Thiam in fact received or

laundered any bribes paid to him by companies unconnected to the BSGR Group. If it is so alleged, Mr Avidan will, if necessary, rely on the rule in _Hollington v Hewthorn_ [1943] K.B. 587 to render inadmissible the contents of the judgment of the US Court in relation to Mr Thiam.

30.4. Save as set out above, paragraph 32 is denied.

## SECTION B: THE MINING LICENCES

Introduction: Guinea and Simandou

31. Save that part of the Simandou range is located in the Kankan region of Guinea, paragraphs 33 to 35 are admitted.

The grant of the Mining Licences to the BSGR Group

32. As to paragraph 36:

32.1. Save that the grant of Mining Licences were actually (and not merely "_formally_") governed by the 1995 Mining Code of the Republic of Guinea ("**the 1995 Mining Code**"), the first sentence is admitted. All mining titles from time to time granted to the BSGR Group, and all titles granted to other persons at all relevant times, were governed by the 1995 Mining Code.

32.2. As to the second sentence and its sub-paragraphs:

(1) A person could not explore for iron ore without a prospecting permit (described by the Claimants as a "_research licence_").

(2) To mine for iron ore, a person needed _either_ an operating permit _or_ a mining concession.

(3) Further, by reason of the 1995 Mining Code:

(a) The constitutive order for a prospecting permit would set a minimum programme of work which the holder had to carry out while the permit was in effect (article 35).

(b) The holder of a prospecting permit had to start prospecting work

20

within six months after the permit was issued and continue it diligently and according to recognised standards (article 35).

(c)    At the request of the holder, the term of an 'industrial' prospecting permit could be renewed twice, for a maximum period of two years each time, and on the same conditions as before (article 30).

(d)    A prospecting permit would be renewed automatically by operation of law if the holder had met all his obligations and his application for renewal set out a minimum programme of work building on the results of the preceding period (article 30).

(e)    With each renewal, the area of a prospecting permit was reduced by half (article 30).

(f)    A mining concession could only be issued where one or more deposits had been discovered and on evidence duly constituted by a feasibility study (article 41).

(g)    A mining concession would be issued by decree on the recommendation of the Minister of Mines and was subject to (inter alia) the conditions set out in a mining agreement (article 43).

(h)    A mining agreement would define the rights and obligations of the parties and set out the legal, financial, tax and social conditions that would govern the mining operation for the duration of the agreement (article 11).

(i)    Mining titles were always issued subject to existing rights (article 47).

(4)    The reference to what was "*typically needed*" is embarrassingly vague and, save as set out above, the second sentence and its sub-paragraphs are not admitted.

33.    As to paragraph 37:

33.1. The first sentence is admitted.

33.2. As to the second sentence, it is admitted that the Mining Licences were granted and that Rio Tinto ProjectCo had previously held rights over SB1 and SB2.

33.3. The second sentence, the sub-paragraphs and further paragraphs in the Particulars of Claim refer to certain matters occurring "*notwithstanding*" the existence of certain rights or interests of the Rio Tinto Group.

    (1)    The Claimants' use of that word is embarrassingly vague. If (which is unclear) the Claimants use that word to imply that any of the BSGR Group's rights or actions were in any way illegitimate, improper or otherwise inappropriate, that implication is denied.

    (2)    As pleaded in paragraphs 33.8 to 33.11 below, by the time the Mining Licences were granted to BSGR ProjectCo, Rio Tinto ProjectCo no longer held any rights in respect of SB1 and SB2. Those rights had been legitimately removed by and at the initiative of the GoG, due to the GoG's view that the Rio Tinto group had failed to take sufficient action in pursuance of those rights.

33.4. Save that it is not admitted that the "*base convention*" "*extend[ed] the validity*" of the renewed prospecting permits until 30 May 2006, paragraph 37.1 is admitted.

33.5. Paragraph 37.2 is admitted.

33.6. As to paragraph 37.3:

    (1)    The first sentence is admitted. Mr Avidan will refer to the February 2006 MoU at trial for its full terms, meaning and effect.

    (2)    As to the second sentence:

        (a)    It is admitted that the February 2006 MoU (i) made provision in relation to the BSGR Group carrying out of a 30-month feasibility study in respect of the areas identified by the Claimants; and (ii) contemplated the potential grant of mining concessions in due course, subject to the 1995 Mining Code.

(b) However, the conduct of the 30-month feasibility study in respect of the relevant area, which included SB1 and SB2, was premised on the grant of a prospecting permit to BSGR BVI or BSGR ProjectCo in respect of that area (see clause 1.2). At that time, no company within the BSGR Group held a prospecting permit in respect of SB1 or SB2.

(c) Moreover, (i) the GoG was at all relevant times dissatisfied and frustrated at the Rio Tinto Group's perceived inaction, and considered it conceivable that its rights in relation to SB1 and SB2 might cease in the future; and (ii) the relevant BSGR Group entity was aware of the GoG's view, and was interested in obtaining rights in respect of SB1 and SB2 in the event that they ceased to be held by the Rio Tinto Group and became available.

(d) Save as set out above, the second sentence is denied.

(3) As to the third sentence, it is admitted that the February 2006 MoU made reference to SB1 and SB2. Rio Tinto ProjectCo's licences have been addressed above. Paragraph 33.6(2)(c) above is repeated.

33.7. Paragraph 37.4 is admitted. The Rio Tinto Concessions were granted subject to the 1995 Mining Code, including its provisions in relation to the revocation of such rights. A mining concession could be revoked, among other things:

(1) Where the prospecting, operation or development period was suspended for more than six months in the case of explorations or more than eighteen months in the case of operations, or was severely restricted without legitimate grounds and in such a way as to be detrimental to the public interest; and

(2) For violations of one of the provisions of the 1995 Mining Code.

33.8. Paragraph 37.5 is admitted. Paragraph 33.6(2)(c) above is repeated.

33.9. As to paragraph 37.6:

(1) The first sentence is admitted.

23

(2)     Save that the July 2008 Decree was concerned with Rio Tinto ProjectCo, rather than "*Rio Tinto*", the second sentence is admitted as a broad summary of the July 2008 Decree.

(3)     Further, the July 2008 Decree was lawful. The reasons for the revocation of Rio Tinto ProjectCo's concession were set out in two letters from the GoG to Rio Tinto ProjectCo dated 22 May 2008 and 30 July 2008. The true position, as reflected in those letters, was that:

    (a)     Rio Tinto ProjectCo had not submitted a feasibility study prior to grant of the concession or subsequently.

    (b)     The base convention and mining concession purported to confer on Rio Tinto ProjectCo continuing long-term prospecting rights without obliging it to make an investment decision regarding mining operations.

    (c)     Taken together, the concession and convention constituted a freeze on Guinea's mineral resources, which was contrary to the GoG's efforts to achieve rapid benefit from its mineral resources so as to increase State revenues.

    (d)     Over the course of 11 years, Rio Tinto ProjectCo had only engaged in limited prospecting activities, and only over a limited part of its holdings. Such delay in bringing its mining project into operation was a breach of the legal undertakings linked to the grant of the mining concession.

33.10. Paragraph 37.7 is admitted.

33.11. Paragraph 37.8 is admitted. Further:

(1)     Between July and October 2008, the GoG afforded Rio Tinto ProjectCo the opportunity to submit, among other things, a feasibility study and retrocession plan indicating which 50% of the area covered by its concession it proposed to give up.

(2)     Rio Tinto ProjectCo did not submit either a feasibility study or a realistic

retrocession plan which complied with the GoG's requirements. Accordingly, on or about 4 December 2008 Rio Tinto ProjectCo was required to cede SB1 and SB2.

33.12. Paragraphs 37.9 and 37.10 are admitted.

## SECTION C: HOW THE MINING LICENCES WERE OBTAINED BY THE BSGR GROUP BETWEEN 2005-2008

### C1   The BSGR Group is introduced to Guinea

34. As to paragraph 38:

34.1. Save as set out below, the first sentence is denied. The Pentler Principals did not introduce the BSGR Group to the "*possibility of acquiring mining licences in the Simandou region*". Rather, the Pentler Principals introduced the BSGR Group to Guinea on the basis that the country offered possible mining opportunities, no more.

34.2. Save that it is admitted that Mr IS Touré was the half-brother of Mme Touré, paragraph 38.1 is not admitted.

34.3. Save that it is admitted that Mr Oron met with Mr Souaré, then Minister of Mines, on or about 20 July 2005, paragraph 38.2 is not admitted. Mr Avidan understands from Mr Struik that it was at this meeting that Mr Oron learned, on behalf of the BSGR Group, that there was an opportunity to be involved in exploring and potentially mining for iron ore in the Simandou region.

34.4. Paragraph 38.3 is admitted. Further, Mr Avidan understands from Mr Struik that:

(1)      Mr Struik made two or three visits to the CPDM on this trip. Mr Cilins accompanied Mr Struik to the CPDM to translate because Mr Struik was not fluent in French. Mr Cilins took no substantive part in the discussions that Mr Struik had with the CPDM about mining.

(2)      During one of these visits to the CPDM, Mr Struik discovered that rights over Simandou North and Simandou South were available and

25

became aware of Rio Tinto's lack of activity in exploiting its rights in the Simandou region.

34.5. Save that it is denied that BSGR suggested that Pentler be purchased, paragraph 38.4 is admitted. In fact, Mr Avidan understands from Mr Noy's evidence in the Arbitration that:

(1) The decision to acquire a corporate vehicle for their Guinean affairs was made by the Pentler Principals, independently of BSGR.

(2) The only link with BSGR was that, upon learning that the Pentler Principals wanted a corporate vehicle for their Guinean affairs, Mr Oron suggested that Onyx might have an off-the-shelf company they could use.

34.6. Paragraph 38.5 is denied. The limited assistance these persons provided to the BSGR Group is addressed below.

**C2   The alleged involvement of Pentler, Mr Cilins, Mme Touré et al**

35. Save as set out below, paragraphs 39 to 42 are not admitted. The time period of the alleged events predates Mr Avidan's involvement with the BSGR Group. Despite the seriousness of the allegations made by the Claimants, these paragraphs are vague and embarrassing for want of particularity. Further:

35.1. In circumstances where the Claimants do not even consider they can actually plead that any "*representatives of the BSGR Group*" were present at the alleged meeting, let alone who was present (instead equivocally asserting that they were "*possibly*" there), that allegation is denied and should be struck out.

35.2. For the avoidance of doubt, Mr Avidan has not at any relevant time believed or understood Mr Cilins to have been a "*representative of BSGR*", or to have acted as alleged either on behalf of the BSGR Group or at all.

36. Paragraph 43 is admitted.

37. As to paragraph 44:

37.1.  Save that the date on which BSGR ProjectCo was incorporated is not admitted, the first sentence is admitted.

37.2.  As to the second sentence:

    (1)    It is admitted that from about April 2006, Mr Struik was principally responsible for running the BSGR Group's business in Guinea, such as it was, and Mr Cilins provided "*help*" to him in this role. That help was logistical and administrative in nature.

    (2)    Mr Cilins acted as Mr Struik's interpreter and local assistant until the arrival of Mr Avidan and performed day-to-day tasks such as opening local bank accounts, procuring vehicles, and assisting in the process of hiring security and domestic staff.

    (3)    After Mr Avidan's arrival, Mr Cilins continued to provide some similar assistance to the business in Guinea for a brief period. In particular, he assisted Mr Avidan in establishing the BSGR Group's local office, and sourcing the necessary office equipment and hiring staff. On one occasion Mr Cilins arranged a meeting at the CPDM which Mr Avidan and Mr Struik attended, but in which Mr Cilins played no substantive part. However, since Mr Avidan was himself fluent in French, it quickly became apparent that Mr Cilins no longer had a role to play in the business. Mr Cilins' involvement ceased altogether within a matter of months of Mr Avidan's arrival.

37.3.  The third sentence is admitted.

37.4.  As to the fourth sentence:

    (1)    It is denied that the BSGR Group employed Mr IS Touré from about February 2006. He was employed from about April 2006, occasionally and on a temporary basis, to assist in finding local staff. Mr Avidan subsequently made Mr IS Touré's position permanent.

    (2)    It is admitted that Mr IS Touré was appointed BSGR ProjectCo's director of external relations in about January 2007.

37.5. Save as set out above, paragraph 44 is denied.

38. As to paragraph 45:

38.1. The first sentence is denied. In fact:

(1) On the day that the BSGR Group's office was officially opened in Guinea, a conference (which was not a "*press conference*") was held by the BSGR Group at the GoG's invitation.

(2) During that meeting, Mr Struik gave a presentation to a number of government officials, representatives of Ministries, the CPDM and journalists setting out the BSGR Group's exploration goals in Simandou North and South. Mr Cilins translated for him. Mr Oron, Mr Avidan, and Mr IS Touré were also present.

38.2. The second sentence is admitted. Mme Touré was one of around 100 people who attended that event. Mr Avidan does not know who invited her, but it is likely that she was invited by her business partner, Mr Cilins.

39. Paragraph 46 is admitted.

40. Paragraph 47 is admitted. Paragraph 33.6(2)(c) above is repeated.

41. As to paragraph 48:

41.1. As to the first sentence of the opening paragraph, it is admitted that Mr Avidan met with Mr Kanté, then Minister for Mines, in around August or September 2007 and discussed the BSGR Group's interest in SB1 and SB2. Mr IS Touré accompanied Mr Avidan but played no substantive part in the meeting (or the meeting referred to in paragraph 48.1).

41.2. As to the second sentence of the opening paragraph, the alleged "*further meetings*" (identified in the sub-paragraphs) are addressed below.

41.3. As to paragraph 48.1:

(1) As to the first sentence:

(a)   It is admitted that Mr Avidan and Mr IS Touré met with President
      Conté and Mr Kanté in about August or September 2007.

(b)   It is not admitted whether Mr Kanté was "*summoned*" to attend
      that meeting.

(c)   It is denied that this was a meeting to "*discuss the BSGR Group's
      desire to obtain mining permits over SB1 and SB2*". In fact, the
      purpose of the meeting was to provide the President and Minister
      with an update on the BSGR Group's progress with respect to its
      Simandou North and South blocks, and in particular Zogota. SB1
      and SB2, and the Rio Tinto Group's inactivity in relation thereto,
      came up in conversation, at which point Mr Avidan mentioned
      that the BSGR Group would be interested in obtaining rights over
      SB1 and SB2 should they become available, referring to the BSGR
      Group's right of first refusal under the February 2006 MoU.

(2)   The second and third sentences are not admitted, save that it is
      admitted that Mr Kanté and President Conté had an exchange to the
      effect alleged.

41.4.  Paragraph 48.2 is denied. No such meeting occurred as alleged or at all. Mr
       Avidan and Mr IS Touré never visited Mr Kanté's office and "*insisted on the
       transfer of rights over SB1 and SB2*".

41.5.  As to paragraph 48.3:

(1)   Sometime in 2007 or 2008, on a Tuesday night at about 10pm, President
      Conté invited Mr Avidan and Mr Struik to the Presidential Palace in
      Conakry.

(2)   When they arrived they were shown into a room where President Conté
      was, to their surprise, accompanied by Mme Touré. They were
      watching football on television. The President asked Mr Avidan and Mr
      Struik how BSGR's work in Simandou North and South was
      progressing. He asked whether BSGR was serious about Zogota or
      whether they would delay like Rio Tinto.

(3)     At one point Mme Touré interrupted President Conté while he was asking questions.

(4)     President Conté reacted angrily and told her to shut up and not to interfere in his business (or words to that effect). Mme Touré was otherwise silent during the meeting.

(5)     Save as set out above, paragraph 48.3 is denied.

41.6.   Paragraphs 48.4 to 48.6 are not admitted.

41.7.   Save that it is admitted that Mr Bangoura was engaged by the BSGR Group at around that time (probably as chief of security, rather than a security guard, as he was promoted to this position at around this time), paragraph 48.7 is denied. No such meeting occurred at any time.

42.   As to paragraph 49:

42.1.   The first sentence is denied.

(1)     The alleged "*series of meetings*" have been addressed above.

(2)     As pleaded at paragraph 46.1 below, BSGR ProjectCo did not enter into the 2008 Matinda Contracts.

42.2.   As to paragraph 49.1(a):

(1)     It is admitted that Mr Steinmetz and Mr Avidan met President Conté in the grounds of the Presidential Palace in about April 2008. Mr IS Touré accompanied them, but he played no substantive part in the meeting. Mme Touré did not attend this meeting.

(2)     It is denied, if it is alleged, that Mr Soumah was present throughout that meeting. He joined briefly at the end. It is admitted that the President instructed Mr Soumah to review the Rio Tinto Group's mining rights.

(3)     It is denied that any "*intercession*" on the part of Mme Touré took place, of any kind. Indeed, paragraph 49.1(a) fails to disclose any such intercession on her part.

42.3. As to paragraph 49.1(b), it is denied that the meeting, and accordingly any "*intercession*" (whatever this is meant to be) occurred. It is not admitted whether the alleged order was given.

42.4. Paragraph 49.1(c) is admitted. It is unclear whether the Claimants allege any causative link between Mr Steinmetz's visit and the events identified in paragraphs 49.1(c)(i) and (ii). Pending proper particulars, it is denied that there was any such link.

42.5. Save as set out above, paragraph 49.1 is denied.

42.6. Paragraph 49.2 is admitted. Paragraphs 33.9 to 33.11 above are repeated.

42.7. Paragraph 49.3 is not admitted.

42.8. As to paragraph 49.4:

    (1)    Save that the application also sought rights in respect of SB3, the first sentence is admitted. It is denied (if it is alleged) that Mme Touré was present at the meeting.

    (2)    It is denied that the meeting was arranged by Mme Touré as alleged in the second sentence. The basis for the purported inference is not explained or understood. The meeting was in fact arranged by Mr Avidan and Mr IS Touré.

    (3)    The third sentence is not admitted.

42.9. Paragraphs 49.5 to 49.7 are admitted. Paragraphs 33.9 and 33.11 above are repeated.

**C3   Alleged payments to the Pentler Principals, Mr IS Touré and Mme Touré**

43.   As to paragraph 50:

43.1. The Claimants have failed properly to explain the nature or basis of the alleged "*need*" on the part of the BSGR Group to remunerate the Pentler Principals. Pending proper particulars, the first sentence is not admitted.

43.2. The Claimants have also failed properly to explain why the BSGR Group "*needed a vehicle*" through which it could make payments to the individuals identified in the second sentence. Pending proper particulars, the second sentence is denied.

43.3. Further, and in any event, on the basis of his own knowledge and information from others, and as pleaded further below, Mr Avidan believes that the BSGR Group did not, and did not have any need to, disguise payments or make bribes as alleged or at all.

44. As to paragraph 51, as a general matter, Mr Avidan only became aware of Pentler in around 2007 or 2008, when the Pentler SPA was being negotiated, at which point he learnt about its minority shareholding. Before that, Mr Avidan knew only that Mr Cilins had a business relationship with Mr Lev Ran (whom Mr Avidan had met once by chance in Israel) and that the two men might have played a part in the BSGR Group's introduction to Guinea. As to the specific allegations:

44.1. It is denied that any steps were taken in order to fulfil the alleged ends identified in paragraph 50.  Paragraph 43 above is repeated.

44.2. It is admitted that the Pentler Principals purchased Pentler from Onyx on or around 14 February 2006. Paragraph 34.5 above is repeated.

44.3. As to paragraph 51.1:

(1) Mr Avidan will refer to the letter dated 14 February 2006 at trial for its full terms, meaning and effect. Mr Avidan understands from Mr Struik that Mr Struik signed this letter on the instructions of Mr Oron, who had negotiated the agreement with Mr Noy; and that Mr Struik's only input was to advise Mr Oron on the technical milestones and timeframes appended to the letter.

(2) It is denied that the 17.65% interest was granted "*in return for the assistance that Pentler (and the Pentler Principals) had provided and would provide in relation to what was described as the 'Simandou Iron Ore Project'*". The letter does not so provide.

(3) Further, according to Mr Noy's evidence in the Arbitration, and Mr

Tchelet's stated recollection of what he had been told by Mr Oron, the 17.65% interest was granted in order to reward the Pentler Principals for introducing the BSGR Group to Guinea and its mining opportunities generally.

(4)   While the letter recorded that success fees were payable for services rendered in connection with achieving certain milestones related to the "*Simandou Iron Ore Project*", it does not specify that they were payable for any services that had already been provided.

(5)   The services that were provided by Pentler and the Pentler Principals were in fact limited in their scope (bearing in mind that Mr Avidan did not regard those services as being provided by "*Pentler*" or the "*Pentler Principals*" as such, because he was not aware of Pentler at the relevant time). They (a) introduced the BSGR Group to Guinea (see paragraph 44.3(3) above); and (b) provided logistical and administrative assistance to Mr Struik (mainly through Mr Cilins) prior to the arrival of Mr Avidan in Guinea, and continued to provide similar services to the business for a short time after his arrival (see paragraph 37.2 above).

(6)   Further, neither Pentler nor the Pentler Principals provided assistance with respect to the grant of rights over SB1 and SB2 thereafter. Mr Avidan understands from Mr Struik that he understood the benefits provided under the agreement in substance to be by way of a finder's fee for the Pentler Principals' introduction of the BSGR Group to Guinea.

(7)   Save as set out above, paragraph 51.1 is admitted.

44.4.   As to paragraph 51.2:

(1)   Mr Avidan had no involvement in and has no direct knowledge of the making of any of the three agreements. He pleads to them below on the basis of the documents and the evidence in the Arbitration. He will also refer to them at trial for their full terms, meaning and effect.

(2)   Any insinuation by the words "*in turn*" as to a causal connection

33

between the BSGR-Pentler Milestone Agreement and the agreements pleaded in the sub-paragraphs is not admitted.

44.5.   As to paragraphs 51.2(a) and (b):

(1)   The existence of the documents identified in paragraphs 51.2(a) and (b) is admitted. Their validity or legal effect is not admitted. All references to the Pentler-Bah Agreement and the Pentler-Daou Agreement (including admissions or non-admissions in respect thereof) are subject to the foregoing non-admission.

(2)   Those documents provided for payment, upon certain milestones being achieved, "*for their services, counsel, and assistance in the development of a project for the exploration and exploitation of the SIMANDOU iron deposit in which Pentler … is participating*", with the project stated to be split into two stages, the first concerning Simandou North and South and the second SB1 and SB2.

(3)   Mr Avidan understands from Mr Noy's evidence in the Arbitration that the purpose of these agreements was for Pentler to reward Mr Bah, Mr Daou and Mr IS Touré for introductions that they had made and as payment for assistance provided to Pentler on the ground in Guinea, not for the purposes alleged at paragraph 50.

44.6.   As to paragraph 51.2(c):

(1)   It is admitted that there is a memorandum of understanding dated 20 February 2006, apparently concluded by Pentler and Mme Touré. Its validity or legal effect is not admitted. All references to the Touré MoU (including admissions or non-admissions in respect thereof) are subject to the foregoing non-admission.

(2)   The Touré MoU purported to provide that Mme Touré *might* receive a 33.3% interest in Pentler, upon (a) the establishment of a partially state-owned company to develop and exploit part of the Simandou iron ore deposits, and (b) that company being awarded "*the mining rights for the operation of the mining area of SIMANDOU*".

(3)     It is not admitted whether these are "*the same mining rights*" which were the subject of the Pentler-Bah and Pentler-Daou Agreements.

(4)     It is admitted that, insofar as Pentler held a 17.65% interest in BSGR BVI at the time of transfer, such an interest would roughly equate to a 5% indirect interest in BSGR BVI (in fact around 5.88%).

(5)     It is denied that the document provided for this interest to be transferred to Mme Touré "*in connection with her assistance in obtaining the same mining licences*". Rather, it merely described Mme Touré as a "*local partner*" and provided for transfer upon the conditions specified above.

(6)     Further, Mr Avidan understands from Mr Noy's evidence in the Arbitration, and also from Mr Struik in the case of paragraph (c) below, that:

     (a)     Mme Touré never in fact received an interest in Pentler, nor did she ever become entitled to one under the Touré MoU since the conditions precedent were never met.

     (b)     The Touré MoU was entered into by Pentler at the behest of Mr Bah and Mr IS Touré. Pentler had originally envisaged granting a shareholding to them in Pentler for the same reasons as the milestone agreement, but they requested that their shareholding be given to Mme Touré instead. Pentler considered this to be a matter for them, and so agreed to do this.

     (c)     Mme Touré had no involvement in the granting of exploration permits to the BSGR Group in February 2006 or in the negotiation or signing of the February 2006 MoU.

(7)     Save as set out above, paragraph 51.2(c) is denied.

44.7.  As to paragraph 51.3:

(1)     The first sentence is admitted.

(2)     Subject to paragraphs 44.5 and 44.6 above, the second sentence of the opening paragraph and paragraphs 51.3(a) to (c) are admitted.

(3)     As to paragraph 51.3(d):

(a)     The first sentence is not admitted.

(b)     The second sentence is insufficiently particularised and is denied. Mr Avidan understands from Mr Struik and Mr Tchelet that, to their knowledge, no such payment was made or procured to be made by BSGR BVI, whether to Pentler, Mr Bah, Mr IS Touré or Mr Daou.

(c)     Further (i) Mr Noy's evidence in the Arbitration refers to Pentler having made payment of US$425,000 to Mr Bah and Mr IS Touré; and (ii) Mr Avidan understands from Mr Struik that the allegation (made by Mr Bah) of a payment made in cash (by Mr Oron in the presence of Mr Struik) is false and was fabricated years after the event to extort money from the BSGR Group.

44.8.   Save that the Claimants have not accurately quoted from the BSGR-Pentler Services Agreement (in that the agreement in fact provided for Pentler to offer BSG MM "*its deal flow in the mining, infrastructure, engineering and telecommunications sector*" (not just its "*deal flow in the mining sector*")), paragraph 51.4 is admitted. This provision in the BSGR-Pentler Services Agreement accurately reflected the fact that the relationship between the BSGR Group and Pentler was not intended to be limited to mining in Guinea. Pentler and the Pentler Principals would and did, from time to time, advise the BSGR Group of other opportunities (including mining opportunities in other African countries).

44.9.   Save that it is not admitted that payment was made on 6 March 2006, paragraph 51.5 is admitted. Mr Avidan understands from Mr Tchelet that this payment was approved by Mr Oron and made on his instructions, and that, as Mr Oron told Mr Tchelet, the invoices were rendered in respect of costs incurred by the Pentler Principals in procuring local legal advice and organising the logistics of the negotiations on behalf of the BSGR Group.

44.10. As to paragraph 51.6:

    (1)    The first sentence is admitted.

    (2)    As to the second sentence, it is admitted that Pentler did not transfer 33.3% of its shares to Mme Touré pursuant to the Touré MoU.

    (3)    The allegation that Pentler and the Pentler Principals "*treated Mme Touré as holding such shares*" or as entitled to a shareholding is too vague properly to be answered.  Pending proper particulars, it is not admitted. According to the terms of the Touré MoU itself, she did not become entitled to a shareholding at any time.

    (4)    The third sentence is admitted.

44.11. As to paragraph 51.7:

    (1)    A company related to BSGR (BSGR Treasury) but not BSGR itself paid Pentler (for the benefit of the Pentler Principals) the sum of US$250,000 in May 2006. This was by way of a payment to one of the Pentler Principals' associated companies, FMA International Trading.

    (2)    It is admitted that the fee was stated in the invoice raised by FMA to be for "*assistance and consulting for the acceptance of bauxite permits in Republic of Guinea*". Mr Avidan understands from Mr Struik that that description was incorrect.

    (3)    Mr Avidan understands from Mr Struik that the fee was in fact part of a milestone and reward payment made to Pentler under the BSGR-Pentler Milestone Agreement, and therefore related to the BSGR Group's introduction to Guinea generally, rather than being related to any specific work by Pentler related to bauxite permits or the Simandou iron ore project.

    (4)    It is not understood what "*work on the Simandou iron ore project*" the Claimants allege that the Pentler Principals did. The limited work they actually carried out for the BSGR Group beyond the introduction they made is set out above.

44.12. Save as set out above, paragraph 51 is denied.

45. The allegations made in paragraph 52 are largely repetitious of allegations made elsewhere in the Particulars of Claim and have been addressed by Mr Avidan above. Without prejudice to the foregoing:

45.1. As to the second sentence of paragraph 52.3, it is admitted that Mr Cilins received a monthly stipend of US$10,000 from about January 2006 to July 2006. This was payment for logistical and administrative assistance which Mr Cilins provided to Mr Struik in Guinea prior to the arrival of Mr Avidan.

45.2. Save as set out more generally above, paragraph 52 is denied.

46. Save that it is not admitted whether Matinda was owned or controlled by Mme Touré, paragraph 53 is denied. Further:

46.1. Mr Avidan did not sign the so-called 2008 Matinda Contracts. They are forgeries which have been used by Mme Touré in attempts to extort money from the BSGR Group. One such attempt was made by letter dated 8 June 2010 (a spurious claim that was unequivocally withdrawn on 23 June 2010).

46.2. Mr Avidan only became aware of the 2008 Matinda Contracts in June 2010 when Mme Touré made the extortion attempt referred to in the preceding sub-paragraph.

47. Paragraph 54 is admitted. Mr Avidan will refer to the Pentler SPA at trial for its full terms, meaning and effect.

48. Paragraph 55 is admitted.

49. As to paragraph 56:

49.1. The existence of the "*affidavit*" is admitted. It is further admitted that the "*affidavit*" included the contents set out by the Claimants. It is not admitted that the "*affidavit*" is authentic.

49.2. It is denied, if it be alleged, that the contents of the "*affidavit*" were true, or that there was any such agreement between "*BSGR*" or any BSGR Group entity and

Mme Touré. Indeed, the "*affidavit*" was subsequently invalidated and annulled at Matinda and Mme Touré's request on 8 June 2010 and 30 July 2010.

49.3.  Save as set out above, paragraph 56 is not admitted.

50.  As to paragraph 57:

50.1.  As to the purported reservation of rights in footnote 4, the Claimants have no rights to reserve save for the ordinary rights of any litigant to apply to amend a statement of case under the CPR, which rights are subject to strict rules relating to limitation.

50.2.  As to paragraph 57.1:

(1)  The existence of the Matilda Invoice is admitted. Its validity is not admitted.

(2)  At all material times, Mr Avidan had no knowledge of the Matilda Invoice or the underlying transaction between LMS and Matilda/Matinda, or whether and at what times Matilda & Co, Matinda or Mme Touré operated in the provision of heavy machinery or came to do so.

(3)  It is admitted (on the basis of a later invoice) that "*Matilda*" may have been a typographical error in spelling "*Matinda*". Mr Avidan understands that the invoice was issued to LMS.

50.3.  Paragraph 57.2 is admitted. Mr Avidan understands from Mr Tchelet that he emphasised the banking details to ensure that (a) no mistake was made, and (b) the sum of US$1.3 million was paid to the correct account. There was nothing wrong or improper in him doing so (and it is noted that the Claimants have not sought to allege that there was).

50.4.  Paragraph 57.3 is admitted, save that the payment was made by BSGR Treasury Services Limited, not BSG Capital Markets PCC.

50.5.  As to paragraph 57.4:

(1)     The first sentence is admitted. The invoice related to the sale of a generator for US$40,000 and Caterpillar equipment.

(2)     It is denied that the invoice was a "*sham*", or merely "*purported*" to be in respect of the stated items.

(3)     As to points (i) and (ii):

   (a)   It is denied that there was no sale of, or intention to sell, such machinery. In fact, Mr Boutros was the BSGR Group's main supplier in Guinea for machinery and various other equipment.

   (b)   Given the passage of time, Mr Avidan cannot recall what prompted this particular purchase. However, this type of machinery was generally required to clear debris and construct roads. At least 20 Caterpillar diggers and extractors had been acquired for use on BSGR ProjectCo's sites. Much of this earthmoving equipment was supplied by Mr Boutros/LMS, although he was not the project's only supplier.

   (c)   Mr Avidan placed an order for the machinery with Mr Boutros and Mr Boutros sourced it through his company LMS. Mr Boutros then requested urgent payment from the BSGR Group for the total sum of US$1.3 million for this machinery and a generator. Mr Avidan in turn asked the BSGR Group to make the payment, which it did. LMS duly invoiced the BSGR Group for this sale in the appropriate sum. This was a legitimate sale of earthmoving equipment which was needed, ordered, paid for, and delivered (probably to Zogota or SB2, Mr Avidan cannot now recall).

(4)     As to point (iii):

   (a)   It is admitted that the payment instruction was given the day before the invoice was provided and that the payment instruction described the payment as "*consulting fees*".

   (b)   It is denied that these facts indicate that the invoice was a sham or

(if it is alleged) that any wrongdoing occurred or was known by Mr Avidan to have occurred.

(c) As for the timing of the invoice and the payment although it was typical for documentation to be provided prior to payment, that was not an invariable practice. Mr Avidan would from time to time contact Mr Tchelet to arrange payment before an invoice was rendered. However, supporting documentation would be provided afterward (as occurred in this case).

(d) It was not uncommon that equipment would need to be purchased urgently so that it could be transported to the relevant site with a particular shipment. There would be a significant cost to the project if work was unable to be done because the necessary equipment was not in hand, and it was part of Mr Avidan's job to prevent such a situation from arising. Such urgency could also arise because Mr Avidan was only in Conakry for a short time (much of his time being spent in the field). He would therefore need to purchase important equipment, and organise payment, at pace. It was for these reasons that he would sometimes ask for a payment to be approved on the basis of a quote agreed with the relevant supplier (principally LMS) with an invoice to follow.

(e) As for the description in the payment instruction, Mr Avidan understands from Mr Tchelet that this was a generic description, only used due to the lack of documentation. LMS and Mr Boutros were, and were known to the BSGR Group (and Mr Avidan) as, among other things, a supplier of earthworks and construction services to the project in Guinea. Mr Avidan's awareness of Mr Boutros and LMS are as set out at paragraph 29.1 above.

(5) Save as set out above, paragraph 57.4 is admitted.

50.6. Paragraph 57.5 is not admitted.

50.7. As to paragraph 57.6, the existence of the further invoice is admitted. Its validity

is not admitted. Paragraph 50.2(2) above is repeated, making changes where necessary and appropriate.

50.8. As to paragraph 57.7:

    (1)    It is admitted that Mr Boutros issued instructions to his bank on 3 September 2009 for the payment of the US$998,000 to Mme Touré. It is not admitted that the account to which payment was to be made was her "*personal account*".

    (2)    The second sentence is not admitted.

    (3)    The third sentence is admitted.

50.9. Save as set out above, paragraph 57 is not admitted.

51.    The allegations made in paragraph 58 are essentially repetitious of allegations made elsewhere in the Particulars of Claim and have been addressed by Mr Avidan above. Accordingly, save as set out more generally above, paragraph 58 is denied.

### SECTION D: 2009/10: HOW THE MINING LICENCES WERE CONFIRMED FOLLOWING PRESIDENT CONTÉ'S DEATH

<u>The Mining Licences are confirmed and renewed</u>

52.    As to paragraph 59:

52.1. Save that the 10 June 2009 decision did not "*extend the period of validity of certain parts of the North and South Permits*", paragraph 59.1 is admitted. By that decision the North and South Permits were renewed, in accordance with the 1995 Mining Code, on BSGR ProjectCo's application. The company was required to give up (or "retrocede") 50% of its area.

52.2. As to paragraph 59.2:

    (1)    Save that the Base Convention was in fact signed on 16 December by Mr Struik, Mr Avidan and Mr Thiam, the first and third sentences are admitted.

> (2)     The second sentence of paragraph 59.2 is admitted as containing a broad summary of certain terms of the Base Convention. Mr Avidan will refer to the Base Convention at trial for its full terms, meaning and effect.

52.3.  Paragraph 59.3 is admitted.

53.   Paragraph 60 is noted.

Allegation that Mr Thiam acted for and was paid by the BSGR Group

54.   Save that it is admitted that Mr Thiam resigned as Minister of Mines on 22 December 2010, paragraph 61 is denied. Mr Thiam did not act as a consultant, adviser, intermediary and/or representative to the BSGR Group as alleged or at all. He was not promised or paid anything by the BSGR Group in return for any "*assistance*".

55.   As to paragraph 62:

55.1.  It is denied that the matters set out in paragraph 62 support the allegations made by the Claimants in paragraph 61 (which are denied above).

55.2.  Paragraph 62.1 is admitted. Mr Avidan understands from Mr Thiam's evidence in the Arbitration that Mr Thiam met with a number of mining companies prior to his appointment as Minister of Mines in January 2009. He was, at that time, unfamiliar with the BSGR Group and the BSGR Group did not pay for Mr Thiam's flight. In any event, the meeting with the BSGR Group did not proceed because Mr Thiam fell ill. See paragraph 55.7(6) below.

55.3.  Paragraphs 62.2 to 62.4 are admitted.

55.4.  As to paragraph 62.5:

> (1)     The first sentence is admitted.

> (2)     Save that it is admitted that Lansana Kouyaté is a former Prime Minister of Guinea, the second sentence is not admitted.

> (3)     The third sentence is too vague properly to be answered (in that certain matters are said to be evidenced by unspecified emails and the precise

form of assistance said to have been given by Mr Thiam is unclear). Pending proper particulars, it is denied. Without prejudice to the foregoing:

(a)    As to point (i), it is admitted that Mr Thiam wrote a letter to the LIA's chairman Saif Gaddafi on 8 June 2009 in which he confirmed that the BSGR Group held permits and that "*BSGR's exploration permits do not fall into the category of concessions subject to review*". The letter did not refer expressly to the validity of the permits. Similarly, President Camara wrote a letter to Mr Gaddafi on the same date assuring him that Libyan investment in Guinea was invited and encouraged.

(b)    It is admitted that Mr Thiam's letter (like the President's letter) was intended to assist BSGR in its discussions with the LIA. These were ordinary actions by pro-active political leaders seeking to encourage investment in their country.

(c)    As to point (ii), it is admitted that Mr Thiam met with the chairman of the LIA. However, Mr Avidan understands from Mr Thiam's evidence in the Arbitration that that meeting took place in Libya, not London. It is understood that the purpose of the meeting was to reassure the chairman that the GoG was supportive of Libyan investment (i.e. such investment generally, not specifically in relation to BSGR). It is not admitted that Mr Thiam reiterated the points made in his letter.

(4)    As to the fourth sentence, it is denied that Mr Thiam took steps (i) or (if he took it) (ii), or any other steps which were of assistance to the BSGR Group, because he was acting as the BSGR Group's consultant, adviser, intermediary and/or representative. He acted solely on behalf of the GoG in his capacity as the Minister of Mines. The allegation that "*the content of the emails passing between Thiam and Steinmetz*" is consistent only with Mr Thiam having acted on behalf of the BSGR Group is

embarrassing for want of particularity. Pending proper particulars, it is denied.

(5)     Save as set out above, paragraph 62.5 is denied.

55.5.  As to paragraph 62.6, paragraph 52.1 above is repeated.

55.6.  Save that it is admitted that Mr Thiam met with representatives of the CIC in Beijing in July 2009, paragraph 62.7 is not admitted.

55.7.  As to paragraph 62.8:

(1)     It is admitted that Mr Thiam travelled to Israel and Hong Kong in September 2009 and that the BSGR Group paid for his flights on around 25 November 2009.

(2)     It is denied that in September 2009 BSGR was involved in negotiations with CIC or Baosteel. It was involved in negotiations at that time with Chinalco. Negotiations with Baosteel began only in around December 2009 when the Chinalco negotiations fell through.

(3)     It is denied that (a) Mr Thiam's travel to Israel, or (b) the BSGR Group's payment for his flight, was for the purpose of Mr Thiam "*attend[ing] and/or assist[ing] with*" negotiations in which the BSGR Group was involved. Mr Avidan understands from Mr Steinmetz's Defence that the purpose of Mr Thiam's visit to Israel was to attend Mr Steinmetz's daughter's wedding.

(4)     It is not admitted that (a) Mr Thiam's travel to Hong Kong, or (b) the BSGR Group's payment for his flight, was for the purpose of Mr Thiam "*attend[ing] and/or assist[ing] with*" negotiations in which the BSGR Group was involved.

(5)     In any event, even if that is what occurred (which is denied in respect of Israel and not admitted in respect of Hong Kong), this would not have

45

been improper. The GoG was likely to play a key role in the project going forward (as any potential joint venture partner would appreciate). The Minister of Mines' presence at such negotiations would serve a useful and proper purpose.

(6)     Further, the BSGR Group did not pay for Mr Thiam's flights in return for "*assistance*" to be provided in connection with the Mining Licences. It was standard (and a legitimate) practice for mining companies at times to pay for the flights of ministers and other GoG officials when they were invited to attend events abroad. In any event, there is no basis for the allegation that covering the cost of Mr Thiam's flights was in any way a quid pro quo for corrupt assistance in relation to the grant, validation or extension of valuable mining rights, and none is pleaded.

55.8.  Paragraph 62.9 is admitted.

55.9.  As to paragraph 62.10:

(1)     As to the first sentence, it is denied that negotiation of the Base Convention began on around 2 December 2009. The committee was formally created by way of a decree made by Mr Thiam as the Minister of Mines dated 1 December 2009. However, negotiation of the Base Convention started around the time that the feasibility study was submitted in November 2009.

(2)     Negotiations between the BSGR Group and the GoG lasted until 16 December 2009, when the Base Convention was signed by the BSGR Group and Mr Thiam, as set out in paragraph 52.2 above. Between 16 December 2009 and 21 December 2009, pending the final signature of Captain Sandé, the finance minister, the fate of the Base Convention was to some extent uncertain and the GoG continued to scrutinise and debate the matter internally. Ultimately, on 21 December 2009, Captain Sandé added his signature to the agreed Base Convention. Mr Avidan does not now recall the details, but believes that some relatively minor

open details were also addressed during this period, and were likely to have been dealt with in annexures.

(3)    As to the second sentence, it is admitted that on 2 December 2009, the first day after the Commission's formal establishment, Mr Thiam gave an introductory address and then left the proceedings. Mr Thiam periodically checked on the progress of negotiations, and ultimately signed the Base Convention as set out above, but had limited substantive involvement in the negotiations over its terms. This sentence is otherwise denied.

(4)    The third sentence is denied for the reasons set out below in relation to paragraphs 62.10(a) to (c).

(5)    The fourth sentence is not admitted.

(6)    As to paragraph 62.10(a):

(a)    The first four sentences are admitted as a broad and partial summary of the email exchange. As to the footnote, it is not admitted who "*sacko*" was.

(b)    The final sentence is denied. This email exchange discloses no more than a political disagreement within the GoG about the detail of the Base Convention. Some within the GoG favoured the agreement and some were opposed to it. This email does not show that Mr Thiam took a position on behalf of, or to assist, the BSGR Group "*against*" the GoG or its interests. A political office holder may support a development, or disagree with a colleague about its terms or implementation, without acting on behalf of the proponent, let alone being its "*consultant, adviser, intermediary and/or representative*".

(c)    Mr Avidan cannot now recall this email exchange. He expects that he was copied into it as a courtesy, merely for his information.

(7)    As to paragraph 62.10(b):

(a)    It is admitted that Mr Kalil sent Mr Thiam an email on 18 December 2009 (copying in Mr Baila Ly) with the subject line "*Zogota Convention*". The email provided a report from an extraordinary Council of Ministers on the Base Convention. It is not admitted that this comprised an explanation of the day's developments. It is also not admitted that the email purported to set out "*proposals that had been made on behalf of the GoG*", or if it did, the nature or status of such proposals. Insofar as this description is intended to suggest that there was a single or settled viewpoint held by the GoG as a whole at that point, rather than (as was in fact the case) that the Base Convention was the subject of ongoing internal debate, it is denied. The email purports only to set out "*points that came up*" at the Council.

(b)    The second sentence is admitted.

(c)    The third sentence is denied. There is no basis for the suggestion that Mr Kalil, himself part of the GoG, was seeking the "*assistance*" of Mr Thiam, likewise part of the GoG, "*in negotiating against the GoG*". As explained in paragraph 55.9(2) above, the Base Convention continued to be debated internally pending Captain Sandé's signature. This email shows no more than that Mr Kalil kept Mr Thiam, the Minister of Mines who had already signed the Convention, informed of what had happened, and sought his feedback. That is entirely unexceptional.

(d)    The fourth sentence is denied. The other allegations in paragraph 62 are addressed elsewhere. Those matters and this email do not support the inference that Mr Thiam provided the BSGR Group with assistance in negotiating "*against*" the GoG.

(8)    As to paragraph 62.10(c):

(a)  As to the first sentence, it is admitted that on 19 December 2009 Mr Baila Ly sent an email to Mr Thiam referring to an upcoming meeting to discuss a "*non sens request to the investor*" and stating that he would call Mr Thiam during the meeting. Save that it is denied, if it is alleged, that this email shows that Mr Baila Ly or Mr Thiam were "*assisting*" the BSGR Group, the first sentence is otherwise not admitted.

(b)  The second and third sentences are admitted. For the avoidance of doubt, it is not admitted that there was any causal link between the date of Captain Sandé's signature and the continued discussion of the Base Convention. As set out above, the agreement was signed on behalf of the BSGR Group and by the principal minister responsible, Mr Thiam, on Wednesday 16 December 2009. Captain Sandé was due to sign after Mr Thiam did. He did so on Monday 21 December 2009. This was at a time when there had recently been an attempt on the life of President Camara and the usual business of government was disrupted.

(c)  The fourth sentence is denied. Mr Thiam's reply does not disclose or indicate the provision of assistance to the BSGR Group. His email was no more than an update about what was happening.

(d)  Mr Avidan cannot now recall this email exchange. He expects that he was copied into it as a courtesy, merely for his information.

55.10. Paragraph 62.11 is admitted. The fact that Mr Struik and Mr Steinmetz were pleased with Mr Thiam's re-appointment does not indicate any impropriety. Mr Thiam was a Minister with whom the BSGR Group had developed a constructive working relationship. The appointment of a new Minister could have caused delay to the project or jeopardised it.

55.11. As to paragraph 62.12:

(1)  The matters alleged in points (i) to (iii) are admitted.

49

(2)     It is denied that, by reason of those matters, Mr Thiam can fairly be described as having "*assisted*" the BSGR Group's negotiations with Vale in connection with the JVA, save in the sense of providing the sort of straightforward confirmation one might expect to be provided by a diligent and competent Minister upon request by a major company investing in the country to help facilitate substantial further investment.

(3)     Mr Thiam acted on behalf of the GoG in his capacity as Minister of Mines throughout. He was not acting on behalf of the BSGR Group.

55.12. As to paragraph 62.13:

(1)     It is admitted that Mr N'Diyae sent Mr Thiam an email on 26 March 2010 which referred to private radio stations and asking Mr Avidan for "*support*" and "*to help us get a budget*". The Claimants' summary of the effect of that email is not admitted. Further:

(a)     It is not clear, and not admitted, who Mr N'Diaye was, or what he was suggesting Mr Thiam might ask Mr Avidan to provide. Mr Avidan believes that he was a journalist.

(b)     There was no reply to the email, and the Claimants do not allege that it was acted on by Mr Thiam.

(c)     Mr Avidan did not receive a request from Mr Thiam in relation to private radio stations at around this time or at all. In all the circumstances, it is to be inferred that whatever the request was, in the event, Mr Thiam did not act on it. It is denied that the email supports the allegation the Claimants make at paragraph 61.

(2)     As to paragraph 62.14:

(a)     The existence of the letter dated 25 June 2010, and the fact that Mr Thiam sent it to Mr Steinmetz on 26 June 2010, are admitted. It is denied that the letter was marked as "*confidential*". It was not.

(b)   Paragraph 62.14 is otherwise not admitted. Mr Avidan has no recollection of receiving or reading the alleged second letter, and the Claimants have failed to provide a copy of it.

(c)   It is denied, if it is alleged, that there was any impropriety in Mr Thiam sharing this information in the way he did. Indeed, Rio Tinto's efforts to win back SB1 and SB2 were of legitimate interest to both the BSGR Group (which now held the rights in relation to those blocks) and the GoG.

55.13. As to paragraph 62.15:

(1)   It is admitted that the BSGR Group made a payment of US$5 million on around 15 November 2010.

(2)   It is denied that the payment was made for Mr Thiam's benefit. In fact, according to reports prepared by BSGR and Mr Struik the payment was made to CCS in the following circumstances:

(a)   As at November 2010, CCS held three coal prospecting licences in the well-known coal district of Moatize in the Tete Province, Mozambique.

(b)   On 13 November 2010, BSGR and CCS entered into a non-disclosure agreement whereby BSGR was granted a 60-day period of exclusivity (extendable by 30 days) within which to, among other things, carry out due diligence. In return, BSGR was to pay CCS the initial sum of US$5 million.

(c)   This was regarded as a significant opportunity by BSGR. It sent a team of experts to the site between 22 and 25 November 2010 to conduct the said due diligence. In the event, the team's report was unfavourable and the project did not proceed.

(3)   The second sentence is not admitted.

(4)     As to the fourth sentence, it is denied that the BSGR Group and Mr Thiam wanted to disguise a payment of US$5 million. As to point (i), payment was made to CCS, not purportedly to CCS. The matters alleged at points (ii) and (iii) are not admitted.

(5)     The fifth and sixth sentences are not admitted.

(6)     Save as set out above, paragraph 62.15 is denied.

55.14. Paragraph 62.16 is not admitted.

55.15. As to paragraph 62.17, paragraphs 30.3(2) and 30.3(3) above are repeated.

## SECTION E: THE JVA AND SHA

**E1    Introduction**

56.    Paragraph 63 is admitted.

57.    Mr Avidan pleads to paragraph 64 on the basis of information from Mr Struik:

57.1.  It is admitted that Mr Struik encountered Eduardo Etchart ("**Mr Etchart**") at a mining conference in Cape Town in February 2010. It is denied that Mr Struik approached Mr Etchart. In fact, it was Mr Etchart who enquired about the Simandou project.

57.2.  In the course of their conversation, Mr Struik told Mr Etchart, among other things, that:

(1)     BSGR ProjectCo had signed a Base Convention which allowed it to export iron ore mined from the Simandou region through Liberia;

(2)     BSGR ProjectCo had obtained a 25-year mining concession in respect of Zogota; and

(3)     Negotiations with the LIA, Chinalco and Baosteel had fallen through.

57.3.  Mr Etchart was interested in the whole project, particularly the right to export iron ore through Liberia. It was Mr Etchart who approached Mr Struik about a fortnight later, at which point he formally expressed Vale's interest in a joint venture.

57.4.  Save as set out above, paragraph 64 is denied.

58.  Paragraphs 65 and 66 are admitted.

59.  Paragraph 67 is admitted save that:

59.1.  It is denied that Clifford Chance conducted "*in-depth*" due diligence. The due diligence was demand-led by Vale and, in the light of Vale's desire to conclude the deal quickly, performed in little over a month. See paragraphs 163 to 169 below.

59.2.  The final sentence is denied, for the reasons set out below.

**E2   The Alleged Representations**

(1)   The Initial DD Questionnaire

60.  Paragraph 68 is admitted (save that Ms dos Santos' title at that time was Associate General Counsel, not Deputy General Counsel).

61.  Paragraph 69 is admitted as containing a broad summary of some of the provisions of the Initial DD Questionnaire and the responses thereto save that:

61.1.  It is denied that the Initial DD Questionnaire "*defined*" UBOs as alleged in paragraph 69.5. Rather, that term was defined to mean "*an individual or entity that, directly or indirectly, ultimately owns or controls or has a right to receive the financial benefit of an equity interest in the BSG Group*". It is not admitted whether any of the alleged persons answered that description.

61.2.  The precise scope of the enquiries and review conducted by Mr Clark (referred

to in paragraph 69.6) is not admitted.

61.3.  Mr Avidan will refer to the Initial DD Questionnaire and the responses thereto at trial for their full terms, meaning and effect.

62.  As to paragraph 70:

62.1.  Paragraph 70.1 is denied. The relevant representation was as follows:

**Question**: "*In connection with the Simandou Project or Project Hill, has the BSG Group, or to its knowledge after reasonable inquiry any of its Personnel [defined to mean its officers and directors], shareholders or UBOs, either directly or indirectly, including through a third party, made, authorized or promised any payments or benefits to any Government Officials …?*"

**Answer**:  "*None whatsoever*"

62.2.  Paragraph 70.2 is admitted.

62.3.  Paragraph 70.3 is denied. The relevant representations were as follows:

**Question**: "*Please identify any consultants, representatives, agents, brokers, or other intermediaries (collectively, "Consultants") retained by or acting on behalf of the BSG Group (directly or indirectly) in connection with the Simandou Project or Project Hill (if any) …*".

**Answer**:  The answer did not identify Pentler, the Pentler Principals, Mr Thiam, Mr Boutros or LMS. (It did not need to do so given that it related <u>solely</u> to the position as at the date of the submission of the Questionnaire.)

**Question**: "*Please indicate if the BSG Group used any intermediaries to interact with the Government of Guinea in relation to BSG Group's efforts to obtain the Concessions …*"

**Answer**:  "*BSGR Guinea obtained all its exploration concessions through formal application in writing. BSGR Guinea did not use any intermediary in its application process nor during any further discussions with the CPDM, which is the technical department of the Ministry of Mines, responsible for adjudicating the applications and final awarding of the exploration licences to the successful party.*"

63.  As to paragraph 71:

63.1.  Insofar as paragraph 71 and its sub-paragraphs are addressed to or concern Mr

Avidan, and save as set out below, paragraph 71 is denied. Insofar as they are addressed to or concern other Defendants, Mr Avidan does not plead to them.

63.2. It is denied that the matters identified in paragraphs 71.1 to 71.11 (even if true) support the averrals made by the Claimants in the first sentence of paragraph 71.

63.3. As to point (i) in paragraph 71, Mr Avidan did not approve or adopt (whether "*manifestly*" (whatever that may mean) or otherwise) any of the representations identified by the Claimants in paragraph 70 or in the Initial DD Questionnaire.

63.4. As to point (ii) in paragraph 71:

(1)     The allegation as to the assistance Mr Avidan is alleged to have provided is embarrassingly vague. Mr Avidan's involvement in completing the Initial DD Questionnaire was limited to responding to Mr Tchelet's requests for information. Mr Tchelet collated the information that Mr Avidan provided to him, together with information provided by others, and drafted the responses to the Initial DD Questionnaire.

(2)     Mr Avidan cannot recall precisely what information was requested by, or provided to, Mr Tchelet. However, that information would have been limited to matters within his own knowledge and expertise, and in particular to operational information about the project (such as budgets, inventory, staff, security, suppliers, the environment and basic information about current drilling progress).

(3)     It is admitted that this amounted to the provision of more than "*trivial*" assistance, but denied that such assistance was provided in any way "*pursuant to a common design that fraudulent misstatements be made to Vale*".

63.5. As to paragraph 71.2, the position held by Mr Avidan "*within*" the BSGR Group was Director of Operations in Guinea (or 'country manager'). He was responsible for the day-to-day management of the Group's business in that

country, including the Simandou project. However, it is denied that, by reason of this position, Mr Avidan should be taken to have approved and adopted every representation made in a document which had several contributors and was drafted and signed by somebody else, or that he thereby participated in a common design to defraud Vale.

63.6.  As to paragraph 71.3:

   (1)   Paragraph 71.3 is embarrassingly vague as to the nature of the specific enquiries made of Mr Avidan, and does not allege that Mr Avidan provided any information in response.

   (2)   Without prejudice to the foregoing, it is admitted that enquiries were made of Mr Avidan. Several people contributed information to the Initial DD Questionnaire and Mr Avidan had no involvement in, or oversight of, its drafting or finalisation. Mr Avidan's role in responding to it was as set out above.

63.7.  As to paragraph 71.8:

   (1)   The subjective allegation that Mr Avidan was (and the other Defendants were) "*closely involved*" in the negotiation of the JVA and SHA is embarrassingly vague. Pending further particulars, it is. not admitted.

   (2)   Mr Avidan supported the negotiation of the JVA/SHA by providing information within his knowledge and expertise to the BSGR Group as and when required for the purpose of the due diligence exercise. Further, due to his detailed first-hand knowledge of the project, Mr Avidan attended a significant number of meetings where the terms of the deal were discussed, and he provided information and logistical assistance as needed. He occasionally participated in the discussions as to the terms themselves to assist with details and suggest solutions when issues arose. However, the deal itself was being negotiated by others, including Mr Steinmetz, with advice from internal lawyer David Barnett and Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**"),

and subject to board approvals. Mr Avidan's role does not support the conclusion that he adopted or approved the contents of the Initial DD Questionnaire ("*manifestly*" or otherwise) or participated in a common design to defraud Vale.

63.8.  Paragraph 71.10(i) is admitted as a broad summary of the effect of section 1.8 of the JVA, but the relevance of this fact for the purposes of the allegations in paragraph 71 is denied. The attribution of Mr Avidan's "*awareness*" to BSGR for the purpose of the subsequently executed JVA has no bearing on whether he adopted or approved the contents of a different, earlier document, or whether he dishonestly made false representations or participated in a common design to defraud Vale.

63.9.  Paragraph 71.10(iii) is admitted, but the relevance of this fact for the purposes of the allegations in paragraph 71 is denied. Mr Avidan's subsequent attendance at the FCPA Interview does not support the conclusion that he adopted or approved the contents of the Initial DD Questionnaire ("*manifestly*" or otherwise) or participated in a common design to defraud Vale. On the contrary, the fact that Mr Avidan, Mr Struik and Mr Tchelet all attended this interview supports the opposite conclusion. No one of them could speak to every aspect of the company's affairs, nor did any of them purport to do so.

63.10. As to paragraph 71.10(iv), paragraphs 21.3 to 21.4 above are repeated.

63.11. Paragraph 71.11 is denied. No such inference is to be drawn. The "*Defendants*" did not all discuss and agree upon the answers to be given in the Initial DD Questionnaire. The process by which that questionnaire was completed is explained above, and involved information being sourced and collated from different persons according to their knowledge and expertise. In any event, even if they did so, this vague and general allegation does not support the allegation that the Defendants were participating in a common design to defraud Vale.

(2)   Supplemental DD Questionnaire

64.   Save that the email referred to is not admitted, paragraphs 72 and 73 are admitted.

65.    As to paragraph 74:

    65.1.    The first sentence is denied. On 31 March 2010, BSGR transferred its shareholding in BSGR Steel to BSG Metals and Mining Ltd, not to Nysco.

    65.2.    The second sentence is admitted (save that is it is not admitted, if it is alleged, that the alleged effect was the only effect of the 31 March 2010 Restructuring).

    65.3.    Insofar as paragraph 74 and its sub-paragraphs are addressed to or concern Mr Avidan, and save as set out below, paragraph 74 is denied. Insofar as they are addressed to or concern other Defendants, they are not admitted.

    65.4.    Mr Avidan was not involved in, and at all material times had no knowledge of, the 31 March 2010 Restructuring.  It is accordingly denied that the restructuring was done because he did not want to disclose those matters alleged. Mr Avidan only learned of the restructure in the course of the Arbitration.

    65.5.    As to paragraphs 74.1 to 74.4, paragraphs 44.3, 44.6, 44.7 and 47 above are repeated.

66.    As to paragraph 75, insofar as it is addressed to Mr Avidan, it is denied that the 31 March 2010 Restructuring was carried out with his assistance or knowledge, or that he acted in any way for the reasons alleged. Paragraph 65.4 above is repeated. No admissions are otherwise made.

67.    As to paragraph 76, the first and second sentences are admitted, save that the precise scope of the enquiries and review conducted by Mr Clark is not admitted. Mr Avidan will also refer to the Supplemental DD Questionnaire at trial for its full terms, meaning and effect.

68.    As to paragraphs 77:

    68.1.    As to the opening sentence, it is admitted that the completed Supplemental DD Questionnaire did not identify the 31 March 2010 Restructuring. It is denied that it "*concealed*" it. The Questionnaire did not require the disclosure of the

restructuring.

68.2. It is admitted that the Supplemental DD Questionnaire contained in substance the representation alleged in paragraph 77.1. As the language of the Questionnaire makes clear, this related to the position as at the date the Supplemental DD Questionnaire was completed, not at any other time. The full text of the relevant request (so far as relevant) was as follows: "*Please identify the entire local advisory team, including counsel, public relations advisors and lobbyists, retained by or acting on behalf of the BSG Group (directly or indirectly) in connection with the Simandou Project, Project Hills or the Liberian Project (collectively, "**Consultants**") (if any).*"

68.3. It is denied that the Supplemental DD Questionnaire contained the representation alleged in paragraph 77.2. The relevant representation was as follows:

**Question**:"*In connection with … Project Hills, has NYSCO Management Corp, Onyx Financial Advisors or the BSG Group, or to its knowledge after reasonable inquiry any of its Personnel [defined to mean its officers and directors], shareholders or UBOs, either directly or indirectly, including through a third party, made, authorized or promised any payments or benefits to any Government Officials …?*"

**Answer**:   "*none whatsoever*".

69. As to paragraph 78:

69.1. As to the cross-reference to paragraph 71 in the first sentence, paragraph 63 above is repeated, making changes where necessary and appropriate.

69.2. Paragraph 78.1 is denied. Paragraphs 65 and 66 above are repeated.

69.3. Paragraphs 78.2, 78.3 and 78.4 are addressed to other Defendants and Mr Avidan does not plead to them.

(3)   The 8 April Representations

70. Paragraph 79 is admitted.

71.    As to paragraph 80:

71.1.  The first sentence is admitted.

71.2.  As to the second sentence, it is denied (if it is alleged) that all the Attendees made all of the representations alleged in paragraphs 80.1 to 80.3. Those paragraphs and the making of the representations are addressed below. Mr Avidan cannot now recall everything that was said at this meeting and pleads to these paragraphs on the basis of what he is now able to recall and what he understands to be the case from Mr Tchelet.

71.3.  Paragraph 80.1 is admitted.

71.4.  As to paragraph 80.2:

(1)     It is admitted that Mr Avidan made the statement in paragraph 80.2(i).

(2)     As to paragraph 80.2(ii):

(a)    Although Mr Avidan cannot recall precisely what he was asked, or what he said in response, he would not have suggested that Mr IS Touré was a "*consultant*" (because he was in fact an employee), or that Mr IS Touré was related to President Conté or his wife (because he was not, Mme Touré not in fact being the President's wife).

(b)    To the best of his recollection, Mr Avidan was not asked whether Mr IS Touré was related to President Conté or his wife. Rather, he was asked whether he was related to former President Touré, which he (correctly) denied.

71.5.  As to paragraph 80.3:

(1)     So far as they relate to Mr Avidan and Mr Tchelet, the opening line and sub-paragraphs 80.3.1 to 80.3.3 are admitted (in the latter case, on the

basis that Mr Tchelet has admitted the same). Mr Avidan made these statements (and would have been understood as making these statements) on the basis of his own knowledge, and he believed them to be true.

(2)     So far as they relate to Mr Struik and Mr Cramer, the opening line and sub-paragraphs 80.3.1 to 80.3.3 are not admitted. Mr Avidan cannot recall whether Mr Struik or Mr Cramer made these statements.

71.6.   As to paragraph 80.4, insofar as it is directed to Mr Avidan:

(1)     It is admitted (if it is alleged) that Mr Avidan did not seek to "*correct*" any of the representations made by the other Attendees. It is also admitted (if it is alleged) that Mr Avidan did not seek to "*disavow any knowledge of the matters referred to therein*".

(2)     This was because (i) so far as he knew, those statements were not false; (ii) he was not verifying and was not purporting to verify the statements of others by his mere presence and silence, particularly insofar as questions were directed at others rather than him; and (iii) it was not, and he did not understand it to be, incumbent upon him to explain to what extent he did or did not have knowledge concerning matters stated by other Attendees.

(3)     Mr Avidan's silence in relation to anything said by any other Attendee did not constitute a representation of any kind.

71.7.   Save as set out above, paragraph 80 is denied.

72.   As to paragraph 81:

72.1.   Insofar as the first sentence is addressed to or concerns Mr Avidan, it is denied. Insofar as it is addressed to other Defendants, Mr Avidan does not plead to it. As to the cross-reference to paragraph 78, paragraph 69 above is repeated, making changes where necessary and appropriate.

72.2. The first sentence of paragraph 81 simply repeats allegations made elsewhere in the Particulars of Claim that have been addressed by Mr Avidan above.

(1)   Paragraph 81.1 is addressed to other Defendants and Mr Avidan does not plead to it, save that it is denied (if it be alleged) that the "*others*" included Mr Avidan.

(2)   As to paragraph 81.2, the sequence of events is admitted, and it is admitted that the questions raised on each occasion covered similar themes. However, it is denied that each instance of questioning "*substantively replicated*" questions previously asked. There were fine, but not insignificant, variations in the precise wording of the questions asked.

(3)   In any event, it is denied that this matter supports or is capable of supporting the conclusion that every Attendee at the FCPA Interview (let alone those not attending) was responsible for everything said at that interview, regardless of who was asked about it, who said it, what it was about, or what he knew in relation to the relevant matter. Mr Avidan is only responsible for his own utterances and responses.

72.3. Save as set out above, paragraph 81 is denied.

(4)   Steinmetz ABL Certificate

73.   Paragraph 82 is admitted.

74.   As to paragraph 83:

74.1. It is denied that the Steinmetz ABL Certificate made the representations alleged. Mr Avidan will refer to the Steinmetz ABL Certificate at trial for its full terms, meaning and effect.

74.2. As to paragraph 83.1, the relevant representation was as follows:

"*In connection with the business of [BSGR Guernsey], and/or the transactions contemplated in the Joint Venture Framework Agreement, I have not and will not, directly or indirectly including through a third party:*

a.   *Pay, offer, promise, or authorize the payment of money or anything of value, to a Government Official … or to anyone else, while knowing or having reason to believe that any portion of such exchange is for the purpose of* [defined herein as "**Prohibited Purposes**"]:

   i.   *corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist [BSGR Guernsey] or any other person in obtaining or retaining business, or directing business to any third party;*

   ii.   *securing an improper advantage;*

   iii.   *corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Government Authority in order to assist [BSGR Guernsey] or any other person in obtaining or retaining business, or directing business to any third party; or*

   iv.   *providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s).*"

74.3.   As to paragraph 83.2, the relevant representation was as follows:

"*I do not know or have reason to believe that [BSGR Guernsey], its subsidiaries and affiliates or their respective officers, directors, employees, or anyone acting on their behalf, or any third party in connection with the business of [BSGR Guernsey] and/or the transactions contemplated in the Joint Venture Framework Agreement has paid or will pay, offer, promise, or authorize the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to believe that any portion of such exchange is for [a Prohibited Purpose].*"

75.   As to paragraph 84:

75.1.   Insofar as the first sentence is addressed to or concerns Mr Avidan, it is denied. Insofar as it is addressed to other defendants, Mr Avidan does not plead to it. As to the cross-reference to paragraph 81, paragraph 72 above is repeated, making changes where necessary and appropriate.

75.2.   Save to admit that the Steinmetz ABL Certificate was circulated in draft to Mr Cramer and Mr Tchelet, paragraph 84.1 is not admitted. The allegation that the Certificate was "*discussed*" at the FCPA Interview is embarrassingly vague. Mr Avidan does not recall whether the Certificate was discussed at all at the

interview. In any event, it is denied that Mr Avidan is or would be responsible for the contents of the Steinmetz ABL Certificate because (if that be the case) (a) he was present at a meeting when it was "*discussed*", or (b) someone else was sent a draft of it.

75.3. It is admitted that the Steinmetz ABL Certificate is referred to in the SHA. Mr Avidan does not recall having been aware of, let alone having seen, this document prior to the execution of the SHA. The allegation that the SHA "*was reviewed by all the Defendants*" is embarrassingly vague. Mr Avidan did not "*review*" the SHA at all. It was not his role to approve this document, nor did he have any input into its drafting (his role in its negotiation being as set out above). It is in any event denied that any knowledge of the existence of the Certificate on Mr Avidan's part would make him responsible for its contents.

75.4. Further, Mr Avidan is not, and cannot be, responsible for the representations contained in the Steinmetz ABL Certificate, in circumstances where they purport to have been made and were made explicitly by Mr Steinmetz, and related to Mr Steinmetz's conduct and state of knowledge. Mr Avidan did not purport to and did not seek to adopt or confirm that Certificate or any representation made therein as such. There is no reason why responsibility for them should be attributed to Mr Avidan.

(5)   The Clark ABL Certificate

76.   Paragraph 85 is admitted, save that it is not admitted (i) when a copy, or (ii) when or if the original, was delivered or provided to Vale.

77.   Paragraph 86 is denied. The relevant representation was as follows:

"*[I] do not know or have reason to believe that [BSGR] (or its subsidiaries and affiliates) or its directors, employees, or any person acting on their behalf, have paid or will pay, offer, promise, or authorize the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to believe that any portion of such exchange is for [a Prohibited Purpose].*"

78.   As to paragraph 87:

78.1.  Insofar as the first sentence is addressed to or concerns Mr Avidan, it is denied. Insofar as it is addressed to other defendants, Mr Avidan does not plead to it. As to the cross-reference to paragraph 84, paragraph 75 above is repeated, making changes where necessary and appropriate.

78.2.  As to paragraph 87.1, the allegation that the Clark ABL Certificate was "*reviewed*" by the First to Fifth Defendants prior to its execution is embarrassingly vague. So far as it concerns Mr Avidan, this paragraph is denied. Mr Avidan does not recall having been aware of this document at the time. He did not review it at all. It is in any event denied that any knowledge of the existence of the Certificate on Mr Avidan's part would make him responsible for its contents. Insofar as this paragraph concerns the other Defendants, Mr Avidan does not plead to it.

78.3.  Paragraph 87.2 is admitted. This knowledge is referred to in the context of a representation about what Mr Clark knew or had reason to believe. It is denied, if it is alleged, that the Clark ABL Certificate made every subsidiary, affiliate, director, employee or other person acting on behalf of BSGR responsible for Mr Clark's representations merely because their knowledge was referred to in that certificate. That is self-evidently not the case.

78.4.  As to paragraph 87.3, the first sentence and third sentences are admitted, and the second sentence is admitted as a broad summary of certain of the warranties in Schedule 4 to the JVA relating to bribery and corruption. None of these matters has any bearing on Mr Avidan's responsibility for the representations contained in the Clark ABL Certificate.

78.5.  Paragraph 87.4 is not admitted. None of these matters has any bearing on Mr Avidan's responsibility for the representations contained in the Clark ABL Certificate.

78.6.  It is denied that any of these matters render Mr Avidan responsible for the Clark ABL Certificate or any representations made therein. The Clark ABL Certificate was made explicitly by Mr Clark, and related to Mr Clark's state of knowledge

65

and understanding of that of others in the BSGR Group. Mr Avidan did not purport to and did not seek to adopt or confirm that certificate or any representation made in it. There is no reason why responsibility for such representations should be attributed to Mr Avidan.

(6)    Further London Meetings

79.    As to paragraph 88:

79.1.    The first and second sentences are admitted as a broad summary of the negotiations which took place in London.

79.2.    Save that it is admitted that Vale was represented by Mr Monteiro and Ms Chimisso (among other people) at most of the meetings that Mr Avidan attended, the third sentence is not admitted.

79.3.    The fourth sentence is embarrassingly vague and Mr Avidan is unable to plead to it, save to say that he, Mr Struik, Mr Tchelet and Mr Cramer were present at some, but not all, of the meetings which took place (albeit each was not present at all of the same the meetings).

79.4.    The fifth sentence is admitted.

79.5.    Mr Avidan is unable to plead to the sixth sentence of paragraph 88 and paragraphs 88.1, 88.2 and 88.3 because those allegations are embarrassingly vague. In particular:

(1)    As to the allegations made against Mr Avidan at paragraphs 88.1 and 88.3, those paragraphs fail to identify at which one or more of the many alleged meetings that took place over a decade ago the representations are alleged to have been made, what words were used and who else was present.

(2)    The allegations against Mr Tchelet, Mr Cramer and Mr Steinmetz paragraphs 88.1, 882. And 88.3 are similarly vague, and Mr Avidan is

unable to plead to them for the same reasons.

(3)     In the circumstances, the most Mr Avidan is able to state at present is that:

(a)     If (which he cannot recall) he had been asked about the matters identified in paragraphs 88.1 and 88.3, he would have made statements broadly to the effect alleged (since he believed those propositions to be true); and

(b)     He cannot recall Mr Tchelet, Mr Cramer or Mr Steinmetz making statements to the effect alleged in paragraphs 88.1, 88.2 and 88.3.

80.   Save as set out below, paragraph 89 is denied. Mr Avidan pleads to this paragraph on the basis of information from Mr Tchelet:

80.1.  It is not admitted what interactions, if any, Mr Monteiro had with Mr Cramer in Mr Tchelet's absence. With regard to Mr Monteiro's discussion with Mr Tchelet, what in fact happened was as follows.

80.2.  The data room established and maintained by Mr Tchelet for the purpose of due diligence contained BSGR's Consolidated Financial Statements for the year ending 31 December 2008 ("**2008 Financial Statements**") and BSGR Guernsey's Statement of Financial Affairs for the period ending 31 December 2009 ("**2009 Statement of Financial Affairs**").

80.3.  The 2008 Financial Statements contained the following statement under the heading '*Goodwill on acquisition of BSG Resources (Guinea) Limited: USD 22,000,000*':

"*In 2006 the Group acquired 82.35% of the unlisted share capital of BSG Resources (Guinea) Limited, a[n] iron ore exploration and mining company, registered in the British Virgin Islands and operating in Guinea. In March 2008, the Group acquired the remaining 17.65% equity interest in BSG Resources (Guinea) Limited it previously had not held, thereby increasing its interest to 100%. The total purchase consideration for this transaction was USD 22,000,000, creating goodwill of USD 22,000,000 as at*

*the date of the acquisition the non-controlling interest's proportionate share of the acquiree's identifiable net assets was USD NIL."*

80.4.   Under the heading 'Other Financial Liabilities', the 2008 Financial Statements said:

*"In March 2008, the Group entered into a Share Purchase Agreement (SPA) with a third party to acquire shares representing 17.65% of the issued share capital of BSGR Resources (Guinea) Limited. By the terms of this Agreement the total consideration for this acquisition was USD 22,000,000, of which USD 4,000,000 has been paid in 2008. The debt is unsecured and does not bear interest. In July 2009 the terms of the outstanding balance were renegotiated whereby USD 4,000,000 was repaid within 3 business days of the date of signature of the settlement agreement, which was signed in July 2009. USD 5,000,000 is repayable on or before 31 December 2009 and USD 9,000,000 is repayable on or before 15 April 2011."*

80.5.   The 2009 Statement of Financial Affairs contained a note titled '*Exploration and Evaluation of Assets – Analysis by area and year*'. That note included the figure of US$22 million for "*Goodwill on acquisition*".

80.6.   At one of the meetings in the course of the London negotiations, Mr Monteiro asked to speak with Mr Tchelet alone in a separate room. They then did so. Mr Cramer was not present. During this discussion:

(1)      Mr Monteiro questioned Mr Tchelet about the minority shareholding disclosed in the 2008 Financial Statements and the figure of US$22 million for goodwill disclosed in the 2009 Statement of Financial Affairs. He asked why there had been a change in the company structure in April 2009.

(2)      Mr Tchelet told Mr Monteiro that there had previously been a minority shareholder in BSGR BVI. The minority shareholder was bought out in 2008 and, in accordance with BSGR's corporate governance and accounting policy, BSGR Guernsey was incorporated so that management of the company could be brought under the auspices of the BSGR Group's head office in Guernsey.

(3)      Further:

(a)   Mr Monteiro did not ask Mr Tchelet who the minority shareholder (or "*selling party*") was.

(b)   Mr Tchelet did not tell Monteiro that the buy-out of the minority shareholding was done for tax planning purposes.

(c)   Mr Tchelet did not tell Mr Monteiro that the minority shareholder was part of the "*Balda group*" or that it was not an external third party. Indeed, it would have been obvious from the nature of the arrangement that this was unlikely to be the case.

(d)   More generally, the due diligence process was demand-led. Vale knew about the share purchase agreement and the settlement agreement underlying the Pentler share buyback but did not ask to see either document.

80.7.   In the premises, it is denied that Mr Tchelet made the Fourth Consultancy Representation as alleged or at all.

81.   As to paragraph 90:

81.1.   Insofar as the first sentence is addressed to or concerns Mr Avidan, it is denied. Insofar as it is addressed to other defendants, Mr Avidan does not plead to it. As to the cross-reference to paragraph 87, paragraph 78 above is repeated, making changes where necessary and appropriate.

81.2.   As to the second sentence, it is denied that the representations alleged at paragraphs 88 and 89, or, in the latter case, what was actually said by Mr Tchelet, "*substantively replicated*" the earlier alleged or actual representations. Each representation (to the extent it was made at all) was made in its own terms and context. It is denied that any substantive replication, insofar as shown, would render Mr Avidan responsible for any representations made by other Defendants.

(7)     Other matters

82.    As to paragraph 91, insofar as it is addressed to or concerns Mr Avidan (no admissions otherwise being made):

82.1.  It is denied that Mr Avidan made or was otherwise responsible for all of the so-called First to Eighth Corruption Representations and First to Fourth Consultancy Representations. Save that the representations alleged in embarrassingly vague terms in paragraphs 88.1 and 88.3 are not admitted (and paragraph 79.5 above is repeated), the only representations made by Mr Avidan were those uttered by him at the FCPA Interview as admitted and averred above.

82.2.  It is admitted that those representations, to the extent made by Mr Avidan, were made with the intention that Vale could rely upon them should it wish to do so. It is denied that they were intended to "*induce*" or did in fact induce Vale to enter the JVA and SHA. Mr Avidan believes that Vale would have entered into the JVA and SHA in any event.

82.3.  It is denied that Mr Avidan knew that the alleged representations would be passed onto Vale's "*subsidiary and affiliate companies for the purposes of implementing the joint venture, including for the purpose of making payments pursuant to the JVA and SHA*". Mr Avidan had no knowledge of the Vale group's structures and processes and did not consider whether or how his representations would be passed on or relied on by other group companies.

82.4.  It is denied that Mr Avidan intended the alleged representations to be relied on by Vale International and Vale Austria in making any payments (or taking any other steps required) under the JVA or SHA. Mr Avidan was participating in negotiations with Vale for the purpose of concluding a transaction with that company on behalf of BSGR. He did not intend what he told Vale to be relied on by any other person.

82.5.  Save as set out above, paragraph 91 is denied.

83.    As to paragraph 92:

83.1.  In the premises, insofar as paragraph 92.1 is addressed to or concerns Mr Avidan, it is denied. The only specific allegations of any implied representation in the Particulars of Claim are at paragraph 80.4, to which Mr Avidan responds specifically above. He made neither these nor any other implied representations. He accordingly did not know he was making any or that they had the meanings alleged. No admissions are otherwise made.

83.2.  As to paragraph 92.2, it is denied that the Claimants had any understanding as to the meaning of representations that were not in fact made. The Claimants' alleged state of mind is otherwise not admitted.

**E3     The terms of the JVA and SHA**

84.    Save as stated below, paragraph 93 is admitted as a broad summary of some of the provisions of the JVA and SHA. Mr Avidan will refer to the JVA and SHA at trial for their full terms, meaning and effect. Further, as to the sub-paragraphs:

84.1.  As to paragraph 93.2, it is denied that the JVA provided or allowed for Vale to procure payment of the Initial and Deferred Consideration, as opposed to pay it itself. Pursuant to section 3 (and sections 4.2(i) and 12), payment of the Initial and First and Second Deferred Consideration was to be made by Vale itself, upon satisfaction of the relevant conditions precedent.

84.2.  Paragraph 93.7 is denied. Neither the JVA nor the SHA required the provision of the Clark and Steinmetz ABL Certificates to Vale, although the SHA refers to those Certificates.

**E4     Completion of the JVA and SHA**

85.    Paragraph 94 is admitted.

**E5      Further payments made by Vale pursuant to the JVA and SHA**

86.    As to paragraph 95:

    86.1.  Save as set out in paragraph 12 above and in addressing the sub-paragraphs of paragraph 95 below, the opening sentence is not admitted. The sub-paragraphs are addressed below.

    86.2.  As to paragraph 95.1:

        (1)      The first sentence is admitted as a broad summary of section 6.3 of the JVA.

        (2)      The second and third sentences are admitted.

        (3)      The fourth sentence is not admitted.

    86.3.  As to paragraph 95.2, the first sentence is admitted as a broad summary of section 6.1 of the JVA. The second sentence is not admitted.

    86.4.  As to paragraph 95.3, the first sentence is admitted. The second sentence is not admitted.

## SECTION F: PAYMENTS TO THE DEFENDANTS AND ALLEGED FACILITATORS AFTER THE JVA AND SHA

<u>Bonus payments made to the Second to Sixth Defendants</u>

87.    As to paragraph 96:

    87.1.  As to the first sentence, (a) it is admitted that the Second to Sixth Defendants were promised and paid bonuses; and (b) it is denied that the bonuses were promised or paid for the reason alleged. As to the circumstances, nature, amount, timing and purposes of the bonuses, paragraphs 18.3 to 18.5, 20.1, 20.2, 21.3, 21.4, 22.4, 23.2 and 23.3 above are repeated.

87.2.  The second sentence is denied:

(1)     It is denied that the bonuses were offered to the Defendants before the entry into the JVA and SHA. The bonuses were arranged (both promised and paid) <u>after</u> entry into the JVA and SHA. Mr Avidan understands from Mr Tchelet and Mr Struik that the bonuses were awarded by BSGR and confirmed to each recipient by way of a letter from Mr Clark written on behalf of that company.

(2)     It is denied that the Second to Sixth Defendants had a "*reasonable expectation of receiving substantial bonuses in the event the JVA and SHA were executed*". Mr Avidan expected a bonus, but that expectation was based on what he considered to be fair in the circumstances and past experience, and was not engendered by any specific representation by the BSGR Group or Mr Steinmetz. The bonuses were not agreed beforehand, nor were they a *fait accompli*. Mr Avidan and Mr Struik had to argue for them after the conclusion of the JVA and SHA.

87.3.  Save as set out above, paragraph 96 is denied.

88.   Save that it is admitted that the "Bonus Schedule" document was produced in about early July 2010 and save as set out in paragraphs 18.3 to 18.5, 20.1, 20.2, 21.3, 21.4, 22.4, 23.2 and 23.3 above, paragraph 97 is denied.

89.   As to paragraph 98:

89.1.  The bonuses (which were actual bonuses and not alleged bonuses as appears vaguely to be alleged by the use of inverted commas) have been addressed above.

89.2.  Paragraph 98.1 is admitted. These were performance related bonuses paid in respect of Mr Avidan's contributions to other BSGR Group projects unconnected with Guinea.

89.3.  Paragraph 98.2 is embarrassingly vague. Insofar as it is addressed to Mr Avidan

and pending proper particulars, it is denied. Without prejudice to the foregoing denial:

> (1)     It is admitted that Mr Avidan received a salary, and occasional performance-related bonuses, for his ongoing work for the BSGR Group after 30 April 2010. His salary ceased in about June 2016, after which he was remunerated as a consultant.

> (2)     It is denied, if it be so alleged, that there is anything inherently improper in BSGR making payments to honour its commitments to those engaged by it or rewarding persons who assisted its work. Quite the contrary.

90.   Paragraph 99 is not admitted.

## Payments allegedly made to Pentler and Mme Touré

91.   As to paragraph 100:

> 91.1.  As to the first sentence, on the basis of the evidence of Mr Steinmetz and Mr Noy in the Arbitration, and the Defence of Mr Steinmetz, it is admitted that the Pentler SPA was renegotiated to the effect that Pentler would receive a further US$22 million on top of US$8 million that had already been received by the end of 2009. It is admitted that this renegotiation occurred in May 2010, after entry into the JVA and SHA, but not admitted whether it occurred in April 2010 or "*at the same time as BSGR was negotiating the JVA and SHA*".

> 91.2.  The second sentence is admitted (save that it is inapt to describe the $22 million as a "*balance*", when it was the product of a renegotiation rather than part of an originally agreed sum). Windpoint then paid the sum of US$22 million to Pentler.

> 91.3.  The third sentence is not admitted.

> 91.4.  The fourth sentence and the sub-paragraphs are not admitted save as follows:

(1) On the basis of Mr Steinmetz's evidence in the Arbitration and his Defence, it is averred that in July 2010 Mr Noy approached Mr Steinmetz and demanded more money, citing the BSGR-Pentler Milestone Agreement. On or about 16 July 2010, Mr Steinmetz and Mr Noy agreed, subject to approval by the BSGR board, that Pentler would be paid a further US$4.5 million ($3 million in 2010 and $1.5 million in 2011). These sums were then paid to Pentler pursuant to this settlement. Insofar as it is inconsistent with this, the fourth sentence is denied.

(2) Paragraph 100.1 is admitted. On or about 5 August 2010, Windpoint then paid the sum of US$3 million to Pentler pursuant to the above settlement.

(3) Paragraph 100.2 is admitted. On or about 22 March 2011 Nysco transferred the sum of US$1.5 million to Windpoint, which in turn paid that amount to Pentler pursuant to the above settlement.

92. As to paragraph 101:

92.1. As to the first sentence:

(1) The further contracts and payments alleged in the sub-paragraphs are addressed below.

(2) It is not admitted that each or any of the contracts and payments alleged was made "*in connection with [Mme Touré's] interest in Pentler and her involvement in procuring the grant of the Mining Licences*". Their purpose is unknown to Mr Avidan.

(3) Neither Mr Avidan, nor to his knowledge any of the Defendants, the BSGR Group or any person on their behalf, was involved in (or a party to) these alleged contracts and payments, or the making of any corrupt payments to Mme Touré, or any efforts to obtain assistance from Mme Touré in the procurement of the Mining Licences.

(4)    Mr Avidan is not aware of any involvement on the part of Mme Touré in procuring the grant of the Mining Licences.

92.2.  As to paragraph 101.1:

(1)    The first sentence is not admitted. Mr Noy has given evidence in the Arbitration that the document referred to therein (that purports to be a written agreement between Pentler and Mme Touré) is a forgery.

(2)    It is admitted that there is a document purporting to record an agreement as described in the second sentence. It is not admitted that the document is authentic or that any such agreement was in fact made.

92.3.  As to paragraph 101.2, Mr Noy has admitted in the Arbitration that the August 2010 Contracts were concluded. Save that the final sentence is not admitted, the paragraph is otherwise admitted as a broad and partial summary of the August 2010 Contracts. Mr Avidan will refer to the August 2010 Contracts at trial for their full terms, meaning and effect.

92.4.  Paragraph 101.3 is not admitted.

**SECTION G: ATTEMPTS TO DESTROY ALLEGEDLY INCRIMINATING MATERIAL**

93.    Paragraphs 102 to 103 concern matters outside the direct knowledge of Mr Avidan and with which he had no involvement. Although Mr Avidan was aware that Mr Cilins intended to travel to the United States to try to get Mme Touré to sign a statement disclaiming lies she had told about corruption by the BSGR Group (which he believed would be a truthful statement), he did not authorise, instruct, encourage or assist Mr Cilins to do so. He was not aware of any intent Mr Cilins may have had to seek the destruction of any documents. Otherwise, and save insofar as they (in passing) refer to allegations which are dealt with elsewhere in this Defence (and to that extent, the relevant parts of the Defence are repeated), paragraphs 102 to 103 are not admitted.

## SECTION H: REVOCATION OF THE MINING LICENCES

94.     As to paragraph 104:

94.1.   The first two sentences are admitted.

94.2.   The remainder of paragraph 104 is improperly pleaded evidence, the relevance
        and admissibility of which is denied. If and insofar as it is alleged that the report
        of the Technical Committee was in any respect accurate, that allegation is
        embarrassing for want of particularity and Mr Avidan is unable to plead to it.

## SECTION I: CLAIMS IN DECEIT

95.     Mr Avidan's case on the alleged making of and responsibility for the alleged
        representations is set out above. In pleading to the alleged falsity of the alleged
        representations below, Mr Avidan does so without prejudice to his case as set out
        above that the representations were not made as alleged and/or that he was not
        responsible for them, and for convenience only does not repeat his case as to whether
        representations were in fact made or as to responsibility for them.

96.     Further, Mr Avidan notes that the Claimants have chosen to frame their claim as one
        based on English law. That is wrong.

96.1.   For the purposes of Regulation (EC) No 864/2007 on the law applicable to non-
        contractual obligations (the "**Rome II Regulation**"), the damage alleged by the
        Claimants occurred in the country where the account from which the money was
        paid is located.

96.2.   The initial payment of US$500 million and all or much of any subsequent
        payments were made from an account in New York.

96.3.   Accordingly, the damage occurred in New York and the Claimants' claims in
        tort are governed by New York law pursuant to Article 4 of the Rome II
        Regulation.

96.4. Given that the proper law of any claim against Mr Avidan is New York law, in the absence of any pleaded case by the Claimants under New York law, the Claimants' claim should be struck out on the basis that they have failed to set out the facts and matters on which their claim is properly based.

**I1    Alleged falsity of the so-called First to Eighth Corruption Representations**

97.    Save as detailed and set out below, paragraph 105 is denied.

### PARTICULARS IN RELATION TO MME TOURÉ

98.    As to paragraph 105.1:

98.1. The opening words (up to the colon) are denied.

98.2. Point (i) is denied. Mmé Touré was not in fact President Conté's wife, notwithstanding that she may have presented herself as such.

98.3. Point (ii) is denied. Mme Touré was not the President's wife. Further and in any event, it is not admitted that she held regular meetings with government ministers or purported to hold any such meetings in that "*capacity*".

98.4. Point (iii) is denied:

(1)    Mme Touré did not attend any public events and ceremonies "*as the spouse of the Head of State*" given that she was not the spouse of the Head of State.

(2)    Further and in any event, it is not admitted that Mme Touré "*frequently*" attended such events or that in doing so she was accompanied by the Presidential Guard.

(3)    Further, as to the allegation in parentheses regarding Mme Touré's attendance at the BSGR Group's office opening in Conakry in 2006, it is admitted that Mme Touré was at this event. She was there along with

around 100 other people. It is denied that she attended it in any official capacity. Mr Avidan does not know who invited her, but she had not been invited in any official capacity and did not purport to act at any time during the event in such a capacity. Mr Avidan believes it is likely that Mr Cilins invited her.

(4)     As to the allegation in parentheses regarding Mme Touré's attendance at a ceremony to commemorate the 50th anniversary of Guinea's independence, it is not admitted that she attended this ceremony (in the capacity alleged or at all), or was invited or purported to act at any time during it in an official capacity.

98.5.   As to point (iv), it is admitted that Mme Touré held a passport which described her as the spouse of the President of the Republic of Guinea. This description was incorrect. Paragraph 27.3 above is repeated.

98.6.   Further, even if all of the facts alleged in points (i) to (iv) were true (which they are not), it is denied that that would mean that Mme Touré acted as a representative of or in an official capacity for, or held a ceremonial position in, the GoG (or otherwise mean she was a "*Government Official*").

(1)     She held no constitutional position or governmental post. She was merely, on the Claimants' case, married to someone who did.

(2)     It is normal for a President's wife to attend social functions, to attend state events, to socialise with government ministers, to be guarded by her husband's guards, and to hold a diplomatic passport.

(3)     That does not mean she represented, or performed any official or ceremonial function on behalf of, the GoG. The Claimants have not pleaded any facts which suggest that she did.

99.     Paragraph 105.2 is denied.

99.1.   As to point (i), the expression "*government official*" was not defined for the

purpose of the FCPA Interview and London Meetings. The Claimants' allegation appears to be that, every time that expression was used, the First to Sixth Defendants recalled and acted on the definition contained in the Initial and Supplemental DD Questionnaires. That is implausible, and insofar as addressed to Mr Avidan, is denied. These were face-to-face conversations in which the expression "*government official*" would have been given its ordinary and natural meaning.

99.2. As to point (ii), it is denied that the ordinary and natural meaning of "*government official*", whether in the (unparticularised) context of the questions asked or otherwise, included the wife of a President or other government official with no governmental position of her own, let alone a businesswoman with no such position.

100. As to paragraph 105.3:

100.1. The opening words (up to the colon) are denied.

(1)   Neither Mr Avidan, nor to his knowledge any of the Defendants, the BSGR Group or any person on their behalf, was involved in the making of any corrupt payments to Mme Touré, or any efforts to obtain assistance from Mme Touré in the procurement of the Mining Licences.

(2)   Further, the matters alleged do not support the allegation that Mme Touré received (or was promised) anything by the BSGR Group "*in connection with the influence that she sought to exert on President Conté and others*", still less that she actually had or exercised any such influence (which allegations, insofar as in fact made, have been addressed above). The specific allegations made in this paragraph are addressed below.

100.2. As to point (i):

(1)   It is admitted that Mme Touré appears to have been offered a 33.3% interest in Pentler. However, her entitlement to the same was conditional and never arose. In any event, that was a transaction

between Mme Touré and Pentler/the Pentler Principals, not the BSGR Group.

(2)   It is not admitted whether or in what way (which is not explained) Pentler regarded Mme Touré as entitled to a 33% interest. On the terms of the Touré MoU itself, she did not become entitled to a shareholding at any time. Paragraph 44.10 above is repeated.

(3)   It is not admitted that Pentler paid Mme Touré at least US$5 million in connection with the Touré MoU. Even if it did, that was a transaction between Mme Touré and Pentler/the Pentler Principals, not the BSGR Group.

100.3. As to point (ii), what these documents purport to state is admitted. However, as pleaded in paragraph 46.1 above, the 2008 Matinda Contracts are forgeries. Further, as pleaded in paragraph 49 above, it is denied that the 2009 Affidavit records an agreement reached between BSGR and Mme Touré, and that document was disavowed by Mme Touré herself.

100.4. As to point (iii), as pleaded in paragraph 50 above, it is denied that "*at least one*" quarterly tranche of US$1 million was paid to Mme Touré pursuant to the 2008 Matinda Contracts.

101.   As to paragraph 105.4:

101.1. As to the opening words (up to the colon), the alleged promises and payments have been addressed above.

101.2. It is denied that the alleged promises or payments were made by BSGR ProjectCo as alleged or at all.

101.3. Save as set out above, paragraph 105.4 is denied.

102.   As to paragraph 105.5:

102.1. As to the opening words (up to the colon), the alleged promises and payments have been addressed above.

102.2. As to point (i), it is admitted that Sandra Merloni-Horemans was a director of BSGR, and that she was involved in the sale of Pentler to the Pentler Principals. She was so involved in her capacity as an officer of Onyx. Paragraph 34.5 above is repeated.

102.3. As to point (ii), it is admitted that Ms Merloni-Horemans was sent a draft of the Touré MoU on 15 February 2006. Point (ii) is otherwise denied. There is no basis for the inference that Ms Merloni-Horemans was to "*review*" the document (and in particular, insofar as it is alleged, its terms) or that she thereafter "*communicated her assent*" to its terms, and none is pleaded.

102.4. Point (iii) is denied. The decision to acquire Pentler was made by the Pentler Principals for their own reasons, independently of BSGR. Paragraph 34.5 above is repeated. Further, and as pleaded above, it is denied that Pentler was formed for the purpose of conferring financial benefits on Mme Touré, or that BSGR "*wished*" to do the same.

102.5. Point (iv) is denied. As pleaded in paragraph 46.1 above, those contracts are forgeries. Further, as pleaded in paragraphs 50 above, payment relied on by the Claimants (of US$998,000) was in fact paid to LMS in respect of the supply of earthmoving machinery.

102.6. As to point (v), it is not admitted that the Pentler SPA and/or BSGR/Pentler Settlement Agreement, and any subsequent amendments thereto, were authorised by BSGR. The allegation in parentheses is not admitted. In any event, the fact that (if true) Pentler paid some of the money it received under those agreements to Mme Touré is immaterial. That does not make the BSGR Group responsible for what Pentler did.

103. As to paragraph 105.6, the alleged "*Touré Intercessions*" have been addressed above at paragraphs 35, 41.5 to 41.7, 42.2, 42.3, 42.7 and 42.8. In relation to the allegations regarding the alleged "*Intercessions*" that Mr Avidan has been able to admit or deny

above, the first sentence is denied. The relevant facts do not support this alleged conclusion. The opening words are otherwise not admitted. Paragraph 100.1(1) above is repeated.

## PARTICULARS IN RELATION TO MR THIAM

104.  Paragraph 105.7 is admitted.

105.  As to paragraph 105.8:

105.1. The allegation that Mr Thiam was made or promised payments, and specifically the payments alleged at points (i) to (iii), have been addressed at paragraphs 54 and 55 above.

105.2. In the premises, it is denied that such promises or payments as were made were in connection with such steps that Mr Thiam took to confirm the Mining Licences. Rather, they were made, as pleaded above, for purposes unconnected with the confirmation and "*extension*" of the Mining Licences.

105.3. The final sentence is accordingly denied.

## PARTICULARS: GENERAL

106.  As to paragraph 105.9 to 105.12, paragraphs 35 to 42, 54 to 55, and 98 to 105  above are repeated. In the premises:

106.1. Paragraph 105.9 (relating to the alleged First and Second Corruption Representations) is denied.

106.2. Save that it is admitted that Mr Thiam was a Government Official, paragraph 105.10 (relating to the alleged First and Second Corruption Representations) is denied. The fact that Mr Thiam was a Government Official does not of itself make any of the representations alleged in the Particulars of Claim false.

106.3. As to paragraph 105.11 (relating to the alleged Third Corruption

Representation):

(1) It is denied that the Third Corruption Representation was false. Paragraphs 105.9 and 105.10 have been addressed immediately above, and Mr Avidan's responses are repeated.

(2) The embarrassingly vague allegation as regards point (i) is not admitted. Paragraph 100.1(1) above is repeated.

(3) The allegation at point (ii) is denied. Paragraph 105 above is repeated.

106.4. As to paragraph 105.12 (relating to the alleged Fourth Corruption Representation):

(1) As to point (i), paragraphs 105.9 to 105.11 have been addressed above.

(2) Point (ii) is denied.

(a) Paragraphs 39 to 49 have been addressed above.

(b) As pleaded in paragraph 33.6(2)(c) above, the fragility of Rio Tinto's title was well known. The BSGR group merely, and legitimately, sought to position itself as the frontrunner to inherit whatever Rio Tinto might lose.

(c) In any event, even if those persons had lobbied for the revocation of the Rio Tinto Concessions, that would not make the Fourth Corruption Representation false. In the context of the FCPA Interview, that representation did not include an attempt to persuade the GoG to take a lawful step.

(3) As to point (iii), the alleged Touré Intercessions have been addressed above. Paragraph 103 above is repeated. The alleged First, Second and Fifth Intercessions are not alleged to have related to Rio Tinto, and this allegation is accordingly denied in respect of those Intercessions in any

event.

(4)     Accordingly, it is denied that the Fourth Corruption Representation was false, save that this is not admitted to the extent that the allegations at point (iii) are not admitted.

107.   As to paragraph 105.13 (the alleged Fifth Corruption Representation), paragraph 106 above is repeated, making changes where necessary and appropriate.

108.   As to paragraph 105.14 (the alleged Sixth Corruption Representation):

108.1. As to point (i), the alleged promises and payments referred to have been addressed above. Insofar as they occurred, it is not admitted that they were authorised by Mr Steinmetz (save that Mr Avidan, and not Mr Steinmetz, authorised the payments for Mr Thiam's flights).

108.2. As to point (ii), it is admitted that BSGR Guernsey was introduced into the corporate structure in 2009 and was BSGR ProjectCo's direct parent company. The payments to Mme Touré and of US$5 million to Mr Thiam are denied and accordingly so too is their alleged authorisation by BSGR Guernsey. As for the payments of Mr Thiam's flights, paragraph 55.7 above is repeated. These were authorised by Mr Avidan, and (so Mr Avidan understands from Mr Tchelet) the payments were approved and requested to be made by BSGR Guernsey on that basis by Mr Tchelet. Their alleged authorisation by BSGR Guernsey is otherwise not admitted.

108.3. Save that it is admitted that the payments of flight expenses related to the business of BSGR Guernsey or its subsidiaries (but not the JVA/SHA), point (iii) is denied. These payments have been addressed at paragraph 50, 54 and 55 above.  It is denied (if it is alleged) that this renders the payments illegitimate or the Sixth Corruption Representation false.

108.4. In the premises, it is denied that the Sixth Corruption Representation was false save that this is not admitted to the extent that non-admissions are made in respect of the alleged payments and promises to Mme Touré referred to in point

(i) and the alleged authorisation thereof.

109.   As to paragraph 105.15 (the alleged Seventh Corruption Representation):

109.1. As to point (i), the alleged promises and payments have been addressed above. Accordingly:

(1)   Point (i) is denied in respect of promises or payments to Mr Thiam. The payments admitted to have been made to him did not render the Seventh Corruption Representation false.

(2)   Point (i) is denied in respect of promises or payments to Mme Touré that are denied above as having been made or authorised by the BSGR Group, and otherwise not admitted.

(3)   Point (ii) is addressed to Mr Clark and Mr Avidan does not plead to it, save that it is denied that Mr Clark knew or had reason to believe any matter was false that was not in fact false.

109.2. Accordingly, it is denied that the Seventh Corruption Representation was false, save that this is not admitted to the extent that non-admissions are made in respect of the alleged payments and promises to Mme Touré referred to in point (i) and the alleged authorisation thereof.

110.   As to paragraph 105.16:

110.1. As to points (i) to (iii), paragraph 109 above is repeated, making changes where necessary and appropriate.

110.2. Further as to points (ii) and (iii), it is denied that any bribery of Mr Thiam took place, or was authorised to take place, or that he was given any payments (improper or otherwise) to confirm and extend the Mining Licences. The allegations of bribery with regard to Mme Touré, and of intercessions on behalf of the BSGR Group, are addressed (and not admitted or denied) above.

110.3. Accordingly, it is denied that the Eighth Corruption Representation was false, save that this is not admitted to the extent that non-admissions are made in respect of the alleged payments and promises and bribes to Mme Touré and the authorisation thereof, and her alleged intercession on behalf of the BSGR Group.

**I2      Alleged falsity of the First to Third Consultancy Representations**

111.   Paragraph 106 is denied. The specific allegations in the sub-paragraphs are addressed below. None of those allegations demonstrates that the alleged First to Third Consultancy Representations were false. In particular, none of those matters disclose that:

111.1. There was an undisclosed consultant, representative, agent, broker, intermediary or member of the local advisory team who was (or had been) retained by the BSG Group in connection with the "*Simandou Project*" or "*Project Hill*".

111.2. The BSG Group had used an intermediary to interact with the GoG in relation to the group's efforts to obtain the Mining Licences; or

111.3. The BSG Group had not "*generally*" only used technical consultants in Guinea who provided skills that the BSG Group needed to explore and develop their properties.

<u>**PARTICULARS IN RELATION TO MR CILINS**</u>

112.   As to paragraph 106.1:

112.1. It is denied that Mr Cilins acted as a consultant, representative, agent and/or intermediary or was a member of the local advisory team retained by BSGR and/or BSGR ProjectCo (whether directly or indirectly). His role in assisting the BSGR Group was limited, as set out above.

112.2. Even if (which is denied) the limited role Mr Cilins in fact played entailed that he acted in one of the alleged capacities, that would not render any of the alleged First to Third Consultancy Representations false. None of those alleged

Representations involved a representation that no persons had acted for the BSGR Group in such a capacity *simpliciter*.

112.3. In any event, if (which is denied) Mr Cilins acted in any of the alleged capacities, he did not do so at the times of the Questionnaires, which are the relevant times for the purposes of the first part of the First Consultancy Representation (i.e. the representation alleged at paragraph 70.3 up to the semi colon and addressed above).

112.4. Save in relation to paragraph 106.1(c), where matters are admitted or not admitted in relation to paragraphs 106(1)(a) to (m), it is denied that those matters are sufficient to demonstrate the allegation in the opening paragraph.

113. Paragraph 106.1(a) is not admitted.

114. Mr Avidan pleads to paragraph 106.1(b) on the basis of information from Mr Struik:

114.1. It is admitted that Mr Struik and Mr Oron (on behalf of BSGR) were introduced to Mr IS Touré through Mr Cilins in 2005 (albeit separately).

114.2. It is admitted that Mr Struik (on behalf of BSGR) was introduced to Mr Bah by Mr Cilins, but this occurred early in 2006. Mr Oron was not with him at the time (and it is not admitted if Mr Cilins introduced Mr Oron to Mr Bah at any time). The research at the CPDM was conducted by Mr Struik. This paragraph is otherwise denied. Paragraph 34.4 above is repeated.

115. Paragraph 106.1(c) is not admitted. Paragraph 100.1(1) above is repeated.

116. As to paragraph 106.1(d), insofar as the Claimants allege that any meetings took place other than those particularised at paragraphs 38 to 43, the allegation is embarrassing for want of particularity and Mr Avidan is unable to plead to it. No admissions are made in relation thereto. As to the meetings actually particularised, paragraphs 34 to 36 above are repeated.

117. Paragraph 106.1(e) is denied. Mr Noy and Mr Cilins' role was limited to procuring

local legal advice and organising the logistics of the negotiations. Paragraph 44.9 above is repeated.

118. As to paragraphs 106.1(f) and 106.1(g):

118.1. It is admitted that Mr Cilins translated for and assisted Mr Struik from time to time prior to the arrival of Mr Avidan (and continued to perform a similar role for a short period after Mr Avidan's arrival). Paragraph 37.2 above is repeated.

118.2. It is denied that Mr Cilins was "*intimately connected with all of BSGR and BSGR ProjectCo's activities*" simply because he had translated for Mr Struik from time to time.

118.3. To the extent that it is alleged Mr Cilins was "*intimately connected*" with those activities for a reason other than translation, paragraph 106.1(f) is embarrassing for want of particularity and Mr Struik is unable to plead to it.

118.4. Save as set out above, paragraphs 106.1(f) and 106.1(g) are denied.

119. As to paragraph 106.1(h):

119.1. Paragraph 45.1 above is repeated.

119.2. The allegation that Mr Cilins received "*other consultancy fees … and was reimbursed for his expenses*" in the form of "*part of the US$250,000 paid … in May 2006*" is denied. Mr Avidan understands from Mr Struik that the US$250,000 was part of a milestone and reward payment due to Pentler, not Mr Cilins personally, under the BSGR-Pentler Milestone Agreement. In any event, that payment did not relate to any work performed in connection with the grant of the Mining Licences or the Simandou project, but to the BSGR Group's introduction to Guinea generally. Paragraph 44.11 above is repeated.

119.3. Paragraph 106.1(h) is otherwise embarrassing for want of particularity. Pending proper particulars, it is denied.

120.    Paragraph 106.1(i) is admitted. It took some time for the BSGR Group to open its own bank account in Guinea. Mr Cilins made his bank account available on a temporary basis so that the BSGR Group had access to a local bank account.

121.    Paragraph 106.1(j) is denied. Mr Cilins ceased providing assistance to the BSGR Group in Guinea in 2006, shortly after Mr Avidan's arrival.

122.    As to paragraph 106.1(k):

122.1. It is admitted that Mr Cilins was a shareholder of Pentler and that the Pentler SPA contained the terms quoted by the Claimants. Following the conclusion of the Pentler SPA, Pentler did thereafter advise the BSGR Group on various opportunities in African countries (including in relation to, among other things, iron ore, gold and base metals).

122.2. It is denied that Mr Cilins acted after 2006 for the BSGR Group or BSGR ProjectCo in relation to the Simandou project or in Guinea.

123.    As to paragraphs 106.1(l) and (m), paragraph 93 above is repeated. These events, insofar as they occurred as alleged, took place long after the entry into the JVA and SHA, and do not demonstrate that Mr Cilins had any role for or in connection with the BSGR Group prior to or at the time thereof.

## PARTICULARS IN RELATION TO PENTLER

124.    Paragraph 106.2 is denied. The matters relied on by the Claimants in the sub-paragraphs are addressed below. Paragraphs 112.2 and 112.3 above are repeated, making modifications as necessary and appropriate.

125.    As to paragraph 106.2(a):

125.1. Paragraph 34.5 above is repeated.

125.2. It is denied that Pentler was or was intended to be the corporate vehicle used by the Pentler Principals to "*represent and act for BSGR and (later) BSGR ProjectCo*".

The purpose of that company at the time of its establishment was to conduct the Pentler Principals' Guinean affairs. Following Mr Avidan's arrival in Guinea in 2006 and the consequent cessation of Mr Cilins' limited role as described above, those affairs did not include those of the BSGR Group (save to the extent that, passively, Pentler stood to benefit from certain of the BSGR Group's exploits pursuant to the BSGR-Pentler Milestone Agreement and Pentler SPA).

126. As to paragraph 106.2(b):

126.1. It is admitted that the Pentler Principals were all shareholders of Pentler from about February 2006.

126.2. Paragraph 106.2(b) is otherwise denied. There is no basis for attributing all of the acts of a company's shareholders to the company (and none is pleaded).

127. Save that the date on which the BSGR-Pentler Services Agreement was entered into is not admitted, paragraph 106.2(c) is admitted.

128. As to paragraph 106.2(d), paragraph 44.3 above is repeated. As to the BSGR Group's position and hopes as regards SB1 and SB2, paragraph 33.6(2)(c) above is repeated.

129. As to paragraph 106.2(e):

129.1. Paragraphs 44.4 to 44.6 above are repeated.

129.2. As to the first sentence, it is denied that Pentler's entry into the Pentler-Bah and Pentler-Daou Agreements and the Touré MoU constituted compliance with any obligation under the BSGR-Pentler Milestone Agreement, or that this was Pentler's purpose in entering into them. It is further denied that by those agreements Pentler obtained "*the assistance and services*" of Mr Bah, Mr IS Touré, Mr Daou and Mme Touré for the benefit of "*BSGR and BSGR ProjectCo*". Pentler had a relationship with those persons. To the best of Mr Avidan's knowledge, the BSGR Group did not (save for the employment relationship between Mr IS Touré and BSGR ProjectCo).

129.3. The second sentence is denied. Paragraph 44.7 above is repeated.

130. As to paragraph 106.2(f):

130.1. The first sentence is embarrassing for want of particularity. Pending proper particulars, it is denied.

130.2. The second sentence is admitted. Mr Avidan understands from Mr Tchelet that he was told by Mr Oron at the time that this payment related to costs and expenses incurred by Pentler and its Principals in relation to the establishment of the BSGR Group's Guinea office. So far as Mr Avidan was aware, Mr Cilins was not doing any work for the BSGR Group in Guinea in May 2007.

131. As to paragraph 106.2(g), the first sentence is admitted. The second sentence is denied. There is no basis for the alleged inference. BSGR Steel was obliged to pay the additional US$8 million regardless of what Pentler did in the meantime. This provision appears to have been intended to tie the level of Pentler's remuneration to the success enjoyed by the BSGR Group, following its introduction to Guinea by Pentler.

## PARTICULARS IN RELATION TO MR BOUTROS

132. Paragraph 106.3 is denied. The matters relied on by the Claimants in the sub-paragraphs are addressed below.

133. Save that the agreement of LMS was actual and not purported, and save that the date it was entered into is not admitted, paragraph 106.3(a) is admitted. Paragraph 29.3(3) above is repeated. Mr Avidan will refer to the contract at trial for its full terms, meaning and effect.

134. Paragraph 106.3(b) is admitted.

135. As to paragraph 106.3(c), paragraphs 31, 57 and 58 have been addressed above and paragraphs 29, 50 and 51 above are repeated by way of response. Payment 7 was made in response to an invoice which contained a genuine demand from a known supplier

for equipment that was needed, ordered and in due course delivered. It was not used by the BSGR Group to pay US$998,000 to Mme Touré.

136.   As to paragraph 106.3(d):

136.1. The first sentence is admitted.

136.2. As to the second sentence, the opening words (up to the colon) are denied. There is no basis for this allegation or inference. Apart from Payment 7, which has been dealt with above, the Claimants do not identify to whom these alleged bribes were paid or for what purpose. These payments were made in respect of legitimate business transactions. Points (i) to (viii) are addressed below.

136.3. As to point (i), Payment 7 has been addressed above. It was not paid as a bribe.

136.4. As to point (ii), the amount of the payments is admitted. The fact that some payments were made for round numbers does not mean or indicate that they were bribes. The payments were made on a frequent but irregular basis in a variety of sums, and each is supported by one or more invoices which contains a breakdown of the goods and services provided.

136.5. Point (iii) is embarrassing for want of particularity. The payments and invoices referred to are not identified. In any event, the final sentence from the previous sub-paragraph is repeated.

136.6. As to points (iv) and (v), from time to time a payment would need to be made urgently and/or in advance of the corresponding invoice having been rendered (as set out in paragraph 50.5(4)(d) above). Whether to seek such a payment on an urgent basis was a judgment made from case to case by Mr Avidan, based on the circumstances. Where the corresponding invoice was not provided in advance, in every case it was provided by LMS thereafter, detailing what the payment was for.

136.7. Point (vi) is admitted in respect of the Payments identified in footnote 10. Mr Avidan understands from Mr Tchelet that this occurred because the 'consulting'

code was sometimes used inappropriately by staff in Guernsey (as a general catch-all). The re-distribution of these payments to other (more appropriate) codes reflected nothing more than the correction of clerical and bookkeeping errors. Any allegation intended to be made (by the words "*at least*") in relation to other unspecified invoices is embarrassing for want of particularity and Mr Avidan is unable to plead to it.

136.8. As to point (vii), the email statement alleged is admitted in respect of Payment 3 only. It was not made in respect of Payment 4 (although Mr Avidan understands from Mr Tchelet that in principle the same instruction would have applied). Mr Avidan understands from Mr Tchelet that this statement meant only that certain information relating to payments made from Guernsey was not to be sent to Guinea so as to avoid its being incorrectly included in the books for BSGR ProjectCo, where it did not belong.

136.9. As to point (viii), it is admitted that a copy of email correspondence between Mr Tchelet and Helen Nicolle dated 20 and 21 April 2009 contains the manuscript note: "*Remove Ghassan Boutros' name from Guinea Spreadsheet*". Mr Avidan understands from Mr Tchelet that this meant only that the individual's name should not be used in lieu of that of the corporate entity to which the liability was in fact owed.

137.   Paragraph 106.3(e) is denied. Paragraphs 132 to 136 above are repeated.

## PARTICULARS IN RELATION TO MR IS TOURÉ

138.   As to paragraph 106.4:

138.1. It is admitted that Mr IS Touré is Mme Touré's half-brother and was related to her by blood.

138.2. It is denied that Mr IS Touré was therefore related to President Conté by marriage or otherwise. Mme Touré was not married to the President.

94

**PARTICULARS: GENERAL**

139.  Paragraph 106.5 largely repeats allegations made elsewhere in the Particulars of Claim in relation to Mr Cilins (in particular, paragraph 106.1).  Paragraphs 112 to 123 above are repeated.

140.  Paragraph 106.6 essentially repeats allegations made elsewhere in the Particulars of Claim in relation to Pentler (in particular, paragraph 106.2).  Paragraphs 124 to 131 above are repeated.

141.  Paragraph 106.7 essentially repeats allegations made elsewhere in the Particulars of Claim in relation to Mr Boutros (in particular, paragraph 106.3).  Paragraphs 132 to 137 above are repeated.

142.  Paragraph 106.8 essentially repeats allegations made elsewhere in the Particulars of Claim in relation to Mr Thiam (in particular, paragraph 62).  Paragraph 55 above is repeated.

143.  In the premises, paragraphs 106.9 and 106.10 are denied.

**I3    Alleged falsity of the so-called Fourth Consultancy Representation**

144.  As to paragraphs 107:

144.1. It is denied that the Fourth Consultancy Representation was made. Paragraph 80 above is repeated.

144.2. Without prejudice to the foregoing, save that Pentler was not owned by Mme Touré, paragraph 107.1 is admitted.

144.3. Paragraph 107.2 is denied.

(1)      Mme Touré was not a shareholder in Pentler.

(2)      As to the first sentence, the purpose of the Pentler SPA was for BSGR

Group to re-acquire the 17.65% of BSGR BVI then owned by Pentler. The payments made thereunder were in consideration of the sale of the shares.

(3)    As to the second sentence:

(a)    In relation to point (i), none of the Pentler Principals were working or engaged at that time to work (as consultants or otherwise) for the BSGR Group in relation to the Simandou project (and paragraph 122 above is repeated). The agreement did not and did not purport to secure Mme Touré's services as a consultant for any period.

(b)    In relation to point (ii), paragraph 131 above is repeated.

## I4    Mr Steinmetz allegedly knew that the representations were false or acted recklessly

145.  Paragraph 108 is addressed to Mr Steinmetz and relates to his alleged knowledge. Mr Avidan therefore does not plead to it.

## I5    Mr Cramer allegedly knew that the representations were false or acted recklessly

146.  Paragraph 109 is addressed to Mr Cramer and relates to his alleged knowledge. Mr Avidan therefore does not plead to it.

## I6    Mr Struik allegedly knew that the representations were false or acted recklessly

147.  Paragraph 110 is addressed to Mr Struik and relates to his alleged knowledge. Mr Avidan therefore does not plead to it.

## I7    Mr Avidan allegedly knew that the representations were false or acted recklessly

148.  As to paragraph 111:

148.1. It is denied that Mr Avidan made "*each of the Corruption and Consultancy Representations*". The Claimants have failed to state a case that Mr Avidan did in

fact make each of those representations.

148.2. The Claimants have in fact only alleged that Mr Avidan made seven of the 18 representations alleged to have been made by the Defendants (namely those comprised in the Fourth, Fifth and (as to its first and third parts) Eighth Corruption and Third Consultancy Representations). Mr Avidan has pleaded to the alleged making of each of those representations above.

148.3. In any event, it is denied that Mr Avidan made any representation knowing it to be false or reckless as to its truth.

148.4. It is noted that the Claimants have not sought to plead that Mr Avidan was aware of all of the facts and matters which are alleged to have made the alleged representations false, but instead only seek to rely on the matters pleaded in the sub-paragraphs to paragraph 111 in relation to his alleged knowledge.

148.5. Save as set out above, paragraph 111 is denied.

149.   As to paragraph 111.1:

149.1. The first sentence is admitted.

149.2. The second sentence is embarrassingly vague, and wholly inadequate as a plea of knowledge, particularly in a fraud claim. Pending further particulars, and save as set out below and elsewhere in this Defence, it is not admitted. Mr Avidan was responsible for the day-to-day management of the BSGR Group's business in Guinea, including the Simandou project. His work, while wide-ranging, was principally on the operational side, rather than the technical or financial side. Many others also worked on the BSGR Group's Guinean business, often with substantial autonomy and without direct input or oversight from Mr Avidan. The fact he had overall responsibility for day-to-day operations in Guinea, performed the roles and duties that he did from time to time, and signed the Base Convention, did not make him aware of, or give him "*intimate familiarity*" with, every detail of the BSGR Group's activities there (and any allegation to this effect is denied). As part of a large team, his knowledge was

inevitably limited to those matters with which he was personally involved or which were otherwise brought or came to his attention.

149.3. The third sentence is denied. Paragraph 21.2 above is repeated.

150. As to paragraph 111.2, paragraphs 21.3, 21.4 and 89.2 above are repeated.

151. Paragraph 111.3 is admitted, as is the email exchange referred to therein. The manner in which this email exchange is said to support the alleged inference of knowledge or recklessness is not particularised adequately or at all and is not understood. It is denied that it supports such an inference.

152. As to paragraph 111.4:

152.1. The alleged "*Intercessions*" are addressed above. Paragraphs 35 to 42 above are repeated. As pleaded therein, insofar as the alleged meetings occurred at all, Mme Touré did not participate in them (indeed, on the one occasion when she attempted to speak, she was angrily shouted down by President Conté).

152.2. It is admitted that Mr Avidan met with President Conté on about seven or eight occasions. Further:

(1)     The manner in which this fact is said to support the alleged inference of knowledge or recklessness is not particularised adequately or at all and is not understood. Any specific allegations relating to specific meetings made elsewhere in the Particulars of Claim are addressed as and when they arise.

(2)     There was no impropriety in Mr Avidan's occasionally meeting with the President (and it is noted that the Claimants do not allege here that there was). The BSGR Group was a significant investor in the country and it was Mr Avidan's role to ensure that the Group maintained a good working relationship with the GoG. As part of this, he had frequent and legitimate meetings with the President and other GoG officials.

98

153. Paragraph 111.5 is denied. Mr Avidan did not sign the 2008 Matinda Contracts. They are forgeries.

154. As to paragraph 111.6:

154.1. Save that the invoices were legitimately raised in respect of legitimate transactions, and did not merely purport to justify the Boutros Payments, the first sentence is admitted. Paragraph 136 above is repeated.

154.2. As to the second sentence:

(1)   The matters upon which the inferences the Claimants seek to draw are based are addressed elsewhere. It is denied that any of those matters supports the inferences the Claimants seek to draw, save to the extent that those inferences are admitted below.

(2)   It is admitted that Mr Avidan was aware of the Boutros Payments.

(3)   Save that it is admitted that Mr Avidan requested the making of these payments, thereby endorsing them at an operational level, it is denied that Mr Avidan "*approved the making of*" them. In fact:

(a)   Approval was a matter for the BSGR Group's head office in Guernsey.

(b)   Mr Avidan was required to seek that approval. His only role in the approval process was to explain the business need for any liability in respect of which payment was requested, should he be asked to do so. Save in respect of certain low-level payments which Mr Avidan had the power to authorise himself, every payment request that he made not only required approval as described, but also appropriate authorisation.

(4)   The matters upon which the Claimants rely in support of the inferences they seek to draw are addressed elsewhere in this Defence. It is denied

that any of those matters supports the inference that Mr Avidan "*knew [the Boutros Payments] were to be used to pay bribes in whole or in part*". As pleaded above, each Boutros Payment was a payment made to a legitimate supplier of the project in respect of a legitimate business transaction. Paragraphs 135, 136 and 154.1 above are repeated.

155.   As to paragraph 111.7:

155.1. As to the first sentence:

(1)   It is admitted that Mr Avidan was involved in the negotiation of the Base Convention, in his role as one of the principal negotiators on behalf of BSGR. Otherwise, pending proper particulars, the embarrassingly vague and subjective allegation that he was "*closely involved*" is not admitted.

(2)   It is admitted that Mr Avidan was a signatory to the Base Convention.

155.2. As to the second sentence:

(1)   The allegation that Mr Avidan was "*copied on emails in which Thiam advised on the Base Convention negotiations*" is understood to be a reference to those email exchanges referred to in paragraphs 62.10(a) and 62.10(c) of the Particulars of Claim. Insofar as reference to any other email was intended, the allegation that Mr Avidan was copied to it is embarrassingly vague and not admitted.

(2)   As to those email exchanges, paragraph 55.9(6) and 55.9(8) above are repeated. As pleaded therein, it is denied that Mr Thiam "*advised on the Base Convention negotiations*", whether in those emails or at all. Accordingly, it is also denied that Mr Avidan knew that Mr Thiam was acting as a consultant, adviser, intermediary and representative to the BSGR Group. Mr Thiam was not so acting.

156.   Paragraph 111.8 is denied. Mr Avidan was not involved in, and at all material times

had no knowledge of, the 31 March 2010 Restructuring. He did not know the purpose of the restructure, and did not know or believe it to be as alleged. Paragraphs 65 and 66 above are repeated.

157. As to paragraph 111.9:

157.1. The first sentence is admitted.

157.2. As to the second sentence:

(1)     It is admitted that Mr Avidan worked with Mr Cilins briefly from mid to late 2006 as described above. Paragraph 37.2 above is repeated. It is denied that they "*worked closely*" together, at that time or at all.

(2)     It is admitted that Mr Avidan worked with Mr IS Touré from the end of 2006. Mr IS Touré was a very valuable employee of BSGR ProjectCo who reported and provided a great deal of assistance to Mr Avidan, and they often worked together. The allegation that they had a "*very close working relationship*" is embarrassingly vague, and pending further particulars is not admitted.

157.3. In any event, it is denied that these matters support the alleged inference of knowledge or recklessness. As pleaded above, Mr Cilins' role was limited to the logistical and administrative assistance provided to Mr Struik and Mr Avidan in 2006. Mr Avidan (rightly) did not regard Mr Cilins or Mr IS Touré as a consultant for the BSGR Group.

158. As to paragraph 111.10:

158.1. The allegation that Mr Avidan was aware of the "*Pentler and Bah disputes and demands for success fees by Pentler and Bah*" is embarrassingly vague and, save as set out below, is accordingly not admitted.

158.2. By early 2010 (the time understood to be relevant for present purposes) Mr Avidan was broadly aware of (i) Pentler's historic shareholding in BSGR BVI, (ii)

the Pentler SPA, (iii) the dispute that arose in 2009 between Pentler and the BSGR Group over the payment for Pentler's shares and the BSGR/Pentler Settlement (this dispute being understood to be the "*Pentler dispute*" to which the Claimants refer), and (iv) the fact that Mr Bah had demanded money from the BSGR Group, despite the fact that the BSGR Group had never had any relationship with him (this dispute being understood to be the "*Bah dispute*" to which the Claimants refer).

158.3. It is denied that these disputes were "*in connection with the licences obtained over SB1 and SB2*" or that they were so understood by Mr Avidan. In fact, Mr Avidan believed, based on what he had been told by Mr Struik and Mr Steinmetz, that:

(1) The Pentler dispute related to payment for Pentler's shares in BSGR BVI (which had been awarded for the Pentler Principals' introduction of the BSGR Group to Guinea).

(2) While Mr Bah's demands ostensibly related to Simandou, they were spurious. He had not played any part in the grant of the Mining Licences.

159. As to paragraph 111.11:

159.1. It is admitted that Mr Avidan knew Pentler was owned by the Pentler Principals and that Pentler was not "*another group company*".

159.2. It is denied that Mr Avidan knew that the Pentler SPA did not involve a "*tax planning transaction*". Mr Avidan did not know the purpose of the buy-back at the time.

159.3. It is denied that Pentler was owned in any part by Mme Touré, or that Mr Avidan knew or believed it to be. It was not, and he did not. Paragraph 44.6 above is repeated.

**I8      Mr Tchelet allegedly knew that the representations were false or acted recklessly**

160.   Paragraph 112 is addressed to Mr Tchelet and relates to his alleged knowledge. Mr Avidan therefore does not plead to it.

**I9      Mr Clark allegedly knew that the representations were false or acted recklessly**

161.   Paragraph 113 is addressed to Mr Clark and relates to his alleged knowledge. Mr Avidan therefore does not plead to it.

**I10    Nysco and Balda allegedly knew that the representations were false or acted recklessly**

162.   Paragraphs 114 and 115 are addressed to Nysco and Balda and relate to their alleged knowledge. Mr Avidan therefore does not plead to them.

**I11    Inducement and reliance**

163.   Paragraph 116 and its sub-paragraphs are denied for the reasons set out below. In particular, it is denied that Mr Avidan "*knew*" of those matters alleged in paragraphs 116.1 and 116.2. Paragraph 82.2 above is repeated. In all the circumstances, it is to be inferred that the Claimants (i) did not rely on the representations Mr Avidan is alleged (or admits or avers) to have made, whether in entering into the JVA and SHA or making any of the alleged payments in connection therewith; and/or (ii) would have entered into the JVA and SHA and made those payments even if those representations had not been made. Pending disclosure, inspection and/or the provision of further information, Mr Avidan relies on the facts and matters set out at paragraphs 164 to 169 below.

164.   Since long before and at the time of the negotiation of and entry into the JVA and SHA, Vale was desperate to acquire an interest in iron ore in Simandou, and eliminate the major "*threat*" it perceived of a competitor gaining and exploiting such an interest instead.

164.1. In an internal report dated 14 September 2009, Mr Etchart (Vale's General Manager for Exploration in Africa) stated that an interest in Simandou was the

company's "*highest priority opportunity*" for iron ore outside of Brazil.

164.2. In a presentation titled 'Project Venezia', prepared by Vale personnel in 2008 or 2009, Simandou is described as a "*major Iron Ore threat for VALE in the world*".

164.3. In an email from João Mendes (Vale's Director of Iron Ore Business Development) ("**Mr Mendes**") to Mr Etchart dated 9 February 2010, Mr Mendes referred to a channel which Mr Etchart had opened up with Mr Struik as presenting an opportunity to "*advance this Simandou/Guinea matter, because this is Vale's goal, to position ourselves in the region!*".

164.4. Although Vale was contemplating a deal with BSGR, its intention, as disclosed in an email from Mr Mendes to Eduardo Ledsham (Vale's Executive Director of Vale's Exploration Department) ("**Mr Ledsham**") dated 16 February 2010, was, in due course, to "*move forward with just Vale*".

164.5. In an email from Vale's Edson Ribeiro ("**Mr Ribeiro**") to Mr Ledsham dated 17 February 2010, Mr Ribeiro stated that "*we cannot run the risk of the deposit falling into the hands of the* Chinese, *and we cannot stand by just watching, we must act*". He said that, absent a joint venture with Rio Tinto, "*we need to be aggressive and buy the rights from BSGR*".

165. Vale knew that Pentler had introduced BSGR to Guinea. It knew that Mr IS Touré was engaged by BSGR and believed that Mr IS Touré was related to Mme Touré, who Vale (incorrectly) believed to be President Conté's fourth wife. Further, Vale was privy to rumour and other innuendo regarding alleged corruption on the part of the BSGR Group and an alleged connection between BSGR and Mme Touré and/or Mr Thiam.

165.1. Mr Avidan understands from Mr Struik that, sometime in 2006, Mr Struik and Mr Cilins encountered Mr Etchart at the Ministry of Mines in Conakry. Mr Struik introduced Mr Etchart to Mr Cilins. He told him that Pentler had introduced BSGR to Guinea and that Mr Cilins was assisting him with general matters (e.g. renting office space, procuring vehicles, and providing assistance in relation to the hiring of staff).

165.2. In an undated "Kick Off Meeting" presentation cited by the First Defendant in paragraph 194.1 of his Defence, Vale expressed the view that "*thanks to their close relationship with influential people of the GoG (the fourth spouse of President Conté), we suppose that BSGR is a strong candidate to be granted with the areas that might be withdrawn from RT [Rio Tinto]*".

165.3. In an email from Vale's Marco Monteiro ("**Mr M. Monteiro**") to Mr Ledsham dated 25 October 2008, Mr M. Monteiro stated that BSGR was being "*very aggressive, but acting in an unethical manner and talking directly to one of the wives of the President in an attempt to get something*".

165.4. During a meeting on 24 November 2008, Vale was put on notice by Rio Tinto PLC that Mr Steinmetz's and BSGR's efforts to obtain the Simandou concession from Rio Tinto involved "*bribery and other acts of political corruption*" (according to an Amended Complaint filed by Rio Tinto PLC in the United States District Court, Southern District of New York, on 15 August 2014).

165.5. In an email from Vale's José André Alves ("**Mr Alves**") to Mr Ribeiro, copied to Mr Ledsham and dated 7 February 2009, Mr Alves stated that: "*BSGR as you have seen has as responsible for international relations Ibrahima Sory Touré, brother of the fourth wife of the deceased Gen. Conté, Mr. [sic] Mamadie Conté*".

165.6. In the internal report dated 14 September 2009 referred to above, Mr Etchart referred to BSGR's "*controversial relationship with former president Conté, particularly one of the wifes [sic] of the defunct president which sponsored BSGR in Guiné*".

165.7. In the Project Venezia presentation referred to above, BSGR was described as having a history "*fraught with bribery affairs and high-level corruption scandals in the country that could affect the process for the Simandou project*" and a "*very strong relationship with the president's 4th wife*". The nature of that alleged relationship is later elaborated on:

"*[Mme Touré] [h]as influence in the government. She placed her brother as a director with BSGR and suspected to [sic] have received around 2MUS$ to*

*interfere in the procedure that would grant the 50% that would be taken from RT [Rio Tinto], to favour BSGR; it could be the first level of a structure of payments to be defined in the process to grant those rights to BSGR."*

165.8. In an email from Mr Mendes to Vale's José C Martins dated 2 February 2010, in relation to the signature of a confidentiality agreement between Vale and BSGR, Mr Mendes stated: "*… it's a document Vale will be signing with this group of 'ill-reputation'. But for me, it has to be that way, otherwise we can't analyse it for buying purposes and get them out of the way*".

165.9. A report authored by Nardello & Co, commissioned by Clifford Chance on behalf of Vale for the purpose of its due diligence exercise, reported that "*BSGR Guinea was 'close to the Conte clan'*", and that Mr IS Touré, who was "*in charge of external relations for BSGR in Guinea*", was "*a brother of Mamadie Conté, the 4th wife of the late President*".

165.10.   Mr Steinmetz is described in the same report as having a "*close connection*" and "*good working relationship*" with Mr Thiam.

165.11.   Mr Avidan understands from Mr Struik that, in March 2010, Mr Alves, Cello Henning and Mr Etchart (all of Vale) travelled to Guinea with Mr Struik for a site visit as part of Vale's due diligence exercise. During that site visit, Mr Struik told Mr Alves, Mr Henning and Mr Etchart that Pentler had introduced BSGR to Guinea.

165.12.   In any event, as pleaded in paragraph 80 above, BSGR Steel's US$22 million purchase of a 17.65% interest in BSGR BVI from a third party (viz. Pentler) was disclosed in the 2008 Financial Statements and 2009 Statement of Financial Affairs, both of which were provided to Vale in the course of the due diligence exercise.

166.   Against that background, Vale conducted a superficial and inadequate due diligence exercise.

166.1. None of the Initial DD Questionnaire, Supplemental DD Questionnaire, Clark ABL Certificate, Steinmetz ABL Certificate or FCPA Interview specifically

addressed the alleged relationship between the BSGR Group and Pentler, Mme Touré or Mr Thiam (or any allegation of bribery or corruption in relation thereto). The only specific question asked by Vale pertained to Mr IS Touré, who Vale already believed to be related to Mme Touré.

166.2. Despite the size and significance of the deal and the risks involved, the due diligence exercise was 'completed' within little over a month, and Vale initially agreed to limit the scope of its due diligence to BSGR Guernsey.

166.3. Ernst & Young (who were contracted by Vale to carry out financial due diligence in relation to the transaction) did not perform any audit work in Guinea, or provide its due diligence report to Vale, until after the transaction had been completed.

166.4. According to paragraph 196.4 of the First Defendant's Defence, Vale pressured Ernst & Young into altering their initial conclusion that BSGR posed a high risk of bribery and corruption.

167. Vale knew that (i) there was a very real risk that bribery and corruption had occurred in relation to Simandou; (ii) there were serious reputational and regulatory risks for it in the event that bribery or corruption had in fact occurred in relation to Simandou (including under the US Foreign Corrupt Practices Act of 1977 (15 U.S.C. § 78dd-1, et seq.) ("**FCPA**")) and from the US Securities Exchange Commission ("**SEC**")); and (iii) it had undertaken an inadequate due diligence exercise, but it nonetheless entered into the JVA and SHA and made any payments in connection therewith. In particular, in addition to the matters set out above:

167.1. On 13 April 2010, Alex Monteiro, Vale's then Director of Mergers and Acquisitions ("**Mr A. Monteiro**"), emailed Fabio Barbosa (also of Vale):

> "*Our recommendations to the business department have been the following, based on the legal and commercial risks:*
>
> *1. If the decision is of closing the deal, that it be made in escrow (bank financing doesn't eliminate FCPA risk). The lawyers' standing is clear, once we close it, we run the risk of already being in violation the FCPA on D+1, given that we*

> *couldn't do a books and accounts review of the 4 companies that come in the acquisition package (located in Guernsey, Guinea, Liberia and BVI);…3. Due diligence – the result of the due diligence is not satisfactory, nor exhaustive; more time and information is needed from the other party …"*

167.2. In a later email from Mr A. Monteiro to Mr Barbosa, also dated 13 April 2010, he stated:

> *"In regard to FCPA, adding to what has been said, I think the risk of closing the deal without escrow is not only reputational, rather, 'risk is of civil administrative liability to the SEC for the Company', transcribing the words of Clifford Chance's specialist in FCPA."*

168.  Accordingly, it is to be inferred that Vale regarded the representations made (or allegedly made) by Mr Avidan (and the other Defendants) with such scepticism that they did not assuage the FCPA risk associated with the transaction. The only reasonable conclusion is that Vale did <u>not</u> rely on, and was not induced by, the truth of those representations, and decided to enter into the JVA and SHA without any regard thereto. In doing so it acquired the interest in Simandou which it so desperately desired and put itself in a position to rid itself of its junior partner (the BSGR Group) in due course. It is to be inferred that this commercial interest overrode any interest Vale might have ordinarily or otherwise had (which is not admitted) in not being exposed to the risks identified in paragraph 116.1. That paragraph is accordingly denied.

169.  Further and in any event, in the premises Vale knew or did not care about (i) the involvement of Pentler or its Principals in the BSGR Group's introduction to Guinea; (ii) the alleged relationship between Mr IS Touré and Mme Touré; and/or (iii) the alleged relationship between Mme Touré and the BSGR Group. Vale would not have relied, and did not rely, on any representation to the contrary. In particular, it is denied that any further disclosures as to the existence of such persons as "*consultants*" or "*intermediaries*" would have been a "*red flag*" for the Claimants. It would not have led to any or any substantial further due diligence being conducted, and in any event the results of any due diligence carried out (whether from independent investigation or responses from the Defendants) would not have affected the Claimants' decision to enter into the transaction. Paragraph 116.2 is accordingly specifically denied.

## SECTION J: CLAIM IN CONSPIRACY

170.  As to paragraph 117, so far as it is addressed to Mr Avidan (no admissions otherwise being made):

170.1. Paragraph 96 above is repeated.

170.2. The opening paragraph is denied. There was no combination, agreement or understanding between Mr Avidan and any other Defendant to make fraudulent misrepresentations to Vale in the course of the due diligence exercise or otherwise.

170.3. It is denied that Mr Avidan made any false representations at all, and further that he did so knowingly (or recklessly), or pursuant to any "*combination*". It is denied that he acted unlawfully, and in any event he genuinely believed at all times that he was acting lawfully.

170.4. It is denied in any event that the Claimants have suffered loss as alleged, for the reasons set out below.

170.5. Paragraph 117.1 is denied. Paragraphs 105 to 115 have been addressed above. Paragraphs 97 to 162 above are repeated.

170.6. Paragraph 117.2 is denied. Paragraphs 68 to 92 have been addressed above. Paragraphs 60 to 83 above are repeated.

170.7. Paragraph 117.3 is denied. Paragraphs 65 to 66 above are repeated.

170.8. Paragraph 117.4 is denied. Paragraphs 82.2 to 82.4 above are repeated.

170.9. Save that it is admitted that Mr Avidan was subsequently awarded a bonus, paragraph 117.5 is denied. Paragraphs 26 to 27 and 96 to 98 have been addressed above. Paragraphs 24, 25 and 87 to 89 above are repeated. To the extent that Mr Avidan made any representations during the course of the due diligence process, these were made not made to advance his (or "*the*

*Defendants'*") own financial interests, but in good faith. It is specifically denied that loss was inevitable, foreseeable or intended.

170.10.   Paragraph 117.6 is denied. Mr Avidan did speak honestly about the alleged matters, insofar as (on the basis of the true position and his knowledge) they arose at all. The true position is addressed above.

## SECTION K: PROPRIETARY CLAIM

171.   As to Section K, paragraph 96 above is repeated. Further or alternatively, as a matter of New York law, which applies to this claim, the Claimants have no proprietary claim, for the reasons set out at paragraph 42 of the First Defendant's Defence. Accordingly, all claims made and relief sought in this section are denied. Without prejudice to this, Mr Avidan pleads as follows to this section on the basis that (contrary to his case) English law applies.

172.   As to paragraph 118:

172.1. Save that it is admitted that Vale initiated the Arbitration proceedings on 28 April 2014, and that it resulted in an Award, the first sentence is denied. The JVA and SHA were not in fact rescinded by Vale. Rather, they were terminated by agreement (and therefore affirmed) by clause 6.1 of the share purchase deed entered into by Vale, BSGR and BSGR Guernsey on 13 March 2015. That termination was without prejudice to the LCIA Arbitration claim by Vale against BSGR (clause 6.2). However, neither that agreement nor the Award binds Mr Avidan or any other third party.

172.2. Further or alternatively, Vale elected in the Arbitration to claim damages for deceit which were assessed, as Vale asked them to be, without giving any credit for the value of any proprietary claim. In those circumstances, Vale is not entitled to claim any proprietary remedy in relation to the proceeds from any person.

172.3. Further or alternatively, even if (which is denied) the JVA and SHA were rescinded, that rescission did not have the result that the US$500 million paid to

BSGR by Vale International, a third party, was impressed with a constructive trust (whether in favour of Vale International or Vale).

172.4. The remainder of paragraph 118 is accordingly denied.

173. As to paragraph 119, insofar as it is addressed to Mr Avidan (no admissions otherwise being made):

173.1. Point (i) is not admitted.

173.2. Point (ii) is denied. Mr Avidan did not receive any part of the US$2.5 million, US$2.8 million, US$1.7 million or US$1.42 million as a volunteer. Those sums were remuneration for work done and value added to the BSGR Group (and only the US$2.5 million had any connection with Guinea). Nor did he receive any part of those sums with notice of deceit as alleged.

173.3. Point (iii) is denied, for the reasons set out above in the preceding sub-paragraphs and paragraphs 171 and 172 above. Further or in the alternative to Mr Avidan's primary case as to when the cause of action for the proprietary claim arose (upon payment of the monies, as set out below), it is further denied (if it be alleged) that any alleged constructive trust arose on receipt of the relevant funds. No trust could arise until the rescission of the JVA.

174. As to paragraph 120 insofar as it is directed to Mr Avidan (namely paragraph 120.4), it is admitted that Mr Avidan's company Fefania received US$2.5 million in July 2010, US$2.8 million in October 2010, US$1.7 million in November 2010, and US$1.42 million in January 2011. Paragraph 89.2 above is repeated. It is not admitted that these sums, or any other sum he received at any time, represented the "*proceeds*" of the US$500 million, and denied for the reasons set out above that they represent the traceable proceeds thereof.

### SECTION L: APPLICABLE LAW AND LIMITATION

175. Save to the extent of any inconsistency with the foregoing, Mr Avidan hereby adopts and pleads in his own Defence the facts and matters pleaded by the First, Second,

Sixth, Seventh and Eighth Defendants in relation to:

175.1. The law applicable to the Claimants' claims, being New York law. The Claimants do not plead any claim under New York law, and Mr Avidan reserves the right to respond to any such case if made, including by setting out further particulars in relation to New York law;

175.2. The limitation periods and principles of laches applicable to the Claimants' claims under New York law, alternatively English law; and

175.3. The date on which the Claimants' causes of action accrued, or the relevant limitation period otherwise started to run (on the basis of knowledge that had been or could with reasonable diligence have been acquired), under New York law, alternatively English law.

176.  In the premises, the Claimants' claims are time-barred or barred by laches.

## SECTION M: CAUSATION, LOSS AND DAMAGE

177.  Paragraph 121 is denied. Paragraphs 163 to 169 above are repeated.

178.  As to paragraph 122:

178.1. The opening paragraph is denied. In the premises, it is denied that the Claimants are entitled to any of the sums claimed by way of damages.

178.2. Paragraph 122.1 is admitted.

178.3. Paragraphs 122.2 to 122.5 are not admitted. Insofar as the costs allegedly spent in the arbitration are proven, they represent a failure by the Claimants to mitigate their losses. It was not a reasonable step to spend so much pursuing BSGR in arbitration, and less could have been spent to achieve the same or a similar outcome as was in fact achieved.

179.  Paragraph 123 is not admitted.

180. As to paragraph 124, it is denied that the Claimants have been caused any loss by any wrongdoing by Mr Avidan. Further and in any event:

    180.1. Paragraph 124.1 is a claim for reflective loss to which the Claimants are not entitled as a matter of law;

    180.2. As to paragraph 124.2, paragraph 178.3 above is repeated.

### SECTION N: INTEREST

181. Paragraph 125 is not admitted, save that it is denied, in the premises, that the Claimants are entitled to any interest.

182. In the premises, paragraph 126 is denied.

183. As to the prayer, it is denied that the Claimants are entitled to the relief claimed, or any relief.

**TOM WEISSELBERG QC**
**DAVID LOWE**
**WARREN FITT**

**15 May 2020**

I believe that the facts stated in this Defence are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Full name: Asher Avidan (Fourth Defendant)

Signed:

Date: 15. 05. 2020

113