# Exhibit 9

<u>IN THE HIGH COURT OF JUSTICE</u>                    <u>CLAIM NO. CL-2019-000723</u>

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (QBD)**

B E T W E E N :-

(1) **VALE S.A.**

(2) **VALE HOLDINGS B.V.**

(3) **VALE INTERNATIONAL S.A.**

<u>Claimants</u>

-and-

(1) **BENJAMIN STEINMETZ**

(2) **DAG LARS CRAMER**

(3) **MARCUS STRUIK**

(4) **ASHER AVIDAN**

(5) **JOSEPH TCHELET**

(6) **DAVID CLARK**

(7) **BALDA FOUNDATION**

(8) **NYSCO MANAGEMENT CORPORATION**

<u>Defendants</u>

---

**DEFENCE OF SIXTH DEFENDANT**

---

## I.    Introduction

1.    This Defence is lodged by the Sixth Defendant ("**Mr Clark**") in response to the Claimants' Particulars of Claim ("**PoC**") dated 15 January 2020.  Save where otherwise indicated:

    1.1    Abbreviations defined in the PoC are adopted herein, without any admissions being made thereby.

    1.2    References to paragraphs herein are to the paragraphs of the PoC.

1

1.3     Sub-paragraphs of the PoC are referred to as paragraphs.

1.4     Where Mr Clark does not admit allegations, he does so because he has no or insufficient knowledge or recollection of the facts concerned so as to admit or deny them, and by pleading a non-admission Mr Clark requires the Claimants to prove the same.

2.      The core allegations against Mr Clark relate to events which took place over ten years ago whilst he was an employee of BSGR, which is now in administration.  Mr Clark has prepared this statement of case without access to any of the emails, skype accounts and documentary records which he would have had available to him whilst an employee of BSGR, and has been largely dependent on documents provided to him by the Claimants, following their application for a Worldwide Freezing Injunction against him. He is hampered in the extent to which he can fairly and properly respond to all of the allegations against him, the majority of which depend on inappropriate inferences being drawn from isolated emails and other communications, divorced of their contemporaneous context.  Mr Clark reserves his position as to whether a fair trial of the claim against him can ever take place, but in any event anticipates that this Defence will be the subject of amendment following disclosure and sight of other Defendants' statements of cases, aspects of which he may adopt in due course.

## II.     Mr Clark's Position: Summary

### Mr Clark

3.      Mr Clark is a qualified chartered accountant and worked as an auditor, prior to taking a role as Director of Internal Audit, within the States Treasury Internal Audit Department of the States of Guernsey.  In 2001, he became States Treasurer, the most senior civil service role in the Treasury of the States of Guernsey, his signature featuring on Guernsey bank notes during the time in which he held this role.  IIe is a director and trustee of various charities within Guernsey, where he has lived with his wife (a fellow of the Institute of Chartered Accountants of England and Wales and a Special Constable with the Guernsey Police, who undertakes forensic accounting services on an unpaid volunteer basis within the Economic Crime Division) since 1990. Mr Clark is financially secure and protective of his reputation in Guernsey.

4.  Mr Clark denies the claims in fraudulent misrepresentation and conspiracy against him. Moreover, for all the reasons set out above (amongst others), it is inherently improbable that:

    4.1  Mr Clark would have acted in the manner alleged against him in this Claim.

    4.2  Any of the other Defendants would have revealed to Mr Clark the nature of their alleged misconduct (as to which no admissions are made) or sought to involve him in the unlawful means conspiracy alleged in this Claim.

*Mr Clark's Role*

5.  Mr Clark joined BSGR on 1 March 2007 as director and as Group Treasurer, his initial role being to establish the Guernsey office as the administrative headquarters of BSGR (it having been based in Jersey until March 2007).  As time went on, Mr Clark acquired an increasing number of directorships of Guernsey-incorporated companies within the BSG Group (12 by the time of his departure from his employment in 2014), such that by the time of the events materially in issue in the Claimants' claims, he spent only approximately 50% of his time on work relating to BSGR projects of which  the project in Guinea was just one.

6.  Mr Clark performed a primarily administrative role in respect of all of his duties for the various Guernsey-based BSG companies of which he was a director (including BSGR). In the main, those roles entailed ensuring that payment requests were dealt with promptly and in line with appropriate approval procedures, as well as tending to the corporate administration of the said companies.

7.  Mr Clark had no first-hand knowledge of events or operations on the ground in Guinea at any material time.

8.  As a member of the BSGR board of directors, Mr Clark exercised his own independent judgment in taking decisions, but was ultimately reliant on the input of others in taking board decisions, such as Mr Tchelet, Mr Avidan, Mr Struik, Mr Cramer, Mr Steinmetz and Ms Sandra Merloni-Horemans.

9.   Although he acted as a board member of BSGR as set out above, Mr Clark did not lead the commercial strategy of any of the many Guernsey-incorporated companies of which he was a director, including BSGR.

10.  At no material time was Mr Clark a close associate of the First Defendant.

*Summary*

11.  In summary of Mr Clark's position (as further elaborated upon below):

11.1   In so far as any representations made by Mr Clark were representations about his knowledge or belief, they were true.

11.2   In so far as any representations made by Mr Clark were about an underlying state of affairs, Mr Clark believed them to be true and his belief was not reckless.

11.3   Mr Clark makes no admissions as to the underlying state of affairs to which any of his representations related.

11.4   Accordingly and in any event, Mr Clark made no representations fraudulently, whether in the deliberate or the reckless sense.

11.5   Mr Clark at no point intended to deceive the Claimants or anyone else in making the representations complained of.

11.6   It is in any event denied that the Claimants at any point relied upon or were induced to act to their detriment by representations made by Mr Clark.

11.7   In the premises, Mr Clark was not party to an unlawful means conspiracy which employed fraudulent misrepresentations as the relevant unlawful means.

**III.   Claimants' Overview**

12.  Mr Clark pleads as follows to the "Overview" section of the PoC, (paragraphs 1 to 11).

13.  Paragraphs 1 to 3 are admitted.

14.  Save that no admissions are made as to the subsequent payments exceeding US$746 million alleged at paragraph 4, paragraph 4 is admitted.

15.    As to paragraph 5:

    15.1    It is denied that Mr Clark made any fraudulent misrepresentations.

    15.2    At no material time did Mr Clark know of the identity or name of Mahmoud Thiam or have any conception that Frédéric Cilins, Ghassan Boutros, Pentler Holdings Limited and Mr Thiam served relevantly as agents, intermediaries and consultants, whether in obtaining the Mining Licences or otherwise.

    15.3    No admissions are made as to whether any of the remaining defendants ("**the Co-defendants**") made the fraudulent misrepresentations they are alleged to have made but, to the extent that they may in due course be proven to have done so, it is denied that Mr Clark had any knowledge of the same, or was put on notice of the same, whether constructively or otherwise.

16.    As to the example set out at paragraph 6, insofar as the Claimants rely upon the matters set out therein to allege wrongdoing against Mr Clark, such wrongdoing is denied, otherwise it is not admitted, as set out in further detail below. In any event, to the extent that any of the matters set out in paragraph 6 may be proven, Mr Clark has no and at no material time had any knowledge as to the same.

17.    As to paragraph 7:

    17.1    The first sentence is admitted.

    17.2    As to the second sentence, only to the extent consistent with the matters set out at paragraphs 6 to 9 above was Mr Clark's role that of a "senior executive" within the BSGR Group at the time the JVA and SHA were entered into.

    17.3    It is denied that Mr Clark received any reward, whether handsome or otherwise, by way of recognition for playing a part in inducing Vale to enter into the JVA and the SHA.  Mr Clark pleads further to this allegation at paragraph 30.4 below.

18.    In so far as it concerns Mr Clark, paragraph 8 is denied for the reasons set out more fully below.  Otherwise, no admissions are made as to paragraph 8.

19.    Paragraph 9 is admitted. No admissions are made as to whether the Mining Licences had in fact been procured by bribery but, to the extent that the Claimants establish the

same, at no material time did Mr Clark have cause to know or to suspect that they had been so procured.

20.  Save that it is denied as aforesaid and as set out more fully below that Mr Clark made any fraudulent misrepresentations, that he held the requisite intention to deceive, that the Claimants relied on, or were induced to act by, any representations made by him and that it is denied that Mr Clark was party to any conspiracy, no admissions are made as to paragraph 10.

21.  As to paragraph 11, Mr Clark repeats his denial that he made any fraudulent misrepresentations and for that reason (without limitation) denies that the Claimant enjoys any proprietary claim as against him, which claim is (as with all claims) in any event statute-barred.

**A.     Parties**

*The Claimants*

22.  The first sentences of paragraphs 12 and 13 (concerning Vale and Vale Holdings) are admitted, the balance of those paragraphs is not admitted.

23.  The first and third sentences of paragraph 14 are admitted, the balance of that paragraph is not admitted.

*The Defendants*

24.  As to the generality of paragraphs 15 to 24 and paragraphs 26 to 27, which concern the Co-defendants:

24.1  No admissions are made as to whether any of the Co-defendants made the fraudulent misrepresentations they are alleged to have made.

24.2  To the extent that any of the Co-defendants did make fraudulent misrepresentations as alleged, it is denied that Mr Clark had any knowledge of the same, or was put on notice of the same, whether constructively or otherwise.

25.  As to paragraph 15 (concerning Mr Steinmetz), the first two sentences are admitted and the final sentence is noted.

6

26.   As to paragraph 16 (concerning Balda), paragraph 16.1 and the first sentence of paragraph 16.2 are admitted.  No further admissions are made.

27.   No admissions are made as to paragraph 17.

28.   No admissions are made as to paragraph 18.

29.   As to paragraphs 19 to 24 (concerning Mr Cramer, Mr Struik, Mr Avidan and Mr Tchelet):

   29.1   No admissions are made as to the accuracy of the descriptions of the roles and professional backgrounds of the said individuals within the BSGR Group, as set out in those paragraphs.

   29.2   It is admitted that Mr Clark understood at the material time that the said individuals were involved in the negotiation of the JVA and the SHA, albeit the precise extent and nature of each individual's involvement in the said negotiation was unknown to him, such that he does not admit whether the said involvement was "close".

   29.3   The balance of those paragraphs do not appear to be relevant to Mr Clark and are therefore not admitted.

30.   As to paragraph 25, concerning Mr Clark:-

   30.1   It is admitted that:

      (a)   Mr Clark is a chartered accountant resident in Guernsey.

      (b)   Mr Clark was appointed as a director of BSGR and as the BSGR Group's treasurer in about March 2007.

      (c)   Mr Clark also assumed the role of money-laundering reporting officer (MLRO) for BSGR.

      (d)   Mr Clark was also a director and MLRO of all BSGR Group companies registered in Guernsey from the later of March 2007 or the date of their incorporation (including BSGR).

30.2   It is denied that Mr Clark was closely involved in the negotiation of the JVA and SHA and averred that the Claimants' true understanding as to the extent of Mr Clark's non-involvement in the negotiation of the JVA and SHA is evidenced by the matters set out as follows:

(a)   Mr Clark was not involved in any of the meetings held in Rio in the week commencing 15 March 2010 which the Claimants allege (at paragraph 67 of the PoC) led to the execution of the Heads of Terms on 19 March 2010. Nor did Mr Clark sign the Heads of Terms on behalf of BSGR.

(b)   As evidenced by the penultimate sentence of paragraph 88 of the PoC, the Claimants did not understand BSGR to be represented by Mr Clark during any material negotiations for the JVA and the SHA (and he did not so represent BSGR).

(c)   Mr Clark attended a single negotiation meeting at the offices of Clifford Chance on either 8 or 9 April 2010, during which he was a bystander and no more, and was seen to be and treated as such by the Claimants' representatives.

(d)   Notwithstanding the prior provision to them of the Initial DD Questionnaire and the Supplemental DD Questionnaire, Vale and its representatives chose to conduct extensive interviews with Mr Tchelet, Mr Avidan, Mr Struik and Mr Cramer, for the specific purposes of interrogating the same as to the BSG Group's business in Guinea, how it was run and the nature of its local relationships, and ostensibly to fully explore the possibility of any corruption in BSGR's affairs. In the present proceedings, the first affidavit of the Claimants' own solicitor dated 22 November 2019 described the purposes of those interviews as being to "*conduct an interview of key BSGR representatives regarding due diligence issues relating to bribery and corruption (Cramer, Struik, Avidan and Tchelet)*".

(e)   Vale could have chosen to interview Mr Clark as part of their due diligence enquiries, but took the considered decision not to do so. In the premises,

it is to be inferred both that Vale knew full well that Mr Clark was not a *"key BSGR representative"* at all, and that Vale knew Mr Clark to be unworthy of interrogation in relation to due diligence issues relating to bribery and corruption.

(f)    In all the premises, it is to be inferred that the Claimants knew at all material times that the nature of Mr Clark's role and his status was as summarised at paragraphs 6 to 10 above.

30.3    It is denied that Mr Clark made fraudulent misrepresentations to induce Vale to enter into either of the JVA or the SHA.  It is denied that Mr Clark made any representations knowing them to be false, without belief in their truth, or acting recklessly as to whether or not they were true.  Any representations made by Mr Clark were made honestly.

30.4    As to the bonus payment to which the Claimants plead in the final three lines of paragraph 25:

(a)    It is admitted and averred that in or about June 2010 (i.e. after Vale entered the JVA and the SHA), Mr Cramer informed Mr Clark that certain BSGR staff would receive a bonus as a show of gratitude for their hard work. It is admitted and averred that at or about the same time Mr Clark was informed that his total bonus would be US$250,000.

(b)    It is admitted and averred that Mr Clark only ever received a sum of US$180,000 by way of such a bonus, which he received on or about 6 July 2010. Mr Clark received the said bonus along with some 21 other BSGR employees, eight of whom received larger bonus awards than Mr Clark.

(c)    It is accordingly denied that Mr Clark was awarded any bonus in about April 2010, as alleged.  Mr Clark first became aware of any bonus award after the JVA and the SHA were entered into, in or about June 2010.  It is further denied that Mr Clark at any material time laboured pursuant to (i) a *"promise"* made before the JVA and SHA were entered into, that he would receive a bonus of US$250,000 (as is alleged at paragraphs 96 and 113.3 of the PoC) or (ii) a reasonable expectation of receiving a substantial

bonus, in the event that the JVA and SHA were executed (as is alleged at paragraph 96 of the PoC).

(d)  It is denied that those who decided to award a bonus to Mr Clark (along with the 21 other BSGR employees) did so pursuant to any conception that Mr Clark had played a role *"in procuring Vale to enter"* into the JVA and SHA.  In the premises set out at paragraphs 6 to 9 and paragraphs 30.2(a) to 30.2(f) above in particular, those who decided upon the said bonus awards would have held no conception that Mr Clark performed any such role because, on any realistic view of his involvement, he did not.

(e)  For the avoidance of doubt, it is denied that the bonus of US$180,000 paid to Mr Clark in July 2010 was paid by way of a reward for making fraudulent misrepresentations which procured Vale to enter into the JVA and the SHA.   As aforesaid, there were no such fraudulent misrepresentations.

31.  As to paragraph 26 (concerning Balda), the first three sentences are admitted, the balance of that paragraph is (to the extent relevant to Mr Clark) not admitted.

32.  As to paragraph 27 (concerning Nysco), the first two and the last sentences are admitted, the balance of that paragraph is not admitted.

**Other Key Companies and Individuals**

33.  As to paragraph 28:

33.1  It is not clear what the Claimants mean by "complex" and so the first sentence is not admitted.

33.2  The second sentence of paragraph 28 is admitted.

33.3  The third sentence is noted.

34.  Paragraph 29 is not admitted.

35.  As to paragraph 30 (concerning Pentler):

35.1  It is admitted that Pentler is a BVI company.

35.2 No admissions are made as to whether or not Pentler was the vehicle through which Mme Touré held a 5% interest in BSGR BVI. Mr Clark in any event relies on the matters set out at paragraph 112 below.

35.3 The second sentence is admitted (albeit it is averred that Mr Clark had no knowledge as to the identities of Pentler's shareholders at the times material to the claim).

35.4 No admissions are made as to the nationalities of Pentler's shareholders.

36. As to paragraph 31 (concerning Mr Boutros):

36.1 No admissions are made as to Mr Boutros' nationality.

36.2 It is admitted and averred that at the material time Mr Clark understood Mr Boutros to be an agent or director of LMS. Mr Clark understood both Mr Boutros and LMS to be in business in the provision of construction plant and equipment, as to which Mr Clark pleads further at paragraph 117 below.

36.3 It is admitted that the BSGR Group paid various significant sums to Mr Boutros and to LMS over 2009/2010. Pending disclosure, no admissions are made as to the precise sums so paid.

36.4 Save as aforesaid, no admissions are made as to paragraph 31. To the extent that any monies paid to Mr Boutros or to LMS were used to pay bribes, Mr Clark had no knowledge of the same.

37. No admissions are made as to paragraph 32. At no material time did Mr Clark know of the identity or name of Mr Thiam or have any conception that Mr Thiam served relevantly as an advisor or consultant to the BSGR Group. To the extent that any bribes were paid to Mr Thiam, Mr Clark had no knowledge of the same.

**B.    The Mining Licences**

38. Mr Clark does not plead to paragraphs 33 to 37, which are irrelevant to his alleged involvement and which concern matters with and of which he had no direct involvement or knowledge. To the extent that, contrary to the foregoing, any of the said paragraphs are alleged to be relevant to Mr Clark, he makes no admissions in relation to the same.

11

C.      **Obtaining of Mining Licences: 2005-2008**

39.     Mr Clark does not plead to paragraphs 38 to 53, which concern matters which pre-dated his involvement with the BSGR group and with and of which he had no involvement or knowledge. To the extent that, contrary to the foregoing, any of the said paragraphs are alleged to be relevant to Mr Clark, he makes no admissions in relation to the same.  For the avoidance of doubt, and to the extent that any of the matters set out in the said paragraphs may be proven at trial, Mr Clark had no relevant knowledge of the same at any material time.

40.     Paragraph 54 is admitted.

41.     As to paragraph 55:

        41.1   Paragraph 55.1 is admitted.

        41.2   No admissions are made as to paragraph 55.2.

        41.3   Paragraph 55.3 is admitted.

42.     Save that paragraphs 57.2 and 57.3 are admitted (Mr Clark's understanding as to the purposes of payments to Mr Boutros being set out at paragraph 117 below), no admissions are made as to paragraphs 56 and 57, which concern matters with which Mr Clark had no involvement and of which he had no relevant knowledge.  For the avoidance of doubt, and to the extent that any of the matters set out in the said paragraphs may be proven at trial, Mr Clark had no relevant knowledge of the same at any material time.

43.     Save that it is admitted that by the end of 2009 Pentler had entered into an agreement to sell its interest in BSGR BVI for US$22 million, no admissions are made as to paragraph 58 (including paragraphs 58.1 and 58.2).  For the avoidance of doubt, and to the extent that any of the matters which Mr Clark does not admit as set out in the said paragraphs may be proven at trial, Mr Clark had no relevant knowledge of the same at any material time.

**D.**     **2009/10: Confirmation of Mining Licences**

44.    No admissions are made as to paragraph 59, which concern matters with which Mr Clark had no involvement and of which he had no relevant knowledge.

45.    Paragraph 60 is noted.

46.    As to paragraphs 61 and 62:

    46.1    As to paragraph 62.15 in particular, Mr Clark has some recollection of a payment of US$5 million for a project in Mozambique, which eventually proved not to be viable. Save that he had no knowledge that the said payment was for Mr Thiam's benefit as alleged (and as to which no admissions are made) and save that he at all material times understood that the payment was legitimately made in relation to a genuine project in Mozambique, Mr Clark cannot recall any further material particulars in relation to the said payment, some ten years after it was made.

    46.2    Otherwise, no admissions are made as to paragraphs 61 and 62, which concern matters with which Mr Clark had no involvement and of which he had no relevant knowledge.  For the avoidance of doubt, and to the extent that any of the matters set out in the said paragraphs may be proven at trial, Mr Clark had no relevant knowledge as to the same at any material time.

**E.**     **The JVA and the SHA**

47.    Paragraph 63 is admitted.

48.    No admissions are made as to paragraph 64.

49.    No admissions are made as to paragraph 65.

50.    No admissions are made as to paragraph 66.

51.    As to paragraph 67:

    51.1    No admissions are made as to the first sentence, as to which Mr Clark repeats his averments that:

(a) He was not involved in any of the meetings held in Rio in the week commencing 15 March 2010 which allegedly led to the execution of the Heads of Terms on 19 March 2010.

(b) He did not sign the Heads of Terms on behalf of BSGR.

51.2 The second sentence (concerning negotiations between Vale, represented by Clifford Chance, and BSGR, represented by Skadden, in Canary Wharf, London) is admitted. As to that sentence, Mr Clark notes the Claimants' implicit case at paragraph 88 of the PoC (which he admits as correct), to the effect that at no point did Mr Clark represent BSGR at any of the negotiations with Vale in Canary Wharf.

51.3 Mr Clark admits that terms for the proposed joint venture were reached during the course of the said negotiations, but makes no admissions as to whether those terms were "*detailed*", as alleged. In the premises set out at paragraphs 136 to 140 below, it is denied that Clifford Chance conducted "*in-depth due diligence relating to (inter alia) corruption and bribery issues*".

51.4 The Claimants' position in the final sentence is noted and pleaded to more fully below.

**Mr Clark's Execution of Due Diligence Documentation: Relevant Context**

52. The core of the Claimants' case against Mr Clark rests on the facts that he signed the Initial DD Questionnaire, the Supplemental DD Questionnaire and the Clark ABL Certificate, which contained the alleged First, Second, Third and Seventh Corruption Representations and the alleged First and Second Consultancy Representations.

53. The context in which Mr Clark signed the Initial DD Questionnaire, the Supplemental DD Questionnaire and the Clark ABL Certificate ("**the Clark Documents**") was one in which:

53.1 The nature of Mr Clark's role within BSGR and the BSGR Group was as summarised at paragraphs 5 to 9 above.

53.2    The nature of Mr Clark's role in the negotiations leading to the JVA and the SHA was as summarised at paragraph 30.2 above.

53.3    Mr Clark had no responsibility for deciding which documents did or did not go into the due diligence "data room" for interrogation by Vale (Mr Tchelet and Mr de Bernardini of Skadden being so responsible).

53.4    Mr Clark understood that:

(a)     The entire due diligence process on behalf of BSGR had been overseen by BSGR's external counsel, Skadden, who had read and approved the Clark Documents prior to Mr Clark's execution of the same and who had assured Mr Clark that they had been through all of the deal documentation (including the Clark Documents), and that they were content with the same.

(b)     The due diligence process on behalf of BSGR had further been overseen by BSGR's de facto internal counsel, Mr David Barnett, who had read and approved the Clark Documents prior to Mr Clark's execution of the same.

(c)     All of the substantive content contained in the Clark Documents had been completed on the basis of information from those closest to events on the ground, and in particular from Mr Avidan, Mr Struik and Mr Tchelet, which information had been provided to Skadden and to Mr Barnett.  Mr Clark understood that Skadden and Mr Barnett had also taken instructions from Mr Steinmetz as to the contents of the same.

53.5    Mr Clark had been present at one of the meetings in Canary Wharf on 8 or 9 April 2010 at which oral assurances from Mr Steinmetz, Mr Avidan and Mr Tchelet that no bribes had been paid in relation to the Guinea project were given.

53.6    In the circumstances set out at paragraphs 5 to 9 above in particular, Mr Clark necessarily and reasonably relied upon the information and confirmations provided by others as set out in paragraphs 53.4 and 53.5 above.

15

53.7   In the circumstances set out at paragraph 30.2 above, Vale (and through it, all of the Claimants) were at all material times aware of the fact that Mr Clark would necessarily and reasonably rely on information from others in providing the certifications he did in the Clark Documents.

54.   Further to the above matters, the context in which Mr Clark signed the Clark ABL Certificate in particular was one in which:

54.1   A team from Ernst & Young's London office had been engaged by Vale to carry out a financial audit of the Guernsey office, which occurred on 29 April 2010.

54.2   Mr Clark had been instructed by Mr Tchelet to provide that team from Ernst & Young with any documentation or information they required, which he did.

54.3   Mr Clark had been informed by Mr Tchelet that, during the FCPA Interview which took place on 8 April 2010, all of Mr Avidan, Mr Struik, Mr Tchelet and Mr Cramer had been interviewed at length as to the BSGR Group's business in Guinea, and had affirmed the propriety of the same.

55.   In signing the Clark Documents and in leaving their contents unqualified post-signature, Mr Clark drew significant comfort from and set significant store by the matters set out at paragraphs 53.4 and 53.5 above, and (as to the Clark ABL Certificate), drew significant comfort from and set significant store by the matters set out at paragraph 54 above.

### *Initial DD Questionnaire*

56.   Paragraph 68 is admitted. Mr Clark will also rely upon the Initial DD Questionnaire at trial for its full terms and true effect.

57.   To the extent consistent with the express wording of section B of the Initial DD Questionnaire (p.2) (which did not identify or purport to identify Mr Cramer or any other entity or individual as a UBO of Onyx) paragraph 69.5 is admitted, otherwise it is denied.

58. Paragraphs 69 and 70 are otherwise admitted. As to paragraph 69.6, in the premises set out at paragraph 53.7 above in particular, it is averred that Mr Clark made the relevant inquiries of BSG Group's directors, senior executives, other employees and UBOs and conducted the relevant review of the matters set out in the Initial DD Questionnaire, as set out at paragraph 53.4 above and that in the circumstances set out at paragraph 53.5 above he was content to leave the contents of the same unqualified, post-signature.

59. As to paragraph 71 itself, Mr Clark repeats paragraphs 53 and 55 above.  Further:

59.1  It is admitted and averred (as aforesaid) that the substantive content contained in the Initial DD Questionnaire was completed on the basis of information provided by Mr Avidan, Mr Struik and Mr Tchelet.

59.2  It is denied that Mr Clark provided more than trivial assistance in completing the Initial DD Questionnaire and Mr Clark repeats that he reasonably relied on the input of others in completion of the same.

59.3  It is denied as aforesaid that Mr Clark was a party to any common design to make fraudulent misstatements to Vale.

59.4  It is admitted that Mr Clark manifestly approved and adopted the representations set out in the Initial DD Questionnaire.

59.5  Mr Clark makes no admissions  as to the position of the Co-defendants in relation to their alleged approval and adoption of the representations in the Initial DD Questionnaire.

60. As to the sub-paragraphs of paragraph 71:

60.1  It is admitted that Mr Clark made inquiry of Mr Steinmetz (through Mr Barnett and/or Skadden as set out in paragraph 53 above) in preparing the responses to the Initial DD Questionnaire.   Otherwise, paragraphs 25 and 26 above are repeated in relation to sub-paragraph 71.1.

60.2  Paragraph 71.2 is addressed above.

60.3  As to paragraphs 71.3 and 71.5, it is admitted that Mr Clark made inquiry of Mr Tchelet, Mr Avidan and Mr Struik (through Mr Barnett and/or Skadden as set

out in paragraph 53 above) in preparing the responses to the Initial DD Questionnaire.

60.4    As to paragraph 71.4, the Initial Due Diligence did not identify or purport to identify Mr Cramer (or any other person or entity) as the UBO of Onyx. Mr Clark made no inquiry of him prior to signing the same.

60.5    Since the email referred to at paragraph 71.6 has been provided to Mr Clark as part of the documentation provided to him by the Claimants after they obtained a worldwide freezing injunction, paragraph 71.6 is admitted.

60.6    Paragraph 71.7 is admitted.

60.7    Paragraph 71.8 is denied insofar as it concerns Mr Clark.  Paragraph 29.2 above is repeated in relation to the balance of paragraph 71.8.

60.8    As to paragraph 71.9, it is admitted that Mr Clark made inquiry of Nysco and Balda (through Mr Barnett and/or Skadden as set out in paragraph 53 above) in preparing the responses to the Initial DD Questionnaire.

60.9    Paragraph 71.10 repeats allegations made elsewhere, the responses to which are repeated.

60.10   Save for his admission set out at paragraph 59.4 above, paragraph 71.11 is denied insofar as it concerns Mr Clark.

60.11   Save as set out above, no admissions are made to paragraphs 71.1 to 71.11.


*Supplemental DD Questionnaire*

61.    Paragraphs 72 and 73 are admitted.

62.    As to the generality of paragraph 74, Mr Clark repeats paragraphs 52 and 55 above. Further as to paragraph 74:

62.1    The first two sentences are admitted.

18

62.2   The final sentence and paragraphs 74.1 to 74.4 are denied insofar as they relate to Mr Clark; Mr Clark's understanding as to purpose of the 31 March 2010 Restructuring is as set out at paragraph 121 below. No admissions are made to those paragraphs insofar as they relate to any other Defendant.

63.   It is denied that Mr Clark materially assisted in the 31 March 2010 Restructuring, as alleged at paragraph 75.1. Mr Clark's understanding as to the 31 March 2010 Restructuring is as set out at paragraph 121 below and it is accordingly denied that he had any notion that the ultimate purpose of the same was as set out at paragraph 75.2 (as to which he otherwise makes no admissions).

64.   Paragraph 76 is admitted. Mr Clark will also rely upon the Supplemental DD Questionnaire at trial for its full terms and true effect.

65.   As to paragraph 77:

65.1   It is admitted that the Supplemental DD Questionnaire did not refer to the 31 March 2010 Restructuring but it is denied (if the same is intended to be alleged by the use of the word "concealed") (a) that there was any obligation so to refer and (b) that Mr Clark considered that there was any obligation so to refer.

65.2   Save that the representation set out at paragraph 77.2 was further qualified by the matters set out at paragraphs 1(i) to 1(iv) under the "Certification" heading of the Supplemental DD Questionnaire, the representations set out in paragraphs 77.1 and 77.2 are admitted.

66.   As to paragraph 78:

66.1   Mr Clark repeats (mutatis mutandis) his response to paragraph 71 above.

66.2   Mr Clark repeats paragraph 62.2 above as to the alleged purpose of the 31 March 2010 Restructuring and as to his alleged knowledge of the same.

66.3   Paragraph 78.2 is admitted.

66.4   No admissions are made as to paragraph 78.3.

66.5   As to paragraph 78.4, it is admitted that Mr Clark made inquiry of Nysco and Balda (through Mr Barnett and/or Skadden as set out in paragraph 53.4 above) in preparing the responses to the Supplemental DD Questionnaire and that in certifying the same he purported to do so on behalf of Nysco.

**8 April Representations**

67.   Paragraph 79 is admitted.

68.   No admissions are made as to paragraph 80, Mr Clark not having been present at the 8 April 2010 interviews.

69.   As to paragraph 81, it is denied that Mr Clark bore responsibility for the representations allegedly made on 8 April 2010, in the premises set out at paragraphs 30.2(a) to 30.2(f) above and in any event.  Further, as to paragraph 81.2, it is denied insofar as it is intended to be alleged that the fact that the Clark ABL Certificate, which Mr Clark signed, repeated the 8 April Representations means that Mr Clark bore any responsibility for the making of those representations as made on 8 April 2010. Otherwise, paragraph 81 is not admitted.

**Steinmetz ABL Certificate**

70.   No admissions are made as to paragraph 82.

71.   Paragraph 83 is admitted as a broad summary of the Steinmetz ABL, which will be referred to at trial for its full terms and effect.

72.   Paragraph 84 is denied in the premises set out at paragraphs 30.2(a) to 30.2(f) above and in any event. Further:

72.1   As to paragraph 84.1, insofar as the Claimants rely on the FCPA Interview as against Mr Clark, paragraph 69 above is repeated.

72.2   As to paragraph 84.2, it is denied insofar as it is intended to be alleged that the fact that the SHA, which Mr Clark signed, made reference to the Steinmetz ABL Certificate means that Mr Clark adopted the contents of the Steinmetz ABL Certificate as his own.

*Clark ABL Certificate*

73. Paragraphs 85 and 86 are admitted. The Seventh Corruption Representation was true, as Mr Clark had no reason to believe that BSGR, its subsidiaries and affiliates or their respective directors, employees or any person acting on their behalf, had paid or would pay, offer, promise or authorise the making of a Prohibited Payment. Further and in any event, Mr Clark believed the said representation to be true.

74. As to paragraph 87, Mr Clark accepts that he made the representations set out in the Clark ABL Certificate, which was again substantively completed on his behalf by Skadden and/or Mr Barnett on the basis of (as Mr Clark understood the position) information provided by Mr Avidan, Mr Struik and Mr Tchelet and instructions from Mr Steinmetz. Save as aforesaid, Mr Clark makes no admissions as to the responsibility of the Co-Defendants for the Clark ABL Certificate.

*Further London Meetings*

75. Save as is admitted and averred at paragraph 53.5 above, no admissions are made as to paragraphs 88 and 89, Mr Clark having not been present at any of the meetings to which the Claimants plead. As to the representations set out at paragraph 89 (to the effect that the transaction by which BSGR Steel purchased the minority interest in BSGR BVI was done for tax planning purposes and that the selling minority shareholder was not an external third party but a company within the Balda group) Mr Clark would have challenged both such representations had he been aware of the same at the material time, because he would have known that neither of them were true.

76. As to paragraph 90, it is denied that Mr Clark bore responsibility for the representations allegedly made during the *"Further London Meetings"* in the premises set out at paragraphs 30.2(a) to 30.2(f) above and in any event.

*Other Matters*

77.   As to paragraph 91, it is admitted that such representations as were made by Mr Clark (being the First, Second, Third and Seventh Corruption Representations and the First and Second Consultancy Representations) were made with the intention that Vale should rely upon them so as to enter into the JVA and SHA.  It is further admitted that Mr Clark knew that Vale would pass the said representations on to its subsidiary and affiliate companies for the purposes of implementing the joint venture, including for the purpose of making payments pursuant to the JVA and SHA and intended the said representations to be relied on by Vale International and Vale Austria in making any payments (or taking any other steps required) under the JVA or SHA.  No admissions are made as to the balance of paragraph 91.

78.   As to paragraph 92, it is denied that any of the representations which Mr Clark admits having made were implied in nature.

79.   The first sentence of paragraph 93 is noted and Mr Clark will do the same. The balance of paragraph 93 is admitted as a brief summary of certain of the provisions of the JVA and SHA, which will be referred to at trial for their full terms and effect.

80.   Paragraph 94 is admitted.

81.   No admissions are made as to paragraph 95.

**F.   Payments post the JVA and the SHA**

82.   Paragraph 96 is denied for the reasons set out at paragraph 30.4 above.

83.   Paragraph 97 is admitted.  The Bonus Schedule also detailed that some 22 employees of BSGR received bonuses on 6 July 2010, including six non-defendant individuals who received bonuses in sums of US$180,000 (x 2 individuals), US$200,000, US$350,000 (x 2 individuals) and US$800,000 (none of whom face allegations of fraudulent misrepresentation or conspiracy).

84.   As to paragraphs 98 and 99:

  84.1   No admissions are made as to paragraph 98.1.

84.2   Paragraphs 98.2 and 99 are vague and unparticularised, and save that it is admitted that Mr Clark received a salary from BSGR until his departure from his employment in 2014, no admissions are made as to the same.

85.   As to paragraph 100:

85.1   It is admitted that the terms of the Pentler SPA were renegotiated to increase the consideration payable to Pentler to US$30 million (US$8 million of which had already been paid).

85.2   No admissions are made as to when the said renegotiation took place and as to whether it took place at the same time as BSGR was negotiating the JVA and SHA. Mr Clark only became aware of the fact of that renegotiation after it had taken place, on or about 12 May 2010 when he was asked to effect the payment of US$22 million to Pentler, and was never informed as to when the renegotiation took place.

85.3   The second and third sentences are admitted.

85.4   As to the fourth and fifth sentences (including paragraphs 100.1 and 100.2), it is admitted that a further US$4.5million was paid to Pentler as set out therein but no admissions are made as to whether the said sum was paid in full and final settlement of Pentler's entitlements under the BSGR-Pentler Milestone Agreement. Mr Clark understood at the material time that these sums were the product of further renegotiation of the Pentler SPA.

86.   No admissions are made as to paragraph 101, Mr Clark having no knowledge as to the same.

**G.   Alleged Attempts to Destroy Incriminating Material**

87.   No admissions are made as to paragraphs 102 and 103, Mr Clark having no knowledge as to the same.

**H.   Revocation of Mining Licences**

88.   Save that no admissions are made as to the final sentence, paragraph 104 is admitted.

I.      **Claims in Deceit**

**Alleged Falsity of Representations**

*Mme Touré and Mr Thiam*

89.     As to paragraphs 105.1 to 105.16:

    89.1   No admissions are made as to paragraphs 105.1 to 105.16 or as to the introductory sentences at paragraph 105.

    89.2   As set out in detail in paragraphs 112 and 113 below, Mr Clark had no knowledge of (a) Mme Touré's existence or role at any material time or (b) any material links she may have had to Pentler or to BSGR or (c) Mr Thiam's existence or role at any material time or (d) any material links Mr Thiam may have had to BSGR or to the BSGR Group.

*Mr Cilins*

90.     As to paragraph 106.1 (concerning Mr Cilins):

    90.1   No admissions are made as to paragraphs 106.1(a) to (j) and 106.1(l) to (m) (including the introductory sentences at paragraphs 106 and 106.1).

    90.2   As to paragraph 106.1(k):

        (a)   The first sentence is admitted.

        (b)   The second sentence is not admitted.

    90.3   As set out at in detail at paragraph 115 below:

        (a)   Mr Clark had no material knowledge as to Frédéric Cilins' existence or role at any material time and in particular had no knowledge that he was a shareholder of Pentler.

        (b)   At no material time did Mr Clark hold any conception that Mr Cilins' role was that of a consultant, representative, agent and/or intermediary to BSGR ProjectCo, or that he was a member of the local advisory team retained by BSGR and/or BSGR ProjectCo.

24

*Pentler*

91.   As to paragraph 106.2 (concerning Pentler):

    91.1   No admissions are made as to paragraphs 106.2(a) to (f) (as to which Mr Clark pleads further at paragraph 116.4 below), or as to the introductory sentences at paragraph 106.2.

    91.2   As set out in detail at paragraph 116 below, at no material time did Mr Clark hold any conception that Pentler's role was that of an agent, intermediary, representative or consultant to BSGR and/or BSGR ProjectCo or that it was a member of the local advisory team retained by BSGR and/or BSGR ProjectCo. For the avoidance of doubt, none of the alleged facts contained in the detailed allegations set out in paragraphs 106.2(a) to (f) were within Mr Clark's knowledge at any material time.

    91.3   As to paragraph 106.2(g):

        (a)   The first sentence is admitted.

        (b)   The inference which the Claimants seek to draw in the second sentence, to the effect that the additional US$8 million payment set out in the SPA, in the event that BSGR Steel should realise a profit exceeding US$1 billion from the Simandou project, was intended to encourage Pentler to continue to act as an intermediary or consultant, representative or agent of BSGR or BSGR ProjectCo, is denied as unrealistic. The more natural and obvious inference is that Pentler negotiated the aforesaid provision to ensure that it was able to benefit from the windfall, in the event that the Simandou project were to realise a profit as large as US$1 billion.

*Mr Boutros / LMS*

92.   As to paragraph 106.3 (concerning Mr Boutros):

    92.1   The first sentence of paragraph 106.3(d) is admitted.

92.2   Otherwise, no admissions are made as to paragraphs 106.3(a) to (e) or to the introductory sentences at paragraph 106.3.

92.3   As set out in detail at paragraph 117 below, at no material time did Mr Clark hold any conception that Mr Boutros' and/or LMS' role was that of an agent, intermediary, representative or consultant for BSGR, BSGR Guinea or BSGR ProjectCo (or that either Mr Boutros and/or LMS was a member of the local advisory team retained by BSGR, BSGR Guinea or BSGR ProjectCo).

*I.S. Touré*

93.    As to paragraphs 106.4 (concerning Mr I.S. Touré):

93.1   Mr Clark makes no admissions as to the said paragraph.

93.2   As set out at paragraph 114 below, Mr Clark had no knowledge of (a) Mr I.S. Touré's existence or role at any material time or (b) any material links he may have had to Pentler or to BSGR or to the BSGR Group.

*General Particulars of Falsity*

94.    Save that it is averred that at no point did Mr Clark possess any knowledge, whether actual or constructive, as to the matters alleged to have rendered the First to Third Consultancy Representations false, as the same are set out at paragraphs 106.5 to 106.10, no admissions are made as to the same.

*Fourth Consultancy Representation*

95.    Save that it is averred that did Mr Clark did not make the Fourth Consultancy Representation and that at no point did he possess any knowledge, whether actual or constructive, as to the matters alleged to have rendered Fourth Consultancy Representation false as the same are set out at paragraphs 107.1 to 107.2, no admissions are made as to the same (including the introductory sentence at paragraph 107).

96.    As to paragraphs 108, 109, 110, 111, 112, 114 and 115:

96.1 To the extent that the underlying particulars are alleged elsewhere in the Particulars of Claim, Mr Clark's response to those underlying particulars is repeated.

96.2 Otherwise, no admissions are made.

**Falsity of representations: Mr Clark's state of knowledge**

97. In light of Mr Clark's knowledge position as to the matters alleged to render the Corruption and Consultancy Representations false, as the same is set out at paragraphs 98-121 immediately below, the entirety of paragraph 113 proceeds on a false premise. It is denied that any of the matters set out at paragraph 113, including those set out at paragraphs 113.1 to 113.13, properly give rise to an inference that Mr Clark made the Corruption and Consultancy Representations knowing them to be false, without belief in their truth or reckless as to their truth and for the avoidance of doubt it is denied that Mr Clark so made the Corruption and Consultancy Representations.

*Book-keeping of Payments*

98. By 2009, the BSG Group had established a physical office and workers based in Guinea. Tatiana Rakitina was a Russian accountant based in Guinea who was in charge of the book-keeping in relation to the local Guinea office. Her counter-part in the Guernsey office was Helen Nicolle. In their day-to-day work, both of these women worked for Mr Tchelet and took their instruction from him. Their job was to keep spreadsheets detailing the costs and expenditure for the whole Guinea project. Mr Clark understood that Mr Tchelet would then regularly send this information up the corporate chain, explaining how much the Guinea project was costing the BSG group, and how and why.

99. Since Mr Tchelet had to justify the expenditure on the Guinea project to individuals who Mr Clark understood were above him within the BSGR group, he took a keen and close interest in how all costs arising out of the Guinea project, whether ultimately accounted for through the local Guinea office or the Guernsey office, were addressed in terms of accounting codes and designations and their proper book-keeping. Mr Tchelet was keen to ensure that certain costs remained accounted for in the Guernsey office only, but to the best of Mr Clark's recollection he never ordered that a specific cost which had been incurred should not be accounted for at all.

100.  Mr Clark was not responsible for day-to-day book-keeping or accounts allocation and accordingly did not personally take charge of how expenditure on the Guinea project was addressed in BSGR's day-to-day book-keeping.

101.  Helen Nicolle and Mr Tchelet would produce a weekly and a monthly report, which effectively served as management accounts.  As part of that process, Mr Tchelet would often (on a monthly basis at least) ask for changes to the presentation of information, including re-allocating costs to different costs descriptions.  To the extent that he was aware of the same, Mr Clark did not view the aforesaid matters as a cause for concern because:

    101.1  He viewed them only as a demonstrating Mr Tchelet's fastidiousness in ensuring that he was completely content with the allocation of costs, to which he was always giving consideration, even when payments had already been made, before he then had to justify those costs upwards to his superiors.

    101.2  BSGR employed Mr Peter Driver, a consolidation expert, to ensure that the accounts were properly presented and costs properly categorised, for the purposes of preparing audited annual consolidated accounts.

**Payment Processing**

102.  In general, when payments had to be made, Mr Tchelet would communicate directly with the staff in the Guernsey office to ensure that the payments were duly made.  Those staff would take their day-to-day instruction from Mr Tchelet.  Mr Clark was sometimes copied into Mr Tchelet's communications to the Guernsey office staff, but was not always so copied in.

103.  Usually, Mr Tchelet might copy Mr Clark into such emails in order to underline the urgency of a payment request and to ensure that Mr Clark was primed to release the payment on the JP Morgan system used by BSGR.  On other occasions, Mr Tchelet would copy Mr Clark in, so as to highlight to the relevant staff member  that he was dissatisfied with them in some way.

104.    There were also occasions when Mr Tchelet would relay a payment request directly to Mr Clark personally.  That might have been because other staff in the office had not responded to him promptly, or because he wanted to ensure that a payment he viewed as urgent or important was being taken in hand.

105.    Those occasions aside and as set out above, Mr Clark's direct involvement in processing a payment generally only came at the later stage of releasing a payment. At that point, he would ensure that the payment was for a legitimate request, and then check (by looking at the payment information sheet) that Mr Tchelet and at least one other BSGR member of staff had approved the payment; that it been given some accounting designation and that at least one member of staff had inputted the payment into the JP Morgan system properly.  Mr Clark would then release the payment.

106.    In doing so, Mr Clark did not carefully scrutinise the accounting code that had been allocated to a given payment within the accounting system used by BSGR: as aforesaid, such matters were the preserve of Ms Nicolle, Mr Tchelet and Mr Driver.

107.    From time to time, Mr Tchelet and/or others made payment demands on an urgent basis, sometimes with the relevant invoice relating to the payment to follow. Mr Clark understood such requests to be driven primarily by the facts that those on the ground in Guinea would have intermittent communication capability and that they wanted to know that the third parties they were dealing with in Guinea were being kept happy, in terms of receipt of payment.  Similarly urgent demands for payment, with invoices sometimes to follow, were also made in relation to other BSG Group projects with which Mr Clark had some involvement, including one in Sierra Leone.

*Payments to "Consultants"*

108.    In BSGR's book-keeping processes, the term *"consultant"* was used loosely and generically so as to refer to any third party contractor, particularly when a given payment was given its first accounting categorisation.

109.    In alleging dishonesty against Mr Clark, the Claimants have focussed on certain payments in which an accounting categorisation of "consultant" or similar was subsequently altered after the payment was first authorised, and thereby seek to draw inferences adverse to Mr Clark.

110. Mr Clark viewed such incidents as unremarkable and they did not give him cause for concern. The Claimants have placed payments which first had a "consulting" categorisation which was subsequently altered under very close scrutiny, but in fact Mr Tchelet would seek to recategorize a good number of other payments; such was not an occurrence confined to payments categorised at one stage as consultancy payments.

111. The fact that certain payments which had first been categorised as payments for consultancy were subsequently given a different designation did not stand out to Mr Clark. It merely formed part of the general pattern of Mr Tchelet's management of the book-keeping of all projects' costs, including the Guinea project's costs, which Mr Clark knew would be subject to further scrutiny, not only by Mr Driver, but by Ernst & Young, who were at all material times BSGR's auditors.

### Knowledge of "Agents, Intermediaries or Consultants" and of Corruption

112. **Mme Touré** - Mr Clark had no knowledge as to Mme Touré's existence or role at any material time and in particular had no knowledge that she was an individual with any material links to Pentler or to BSGR or the BSGR Group. After first becoming aware of the allegations involving Mme Touré in late 2012, Mr Clark was involved in an internal search of the BSGR payment systems, to determine whether Matinda or Mme Touré featured anywhere in BSGR's records. No record of any payment to, or financial transaction with Mme Touré was found. In the course of detailed work carried out by Ernst & Young during their statutory audit, they found no record of financial transactions with Mme Touré or Matinda either.

113. **Mahmoud Thiam** - Mr Clark had no knowledge as to Mahmoud Thiam's existence or role at any material time and in particular had no knowledge that he was an individual with any material links to BSGR or the BSGR Group.

114. **I.S. Touré** - Mr Clark had no knowledge as to I.S. Touré's existence or role at any material time and in particular had no knowledge that he was an individual with any material links to BSGR or the BSGR Group.

115. **Frédéric Cilins** – as to Mr Cilins:

115.1  Mr Clark admits (as would appear from paragraph 113.9) that Mr Cilins' name featured in at least one document which passed before Mr Clark.

115.2  That fact notwithstanding, Mr Clark had no conception of who Mr Cilins was, or of the nature of his role at the time of making any of the representations he is alleged to have made.

115.3  In particular, Mr Clark had no knowledge that Mr Cilins was a shareholder of Pentler (the same also being the case in relation to Michael Noy and Avraham Lev Ran). At no material time did Mr Clark hold any conception that Mr Cilins' role was that of a consultant, representative, agent and/or intermediary to BSGR ProjectCo, or that he was a member of the local advisory team retained by BSGR and/or BSGR ProjectCo.

115.4  Further, insofar as relevant to his knowledge of Mr Cilins, Mr Clark relies on the matters set out at paragraph 116.5 below.

116.  **Pentler** - As to Pentler:

116.1  Mr Clark first became aware of Pentler in or about early Spring 2008 in the context of the proposed purchase of its shares, relatively shortly before that eventual purchase went ahead.

116.2  Everything Mr Clark first learned about Pentler was communicated to him by Mr Tchelet, who explained to Mr Clark that Pentler was an SPV company which had first been set up by Sandra Merloni-Horemans.

116.3  At the point in time at which the purchase of Pentler was first proposed to Mr Clark, there was increasing optimism about the prospects of the Guinea project (which was one of a number of ongoing projects at the time). Mr Tchelet explained to Mr Clark that:

(a)  The principals of Pentler could not contribute any further funds into the next stages of the Guinea project.

(b)   The fact of Pentler's 17.65% interest meant that, as the project came to fruition, Pentler was likely to see a reward from the project out of proportion with its contribution to it.

(c)   There was therefore a significant advantage in the BSG Group buying out Pentler's shareholding, in order to ensure that it could enjoy a 100% interest in the Guinea project, when it eventually realised a return, as seemed increasingly likely at that point.

116.4   The Claimants place reliance (at paragraph 106.2(f) of the PoC) on a payment to Pentler of US$62,000 in May 2007.  The said payment came at a time when Mr Clark had only recently joined BSGR and was still in the process of setting up its office.  It is denied that Mr Clark was aware at any material time of the said payment or of its alleged status as being for a "consultancy fee".  Mr Tchelet took charge of organising this payment, as is evidenced by an email dated 22 May 2007 which he copied to Mr Struik, asking Zoe Lihou to process the said payment. Further and in any event, a payment of that (in context, small) size made so early in Mr Clark's time at BSGR would not have registered with Mr Clark at all, such that he would had had cause thereafter to have considered Pentler to be a "consultant".

116.5   The Claimants place reliance (at paragraph 106.1(k) of the PoC) on the fact that the Pentler SPA stated *"The Consultant (Pentler's shareholders) will continue to advise and act as consultant for the period of 5 years from signing the date hereof to the best interest of [BSGR BVI]"*.

(a)   Mr Clark avers that he considered the Pentler SPA when approving of it at a BSGR board meeting in March 2008.  However, at that point in time he had no knowledge as to the identities of the shareholders of Pentler. Further, the extract from the Pentler SPA set out at paragraph 106.1(k) (and above) would not have placed Mr Clark on notice that Mr Cilins had been conducting a consultancy role.  To the best of Mr Clark's recollection, Mr Cilins was not the recipient of any BSGR payments made in his name.

     (b)    Further and in any event, it is averred that the extract from the Pentler SPA set out above would not have revealed to Mr Clark that Pentler was, itself, acting in the capacity as a consultant, because it does not state as much.

116.6  Accordingly (and in any event), at no material time did Mr Clark hold any conception that Pentler's role was that of an agent, intermediary, representative or consultant or that it was a member of the local advisory team retained by BSGR and/or BSGR ProjectCo. Mr Clark's understanding was that Pentler's primary importance lay in its ownership interest in BSGR BVI.

117.    **Mr Boutros and/or LMS** – As to Mr Boutros and/or LMS, at no material time did Mr Clark hold any conception that either Mr Boutros and/or LMS' role was that of an agent, intermediary, representative or consultant for BSGR, BSGR Guinea or BSGR ProjectCo (or that either Mr Boutros and/or LMS was a member of the local advisory team retained by BSGR, BSGR Guinea or BSGR ProjectCo).

117.1  In particular, at the material time of signing the Initial DD Questionnaire, the Supplemental DD Questionnaire and the Clark ABL Certificate, Mr Clark had no understanding that Mr Ghassan Boutros or his company LMS performed any of the aforesaid roles. In this regard, Mr Clark will rely (without limitation) on an email dated 29 March 2010 (timed 11:29am) from Mr Clark to Ms Nicolle concerning a payment to Mr Boutros on that day, into which email Mr Clark copied a Skype message sent to him by Mr Tchelet earlier that morning in which Mr Tchelet stated:

    *'all payments to Ghassan relate to transport, electrical, site preparation etc … none of it is anything remotely resembling consulting but actual work as per the descriptions previously…'.*

117.2  Mr Clark reasonably took the said statement at face value.

117.3  Further, at paragraph 106.3(d) of the PoC, the Claimants themselves aver that the BSGR Group's records suggest that some or all of the Boutros Payments were made in return for the supply of mining-related equipment or works. Such was Mr Clark's general understanding as to the purpose of the Boutros Payments

at the material times (and in particular at the dates he signed the Initial DD Questionnaire, the Supplemental DD Questionnaire and the Clark ABL Certificate).

117.4 The Claimants place reliance (at paragraph 106.3(d) of the PoC) on various matters said to give rise to the inference that the Boutros Payments or the vast majority of them were paid in order that Mr Boutros could act as an intermediary in the payment of bribes. In the premises set out immediately above, and in the further premises set out at paragraphs 98 to 111 (especially at 107 to 111) above, it is averred that Mr Clark at no point drew or had cause to draw such an inference himself.

*Alleged Concealment of Payments to Pentler & 31 March 2010 Restructure*

118. The approval of the Pentler SPA was recorded in the minute of a BSGR board meeting which Mr Clark had himself convened in March 2008 and that minute, together with all of the details of the payments made in respect of Pentler, was maintained in BSGR's books and records which were regularly audited by Ernst & Young. Further, BSGR provided Ernst & Young with information and back-up documents about Pentler in 2009 when Ernst & Young were auditing the consolidated financial statements for the year ending 31 December 2008, such that the 2008 audited financial statements described in full the terms of the Pentler SPA and the Settlement Agreement subsequently reached with Pentler in section 24(a).

119. Whilst Mr Clark was not responsible for deciding which documents did or did not go into the due diligence "data room" for interrogation by Vale (Mr Tchelet being so responsible), by reason of the matters summarised at paragraph 118 above he reasonably assumed at all material times that Vale was able to make such enquiries as it wished in respect of Pentler, of which entity he assumed Vale was aware, by reason of it featuring as aforesaid in BSGR's 2008 audited financial statements.

120. In the premises, Mr Clark denies that he was party to, aware of or put on notice of, or should have been so aware or put on notice of, any attempt to conceal the nature of Pentler's dealings with BSGR.

121. As to the 31 March 2010 Restructuring and how it came about, Mr Clark's understanding was as follows:

121.1 Mr Clark had first signed the Initial DD Questionnaire on behalf of BSG Resources (Guinea) Ltd.

121.2 However, when the Supplemental DD Questionnaire was received, it contemplated a signature in a different capacity, and extended to notification obligations on the part of the "*BSG Group*" as well as on the part of Nysco and Onyx, which self-evidently involved a much broader confirmation.

121.3 Included within the BSG Group structure at that point was BSGR Steel, in which vehicle there still lay a number of legacy projects having nothing to do with the Guinea project, including the Baku Steel Mill.

121.4 As at end March 2010, all parties were desperate to complete on the deal eventually embodied by the JVA and the SHA (Vale included) and no party welcomed a new source of delay.

121.5 The problem, as explained to Mr Clark by Mr Tchelet, was that signing a due diligence questionnaire which extended to the likes of BSGR Steel had the potential to open up whole new avenues of expensive, time-consuming and ultimately futile due diligence enquiries.

121.6 Mr Tchelet explained to Mr Clark that the restructure was needed in order to make the company structure "purely Guinea" in nature. Mr Tchelet further explained that moving the dormant BVI Guinea company out of the structure of which BSGR formed a part was less cumbersome than retaining it within the same, given that it was owned by BSGR Steel.

121.7 In summary, Mr Clark understood the purpose of the 2010 restructure to be to leave the group structure free from activities unrelated to Guinea and to be intended to ensure that only active Guinea entities were included within the structure forming the subject of the due diligence and sale to Vale.

121.8 At no material time did Mr Clark believe that there was anything untoward about the 31 March 2010 Restructuring. He believed that BSGR's lawyers Skadden

were aware of the 2010 restructure and given that fact assumed that Vale would also be.

**Falsity of representations: Facts relied on by Claimants**

122.   As set out at paragraph 97 above, the introductory sentence to paragraph 113 is denied. Mr Clark pleads further to the individual sub-paragraphs of paragraph 113 as follows.

123.   Paragraph 113.1 is admitted and averred.  None of the matters set out at paragraph 113.1 give rise to any inference of dishonesty or recklessness.

124.   Paragraph 113.2 is admitted and averred.  The context in which Mr Clark stated that he had conducted a "thorough review" of the matters addressed in the Initial and Supplemental DD Questionnaires is set out above.  Given the nature of Mr Clark's role as set out above, he was ultimately reliant on information which came from others, insofar as he attested to the accuracy of those documents, and the Claimants (as relevant) at all material times understood him to be so reliant.

125.   Save that it is admitted that Mr Clark received a bonus of US$180,000 and that Mr Cramer indicated in or about June 2010 that he would receive a total bonus of US$250,000 (which never transpired), paragraph 113.3 is denied and Mr Clark repeats paragraph 30.4 above.

126.   Paragraph 113.4 is admitted.  None of the matters set out at paragraph 113.4 give rise to any inference of dishonesty, including of the reckless type and Mr Clark repeats paragraph 115.4 to 116.5(b) above.

127.   As to paragraph 113.5:

127.1   The first sentence is admitted.

127.2   The second sentence is denied.  In circumstances in which Mr Clark had no knowledge as to the existence and identity of Mme Touré at the material time, and in which Mr Clark's understanding as to Boutros/LMS is as set out at paragraph 117 above and in the premises set out at paragraph 99 and more generally at paragraphs 98 to 111 above, there is no basis for drawing the inference of dishonesty alleged therein.

127.3   Mr Clark notes that nowhere in the PoC have the Claimants made reference to any facts which demonstrate any knowledge on Mr Clark's part as to the existence or identity of Mme Touré (which knowledge is denied as aforesaid).

128.   Paragraph 113.6 is admitted.  In the premises set out at paragraphs 116 and 118 above, Mr Clark's approval of a payment instruction to Pentler forms no basis for raising an inference of dishonesty against him.

129.   As to paragraph 113.7:

129.1   It is admitted and averred that Mr Clark's role was simply to ensure that the transactions he was asked to make were effected and that this is the manner in which he was *"involved in the process by which at least 12 of the Boutros Payments were made"*.   The second sentence is otherwise denied and in particular it is denied Mr Clark had any substantive role in *"approving"* the said payments.

129.2   As to the second sentence:

(a)   The second email relied upon by the Claimants from Mr Tchelet was dated 17 August 2009 and not 17 July 2009.

(b)   The said email did not contain an instruction not to enter a payment on BSGR Group's accounting system "in the usual way" (as alleged), but instead asked that the payment be directed to a different bank account to that which had regularly been used before.

129.3   Paragraph 113.7 is otherwise admitted.

129.4   In the premises set out in this paragraph 129 and at paragraphs 98 to 111 above, in particular at paragraphs 107 and 108, the matters set out in paragraph 113.7 do not form a basis for drawing an inference of dishonesty on Mr Clark's part.

130.   As to paragraph 113.8:

130.1   Mr Clark admits and avers that he signed the letter written on behalf of BSGR which was sent to Mr Bah, which letter was not written by Mr Clark, as is evidenced (apart from the lawyerly writing style) by the fact that it bears a date

in the U.S. form "*December 3, 2009*", whereas Mr Clark would have dated the letter "*3 December 2009*". In the premises, Mr Clark infers that somebody from the Guinea project team would have provided him with this letter (drafted by a lawyer) to sign, and that he would have done so.

130.2   Pending disclosure, no admissions are made as to whether:

(a)   Mr Clark would have been provided with any of the agreements or documents itemised as (i) to (iii) at paragraph 113.8, (of which there appears to be no evidence that they were sent to Mr Clark, there being instead evidence that they were sent to Messrs Struik and Cilins).

(b)   Any of the said documents were provided in English at the material time (if they were only ever provided in French, Mr Clark would have been unable to understand them).

130.3   In any event, Mr Clark's involvement in signing a letter threatening legal action against Mr Bah did not either give or demonstrate knowledge of bribery or corruption on the BSG Group's part, or knowledge of BSGR's use of consultants, intermediaries or agents.

130.4   In the premises, the matters set out in paragraph 113.8 do not form a basis for drawing an inference of dishonesty on Mr Clark's part.

131.   Paragraph 113.9 is admitted.

131.1   Even on their face, none of the matters set out therein gave Mr Clark knowledge of bribery or corruption on the BSG Group's part, or knowledge of BSGR's use of consultants, intermediaries or agents, nor do those matters demonstrate the same.

131.2   Instead, the fact that Mr Clark was commanded by Mr Struik to ignore an apparent attempt by Mr Bah to procure a corrupt payment to himself would have caused Mr Clark to think only that BSGR would not countenance bribery or corruption.

131.3   In the premises, Mr Clark's signing of the Initial and Supplemental DD Questionnaires without reference to Mr Cilins or to Pentler a week later, which is admitted, is not a basis for any inference of dishonesty or recklessness against Mr Clark.

131.4   In the premises, the matters set out in paragraph 113.9 do not form a basis for drawing an inference of dishonesty on Mr Clark's part.

132.   As to paragraph 113.10:

132.1   It is admitted that the 31 March 2010 Restructuring was carried out to Mr Clark's knowledge, but denied that he had any significant role in assisting with the same.

132.2   The second sentence is denied. The allegation that Mr Clark was party to a knowing attempt to conceal from Vale the role of Pentler is not only false but (in the premises set out at paragraph 118 above) unrealistic.

132.3   Mr Clark in any event repeats paragraphs 116 and 121 above, as to his understanding of Pentler's role and the object of the 31 March 2010 Restructuring.

132.4   In the premises, the matters set out in paragraph 113.10 do not form a basis for drawing an inference of dishonesty or recklessness on Mr Clark's part.

133.   As to paragraph 113.11:

133.1   The first two sentences are admitted.

133.2   Paragraph 85.2 above is repeated.

133.3   In the premises, it is denied that there is any proper basis for drawing the inference set out in the third sentence.

(a)   The contents of the 10 May 2010 Email did not indicate that the settlement with Pentler was being negotiated by (inter alios) Cramer and Tchelet at the same time as the JVA and SHA as alleged. The said email merely stated: *"Please would you ensure that Windpoint Overseas limited receives*

*funds amounting to USD 22,000,000 for value today. Windpoint will then pay out the final settlement amount once the indemnity and settlement letters have been signed by Pentler. Melissa - please note in respect of the banking details of Windpoint I am referring to the JP Morgan banking account. Please let me know if you don't have the full banking details as it's a bank holiday in Guernsey today."*

(b) Nor were there any *"other steps* [being] *taken to hide Pentler's involvement with procuring the grant of the Mining Licences"* of which Mr Clark was aware and paragraphs 118 and 119 above are repeated.

(c) In those circumstances (including those set out at paragraph 85.2 above), there is no proper basis for inferring that Mr Clark knew that the settlement with Pentler was being negotiated by (inter alios) Mr Cramer and Mr Tchelet at the same time as the JVA and SHA. As set out aforesaid, he had no such knowledge and no admissions are made as to who renegotiated the Pentler settlement.

134.  As to paragraph 113.12:

134.1 Some 8 years after sending the email of 11 April 2012, Mr Clark does not know exactly what he had in mind when he stated said that *"we were very circumspect about Pentler"*, when asked to find documents evidencing decisions made in relation to Pentler long after the Vale transaction had closed. Mr Clark may have used the word "circumspect" as referring to the care which Mr Tchelet ensured was taken, in making sure that details as to the Pentler transaction were not shared with the local Guinea office, the effect of which would have been that there would be less internal financial reports referencing Pentler than might otherwise have been the case.

134.2 Mr Clark in any event denies that he used the word "circumspect" as some kind of recognition that the arrangements concerning Pentler were intentionally kept from Vale.

(a)  As set out above, the Pentler transaction was fully board-minuted at BSGR level and all payments in respect of Pentler were recorded in BSGR's audited books and records.

(b)  Those records were kept, in good order, with all of the other payments and related records in the Guernsey office.

(c)  The same records were made available to Ernst & Young when they visited the Guernsey office on 29 April 2010 on behalf of Vale's due diligence enquiries, as aforesaid.

(d)  Further and as aforesaid, section 24(a) of the BSG Group's consolidated financial statements for the year ending 31 December 2008 described in full the terms of the SPA and the Settlement Agreement subsequently reached with Pentler and Mr Clark expected Vale to have scrutinised and interrogated the same as part of its due diligence process.

134.3  Further, it is denied that the said email can be properly interpreted as referring to a decision made in relation to disclosure given to Vale prior to the execution of the JVA/SHA.

134.4  In the premises, the matters set out in paragraph 113.12 do not form a basis for drawing an inference of dishonesty or recklessness on Mr Clark's part.

135.  As to paragraph 113.13 (and save that it would appear from paragraph 113.9 that Mr Cilins' name featured in at least one document which passed before Mr Clark), it is denied as aforesaid that Mr Clark had any knowledge as to the existence or identities of the Pentler principals and Mme Touré. It is admitted that Mr Clark knew that the Pentler SPA did not involve another group company or a tax planning transaction and he repeats paragraph 75 above in this regard. In those premises, the matters set out in paragraph 113.13 do not form a basis for drawing an inference of dishonesty on Mr Clark's part.

**Inducement & Reliance**

136. As to paragraph 116, it is denied that Vale entered into the JVA and SHA induced by or reliant on any representations made by Mr Clark as alleged. Mr Clark admits as aforesaid that it was his intention that the Claimants would rely upon such representations as he made. However:

136.1 In the premises set out as follows it is now clear that the representations made during Vale's due diligence process on which the Claimants rely in these proceedings were provided as part of a sham due diligence process, undertaken solely so that Vale could demonstrate that it had met any regulatory requirements by reference to the undertaking of the said process, but without Vale at any point believing in the truth of the representations so made, such that it placed no reliance on the same and was not induced by them to enter into the JVA and the SHA.

136.2 Further or in the alternative, and in the event that the representations made by Mr Clark were false (as to which no admissions are made), Vale knew them to be false when they were made, such that it placed no reliance on the same and was not induced by them to enter into the JVA and the SHA.

136.3 Further and in any event and in the premises set out below, Vale placed no reliance on representations made by Mr Clark in particular.

137. Prior even to commencing its due diligence process, Vale considered that BSGR had a poor reputation (for acting unethically), was reputed to be engaged in bribery and other acts of political corruption and was reputed to have a corrupt relationship with Mme Touré in particular, who was suspected of receiving a US$2 million bribe from BSGR as the first level of a structure of payments used by BSGR to obtain the mining rights at Simandou and who had placed her brother as a director with BSGR. In particular:

137.1 As is evidenced by an internal Vale email dated 25 October 2008, Vale was of the view as of that date that, in relation to the Simandou project in Guinea, BSGR was *"acting in an unethical manner and talking directly to one of the wives of the President in an attempt to get something"*.

137.2 During a meeting on 24 November 2008, Vale was informed by Rio Tinto PLC that Mr Steinmetz's and BSGR's efforts to obtain the Simandou concession from

42

Rio Tinto involved *"bribery and other acts of political corruption"* (as set out at paragraph 82 of an Amended Complaint filed by Rio Tinto PLC in the United States District Court, Southern District of New York, dated 15 August 2014).

137.3   As is evidenced by an internal Vale email dated 7 January 2009, Vale believed at that date that:

    (a)   I.S. Touré worked for BSGR and was responsible for international relations.

    (b)   I.S. Touré was the brother of Mme Touré.

    (c)   Mme Touré was President Conté's fourth wife.

137.4   In a report prepared for Vale by a Mr Etchart dated 14 September 2009, BSGR was described as having a *"controversial relationship with former president Conté, particularly one of the wifes* [sic] *of the defunct president which sponsored BSGR in Guinea"*.

137.5   A presentation entitled "Projeto Venezia" prepared by Vale towards the end of 2009 recorded as follows of BSGR and some unspecified *"Chinese Companies"*:

    *"Please note that both have histories fraught with bribery affairs and high-level corruption scandals in the country that could affect the process for the Simandou project. Particularly in the case of BSGR, which has a very strong relationship with the president's 4th wife…"*

137.6   The same presentation recorded that (i) Mme Touré was suspected as having received an approximately US$2 million bribe from BSGR (ii) payments to Mme Touré could be a first level of a structure of payments used by BSGR to obtain the mining rights at Simandou and (iii) Mme Touré had placed her brother as a director with BSGR.

137.7   An internal Vale email dated 5 February 2010 made reference to BSGR, in the context of a statement regarding a non-disclosure agreement between BSGR and Vale, in terms as follows:

> *"it's a document Vale will be signing with this group of "ill-reputation". But for me, it has to be that way, otherwise we can't analyze it for buying purposes and get them out of the way."*

138.   Whilst armed with knowledge as to all of the aforesaid matters, by as early as February 2010 Vale was desperate to obtain a share of the rights in the Simandou. In particular, in an internal Vale email dated 17 February 2010 Vale's position was expressed as follows:

> *"We cannot run the risk of leaving the deposit in the hands of the Chinese. We can't just watch. We must act. If you think that the JV with RT is not possible, we must be aggressive to buy the rights from BSGR."*

139.   Viewed in the light of the matters set out at paragraph 137 above, Vale then proceeded to conduct a knowingly and deliberately cursory and superficial due diligence exercise. In particular:

139.1   With the agreement of Vale, the scope of due diligence was narrowed significantly in that the definition of "the Group" excluded the "associated companies" and "investment companies" and in that financial due diligence was limited to BSGR Guernsey, excluding BSGR Guinea.

139.2   Vale's due diligence questionnaires posed no specific questions about BSGR's relationship with Mme Touré, I.S. Touré or any of the matters set out at paragraph 137 above.

139.3   Ernst & Young carried out no audit procedures in Guinea as part of the due diligence exercise.

139.4   By 13 April 2010, the Initial Due Diligence Questionnaire, the Supplemental Due Diligence Questionnaire and the Steinmetz ABL Certificate had been completed, and the alleged 8 April Representations been made. On 13 April 2010, Mr Monteiro (Vale's then Director of Mergers and Acquisitions) wrote as follows:

> *"Our recommendations to the business department have been the following, based on the legal and commercial risks:*
>
> *1. If the decision is of closing the deal, that it be made in escrow (bank financing doesn't eliminate FCPA risk). The lawyers' standing is clear, once we close it,*

*we run the risk of already being in violation the FCPA on D+1, given that we couldn't do a books and accounts review of the 4 companies that come in the acquisition package (located in Guernsey, Guinea, Liberia and BVI);*

*… 3. Due Diligence - the result of the due diligence is not satisfactory, nor exhaustive; more time and information is needed from the other party…"*

139.5   In a separate email on the same date, Mr Monteiro referred to advice Vale had received from Clifford Chance as to the risk of Vale contravening the US Foreign Corrupt Practices Act ("**FCPA**") by reason of its limited due diligence, as follows:

*"In relation to the FCPA, I ponder that the risk to close the deal without any escrow is not just reputational, but is a "risk of civil administrative liability to the SEC for the Company", according to the Clifford Chance specialists in FCPA."*

139.6   As part of the due diligence, Vale was put on notice, by provision of BSGR's 2008 Consolidated Financial Statements, that US$22m was paid to a "third party" minority shareholder, but it raised no queries as to the same payment.

140.   Given Vale's knowledge as to the matters set out at paragraph 137 above and in the circumstances of its desperation to close a deal with BSGR as set out at paragraph 138 above, it is to be inferred from Vale's cursory and superficial due diligence exercise as described at paragraph 139 above, (in particular at paragraph 139.2) that the said exercise was conducted in that manner knowingly and deliberately.   In those circumstances, the only proper inferences to be drawn are those set out at paragraphs 136.1 and/or 136.2 above.

## J.   Claim in Conspiracy

141.   Insofar as it relates to Mr Clark, paragraph 117 is denied. Otherwise, paragraph 117 is not admitted. For the avoidance of doubt:

141.1   Mr Clark was not party to any relevant agreement or combination between himself and the Co-defendants.

141.2   Mr Clark at no point possessed any intention to injure the Claimants.

45

141.3  Mr Clark carried out no unlawful acts pursuant to a combination or agreement with the Co-defendants as a means of injuring the claimant and in particular at no point made any fraudulent misrepresentations to Vale.

141.4  Paragraphs 117.1 to 117.6 are denied, insofar as they relate to Mr Clark, for the reasons set out more generally above.

## K.   Proprietary Claim

142.  As to paragraphs 118 to 120 (and without prejudice to Mr Clark's position on limitation as set out below):

142.1  Mr Clark was not involved in any deceit or conspiracy and makes no admission of any deceit or conspiracy by any other person.

142.2  Mr Clark received the bonus sum of US$180,000 as part of his employment by BSGR.

142.3  Mr Clark was not on notice of any reason why BSGR was not making the bonus payment of US$180,000 from its own money.

142.4  Mr Clark acted in good faith at all material times.

142.5  Mr Clark was accordingly a bona fide purchaser for value without notice of the said bonus.

142.6  It is accordingly denied that the Claimants have a valid proprietary claim to the sum of US$180,000.

142.7  It is denied that any further sums were so received by Mr Clark; inasmuch as he received further payments from BSGR which ultimately derived from funds paid over by the Claimants, he did so not as a volunteer, but in reward for work.

## L.   Causation, Loss and Damage

143.  In the circumstances set out above, it is denied that Mr Clark has committed any acts of wrongdoing against the Claimants capable of founding a claim for loss and damage against him.  Causation as alleged at paragraphs 121 and 122 and as applicable to Mr Clark is denied. Whilst the Claimants are put to proof as to the quantum of their losses

as set out at paragraphs 122 to 124, it is in any event denied that they are entitled to recover those losses from Mr Clark.

## M.   Interest

144.   For the reasons set out above, it is denied that the Claimants have any entitlement to a payment of interest by Mr Clark, whether as set out at paragraph 125 or at paragraph 126.

## N.   Limitation

145.   The entirety of the claims against Mr Clark are, in any event, statute-barred under the Limitation Act 1980 ("**the 1980 Act**").

146.   As to the Claimants' claims against Mr Clark in fraudulent misrepresentation and conspiracy (which latter claim is contingent on the claim in fraudulent misrepresentation):

146.1   The Claimants' Claim Form was issued on 3 December 2019.

146.2   The primary limitation period is six years under section 2 of the 1980 Act.

146.3   That limitation period can be extended under section 32 of the 1980 Act until such time as the Claimants have discovered the fraud, concealment or mistake (as the case may be), or could with reasonable diligence have discovered such matters.

146.4   Mr Clark avers that the Claimants either did discover the essential facts underlying their claims against him more than six years prior to 3 December 2019, or could with reasonable diligence have done so.

146.5   In particular:

(a)   Mr Clark relies on the matters set out at paragraph 137 above, as evidencing the matters set out at paragraph 146.4 above.

(b)   Further, the Claimants were possessed of all of the Initial DD Questionnaire, the Supplemental DD Questionnaire and the Clark ABL

47

Certificate (containing the core representations relied upon as against Mr Clark) as of end of April 2010 at the latest.

(c) Accordingly, Mr Clark's primary position is that the Claimants knew the essential facts underlying their claims as at 30 April 2010.

(d) In any event, the Claimants were put on notice of the alleged factual basis for their claim that the relevant representations were false by as early as receipt of a letter dated 30 October 2012 (which letter Mr Clark infers came to the Claimants' notice on or about the same date) from a Technical Committee established by the Guinean Ministry of Mines, alternatively by as early as their receipt of a letter dated 9 May 2013 (which Mr Clark infers came to the Claimants' notice on or about the same date) from the same Technical Committee.  The letter dated 30 October 2012 in particular contained details of the bribery and alleged corruption on the parts of Mme. Touré, I.S. Touré and Mr Thiam now relied upon by the Claimants as ultimately founding their claims in fraudulent misrepresentation.

(e) To the extent that Mr Clark's primary position is not accepted, it is averred that, both of the said letters either put the Claimants on notice of the essential facts underlying their claims against Mr Clark, or enabled them with reasonable diligence to discover the same on or before 2 December 2013.

147. As to the Claimants' proprietary claim against Mr Clark:

147.1 The primary limitation period is six years under section 21(3) of the 1980 Act.

147.2 The only sum which the Claimants have identified with any particularity as founding their proprietary claim against Mr Clark is the bonus payment received by Mr Clark on or about 6 July 2010.

147.3 The Claimants' cause of action in relation to their proprietary claim against Mr Clark was complete as of the date on which sums were received by Mr Clark, which derived from monies paid by the Claimants pursuant to the JVA (and not,

48

as the Claimants appear to contend, on the date on which the JVA was first rescinded).

147.4  In the premises, the Claimants' proprietary claim in relation to Mr Clark's bonus payment has been statute-barred since in or about July 2016.

**Hugh Norbury QC**
Serle Court, Lincoln's Inn

**Matthew Bradley**
4 New Square, Lincoln's Inn

**Statement of Truth**

The Sixth Defendant believes that the facts stated in this Defence are true.

Full Name: David Michael Clark

Signed: ...........~DM. Clk........................................................................

Date:  3 April 2020

**Address for Service**

Sixth Defendant's solicitors' address to which documents should be sent:

Peters & Peters Solicitors LLP
15 Fetter Lane
London EC4A 1BW
DX 407 London Chancery Lane

Ref: KEO/VJM/CL6372.1