# Exhibit 10

Claim No CL-2019-000723

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

**B E T W E E N :**

**(1) VALE SA**
**(2) VALE HOLDINGS BV**
**(3) VALE INTERNATIONAL SA**

**Claimants**

**and**

**(1) BENJAMIN (BENY) STEINMETZ**
**(2) DAG LARS CRAMER**
**(3) MARCUS STRUIK**
**(4) ASHER AVIDAN**
**(5) JOSEPH TCHELET**
**(6) DAVID CLARK**
**(7) BALDA FOUNDATION**
**(8) NYSCO MANAGEMENT CORPORATION**

**Defendants**

---

**DEFENCE OF THE SEVENTH AND**
**EIGHTH DEFENDANTS**

---

## Overview

1.  The overview of the Claimants' claims is noted; the Claimants' claims are pleaded to where set out in detail below. Without prejudice to the generality of the same, the Claimants' claims are denied as against Balda and Nysco which (i) did not make the representations alleged by the Claimants to have been made, the accuracy of which Balda and Nysco are unable to admit or deny, and (ii) were not party to any common design to make such representations. Further, the proprietary claims asserted against Balda and Nysco are misconceived since they are said to arise in respect of a payments made by Vale Holdings and Vale International, are precluded by the terms of a Share Purchase Deed entered into by Vale, BSGR and BSGR Guernsey on 13 March 2015, and are not brought by Vale as the relevant contractual counterparty. Further and in any event, the Claimants' claims are statute barred in limitation (whether as a matter

1

of New York, or English law) and/or fail (under English law, and insofar as proprietary) by application of the doctrine of laches.

## Introduction

2.   In this Defence:

    (a)   The abbreviations used in the Particulars of Claim are adopted, without thereby making any admission.

    (b)   References to paragraphs by number are, unless otherwise stated, to paragraphs in the Particulars of Claim.

    (c)   Any references to matters being admitted, denied, or not admitted are to their being admitted, denied, or not admitted by Balda and Nysco.

## Parties

*The Claimants*

3.   The first sentence of paragraph 12 is admitted. Otherwise, paragraphs 12 to 14 are not admitted.

*The Defendants*

4.   As to paragraph 15:

    (a)   It is denied that the BSGR Group, as defined in the Particulars of Claim, is accurately so described. In particular, there was no single legal entity known as the "BSGR Group" and BSG Resources headed up only one sector of the various business interests conducted under the ultimate ownership of the Balda and also Vessna Foundations. These interests did not concern only mining but also (inter alia) real estate and energy. Where the term "BSGR Group" is used in this Defence, it is used without prejudice to the foregoing.

    (b)   It is denied that the BSGR Group or the companies alleged to comprise it are entities 'through' which to carry on interests which Mr Steinmetz 'holds'. So far as Balda and Nysco are concerned, they carry on their own business interests,

2

and in so far as Mr Steinmetz has an interest in them it is through his status as a beneficiary of Balda, as hereinafter described.

Otherwise, paragraph 15 is admitted.

5. As to paragraph 16, Balda and Nysco's case as to the ownership of Nysco and BSGR, and as to the beneficiaries of Balda, is set out in paragraph 15 below. For the avoidance of doubt, whilst it is admitted that Balda has engaged Mr Steinmetz to provide advisory services, Balda does not and did not act at his direction. Save as aforesaid, the allegations contained in paragraph 16 are vague and ill-defined and are denied.

6. In relation to paragraph 17, it is admitted that Mr Steinmetz and his family were awarded distributions by Balda's council during the period between May 2010 and December 2012. Balda and Nysco are currently undertaking a tracing exercise to ascertain (in so far as they are able to do so) what happened to the proceeds of the Vale payment from BSGR (the "**Tracing Exercise**"). This exercise has not yet been completed. Pending completion of the Tracing Exercise, Balda and Nysco do not admit or deny paragraph 17 and are unable to say how far (if at all) the money paid to Mr Steinmetz and his family derived from the said Vale payment.

7. Paragraph 18 does not contain a claim against Balda and Nysco and accordingly is not pleaded to, save that in so far as it is alleged that the matters therein alleged are admissible evidence of any fact relevant to this claim, they are not.

8. As to paragraph 19:

   (a) It is admitted that by a service agreement effective 4 November 1998 ("**Service Agreement**"), Onyx agreed to provide such services as Balda and its underlying companies might require including fiscal, financial, administrative, advisory, corporate, and other business services. Balda and Nysco will rely on the agreement as may be necessary.

   (b) Pursuant to the Service Agreement, Onyx did provide services to Balda, and maintained Balda's books and records. As permitted by the agreement, it largely delegated that responsibility to Onyx Financial Advisers SA, a Swiss company, and its subsidiaries.

3

(c) The provision of those services did not constitute the delegation of day to day management of the BSGR Group.

(d) The Service Agreement was terminated in 2014, and Onyx then ceased to provide services thereunder.

(e) Onyx and its related companies ceased to operate in around 2016, and Onyx Financial Advisers SA was put into liquidation on 29 November 2019.

(f) Otherwise paragraph 19 relates to Mr Cramer and is not admitted.

9. As to paragraph 20, it is admitted that on 1 July 2010 Balda approved a payment of USD2.5 million to Onyx, and that a payment of USD2.5 million was made from Nysco to Onyx on 15 July 2010, but denied that this reflect a bonus or award as alleged. The payment is addressed further in paragraph 52(b) below. Otherwise, Balda and Nysco are unable to admit or deny the allegations in paragraph 20.

10. Paragraph 21 is admitted.

11. Balda and Nysco are unable to admit or deny the allegations in paragraph 22.

12. The first sentence of paragraph 23 is admitted. Balda and Nysco are unable to admit or deny the other allegations in paragraph 23.

13. The first two sentences of paragraph 24 are admitted. Balda and Nysco are unable to admit or deny the other allegations in paragraph 24.

14. The first four sentences of paragraph 25 are admitted. Balda and Nysco are unable to admit or deny the other allegations in paragraph 25.

15. As to paragraph 26:

(a) It is admitted that Balda is an irrevocable Liechtenstein foundation established in about 1994.

(b) It is admitted that Balda holds 100 percent of the shares of Nysco.

(c) At all material times Balda has operated pursuant to the terms of its statutes and byelaws, and under a Foundation Council comprised of professional personnel. Balda's council is required to meet as often as necessary, but in any event at least twice a year. At the time of entry into the JVA the members of the Foundation

4

Council comprised Mr Marc Bonnant (a Swiss attorney), Dr Peter Goop, a Liechtenstein lawyer, and Rothschild Trust (Guernsey) Limited (known, as of March 2019, as Sequent (Guernsey) Limited).

(d)    Balda holds funds at the discretion of the Foundation Council and the extent of any beneficial interest in funds held by Balda is subject to the absolute discretion of the Foundation Council. No beneficiary has any fixed entitlement to the same. The "*Class of Beneficiaries*" for which Balda holds these funds is defined under Balda's statutes and byelaws as:

1.    Mr Steinmetz;

2.    Mr Steinmetz's spouse, Mrs Agnes Steinmetz;

3.    their common children and such children's issue and remoter issue;

4.    any charity as the Foundation Council shall unanimously determine with approval of the Protector

(save that any potential beneficiary who is tax resident in Israel is excluded).

(e)    Balda is a holding entity and not an operational business. Accordingly it operates only with a general overview of the various companies that sit below Nysco in the corporate structure it heads, and its role is limited to a general supervisory role where appropriate.

(f)    It is denied, as hereinafter set out, that Balda made fraudulent representations to induce Vale to enter into the JVA and SHA.

(g)    Because the Tracing Exercise has not been completed, Balda is not able to admit or deny whether it received a substantial portion of the USD500 million paid by Vale pursuant to the JVA.

(h)    Save as aforesaid, paragraph 26 is denied.

16.    As to paragraph 27:

(a)    It is admitted that Nysco is a BVI company, that it holds 100 percent of the shares of BSGR, and that it is in turn wholly owned by Balda.

    (b)   Nysco's operations are governed by its *de jure* directors including, as at the date of entry into the JVA, Mr Bonnant (a director of Nysco since 2001), Margali Management Corp. and Second Board Limited.

    (c)   Like Balda, Nysco is a holding structure and not an operational business.

    (d)   It is denied, for reasons hereinafter set out, that Nysco made fraudulent representations to induce Vale to enter into the JVA and SHA.

    (e)   It is admitted that Nysco received the payments from BSGR referred to in paragraph 27 in repayment of loans previously made to BSGR. Nysco is unable to say whether those transfers represent all that Nysco received or how those transfers were subsequently dealt with because the Tracing Exercise has not been completed.

    (f)   Save as aforesaid, paragraph 27 is denied.

*Other companies and individuals*

17.   Paragraph 28 is noted, but no admissions are made. Whether the companies identified had a complex corporate structure is an irrelevant matter of opinion not of fact. The companies identified as the BSGR Group in the Particulars of Claim are noted, but it is denied that they form a single group of companies in any legal sense.

18.   Save as set out in paragraph 57, paragraph 29 is not admitted.

19.   As to paragraph 30, it is admitted that Pentler was a company incorporated in the BVI whose registered shareholders were Noy, Cilins and Lev Ran. Otherwise, no admissions are made.

20.   Paragraph 31 is not admitted: Balda and Nysco know nothing about Boutros.

21.   The first two sentences, and the last sentence, of paragraph 32 are admitted. The last sentence is entirely irrelevant to any matter in issue herein. Balda and Nysco do not know whether the rest of paragraph 32 is true, and therefore make no admissions as to any other allegation therein (except that in so far as it is alleged that Thiam helped either of them in the manner alleged or at all, that is denied).

## The mining licences

22. Paragraphs 33 to 36 and the first sentence of paragraph 37 are admitted (except that no licence was held by the BSGR Group: the licences were held by BSGR BVI and BSGR ProjectCo). Balda and Nysco had no involvement in the detailed narrative set out in paragraph 37 and are unable to admit or deny it, but do admit that BSGR BVI and BSGR Project Co obtained their licences following the revocation of concessions previously held by Rio Tinto ProjectCo over SB1 and SB2, that President Conté was the President at the relevant time, and that he died on 22 December 2008.

## How the mining licences were obtained

23. Paragraphs 38 to 62 consist of a discursive and frequently irrelevant narrative. Nysco and Balda did not participate in any of the matters therein alleged, and accordingly cannot admit or deny them, except in so far as they consist of assertions as to the existence of and quotations from documents, which are admitted, and except that it is admitted (as a matter of public record) that Thiam was appointed as Minister of Mines at paragraph 62.2 in January 2009 and  was convicted as set out in paragraph 62.17 (though it is denied that his conviction is admissible as evidence or otherwise relevant to this claim). In so far as any acts are alleged to have been done or payments alleged to have been made by the BSGR Group, it is denied (if it is alleged) that they were done by Nysco or Balda.

## The JVA and SHA: Introduction

24. Paragraph 63 is admitted.

25. Paragraphs 64 to 67 consist of an immaterial narrative of background facts which Nysco and Balda are unable to admit or deny, save that the first two sentences of paragraph 65 are admitted.

## The JVA and SHA: Representations

*The Initial Due Diligence Questionnaire*

26. Paragraph 68 is admitted. Balda and Nysco will also rely on the Initial DD Questionnaire at trial for its full terms and true effect.

7

27.  As to paragraph 69:

    (a)  Paragraph 69.1 is admitted.

    (b)  Paragraph 69.2 is admitted.

    (c)  Paragraph 69.3 is admitted.

    (d)  Paragraph 69.4 is admitted.

    (e)  Paragraph 69.5 is denied. 'UBO' was defined for the purposes of the Initial DD Questionnaire as an 'individual or entity that, directly or indirectly, *ultimately* owns or controls or has a right to receive the financial benefit of an equity interest in the BSG Group'. For those purposes, Balda was, but Nysco was not, a UBO. No admission is made as to the status of any other person.

    (f)  As to paragraph 69.6, it is admitted that the Initial DD Questionnaire was signed by Mr Clark, as Director and Group Treasurer of BSGR Guernsey. He certified on behalf of the BSG Group (as therein defined in terms which were not the same as the definition of BSGR Group used in the Particulars of Claim, and which did not include Balda or Nysco), and not on behalf of Balda or Nysco, that the answers in the questionnaire were accurate and complete. He stated that he had made 'inquiry of the BSG Group's directors, senior executives, other employees, and UBOs, as appropriate, and otherwise conducted a thorough review of the matters addressed in this response'. No admission is made as to whether he had in fact made such inquiries or conducted such a review save that it is denied that he had made any inquiry of Balda or Nysco.

28.  Paragraph 70 is admitted. The said representations were made by Mr Clark, as director of BSGR Guernsey, and on behalf of BSGR Guernsey, BSGR ProjectCo, BSG Resources (Liberia) Limited and BSGR (Liberia) Ltd, and not on behalf of Balda or Nysco.

29.  As to paragraph 71:

    (a)  Balda and Nysco do not plead to, and make no admissions as to, the position with respect to any of the other defendants.

(b)   Even if Mr Clark had consulted Balda and Nysco 'as appropriate' in relation to the responses provided in the Initial DD Questionnaire, that would not have meant that they approved or adopted (manifestly or at all) any of the representations therein made by him. Further or alternatively, if they had approved and adopted any such representations (manifestly or at all), such approval and adoption would only have related to the representations so far as they affected (i) Balda and Nysco's status as UBOs and/or (ii) anything done or omitted to be done by Balda or Nysco or on their behalf.

(c)   So far as the representations set out in paragraph 70 are concerned, the only relevant representation which could (had Mr Clark consulted Balda and Nysco) have been approved or adopted by them was a representation arising from the terms of the First Corruption Representation that neither Balda nor Nysco had made, authorised, or promised any payments or benefits to Government Officials.

(d)   In fact, Balda and Nysco were not involved in completing the Initial DD Questionnaire. No inquiries were made of Nysco or Balda regarding the Initial DD Questionnaire. Save as aforesaid, paragraph 71.9 is denied.

(e)   In the premises, Balda and Nysco did not approve or adopt any or any material representation.

(f)   Further, it is denied that there was any common design in which Balda or Nysco participated to make fraudulent misstatements to Vale, whether as alleged or at all.

(g)   Paragraph 71.11 is improperly pleaded in that it alleges an activity (discussion and agreement) which could only be carried out by natural persons, but does not allege which natural persons on behalf of Nysco and Balda are alleged to have participated in such discussions. It is denied.

(h)   For the avoidance of doubt, in so far as it is alleged that Balda or Nysco made, or were legally responsible for, any of the representations in the Initial DD Questionnaire on which the Claimants rely, that allegation is denied.

*The Supplemental DD Questionnaire*

30.   Paragraph 72 is not admitted.

31.   Paragraph 73 is admitted.

32.   As to paragraph 74:

   (a)   It is denied that BSGR transferred its shares in BSGR Steel to Nysco, as pleaded in the first sentence of paragraph 74. On 31 March 2010 BSGR transferred its shareholding in BSGR Steel to BSG Metals and Mining Ltd, as indicated by the title of Appendix 1, Chart 7 to the Particulars of Claim. The transaction removed BSGR Steel as a 100% subsidiary of BSGR and therefore from the companies owned and controlled by BSGR.

   (b)   This transfer was done without the involvement or prior knowledge or approval of Balda and Nysco.

   (c)   It is denied that, so far as Balda and Nysco was concerned, the changes were made because either of them did not want to disclose the matters alleged.

   (d)   No admission is made as to the motivation of any other defendant.

33.   As to paragraph 75:

   (a)   Balda and Nysco had no involvement in the Restructuring, whether as alleged or at all.

   (b)   So far as Balda and Nysco are concerned, paragraph 75.2 is denied for the reasons given above.

   (c)   Otherwise, and with respect to any defendant other than Balda and Nysco, no admissions are made.

34.   As to paragraph 76:

   (a)   It is admitted that the Supplemental DD Questionnaire, signed by Mr Clark purportedly on behalf of the BSG Group (as therein defined), Nysco, and Onyx was returned by Mr Tchelet to Dos Santos on 2 April 2010. It is denied that Mr Clark in fact made the representations contained in the Supplemental DD Questionnaire on behalf of Nysco.

(b)  Mr Clark purportedly certified on behalf of those persons (but not on behalf of Balda) that the answers in the questionnaire were accurate and complete. He stated that he had made 'inquiry of the BSG Group's, Nysco's, and Onyx's directors, senior executives, other employees, and UBOs, as appropriate, and otherwise conducted a thorough review of the matters addressed in this response'. No admission is made as to who he had consulted, but he had not consulted Nysco's directors, senior executives, or other employees (and nor would it have been appropriate for him to do so).

(c)  Otherwise, and save that Nysco and Balda will also refer to the Supplemental DD Questionnaire at trial, paragraph 76 is denied.

35.  As to paragraph 77:

(a)  It is admitted that the Supplemental DD Questionnaire did not refer to the 31 March 2010 Restructuring

(b)  To the extent it is alleged there was a deliberate concealment of the March 2010 Restructuring, this is not admitted (and it is denied that Balda or Nysco concealed it).

(c)  It is admitted that the Supplemental DD Questionnaire contained in substance the representation set out in paragraph 77.1 (though the reference was in fact to a Mohammed L Doubia, as local counsel, not to Mohammed L Boumbia as legal counsel).

(d)  It is admitted that the Supplemental DD Questionnaire contained in substance the representation set out in paragraph 77.2 (though the reference was to the "Liberian Project or Project Hills"), not the "Simandou Project of Project Hill".

36.  As to paragraph 78:

(a)  Balda and Nysco object to the pleading by repetition of paragraph 71 "*mutatis mutandis*" because it is not clear what is *mutandis*, and accordingly not clear what is *mutatis*.

(b)  Accordingly, Balda and Nysco repeat paragraph 29, *mutatis mutandis* (whatever that means) and otherwise make no admissions.

(c)   As to the sub-paragraphs of paragraph 78:

i.   Paragraph 78.1 is denied, so far as it concerns Balda and Nysco, and otherwise not admitted. Paragraph 33 is repeated.

ii.   Save that it is not admitted that Mr Clark made inquiry of Mr Cramer when completing the Initial DD Questionnaire, paragraph 78.2 is admitted, but its relevance is denied.

iii.   Paragraph 78.3 is admitted, but its relevance is denied.

iv.   It is denied that Mr Clark made inquiry of Nysco or Balda. Further, even had such inquiry been made it is denied that such inquiries would have the effect of making Nysco (to the extent it was not otherwise so responsible) or Balda responsible for the alleged representations.

v.   Further it is denied that Mr Clark in fact made the representations contained in the Supplemental DD Questionnaire on behalf of Nysco.

*The 8 April Representations*

37.   Balda and Nysco were not present at or represented at the events described in paragraphs 79 and 80, and therefore can neither admit nor deny them. None of those persons who was present was acting on behalf of Balda or Nysco in that respect.

38.   As to paragraph 81:

(a)   Balda and Nysco object to the pleading by repetition of paragraph 78 "*mutatis mutandis*" because it is not clear what is *mutandis*, and accordingly not clear what is *mutatis*.

(b)   In so far as it is alleged, by repeating paragraph 78, that any of the attendees consulted Balda or Nysco before making any representation on 8 April, that allegation is denied.

(c)   In so far as it is alleged, by repeating paragraph 78, that there is any basis for inferring that Balda or Nysco discussed in advance or agreed upon representations which would be made at that meeting, that allegation is denied.

(d)    In so far as it is alleged, by repeating paragraph 78, that Balda or Nysco provided assistance in preparing anything that was said at that meeting, that allegation is denied.

(e)    In so far as it is alleged that any representation made on 8 April was manifestly approved or adopted by Balda or Nysco, that allegation is denied.

(f)    Accordingly, and save as above, Balda and Nysco repeat paragraphs 29 and 36 *mutatis mutandis* (whatever that means) and otherwise make no admissions.

(g)    As to the sub-paragraphs of paragraph 81:

      i.    Paragraph 81.1 is not admitted, and it is denied (if it be alleged) that the 'others' included Balda or Nysco.

      ii.    No admissions are made as to paragraph 81.2 (which consists of submission), and its relevance is in any event denied.

*The Steinmetz ABL Certificate*

39.    Paragraph 82 is admitted.

40.    Paragraph 83 is admitted as a reasonably accurate paraphrase of certain parts of the Steinmetz ABL Certificate (on which Balda and Nysco will rely for its true terms), except that:

(a)    Government Official had a defined meaning in the Steinmetz ABL Certificate;

(b)    the term 'affiliate' was not defined;

(c)    the reference to inducing Government Official(s) to use influence was in fact a reference to corruptly inducing them to do so.

41.    As to paragraph 84:

(a)    Balda and Nysco object to the pleading by repetition of paragraph 81 "*mutatis mutandis*" because it is not clear what is *mutandis*, and accordingly not clear what is *mutatis*.

13

(b)     In so far as it is alleged, by repeating paragraph 81, that Mr Steinmetz consulted Balda or Nysco before executing the Steinmetz ABL Certificate, that allegation is denied.

(c)     In so far as it is alleged, by repeating paragraph 81, that there is any basis for inferring that Balda or Nysco discussed in advance or agreed upon the terms of the Steinmetz ABL Certificate, that allegation is denied.

(d)     In so far as it is alleged, by repeating paragraph 81, that Balda or Nysco provided assistance in preparing the Steinmetz ABL Certificate, that allegation is denied.

(e)     In so far as it is alleged that any representation made in the Steinmetz ABL Certificate was manifestly approved or adopted by Balda or Nysco, that allegation is denied.

(f)     Accordingly, and save as above, Balda and Nysco repeat paragraphs 29, 36 and 38 *mutatis mutandis* (whatever that means) and otherwise make no admissions.

(g)     As to the sub-paragraphs:

    i.      No admissions are made as to what discussions, if any, there were about the Steinmetz ABL Certificate at the FCPA interview. It is admitted that it was circulated in draft to Mr Tchelet and Mr Cramer. It is denied that those facts have any relevance to the responsibility of Nysco or Balda for it.

    ii.     It is admitted that the Steinmetz ABL Certificate is referred to in the SHA. It is denied that it was reviewed by Nysco or Balda prior to issue. It is admitted that it was signed by Mr Steinmetz It is denied that these matters have any relevance to the responsibility of Nysco or Balda for it.

*The Clark ABL Certificate*

42.   Paragraph 85 is admitted

43.   Paragraph 86 is admitted as a reasonably accurate paraphrase of certain parts of the Steinmetz ABL Certificate (on which Balda and Nysco will rely for its true terms), except that:

(a)     Government Official had a defined meaning in the Clark ABL Certificate;

14

(b)     the term 'affiliate' was not defined;

(c)     the reference to inducing Government Official(s) to use influence was in fact a reference to corruptly inducing them to do so.

44.   As to paragraph 87:

(a)     Balda and Nysco object to the pleading by repetition of paragraph 84 "*mutatis mutandis*" because it is not clear what is *mutandis*, and accordingly not clear what is *mutatis*.

(b)     In so far as it is alleged, by repeating paragraph 84, that any of the attendees consulted Balda or Nysco before making any representation in the Clark ABL Certificate, that allegation is denied.

(c)     In so far as it is alleged, by repeating paragraph 84, that there is any basis for inferring that Balda or Nysco discussed in advance or agreed upon the terms of the Clark ABL Certificate, that allegation is denied.

(d)     In so far as it is alleged, by repeating paragraph 84, that Balda or Nysco provided assistance in preparing the Clark ABL Certificate, that allegation is denied.

(e)     In so far as it is alleged that any representation made in the Clark ABL Certificate was manifestly adopted or approved by Nysco or Balda, that allegation is denied.

(f)     Accordingly, and save as above, Balda and Nysco repeat paragraphs 29, 36, 38 and 41 mutatis *mutandis* (whatever that means) and otherwise make no admissions.

(g)     As to the sub-paragraphs thereof:

i.     Paragraph 87.1 is not admitted, so far as the First to Fifth Defendants are concerned, but in so far as it is implied that neither Nysco or Balda did review the Clark ABL Certificate prior to its execution, that is admitted and averred.

ii.     The quotation in paragraph 87.2 is admitted, but its relevance is denied. Even if, which is denied, Mr Clark made any representation as to the knowledge of Nysco or Balda, that representation was not made by or on

15

their behalf; Mr Clark was not authorised to make such representations by Nysco and Balda.

iii.  Paragraph 87.3 is admitted. The JVA contained no provision to the effect that the knowledge of Nysco or Balda was that of BSGR, nor any warranty given by or on behalf of Nysco or Balda, nor any representation that any other Defendant's knowledge was that of Nysco or Balda.

iv.  It is admitted that the transactional documents were approved at a BSGR board meeting as set out in paragraph 87.4(i). It is denied that the transactional documents were approved by Balda as alleged in paragraph 87.4(ii). The Board of BSGR informed the Balda council members by telephone of the proposed joint venture before the transactional documents were executed. Subsequently a written resolution confirming their approval of the joint venture in general terms was executed by Balda Foundation Council members. As to paragraph 87.4 (iii), no admissions are made as to who gave instructions for the transactional documents to be executed, but it is admitted and averred that they were not executed on the instructions of (or on behalf of) Nysco or Balda.

*Further London Meetings*

45.  Save that it is admitted and averred that neither Balda nor Nysco was represented at any meeting for the negotiation of the JVA and SHA, Balda and Nysco are unable to admit or deny paragraphs 88 and 89.

46.  As to paragraph 90:

(a)  Balda and Nysco object to the pleading by repetition of paragraph 90 "*mutatis mutandis*" because it is not clear what is *mutandis*, and accordingly not clear what is *mutatis*.

(b)  In so far as it is alleged, by repeating paragraph 87, that any of the attendees consulted Balda or Nysco before making any representation alleged in paragraphs 88 and 89, that allegation is denied.

(c)    In so far as it is alleged, by repeating paragraph 87, that there is any basis for inferring that Balda or Nysco discussed in advance or agreed upon the representations alleged in paragraphs 88 and 89, that allegation is denied.

(d)    In so far as it is alleged, by repeating paragraph 87, that Balda or Nysco provided assistance in preparing the representations alleged in paragraphs 88 and 89, that allegation is denied.

(e)    In so far as it is alleged that any of the representations alleged in paragraphs 88 and 89 was manifestly adopted or approved by Nysco or Balda, that allegation is denied.

(f)    Accordingly, and save as above, Balda and Nysco repeat paragraphs 29, 36, 38, 41, 44 and 46 mutatis *mutandis* (whatever that means) and otherwise make no admissions.

*Other matters*

47.    As to paragraph 91:

(a)    In the premises, it is denied that the First to Eighth Corruption Representation and the First to Fourth Consultancy Representations was made by Nysco or Balda to Vale.

(b)    Otherwise, it being denied that Nysco and Balda made any representations, it is also denied that they had any intention in that respect.

(c)    It is denied that Nysco or Balda knew that Vale would pass any representation to its subsidiary and related companies, or that they intended any representation to be relied on by Vale International or Vale Austria.

48.    As to paragraph 92:

(a)    So far as Nysco and Balda can ascertain, the only implied representations alleged to have been made are those pleaded at paragraph 80.4.1. Each of those representations is said to have been impliedly made by an attendee at the meeting. Neither Nysco nor Balda was, or is alleged to have been, in attendance at the meeting or represented at it, and accordingly neither Nysco nor Balda was

17

or could have been aware of those implied representations. Paragraph 92.1 is accordingly denied.

(b)   Whether paragraph 92.2 is intended to make an allegation as to the Claimants' actual understanding (which, presumably, means Mr Kleinfeld's understanding) or as to any other Defendant's knowledge of his understanding, no admissions are made. So far as Nysco and Balda are concerned, it is denied that they had any relevant knowledge.

(c)   Except as aforesaid, no admissions are made.

*The terms of the JVA and SHA*

49.   Paragraph 93 is admitted as a brief summary of the terms of the JVA and SHA, to which Nysco and Balda will also refer at trial as necessary.

*Completion of the JVA and SHA*

50.   Paragraph 94 is admitted.

*Payments made by Vale pursuant to the JVA and SHA*

51.   Paragraph 95 is not admitted

## Alleged payments to the First to Sixth Defendants and others after the JVA and SHA

*Payments to the Second to Sixth Defendants*

52.   As to paragraphs 96 and 97:

(a)   It is denied that Balda offered any bonuses prior to the JVA and SHA, and/or that Balda gave the Second to Sixth Defendants grounds to expect a bonus from Balda in relation to the execution of the JVA and SHA. Balda and Nysco are unable otherwise either to admit or deny paragraph 96.

(b)   It is admitted that on 1 July 2010 Balda resolved to pay Onyx US\$ 2.5 million, and that that sum was paid on or about 15 July 2010. Balda's Foundation Council

understood that much if not all of these monies would be used to repay a loan from Nysco to Onyx, and Nysco received a payment of about USD1.7 million from Onyx shortly thereafter.

(c)  Save as aforesaid, Balda and Nysco deny (if it be alleged) that they made any of the payments therein pleaded, and otherwise are unable either to admit or deny the allegations.

53.  As to paragraph 98:

(a)  Balda and Nysco are unable either to admit or deny the allegations in paragraph 98.1.

(b)  Save that it is admitted that Nysco received some USD371.5 million from BSGR between 10 May 2010 and 12 July 2010, no admission is made in relation to paragraph 98.2.

54.  As to paragraph 99:

(a)  So far as the USD2.5 million paid by Balda to Onyx is concerned, pending completion of the Tracing Exercise it is not admitted that the cash to make that payment derived from the USD 500 million paid by Vale International to BSGR on 30 April 2010.

(b)  So far as the other payments are concerned, Nysco and Balda are unable at this stage, and pending completion of the Tracing Exercise, either to admit or deny the allegation.

*Payments to Pentler and Mme Touré*

55.  As to paragraph 100:

(a)  In relation to the alleged payments to and from Nysco, Nysco and Balda are unable at this stage, and pending completion of the Tracing Exercise, either to admit or deny the same.

(b)  Otherwise, no admissions are made.

56.  Nysco and Balda are unable to admit or deny paragraph 101 because they had no involvement in the alleged transactions between Pentler and Mme Touré.

19

## Alleged attempts to destroy incriminating material

57. Paragraphs 102 and 103 do not allege any material fact relevant to the causes of action on which the Claimants rely, but set out purported evidence which ought not to have been pleaded. Save that paragraph 103.7 is admitted as a matter of public record (but not as admissible evidence of the truth of the matters on which the conviction was said to have been based, if such be alleged), and save that it is denied (if it be alleged) that Balda or Nysco took any of the alleged steps, Balda and Nysco are unable to admit or deny them.

## Revocation of the Mining Licences

58. The first sentence of paragraph 104 is admitted. Further it is admitted that the Technical Committee was appointed in spring March 2012 by the then Government of Guinea to investigate a review of mining titles that had been granted under the prior regime, and produced a letter setting out its initial findings which was sent to Vale on 30 October 2012 (as set out further below). The balance of paragraph 104 is improperly pleaded evidence which is in any event inadmissible (if relied upon) for the truth of its contents, and Balda and Nysco neither admit nor deny it. In so far as it is intended to be alleged that the report of the Technical Committee is accurate, no admission is made.

## Claims in Deceit

59. The only representation relied on by the Claimant and purportedly made on behalf of Nysco was the representation in the Third Corruption Representation that Nysco had not, whether directly or indirectly, including through a third party (including its directors, employees, shareholders, UBOs or consultants), made, authorised, or promised any payments of benefits to government officials. Despite the purported breadth of paragraph 105, that aspect of the Third Corruption Representation is not alleged to have been false, and was not false, there being no allegation that Nysco did make any such payment, whether directly or indirectly.

60. As to paragraph 105:

(a)     It is denied that Mme Touré fulfilled the definition of Government Official in the Initial or Supplemental DD Questionnaires, or the Steinmetz and Clark ABL Certificates, or as a matter of ordinary language.

(b)     It is admitted that, so long as he was Minister of Mines, Thiam fulfilled the said definition of Government Official.

(c)     Otherwise, Balda and Nysco are unable to admit or deny paragraph 105.

61.   Balda and Nysco are unable to admit or deny paragraph 106.

62.   Balda and Nysco are unable to admit or deny paragraph 107.

*Allegation of fraud against Mr Steinmetz*

63.   Balda and Nysco are unable either to admit or deny whether Mr Steinmetz made any representation knowing it was false, without belief in its truth, or reckless as to whether it was true or not. Paragraph 108 is accordingly not admitted save that:

(a)     As to paragraph 108.1, it is denied that Mr Steinmetz was the ultimate beneficial owner of the BSGR Group. Balda was the Ultimate Beneficial Owner of the Nysco and its subsidiaries. In so far as it is alleged that Mr Steinmetz controlled all material decisions relating to Balda or Nysco, that is denied as set out above.

(b)     As to paragraph 108.3 it was Balda not Mr Steinmetz who approved the USD2.5 million payment to Onyx as set out in paragraph 52(b) above.

*Allegation of fraud against Mr Cramer*

64.   Balda and Nysco are unable either to admit or deny whether Mr Cramer made any representation knowing it was false, without belief in its truth, or reckless as to whether it was true or not. Paragraph 109 is accordingly not admitted save that:

(a)     As to paragraph 109.2, it is admitted that, pursuant to the Service Agreement, Onyx was retained to provide various corporate services to Balda but it is denied that Onyx was thereby, whether by itself or its subsidiaries, authorised to conduct the day to day management of the BSGR Group. It is admitted that Mr Cramer

21

attended the Balda Foundation Council meetings as a representative of Onyx and to report accordingly to the council.

(b)   As to paragraph 109.3 it is admitted that Mr Cramer was appointed a non-executive director of BSGR in around 2004. It is denied that he was CEO of the Group.

(c)   Paragraph 109.4 is denied. In particular it is denied (in so far as it is alleged) that Onyx made any representations in the Supplemental DD Questionnaire on behalf of Balda or Nysco.

(d)   Paragraph 109.6 is admitted.

(e)   As to paragraph 109.9, paragraph 52 is repeated.

(f)   It is admitted that Mr Cramer was a point of contact for the Balda Foundation Council in respect of the proposed joint venture and that the Foundation Council approved the venture in general terms prior to its entry, and as thereafter confirmed by written resolution.

*Allegation of fraud against Messrs Struik, Avidan, Tchelet and Clark*

65.   It is not alleged that the state of mind of Messrs Struik, Avidan, Tchelet, or Clark is to be attributed to Balda or Nysco. In those circumstances, Balda and Nysco do not plead to paragraphs 110, 111, 112, or 113 and make no admissions in respect thereof.

*Allegations of fraud against Balda and Nysco*

66.   It is denied, for reasons given above, that Balda or Nysco made any representations (other than the representation that Nysco made in relation to one aspect of the Third Corruption Representation, which is not alleged to have been false). It is in any event denied that any representation was made by them knowing it was false, without belief that it was true, or recklessly as to whether it was true or not, and paragraphs 114 and 115 are is accordingly denied.

67.   As to the sub-paragraphs under paragraph 114:

(a)   The reference to the 'controlling minds' of Nysco is legally incorrect; it is in any event denied that Messrs Cramer and Steinmetz were the controlling minds of

Nysco. Messrs Cramer and Steinmetz were not directors of Nysco, were not acting on Nysco's behalf in any material respect, and did not act (and are not alleged to have acted) as agents for Nysco in making the representations of which the Claimants complain.

(b)     It is admitted that Mr Cramer was a director of Margali Management Corporation, which was a director of Nysco.   In any event it is denied (if it be alleged) that he acted as such in relation to the matters of which the Claimants complain.

(c)     It is denied that Mr Cramer had been engaged by Balda, through Onyx, to provide consultancy, advisory and management services to the BSGR Group. Onyx was engaged to provide those services. To the extent that it delegated their provision to Mr Cramer, or that Mr Cramer provided those services, he did so on Onyx's behalf.

(d)     Mr Steinmetz was one permissible beneficiary of Balda but not the ultimate beneficiary or controller of the BSGR Group. So far as his services are concerned, Mr Steinmetz was engaged by Balda to provide advisory services. It is denied (if it be alleged) that he acted as an advisor to Nysco or Balda in relation to the matters of which the Claimants complain.

(e)     As to the repetition "*mutatis mutandis*" of paragraphs 108 and 109, Nysco repeats paragraphs 63 and 64.

(f)     As set out in paragraph 32(a) it is denied that Nysco was the recipient of the shares in BSGR Steel pursuant to the 31 March Restructuring.

(g)     Pending completion of the Tracing Exercise, it is not admitted the Nysco made the payments referred to in paragraph 114.6 to Windpoint or (if made) the reason for the same.

(h)     Except as aforesaid, those sub-paragraphs are denied. It is denied that, in respect of the matters complained of, the knowledge or other state of mind of Messrs Steinmetz or Cramer is attributable to Nysco.

68.   As to the sub-paragraphs under paragraph 115:

(a) Paragraph 115.1 is admitted.

(b) Save that it is admitted that a de facto organ of a Liechtenstein is a person who acted as a director or took the decisions a director would take, paragraph 115.2 is not admitted.

(c) Paragraph 115.3 is denied. Mr Steinmetz was not a de facto organ of Balda at the relevant time. Further, the matters relied on in the sub-paragraphs to 115.3 would be insufficient to render Mr Steinmetz a de facto organ of Balda, but in any event are denied save as admitted elsewhere in this Defence.

(d) The decision to appoint Onyx was not a decision of Mr Steinmetz in substance or form. It was a decision taken by Balda's Foundation Council.

(e) Requests for distributions to Mr Steinmetz and his family were received from time to time and these were considered by Balda's Foundation Council in accordance with its powers and in its discretion.

(f) Mr Steinmetz sometimes attended meetings of the Balda Foundation Council, but never as a member of that council.

(g) Balda can neither admit nor deny paragraph 115.3.5 regarding Mr Steinmetz's assets or his asset disclosure.

(h) As to paragraph 115.4 it is denied that Mr Cramer was a de facto organ of Balda at the relevant time. Further, the matters relied on in the sub-paragraphs to 115.3 would be insufficient to render Mr Cramer a de facto organ of Balda, but in any event are denied save as follows:

(i) It is admitted Balda engaged Onyx to provide services. Paragraph 8 is repeated.

(j) Proposals presented by Mr Cramer to Balda's Foundation Council were often but not invariably followed. It is not surprising that Balda's council often followed the recommendations of Onyx given that Onyx were hired for their financial, administrative and management skills and expertise, particularly in view of Balda's council being comprised of busy lawyers and professional trustees without the time and expertise to conduct and investigate such matters independently. The fact that Onyx and/or Mr Cramer presented matters to

24

Balda's council for approval shows that it was the Foundation Council, and not Mr Cramer or Onyx, which was the relevant decision-making organ of Balda in relation to the matters complained of, and is accordingly inconsistent with the Claimant's allegation.

(k) As to paragraph 115.4.3, paragraph 52(b) is repeated.

(l) Balda is unable to admit or deny paragraph 115.4.4, which deals with Mr Cramer's asset disclosure.

(m) As to the repetition "*mutatis mutandis*" of paragraphs 108 and 109, Balda repeats paragraphs 63 and 64.

(n) It is denied that, in respect of the matters complained of, the knowledge or other state of mind of Messrs Steinmetz or Cramer is attributable to Balda.

*Alleged inducement and reliance*

69. As to paragraph 116, paragraphs 116.1 and 116.2 are matters of evidence and submission, and ought not to have been pleaded. Otherwise, subject to paragraph 70 below, Nysco and Balda make no admission as to reliance or inducement.

70. Although Nysco and Balda do not admit paragraph 116, and do not know (and cannot pending disclosure know) what matters influenced Vale to enter into the JVA and the SHA, they will rely on the following facts:

(a) Vale believed, prior to 30 April 2010, that BSGR had a close or very strong relationship with Mme Touré, whom it believed to be the wife of the President, which belief was recorded in a "Kick-Off Meeting" document prepared in 2008, in a report prepared for Vale by Mr Etchart dated 14 September 2009, and in a presentation regarding "Project Venezia" (that is, Vale's plans in relation to Guinea) prepared at the end of 2009.

(b) Despite that belief, Vale asked no specific question in the due diligence questionnaires concerning Mme Touré.

(c) It is to be inferred that Vale did not do so because it either did not care or did not wish to know, or did not wish to have a written record of, what connection there was between Mme Touré and the companies about which it was inquiring.

25

(d) It is also to be inferred that Vale did not believe that the answers it had been provided addressed any connection with Mme Touré.

(e) Vale believed, by no later than late 2009 (when the matter was addressed in the Project Venezia presentation referred to above) that I S Touré was related to Mme Touré and was working for BSGR. It could not reasonably have believed, and it is to be inferred that it did not believe, any representation to the contrary.

(f) Despite that fact, Vale did not include any specific questions in the due diligence questionnaires concerning I S Touré. It is to be inferred that it did not do so either because it did not care or did not wish to know, or did not wish to have a written record of the relationship, between I S Touré and Mme Touré.

(g) BSGR's 2008 Consolidated Financial Statements disclosed that USD 22 million was paid to a third-party minority shareholder. Those Consolidated Financial Statements were provided to Vale as part of due diligence, and it is to be inferred that Vale knew of their contents because of their obvious relevance.

(h) Nevertheless, Vale asked no specific questions regarding that payment in the course of due diligence. It is to be inferred that it did not care about it.

(i) Vale was strongly motivated for commercial reasons to enter into the SHA and JVA, and wished to do so very quickly.

(j) The due diligence conducted by Vale was limited in that:

    i. It extended only to a relatively narrow range of companies within the BSGR Group (as that term is used in the Particulars of Claim).

    ii. It did not instruct Ernst & Young to carry out any audit procedures in Guinea as part of the due diligence process.

(k) The Technical Committee formally accused BSGR of bribery by letters dated 30 October 2012 and 9 May 2013. Mr Cilins was arrested by the FBI on 14 April 2013. Despite those things, Vale continued to invest in the Simandou project between 30 October 2012 and 2 February 2015.

## Claim in conspiracy

71.  Paragraph 117 is, so far as it concerns Balda and Nysco, denied in its entirety. As to the sub-paragraphs thereof:

(a)  Sub-paragraph 117.1 is denied. The Defendants made no relevant representations, false or otherwise.

(b)  In the premises Balda and Nysco also did not make such representations fraudulently: paragraphs 58 to 67 are repeated.

(c)  Balda and Nysco were not party to any common design to make representations or any misrepresentation. They did not provide more than trivial assistance to any other Defendant in making any allegedly false representation.

(d)  Balda and Nysco did not participate in and did not know about the March 2010 Restructuring.

(e)  Paragraph 117.4 is denied, so far as it concerns Nysco and Balda, for the reasons set out in paragraph 48.

(f)  It is admitted that Nysco and Balda would benefit from the JVA and SHA. It is denied that the alleged or any inference of fraud follows.

(g)  Paragraph 117.6 is denied, so far as it concerns Nysco and Balda (who make no admissions as to any other Defendant).

## Proprietary claim

72.  As to paragraph 118, it is admitted that the Award held that Vale was entitled to rescission of the JVA and SHA, but that paragraph is otherwise denied.

73.  By its Award, the Tribunal held that Vale was entitled to damages for deceit, and Vale elected to claim and to obtain an award for such damages, which were assessed, as Vale asked them to be, without giving any credit for the value of any proprietary claim. In those circumstances, while entitled to rescission so far as it affects the contractual rights of the parties, Vale is not entitled to claim any proprietary remedy in relation to the proceeds from any person.

74.  Further or alternatively:

(a)   By Share Purchase Deed entered into on 13 March 2015 as between Vale, BSGR and BSGR Guernsey (the **"Share Purchase Deed"**), Vale sold its 51% interest in BSGR Guernsey back to BSGR, BSGR assumed liability for the debts owed by BSGR Guernsey and others to Vale, and the JVA and SHA were terminated

*(b)*   Clause 6 of the Share Purchase Deed provided as follows:

*"Termination of Agreements*

*6.1 Subject to Clause 6.2 and 6.3, the Vale Investment Agreements (and all rights and obligations thereunder, including, for the avoidance of doubt, any rights which are stated as surviving termination) shall terminate with immediate effect upon Completion; provided, however, that (as contemplated by Section 6.2) nothing in this Section 6.1 shall be deemed to affect any claims between Vale and BSGR that have been or may be brought in the LCIA Arbitration in relation to events that occurred prior to the Completion Date.*

*Claims between Vale and BSGR*

*6.2 The provisions of the Vale Exit Agreements shall not affect, shall be without prejudice to and shall be without restriction on the assertion or prosecution of any claims or counter-claims that have been or may in the future be made in the LCIA Arbitration between Vale and BSGR and in particular, shall not preclude Vale from making any claim in the LCIA Arbitration, including but not limited to any claim based on:*

*(a) the VBG Debt (including any claim for damages based on the loss caused by the non-repayment of VBG Debt and interest thereon that has accrued through 29 April 2014 or that would have, notwithstanding the Vale Debt Amendment Agreement, accrued thereafter);*

*(b) the Vale Expenditures; and*

*(c) the payment made by Vale to BSGR pursuant to the Vale Investment*

28

*Agreements.*

*6.3 For the avoidance of doubt, following Completion: (i) none of the fact or content of the parties' negotiations, nor the transactions contemplated by the Vale Exit Agreements shall be used as a defence (whether by way of an alleged affirmation, waiver, release or otherwise) by BSGR to any claim against BSGR and its Affiliates in the LCIA Arbitration or to bar, limit or affect in any way any such claim in the LCIA Arbitration (including, without limitation any claim for damages, rescission of the Vale Investment Agreements or any other claim whatsoever); and (ii) Vale and its Affiliates shall not be entitled to make any claim whatsoever against BSGR and/or any of its Affiliates in respect of the VBG Debt other than as part of the LCIA Arbitration, in which case the reservation of rights set forth in Clause 6.2 shall be applicable, or based on the terms of the Vale Debt Amendment Agreement."*

(c)  The effect of the Share Purchase Deed, and in particular of the termination of all rights and obligations thereunder and of the sale of Vale's interest in BSGR Guernsey to BSGR, was to affirm the Vale Investment Agreements and/or to preclude rescission thereof and/or to prevent rescission thereof by putting it beyond Vale's power to return the BSGR Shares.

(d)  That effect was, pursuant to clause 6 of the Share Purchase Deed, subject to the assertion or prosecution of claims in the LCIA Arbitration, but not otherwise.

(e)  By its proprietary claims herein, the Claimants purport to assert claims outside the LCIA Arbitration. Those claims are not within clause 6.2 of the Share Purchase Deed, and the Share Purchase Deed did not preserve any right to assert those claims.

(f)  In the premises, on its true construction and effect, the Share Purchase Deed precludes such claims for the reasons given in sub-paragraph (c) above.

75.  Yet further or alternatively, the payments in respect of which proprietary claims are now asserted were made by Vale Holdings and Vale International, rather than Vale, and

thus not by the relevant contractual counterparty. In the premises, no proprietary claim can be made in respect of them.

76. As to paragraphs 119 and 120:

    (a)    Since the Tracing Exercise has not been completed, Balda and Nysco are unable currently to admit or deny how far they received the proceeds of the USD500 million, and how far they retain any such proceeds save that Nysco admits receipt of some USD371.5 million between May and July 2010 from BSGR.

    (b)    It is denied, for reasons hereinabove set out, that Balda and Nysco received the proceeds with notice of the alleged or any deceit. No admission is made as to whether they received them as volunteers (which cannot be determined until it is known how far, when, and in what manner they received them).

    (c)    Even if, which is denied, a constructive trust were imposed, such trust was not imposed upon receipt of the funds. Upon receipt of the funds, their holder would (at most) be subject to a mere equity, and no constructive trust existed until, at the earliest and in the event that such trust can be said properly to exist, the rescission of the JVA and SHA.

    (d)    Otherwise, those paragraphs are denied.

## Alleged Loss and Damage

77. Paragraph 121 is denied for the reasons set out above. Further and as to paragraph 122:

    (a)    It is denied that the Claimants are entitled to assert any claim in relation to the sums set out in paragraph 122.2 as against Nysco and Balda in these proceedings since it was, as set out above, a material term of the Share Purchase Deed (at clause 6.3(ii)) that following completion "…*Vale and its Affiliates shall not be entitled to make any claim whatsoever against BSGR and/or any of its Affiliates in respect of the VBG Debt other than  as part of the LCIA Arbitration, in which case the reservation of rights set forth in Clause 6.2 shall be applicable, or  based on the terms of the Vale Debt Amendment Agreement*".

(b)    For these purposes the "VBG Debt" comprised the debt owed by BSGR Guernsey under promissory notes advanced between 2010 and 2015 by Vale to finance the Business Plan as defined in the JVA, and now claimed by the Claimants in the sum of USD581,197.104, and Affiliates *"means, in relation to a specified person, any family relation of such person, any person directly or indirectly Controlling, Controlled by or under direct or indirect common Control with the specified person and shall also include any person who is a director or officer of the specified person or beneficial owner of at least 50% (fifty per cent.) of any class of the then issued share capital of the specified person, and in the case of any Party shall include their respective subsidiaries."*

(c)    Balda and Nysco were *"Affiliates"* as defined within the Share Purchase Deed by reason of their position in BSGR's ultimate holding structure; in the premises, it is denied that the Claimants are now permitted to assert any claim in respect of the VBG Debt as against Nysco and Balda.

78.    Otherwise, it is admitted that on 30 April 2010, pursuant to the JVA, Vale International paid USD500 million to BSGR from its account held with JP Morgan Chase (New York). Save as aforesaid, no admissions are made as to paragraphs 122-124, and the Defendants are put to proof as (i) to the amount and causation of their alleged losses and (ii) their attempts reasonably to mitigate their losses, including by seeking to prevent the cancellation of the mining licences.

## Limitation

79.    For the purposes of Regulation (EC) No 864/2007 on the law applicable to non-contractual obligations (the "Rome II Regulation"), the damage alleged by the Claimants occurred in the country where the account from which money was paid is located.

80.    The initial payment of USD 500 million and all or much of any subsequent payments were made from an account in New York.

81.    Accordingly, the damage occurred in New York and the Claimants' claims in tort are governed by New York law pursuant to Article 4 of the Rome II Regulation.

82. Under New York law, and specifically under New York's Civil Procedure Law and Rules section 213 (8), a claim for fraudulent misrepresentation is time barred unless brought within the greater of:

    (a)    6 years from the date on which the cause of action accrued;

    (b)    2 years from the time when the plaintiff or the person under whom the plaintiff claims discovered the fraud or could with reasonable diligence have discovered it.

83. Under New York law, a claim for conspiracy (i) must be predicated on a civil tort and (ii) is time barred if the claim under that underlying civil tort is time barred.

84. If (which is denied) the Claimants have a cause of action in deceit, then it accrued on 30 April 2010.

85. If (which is denied) the Claimants have a cause of action in fraudulent misrepresentation, then they discovered the fraud or could with reasonable diligence have discovered it on some date before, and in any event no later than, 28 April 2014 when the LCIA Arbitration was commenced. (Balda and Nysco reserve the right, in so far as the Claimants in any Reply seek to rely on section 32 of the Limitation Act 1980, to say that the Claimants knew or could with reasonable diligence have discovered the fraud before that date.)

86. Accordingly, the Claimants' claims in fraudulent misrepresentation are time barred under New York law.

87. The Claimants' claims in conspiracy are predicated on the tort of fraudulent misrepresentation. In the premises, those claims are also time barred under New York law.

88. Alternatively, under English law, the cause of action on the Claimants' claims arose on 30 April 2010, and those claims are time barred pursuant to section 2 of the Limitation Act 1980.

89. Further or alternatively, in so far as the Claimants' claim is proprietary, the Claimants' claims against Balda and Nysco are time barred pursuant to section 21 (3) of the Limitation Act 1980, alternatively by the doctrine of laches:

(a)     The facts necessary to plead those claims must have been known to them by no later than 28 April 2014, when the LCIA Arbitration was commenced.

(b)     The Claimants thereafter delayed nearly six years before commencing these proceedings in December 2019.

(c)     This delay has prejudiced Nysco and Balda's ability to defend themselves given the time that has elapsed since the relevant events alleged, including where proprietary tracing relief is sought over many multiple transactions occurring since 2010;

(d)     It would be unjust to permit the Claimants now to pursue their proprietary claims.

## Interest

90.   No admissions are made as to paragraph 125.

PAUL STANLEY QC

RUTH DEN BESTEN

STATEMENT OF TRUTH

The Seventh Defendant and the Eighth Defendant believe that the facts stated in this Defence are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:      _____

Name:        Brian Padgett

Position:     Member of the Seventh's Defendant's Foundation Council;

              Director, Eighth Defendant

Dated:       1 May 2020