# Exhibit 1

**Air Canada, Air France-KLM, Cargolux Airlines International SA, Cathay Pacific Airways Limited, KLM NV, Martinair Holland NV, SAS AB, SAS Cargo Group A/S, Scandinavian Airlines System Denmark-Norway-Sweden, Singapore Airlines Cargo Pte Ltd, Singapore Airlines Limited, Société Air France, Korean Air Lines Co. Limited, Thai Airways International Public Company Limited, Polar Air Cargo LLC v Air New Zealand Limited, All Nippon Airways Co Limited, Emirates Hong Kong Dragon Airlines Limited, Malaysia Airlines, Saudi Arabian Airlines, British Airways Plc ("BA"), Emerald Supplies Limited & Ors**
**British Airways Plc v Emerald Supplies Limited & Ors v Air Canada, Air France-KLM, Cargolux Airlines International SA, Cathay Pacific Airways Limited, KLM NV, Martinair Holland NV, Polar Air Cargo LLC, Singapore Airlines Limited, Singapore Airlines Cargo Pte Ltd, Société Air France**

 **Positive/Neutral Judicial Consideration**

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
14 October 2015

Case No: A3/2014/2690, 2692, 2693, 2694, 2695, 2696, 2706, 2707, 2708, 2709, 2710, 2711, 2894, 2895, 3575, 3576, 3582, 3583, 3587, 3590, 3591, 3593, 3998, 4000, 4029, 4030, 4031, 4033, 4055, Case No: A3/2014/3581, 3678, 3707, 3736, 3738, 3739, 3740, 4184

Court of Appeal (Civil Division)

**[2015] EWCA Civ 1024, 2015 WL 5885546**

Before: Lord Justice Elias Lady Justice Gloster and Sir Bernard Rix

Date: Wednesday 14th October 2015

On Appeal from the High Court of Justice Chancery Division

The Honourable Mr Justice Peter Smith

HC08C02648

© 2020 Thomson Reuters.

HC2008000002

Hearing dates: Tuesday 12 May, Wednesday 13 May and Thursday 14 May 2015

**Representation**

(The Pergan appeals).
Daniel Beard QC and Thomas Sebastian (instructed by Hogan Lovells International LLP for Air Canada, Linklaters LLP for Air France-KLM, KLM NV, Martinair Holland NV and Société Air France, Shearman & Sterling (London) LLP for Cargolux Airlines International SA, Squire Paton Boggs (UK) LLP for Cathay Pacific Airways Limited, Shepherd and Wedderburn LLP for Scandinavian Airline System Denmark-Norway-Sweden, SAS AB and SAS Cargo Group A/S and Latham & Watkins LLP for Singapore Airlines Limited and Singapore Airlines Cargo Pte Ltd ) for the Addressee Airlines.
Jon Turner QC (instructed by Slaughter & May ) for BA.
Sarah Ford (instructed by Wragge Lawrence Graham & Co LLP ) for the Non-Addressee Airlines.
Iain Milligan QC , Paul Harris QC , Ben Rayment and Anneliese Blackwood (instructed by Hausfeld & Co LLP ) for Emerald Supplies Limited and 564 Others.
(The Strike-out appeals).
Daniel Beard QC and Thomas Sebastian (instructed by Hogan Lovells International LLP for Air Canada, Linklaters LLP for Air France-KLM, KLM NV, Martinair Holland NV and Société Air France, Shearman & Sterling (London) LLP for Cargolux Airlines International SA, Squire Paton Boggs (UK) LLP for Cathay Pacific Airways Limited, Bird & Bird LLP for Polar Air Cargo LLC and Latham & Watkins LLP for Singapore Airlines Limited and Singapore Airlines Cargo Pte Ltd ) for the Non BA strike-out Applicants.
Jon Turner QC , Conall Patton and Gideon Cohen (instructed by Slaughter & May ) for BA.
Sarah Ford (instructed by Wragge Lawrence Graham & Co LLP ) for the Non-Addressee Airlines.
Iain Milligan QC , Paul Harris QC , Ben Rayment and Anneliese Blackwood (instructed by Hausfeld & Co LLP ) for Emerald Supplies Limited and 564 Others.

**Judgment**

Lord Justice Elias:

**Introduction**

1. This is the judgment of the court to which all members have contributed. Gloster LJ is principally responsible for the section dealing with the Pergan appeals and Elias LJ is principally responsible for the section dealing with the strikeout appeals.

2. These are appeals against certain case management and other orders made by Peter Smith J ("the judge") in proceedings ("the action") brought by some 565 claimant companies ("the claimants") against British Airways plc ("BA"), arising out of an alleged unlawful cartel said to have operated worldwide between 1999 and 2007. The claimants are shippers of air freight who purchased air freight services in various territories worldwide, in virtually all cases acquiring those services indirectly through freight forwarders who contracted directly with the airline concerned. The object of the cartel, it is alleged, was to co-ordinate and fix prices for air cargo services, especially with respect to fuel and security surcharges, thereby distorting competition and inflating prices for those acquiring the services.

3. In the action the claimants have brought three claims against BA: (1) a claim for breach of statutory duties owed to the claimants under Article 101 of the Treaty on the Functioning of the European Union ("TFEU") [1] and/or Article 53 of the Agreement on the European Economic Area; (2) a claim that BA has committed the tort of unlawful interference with the claimants' businesses by unlawful means; and (3) a claim that BA has committed the tort of conspiracy to injure the claimants by unlawful means.

© 2020 Thomson Reuters.

4. In bringing their claims, the claimants seek to rely inter alia upon a decision of the European Commission ("the Commission") issued on 9 November 2010 in which the Commission made findings that in case Comp/39258- AirFreight certain airlines including BA and other airlines addressed in the operative part of that decision ("the addressee airlines") had infringed Article 101 TFEU at particular times by participating in a cartel on a global scale in respect of air freight services ("the Commission Decision"). In the Commission's public press release (IP/10/1487 dated 9 November 2010), which summarised that decision, the Commission announced its findings that:

i) BA had combined with 11 other identified air carriers in a cartel which had run in the period December 1999 to 14 February 2006, the object of which was to coordinate prices for Air Cargo Services, and in particular in relation to Fuel and Security Surcharges;

ii) BA thereby infringed Article 101 TFEU ; and

iii) BA was accordingly fined &euro;104,040,000. [2]

5. As well as the addressee airlines who were identified in the operative parts of the Commission Decision as having infringed Article 101 , certain other airlines were also mentioned in that decision, although not identified as infringers ("the non-addressee airlines"). Whilst the claimants have only sued BA, BA in turn has brought CPR Part claims under the Civil Liability (Contribution) Act 1978 against "19" of the addressee airlines [3] as well as against four, but not all, of the non-addressee airlines [4] seeking an indemnity and/or contribution in respect of any liability that BA is found to owe to the claimants.

6. At the date of the hearings before the judge, neither the complete, nor a non-confidential, version of the Commission Decision had been published by the Commission. The claimants sought disclosure of the unredacted version of the Commission Decision held by BA. This was objected to by certain of the addressee and non-addressee airlines on the grounds that they were entitled to redaction of certain materials on the basis that they were protected by EU law pursuant to the judgment of the General Court in Case T-474/04 Pergan *Hilfsstoffe für industrielle Prozesse GmbH v Commission [2007] ECR II-4225* (" Pergan ").

7. Separately BA also sought to strike out certain paragraphs of the Particulars of Claim, in particular those relating to the claims based on the torts of conspiracy and economic interference.

8. It is relevant to note for the purposes of these appeals that other proceedings are also pending, both in this and other jurisdictions, against members and alleged members of the cartel. In particular, a claim [5] was issued against BA in the High Court on 8 May 2014 by approximately 64,000 Chinese corporate claimants who are all members of the China Chamber of International Commerce, and a further claim was issued against BA on 28 November 2013 by Hyundai Industries Industires & Others v British Airways Plc (HC13E05164) arising out of the same alleged conduct. The claimants' solicitors, Hausfeld & Co LLP, are apparently acting for the claimants in these other proceedings. We were also told that a further claim has been issued in the Netherlands by the Chinese Chamber of International Commerce against BA, KLM and Martinair. Finally, we were told that there are extant proceedings in the Court for the Eastern District of New York, ( Re Air Cargo Shipping Services Antitrust Litigation , 06-MD-01775 (EDNY)). The claimants' solicitors associated US firm, Hausfeld LLP, are apparently acting for the claimants in some of these other proceedings.

9. Although we refer in this judgment to "the cartel", since BA and other addressee airlines are appealing against the Commission Decision, any such reference should be regarded as a reference to an alleged cartel.

© 2020 Thomson Reuters.

**The appeals**

10.  In summary, the appeals consist of:

i)  an appeal by the Addressee Airlines [6] and by the Non-Addressee Airlines [7] against orders made by the judge on 31 July 2014, 12 August 2014 and 28 October 2014 ("the contested Pergan orders") whereby he directed that an unredacted version of the Commission Decision should be disclosed to members of a confidentiality ring which included the claimants' legal representatives and economic advisers ("the Pergan appeals"); the reasons for these orders were contained principally in his judgment dated 28 October 2014 addressing the Pergan applications ("the redactions judgment");
ii)  an appeal by BA and certain, but not all, of the Addressee Airlines and Non-Addressee Airlines ("the non-BA strike-out appellants") against paragraph 4 of the judge's order dated 28 October 2014, whereby he refused to accede to BA's application that parts of the claimants' pleaded case should be struck out or summarily dismissed and instead ordered that such application "should be adjourned until at the earliest after disclosure has taken place" ("the strikeout appeals"); the reasons for this order were contained in a second judgment also dated 28 October 2014 ("the strikeout judgment"); and
iii)  an appeal by BA against the judge's order dated 5 December 2014, whereby he ordered BA to pay the claimants' costs of BA's strikeout application to be assessed on the indemnity basis, with an interim payment of £100,000 ("the costs appeal").

11.  We deal with each of these three appeals in turn.

*(1) The Pergan appeals*

**The relevant legal provisions, cases and principles**

12.  Before setting out the respective contentions of the parties in relation to the Pergan appeals and the procedural history of this matter, it is helpful to set out the relevant legal provisions, cases and principles.

**Article 48 of the Charter**

13.  Article 48 of the Charter provides as follows:

"**Article 48**

*Presumption of innocence and right of defence*

1.  Everyone who has been charged shall be presumed innocent until proved guilty according to law.

2.  Respect for the rights of the defence of anyone who has been charged shall be guaranteed."

*Pergan*

14.  The ruling in Pergan arose out of the Commission's investigation into a peroxides cartel. After the applicant company, Pergan, had given certain undertakings, the Commission decided to close the proceedings against it on the basis that the Commission considered it did not have enough evidence of Pergan's participation in the infringement after the date at which prescription applied and Pergan was not an addressee of this subsequent peroxides decision. However, recitals 156 to 177 of the decision contained a detailed description of Pergan's participation in the cartel at an earlier date and the decision contained numerous other references to it. [8] Pergan asked the Commission to remove the passages describing its alleged offending conduct in the public non-confidential version of the decision on the grounds that it was not the addressee of the decision and

that the proceedings which had been initiated against it had been closed. It also stated that certain passages in the decision, relating to the applicant's involvement in the infringement, had been disputed by the applicant and were inaccurate. The Commission refused to do so and Pergan challenged that refusal before the General Court.

15.  Pergan raised two particular concerns before the General Court: first, that the passages in question "could provide third parties with evidence for the purpose of actions for damages against the applicant" [9] ; and second, that publication of the passages in question could harm its reputation in the market. [10]

16.  In response, the Commission sought to argue that the passages in question were not binding on national courts, could not be used as conclusive evidence in national proceedings in circumstances where Pergan would be unable to defend itself and could not facilitate the production of evidence by third parties in any private damages claims brought against Pergan. [11]

17.  The General Court upheld Pergan's claim for redaction and rejected the Commission's defence.

18.  In so doing the General Court recognised that the non-disclosure interests of an undertaking which had been fined for a breach of competition law did not merit protection. [12] However, that presupposed that the undertaking in question had the opportunity to contest the infringement in court, whereas a non-addressee had no standing to do so. [13] At paragraphs 72-74 the General Court said:

> "72.  The Court would point out that the interest of an undertaking which the Commission has fined for breach of competition law in the non-disclosure to the public of details of the offending conduct of which it is accused does not merit any particular protection, given, first, the public interest in knowing as fully as possible the reasons for any Commission action, the interest of economic operators in knowing the sort of behaviour for which they are liable to be penalised and the interest of persons harmed by the infringement in being informed of the details thereof so that they may, where appropriate, assert their rights against the undertakings punished, and, second, the fined undertaking's ability to seek judicial review of such a decision ( Bank Austria Creditanstalt v Commission , paragraph 46 above, paragraph 78). The Court considers that this appraisal applies *mutatis mutandis* to a decision in which an undertaking is found to have committed an infringement, but proceedings against it are barred by limitation pursuant to Article 1 of Regulation No 2988/74 , the Commission being implicitly authorised to take that decision on the basis of the rules laid down by Regulation No 17, provided that it shows a legitimate interest for doing so (Joined Cases T-22/02 and T-23/02 *Sumitomo Chemical and Sumika Fine Chemical v Commission [2005] ECR II-4065* , paragraphs 60 to 63).
>
> 73.  However, the application of the case law cited in paragraph 72 above presupposes that the infringement found at least appears in the operative part of the decision and that the decision is addressed to the undertaking concerned so that it may contest that infringement in court. As the Commission itself argues, regardless of the grounds on which such a decision is based, only the operative part thereof is capable of producing legal effects and, as a consequence, of adversely affecting an undertaking's interests. By contrast, the assessments made in the grounds of a decision are not in themselves capable of forming the subject of an application for annulment. They can be subject to judicial review by the Community judicature only to the extent that, as grounds of a measure adversely affecting a person's interests, they constitute the essential basis for the operative part of that measure (order in Case C-164/02 *Netherlands v Commission [2004] ECR I-1177* , paragraph 21; Case T-213/00 *CMA CGM and Others v Commission [2003] ECR II-913* , paragraph 186), and if, in particular, those grounds are likely to alter the substance of what was decided in the operative part of the measure in question (see, to that effect, Case T-251/00 *Lagardère and Canal + v Commission [2002] ECR II-4825* , paragraphs 67 and 68).
>
> 74.  In the present case, it follows from the foregoing that, regardless of whether or not the Commission was justified in finding, in the grounds of the peroxides decision, an infringement attributable to the applicant, in the absence of such a finding in the operative part, the applicant did not have standing to bring an action against that decision. Accordingly, an action brought by

© 2020 Thomson Reuters.

the applicant against the peroxides decision seeking review by the Court of First Instance of the substance of the disputed information would, in any event, have been inadmissible, even if brought within the time limit provided for in the fifth paragraph of Article 230 EC (see, to that effect, Compagnie maritime belge transports and Others v Commission , paragraph 52 supra, paragraph 150).”

19.  The General Court stated that the Commission's powers of publication and the obligation of professional secrecy [14] fell to be interpreted in the light of [15] :

> “…general principles and fundamental rights, which are an integral part of the Community legal order, and, in particular, of the principle of presumption of innocence – as reaffirmed in Article 48 of the Charter of Fundamental Rights of the European Union proclaimed in Nice on 7 December 2000 (OJ 2000 C 364, p. 1) …”

20.  As to the presumption of innocence, the General Court held at paragraphs 76-77 that:

> “76.   The Court also observes that the presumption of innocence implies that every person accused is presumed to be innocent until his guilt has been established according to law. **It thus precludes any formal finding and even any allusion to the liability of an accused person for a particular infringement in a final decision unless that person has enjoyed all the usual guarantees accorded for the exercise of the rights of defence in the normal course of proceedings resulting in a decision on the merits of the case** ( Sumitomo Chemical and Sumika Fine Chemicals v Commission , cited in paragraph 72 above, paragraph 106). Furthermore, the guilt of a person accused of an infringement is established definitively only where the decision finding that infringement has acquired the force of res judicata, which implies either the absence of an appeal against that decision by the person concerned within the time limits provided for in the fifth paragraph of Article 230 EC , or, after such an appeal, the definitive closure of the contentious proceedings, in particular, by a judicial decision confirming the lawfulness of that decision.
>
> 77.   **As a consequence, findings which the person charged with an infringement, even though he contests their merits, has not had the opportunity to contest before the Community judicature cannot be regarded as established in law. The fact that such findings evade any review by the courts, and therefore, in the event that they are unlawful, any correction by the Community judicature, is manifestly contrary to the principle of the presumption of innocence.** Any other interpretation would upset the system of division of functions and the institutional balance between the administration and the courts, on the ground that, where findings are contested, it is for the courts alone to make a definitive ruling on the existence of sufficient evidence that an undertaking is liable for an infringement of the rules on competition.” (Emphasis added)

21.  The General Court also observed at paragraphs 78-79 that:

> “78.  The Court considers, further, that, since the Commission's findings relating to an infringement committed by an undertaking are capable of infringing the principle of the presumption of innocence, those findings must, in principle, be regarded as confidential as regards the public, and therefore as

being of the kind covered by the obligation of professional secrecy. This principle stands, inter-alia, from the need to respect the reputation and dignity of the person concerned if that person has not been finally found guilty of an infringement … The confidentiality of such information is confirmed by Article 4 (1) (b) of Regulation No 1049/2001 , which provides that information, whose disclosure would harm the protection of privacy and the integrity of the individual, is to be protected. Finally, **the confidentiality of that information cannot depend on whether, and to what extent, it is of probative value for the purpose of proceedings at national level** .” (Emphasis added).

79.   In that regard, the defendant cannot rely on paragraph 89 of the ruling in Bank Austria Creditanstalt v Commission , paragraph 46 above, given that the Court's appraisal in that part of the ruling does not concern a similar situation to that in the present case, in which the applicant has no possibility of contesting the merits of the assertions relating to it in the peroxides decision ( Bank Austria Creditanstalt v Commission , paragraph 46 above, last line of paragraph 78). It is clear from the case law cited in paragraphs 72 and 73 above that the Commission cannot adopt a decision finding an infringement after expiry of the limitation period, where such a finding is not justified by the existence of a legitimate interest and where the undertaking concerned has no possibility of seeking review of that finding by the Community judicature (see also, to that effect, Coca Cola v Commission , paragraph 52 above, paragraph 86).”

22.   As a non-addressee, the applicant Pergan had no standing to challenge the Commission's peroxides decision. Accordingly, because Pergan was not entitled to obtain a review of the Commission's findings or allusions to infringement of Article 101 TFEU , the General Court concluded at paragraph 80 that:

“80.   In the present case, as the Court has pointed out in paragraph 74 above, the applicant did not have standing to bring an action against the peroxides decision, given, in particular, that its participation in the infringement was not referred to in the operative part even though it contested the merits of the grounds of that decision in which its participation in the infringement was mentioned. Such a situation is contrary to the principle of presumption of innocence and infringes the protection of professional secrecy, as interpreted in paragraph 75 to 78 above, which require that respect for the reputation and dignity of the applicant be ensured. The disputed information must therefore be held to be covered by the obligation of professional secrecy within the meaning of Article 287 EC . In that regard, the Court would point out, finally, that the Commission itself accepted, during the hearing, that it could have published the peroxides decision by limiting itself to finding that the applicant had participated in the administrative procedure and then closing the investigation in its regard by reason of the limitation period. It must be held that, in those circumstances, **there is therefore no public interest in publishing the disputed information that is capable of prevailing over the applicant's legitimate interest in having such information protected.”** (Emphasis added.)

23.   Accordingly the General Court annulled the Commission's refusal to remove all references to the applicant in the published non-confidential version of its decision.

**The respective contentions of the parties in relation to the Pergan appeals – in summary**

*The appellants' submissions*

24.   The Addressee Airlines, which were represented on the appeal by Mr Daniel Beard QC and Mr Thomas Sebastian, and the Non-Addressee Airlines, which were represented by Miss Sarah Ford, have at all material times contended that the Commission Decision contains material protected by EU law pursuant to the judgment of the General Court in Pergan . Accordingly, they submitted that, if BA was to be required to disclose its unredacted version of the Commission Decision in the English action, the Addressee Airlines and Non-Addressee Airlines had an *absolute* entitlement, in accordance with the

Pergan decision, to have the Decision redacted in such a way so as to exclude statements that either described conduct which is characterised by the Commission as infringing Article 101 TFEU or alludes to such infringements, but which cannot, in either case, be challenged on appeal before the European courts.

25.  They further submitted that the problem arises because of the nature and structure of Commission decisions. It was common ground that these are frequently made up of many recitals which set out evidence, reasoning and findings and a short operative part which effectively sets out the orders of the Commission in relation to the findings made. However, it is only matters in the operative part (and reasoning in the recitals directly supporting those particular conclusions) which are binding and which can be the subject of appeal to the EU courts. As was said by the Supreme Court in *Deutsche Bahn AG v Morgan Advanced materials plc (European Commission intervening) [2014] UKSC 24* per Lord Mance JSC [16] at paragraph 21:

> ….
>
> "a Commission Decision regarding the existence of a cartel constitutes a series of decisions addressed to its individual addressees, which remain binding or not according to the lodging and outcome of any individual appeals. A successful appeal by one addressee, establishing that there was no cartel, has no effect on the validity and effects of the Decision determining that there was such a cartel and levying a fine as against another addressee who has not appealed. This is so although article 81 (1) EC (and now article 101(1) TFEU ) applies to agreements and concerted practices (concepts which postulate the involvement of more than one party), and although a Commission Decision, such as that in question on this appeal, addresses in a single document all addressees by reference to one or more particular agreements or practices found to exist between all of them."

26.  Mr Beard and Miss Ford submitted that the Commission Decision contained findings or allusions to infringements by addressee and non-addressee airlines which were not part of the operative part of the Commission Decision and were not facts essential to the infringement findings in that operative part ("the Pergan materials"). They contended that the case law of the European Court and, in particular, Pergan , recognised that where a party was unable to appeal findings of infringement or allusions to infringements in the EU courts, then there was an obligation on the Commission not to make those parts of the Decision available. In particular, in the present case they referred to two examples of such materials contained in the Commission Decision: one was findings of infringement, or allusions to infringement, in relation to periods outside the temporal scope of the infringements actually found by the Commission in the operative part of its decision; the second was findings of infringement, or allusions to infringement, outside of the geographical scope of the infringements as actually found in the operative part of the Commission Decision (in other words, infringements that took place entirely outside the EEA ).

27.  Accordingly they contended that the judge's decision that those parts of the Commission Decision which made findings or allusions to infringement which are not reflected in the operative part of the Commission Decision, or are not facts essential to such infringement findings, should nevertheless be disclosed in the English proceedings to the claimants, within the confines of a confidentiality ring, was clearly contrary to European law; and that the judge fundamentally erred in his analysis of Pergan and the other relevant European authorities. They submitted that the judge's order preventing the disclosure of Pergan materials to the world at large was not sufficient to vindicate the rights conferred under Article 48 of the Charter of Fundamental Rights of the European Union ("the Charter") as interpreted in Pergan and that, contrary to the reasoning put forward in the redactions judgment, the "protections" referenced by the judge were illusory.

**The respondents' submissions**

28.  Mr Paul Harris QC, Mr Ben Rayment and Ms Anneliese Blackwood, who appeared on behalf of the respondent claimants, sought to uphold the judge's decision. In summary, they contended that the protection provided by the Pergan decision was *not absolute* and that a distinction had to be drawn between the Commission itself and a national court; the latter had more nuanced powers of case management in relation to the disclosure of documents. The judge in the national court had power, in accordance with the court's own procedural rules, to strike a balance between preserving Pergan protections and requiring disclosure of an unredacted copy of the Commission Decision in the interests of justice. As the judge had made absolutely clear, the addressee and non-addressee airlines who were Part 20 defendants, would have the full right to defend themselves in the English proceedings; in those circumstances their rights to the presumption of innocence and a right of defence were

© 2020 Thomson Reuters.

not infringed. In reality the non-addressee airlines would also have an opportunity to protect their interests by appearance at future hearings. Moreover the addressee airlines were, in their appeals before the European Court, clearly challenging findings by the Commission which arguably fell outside the operative parts of the decision. The confidentiality ring and the possibility of hearings in private protected any potential reputational damage.

29.  On the other hand, Mr Harris submitted, the claimants in the present case would be substantially prejudiced in the conduct of their case against BA if the Pergan materials were redacted from the Commission Decision. That, it was submitted, would amount to a substantial injustice in circumstances where BA and all the Part 20 defendants, who were addressee airlines, had in their possession unredacted versions of the Commission Decision. The judge was quite right in the circumstances to have corrected that unfair asymmetry. As a matter of European law, the claimants were entitled to rely upon the Commission Decision and the findings of liability in order to prosecute the follow-on part of their infringement claim in the English court.

30.  By their respondent's notice the claimants suggested an alternative or fall-back position to the effect that, if this court were not minded to uphold the redactions judgment, then the terms of the 31 July order should be restored so that the court below should investigate and establish whether or not the Pergan redactions, which the appellants had sought to make, could be justified as genuine Pergan materials. In this context Mr Harris contended that the addressee airlines had been given every opportunity to establish, but had not in fact established, that the material in respect of which they claimed protection by redaction in fact fell within the scope of the Pergan decision.

**The procedural history**

31.  As we have already mentioned, at the date of the hearings before the judge, the Commission had not published a non-confidential version of the Commission Decision. Accordingly, on 10 February 2014 the claimants issued their first application in the action for inspection of the Commission Decision within the confines of a confidentiality ring.

32.  In a letter from the Commission dated 19 March 2014 to Latham & Watkins LLP, solicitors acting for Singapore Airlines, an addressee airline, (referred to by the judge at paragraph 70 of the judgment), the Commission said:—

> "….The Commission would point out that any obligation on the Defendant to disclose documents to the claimants would arise from the CPR governing the conduct of proceedings before the High Court and any question about the extent of those obligations or the manner in which they are to be discharged is therefore a matter for the High Court to determine.
>
> In case your client fears that any disclosure of the Airfreight Decision in the national proceedings may compromise your client's rights, it is for the High Court to assess any such claims and decide on the appropriate measures. Bearing in mind that the above mentioned private litigation is taking place in the EU, the national Court has the competence, expertise and necessary legal means, both under EU and national laws, to resolve any such claims, striking the right balance between your client's rights and rights of any other parties, including those of the claimants for damages".

33.  The judge heard the first application at a case management hearing held on 27-28 March 2014. At that hearing several of the Addressee Airlines intervened and objected to the disclosure of three categories of material to the claimants. Those categories were: (1) material in the Commission Decision protected by legal professional privilege under English law ("LPP material"); (2) material in the Commission Decision which reflected the content of the leniency submissions made by airlines

which had sought leniency under the EU's leniency scheme ("leniency material"); and (3) material in the Commission Decision the disclosure of which it was said would be contrary to rights under Article 48 of the Charter and Article 339 of the TFEU as applied in Pergan . This third category of material was referred to as the " Pergan material" or the " Pergan redactions" and it is this third category of material which has given rise to the present appeal. [17]

34. At the 27-28 March 2014 hearing the claimants contended that, as a matter of principle, addressees of the Commission Decision could not avail themselves of Pergan protection; that was because, if one was a subject of findings of infringement, one had a right to bring an appeal; and in the particular case the addressee airlines had brought a challenge seeking the annulment of the whole of the decision including all its recitals. The claimants did not make any submissions to the effect that, even if material was properly classified as Pergan material, it should nevertheless be disclosed to them within a confidentiality ring. At the conclusion of that hearing the judge rejected the claimants' submission that the Pergan judgment (which was a case about a non-addressee of the decision) did not apply in principle to redactions sought by addressee airlines – he recognised that Pergan protection could apply. [18] With the consent of the parties no reasons were given by the judge for this conclusion. The judge ordered BA to provide a version of the Commission Decision to the claimants with leniency material, LPP material and Pergan material removed (if requests for such removal were made to BA). [19] In particular, by paragraphs 7 to 13 of his order of 28 March 2014 ("the 28 March Order"), the Court gave directions to grant the advisers of the claimants [20] inspection within a confidentiality ring of an appropriately redacted copy of the Decision ("the redacted Decision") following requests for redaction. Thus:

i) by paragraph 8(1) of the 28 March Order the judge directed BA to write to each of the addressee airlines inviting them to identify to BA by 30 April 2014 all passages in the Commission Decision which they required to be redacted on the grounds that they referred to leniency material, LPP material or Pergan material, and informing them that, if they did not respond, the court would refuse any later claims for confidential treatment of the Commission Decision; and
ii) by paragraph 8(2) of the 28 March Order the judge directed BA to write to each of the non-addressee airlines, enclosing a copy of the 28 March Order and notifying them that, unless they made an application to the court by 30 April 2014, a redacted copy of the Commission Decision would be provided to the claimants within a confidentiality ring "containing information relating to them in an unredacted form."

35. By a letter dated 23 April 2014 from the Commission to the judge, the Commission made reference to the 28 March Order and explained the approach it would adopt to the publication of a non-confidential version of the Commission Decision. In particular, it said that:

> "The Commission understands the Court's concern at the delay in publishing a non-confidential version of the Decision. Under the present state of European Union law however, it is not possible for the Commission, within a reasonable timeframe, to override the numerous confidentiality claims made by addressees of the Decision, which prevent publication of a meaningful non-confidential version of the Decision. In this respect, I would refer you to an interim order made by the General Court in Case T-462/12 R, Pilkington Group Ltd v Commission and, on appeal, by the Court of Justice in Case C-278/13 p(R), Commission v Pilkington Group Ltd . The Court of Justice upheld an order made at first instance by the General Court **restraining the Commission from publishing a non-confidential version of another cartel decision, the European Courts accepting the applicant's argument that the publication of material over which confidentiality was claimed could cause irreparable harm to the applicant** . The determination of whether the material in question is indeed deserving of protection as confidential is a matter that will only be decided in the final judgment.l **In the light of the position taken by the Court in Pilkington, the Commission finds it is unable to publish a non-confidential version of the Decision, given the widespread objections to publication on grounds of confidentiality: the addressees would be able to rely on Pilkington to obtain interim measures from the European Courts preventing publication of a non-confidential version of the Decision.** The further implication of the Commission's inability to override the addressees' confidentiality claims is that the Commission is unable to explain to the non-addressees the exact context in which they are mentioned in the Decision. The Commission is

© 2020 Thomson Reuters.

therefore not in a position to provide the non-addressees with the information necessary for them to make a substantiated application to your Court of the sort that appears to be contemplated by paragraph 8(2)(i) of your Order. The Commission has only been able to confirm, either in writing or orally and without any reference to any paragraphs of the Decision, that the non-addressees are mentioned in the factual part of the Decision. The Commission hopes therefore that you will understand that any applications made pursuant to paragraph 8(2)(i) of your Order by non-addressees of the Decision cannot be substantiated further than a request that any reference to the non-addressee making the application be removed from the Redacted Decision to be prepared pursuant to paragraph 10 of your Order.

The Commission would emphasise that, irrespective of the issues raised by Pilkington in relation to the publication of information relating to the addressees of the Decision it is in any event clear that **the names of third parties would have to be redacted from the non-confidential public version of the Decision.** This follows from the General Court's judgment in Case T-474/04 Pergan Hilfsstoffe fur Industrielle Prozesse v Commission … There, the General Court held (at paragraph 76) that the Commission could not publish "even any allusion to the liability of an accused person for a particular infringement in a final decision unless that person has enjoyed all the usual guarantees accorded for the exercise of the rights of defence in the normal course of proceedings resulting in a decision on the merits of the case." As non-addressees, those mentioned in the Decision have no right to contest any inferences that might be contained in the Decision as to their participation in the infringement found in the Decision. The General Court also held that any findings made in relation to non-addressees of the decision was subject to the obligation of professional secrecy, binding on the Commission pursuant to Article 339 TFEU and (at paragraph 78) that "the confidentiality of that information [about non-addressees] cannot depend on whether, and to what extent, it is of probative value for the purposes of proceedings at national level."

As **the Commission has confirmed to non-addressees that it intends to redact the names of third parties from the non-confidential version that will ultimately be published** , and as it appears that the steps set out in your Order are intended to substitute for the absence at present of a published non-confidential version of the Decision, the Commission would respectfully suggest that it may be unnecessary for non-addressees to make applications pursuant to paragraph 8(2)(i) of your Order. In the light of Pergan , **the Court could simply order that the Defendant's solicitors remove the names of any third parties from the** Redacted Decision **that they are to prepare pursuant to paragraph 10 of your Order.** This would also save costs and deal with the concern expressed to the Commission by some non-addressees that, by making an application pursuant to paragraph 8 (2)(i) of your order, they will thereby reveal their identity, and thus undermine the very purpose of the application pursuant to paragraph 8 (2) (i)." (Emphasis added.)

36. Thus it can be seen that it was the Commission's position that, in preparing the non-confidential version of the Commission Decision, it would redact the names of third parties. Effectively it was suggesting that the court should do the same.

37. In a letter dated 25 April 2014 from the Commission to Hogan Lovells International LLP, solicitors acting for Korean Airlines Co Ltd, a non-addressee airline (wrongly referred to by the judge at paragraph 69 of the redactions judgment as a letter from the Commission to him dated 25 April 2014), the Commission said:

"In case your client fears that the disclosure of the Decision in the above mentioned proceedings may compromise your client's rights, it is for the High Court to assess any such claim and decide on the appropriate measures. As a Court of a Member State of the European Union the High Court is competent both under the EU and national laws, to resolve any such claim, striking the right balance

between your client's rights and the rights of any other parties, including those of the claimants for damages".

38.   On 29 April 2014 Korean Airlines Co Limited made an application, supported by 12 other non-addressee airlines, to vary the terms of inspection provided for in the 28 March Order. As a result, by a consent order dated 30 April 2014 ("the 30 April 2014 Order") the court gave amended directions for inspection, including by paragraph 7 of the 30 April 2014 Order that, upon receipt of a version of the Commission Decision from BA that had already been redacted by the addressees (to remove leniency material, Pergan material and privileged material), the non-addressee airlines' solicitors should identify to BA the passages in the Commission Decision which they required to be redacted on the grounds inter alia of the principles set out in Pergan . In the event, very few, if any, references to the non-addressees remained visible at that stage, because the great majority had already been redacted by the addressees.

39.   On 10 June 2014 the judge made an order establishing a formal confidentiality ring ("the Confidentiality Ring") consisting of certain legal and economic advisers to the claimants, claimants in the La Gaitana and Allston Landing [21] claims and to specified addressee and non-addressee airlines.

40.   In accordance with the judge's order, on 10 July 2014 BA provided a redacted version of the Commission Decision to the claimants within the confines of the Confidentiality Ring. (In the subsequent redactions judgment the judge referred to this version of the Commission Decision as being "completely useless", [22] notwithstanding the fact that, even with its redactions, it was a far more extensive document than the summary of the Commission Decision provided by the Commission itself prior to that date).

41.   By application notice dated 23 July 2014, the claimants issued a further application for the judge to review the appropriateness/lawfulness of the redactions that had been made by BA and others to the Commission Decision and, for an order that, if those redactions were found not to be appropriate/lawful, they should be lifted. This was an attempt by the claimants to put in place a process of verification of the Pergan redactions. It is important to note that at this stage there was no application by the claimants for a wholesale disclosure within the confidentiality ring of the material claimed by the addressee and non-addressee airlines to be subject to Pergan protection.

42.   The claimants' second application was heard by the judge on 31 July 2014. At the end of that hearing the judge reserved judgment on the claimants' application but nonetheless made orders requiring that a further version of the Commission Decision be produced (in which Pergan redactions could still be maintained) and that certain witness statements should be produced by the addressee airlines (but not the non-addressee airlines) verifying the basis on which the redaction claims had been made. [23] The witness statements were required by the judge to be provided by specific senior individuals within the respective addressee airlines.

43.   It appears from the transcript of the hearing on that date that, so far as the non-addressee airlines were concerned, the judge apparently agreed that any references to them should remain redacted in the further version of the Commission Decision which he had directed to be produced. The relevant passage in the transcript reads as follows:

"MR JUSTICE PETER SMITH: Let me take stock at the moment. I am going to reserve my decision.
… What I am going to do now, however, it is appropriate whatever the decision, is I am going to

order all parties who have made redactions to the decision, to review their decision and remove such redactions as they think appropriate in the light of the arguments that have taken place today. I am talking about the naming of the non-addressees, I am talking about the over-redaction of the leniency and these things, and they should provide that to the claimants' solicitors within 14 days. The claimants' solicitors, I am afraid, will have the task of collating it all into one master.

…

MISS LESTER: My Lord, could I just one non-addressees' point, that, with respect, gives the claimant exactly what we were suggesting could not happen or should not happen, because it may result in addressees unredacting the names of non-addressees and those names will then go to the claimants in circumstances where we have not had an opportunity to see them.

MR JUSTICE PETER SMITH: I thought the non-addressees were all going to be deleted from the decision.

MISS LESTER: As I understood what your Lordship said, they are going to be deleted by the Commission, but if your Lordship's order means that –

MR JUSTICE PETER SMITH: **I am going to follow the Commission on that and delete them from the decision.**

MISS LESTER: You are going to?

MR JUSTICE PETER SMITH: Yes.

MISS LESTER: **So just to be clear, your Lordship's order does not allow addressees to unredact names of non-addressees?**

**MR JUSTICE PETER SMITH: No.**

MISS LESTER: Thank you." (Emphasis added.)

44.  Accordingly, the draft of paragraph 1 of the order made by the judge on 31 July 2014 ("the 31 July Order") directed that the name of any non-addressee airline or specific information that would allow the identification of a non-addressee airline should remain redacted in the further version of the Commission Decision. Likewise paragraph 3 of the order did not impose any requirement on non-addressee airlines to provide witness statements seeking to support redactions on Pergan grounds. However, in drawing up the 31 July Order, the claimants apparently inserted the words "other than where the non-addressee airline is mentioned in any contemporaneous documents that are part of the Commission file" ("the paragraph 1 proviso"). The paragraph 1 proviso effectively rendered nugatory the Pergan protection which the judge had previously directed should be accorded to the Non-Addressee Airlines. Moreover that qualification did not apply to the redactions to be maintained on behalf of the addressee airlines; the addressee airlines were permitted, at that stage, to maintain redactions of references to themselves on Pergan grounds where they believed they were entitled to such protection, irrespective of whether their names appeared in contemporaneous documents.

45.  Various non-addressee airlines wrote to the judge and objected to the proposed inclusion of the paragraph 1 proviso. Their objection was considered by the judge at a reconvened hearing held on 12 August 2014. At that hearing the judge decided to maintain the paragraph 1 proviso for reasons given in his ex tempore judgment of 12 August 2014. Thus paragraphs 1 and 2 of the 31 July Order in their final form read:

"1.  All airlines that have made redactions to the Redacted Decision shall by no later than 4pm on 14 August 2014 review and remove such redactions that they now consider were incorrectly applied to the Redacted Decision, save that in removing any such redactions they shall leave redacted the name of any non-addressee airline or any specific information that would allow the identification of a non-addressee airline mentioned in the Decision **other than where the non-addressee airline is referred to in any contemporaneous documents that are part of the European Commission file** .

2.  The solicitors to Air France-KLM be responsible for collating the amendments to the Redacted Decision and providing an amended version of the Redacted Decision to the Claimant's Advisers within the Confidentiality Ring and the Court by the date mentioned in paragraph 1, above." (Emphasis supplied.)

46.  At that hearing on 12 August 2014 the judge also announced that he would, in due course, order the disclosure of *all Pergan* material within the confines of a confidentiality ring. [24] That was a radical departure from the approach which he had previously adopted at earlier hearings. Thus at paragraph 43 he said:

"I should also say that at the start of this hearing I indicated that my decision was going to be that I did not believe the Pergan decision required me to redact the decision at all because I believe the Pergan decision has no application to the unique facts of this case where some parties are already relying on the decision and have brought proceedings. That was not the case in Pergan's . I will give more detail in that judgment when I handed down."

47.  On 14 August 2014 Rupert Jackson LJ granted a stay of paragraphs 1 and 2 of the Order dated 31 July 2014 pending the determination of the application by certain non-addressee airlines for permission to appeal the judge's decision of 12 August 2014 to maintain the paragraph 1 proviso.

48.  On 16 October 2014 Hogan Lovells, solicitors acting on behalf of Air Canada, wrote to the judge informing him of the judgment of the General Court in Case T- 534/11 Schenker v Commission . The letter enclosed copies of the French and German versions of the judgment (as the judgment was not available in English at that date) and summarised the key points arising from that judgment. It also enclosed a provisional version of the Commission's summary of the Commission Decision. The letter informed the judge that in Schenker , Schenker, a third party, had applied to the Commission requesting access to its Airfreight case file. The Commission rejected Schenker's application and Schenker appealed the Commission's decision to the General Court. The General Court held that, under EU law, Schenker did not have a right to access the Commission's procedural file or the confidential version of the Airfreight decision. On the same day the judge replied to that letter by his clerk to the effect that he was of the view that the enclosures to the letter did not affect his judgment.

**The redactions judgment**

© 2020 Thomson Reuters.

49.  In the redactions judgment dated 28 October 2014, the judge set out his reasons for his decision that, contrary to his previous approach, and despite the fact that the claimants had not sought such an order, Pergan material should be provided to the claimants:

i)  within the confines of a confidentiality ring; [25]  and

ii)  subject to the restraint (contained in undertakings given by the claimants ("the claimants' undertakings") that the claimants would not bring:

> "proceedings against anybody else either in these proceedings or fresh proceedings or in any jurisdiction elsewhere without the consent of the courts in this action". [26]

50.  The judge was understandably frustrated by the length of time which the Commission had taken to produce a non-confidential version of the Commission Decision and to work through its appeal process. Thus, having referred to the Commission's letter to the judge dated 23 April 2014, at paragraphs 27-29 he said:

> "27.  Although the letter was sent in the "spirit of co-operation" between the national courts and the EC there does not with respect to the Commission seem to be much co-operation from it. Despite the fact that it must be self-evident that 4 years even just to consider working out the non confidential part of the Decision is completely unacceptable no steps are being made to speed up that process and no indication is given as to when the whole process will be finalised.
>
> 28.  As I said in reply to their letter the spirit of co-operation must be a mutual thing but it does not with respect appear to be very mutual. I do not think it is acceptable for these kinds of delays to be imposed on the Courts within this jurisdiction. The events go back some 17 years and I was told at the hearing in March 2014 that it was possible that matters would not be finished within the European system until 2020. These proceedings are already stale as they are already nearly 6 years old and they have not moved beyond close of pleadings. There has been no disclosure, no exchange of witness statements and as will appear below there are apparently restraints on this jurisdiction in the "spirit of co-operation" in coming to decisions which might be at variance with the decisions that the Commission make.
>
> 29.  Of course there are well established procedures within these courts to protect people's confidentiality. I have come to the conclusion as I shall set out below that together with restrictions on the claimants' ability to bring proceedings against anybody other than those already in the Part 20 proceedings without permission of the court provide a more than ample protection of the so-called confidential issues in the Decision"

51.  The judge made no specific finding that *any* of the Pergan redactions before him were inappropriately made. Instead, his reasoning proceeded on the basis that the Pergan redactions were appropriate but that the Court had provided " *ample protection* " for that material through the use of a confidentiality ring and a restraint on further proceedings being brought by the claimants against parties other than BA using the Commission Decision. He sought in particular to rectify what he saw as the disadvantaged position of the claimants with no disclosure of the unredacted Commission Decision, when compared with

Emerald Supplies Ltd v British Airways Plc, 2015 WL 6685516 (2015)

that of BA and the addressee airlines. In so doing, the judge therefore went beyond what had been sought by the claimants in their application of 23 July 2014.

52.  The judge's reasoning for ordering disclosure of the Pergan material appears in particular from paragraphs 72 to 73, 102, 104, 106, and 107 of the redactions judgment. The primary justification which he gave was that the presence of a confidentiality ring, and the existence of a restraint imposed on the claimants bringing further proceedings, sufficed to protect the presumption of innocence guaranteed under Article 48 of the Charter as interpreted in Pergan . In this regard, the judge said:

> "72.  The claimants' rights are to have the matters brought to trial and tried justly and fairly with all requisite information available to it within the bounds of the rules as to admissibility (such as issues as to privilege and the like). The rights of Defendants as I understand it are that this Court should do nothing that might be inconsistent with the decisions that might be made in the EC and the European Courts in respect of these issues and that they should have confidentiality as regards production of the Decision in part or in whole as one of their rights. The latter right of course is to ensure that their Defence is not unfairly compromised by material being disclosed which they might challenge without having an opportunity to challenge it or matters that are in the Decision should not be put in the public domain when they have not had the opportunity to challenge them because of the damage that might ensue.

> 73.  They are fully protected in the EC as regards the EC's inability in effect to come to a decision. As regards the situation within this Court they are to my mind fully protected by the confidentiality ring and I have heard nothing from anybody in my view which suggests their rights will be adversely affected by disclosure within the confidentiality ring. I reject therefore Air Canada's submission that I should view the EC's letters as indicating that it did not appreciate the extent that an order for disclosure in this Court would undermine their separate applications for redaction which are currently pending before it. I do not see how what I might decide within the confidentiality ring can possibly have an impact on the submissions that have been made to the EC. Self-evidently the EC because of the confidentiality ring will itself not be aware of what decisions are made in this Court so I do not see how there can possibly be any adverse impact. One should avoid a knee jerk reaction as opposed to an analysis of what actually will happen.

> ….

> 102.  There is nothing in the Pergan decision in my view which prevents this Court invoking procedures with the same object in mind namely protecting the presumption of innocence and protecting trade secrets and confidentiality. The confidentiality ring in my view coupled with a restraint of the claimants bringing further proceedings provides ample protection for the reasons that are already set out. No particular secrets have been identified that it would be damaging to disclose to other parties. If it were further restrictions to the confidentiality ring could be entertained.

> 103.  I am fortified in my view of my ability to devise procedures that are familiar within this jurisdiction that have the same effect as the procedure in the EC by the decision of *Pfleiderer AG v Bundeskartellamt [2011] All ER (EC) 979* and the observations of the Advocate General in paragraph 47 as follows:—

>> "47  However, aside from such self-incriminating statements, alleged injured parties, such as Pfleiderer, should have access to all other pre-existing documents submitted by a leniency applicant in the course of a leniency procedure which would assist those parties in the establishment, for the purposes of a private action for damages, of the

existence of an illegal act in breach of Article 101 TFEU , damage to those parties and a causal link between the damage and the breach. The documents in question are not in effect a product of the leniency procedure as they, unlike the self-incriminating corporate statements referred to above, exist independently of that procedure and could, at least in theory, be discovered elsewhere. I can see no cogent reason why access to such documents which are specifically destined and apt to assist in an action for damages should be refused. It would run counter to the fundamental right to an effective remedy if access to such documents could be denied by a national competition authority in circumstances such as those in the main proceedings."

104.  Although that related to leniency material the same principle is applicable namely access should be had so as to prevent a fundamental right to an effective remedy being denied………

107.  In my judgment the confidentiality ring with the restrictions on the claimants as I have set out above not only addresses all of the concerns expressed by the Court in Pergan but also provides more than adequate protection. In addition of course it enables the present dispute to be pursued by all parties on an equal arms basis i.e. all of them as opposed to some of them have the benefit of the Decision. As the action proceeds the confidentiality can be maintained so that there can be no damage caused by the Decision and whatever it might say about any party to this action going in the public domain and affecting that company's goodwill."

53.  Accordingly paragraph 8 of the 28 October 2014 order required a redacted version of the Commission Decision to be produced to the claimants' legal and economic advisers "listed under the heading "Emerald Supplies & Others" in Part A of the Confidentiality Ring", excluding merely leniency materials and LPP materials. That was against the claimants' undertaking that:

"they will not make any use of any information obtained from the version of the Decision redacted in accordance with paragraph 8(i) of this Order to commence new proceedings against any person or company whether in this or any other jurisdiction, or use the information contained in the Redacted Decision in any other proceeding save for the present proceedings, **the Decision** [sic] to commence any proceedings whether within this action or in any other action within this jurisdiction or elsewhere against the parties to this action (including the Third and Fourth Parties) or any Non-Party unless the parties agree or the Court otherwise orders (the "Claimant Undertaking")." [Emphasis added.]

The wording of the undertaking in the order is ambiguous since the words "the Decision" in the seventh line appear redundant. Presumably they should be replaced by the word "or".

**The subsequent process before the Commission**

54.  On 8 May 2015 the Commission published a provisional non-confidential version of the Commission Decision ("the non-confidential Commission Decision") on its website. The non-confidential Commission Decision maintains most, but not all

[27], of the Pergan redactions which the Addressee and Non-Addressee Airlines were required by the 28 October 2014 order to disclose to the claimants within the confines of the confidentiality ring. We were told by Mr Beard QC that in terms of the quantity of redaction, the extent of the redaction was relatively similar — "more than broadly similar"- although there were differences in terms of the particular words that were removed. Mr Harris QC, however, did not necessarily accept this and pointed to what he referred to as real differences between the redacted version of the Commission Decision provided to the claimants within the confines of the confidentiality ring on 26 August 2014 and the non-confidential Commission Decision. We consider that such differences as there may be do not affect our decision in relation to the critical issues on this appeal.

### Summary of the judge's reasoning

55.  The judge's reasoning, as set out in the 12 August judgment and in the redactions judgment, may be summarised as follows:

i)  Disclosure into a confidentiality ring coupled with the claimants' undertakings was sufficient to protect non-addressees' Pergan rights; [28]

ii)  BA (and the other addressees of the Decision) already had access to the Decision; [29]

iii)  Although it related to leniency material, the CJEU's decision in Case C-360/09 *Pfleiderer v Bundeskartellamt [2011] All ER EC 979* (" Pfleiderer ") at [30]-[31] shows that access to material should be granted so as to prevent a fundamental right to an effective remedy being denied; [30]

iv)  The redaction process was a " *hopeless exercise* " and had reduced the Decision to a " *meaningless document* "; [31]

v)  Finally, specifically in relation to the paragraph 1 proviso, in the 12 August judgment the judge stated that Pergan should not be used as a 'device' for the suppression of contemporaneous documents which would be disclosable in due course.

56.  However, the arguments on the appeal by both the appellants and the respondents covered a far broader canvas. We refer where necessary to these arguments in our discussion below.

### Discussion and determination

*Relevant matters in relation to the appeal*

57.  This Court had the benefit, which the judge did not have, of the official, provisional, non-confidential version of the Commission's decision, which, although possibly subject to further amendment prior to the publication of the definitive non-confidential version, currently reflects the Commission's view as to what are justifiable Pergan redactions, both in relation to addressee airlines as well as to non-addressee airlines. It is possible that, as a result of further argument, certain redactions may be lifted but, for the time being at least, the official non-confidential version reflects the Commission's view as to what is legitimate Pergan protection to afford both addressee and non-addressee airlines. In other words the redactions in the non-confidential decision reflect the Commission's current view as to what findings are not subject to challenge, whether by judicial review or appeal, either because the relevant findings of infringement were not made in the operative part of the decision or the "assessments", or allusions to infringement made in the grounds of decision "did not constitute the essential basis" for the findings in the operative part of the decision; see paragraphs 73 and 74 of the Pergan judgment.

58.  As Miss Ford submitted, the position is clear. Thus while BA and the addressee airlines may have exercised, and may be exercising, a right to appeal in the European Court against the operative parts, or the essential basis, of the Commission's decision, they have no right to do so in relation to those findings in the redacted parts of the non-confidential Commission Decision. In relation to the operative parts or the essential basis of the Commission's decision, they have no Pergan protection; in relation to findings which do not form part of the operative part or the essential basis for the Commission decision, then both addressee and non-addressee airlines alike enjoy Pergan protection in relation to publication of those materials — at least so far as publication by the Commission is concerned. In those circumstances it is not necessary for us to consider various submissions made by Mr Harris in relation to the identification of genuine Pergan materials.

© 2020 Thomson Reuters.

59.  Mr Beard and Miss Ford submitted that the non-confidential decision supported the Addressee and Non-Addressee Airlines' stance on the appeal, as it was now beyond argument as to what their respective Pergan rights were, subject to any subsequent definitive ruling of the European Court. In essence those parts of the Commission's Decision which had been redacted referred to infringements or factual matters supporting infringements outside the geographical jurisdiction of the EU or relating to a time which was outside the relevant limitation period.

60.  Mr Harris on the other hand contended that it made no difference to the arguments which the claimants raised on the appeal to support the judge's redactions judgment.

61.  BA was not appealing the redactions judgment. Although it was appealing the Commission's decision in various respects, it was not seeking Pergan protection in the English proceedings in relation to those aspects of the Commission's findings which it was appealing to the General Court. In practical terms it was common ground that BA was entitled to make use of the information contained in its copy of the full, unredacted version of the Commission's decision in pleading and proving its case against both the addressee and non-addressee airlines, who were Part 20 Defendants, and to defend itself against the claim made by the claimants, although Mr Beard's and Miss Ford's submission was that BA was not entitled in evidence or trial to refer to those parts of the Commission's decision which were protected on Pergan grounds, so far as the addressee and non-addressee airlines were concerned. It was also common ground that BA was obliged to disclose, and indeed had already disclosed, in the action documents which were relevant to the claimants' allegations, notwithstanding that such documents might relate to findings of infringement, or allusions to infringement, contained in the Decision which were protected on Pergan grounds.

**The issues which arise for determination**

62.  These may be articulated as:

i)  Is Pergan protection absolute?
ii)  If not, and the judge had a discretion to strike the balance between the Pergan rights of the addressee and non-addressee airlines and the claimants' rights effectively to pursue their claim in damages, was the judge entitled to override the Pergan rights of the addressee and non-addressee airlines to the extent of ordering disclosure within the confines of the confidentiality ring and, in particular, were the so-called safeguards which the judge put in place as part of his alternative regime sufficient to protect the rights of the addressee and non-addressee airlines in relation to the presumption of innocence?

*Is Pergan protection absolute?*

63.  Logically the first issue which arises for determination is whether Pergan protection is, as counsel characterised it, "absolute". We would prefer to rephrase the issue as being whether a national court is obliged to afford the same protection which is afforded at Community level to the confidential version of the Commission's decision to Pergan materials, notwithstanding that a damages claimant has made an application for disclosure in national court proceedings.

64.  Mr Harris QC argued that the fact that, at Community level, the Commission was obliged, as a result of the Pergan decision, to publish a non-confidential version of its decision, thereby affording Pergan protection to addressee and non-addressee airlines, did not predicate that a national court had to afford similar protection in the context of proceedings under Article 101 TFEU . He submitted that a national court had power, in accordance with its own procedural rules, to strike a balance between preserving Pergan protections adopted by the Commission and requiring disclosure of an unredacted copy of the Commission Decision in the interests of justice; where the correct balance lay had to be determined on a case-by-case basis by the national court; the national court was not obliged to adopt the course of imposing redactions which were required at Community level; the national court could impose other forms of protection which it regarded as sufficient to protect the interests of addressee or non-addressee airlines and to deal with the mischiefs which the Pergan decision identified; as the judge had made absolutely clear, the addressee and non-addressee airlines, whether or not they were Part 20 defendants, or otherwise parties to the action, would have the full right to defend themselves in the English proceedings to challenge the findings of the Commission and to assert their innocence of any cartel activity; in those circumstances their rights to a presumption of innocence and a right of defence were not infringed by the imposition of a confidentiality ring, which limited disclosure or publication of an unredacted copy of the Commission decision to members of the confidentiality ring, and made it subject to the claimants' undertakings; in the present case the judge had correctly undertaken the balancing exercise and

struck the right balance between the interests of the addressee and non-addressee airlines and the claimants. In this context Mr Harris relied upon: Case C-360/09 *Pfleiderer v Bundeskartellamt [2011] All ER EC 979* (" *Pfleiderer* "); the decision of the European Court in Case 536/11 *Bundeswettbewerbsbehorde v Donau Chemie* (" *Donau Chemie* ") dated 6 June 2013; the Commission Opinion in Wm Morrison Supermarkets Plc v MasterCard Incorporated & Ors [5.5.2014]; and the decision of the UK Competition Appeal Tribunal in *National Grid v ABB and ors [2012] EWHC 869 (Ch). [2012] ECC 12* .

65.  In our judgment the claimants' submission that the judge, as the national court, was free to relax the "absolute" protection of the presumption of innocence afforded to addressee and non-addressee airlines by the Pergan redactions, which are now reflected in the provisional non-confidential version of the Commission Decision, and to substitute his own regime for disclosure of an unredacted version within a confidentiality ring, has to be rejected. In our view, not only was the judge not entitled as a matter of law to relax or amend the Pergan safeguards recognised by the Commission in its publication of the provisional non-confidential version of the Decision, but also, even if, contrary to that view, he had a discretion to strike a balance between preserving the Pergan protections adopted by the Commission and requiring disclosure of an unredacted copy of the Decision to enable the claimants to pursue their damages claim effectively, he failed to determine where the correct balance lay. In this context, he failed, in our judgment, to give due recognition to the nature of the protection afforded by Pergan to the presumption of innocence and wrongly put in place a regime which was not sufficient to protect the rights which both the addressee and the non-addressee airlines enjoyed in respect of Pergan materials.

66.  Our reasons for our conclusions are as follows.

67.  Article 48 of the Charter applies to national courts of Member States when they are implementing EU law. Article 51.1 of the Charter provides that:

> "The provisions of this Charter are addressed to the institutions and bodies of the Union with due regard to the principle of subsidiarity and to the Member States only when they are implementing Union law."

Article 48 thus applied to the proceedings before the judge, as those proceedings, amongst other things, involve the implementation of EU law; namely, in particular, claims for the breach of duties owed to the claimants under Article 101 TFEU . Whilst it is correct that the actual decision in Pergan related to a decision by the Commission to reject the applicant's request for removal of references to the applicant in publication of the Commission's own decision, the reasoning in the judgment itself, as cited above, is clearly wide enough to apply to determinations by national courts. Thus the suggestion made in paragraph 40 of the claimants' skeleton argument dated 19 December 2014 to the effect that:

> " Pergan applies to the obligations of *the Commission* in deciding whether or not to publish a decision within the framework of rules that govern *its* procedures in competition cases. These obligations do not apply to the work of national courts which operate within very different procedural rules that are specifically designed to adjudicate fairly on disputes between the parties before them." (Emphasis as in the original.)"

in our judgment suggests an overly restrictive description of the implications of the Pergan judgment. The reasoning contained in that judgment equally applies, in our view, to any consideration by a national court as to whether rights under Article 48 of the Charter have been infringed in the context of competition proceedings in the domestic court. If there is a presumption of innocence, which under Article 48 the national court has to respect, then there is no rational justification for allowing third parties, such as claimants in proceedings in national courts in existing or future damages actions (a class specifically referred to and contemplated in Pergan ), to have access to incriminatory material (such as the Pergan materials contained in the Commission decision), without any right of challenge or appeal to the party concerned in the relevant forum, namely the European Court, suggests that that party has been guilty of conduct infringing Article 101 .

68.  In our judgment there is no principled basis for an approach which permits a judge in national court proceedings to allow a claimant in a damages action to achieve an advantage (namely access to an unredacted, non- Pergan protected, version of the Commission Decision) which such a party could not obtain at Community level. There is nothing in the Pergan judgment which justifies providing a remedy for the prejudice that arises from public disclosure, while denying such a remedy for the prejudice that arises from disclosure to actual or potential claimants in damages actions. The General Court in Pergan was well aware that disclosure in that case would create a risk that Pergan would be subject to damages actions in national courts and that one purpose of Pergan's application was to ensure that particular information did not reach potential claimants. [32] Moreover, the General Court explicitly dealt with the concern that granting relief would deprive claimants of information that may be "of probative value" in "proceedings at national level". [33] Furthermore, although the Commission argued that Pergan would be "able to defend itself" [34] in proceedings at national level, there is nothing in the judgment which suggests that the General Court took the view that this was capable of resolving the concerns raised. To the contrary, the General Court makes the emphatic statement that findings of, or allusions to, infringements which do not support the operative part of the Decision "cannot be regarded as established in law" [35] and does not appear to place any weight on the ability to rebut allegations in national court proceedings. The judge's approach, which permitted disclosure within a confidentiality ring and subject to protective measures, appears to us to be inconsistent with the approach of the General Court in Pergan which stated in categorical terms:

> "there is….. no public interest in publishing the disputed information that is capable of prevailing over the applicant's legitimate interest in having such information protected. [36] "

69.  Nor, contrary to the claimants' submission, can any restriction be placed on the ambit of the Pergan decision on the grounds that it related to a claim for confidentiality by a non-addressee, as opposed to a claim by an addressee of a Commission decision. The reasoning in the judgment clearly extends to materials in a decision which an addressee has no means to challenge before the European Court, whether by appeal or judicial review.

70.  The above analysis is, however, not merely dependent on principle. Article 4(3) of the Treaty on European Union ("TEU") provides:

> "Pursuant to the principle of sincere cooperation, the Union and the Member States shall, in full mutual respect, assist each other in carrying out tasks which flow from the Treaties. The Member States shall take any appropriate measure, general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the Union. The Member States shall facilitate the achievement of the Union's tasks and refrain from any measure which could jeopardise the attainment of the Union's objectives."

The duty under Article 4(3) TEU is binding on all authorities of the Member States, including the courts: see Case C-344/98 *Masterfoods Ltd v HB Ice Cream Ltd [2000] ECR I-11369* (" Masterfoods ") at [49]. The general principle of legal certainty, which underpins the duty of sincere cooperation, requires Member States to avoid making decisions that could conflict with a decision contemplated by the Commission: see Case C-234/89 *Delimitis v Henniger Brau [1991] ECR I-935* at [47] (" Delimitis "); Masterfoods at [51] and National Grid Electricity Transmission v ABB Ltd [2009] EWHC 1326 at [24.] It is only where, in the words of the Commission in Delimitis at [50], there is "scarcely any risk" of a conflict between decisions of domestic and EU institutions, that the national authorities should proceed. Where the EU and domestic authorities have overlapping jurisdictions i.e. considering the same or similar matters, the risk of conflicting decisions will be high.

71.  The judge purported to address this issue in paragraphs 67 to 74 of the redactions judgment. In rejecting the airlines' submission he said as follows:

"67.  There are a number of reasons for rejecting that submission. First there is no question of coming to a concluded decision that might be in conflict with the EC or the European Court decision. It is accepted that it is not possible to have a final trial within this jurisdiction pending finality of the European process. Equally however it is accepted that it is possible for this court to proceed to examine matters and identify issues in advance of the final trial. In respect of the Decision that exercise will be done under a confidentiality ring.

68.  I do not see that there is any potential conflict in that evaluation process as regards decisions that have to be made as opposed to interlocutory determinations as to what items of the Decision should be redacted. I have already observed that the disclosure of the entirety of the Decision within this confidentiality ring will not adversely affect any party that is concerned with the Decision as they are already parties to this action. I have already observed on the absurdity of some parties having full access to the Decision, some having a limited access and some having none at all."

72.  The judge then quoted from the letter from the Commission to Korean Airlines Co Limited dated 25 April 2014, which we have already referred to in paragraph 37 above, but wrongly referring to it as the letter from the Commission to himself which in fact was dated 23 April 2014; additionally he went on to quote from the Commission's letter to Singapore Airlines dated 19 March 2014, which we have also referred to in paragraph 32 above. The judge continued:

"71.  Thus the following appears to be the position:—

1)  The EC is unable to decide on the question of redactions even now, 4 years after the process was started.

2)  It will not expedite that procedure to assist (sincerely co-operate with) this Court in deciding issues before it.

3)  It has accepted that it is for this Court balancing the rights of the claimants as victims with the rights of the Defendants and the Part 20 Defendants to carry out the exercise. That exercise is to protect the parties' respective rights.

72.  The claimants' rights are to have the matters brought to trial and tried justly and fairly with all requisite information available to it within the bounds of the rules as to admissibility (such as issues as to privilege and the like). The rights of Defendants as I understand it are that this Court should do nothing that might be inconsistent with the decisions that might be made in the EC and the European Courts in respect of these issues and that they should have confidentiality as regards production of the Decision in part or in whole as one of their rights. The latter right of course is to ensure that their Defence is not unfairly compromised by material being disclosed which they might challenge without having an opportunity to challenge it or matters that are in the Decision should not be put in the public domain when they have not had the opportunity to challenge them because of the damage that might ensue.

73.  They are fully protected in the EC as regards the EC's inability in effect to come to a decision. As regards the situation within this Court they are to my mind fully protected by the confidentiality ring and I have heard nothing from anybody in my view which suggests their rights will be adversely affected by disclosure within the confidentiality ring. I reject therefore Air Canada's submission that I should view the EC's letters as indicating that it did not appreciate the extent that an order for disclosure in this Court would undermine their separate applications for redaction which are currently pending before it. I do not see how what I might decide within the confidentiality ring can possibly have an impact on the submissions that have been made to the EC. Self-evidently the EC

because of the confidentiality ring will itself not be aware of what decisions are made in this Court so I do not see how there can possibly be any adverse impact. One should avoid a knee jerk reaction as opposed to an analysis of what actually will happen.

74. It must be borne in mind that there has been no mutual assistance as between this Court and the EC; the latter has simply declined to do anything beyond saying that it is unable to do anything whether by speeding up a decision or even making a decision."

73. We cannot accept the reasoning of the judge in relation to the issue of the obligation of sincere cooperation pursuant to Article 4(3) TEU . His primary reason appears to have been that, because he regarded the Commission as having behaved in a wholly uncooperative fashion by not providing a non-confidential version of the Decision in a timely fashion, there was no corresponding obligation on the English court to cooperate. That, in our view, was a misguided approach. Delay by the Commission, even unconscionable delay, in the production of the provisional non-confidential Decision (which in any event was attributable, it appears, to submissions being made by various parties as to appropriate redactions) does not relieve the English court of its mutual cooperation obligations under Article 4(3) .

74. In this case there was, in our judgment, a real risk, at the time when the judge gave his redactions judgment, that his order providing for disclosure within the confines of a confidentiality ring would conflict with any future decisions by the Commission in respect of the applications for redaction made by the Addressee and Non-Addressee Airlines (as well as future decisions by the European courts on appeal from those Commission decisions). Necessarily, in making their decisions, in the light of Pergan , the Commission and the European Court would be bound to afford the full Pergan protections to Addressee and Non-Addressee Airlines alike. By the date of the hearing before us the conflict was even more acute; any order which permitted disclosure of Pergan materials to the claimants within the confidentiality ring would clearly be contrary to the regime adopted in the Commission's provisional non-confidential decision dated May 2015, which clearly respects the Addressee and Non-Addressee Airlines' rights not to have incriminatory materials provided to claimants or potential claimants bringing damages claims.

75. Whilst the judge's decision was an interlocutory, case management decision, as opposed to a final decision determining the substantive issues in the action (for example as to whether BA was liable to the claimants or the Part 20 defendants were liable to BA), that of itself did not mean that his decision could not be in conflict with a decision or potential decision of the Commission or the European Court. The judge's decision to provide the claimants with the Pergan material, within the confines of the confidentiality ring, was a final decision, in the sense that it enabled the claimants irrevocably to have sight of, and make use of, Pergan materials. That necessarily and directly had the potential to conflict with any future decision by the Commission to uphold claims to Pergan protections by addressee and non-addressee airlines in the provisional version of the non-confidential Decision — a decision which it was bound to take in relation to genuinely claimed Pergan materials in accordance with European law. It also has the likely potential to conflict with any subsequent decision by the Commission (or the European Court) to maintain such claims in the final version of the non-confidential Decision. It undermines the protection of EU law rights at Community level.

76. Moreover, the recent judgment of the General Court in Schenker , [37] which was sent to the judge under cover of Hogan Lovells' letter dated 16 October 2014, after argument had concluded but before delivery of the redactions judgment, clearly demonstrated that any decision by the judge permitting disclosure of an unredacted version of the confidential Decision, within the confines of a confidentiality ring, would conflict with the approach adopted by the General Court in Schenker and would be likely to conflict with future decisions made by the Commission in response to redaction requests by the addressee and non-addressee airlines and with any decisions made by the European Courts on subsequent appeals.

77. In Schenker , Schenker, a third party provider of logistics services and a potential claimant for damages for infringement of Article 101 TFEU , applied to the Commission requesting access to its case file and the confidential version of the Commission Decision in relation to the airfreight investigation in case COMP/39258- Airfreight (i.e. the Commission Decision in the present case). The Commission rejected Schenker's application and Schenker appealed the Commission's decision to the General Court. The General Court held that, under EU law, Schenker did not have a right to access the Commission's procedural file or to the confidential version of the Commission Decision. The General Court held that:

i) there was a general presumption that all procedural documents are confidential in nature and should not be disclosed to third parties;

ii)  the Commission was required to refuse third party access to the confidential version of the Commission Decision in order to protect the legitimate commercial interests of the airlines pursuant to Article 4(2) of Regulation No. 1049/2001 ("the Regulation"). In this context, the General Court emphasised that, pursuant to Article 4(7) of the Regulation and EU case-law, the protection of the commercial interests of companies such as the airlines involved in this case could apply for 30 years or even longer (paragraph 66 of the judgment);

iii)  access by third parties to the confidential version of the Commission Decision should also be restricted in order to protect the purpose of inspections, investigations and audits of the Commission pursuant to Article 4(2) of the Regulation (paragraph 70 of the judgment);

iv)  for the purposes of the Regulation there was no overriding public interest so far as private damages claimants were concerned justifying access to these documents. The General Court explained that:

> "such a wide access would jeopardise the balance that the Union lawmakers intended to strike, in Regulation No. 1/2003 , between the obligation for the undertakings concerned to provide the Commission with commercial information that is possibly sensitive and the guarantee of enhanced protection arising from the professional secrecy and business secrecy of the information thus provided to the Commission";

v)  accordingly, and in line with a previous decision of the EU Court of Justice of 27 February 2014 ( Commission vs. EnBW , C-365/12 P) there was no right under the Regulation for third parties to access the confidential version of a Commission decision in relation to proceedings regarding an alleged infringement of Article 101 TFEU ;

vi)  Schenker therefore only had the right to access a non-confidential version of the Commission Decision. As a non-confidential version of the Commission Decision did not at that date exist, the General Court directed that Schenker should only have access to those parts of the Commission Decision which were not the subject of any confidentiality claims; (paragraphs 137 — 138 of the judgment).

vii)  the process of preparing a non-confidential version of the Commission Decision for publication was, in conformity with the principle of transparency, to be completed in "the briefest period possible and, in any case, in a reasonable period based on the specific circumstances in each case"; (paragraph 130 of the judgment).

78.  Although there was no specific mention in the judgment of any claim to Pergan protection in connection with the claims for confidentiality, and no specific reference to the presumption of innocence, it is obvious that any such claims arise *a priori* to any objections to disclosure by addressees of the Decision on grounds of commercial confidentiality. Moreover it is also clear from the decision in Pergan that the right to the presumption of innocence is one aspect of the right to commercial confidentiality. What should have been obvious to the judge was that, in the light of the decision in Schenker , there was a clear risk of conflict between the order which he was proposing to make and the decision of the General Court. It would, or should, have been obvious to him that there was in due course going to be a non-confidential version of the Commission Decision which was going to be made available and in relation to which the Commission was going to have to reach its conclusions on proposed Pergan redactions. It was clearly going to be inconsistent with the protection afforded by the General Court to redacted material, through the process described in Schenker , if a full disclosure were to be made of the Commission Decision to the claimants' representatives in national proceedings in circumstances where the Commission had not yet made a final decision on those requests for redaction. That would be contrary to the duty of sincere cooperation. It was irrelevant in our judgment that Schenker involves consideration of article 4 of the Regulation which does not apply to national courts. The judge did not address Schenker in the redactions judgment.

79.  The next point in relation to which in our view the judge went wrong was his assumption that the opportunity, or possibility, of the addressee and non-addressee airlines defending themselves in the English action against allegations of infringement was sufficient to obviate the need for full protection of their Pergan rights. Contrary to the judge's view, the fact that the Addressee Airlines, and those of the Non-Addressee Airlines who are Part 20 defendants, have the opportunity in the English action to defend themselves against BA's claims for contribution and therefore to challenge allegations that they were party to a cartel, is no answer to the point articulated in Pergan . That case makes clear that their rights to the presumption of innocence would be infringed by the mere dissemination of statements made by the Commission, which either describe conduct which is characterised by the Commission as infringing Article 101 TFEU or allude to such characterisation, but which in either case cannot be challenged on appeal before the European courts. The findings or allusions to findings of liability made by the Commission in its Decision cannot be challenged in the domestic courts; the European Court is the

© 2020 Thomson Reuters.

only forum where the Commission's decision can be challenged: see Case C-314/85 Foto-Frost v Hauptzollamt at paragraphs 17-20.

80.  The judge's reasoning wrongly assumes that a right of defence in the national courts predicates that the presumption of innocence has not been infringed. There are two reasons why this approach is wrong:

i)  As the decision in Pergan itself makes clear, the opportunity to raise a defence in the national court is not sufficient to prevent the right to the presumption of innocence being breached. In Pergan , Pergan specifically referred to the concern that the passages in question "could provide third parties with evidence for the purpose of actions for damages against the applicant" [38] . In response, the Commission sought to argue that the passages in question were not binding on national courts, could not be used as conclusive evidence in national proceedings in circumstances where Pergan would be unable to defend itself and could not facilitate the production of evidence by third parties in any private damages claims brought against Pergan [39] . But, despite these arguments, the General Court upheld Pergan's claim for redaction and rejected the Commission's defence, holding that Pergan's right to the presumption of innocence was breached: see paragraphs 76-78 and 80 already quoted above. We emphasise the General Court's view, as expressed in these paragraphs, that, in the absence of an opportunity on the part of a party "to contest *before the Community judicature* " the relevant findings, they could not "be regarded as established in law" and that there was "no public interest in publishing the disputed information that is capable of prevailing over the applicant's legitimate interest in having such information protected". Moreover the General Court also observed that "the confidentiality of that information cannot depend on whether, and to what extent, it is of probative value for the purpose of proceedings at national level."

ii)  The presumption of innocence (which is protected under Article 48(1) of the Charter) is of a different character, and separate from, the protection of the right of defence (which is ensured under Article 48(2) of the Charter). As stated above, the General Court in Pergan did not accept that the protection of rights of defence necessarily sufficed to ensure compliance with the presumption of innocence.

81.  Moreover, so far as the Non-Addressee Airlines, who are not Part 20 defendants, are concerned, there is absolutely no reason why they should be required, in order to protect their rights to the presumption of innocence, and to prevent the further dissemination of Pergan materials, to appear, and possibly take a substantive part, in proceedings to which they are not parties, in what may well be a foreign jurisdiction to which they may have not submitted, to "rebut" findings of, or allusions to, Article 101 infringements made by the Commission.

82.  Contrary to the view taken by the judge in paragraph 72 of the redactions judgment, the right of the Addressee Airlines and the Non-Addressee airlines to "have confidentiality as regards production of the Decision in part or in whole" is not:

"to ensure that their Defence is not unfairly compromised by material being disclosed which they might challenge without having an opportunity to challenge it or matters that are in the Decision should not be put in the public domain when they have not had the opportunity to challenge them because of the damage that might ensue".

Indeed, it is axiomatic that, so far as the Commission is concerned, there is no possibility of an airline raising a "defence" at Community level to the relevant adverse statements made by the Commission in Pergan materials, or of testing or challenging such statements by due process of law in the European courts. Moreover, as the decision in Pergan itself makes clear, one mischief which the right of the presumption of innocence, as defined in Pergan , is designed to avoid is precisely the risk of a party referred to in such statements being subjected to private damages claims at the suit of third parties in national courts on the basis of adverse statements made by the Commission, which can never be tested or challenged and which "cannot be regarded as established in law". Thus the rationale underlying the presumption of innocence is that the party, who is the object of such statements by the Commission, never has to raise a defence to claims made by third parties on the basis of such unchallenged statements — not that its defence should not be "compromised".

83.  Another reason which the judge gave for his conclusion that there was no breach of the obligation of mutual co-operation, and indeed his view that he should make the order for disclosure, was that:

> "As regards the situation within this Court they are to my mind fully protected by the confidentiality ring and I have heard nothing from anybody in my view which suggests their rights will be adversely affected by disclosure within the confidentiality ring. [40] "

Apart from the fact that such reasoning fails to address the risk of conflict between decisions by EU institutions (upholding requests for redaction on Pergan grounds) and the English court (mandating the provision of Pergan materials within the confidentiality ring), we do not agree that the position of Addressee and Non-Addressee Airlines are "fully protected", or indeed sufficiently protected, by the limited disclosure regime put in place by the judge, coupled with the claimants' undertakings.

84.  As Mr Beard and Miss Ford submitted, while a confidentiality ring may protect an enterprise from wider reputational repercussions it may suffer if allegations about its conduct in Commission decisions are widely publicised, it does not protect an enterprise from the harm that arises when adverse statements by the Commission are used to support private claims for damages by third parties. The provisions of the order dated 28 October 2014, coupled with the claimants' undertakings, do not in fact offer any sufficient protection in this regard. This is for the following reasons:

i)  The logical outcome of the judge's order is that any third-party damages claimant can start proceedings in a national court and obtain an unredacted copy of the Commission Decision, provided that it agrees to disclosure within the confines of a so-called confidentiality ring. In reality therefore the judge's order renders Pergan protection nugatory. The utility of the protection against the presumption of innocence is therefore critically undermined if in fact Pergan materials are made available to enable all third party claimants to use such materials to inform or support their claims in national courts, subject to their first issuing proceedings and making an application for disclosure. The protection is in fact lost once and for all.

ii)  The claimants' undertakings do not impose any restriction on the claimants deploying the information in the context of the present proceedings in a manner which falls short of issuing new claims. They could, in particular, use the information in question (relating to additional infringements allegedly occurring in more extensive time periods and wider geographical regions than the infringements disclosed in the non-confidential version of the Decision) to expand the scope or quantum of their claims against BA. That would almost inevitably lead to BA seeking to recover greater sums by way of contribution from existing Part 20 Defendants or potentially commencing further contribution proceedings against those Pergan Non-Addressee Airlines who are not currently parties to the proceedings. Neither of these potential outcomes is precluded by the terms of the claimants' undertakings. Accordingly, as a result of the order, both the Addressee and the Non-Addressee Airlines are exposed to a greater risk of being required to make a larger contribution, or, in the case of those Non-Addressee Airlines who are not already Part 20 defendants, a contribution, to BA.

iii)  Contrary to the claimants' argument, the fact that proceedings are not brought directly against the Addressee or Non-Addressee Airlines using the Commission Decision does not prevent the breach of their fundamental rights, since the scope of their liability to make contributions to BA is derived from the existence and quantum of BA's liability. Any action which increases the probability that BA will be found liable, which expands the scope of liability on the part of BA, and/or which increases the quantum of BA's liability, prejudices the Addressee and Non-Addressee Airlines who are currently Part 20 Defendants or who might subsequently be made so.

iv)  The claimants' undertakings do not provide any *absolute* protection to the Addressee and Non-Addressee Airlines against the use of the information by the claimants either: (i) to inform their decisions whether to commence new proceedings in this or other jurisdictions; (ii) actually to bring new proceedings in this or other jurisdictions; or (iii) to use the information in extant proceedings in this or other jurisdictions. For example, the order does not restrict the claimants from making a without notice application for permission to use such information for such purposes, nor is there any identification of criteria, either in the order or in the judgment, that would apply to inform the court's decision as to whether to grant permission in such circumstances. That in our judgment is inconsistent with the protections to which the Addressee and Non-Addressee Airlines are entitled by virtue of the Pergan decision.

v)  The claimants' undertakings do not provide any protection against the risk of the claimants' solicitors and economic advisers (who are also advising other claimants on other claims in respect of the Cartel, including against a number of the addressee and Pergan Non-Addressee Airlines in these proceedings) being influenced in their conduct of those other proceedings by their knowledge of the information contained in an unredacted copy of the Decision. The claimants' solicitors and advisers would in reality find it difficult, if not impossible, to put such information out of their minds.

© 2020 Thomson Reuters.

Indeed, the list of persons who will be eligible to obtain this material is already long. We were informed that the members of the Confidentiality Ring identified in Part A of the judge's order dated 10 June 2014 include not only advisers acting for the claimants in the Emerald claims but also (different) legal and economic advisers acting in the La Gaitana Farms and Allston Landing claims. The claimants' solicitors also act for almost 65,000 claimants in the Bao Xiang claim and for the Korean claimants in the Hyundai Heavy Industries claim, all of which arise from the same alleged conduct. Plainly, therefore, the release of the unredacted Commission Decision into a confidentiality ring of this sort would not only affect the position of the Addressee and Non-Addressee Airlines in relation to the Emerald claim but would potentially have further impact on other claims, where claimants might wish to seek redress directly against Addressee and Non-Addressee Airlines.

85.   Contrary to the view taken by the judge, and to the submissions made by Mr Harris in this court, in our judgment the cases of Pfleiderer , Donau Chemie and National Grid and the Commission opinion in Wm Morrison Supermarkets provide no support for the proposition that a national court is entitled to adopt a different, or more lenient, approach from that taken by the Commission in relation to protecting a party's right to the presumption of innocence.

86.   Pfleiderer was a reference which was made in the context of proceedings between Pfleiderer, a customer of certain undertakings which had been subject to fines as a result of a cartel in the decor paper sector, and the Bundeskartellamt, the German competition authority, in relation to an application by Pfleiderer for full access to the file maintained by the authority, including documents which had been seized and documents relating to leniency materials, which had been voluntarily submitted by the applicants for leniency. The purpose of Pfleiderer's application was in order to assist it in its preparation for a civil action for damages against the infringers. The German competition authority partially rejected Pfleiderer's application. Pfleiderer then brought an action before the Amtsgericht Bonn (the local court) challenging the decision of partial rejection. The local court ordered access both to the material in the file which the applicant for leniency had voluntarily made available to the competition authority and to the incriminating material and evidence collected. However, the local court held that various interests had to be weighed and balanced in order to determine the extent of the right of access, which was restricted to documents required for the purpose of substantiating a claim for damages. But it stayed its order and referred the following issue to the European Court for a preliminary ruling:

> "'Are the provisions of Community competition law – in particular Articles 11 and 12 of Regulation No 1/2003 and the second paragraph of Article 10 EC, in conjunction with Article 3(1)(g) EC – to be interpreted as meaning that parties adversely affected by a cartel may not, for the purpose of bringing civil-law claims, be given access to leniency applications or to information and documents voluntarily submitted in that connection by applicants for leniency which the national competition authority of a Member State has received, pursuant to a national leniency programme, within the framework of proceedings for the imposition of fines which are (also) intended to enforce Article 81 EC?'"

87.   In its judgment, the European Court held at paragraphs 25 — 32 as follows:

> "25   However, as maintained by the Commission and the Member States which have submitted observations, leniency programmes are useful tools if efforts to uncover and bring to an end infringements of competition rules are to be effective and serve, therefore, the objective of effective application of Articles 101 TFEU and 102 TFEU .
>
> 26   The effectiveness of those programmes could, however, be compromised if documents relating to a leniency procedure were disclosed to persons wishing to bring an action for damages, even if the national competition authorities were to grant to the applicant for leniency exemption, in whole or in part, from the fine which they could have imposed.
>
> 27   The view can reasonably be taken that a person involved in an infringement of competition law, faced with the possibility of such disclosure, would be deterred from taking the opportunity offered

by such leniency programmes, particularly when, pursuant to Articles 11 and 12 of Regulation No 1/2003 , the Commission and the national competition authorities might exchange information which that person has voluntarily provided.

28 Nevertheless, it is settled case-law that any individual has the right to claim damages for loss caused to him by conduct which is liable to restrict or distort competition (see Case C-453/99 *Courage and Crehan [2001] ECR I-6297* , paragraphs 24 and 26, and Joined Cases C-295/04 to C-298/04 *Manfredi and Others [2006] ECR I-6619* , paragraphs 59 and 61).

29 The existence of such a right strengthens the working of the Community competition rules and discourages agreements or practices, frequently covert, which are liable to restrict or distort competition. From that point of view, actions for damages before national courts can make a significant contribution to the maintenance of effective competition in the European Union ( Courage and Crehan , paragraph 27).

30 Accordingly, in the consideration of an application for access to documents relating to a leniency programme submitted by a person who is seeking to obtain damages from another person who has taken advantage of such a leniency programme, it is necessary to ensure that the applicable national rules are not less favourable than those governing similar domestic claims and that they do not operate in such a way as to make it practically impossible or excessively difficult to obtain such compensation (see, to that effect, Courage and Crehan , paragraph 29) and to weigh the respective interests in favour of disclosure of the information and in favour of the protection of that information provided voluntarily by the applicant for leniency.

31 That weighing exercise can be conducted by the national courts and tribunals only on a case-by-case basis, according to national law, and taking into account all the relevant factors in the case.

32 In the light of the foregoing, the answer to the question referred is that the provisions of European Union law on cartels, and in particular Regulation No 1/2003 , must be interpreted as not precluding a person who has been adversely affected by an infringement of European Union competition law and is seeking to obtain damages from being granted access to documents relating to a leniency procedure involving the perpetrator of that infringement. It is, however, for the courts and tribunals of the Member States, on the basis of their national law, to determine the conditions under which such access must be permitted or refused by weighing the interests protected by European Union law.”

88. On those grounds, the Court (Grand Chamber) ruled:

“The provisions of European Union law on cartels, and in particular Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 101 TFEU and 102 TFEU , must be interpreted as not precluding a person who has been adversely affected by an infringement of European Union competition law and is seeking to obtain damages from being granted access to documents relating to a leniency procedure involving the perpetrator of that infringement. It is, however, for the courts and tribunals of the Member States, on the basis of their national law, to determine the conditions under which such access must be permitted or refused by weighing the interests protected by European Union law.”

89. But it is notable that there is nothing in the Court's decision that addresses the absolute right to the presumption of innocence or the principles which were under consideration in Pergan . Indeed Pergan is not even mentioned in Pfleiderer , notwithstanding the former's importance and the fact that it had been decided only four years earlier. That, in our view, is

© 2020 Thomson Reuters.

not surprising since the Pergan issues simply did not arise in relation to the court's consideration in Pfleiderer as to whether *documentary* materials *voluntarily* supplied to the regulator by a party seeking leniency should be disclosed to a claimant in a damages action. These documents were of a very different character from adverse *findings* by a national or European regulator that there had been an infringement, or *allusions* in the relevant report to the liability of an accused person for an infringement, which were the subject of the absolute protection conferred in Pergan . Again the distinction is between the *findings* of the regulator which have not been subject to judicial challenge and *documentary* evidence. Moreover it is important to note that Pfleiderer concerned parties who had not only been addressees of an infringement decision which had not been appealed and therefore had become final against them [41] , but had also sought leniency in respect of the infringement concerned. The rights of such parties to protection in relation to such materials are much more limited. [42] Thus, in our view the judge was in error to equate the interests of parties in the Pfleiderer type situation with the interests of the Addressee and the Non-Addressee airlines in seeking to protect their Pergan rights. Furthermore, paragraph 47 of the Advocate General's opinion in Pfleiderer cited by the judge was concerned with the disclosure of pre-existing contemporaneous documents rather than leniency materials as such.

90.   In this context it is important to stress the point, forcefully advanced in submission by Miss Ford in relation to the Non-Addressee Airlines and the effect of the paragraph 1 proviso, that the judgment in Pergan did not suggest any qualification to the clear principles which it set out in relation to references in the Commission's decision to contemporaneous documents. Indeed, an examination of Recitals 156 to 177 to the non-confidential version of the peroxides decision, being the principal recitals in issue in Pergan , [43] discloses comprehensive and blanket redactions of both recitals and the footnotes thereto, notwithstanding the fact that the latter are likely to have included references to contemporaneous documents on the Commission's file. The distinction between contemporaneous [44] documents in the possession of a party and adverse findings of infringement by the Commission is accepted by the Addressee and Non-Addressee Airlines in the present case; they rightly accept that BA as defendant is obliged to give standard disclosure of all documents relevant to the issues in the case [45] . What they resist — correctly in our view — is the disclosure of any findings in the Commission's decision which conclude that there has been infringement, or which allude to liability for infringement, based on such documents. It is for that reason that footnotes appended to such findings of infringement and which refer to documents in the Decision should also be redacted, in accordance with the decision in Pergan , since by implication they were necessarily relied upon to support the Commission's findings of infringement.

91.   Similar observations may be made in relation to the other cases relied upon by Mr Harris. Donau Chemie was a case relating to the disclosure of documentary materials on the court file. The Bundeswettbewerbsbehörde (Austrian Federal Competition Authority) ('the BWB') had brought judicial proceedings before the Oberlandesgericht Wien (Higher Regional Court, Vienna), sitting as a Kartellgericht (Cartel Court), against Donau Chemie AG and other companies ('Donau Chemie and others'), which culminated in a final judgment from the Oberlandesgericht Wien ordering the former to pay a fine because of their participation in agreements and concerted practices contrary to Article 101 TFEU . The Verband Druck & Medientechnik ('the VDMT'), an association of undertakings, whose members had allegedly suffered loss due to the infringements committed by Donau Chemie and others, made an application in the proceedings seeking access to the court file relating to the proceedings. The VDMT wished to gain evidence enabling an assessment to be made, in particular, of the nature and amount of the potential losses to its members, and to determine whether it was appropriate to bring an action for damages against those undertakings.

92.   The relevant legal background to the reference by the Oberlandesgericht Wien appears from the following paragraphs of the judgment of the European Court (First Chamber):

"**Legal context**

3  Paragraph 39(2) of the 2005 Law on cartels (Kartellgesetz 2005) ('the KartG') states:

'Persons, who are not parties to the procedure, may gain access to the files of the Cartel Court only with the consent of the parties.'

4  Paragraph 219 of the Austrian Code of Civil Procedure (Zivilprozessordnung) ('the ZPO') provides:

'1.  The parties may gain access and have made copies and obtain extracts of all of the files relating to their case in the court's possession (case file), except for draft judgments and orders, minutes of discussions and court votes and written documents concerning disciplinary measures.

2.  With the consent of both parties, third parties can gain access in the same way, make copies thereof and obtain extracts therefrom, at their own expense, in so far as this is not precluded by the legitimate overriding interests of another individual or overriding public interests within the meaning of the first sentence of Paragraph 26(2) of the 2000 Law on data protection DSG 2000 [Datenschutzgesetz 2000]. In the absence of such consent, the third party is entitled to access and to obtain copies only in so far as it can adduce prima facie evidence to show that it has a legal interest in so doing … '

…

The dispute in the main proceedings and the questions referred for a preliminary ruling

5  By judgment of 26 March 2010, the Oberlandesgericht Wien imposed fines totalling EUR 1.5 million on Donau Chemie and Others for infringement, inter alia, of Article 101 TFEU on the market in the wholesale distribution of printing chemicals. By judgment on appeal of 4 October 2010, the Oberster Gerichtshof upheld that judgment of the Oberlandesgericht Wien, which thereby became res judicata.

6  The VDMT was established with a view to representing the interests of its members, which include in particular undertakings in the printing sector. On 3 July 2011, acting pursuant to Paragraph 219(2) of the ZPO, it applied to the Oberlandesgericht Wien for access to the file relating to the judicial proceedings between the BWB and Donau Chemie and Others. The purpose of that application was to gather evidence enabling an assessment to be made, in particular, of the nature and amount of the potential loss suffered by the VDMT's members due to the infringements committed by Donau Chemie and Others, and to determine whether it was appropriate to bring an action for damages against those undertakings.

7  Relying on Paragraph 39(2) of the KartG, all the parties to the judicial proceedings between the BWB and Donau Chemie and Others in essence refused to consent to the VDMT being granted access to the file.

© 2020 Thomson Reuters.

8  In that regard, the Oberlandesgericht Wien states that, contrary to what is provided for in Paragraph 219(2) of the ZPO, Paragraph 39(2) of the KartG makes no allowance for the court to authorise access to the judicial case file in competition cases without the consent of the parties, even where the party seeking access can demonstrate a legitimate legal interest in having access. In other words, according to the referring court, under the Austrian system, it is the legislature itself which weighed up, on the one hand, the general interest of the federal competition authority in obtaining information and identifying infringements of competition law and, on the other, the interest of third parties in having access to files in order to facilitate their bringing actions for damages. Thus, in that weighing-up, the former interest was given absolute priority, to the detriment of the latter. That court indicates that it follows that, even if only one of the parties to the proceedings has not given its consent, the court, which has no power to weigh up the interests present, is bound not to allow third parties access to the file.

9  The referring court observes that, according to Case C-360/09 Pfleiderer [2011] ECR I-5161 , the provisions of European Union law on cartels do not preclude a party from being granted access to documents relating to a leniency procedure involving the perpetrator of an infringement of European competition law. In the absence of binding European competition law rules, it is for the Member States to establish and apply the national rules governing access for persons who have been adversely affected by a cartel to documents relating to a leniency procedure.

10  The Oberlandesgericht Wien observes, however, that the Court, in paragraphs 30 and 31 of Pfleiderer , also stated that, in keeping with the principle of effectiveness, it is necessary to ensure that the applicable national rules do not operate in such a way as to make it practically impossible or excessively difficult to obtain such damages and to weigh the respective interests in favour of, on the one hand, disclosure of the information and, on the other, the protection of that information. That weighing-up exercise can be conducted by the national courts and tribunals only on a case-by-case basis, according to national law, and taking into account all the relevant factors in the case.

11  The Oberlandesgericht Wien accordingly is in some doubt as to the compatibility of Paragraph 39(2) of the KartG with that interpretation of the applicable European Union law, given that that provision precludes the court from proceeding with any weighing-up of the interests present.

12  Moreover, in the light of the reference to the principle of equivalence in paragraph 30 of Pfleiderer , the referring court also wonders whether, although Paragraph 39(2) of the KartG applies in the same manner to any cartel proceedings, be they based on national law or European Union law, that provision is nevertheless contrary to the principle of equivalence, as it does not apply to actions for damages for harm suffered due to infringements committed in other areas of civil or criminal law, those actions being governed more favourably, in terms of access to documents, by Paragraph 219(2) of the ZPO.

13  In those circumstances, the Oberlandesgericht Wien decided to stay the proceedings and to refer the following questions to the Court for a preliminary ruling:

‘1.  Does European Union law, in particular in the light of the judgment [in Pfleiderer ], preclude a provision of national antitrust law which, (inter alia) in proceedings involving the application of Article 101 or Article 102 [TFEU] in conjunction with [ Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty (OJ 2003 L 1, p. 1)], makes the grant of access to documents before the cartel court to third persons who are not parties to the proceedings, so as to enable them to prepare actions for damages against cartel participants, subject, without exception, to the condition that all the parties to the proceedings

must give their consent, and which does not allow the court to weigh on a case-by-case basis the interests protected by European Union law with a view to determining the conditions under which access to the file is to be permitted or refused?

If the answer to Question 1 is in the negative:

2.   Does European Union law preclude such a national provision where, although the latter applies in the same way to purely national antitrust proceedings and, moreover, does not contain any special rules in respect of documents made available by applications for leniency, comparable national provisions applicable to other types of proceedings, in particular contentious and non-contentious civil and criminal proceedings, allow access to documents before the court even without the consent of the parties, provided that the third person who is not party to the proceedings adduces prima facie evidence to show that he has a legal interest in obtaining access to the file and that such access is not precluded in the case in question by the overriding interest of another person or overriding public interest?'"

93.   The conclusion of the European Court (First Chamber) in relation to the first question was to answer it in the affirmative. The Court held:

"49.   In the light of all the foregoing considerations the answer to the first question is that European Union law, in particular the principle of effectiveness, precludes a provision of national law under which access to documents forming part of the file relating to national proceedings concerning the application of Article 101 TFEU , including access to documents made available under a leniency programme, by third parties who are not party to those proceedings with a view to bringing an action for damages against participants in an agreement or concerted practice is made subject solely to the consent of all the parties to those proceedings, without leaving any possibility for the national courts of weighing up the interests involved."

94.   In reaching this conclusion the Court made the following preliminary observations:

"**Preliminary observations**

20   In order to answer the questions put by the referring court, it should be borne in mind at the outset that just as it imposes burdens on individuals, European Union law is also intended to give rise to rights which become part of their legal assets. Those rights arise not only where they are expressly granted by the Treaties but also by virtue of obligations which they impose in a clearly defined manner both on individuals and on the Member States and the EU institutions (see, to that effect, Joined Cases C-6/90 and C-9/90 *Francovich and Others [1991] ECR I-5357* , paragraph 31, and Case C-453/99 *Courage and Crehan [2001] ECR I-6297* , paragraph 19 and the case-law cited).

© 2020 Thomson Reuters.

21  In that context, the Court has held previously that since Article 101(1) TFEU produces direct effects in relations between individuals and creates rights for the individuals (Joined Cases C-295/04 to C-298/04 *Manfredi and Others [2006] ECR I-6619* , paragraph 39 and the case-law cited), the practical effect of the prohibition laid down in that provision would be put at risk if it were not open to any individual to claim damages for loss caused to him by a contract or by conduct liable to restrict or distort competition ( Courage and Crehan , paragraph 26).

22  Moreover, in accordance with settled case-law, the national courts whose task it is to apply the provisions of EU law in areas within their jurisdiction must ensure that those rules take full effect and must protect the rights which they confer on individuals (see, inter alia, Case 106/77 *Simmenthal [1978] ECR 629* , paragraph 16; Case C-213/89 *Factortame and Others [1990] ECR I-2433* , paragraph 19; Courage and Crehan , paragraph 25; and Manfredi and Others , paragraph 89).

23  Thus, first of all, the right of any individual to claim damages for loss caused to him by conduct which is liable to restrict or distort competition contrary to, inter alia, Article 101(1) TFEU strengthens the working of the Community competition rules, since it discourages agreements or practices, frequently covert, which are liable to restrict or distort competition, thereby making a significant contribution to the maintenance of effective competition in the European Union (see, to that effect, Courage and Crehan , paragraphs 26 and 27; Manfredi and Others , paragraph 91; and Pfleiderer , paragraph 28).

24  Secondly, that right constitutes effective protection against the adverse effects that any infringement of Article 101(1) TFEU is liable to cause to individuals, as it allows persons who have suffered harm due to that infringement to seek full compensation not only for actual loss (damnum emergens) but also for loss of profit (lucrum cessans) plus interest (see, to that effect, Manfredi , paragraph 95).

25  In the absence of EU rules governing the matter, it is for the domestic legal system of each Member State to lay down the detailed procedural rules governing actions for safeguarding rights which individuals derive from EU law.

26  Regarding, more specifically, the detailed procedural rules governing actions for damages arising from infringement of the competition rules, it is for the Member States to establish and apply national rules on the right of access, by persons believing themselves to be adversely affected by a cartel, **to documents relating to national proceedings concerning that cartel** (see, to that effect, Pfleiderer , paragraph 23).

27  However, while the establishment and application of those rules falls within the competence of the Member States, **they must none the less exercise that competence in accordance with European Union law. In particular, the rules applicable to actions for safeguarding rights which individuals derive from the direct effect of EU law must not be less favourable than those governing similar domestic actions (principle of equivalence) and must not make it in practice impossible or excessively difficult to exercise rights conferred by EU law** (principle of effectiveness) (see Courage and Crehan , paragraph 29; Manfredi , paragraph 62; and Case C-397/11 Jörös [2013] ECR I-0000 , paragraph 29). **Specifically, in the area of competition law, those rules must not jeopardise the effective application of** Articles 101 TFEU and 102 TFEU (see Pfleiderer , paragraph 24, and Case C-439/08 VEBIC [2010] ECR I-12471 , paragraph 57).

28  It is in the light of those considerations that the questions asked by the referring court should be answered." (Emphasis added.)

95.  Similar observations were made by the Court in its consideration of the first question. For example, at paragraphs 30-39 the Court stated:

© 2020 Thomson Reuters.

"30  In order to answer that question, it should be observed that, in exercising their powers for the purpose of applying national rules on the right of access, by persons believing themselves to be adversely affected by a cartel, to documents relating to national proceedings concerning that cartel, the national courts must weigh up the respective interests in favour of disclosure of the information and in favour of the protection of that information (see, to that effect, Pfleiderer , paragraph 30).

31  That weighing-up is necessary because, in competition law in particular, any rule that is rigid, either by providing for absolute refusal to grant access to the documents in question or for granting access to those documents as matter of course, is liable to undermine the effective application of, inter alia, Article 101 TFEU and the rights that provision confers on individuals.

32  On the one hand, it is clear that a rule under which access to any document forming part of competition proceedings must be refused is liable to make it impossible or, at the very least, excessively difficult to protect the right to compensation conferred on parties adversely affected by an infringement of Article 101 TFEU . This is the case inter alia when only access to the documents relating to the proceedings before the competent national competition authorities enables those parties to obtain the evidence needed to establish their claim for damages. Where those parties have no other way of obtaining that evidence, a refusal to grant them access to the file renders nugatory the right to compensation which they derive directly from European Union law.

33  **On the other hand, it should be observed that a rule of generalised access under which any document relating to competition proceedings must be disclosed to a party requesting it on the sole ground that that party is intending to bring an action for damages is not necessary in order to ensure effective protection of the right to compensation enjoyed by that party, as it is highly unlikely that the action for damages must be based on all of the evidence in the file relating to those proceedings. Furthermore, that rule could lead to infringement of other rights conferred by EU law, inter alia, on the undertakings concerned, such as the right to protection of professional secrecy or of business secrecy, or on the individuals concerned, such as the right to protection of personal data** . Lastly, such generalised access is also liable to adversely affect public interests, such as the effectiveness of anti-infringement policies in the area of competition law, because it could deter parties involved in infringements of Articles 101 TFEU and 102 TFEU from cooperating with the competition authorities (see, to that effect, Pfleiderer , paragraph 27).

34  It follows that, as the Court has held previously, the weighing-up of interests justifying disclosure of information and the protection of that information can be conducted by the national courts and tribunals only on a case-by-case basis, according to national law, and taking into account all the relevant factors in the case ( Pfleiderer , paragraph 31).

35  Although it is true, as observed by the Austrian Government, that that weighing-up must be done in the national legal context, national law must not be developed in such a way as to preclude any possibility for the national courts to conduct that weighing-up on a case-by-case basis.

36  Yet it is apparent from the order for reference and from all of the observations submitted to the Court that, under Paragraph 39(2) of the KartG, access to the competition court file is granted only if none of the parties to the proceedings object.

37  In such a situation, national courts having to rule on a request for access to the file have no opportunity to weigh up the interests protected by European Union law. In particular, those courts, which are empowered only to take due note of the consent or refusal expressed by the parties to the proceedings concerning the disclosure of the evidence in the file, may not intervene in order to protect overriding public interests or the legitimate overriding interests of other parties, including that of allowing disclosure of the documents requested, if just one of those parties objects.

© 2020 Thomson Reuters.

Emerald Supplies Ltd v British Airways Plc, 2015 WL 3685616 (2015)

38  It is also apparent from the order for reference that the parties to the proceedings before the competition court may object to access to the file without having to give any reasons. In practice this allows for systematic objections to any request for access, inter alia when the requests pertains to documents the disclosure of which is contrary to the interests of the parties to the proceedings, including documents which may contain evidence on which a claim for compensation could be based and which the requesting party cannot obtain by other means.

39  It follows that, in so far as the national legal measure or rule at issue in the main proceedings allows the parties to the main proceedings having infringed Article 101 TFEU the possibility of preventing persons allegedly adversely affected by the infringement of that provision from having access to the documents in question, without taking account of the fact that that access may be the only opportunity those persons have to obtain the evidence needed on which to base their claim for compensation, that rule is liable to make the exercise of the right to compensation which those persons derive from European Union law excessively difficult." (Emphasis supplied.)

96.  Mr Harris relied on these types of statements in Donau Chemie further to support the claimants' submission that the protection afforded by the Pergan decision could not in any way be regarded as "absolute".

97.  We do not agree. The issue in Donau Chemie , as in Pfleiderer , was entirely different from that in the present case. The issue in Donau Chemie related to access to evidence — i.e. documents (leniency materials) — used in national court proceedings brought by the relevant competition regulator. The issue in the present case, on the other hand, relates to access to findings of, and allusions to, infringements contained in the Commission Decision which have already been redacted at Community level in accordance with Pergan . The two categories of material, as we have already said, are of entirely different nature. The findings of infringement are not evidence at all, notwithstanding, of course, that perusal of such findings, and the documents to which the Commission referred in making such findings, might well lead to a line of evidential enquiry, which would be useful to support a civil claim for damages. Moreover, it would be surprising, to say the least, if the statements in Pfleiderer and Donau Chemie quoted above were intended to cut down the protection afforded to Pergan materials, without the Court even referring to the decision in Pergan or giving any consideration to the extent to which, if at all, a party's right to the presumption of innocence could be eroded or overridden by the national court conducting a "balancing" exercise. Indeed it is clear from paragraph 33 of the judgment and other passages that, in rejecting the notion that a damages claimant might have a generalised right of access to documents, the Court expressly recognised that the need to protect an undertaking from any infringement of other rights conferred by EU law, inter alia, on the undertakings concerned.

98.  Similar points can be made in relation to Mr Harris' reliance upon the case of *National Grid v ABB and ors [2012] EWHC 869 (Ch)* and the Commission's opinion in William Morrison Supermarkets Plc & Others v MasterCard Incorporated & Ors dated 5 May 2014 (C(2014) 3066). National Grid was a case where claimants in a "follow-on" damages claim for breach of Article 101 TFEU had made an application for disclosure of various documents, including a confidential version of the Commission's infringement decision and statements made by investigated companies in response to various enquiries made by the Commission. It was common ground in the case that the documents would or might include leniency materials and that inspection should be restricted to those within the confidentiality ring established in the case. Roth J, having inspected the relevant documents himself, applied Pfleiderer , conducted a balancing exercise and ordered the disclosure of the relevant leniency materials. In relation to disclosure of the Commission decision in that case, he said:

"56.  Having read the documents, it seems to me that the Decision is in a different category from the other documents. It sets out the Commission's findings of the infringement, including the nature of the cartel and how it operated. The unredacted text of the Decision is made available to the EU Courts on the appeals brought by some of the present defendants. Moreover, the findings are likely to be binding on the English court in this claim against the addressees of the Decision arising out of the same facts: cp *Inntrepreneur Pub Co v Crehan [2006] UKHL 38, [2007] 1 AC 333* . It would be unsatisfactory in those circumstances if the court could not see the relevant parts of the Decision, and therefore if it was not available to the claimant.

57.  Some of the redactions from the non-confidential version of the Decision are made on the grounds of commercial confidentiality, or, as the Commission points out in its submissions, to reflect its policy of not publicly disclosing the source of evidence given through corporate statements. Those concerns are met by restricting any disclosure to the confidentiality ring. They do not affect a leniency applicant's defence to the damages claim.

58.  The Decision comprises 552 recital paragraphs and two annexes. Having read the relevant parts of the Decision in unredacted form, I conclude that a number, but by no means all, of the redacted passages should be disclosed. I set out the list of paragraphs (or parts of paragraphs) to be disclosed in the Appendix to this judgment. I should add that although, at my suggestion, NGET supplied a list of the paragraphs which it thought were the most likely to be relevant, in the end that was not of great assistance since NGET's advisers obviously could only guess at what might be contained in redacted passages and they would not be aware of a large number of redacted footnotes since those are not evident at all from the non-confidential version of the Decision.

59.  As regards the other documents covered by the amended application, I consider that only very limited passages from a few of those documents should be disclosed. From the responses by ABB to the information requests from the Commission, those are passages which for the most part provide explanations of some of the pre-existing documents supplied by ABB to the Commission, which as I understand it have already been disclosed by ABB to NGET, or which explain the way the cartel operated. From the response of Areva to the information request from the Commission, the version of this document held by ABB and Siemens is in itself in redacted form. I find that in respect of only one answer which gives some explanation of the nature of the discussions at cartel meetings, and the documents involved, is the potential relevance of the material such that it should be disclosed. I set out those references in the Appendix. As regards all the other ABB leniency materials, including the responses by ABB to the SO, and the other parts of the Areva document, I find that they are not of such relevance to these proceedings and that the interest of protecting information supplied under the leniency programme outweighs the interest of providing disclosure to assist this compensation claim."

99.  But, as was common ground before us, there is no suggestion that in National Grid any of the parties opposing disclosure before Roth J were arguing that the decision in Pergan , their right to the presumption of innocence or their right to have their infringement liability judicially determined by the European Court prevented disclosure of the relevant parts of the Commission's decision. In those circumstances we derive no assistance from Roth J's decision in National Grid to order disclosure of certain paragraphs of the Commission's decision in that case.

100.  Likewise paragraphs 14-20 of the Commission's opinion in William Morrison Supermarkets Plc & Others v MasterCard Incorporated & Ors [5.5 2014], which the judge referred to in paragraph 105 of the redactions judgment, relates to access to documents and to leniency materials. It was common ground before us that the opinion was not in any way addressing issues which arise in relation to the protection of Pergan materials.

101.  The judge appears to have derived some support for the approach which he adopted from the Commission's letter to Singapore Airlines dated 19 March 2014 and from its letter dated 25 April 2014 to Korean Airlines Co (which he wrongly referred to as a letter addressed to himself) [46] . In so doing he was misguided. The fact that in those letters the Commission stated that it was for the High Court to determine any such claims for disclosure and decide on appropriate measures — which obviously was the case, given that the application for disclosure was before the High Court — did not address, and could not be determinative of, the issues of whether it was appropriate in the circumstances of this case to afford the Addressee and Non-Addressee Airlines Pergan protection or whether there was a material risk of conflict between decisions of domestic and EU authorities in the circumstances of this case. Moreover the judge appears to have disregarded the content of the Commission's letter addressed to him dated 23 April 2014 [47] , which, in the context of dealing with concerns raised by Non-Addressee Airlines, expressly (a) referred to the decision in Pilkington which restrained the Commission from publishing a non-confidential version of another cartel decision in the face of objections by addressees of the decision; and (b) referred to Pergan and implied that any decision of the national court necessarily had to respect the rights protected under Pergan .

102.  For the above reasons we conclude that the judge was wrong not to afford the Addressee and Non-Addressee Airlines the same protection which is afforded at Community level to Pergan materials in the provisional confidential version of the Commission's decision. He was also wrong, in his judgment dated 12 August 2014, to direct, in relation to the Non-, in relation to the Non-Addressee Airlines, that the paragraph 1 proviso to the 31 July order should be maintained.

**Exercise of discretion**

103.  In the alternative, even if we are wrong in our conclusion that, in an application by a damages claimant for disclosure in national court proceedings, a national court is obliged to afford the same protection which is afforded at Community level to Pergan materials in the confidential version of the Commission's decision, and, contrary to that view, the judge had a discretion to strike a balance between preserving the Pergan protections adopted by the Commission and requiring disclosure of an unredacted copy of the Commission Decision to the claimants, nonetheless, in our judgment the judge failed to exercise his discretion in accordance with principle and thus failed to determine where the correct balance lay.

104.  For the reasons which we have already stated above in relation to the first question, the judge in this context failed to give due recognition to the extent and nature of the protection afforded by Pergan to the presumption of innocence. He wrongly put in place a regime which was not sufficient to protect the rights which both the Addressee and the Non-Addressee Airlines enjoyed in respect of Pergan materials.

105.  In addition to the points we have already made above, which in our view demonstrate that the exercise of the judge's discretion was in any event flawed, we address some of the further points upon which the judge appears to have relied to support the exercise of his discretion, none of which in our view was well-founded.

   i)  At paragraph 100 of the judgment he stated that:

> "It defies logic to understand why given the fact that the Decision is available to BA in its entirety and in this case being used by BA in the claim against them, they [the Part 20 Defendants] do not wish the document to be put in the confidentiality ring so that they can fully see what is said about them in the Decision and deal with it."

We cannot agree with this statement. The whole point of obtaining Pergan protection is to prevent reliance on this particular category of information by third party private damages claimants. There was every logical reason for both the Addressee and the Non-Addressee Airlines who were Part 20 Defendants — and indeed those who were not — seeking to avoid a wider dispersal of the Commission Decision in order to avoid further damages claims being made against them, whether in this jurisdiction or elsewhere.

   ii)  In paragraphs 98, 99 and 106 of the redactions judgment the judge appeared to envisage a tortuous redactions procedure, supervised by himself, and to regard the undesirability of this process as a reason for ordering disclosure of an unredacted version of the Commission Decision. The principled answer to this point is that, whatever the length or complexity of the redaction process, that fact itself cannot justify an order for disclosure in disregard of a party's rights to Pergan protection. The practical answer is that there was no need for the judge himself to be involved in or supervise such a procedure (although he could have done so); he could simply have followed the course taken by the Commission and ordered disclosure in accordance with its rulings from time to time. In any event the point is now moot, given the publication of the provisional non-confidential version of the Commission Decision, which reflects the redactions accepted by the Commission.

   iii)  The next ancillary reason given by the judge was that disclosure carried the advantage that all parties to the proceedings would have access to the Commission Decision. He said:

> "In addition of course it enables the present dispute to be pursued by all parties on an equal arms basis i.e. all of them as opposed to *some* of them have the benefit of the Decision. As the action

> proceeds the confidentiality can be maintained so that there can be no damage caused by the
> Decision and whatever it might say about any party to this action going in the public domain
> and affecting that company's goodwill." [48]

However the supposed "advantage" of having all parties on an equal footing could not override the fundamental rights of the Addressee and the Non-Addressee Airlines under EU law to the presumption of innocence. As the European Court said in Pergan :

> "there is therefore no public interest in publishing the disputed information that is capable of
> prevailing over the applicant's legitimate interest in having such information protected." [49]

Moreover the "advantage" to the claimants of having an unredacted version of the Decision is more apparent than real. The claimants have, or will have, in their possession copies of all relevant documents disclosed by BA in relation to the allegations currently contained in the Particulars of Claim, which will necessarily include documents relating to alleged infringements by the Addressee and Non-Addressee Airlines. What the claimants will be deprived of is the Commission's findings of infringement, or allusions to the liability of an accused person for infringement, in relation to breaches of Article 101 TFEU which occurred either outside the EEA or outside the relevant time period for the purposes of the Commission's decision. But, as Pergan itself makes clear, such findings cannot be regarded as established in law, are not binding on the English courts as findings of fact and amount to no more, in effect, than the opinions of the Commission in relation to matters outside the operative part of its decision. Notwithstanding their potential utility to the claimants in providing evidential and "cause of action" leads, we see no substantive unfairness in the claimants being deprived of the opportunity of access to the Commission's views in respect of such matters. As the European Court said in paragraph 78 of its judgment in Pergan :

> "the confidentiality of that information cannot depend on whether, and to what extent, it is of
> probative value for the purpose of proceedings at national level."

It is also of note that BA itself, in the English proceedings, will not be entitled to refer to or rely upon findings of infringement, or allusions to such infringements, made by the Commission as against the Part 20 Defendants which are contained exclusively in the confidential version of the Commission Decision, although of course BA will have knowledge of what the Commission said in this respect. It is therefore difficult to see why, as between the claimants and BA, there is an *unfairly* unequal playing field.

iv)  Furthermore the notion that, as the action proceeds the "confidentiality can be maintained", appears to us to be unrealistic. Once the facts and matters relied upon by the Commission to support their findings of, or allusions to, infringement by the Addressee and Non-Addressee Airlines are pleaded or addressed in evidence by the claimants, it is almost inevitable that such matters will be released into the public domain unless the entirety of the proceedings are conducted in private — a course which itself is wholly undesirable.

v)  A further reason given by the judge for disclosure was his view that the redaction process conducted following the March 2014 hearing was a "hopeless exercise". If by this the judge meant that the redactions sought to be made by the Addressee and Non-Addressee Airlines to the Commission Decision were extensive, that complaint is misplaced: as long as each redaction was justified, the cumulative effect of the redactions could not justify a deprivation of rights conferred under Article 48 of the Charter. In any event, the judge was wrong in our judgment to conclude that the redaction process had "failed" or was a "hopeless exercise". It appears that the majority of the Pergan redactions, albeit not all, have in fact now been accepted by the Commission in publishing its provisional non-confidential version of the Decision.

106.  For all the above reasons we conclude that the judge exercised his discretion contrary to principle, without taking into account relevant factors and affording too much weight to inappropriate or irrelevant considerations. If it were necessary for us to do so, we would re-exercise the discretion by ruling that no disclosure should be made at this stage by BA of any parts of the Commission Decision which do not appear in the provisional non-confidential Decision.

**The claimants' alternative submission that the October order should be varied**

107.  The claimants make the alternative submission that, if the judge's order cannot be upheld, it should be varied to put into place a process of verifying the validity of the Pergan redactions made by various airlines, including disclosure. We do not consider it appropriate to make such an order. The Commission has now published a provisional non-confidential version of its Decision which, for the time being at least, and subject to any ruling by the European Court, must be regarded as the definitive position in relation to the validity of claimed Pergan redactions. Any attempt by the English court to second-guess the process would in our view be contrary to the duty of sincere cooperation, as there would clearly be a risk of conflict between decisions by the Commission and the English court regarding the validity of particular redactions. Moreover, in case management terms, the duplication of such a process by the English court in circumstances where the process has already been carried out by the Commission, and is clearly subject to further review at European level, would not be proportionate. Accordingly we decline to make such an order.

**Reference to the CJEU**

108.  All parties respectively contended that the application of EU law in these appeals is " *acte clair* " in their favour. However, as a fall-back position, all parties respectively contended in the alternative that, if this court were against them on their primary submissions, then the case should be referred to the CJEU under Article 234 TFEU for a preliminary ruling.

109.  In our judgment no need for a reference arises in this case. There can, in our view, be no doubt that, for the reasons we have given, European law requires a national court in damages proceedings under Article 101 TFEU to respect the protections afforded by the decision in Pergan to addressees and non-addressees of a Commission decision in relation to the presumption of innocence. But even if we were to be wrong in that view, and it is open to question whether European law permits a national court to strike a balance between affording disclosure to claimants and protecting third-party Pergan rights, given that we have held that, in any event, the judge's exercise of his discretion was fatally flawed, there is simply no need for a reference to the CJEU. On any basis the redaction decision is clearly wrong and must be set aside.

**Disposition of the Pergan appeals**

110.  Accordingly the Pergan appeals are allowed and the 28 October order must be set aside, as must the paragraph 1 proviso and paragraph 1 of the 12 August Order.

**II The strikeout appeals**

*Introduction*

111.  The strikeout appeals are separate and quite distinct from the Pergan appeals. Although the broad factual background has already been set out, we will, at the risk of some repetition, include in this part of the judgment such facts as are necessary to enable this section of our judgment to be read as a self-contained judgment.

112.  The claimants, some 565 in all, have made three separate types of claim against BA, all arising out of an alleged unlawful cartel said to have operated between 1999 and 2007. The object of the cartel, it is said, was to co-ordinate and fix prices for air cargo services, especially with respect to fuel and security surcharges, thereby distorting competition and inflating prices

for those acquiring the services. Only BA has been sued but it has in turn made 23 other airlines Part 20 defendants (both Addressee and Non-Addressee Airlines) in order to ensure that, if also liable, they will make their contributions to any losses for which BA is found legally responsible.

113.   The claimants are all companies who are shippers of air freight. They have sought to use air cargo services for the freight of goods by, in virtually all cases, acquiring these services indirectly through freight forwarders who contract directly with the airline. The first claim is for damages allegedly sustained as a result of a breach of the competition or anti-trust laws operating within Europe. It is said that there are breaches of Article 101 TFEU and Article 53 of the European Economic Area Agreement (EEA) . Indeed, the Commission held in 2010 that there had been statutory breaches by BA and eleven other airline groups although some of these findings are being appealed to the European Court of Justice. To the extent that the infringement findings are upheld by the European Court of Justice, they will be binding in the domestic action. It is alleged that there are in addition other infringements of these provisions, not determined by the Commission. It is not disputed that these EU/ EEA claims are in principle sustainable causes of action.

114.   Other regulatory authorities and courts abroad have also made infringement findings with respect to their own national competition laws. These are not the subject of these proceedings, but some have generated separate claims. For example, a significant related, but distinct, claim has been brought by a large number of Korean companies (who apparently constitute some 35 claimants of the claimants in these proceedings) for breaches of Korean competition law. Whether the claimants can establish these foreign law claims will depend upon the nature and scope of the particular foreign law in issue.

115.   The other two causes of action in these proceedings are common law torts, colloquially known as the economic torts, namely interfering with business by unlawful means and conspiracy to injure using unlawful means. They were added by amendment in 2013 following a favourable ruling by Roth J in the High Court in the case of *Newson Holding v IMI Plc [2012] EWHC 3680 (Ch)* . The alleged conspiracies are between BA and certain senior members of staff as well as between BA and the other airlines. The unlawful means relied upon with respect to both torts are the infringement of EU/ EEA competition laws, breaches of various other foreign national competition laws (albeit that they are not relied upon directly to found a cause of action in these proceedings), and deceit. The tort of deceit is said to arise from false representations made both to the purchasers of BA's services and to regulators in different parts of the world that the charges made, for example as between the fuel and security surcharges, properly reflected the actual costs incurred by BA.

116.   BA sought to have the causes of action based on the economic torts struck out on the grounds that as a matter of law they could not be sustained. It argued that the claimants could not show the necessary intention to injure which these torts require, relying in particular on the judgments of the House of Lords when they considered three appeals together, *OBG v Allen; Mainstream Properties v Young; and Douglas v Hello! Ltd [2007] UKHL 21; [2008] 1 AC 1* (hereinafter "OBG") and the lead judgment of Arden LJ in the Court of Appeal in *Newson Holding v IMI Plc [2013] EWCA Civ 1377* , the appeal from the decision of Roth J, which the court reversed in part.

117.   Peter Smith J refused the application holding that it was premature for the court to rule on it. In essence he held that the application raised a difficult question of law not yet resolved by the authorities; that it depended upon precisely how the claimants put their case on intention, which was heavily fact sensitive and could not be done until after disclosure; that there would in any event be no real saving of costs by ruling on the issue now; and that any ruling would inevitably be the subject of appeal which would only delay matters unnecessarily. Accordingly he adjourned the application with liberty to restore, but only after disclosure.

118.   At a subsequent costs hearing, the judge expressed the view that it was reprehensible for BA even to have brought the application as a strike-out application – indeed, so reprehensible as to amount to an abuse of process. BA was, in the judge's view, being unnecessarily obstructive. In the circumstances he awarded costs against BA on an indemnity basis.

119.   BA now appeals both the refusal to accede to the strike out application and the costs determination, but of course the success or otherwise of the latter appeal is bound up with the disposal of the primary strike-out appeal. Accordingly we focus on that first. Certain of the Part 20 defendants (the non-BA strike-out appellants) were also given permission to appeal the judge's refusal to strike out certain of the claims.

**The economic tort claims**

120.   The question may be asked: since the claimants have their claims for breach of competition law, why pursue the economic torts at all? The answer is that competition law claims do not necessarily provide a remedy for the full range of the damage caused by the alleged cartel. First, the EU/ EEA law claims do not cover anti-competitive behaviour which falls outside the

scope of EU/ EEA law. This is the case where flights are conducted from one non EU/ EEA country to another; if neither the origin nor the destination of the flight is within the EU/ EEA , no claim arises under EU law [50] . It has been estimated that about 60% of the damages claimed concern shipments on such routes. There may in such circumstances be claims under the competition laws of other states, but not necessarily so. For example, liability may be limited to the direct purchaser of the services, or limitation periods may bar a claim. Second, the claims under Article 101 TFEU and Article 53 EEA do not even cover the whole of the cartel's alleged activities within the EU/ EEA because although the cartel has allegedly operated since 1997, EU/ EEA competition law did not regulate the airline routes between the EU/ EEA and third countries until May 2004: see *Ministere public v Asjes [1986] ECR 1425* and Ahmed Saeed v Zentrale zur Bekampfung Ulauterer Wettbewerb [1989] ER 803 . Hence damage caused by the cartel prior to that date in relation to those using freight services on such routes will be recoverable only if some other independent cause of action can be identified.

## The economic torts

121.   The economic torts identify a number of discrete causes of action which enable a claimant to recover economic loss resulting from certain business practices deemed to be unlawful. In the seminal case of *Allen v Flood [1898] AC 1* , the House of Lords held, by a majority of six to three, that it was not unlawful deliberately to harm a third party even where the defendant was motivated by malice against the victim, provided no unlawful means were used. Such conduct may be morally reprehensible but it is not legally actionable.

122.   But this principle does not apply if the defendants use unlawful means, or if they operate as a conspiracy. As to the latter, later developments have established that in this area the law distinguishes between combinations and individuals: where there is a conspiracy, where the predominant motive is to injure the claimant and the conspirators do so causing damage, there will be liability. That is so even though no independent unlawful means are used. But the conspirators will not be liable if they are pursuing their own legitimate interests: see Crofter Hand Woven Harris Tweed Co. v Veitch [1942] AC 435 (HL) . This tort, sometimes termed "lawful means conspiracy", is not relied upon here.

123.   As to the use of unlawful means, Lord Herschell pointed out in Allen v Flood that there is what he described as "a chasm" between using lawful means and employing unlawful means. The common law recognises that there must be limits to unbridled competitive behaviour and has developed certain torts which enable an injured party to sue for damage caused by unlawful activity. The principal torts relating to anti-competitive behaviour are inducing a breach of contract, interfering with business by unlawful means, and conspiracy to use unlawful means. The alleged wrong-doing in this appeal does not involve any inducing breaches of contract, but the other two torts are relied upon.

## The elements of the two torts.

*(i) Interfering with business by unlawful means.*

124.   The tort of interfering with business by unlawful means was considered by the House of Lords in OBG in which their Lordships sought to explain and rationalise the economic torts. Lord Hoffmann described the essence of this tort as:

> "(a)  a wrongful interference with the actions of a third party in which the claimant has an economic interest and (b) an intention thereby to cause loss to the claimant".

In this case the claimants are the shippers and the third parties the freight forwarders.

© 2020 Thomson Reuters.

125.  When identifying the rationale of the tort, he cited the following passage from the judgment of Lord Lindley in *Quinn v Leathem [1901] AC 495* , 534-535:

> "a person's liberty or right to deal with others is nugatory, unless they are at liberty to deal with him if they choose to do so. Any interference with their liberty to deal with him affects him. If such interference is justifiable in point of law, he has no redress. Again, if such interference is wrongful, the only person who can sue in respect of it is, as a rule, the person immediately affected by it; another who suffers by it has usually no redress; the damage to him is too remote, and it would be obviously practically impossible and highly inconvenient to give legal redress to all who suffer from such wrongs. But if the interference is wrongful and is intended to damage a third person, and he is damaged in fact—in other words, if he is wrongfully and intentionally struck at through others, and is thereby damnified—the whole aspect of the case is changed: the wrong done to others reaches him, his rights are infringed although indirectly, and damage to him is not remote or unforeseen, but is the direct consequence of what has been done."

126.  Their Lordships in the OBG case did not agree about what constitutes unlawful means for the purposes of this tort. But the majority (Lord Walker, Baroness Hale and Lord Brown) approved the analysis of Lord Hoffmann (paragraph 49) who considered that the unlawful means must be actionable by the third party, or at least they would be actionable if the third party had suffered loss as a consequence. The qualification is necessary to cover the case where the third party accedes to a threat of harm and therefore does not in fact suffer loss. Lord Nicholls disagreed on the scope of unlawful means; he would have cast the net wider.

127.  The tort as defined by Lord Hoffmann involves three parties. (There can exceptionally be a two party case where the claimant is intimidated into a course of action which causes him damage, but that is not pleaded here; and Lord Hoffmann expressly said that the principles he was enunciating were not intended to apply to the two party tort of interference.) The claimants submit that the three party tort of interference is committed here in a number of ways. First, BA has taken unlawful action against the freight forwarders, namely infringing EU competition law and the tort of deceit, both of which would be actionable by them if they could show loss; and through the freight forwarders, it has caused harm to the shippers. Further, BA has deceived the various national regulators, who would in principle have a claim in damages if they had suffered any, to accept their pricing arrangements and thereby caused harm to the claimants. In addition the claimants have alleged that the unlawful means include the breach of various foreign competition laws, although whether they confer any right of action on the freight forwarders as the direct purchasers of the airline's services will, as we have said, depend upon how those laws are framed. Even if they are actionable by the third party (i.e. the freight forwarders here), there is an issue as to whether the claimants can rely as unlawful means upon actionable wrongs which are only unlawful under foreign law. In fact the claimants sought to have this point determined as a preliminary issue but the judge refused that application also and his ruling on that point has not been appealed.

128.  Apart from the narrow formulation of unlawful means, there are two other limitations on the scope of this tort. First, Lord Hoffmann emphasised that in order to constitute relevant unlawful means, the unlawful acts must affect the freedom of the third party to deal with the claimant. This reflects the rationale as explained by Lord Lindley in Quinn v Leathem . If that freedom remains, the tort is not committed even though the defendant acts unlawfully and thereby makes a profit at the expense of the claimant who therefore suffers damage. The examples given by Lord Hoffmann were *RCA Corpn v Pollard [1983] Ch 135* and *Isaac Oren v Red Box Toy Factory Ltd. [1999] FSR 785* . In the former case, the defendant sold bootleg Elvis Presley records which infringed RCA's exclusive right, conferred by Elvis' estate, to exploit Elvis' recordings. Although this would inevitably have caused damage to RCA, it could not sue under this tort because the wrongful act did not interfere with the Elvis estate's liberty of action in relation to the claimant. In the Red Box case the defendant sold articles which infringed a registered design. The registered design owner had the right to sue for breach, but the claimant was an exclusive licensee who had no such right. He unsuccessfully sued for interfering with business by unlawful means. Although the infringement caused him loss, the defendant was doing nothing which affected the relationship between the owner of the design and the licensee.

© 2020 Thomson Reuters.

129.  We are very doubtful whether action which simply increases the price at which freight services can be acquired by the claimants can be said to affect the freedom of freight forwarders to deal with the shippers. It may affect the way in which that freedom can be exercised if, say, the shippers choose not to purchase the services because they are too expensive, but that does not seem to be an interference with the freedom itself. However, this issue is not directly before us and we did not hear any detailed argument about it, so it would be wrong to express any concluded view. Accordingly, for the purposes of this appeal we will assume that the claimants would be able to establish that the means employed by BA, including the breaches of the foreign competition laws, were unlawful for the purposes of these two torts and that as a consequence BA interfered with the liberty of the freight forwarders to deal with the claimants.

130.  The final limitation on the scope of these torts arises from the fact that the defendant must intend to injure the claimant. The issue of intent lies at the heart of this appeal and we consider it in detail below. The appellant's case is that as a matter of law no such intention can properly be inferred in the circumstances of this case and that this is so whatever further evidence may turn up as a result of disclosure.

*(ii) Conspiracy to use unlawful means*

131.  The second tort relied upon is conspiracy to use unlawful means. This arises where the defendant, in pursuance of an agreement with others, intentionally harms the claimant using unlawful means. There are two potentially important distinctions between this tort and the interference with business tort so far as these claims are concerned. The first is that the conspiracy tort is not committed through a third party and therefore there is no need to establish an interference with the liberty of the third party to deal with the claimant. So whatever difficulties this requirement poses for the claimants with respect to the interference tort, it creates no hindrance here. The second is that the concept of unlawful means is in certain respects wider for this tort, not being limited to actionable wrongs, as the House of Lords made plain in *Customs and Excise Commissioners v Total Network SL [2008] UKHL 19; [2008] 1 AC 1174* . That case involved a complex carousel VAT fraud which enabled the defendant and its co-conspirators to obtain substantial sums of money by deceiving the Revenue. The unlawful means were a crime, the common law crime of cheating the Revenue. The Court of Appeal had held that this could not be unlawful means for the purposes of the conspiracy tort and struck out the claim, but they were reversed on this point by a unanimous House of Lords (Lords Hope, Scott, Walker, Mance and Neuberger). Lord Walker explained the justification for adopting a different concept of unlawful means from that adopted in the interference with business tort, whilst indicating that they shared a common concept of intention (paragraph 100):

> "The intentional harm tort and the "unlawful means" variety of conspiracy share the ingredients of the intentional infliction of harm on the claimant. But that variety of conspiracy is not simply the intentional harm tort committed by joint tortfeasors. The gist of the intentional harm tort (apart from exceptional "two party" cases) is striking at the claimant through a third party, and doing so by interfering with his freedom of economic activity. The gist of conspiracy is damage intentionally inflicted by persons who combine for that purpose (Viscount Simon LC in *Crofter Hand Woven Harris Tweed Co Ltd v Veitch [1942] AC 435* , 444) and the claimant need not be a trader who is injured in his trade, though that is the most common case. In my opinion your Lordships are driven to the conclusion that, as the economic torts have developed, "unlawful means" has a wider meaning in the tort of conspiracy than it has in the intentional harm tort."

132.  The wider concept of unlawful means for this tort could be important in this case. Mr Milligan QC, counsel for the claimants, has suggested, for example, that a breach of foreign competition laws may be unlawful means for the purposes of this tort even if they confer no claim in damages on anyone, or even if the claims are defeated by a relevant limitation period. As we have said, there is an issue whether foreign wrongs can be unlawful means for the purposes of these torts. But if they can, it would mean that the common law could provide remedies for breach of competition laws which those laws themselves had chosen not to confer.

133.  As with the interference with business tort, there must be an intention to injure. And although the conspiracy tort has a wider reach so far as unlawful means are concerned, it is well established, and all parties accept, that the concept of intention has the same meaning for both torts: see *Meretz Investments NV v ACP Ltd [2006] EWHC 74 (Ch)* . Accordingly, if the

appellants are right in the argument on intention, it will mean that neither tort could be established as a matter of law even if the relevant unlawful means can be identified.

**The meaning of intention**

134.  The meaning of intention, considered in the context of the interference with business tort, was considered in the speeches of Lords Hoffmann and Nicholls in OBG v Allen . Lord Hoffmann said this (paragraph 61):

> "Finally, there is the question of intention. In the Lumley v Gye tort, there must be an intention to procure a breach of contract. In the unlawful means tort, there must be an intention to cause loss. The ends which must have been intended are different. *South Wales Miners' Federation v Glamorgan Coal Co Ltd [1905] AC 239* shows that one may intend to procure a breach of contract without intending to cause loss. Likewise, one may intend to cause loss without intending to procure a breach of contract. But the concept of intention is in both cases the same. In both cases it is necessary to distinguish between ends, means and consequences. One intends to cause loss even though it is the means by which one achieved the end of enriching oneself. On the other hand, one is not liable for loss which is neither a desired end nor a means of attaining it but merely a foreseeable consequence of one's actions."

135.  Lord Hoffmann referred to the case of *Tarleton v McGawley (1794) Peake 270; 170 E.R. 153* , one of the earliest cases in which an action of this nature succeeded. Two ships were vying to trade with natives on the West coast of Africa. The captain of one of the ships, the Othello, fired a cannon at a canoe filled with natives (killing one of them) in order to deter them from trading with the other ship and to secure the trade for the Othello. Lord Kenyon held that the defendant had intentionally interfered with the trade and was liable in damages. Lord Hoffmann observed that there was the requisite intention even though the defendant bore no ill will to the claimant (paragraph 63):

> "The master of the Othello in Tarleton v M'Gawley Peake 270 may have had nothing against the other trader. If he had gone off to make his fortune in other waters, he would have wished him well. He simply wanted a monopoly of the local trade for himself. But he nevertheless intended to cause him loss. This, I think, is all that Woolf LJ was intending to say in a passage in *Lonrho plc v Fayed [1990] 2 QB 479* , 494 which has proved controversial:
>
>> "Albeit that he may have no desire to bring about that consequence in order to achieve what he regards as his ultimate ends, from the point of view of the plaintiff, whatever the motive of the defendant, the damage which he suffers will be the same."

136.  Lord Nicholls adopted a similar approach, also distinguishing intention to harm as an end in itself and as a means to an end. He said this (paragraphs. 164-166):

© 2020 Thomson Reuters.

"164  I turn next, and more shortly, to the other key ingredient of this tort: the defendant's intention to harm the claimant. A defendant may intend to harm the claimant's business either as an end in itself or as a means to an end. A defendant may intend to harm the claimant as an end in itself where, for instance, he has a grudge against the claimant. More usually a defendant intentionally inflicts harm on a claimant's business as a means to an end. He inflicts damage as the means whereby to protect or promote his own economic interests.

165  Intentional harm inflicted against a claimant in either of these circumstances satisfies the mental ingredient of this tort. This is so even if the defendant does not wish to harm the claimant, in the sense that he would prefer that the claimant were not standing in his way.

166  Lesser states of mind do not suffice. A high degree of blameworthiness is called for, because intention serves as the factor which justifies imposing liability on the defendant for loss caused by a wrong otherwise not actionable by the claimant against the defendant. The defendant's conduct in relation to the loss must be deliberate. In particular, a defendant's foresight that his unlawful conduct may or will probably damage the claimant cannot be equated with intention for this purpose. The defendant must *intend* to injure *the claimant* . This intent must be a cause of the defendant's conduct, in the words of Cooke J in *Van Camp Chocolates Ltd v Aulsebrooks Ltd [1984] 1 NZLR 354* , 360. The majority of the Court of Appeal fell into error on this point in the interlocutory case of *Miller v Bassey [1994] EMLR 44* . Miss Bassey did not breach her recording contract with the intention of thereby injuring any of the plaintiffs." (Emphasis in the original.)

137.  Lord Nicholls then added this further observation – which he termed an "explanatory gloss" — which has been relied upon by the claimants in this case (paragraph 167):

"I add one explanatory gloss to the above. Take a case where a defendant seeks to advance his own business by pursuing a course of conduct which he knows will, in the very nature of things, necessarily be injurious to the claimant. In other words, a case where loss to the claimant is the obverse side of the coin from gain to the defendant. The defendant's *58 gain and the claimant's loss are, to the defendant's knowledge, inseparably linked. The defendant cannot obtain the one without bringing about the other. If the defendant goes ahead in such a case in order to obtain the gain he seeks, his state of mind will satisfy the mental ingredient of the unlawful interference tort. This accords with the approach adopted by Lord Sumner in *Sorrell v Smith [1925] AC 700* , 742:

"When the whole object of the defendants' action is to capture the plaintiff's business, their gain must be his loss. How stands the matter then? The difference disappears. The defendants' success is the plaintiff's extinction, and they cannot seek the one without ensuing the other.""

© 2020 Thomson Reuters.

138.  The particular appeal in the OBG appeals in which the interference with business was directly in issue was Douglas v Hello! Magazine . Two celebrities, Michael Douglas and Catherine Zeta Jones, had sold the exclusive right to publish their wedding photographs to OK magazine. All other photography at the wedding was expressly banned. A rival magazine, Hello!, surreptitiously obtained photographs and published them. OK alleged that this was a breach of the duty of confidence and also involved the tort of interfering with business by unlawful means.

139.  A strong Court of Appeal (Lord Phillips MR, Clarke and Neuberger LJJ) dismissed both claims and held that neither wrong had been committed: [2005] EWCA Civ 595; [2006] QB 125. They rejected the tort claim on the grounds that the necessary intention was missing; the defendant had not aimed or targeted its conduct at the third party and a reckless indifference was not enough. The House of Lords, by a majority, held that there was a breach of confidence but unanimously dismissed the tort appeal. However, Lord Hoffmann disagreed with the Court of Appeal on the issue of intention. He considered that there was the necessary intent; the claim failed only because there was no interference with the liberty of the third party to deal with the claimant. As to intention, it is important to note that Lord Hoffmann appears to have assumed (arguably incorrectly) that any profit made by Hello! would necessarily have been made at the expense of OK magazine. He referred to the evidence of the controlling shareholder in Hello! who had claimed that he was not concerned to damage OK or spoil their sales but merely to advance the interests of his own publication. Lord Hoffmann observed – consistently with his view that Hello! had benefited at the expense of OK Magazine — that the captain of the Othello in the Tarleton case was in the same position. In both cases the injury to the defendant was the means of attaining the desired end and not merely a foreseeable consequence. He cited with approval the observations of Lord Sumner in Sorrell v Smith which were also adopted by Lord Nicholls in his explanatory gloss, and are recited above (paragraph 137). Lord Nicholls also dismissed the appeal simply on the grounds that no unlawful means had been used.

140.  It is true that Lord Hoffmann in the OBG case expressed the view that a very narrow concept of intention, reflected in the language of "targeting" or "aimed at" should not be employed to limit the scope of the tort; he preferred a narrow concept of unlawful means to achieve that objective. But that is not to say that he thought that the concept should be broadly construed. There is no reason to think that he intended a different concept of intention from that enunciated by Lord Nicholls and the other members of the court do not appear to have thought that Lords Hoffmann and Nicholls were at odds on this point, whilst recognising that they were in disagreement on other issues. Lord Nicholls clearly did see the concept of intention as a limitation on the scope of the tort, and an important one given that he would have adopted a wider view than Lord Hoffmann did as to what might count as unlawful means. The objection to the language of "targeted" or "aimed at", it seems to us, was that it suggests too conscious a desire to harm the defendant and might be thought to exclude liability in cases such as Tarleton v McGawley or indeed (as the Court of Appeal had held, using that language) in the Hello! case itself, where the defendant seeks to advance his own interest directly at the expense of the claimant.

### Newson Holdings v IMI

141.  The analysis of the House of Lords in OBG was considered by the Court of Appeal in Newson Holding Ltd v IMI plc , a case which is in many respects similar to the facts here. The defendants were suppliers of copper plumbing tubing. They were found by the European Commission to have been a party to a cartel in breach of EU competition law, namely Article 101 TFEU . Under section 47A of the Competition Act 1998 , parties adversely affected by certain anti-competitive practices can bring "follow on" claims to recover damages, relying upon the infringement findings of the Commission which bind the English courts.

142.  The claimants had purchased the tubing directly (as opposed to indirectly, as in this case). They alleged a breach of statutory duty and two forms of conspiracy to use unlawful means, relying upon the breach of statutory duty as the relevant unlawful means. The case started in the Competition Appeal Tribunal ("CAT") but it was transferred to the High Court with the consent of the parties. However, the jurisdiction of the High Court is limited to the CAT's jurisdiction.

© 2020 Thomson Reuters.

143.  The defendants alleged that the CAT did not have jurisdiction to hear the two conspiracy claims under section 47A . This section

> "applies to— (a) any claim for damages, or (b) any other claim for a sum of money, which a person who has suffered loss or damage as a result of the infringement of a relevant prohibition may make in civil proceedings brought in any part of the United Kingdom."

The relevant prohibitions include those forbidden by Article 101 TFEU : section 47A(2) . The effect of section 47A(9) is that the CAT is bound by the infringement findings in the Commission's decision.

144.  In an earlier decision, *Enron Coal Services (In Liquidation) v English Welsh and Scottish Railway Ltd. [2009] EWCA Civ 647; [2010] Bus. L R.28* , in a judgment given by Patten LJ with which Carnwath and Jacob LJJ agreed, the Court of Appeal had held that it was not open to the CAT to find any infringement of the relevant EU law unless the regulator had expressly made such a finding. In that case the regulator had found that there had been an abuse of a dominant position but did not make a finding of infringement which covered the particular claim pleaded. The Court of Appeal held that a claim could not be advanced simply on the grounds that it was arguable in the light of the Commission's findings; the CAT had no jurisdiction to make any infringement findings not made by the regulator.

145.  The first issue for the Court of Appeal in Newson was whether section 47A allowed a claimant to advance a claim based on the tort of conspiracy to use unlawful means. The defendants had submitted that the only domestic claim which could be advanced was for breach of statutory duty. Roth J at first instance rejected this analysis and held that the conspiracy tort could be advanced provided that it was supported by either express or necessarily implied factual findings of the Commission in the infringement proceedings. He concluded that one of the conspiracy claims did not satisfy this requirement but the other one did. In relation to the conspiracy claim which could be advanced, he held that the intent to injure, although not an express finding of the Commission, could be inferred from its decision. He relied upon the analysis of Lord Nicholls in OBG v Allen and concluded that the requisite intent was satisfied. He said (paragraph 36):

> "36.  In my judgment, although the defendants' purpose in entering into the cartel was to promote their own economic interests, it is wholly unrealistic to regard this as divorced from the causation of loss to purchasers of copper plumbing tubes, even if the loss caused to the claimants might not correspond to the defendants' gain. On the basis of OBG Ltd v Allan [2008] AC 1 , I consider that this element of the tort can be established on the basis of the finding of infringement in the Decision alone."

146.  Essentially this is adopting the "obverse side of the coin" argument, which Lord Nicholls referred to in his "explanatory gloss". It was following this ruling that the claimants in this case issued new proceedings, had them consolidated with the existing claim and served new, consolidated particulars of claim to include the two economic torts.

147.  In the Court of Appeal, Arden LJ, giving a judgment with which Patten and Beatson LJJ agreed, accepted that as a matter of construction section 47A did extend to torts other than breach of statutory duty provided, as Enron had decided, that the relevant factual findings had been determined by the Commission in its infringement decision.

148.  However, the Court of Appeal disagreed with the judge's analysis on the issue of intention. Arden LJ held that the relevant intent was not a necessary inference from the facts. The gain and loss were not, in Lord Nicholls' words, "inseparably linked". She cited the passage from Lord Sumner's judgment in Sorrell v Smith , (reproduced in paragraph 26 above) and added (paragraph 40):

> "Lord Sumner is taking the situation where loss to the plaintiff must follow from the object of the conspiracy. He was taking the case where the proved facts exclude every other inference. As Lord Nicholls puts it, the gain and the loss are inseparably linked. But it does not follow in this case that Newson group would inevitably suffer loss. That would not be so if they were able to pass on the price increases to their customers. They might even have made a profit if they were able to raise their prices in advance of becoming liable to pay price increases to IMI group."

149.  She then considered and rejected an argument akin to that which has been advanced before us (paragraph 41):

> "Mr de la Mare seeks to meet this difficulty by submitting that it matters not if IMI group were simply indifferent whether the victims were the direct or the indirect purchasers of pipes and that it is sufficient that IMI group intended to make a profit at the expense of a class of persons to whom the wrongful acts were targeted. I would reject this argument. It deprives the requirement of intent to injure of any substantial content. It is tantamount to saying that it is sufficient that the conspirators must have intended to injure anyone who might suffer loss from their agreement."

*Is Newson binding authority?*

150.  An issue in this case, which it is appropriate to take at this point, is whether this particular ruling in Newson is binding or not. Mr Milligan says that the whole discussion of intent was *obiter* because there was the regulator had made no finding on the question of intent at all. As Arden LJ pointed out, it was not necessary for the Commission to do so in the context of the wrongs which it was considering, since intent was not an element of the wrongdoing. Enron establishes that the CAT (and therefore the High Court which was simply exercising CAT jurisdiction) cannot rely upon findings which had not been made by the regulator, and this included a finding on intent.

151.  We do not agree with that submission. In our judgment the Court of Appeal was accepting that Roth J was right to conclude that where the necessary intent could be inferred from such infringement findings as the Commission had made, the claim could be pursued. Hence the court held that the conspiracy tort could in principle be advanced. If the claimants were right, the appeal could have been dismissed on the simple ground that there was no finding on intent and the condition in Enron had therefore not been satisfied. There would have been no reason for Arden LJ to engage with that issue at all. Moreover, if Arden LJ had thought that her analysis on the question of intention was strictly unnecessary and merely intended as *obiter* observations, we would have expected her to have indicated that this was their status.

152.  It follows that in our view we are bound by the ruling in the Newson case. We should add that in any event, for reasons we develop below, we respectfully agree with it. It seems to us to be entirely consistent with the reasoning of the House of Lords in the OBG case.

**The judgment under appeal**

153.  A court has a discretion to strike out a statement of case if it discloses no reasonable grounds for bringing or defending a claim: CPR 3.4(2) . The judge noted that the White Book encourages a point of law to be determined if it is a short point. He did not consider that this was the position here. His view was that the claimants' case on intention was highly fact sensitive and could not be properly pleaded until after disclosure of documents by BA and the Part 20 defendants. The judge drew an analogy with a case he had heard, *RBS v Hicks [2012] EWHC 2699 (Ch)* , when possible grounds for alleging that the bank were accessories to a breach of fiduciary duty emerged only after discovery had been ordered. Again in *KME v Toshiba Carrier UK Ltd [2012] EWCA Civ 1190* , the Chancellor observed that cartels are shrouded in secrecy and it can be difficult until after disclosure to establish whether a defendant was a party to it or not. The judge held that the same goes for the question of intention.

154.  Furthermore, the judge considered that the point of law was difficult. He reproduced extensive passages from the judgments of Lords Hoffmann and Nicholls in OBG . The judge said that it was the claimants' case that they had suffered a loss and had not passed on all the extra cost, and that could only be determined after disclosure. He also considered Newson and took the view that Arden LJ had treated the potential category of claimants as being open ended, whereas in fact it could be limited to those classes of claimants who might suffer loss, and any of those who actually suffer it could then claim. In addition, he accepted a submission from the claimants, which we have rejected, that Arden LJ's observations on intention in Newson were in any event *obiter* .

155.  Finally, the judge supported his conclusion by reference to two further considerations which he summarised in a single paragraph. First, he said that it was not in the interests of the parties that he should decide the matter at this stage because it was inevitable that the loser would appeal, thereby adding to what was already a lengthy delay. Second, he did not consider that there would be a significant increase in costs if the issue was not resolved at this stage.

156.  Mr Milligan submits that these were cogent reasons, rooted in principle, justifying the judge's determination. Each of the grounds relied on by the judge had merit. Mr Milligan emphasises that no final determination had been made. The judge had not made a ruling against BA on the issue of intention; he had simply made a case management decision, with which we should be particularly reticent to interfere, that the application was premature and should not be resolved at this stage. The appellate courts have frequently cautioned against judges taking preliminary issues where the law is complex and in a state of development, particularly where the answer will depend upon findings of fact. It may even be the case that once the facts are determined it will demonstrate that the grounds are unarguable, in which case the issue of law will not have to be resolved at all, at least not in these proceedings.

157.  Mr Milligan in his submissions set out certain matters which he said justified the judge's somewhat cursory conclusions that a resolution of the issue at this stage would add to delay and would not result in any significant savings on costs. As to delay, he said that given that the point is complex and important, the judge was right to say that there would inevitably be an appeal. As to the costs savings, he submits that it is far from clear that they would be saved. Even if the economic tort claims were removed and the case was limited to EU/ EEA breaches, it was relevant to have regard to the global conspiracy, as indeed the Commission had done, to understand its true nature and scope. Furthermore, there were complex damages issues which would raise the question of potential losses from non EU routes even if only the EU/ EEA claims could be sustained. For example, there were potential umbrella losses resulting from the fact that other, non-conspiring airlines may have put up their prices knowing they could do so whilst still remaining competitive. These are in principle recoverable damages, certainly within the EU (see Kone and others v OBB-Infrastruktur AG , 5 June 2014) and arguably outside it. These claims

would involve widespread discovery of documents not simply limited to EU/ EEA routes. So striking out the common law claims at this stage would have limited significance on the disclosure obligations.

158.   Finally, he submitted that if we were to conclude that the judge was wrong not to determine the issue of intent, and that we should decide the question rather than remit it to the judge, then we ought to conclude that BA did intend, within the meaning of the economic torts, to harm the claimants. Causing harm to the claimants was the means through which BA and the co-conspirators achieved their objective of increasing profits. Newson was not binding on us but even if it was, it could be distinguished.

**Discussion**

159.   We bear in mind that we are dealing with a case management decision and that, absent some error of approach, we should not interfere merely because we would have made a different decision: see *Broughton v Kop Football (Cayman) [2012] EWCA (Civ) 1743* per Lewison LJ, paragraph 51. However, notwithstanding the forceful submissions by Mr Milligan to the contrary, in our judgment the judge did err in his approach to this issue, essentially for the reasons relied upon by the appellants. We accept that where the issue of law depends upon facts which have yet to be determined, it cannot possibly be right for a court to strike out the case, or any part of it, before disclosure. But in our judgment that is not the position here. The analogy with the question whether a defendant is a party to a conspiracy is inapt; that is plainly a matter of fact. We would also accept that it would be premature to resolve the issue of intention if, in the particular context, it concerned the subjective intent of the defendant. That would be relevant for the lawful means form of conspiracy which relies upon a predominant intention to harm the defendant, for example out of spite. In such a case further documents may well cast light on the defendant's intentions. Although Mr Milligan vaguely floated this as a potential basis of liability in his oral submissions, it is entirely fanciful to suggest that BA and their co-conspirators had as their objective to harm the very customers on whom they rely for their business, and for good reason that is not how the case has been put in the pleadings.

160.   BA's case, supported by the non-BA strike-out appellants, is that the essential facts are sufficiently clear to enable a court with confidence to determine the matter prior to disclosure. They focus upon the fact that the vast majority of the claimants are indirect purchasers (through the freight forwarders) of BA's services and are part of a chain of interlinked commercial relationships. Although the particular arrangements may vary from claimant to claimant, there will typically be an airline providing the air freight services to the freight forwarders who in turn contract with the shippers (claimants); the shippers in turn sell to their customers, who may be manufacturers, wholesalers or distributors; they in turn sell to their customers, such as retailers; and finally there is a sale to the ultimate consumers. Although, assuming the conspiracy is established, BA will charge more to the freight forwarders than it would otherwise do, it has no idea where the loss will ultimately fall. BA will know that it is profiting at someone's expense (although even that is perhaps not inevitably the case since by charging higher prices it may lose business to airlines not parties to the conspiracy) but it may be all or only some of these parties in the chain who will bear the loss, depending upon whether they choose to pass on the extra cost down the line or not. The airlines will not know, and no doubt will be indifferent to, where the loss falls. As unattractive as that might be, the airlines say that it is clearly not sufficient on the authorities to show that they had the necessary deliberate intention to harm the claimants. They also contend that Newson is binding on this point.

161.   In our judgment, contrary to the views of the judge, BA is right to say that this argument will not be affected by further disclosure. The way in which Mr Milligan puts his case in our view demonstrates that the issue is not fact based. His primary case is that BA had intended to injure the end purchaser of the air cargo services. These end-users were the claimants but not the freight forwarders who actually contracted with the airlines nor those further down the chain than the claimants.

162.   Mr Milligan advanced two premises to underpin the argument. The first is that BA knew and intended that the freight forwarders should pass on the extra cost to the shippers (claimants) without absorbing any of it themselves. It is said that BA so designed or structured the extra costs that they could not be negotiated or discounted by the freight forwarders, and

that such costs will inevitably be charged to the shipper. The second premise is that any further passing on of the cost by the claimants to those lower down the chain constituted a mitigation of loss but did not affect the fact that the tort had by then been committed. In other words, even if the claimants were able to avoid the extra cost by transferring it to those lower in the chain, that went only to damage but not intent. The tort crystallised when the damage was initially incurred by the claimants. The first premise is one of fact, but the second must be one of law.

163.  The alternative argument advanced by Mr Milligan is that BA intended to injure every purchaser of air cargo services. That would include the freight forwarders and the shippers but not those further down the chain from the shippers. This again assumes that it is legitimate and legally correct to treat the opportunity for any subsequent laying off of the extra cost as going to damage and not intent.

164.  Mr Milligan emphasises that in either alternative he is identifying a narrower group than the much wider category of potential claimants identified in Newson , where it was argued that provided a defendant in BA's position intends to make a profit at the expense of someone in the chain, anyone in the chain who in fact suffers damage is a potential claimant.

165.  BA denies that it could possibly be known that the freight forwarders would necessarily pass on the additional costs to the shippers. That is ultimately a commercial decision for the freight forwarders to be taken in the particular circumstances of a transaction; it may sometimes be politic for them to absorb the cost. But Mr Milligan referred us to some documentation which at least suggested that the airlines knew that typically the freight forwarders would pass on the costs; and in our view it would be wrong to conclude at this stage that the claimants would be unable to establish that BA knew that this would be at least the overwhelming likelihood as a matter of fact, even if BA could not ultimately be certain that this is how the freight forwarders would react.

166.  Mr Milligan also submitted that there may be evidence that the shippers would not, to the knowledge of BA, be able to pass the cost on to those further down in the chain. But the claimants themselves have provided no evidence of that, and they would know better than BA if that was in fact their market position. Furthermore, there is no reason for BA to assume that it will be so, since the ability to lay off costs further down the chain will necessarily depend upon a host of economic circumstances which may vary depending on the market forces for the particular product – and there is a vast range of products relating to these shippers — at a particular time and in a particular place. Mr Milligan referred to some documents which he suggested showed that BA knew that the costs would stay with the shippers. It is not necessary to go into the detail; suffice it to say that we think they fall well short of that.

167.  The critical point, in our view, is whether Mr Milligan is right to say that the possibility of laying off the cost goes solely to damage and not to intent. That is not a fact sensitive issue and the court would not in our view be assisted by further evidence. As to the legal merit of the submission, in our judgment the authorities demonstrate clearly that the possibility of passing on the loss goes to intent. Lord Nicholls made it plain in OBG that the intent to injure the particular claimant must be the cause of the defendant's conduct. An intention to harm the claimant cannot properly or sensibly be described as a cause of the defendant's conduct if the defendant is not even sure that the claimant will suffer loss at all. In this context, as Lord Nicholls said in terms, it is not enough that the defendant foresees that the claimant will probably suffer harm.

168.  We would accept, as Mr Milligan contends, that if a defendant intends to cause harm to the members of a particular class, but in fact only some suffer harm, then those actually damnified can sue. He gives as an example a variation on the facts in Tarleton v McGawley , positing that there were two boats seeking to trade with the natives rather than one who were affected by the firing of the cannon from the Othello. He submits that it would be absurd if the mere fact that there were two of them meant that neither could sue the defendant simply because it was not known which would bear the loss. Either boat should be entitled to sue if it could show loss.

169.  We would accept that in that example there is the intent to damage the identifiable and known class of two boats; it is effectively a zero-sum game and the defendant would be seeking to gain at their expense. The fact that one of them could not establish loss in fact would not alter the analysis of intent. But that is not this case. It is not known whether anyone from the alleged class (whether that be the shippers or the shippers and freight forwarders together) will in fact suffer at all. BA is not seeking to gain at their expense, even if it is foreseeable that this is in fact what may happen. Even if one expands the class to anyone in the chain down to the ultimate consumers (which is not in fact how the case is put), this opens up an unknown and unknowable range of potential claimants. It cannot be said that there is, to use Lord Nicholls' emphasised words, an intent to injure the particular claimant. Moreover, to fix liability in these circumstances is in our view directly at odds with the binding decision in Newson .

170.  Mr Milligan also relied upon the explanatory gloss of Lord Nicholls to the effect that, if the defendant benefits himself at the expense of the claimant, so that "in the very nature of things" he injures the claimant, that will provide the necessary intent. In this context he relied upon some observations of Mance J in the case of *Grupo Torras SA v Al Sabah (No 5) [1999] CLC 1469* in which he said this:

> "..in circumstances where persons combine to abstract monies from a group and then to cover up and account for the abstraction in any way they can, an intent to injure or defraud any company which, as a result of their operations, ends up bearing the loss, may readily be inferred."

That formulation of intent would indeed assist the claimants, but in our view it can no longer stand with the speeches in OBG . For reasons we have given, it cannot be said to be inherent in the nature of the arrangements that the shippers will suffer the loss in circumstances where it might be passed down the chain. Moreover, the logic of this argument is that anyone in the chain would be able to sue, provided they could show that they had actually suffered loss. That is not what the claimants have asserted and again would be inconsistent with Newson . We would in fact have rejected this particular submission even in the unlikely event that a claimant was able to show that BA somehow knew that the claimant did not think he could commercially pass on the extra cost. That decision would still not be one which was inherent in the nature of the arrangements.

171.  Mr Milligan advanced a broader argument, not apparently put before the judge below, that there are powerful reasons why it may be said that the claimants, as shippers, necessarily suffer damage and that as a matter of policy the possibility of passing on the loss should not be allowed to defeat the claim. He referred us to some observations of Mr Justice White, giving the opinion of the Supreme Court in Hanover Shoe Inc v United Shoe Machinery Corp 392 U.S. 481 when a majority of the court rejected a passing on defence. The judge said this:

> "Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued."

Mr Milligan added that furthermore the increased prices may result in a loss of volume of sales because potential customers may refuse to pay the higher price.

172.  We think that these observations must be read in the context of that case. They concerned the operation of the Clayton Act , a US anti-trust law, and the judge appears to have accepted that the facts established a prima facie case of loss which the defendant would have the onus of rebutting and which they would not be able to discharge. The focus was on injury, not intent.

173.  In any event, we respectfully do not understand why it follows that a claimant has necessarily suffered a loss from the actions of the cartel. He might not have chosen to increase his prices at all even if the proper costs had been charged and so his profit would have remained the same. More importantly, even if he would in fact have increased his prices, or if he suffered a loss because the increase in prices resulted in a reduced volume of business (both of which we accept are possible though would require evidence), we do not accept that these complexities about potential loss affect the question of intent. These more indirect losses may, or may not, have been incurred, but in our view it cannot be said that BA would either be intending that they should be incurred or would, in the language of Lord Nicholls' explanatory gloss, know that in the very nature of things they were likely to occur.

174.  We are not unhappy to reach this conclusion. It seems to us that if these economic tort claims could be advanced, it would have two results, both of which seem to us to be undesirable. First, it would extend the effect of competition law and upset the balance which the draftsman had thought appropriate when framing the rules for unfair competition. The claimants have contended that because of the limitations so far as geography and time are concerned under EU/ EEA law, it would be desirable as a matter of policy to circumvent them by employing these torts. We are inclined to think that policy points in the contrary direction and agree with the observations of Jacob J in the Red Box case (referred to above) who said (paragraph 42), in the context of intellectual property rights, that "it is not for the courts to invent that which Parliament did not create". Second, it would in reality dilute the concept of intention and bring it unacceptably and perilously close to a concept of foreseeability.

175.  Mr Milligan submitted that even if we disagreed with the judge on some of his reasoning, if any of the matters on which the judge relied was sustainable, that would be enough to justify upholding the judge's case management decision. We do not accept that. Where the judge has misdirected himself, and that error has infected his analysis, the matter must be reconsidered. We see no purpose in remitting this point of law to the judge, not least because it would in all likelihood return to this court, and in our view we must decide it. For reasons we have given, we would uphold the appeal and order that these torts of unlawful conspiracy and interfering with business by unlawful means should be struck out.

176.  Accordingly, we would overturn the decision of the judge on the grounds that there is sufficient material before the judge to determine the issue, and in our judgment it is desirable and in the interests of the expeditious handling of this litigation that the issue should be resolved now. We should add that we are not persuaded by the analysis of the judge with respect to the two supplementary matters relied upon by him in support of his ruling. The first was delay. A conclusion by the judge that he should not determine the issue at that stage was as likely to result in an appeal and cause delay as a decision to determine it, as the very fact of this appeal has shown. The claimants themselves say that this was a very difficult and controversial point. Although we think that that both parties perhaps overstate the complexity of the point and give insufficient weight to guidance given by the House of Lords decision in OBG , it is certainly the case that the issue would have to be determined one way or another at some stage before the question of liability could finally be determined. Moreover, although it is true that there would be no discovery with respect to the domestic law claims pending appeal, there will have to be substantial disclosure with respect to the remaining claim which can take place — and indeed we understand is taking place — notwithstanding this appeal. So it is a very much a moot point whether determining the issue would have increased the delay or not.

177.  As to the saving of costs, it seems to us that it is almost inevitable that some costs will be saved if the common law torts are eliminated now. We accept Mr Milligan's submission that the fact that it would remove 60% of the claim does not necessarily mean that it would lead to a saving of 60% of the costs. We also accept that there may have to be some disclosure of non EU/ EEA material even if the non EU/ EEA claims fall away, at least with respect to those alleged infringements

not found by the Commission. Such wider disclosure may also be required to deal with the quantum issue in relation, for example, to the umbrella claim. But the focus would be different, being on damage rather than liability, and it seems to us inevitable that it would be very much more limited. Given the enormous number of claimants not only in this case but in other actions waiting in the wings (we are told that some 65,000 claimants from China are bringing proceedings) there must be real advantages in focusing the case on those claims which may be sustainable in law as soon as possible, and eliminating those which can properly, at a preliminary stage, be struck out.

178.  It may be that other claims, like those now being pursued by Korean shippers, will be advanced relying directly upon breaches of foreign competition laws. No doubt, depending upon how extensively such claims were pursued, it would involve disclosure which would overlap with the current economic tort claims where these foreign laws are relied upon as unlawful means. But it is not clear whether such claims either will or can properly be advanced, and we do not think that the speculative possibility that such claims might be advanced in future would justify the conclusion at this stage that there will be no realistic benefit in clarifying whether these economic torts can be pursued or not.

**Disposition of the strikeout appeals**

179.  For these various reasons, therefore, we would uphold the strikeout appeals and order the strike out of these two torts.

**III The costs appeal**

180.  It follows from this analysis that the judge's decision to award costs to the claimants on an indemnity basis cannot stand. There were various arguments which BA advanced as to why the costs order was wholly inappropriate even if the judge had been right to strike out their claim, but there is no purpose in addressing them in view of their success on the strikeout appeal. We will consider written submissions as to what, in the light of this judgment, the appropriate costs order ought to be with respect both to the hearing before the judge and the appeal.

**Appendix 1**

*Article 101 of the Consolidated Version of the Treaty on the Functioning of the European Union*

**TITLE VII**

**COMMON RULES ON COMPETITION, TAXATION AND APPROXIMATION OF LAWS**

**CHAPTER 1**

**RULES ON COMPETITION**

**SECTION 1**

**RULES APPLYING TO UNDERTAKINGS**

*Article 101*

**(ex Article 81 TEC)**

1. The following shall be prohibited as incompatible with the internal market: all agreements between undertakings, decisions by associations of undertakings and concerted practices which may affect trade between Member States and which have as their object or effect the prevention, restriction or distortion of competition within the internal market, and in particular those which:

© 2020 Thomson Reuters.

(a)  directly or indirectly fix purchase or selling prices or any other trading conditions;
(b)  limit or control production, markets, technical development, or investment;
(c)  share markets or sources of supply;
(d)  apply dissimilar conditions to equivalent transactions with other trading parties, thereby placing them at a competitive disadvantage;
(e)  make the conclusion of contracts subject to acceptance by the other parties of supplementary obligations which, by their nature or according to commercial usage, have no connection with the subject of such contracts.

2. Any agreements or decisions prohibited pursuant to this Article shall be automatically void.

3. The provisions of paragraph 1 may, however, be declared inapplicable in the case of:

— any agreement or category of agreements between undertakings,

— any decision or category of decisions by associations of undertakings,

— any concerted practice or category of concerted practices,

which contributes to improving the production or distribution of goods or to promoting technical or economic progress, while allowing consumers a fair share of the resulting benefit, and which does not:

(a)  impose on the undertakings concerned restrictions which are not indispensable to the attainment of these objectives;
(b)  afford such undertakings the possibility of eliminating competition in respect of a substantial part of the products in question.

Footnotes
1       See Appendix 1 to this judgment for the provisions of Article 101 .
2       The total fines imposed on undertakings participating in the cartel totalled &euro;799,445,000.
3       Of the addressee airlines identified in the Commission Decision only a subset are appellants in the present proceeding. The defined term "Addressee Airlines" (in capitals) is used to refer to that subset.
4       Only a subset of the non-addressee airlines are appellants in the present proceeding. The defined term "Non-Addressee Airlines" (in capitals) is used to refer to that subset. The Non-Addressee Airlines are Air New Zealand Limited, Emirates, Hong Kong Dragon Airlines Limited, Korean Airlines Co Limited, Polar Air Cargo LLC, Thai Airways International Public Company Limited, All Nippon Airways, Saudi Arabian Airlines and Malaysian Airline System Berhad. Of the Non-Addressee Airlines, BA has only sued Korean Airlines Co Limited, Polar Air Cargo LLC, and Thai Airways International Public Company Limited. The remaining Non-Addressee Airlines have not been sued by BA as Part 20 Defendants.
5       Bao Xiang International Garment Center & Others v British Airways Plc (HC-2014-000482)
6       The Addressee Airlines are: (1) Air Canada ("AC"), (2) Cargolux Airlines International SA ("Cargolux"), (3) Cathay Pacific Airlines Limited ("CX"), (4) Scandinavian Airline Systems Denmark-Norway-Sweden/SAS AB/SAS Cargo Group A/S (jointly "SAS"), (5) Singapore Airlines Limited/Singapore Airlines Cargo Pte Ltd (jointly "SQ"), and (6) Société Air France/KLM NV/Martinair Holland NV/AirFrance-KLM (jointly "AF-KLM"). All have been sued by BA as Part 20 defendants.
7       The Non-Addressee Airlines are Air New Zealand Limited, Emirates, Hong Kong Dragon Airlines Limited, Korean Airlines Co Limited, Polar Air Cargo LLC, Thai Airways International Public Company Limited, All Nippon Airways, Saudi Arabian Airlines and Malaysian Airline System Berhad. Of the Non-Addressee Airlines, BA has only sued Korean Airlines Co Limited, Polar Air Cargo LLC, and Thai Airways International Public Company Limited.
8       Pergan , paragraphs 12, 15 and 20.
9       Pergan , paragraph 20.
10      Pergan , paragraph 20.
11      Pergan paragraph 53.

Emerald Supplies Ltd v British Airways Plc, 2015 WL 8888518 (2015)

| | |
|---|---|
| 12 | Pergan , paragraph 72. |
| 13 | Pergan , paragraphs 73-75. |
| 14 | Pergan paragraphs 57-67. |
| 15 | Pergan paragraph 75. |
| 16 | With whom the other Justices agreed. |
| 17 | BA itself is in a different position from the Addressee Airlines in relation to the Pergan Material, because it does not identify any material in the Commission Decision relating to it, which BA says should be protected from disclosure on account of Pergan . |
| 18 | This decision was not appealed. |
| 19 | Order of Mr Justice Peter Smith of 28 March 2014, paragraph 8. |
| 20 | This included the advisers of the claimants in claim number 8C13C03115, namely the La Gaitana Proceedings. |
| 21 | Allston Landing II LLC and Others v British Airways Plc (Claim No. HC13D03110). |
| 22 | See the redactions judgment, paragraph 31. |
| 23 | Order dated 31 July 2014. |
| 24 | Transcript of 12 August 2014 hearing, page 2, lines 12-19; judgment of 12 August 2014, paragraphs 17 and 43. The judge's Order of 31 July 2014 was modified through his Order of 12 August 2014. |
| 25 | The confidentiality ring in question includes the external legal and economic advisers for the claimants who are responsible for preparing and pursuing the following claims, namely: these proceedings, the La Gaitana claims and the Allston Landing claims. |
| 26 | See the redactions judgment, paragraphs 81, 56, 102 and 107. |
| 27 | We were informed by Mr Beard QC that the redactions which were proposed to the Commission by the addressee airlines were in the main accepted. Apparently one or two were not pursued further by particular airlines and that there was a process by which some of those initially sought likewise were not pursued. |
| 28 | See 12 August judgment paragraphs 17, 25-29; 34-40 and 46-48; 28 October judgment paragraphs 29, 52, 56, 73, 81-82, 102 and 107. |
| 29 | See 12 August judgment paragraphs 18, 21-22, 30 and 43; 28 October judgment paragraphs 33, 52, 77, 100 and 107. |
| 30 | 28 October judgment paragraphs 103-104. |
| 31 | 28 October judgment paragraph 106. |
| 32 | Pergan , paragraph 20. |
| 33 | Pergan , paragraph 78. |
| 34 | Pergan , paragraph 53. |
| 35 | Pergan , paragraph 77. |
| 36 | Pergan , paragraph 80. |
| 37 | Case T-534/11 Schenker v Commission (judgment of the General Court (First Chamber) of 7 October 2014. |
| 38 | Pergan , paragraph 20. |
| 39 | Pergan , paragraph 53. |
| 40 | See paragraph 73 and also paragraph s 102 and 107 of the judgment. |
| 41 | See Pfleiderer , paragraph 9. |
| 42 | See Pergan , paragraph 72 in which the Court pointed out that "…the interest of an undertaking which the Commission has fined for breach of competition law in the non-disclosure to the public of details of the offending conduct of which it is accused does not merit any particular protection…". |
| 43 | Pergan , paragraphs 12 and 20. |
| 44 | I.e. documents relating to the period of the alleged infringement. |
| 45 | Indeed we were told that BA has already provided disclosure of a large volume of material pursuant to specific Court orders. |
| 46 | See paragraph 70 and 69 of the judgment. |
| 47 | We have cited this at paragraph 35 above. |
| 48 | See paragraph 107 of the redactions judgment. |
| 49 | See paragraph 80 of the Pergan judgment. |
| 50 | The claimants' case is that umbrella losses would, if proven, nonetheless be recoverable. BA disputes this propostion. |

Crown copyright

© 2020 Thomson Reuters.