# CLEARY GOTTLIEB STEEN & HAMILTON LLP

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

WASHINGTON, D.C. • PARIS • BRUSSELS • LONDON • MOSCOW
FRANKFURT • COLOGNE • ROME • MILAN • HONG KONG
BEIJING • BUENOS AIRES • SÃO PAULO • ABU DHABI • SEOUL

D: +1 212 225 2086
jrosenthal@cgsh.com

THOMAS J. MOLONEY
STEVEN M. LOEB
CRAIG B. BROD
NICOLAS GRABAR
HOWARD S. ZELBO
DAVID E. BRODSKY
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
ANDRES DE LA CRUZ
DAVID C. LOPEZ
MICHAEL A. GERSTENZANG
LEV L. DASSIN
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
DIANA L. WOLLMAN
JEFFREY A. ROSENTHAL
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
SUNG K. KANG
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
JOON H. KIM
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
CHANTAL E. KORDULA
BENET J. O'REILLY
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
JONATHAN S. KOLODNER
DANIEL ILAN
MEYER H. FEDIDA
ADRIAN R. LEIPSIC
ELIZABETH VICENS
ADAM J. BRENNEMAN
ARI D. MACKINNON
JAMES E. LANGSTON
JARED GERBER
COLIN D. LLOYD
COREY M. GOODMAN
RISHI ZUTSHI
JANE VANLARE
DAVID H. HERRINGTON
KIMBERLY R. SPOERRI
AARON J. MEYERS
DANIEL C. REYNOLDS
ABENA A. MAINOO
HUGH C. CONROY, JR.
JOSEPH LANZKRON
MAURICE R. GINDI
KATHERINE R. REAVES
RAHUL MUKHI
ELANA S. BRONSON
MANUEL SILVA
KYLE A. HARRIS
LINA BENSMAN
ARON M. ZUCKERMAN
RESIDENT PARTNERS

SANDRA M. ROCKS
JUDITH KASSEL
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
HEIDE H. ILGENFRITZ
KATHLEEN M. EMBERGER
AVRAM E. LUFT
ANDREW WEAVER
HELENA K. GRANNIS
JOHN V. HARRISON
CAROLINE F. HAYDAY
NEIL R. MARKEL
KENNETH S. BLAZEJEWSKI
LAURA BAGARELLA
JONATHAN D.W. GIFFORD
SUSANNA E. PARKER
DAVID W.S. YUDIN
RESIDENT COUNSEL

LOUISE M. PARENT
OF COUNSEL

September 17, 2020

VIA ECF

The Honorable Ona T. Wang
United States District Court for the Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007

     Re: *In re Application of Vale S.A., Vale Holdings B.V., and Vale International S.A. for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings*, No. 20-mc-199-JGK-OTW

Dear Judge Wang:

  On behalf of Vale S.A., Vale Holdings B.V., and Vale International S.A. (collectively, "Vale"), attached hereto are Vale's respective three-page responses in opposition to the requests to quash or narrow the subpoenas served by Vale (the "Subpoenas") from (i) HFZ Capital Group LLC on behalf of 26 HFZ entities and associated individuals (collectively, "HFZ"), ECF No. 63; (ii) Perfectus Real Estate Corp. and Tarpley Belnord Corp. (collectively, "Perfectus"), ECF No. 59; and (iii) RFR Holding LLC, RFR Realty LLC, R&S Chrysler LLC, and Aby Rosen (collectively, "RFR"), ECF No. 58.

  The remaining Respondents, Fine Arts NY LLC, Bryan Cave Leighton Paisner LLP, and Kenneth Henderson, did not seek relief from the Court by the extended deadline and thus we await their full and prompt compliance with the Subpoenas.

        Respectfully submitted,

        /s/ *Jeffrey A. Rosenthal*
        Jeffrey A. Rosenthal

## HFZ

Nearly five months after Vale filed its Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782 ( the "Application") and nearly two months after this Court granted that Application, HFZ has yet to produce a single document even though it is indisputable that shortly after Beny Steinmetz Group Resources ("BSGR") defrauded Vale out of $500 million in 2010, HFZ entered into a joint venture with at least one entity owned by Steinmetz, BSG Real Estate ("BSG RE"). As part of that joint venture, BSG RE and HFZ invested in multiple New York real estate assets. Vale seeks documents to ascertain whether its fraudulently-induced payment of $500 million to BSGR was used in the purchase, financing or sale of any real estate investments by Steinmetz and HFZ post-2010. The Court has already concluded that this is a legitimate use of § 1782 discovery, and in denying Fine Arts NY LLC's objection, that Vale's requests are relevant.[1]

In claiming that Vale's Subpoenas to HFZ (the "HFZ Subpoenas") should be quashed on account of undue burden, HFZ's motion is remarkable in its citation to general legal principles with no support whatsoever with regard to *these* subpoenas. Under Rule 45 of the Federal Rules of Civil Procedure, "[w]hether a subpoena imposes an 'undue burden' 'depends on such factors as relevance, the need of the party for the documents, the breadth of the document, the time period covered by it, the particularity with which the documents are described and the burden imposed.'"[2] HFZ's motion makes no effort to "set[] forth the manner and extent of the burden and the probable negative consequences of insisting on compliance."[3] Despite having months to do so, HFZ has not presented this Court with its search results or a calculation of the cost of its review and production, fundamental elements of a claim of undue burden. Instead, HFZ guesses that Vale's requests "are expected to sweep in tens of thousands of additional documents" and that HFZ "will be required to spend inordinate numbers of hours and "tens of thousands of dollars."[4] Unwilling to offer even the most basic details, HFZ provides no basis for its bald assertions even though, to quote Judge Kaplan, "boilerplate objections . . . are a paradigm of discovery abuse."[5]

The complaints raised by HFZ lack legal or factual basis. For example, HFZ's motion asserts that the HFZ Subpoenas' ten-year time period is unduly burdensome, but that is the exact period subsequent to Steinmetz's company's theft of $500 million from Vale during which he made investments subject to the English proprietary claim. HFZ also complains at the breadth of the definition of Steinmetz's associates and BSG Entities, but that is necessitated by Steinmetz's and his associates' modus operandi of conducting business through elaborate webs of shell companies and intermediaries.[6] Vale's terms specifically name those entities known to Vale. Application of Vale's proposed search terms will presumably not generate hits with regard to vehicles that Steinmetz did not use and thus incur little or no cost. HFZ's attempt to persuade this Court to limit its search is a transparent effort to conceal the full scope of HFZ's relationships with

---

[1] Order Granting Ex Parte Application to Conduct Discovery For Use In Foreign Proceedings Pursuant to 28 U.S.C. § 1782 (July 20, 2020), ECF No. 45 (the "Order").
[2] Koch v. Pechota, No. 10-cv-9152, 2012 WL 4876784, at *3 (S.D.N.Y. Oct. 12, 2012) (quotations omitted).
[3] Kirschner v. Klemons, No. 99 Civ. 4828 (RCC), 2005 WL 1214330, at *2 (S.D.N.Y. May 19, 2005).
[4] HFZ Motion to Quash at 2, ECF No. 63 ("HFZ Motion").
[5] Jacoby v. Hartford Life & Accident Ins. Co., 254 F.R.D. 477, 478 (S.D.N.Y. 2009).
[6] See Declaration of Jeffrey A. Rosenthal, ECF No. 3 (Apr. 24, 2020) ("First Rosenthal Decl."), Ex. JJ, Vale S.A. v. BSG Resources Ltd., LCIA Arb. No. 142683, ¶¶ 1002-03 (Apr. 4, 2019).

1

Steinmetz.[7]  And while Vale knows with certainty that HFZ collaborated with Steinmetz in real estate investments, discovery is needed to identify who was involved in the flow of funds to or from Steinmetz and his associates and what was discussed or known about those funds.  HFZ also seeks to strike the HFZ Subpoenas addressed to 26 HFZ entities or individuals that it claims do not "manage the HFZ projects for which monetary transfers are identified."[8]  But there is no increased burden in maintaining those subpoenas given that HFZ acknowledged to Vale in writing that HFZ's data is contained on a single server.[9]  Whichever of the 26 HFZ Subpoena recipients have no responsive documents will incur no costs in producing them.  Vale should not have to guess how HFZ structured its relationships with Steinmetz rather than discover them.

HFZ's assertion that the HFZ Subpoenas should be quashed because the requests "are more appropriately directed to the judgment debtor [BSGR]"[10] is also misguided.  As the Court noted, the "proprietary claim is not seeking to enforce the arbitration award against BSGR."[11]  Rather, "the High Court proceedings involve separate claims against a different set of defendants."[12]  Even were HFZ to have meant Steinmetz instead of BSGR, its argument fails as a matter of law.  Under § 1782, Vale's alleged ability to obtain discovery from a party to those proceedings does not relieve HFZ of its obligation to produce relevant information.[13]  A § 1782 petitioner need not exhaust all party discovery before seeking non-party discovery of potentially overlapping documents.[14]  Citing only to non-§ 1782 cases, HFZ offers no contrary authority.[15]

HFZ unilaterally proposes to limit its production to just "three categories of documents: (1) documentation concerning the financial transfer between HFZ and Steinmetz or a Steinmetz entity, (2) back-up or other explanatory documentation (such as underlying agreements) relating to such transfers, and (3) to the extent necessary, organizational documents that relate to the underlying transactions."[16]  While Vale agrees that these categories are relevant, HFZ's motion never attempts to argue that Vale's other requests are irrelevant, an omission that dooms its motion.  Vale seeks information concerning agreements between HFZ and BSG entities, their joint venture, assets or property in which Steinmetz and HFZ currently or formerly held an interest, payments and asset transfers, and financial statements referencing BSG entities and beneficial ownership

---

[7] Insofar as the HFZ Subpoenas seek production regarding Steinmetz entities other than those enumerated, a common sense approach is all that is needed.  HFZ's duty is simply to discuss internally whether they are aware of any such other entities and, if so, to search for them.  HFZ is obviously not required to search for entities that neither Vale identifies nor HFZ knows have any relationship to Steinmetz or his associates.

[8] HFZ Motion at 3.

[9] See HFZ Motion, Ex. 3, Email Proposal from A. Lin dated Sept. 11, 2020.

[10] HFZ Motion at 3.

[11] Order at 6.

[12] Id.

[13] See In re Top Matrix Holdings Ltd., No. 18 MISC. 465 (ER), 2020 WL 248716, at *5 (S.D.N.Y. Jan. 16, 2020) (in § 1782 application, rejecting nonparty's argument that requested documents were also in the possession of a party to the foreign proceeding).

[14] See Mees v. Buiter, 793 F.3d 291, 303 (2d Cir. 2015) (explaining that the Second Circuit has "rejected such a 'quasi-exhaustion' requirement") (citations omitted).  See also Amphenol Corp. v. Fractus, S.A., No. 19 MISC. 160 (PAE), 2019 WL 2521300, at *11 (S.D.N.Y. June 19, 2019) (denying motion to quash, explaining that even though petitioner "may be able to seek discovery (some likely overlapping)" from defendants, petitioner was "not preclude[d]" from seeking such discovery on non-party).

[15] HFZ Motion at 3.

[16] Id. at 2.

2

interests.[17] The information sought concerns HFZ's investments that identify the proceeds of Vale's payment to BSGR (most of which immediately went to Steinmetz and/or his foundation). As Vale's requests are squarely aimed at tracing proceeds in accordance with English law,[18] and HFZ has identified no reason for narrowing them, HFZ's proposed limitation is without basis.

Moreover, HFZ stands alone among all Respondents in refusing to produce *any* of its communications with Steinmetz and his associates. As all other Respondents implicitly concede, such communications are plainly relevant. Under English law, the exercise of tracing includes identifying the "persons who have handled or received" the property of the claimant.[19] Additionally, communications between HFZ and BSG entities can provide context for transfers that are not revealed by the transfer documents themselves, such as discussions about the source of funds, knowledge of the parties, or details about other investments. Indeed, it was through the review of certain email and text exchanges between HFZ principals and Steinmetz and his associates that Vale even learned of the existence of a BSG-HFZ joint venture.[20] For this same reason, HFZ's refusal to produce board meeting minutes concerning BSG Entities must also fail, as such minutes are likely to reflect HFZ's decisions concerning BSG entities and their common investments. Given that Steinmetz may argue that bank transfer documents alone do not show that it is *Vale's* money that went to or from the Steinmetz-HFZ joint venture or that the ultimate recipients of funds acted in good faith, those communications may provide material context.

Steinmetz and HFZ have taken measures to conceal their relationship, including their denial to the press even as the Application was pending before the Court.[21] It is certainly reasonable for Vale to discover statements made to the government (Req. 10) or the media (Req. 11) as they may provide further details, *inter alia*, about investors in a project, ownership interests, and other financial information and efforts at concealment.[22] The discovery sought by Vale is necessary and appropriate to minimize the likelihood that material information remains concealed.

For the reasons set forth herein, Vale requests that Your Honor deny HFZ's motion to quash and set a prompt deadline for HFZ's long anticipated production of responsive documents.

---

[17] See, e.g., Requests No. 1, 2, 4, 5, 6, 8, 9, and 12.
[18] "Tracing is …the process by which a claimant demonstrates what has happened to his property, identifies its proceeds and the persons who have handled or received them, and justifies his claim that the proceeds can properly be regarded as representing his property." Ex. 1, Foskett v. McKeown (2001) 1 AC 102 (HL) 128 (appeal taken from Eng.).
[19] Id.
[20] See, e.g., First Rosenthal Decl., Ex. ZZ, Email from C. Papachristophorou to B. Steinmetz at CGS&H p. 4, Jan. 25, 2013 (BSGR_LCIA_0023515) (discussing HFZ JV with Steinmetz)*;* id, Email from HFZ Officer N. Meir to B. Steinmetz at CGS&H p. 2, Oct. 31, 2012 (BSGR_LCIA_0023384) (email from Nir Meir to Beny Steinmetz with the subject line "Fwd: BSG-HFZ FUND SUMMARY" describing a potential investment in the Chatsworth).
[21] See, e.g., Ex. 2, Neil Hume, Vale launches New York front in bitter battle with Beny Steinmetz, Financial Times, May 7, 2020; First Rosenthal Decl. Ex. WW Konrad Putzier, Rough Cut: How the Global Diamond Trade – from Cartels to War Zones –Shaped New York's Skyline, Real Deal, Apr. 2, 2018 ("HFZ 'vigorously denies' any connection to Steinmetz, and so did a representative for Steinmetz."). HFZ's counsel acknowledges a relationship, proposing "to perform a search of the HFZ electronic server in order to confirm *which* specific HFZ projects contain information relevant to tracing Steinmetz funds." HFZ Motion, Ex. 3, Email Proposal from A. Lin dated Sept. 11, 2020. (emphasis added).
[22] Even in their correspondence with us submitted to this Court, ECF No. 63-3, HFZ has never identified any specific requests other than Requests 10 and 11 as objectionable.

**Perfectus**

While Perfectus attempts to artificially narrow the subpoenas served by Vale (the "Perfectus Subpoenas"), it does not challenge – and thus implicitly concedes – the discoverability of numerous categories of documents resisted by HFZ, as well as communications. Perfectus's unfounded objections to the Perfectus Subpoenas should be rejected by the Court.

Perfectus is a subsidiary of BSGR's ultimate parent, the Balda Foundation ("Balda"),[23] a Liechtenstein trust, of which Beny Steinmetz and his family are the sole beneficiaries, and a defendant in the English Proceedings.[24] Immediately after Vale paid BSGR $500 million as a result of BSGR's fraud, the majority of that payment was funneled directly from BSGR to Balda. Shortly thereafter, another Balda subsidiary, BSG RE, entered into a joint venture with HFZ, a real estate company with close ties to Steinmetz. A corporate organization chart produced by BSGR describes Tarpley Belnord Corp. as owning "USA property" as a subsidiary of BSG RE's predecessor company Five Mounts Properties Ltd.[25] Perfectus's headquarters are located at HFZ's offices at 600 Madison Avenue and Perfectus holds an interest in the Belnord located in New York, which HFZ reportedly purchased for $575 million in 2015.[26]

Thus, and as Vale has demonstrated in the Application, the relevance of Vale's requests is clear: Vale's discovery is specifically targeted to obtain documents concerning Perfectus's role in investments and transfers from the proceeds of Vale's $500 million payment, as well as information in its possession, custody, and control about the joint ventures entered into and properties invested in by the Defendants in the English Proceedings. Indeed, Your Honor has expressly recognized the relevance of the requests in granting the Application, finding that Vale had "provided submissions sufficient to show relevance for purposes of discovery." Order at 8.[27]

Perfectus seeks to narrow the scope of the Perfectus Subpoenas and limit its production of responsive documents by general reference to relevance and proportionality principles under Rules 26 and 45 of the Federal Rules of Civil Procedure. "The touchstone of the court's power under Rule 26(c) is the requirement of 'good cause.'" In re Zyprexa Injunction, 474 F. Supp. 2d 385, 415 (E.D.N.Y. 2007), aff'd sub nom. Eli Lilly & Co. v. Gottstein, 617 F.3d 186 (2d Cir. 2010). The burden of persuasion in a motion to quash a subpoena or for a protective order is borne by the movant." Jones v. Hirschfeld, 219 F.R.D. 71, 74-75 (S.D.N.Y. 2003). The party moving to quash or for a protective order must show through "specific examples or articulated reasoning" that "disclosure will result in a clearly defined, specific and serious injury." Schiller v. City of New

---

[23] See First Rosenthal Decl., Ex. FFF, Balda Meeting Minutes, Sept. 21, 2009 (BSGR_LCIA_2_0037307); Ex. GGG, 2008 Org Chart (BSGR_LCIA_2_0040240).

[24] Despite Vale's repeated requests, Perfectus has not produced a current organizational chart. Based on the most recent historical information available to Vale, Perfectus is ultimately owned by Balda.

[25] See First Rosenthal Decl., Ex. GGG, 2008 Org Chart (BSGR_LCIA_2_0040240).

[26] See First Rosenthal Decl., Ex. HHH, Josh Barbanel, The Belnord on Upper West Side Gets a New Owner, Wall St. J. (Mar. 12, 2015).

[27] Despite Perfectus's contention otherwise, there is no inconsistency between this position and Vale's statement in its initial *ex parte* petition that Respondents would later have an opportunity to object. See Perfectus Motion to Quash at 2 n.2, ECF No. 59 ("Perfectus Motion"). As the Court knows, the Court ultimately did not consider the Motion *ex parte*, but rendered its ruling several months after Vale served the subpoena on Perfectus, and upon consideration of the objections of several Respondents.

York, No. 04 Civ. 7922 KMK JCF, 2007 WL 136149, at *5 (S.D.N.Y. Jan. 19, 2007) (internal quotations omitted). The alleged harm "must be significant, not a mere trifle." Id. Similarly, under Rule 45, the responding party bears the burden of showing that the subpoena imposes an undue burden. See Universitas Educ., LLC v. Nova Grp., Inc., No. 11 Civ. 1590 (LTS)(HBP), 2013 WL 3328746, at *7 (S.D.N.Y. July 2, 2013) (movants had not demonstrated that "the burden of responding to the subpoenas is so substantial that the subpoena should be quashed").

Here, like HFZ, Perfectus comes nowhere close to carrying its burden. Perfectus's sole objection to the Perfectus Subpoenas is its repeated *ipse dixit* that the Perfectus Subpoenas are overbroad and seek irrelevant information. But such assertions are insufficient to demonstrate a particular need to obtain a protective order. Fatally absent from Perfectus's motion is any particularized identification of burden, such as the number of false hits from its search, the projected cost of its document production, or the person-hours that would be required to search for and produce responsive documents. As a result, Perfectus offers this Court no basis to conclude that compliance with the Perfectus Subpoenas is burdensome, let alone unduly so.

The few complaints Perfectus does articulate are misplaced. For example, Perfectus cites Vale's Requests 3 and 6 – which seek board meeting minutes and communications concerning Perfectus's relations with BSG Entities, including HFZ – but fails to provide *any* reasoning to support its claim that these requests "are not tethered in any way to Vale's rationale for . . . discovery." Perfectus Motion at 2. Indeed, notwithstanding its unqualified statement that these requests are wholly irrelevant, Perfectus elsewhere agreed to produce certain documents responsive to these requests, but, through its R&Os[28] and Exhibit A, unilaterally and without explanation purports to limit its production of documents responsive to these requests and numerous others,[29] to documents showing transfers from BSG Entities *to* Perfectus. This is an entirely improper limitation. Discovery of documents exchanged *between* (i) Perfectus and BSG Entities, or (ii) Perfectus and other entities identified in the Perfectus Subpoenas, including documents in Perfectus's possession, custody or control that show transfers to and agreements with HFZ, is equally relevant. Under English law, the holder of a proprietary claim may elect to follow the original asset as it passes into the hands of a new owner, or to trace its value into the new asset in the hands of the original owner.[30] Thus, information regarding *both* the original and new asset, as well as the conduct of both the original and new owners, may be considered by the English court. Perfectus's demand to limit its production to only transfers from BSG Entities to Perfectus, but not subsequent transfers, ignores the proper scope of the proprietary claim and should be rejected. Remarkably, Perfectus seeks to have this Court adjudicate what is and is not relevant for the English court's consideration of proprietary claims without a single citation to English law on this issue.

As with HFZ, Perfectus complains that the Perfectus Subpoenas are overbroad because many entities may be included in the definitions of "Steinmetz Associates" and "Associates." But these definitions encompass persons and entities that have historically been known to have

---

[28] Ex. 3, Perfectus's Responses and Objections to the Perfectus Subpoenas.
[29] See also Responses and Objections Nos. 1, 4, 5, 9, 10, 11
[30] "Tracing is …the process by which a claimant demonstrates what has happened to his property, identifies its proceeds and the persons who have handled or received them, and justifies his claim that the proceeds can properly be regarded as representing his property." See Ex. 1, Foskett v. McKeown (2001) 1 AC 102 (HL) 128 (appeal taken from Eng.).

2

dealings with Steinmetz, and Vale cannot know without discovery – which is why it seeks such discovery from entities such as Perfectus – which persons or entities may have acted here on Steinmetz's behalf to help conceal the fruits of his fraud.[31] As with HFZ, the burden, if any, on Perfectus is minimal because its documents with respect to persons or entities defined among "Steinmetz Associates" with whom Perfectus had no dealings will be a null set. The broad definition ensures that responsive documents are not concealed because Vale did not identify the correct Steinmetz associate responsible for a particular investment. Particularly when dealing with a fraudster who has been known to use a web of intermediaries and proxies to conceal assets, a broad definition of his associates is more than appropriate for discovery.[32]

Perfectus's Motion proposes additional "substantial[] narrow[ing] [of the Perfectus Subpoenas] consistent with its R&Os and Exhibit A," Perfectus Motion at 3, that it makes no effort whatsoever as movant to justify and thus should be rejected. For example, in Exhibit A, Perfectus asserts that it will not produce *any* documents in its possession, custody or control concerning any joint venture between HFZ and BSG RE between January 1, 2010 and today. But documents reflecting joint ventures between HFZ and BSG RE are central to the discovery granted in the Order, which seeks to understand whether any joint venture served as a vehicle for the transfer of assets. Likewise, Perfectus takes the position in Exhibit A that it will not produce documents that would identify direct and indirect investors, shareholders, and lenders of the Subject Properties. However, Vale's right to follow and trace assets includes its right to documents reflecting the structure of how the Subject Properties are held, including which entities and individuals provided loans or investments.

Perfectus's vague assertions and arbitrary limitations for the discovery requests are inconsistent with the Order and define relevance in a far narrower manner than does English law and thus should be overruled. Accordingly, and for the reasons set forth herein, Vale requests that Your Honor deny Perfectus's request for an order limiting the scope of discovery and set a prompt deadline for Perfectus's production of all responsive documents.

---

[31] See, e.g., First Rosenthal Decl., Ex. JJ, Award ¶¶ 174-77, 184-97, 215, 221, 252-56.
[32] In prior communications with Vale, Perfectus has similarly taken the unfounded position that "BSG Entities" should not include "Steinmetz's Associates" or any other entity in which Steinmetz is known, believed, or suspected to have any interest. Perfectus cannot plausibly claim that Steinmetz's associates, including Gregg Blackstock, Perfectus's CEO, should be outside the scope of BSG Entities. Perfectus should not be permitted to so confine the discovery requests in the Subpoenas to the extent Perfectus maintains its objection to the definition of "BSG Entities."

## **RFR**

RFR's motion is its second bite at the apple, having unsuccessfully opposed Vale's initial § 1782 application. It appears to make three primary arguments: RFR (i) seeks to limit discovery to only two transactions, and specifically exclude transactions concerning a known Steinmetz vehicle Signa Holding GmBH ("Signa"), (ii) demands a commitment upfront by Vale to pay all of its costs, and (iii) raises obstacles under GDPR and demands indemnification. All three objections should be overruled.

*First*, RFR and its principal, Aby Rosen, have had a working relationship with Steinmetz for at least seven years.[33] In addition to their collaboration in the 2019 purchase of the Chrysler Building alongside RFR,[34] Steinmetz's joint venture with Signa invested in at least several European real estate assets, including the largest department-store operator in Germany, Galeria Karstadt Kaufhof.[35] Steinmetz later sold his stake in Galeria Karstadt Kaufhof to RFR.[36]

It is black letter law that relevance for purposes of discovery "is to be construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim or defense."[37] RFR concedes that it has had a relationship with Steinmetz through Signa: "[a]n entity affiliated with Steinmetz is alleged to have invested in the Chrysler Building *with Signa*, not RFR."[38] As a result, Signa is properly within the scope of Vale's tracing exercise of the funds Steinmetz's company obtained by defrauding Vale. RFR's baseless suggestion that Vale must establish that RFR's "dealings with Signa [] involved the English Defendants other than the Chrysler Building transaction"[39] reflects RFR's unawareness that Signa itself may have invested Steinmetz's ill-gotten funds. Given Steinmetz's investment in or with Signa, *all* of Signa's transactions are relevant for tracing purposes; at a minimum, the legal consequences of such tracing evidence is for the English court to decide. Vale, however, is entitled to such factual evidence in the possession, custody or control of RFR to present to that court, the central issue that RFR never acknowledges, let alone addresses, in its motion.

While RFR's motion does not address any party other than Signa, for the reasons articulated with respect to HFZ and Perfectus, it has no cognizable basis to limit Vale's discovery

---

[33] See Declaration of Jeffrey A. Rosenthal, ECF No. 37 (Jun. 15, 2020) ("Second Rosenthal Decl."), Ex. 1, Emails between Beny Steinmetz and Aby Rosen, Mar. 6, 2013 (BSGR_LCIA_0024477, 25026)
[34] As seems to have been a common occurrence amount Steinmetz's associates, Signa previously denied their relationship. First Rosenthal Decl., Ex. KKK, Beny Steinmetz, reported backer of Chrysler Building owner and HFZ, to be tried in Guinean bribery scandal, The Real Deal, (Aug. 13, 2019), https://therealdeal.com/2019/08/13/beny-steinmetz-reported-backer-of-chrysler-building-owner-and-hfz-to-be-tried-in-guinean-bribery-scandal/.
[35] See First Rosenthal Decl., Ex. YY, Robin Marriott, Europe News: Papa's Back, PERE News (Mar. 4, 2013), https://www.perenews.com/europe-news-papas-back/; First Rosenthal Decl., Ex. MMM, Konrad Putzier, Meet the Other Man Who Bought the Chrysler Building, Wall St. J. (July 23, 2019), https://www.wsj.com/articles/meet-the-other-man-who-bought-the-chrysler-building-11563879601; see also ECF No. 2 at 12-13.
[36] See RFR Motion to Quash, ECF No. 58, at 2 ("RFR Motion").
[37] Strike 3 Holdings, LLC v. Doe, 19-CV-2552 (LAK) (OTW), 2019 WL 4855039, at *2 (S.D.N.Y. Oct. 2, 2019) (internal quotations omitted).
[38] RFR Motion at 2.
[39] Id.

to two specific transactions.[40] Indeed, while RFR throws around phrases like "undue burden," Vale is entitled to discovery of all communications between RFR and the Defendants to assess RFR's assertions.[41] If there truly are no other transactions in which any Defendant has a direct or indirect interest (including through Signa), RFR's search will be inexpensive and quick. RFR makes no attempt to satisfy any of the factors.[42]

*Second*, RFR argues that before it produces a single document to Vale, Vale must accept the obligation to pay all of RFR's future fees and costs, regardless of how, when, or why they are incurred or whether their amount is reasonable and necessary. Of the five groups of Respondents, RFR is the only one to take this position. Respectfully, RFR's demand is premature and, if anything, not conducive to cost-effective, prompt, and efficient compliance with the RFR subpoenas.

As an initial matter, the sole § 1782 case upon which RFR relies actually rejected its argument. In In re Hansainvest Hanseatische Investment-GmbH, 364 F. Supp. 3d 243 (S.D.N.Y. 2018),[43] Judge Sullivan (sitting by designation from the Second Circuit) denied applicants' request to shift costs related to documents held by U.S. custodians. The court only granted cost-shifting and indemnification as to documents held by foreign custodians, but that distinction may have been motivated by the pending uncertainty at that time as to the right of parties to obtain discovery from foreign custodians at all. See In re Hansainvest Hanseatische Investment-GmbH, 18-MC-310 (ALC), 2019 WL 5939860 (S.D.N.Y. Oct. 4, 2019) (granting a stay of all discovery of documents held outside of the United States pending the resolution by the Second Circuit of this issue of first impression). That uncertainty was subsequently resolved when the Second Circuit ruled that "§ 1782 . . . allows extraterritorial discovery." In re del Valle Ruiz, 939 F.3d 520, 533 (2d Cir. 2019). Thus, the rationale for cost-shifting with respect to foreign custodians no longer exists.

As a policy matter, cost-shifting is an issue best deferred to a later date. When the allocation of costs is uncertain, both parties are incentivized to confer and reach agreement regarding search terms, sampling, and potential means to reduce costs as they do not know who will ultimately bear them. If this Court orders Vale to pay all such costs from the outset, any incentive for RFR to work amicably with Vale to be efficient will disappear. Indeed, this can already be seen in RFR's letter when it proclaims that it has 65,000 document hits for review at an estimated cost of $275,000. Vale has tried repeatedly to work with RFR to modify the search in order to ascertain whether these 65,000 hits may include false positives, and figure out the best means to ensure that RFR's production is both comprehensive and targeted and ascertain whether and why those costs may be improperly inflated.

---

[40] See, e.g., Anvik Corp. v. Samsung Elecs., 07 Civ. 818 (SCR) (LMS), 2009 WL 10695623, at *4 (S.D.N.Y. Sept. 16, 2009) (holding that "the merits and facts of the disputes are not grounds for objections to discovery under Rule 26").

[41] Id. (holding that "[u]nadorned assertions of undue burden . . . cannot support a limitation on discovery under Rule 26.")

[42] See Koch v. Pechota, No. 10-cv-9152, 2012 WL 4876784, at *3 (S.D.N.Y. Oct. 12, 2012) ("Whether a subpoena imposes an undue burden depends on such factors as relevance, the need of the party for the documents, the breadth of the document, the time period covered by it, the particularity with which the documents are described and the burden imposed.") (internal quotations omitted).

[43] See Motion to Quash at 3.

*Third*, RFR has no basis to demand indemnification.  RFR misstates the decision of the Court of Justice of the European Union in Data Protection Commissioner v. Facebook Ireland Limited and Maximillian Schrems ("Schrems II"), claiming that it "calls into question the legality under the GDPR of transferring documents to the US for use in *litigation*."[44]  But Schrems II explicitly notes that Article 49 of the GDPR provides a derogation in the litigation context.[45]  Further, as RFR controls its compliance with the GDPR (for example, by redacting where necessary), indemnification would create perverse incentives and lead to potential liability over production issues outside of Vale's control and which can be avoided by RFR's own diligence.  In any event, while there is no issue in the first place, we made RFR an offer that resolves even RFR's perception of a problem by proposing that RFR could produce documents from European custodians to our United Kingdom colleagues (who are responsible for the English litigation), thus mooting concern that a production to the United States carries regulatory risk.[46]

RFR's objections to production are unfounded.  For the reasons set forth herein, Vale requests that Your Honor dismiss RFR's motion to quash and set a prompt deadline for RFR's production of all responsive documents.

---

[44] RFR Motion at 2 (emphasis added).
[45] See RFR Motion, ECF No. 58-5, Ex. E ¶ 202.  The European Data Protection Board issued guidelines on derogations of Article 49 under the GDPR which state that "[u]nder Article 49(1)(e) transfers may take place when 'the transfer is necessary for the establishment, exercise or defense of legal claims.'"  This derogation covers a wide range of activities including "data transfers for the purpose of formal pre-trail discovery procedures in civil litigation."  Ex. 4, European Data Protection Board, Guideline 2/2018 on derogations of Article 49 under Regulation 2016/676, at § 2.5.
[46] It is indisputable that foreign legal concerns do not excuse RFR's duty to produce their documents.  See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for Southern Dist. of Iowa, 482 U.S. 522, 543-44 n.29 (1987) (finding that a foreign statute cannot deprive a U.S. court of the power to order production of evidence, even though the production might violate that statute); Finjan, Inc. v. Zscaler, Inc., No. 17-cv-06946-JST (KAW), 2019 WL 618554, at **2-3 (N.D. Cal. Feb. 14, 2019) (applying Aerospatiale in the GDPR context).

3