# Exhibit 1

House of Lords                          *A*

# Foskett *v* McKeown and others

1999  March 15, 16, 17, 22;           Lord Browne-Wilkinson, Lord Steyn,
2000  May 18                          Lord Hoffmann, Lord Hope of Craighead
                                      and Lord Millett

*B*

*Trusts — Trustee — Breach of trust — Trustee fraudulently using trust moneys to pay*
*    premiums on policy of life insurance — Policy held for benefit of innocent*
*    volunteers — Whether trust moneys traceable into policy proceeds — Whether*
*    trust beneficiaries entitled to share of proceeds*

In 1988 a number of purchasers entrusted a total of £2·6m to M and an associate
for a property development scheme in Portugal on terms that within two years the
developed plots would be conveyed to the purchasers or their money repaid with          *C*
interest. The scheme was never carried out. M, in breach of trust, used some
£20,440 of the purchasers' money to pay two annual premiums for 1989 and 1990
on a whole life insurance policy effected in 1986. There was a dispute as to the extent
to which he used trust moneys to pay the premium for 1988. The policy provided
that, in consideration of the first premium and of the further premiums payable under
the policy, a specified death benefit was to be paid on M's death, namely whichever
was greater of £1m and the aggregate value of units notionally allocated to the policy.       *D*
The policy provided for those units to be allocated on receipt of each premium, and
that units were to be cancelled each year in order to meet the cost of the life cover for
that year. The surrender value of the policy was the aggregate value of the
uncancelled units from time to time. In 1989 M divested himself of any beneficial
interest in the policy, appointing it to be held principally for the benefit of his three
children, the third to fifth defendants. In 1991 M committed suicide, whereupon the
insurers paid to the trustees of the policy, the first and second defendants, £1m, as          *E*
the death benefit due under it. In 1994 the purchasers obtained a declaration that the
land in Portugal and the shares in the company which was to develop it were held in
trust for the purchasers. They also obtained £600,000 under a compromise with the
bank from whose accounts the money had been misappropriated. The purchasers
then brought an action claiming the proceeds of the policy. The judge held that they
could recover 53·46% of the proceeds as representing the extent to which their money
had contributed to the investment value of the policy at the date of M's death. The          *F*
Court of Appeal held, allowing an appeal by the third to fifth defendants, that the use
of the purchasers' money to pay the premiums could not give them an equitable
interest in the death benefit nor could it give them a share in the proceeds of the policy
proportionate to the premiums paid with their money and that they were limited to a
restitutionary charge over the proceeds of the policy to the extent that their money
could be traced into the premiums with interest thereon.

On appeal by the purchasers and cross-appeal by the third to fifth defendants—       *G*

*Held*, (1) dismissing the cross-appeal, that the remedy claimed by the purchasers
was a proprietary remedy, and the compensation obtained by them in earlier
proceedings could not deprive them of their proprietary interest in their own money;
that, since the policy proceeds were paid in consideration of the receipt of all the
premiums payable under the policy, the purchasers were able to follow their money
into the policy when the premiums were paid and from there into the hands of the
trustees when the death benefit was paid to them, so as to obtain reimbursement from        *H*
the policy proceeds of the amount of the premiums paid with their money with
interest (*post*, pp 108C–D, 112B, 113E–F, 115E–G, 117G–118C, 119D–H, 145D–E).

(2) Allowing the appeal (Lord Steyn and Lord Hope of Craighead dissenting),
that, where a trustee wrongfully used trust money to provide part of the cost of
acquiring an asset, the beneficiary was entitled, at his option, either to claim a

A  proportionate share of the asset or to enforce a lien upon it to secure his personal claim against the trustee for the amount of the misapplied money; that it was immaterial whether the trustee mixed the trust money with his own in a single fund before using it to acquire the asset, or made separate payments, either simultaneously or sequentially, out of the differently owned funds to acquire a single asset; that volunteers deriving title otherwise than for value could be in no better position than the wrongdoer notwithstanding their innocence of any wrongdoing; and that,

B  accordingly, since the purchasers could trace trust money through the premiums into the policy money, and since the beneficiaries of the policy were volunteers and had not themselves contributed to the premiums, the purchasers were entitled to a share in the policy proceeds proportionate to the premiums paid out of the trust money (post, pp 108D, 109H–110E, 11B–E, 115E–G, H–116B, C–D, 127F–H, 129B–C, 129H–130C, 131G–132G, 134C–E, 139F–140A, 141A–C, 145D–E).

Dictum of Sir George Jessel MR in *In re Hallett's Estate; Knatchbull v Hallett*
C  (1880) 13 Ch D 696, 709, CA disapproved.

Decision of the Court of Appeal [1998] Ch 265; [1998] 2 WLR 298; [1997] 3 All ER 392 varied.

The following cases are referred to in the opinions of their Lordships:

*Baxter House Inc v Rosen* (1967) 278 NYS2d 442
*D'Avigdor-Goldsmid v Inland Revenue Comrs* [1953] AC 347; [1953] 2 WLR 372;
D      [1953] 1 All ER 403, HL(E)
*Diplock, In re; Diplock v Wintle* [1948] Ch 465; [1948] 2 All ER 318, CA
*Edinburgh Corpn v Lord Advocate* (1879) 4 App Cas 823, HL(Sc)
*Edinburgh, Magistrates of v McLaren* (1881) 8 R 140, HL(Sc)
*El Ajou v Dollar Land Holdings plc* [1993] 3 All ER 717
*Falcke v Scottish Imperial Insurance Co* (1886) 34 Ch D 234, CA
*Frith v Cartland* (1865) 2 H & M 417
E  *Hallett's Estate, In re; Knatchbull v Hallett* (1880) 13 Ch D 696, CA
*Holmes v Gilman* (1893) 138 NY 369
*Jones v De Marchant* (1916) 28 DLR 561
*Jones (F C) & Sons (Trustee of the Property of) v Jones* [1997] Ch 159; [1996]
      3 WLR 703; [1996] 4 All ER 721, CA
*Leslie, In re; Leslie v French* (1883) 23 Ch D 552
*Lohman v General American Life Insurance Co* (1973) 478 F2d 719
F  *Lupton v White* (1808) 15 Ves 432
*Primeau v Granfield* (1911) 184 F 480
*Sandeman & Sons v Tyzack and Branfoot Steamship Co Ltd* [1913] AC 680, HL(Sc)
*Scott v Scott* (1963) 109 CLR 649
*Shaler v Trowbridge* (1877) 28 NJEq 595
*Sinclair v Brougham* [1914] AC 398, HL(E)
*Thum v Wolstenholme* (1900) 61 P 537
*Tilley's Will Trusts, In re* [1967] Ch 1179; [1967] 2 WLR 1533; [1967] 2 All ER 303
G  *Truelsch v Northwestern Mutual Life Insurance Co* (1925) 202 NW 352
*Vorlander v Keyes* (1924) 1 F2d 67

The following additional case was cited in argument:

*Halifax Building Society v Thomas* [1996] Ch 217; [1996] 2 WLR 63; [1995] 4 All
      ER 673, CA

H  **APPEAL** from the Court of Appeal

This was an appeal by the plaintiff, Paul Foskett, acting on his own behalf and on behalf of 219 other potential purchasers of plots of land at Mount Eden, Algarve, Portugal, and a cross-appeal by the third to fifth defendants, Daragh Timothy Murphy, Jason John Murphy and Louise Mary Murphy

(the children of Timothy Mary Murphy, deceased, and the principal *A*
beneficiaries under a policy of life insurance effected by him), from a
decision of the Court of Appeal (Sir Richard Scott V-C and Hobhouse LJ;
Morritt LJ dissenting) on 21 May 1997 allowing an appeal by the third to
fifth defendants from a decision of Laddie J on 12 July 1996 on a summons
for summary judgment under RSC Ord 14, awarding the plaintiff 53·46% of
the death benefit paid to the first and second defendants, Jean Elizabeth
McKeown and Michael John Nelson.                                           *B*

On 18 December 1997 the House of Lords (Lord Lloyd of Berwick, Lord
Nolan and Lord Clyde) granted the plaintiff leave to appeal. On 21 May
1998 the House of Lords (Lord Browne-Wilkinson, Lord Hope of Craighead
and Lord Hutton) granted the third to fifth defendants leave to cross-appeal.

The facts are stated in the opinions of their Lordships.

*Richard Mawrey QC* and *Adrian Cooper* for the plaintiffs. M held the    *C*
money on express trust for the purchasers and held the insurance policy on
trust for a class which excluded himself. The two trust funds were mixed.
Where a trustee of two separate trusts (A and B) employs the assets of trust
A to contribute towards the assets of trust B, the beneficiaries of trust A have
a proprietary claim against the assets of trust B. They can elect to recover the
amount of the wrongful contribution, with interest, or to take a share of the  *D*
assets of trust B proportionate to the contribution from trust A: see
*Edinburgh Corpn v Lord Advocate* (1879) 4 App Cas 823.

Although this case was analysed in terms of tracing, it is in fact the
application of a more general equitable principle of fairness in judging
between competing innocent claimants to the same fund. The identity of the
competing claimants is irrelevant since tracing is independent of any state of
knowledge or notice of the wrongful application of trust funds. A "guilty"  *E*
beneficiary, as M was when he was an actual or potential beneficiary of the
policy, is neither essential nor relevant to the tracing of misappropriated
moneys into their proceeds.

The misuse by M of the purchasers' moneys to pay the premiums on the
policy gave the purchasers a proprietary right against the proceeds sufficient
to enable them to recover the premiums paid plus interest, whether that right *F*
was regarded as giving rise to a tracing claim or to an equitable lien or charge.

Whether the purchasers can go further and assert a proprietary claim to a
pro rata proportion of the proceeds of the policy depends on the answer to
the question whether, where a "whole life" policy of life insurance requires
the payment of annual premiums, those premiums are to be treated as
contributing rateably to the acquisition of the policy and its eventual
proceeds, thus creating a proportionate equitable interest for the beneficiary *G*
of the trust or the tracing claim, or simply as maintaining in existence an
asset which has been acquired bu the granting of the policy and the payment
of the first premium.

Clearly, where the asset is acquired by a single payment and transferred
into the name of one or more persons then anyone else who wishes to assert a
proprietary right to the asset must show that he provided some or all of that
single payment. If however the acquisition of the asset involves the making *H*
of payments over a period of time it might be unrealistic to have regard only
to the the transaction whereby title came to be vested in the acquirer. The
obvious example is property purchased on mortgage where outright title is
normally acquired by the mortgagor with money provided by the

A mortgagee, but a third party who subsequently pays a mortgage instalment at the express or implied request of the mortgagor might obtain a proprietary interest even though those instalments did not directly contribute to the actual acquisition of title.

Therefore the distinction between contribution to acquisition at or prior to the time of acquisition, and contribution to the asset thereafter, is not

B always sustainable. It is better to have regard to the nature of the asset and to apply general equitable principles to ascertain whether contributions give rise to an equitable entitlement.

*The true nature of a whole life policy is that it is an asset acquired by payment of all the premiums and not an asset acquired by payment of the first premium alone and merely maintained by the payment of subsequent premiums.* Where an asset is purchased in circumstances giving rise to a

C trust, the beneficiary under the trust can elect to recover the amount of the purchase money or to claim a proportionate interest in the value of the asset: see *In re Diplock; Diplock v Wintle* [1948] Ch 465 and *In re Tilley's Will Trusts* [1967] Ch 1179.

Where a wrongdoer holds the legal title to property which is subject to a claim based on constructive trust or the equitable right to trace, the

D wrongdoer cannot defeat the claim by executing a declaration of trust in favour of a third party.

*It would match the layman's approach to what is just if the proceeds of the policy were split between the purchasers and the children.*

*Roger Kaye* QC and *Clare Stanley* for the defendants. The policy moneys are not the true product of a relevant mixed fund. This is not a case of unjust

E enrichment but of vindication of property rights. The purchasers have no property rights to vindicate.

The purchasers elected to take the plots in specie, the very property for which their deposit moneys were earmarked. Therefore the purchasers cannot establish that they retained any equitable interest in the deposit moneys. They have no proprietary base from which they can trace. Thus, they can make no proprietary claim to the policy moneys. Besides, the

F purchasers obtained compensation from Lloyds Bank Plc for breach of trust in relation to dealings with the relevant account. They thus made a binding election preventing them from pursuing any claim to the policy moneys.

Alternatively, if the purchasers can establish a proprietary claim, they nevertheless cannot trace into the policy moneys because the moneys used to pay the 1989 and 1990 premiums cannot be identified as being represented

G by the policy moneys since the policy was acquired prior to the payment of the premiums, and one cannot trace into an asset already acquired. Those premiums were not made in *exchange* for anything since they did not increase the value of the policy or policy moneys. The same sum would have been paid out on M's death whether or not those premiums had been paid.

If the asset has disappeared then it cannot be traced. It cannot be traced into a product which has been acquired with other-source moneys. The law

H hitherto has been that you cannot trace into an improvement or into an asset already acquired. Tracing is forward-looking and is all about identifying proprietary rights, not about identifying value in the asset claimed. [Reference was made to *In re Diplock; Diplock v Wintle* [1948] Ch 465; *In re Leslie; Leslie v French* (1883) 23 Ch D 552; *D'Avigdor-Goldsmid v*

Foskett v McKeown (HL(E))                                          [2001] 1 AC
Lord Browne-Wilkinson

*Inland Revenue Comrs* [1953] AC 347 and *Halifax Building Society v*   A
*Thomas* [1996] Ch 217.]

   If the purchasers cannot trace into the policy or policy moneys, they are
not entitled to the policy moneys on the basis of a resulting or constructive
trust. If it is accepted that the 1989 and 1990 premiums did not contribute to
the acquisition of the policy or policy moneys, then no resulting trust can
have arisen. In any event, the policy had already been settled on the children
by that time. A resulting trust cannot vary vested interests. Neither is this a   B
case where the institutional constructive trust can arise: the children owed
no fiduciary duties and have not acted unconscionably.

   If the 1989 and 1990 premiums can be traced, the remedy is a lien for the
amount of the premiums, not a hitherto unknown type of constructive trust.

   It is neither against conscience nor inequitable that the children should
keep the money since they are innocent of any wrongdoing. They acquired   C
their property interest before the fraud commenced and prior to the time the
money was subtracted from the purchasers. The first premiums were paid
before the fraud commenced. Justice is well served by restoring to the
purchasers their premiums.

   *Mawrey* QC replied.

                                                                      D
   Their Lordships took time for consideration.

   18 May 2000.  **LORD BROWNE-WILKINSON**   My Lords, there are
many cases in which the court has to decide which of two innocent parties is
to suffer from the activities of a fraudster. This case, unusually, raises the
converse question: which of two innocent parties is to benefit from the
activities of the fraudster. In my judgment, in the context of this case the two   E
types of case fall to be decided on exactly the same principles, viz, by
determining who enjoys the ownership of the property in which the loss or
the unexpected benefit is reflected.

   On 6 November 1986, Mr Murphy effected a whole-life policy ("the
policy") with Barclays Life Assurance Co Ltd ("the insurers") in the sum of
£1m at an annual premium of £10,220. The policy (which was issued on   F
27 January 1987) provided that on the death of Mr Murphy a specified
death benefit became payable, such benefit being the greater of (1) the sum
assured (£1m) and (2) the aggregate value of units notionally allocated under
the terms of the policy to the policy at their bid price on the day of the receipt
by the insurers of a written notice of death. The policy stated that "in
consideration of the first premium already paid and of the further premiums
payable and subject to the conditions of this policy the company will on the   G
death of the life assured pay to the policy holder or his successors in title ('the
policy holder') the benefits specified".

   Although primarily a whole-life policy assuring the sum assured of £1m,
the policy had an additional feature, viz, a notional investment content
which served three purposes. First, it determined the surrender value of the
policy. Second, it determined the alternative calculation of the death benefit
if the value of the notionally allocated units exceeded the sum assured of   H
£1m. Third, the investment element was used to pay for the cost of life cover
after the payment of the second premium in November 1987. By condition
4 of the policy, units were notionally allocated to the policy upon receipt of
the second and all subsequent premiums. By condition 6 of the policy, upon

[2001] 1 AC                                           Foskett v McKeown (HL(E))
                                                      Lord Browne-Wilkinson

A     receipt of each premium resulting in the notional allocation of units under condition 4, the insurers cancelled sufficient units to meet the cost of life cover for the next year. Condition 10 provided for conversion of the policy into a paid-up policy: units would thereafter continue to be cancelled under condition 6 so long as there were units available for that purpose. As soon as there were no units available, no death benefit or surrender value was to be available under the policy. Sir Richard Scott V-C [1998] Ch 265, 275,

B     summarised the position as follows:

> "if a premium is not paid, then ( provided at least two years' premiums have been paid) the policy is converted into a paid-up policy and units that have been allocated to the policy are applied annually in meeting the cost of life insurance until all the allocated units have been used up. Only at that point will the policy lapse."

C     Five premiums were paid, in November 1986, 1987, 1988, 1989 and 1990. The 1986 and 1987 premiums were paid by Mr Murphy out of his own resources. The 1989 and 1990 premiums were paid out of moneys misappropriated by Mr Murphy from the plaintiffs. The source of the 1988 premium is disputed: unconditional leave to defend on issues relating to this premium has been granted.

D     The policy was directed to be held on trusts. On 15 March 1989 the policy was irrevocably appointed to be held in trust for Mr Murphy absolutely. On 16 March 1989 he settled the policy on trust for his wife and his mother but subject to a power for him to appoint to members of a class which included his wife, his mother and his children but which excluded Mr Murphy himself. By a deed of appointment dated 1 December 1989

E     Mr Murphy appointed the policy and all moneys payable thereunder upon trust (in the events which happened) as to one-tenth for Mrs Bridget Murphy and as to nine-tenths for his three children equally.

     I turn then to consider the source of the moneys which constituted the fourth and fifth premiums. In 1988 Mr Murphy, together with an associate of his, Mr Deasy, acquired control of an English company which itself owned and controlled a Portuguese company. Those two companies

F     between them marketed plots of land forming part of a site in the Algarve in Portugal to be developed and sold by them to purchasers. Each prospective purchaser entered into a contract with one of the companies for the purchase of his plot. The contract required each purchaser to pay the purchase price to Mr Deasy, to be held by him upon the trusts of a trust deed ("the purchasers trust deed") under which the purchasers' money was to be held in

G     a separate bank account until either the plot of land was transferred to him or a period of two years had expired, whichever first happened. If after two years the plot had not been transferred to the purchaser the money was to be repaid with interest. Some 220 prospective purchasers entered into transactions to acquire plots on the building estate and paid some £2,645,000 to Mr Deasy to be held by him on the terms of the purchasers trust deed. However, the land in Portugal was never developed. When the

H     time came for the money to be refunded to the purchasers it was found that it had been dissipated and that £20,440 of those funds had been used to pay the fourth and fifth premiums due under the policy.

     Mr Murphy committed suicide on 9 March 1991. On 6 June 1991 the insurers paid £1,000,580·04 to the two surviving trustees of the policy.

Foskett v McKeown (HL(E))                                    [2001] 1 AC
Lord Browne-Wilkinson

Mrs Murphy has been paid her one-tenth share. The dispute, for the rest,   A
lies between Mr Murphy's three children (as beneficiaries under the policy
trust) and the purchasers of the plots in Portugal, from whose money
£20,440 has been applied in breach of the trusts of the purchasers trust deed
in paying the fourth and fifth premiums. The purchasers allege that, at a
minimum, 40% of the premiums on the policy have been paid out of their
moneys and that having traced their moneys through the policy into the
policy moneys, they are entitled to 40% of the policy moneys. On the other   B
side, the children contend that the purchasers are not entitled to any interest
at all or at most only to the return of the sum misappropriated to pay the
premiums, viz, £20,440 plus interest. The Court of Appeal [1998] Ch 265
by a majority (Sir Richard Scott V-C and Hobhouse LJ; Morritt LJ dissenting)
held that the purchasers were entitled to be repaid the amount of the fourth
and fifth premiums together with interest but were not entitled to a pro rata   C
share of the policy proceeds.

The purchasers appeal to your Lordships claiming that the policy moneys
are held in trust for the children and themselves pro rata according to their
respective contributions to the premiums paid out of the purchasers' moneys
on the one hand and Mr Murphy personally on the other, i e, they claim that
a minimum of 40% (being two out of the five premiums) is held in trust for
the purchasers. The children, on the other hand, seek to uphold the decision   D
of the majority of the Court of Appeal and, by cross-appeal, go further so as
to claim that the purchasers are entitled to no rights in the policy moneys.

As to the cross-appeal, I have read in draft the speech of my noble and
learned friend, Lord Hope of Craighead. For the reasons which he gives
I would dismiss the cross-appeal.

As to the appeal, at the conclusion of the hearing I considered that the   E
majority of the Court of Appeal were correct and would have dismissed the
appeal. However, having read the draft speech of Lord Millett I have changed
my mind and for the reasons which he gives I would allow the appeal. But, as
we are differing from the majority of the Court of Appeal I will say a word or
two about the substance of the case and then deal with one minor matter on
which I do not agree with my noble and learned friend, Lord Millett.

The crucial factor in this case is to appreciate that the purchasers are   F
claiming a proprietary interest in the policy moneys and that such
proprietary interest is not dependent on any discretion vested in the court.
Nor is the purchasers' claim based on unjust enrichment. It is based on the
assertion by the purchasers of their equitable proprietary interest in
identified property.

The first step is to identify the interest of the purchasers: it is their absolute   G
equitable interest in the moneys originally held by Mr Deasy on the express
trusts of the purchasers trust deed. This case does not involve any question of
resulting or constructive trusts. The only trusts at issue are the express trusts
of the purchasers trust deed. Under those express trusts the purchasers were
entitled to equitable interests in the original moneys paid to Mr Deasy by the
purchasers. Like any other equitable proprietary interest, those equitable
proprietary interests under the purchasers trust deed which originally existed   H
in the moneys paid to Mr Deasy now exist in any other property which, in
law, now represents the original trust assets. Those equitable interests under
the purchasers trust deed are also enforceable against whoever for the time
being holds those assets other than someone who is a bona fide purchaser for

[2001] I AC                                          Foskett v McKeown (HL(E))
                                                     Lord Browne-Wilkinson

A   value of the legal interest without notice or a person who claims through such a purchaser. No question of a bona fide purchaser arises in the present case: the children are mere volunteers under the policy trust. Therefore the critical question is whether the assets now subject to the express trusts of the purchasers trust deed comprise any part of the policy moneys, a question which depends on the rules of tracing. If, as a result of tracing, it can be said that certain of the policy moneys are what now represent part of the assets

B   subject to the trusts of the purchasers trust deed, then as a matter of English property law the purchasers have an absolute interest in such moneys. There is no discretion vested in the court. There is no room for any consideration whether, in the circumstances of this particular case, it is in a moral sense "equitable" for the purchasers to be so entitled. The rules establishing equitable proprietary interests and their enforceability against certain parties

C   have been developed over the centuries and are an integral part of the property law of England. It is a fundamental error to think that, because certain property rights are equitable rather than legal, such rights are in some way discretionary. This case does not depend on whether it is fair, just and reasonable to give the purchasers an interest as a result of which the court in its discretion provides a remedy. It is a case of hard-nosed property rights.

D      Can then the sums improperly used from the purchaser's moneys be traced into the policy moneys? Tracing is a process whereby assets are identified. I do not now want to enter into the dispute whether the legal and equitable rules of tracing are the same or differ. The question does not arise in this case. The question of tracing which does arise is whether the rules of tracing are those regulating tracing through a mixed fund or those regulating the position when moneys of one person have been innocently expended on

E   the property of another. In the former case (mixing of funds) it is established law that the mixed fund belongs proportionately to those whose moneys were mixed. In the latter case it is equally clear that money expended on maintaining or improving the property of another normally gives rise, at the most, to a proprietary lien to recover the moneys so expended. In certain cases the rules of tracing in such a case may give rise to no proprietary interest at all if to give such interest would be unfair: see *In re Diplock;*

F   *Diplock v Wintle* [1948] Ch 465, 548.
      Both Sir Richard Scott V-C and Hobhouse LJ considered that the payment of a premium on someone else's policy was more akin to an improvement to land than to the mixing of separate trust moneys in one account. Hobhouse LJ was additionally influenced by the fact that the payment of the fourth and fifth premiums out of the purchasers' moneys

G   conferred no benefit on the children: the policy was theirs and, since the first two premiums had already been paid, the policy would not have lapsed even if the fourth and fifth premiums had not been paid.
      Cases where the money of one person has been expended on improving or maintaining the physical property of another raise special problems. The property left at the end of the day is incapable of being physically divided into its separate constituent assets, i e the land and the money spent on it.

H   Nor can the rules for tracing moneys through a mixed fund apply: the essence of tracing through a mixed fund is the ability to re-divide the mixed fund into its constituent parts pro rata according to the value of the contributions made to it. The question which arises in this case is whether, for tracing purposes, the payments of the fourth and fifth premiums on a

policy which, up to that date, had been the sole property of the children for    A
tracing purposes fall to be treated as analogous to the expenditure of cash on
the physical property of another or as analogous to the mixture of moneys in
a bank account.  If the former analogy is to be preferred, the maximum
amount recoverable by the purchasers will be the amount of the fourth and
fifth premiums plus interest: if the latter analogy is preferred the children and
the other purchasers will share the policy moneys pro rata.

The speech of my noble and learned friend, Lord Millett, demonstrates    B
why the analogy with moneys mixed in an account is the correct one.  Where
a trustee in breach of trust mixes money in his own bank account with trust
moneys, the moneys in the account belong to the trustee personally and to
the beneficiaries under the trust rateably according to the amounts
respectively provided.  On a proper analysis, there are "no moneys in the
account" in the sense of physical cash.  Immediately before the improper    C
mixture, the trustee had a chose in action being his right against the bank to
demand a payment of the credit balance on his account.  Immediately after
the mixture, the trustee had the same chose in action (i e the right of action
against the bank) but its value reflected in part the amount of the
beneficiaries' moneys wrongly paid in.  There is no doubt that in such a case
of moneys mixed in a bank account the credit balance on the account
belongs to the trustee and the beneficiaries rateably according to their    D
respective contributions.

So in the present case.  Immediately before the payment of the fourth
premium, the trust property held in trust for the children was a chose in
action, i e the bundle of rights enforceable under the policy against the
insurers.  The trustee, by paying the fourth premium out of the moneys
subject to the purchasers trust deed, wrongly mixed the value of the    E
premium with the value of the policy.  Thereafter, the trustee for the children
held the same chose in action (i e the policy) but it reflected the value of both
contributions.  The case, therefore, is wholly analogous to that where
moneys are mixed in a bank account.  It follows that, in my judgment, both
the policy and the policy moneys belong to the children and the trust fund
subject to the purchasers trust deed rateably according to their respective
contributions to the premiums paid.    F

The contrary view appears to be based primarily on the ground that to
give the purchasers a rateable share of the policy moneys is not to reverse an
unjust enrichment but to give the purchasers a wholly unwarranted windfall.
I do not myself quibble at the description of it being "a windfall" on the facts
of this case.  But this windfall is enjoyed because of the rights which the
purchasers enjoy under the law of property.  A man under whose land oil is    G
discovered enjoys a very valuable windfall but no one suggests that he, as
owner of the property, is not entitled to the windfall which goes with his
property right.  We are not dealing with a claim in unjust enrichment.

Moreover the argument based on windfall can be, and is, much over-
stated.  It is said that the fourth and fifth premiums paid out of the
purchasers' moneys did not increase the value of the policy in any way: the
first and second premiums were, by themselves, sufficient under the unusual    H
terms of the policy to pay all the premiums falling due without any
assistance from the fourth and fifth premiums: even if the fourth and fifth
premiums had not been paid the policy would have been in force at the time
of Mr Murphy's death.  Therefore, it is asked, what value has been derived

111

A    from the fourth and fifth premiums which can justify giving the purchasers a pro rata share. In my judgment this argument does not reflect the true position. It is true that, *in the events which have happened*, the fourth and fifth premiums were not required to keep the policy on foot until the death of Mr Murphy. But at the times the fourth and fifth premiums were paid (which must be the dates at which the beneficial interests in the policy were established) it was wholly uncertain what the future would bring. What if

B    Mr Murphy had not died when he did? Say he had survived for another five years? The premiums paid in the fourth and fifth years would in those events have been directly responsible for keeping the policy in force until his death since the first and second premiums would long since have been exhausted in keeping the policy on foot. In those circumstances, would it be said that the purchasers were entitled to 100% of the policy moneys? In my judgment, the

C    beneficial ownership of the policy, and therefore the policy moneys, cannot depend upon how events turn out. The rights of the parties in the policy, one way or another, were fixed when the relevant premiums were paid when the future was unknown.

    For these reasons and the much fuller reasons given by Lord Millett, I would allow the appeal and declare that the policy moneys were held in trust for the children and the purchasers in proportion to the contributions

D    which they respectively made to the five premiums paid.

    There is one small point on which my noble and learned friends, Lord Millett and Lord Hoffmann, disagree, namely, whether the pro rata division should take account of the notional allocation of units to the policy and of the fact that contributions were made at different times, i e when the various premiums were paid. I agree that, for the reasons given by Lord Hoffmann, it

E    is not necessary to complicate the calculation of the pro rata shares by taking account of these factors and would therefore simply divide the policy moneys pro rata according to the contributions made to the payment of the premiums.

**LORD STEYN**   My Lords, this is a dispute between two groups of innocent parties about the rights to a death benefit of about £1m paid by insurers pursuant to a whole life policy. The first group are individuals who

F    contracted between June 1989 and January 1991 to purchase plots of land in Portugal which were intended to be developed as an estate with villas and a golf and country club. Mr Timothy Murphy was the dominant figure behind the development project. He obtained over £2·6m from the purchasers. With effect from November 1987 he took out a whole life policy at an annual premium of £10,200. The policy had an investment content, which served various purposes. It determined the surrender value of the policy. It

G    determined the alternative calculation of the death benefit if the value of notionally allocated units exceeded the sum assured (i e £1m). The investment element was to be used to pay for the cost of life cover after the payment of the second premium. Mr Murphy used his own money to pay the premiums for 1986 and 1987. The value of the units allocated to the policy after the payment of the 1987 premium was more than enough to pay for the life element in the next three years. Mr Murphy in fact paid the

H    premium for 1988. It is still unclear where he got the money from. But he undoubtedly paid the premiums for 1989 and 1990 with money stolen from the purchasers. On 9 March 1991 Mr Murphy committed suicide. On 6 June 1991 the insurers paid a sum of about £1m as a death benefit under the policy. The children are express beneficiaries of the trusts of the policy.

Foskett v McKeown (HL(E))                                    [2001] 1 AC
Lord Steyn

The purchasers claimed a proportionate part of the policy moneys. The         A
issue concerns the respective rights of the purchasers and the children to the
policy moneys. By a majority the Court of Appeal [1998] Ch 265 reversed
the trial judge's decision in favour of the purchasers and decided that the
purchasers are only entitled to recover the money stolen from them and used
to pay the 1989 and 1990 premiums together with interest. On appeal to the
House of Lords the primary case of the purchasers was that they are entitled
to share in the policy moneys in the same proportion as the amount of the         B
premiums paid out of the purchasers' moneys bear to the total amount of
the premiums paid i e a two-fifths share. I will explain my reasons for
concluding that the purchasers have no rights to the policy moneys. There is,
however, an anterior point. On the appeal to the House of Lords counsel for
the children argued that by resorting to other remedies the purchasers made
a binding election which preclude them from advancing their present claim.         C
In my view there was in truth no inconsistency between the remedies to
which the purchasers resorted.
     The purchasers put forward a proprietary claim. They allege that they are
equitable co-owners in the policy moneys: specifically their claim is that they
are entitled to 40% and the children to 60% of the policy moneys. The
purchasers point out that they can trace the stolen money (£20,440) through         D
various bank accounts into payments in respect of the 1989 and 1990
premiums. Given that a total of five premiums were paid the purchasers
assert that they are entitled to equitable proprietary rights to 40% of the sum
assured. The purchasers argued that the proceeds of the policy were
purchased out of a common fund to which the purchasers and the children
contributed and that on equitable principles the purchasers are entitled to a
proportionate part of the proceeds. Counsel for the purchasers observed in         E
his printed case that it is not an area of the law where the House is
constrained by previous authority. Accordingly, he argued, wider
considerations of policy must be taken into account.
     There are four considerations which materially affect my approach to the
claim of the purchasers. First the relative moral claims of the purchasers and
the children must be considered. The purchasers emphasise that their claim
is the result of the deliberate wrongdoing of Mr Murphy. This is a point in         F
favour of the purchasers. Moreover the case for the children is not assisted
by the fact that Mr Murphy sought to make provision for his family. The
legal question would be the same if the beneficiary under the express trust
was a business associate of Mr Murphy. On the other hand, it is an
important fact that the children were wholly unaware of any wrongdoing by
their father. Secondly, it is clear that in the event the premiums paid in 1989         G
and 1990 added nothing of value to the policy. The policy was established
and the children acquired vested interests (subject to defeasance) before
Mr Murphy pursuant to the rights acquired by the children before 1989.
The entitlement of the children was not in any way improved by payment of
the 1989 and 1990 premiums. Thirdly, the purchasers have no claim in
unjust enrichment in a substantive sense against the children because the
payment of the 1989 and 1990 premiums conferred no additional benefit on         H
the children. They were not enriched by the payment of those premiums:
they merely received their shares of the sum assured in accordance with their
pre-existing entitlement. The fourth point is that the children, as wholly
innocent parties, can cogently say that, if they had become aware that

A  Mr Murphy planned to use trust money to pay the fourth and fifth premiums, they would have insisted that he did not so pay those premiums, with the result that they would have still received the same death benefit. (The relevance of such a factor is helpfully explained by Professor Hayton, "Equity's Identification Rules", Chapter 1 in *Birks, Laundering and Tracing* (1995), pp 11–12 and Charles Mitchell, "Tracing Trust Funds Into Insurance Proceeds" [1997] LMCLQ 465, 472.)

B  In arguing the merits of the proprietary claim counsel for the purchasers from time to time invoked "the rules of tracing". By that expression he was placing reliance on a corpus of supposed rules of law, divided into common law and equitable rules. In truth tracing is a process of identifying assets: it belongs to the realm of evidence. It tells us nothing about legal or equitable rights to the assets traced. In a crystalline analysis Professor Birks ("The

C  Necessity of a Unitary Law of Tracing", essay in *Making Commercial Law, Essays in Honour of Roy Goode* (1997), pp 239–258) explained, at p 257, that there is a unified regime for tracing and that "it allows tracing to be cleanly separated from the business of asserting rights in or in relation to assets successfully traced". Applying this reasoning Professor Birks concludes, at p 258:

D      "that the modern law is equipped with various means of coping with the evidential difficulties which a tracing exercise is bound to encounter. The process of identification thus ceases to be either legal or equitable and becomes, as is fitting, genuinely neutral as to the rights exigible in respect of the assets into which the value in question is traced. The tracing exercise once successfully completed, it can then be asked what rights, if any, the plaintiff can, on his particular facts, assert. It is at that point that

E      it become relevant to recall that on some facts those rights will be personal, on others proprietary, on some legal, and on others equitable."

I regard this explanation as correct. It is consistent with orthodox principle. It clarifies the correct approach to so-called tracing claims. It explains what tracing is about without providing answers to controversies about legal or equitable rights to assets so traced.

F  There is no difficulty in tracing the stolen moneys. Moreover, it is self-evident that there must be a right to recover the moneys stolen and used for the payment of the 1989 and 1990 premiums. Equity's method of achieving the necessary result is to impose a lien or charge over the stolen money. The formal assertion to the contrary on behalf of the children, which is the subject of a cross-appeal, is without substance. The question is whether the purchasers have equitable proprietary rights to the sum assured which

G  was paid in terms of the policy. This brings me back to the distinctive feature of the case, namely that the fourth and fifth premiums did not contribute or add to the sum received by the children. Sir Richard Scott V-C observed [1998] Ch 265, 282:

       "If a trustee used trust money to improve or maintain his house, the

H      beneficiaries would, in my view, be entitled to a charge on the house to recover their money. But unless it appeared that the improvements had increased the value of the house there would be no basis for a claim to a pro rata share in the house and no reason for the imposition of a constructive trust. There would, in such a case, be no benefit acquired by the use of the trust money for which the trustee would be accountable.

114

Foskett v McKeown (HL(E))                                    [2001] 1 AC
Lord Steyn

> Similar reasoning applies, in my opinion, in the present case . . . They did        A
> not, in my opinion, become entitled to a pro rata share in the policy either
> via a constructive trust route or via a resulting trust route."

On this point Hobhouse LJ, at p 291E–F, apparently took a similar view.
I am in respectful agreement with this reasoning of the majority on this
aspect. Sir Richard Scott V-C and Hobhouse LJ further concluded that the
misapplied trust funds were not used to acquire the policy, or the death       B
benefit of £1m nor any share in either. On appeal to the House counsel for
the purchasers while not formally conceding anything observed that the
improvement argument is "a wholly unrealistic argument". He argued that
the proceeds of the policy were purchased out of a common fund to which
both the purchasers and the children had contributed. This was the primary
issue on the appeal to the House.

   The argument of the purchasers is supported by the carefully reasoned       C
dissenting judgment of Morritt LJ He relied on the analogies of the cases
where (1) an asset is bought with a mixed fund composed of trust money and
the trustees own money, and is then passed to an innocent volunteer, and
(2) a trustee mixes money from one trust with that of another, and uses the
mixed fund to purchase an asset. Morritt LJ, at pp 302–304, pointed to
longstanding authorities to the effect that in such situations beneficiaries    D
may be entitled to a pro rata share of the purchased asset. But it is clear that
this reasoning of Morritt LJ is critically dependent on the relative closeness
of the two analogies. On balance I have been persuaded that the analogies
cited by Morritt LJ, and strongly relied on by counsel for the purchasers, are
not helpful in the circumstances of the present case.

   There is in principle no difficulty about allowing a proprietary claim in
respect of the proceeds of an insurance policy. If in the circumstances of the   E
present case the stolen moneys had been wholly or partly causative of the
production of the death benefit received by the children there would have
been no obstacle to admitting such a proprietary claim. But those are not the
material facts of the case. I am not influenced by hindsight. The fact is
that the rights of the children had crystallised by 1989 before any money
was stolen and used to pay the 1989 and 1990 premiums. Indeed            F
Morritt LJ expressly accepts, at p 302F, that "in the event, the policy moneys
would have been the same if the later premiums had not been paid". Counsel
for the purchasers accepted that as a matter of primary fact this was a correct
statement. But he argued that there was nevertheless a causal link between
the premiums paid with stolen moneys and the death benefit. I cannot
accept this argument. It would be artificial to say that all five premiums
produced the policy moneys. The purchasers' money did not "buy" any part   G
of the death benefit. On the contrary, the stolen moneys were not causally
relevant to any benefit received by the children. The 1989 and 1990
premiums did not contribute to a mixed fund in which the purchasers have
an equitable interest entitling them to a rateable division. It would be an
innovation to create a proprietary remedy in respect of an asset (the death
benefit) which had already been acquired at the date of the use of the stolen
moneys. Far from assisting the case of the purchasers the impact of wider    H
considerations of policy in truth tend to undermine the case of the
purchasers. One needs to consider the implication of a holding in favour of
the purchasers in other cases. Suppose Mr Murphy had surrendered the
policy before going bankrupt. Assume Mr Murphy had partly used his own

115

A  money and partly used money stolen from the purchasers to pay premiums.
The hypothesis is that the stolen money did not in any way increase the
surrender value of the policy. Justice does not support the creation to the
prejudice of trade creditors of a new proprietary right in the surrender value
of the policy: compare Roy Goode, "Proprietary Restitutionary Claims",
essay in *Restitution: Past, Present and Future* (ed Cornish), pp 63 et seq.
For these reasons I differ from the analysis of Morritt LJ and reject the
B  argument of the purchasers.

There is one final matter of significance. In a critical final passage in his
judgment Morritt LJ observed, at p 303:

> "In my view . . . common justice requires that the purchasers should
> have the right to participate in that which has followed from the use of
> their money together with the other moneys, taking their share out of that
C  > joint and common stock."

The purchasers do not assert that they suffered any loss. They cannot assert
that the children would be unjustly enriched if the purchasers' claim fails.
In these circumstances my perception of the justice of the case is different
from that of Morritt LJ If justice demanded the recognition of such a
proprietary right to the policy moneys, I would have been prepared to
D  embark on such a development. Given that the moneys stolen from the
purchasers did not contribute or add to what the children received, in
accordance with their rights established before the theft by Mr Murphy, the
proprietary claim of the purchasers is not in my view underpinned by any
considerations of fairness or justice. And, if this view is correct, there is no
justification for creating by analogy with cases on equitable interests in
mixed funds a new proprietary right to the policy moneys in the special
E  circumstances of the present case.

My Lords, for these reasons, as well as the reasons given by Lord Hope of
Craighead, I would dismiss both the appeal by the purchasers (the
appellants) and the cross-appeal by the children (the cross-appellants).

**LORD HOFFMANN**   My Lords, I have had the advantage of reading in
F  draft the speech of my noble and learned friend, Lord Millett. I agree with
him that this is a straightforward case of mixed substitution (what the
Roman lawyers, if they had had an economy which required tracing through
bank accounts, would have called confusio). I agree with his conclusion that
Mr Murphy's children, claiming through him, and the trust beneficiaries
whose money he used, are entitled to share in the proceeds of the insurance
policy in proportion to the value which they respectively contributed to the
G  policy. This is not based upon unjust enrichment except in the most trivial
sense of that expression. It is, as my noble and learned friend says, a
vindication of proprietary right.

The only point on which I differ from my noble and learned friend is the
calculation of the proportions. The policy was a complicated chose in action
which contained formulae for the calculation of different amounts which
would become payable on different contingencies.  One such formula
H  (which, in the event, was irrelevant to the calculation of the amount payable)
was by reference to notional units in a notional fund of notional
investments. My noble and learned friend considers that these units should
be treated as if they were real and that they formed separate property which
some part of each premium had been used to buy. In my opinion, that

116

Foskett v McKeown (HL(E))                                    [2001] 1 AC
Lord Hoffmann

overcomplicates the matter. The units were merely part of the formula for    A
calculating what would be payable. They cannot be regarded as separate
property or even some kind of internal currency. It would not in my view
have mattered whether the formula for calculating the amount payable had
been by reference to the movements of the heavenly bodies. The policy was
a single chose in action under which some amount would fall due for
payment in consideration of the premiums which had been paid.
Immediately before Mr Murphy's suicide, it was owned by the children and    B
the beneficiaries in proportion to the value of their contributions to that
consideration. The fact that the contingency which made the money payable
was the death of Mr Murphy cannot affect the proprietary interests in the
chose in action and therefore in its proceeds: see *D'Avigdor-Goldsmid v
Inland Revenue Comrs* [1953] AC 347.
   In the case of contributions which are made at different times to the    C
consideration for a single item of property such as the chose in action in this
case, I can see an argument for saying that the value of earlier payments is
greater than that of later payments. A pound today is worth more than the
promise of a pound in a year's time. So there may be a case for applying
some discount according to the date of payment. But no such argument was
advanced in this case and I do not think that your Lordships should impose it
upon the parties. I therefore agree with Morritt LJ that the fund should be    D
held simply in proportion to the contributions which the parties made to the
five premiums.

**LORD HOPE OF CRAIGHEAD**   My Lords, this is a competition between
two groups of persons who claim to be entitled to participate in the same
fund. The fund consists of the death benefit paid by the insurers under a
policy of life assurance to the trustees of the policy following the death of the    E
life assured, Timothy Murphy, by suicide. The amount of the death benefit
was £1m, to which a small sum was added as interest from the date of the
death until payment. At the date of death the policy was held in trust for the
children of the life assured and for his mother, who is also now deceased.
The mother's share of the sum paid under the policy was distributed to her
before her death. The trustees have made certain payments from the balance    F
of that sum for the maintenance of the children. The remainder has been
retained and invested by them, and it is that sum which forms the amount
now in dispute. The third, fourth and fifth respondents, who are the children
of the life assured, claim to be entitled to payment of the whole of that
amount as the remaining beneficiaries under the trusts of the policy.
   There would have been no answer to the claim by the children had it not    G
been for the fact that the last two of five annual premiums (and possibly a
portion of the previous year's premium—the facts have yet to be established
by evidence) were paid by the life assured out of money which, dishonestly
and in breach of trust, he had misappropriated. The facts have been set out
fully by my noble and learned friend, Lord Browne-Wilkinson, and I do not
need to repeat them here. It is sufficient to say that it is not disputed that
these premiums were paid from money which had been deposited with the    H
life assured and his business associate Mr Deasy by the purchasers of plots of
land in Portugal. This money was to be held in trust on their behalf upon the
trusts of a trust deed pending the carrying out by a company controlled by
the life assured of a scheme for the development of the land. In the event the
company did not carry out the development and the purchasers' money was

A   misappropriated from the bank accounts into which it had been deposited. The purchasers' claim is to a share of the proceeds of the life insurance policy, on the ground that the rights under the policy had been paid for in part with money which was taken from them without their agreement and in breach of trust to pay the premiums.

    In the Court of Appeal [1998] Ch 265 it was held by a majority (Sir
B   Richard Scott V-C and Hobhouse LJ; Morritt LJ dissenting) that the purchasers were not entitled to participate in the proceeds of the policy except to the extent of such of their money, with interest thereon, as could be traced into the premiums. Morritt LJ would have granted a declaration to the effect that the proceeds were to be shared between the children and the purchasers. He held that they should be distributed between them in the same proportions as the life assured's own money and that which he took
C   from the purchasers bore to the total amount paid to the insurers by way of premium during the lifetime of the policy. The purchasers have appealed against that judgment on the broad ground that common justice requires that the children should share the proceeds with them commensurately with the premiums which were paid by the life assured from his own money and the purchasers' money respectively. The children have cross-appealed on two grounds. The first is that the purchasers, having elected to take the
D   benefit of other remedies, are precluded from pursuing any claim against the proceeds of the policy. The second is that the purchasers cannot trace their money into any part of the proceeds, because the right to payment of the sum of £1m paid by the insurers as death benefit had already been acquired before the purchasers' money was used to pay the premiums.

    I shall deal first with the children's cross-appeal. Mr Kaye for the children
E   based his argument on election upon the purchasers' receipt of compensation for the breach of trust in other proceedings brought on their behalf. The appellant obtained a declaration in 1994 that the shares in the company and the land in Portugal which was to be developed by it were held in trust for the purchasers. He also obtained for them £600,000 under a compromise in 1997 with Lloyds Bank, with whom the purchasers' money had been deposited and from whose bank accounts it had been
F   misappropriated to pay the 1990 premium. Mr Kaye submitted that, as the purchasers had elected to recover their plots of land in specie and had received monetary compensation in satisfaction of their claims for the misappropriation of the deposit moneys, they were barred by that election from pursuing any claim against the proceeds of the policy. He maintained that the purchasers, by pursuing these remedies, had obtained all that they
G   had bargained for when they paid their money to the developers. They no longer had any proprietary base from which they could trace, and they had already been fully compensated as they were now in a position to complete the development. As the entire original purpose of the deposits had been fulfilled, they had lost nothing. They were in no need of any further relief by way of any proprietary or equitable remedy.

    In my opinion the claims which were made against the developers and the
H   bank and the claim now made against the proceeds of the policy are two wholly unrelated remedies. The purchasers were not put to any election when they were seeking to recover from the developers and the bank what they lost when, in breach of trust, their money was misappropriated. Had the claim which they are now making been one by way of damages, the relief

Foskett v McKeown (HL(E))                                    [2001] 1 AC
Lord Hope of Craighead

which they have already obtained in the other proceedings would have been     *A*
taken into account in this action in the assessment of their loss. That would
not have been because they were to be held to any election, but by applying
the rule that a party who is entitled to damages cannot recover twice over for
the same loss. But in this action they are claiming a share of the proceeds
of the policy on the ground that the money which was taken from them can
be traced into the proceeds. The amount, if any, to which they are entitled as
a result of the tracing exercise does not require any adjustment on account of     *B*
the compensation obtained by pursuing other remedies. This is because the
remedy which they are now seeking to pursue is a proprietary one, not an
award of damages. The purpose of the remedy is to enable them to vindicate
their claim to their own money. The compensation which they have
obtained from elsewhere may have a bearing on their claim to a
proportionate share of the proceeds. But it cannot deprive them of their     *C*
proprietary interest in their own money. For these reasons I would reject this
argument.

Mr Kaye then said in support of the cross-appeal that, if his argument on
election were to be rejected, the purchasers were nevertheless unable to trace
into any part of the policy moneys. He submitted that the majority of the
Court of Appeal were wrong to hold that the purchasers were entitled to     *D*
repayment of such amounts of their money as could be shown to have been
expended by the life assured on the payment of the premiums. This was
because the purchasers could not show that there was any proprietary or
causal link between their money and the asset which they claimed, which
was the death benefit paid under the policy. A contingent right to the
payment of that sum was acquired at the outset when the first premium was
paid by the life assured out of his own money. The purchasers' money did     *E*
not add anything of value to what had already been acquired on payment of
that premium. The sum payable on the death remained the same, and the
rights under the policy were not made more valuable in any other respect by
the payment of the additional premiums.

I do not think that there is any substance in this argument. One possible
answer to it is that given by Sir Richard Scott V-C [1998] Ch 265, 277C–D,
who said that the statements of principle by Fry LJ in *In re Leslie; Leslie v*     *F*
*French* (1883) 23 Ch D 552, 560 supported the right of the purchasers to
trace their money into the proceeds of the policy. On his analysis the life
assured, as a trustee of the policy, was prima facie entitled to an indemnity
out of the trust property in respect of the payments made by him to keep the
policy on foot, and the purchasers can by subrogation pursue that remedy.

I am, with great respect, not wholly convinced by this line of reasoning. It     *G*
seems to me that the circumstances of this case are too far removed from
those which Fry LJ had in mind when he said a lien might be created upon
the moneys secured by a policy belonging to someone else by the payment of
the premiums. He referred, in his description of the circumstances, to the
right of trustees to an indemnity out of the trust property for money which
they had expended in its preservation, and to the subrogation to this right of
a person who at their request had advanced money for its preservation to the     *H*
trustees. In this case the life assured was a trustee of the policy, but he was
also the person who had effected the policy and had set up the trust. When
he paid the premiums, he did so not as a trustee—not because the person
who was primarily responsible for their payment had failed to pay and it was

119

[2001] 1 AC                                              Foskett v McKeown (HL(E))
                                                         Lord Hope of Craighead

A   necessary to take steps to preserve the trust—but because he was the person
    primarily responsible for their payment.  The trust was one which he himself
    had created.  He was making a further contribution towards the property
    which, according to his own declaration, was to be held in trust for the
    beneficiaries.  In that situation it is hard to see on what ground the trustees of
    the policy could be said to be under any obligation to refund to him the
    amount of his expenditure.  The general rule is that a man who makes a
B   payment to maintain or improve another person's property, intentionally
    and not in response to any request that he should do so, is not entitled to any
    lien or charge on that property for such payment: *Falcke v Scottish Imperial
    Insurance Co* (1886) 34 Ch D 234, 241, per Cotton LJ A further difficulty
    about the subrogation argument is that it cannot be said that it was at the
    purchasers' request that the life assured used their money to pay the
C   premiums.
        On the other hand I consider that there is no difficulty, on the facts of this
    case, as to the purchasers' right on other grounds to reimbursement of the
    money which was taken from them by the life assured.  Mr Kaye's argument
    was that the purchasers could not trace their money into the proceeds of the
    policy because no causative link could be established between the proceeds
    which had been paid out by way of death benefit and the relevant premiums.
D   In my opinion the answer to this point is to be found in the terms of the
    policy.  It states that "in consideration of the payment of the first premium
    already made and of the further premiums payable and subject to the
    conditions of this policy" the insurer was, on the death of the life assured, to
    pay to the policy holder the benefits specified.  The purchasers' claim that
    they have a right to a proportionate share of the proceeds raises more
E   complex issues, for the resolution of which it will be necessary to look more
    closely at the terms of the policy.  But their right to the reimbursement of
    their own money seems to me to depend simply upon it being possible to
    follow that money from the accounts where it was deposited into the policy
    when the premiums were paid, and from the policy into the hands of the
    trustees when the insurers paid to them the sum of £1m by way of death
    benefit.
F       On the agreed facts it is plain that the purchasers can trace their money
    through the premiums which were paid with it into the policy.  When the
    insurers paid out the agreed sum by way of death benefit, the sum which they
    paid to the trustees of the policy was paid in consideration of the receipt by
    them of all the premiums.  As *Smith, The Law of Tracing* (1997), p 235, has
    explained, the policy proceeds are the product of a mixed substitution where
G   the value being traced into a policy of life assurance has provided a part of
    the premiums.  In my opinion that is enough to entitle the purchasers, if they
    cannot obtain more, at least to obtain reimbursement of their own money
    with interest from the proceeds of the policy.  There can be no doubt as to
    where the equities lie on the question of their right to recover from the
    proceeds the equivalent in value of that which they lost when their money
    was misappropriated.  I would dismiss the cross-appeal.
H       There remains however the principal issue in this appeal, which is
    whether the purchasers can go further and establish that they are entitled to
    a much larger sum representing a proportionate share of the proceeds
    calculated by reference to the amount of their money which was used to pay
    the premiums.  The purchasers' argument was presented by Mr Mawrey on

Foskett v McKeown (HL(E))                                    [2001] 1 AC
Lord Hope of Craighead

two grounds.  The first was that they were entitled as a result of the tracing    *A*
exercise to a proprietary right of part ownership in the proceeds which, on
the application of common justice, enabled them to claim a share of them
proportionate to the contribution which their money had made to the total
sum paid to the insurers by way of premium.  The second, which was
developed briefly in the alternative and, I thought, very much by way of a
subsidiary argument, was that the law of unjust enrichment would provide
them with a remedy.    *B*

It seems to me that two quite separate questions arise in regard to the first
of these two arguments.  The first question is simply one of evidence.  This is
whether, if the purchasers can show that their money was used to pay any of
the premiums, they can trace their money into the proceeds obtained by the
trustees from the insurers in virtue of their rights under the policy.  The
second question is more difficult, and I think that it is the crucial question in    *C*
this case.  As I understand the question, it is whether it is equitable, in all the
circumstances, that the purchasers should recover from the trustees a share
of the proceeds calculated by reference to the contribution which their
money made to the total amount paid to the insurers by way of premium.

I believe that I have already said almost all that needs to be said on the first
question.  It is agreed that the purchasers' money was used to pay the last
two premiums.  Whether their money was also used to pay a part of the 1988    *D*
premium, and if so, how much of it was so used will require to be resolved by
evidence.  But at least to the extent of the last two premiums the purchasers
can trace their money into the policy.  The terms of the policy provide a
sufficient basis for tracing their money one step further.  They show that this
money can be followed into the proceeds received by the trustees of the
policy by way of death benefit.  It is clearly stated in the policy document    *E*
that the benefits specified are to be made in consideration of the payment to
the insurer of all the premiums.  This is enough to show that the tracing
exercise does not end with the receipt of the premiums by the insurers.  They
can say that they gave value for the premiums when they paid over to the
trustees the sum to which they were entitled by way of death benefit.
Nothing is left with the insurers, because they have given value for all that    *F*
they received.  That value now resides in the proceeds received by the
trustees.

But the result of the tracing exercise cannot solve the remaining question,
which relates to the extent of the purchasers' entitlement.  It is the fact that
this is a case of mixed substitution which creates the difficulty.  If the
purchasers' money had been used to pay all the premiums there would have
been no mixture of value with that contributed by others.  Their claim would    *G*
have been to the whole of the proceeds of the policy.  As it is, there are
competing claims on the same fund.  In the absence of any other basis for
division in principle or on authority—and no other basis has been
suggested—it must be divided between the competitors in such proportions
as can be shown to be equitable.  In my opinion the answer to the question as
to what is equitable does not depend solely on the terms of the policy.  The
equities affecting each party must be examined.  They must be balanced    *H*
against each other.  The conduct of the parties so far as this may be relevant,
and the consequences to them of allowing and rejecting the purchasers'
claim, must be analysed and weighed up.  It may be helpful to refer to what
would be done in other situations by way of analogy.  But it seems to me that

[2001] 1 AC                                    Foskett v McKeown (HL(E))
                                               Lord Hope of Craighead

A   in the end a judgment requires to be made as to what is fair, just and reasonable.

My noble and learned friend, Lord Hoffmann, states that this is a straightforward case of mixed substitution, which the Roman lawyers (if they had an economy which required tracing through bank accounts) would have called confusio. I confess that I have great difficulty in following this observation, as the relevant texts seem to me to indicate that they would

B   have found the case far from straightforward and that it is quite uncertain what they would have made of it.

The discussion by the Roman jurists of the problems of ownership that arise where things which originally belonged to different people have been inextricably mixed with or attached to each other took place in an entirely different context. They were concerned exclusively with the ownership of

C   corporeal property: with liquids like wine or solid things like heaps of corn, to which without any clear distinction in their use of terminology they applied what have come to be recognised as the doctrines of confusio and commixtio (*Institutes of Justinian,* II.I.27 and 28), and with the application of the principle accessorium principale sequitur to corporeal property according to the type of property involved—accession by moveables to land, by moveables to moveables, by land to land and accession by the produce of

D   land or the offspring of animals. I would have understood the application of the Roman law to our case if we had been dealing with the ownership of a collection of coins of gold or silver which had been melted down into liquids and transformed into another corporeal object such as a bracelet or a statue. That would indeed have been a problem familiar to Gaius and Justinian, which they would have recognised as being capable of being solved by the

E   application of the doctrine of confusio. But here we are dealing with a problem about the rights of ownership in incorporeal property.

The taking of possession, usually by delivery, was the means by which a person acquired ownership of corporeal property. The doctrines of commixtio and confusio were resorted to in order to resolve problems created by the mixing together, or attaching to each other, of corporeal things owned by two or more people. *Sandeman & Sons v Tyzack and*

F   *Branfoot Steamship Co Ltd* [1913] AC 680, in which Lord Moulton described the doctrines of English law which are applicable to cases where goods belonging to different owners have become mixed so as to be incapable of either being distinguished or separated, was also a case about what the Roman jurists would have classified as corporeal moveables—bales of jute in the hold of a cargo vessel which were unmarked and could not be

G   identified as belonging to any particular consignment. But incorporeal property, such as the rights acquired under an insurance policy upon payment of the premiums, is incapable either of possession or of delivery in the sense of these expressions as understood in Roman law. Problems relating to rights arising out of payments made by the insurers under the policy would have belonged in Roman law to the law of obligations, and it is likely that the remedy would have been found in the application of an

H   appropriate condictio. This is an entirely different chapter from that relating to the possession and ownership of things which are corporeal.

I think that, even if they had felt able to apply the doctrine of confusio to our case, it is far from clear that the Roman jurists would have reached a unanimous view as to the result. It is worth noting that even in the well

known case of the picture painted by Apelles on someone else's board or   A
panel differing views were expressed: see *Stair, The Institutions of the Law
of Scotland* (1693), vol 1, II.1.39. Paulus thought that the picture followed
the ownership of the board as an accessory thereto (*Digest*, 6.1.23.3), while
Caius regarded the board as accessory to the picture (*Digest*, 41.1.9.2).
Justinian's view, following Caius, was that the board was accessory to the
picture, as the picture was more precious (*Institutes of Justinian*, II.I.34).   B
Stair expresses some surprise at this conclusion, because Justinian had
previously declared that ownership of precious stones attached to cloth,
although of greater value than cloth, was carried with the cloth. These
differences of view are typical of the disputes between the Roman jurists
which are to be found in the Digest.

In these circumstances I see no escape from the approach which I propose
to follow, which is to examine the evidence about the rights which, in the   C
events which happened, were acquired under the policy.

I turn first to the terms of the policy. In return for the payment of each
premium the insured acquired a chose in action against the insurers which
comprised the bundle of rights in terms of the policy which resulted from the
payment of that premium. What those rights comprised from time to time
must depend on the facts. If the life assured had not committed suicide at the
age of 45, the policy might have remained on foot for many years. It was a   D
contract of life assurance in which the sum assured on death was £1m.
There was a unit-linked investment content in each premium. The value of
the units allocated by the insurers on receipt of each premium might in time
have exceeded that sum. That would have increased the total amount
payable on the death. But in the event the policy was not kept up for long
enough for this to occur. The unit-linked investment content did not in fact   E
make any contribution to the amount which was paid to the trustees of the
policy. The effect of the payment of the first premium was to confer a right
on the trustees of the policy as against the insurers to the payment of £1m on
the death of the life assured. The effect of the payment of the four remaining
premiums up to the date of the life assured's suicide was to reduce the
amount which the insured had to provide to meet this liability out by
reinsurance or of its own funds. But they had no effect on the right of the   F
trustees to the payment of the sum assured under the terms of the policy, as
they did not increase the amount payable on the death.

I do not think that the purchasers can demonstrate on these facts that they
have a proprietary right to a proportionate share of the proceeds. They
cannot show that their money contributed to any extent to, or increased the
value of, the amount paid to the trustees of the policy. A substantially   G
greater sum was paid out by the insurers as death benefit than the total of the
sums which they received by way of premium. A profit was made on the
investment. But the terms of the policy show that the amount which
produced this profit had been fixed from the outset when the first premium
was paid. It was attributable to the rights obtained by the life assured when
he paid the first premium from his own money. No part of that sum was
attributable to value of the money taken from the purchasers to pay the   H
additional premiums.

The next question is whether the equities affecting each party can assist
the purchasers. The dispute is between two groups of persons, both of
whom are innocent of the breach of trust which led to the purchasers' money

A being misappropriated. On the one hand there are the purchasers, who made a relatively modest but wholly involuntary contribution to the upkeep of the policy. On the other there are the children, who are the beneficiaries of the trusts of the policy but who made no contribution at all to its upkeep.

Mr Mawrey submitted that a solution to precisely the same problem had been found in *Edinburgh Corpn v Lord Advocate* (1879) 4 App Cas 823
B where competing claims to a mixed fund had been resolved by the application of equitable principles. Central to his argument was the proposition that the asset of which the purchasers had been the part-purchasers was the policy itself, not the amount of the death benefit. They were to be seen as the involuntary purchasers of a share in the entire bundle of contractual rights under the policy. The proceeds of the policy were the product of those contractual rights. The terms of the policy made it clear
C that all benefits which were payable under it were to be made in consideration of the payment to the insurers of all the premiums. It followed that, as it was the product of the premiums towards the payment of which they had contributed, the amount of the death benefit was a mixed fund in which they were entitled to participate. He relied also, by way of analogy, on the observations of Ungoed-Thomas J in *In re Tilley's Will Trusts* [1967]
D Ch 1179, 1189 as to the rights of the beneficiary to participate in any profit which resulted where a trustee mixed trust money with his own money and then used it to purchase other property: see also *Scott v Scott* (1963) 109 CLR 649.

I am unable to agree with this approach to the facts of this case. In *Edinburgh Corpn v Lord Advocate* 4 App Cas 823 the property in question was clearly a mixed fund, all the assets of which had contributed to the
E increase in the value of the funds held by the trustees. The facts of the case and the prolonged litigation which resulted from it are somewhat complicated: for a full account, see *Magistrates of Edinburgh v McLaren* (1881) 8 R 140. The essential point was that funds contributed by a benefactor of a hospital for particular trust purposes had for more than 170 years been held, administered and applied as part of the general funds of the
F hospital. The Court of Session had been directed by an earlier decision of the House of Lords in the same case to ascertain how much of the funds which had been managed in this way belonged to the hospital. In terms of its interlocutor of 20 July 1875 the Court of Session held that the benefactor's funds had been immixed with the funds of the hospital from an early period down to that date, and that they must therefore be held to have participated
G proportionately with the hospital's funds and property in the increase of value of the aggregate funds and property of the hospital during that period. Steps were then taken to ascertain and fix the amount of the whole of the aggregate funds and what the amount of the benefactor's funds was in proportion to the present value of the aggregate. When this had been done the case was appealed again to the House of Lords on the question, among others, *whether it was right to treat the two funds as having been*
H *inextricably mixed up.*

The decision of the Court of Session was upheld on this point, for reasons which I do not need to examine in detail as they have no direct bearing on the issues raised in this appeal. As Lord Blackburn put it, at p 835, the Court of Session solved the difficulty

> "in a way perfectly consistent with justice and good sense, and not      A
> inconsistent with any technical rule of law, and no other solution has been
> suggested which would be so satisfactory."

But the main relevance of the case for the purposes of the purchasers'
argument lies in the following observation, which he made at p 833:

> "No other way was suggested at the bar in which the fund, if the two      B
> were inextricably mixed up, could be apportioned except that of taking
> the proportion which the two funds bore to each other, and dividing the
> mixed fund in that proportion; and I cannot myself see any other way."

I would have had no difficulty in reaching the same conclusion had I been
persuaded that, on the facts, this was truly a case of two funds which had
been inextricably mixed up, each of which had contributed to the profit in      C
the hands of the trustees. But it seems to me that it is on this point that the
analogy with that case, and with the example of a lottery ticket purchased
with money from two different sources which was also mentioned in
argument, breaks down. It is no doubt true to say that the policy consisted
of a bundle of rights against the insurers in consideration of the payment of
all the premiums. But these rights have now been realised. We can see what
has been paid out and why it was paid. We know that we are dealing with an      D
amount paid to the trustees of the policy as death benefit in consequence of
the life assured's suicide. In terms of the policy the right to payment of that
amount of death benefit was purchased when the life assured paid the first
premium. The insurers' right to decline payment in the event of the death of
the life assured by suicide was lost after 12 months, when he kept the policy
on foot by the payment of the second premium. Nothing that happened      E
after that date affected in any way the right of the trustees of the policy to be
paid the sum of £1m when the life assured took his own life. The policy was
kept on foot by the payment of the further premiums over the next three
years. These premiums reduced the cost to the insurers of covering their
liability under the policy in the event of the insured's death. But they made
no difference to the rights which were exercisable against the insurers by the
trustees of the policy or to the rights of the children as beneficiaries against      F
the trustees.

The situation here is quite different from that where the disputed sum is
the product of an investment which was made with funds which have
already been immixed. In the case of the lottery ticket which is purchased by
A partly from his own funds and partly from funds of which B was the
involuntary contributor, the funds are mixed together at the time when the      G
ticket is purchased. It is easy to see that any prize won by that lottery ticket
must be treated as the product of that mixed fund. In the case of the funds
administered as an aggregate fund by the hospital, the funds from each of the
two sources had been mixed together from an early date before the various
transactions were entered into which increased the amount of the aggregate.
It was consistent with justice and common sense to regard the whole of the
increase as attributable in proportionate shares to the money taken from the      H
two sources. But in this case the right to obtain payment of the whole
amount of the death benefit of £1m had already been purchased from the
insurers before they received payment of the premiums which were funded
by the money misappropriated from the purchasers.

A   Of the other analogies which were suggested in the course of the argument to illustrate the extent of the equitable remedy, the closest to the circumstances of this case seemed to me to be those relating to the expenditure by a trustee of money held on trust on the improvement of his own property such as his dwelling house. This was the analogy discussed by Sir Richard Scott V-C and by Hobhouse LJ [1998] Ch 265, 282 and 289–

B   290. There is no doubt that an equitable right will be available to the beneficiaries to have back the money which was misappropriated for his own benefit by the trustee. But that right does not extend to giving them an *equitable right to a pro rata share in the value of the house. If the value of the property is increased by the improvements which were paid for in whole or in part out of the money which the trustee misappropriated, he must account to the trust for the value of the improvements.* This is by the

C   application of the principle that a trustee must not be allowed to profit from his own breach of trust. But unless it can be demonstrated that he has obtained a profit as a result of the expenditure, his liability is to pay back the money which he has misapplied.

      In the present case the purchasers are, in my opinion, unable to demonstrate that the value of the entitlement of the trustees of the policy to death benefit was increased to any extent at all as a result of the use of their

D   money to keep the policy on foot, as the entitlement had already been fixed before their money was misappropriated. In these circumstances the equities lie with the children and not with the purchasers. I do not need to attach any weight to the fact that the purchasers have already been compensated by the successful pursuit of other remedies. Even without that fact I would hold

E   that it is fair, just and reasonable that the children should be allowed to receive the whole of the sum now in the hands of the trustees after the purchasers have been reimbursed, with interest, for the amount of their money which was used to pay the premiums.

      There remains the question which Mr Mawrey raised in his alternative argument, which is whether the purchasers have a remedy in unjust enrichment. Normally, where this question is raised, there are only two

F   parties—the plaintiff *is the person at whose expense the defendant is said to have been enriched and the defendant is the person who is said to have been enriched at the expense of the plaintiff. This case is an example of third party enrichment.* The enrichment of the children is said to have resulted from a transaction with the insurers by the life assured, who enriched himself by subtracting money from the purchasers. It is clear that the life

G   assured was unjustly enriched when, in breach of trust and without their knowledge, he took the money from the purchasers. He transferred his enrichment to the insurers when he used that money to pay premiums. But the insurers can say in answer to a claim of unjust enrichment against them that they changed their position when, in ignorance of the breach of trust, they paid the sum assured to the trustees of the policy. Can the purchasers take their remedy against the children, who are entitled as beneficiaries

H   under the trust of the policy to payment of the sum now in the hands of the trustees? And, if they can, does their remedy in unjust enrichment extend to a proportionate share of the proceeds of the policy, which far exceeds the amount of their involuntary expenditure when the life assured took from them the money which he used to make payment of the premiums?

These questions were not fully explored in the course of the argument, but   *A*
I think that it is not necessary to do more than to make a few basic points in
order to show why I consider that the purchasers cannot obtain what they
want by invoking this remedy. If it could be shown that the children had
consciously participated in the life assured's wrongdoing and that, having
done so, they had profited from his subtraction from the purchasers of the
money used to pay the premiums, the answer would be that the law will not
allow them to retain that benefit. A remedy would lie against them in unjust   *B*
enrichment for the amount unjustly subtracted from the purchasers and for
any profit attributable to that amount. But in this case it is common ground
that the children are innocent of any wrongdoing. They are innocent third
parties to the unjust transactions between the life assured and the
purchasers. In my opinion the law of unjust enrichment should not make
them worse off as a result of those transactions than they would have been if   *C*
those transactions had not happened.

The aim of the law is to correct an enrichment which is unjust, but the
remedy can only be taken against a defendant who has been enriched. The
undisputed facts of this case show that the children were no better off
following payment of the premiums which were paid with the money
subtracted from the purchasers than they would have been if those
premiums had not been paid. This is because, for the reasons explained by   *D*
Hobhouse LJ [1998] Ch 265, 286D–F, the insurers would have been entitled
to have recourse to the premiums already paid to keep up the policy and
because the premiums paid from the purchasers' money did not, in the
events which happened, affect the amount of the sum payable in the event of
the insured's death. The argument for a claim against them in unjust
enrichment fails on causation. The children were not enriched by the
payment of these premiums. On the contrary, they would be worse off if   *E*
they were to be required to share the proceeds of the policy with the
purchasers. It is as well that the purchasers' remedy in respect of the
premiums and interest does not depend upon unjust enrichment, otherwise
they would have had to have been denied a remedy in respect of that part of
their claim also.

In these circumstances I cannot see any grounds for holding that the   *F*
purchasers are entitled to participate in the amount of the death benefit
except to the extent necessary for them to recover the premiums, with
interest, which were paid from their money which had been
misappropriated. So I would dismiss both the appeal and the cross-appeal.

**LORD MILLETT**   My Lords, this is a textbook example of tracing through
mixed substitutions. At the beginning of the story the plaintiffs were   *G*
beneficially entitled under an express trust to a sum standing in the name of
Mr Murphy in a bank account. From there the money moved into and out of
various bank accounts where in breach of trust it was inextricably mixed by
Mr Murphy with his own money. After each transaction was completed the
plaintiffs' money formed an indistinguishable part of the balance standing to
Mr Murphy's credit in his bank account. The amount of that balance
represented a debt due from the bank to Mr Murphy, that is to say a chose in   *H*
action. At the penultimate stage the plaintiffs' money was represented by an
indistinguishable part of a different chose in action, viz, the debt
prospectively and contingently due from an insurance company to its
policyholders, being the trustees of a settlement made by Mr Murphy for the

[2001] 1 AC

Foskett v McKeown (HL(E))

Lord Millett

A benefit of his children. At the present and final stage it forms an indistinguishable part of the balance standing to the credit of the respondent trustees in their bank account.

*Tracing and following*

B The process of ascertaining what happened to the plaintiffs' money involves both tracing and following. These are both exercises in locating assets which are or may be taken to represent an asset belonging to the plaintiffs and to which they assert ownership. The processes of following and tracing are, however, distinct. Following is the process of following the same asset as it moves from hand to hand. Tracing is the process of identifying a new asset as the substitute for the old. Where one asset is exchanged for another, a claimant can elect whether to follow the original

C asset into the hands of the new owner or to trace its value into the new asset in the hands of the same owner. In practice his choice is often dictated by the circumstances. In the present case the plaintiffs do not seek to follow the money any further once it reached the bank or insurance company, since its identity was lost in the hands of the recipient (which in any case obtained an unassailable title as a bona fide purchaser for value without notice of the plaintiffs' beneficial interest). Instead the plaintiffs have chosen at each stage

D to trace the money into its proceeds, viz, the debt presently due from the bank to the account holder or the debt prospectively and contingently due from the insurance company to the policy holders.

Having completed this exercise, the plaintiffs claim a continuing beneficial interest in the insurance money. Since this represents the product of Mr Murphy's own money as well as theirs, which Mr Murphy mingled

E indistinguishably in a single chose in action, they claim a beneficial interest in a proportionate part of the money only. The transmission of a claimant's property rights from one asset to its traceable proceeds is part of our law of property, not the law of unjust enrichment. There is no "unjust factor" to justify restitution (unless "want of title" be one, which makes the point). The claimant succeeds if at all by virtue of his own title, not to reverse unjust enrichment. Property rights are determined by fixed rules and settled

F principles. They are not discretionary. They do not depend upon ideas of what is "fair, just and reasonable". Such concepts, which in reality mask decisions of legal policy, have no place in the law of property.

A beneficiary of a trust is entitled to a continuing beneficial interest not merely in the trust property but in its traceable proceeds also, and his interest binds every one who takes the property or its traceable proceeds except a

G bona fide purchaser for value without notice. In the present case the plaintiffs' beneficial interest plainly bound Mr Murphy, a trustee who wrongfully mixed the trust money with his own and whose every dealing with the money (including the payment of the premiums) was in breach of trust. It similarly binds his successors, the trustees of the children's settlement, who claim no beneficial interest of their own, and Mr Murphy's children, who are volunteers. They gave no value for what they received and

H derive their interest from Mr Murphy by way of gift.

*Tracing*

We speak of money at the bank, and of money passing into and out of a bank account. But of course the account holder has no money at the bank.

Foskett v McKeown (HL(E))                                              [2001] 1 AC
Lord Millett

Money paid into a bank account belongs legally and beneficially to the bank       A
and not to the account holder.  The bank gives value for it, and it is
accordingly not usually possible to make the money itself the subject of an
adverse claim.  Instead a claimant normally sues the account holder rather
than the bank and lays claim to the proceeds of the money in his hands.
These consist of the debt or part of the debt due to him from the bank.  We
speak of tracing money into and out of the account, but there is no money in       B
the account.  There is merely a single debt of an amount equal to the final
balance standing to the credit of the account holder.  No money passes from
paying bank to receiving bank or through the clearing system (where the
money flows may be in the opposite direction).  There is simply a series of
debits and credits which are causally and transactionally linked.  We also
speak of tracing one asset into another, but this too is inaccurate.  The
original asset still exists in the hands of the new owner, or it may have          C
become untraceable.  The claimant claims the new asset because it was
acquired in whole or in part with the original asset.  What he traces,
therefore, is not the physical asset itself but the value inherent in it.
    Tracing is thus neither a claim nor a remedy.  It is merely the process by
which a claimant demonstrates what has happened to his property, identifies
its proceeds and the persons who have handled or received them, and
justifies his claim that the proceeds can properly be regarded as representing     D
his property.  Tracing is also distinct from claiming.  It identifies the
traceable proceeds of the claimant's property.  It enables the claimant to
substitute the traceable proceeds for the original asset as the subject matter
of his claim.  But it does not affect or establish his claim.  That will depend
on a number of factors including the nature of his interest in the original
asset.  He will normally be able to maintain the same claim to the substituted     E
asset as he could have maintained to the original asset.  If he held only a
security interest in the original asset, he cannot claim more than a security
interest in its proceeds.  But his claim may also be exposed to potential
defences as a result of intervening transactions.  Even if the plaintiffs could
demonstrate what the bank had done with their money, for example, and
could thus identify its traceable proceeds in the hands of the bank, any claim     F
by them to assert ownership of those proceeds would be defeated by the
bona fide purchaser defence.  The successful completion of a tracing exercise
may be preliminary to a personal claim (as in *El Ajou v Dollar Land
Holdings plc* [1993] 3 All ER 717) or a proprietary one, to the enforcement
of a legal right (as in *Trustees of the Property of F C Jones & Sons v Jones*
[1997] Ch 159) or an equitable one.
    Given its nature, there is nothing inherently legal or equitable about the     G
tracing exercise.  There is thus no sense in maintaining different rules for
tracing at law and in equity.  One set of tracing rules is enough.  The
existence of two has never formed part of the law in the United States: see
*Scott on Trusts*, 4th ed (1989), section 515, at pp 605–609.  There is
certainly no logical justification for allowing any distinction between them
to produce capricious results in cases of mixed substitutions by insisting on
the existence of a fiduciary relationship as a precondition for applying          H
equity's tracing rules.  The existence of such a relationship may be relevant
to the nature of the claim which the plaintiff can maintain, whether personal
or proprietary, but that is a different matter.  I agree with the passages which
my noble and learned friend, Lord Steyn, has cited from Professor Birks's

A   essay "The Necessity of a Unitary Law of Tracing", and with Dr Lionel Smith's exposition in his comprehensive monograph *The Law of Tracing* (1997): see particularly pp 120–130, 277–279 and 342–347.

   This is not, however, the occasion to explore these matters further, for the present is a straightforward case of a trustee who wrongfully misappropriated trust money, mixed it with his own, and used it to pay for an asset for the benefit of his children. Even on the traditional approach, the

B   equitable tracing rules are available to the plaintiffs. There are only two complicating factors. The first is that the wrongdoer used their money to pay premiums on an equity-linked policy of life assurance on his own life. The nature of the policy should make no difference in principle, though it may complicate the accounting. The second is that he had previously settled the policy for the benefit of his children. This should also make no

C   difference. The claimant's rights cannot depend on whether the wrongdoer gave the policy to his children during his lifetime or left the proceeds to them by his will; or if during his lifetime whether he did so before or after he had recourse to the claimant's money to pay the premiums. The order of events does not affect the fact that the children are not contributors but volunteers who have received the gift of an asset paid for in part with misappropriated trust moneys.

D

### The cause of action

   As I have already pointed out, the plaintiffs seek to vindicate their property rights, not to reverse unjust enrichment. The correct classification of the plaintiffs' cause of action may appear to be academic, but it has important consequences. The two causes of action have different

E   requirements and may attract different defences.

   A plaintiff who brings an action in unjust enrichment must show that the defendant has been enriched at the plaintiff's expense, for he cannot have been unjustly enriched if he has not been enriched at all. But the plaintiff is not concerned to show that the defendant is in receipt of property belonging beneficially to the plaintiff or its traceable proceeds. The fact that the beneficial ownership of the property has passed to the defendant provides no

F   defence; indeed, it is usually the very fact which founds the claim. Conversely, a plaintiff who brings an action like the present must show that the defendant is in receipt of property which belongs beneficially to him or its traceable proceeds, but he need not show that the defendant has been enriched by its receipt. He may, for example, have paid full value for the property, but he is still required to disgorge it if he received it with notice of

G   the plaintiff's interest.

   Furthermore, a claim in unjust enrichment is subject to a change of position defence, which usually operates by reducing or extinguishing the element of enrichment. An action like the present is subject to the bona fide purchaser for value defence, which operates to clear the defendant's title.

### The tracing rules

H   The insurance policy in the present case is a very sophisticated financial instrument. Tracing into the rights conferred by such an instrument raises a number of important issues. It is therefore desirable to set out the basic principles before turning to deal with the particular problems to which policies of life assurance give rise.

The simplest case is where a trustee wrongfully misappropriates trust *A* property and uses it exclusively to acquire other property for his own benefit. In such a case the beneficiary is entitled *at his option* either to assert his beneficial ownership of the proceeds or to bring a personal claim against the trustee for breach of trust and enforce an equitable lien or charge on the proceeds to secure restoration of the trust fund. He will normally exercise the option in the way most advantageous to himself. If the traceable *B* proceeds have increased in value and are worth more than the original asset, he will assert his beneficial ownership and obtain the profit for himself. There is nothing unfair in this. The trustee cannot be permitted to keep any profit resulting from his misappropriation for himself, and his donees cannot obtain a better title than their donor. If the traceable proceeds are worth less than the original asset, it does not usually matter how the beneficiary exercises his option. He will take the whole of the proceeds on either basis. *C* This is why it is not possible to identify the basis on which the claim succeeded in some of the cases.

Both remedies are proprietary and depend on successfully tracing the trust property into its proceeds. A beneficiary's claim against a trustee for breach of trust is a personal claim. It does not entitle him to priority over the trustee's general creditors unless he can trace the trust property into its product and establish a proprietary interest in the proceeds. If the *D* beneficiary is unable to trace the trust property into its proceeds, he still has a personal claim against the trustee, but his claim will be unsecured. The beneficiary's proprietary claims to the trust property or its traceable proceeds can be maintained against the wrongdoer and anyone who derives title from him except a bona fide purchaser for value without notice of the breach of trust. The same rules apply even where there have been numerous successive transactions, so long as the tracing exercise is successful and no *E* bona fide purchaser for value without notice has intervened.

A more complicated case is where there is a mixed substitution. This occurs where the trust money represents only part of the cost of acquiring the new asset. As James Barr Ames pointed out in "Following Misappropriated Property into its Product" (1906) 19 HarvLRev 511, consistency requires that, if a trustee buys property partly with his own *F* money and partly with trust money, the beneficiary should have the option of taking a proportionate part of the new property or a lien upon it, as may be most for his advantage. In principle it should not matter (and it has never previously been suggested that it does) whether the trustee mixes the trust money with his own and buys the new asset with the mixed fund or makes separate payments of the purchase price (whether simultaneously or *G* sequentially) out of the different funds. In every case the value formerly inherent in the trust property has become located within the value inherent in the new asset.

The rule, and its rationale, were stated by Samuel Williston in "The Right to Follow Trust Property when Confused with other Property" (1888) 2 Harv L Rev 28, 29:

> "If the trust fund is traceable as having furnished in part the money *H* with which a certain investment was made, and the proportion it formed of the whole money so invested is known or ascertainable, the cestui que trust should be allowed to regard the acts of the trustee as done for his benefit, in the same way that he would be allowed to if all the money so

A      invested had been his; that is, he should be entitled in equity to an undivided share of the property which the trust money contributed to purchase—such a proportion of the whole as the trust money bore to the whole money invested. The reason in the one case as in the other is that the trustee cannot be allowed to make a profit from the use of the trust money, and if the property which he wrongfully purchased were held subject only to a lien for the amount invested, any appreciation in value

B      would go to the trustee."

If this correctly states the underlying basis of the rule (as I believe it does), then it is impossible to distinguish between the case where mixing precedes the investment and the case where it arises on and in consequence of the investment. It is also impossible to distinguish between the case where the investment is retained by the trustee and the case where it is given away to a

C      gratuitous donee. The donee cannot obtain a better title than his donor, and a donor who is a trustee cannot be allowed to profit from his trust.

In *In re Hallett's Estate; Knatchbull v Hallett* (1880) 13 Ch D 696, 709 Sir George Jessel MR acknowledged that where an asset was acquired exclusively with trust money, the beneficiary could either assert equitable ownership of the asset or enforce a lien or charge over it to recover the trust

D      money. But he appeared to suggest that in the case of a mixed substitution the beneficiary is confined to a lien. Any authority that this dictum might otherwise have is weakened by the fact that Sir George Jessel MR gave no reason for the existence of any such rule, and none is readily apparent. The dictum was plainly obiter, for the fund was deficient and the plaintiff was only claiming a lien. It has usually been cited only to be explained away: see for example *In re Tilley's Will Trusts* [1967] Ch 1179, 1186, per Ungoed-

E      Thomas J; Burrows, *The Law of Restitution* (1993), p 368. It was rejected by the High Court of Australia in *Scott v Scott* (1963) 109 CLR 649: see the passage at pp 661–662 cited by Morritt LJ below [1998] Ch 265, 300–301. It has not been adopted in the United States: see the *American Law Institute, Restatement of the Law, Trusts,* 2d (1959) at section 202(h). In *Primeau v Granfield* (1911) 184 F 480, 482 Learned Hand J expressed himself in forthright terms: "On principle there can be no excuse for such a rule."

F      In my view the time has come to state unequivocally that English law has no such rule. It conflicts with the rule that a trustee must not benefit from his trust. I agree with Burrows that the beneficiary's right to elect to have a proportionate share of a mixed substitution necessarily follows once one accepts, as English law does, (i) that a claimant can trace in equity into a mixed fund and (ii) that he can trace unmixed money into its proceeds and

G      assert ownership of the proceeds.

Accordingly, I would state the basic rule as follows. Where a trustee *wrongfully uses trust money to provide part of the cost of acquiring an asset,* the beneficiary is entitled *at his option* either to claim a proportionate share of the asset or to enforce a lien upon it to secure his personal claim against the trustee for the amount of the misapplied money. It does not matter whether the trustee mixed the trust money with his own in a single fund

H      before using it to acquire the asset, or made separate payments (whether simultaneously or sequentially) out of the differently owned funds to acquire a single asset.

Two observations are necessary at this point. First, there is a mixed substitution (with the results already described) whenever the claimant's

property has contributed in part only towards the acquisition of the new    A
asset. It is not necessary for the claimant to show in addition that his
property has contributed to any increase in the *value* of the new asset. This
is because, as I have already pointed out, this branch of the law is concerned
with vindicating rights of property and not with reversing unjust
enrichment. Secondly, the beneficiary's right to claim a lien is available only
against a wrongdoer and those deriving title under him otherwise than for
value. It is not available against competing contributors who are innocent of    B
any wrongdoing. The tracing rules are not the result of any presumption or
principle peculiar to equity. They correspond to the common law rules for
following into physical mixtures (though the consequences may not be
identical). Common to both is the principle that the interests of the
wrongdoer who was responsible for the mixing and those who derive title
under him otherwise than for value are subordinated to those of innocent    C
contributors. As against the wrongdoer and his successors, the beneficiary is
entitled to locate his contribution in any part of the mixture and to
subordinate their claims to share in the mixture until his own contribution
has been satisfied. This has the effect of giving the beneficiary a lien for his
contribution if the mixture is deficient.

Innocent contributors, however, must be treated equally inter se. Where    D
the beneficiary's claim is in competition with the claims of other innocent
contributors, there is no basis upon which any of the claims can be
subordinated to any of the others. Where the fund is deficient, the
beneficiary is not entitled to enforce a lien for his contributions; all must
share rateably in the fund.

The primary rule in regard to a mixed fund, therefore, is that gains and
losses are borne by the contributors rateably. The beneficiary's right to elect    E
instead to enforce a lien to obtain repayment is an exception to the primary
rule, exercisable where the fund is deficient and the claim is made against the
wrongdoer and those claiming through him. It is not necessary to consider
whether there are any circumstances in which the beneficiary is confined to a
lien in cases where the fund is more than sufficient to repay the contributions
of all parties. It is sufficient to say that he is not so confined in a case like the
present. It is not enough that those defending the claim are innocent of any    F
wrongdoing if they are not themselves contributors but, like the trustees and
Mr Murphy's children in the present case, are volunteers who derive title
under the wrongdoer otherwise than for value. On ordinary principles such
persons are in no better position than the wrongdoer, and are liable to suffer
the same subordination of their interests to those of the claimant as the
wrongdoer would have been. They certainly cannot do better than the    G
claimant by confining him to a lien and keeping any profit for themselves.

Similar principles apply to following into physical mixtures: see *Lupton v
White* (1808) 15 Ves 432; and *Sandeman & Sons v Tyzack and Branfoot
Steamship Co Ltd* [1913] AC 680, 695 where Lord Moulton said: "If the
mixing has arisen from the fault of 'B,' 'A' can claim the goods." There are
relatively few cases which deal with the position of the innocent recipient
from the wrongdoer, but *Jones v De Marchant* (1916) 28 DLR 561 may be    H
cited as an example. A husband wrongfully used 18 beaver skins belonging
to his wife and used them, together with four skins of his own, to have a fur
coat made up which he then gave to his mistress. Unsurprisingly the wife
was held entitled to recover the coat. The mistress knew nothing of the true

A   ownership of the skins, but her innocence was held to be immaterial. She was a gratuitous donee and could stand in no better position than the husband. The coat was a new asset manufactured from the skins and not merely the product of intermingling them. The problem could not be solved by a sale of the coat in order to reduce the disputed property to a divisible fund, since (as we shall see) the realisation of an asset does not affect its ownership. It would hardly have been appropriate to require the two ladies
B   to share the coat between them. Accordingly it was an all or nothing case in which the ownership of the coat must be assigned to one or other of the parties. The determinative factor was that the mixing was the act of the wrongdoer through whom the mistress acquired the coat otherwise than for value.

The rule in equity is to the same effect, as Sir William Page Wood V-C
C   observed in *Frith v Cartland* (1865) 2 H & M 417, 420: "if a man mixes trust funds with his own, the whole will be treated as the trust property, except so far as he may be able to distinguish what is his own". This does not, in my opinion, exclude a pro rata division where this is appropriate, as in the case of money and other fungibles like grain, oil or wine. But it is to be observed that a pro rata division is the best that the wrongdoer and his donees can
D   hope for. If a pro rata division is excluded, the beneficiary takes the whole; there is no question of confining him to a lien. *Jones v De Marchant* 28 DLR 561 is a useful illustration of the principles shared by the common law and equity alike that an innocent recipient who receives misappropriated property by way of gift obtains no better title than his donor, and that if a proportionate sharing is inappropriate the wrongdoer and those who derive title under him take nothing.
E

*Insurance policies*

In the case of an ordinary whole life policy the insurance company undertakes to pay a stated sum on the death of the assured in return for fixed annual premiums payable throughout his life. Such a policy is an entire contract, not a contract for a year with a right of renewal. It is not a series of
F   single premium policies for one year term assurance. It is not like an indemnity policy where each premium buys cover for a year after which the policyholder must renew or the cover expires. The fact that the policy will lapse if the premiums are not paid makes no difference. The amounts of the annual premiums and of the sum assured are fixed in advance at the outset and assume the payment of annual premiums throughout the term of the
G   policy. The relationship between them is based on the life expectancy of the assured and the rates of interest available on long term government securities at the inception of the policy.

In the present case the benefits specified in the policy are expressed to be payable "in consideration of the payment of the first premium already made and of the further premiums payable". The premiums are stated to be
H   "£10,220 payable at annual intervals from 6 November 1985 throughout the lifetime of the life assured". It is beyond argument that the death benefit of £1m. paid on Mr Murphy's death was paid in consideration for *all* the premiums which had been paid before that date, including those paid with the plaintiffs' money, and not just some of them. Part of that sum, therefore, represented the traceable proceeds of the plaintiffs' money.

Foskett v McKeown (HL(E))                                      [2001] 1 AC
Lord Millett

It is, however, of critical importance in the present case to appreciate that   *A*
the plaintiffs do not trace the premiums directly into the insurance money.
They trace them first into the policy and thence into the proceeds of the
policy. It is essential not to elide the two steps. In this context, of course,
the word "policy" does not mean the contract of insurance. You do not trace
the payment of a premium into the insurance contract any more than you
trace a payment into a bank account into the banking contract. The word   *B*
"policy" is here used to describe the bundle of rights to which the
policyholder is entitled in return for the premiums. These rights, which may
be very complex, together constitute a chose in action, viz, the right to
payment of a debt payable on a future event and contingent upon the
continued payment of further premiums until the happening of the event.
That chose in action represents the traceable proceeds of the premiums; its
current value fluctuates from time to time. When the policy matures, the   *C*
insurance money represents the traceable proceeds of the policy and hence
indirectly of the premiums.

It follows that, if a claimant can show that premiums were paid with his
money, he can claim a proportionate share of the policy. His interest arises
by reason of and immediately upon the payment of the premiums, and the
extent of his share is ascertainable at once. He does not have to wait until
the policy matures in order to claim his property. His share in the policy and   *D*
its proceeds may increase or decrease as further premiums are paid; but it is
not affected by the realisation of the policy. His share remains the same
whether the policy is sold or surrendered or held until maturity; these are
merely different methods of realising the policy. They may affect the amount
of the proceeds received on realisation but they cannot affect the extent of
his share in the proceeds. In principle the plaintiffs are entitled to the   *E*
insurance money which was paid on Mr Murphy's death in the same shares
and proportions as they were entitled in the policy immediately before his
death.

Since the manner in which an asset is realised does not affect its
ownership, and since it cannot matter whether the claimant discovers what
has happened before or after it is realised, the question of ownership can be
answered by ascertaining the shares in which it is owned immediately before   *F*
it is realised. Where A misappropriates B's money and uses it to buy a
winning ticket in the lottery, B is entitled to the winnings. Since A is a
wrongdoer, it is irrelevant that he could have used his own money if in fact
he used B's. This may seem to give B an undeserved windfall, but the result is
not unjust. Had B discovered the fraud before the draw, he could have
decided whether to keep the ticket or demand his money back. He alone has   *G*
the right to decide whether to gamble with his own money. If A keeps him in
ignorance until after the draw, he suffers the consequence. He cannot
deprive B of his right to choose what to do with his own money; but he can
give him an informed choice.

The application of these principles ought not to depend on the nature of
the chose in action. They should apply to a policy of life assurance as they
apply to a bank account or a lottery ticket. It has not been suggested in   *H*
argument that they do not apply to a policy of life assurance. This question
has not been discussed in the English authorities, but it has been considered
in the United States. In a Note (1925) 35 YLJ 220–227 Professor Palmer
doubted the claimant's right to share in the proceeds of a life policy, and

A   suggested that he should be confined to a lien for his contributions. Professor Palmer accepted, as the majority of the Court of Appeal in the present case did not, that the claimant can trace from the premiums into the policy and that the proceeds of the policy are the product of all the premiums. His doubts were not based on any technical considerations but on questions of social policy. They have not been shared by the American courts. These have generally allowed the claimant a share in the proceeds

B   proportionate to his contributions even though the share in the proceeds is greater than the amount of his money used in paying the premiums: see for example *Shaler v Trowbridge* (1877) 28 NJEq 595; *Holmes v Gilman* (1893) 138 NY 369; *Vorlander v Keyes* (1924) 1 F2d 67; *Truelsch v Northwestern Mutual Life Insurance Co.* (1925) 202 NW 352; *Baxter House v Rosen* (1967) 278 NY2d 442; *Lohman v General American Life Insurance Co*

C   (1973) 478 F2d 719. This accords with Ames's and Williston's opinions in the articles to which I have referred.

      The question is discussed at length in *Scott on Trusts*, 4th ed, pp 574–584, section 508.4. Professor Scott concludes that there is no substance in the doubts expressed by Palmer. He points out that the strongest argument in favour of limiting the beneficiary's claim to a lien is that otherwise he obtains

D   a windfall. But in cases where the wrongdoer has misappropriated the claimant's money and used it to acquire other forms of property which have greatly increased in value the courts have consistently refused to limit the claimant to an equitable lien. In any case, the windfall argument is suspect. As Professor Scott points out, a life policy is an aleatory contract. Whether or not the sum assured exceeds the premiums is a matter of chance. Viewed from the perspective of the insurer, the contract is a commercial one; so the

E   chances are weighted against the assured. But the outcome in any individual case is unpredictable at the time the premiums are paid. The unspoken assumption in the argument that a life policy should be treated differently from other choses in action seems to be that, by dying earlier than expected, the assured provides a contribution of indeterminate but presumably substantial value. But the assumption is false. A life policy is not an indemnity policy, in which the rights against the insurer are acquired by

F   virtue of the payment of the premiums and the diminution of the value of an asset. In the case of a life policy the sum assured is paid in return for the premiums and nothing else. The death of the assured is merely the occasion on which the insurance money is payable. The ownership of the policy does not depend on whether this occurs sooner or later, or on whether the bargain proves to be a good one. It cannot be made to await the event.

G      The windfall argument has little to commend it in the present case. The plaintiffs were kept in ignorance of the fact that premiums had been paid with their money until after Mr Murphy's death. Had they discovered what had happened before Mr Murphy died, they would have intervened. They might or might not have elected to take an interest in the policy rather than enforce a lien for the return of the premiums paid with their money, but they would certainly have wanted immediate payment. This would have entailed

H   the surrender of the policy. At the date of his death Mr Murphy was only 45 and a non-smoker. He had a life expectancy of many years, and neither he nor the trustees had the means to keep up the premiums. The plaintiffs would hardly have been prepared to wait for years to recover their money, paying the premiums in the meantime. It is true that, under the terms of the

policy, life cover could if necessary be maintained for a few years more at the    *A*
expense of the investment element of the policy (which also provided its
surrender value). But it is in the highest degree unlikely that the plaintiffs
would have been willing to gamble on the remote possibility of Mr Murphy's
dying before the policy's surrender value was exhausted. If he did not they
would recover nothing. They would obviously have chosen to enforce their
lien to recover the premiums or have sought a declaration that the trustees    *B*
held the policy for Mr Murphy's children and themselves as tenants in
common in the appropriate shares. In either case the trustees would have
had no alternative but to surrender the policy. In practice the trustees were
able to obtain the death benefit by maintaining the policy until Mr Murphy's
death only because the plaintiffs were kept in ignorance of the fact that
premiums had been paid with their money and so were unable to intervene.

   *C*

*The reasoning of the Court of Appeal*

   The majority of the Court of Appeal (Sir Richard Scott V-C and
Hobhouse LJ) held that the plaintiffs could trace their money into the
premiums but not into the policy, and were accordingly not entitled to a
proportionate share in the proceeds. They did so, however, for different
and, in my view, inconsistent reasons which cannot both be correct and    *D*
which only coincidentally led to the same result in the present case.

   Sir Richard Scott V-C considered that Mr Murphy's children acquired
vested interests in the policy at its inception. They had a vested interest
(subject to defeasance) in the death benefit at the outset and before any of the
plaintiffs' money was used to pay the premiums. The use of the plaintiffs'
money gave the plaintiffs a lien on the proceeds of the policy for the return of
the premiums paid with their money, but could not have the effect of    *E*
divesting the children of their existing interest. The children owned the
policy; the plaintiffs' money was merely used to maintain it. The position
was analogous to that where trust money was used to maintain or improve
property of a third party.

   Sir Richard Scott V-C treated the policy as an ordinary policy of life
assurance. It is not clear whether he thought that the children obtained a    *F*
vested interest in the policy because Mr Murphy took the policy out or
because he paid the first premium, but I cannot accept either proposition.
Mr Murphy was the original contracting party, but he obtained nothing of
value until he paid the first premium. The chose in action represented by the
policy is the product of the premiums, not of the contract. The trustee took
out the policy in all the recorded cases. In some of them he paid all the
premiums with trust money. In such cases the beneficiary was held to be    *G*
entitled to the whole of the proceeds of the policy. In other cases the trustee
paid some of the premiums with his own money and some with trust money.
In those cases the parties were held entitled to the proceeds of the policy
rateably in proportion to their contributions. It has never been suggested
that the beneficiary is confined to his lien for repayment of the premiums
because the policy was taken out by the trustee. The ownership of the policy
does not depend on the identity of the party who took out the policy. It    *H*
depends on the identity of the party or parties whose money was used to pay
the premiums.

   So Sir Richard Scott V-C's analysis can only be maintained if it is based on
the fact that Mr Murphy paid the first few premiums out of his own money

A    before he began to make use of the trust money. Professor Scott records only one case in which it has been held that in such a case the claimant is confined to a lien on the ground that the later premiums were not made in acquiring the interest under the policy but merely in preserving or improving it: see *Thum v Wolstenholme* (1900) 61 P 537. The case is expressly disapproved in *Scott on Trusts*, pp 616–617, where it is said that the decision cannot be supported, and that the claimant should be entitled to a proportionate share

B    of the proceeds, regardless of the question whether some of the premiums were paid wholly with the claimant's money and others wholly with the wrongdoer's money and regardless of the order of the payments, or whether the premiums were paid out of a mingled fund containing the money of both.

      In my opinion there is no reason to differentiate between the first premium or premiums and later premiums. Such a distinction is not based

C    on any principle. Why should the policy belong to the party who paid the first premium, without which there would have been no policy, rather than to the party who paid the last premium, without which it would normally have lapsed? Moreover, any such distinction would lead to the most capricious results. If only four annual premiums are paid, why should it matter whether A paid the first two premiums and B the second two, or B

D    paid the first two and A the second two, or they each paid half of each of the four premiums? Why should the children obtain the whole of the sum assured if Mr Murphy used his own money before he began to use the plaintiffs' money, and only a return of the premiums if Mr Murphy happened to use the plaintiffs' money first? Why should the proceeds of the policy be attributed to the first premium when the policy itself is expressed to be in consideration of all the premiums? There is no analogy with the case

E    where trust money is used to maintain or improve property of a third party. The nearest analogy is with an instalment purchase.

      Hobhouse LJ adopted a different approach. He concentrated on the detailed terms of the policy, and in particular on the fact that in the event the payment of the fourth and fifth premiums with the plaintiffs' money made no difference to the amount of the death benefit. Once the third premium had been paid, there was sufficient surrender value in the policy, built up by

F    the use of Mr Murphy's own money, to keep the policy on foot for the next few years, and as it happened Mr Murphy's death occurred during those few years. But this was adventitious and unpredictable at the time the premiums were paid. The argument is based on causation and as I have explained is a category mistake derived from the law of unjust enrichment. It is an example of the same fallacy that gives rise to the idea that the proceeds of an

G    ordinary life policy belong to the party who paid the last premium without which the policy would have lapsed. But the question is one of attribution not causation. The question is not whether the same death benefit would have been payable if the last premium or last few premiums had not been paid. It is whether the death benefit is attributable to all the premiums or only to some of them. The answer is that death benefit is attributable to all of them because it represents the proceeds of realising the policy, and the

H    policy in turn represents the product of all the premiums.

      In any case, Hobhouse LJ's analysis of the terms of the policy does not go far enough. It is not correct that the last two premiums contributed nothing to the sum payable on Mr Murphy's death but merely reduced the cost to the insurers of providing it. Life cover was provided in return for a series of

Foskett v McKeown (HL(E))                                    [2001] 1 AC
Lord Millett

internal premiums paid for by the cancellation of units previously allocated  A
to the policy.  Units were allocated to the policy in return for the annual
premiums.  Prior to their cancellation the cancelled units formed part of a
mixed fund of units which was the product of all the premiums paid by
Mr Murphy, including those paid with the plaintiffs' money.  On ordinary
principles, the plaintiffs can trace the last two premiums into and out of the
mixed fund and into the internal premiums used to provide the death benefit.
                                                                           B
   It is true that the last two premiums were not needed to provide the death
benefit in the sense that in the events which happened the same amount
would have been payable even if those premiums had not been paid.  In other
words, with the benefit of hindsight it can be seen that Mr Murphy made a
bad investment when he paid the last two premiums.  It is, therefore,
superficially attractive to say that the plaintiffs' money contributed nothing
of value.  But the argument proves too much, for if the plaintiffs cannot trace  C
their money into the proceeds of the policy, they should have no proprietary
remedy at all, not even a lien for the return of their money.  But the fact is
that Mr Murphy, who could not foresee the future, did choose to pay the last
two premiums, and to pay them with the plaintiffs' money; and they were
applied by the insurer towards the payment of the internal premiums needed
to fund the death benefit.  It should not avail his donees that he need not have
paid the premiums, and that if he had not then (in the events which          D
happened) the insurers would have provided the same death benefit and
funded it differently.
   In the case of an ordinary life policy which lapses if the premiums are not
paid, Sir Richard Scott V-C's approach gives the death benefit to the party
whose money was used to pay the first premium, and Hobhouse LJ's
approach gives it to the party whose money was used to pay the last          E
premium.  In the case of a policy like the present, Hobhouse LJ's approach
also produces unacceptable and capricious results.  The claimant must wait
to see whether the life assured lives long enough to exhaust the amount of
the policy's surrender value as at the date immediately before the claimant's
money was first used.  If the life assured dies the day before it would have
been exhausted, the claimant is confined to his lien to recover the premiums;
if he dies the day after, then the claimant's premiums were needed to         F
maintain the life cover.  In the latter case he takes at least a proportionate
share of the proceeds or, if the argument is pressed to its logical conclusion,
the whole of the proceeds subject to a lien in favour of the trustees of the
children's settlement.  This simply cannot be right.
   Hobhouse LJ's approach is also open to objection on purely practical
grounds.  It must, I think, be unworkable if there is an eccentric pattern of   G
payment; or if there is a fall in the value of the units at a critical moment.
Like Sir Richard Scott V-C's approach, it prompts the question: why should
the order of payments matter?  It is true that the premiums paid with the
plaintiff's money did not in the event increase the amount payable on
Mr Murphy's death, but they increased the surrender value of the policy and
postponed the date at which it would lapse if no further premiums were
paid.  Why should it be necessary to identify the premium the payment of     H
which (in the events which happened) prevented the policy from lapsing?
Above all, this approach makes it impossible for the ownership of the policy
to be determined until the policy matures or is realised.  This too cannot be
right.

A  The trustees argued that such considerations are beside the point. It is not necessary, they submitted, to consider what the plaintiffs' rights would have been if the policy had been surrendered, or if Mr Murphy had lived longer. It is sufficient to take account of what actually happened. I do not agree. A principled approach must yield a coherent solution in all eventualities. The ownership of the policy must be ascertainable at every moment from inception to maturity; it cannot be made to await events. In my view the

B  only way to achieve this is to hold firm to the principle that the manner in which an asset is converted into money does not affect its ownership. The parties' respective rights to the proceeds of the policy depend on their rights to the policy immediately before it was realised on Mr Murphy's death, and this depends on the shares in which they contributed to the premiums and nothing else. They do not depend on the date at which or the manner in

C  which the chose in action was realised. Of course, Mr Murphy's early death greatly increased the value of the policy and made the bargain a good one. But the idea that the parties' entitlements to the policy and its proceeds are altered by the death of the life assured is contrary to principle and to the decision of your Lordships' House in *D'Avigdor-Goldsmid v Inland Revenue Comrs* [1953] AC 347. That case establishes that no fresh beneficial interest in a policy of life assurance accrues or arises on the death

D  of the life assured. The sum assured belongs to the person or persons who were beneficial owners of the policy immediately before the death.
    In the course of argument it was submitted that if the children, who were innocent of any wrongdoing themselves, had been aware that their father was using stolen funds to pay the premiums, they could have insisted that the premiums should not be paid, and in the events which happened would still

E  have received the same death benefit. But the fact is that Mr Murphy concealed his wrongdoing from both parties. The proper response is to treat them both alike, that is to say rateably. It is morally offensive as well as contrary to principle to subordinate the claims of the victims of a fraud to those of the objects of the fraudster's bounty on the ground that he concealed his wrongdoing from both of them.

F  The submission is not (as has been suggested) supported by Professor David Hayton's article "Equity's Identification Rules" in *Laundering and Tracing* (1995), edited by Peter Birks, at pp 11–12. Professor Hayton is dealing with the very different case of the party who decides to purchase an asset and has the means to pay for it, but who happens to use trust money which he has received innocently, not knowing it to belong to a third party and believing himself to be entitled to it. In such a case his decision to use the

G  trust money rather than his own is independent of the breach of trust; it is a matter of pure chance. This is a problem about tracing, not claiming, and has nothing to do with mixtures, as Professor Hayton's article itself makes clear. It is a difficult problem on the solution to which academic writers are not agreed. But it does not arise in the present case. It was Mr Murphy's decision to use the plaintiffs' money to pay the later premiums. The children are merely passive recipients of an asset acquired in part by the use of

H  misappropriated trust money. They are innocent of any personal wrongdoing, but they are not contributors. They are volunteers who derive their interest from the wrongdoer otherwise than for value and are in no better position than he would have been if he had retained the policy for the benefit of his estate. It is not, with respect to those who think otherwise, a

140
Foskett v McKeown (HL(E))                                    [2001] 1 AC
Lord Millett

case where there are competing claimants to a fund who are both innocent    A
victims of a fraud and where the equities are equal. But if it were such a case,
the parties would share rateably, which is all that the plaintiffs claim.

I should now deal with the finding of all the members of the Court of
Appeal that the plaintiffs were entitled to enforce a lien on the proceeds of
the policy to secure repayment of the premiums paid with their money. This
is inconsistent with the decision of the majority that the plaintiffs were not
entitled to trace the premiums into the policy. An equitable lien is a    B
proprietary interest by way of security. It is enforceable against the trust
property and its traceable proceeds. The finding of the majority that the
plaintiffs had no proprietary interest in the policy or its proceeds should have
been fatal to their claim to a lien.

The Court of Appeal held that the plaintiffs were entitled by way of
subrogation to Mr Murphy's lien to be repaid the premiums. He was, they    C
thought, entitled to the trustee's ordinary lien to indemnify him for
expenditure laid out in the preservation of the trust property: see *In re Leslie*
23 Ch D 560. Had Mr Murphy used his own money, they said, it would
have been treated as a gift to his children; but the fact that he used stolen
funds rebutted any presumption of advancement.

With all due respect, I do not agree that Mr Murphy had any lien to which    D
the plaintiffs can be subrogated. He was one of the trustees of his children's
settlement, but he did not pay any of the premiums in that capacity. He
settled a life policy on his children but without the funds to enable the
trustees to pay the premiums. He obviously intended to add further property
to the settlement by paying the premiums. When he paid the premiums with
his own money he did so as settlor, not as trustee. He must be taken to have
paid the later premiums in the same capacity as he paid the earlier ones. I do    E
not for my own part see how his intention to make further advancements
into the settlement can be rebutted by showing that he was not using his own
money; as between himself and his children the source of the funds is
immaterial. He could not demand repayment from the trustees by saying:
"I used stolen money; now that I have been found out you must pay me back
so that I can repay the money." Moreover, even if the presumption of
advancement were rebutted, there would be no resulting trust. Mr Murphy    F
was either (as I would hold) a father using stolen money to make further gifts
to his children or a stranger paying a premium on another's policy without
request: see *Falcke v Scottish Imperial Insurance Co* 34 Ch D 234.

But perhaps the strongest ground for rejecting the argument is that it
makes the plaintiffs' rights depend on the circumstance that Mr Murphy
happened to be one of the trustees of his children's settlement. That is    G
adventitious. If he had not been a trustee then, on the reasoning of the
majority of the Court of Appeal, the plaintiffs would have had no
proprietary remedy at all, and would be left with a worthless personal claim
against Mr Murphy's estate. The plaintiffs' rights cannot turn on such
chances as this.

### The relevant proportions                                                H

Accordingly, I agree with Morritt LJ in the Court of Appeal that, on well
established principles, the parties are entitled to the proceeds of the policy in
the proportions in which those proceeds represent their respective
contributions. It should not, however, be too readily assumed that this

A    means in the proportions in which the insurance premiums were paid with their money. These represent the *cost* of the contributions, not necessarily their *value*.

     A mixed fund, like a physical mixture, is divisible between the parties who contributed to it rateably in proportion to the value of their respective contributions, and this must be ascertained at the time they are added to the mixture. Where the mixed fund consists of sterling or a sterling account or

B    where both parties make their contributions to the mixture at the same time, there is no difference between the cost of the contributions and their sterling value. But where there is a physical mixture or the mixture consists of an account maintained in other units of account and the parties make their contributions at different times, it is essential to value the contributions of *both* parties at the same time. If this is not done, the resulting proportions

C    will not reflect a comparison of like with like. The appropriate time for valuing the parties' respective contributions is when successive contributions are added to the mixture.

     This is certainly what happens with physical mixtures. If 20 gallons of A's oil are mixed with 40 gallons of B's oil to produce a uniform mixture of 60 gallons, A and B are entitled to share in the mixture in the proportions of 1 to 2. It makes no difference if A's oil, being purchased later, cost £2 a

D    gallon and B's oil cost only £1 a gallon, so that they each paid out £40. This is because the mixture is divisible between the parties rateably in proportion to the *value* of their respective contributions and not in proportion to their respective *cost*. B's contribution to the mixture was made when A's oil was added to his, and *both* parties' contributions should be valued at that date. Should a further 20 gallons of A's oil be added to the mixture to produce a

E    uniform mixture of 80 gallons at a time when the oil was worth £3 a gallon, the oil would be divisible equally between them. (A's further 20 gallons are worth £3 a gallon—but so are the 60 gallons belonging to both of them to which they have been added.) It is not of course necessary to go through the laborious task of valuing every successive contribution separately in sterling. It is simpler to take the account by measuring the contributions in gallons rather than sterling. This is merely a short cut which produces the same

F    result.

     In my opinion the same principle operates whenever the mixture consists of fungibles, whether these be physical assets like oil, grain or wine or intangibles like money in an account. Take the case where a trustee misappropriates trust money in a sterling bank account and pays it into his personal dollar account which also contains funds of his own. The dollars

G    are, of course, merely units of account; the account holder has no proprietary interest in them. But no one, I think, would doubt that the beneficiary could claim the dollar value of the contributions made with trust money. Most people would explain this by saying that it is because the account is kept in dollars. But the correct explanation is that it is because the contributions are made in dollars. In order to allocate the fund between the parties rateably in proportion to the value of their respective

H    contributions, it is necessary to identify the point at which the trust money becomes mixed with the trustee's own money. This does not occur when the trustee pays in a sterling cheque drawn on the trust account. At that stage the trust money is still identifiable. It occurs when the bank credits the dollar equivalent of the sterling cheque to the trustee's personal account. Those

dollars represent the contribution made by the trust. The sterling value of    *A*
the trust's contribution must be valued at that time; and it follows that the
trustee's contributions, which were also made in dollars, must be valued at
the same time. Otherwise one or other party will suffer the injustice of
having his contributions undervalued.

*Calculating the plaintiffs' share*    *B*

I finally come to the difficult question: how should the parties'
contributions, and therefore their respective shares in the proceeds, be
calculated in the case of a unit-linked policy of the present kind? This makes
it necessary to examine the terms of the policy in some detail.

All the reported cases have been concerned with ordinary policies of life
assurance. In all the cases the insurance moneys have been shared between
the parties in the proportions in which their money has been used to pay the    *C*
premiums irrespective of the dates on which the premiums were paid. This
favours the party who paid the later premiums at the expense of the party
who paid the earlier ones. There is therefore a case for adding interest to the
premiums in order to produce a fair result. This cannot be justified by the
need to compensate the parties for the loss of the use of their money over
different periods. It is not merely that this branch of the law is concerned    *D*
with vindicating property rights and not with compensation for
wrongdoing. It is that ex hypothesi the money has not been lost but used to
produce the insurance money. But I think that taking account of interest can
be justified nonetheless. The policy and its proceeds are not the product of
the uninvested premiums alone. If they were, the sum assured would be very
much smaller than it is. They are the product of the premiums invested at
compound interest. It does not matter, of course, what the insurance    *E*
company actually does with the money. What matters is how the sum
assured is calculated, because this shows what it represents. In practice it
represents the sum which would be produced by the premiums over the term
of the expected life of the assured together with compound interest at the
rate available at the inception of the policy on long term government
securities. But the question has not been the subject of argument before us,
and having regard to the mechanics of the present policy the calculations    *F*
may not be worth doing. I agree therefore with my noble and learned friend
Lord Hoffmann that there is no need to explore this aspect further.

Unit-linked policies, however, are very different. These policies have
become popular in recent years, and are commonly employed for personal
pension plans taken out by the self-employed. Under such a policy the
premiums are applied by the insurance company in the acquisition of    *G*
accumulation units in a designated fund usually managed by the insurance
company. The bid and offer prices of the units are published daily in the
financial press. The value of the units can go down as well as up, but since
they carry the reinvested income their value can be expected to increase
substantially over the medium and long term. The policy is essentially a
savings medium, and (subject to tax legislation) can be surrendered at any
time. On surrender the policyholder is entitled to the value of the units    *H*
allocated to the policy. Early policies provided that on death the
policyholder was entitled merely to the return of his premiums with interest,
but more modern policies provide for payment of the value of the units in
this event also.

A     Where money belonging to different parties is used to pay the premiums under a policy of this kind, it cannot be right to divide the proceeds of the policy crudely according to the number of premiums paid by each of them. The only sensible way of apportioning the proceeds of such a policy is by reference to the number of units allocated to the policy in return for each premium. This is readily ascertainable, since policyholders are normally

B  issued with an annual statement showing the number of units held before receipt of the latest premium, the number allocated in respect of the premium, and the total number currently held. But in any case these numbers can easily be calculated from published material.

     This would obviously be the right method to adopt if the policyholder acquired a proprietary interest in the units. These would fall to be dealt with in the same way as grain, oil or wine. There would of course still be a mixed

C  substitution, since after the mixture neither party's contributions can be identified. Neither can recover his own property, but only a proportion of the whole. Unlike Roman law, the common law applied the same principles whenever there is no means of identifying the specific assets owned by either party. In the United States they have been applied to logs, pork, turkeys, sheep and straw hats: see *Smith, The Law of Tracing*, at p 70. In fact unit-linked policies normally provide that the policyholder has no proprietary

D  interest in the units allocated to the policy. They are merely units of account. The absence of a proprietary interest in the units would be highly material in the event of the insolvency of the insurance company. But it should have no effect on the method of calculating the shares in which competing claimants are entitled to the proceeds of the policy. This depends upon the proportions in which they contributed to the acquisition of the policy, and the question

E  is: in what units of account should the parties' respective contributions be measured? Should they be measured in sterling, this being the currency in which the premiums were paid? Or should they be measured by accumulation units, if this was the unit of account into which the premiums were converted before the admixture took place? Principle, and the cases on physical mixtures, indicate that the second is the correct approach. A unit linked policy of the kind I have described is simply a savings account. The

F  account is kept in units. The mixing occurs when the insurance company, having received a premium in sterling, allocates units to the account of the insured where they are at once indistinguishably mixed with the units previously allocated. The contribution made by each of the parties consists of the units, not merely of their sterling equivalent. The proceeds of a unit-linked policy should in my opinion be apportioned rateably between the

G  parties in proportion to the value of their respective contributions measured in units, not in sterling.

     The policy in the present case is only a variant of the unit-linked policy of the kind I have described. It is also primarily a savings medium but it offers an additional element of life assurance. This protects the assured against the risk of death before the value of the units allocated to the policy reaches a predetermined amount. On receipt of each premium, the insurance

H  company allocates accumulation units in the designated fund to the policy ("the investment element"), and immediately thereafter cancels sufficient of the units to provide "the insurance element". This is in effect an internal premium retained by the insurance company to provide the life cover. The amount of the internal premium is calculated each year by a complicated

Foskett v McKeown (HL(E))                                    [2001] 1 AC
Lord Millett

formula. The important feature of the formula for present purposes is that    A
the internal premium is not calculated by reference to the sum assured of
£1m. but by reference to the difference between the current value of the
units allocated to the policy and the sum assured. As the value of the
units increases, therefore, the amount of the internal premium should reduce.
When their value is equal to or greater than the sum assured, no further
internal premiums are payable. Thenceforth the policy is exactly like the
kind of unit-linked policy described above. The policyholder is entitled to    B
the investment element, i e the value of the accumulated units, on death as
well as on surrender.

    If the policyholder dies at a time when the investment element is less than
the sum assured, then he receives the sum assured. This is paid as a single
sum, but it has two components with different sources.  One is the
investment element, which represents the value of the accumulated units at    C
the date of death.  The other is the insurance element, which is merely a
balancing sum.  It will be very large in the early years of the policy and will
eventually reduce to nothing. It is the product of the internal premiums and
is derived from the cancelled units.  The internal premiums, however,
though derived from the cancelled units, were credited to the account in
sterling.  The proceeds of the internal premiums, therefore, should be
apportioned between the parties pro rata in the proportions in which those    D
premiums were provided in sterling.

    In my opinion the correct method of apportioning the sum assured
between the parties is to deal separately with its two components.  The
investment element (which amounted to £39,347 at the date of death in the
present case) should be divided between the parties by reference to the value
at maturity of the units allocated in respect of each premium and not    E
cancelled.  The balance of the sum assured should be divided between the
parties rateably in the proportions in which they contributed to the internal
premiums.  This is not to treat the allocated units as a real investment
separate from the life cover when it was not. Nor is it to treat the method by
which the benefits payable under the policy is calculated as determinative or
even relevant.  It is to recognise the true nature of the policy, and to give
effect to the fact that the sum assured had two components, to one of which    F
the parties made their contributions in units and to the other of which they
made their contributions in the sterling proceeds of realised units.

    These calculations require the policyholder's account to be redrawn as
two accounts, one for each party.  The number of units allocated to the
policy on the receipt of each premium should be credited to the account of
the party whose money was used to pay the premium.  The number of units    G
so allocated should be readily ascertainable from the records of the
insurance company, but if not it can easily be worked out.  The number of
units which were cancelled to provide the internal premium should then be
ascertained in similar fashion and debited to the appropriate account.  In
the case of the earlier premiums paid with Mr Murphy's own money this
will be the trustees' account.  In the case of the later premiums paid with
the plaintiffs' money, the cancelled units should not be debited wholly to    H
the plaintiffs' account, but rateably to the two accounts. The amount of the
internal premiums should then be credited to the two accounts in the same
proportions as those in which the cancelled units were debited to provide
them.

A    This approach is substantially more favourable to the children than a crude allocation by reference to the premiums. By taking account of the value of the units, it automatically weights the earlier premiums which should have bought more units than the later ones. And it gives effect to the fact that, under the terms of the policy, both parties contributed to the later internal premiums which produced the greater part of the death benefit.

B    It is, of course, always open to the parties in any case to dispense with complex calculations and agree upon a simpler method of apportionment. But in my opinion the court ought not to do so without the parties' consent. If it does, anomalies and inconsistencies will inevitably follow. Take the present case. The method of apportionment, with greatly differing results, ought not to depend upon whether the value of the units at the date of death is slightly more or slightly less than the sum assured. Yet once their value

C    exceeds the amount of the sum assured, the policy becomes an ordinary unit-linked pension policy without an insurance element. If the sum assured is divided crudely in proportion to the premiums in the present case, their consistency requires that the same method be adopted for pension policies, which is surely wrong. If it is adopted for pension policies, then it is difficult to see how foreign currency assets can be treated differently, which is certainly wrong. There is an enormous variety of financial instruments. For

D    present purposes they form a seamless web. Cutting corners in the interest of simplicity is tempting, but in my opinion the temptation ought to be resisted.

*Conclusion*

     Accordingly I would allow the appeal. In my opinion the insurance money ought to be divided between the parties in the proportions I have

E    indicated. But I am alone in adopting this approach, and as the question was not argued before us I am content that your Lordships should declare that the money should be divided between the parties in proportions in which they contributed to the premiums. For the reasons given by my noble and learned friend, Lord Hope of Craighead, with which I agree, I would dismiss the children's cross-appeal.

F                              *Appeal allowed.*
                              *Cross-appeal dismissed.*
                              *Declaration that plaintiffs entitled to share in fund in accordance with proportion of premiums paid out of their money.*
                              *Cause remitted to Chancery Division.*
G                              *No order for costs in High Court.*
                              *Plaintiffs' costs in Court of Appeal and House of Lords to be paid out of legal aid fund.*

          Solicitors: *Kidd Rapinet; Fitzgerald-Harts, Boroughbridge.*

H                                                                    S H

_____